No. 16-1

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA, Plaintiff-Appellee,

vs.

CARLOS DAVID CARO, Defendant-Appellant.

Appeal from the United States District Court
for the Western District of Virginia
Hon. James P. Jones, District Judge, Presiding
Dist. Ct. No. 1:06CR00001

## OPENING BRIEF OF APPELLANT CARLOS DAVID CARO

JON M. SANDS
Federal Public Defender
District of Arizona
TIMOTHY M. GABRIELSEN
Nevada Bar No. 8076
Assistant Federal Public Defender
407 West Congress Street, Suite 501
Tucson, Arizona 85701
tim_gabrielsen@fd.org
Tel. (520) 879-7614
Facsimile (520) 622-6844

FAY F. SPENCE
Virginia Bar No. 27906
First Assistant Federal Public Defender
210 First Street, SW, Suite 400
Roanoke, Virginia 24011
fay_spence@fd.org
Tel. (540) 777-0880
Facsimile (540) 777-0890

BRIAN J. BECK
Virginia Bar No. 78049
Assistant Federal Public Defender
201 Abingdon Place
Abingdon, Virginia 24211
brian_beck@fd.org
Tel. (276) 619-6080
Facsimile (276) 619-6090

*Counsel for Defendant-Appellant Carlos David Caro*

## TABLE OF CONTENTS

Jurisdictional Statement ...............................................................................1

Statement of the Issues................................................................................2

Statement of the Case..................................................................................3

I.    This Court's summary of guilt phase facts..........................................3

II.   Capital Sentencing Hearing. ..............................................................4

    A.    Eligibility Phase ........................................................................4

    B.    Selection Phase..........................................................................5

        1.    Government's case in aggravation.............................................6

        2.    The defense case in mitigation.................................................9

            a.    Security at ADX Florence .................................9

            b.    Social History Mitigation ................................14

            c.    Closing argument and verdict.........................17

Summary of the Arguments .......................................................................18

    Certified Issue I.........................................................................18

    Uncertified Issue II ...................................................................19

    Uncertified Issue III..................................................................20

Standards of Review ..................................................................................21

Arguments..................................................................................................22

I.      Carlos Caro was denied his right to due process of law under the Fifth Amendment where the Government withheld Bureau of Prisons data on the maximum length of time inmates can be housed at ADX Florence, where the records constituted material exculpatory evidence under *Brady* and failure to disclose those records deprived Caro of the opportunity to place accurate information before the sentencing jury that would refute the Government's theory that Caro would be dangerous in the future if not sentenced to death and support Caro's theory in mitigation that the BOP could house him in a sufficiently secure setting that he would not pose a danger to other inmates or correctional officers. ...................................................22

A.      The law of accuracy and reliability at capital sentencing ...................23

B.      Facts relevant to the *Brady* claim on direct appeal .............................25

C.      Caro is entitled to relief on the *Brady* claim.  In the alternative, Caro is entitled to discovery and an evidentiary hearing ....................28

   1.      The *Brady* claim in the § 2255 Motion and the court's ruling .................................................................................29

   2.      Caro is not barred from presenting the *Brady* claim.................33

   3.      Caro's *Brady* claim is material; alternatively, it is sufficiently plausible to require discovery................................38

Uncertified Claims ...........................................................................................40

II.      Carlos Caro was denied his right to the effective assistance of counsel under the Sixth Amendment where his appointed counsel failed to produce evidence in mitigation at capital sentencing of Caro's brain impairment, cognitive dysfunction and mental illness that included symptomatology associated with PTSD due to his traumatic childhood. ................................40

A.      The law of *Strickland* as applied at capital sentencing ........................42

B.      Counsel's deficient performance at sentencing ...................................44

1.   The duties of reasonably competent counsel at capital sentencing .................................................................44

2.   The mental health evaluations of Dr. Spica and Dr. Schwartz-Watts and the district court's decision. ...................................46

3.   Counsel's objectively unreasonable decision not to call Dr. Spica. ................................................................49

4.   Counsel's unreasonable decision not to produce traumatic social history to a qualified mental health practitioner ............52

C.   Caro was prejudiced by those omissions ........................................................53

III.   Carlos Caro was denied his right to the effective assistance of counsel under the Sixth Amendment where trial counsel failed to investigate and challenge in a separate collateral proceeding Caro's prior federal conviction for conspiracy to commit murder, which was later admitted in aggravation at his capital sentencing hearing. ..................54

Conclusion .................................................................56

Request for Oral Argument.................................................................57

# TABLE OF AUTHORITIES

## SUPREME COURT OPINIONS

*Banks v. Dretke*, 540 U.S. 668 (2004) ........................................................ 28, 35

*Bobby v. Van Hook*, 558 U.S. 4 (2009) ................................................................ 43

*Bousley v. United States*, 523 U.S. 614 (1998) ...................................................... 33

*Bracy v. Gramley*, 520 U.S. 899 (1997) ...............................................................40

*Brady v. Maryland*, 373 U.S. 83 (1963) ................................................... 19, 21, 23

*Eddings v. Oklahoma*, 455 U.S. 104 (1982) ...................................................... 24, 41

*Florida v. Nixon*, 543 U.S. 175 (2004) ............................................................. 25, 43

*Hill v. Lockhart*, 474 U.S. 52 (1985) ....................................................................54

*Johnson v. Mississippi*, 486 U.S. 578 (1988) .................................................... 21, 54

*Padilla v. Kentucky*, 559 U.S. 356 (2010) ............................................................ 43

*Porter v. McCollum*, 558 U.S. 30 (2009) ....................................................... *passim*

*Rompilla v. Beard*, 545 U.S. 374 (2005) ............................................................53, 55

*Simmons v. South Carolina*, 512 U.S. 154 (1994) ............................................. 23, 24

*Skipper v. South Carolina*, 476 U.S. 1 (1986) ...................................................... 24

*Strickland v. Washington*, 466 U.S. 668 (1984) ................................. 19, 42, 43, 56

*Strickler v. Greene,* 527 U.S. 263 (1999) ..............................................................38

*United States v. Agurs*, 427 U.S. 97 (1976) ...................................................... 25, 38

*Wiggins v. Smith*, 539 U.S. 510 (2003) ............................................................. 43, 53

*Williams v. Taylor*, 529 U.S. 362 (2000) ...................................................... 43, 45, 51

*Woodson v. North Carolina*, 428 U.S. 280 (1976) .......................................... 23, 38

## FEDERAL COURT OPINIONS

*Bell v. Bell*, 512 F.3d 223 (6th Cir. 2008) ............................................................. 36

*Boeckenhaupt v. United States*, 537 F.2d 1182 (4th Cir. 1976) .......... 32, 33, 34, 35

*Gannt v. Roe*, 398 F.3d 908 (9th Cir. 2004) ...........................................................35

*Gray v. Branker*, 529 F.3d 220 (4th Cir. 2008) .................................................... 44

*Monroe v. Angelone*, 323 F.3d 286 (4th Cir. 2003) .......................................... 38, 39

*Spicer v. Roxbury Corr. Inst.,* 194 F.3d 547 (4th Cir.1999)....................................38

*Thomas v. Taylor*, 170 F.3d 466 (4th Cir. 1999) ................................................. 22

*United States v. Caro*, 597 F.3d 608 (4th Cir. 2010) ............................................ 18

*United States v. Kelly*, 35 F.3d 929 (4th Cir. 1994)...........................................21, 35

*United States v. King*, 628 F.3d 693 (4th Cir. 2011) ............................................ 21

*United States v. Linder*, 552 F.3d 391 (4th Cir. 2009) ............................... 32, 33, 35

*United States v. Nicholson*, 611 F.3d 191 (4th Cir. 2010) ..................................... 21

*United States v. Smith*, 640 F.3d 580 (4th Cir. 2011) ............................................ 21

*United States v. Stitt*, 552 F.3d 345 (4th Cir. 2008) ............................................. 21

## UNITED STATES CODE

18 U.S.C. § 3593.................................................................................................29, 33

28 U.S.C. § 1291  ................................................................................................. 1

28 U.S.C. § 2255 ......................................................................................... *passim*

## RULES

Fed. R. App. P. 32.................................................................................................. 58

Fed. R. Civ. P. 59(e) ............................................................................................. 1

## JURISDICTIONAL STATEMENT

On January 8, 2013, Appellant Carlos David Caro ("Caro") filed under seal in his capital case a timely Defendant's Motion for Collateral Relief Pursuant to 28 U.S.C. § 2255 ("§ 2255 Motion"). *See United States v. Caro*, W.D.Va. No. 1:06CR00001-JPJ, Dkt. 781 (future trial court citations to items not included in the Joint Appendix are to "Dist. Ct." and docket number). On March 22, 2013, the court ordered the redacted § 2255 Motion filed, Dist. Ct. Dkt. 789, and Caro filed the § 2255 Motion. JA 1020. On June 11, 2013, the Government filed the Motion to Dismiss in Response to Petitioner's Motion for Relief Pursuant to Title 28, United States Code, Section 2255. JA 1347. ("Motion to Dismiss"). The court granted the Motion to Dismiss in an Opinion of May 4, 2015, JA 1889, and issued a separate Certificate of Appealability ("COA") as to Claim Seven. JA 1984.

Caro filed a timely Motion to Alter or Amend Judgment Pursuant to Fed. R. Civ. P. 59(e) on November 6, 2015. JA 1985. The district court denied the Rule 59(e) motion in an Opinion and Order of June 11, 2015. JA 2015. The district court's denial of the § 2255 Motion and the Rule 59(e) Motion resulted in a judgment that disposed of all of the parties' claims. Caro filed a timely Notice of Appeal on January 4, 2016. JA 2019. This Court has jurisdiction over Caro's appeal pursuant to 28 U.S.C. §§ 1291 and 2253.

1

## STATEMENT OF THE ISSUES

### CERTIFIED ISSUE

I.      Whether Carlos Caro was denied his right to due process of law under the Fifth Amendment where the Government withheld Bureau of Prisons data on the maximum length of time inmates can be housed at ADX Florence, where the records constituted material exculpatory evidence under *Brady* and failure to disclose those records deprived Caro of the opportunity to place accurate information before the sentencing jury that would refute the Government's theory that Caro would be dangerous in the future if not sentenced to death and support Caro's theory in mitigation that the BOP could house him in a sufficiently secure setting that he would not pose a danger to other inmates or correctional officers.

### UNCERTIFIED ISSUES[1]

II.     Whether Carlos Caro was denied his right to the effective assistance of counsel under the Sixth Amendment where his appointed counsel failed to introduce in mitigation evidence of Caro's brain damage and cognitive dysfunction, and diagnoses of Cognitive Disorder NOS and Anxiety Disorder NOS that included symptomatology associated with PTSD due to a traumatic childhood.

III.    Whether Carlos Caro was denied his right to the effective assistance of counsel under the Sixth Amendment where trial counsel failed to investigate and challenge in a separate collateral proceeding Caro's prior federal conviction for conspiracy to commit murder, which was later admitted in aggravation at his capital sentencing hearing.[2]

---

[1] Consistent with Fourth Circuit Local Rule 22(a)(2)(B), Caro files concurrently with this Opening Brief a Request for COA to include Uncertified Issues II and III.

[2] The appeal of the denial of relief in that § 2255 matter pends as Fourth Circuit No. 16-6027.

2

## STATEMENT OF THE CASE

On January 3, 2006, a grand jury indicted Carlos Caro for the deliberate, willful, malicious and premeditated murder of Roberto Sandoval at USP-Lee on December 17, 2003.  JA 1.

### I.    This Court's summary of guilt phase facts.

At about 6:40 p.m. on December 17, 2003, a prison guard discovered inmate Roberto Sandoval strangled to death inside his cell in the Special Housing Unit (the "SHU") at United States Penitentiary Lee ("USP Lee") in Jonesville, Virginia. He lay dead with a towel knotted around his neck.  His cellmate Caro had been the only other person inside the locked cell. Caro later explained, "[Sandoval] called me mother fucker, that whore, that's why I fucked him up."

* * *

Sandoval was placed in Caro's cell at around 9:00 p.m. on December 16, 2003.  The next day, Sandoval and Caro were served breakfast in their cell at 6:10 a.m.  They later took one hour of recreation outside and were last observed by prison staff at 6:17 p.m.  Soon after, inmate Sean Bullock, whose cell faced Caro's, noticed Caro standing behind Sandoval and apparently choking him. Bullock watched them fall to the ground and assumed they were tussling.  At about 6:40 p.m., a prison guard came to deliver mail.  Caro yelled to him several times, "Come get this piece of shit out of here," and pointed at Sandoval lying by the door.  Peering inside the cell, the guard observed Sandoval lying motionless with blood on him and a towel knotted around his neck. Blood was also splattered against the wall.

Other guards quickly arrived and handcuffed Caro.  When asked whether Sandoval was still breathing, Caro responded: "No. At this time he's stinking up the room, get him out."  Caro later received

3

*Miranda* warnings and was interviewed.  He denied that Sandoval's murder had any connection to the Texas Syndicate.  Instead, Caro explained that he had eaten Sandoval's breakfast that morning; that Sandoval had awakened, cursed him, and threatened to eat Caro's breakfast the next morning; and that Caro, using a towel tied with one overhand knot, had later strangled Sandoval for four or five minutes until he stopped breathing.

The next day Caro taunted a prison guard, grinning and calling out, "When [are] you ... going [to] assign [me] a new cellie?"  Several days later, again grinning, Caro requested fellow inmate Ortiz for his next "cellie."

Caro later mentioned Sandoval in two telephone conversations and a letter. The letter stated, "I killed a guy two weeks ago ... [f]or being a fool."  Caro told his wife, laughing, "[Sandoval] called me a mother fucker."  Caro also assured her, "But I'm all right."  Finally, Caro told another Texas Syndicate member Roel Rivas, "I also have a death," and explained, "It's because they gave me a cell mate and he disrespected me, so I took him down."  When Rivas proposed claiming self-defense, Caro said, "That is what I'm going to do.... That is what I'm going for."

*Caro*, 597 F.3d at 610-11.  The jury returned a verdict on February 1, 2007, in which it found Caro guilty of premeditated murder. *See* Tr., Feb. 1, 2007, at 68.

## II.    Capital Sentencing Hearing.

### A.    Eligibility Phase.

The eligibility phase of the bifurcated capital sentencing hearing took place on February 5, 2007. JA151 *et seq.*  The parties stipulated to Caro's prior federal

4

criminal history. JA 163. Pursuant to the federal death penalty statute, the jury found that Caro was 18 years old or older and that he had killed Sandoval intentionally. JA 186. The jury further found two statutory aggravating factors: 1) Caro had one conviction for a drug offense for which he could have received a sentence of five years in prison; and 2) Caro had two convictions for drug possession for which he could have received more than one year in prison. JA 186-87.

### B.    Selection Phase.

In opening statement, the Government stated that Caro is "an extremely violent man," JA 195, and would continue to represent a future danger if not sentenced to death based on the murder of Sandoval, his gang activity and ability to communicate in "code," a prison assault in which Caro participated in 2002 in Louisiana, the attempted murder of Ricardo Benavidez, Caro's three convictions for drug trafficking, and his lack of remorse for the Sandoval murder. JA 196-97.

Defense counsel stressed that Caro had no history of violence or gang membership until he was sent to federal prison for drug possession. JA 212. Counsel outlined the dysfunctional family circumstance in which Caro grew up in the impoverished city of Falfurrias in south Texas, his exposure to violence directed by his alcoholic father against Caro's mother and siblings, the poverty in

which the family lived, his placement in special education classes from seventh to ninth grade, and his having been recruited at a young age by maternal uncles to transport drugs from Mexico into the United States. JA 203-10. Counsel also described Caro's marriage, during which Caro was periodically imprisoned for drug possession, but would return to his wife Louyveth and his young daughter Xinia, vowing to do better. JA 213-220.

### 1.   Government's case in aggravation.

David Mrad, an intelligence officer at USP-Lee, was recalled from the guilt phase. JA 224. Mrad testified that the prison monitored a post-homicide Spanish-language phone call from Caro to another Texas Syndicate member, Eduardo Rivas, in Premont, Texas, in January 2004, and, after the recording of the call was translated by BOP translator Jacoba Guzman and because Caro had asked Rivas if he could read "code," BOP obtained a warrant to intercept a "coded" letter Caro had written to Rivas. JA 226-32. The letter was obtained pursuant to the warrant on February 4, 2004. Guzman decoded the letter and testified that the letter indicated that inmate Francisco Tijerina ordered the hit on Benavidez at USP-Lee and that Caro would have been hit if he had not carried out the order. JA 344-46.

The BOP also intercepted a letter signed by Caro and the other six inmates implicated in the Benavidez assault of August 29, 2003, and mailed by a known

6

Texas Syndicate member, Sammy Enriquez, to a Mr. Gomez in San Antonio, Texas, on March 29, 2004. JA 233. Guzman identified Mr. Gomez as Nick Gomez, the leader of the Texas Syndicate in "the free world" in San Antonio. JA 349. The letter was sent to the address of the brother of USP-Lee stabbing victim Ricardo Benavidez, a known Texas Syndicate "drop box" in San Antonio. JA 349. The drop box is used as a conduit to send mail from one institution to the free world and then on to another institution. JA 350. The letter stated that the hit on Benavidez was "without purpose," meaning that he should not have been hit and that he was "clear" and in good standing with the Texas Syndicate. JA 353. The parties stipulated that Caro was convicted of conspiracy to commit murder in the Benavidez case and was sentenced to 327 months in prison. JA 255-56.[3]

Sandoval's 17-year-old daughter testified to her relationship with her deceased father and identified correspondence and cards addressed by her father to her and other family members, and she identified family photographs that included her father. JA 291-300.

Operations Lieutenant John Blaze at FCI-Oakdale, Louisiana, testified to an incident on July 11, 2002, in which Caro and other Texas Syndicate members

---

[3] Caro challenged the constitutionality of his conviction for conspiracy to murder Benavidez both in the § 2255 Motion at issue in this appeal, *see* JA 1139 (Claim Six(F), and in the separate § 2255 Motion that is the subject of the appeal in *United States v. Caro*, Fourth Cir. No. 16-6027.

assaulted incoming inmates who were members of another gang. JA 302. Security officer John Gordon testified that, several weeks prior to the arrival of the other gang members at Oakdale, he spoke with Caro, who had identified himself as the head of the Texas Syndicate at Oakdale, in order to maintain calm when the new inmates arrived. JA 318. Gordon testified that Caro stated that the Texas Syndicate would "do what it had to do" when the new gang members arrived, and, afterward, Caro stated that he did not care if he were prosecuted because "I have 30 years to do." JA 321.

Daniel Olson, an FBI cryptographer, testified to having analyzed security at ADX Florence and found that inmates are able to communicate with other inmates inside and outside the institution. JA 358. He described a coded letter sent from the Aryan Brotherhood at ADX Florence in 1997 that resulted in murders being carried out against two black gang members at the federal prison in Lewisburg, Pennsylvania. JA 369.

The Government produced two witnesses to describe the assault on Benavidez on August 29, 2003. USP-Lee recreation specialist Kevin Dye witnessed Caro and another inmates stab Benavidez at a prison movie. JA 381-83, 386. Officer Mrad testified that a prison video showed Caro and Julian Moreno stabbing Benavidez, that Benavidez was stabbed 29 times, and that each placed a

8

shank, described as having been fashioned from Plexiglass, in the vicinity of the rec room TV.[4]  JA 397.  Caro, Moreno and Benavidez were members of the Texas Syndicate.  JA 398.

### 2.    The defense case in mitigation.

### a.    Security at ADX Florence.

James Aiken, a prison security consultant who spent a career as a corrections official in South Carolina and Indiana, testified that ADX Florence has the ability to control Caro for the rest of his life.  JA 448.  Aiken testified that he reviewed Caro's criminal history and visited ADX Florence in anticipation of his testimony. JA 437.  He testified that a "security envelope" exists to monitor all of an inmate's behavior and communication in order to eliminate dangerous communications.  JA 443.  He further testified that Caro was nearly 40 years old at that time and aging out of violence.  JA 445-46.

Dr. Mark Cunningham, Ph.D., testified to his experience as a clinical and forensic psychologist and sentencing consultant with 29 years' experience in assessing prison security and violence.  JA 663.  He reviewed files on Caro prepared by the BOP or the Government with respect to the incident at Oakdale in

---

[4] As Caro pleaded in the § 2255 Motion, all of the wounds were superficial, according to the treating physician, and the victim was treated and discharged from the hospital on the same day.  JA 1144 (citing the Lee Regional Medical Center's "Short Stay Note" of August 30, 2003, Dist. Ct. Dkt. 790-60).

2002, the Benavidez stabbing, and the Sandoval murder. JA 681-82. He described Caro's having been single-celled since Sandoval's death at USP-Lee, ADX Florence, and the Lee County Jail while awaiting trial, and levels of security within BOP facilities. JA 682. He described BOP's capacity for moving inmates to a more secure housing unit or single cell, or to ADX Florence as placements offering greater security for inmates for whom treatment, discipline or greater security within another institution is not sufficient to control a violent inmate. JA 683-84. He described the ADX Florence as the most secure prison within the BOP system. JA 685. Within it he described a "control unit" as a prison-within-the-prison, a unit that holds inmates who have committed "particularly serious acts of violence" in the BOP who "may require longer term placement in a highly restricted status." JA 685.

Dr. Cunningham testified that BOP records show that Caro has never tried to escape and has never assaulted correctional officers or staff. JA 698. Mr. Aiken testified that in ADX Florence's history, only two murders have occurred, and those occurred during use of a now-discontinued reintegration program that allowed contact between inmates prior to their transfers to less secure facilities. JA 428-29. That low number is despite the fact to which Dr. Cunningham testified that 32% of the 490 inmates housed at ADX Florence have killed another inmate in

10

prison. JA 699. In the other 18 U.S. Penitentiaries, there are between three and six murders per year in an inmate population of 25,000. JA 699.

Dr. Cunningham testified that he had only "limited information on average length of stay at ADX." JA 700. He requested from the BOP and DOJ "specific statistical information on length of stay at ADX, and range of stay in the facility as a whole, and also on the control unit, and [has] not been provided that." JA 700. During a recent tour of ADX Florence, a senior official told him the average stay by an inmate was five years before being moved to another facility as part of a "step-down" program that prepares inmates for release. JA 701. The official said five inmates had been at ADX Florence for 12 years since the prison opened in 1994. The required progression for "step-down" is for an inmate to spend 12 months in general population, single-celled, during which he is discipline free, maintains positive relationships with staff, participates in rehabilitation, and mitigates the behavior that led to single-celling. JA 702. The inmate is transferred to "immediate." JA 703. In "immediate," there is more contact with other inmates, in preparation for transfer to a "transitional unit," where he remains for another 12 months before moving to a "pre-transfer unit" for an additional year before he is placed in another BOP facility. JA 704-05. Dr. Cunningham described a 2005 murder of an inmate in general population by two other inmates,

11

one of only two murders to have ever occurred at ADX Florence, as having occurred in a recreation yard that allowed 12 inmates to exercise at a time, but the policy was changed so that now general population inmates do not exercise alone. JA 706.  Dr. Cunningham described Special Administrative Measures ("SAMs") that may be applied to eliminate contact visits and all inmate communications, if necessary for security, except for those with counsel of record.  JA 720.  He described the security built into the physical plant and practices to curtail access to metal and Plexiglass from which weapons may be fashioned.  JA 725-30.

On cross-examination, Dr. Cunningham acknowledged that there was a high risk that Caro would commit acts of violence if left at large in a U.S. penitentiary and the risk could last five to ten years, but that risk can be minimized with appropriate placement within the BOP.  JA 763-64.  Dr. Cunningham also agreed that Caro would use weapons at his disposal.  JA 769.  He also agreed that incentives such as good time credit and eventual release from prison have not served to make Caro less violent, as his actions at Oakdale and his post-event admissions at Oakdale made clear.  JA 774.  While Dr. Cunningham agreed that another life sentence would not deter Caro, he did believe that the security that attaches to that life sentence could go a long way toward preventing him from committing another violent crime.  JA 775.

During cross-examination, JA 792, Dr. Cunningham testified he was denied BOP data concerning the rates of violence, placements, lengths of stay, security levels, and disciplinary records of 47 inmates of those who killed while in BOP custody, whom he listed in his second affidavit filed in the court, JA 137-38. In response to the Government's questions about prison killings committed by inmates Bruce Pierce and David Fleming, Dr. Cunningham again testified that data concerning the inmates was not disclosed to him. JA 793-95. When asked to concede that few of the 47 inmates who committed homicides in BOP facilities actually did so at ADX Florence, and that they killed while being held in less secure BOP facilities, Dr. Cunningham again testified he was not provided the requested data and could not comprehend why the DOJ would balk at providing information that "could best illuminate these proceedings." JA 797.

In rebuttal, the Government called Gregory Hershberger, who retired from the BOP after 26 years as a warden, including at ADX Florence, and as a financial officer. JA 824. He testified that inmates are not permanently assigned to ADX Florence and it is anticipated that they will return to "an open population." JA 835. He testified that the policy at ADX Florence is to work inmates through a program for a minimum of three years before dispersing them to other institutions. JA 837-38. Mr. Hershberger testified that the "step-down" program contemplates 12

13

months in general population, 12 months in immediate, and 12 months in transition before being placed outside the ADX at a pre-transfer unit before release to another USP. JA 842. Mr. Hershberger testified that, like general population, the purpose of the control unit is to return inmates to "an open population institution." JA 843. Mr. Hershberger testified that BOP could not guarantee that Caro could not communicate with associates outside the prison, either directly or through proxies, including by sending coded messages. JA 851.

### b.    Social History Mitigation.

Three of Caro's paternal aunts, his wife, and a cousin, as well as his 8th grade teacher testified in mitigation. Susannah Rodriguez, an aunt, testified that the Caro family was from Falfurrias, Texas, a city of 7,000 in an agricultural community 150 miles south of San Antonio. JA 478-79. Caro's parents dropped out of elementary school, and Caro and his brothers all dropped out of high school, were involved in drug and alcohol, and had criminal records. JA 492-93. Caro's father Jose was a violent alcoholic who got drunk 4-5 times per week, had a criminal record, and beat his wife Virginia when he was drunk. JA 487, 512. She described Caro's developmental problems as a child and described him as a loner who did not get into fights like his brothers did. JA 502-03. She believed Caro's father to be a drug dealer, JA 510, and described Caro's maternal uncles as drug

14

dealers who encouraged Caro and his brothers to do the same. JA 517. She testified that she loved Caro. JA 518.

Delia Contreras, another aunt, testified that her brother Jose had a drinking problem from age 16 and was abusive toward Caro's mother. JA 547, 552. She testified that Caro was often present when Jose struck his wife. JA 557-58. Ms. Contreras testified that Jose and Virginia did not give Caro and his brothers the attention they needed as children. JA 558. Diamontina Razo, another aunt, corroborated Jose's alcohol abuse. JA 572. She testified that Caro was neither disrespectful nor violent, that he was shy and often played by himself. JA 576-77.

Laura Perez testified that she was a cousin of Carlos Caro. JA 585. Because of her own mother's substance abuse problems, she was often left with Jose and Virginia. JA 592. She observed her uncle's alcohol problems and his violence toward her aunt, which terrified her. JA 594. Ms. Perez described two of her uncles as drug dealers. JA 595. She testified that she loved Carlos Caro and his execution would negatively impact his daughter, who, like Ms. Perez, would be left without a father. JA 600.

Yomieda Martinez testified to being Caro's 8th grade math teacher, although she had not seen him in the years since he finished her class. JA 537. She testified

15

that he was quiet and respectful, and did not engage in violence. JA 538-39. She believed he dropped out of high school in 9th grade. JA 539.

Finally, the defense called Caro's wife, Louyveth Caro. JA 606. She testified that she has bachelor and master's degrees in communications disorders and is employed as a speech therapist at a San Antonio school district. JA 607. She met Caro in 1985 and they married in 1987. She described his incarcerations for drug possession, including the first time when Caro and a brother were arrested for "backpacking" marijuana around a border checkpoint. JA 610. Caro's brothers were imprisoned for selling drugs on behalf of their uncles. JA 628. Louyveth and Caro's daughter, Xinia, was born a month after one of his drug arrests, and Louyveth brought their daughter to a federal prison in Texas to see him. JA 612. They moved from Falfurrias to Fort Worth after Caro's release from prison in 1989, where Caro worked to supported her and Xinia, cooked and cleaned, and cared for his daughter. When she was forced to withdraw from her master's program for financial reasons and enroll in a school in Edinburg in South Texas, the family moved and Caro failed a drug test and was forced to serve six additional months in prison. JA 614. In 1993, Caro was arrested on another drug charge and was sentenced to 71 months in prison. JA 616. When he was transferred back to Texas, Louyveth and Xinia visited him in prison. JA 618. After his release, he

16

and Louyveth reconciled again and were together for a year and a half before Caro disappeared in May 2000. JA 622. When Louyveth was hurt in a hit-and-run accident and her car totaled, Caro donated his work vehicle to her. JA 623.

She later learned that he was convicted of another drug offense and sentenced to 30 years in prison. JA 624. After a period of disappointment and anger, Louyveth and Xinia continued their relationships with him and still loved him. In December 2003, she received a phone call from Caro in which he stated he killed someone. JA 627. Louyveth was stunned because it was "just not my husband." Caro had never been violent with her or Xinia. She testified that his death would have a devastating impact on their lives. JA 629.

### c.    Closing argument and verdict.

The Government focused its argument on Caro's history and future dangerousness. JA 909 *et seq.* The Government argued that BOP cannot control Caro because all prior efforts have failed; even if he is sentenced to the Control Unit or General Population at ADX Florence, he will be stepped-down to another prison; his stay at ADX Florence, according to Warden Hershberger, would be three years; and "we know . . . he's not going to stay there." JA 923-24. The Government argued again in rebuttal that the warden testified that Caro would leave ADX Florence in three years. JA 979.

17

On February 13, 2007, the jury returned a special verdict in which it sentenced Caro to death. JA 1009 (transcript); JA 880 (special verdict). On March 30, 2007, the court formally sentenced Caro to death. JA 1017.

On March 17, 2010, this Court affirmed the conviction and death sentence on direct appeal, with one judge dissenting. *See United States v. Caro*, 597 F.3d 608 (4th Cir. 2010).[5] The Court denied a Petition for Rehearing and Rehearing *En Banc* on September 7, 2010. *United States v. Caro*, Fourth Cir. No. 7-5, Dkt. 152. On January 10, 2011, Caro filed a Petition for Writ of Certiorari, *Caro v. United States*, U.S. Sup. Ct. No. 10-8356, which was denied on January 9, 2012.

## SUMMARY OF THE ARGUMENTS

**Certified Issue I.** Caro was denied his Fifth Amendment right to due process under *Brady v. Maryland*, 373 U.S. 83 (1963), where the Government withheld material exculpatory evidence in the form of data maintained by the BOP that reflects precisely how long BOP would hold Caro at ADX Florence, the

---

[5] Judge Gregory found Caro's death sentence to violate the Eighth Amendment's ban on cruel and unusual punishment where his eligibility for the death penalty rested solely on his prior convictions for three "minor, nonviolent drug offenses," two of which were punishable for as little as one year in prison. 597 F.3d at 636. According to Judge Gregory, contrary to other provisions in the Federal Death Penalty Act, Congress intended to target relatively minor drug offenders, such as "street-level distributors, drug mules, and even some possessors" rather than those "who operate through violence and intimidation, drug kingpins, and those who target children and schools." *Id.* at 636-37. Caro was a drug mule recruited by his father and uncles at a young age to transport drugs from Mexico. *Id.*

BOP's most secure institution, if the jury did not sentence him to death. Such evidence would have impeached the prosecution testimony of retired BOP Warden Gregory Hershberger to the effect that an inmate would likely only be held in the most secure setting for approximately three years before being "stepped down" to less secure BOP institutions. The evidence also would have bolstered the testimony of Dr. Mark Cunningham, Ph.D., a defense psychologist specializing in violent risk assessment, to the effect that inmates are routinely held BOP's most secure location well past three years, thus assuring that Caro would not pose a danger in the future to other inmates and correctional officers if the jury did not impose a sentence of death. This issue was raised as Claim Seven in the § 2255 Motion. JA 1167-77.

**Uncertified Issue II.** Caro was denied his right to the effective assistance of counsel under the Sixth Amendment and *Strickland v. Washington*, 466 U.S. 668 (1984), where trial counsel failed to introduce evidence of brain damage to Caro's cerebral frontal lobes and the resultant diagnosis of Cognitive Disorder NOS, which were discovered during a pretrial neuropsychological evaluation performed at counsel's request by Dr. Malcom Spica, Ph.D. Caro's brain damage and cognitive dysfunction were corroborated in the § 2255 proceeding by forensic psychiatrist Donna Schwartz-Watts, M.D., who also reviewed Caro's history of

19

exposure to violence as a child and diagnosed symptoms of Posttraumatic Stress Disorder ("PTSD"). The claim further alleges that trial counsel failed to produce Caro's history of exposure to trauma, including domestic violence, to a mental health expert for consideration of mitigating circumstances. The Supreme Court of the United States has held that such evidence of brain damage and PTSD may be sufficiently compelling as non-statutory mitigation that counsel's failure to investigate or present that precise evidence may sustain a claim of ineffective assistance of counsel. *See Porter v. McCollum*, 558 U.S. 30, 455 (2009). Caro raised this issue as Claim Six (B) & (C) in the § 2255 Motion. JA 1110-33.

**Uncertified Issue III.** Carlos Caro was denied his right to the effective assistance of counsel under the Sixth Amendment and *Strickland* where trial counsel failed to investigate and challenge in a collateral proceeding the constitutionality of Caro's prior federal conviction for conspiracy to commit murder, where that conviction was admitted at capital sentencing to support the Government's theory in aggravation that Caro would be dangerous in the future if the jury failed to sentence Caro to death, and the sentence of 27 years supported the Government's argument that, given the length of Caro's sentences on other convictions, a sentence less than death would amount to no punishment at all. The Supreme Court has recognized that a death sentence that rests on the admission in

aggravation of a conviction that is later invalidated violates the Eighth Amendment prohibition on cruel and unusual punishment. *See Johnson v. Mississippi*, 486 U.S. 578 (1989). This issue was raised as Claim Six (F) in the § 2255 Motion, JA 1139-48, and in a § 2255 motion in which relief was denied and the matter is the subject of the appeal in Fourth Circuit No. 16-6027.

## STANDARDS OF REVIEW

The Court reviews the district court's legal conclusions in denying a **§ 2255** motion *de novo. United States v. Stitt,* 552 F.3d 345, 352 (4th Cir. 2008). In reviewing the denial of a *Brady* claim, the Court reviews the district court's legal conclusions *de novo* and its factual findings for clear error. *United States v. King*, 628 F.3d 693, 702 (4th Cir. 2011) (citing *Walker v. Kelly,* 589 F.3d 127, 140 (4th Cir. 2009)). On direct appeal, the Court reviewed the district court's legal conclusions with respect to the *Brady* claim *de novo* "because no factual findings were made." *Caro*, 597 F.3d at 616. Caro submits that that standard would apply again here, as the district court made no factual findings. Whether Caro was denied the effective assistance of counsel presents a mixed question of fact and law, and this Court reviews the claim *de novo. United States v. Nicholson*, 611 F.3d 191, 205 (4th Cir. 2010). The district court's factual findings are reviewed for clear error. *United States v. Smith*, 640 F.3d 580, 590 (4th Cir. 2011). The

Court reviews the decision to deny an evidentiary hearing in a habeas proceeding for an abuse of discretion. *See Thomas v. Taylor*, 170 F.3d 466, 474 (4th Cir. 1999).

## ARGUMENTS

### I.

> Carlos Caro was denied his right to due process of law under the Fifth Amendment where the Government withheld Bureau of Prisons' data on the maximum length of time inmates can be housed at ADX Florence, where the records constituted material exculpatory evidence under *Brady* and failure to disclose those records deprived Caro of the opportunity to place accurate information before the sentencing jury that would refute the Government's theory that Caro would be dangerous in the future if not sentenced to death and support Caro's theory in mitigation that the BOP could house him in a sufficiently secure setting that he would not pose a danger to other inmates or correctional officers.

The most critical issue at capital sentencing, and the one capable of dispositive proof had the district court been inclined to so order it, was whether Caro could be held at ADX Florence for sufficient time as to significantly diminish his threat of dangerousness in the future to correctional officers and other inmates were the jury to sentence him to life in prison instead of the death penalty. Caro challenged the Government's suppression of the relevant BOP data in Claim 7 of his § 2255 Motion. JA 1167-77. The centrality of that claim to Caro's capital sentencing determination is clear in the pervasiveness and intensity of the litigation

22

in which the parties engaged over the production of the suppressed BOP records that might illuminate for the jury precisely how long Caro could be held in such custody.

Here, the district court denied relief on two bases: 1) the court denied relief on the *Brady* request at trial and Caro was therefore precluded from raising the claim again in the § 2255 Motion; and, 2) the BOP records suppressed by the Government were not sufficiently material to require the grant of relief under *Brady v. Maryland*, 373 U.S. 83 (1963).   JA 1950-60.   The court also denied discovery and an evidentiary hearing, JA 1960, but granted a COA on Claim 7.  JA 1984.

## A.    The law of accuracy and reliability at capital sentencing.

The Eighth Amendment requires a heightened standard for reliability in determining that death is the appropriate punishment in a specific case.  *See Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (plurality).   Eighth Amendment reliability therefore requires the provision of "accurate sentencing information [as] an indispensable prerequisite to a reasoned determination of whether a defendant shall live or die." *Simmons v. South Carolina*, 512 U.S. 154, 172 (1994) (Souter, J., concurring) (quoting *Gregg v. Georgia*, 428 U.S. 153, 190 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.)).

The requirement that sentencing information be accurate and reliable can be no more important than where the prosecution posits the theory that a defendant will be dangerous in the future if he is not sentenced to death. *See Simmons*, 512 U.S. at 162. The Supreme Court "has approved the jury's consideration of future dangerousness during the penalty phase of a capital trial, recognizing that a defendant's future dangerousness bears on all sentencing determinations made in our criminal justice system." *Simmons*, 512 U.S. at 162 (citing *Jurek v. Texas*, 428 U.S. 262, 275 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.); *California v. Ramos*, 463 U.S. 992, 1003 n. 17 (1983)). The Court has stated that a prediction of future dangerousness constitutes not only aggravating evidence at capital sentencing, but, "[l]ikewise, evidence that the defendant would not pose a danger if spared (but incarcerated) must be considered potentially mitigating." *Skipper v. South Carolina*, 476 U.S. 1, 5 (1985).

The Court has treated claims of inaccuracy in the capital sentencing determination as matters of due process. *See Simmons*, 512 U.S. at 164; *Skipper*, 476 U.S. at 5 n. 1 ("Where the prosecution specifically relies on a prediction of future dangerousness in asking for the death penalty, it is not only the rule of *Lockett* [*v. Ohio*, 438 U.S. 586 (1978)] and *Eddings* [*v. Oklahoma*, 455 U.S. 104 (1982)] that requires that the defendant be afforded an opportunity to introduce

24

evidence on this point; it is also the elemental due process requirement that a defendant not be sentenced to death 'on the basis of information which he had no opportunity to deny or explain.' *Gardner v. Florida,* 430 U.S. 349, 362 (1977))".

It must be recalled that *Brady* itself was a capital trial in which the prosecution withheld inculpatory statements made by the co-defendant in which he "admitted the actual homicide." *Brady*, 373 U.S. at 84. The Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87. In *United States v. Agurs*, 427 U.S. 97, 107 (1976), the Court held that *Brady* applies to guarantee a fair trial in the federal courts pursuant to the Due Process Clause of the Fifth Amendment just as the Fourteenth Amendment's Due Process Clause insures the fairness of a trial in state court. *Id.* at 107.

**B.    Facts relevant to the *Brady* claim on direct appeal.**

On January 11, 2006, the Government filed a Notice of Intent to Seek the Death Penalty. JA 4. The Notice indicated that the Government would introduce evidence of non-statutory aggravating circumstances to show his future dangerousness, including that he attempted to murder another USP-Lee inmate, Ricardo Benavidez, by stabbing him August 29, 2003, a July 11, 2002, gang-based

assault on inmates at a federal prison in Oakdale, Louisiana, and evidence concerning the security of BOP facilities to which Caro would be sent were the jury to not sentence him to death. JA 5-6.

Prior to trial, Caro sought records relative to the security of BOP facilities and the length of time the BOP could hold him in the supermax prison in Florence, Colorado, ADX Florence. Significant to the certified claim brought in this appeal, Caro filed a Motion for Exculpatory Evidence pursuant to *Brady*, JA 8, and a later Motion for Exculpatory Evidence Related to Penalty Phase Information, in which he detailed the specific BOP records sought. JA 15, 19-20. In support of the latter motion, Caro filed the Declaration and Affidavit of Dr. Cunningham in which he explained that "[v]iolence risk assessment, a particular area of research and knowledge within psychology, also fundamentally relies on the accumulation of group data that are often applied to a given individual." JA 24, 29 ¶ 15. Such risk is "always a function of context," to wit, that it is "a function of the conditions of incarceration." JA 33 ¶ 21. In capital sentencing, where the Government asserts that a defendant will commit acts of violence if not sentenced to death there exists the "corollary that the Federal Bureau of Prisons is unable to safely contain this defendant, and thus a penalty of death is a reasonable preventive measure." JA 33 ¶ 22. "Informing the jury of the capabilities of BOP to bring higher levels of

26

security to bear would appear to be the only evidence that might respond to this implicit corollary assertion regarding a particular inmate." *Id.*

At a hearing on November 3, 2006, defense counsel indicated that Dr. Cunningham requested the additional BOP records, including those pertaining to "group data," that are the subject of the *Brady* motion at issue here. *See* Tr., Nov. 3, 2006, at 10, 15. The Government stated that it would produce at sentencing BOP data on the average length of stay for an inmate at ADX Florence and its expert would testify that "unless there's someone like Moussaoui or the FBI agent who sold secrets to the Soviets, you don't stay there forever." *Id.* at 29. With regard to the Government's argument that the production would be burdensome, the magistrate judge indicated that the BOP lawyer involved in that day's proceedings stated she did not know whether the data requested by Caro existed. *Id.* at 37, 45.

In a Memorandum Opinion of November 8, 2006, JA 56-58, and in its Order of the same date, JA 62-63, the magistrate judge ordered the production of all 13 of Caro's requests for inmate and incident information for ADX Florence and the BOP presented in the Motion for Exculpatory Evidence Related to Penalty Phase Information as set forth in paragraphs A though M.

27

The Government objected to the magistrate judge's order. JA 65. After argument, JA 68, the court ruled that the information requested was immaterial to Caro's defense. JA 149. This Court denied relief on the discovery and subpoena issues brought prior to trial pursuant to Rules 16(a)(1)(E) and 17(c) of the Federal Rules of Criminal Procedure, which issues are not now before the Court. *See Caro*, 597 F.3d at 619-22. The Court also denied relief under *Brady* on the basis that Caro could only "speculate as to what the requested material might reveal." *Id.* at 619.

**C.    Caro is entitled to relief on the *Brady* claim. In the alternative, Caro is entitled to discovery and an evidentiary hearing.**

In *Banks v. Dretke*, 540 U.S. 668, 696 (2004), the Supreme Court stated that "[a] rule . . . declaring 'prosecutor may hide, defendant must seek' is not tenable in a system constitutionally bound to accord defendants due process." It is especially not tenable here, where no amount of "seeking" by Caro will reveal the precise data in the possession of the BOP that, as Dr. Cunningham noted in his testimony at sentencing, would "best illuminate these proceedings." JA 797. This Court's characterization of Caro's *Brady* claim on direct appeal as "speculation" was forcefully defeated with new data attached to the § 2255 Motion.

Critical to the Court's review of the district's judgment is that the court applied the wrong materiality standard where it concluded that it found "no

28

plausible reason to believe that the additional undisclosed data now presented *would have persuaded the jurors* that the mitigating factors outweighed the aggravating factors, such that Caro should not be sentenced to death." JA 1960 (emphasis added). As will be discussed below, the standard is actually whether there is a reasonable probability of a different outcome, *see Kyles v. Whitley*, 514 U.S. 419, 433 (1995)*,* not whether "jurors," plural, might have opted for life. Under the FDPA, 18 U.S.C. § 3593(d), and as the Special Verdict here reflected, JA 886, the death verdict required unanimity. Thus, a reasonable probability is whether even one juror would have been swayed by the new evidence.

### 1.    The *Brady* claim in the § 2255 Motion and the court's ruling.

Caro attached to the § 2255 Motion an affidavit from Jeanne Dvorak of a New Mexico law firm who, in November 2010, sent a survey questionnaire to 129 inmates housed at ADX Florence seeking information about the number of consecutive years each inmate had been housed there or housed in combination at ADX Florence and its predecessor, USP-Marion, Illinois. JA 1338. While the survey involved only a portion of the 470 inmates then housed at ADX Florence, the results refute the government's evidence presented at trial, through Warden Hershberger, that the average stay at ADX Florence was approximately three years. Of these 129 questionnaires sent to ADX Florence, 14 were returned unanswered, indicating that these prisoners were under SAMs and, thus, BOP had limited their correspondence such that they could not respond to the

29

survey, and 69 were completed and returned. Of these 69 inmates, 43 claimed they had been in ADX-Florence, which opened in 1994, or ADX-Florence and USP-Marion, for eight or more consecutive years. Indeed, 22 of these inmates had been at ADX-Florence/USP-Marion for over 13 years. JA 1331-34.

Applying this data to 2007 when Warden Hershberger testified in aggravation and the Government was claiming that BOP policies prevented it from housing Caro at ADX Florence for more than three years, at least 43 inmates currently housed at ADX Florence had been at ADX Florence or ADX Florence/USP-Marion for more than five years. The longest stay, as of the date of Caro's trial, was 27 years, JA 1342, and 22 inmates had been there for at least 10 or more years. Former BOP official Mark Bezy who retired in 2006, averred explicitly that he disagreed with Warden Hershberger's prediction that inmates would not be held at ADX Florence more than three to five years, recalling three inmates who had been held in USP-Marion and ADX Florence for more than 18 years. JA 1220 ¶ 4. He averred inmates could be held indefinitely for security reasons. JA 1225 ¶ 28.

In response to the Government's Motion to Dismiss, FPD Investigator Susan Richardson began with Ms. Dvorak's earlier survey questionnaires and compiled additional data from subpoenas issued in a lawsuit involving the BOP in New York, a FOIA request, the BOP inmate locator website, the website of Federal Death Penalty Resource Counsel website, PACER, and internet searches for inmates, to support the *Brady* claim in the § 2255 Motion. JA 1750 ¶ 3. She acknowledged that her research

was "incomplete and under-represented the total number of inmates who have been designated to ADX Florence for more than three years" and failed to account for inmates who were held in the Control Unit at USP-Marion prior to the opening of ADX Florence. JA 1751 ¶¶ 5, 6.

Nevertheless, Ms. Richardson concluded that at least 126 inmates had been held at ADX Florence for more than five years and 155 inmates had been held there for more than three years. JA 1751-52 ¶ 7. As her tables show, at the time of Caro's trial, 25 inmates had been held there for more than ten years, 63 for more than five years, and 79 for more than three years. JA 1752 ¶ 8; JA 1754-60. Of the 54 inmates held at ADX Florence in 2007 for murders committed within a BOP facility, JA 1761-66, apart from the two that were identified at trial as having committed a homicide at ADX Florence in 2005 before a reintegration program was discontinued, JA 446 (Mr. Aiken), JA 706 (Dr. Cunningham), Ms. Richardson was unable to find another inmate who had been indicted for homicide since his designation to ADX Florence. JA 1753 ¶ 10. It is worth noting that all of the inmates convicted of BOP murders who received life sentences and were sent to ADX Florence following a jury trial, except for a mentally ill inmate who received life after a death sentence was vacated and was not permitted to be housed there, have never left ADX Florence. JA 11767-68. The data refutes the Government's assertion in closing that "[w]e know that if Carlos Caro goes to that facility, he's not going to stay there." JA 923. All five inmates who were convicted of murders prior to Caro's trial had already spent at least three years at ADX Florence by the time of Caro's trial. *Id.*

31

Due to the incompleteness of the records described above, Caro moved, prior to the district court's dismissal of his § 2255 Motion, for discovery of the BOP records pursuant to Rule 6 of the Rules Governing Section 2255 Cases, JA 1788-93, but the motion was rendered moot when the court denied relief. JA 1960. The Government has not contested in the § 2255 proceedings Caro's argument that it had access to this BOP data at the time of Caro's trial.

In its Opinion of May 4, 2015, the district court identified two issues for decision: 1) "whether Caro is attempting to relitigate the *Brady* claim raised on appeal and rejected by the Fourth Circuit"; and, 2) materiality under *Brady*. JA 1957-58. The court cited *United States v. Linder*, 552 F.3d 393, 396 (4th Cir. 2009), and *Boeckenhaupt v. United States*, 537 F.3d 1182, 1193 (4th Cir. 1976), for the proposition that "a § 2255 motion is not a vehicle for relitigating claims already decided by the appellate court." JA 1957. Although the court described Claim Seven as "the same *Brady* claim raised at trial," it acknowledged that Caro now attached "some newly developed, sample statistics extrapolated from raw data he has located on his own since the appeal, that are favorable to his position on future dangerousness." *Id.* The court said the "recast version of the claim is still seeking the same data for the same reasons." *Id.* The court concluded:

> Caro makes no showing that he could not have collected and presented similar evidence when he raised the original *Brady* claim. Had he done so, such evidence would have been part of the record – for me to consider in reviewing the magistrate judge's ruling and for the court of appeals to consider. Caro's claim here is no different in substance from the claim he lost on appeal, and therefore, is barred.

32

JA 1958 (citing *Boeckenhaupt*, 537 F.3d. at 1183). In a footnote, the court rejected Caro's argument that *Bousley v. United* States, 523 U.S. 614, 621-22 (1998), erected an exception to procedural default that allows consideration of the *Brady* claim where the direct appeal record did not fully support the claim. The court concluded that Caro was asking it to "reverse the Fourth Circuit's ruling on that claim, based on a type of evidence that was not made part of the trial record only because Caro did not then make the effort to do so. Such relitigation of an already decided claim, using newly acquired ammunition, is barred." *Id.* (citing *Boeckenhaupt*, 537 F.3d at 1183). The court further ruled that "Caro's new statistics do not meet the materiality standard under *Brady*." *Id.* As noted above, *supra* at p. 29, the court asked whether the new evidence "would have persuaded *jurors* that mitigating factors outweighed aggravating factors," rather whether there is a reasonable probability of a different outcome that, due to the unanimity requirement of 18 U.S.C. § 3593(d), only required a showing that it was reasonably probable that only one juror would have voted for life.

### 2.    Caro is not barred from presenting the *Brady* claim.

Caro posits three powerful reasons for the Court to exercise its *de novo* review and reverse the district court. First, *Linder*, 552 F.3d 391, and *Boeckenhaupt*, 537 F.3d 1182, are inapt because in each case the movant, in contradistinction to what occurred here, alleged *precisely the same facts in support of precisely the same claim* in the § 2255 motion that he raised on direct appeal. In

*Linder*, it is actually more accurate to state that Linder only *attempted* to raise the same claim on the same facts, as he was barred from raising any claim on direct appeal due to a valid appellate waiver that accompanied his guilty plea. 552 F.3d at 396-97. In *Boeckenhaupt*, the Court held that a movant is not permitted to "recast, under the guise of collateral attack, questions *fully considered* by this court in 1968." 537 F.3d at 1183 (emphasis added).

Here, the *Brady* claim in the trial court, in the absence of the production of the BOP data requested by Caro in discovery and initially ordered produced by the magistrate judge, was not "fully considered." The district court erred in characterizing it as "the same claim" raised at trial and on appeal, where the anecdotal evidence gathered by Dr. Cunningham and outlined in his testimony was *de minimis* compared to the responses received by Ms. Dvorak from actual ADX Florence inmates and the data painstakingly accumulated by FPD Investigator Richardson. The district court could not make an accurate assessment of *Brady* materiality in the absence of the suppressed BOP data. What is clear is that the dueling expert testimony of Dr. Cunningham and Warden Hershberger was a poor substitute for reliable BOP data that would have *accurately* apprised the capital sentencing jury of the length of imprisonment at ADX Florence that Caro would be certain to face if he were not sentenced to death. The jury needed to know that one

inmate, Gometz, had spent 27 consecutive years between USP-Marion and ADX Florence, JA 1342; three had been held there for more than 18 years, JA 1220 ¶ 4; 22 had been there for more than ten years, JA 1341-44; and 126 inmates had been held at ADX Florence for more than five years.  JA 1751-52 ¶ 7.  Significantly, neither *Linder* nor *Boeckenhaupt* involved *Brady* claims where the appellate record was rendered void of facts necessary to resolve a claim due to the Government's withholding of evidence.

Second, even the defendant's ability to develop *some* of the exculpatory evidence does not absolve the Government of its *Brady* obligation.  The court erred when it ruled that Caro "makes no showing that he could not have collected and presented similar evidence when he raised the original *Brady* claim." JA 1957. The Ninth Circuit has held that even a lack of diligence that might give rise to a claim of ineffective assistance of counsel "does not absolve the prosecution of its *Brady* responsibilities."  *Gannt v. Roe*, 398 F.3d 908, 912-13 (9th Cir. 2004) (quoting *Banks*, 540 U.S at 696; *supra* at p. 28).  This Court reversed a conviction in *United States v. Kelly*, 35 F.3d 929, 937 (4th Cir. 1994), on *Brady* grounds where the Government failed to produce until after the defense rested its case, a search warrant affidavit in an unrelated case involving the complaining witness and the documents unearthed during the subsequent search, all of which would have impeached the complaining witness at Kelly's trial.  While the Court noted that

35

*Brady* does not apply where the evidence in question is available from other sources and, thus, when defense counsel could have discovered the evidence through "reasonable diligence," it did find that *Brady* applies where there is a partial disclosure, in that case in a pretrial letter from the prosecution, but significant additional impeachment evidence has been suppressed to which the defense did not have timely access. *Id.* Similarly, the Sixth Circuit has consistently ruled that the prosecution is only absolved of its *Brady* responsibility where the evidence sought is reasonably available through another, public source. *See Bell v. Bell*, 512 F.3d 223, 235 (6th Cir. 2008) (citations omitted). There is no question that accurate BOP data sought by Caro was not available to him through a public source, and his later partial discovery of lengths of stay at ADX Florence did not absolve the Government of its *Brady* obligation.

Third, the district court's ruling, *see* JA 1957, that the data produced by the New Mexico law firm and, later, by Caro's FPD investigator "would have been part of the record – for [it] to consider in reviewing the magistrate judge's ruling and for the court of appeals to consider," JA 1957, misses the point entirely. According to the New Mexico declaration author, by November 2011, she was able to identify only 129 inmates who had been held at ADX Florence – a prison that, since it opened in 1994, has held approximately 430 inmates at all times. JA

36

1338-39. In addition, the BOP returned 14 of the survey questionnaires without response due to the inmates' security status. JA 1338. What is more is that the inmate questionnaire in the New Mexico firm's lawsuit against BOP was not sent until November 29, 2010. JA 1338. Obviously the data contained therein was not available to Caro's defense at his 2007 trial. To the extent the district court suggested Caro should have gathered "similar" evidence, JA 1957, it must be noted that the BOP lawsuit that ultimately generated Ms. Dvorak's data had already been in litigation for five years when she sent the questionnaires and there is no indication as to how long it took to perform the labor intensive task of identifying the present and former ADX Florence inmates.

According to FPD Investigator Richardson, the data in her tables (JA1754-68) "are based only on the limited public data I have been able to gather. The numbers are necessarily incomplete and are believed to under-represent the total number of inmates who have been designated to ADX-Florence for more than three years." JA 1751 ¶ 5. Due to the limitations on the gathering of pubic data, the numbers also fail to include "years that the inmate may have been assigned to the Control Unit at USP-Marion" prior to ADX's opening and, thus, may under-represent the number of years an inmate might have been designated to BOP's most secure facility, whether it was Marion or Florence. JA 1751 ¶ 6. Thus, the

37

data the district court stated it would have considered had Caro found it sooner

remains a woefully inadequate sample size upon which the district court or this

Court could have rendered a judgment as to the materiality of the suppressed data

for length of stays at ADX Florence.

The data remains incomplete even though the Government can, as the

magistrate judge found, direct the BOP to produce the relevant data.    In the

absence of such data, Caro's death sentence falls short of the reliability required

under the Eighth Amendment.  *See Woodson*, 428 U.S. at 305.

> ### 3.    Caro's *Brady* claim is material; alternatively, it is sufficiently plausible to require discovery.

This Court has set forth the three elements a defendant must prove to

establish a due process claim under *Brady*:

> (1) the evidence must be favorable to the accused; (2) it must have
> been suppressed by the government, either willfully or inadvertently;
> and (3) the suppression must have been material, i.e., it must have
> prejudiced the defense at trial.

*Monroe v. Angelone*, 323 F.3d 286, 299-300 (4th Cir. 2003) (citing *Strickler v.*

*Greene,* 527 U.S. 263, 281–82 (1999)).  As the Court noted,

> [U]under *Brady,* "[t]he touchstone of materiality is a 'concern that the
> suppressed evidence might have affected the outcome of the trial.'"
> *Spicer v. Roxbury Corr. Inst.,* 194 F.3d 547, 559 (4th Cir.1999)
> (quoting *United States v. Agurs,* 427 U.S. 97, 104 (1976).    Put
> differently, suppressed evidence is material "if there is a reasonable
> probability that, had the evidence been disclosed to the defense, the

result of the proceeding would have been different." *Kyles*, 514 U.S. at 433 (internal quotations omitted). A reasonable probability, in turn, is shown "when the government's evidentiary suppression undermines confidence in the outcome of the trial." *Id.* at 434 (internal quotations omitted).

*Monroe*, 323 F.3d at 301-02.

The first two prongs of the *Brady* test are not contested. The BOP data suppressed by the Government is favorable to Caro. As noted above, even the limited data generated by Ms. Dvorak and Investigator Richardson in the § 2255 proceedings gives rise to a reasonable probability that the jury would have imposed a sentence less than death if it had been apprised that Caro would be imprisoned at ADX Florence for a period of years substantially longer than Warden Hershberger's expert testimony that Caro likely would only be held there for three years. When asked to render his ultimate opinion, Dr. Cunningham concluded that "[t]here's a level of security that's available within the Bureau of Prisons that can house Carlos Caro, or any inmate, so the likelihood of serious violence is very low." JA 742. The data gathered by Ms. Dvorak and Investigator Richardson bears this out.

Should the Government contest the veracity or integrity of that data, or should the Court find that the supporting data remains insufficient to find materiality and grant relief, Caro respectfully requests that the Court direct the

39

district court to order discovery pursuant to Rule 6 of the Rules Governing Section 2255 Cases. He has demonstrated the "good cause" required by Rule 6(a). He has pleaded a constitutional claim that, with the production of accurate BOP data, might entitle him to relief. *See Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997). Consistent with 28 U.S.C. § 2255(b), the Court should also direct the district court to hold a hearing, find the relevant facts and render a judgment on a fully-developed record, as the § 2255 motion and the files and records of the case fail to conclusively show that Caro is entitled to no relief.

## UNCERTIFIED CLAIMS

### II.

**Carlos Caro was denied his right to the effective assistance of counsel under the Sixth Amendment where his appointed counsel failed to introduce in mitigation evidence of Caro's brain damage and cognitive dysfunction, and diagnoses of Cognitive Disorder NOS and Anxiety Disorder NOS that included symptomatology associated with PTSD due to a traumatic childhood.**

In *Porter v. McCollum*, 558 U.S. 30, 42-43 (2009), the Court granted penalty phase relief in a capital habeas corpus case where defense counsel failed to present to the sentencing jury neuropsychological evidence that the defendant suffered from "a brain abnormality and cognitive deficits." A neuropsychologist evaluated the defendant and concluded that he suffered from "brain damage that could manifest in impulsive, violent behavior." *Id.* at 36. The *Porter* Court also noted

40

that counsel failed to elicit mental health evidence in the form of Porter's Posttraumatic Stress Disorder ("PTSD") related to his military service in Korea. *Id.* at n. 4. The Court ruled that the evidence, while not qualifying as statutory aggravating evidence was nonetheless compelling non-statutory mitigating evidence, which was admissible under *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982).

Here Malcom Spica, Ph.D., a neuropsychologist, tested Caro prior to trial and found Caro suffered from brain damage to his cerebral frontal lobes that gave rise to cognitive dysfunction and a formal diagnosis of Cognitive Disorder NOS, which caused him *inter alia* to act impulsively. JA 1309-44. In addition, Donna Schwartz-Watts, M.D., a psychiatrist retained by Caro in the § 2255 proceedings, corroborated Dr. Spica's findings and, based on Caro's social history, which included his exposure to violence during his formative years, diagnosed Caro as suffering from Anxiety Disorder NOS, which included the presence of certain diagnostic criteria that would support a diagnosis of PTSD under the Diagnostic and Statistical Manual of Mental Disorders (4th ed. 2000 - Text Revision) ("DSM-IV-TR") in effect at the time of Caro's offense.

Yet, defense counsel failed to call Dr. Spica at capital sentencing, and they failed to obtain the opinions of Dr. Schwartz-Watts or any other mental health

41

expert familiar with Caro's traumatic history in the capital sentencing proceeding. The basis for the omission of Dr. Spica's opinions at sentencing was that the Government was prepared to offer the opinions of a forensic psychiatrist, Robert Phillips, M.D., whose report of the evaluation of Caro defense counsel had not yet even seen and had not had a defense mental health expert such as Dr. Spica review or critique. JA 1257 ¶ 18 (Decl. of Steven Kalista); JA 1309-10 ¶ 7 (Decl. of Dr. Spica).

Counsel's decision to forego the presentation of mental health mitigation at capital sentencing constituted abdication rather than advocacy on Caro's behalf. For reasons set forth below, the aggravating aspects of Dr. Phillips' report were more than assailable, as is made clear in: 1) Dr. Spica's letter of September 10, 2013 (JA 1697-98); the Supplemental Declaration of Dr. Schwartz-Watts of October 7, 2013 (JA 1712-13); and, 3) the letter of Dr. Thomas Hyde, M.D., of December 22, 2012 (JA 1336). Defense counsel's performance was objectively unreasonable and Caro suffered actual prejudice such that he is entitled to sentencing phase relief pursuant to *Strickland v. Washington*, 466 U.S. 668 (1984).

**A.    The law of *Strickland* as applied at capital sentencing.**

In *Strickland*, the Court stated that "the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper

functioning of the adversarial process that the trial cannot be relied on as having produced a just result." 466 U.S. at 686. Counsel is ineffective if: (1) "representation fell below an objective standard of reasonableness"; and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 688, 694. The inquiry under the first prong, deficiency, is "whether counsel's assistance was reasonable considering all the circumstances." *Strickland*, 466 U.S. at 688. Performance is deficient when the attorney fails to render the performance of a reasonably competent attorney. *Id.* at 687.

In *Padilla v. Kentucky*, 559 U.S. 356, 366 (2010), the Court stated: "We long have recognized that 'prevailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable . . .'" *Padilla* cited *Strickland*, 466 U.S. at 688; *Bobby v. Van Hook*, 558 U.S. 4 (2009) (*per curiam*); *Florida v. Nixon*, 543 U.S. 175, 191 and n.6 (2004); *Wiggins v. Smith*, 539 U.S. 510, 524 (2003); and *Williams v. Taylor*, 529 U.S. 362, 396 (2000), for that proposition. *Padilla*, 559 U.S. at 366-67. The *Padilla* Court concluded: "Although they are 'only guides,' *Strickland*, 466 U.S. at 688, and not 'inexorable commands,' *Bobby*, 558 U.S. at 8, these standards may be valuable measures of the prevailing norms of effective representation . . ." 559 U.S. at 367.

43

In addition, this Court has recognized that the standard of care owed by counsel to a client in a criminal matter may also derive from expert counsel. *See Gray v. Branker*, 529 F.3d 220, 235 (4th Cir. 2008) (noting with respect to an IAC claim that the petitioner presented an "expert on the practice of criminal law").

**B.     Counsel's deficient performance at sentencing.**

**1.     The duties of reasonably competent counsel at capital sentencing.**

The Commentary to Guideline 1.1 of the American Bar Association Guidelines on the Appointment and Performance of Defense Counsel in Death Penalty Cases (rev. 2003) ("ABA Guidelines") states: "Counsel must be experienced in the utilization of expert witnesses and evidence, such as psychiatric and forensic evidence, and must be able to challenge zealously the prosecution's evidence and experts through effective cross-examination." The Commentary to Guideline 10.11 informs counsel that expert witnesses may be useful for obtaining social history from a client but "are almost always crucial to explain the significance of the [social history] observations."

Consistent with this Court's decision in *Gray*, 539 F.3d at 235, Caro retained expert *Strickland* counsel Larry Hammond, who executed a declaration outlining the standard of care owed by counsel at capital sentencing. JA 1235 *et seq.* By way of qualifications, Mr. Hammond is an impeccably-credentialed attorney who

44

clerked for Justices Lewis Powell and Hugo Black, and has more than 30-years of experience representing capital clients and serving as a consultant and expert *Strickland* counsel in capital cases at all stages. JA 1230-31. In his declaration, Mr. Hammond averred that in light of the promulgation of the 2003 ABA Guidelines and subsequent issuance of the Supplementary Guidelines for the Defense Function of Defense Teams in Death Penalty Cases, and "underscored by hundreds of cases, the central importance of thorough mental health development is no longer doubted." JA 1237 ¶ 28.

The Supreme Court has held, in capital appeals where it has found counsel to have been ineffective under *Strickland*, that counsel's duties at capital sentencing include the investigation *and* presentation of mental health mitigation. *See Williams* (*Terry*) *v. Taylor*, 529 U.S. 362, 393 (2000) (the defendant had a constitutional right to provide the jury "with the mitigating evidence that his trial counsel either failed to discover or failed to offer"). In *Porter*, 558 U.S. at 32, counsel told the sentencing jury Porter was "not mentally healthy" but failed to "put on any evidence related to Porter's mental health." In *Porter*, evidence of a traumatic childhood, brain damage, and PTSD from military duty in Korea went uninvestigated at trial. *Id.* at 36 & n. 4. In *Williams*, the Court granted habeas

45

relief *inter alia* on the basis that counsel "failed to introduce available evidence that Williams was 'borderline mentally retarded.'"  529 U.S. at 396.

> ## 2.    The mental health evaluations of Dr. Spica and Dr. Schwartz-Watts, and the district court's decision.

In June 2006, Dr. Spica performed neuropsychological testing on Caro and concluded he suffered from "cerebral frontal lobe dysfunction," which resulted in a diagnosis of Cognitive Disorder NOS.  JA 133-34.  When the Government alleged in the Motion to Dismiss that Dr. Spica failed to diagnose "brain damage," JA 1388, Dr. Spica executed an addendum for Caro's Opposition to that motion (JA 1513) in which he stated with unmistakable clarity that Caro was "brain damaged" as that term of art "denotes a compromise from previous function," that is, a "normally functioning brain that was then injured or compromised and exhibited subsequent decrements in functioning from a previous state."  JA 1697.  Caro has frontal lobe dysfunction that impairs his daily functioning and makes him highly suggestible.  JA 1333.  Dr. Spica opined that Mr. Caro has "unreliable judgment skills, and an inability to sort through information provided to him."  JA 1334.  He further explained that Caro's reasoning ability "under calm, controlled conditions ranks at the level of a 10-year-old" but that if he is under pressure, he will perform at a much more impaired level.  *Id.*

Instead of using this critical information to build a mitigation case that could

46

help explain Caro to the jury, counsel decided not to present any mental health expert testimony. Dr. Spica was never called to testify at sentencing, and he was never told why he was not called to testify. JA 1334. After the trial started but before Caro was convicted, counsel made the decision not to call Dr. Spica without having yet reviewed the report of the government's expert, Dr. Phillips. JA 1257. As Steven Kalista averred:

> At some point during trial, we decided that we were not going to present mental health testimony during the penalty phase. We did not review Dr. Phillips' report. We made this decision based on the reputation of Dr. Phillips, his anticipated testimony, and a feeling we could not rebut that testimony.

JA 1257 ¶ 18.[6]

In addition to attaching Dr. Spica's Consultation to the § 2255 Motion, Caro attached the report of a psychiatrist, Donna Schwartz-Watts, M.D., who evaluated Caro in January 2013 and also diagnosed Caro as suffering from Cognitive Disorder NOS. JA 1288, 1292. She also stated that "Caro's performance on cognitive testing is indicative of dysfunction based on his age, lack of head injury, and his reported abstinence from alcohol since his confinement." JA 1290 ¶ 17.

---

[6] Dr. Robert Phillips, M.D., is the Government's psychiatrist who, along with a psychologist, Dr. Paul Montalbano, Ph.D., evaluated Caro prior to trial and wrote a report that was sealed and filed with the district court. The Government cited and quoted from that report in its Motion to Dismiss. JA 1391-94 & n. 12. Caro cited the sealed report in his Opposition, JA 1587-90, and he files Dr. Phillips' report as a Sealed Joint Appendix here.

47

She averred that Caro's developmental delays described by family members during his formative years could have been the result of exposure to the trauma he witnessed in the home or to his cognitive deficits. JA 1290 ¶ 19. Dr. Schwartz-Watts indicated that Caro demonstrated symptomatology for Posttraumatic Stress Disorder ("PTSD"), including poor memory of a traumatic childhood, aversion to discussing the domestic abuse of his mother by his father, his own abuse, and being "hyper alert when he is in the general prison population." JA 1290 ¶ 20. Other indicia of PTSD include family reports that Caro was reserved and quiet as a child, demonstrating "avoidance" and a "constricted affect." JA 1293 ¶¶ 30, 31. Dr. Schwartz-Watts concluded that Caro's brain impairment and trauma-based anxiety disorder make him "increasingly anxious and unable to use all of the cognitive strategies available to him" and that when he becomes more anxious, "he is more likely to exercise poor judgment." JA 1295 ¶ 41.

The district court denied relief on the claim that counsel rendered ineffective assistance for failing to call Dr. Spica on basis that defense counsel had no access to Dr. Phillips' report until after they gave post-trial notice of intent to present mental health evidence, which they failed to do. JA 1933. In light of their belief that his testimony might be unfavorable and that Dr. Spica's testimony might not be sufficiently favorable to overcome harmful testimony from Dr. Phillips, the

48

decision was not unreasonable. *Id.*

With respect to the claimed failure to produce Caro's horrific childhood trauma to a mental health expert such as Dr. Schwartz-Watts, the court concluded that "[t]here is not a reasonable likelihood that the testimony of a mental health expert on Caro's childhood trauma would have changed the outcome of the penalty phase." JA 1934.

### 3.    Counsel's objectively unreasonable decision not to call Dr. Spica.

Caro's counsel possessed Dr. Spica's pretrial report that described Caro as suffering from brain damage in the form of frontal lobe impairment and cognitive dysfunction, which included the likelihood that Caro was prone to engage in impulsive acts without being able to think through consequences. JA 1333-34. Reasonably competent counsel would have presented favorable neuropsychological testing results already in their possession, as contributed significantly to the Court's finding of ineffective assistance in *Porter*, 558 U.S. at 36.

Defense counsel made the decision without even having seen Dr. Phillips' report, which means counsel did not know there was any damaging information contained therein. In addition, the information in Dr. Phillips' report would have been easily refuted by defense experts and even the report itself. Significantly,

counsel failed to consult with Dr. Spica about the government's experts, which they could have done, at a minimum, to determine whether the results of his neuropsychological testing would hold up under scrutiny. JA 1309-10 ¶ 7. Had counsel reviewed Dr. Phillips's report and consulted with Dr. Spica, they would have learned that Dr. Phillips' opinion, which relied in part upon Dr. Montalbano's testing, was problematic for two reasons.

According to Dr. Spica, Dr. Montalbano did not administer the appropriate tests that would have shown deficits and demonstrated that Caro has brain impairment. JA 1310 ¶ 11. In addition, Dr. Montalbano administered some of the same tests that Dr. Spica administered less than six months earlier. *Id.* ¶ 12. This resulted in what is termed "practice effect," where scores may be artificially inflated due to the fact that the second test was given shortly after the first test. *Id.* Dr. Montalbano acknowledged the possibility that his results on some tests may have been skewed due to "practice effect or bias" from Caro's having recently taken the same tests. *See* Sealed Report at 27. Notwithstanding, even Dr. Montalbano found indicia of neurocognitive deficits that included possible impulsivity from Caro's performance on the Halstead-Reitan neuropsychological battery and discrepancies between verbal and non-verbal performance on the Validity Indicator Profile and the WAIS-III, a standardized IQ test, which

50

Montalbano described as "a statistically significant difference between verbal and perceptual organizational abilities." *Id.* at 28-29. That disparity also showed up on a test of memory. *Id.* at 31.

Further, had counsel reviewed Dr. Phillips' report, they could have obtained an opinion of a relevant expert to undermine the neurological portion of the examination performed by Dr. Phillips. Indeed, they indicated in the first approved budget that if testing "suggests a possibility" of brain damage, then counsel would ask for funding for a "full neurological examination." *See* Dkt. 42-1 at 6. But they did not. Had they done so, and retained someone like defense neurologist Thomas Hyde, M.D., they would have learned that Dr. Phillips' examination was "cursory" and lacked "many of the tests routinely performed on forensic cases, especially those where there might be a suspicion of frontal lobe dysfunction." JA 1336. Moreover, even though Dr. Phillips' administration of neurological testing was "substandard," some of the tests he administered to Caro revealed abnormal results. *Id. See* Sealed Report of Dr. Phillips at 32. Such evidence is at odds with Dr. Phillips' conclusion that Caro's performance was "superior." JA 1336.

Mr. Caro's trial counsel's performance fell below the standard of care by failing to present evidence of brain damage and mental illness to the jury. *See Porter*, 558 U.S. 35-36; *Williams*, 529 U.S. at 396. Had counsel adequately

51

prepared in advance of trial in accordance with the standard of care for capital defense attorneys, they would have been able to present evidence of Mr. Caro's cognitive deficits and would have been able to cross-examine Dr. Phillips regarding his opinions. Counsel's decision to prevent the jury from hearing this evidence was unreasonable and their performance was deficient.

### 4. Counsel's unreasonable decision not to produce traumatic social history to a qualified mental health practitioner.

Prior to trial, Hans Selvog, a mitigation specialist, recommended to counsel that a forensic psychiatrist was necessary to explain Caro's developmental difficulties, cognitive deficits, brain impairment, and traumatic childhood. JA 1261 ¶¶ 8, 9. Although the defense initially retained Dr. Keith Caruso, M.D., he was not provided with Caro's substantial horrific social history. Mr. Kalista averred that Dr. Caruso "interviewed Mr. Caro about the crime." JA 1256 ¶ 15. Caro pleaded that "the bulk of records [defense counsel] provided Dr. Caruso related to Mr. Caro's BOP record and the incidents in which he was involved." JA 1119. When Dr. Caruso reported to the defense team that his testimony would not be useful, counsel did not seek another expert or even ask Selvog to recommend someone who could "provide the jury with an explanation of Mr. Caro's brain impairment or the impact of his traumatic childhood." JA 1261 ¶ 10.

Guideline 10.11(F)(2) of the 2003 ABA Guidelines makes clear that a

52

thorough social history investigation is critical to the diagnosis of mental illness and the production of appropriate mental health mitigation at capital sentencing. In *Rompilla v. Beard*, 545 U.S. 374 (2005), the Court vacated a death sentence on the basis that counsel rendered ineffective assistance, in part for failing to produce the defendant's social history to mental health experts taxed with evaluating him for capital sentencing. The horrific social history contributed to diagnoses of brain damage and cognitive dysfunction. *Id.* at 392. Trial counsel's failure to produce the horrific social history to a forensic psychiatrist constituted deficient performance under *Strickland*.

## C.    Caro was prejudiced by those omissions.

Had counsel introduced Dr. Spica to testify to Caro's brain damage and cognitive dysfunction, and had counsel produced evidence of his horrific exposure to violence and dysfunctional family history to a qualified mental health expert, such as Dr. Schwartz-Watts, and called her in mitigation, there is a reasonable probability that "one juror would have struck a different balance," which the Supreme Court has identified as the test for *Strickland* prejudice at capital sentencing. *Wiggins*, 539 U.S. at 537. Prejudice was compounded where the defense was hamstrung in its efforts to show that Caro could be held indefinitely at ADX Florence and the only other mitigation consisted of the testimony of family

53

members who could only testify concerning distant memories of their experiences with Caro. The most recently any family member had seen Caro was seven years prior to capital sentencing. *See* JA 623 (wife); JA 600 (cousin).

### III.

**Carlos Caro was denied his right to the effective assistance of counsel under the Sixth Amendment where trial counsel failed to investigate and challenge in a separate collateral proceeding Caro's prior federal conviction for conspiracy to commit murder, which was later admitted in aggravation at his capital sentencing hearing.**

Whether Caro is entitled to relief from his death sentence turns on the court's decision in *United States v. Caro*, Fourth Cir. No. 16-6027. There Caro alleges ineffective assistance of counsel under the Sixth Amendment and *Hill v. Lockhart*, 474 U.S. 52 (1985), where counsel failed to apprise Caro of the serious collateral consequence of his guilty plea to the charge of conspiracy to murder USP-Lee inmate Ricardo Benavidez, to wit, that it would be admitted in aggravation at capital sentencing after Caro's conviction for the murder of Roberto Sandoval. Should the Court reverse the district court and vacate Caro's conviction, he would be entitled to relief pursuant to *Johnson v. Mississippi*, 486 U.S. 578 (1989), where his death sentence would rest, in part, on an invalid aggravator.[7]

---

[7] Indeed, this failure is perplexing in light of the uncontested facts that all of the wounds were superficial, the victim was treated and discharged from the hospital on the same day, and all of Caro's co-defendants received convictions only for

54

Here, Caro raised the claim that he was denied his Sixth Amendment right to the effective assistance of counsel where counsel failed to mount the same challenge that is now before the Court in No. 16-6027. JA 1139. The district court denied relief on the basis that Caro failed to show that his trial counsel in the capital case "acted unreasonably in failing to challenge the prior conviction" because "[i]t certainly is within the bounds of professional norms to focus on the case at hand rather than attempting to challenge and reinvestigate prior convictions." JA 1941.

In capital litigation, was beyond dispute at the time of Caro's sentencing hearing that reasonably competent counsel has a duty to challenge prior convictions that will be admitted at the capital sentencing hearing. *See Rompilla v. Beard*, 545 U.S. 374, 383-86 (2005). The duty is spelled out in the declaration of Larry Hammond, JA 1241-42 ¶ 37, who opines that the duty attaches whether the defendant's prior conviction comes as a result of trial or guilty plea. The Commentary to Guideline 10.7 of the 2003 ABA Guidelines states: "Counsel must also investigate prior convictions . . . If a prior conviction is legally flawed, counsel should seek to have it set aside."

---

weapons possession. JA 1144. Even more perplexing is counsel's failure to mitigate the Benavidez assault with these circumstances at sentencing in the Sandoval homicide, which counsel had a duty to do. *See Rompilla*, 545 U.S. at 387.

55

Caro's counsel's performance was objectively unreasonable under the first prong of *Strickland v. Washington*, 466 U.S. 668, 687-888 (1984). The district court failed to determine whether Caro established *Strickland* prejudice. Because Caro's three prior convictions were for non-violent drug offenses, the *vacatur* of his conviction for conspiracy to murder in No. 16-6027 requires that this Court grant relief in the form of a new sentencing hearing. Alternatively, Caro requests that the Court remand for a determination of *Strickland* prejudice.

## CONCLUSION

Carlos Caro respectfully requests the Court reverse the order of the district court in which it denied him relief on the claim that he was denied due process of law under the Fifth Amendment and *Brady*. Caro further requests that the court remand with directions for the district court to order the Government to produce all BOP records that reflect the lengths of sentences inmates have served at ADX Florence and, if necessary, an evidentiary hearing on the materiality prong of test for the violation of due process under *Brady*.

For the foregoing reasons, and for the reasons stated in the Request for Certificate of Appealability filed concurrently with this Opening Brief, Caro requests that the Court grant the COA as to Uncertified Claims II and order Appellees to file a Responsive Brief on the claim that Caro was deprived of his

56

right to the effective assistance of counsel under the Sixth Amendment where his counsel failed to produce evidence of his brain impairment, cognitive dysfunction, and mental illness at the capital sentencing hearing.

For the foregoing reasons and those stated in the Request for COA, Caro requests that the Court grant the COA and order Appellees to file a Responsive Brief on the claim that he was denied his right to effective assistance of counsel where trial counsel failed to challenge in a separate collateral proceeding Caro's conviction for conspiracy to commit murder in the Benavidez case that was admitted as non-statutory aggravation at capital sentencing in the Sandoval case.

## REQUEST FOR ORAL ARGUMENT

Caro respectfully requests that the Court set oral argument in this capital § 2255 matter.

Respectfully submitted this 19th day of December, 2016.

s/Timothy M. Gabrielsen
Timothy M. Gabrielsen
Fay F. Spence
Brian J. Beck
Assistant Federal Public Defenders

Attorneys for Defendant-Appellant

57

## CERTIFICATE OF COMPLIANCE PURSUANT TO
## FED. R. APP. P. 32(A)(7)(C)

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,862 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

s/Timothy M. Gabrielsen
Attorney for Defendant/Appellant
Dated:  December 19, 2016

58

**CERTIFICATE OF SERVICE**

I hereby certify that on December 19, 2016, I electronically filed the attached document with the clerk of Court using the CM/ECF System which will send notice of such filing to the following registered CM/ECF users:

Jean B. Hudson
Assistant United States Attorney
United States Attorney's Office
255 West Main Street, Room 130
Charlottesville, VA 22902


s/Teresa Ardrey
Legal Assistant