No. 16-1

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA, Plaintiff-Appellee,

vs.

CARLOS DAVID CARO, Defendant-Appellant.

Appeal from the United States District Court for the Western District of Virginia
Hon. James P. Jones, District Judge, Presiding
Dist. Ct. No. 1:06CR00001

## JOINT APPENDIX TO OPENING BRIEF
## VOLUME 1 JA 1 – JA 600

JON M. SANDS
Federal Public Defender
District of Arizona
TIMOTHY M. GABRIELSEN
Nevada Bar No. 8076
Assistant Federal Public Defender
407 West Congress Street, Suite 501
Tucson, Arizona 85701
tim_gabrielsen@fd.org
Tel. (520) 879-7614
Facsimile (520) 622-6844

FAY F. SPENCE
Virginia Bar No. 27906
First Assistant Federal Public Defender
210 First Street, SW, Suite 400
Roanoke, Virginia 24011
fay_spence@fd.org
Tel. (540) 777-0880
Facsimile (540) 777-0890

BRIAN J. BECK
Virginia Bar No. 78049
Assistant Federal Public Defender
201 Abingdon Place
Abingdon, Virginia 24211
brian_beck@fd.org
Tel. (276) 619-6080
Facsimile (276) 619-6090

*Counsel for Defendant-Appellant Carlos David Caro*

**U.S. District Court Docket and Transcripts**

JA 1        Dkt. 2 - Indictment, *United States v. Caro*, W.D.Va. No. 1:06CR00001-JPJ (Jan. 3, 2006);[1]

JA 4        Dkt. 8 - Notice of Intent to Seek the Death Penalty (Jan. 11, 2006);

JA 8        Dkt. 19 - Motion for Exculpatory Evidence (Jan. 27, 2006);

JA 13       Dkt. 29 - Order (Discovery and *Brady*) (Feb. 6, 2006);

JA 15       Dkt. 307 - Carlos David Caro's Motion for Exculpatory Evidence Related to Penalty Phase Information (Oct. 3, 2006);

JA 22       Dkt. 316 - Notice of Filing of Affidavit of Declaration of Mark Cunningham, Ph.D. (Oct. 16, 2006);

JA 49       Dkt. 343 - Memorandum Opinion (Magistrate Judge) (Nov. 8, 2006) (granting Defendant's Motion at Dkt. 307);

JA 61       Dkt. 344 - Order (Nov. 8, 2006) (re: Dkt. 343);

JA 65       Dkt. 345 - Objection to Order of the Magistrate Judge (Nov. 8, 2006);

JA 66       Dkt. 346 - Carlos David Caro's Response to Objection to Magistrate Judge's Order of November 8, 2006 (Nov. 9, 2006);

JA 68       Transcript, Hearing November 13, 2006 (District Court ruling on Dkt. 307 and Government objection to Magistrate Judge's Memorandum Opinion, Dkt. 343);

JA 109      Dkt. 353 – Declaration of Tomas J. Gomez (Nov. 16, 2006);

JA 115      Dkt. 354 – Declaration of Jennifer Batchelder (Nov. 16, 2006);

JA 116      Dkt. 355 – Declaration of Linda Thomas (Nov. 16, 2006);

JA 118      Dkt. 356 – Declaration of Joetta A. Terrell (Nov. 16, 2006);

---

[1] All references to Case No. 1:06CR00001-JPJ are to "Dist. Ct." and the docket number.

JA 121    Dkt. 358 – Response to Government's Affidavits (Nov. 17, 2006);

    JA 126    Dkt. 358-1 Declaration of Mark Cunningham (Nov. 17, 2006);

    JA 131    Dkt. 358-2  Appendix A-H (Nov. 17, 2006);

JA 144    Dkt. 363 - Opinion and Order (Nov. 20, 2006) (District Court re: objections to Magistrate Judge's ruling at hearing on Nov. 8, 2006);

JA 151    Transcript, Capital Sentencing Hearing, Feb. 5, 2007;

JA 333    Transcript, Capital Sentencing Hearing, Feb. 6, 2007;

JA 410    Transcript, Capital Sentencing Hearing, Feb. 7, 2007;

JA 583    Transcript, Capital Sentencing Hearing, Feb. 8, 2007;

JA 661    Transcript, Capital Sentencing Hearing, Feb. 12, 2007;

JA 880    Dkt. 639 – Special Verdict (Feb. 13, 2007);

JA 890    Transcript, Capital Sentencing Hearing, Feb. 13, 2007;

JA 1015    Transcript, Capital Sentencing Hearing, Mar. 30, 2007;

JA 1020    Dkt. 790 - Redacted Motion for Collateral Relief Pursuant to 28 U.S.C. § 2255 & exhibits (Mar. 22, 2013):

    JA 1220    Exhibit 1 Declaration of Mark A. Bezy (Jan. 1, 2013);

    JA 1230    Exhibit 4 Declaration of Larry A. Hammond (Jan. 8, 2013);

    JA 1255    Exhibit 5 Declaration of Stephen J. Kalista (Dec. 29, 2012);

    JA 1260    Exhibit 7 Declaration of Hans Selvog, Ph.D. (Dec. 31, 2012);

JA 1286    Exhibit 8 Declaration of Donna Marie Schwartz-Watts, M.D. (Jan. 7, 2013);

JA 1307    Exhibit 9 Declaration of James Simmons (Dec. 29, 2012);

JA 1309    Exhibit 10 Declaration of D. Malcolm Spica, Ph.D. (Jan. 4, 2013);

JA 1336    Exhibit 11 Report of Thomas M. Hyde, M.D., Ph.D. (Dec. 22, 2012);

JA 1338    Exhibit 48 Affidavit of Jeanne Dvorak (Nov. 11, 2011);

JA 1347    Dkt. 791 - Gov't's Motion to Dismiss in Response to Motion for Relief & Exhibits (June 11, 2013);

JA 1475    Exhibit 1 to Motion to Dismiss, copies of defense emails (Jan. 24, 2006);

JA 1478    Exhibit 2 to Motion to Dismiss, copies of defense emails (Dec. 12, 2006;

JA 1482    Exhibit 3 to Motion to Dismiss, copies of defense emails (June 20, 2006);

JA 1484    Exhibit 4 to Motion to Dismiss, defense Memorandum Re: Potential Caro Witnesses and Other Issues;

JA 1489    Exhibit 5 to Motion to Dismiss, copies of defense emails (Sept. 25, 2006);

JA 1491    Exhibit 6 to Motion to Dismiss, Memorandum, Carlos Caro, Witnesses/Records by Location (May 15, 2006);

JA 1497    Exhibit 7 to Motion to Dismiss, Timeline Narrative - Chronological Critical Incidents and Developmental History of Carlos Caro;

JA 1513    Dkt. 797 - Carlos David Caro's Response to Motion to Dismiss (Oct. 9, 2013);

    JA 1687    Ex. 61 Letter from A. Giorno to Carlos David Caro (Dec. 30, 2004);

    JA 1689    Ex. 62 Supplemental Declaration of Mark Bezy (Oct. 8, 2013);

    JA 1692    Ex. 63 Letter from James W. Marquart to Stephen Kalista (Dec. 6, 2006);

    JA 1695    Ex. 64 Letter from A. Giorno to S. Kalista (Dec. 29, 2006);

    JA 1697    Ex. 65 Letter from D. Malcolm Spica, Ph.D. to Robin Konrad (Sept. 10, 2013);

    JA 1700    Ex. 66 Email from H. Selvog to S. Kalista (with Selvog CV attached) (Mar. 15, 2006);

    JA 1710    Ex. 67 Email from A. Giorno to S. Kalista (Sept. 28, 2006);

    JA 1712    Ex. 68 Supplemental Declaration of Donna Marie Schwartz-Watts, M.D. (Oct. 7, 2013);

    JA 1739    Ex. 69 Memorandum from H. Selvog to D. Mullikin, S. Kalista, and J. Simmons (May 15, 2006), re: Witnesses/Records by Location;

    JA 1745    Ex. 70 Memorandum from W. Johnson re: Special Handling Instructions for Carlos David Caro (Dec. 19, 2003);

    JA 1747    Ex. 71 Declaration of Juror #33 (Sept. 26, 2013);

    JA 1750    Ex. 72 Declaration of Susan Richardson (Oct. 9, 2013);

JA 1770    Ex. 73 Federal Bureau of Prisons Transfer Order for
Carlos David Caro (Oct. 11, 2005);

JA 1772    Ex. 77 Declaration of Petra Herrera (Oct. 2, 2013);

JA 1774    Dkt. 800 - Defendant's First Motion for Leave to Conduct Discovery
and Preliminary Request for an Evidentiary Hearing and Expansion of
the Record (Oct. 25, 2013);

JA 1809    Dkt. 803 - Government's Response to Defendant's First Motion for
Leave to Conduct Discovery and Preliminary Request for an
Evidentiary Hearing and Expansion of the Record (Nov. 15, 2013);

JA 1816    Transcript, Oral Argument, Nov. 25, 2013;

JA 1889    Dkt. 808 – Opinion (May 4, 2015);

JA 1984    Dkt. 810 – Certificate of Appealibility (May 4, 2015);

JA 1985    Dkt. 811 – Carlos David Caro's Motion to Alter or Amend Judgment
Pursuant to Federal Rule of Civil Procedure Rule 59(e) (June 1,
2015);

JA 1997    Dkt. 813 – Government's Response to Motion to Alter or Amend
Judgment (June 18, 2015);

JA 2008    Dkt. 816 – Reply to Government's Response to Motion to Alter or
Amend Judgment (July 6, 2015);

JA 2015    Dkt 818 – Order Denying Rule 59(e) Motion (Nov. 6, 2015);

JA 2019    Dkt. 819 – Carlos David Caro's Notice of Appeal (Jan.4, 2016).

CLERK'S OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED

JAN - 3 2006

JOHN F. CORCORAN, CLERK
BY: _____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION
January, 2006 Session

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal Number 1:06CR00001 |
| | ) | |
| v. | ) | In violation of: |
| | ) | |
| | ) | Title 18, U.S.C. §§ 7 & 1111 |
| CARLOS DAVID CARO | ) | |

## INDICTMENT

### COUNT ONE
### FIRST DEGREE PRE-MEDITATED MURDER

The Grand Jury charges:

1.    That on or about December 17, 2003, in the Western Judicial District of Virginia, within the United States Penitentiary, Lee County, Virginia, a place within the special maritime and territorial jurisdiction of the United States, the defendant, CARLOS DAVID CARO, willfully, deliberately, maliciously, and with premeditation and malice aforethought, did unlawfully kill Roberto Sandoval.

2.    All in violation of Title 18, United States Code, Sections 7 & 1111.

JA-1

## NOTICE OF SPECIAL FINDINGS REGARDING COUNT ONE

The Grand Jury further finds:

Pursuant to the provisions of Title 18, United States Code, Sections 3591 and 3592, the following factors exist regarding defendant CARLOS DAVID CARO'S commission of the offense charged in Count One:

A.    CARLOS DAVID CARO was then 18 years of age or older at the time of his commission of the offense.

B.    Statutory Intent Factors Enumerated Under Title 18, United States Code, Section 3591(a)(2).

      i.    Intentional Killing: Section 3591(a)(2)(A).

          CARLOS DAVID CARO intentionally killed Roberto Sandoval.

      ii.    Intentional Infliction of Serious Bodily Injury: Section 3591(a)(2)(B)

          CARLOS DAVID CARO intentionally inflicted serious bodily injury that resulted in the death of Roberto Sandoval.

      iii.    Intentional Participation in a Lethal Act: Section 3591(a)(2)(C).

          CARLOS DAVID CARO intentionally participated in an act, contemplating that the life of Roberto Sandoval be taken or intending that lethal force be used in connection with a person, other than one of the participants in the offense, namely, Roberto Sandoval, and which directly resulted in the death of Roberto Sandoval.

      iv.    Intentionally Creating a Grave Risk of Death: Section 3591(a)(2)(D).

          CARLOS DAVID CARO intentionally and specifically engaged in an act of violence knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life,

2

and said act resulted directly in the death of Roberto Sandoval.

C.    Aggravating Factors Enumerated under Title 18, United States Code, Section 3592

    i.    CARLOS DAVID CARO has been previously convicted of two state or federal offenses punishable by a term of imprisonment of more than one year, committed on different occasions, involving the distribution of a controlled substance.[18 U.S.C. § 3592(c)(10)]

    ii.    CARLOS DAVID CARO had been previously convicted of violating Title II or Title III of the Comprehensive Drug Abuse Prevention and Control Act of 1970 for which a sentence of 5 or more years may be imposed. [18 U.S.C. § 3592(c)(12)]

    iii.    CARLOS DAVID CARO committed the offense after substantial planning and premeditation to cause the death of a person. Title 18, United States Code, Section [18 U.S.C. § 3592(c)(9)].

A TRUE BILL, this 3rd day of January 2006.

_____
FOREPERSON

_____
JOHN L. BROWNLEE
UNITED STATES ATTORNEY

3

JA 3

IN THE
UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION

UNITED STATES OF AMERICA  )
             )
             )
vs.            )  Criminal No. 1:06CR00001
             )
             )
CARLOS DAVID CARO    )

### NOTICE OF INTENT TO SEEK THE DEATH PENALTY

COMES NOW the United States of America, pursuant to 18 U.S.C., § 3593(a), by and through its undersigned counsel, and notifies the Court and the defendant in the above-captioned case, CARLOS DAVID CARO, that the Government believes the circumstances of the offense charged in Count One of the Indictment are such that, in the event of a conviction, a sentence of death is justified, and that the Government will seek the sentence of death for this offense: Title 18, United States Code, Section 1111 which carries a possible sentence of death.

The Government proposes to prove the following factors as justifying a sentence of death under the offense charged in Count One of the Indictment, the allegations of which are fully realleged and incorporated herein by reference:

A.  CARLOS DAVID CARO was then 18 years of age or older at the time of his commission of the offense.

B.  Statutory Intent Factors Enumerated Under Title 18, United States Code, Section 3591(a)(2).

    i.  Intentional Killing: Section 3591(a)(2)(A).
      CARLOS DAVID CARO intentionally killed Roberto Sandoval.

JA 4

ii.  <u>Intentional Infliction of Serious Bodily Injury: Section 3591(a)(2)(B)</u>
CARLOS DAVID CARO intentionally inflicted serious bodily injury that
resulted in the death of Roberto Sandoval.

iii.  <u>Intentional Participation in a Lethal Act: Section 3591(a)(2)(C).</u>
CARLOS DAVID CARO intentionally participated in an act,
contemplating that the life of Roberto Sandoval be taken or intending that
lethal force be used in connection with a person, other than one of the
participants in the offense, namely, Roberto Sandoval, and which directly
resulted in the death of Roberto Sandoval.

iv.  <u>Intentionally Creating a Grave Risk of Death: Section 3591(a)(2)(D).</u>
CARLOS DAVID CARO intentionally and specifically engaged in an act
of violence knowing that the act created a grave risk of death to a person,
other than one of the participants in the offense, such that participation in
the act constituted a reckless disregard for human life, and said act
resulted directly in the death of Roberto Sandoval.

C.  <u>Aggravating Factors Enumerated under Title 18, United States Code, Section 3592</u>

i.  CARLOS DAVID CARO has been previously convicted of two state or
federal offenses punishable by a term of imprisonment of more than one
year, committed on different occasions, involving the distribution of a
controlled substance.[§3592(c)(10)]

ii.  CARLOS DAVID CARO had been previously convicted of violating Title
II or Title III of the Comprehensive Drug Abuse Prevention and Control
Act of 1970 for which a sentence of 5 or more years may be imposed.
[§3592(c)(12)]

iii.  CARLOS DAVID CARO committed the offense after substantial
planning and premeditation to cause the death of a person. Title 18, United
States Code, Section 3592(c)(9).

D.  <u>Non-Statutory Aggravating Factors under 18 U.S.C. 3593(a)</u>

The non-statutory aggravating factors which the Government will seek to prove as the basis
for the death penalty which are applicable to the homicide and to the defendant under Count One
are as follows.

2

JA 5

i.  Victim Impact. The victim maintained close contact with his family, and the murder of the victim had a significant impact on his family and friends. *Payne v. Tennessee*, 501 U.S. 808 (1991). Specifically, the surviving members of the victim's family have been deprived of the benefits of having their son and father in their lives. Likewise, his friends have been deprived of the benefits of social interaction with the victim. As a result, their lives have changed and they have experienced significant emotional trauma.

ii.  Future Dangerousness.

a. *Continuing pattern of violence and recidivist conduct*: While imprisoned, CARLOS DAVID CARO has occupied a leadership position in a violent gang and, through his connection with the gang, has been involved in physical assaults on other inmates on at least two occasions. He also has committed numerous prior felony drug offenses.

b. *Low rehabilitative potential*: CARLOS DAVID CARO has a lengthy history of illegal conduct outside the prison setting and a significant history of violent and non-violent rules violations while in custody. Through his words and recidivism, he has demonstrated that the threat of incarceration does not deter his misconduct.

Among CARO'S in-custody misconduct, he participated in a July 11, 2002 gang-based assault on other inmates at the United States Prison in Oakdale. When questioned about his involvement in the Oakdale incident, CARO expressed a lack of concern about being prosecuted because he was already serving a 30-year sentence. He implied his belief that government officials could not meaningfully punish him in view of his pre-existing sentence. CARO expressed a similar lack of concern about the consequences arising from his August 29, 2003 attempted murder of Ricardo Benevidez, whom he stabbed 29 times.

c. *Lack of remorse*: CARLOS DAVID CARO has not expressed remorse for his violent acts, including (but not limited to) the murder of Sandoval, the stabbing of Benevidez and the gang-based assault in Oakdale. After killing Sandoval, CARO referred to the victim in vulgar terms and taunted guards by asking when he would receive a new cell mate.

3

JA 6

The government gives further notice that in support of imposition of the death penalty it intends to rely upon all the evidence admitted by the Court at the guilt phase of the trial and the offenses of conviction as described in the Indictment as they relate to the background and character of the defendant, his moral culpability and the nature and circumstances of the offense of conviction.

Respectfully submitted,

JOHN L. BROWNLEE
UNITED STATES ATTORNEY

Dated: January 11, 2006

s/ Anthony P. Giorno
Assistant United States Attorney
Western District of Virginia
VSB #15830
United States Attorney's Office
P.O. Box 1709
Roanoke, VA 24008
TEL (540) 857-2878
FAX (540) 857-2614

## CERTIFICATE OF SERVICE

I hereby certify that I have this 11th day of January, 2006, electronically filed the Notice of Intent to Seek the Death Penalty with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following: Stephen J. Kalista, Esq., P.O. Box 1186, Big Stone Gap, Virginia 24219, and mailed by United States Postal Service a copy of the document to the following non-CM/ECF participant: James Simmons, Esq., 1208 17th Avenue South, Nashville, Tennessee 37212-2802, counsel for the defendant.

s/Anthony P. Giorno
Assistant United States Attorney
VSB Code # 15830

4

JA 7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION

UNITED STATES OF AMERICA
v.                                          1:06CR0001
CARLOS DAVID CARO,
    DEFENDANT

MOTION FOR EXCULPATORY EVIDENCE

Now comes Carlos David Caro, the Defendant, by counsel, and moves

this Court to require the government to reveal to Defendant's counsel and to

permit inspection and copying of all information and material known to the

government or under its control which may be favorable to the Defendant on

the issues of guilt or punishment within the scope of Brady v. Maryland, 373

U.S. 83 (1963), and the cases interpreting that decision, see e.g. Kyles v.

Whitely, 131 L.Ed. 2d 490 (1995); United States v. Agurs, 427 U.S. 97

(1976); and Giglio v. United States, 405 U.S. 150 (1972).

Defendant moves the Court to require the government to disclose to

the Defendant's counsel any and all evidence which might arguably tend to

diminish the credibility of any and all persons that the United States, in all

likelihood, intends to call as witnesses, including, but not limited to, the

existence and substance of any plea agreements, payments of money or any

other things of value, promises of immunity, leniency or preferential

treatment within the scope of Giglio, supra., and Napue v. Illinios, 360 U.S.

264 (1959), and any and all consideration or promises of consideration given to any witness to be called for the government. By "consideration" is meant absolutely anything, whether bargained for or not, which could be of value or use to a witness or to persons of concern to the witness, including, but not limited to criminal, civil or tax immunity grants, relief from forfeiture, assistance or favorable treatment or recommendations with respect to any criminal, civil, tax court, court of claims, any administrative or other legal dispute with the government or any other party, payment of money or fees, witness fees or special witness fees, provision of food, clothing, shelter, transportation or other like benefits, placement in a "Witness Protection Program," transfer to a certain institution, and anything else which arguably could result in an interest or bias in the witness in favor of the government against the defense or an inducement to testify or to color testimony.

Defendant specifically requests disclosure of all information concerning the content of any plea negotiations between the United States and its witnesses and all promises and threats, express or implied, directed to the witness.

Defendant requests disclosure of any and all records of polygraph examinations given to government witnesses as well as any information concerning the refusal of any government witness to submit to such an

JA 9

examination in connection with this case.

Defendant further requests disclosure of the criminal records of any and all government witnesses, and any other information about the witnesses which could have a bearing on their credibility, including any pending charges; information known to the United States or any of its agents concerning the witness's drug or alcohol abuse, involvement with controlled substances, and narcotics abuse. This request includes, but is not limited to, all information regarding all prior material acts of misconduct of the witnesses and all psychiatric reports and evidence of narcotics addiction or usage by the witnesses.

Defendant further requests disclosure and production by the government of any statements, written or oral, of any government witnesses which are favorable to the Defendant and the names and addresses of any and all potential witnesses who possess, or may know of, any exculpatory evidence.

Defendant further moves the Court to require the government to disclose any and all statements of witnesses which vary in material detail, either internally or with other statements of the same witness, or with statements of other witnesses, such statements being evidence which tend to diminish the credibility of such witnesses pursuant to Giles v. Maryland, 386

3

JA 10

U.S. 66 (1967).

The Defendant further moves the Court to require the government to disclose any and all information concerning untruthful or false statements made by government witnesses, and any and all information concerning the lack of credibility of any government witness including reputation for untruthfulness or fraud, previous criminal activity, dishonesty, prior misconduct reflecting on truthfulness, false exculpatory statements made by the government witness or other inconsistent statements.

The Defendant further moves the Court to require the government to disclose the substance of any co-conspirator statements that the government intends to offer into evidence pursuant to Federal Rule of Evidence 801(d)(2)(e) and any information or records concerning the lack of credibility of such co-conspirator or unindicted co-conspirator including reputation for untruthfulness or fraud, previous criminal activity, dishonesty, any prior misconduct reflecting untruthfulness, false exculpatory statements made by the declarant or other inconsistent statements.

Defendant further specifically moves the Court to require the government to provide to the Defendant with all Brady/Agurs/Giglio material forthwith, noting that where there is evidence having a "material bearing on defense preparation", the government should provide the defense

4

JA 11

with such material, especially exculpatory material, in sufficient prior to trial

to allow the Defendant to use such evidence in a meaningful way.

CARLOS DAVID CARO
BY COUNSEL

s/_____
Stephen J. Kalista, Esq.
Counsel for Defendant
VSB No. 15603
P.O. Box 1186
Big Stone Gap VA  24219
Ph. 276 523 1950
Fax 276 523 1949
Email: skalista@mounet.com

s/_____
James Simmons, Esq.
Counsel for Defendant
TN Bar No. 10107
1208 17th Avenue South
Nashville TN  37212
Ph. 615 329 9122
Fax 615 320 4159
Email: jas52@earthlink.net

Certificate

I certify that on January 27, 2006, I electronically filed the foregoing with the clerk of the Court using the CM/ECF system which will send the notification of such filing to the following:  Anthony Giorno, AUSA, and John Brownlee, USA.

s/_____
Stephen J. Kalista

5

JA 12

# UNITED STATES DISTRICT COURT.
## WESTERN DISTRICT OF VIRGINIA
### 'Abingdon Division

UNITED STATES OF AMERICA     )
                                  )
     v.                           )     Case Number: **1:06cr00001**
                               )     <u>**ORDER**</u>
CARLOS DAVID CARO,         )
     Defendant              )

This matter came before the undersigned on the following discovery motions, (collectively, "Defendant's Discovery Motions"):

1.     Motion For Discovery, (Docket Item No. 18);

2.     Motion For **R**elease of Brady Materials, (Docket Item No. 19);

3.     Motion For Disclosure, (Docket Item No. 20);

4.     Motion To Produce Grand Jury Testimony, (Docket Item No. 21);

5.     Motion To Produce Witness Statements, (Docket Item No. 22);

6.     Motion To Produce Bureau of Prison Inmate Files, (Docket Item No. 23); and

7.     Motion For Bill Of Particulars, (Docket Item No. 26).

Upon consideration of Defendant's Discovery Motions, it is **ORDERED** as follows:

1.     The United States Attorney's office has notified the court that it intends

1

JA 13

to offer defense counsel "open file discovery" in this case. *See* Response to Motion for Bill of Particulars, (Docket Item No. 28). Therefore, the court assumes that defense counsel will be afforded the opportunity, upon request, at a reasonable time prior to trial, to inspect and copy relevant information, including but not limited to the materials described in Fed. R. Crim. P. 16(a)(1) and sought by Defendant's Discovery Motions. Counsel are directed to cooperatively arrange a suitable date for such disclosures. No further order or directive of the court is required, unless the parties advise the court of any disputes regarding disclosure. Note should be taken of the defendant's disclosure obligations under Fed. R. Crim. P. 16(b), and the parties shall agree as to a deadline date for any such defendant's disclosures.

2. To the extent that the defendant seeks disclosure of material described in *Brady v. Maryland*, 373 U.S. 83 (1963), and related cases, including *United States v. Giglio,* 405 U.S. 150 (1972) (impeachment evidence), the government's obligations exist regardless of any specific direction by the court. *See United States v. Holmes,* 722 F.2d 37, 41 (4th Cir. 1983).

3. Otherwise than as set forth herein, the Defendant's Discovery Motions are DENIED.

ENTER: February 6, 2006.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE

2

JA 14

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION

UNITED STATES OF AMERICA
v.                                          1:06CR0001
CARLOS DAVID CARO,
        DEFENDANT

CARLOS DAVID CARO'S MOTION FOR EXCULPATORY EVIDENCE
RELATED TO PENALTY PHASE INFORMATION

Now comes Carlos David Caro, the Defendant, by counsel, and moves

this Court to require the government to reveal to Defendant's counsel and to

permit inspection and copying of all information and material known to the

government or under its control which may be favorable to the Defendant on

the issue of punishment within the scope of Brady v. Maryland, 373 U.S.

83 (1963), and the cases interpreting that decision, see e.g. Kyles v. Whitely,

131 L.Ed. 2d 490 (1995); United States v. Agurs, 427 U.S. 97 (1976); and

Giglio v. United States, 405 U.S. 150 (1972).

The Defendant has previously filed a motion for exculpatory evidence

(Docket No. 19) and the Court has entered an agreed order on February 10,

2006, (Docket No. 35) directing the Government to provide to the Defendant

any evidence of an exculpatory nature as defined in Brady v. Maryland, 373

U.S. 83 (1973), and those cases interpreting that opinion. It is anticipated

that at a capital sentencing proceeding the Government will present evidence

JA 15

in its case in chief that the Defendant will be a danger in the future because of his killing of an inmate while incarcerated, his previous acts of violence while incarcerated, and his membership position in a prison gang, and that incarceration will not deter his future misconduct. The Defendant would rebut this evidence and present evidence in mitigation in part that the Defendant can be safely housed, managed and controlled by and within the Bureau of Prisons; and that prior to his indictment, the Defendant was confined for a time without incident at Florence ADMAX Colorado, the only super-maximum facility within the Bureau of Prisons' system.

The prosecutor has a duty to disclose all evidence favorable to the defendant which is "material either to guilt or to punishment." (Emphasis added). Brady v. Maryland, 373 U.S. 83, 87 (1963). Evidence is material as long as there is a strong indication that it will "play an important role in uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment or rebuttal." United States v. Lloyd, 992 F. 2d. 348, 351 (D.C. Cir. 1993) (internal quotation marks and citations omitted); See also United States v. NYNEX Corp., 781 F. Supp. 19 (D.D.C. 1991) (government should interpret "materiality" requirement broadly to ensure fairness to the defendant.) Evidence is material if "there is a reasonable probability that, had the evidence been disclosed to the defense,

2

the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." United States v. Bagley, 473 U.S. 667, 682 (1985) (internal quotations omitted).  Knowledge or possession of exculpatory evidence is imputed to the prosecutor as the acting agent of the government, or "arm of the prosecution."  See United States v. Wood, 57 F.3d 733, 737 (9th Cir. 1995).  Most courts have ruled that Bureau of Prisons files are within the possession and control of the United States Attorney.  See United States v. Santiago, 46 F.3d. 885, 893 (9th Cir. 1995).  Where counsel cannot agree on whether certain materials are subject to disclosure, the Supreme Court has approved *in camera* inspection and determination by the trial court. Pennsylvania v. Ritchie, 480 U.S. 39 (1987).

Defendant moves the Court to require the government to disclose to the Defendant's counsel any and all evidence which might arguably tend to diminish the credibility of any and all persons that the United States, in all likelihood, intends to call as witnesses at a possible capital sentencing proceeding.

Defendant further requests disclosure and production by the government of any statements, written or oral, of any government witnesses which are favorable to the Defendant at a capital sentencing proceeding and

3

JA 17

the names and addresses of any and all potential witnesses who possess, or may know of, any exculpatory evidence at a capital sentencing proceeding.

Defendant further moves the Court to require the government to disclose any and all statements of witnesses which vary in material detail, either internally or with other statements of the same witness, or with statements of other witnesses, such statements being evidence which tend to diminish the credibility of such witnesses pursuant to Giles v. Maryland, 386 U.S. 66 (1967).

Defendant further specifically moves the Court to require the government to provide to the Defendant with all Brady/Agurs/Giglio material forthwith, noting that where there is evidence having a "material bearing on defense preparation", the government should provide the defense with such material, especially exculpatory material, in sufficient time prior to trial to allow the Defendant to use such evidence in a meaningful way.

The Defendant further moves the Court to require the Government to immediately disclose to the Defendant the following information which is material and will play an important role in uncovering admissible evidence, aid defendant's expert witnesses' preparation, corroborate their anticipate testimony, and impeach and rebut the government's anticipated expert witnesses' testimony on its case in chief at a capital sentencing proceeding.

4

JA 18

A. Data from Florence ADMAX Colorado showing 1. median length of stay, 2. range of length of stay, and 3. standard deviation of the distribution of length of stay at Florence ADMAX for all inmates since it was opened in 1994 to the present time.

B. Data from Florence ADMAX Colorado showing how many inmates who were admitted to Florence ADMAX from the date of its opening to the present time continue to be confined there, broken down by name, register number, offense conduct that caused them to be transferred to Florence ADMAX, and Security Threat Group classification.

C. Movement sheets from the Bureau of Prisons on every inmate currently at Florence ADMAX who has killed another inmate within the Bureau of Prisons within the last twenty years.

D. Investigative reports on all inmate homicides at Florence ADMAX since it was opened including any "after action reports" indicating any operational or institutional changes in response to each killing and final memorandum from SIS to the Warden of the institution regarding each killing.

E. Regarding each inmate of the above (subparagraph D.) involved in an inmate killing within Florence ADMAX since it opened, the respective inmate's "Chronological Disciplinary Record" and "Inmate History ADM-REL" and/or movement sheets within the Bureau of Prisons.

F. Records of any assaultive conduct by an inmate in the Control Unit at Florence ADMAX from the time it opened to the present date, showing the inmate involved, register number, Security Threat Group classification, date of occurrence, description of conduct, staff member victim or inmate victim of each assault. Assaultive conduct can be identified and grouped by using the Bureau of Prison's misconduct codes, including 100 Level Prohibited Acts (Killing,100; Assault, 101; Escape, 102; Weapon, 104; Riot/Encourage Riot, 105/106) and 200 Level Prohibited Acts (Escape, 200; Fighting, 201; Assault, 224).

G. Names, register numbers, assignment rationale, Security Threat Group classification, and tenures of all inmates in the Control Unit at Florence ADMAX since it opened to the present time showing the date

JA 19

assigned, the reason assigned, and the date exiting the Control Unit to lesser security or release from the BOP, and reason leaving the Control Unit.

H. Names of all correctional officers working on the Control Unit at Florence ADMAX showing date assigned and date left.

I. Disciplinary Incident Reports on all inmates in the Control Unit at Florence ADMAX from its opening to the present time showing inmate name, register number, date of offense, details of the disciplinary incident, and Security Threat Group classification.

J. Correctional Services Significant Incidents Data on level and frequency of violence at each security level at Florence ADMAX by year from and including 2001 to and through 2006.

K. Movement sheets from the Bureau of Prisons on every inmate who has killed another inmate within the Bureau of Prisons within the last twenty years.

L. Investigative reports on all inmate homicides within the Bureau of Prisons within the last twenty years including any "after action reports" indicating any operational or institutional changes within the institution or within the Bureau of Prisons in response to each killing and any final memorandums from SIS to the Warden of each institution regarding each killing.

M. Regarding each inmate in the above (Subparagraph L.) involved in an inmate killing with the Bureau of Prisons within the last twenty years, the respective inmate's "Chronological Disciplinary Record" and "Inmate History ADM-REL" and/or movement sheets within the Bureau of Prisons.

This information is in the control of the government and the defendant will be prejudiced in its ability to rebut the government's case in chief at a capital sentencing proceeding and to present its expert evidence in mitigation at a capital sentencing proceeding should the Court not require its disclosure to the defendant.

6

JA 20

Wherefore, the Defendant prays that this Court enter an order requiring the Government to forthwith provide to the defense the information requested in this motion.

CARLOS DAVID CARO
BY COUNSEL

s/_____
Stephen J. Kalista, Esq.
Counsel for Defendant
VSB No. 15603
P.O. Box 1186
Big Stone Gap VA  24219
Ph. 276 523 1950
Fax 276 523 1949
Email:  skalista@mounet.com

s/_____
James Simmons, Esq.
Counsel for Defendant
TN Bar No. 10107
1208 17th Avenue South
Nashville TN  37212
Ph. 615 329 9122
Fax 615 320 4159
Email:  jas52@earthlink.net

Certificate

I certify that on October 3, 2006, 1 electronically filed the foregoing with the clerk of the Court using the CM/ECF system which will send the notification of such filing to the following:  Anthony Giorno, AUSA, and John Brownlee, USA.

s/_____
Stephen J. Kalista

7

JA 21

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF VIRGINIA**
**ABINGDON DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **vs.** | ) | **Criminal Number** |
| | ) | **1:06CR00001** |
| **CARLOS DAVID CARO** | ) | |

**CARLOS DAVID CARO'S NOTICE OF FILING**
**OF DECLARATION AND AFFIDAVIT**

COMES now the accused, CARLOS DAVID CARO, by and through counsel, Stephen J. Kalista and James A. Simmons, and hereby gives notice of the filing of a Declaration and Affidavit of Mark D. Cunningham, Ph.D., ABPP, attached hereto, in support of the Defendant's Motions for Issuance of Subpoenas Duces Tecum and Motions for Discovery and for Exculpatory Evidence related to a capital sentencing proceeding in this cause.

Respectfully submitted,

s/_____
Stephen J. Kalista, Esq.
Counsel for Defendant
VSB No. 15603
P.O. Box 1186
Big Stone Gap, VA 24219
Ph. 276-523-1950
Fax 276-523-1949
email:  skalista@mounet.com

s/_____
James A. Simmons, Esq.
Counsel for Defendant
TN Bar ID No. 10107
1208 17th Avenue South
Nashville, TN  37212
Ph. 615-329-9122
Fax 615-320-4159
Email: jas52@earthlink.net

JA 22

**CERTIFICATE OF SERVICE**

I do hereby certify that on October 16, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF filing system which will send the notification of such filing to the following:

Anthony Giorno, AUSA, and John Brownlee, USA.

s/_____
Stephen J. Kalista, Esq.

# MARK D. CUNNINGHAM, PH.D., ABPP

Clinical & Forensic Psychology

*Board Certified in Forensic Psychology, American Board of Professional Psychology*
417 Oak Bend, Suite 260    Lewisviile, Texas 75067
972-459-0658   Fax 972-459-0958   mdc@markdcunningham.com

*Licensed psychologist: Arizona #3662, Arkansas #98-17P, Colorado #2305, Connecticut #846, Idaho #PSY-379, Illinois #071-006010, Indiana #20041376A, Louisiana #794, New Mexico #0768, Oklahoma #1002, Oregon #1333, South Carolina #764, Tennessee #2255, Texas #22351*

## Declaration and Affidavit

Re: *United States v Carlos David Caro*, 1:06CR0001 Government's Response to Defense Subpoena Duces Tecum

I, Mark D. Cunningham, Ph.D., ABPP, hereby swear and affirm:

1.      I am a clinical and forensic psychologist, licensed as a psychologist in the States of Arizona, Arkansas, Colorado, Connecticut, Idaho, Indiana, Illinois, Louisiana, New Mexico, Oklahoma, Oregon, South Carolina, Tennessee, and Texas. I am over age 21. 1 have personal knowledge of the facts contained in this declaration and am competent to testify about them.

2.      This declaration has been prepared at the request of defense counsel for Mr. Carlos David Caro, who have asked me to describe the relevance of the information requested in defense Subpoenas Duces Tecum and Motions for Discovery and for Exculpatory Evidence related to my capital sentencing violence risk assessment and/or associated appraisal of BOP security measures and confinement conditions that can be applied to Mr. Caro to substantially reduce the probability of serious prison violence.

*General qualifications:*

3.      I received a Bachelor's degree in Psychology from Abilene Christian College in 1973, a Master's degree in Psychology from Oklahoma State University in 1976, and a Ph.D. in Clinical Psychology from Oklahoma State University in 1977. This doctoral training program in clinical psychology was accredited by the American Psychological Association. I completed a one-year APA accredited internship in Clinical Psychology at the National Naval Medical Center of Bethesda, Maryland. I subsequently served as an active duty clinical psychologist at the Naval Submarine Medical Center in Groton, Connecticut from 1978 to 1981 where I was decorated for my professional contributions. I was first licensed as a psychologist in the State of Connecticut during this U.S. Navy tenure. I did two years of part-time post-doctoral study at the Yale University School of Medicine, where I was recognized as the outstanding trainee. I was an assistant professor of psychology at

JA 24

*U.S. v Caro*, Declaration and Affidavit Regarding Government's Response
Mark D. Cunningham, Ph.D., ABPP, 10-13-06

Hardin-Simmons University in Abilene, Texas from 1981 to 1983. I have maintained a private practice in clinical and forensic psychology with offices in Texas since 1981. I have participated in extensive continuing education in the area of forensic psychology, and more specifically, capital sentencing evaluations.

*Specific qualifications:*

4.      I am one of approximately 220 psychologists who are board certified in forensic psychology by the American Board of Forensic Psychology, a specialty board of the American Board of Professional Psychology (ABPP). This credential is intended to signify the highest levels of expertise and practice in forensic psychology.

5.      I have been recognized as a clinical and forensic psychology expert in testifying regarding sentencing determination issues including mitigation and capital violence risk assessment in both state and federal courts. I have testified as a clinical and forensic psychology expert regarding sentencing determination issues in approximately 75 state capital cases and approximately 40 federal capital cases. I have been recognized as an expert in clinical and/or forensic psychology in state and/or federal district courts in Arizona, Alabama, Arkansas, California, Colorado, Florida, Georgia, Idaho, Illinois, Indiana, Iowa, Louisiana, Maryland, Kansas, Massachusetts, Michigan, Missouri, New Jersey, New Mexico, New York, North Carolina, Nevada, Oklahoma, Oregon, Pennsylvania, Puerto Rico, South Carolina, Tennessee, Texas, Virginia, Washington, and West Virginia. I have never failed to qualify as an expert in clinical and/or forensic psychology.

*Scholarship specific to capital sentencing issues:*

6.      As my curriculum vitae will demonstrate, I am extensively involved in research and the authoring of scholarly publications relevant to violence risk assessment in a prison context. These scholarly publications include peer reviewed papers addressing evidentiary standards and associated scientific support for various violence risk assessment methodologies at capital sentencing. I am lead investigator or co-investigator on large scale research projects (some published or in press, others under review or in preparation) examining inmate correlates of serious violence in prison. I am first author of the chapter on forensic psychology evaluations in death penalty cases in the well-regarded 12-volume *Handbook of Psychology*. To my knowledge, no other forensic psychology scholar in the United States has published more peer-reviewed publications and edited book chapters or case reports regarding violence risk assessment at capital sentencing and associated risk of prison misconduct. These scholarly publications include the following:

Cunningham, M. D. & Reidy, T. J. (1998). Integrating base rate data in violence

2

JA 25

*U.S. v Caro*, Declaration and Affidavit Regarding Government's Response
Mark D. Cunningham, Ph.D., ABPP, 10-13-06

risk assessments at capital sentencing. *Behavioral Sciences & the Law, 16*, 71-95.

Cunningham, M. D., & Reidy, T. J. (1998). Antisocial personality disorder and psychopathy: Diagnostic dilemmas in classifying patterns of antisocial behavior in sentencing evaluations. *Behavioral Sciences & the Law, 16*, 333-351.

Cunningham, M. D., & Reidy, T. J. (1999). Don't confuse me with the facts: Common errors in violence risk assessment at capital sentencing. *Criminal Justice and Behavior, 26*, 20-43.

Reidy, T. J., Cunningham, M. D. & Sorensen, J. (2001). From death to life: Prison behavior of former death row inmates in Indiana. *Criminal Justice and Behavior, 28*, 62-82.

Cunningham, M. D. & Reidy, T. J. (2001). A matter of life or death: Special considerations and heightened practice standards in capital sentencing evaluations. *Behavioral Sciences & the Law, 19*, 473-490.

Cunningham, M. D. (2002). Capital sentencing [case report]. In K. Heilbrun, G. Marczyk, & D. DeMatteo, *Forensic mental health assessment: A casebook* (152-171). New York: Oxford University Press.

Cunningham, M. D. & Reidy, T .J. (2002). Violence risk assessment at federal capital sentencing: Individualization, generalization, relevance, and scientific standards. *Criminal Justice and Behavior, 29*, 512-537.

Cunningham, M. D. & Goldstein, A. M. (2003). Sentencing determinations in death penalty cases (pp. 407-436). In A. Goldstein (Ed.), *Forensic psychology* (vol. 11 of 12). I. Weiner (Ed.), *Handbook of psychology*. New York: John Wiley & Sons.

Cunningham, M. D., Sorensen, J. R., & Reidy, T. J. (2004). Revisiting future dangerousness revisited: Response to DeLisi and Munoz. *Criminal Justice Policy Review, 15*, 365-376.

Cunningham, M. D., Reidy, T. J., & Sorensen, J. R. (2005). Is death row obsolete? A decade of mainstreaming death-sentenced inmates in Missouri. *Behavioral Sciences & the Law, 23*, 307-320.

Cunningham, M. D., Sorensen, J. R., & Reidy, T. J. (2005). An actuarial model for assessment of prison violence risk among maximum security inmates. *Assessment, 12*, 40-49.

3

JA 26

*U.S. v Caro*, Declaration and Affidavit Regarding Government's Response
Mark D. Cunningham, Ph.D., ABPP, 10-13-06

Cunningham, M. D. & Sorensen, J. R. (2006).   Actuarial models for assessment of prison violence risk: Revisions and extensions of the Risk Assessment Scale for Prison (RASP). *Assessment, 13*, 253-265.

Lyon, A. D. & Cunningham, M. D. (2006) Reason not the need: Does the lack of compelling state interest in maintaining a separate death row make it unlawful? *American Journal of Criminal Law, 33*, 1-30.

Cunningham, M. D. & Sorensen, J. R. (*in press*). Nothing to lose? A comparative examination of prison misconduct rates among life-without-parole and other long-term high security inmates. *Criminal Justice and Behavior.*

Cunningham, M. D. (*in press*).  Dangerousness and death: A nexus in search of science and reason. *American Psychologist.*

Cunningham, M. D. (*pending publication*). Forensic psychology evaluations at capital sentencing. In R. L. Jackson (Ed.). *Learning forensic assessment.* Mahwah, NJ: Lawrence Erlbaum Associates, Inc.

Cunningham, M. D. (*in press*). Special issues in capital sentencing. In M.A. Conroy, P. Lyons, & P. Kwartner (Eds.), *Forensic evaluations under Texas law: Selected criminal issues.* To be published by the Capacity for Justice.

Cunningham, M. D. & Sorensen, J. R. (*in press*). Predictive factors for violent misconduct in close custody. *Prison Journal.*

7.      My scholarly activities and research regarding risk of prison violence and misconduct are ongoing, with studies both in preparation as well as papers currently under review.  To illustrate, the following scholarly papers are currently under review with peer-reviewed journals:

Cunningham, M. D. & Sorensen, J. R. (*manuscript under review*). Capital offenders in Texas prisons: Rates, correlates, and an actuarial analysis of violent misconduct.

Sorensen, J. R. & Cunningham, M. D. (*manuscript under review*).  Conviction offense and prison violence: A comparative study of murderers and other offenders.

Sorensen, J. R. & Cunningham, M. D. (*manuscript under review*). Operationalizing risk:  The influence of measurement choice on the prevalence

4

JA 27

*U.S. v Caro*, Declaration and Affidavit Regarding Government's Response
Mark D. Cunningham, Ph.D., ABPP, 10-13-06

and correlates of violence among incarcerated murderers.

8.    My scholarly activities have been noted by my peers. I am the 2006 recipient of the highly prestigious *American Psychological Association Award for Distinguished Contribution to Research in Public Policy*. The American Psychological Association, a professional organization of 150,000 members, confers this award on one psychologist annually who has made distinguished empirical and/or theoretical contribution to research in public policy, either through a single extraordinary achievement or a lifetime of work. In 2005 I was the recipient of the *Texas Psychological Association Award for Outstanding Contribution to Science*. This is an annual award in recognition of significant scientific contribution in the discovery and development of new information, empirical or otherwise, to the body of psychological knowledge. In 2004 1 was the recipient of the *National Association of Sentencing Advocates John Augustus Award*.

*Individualized Violence Risk Assessment of Carlos David Caro*

9.    An explanation of the role and significance of the information requested in the defense Subpoenas Duces Tecum and Motions for Discovery and for Exculpatory Evidence in this case necessarily requires a brief summary of the methodology for a reliable violence risk assessment.

10.    A reliable individualized assessment can be made of the likelihood that Mr. Caro will commit acts of serious violence from this point forward while confined for life in the Federal Bureau of Prison. This individualized assessment of Mr. Caro is most reliable when incorporating group statistical data from offenders sharing fundamental characteristic (e.g., convicted of the homicide of another inmate in BOP, confined at ADX, confined on the Control Unit at ADX, confined in BOP following Control Unit sanction). Such group statistical data forms an anchoring point that can be individualized utilizing case specific information. Because risk is always a function of context or preventative interventions, increased security measures can act to significantly reduce the likelihood of Mr. Caro engaging in serious violence in prison. Mr. Caro's risk of violence in the face of such increased security measures can also be projected.

*Individualization and Group Statistical Data*

11.    In order to scientifically address the question of the likelihood that Mr. Caro will seriously assault a staff member or another inmate during a capital life term, knowledge and application of the relevant group statistical data are essential.  Assertions that there are *individualized* methods for arriving at this determination, independent of group statistical data, reflects a fundamental misunderstanding of the nature, methodology, and underlying data of medical and psychological sciences.

5

JA 28

*U.S. v Caro*, Declaration and Affidavit Regarding Government's Response
Mark D. Cunningham, Ph.D., ABPP, 10-13-06

12.    Simply stated, there is no *individualized* assessment of a particular person that does not rest on group data of one sort or another.  Appraisals and predictions regarding the behavior of a given individual rely on personal or vicarious experience with the behavior of others (the group). Personal experience with groups of people, however, is limited in number and scope, as well as subject to ignorance, self-fulfilling prophesies, prejudice, misinterpretation, and distortion.

13.    Psychology exists as a science because it provides a database regarding the behavior of groups of individuals that is systematically and reliably obtained using the scientific method. All scientifically derived (as distinct from personal experiential) expert knowledge in psychology consists of published observations and research on various groups of animals and individuals. Scientific expertise in psychology then consists *solely* of knowledge about this group-derived data. Scientific evaluation, treatment, or behavioral prediction regarding a specific person relies on these collective observations and research data from a specified context.

14.    That group outcomes are relevant to individual behavior is illustrated in the greater confidence we give to a study involving 10,000 subjects than one involving 100 subjects. The larger the group studied, the more confident we are that the individualized applications are sound. As consistent findings are obtained from research on multiple groups that share the characteristic under consideration, our confidence in the application to the individual increases further.

15.    Violence risk assessment, a particular area of research and knowledge within psychology, also fundamentally relies on the accumulation of group data that are then applied to a given individual. At the point that group data are applied to a particular person, the methodology becomes individualized. Regardless of whether the violence risk assessment method is clinical (interview/testing), anamnestic (past behavioral pattern in a similar context), or explicitly group statistical; conclusions offered by an expert about a particular individual are purported to be reasonably and reliably inferred from group data. Similarly, inferences regarding violence risk from history, personality characteristics, psychological testing profiles, and diagnoses all rely on group statistical data as their scientific foundation.

16.    The base rate is the statistical prevalence of a particular behavior over a set period of time.  It is the fundamental group statistic in risk assessment and is considered to be the single most important piece of data necessary in making an accurate risk estimate (Monahan, 1981; Webster et al., 1994). Failure to anchor individual violence risk assessments to the base rate of violence in the estimated group is a common fundamental error (Monahan, 1981, 1996; Smith, 1993).  Without this anchor of a comparative reference point, individual risk estimates at capital sentencing may be little more than speculation (Cunningham & Reidy, 1999; 2001).

6

*U.S. v Caro*, Declaration and Affidavit Regarding Government's Response
Mark D. Cunningham, Ph.D., ABPP, 10-13-06

17.    When alleging future dangerousness in capital cases, the Government has routinely asserted that certain elements of the defendant's prior history are associated with his *individual* risk of violence in prison. In this assertion the Government is necessarily, if perhaps unwittingly, endorsing the proposition that *group* pattern principles and data regarding continuity of conduct apply to a particular defendant. To explain, a violence risk assessment based on a past behavior pattern such as this relies on assumptions that people as a *group* maintain similar behaviors over varying periods of time. Further it assumes that the *groups* of individuals who have had a pattern of violent and/or criminal activity in the past have a much higher continuing incidence (*base rate*) of those misdeeds – even in prison. These *group* assumptions and experiences form the basis for an *individualized* appraisal of the violence risk of a particular defendant. Again the individual appraisal is not made in a vacuum; rather the pattern of the individual is analyzed in light of the pattern history of the group.

*Federal Capital Cases Allowing Testimony regarding Group Statistical Data in Violence Risk Assessment*

18.    Group statistical methodology and data have been the dominant methodology in violence risk assessments at federal capital sentencing. This has occurred through the testimony of several different experts. I have utilized and described group statistical methodology and data in testimony regarding violence risk assessment in the following federal capital sentencing trials in responding to the Government's allegation of future dangerousness:

> U.S. v Louis Jones, Jr. (1995),  Cause No. 5:95-CR-047-C in the U.S. District Court, Northern District of Texas.
>
> U.S. v Paul Hardy, (1996), Cause No. CR94-381"C" (4) in the U.S. District Court, Eastern District of Louisiana.
>
> U.S. v Bruce Webster (1996), Cause No. 4:94-CR121-Y in the U.S. District Court, Northern District of Texas.
>
> U.S. v Trinity Ingle  (1997), Cause No. 96-60023 in the U.S. District Court, Western District of Arkansas, Hot Springs Division.
>
> U.S. v Dean Beckford (1997), Cause No. 3:96CR66-01 in the U.S. District Court, Eastern District of Virginia, Richmond Division.
>
> U.S. v Darryl Johnson  (1997), Cause No. 96 CR 379-1 in the U.S. District Court, North District of Illinois, Eastern Division.

7

JA 30

*U.S. v Caro*, Declaration and Affidavit Regarding Government's Response
Mark D. Cunningham, Ph.D., ABPP, 10-13-06

U.S. v Aquilia Marcivicci **Barnette** (1998), Criminal Docket 3:97CR23-P in the District Court of the United States of the Western District of North Carolina, Charlotte Division.

U.S. v LaFawn **Bobbitt** (1998), Criminal No. 3:97CLR169 in the District Court of the United States for the Eastern District of Virginia, Richmond Division.

U.S. v Anthony Ayeni **Jones** (1998), Cause No. CR-WMN-96-0458 in the U.S. District Court for the District of Maryland.

U.S. v Marvin **Holley** (1998), Cause No. CR96-B-0208-NE in the U.S. District Court for the Northern District of Alabama.

U.S. v Saheem **Johnson** and Raheem **Johnson** (1998), Criminal No. 97-00241-A in the U.S. District Court for the Eastern District of Virginia, Alexandria Division.

U.S. v Christopher Andre **Vialva** (2000), Criminal No. W-99-CR-070 in the U.S. District Court, Western District of Texas, Waco Division.

U.S. v Coleman Leake **Johnson, Jr.** (2001), No. 3:00CR00026 in the U.S. District Court, Western District of Virginia, Charlottesville Division.

U.S. v Keith **Nelson** (2001), Cause No. 99-00303-01-CR-W-2, in the U.S. District Court, Western District of Missouri, Western Division.

U.S. v Khalfan Khamis **Mohamed** (2001), Criminal No. 98-CR-1023:008 in U.S. District Court of New York, Southern Division.

U.S. v Julius Omar **Robinson** (2002), Cause No. 4:00-CR-260-Y in the U.S. District Court for Northern District of Texas, Fort Worth Division.

U.S. v Carl **Haskell** (2002), Cause No. 00-395-01-CR-W-2 in the U.S. District Court, Western District of Missouri, Western Division.

U.S. v Samuel **Ealy** (2002), Criminal Case No. 1:00CR104 in U.S. District Court for Western District of Virginia.

U.S. v John **Bass** (2003), 97-CR-80235 in the U.S. District Court for the Eastern District of Michigan.

8

JA 31

*U.S. v Caro*, **Declaration and Affidavit Regarding Government's Response**
**Mark D. Cunningham, Ph.D., ABPP, 10-13-06**

U.S. v Wesley Purkey (2003), Cause No. 01-308-01-CR-W-1, in the U.S. District Court, Western District of Missouri, Western Division, Missouri.

U.S. v Emile Dixon (2003), Cause No. 01 CR389 (S-2) (RJD), in the U.S. District Court, Eastern District of New York, New York.

U.S. v Nasih Ra'id (Odell Corley) (2004), Case No. 3:02 CR 116 in the U.S. District Court, Northern District of Indiana, Hammond Division.

U.S. v Xavier Williams, et al. (Michael Williams) (2005), (SI) 00-CR-1008 (NRB) in the U.S. District Court, Southern District of New York.

U.S. v Angela Jane Johnson (2005), Case No. 01-CR-3046-MWB in the U.S. District Court, Northern District of Iowa.

U.S. v John Richard Mayhew (2005), CR 2-03-165 in the U.S. District Court, Southern District of Ohio, Eastern Division.

U.S. v Kenneth Lighty, et. al (2005), Case No. PJM-03-0457, in the U.S. District Court for the District of Maryland.

U.S. v Daryl Lawrence (2006), Case No. 05 CR 11 in the U.S. District Court, Southern District of Ohio, Eastern Division.

U.S. v Jamain Williams, Vincent Williams, and Andre Cooper (2006), Case No. 01-512-5 in U.S. District Court, Eastern District of Pennsylvania.

19.     Additionally, following a proffer in the following case the Court overruled the Government's objection and agreed to allow my risk assessment testimony based on group statistical data particularized to the defendant through demographic and offense-factor data, but I was not subsequently put on by the defense to testify in front of the jury:

U.S. v Brent K. Simmons (2005), Criminal No.5:04CR30014, in the U.S. District Court for the Western District of Virginia, Harrisonburg Division.

20.     In the above instances, however, the group data applied to the federal capital defendant involved the prison record of capital offenders who had killed in the community, not prison. The application of group data to inmate-homicide offenders requires information regarding this specific population and their post-offense prison conduct.

9

JA 32

*U.S. v Caro*, **Declaration and Affidavit Regarding Government's Response**
Mark D. Cunningham, Ph.D., ABPP, 10-13-06

*Individualization and Preventative Measures*

21.    Violence risk is always a function of context. In other words, the likelihood of violence involves an interaction of the individual with environmental factors at a particular time, place and setting (Hall, 1987). Hall summarized: "Individual persons are never dangerous in toto" (p.10). Similarly, the risk of inmate violence is a function of the conditions of incarceration (Cunningham & Reidy, 1999, 2002; Cunningham, in press). Under an administrative maximum level of confinement at ADX Florence or other ultra-high security unit, an inmate is single-celled and locked down 23 hours daily, with individual or small group exercise, and shackled movement under escort.  Under such conditions of security, opportunities for serious violence toward others are greatly reduced. For example, among inmates held under a similar level of security, rates of inmate assault on a correctional officer resulting in an injury requiring more than first aid treatment occur at a rate of 6 per 10,000 inmates annually.

22.    The assertion of future dangerousness in a federal capital trial is necessarily an assertion that the defendant will commit acts of serious violence even though confined for life in prison. Implicit in this allegation is the corollary that the federal Bureau of Prisons is unable to safely contain this defendant, and thus a penalty of death is a reasonable preventive measure. Informing the jury of the capabilities of BOP to bring higher levels of security to bear would appear to be the only evidence that might respond to this implicit corollary assertion regarding a particular inmate.

*Federal Cases Allowing Testimony regarding Risk-Reducing Conditions of Confinement*

23.    In individualizing risk assessments in terms of preventive measures that can be brought to bear, I have testified regarding federal Bureau of Prisons confinement options and associated security procedures, and the impact of these on the likelihood of serious violence by the defendant, including heightened super-maximum security procedures and capabilities of ADX Florence - with utilization of photographs, schematics, and drawings of ADX - in federal capital cases including:

U.S. v Dean Beckford (1997), Cause No. 3:96CR66-01 in the U.S. District Court, Eastern District of Virginia, Richmond Division

U.S. v Darryl Johnson  (1997), Cause No. 96 CR 379-1 in the U.S. District Court, North District of Illinois, Eastern Division.

U.S. v Anthony Ayeni Jones (1998), Cause No. CR-WMN-96-0458 in U.S. District Court for the District of Maryland.

U.S. v Marvin Holley (1998), Cause No. CR96-B-0208-NE in U.S. District

10

JA 33

*U.S. v Caro*, Declaration and Affidavit Regarding Government's Response
Mark D. Cunningham, Ph.D., ABPP, 10-13-06

Court for the Northern District of Alabama.

U.S. v Saheem Johnson and Raheem Johnson (1998), Criminal No. 97-00241-A in U.S. District Court for the Eastern District of Virginia, Alexandria Division.

U.S. v Khalfan Khamis Mohamed, (2001), Criminal No. 98-CR-1023:008 in U.S. District Court of New York.

U.S. v Keith Nelson (2001), Cause No. 99-00303-01-CR-W-2, in U.S. District Court, Western District of Missouri, Western Division.

U.S. v Julius Omar Robinson (2002), Cause No. 4:00-CR-260-Y in U. S. District Court for Northern District of Texas, Fort Worth Division.

U.S. v Carl Haskell (2002), Cause No. 00-395-01-CR-W-2  in U.S. District Court, Western District of Missouri, Western Division.

U.S. v John Bass (2003), 97-CR-80235 in the U.S. District Court for the Eastern District of Michigan.

U.S. v Wesley Purkey (2003), Cause No. 01-308-01-CR-W-1, in the U.S. District Court, Western District of Missouri, Western Division, Missouri.

U.S. v Gary Sampson (2003), Cause No. 01-010384-MLW, in the U.S. District Court, District of Massachusetts, Boston, Massachusetts.

U.S. v Emile Dixon (2003), Cause No. 01 CR389 (S-2) (RJD), in the Eastern District of New York, New York.

U.S. v Dustin Honken (2004), Case No. CR-01-3047MWB in US District Court, Northern District of Iowa

US v Nasih Ra'id (Odell Corley) (2004), Case No. 3:02 CR 116 in the US District Court, Northern District of Indiana, Hammond Division

U.S. v Xavier Williams, et al. (Michael Williams) (2005), (SI) 00-CR-1008 (NRB) in the U.S. District Court, Southern District of New York.

U.S. v John Richard Mayhew (2005), CR 2-03-165 in the U.S. District Court, Southern District of Ohio, Eastern Division.

U.S. v Kenneth Lighty, et. al (2005), Case No. PJM-03-0457, in the U.S. District

11

*U.S. v Caro*, Declaration and Affidavit Regarding Government's Response
Mark D. Cunningham, Ph.D., ABPP, 10-13-06

Court for the District of Maryland.

U.S. v Daryl Lawrence (2006), Case No. 05 CR 11 in the U.S. District Court, Southern District of Ohio, Eastern Division.

U.S. v Jamain Williams, Vincent Williams, and Andre Cooper (2006), Case No. 01-512-5 in U.S. District Court, Eastern District of Pennsylvania.

*Role of Requested Data*

24.     Group data (i.e., base rate data) are fundamentally relied upon in the medical and psychological science and practice even though there are always ways in which the personal characteristics of a given individual are distinct from the group. The critical issue is not the presence of inevitable differences, rather the sharing of a common characteristic that allows these individuals to be meaningfully grouped. Notable in this regard, the BOP's entire system of inmate classification is based on group data that is applied to decisions made regarding a specific inmate.

25.     The Government has endorsed this principle by sponsoring testimony regarding rates of violence in BOP among members of Security Threat Groups (STG) in *U.S. v Darryl Johnson*, and rates of homicide in USP's (*U.S. v Catalan-Roman*). By alleging that Mr. Caro having killed another inmate in BOP is predictive of future violence in BOP, the Government is necessarily relying on a group-based assumption that such conduct is related to future misconduct. What if, for example, the BOP homicide offenders of the last 20 years - likely now totaling over 100 - had, regardless of their STG affiliation or prior disciphnary history, to a man never received another disciplinary ticket in BOP. What could be more relevant in rebutting an assertion that Mr. Caro's offense renders him likely to commit violence in BOP in the future? Once you have accepted the relevance of this proposition, then the actual rate is equally relevant.

26.     In opposition to providing information regarding the offense circumstances, movement histories, and disciphnary records of other inmate homicide offenders in BOP, the Government in its motion in its Response asserts:

The request seeks to obtain records of conduct perpetrated by inmates who may or may not be similarly situated as Caro. For example, the request is not limited to inmates who are affiliated with a violent prison gang, or who have engaged in a pattern (two or more) of physical assaults within the prison. (page 5)

27.     The Government has provided information regarding inmate killings in BOP (perpetrator, victims, brief description) in discovery in other federal capital involving homicide of an inmate. This information, however, does not include the last several years.

12

*U.S. v Caro*, **Declaration and Affidavit Regarding Government's Response**
**Mark D. Cunningham, Ph.D., ABPP, 10-13-06**

Additionally, information previously provided does not include critically important information regarding the movement and disciphnary histories of these offenders to give outcome meaning and risk assessment application to these instances.

28.    By requesting the circumstances of the inmate homicides in BOP, their disciplinary records, and their BOP custody aftermath, I am seeking data that would assist in particularizing outcomes within the inmate-homicide offenders. The broad group providing data relevant to Mr. Caro's risk assessment are inmate homicide offenders in BOP. Associated information regarding the perpetrators/victims of these offenses and summaries of the associated circumstances will allow analysis of whether prison gang membership or prior history of institutional assaults is meaningfully predictive of *post inmate homicide* misconduct in BOP. In other words, it is not possible to identify whether the individualizing characteristics posited by the Government are relevant to future institutional violence until the data specific to this group of inmate homicide offenders are examined. It is conceivable the prison gang membership is associated with a lower frequency of future institutional violence as compared to inmate homicides perpetrated by mentally ill inmates, or that offenders who are also members of prison gangs have subsequent confinement/movement histories that are *not* distinct from other inmate homicide offenders – indicating that BOP does not regard this feature as determinative of elevated future risk. Again, this information cannot be identified without inspection of the universe of inmate homicide offenders in BOP.

29.    The Government's suggestion, however, is well-taken. If not yet specified in the prior subpoena duces tecum, I request the STG status of these BOP inmate-homicide offenders at the time of these offenses.

30.    It is conceivable that the Government will argue that Mr. Caro presents a greater risk of future violence in BOP than other inmate homicide offenders because of his alleged prison gang affiliation or past history of assaults in BOP. It is not possible to test these assertions without examining the requested records regarding all of the inmate-homicide offenders in BOP.

31.    Regarding "admissibility" (page 6), the Government complains:

> If the court were to admit evidence of other homicides and assaultive and disruptive behavior by other inmates, it would potentially open the door to a full blown hearing on each such incident, circumstances of the crime and personal characteristics of the perpetrator. (page 6)

32.    This assertion misrepresents my intended application of the data regarding individual inmate-homicide offenders in BOP. I would utilize such data to generate group rates, as well as rates for meaningful sub-groups of these inmates. This can only be

13

JA 36

*U.S. v Caro*, Declaration and Affidavit Regarding Government's Response
Mark D. Cunningham, Ph.D., ABPP, 10-13-06

accomplished by obtaining and analyzing detailed information regarding these offenders. Data from individual inmate-homicide offenders would also be utilized to identify trends/policies/patterns in BOP confinement of these offenders following their inmate-homicides. In the absence of these latter data, the defense has no mechanism to test the accuracy of Government-sponsored testimony from BOP administrators.

33.     The Government asserts that the subpoena duces tecum fails to define assaultive misconduct and fails to limit the scope of disciplinary incident reports. This failure creates no additional burden or hardship for the Government/BOP as all inmate disciphnary misconduct is detailed on a single computer generated BOP form entitled "Inmate Disciplinary Data, Chronological Disciplinary Data." Limiting the request to specific misconduct codes would increase the production effort required by BOP as many disciplinary offenses would have to be redacted.  Further, in analyzing factors that may be associated with future institutional violence among BOP inmate homicide offenders, total number of disciplinary infractions of any sort may be a relevant predictive variable. Alternatively, these offenders may have remarkably low rates of disciplinary misconduct of any type following their institutional homicides. This would relevant in identifying the potential for positive prison adjustment as a mitigating factor. Thus any and all disciplinary incident reports involving the inmate-homicide offenders are relevant in specifying their general pre and post homicide adjustment, pre-homicide assaults, STG status - all important in particularizing the data to the defendant as well as important in examining their "rehabilitation" in response to the post-homicide sanctions.

34.     That said, regarding "assaultive misconduct," I am specifically requesting for each inmate-homicide offender the incidence and underlying reports regarding the following misconduct codes both prior to and subsequent to the inmate-homicide offense:

100-Level Prohibited Acts:

Killing (100)
Assault (101)
Escape (102)
Weapon (104)
Riot/Encourage Riot (105/106)

200-Level Prohibited Acts:

Escape (200)
Fighting (201)
Assault (224)

35.     The assertion by the Government of potential hearings on "each incident" is

14

JA 37

*U.S. v Caro*, Declaration and Affidavit Regarding Government's Response
Mark D. Cunningham, Ph.D., ABPP, 10-13-06

surprising given the Government's cross-examination of me in prior capital cases. For example, in *U.S. v Kalafan Muhammed* I was questioned about inmates secreting razor blades in their mouths and fashioning paper spears. Additionally, videos of fights at ADX were played during cross examination to again illustrate the purported inability of BOP to control violence even at ADX.

36.    It is not inconceivable, then, that the Government would introduce the two inmate homicides at ADX last year in support of a similar proposition. Detailed after action investigation reports regarding these homicides is necessary to analyze the circumstances giving rise to these offenses. Similarly, information regarding how procedures at ADX have been modified in the aftermath of these offenses is necessary to rebut assertions that these offenses remain relevant to Mr. Caro's risk if confined in ADX. It seems probable that a "full blown hearing" regarding assaults or homicides at ADX would not occur unless the Government introduced these events.

37.    BOP administrators have testified in prior federal capital cases that inmate-homicide offenders are confined on the Control Unit for a minimum of seven years. Data regarding all disciplinary misconduct committed by inmates on the Control Unit from 1994 (when it was moved to ADX) to the present is necessary to rebut Government assertions that they are incompetent to adequately secure these inmates. It is also conceivable that Control Unit inmates become remarkably docile, despite the misconduct that resulting in their referral to the Control Unit. Providing the full disciplinary histories of each inmate who has been assigned to the Control Unit is no burden on BOP as this is a standard computer generated print-out entitled: "Inmate Disciplinary Data." Movement histories of Control Unit inmates is also necessary to isolate their tenures on the Control Unit and associated disciplinary infractions. Production of this movement data is not a hardship for BOP as it is contained in a computer generated BOP form entitled: "Inmate History, ADM-REL."

38.    The "Discipline Hearing Officer Report" of the disciphnary infractions listed on the "Inmate Disciplinary Data" form is necessary to identify the nature and injury severity of any assault. Detailed information on assaultive misconduct by Control Unit inmates has previously been provided in another federal capital case and I have testified regarding this data at federal capital sentencing. This data, however, does not include the last several years and thus is in need of updating.

39.    Identification of the corrections officers working on the Control Unit is necessary so that interviews of them can be performed to obtain front-line descriptions of the associated security procedures. These officers would have expert knowledge of the procedures of that unit, unless the Government is representing that these officers are totally untrained and incompetent. Routinely I am cross-examined on not having been

15

*U.S. v Caro*, **Declaration and Affidavit Regarding Government's Response**
Mark D. Cunningham, Ph.D., ABPP, 10-13-06

employed by BOP or on the staff of ADX. The potential testimony of these officers that is consistent with my testimony substantially undermines this cross-examination.

40.     The Government has routinely represented at federal capital sentencing that placement in ADX is temporary. This "temporary" assertion by the Government is suspect at best for a large proportion of the inmates at ADX, given historic refusals of BOP/DOJ to detail length of stay information regarding inmates at ADX and broad data reflecting only 7-9% of inmates at ADX being transferred to lower custody in any given year. Further, it is patently inconceivable that BOP has not calculated detailed length of stay information regarding this unique facility housing the "worst of the worst" when an in-house BOP research unit is available to examine such vitally important performance and outcome data. Accordingly, I doubt that such a request would represent any additional burden beyond simple production of these analyses. Should BOP not have calculated such information to date, I would be pleased to provide such analysis if BOP will provide me with unredacted movement information on everyone who has ever been assigned to ADX and the Control Unit at ADX. In the absence of such analyses, the defense is helpless to test or rebut this "temporary" assertion that is routinely made at federal capital sentencing, or how this assertion might apply or not apply to Mr. Caro.

41.     Contrary to the representation of the Government, identification of inmates who have been housed at ADX since 1994/1995 is not a burdensome enterprise. Inmates admitted to ADX must serve a minimum of three years before eligibility for transfer to a lower level of security. To illustrate the minimal burden in producing this information, an annual listing for each year since 1994 of inmates (and their register numbers) then housed in ADX would quickly identify the universe of inmates that have been assigned to this facility or who remain there. Once identified from such facility census information, obtaining the computer generated BOP "Inmate History, ADM-REL" would appear to involve no more than a few key strokes. Similarly, annual lists of inmates on the Control Unit are certain to be available in BOP files. If provided with the "Inmate History, ADM-REL forms on the inmates identified through the above procedure, I can calculate the desired information with no additional requirements of BOP.

42.     I have some confidence that the senior administrative staff of ADX Florence are intimately familiar with the names of inmates who have tenures at ADX that date to the facility's opening. Their familiarity with such inmates represents another mechanism for the production of their names and records without undue burden on BOP.

43.     Request for the above information is critically important to a scientifically determined and particularized assessment of Mr. Caro's probability of criminal acts of violence that would constitute a continuing threat to society.

16

JA 39

*U.S. v Caro*, **Declaration and Affidavit Regarding Government's Response**
**Mark D. Cunningham, Ph.D., ABPP, 10-13-06**

I hereby declare under the penalty of perjury of the laws of the State of New York and the United States of America that the foregoing is true and correct to the best of my knowledge.

Dated this 13th day of October, 2006 at New York, New York.

Mark D. Cunningham, Ph.D.
Clinical and Forensic Psychologist
Board Certified in Forensic Psychology
American Board of Professional Psychology

17

JA 40

*U.S. v Caro*, Declaration and Affidavit Regarding Government's Response
Mark D. Cunningham, Ph.D., ABPP, 10-13-06

## Attachment A

## CURRICULUM VITAE OF MARK D. CUNNINGHAM, PH.D., ABPP

### EDUCATION

Postdoctoral:      Yale University School of Medicine, New Haven, Connecticut
                   (September 1979 to June 1981)
                   NIMH-sponsored training program, part-time

Internship:        National Naval Medical Center, Bethesda, Maryland
                   (February 1977 to February 1978)
                   Specialty:  Clinical Psychology (APA accredited)

Graduate:          Oklahoma State University, Stillwater, Oklahoma
                   *Master of Science* (December 1976)
                   *Doctor of Philosophy* (December 1977)
                   Specialty:  Clinical Psychology (APA accredited)

Undergraduate:     Abilene Christian College, Abilene, Texas
                   *Bachelor of Arts*, (May 1973)
                   Majors: Psychology, Mass Communications

### BOARD CERTIFICATION

Forensic Psychology (1995), American Board of Professional Psychology (ABPP)

### PROFESSIONAL PRACTICE

1981 - date    Clinical and Forensic Psychologist
               Private practice (Texas: Abilene, 1981-2002; Dallas, 2002 - date)

1998 - date    Research scientist

1978 - 1981    Clinical Psychologist (Lieutenant, MSC, USNR)
               Naval Submarine Medical Center, Groton, Connecticut

18

JA 41

*U.S. v Caro*, **Declaration and Affidavit Regarding Government's Response**
**Mark D. Cunningham, Ph.D., ABPP, 10-13-06**

## CURRICULUM VITAE (2)

## HONORS, AWARDS, AND DISTINCTIONS

*American Psychological Association Award for Distinguished Contribution to Research in Public Policy* – annual award bestowed for distinguished empirical and/or theoretical contribution to research in pubhc policy, either through a single extraordinary achievement or a lifetime of work, 2006 recipient

*Texas Psychological Association Award for Outstanding Contribution to Science* – annual award in recognition of significant scientific contribution in the discovery and development of new information, empirical or otherwise, to the body of psychological knowledge, 2005 recipient

*John Augustus Award* - annual award bestowed for outstanding contributions to the profession of sentencing advocacy, National Association of Sentencing Advocates, 2004 recipient

*Fellow, American Psychological Association (Division 41: American Psychology-Law Society)* – peer reviewed distinction reflecting uncommon and outstanding contributions having national impact on the field of psychology, 2006 election

*Fellow, American Academy of Forensic Psychology* – distinction reflecting diplomate in forensic psychology by the American Board of Professional Psychology, 1995-
*Al Brown Memorial Award* – award bestowed for outstanding achievement, National Institute of Mental Health (NIMH) Sex Therapy Training Program, Yale University School of Medicine, 1979-1981
*Navy Commendation Medal* – decoration for meritorious service as a clinical psychologist, Naval Submarine Medical Center, United States Navy, 1978-1980
*Magna cum Laude* - Bachelor of Arts, Abilene Christian College, 1973

## PROFESSIONAL LICENSES

*Licensed Psychologist:*

| | | |
|---|---|---|
| Arizona #3662 | Arkansas #98-17P | Colorado #2305 |
| Connecticut #846 | Idaho #PSY-379 | Illinois #071-006010 |
| Indiana #20041376A | Louisiana #794 | New Mexico #0768 |
| Oklahoma #1002 | Oregon #1333 | South Carolina #764 |
| Tennessee #2255 | Texas #22351 | |

19

JA 42

*U.S. v Caro*, Declaration and Affidavit Regarding Government's Response
Mark D. Cunningham, Ph.D., ABPP, 10-13-06

## CURRICULUM VITAE (3)

### ACADEMIC APPOINTMENTS

**1981 - 1983**     Assistant Professor: Psychology Department,
                    Hardin-Simmons University, Abilene, Texas

**1978 - 1980**     Instructor (part-time): Psychology Department,
                    Old Dominion University (U.S. Submarine Base Extension);
                    Mohegan Community College, Norwich, Connecticut

**1974 - 1977**     Teaching Assistant: Psychology Department
                    Oklahoma State University, Stillwater, Oklahoma

### PROFESSIONAL AFFILIATIONS

American Board of Professional Psychology - *Diplomate*
American Academy of Forensic Psychology - *Fellow*
        (workshop teaching faculty)
        (ABFP examiner 1996-2006)
American Psychological Association - *Fellow*

National Register of Health Service Providers in Psychology
Certificate of Professional Qualification in Psychology (CPQ)

Texas Psychological Association
National Association of Sentencing Advocates
American Association for Correctional Psychology

### EDITORIAL

Ad hoc reviewer: *Assessment*
                *Criminal Justice Policy Review*
                *Behavioral Sciences & the Law*
                *Law & Human Behavior*

20

JA 43

*U.S. v Caro*, **Declaration and Affidavit Regarding Government's Response**
**Mark D. Cunningham, Ph.D., ABPP, 10-13-06**

## CURRICULUM VITAE (4)

## SCHOLARLY PUBLICATIONS

*Chapters in edited books:*

Cunningham, M. D. & Goldstein, A. M. (2003). Sentencing determinations in death penalty cases (pp. 407-436). In A. Goldstein (Ed.), *Forensic psychology* (vol. 11 of 12). I. Weiner (Ed.), *Handbook of psychology*. New York: John Wiley & Sons.

Cunningham, M. D. (*in press*). Special issues in capital sentencing. In M.A. Conroy, P. Lyons, & P. Kwartner (Eds.), *Forensic evaluations under Texas law: Selected criminal issues*. To be published by the Capacity for Justice.

Cunningham, M. D. (*pending publication*). Sentencing considerations in death penalty cases. In R. L. Jackson (Ed.). *Learning forensic assessment*. Mahwah, NJ: Lawrence Erlbaum Associates, Inc.

*Papers in peer-reviewed journals:*

Cunningham, M. D. & Murphy, P. J. (1981). The effects of bilateral EEG biofeedback on verbal, visual-spatial, and creative skills in learning disabled male adolescents. *Journal of Learning Disabilities, 14*, 204 -208.

Cunningham, M. D. & Reidy, T. J. (1998). Integrating base rate data in violence risk assessments at capital sentencing. *Behavioral Sciences & the Law, 16*, 71-95.

Cunningham, M. D., & Reidy, T. J. (1998). Antisocial personality disorder and psychopathy: Diagnostic dilemmas in classifying patterns of antisocial behavior in sentencing evaluations. *Behavioral Sciences & the Law, 16*, 333-351.

Cunningham, M. D., & Reidy, T. J. (1999). Don't confuse me with the facts: Common errors in violence risk assessment at capital sentencing. *Criminal Justice and Behavior, 26*, 20-43.

Cunningham, M. D. & Vigen, M. P. (1999). Without appointed counsel in capital postconviction proceedings: The self-representation competency of Mississippi Death Row inmates. *Criminal Justice and Behavior, 26*, 293-321.

21

JA 44

*U.S. v Caro*, **Declaration and Affidavit Regarding Government's Response**
**Mark D. Cunningham, Ph.D., ABPP, 10-13-06**

## CURRICULUM VITAE (5)

Reidy, T. J., Cunningham, M. D. & Sorensen, J. (2001). From death to life: Prison behavior of former death row inmates in Indiana. *Criminal Justice and Behavior, 28,* 62-82.

Cunningham, M. D. & Reidy, T. J. (2001). A matter of life or death: Special considerations and heightened practice standards in capital sentencing evaluations. *Behavioral Sciences & the Law, 19,* 473-490.

Cunningham, M. D. & Reidy, T .J. (2002). Violence risk assessment at federal capital sentencing: Individualization, generalization, relevance, and scientific standards. *Criminal Justice and Behavior, 29,* 512-537.

Cunningham, M. D. & Vigen, M. P. (2002). Death row inmate characteristics, adjustment, and confinement: A critical review of the literature. *Behavioral Sciences & the Law, 20,* 191-210.

Shuman, D. W., Cunningham, M. D., Connell, M. A, & Reid, W. H. (2003). Interstate forensic psychology consultations: A call for reform and proposal for a model rule. *Professional Psychology: Research and Practice, 34,* 233-239.

Cunningham, M. D., Sorensen, J. R., & Reidy, T. J. (2004). Revisiting future dangerousness revisited: Response to DeLisi and Munoz. *Criminal Justice Policy Review, 15,* 365-376.

Cunningham, M. D., Reidy, T. J., & Sorensen, J. R. (2005). Is death row obsolete? A decade of mainstreaming death-sentenced inmates in Missouri. *Behavioral Sciences & the Law, 23,* 307-320.

Cunningham, M. D., Sorensen, J. R., & Reidy, T. J. (2005). An actuarial model for assessment of prison violence risk among maximum security inmates. *Assessment, 12,* 40-49.

Cunningham, M. D. (2006). Informed consent in capital sentencing evaluations: Targets and content. *Professional Psychology: Research and Practice, 37,* 452-459.

Cunningham, M. D. & Sorensen, J. R. (2006). Actuarial models for assessment of prison violence risk: Revisions and extensions of the Risk Assessment Scale for Prison (RASP). *Assessment, 13,* 253-265.

22

JA 45

*U.S. v Caro*, Declaration and Affidavit Regarding Government's Response
Mark D. Cunningham, Ph.D., ABPP, 10-13-06

### CURRICULUM VITAE (6)

Cunningham, M. D. (*in press*).  Dangerousness and death: A nexus in search of science and reason. *American Psychologist*.

Cunningham, M. D. & Sorensen, J. R. (*in press*). Nothing to lose? A comparative examination of prison misconduct rates among life-without-parole and other long-term high security inmates. *Criminal Justice and Behavior*.

Cunningham, M. D. & Sorensen, J. R. (*in press*). Predictive factors for violent misconduct in close custody. *Prison Journal*.

*Papers in edited legal journals:*

Lyon, A. D. & Cunningham, M. D. (2006) Reason not the need: Does the lack of compelling state interest in maintaining a separate death row make it unlawful? *American Journal of Criminal Law, 33*, 1-30.

*Invited case reports and teaching points:*

Cunningham, M. D. (2002). Capital sentencing [case report]. In K. Heilbrun, G. Marczyk, & D. DeMatteo, *Forensic mental health assessment: A casebook* (152-171).  New York:  Oxford University Press.

Cunningham, M. D. (2002). Competence to be executed [case report]. In K. Heilbrun, G. Marczyk, & D. DeMatteo, *Forensic mental health assessment: A casebook* (96-114).  New York:  Oxford University Press.

Cunningham, M. D. (2002). How do you evaluate the accuracy of different sources of third-party information? [teaching point]. In K. Heilbrun, G. Marczyk, & D. DeMatteo, *Forensic mental health assessment: A casebook* (171-173).  New York: Oxford University Press.

Cunningham, M. D. (2002). Why and how do you attribute information to sources in a forensic mental health assessment? [teaching point].  In K. Heilbrun, G. Marczyk, & D. DeMatteo, *Forensic mental health assessment: A casebook* (114-115).  New York:  Oxford University Press.

23

*U.S. v Caro*, Declaration and Affidavit Regarding Government's Response
Mark D. Cunningham, Ph.D., ABPP, 10-13-06

## CURRICULUM VITAE (7)

*Articles in professional periodicals:*

Marcy, M. R., Hopkins, J. B. & Cunningham, M. D. (1978). A behavioral treatment of nocturnal enuresis, *U.S. Navy Medicine, 69,* 26-28.

Cunningham, M. D. & Reidy, T. J. (1998). Antisocial personality disorder vs. psychopathy as diagnostic tools. *Prosecutor's Brief: California District Attorneys Association, 20,* 9-11.

Cunningham, M. D. (2001). Bias in capital sentencing evaluations [invited opinion column]. *American Psychology and Law Society News, 21,* 2, 8-9.

*Manuscripts under review:*

Cunningham, M. D. & Sorensen, J. R. (*manuscript under review*). Capital offenders in Texas prisons: Rates, correlates, and an actuarial analysis of violent misconduct.

Sorensen, J. R. & Cunningham, M. D. (*manuscript under review*). Conviction offense and prison violence: A comparative study of murderers and other offenders.

Sorensen, J. R. & Cunningham, M. D. (*manuscript under review*). Operationahzing risk: The influence of measurement choice on the prevalence and correlates of violence among incarcerated murderers.

*Manuscripts in preparation:*

Reidy, T. J., Cunningham, M. D., & Sorensen, J. R. (*manuscript in preparation*). Rates and correlates of prison misconduct among federal capital inmates.

## SCHOLARLY SYMPOSIA / ADDRESSES

Competency to be executed. Symposium with Stanley Brodsky, Ph.D. & Patricia Zapf, Ph.D., American Psychology-Law Society Annual Conference, Austin, TX, March 2002.

24

*U.S. v Caro*, Declaration and Affidavit Regarding Government's Response
Mark D. Cunningham, Ph.D., ABPP, 10-13-06

## CURRICULUM VITAE (8)

Informed consent in forensic evaluations. Symposium with Mary Connell, Ph.D., William Foote, Ph.D., & Daniel Shuman, J.D., American Psychology-Law Society Annual Conference, LaJolla, CA, March 2005

Dangerousness and death: A nexus in search of science and reason. Invited Award Address, American Psychological Association 114th Annual Convention, New Orleans, LA, August 2006.

The role of the forensic psychologist in death penalty litigation. American Academy of Forensic Psychology: Workshop Series.

> Milwaukee, Wisconsin, March 1998.
> Austin, Texas, February 1999.
> Monterey, California, January 2000.
> San Diego, California, February 2002.
> Cincinnati, Ohio, September 2003.
> La Jolla, California, March 2005.

## AMICUS CURIAE

*Consultation and assistance in preparation of:*

Brief of *Amicus Curiae* American Psychological Association in Support of Defendant-Appellant, *U.S. v. Sherman Lamont Fields* in the United States Court of Appeals for the Fifth Circuit (2005).

25

JA 48

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Case No. I:06cr00001 |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| CARLOS DAVID CARO, | ) | |
| | ) | By: Pamela Meade Sargent |
| Defendant | ) | United States Magistrate Judge |
| | ) | |

In this capital case, all nondispositive pretrial motions were referred to the undersigned pursuant to 28 **U.S.C.** § 636(b)(1)(A) and Federal Rule of Criminal Procedure 59(a) for decision. This matter is before the undersigned on the defendant's motions to issue subpoenas duces tecum, (**Docket Item Nos.** 273, 274), motion for release of exculpatory evidence related to the penalty phase, (**Docket Item No.** 307), and motion for discovery, (**Docket Item No.** 308) ("the **Discovery Motions**"). The Discovery Motions request that the following specifically identified information be provided to defense counsel:

A.   Data showing median length of stay, range of length of stay and standard deviation of the distribution of length of stay at Florence ADMAX[1] for all inmates since it was opened in 1994 to the present time;

B.   Data showing how many inmates who were admitted to Florence ADMAX in 1994 or 1995 continue to be confined there, broken down by offense conduct that caused them to be transferred to Florence ADMAX;

C.   Movement sheets from the central inmate file on every inmate

---

[1]"Florence ADMAX" refers to the Bureau of Prisons, ("BOP"), "administrative maximum" security prison in Florence, Colorado.

who has killed another inmate within the Bureau of Prisons, ("BOP"), within the last 20 years;

D.  Investigative reports on all inmate homicides within the BOP within the last 20 years including any "after action reports" indicating any operational or institutional changes in response to each killing and any final memoranda from Special Investigative Services, ("SIS"), to the Warden of each institution regarding each killing;

E.  Regarding each inmate involved in an inmate killing within the BOP within the last 20 years, the respective inmate's "Chronological Disciplinary Record" and Inmate History "ADM-REL"[2] and/or movement Sheets within the BOP;

F.  Any updates to FLM[3] 5321.1d dated June 6, 1997, regarding Control Unit Programs;

G.  Any updates to FLM 5321.1d dated March 14, 1997, regarding General Population and Step-Down Unit Operations at Florence ADMAX;

H.  Most current fact card given to official visitors at Florence ADMAX who take a tour or do not take a tour of the facility;

I.  Records on any assaultive conduct by an inmate in the "Control Unit" at Florence ADMAX from November 1994 to present date, showing the inmate involved, inmate number of the inmate involved, date of occurrence and description of the conduct and the staff member victim of each assault. Such identifying information is necessary to identify the extent to which assaultive conduct is committed by a specific minority of inmates, or is directed against specific staff members;

J.  Names, prison numbers, assignment rationale and tenures of all inmates in the Control Unit at Florence ADMAX since opening in 1994 to present date showing date assigned, the reason assigned and date exiting the Control Unit to lesser security or release from BOP;

K.  Names of all correctional officers working on the Control Unit at Florence ADMAX showing date assigned and date left;

---

[2]Counsel has been unable to explain what the term "ADM-REL" means to the court.

[3]Counsel has been unable to identify what the term "FLM" means to the court.

- 2 -

JA 50

L.    Disciplinary Incident Reports on all inmates in the Control Unit at Florence ADMAX from 1994 to present date showing inmate name, number, date of offense and details of disciplinary incident; and

M.    Correctional Services Significant Incidents Data on levels and frequency of violence at each security level at Florence ADMAX by year from 2001 through 2006.

The government has agreed to make the following information available for review at the United States Attorney's office:

A.    Any updates to FLM 5321.1d dated June 6, 1997, regarding Control Unit Programs;

B.    Any updates to FLM 5321.1d dated March 14, 1997, regarding General Population and Step-Down Unit Operations at Florence ADMAX; and

C.    Most current fact card given to official visitors at Florence ADMAX who take a tour or do not take a tour of the facility.

The government opposes production of the remaining specifically requested documents and information.

In their motion for production of exculpatory evidence, defense counsel also request the court to order the production of the following categories of evidence:

A.    All evidence which might tend to diminish the credibility of any of the persons that the government intends to call as witnesses at a possible capital sentencing proceeding;

B.    Any statements, written or oral, of any government witnesses which are favorable to the defendant regarding sentencing;

C.    The names and addresses of all potential witnesses who possess any exculpatory evidence regarding sentencing; and

D.    All statements of witnesses which vary in material detail, either

- 3 -

JA 51

internally or with other statements of the same witness, or with statements of other witnesses.

The government has not argued that the defendant is not entitled to this evidence. In fact, the government has not filed any written response to this motion.

This matter also is before the court on the defendant's motion in limine to exclude from evidence an April 15, 2004, letter, (Docket Item No. 301), and defendant's motion to allow allocution before the jury without cross-examination, (Docket Item No. 312). The government has filed responses in opposition to these Motions. Oral argument was presented before the undersigned on these Motions on November 3, 2006.

By Scheduling Order dated January 23, 2006, (Docket Item No. 17), this matter was originally set for trial beginning July 31, 2006. By the terms of this order, all pretrial motions were to be filed by no later than May 1, 2006. This order also required that any response to a pretrial motion should be filed within 14 days of the filing of the motion. By Order dated June 27, 2006, the court continued the trial of this matter to January 22, 2007. (Docket Item No. 206.) By Order dated July 12, 2006, (Docket Item No. 229), the court stated: "[a]ny additional pretrial motions shall be filed with the court by no later than October 15, 2006, *and will be considered by the court only for good cause shown as to why the motions could not have been filed prior to the original pretrial motions deadline.*" (Emphasis added.)

None of the motions filed by the defendant subsequent to May 1, 2006, other than the motion in limine, (Docket Item 301), states any reason to support a finding

- 4 -

JA 52

of good cause as to why the motion could not have been filed prior to the original pretrial motions deadline. The motion in limine recites that the letter which defense counsel is seeking to exclude from evidence at trial was provided to defense counsel by the government on June 15, 2006, more than a month after the May 1, 2006, pretrial motions deadline. Also, this motion in limine, as well as the motion to allow allocution without cross-examination, could be properly raised at trial and, therefore, should not be considered as "pretrial motions." *See* FED. R. CRIM. P. 12(b)(3). Furthermore, insofar as the defendant's Discovery Motions seek production of exculpatory information or information which must be produced pursuant to Federal Rule of Criminal Procedure 16, the government's obligations exist regardless of any order by the court.

That being the case, I will deny the defendant's motions contained in Docket Item Nos. 273, 274 and 308 based on my finding that these motions were not timely filed and that defense counsel has made no showing of good cause to justify their filing after the court-imposed deadline. I will consider each of the motions contained in Docket Item Nos. 301, 307 and 312.

I will first consider whether the documents and information sought by defense counsel in Document No. 307, the motion for release of exculpatory evidence, seeks disclosure of exculpatory information or information which must be produced pursuant to Federal Rule of Criminal Procedure 16. Rule 16 lists certain information and items that the government must produce upon the defendant's request. Included in this list are any documents that are "material to preparing the defense" and any documents the government intends to use in its case-in-chief at trial. FED. R. CRIM. P.

-5-

JA 53

16(a)(1)(E)(i). At the November 3 hearing, the government represented that it does not intend to use any of the documents sought in the Discovery Motions in its case-in-chief during either the guilt or the penalty phase of this case. Based on this representation, the only remaining basis under Rule 16 on which the court could order production of the documents and information requested is upon a finding that the documents and information are "material to preparing the defense." Defense counsel argue that the documents and information sought is material in that it is exculpatory in that it can be used to refute government claims that Caro would present a danger to other BOP inmates if sentenced to life in prison rather than given the death penalty.

In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." In *U. S. v. Bagley*, the Supreme Court held that *Brady* "requires disclosure only of evidence that is both favorable and 'material either to guilt or to punishment.'" 473 U.S. 667, 674 (1985). Evidence is "favorable" when it would tend to exculpate the accused or it could be used to impeach government witnesses. *U. S. v. Ellis*, 121 F.3d 908, 914 (1997); *U. S. v. Trevino*, 89 F.3d 187, 189 (1996). "Evidence is 'material' if there is a reasonable probability that it will affect the result of the proceeding." *Trevino*, 89 F.3d at 189. Furthermore, there is a lower threshold of materiality for specifically requested exculpatory material versus where there is only a general request or no request for exculpatory material. *See Chavis v. State of N.C.*, 637 F.2d 213, 223 (4th Cir. 1980). In the case of specifically requested exculpatory material, such material should be disclosed if there is a "reasonable possibility" that the undisclosed evidence would materially affect the verdict. *Chavis*, 637 F.2d at 223.

- 6 -

In support of their argument that the information requested is exculpatory, defense counsel have filed an affidavit by Mark D. Cunningham, Ph.D., (Docket Item No. 316), a clinical and forensic psychologist, who has been retained by defense counsel to offer expert testimony regarding whether BOP security measures and confinement conditions can be applied to Caro to substantially reduce the probability that he will commit any further serious prison violence while incarcerated. Cunningham has stated that the information requested by the defendant is necessary to rebut anticipated government claims in the sentencing phase that assignment to Florence ADMAX is a temporary assignment and that the BOP will be unable to adequately secure Caro within the BOP system regardless of whether he were to be placed in the Control Unit at Florence ADMAX.

The government has opposed providing the specifically requested documents and information on the bases that the information is not relevant, the requests are not specific enough, the information sought is not admissible at trial and that the burden of production would greatly outweigh any probative value. It is important to note that, despite the undersigned's inquiries at the November 3 hearing, the government has produced no evidence through affidavit or otherwise as to its argument that production of the documents and information requested would be burdensome to the BOP. Surprisingly, the government also has not specifically contested the defense assertions that the specific documents and information sought contains exculpatory information, other than its general assertion that the information is not relevant. In particular, the government has not contested defense assertions with regard to the evidence that the government has offered in similar cases and which it anticipates that the government will offer in this case, including evidence that the defendant cannot be securely

- 7 -

JA 55

maintained in the BOP or that he presents a greater risk of future violence than other inmates involved in inmate killings. In fact, it would appear that through its response to the defendant's motion in limine, (Docket Item No. 327), the government concedes that the government will argue and present evidence that the defendant's future dangerousness to others, even if he is incarcerated, is an aggravating factor warranting imposition of the death penalty. Furthermore, at the November 3 hearing, the government conceded that it intended to argue and present evidence that the defendant cannot be securely maintained within the BOP system. In particular, the government conceded that it would argue and present evidence that an inmate's assignment to the Control Unit at Florence ADMAX is a temporary assignment.

Based on the information before the court, I find that the defendant has made a compelling argument that some of the specific documents and information requested by the defense should be provided by the government as exculpatory information in that it is "material" on the issue of punishment and "favorable" in that it may be used to impeach anticipated government witnesses. Therefore, I will order that the following information be provided by the government to defense counsel:

    A.    Data showing median length of stay, range of length of stay and standard deviation of the distribution of length of stay at Florence ADMAX for all inmates since it was opened in 1994 to the present time;

    B.    Data showing how many inmates who were admitted to Florence ADMAX in 1994 or 1995 continue to be confined there, broken down by offense conduct that caused them to be transferred to Florence ADMAX;

    C.    Movement sheets from the central inmate file on every inmate who has killed another inmate within the BOP within the last 20 years;

- 8 -

JA 56

D.  Investigative reports on all inmate homicides within the BOP within the last 20 years including any "after action reports" indicating any operational or institutional changes in response to each killing and any final memoranda from SIS to the Warden of each institution regarding each killing;

E.  Regarding each inmate involved in an inmate killing within the BOP within the last 20 years, the respective inmate's "Chronological Disciplinary Record" and Inmate History ADM-REL and/or movement Sheets within the BOP;

F.  Records on any assaultive conduct by an inmate in the "Control Unit" at Florence ADMAX from November 1994 to present date, showing the inmate involved, inmate number of the inmate involved, date of occurrence and description of the conduct and the staff member victim of each assault. Such identifying information is necessary to identify the extent to which assaultive conduct is committed by a specific minority of inmates, or is directed against specific staff members;

G.  Names, prison numbers, assignment rationale and tenures of all inmates in the Control Unit at Florence ADMAX since opening in 1994 to present date showing date assigned, the reason assigned and date exiting the Control Unit to lesser security or release from BOP;

H.  Disciplinary Incident Reports on all inmates in the Control Unit at Florence ADMAX from 1994 to present date showing inmate name, number, date of offense and details of disciplinary incident; and

I.  Correctional Services Significant Incidents Data on levels and frequency of violence at each security level at Florence ADMAX by year from 2001 through 2006.

Based on the fact that the government has not contested its obligation to produce the categories of evidence sought by this motion, I also will order that the government produce the following:

A.  All evidence which might tend to diminish the credibility of any

- 9 -

JA 57

of the persons that the government intends to call as witnesses at a possible capital sentencing proceeding;

B.    Any statements, written or oral, of any government witnesses which are favorable to the defendant regarding sentencing;

C.    The names and addresses of all potential witnesses who possess any exculpatory evidence regarding sentencing; and

D.    All statements of witnesses which vary in material detail, either internally or with other statements of the same witness, or with statements of other witnesses.

Regarding the defendant's motion to allow allocution before the jury without cross-examination, (Docket Item No. 312), this court previously has denied such motions in other capital cases. In *U.S. v. Johnson,* 136 F. Supp. 2d 553, 566-68 (W.D. Va. 2001), Judge Norman K. Moon held that the defendant in a capital case has no statutory or constitutional right to allocution before the jury without cross-examination. In *U.S. v. Church,* 2001 WL 1661706, at *2-3 (W.D. Va. Dec. 27, 2001), Judge James P. Jones rejected a similar motion for the reasons set forth in Judge Moon's opinion in *Johnson.* It appears that defense counsel in this case have raised the same arguments as addressed by the court previously in *Johnson* and *Church.* That being the case, I will deny this motion.

I will next address the defendant's motion in limine, (Docket Item No. 301). The defendant has moved the court for entry of an order prohibiting the government from introducing into evidence at trial, in either the guilt or sentencing phase, a letter purportedly written by the defendant to his wife, Yvette Caro, dated April 15, 2004, (Docket Item No. 301, Exhibit 1) ("the Letter"). The Letter states in pertinent part:

> ... I got a morning prayer I read every morning ... do you want to hear it well hear it is just for you.

- 10 -

JA 58

My Morning Prayer

God give me the strength to put up with this place one more day help me keep my temper in check so that I won't kill one of this [sic] f---ing fools. Help me overlook the wrong others do. So I wont [sic] hurt one of this [sic] f---ing rats. Help me to overlook the liars, punks, no good pieces of s---, and all the stupid things they do[.] Help me to keep my mouth shut so I wont [sic] hurt some child molesters f---ing feelings and most of all God give the a--holes on this prison yard the good sense to stay the f--- away from me! Amen.

The government, in its written response to the motion in limine, argues that evidence which tends to show the motive of the defendant, his lack of remorse, his general moral character and his predisposition to commit other crimes is admissible in aggravation. These written arguments address only the government's position that the Letter should be admissible in aggravation at the punishment phase of trial. Nevertheless, at the November 3 hearing, the government's counsel would not stipulate that it would not seek to admit the Letter in the guilt phase as well. In particular, the government argues that the defendant has stated that he killed the victim because the victim made him angry and "disrespected" him. Thus, the defendant argues that the statements in the Letter could be relevant on the issue of motive at the guilt phase.

Defense counsel argue that the Letter should be not be admitted at either the guilt or sentencing phase of trial because it does not contain an express or implied threat against anyone in the present or the future and that it is irrelevant on any probative value it possesses is outweighed by the danger that it will unfairly prejudice the jury.

- 11 -

JA 59

Based on the arguments and evidence before the court at this time, I believe it would be inappropriate to grant the defendant's motion in limine. If the government's representations with regard to the defendant's statements are correct, the court could find that the statements contained in the Letter are relevant to the issue of motive. That being the case, I will deny the defendant's motion in limine without prejudice to the defendant's right to raise objections to the admission of the Letter at trial.

An appropriate order will be entered.

DATED:    November 8, 2006.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE

- 12 -

JA 60

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Case No. I:06cr00001 |
| v. | ) | |
| | ) | **ORDER** |
| CARLOS DAVID CARO, | ) | |
| | ) | By: Pamela Meade Sargent |
| Defendant | ) | United States Magistrate Judge |
| | ) | |

Based on the reasoning set forth in the Memorandum Opinion accompanying this Order, it is **ORDERED** as follows:

1.  The defendant's motions to issue subpoenas duces tecum, (Docket Item Nos. 273, 274), motion for release of exculpatory evidence related to the penalty phase, (Docket Item No. 307), and motion for discovery, (Docket Item No. 308), are **GRANTED** insofar as the government has agreed that it shall make the following available for review by defense counsel:
    A.  Any updates to FLM 5321.1d dated June 6, 1997, regarding Control Unit Programs;
    B.  Any updates to FLM 5321.1d dated March 14, 1997, regarding General Population and Step-Down Unit Operations at Florence ADMAX; and
    C.  Most current fact card given to official visitors at Florence ADMAX who take a tour or do not take a tour of the facility.

2.  Otherwise, the defendant's motions to issue subpoenas duces tecum, (Docket Item Nos. 273, 274), and motion for discovery, (Docket Item No. 308), are **DENIED** based on the fact that these motions were not

JA 61

filed prior to the deadline for filing of all pretrial motions and the defendant has made no showing of good cause for the untimely filing of these motions;

3. The defendant's motion for release of exculpatory evidence related to the penalty phase, (Docket Item No. 307), is **GRANTED** insofar as the government shall provide the following information to defense counsel by no later than November 20, 2006:

A. Data showing median length of stay, range of length of stay and standard deviation of the distribution of length of stay at Florence ADMAX for all inmates since it was opened in 1994 to the present time;

B. Data showing how many inmates who were admitted to Florence ADMAX in 1994 or 1995 continue to be confined there, broken down by offense conduct that caused them to be transferred to Florence ADMAX;

C. Movement sheets from the central inmate file on every inmate who has killed another inmate within the Bureau of Prisons, ("BOP"), within the last 20 years;

D. Investigative reports on all inmate homicides within the BOP within the last 20 years including any "after action reports" indicating any operational or institutional changes in response to each killing and any final memoranda from Special Investigative Services to the Warden of each institution regarding each killing;

E. Regarding each inmate involved in an inmate killing within the BOP within the last 20 years, the respective inmate's "Chronological Disciplinary Record" and Inmate History ADM-REL and/or movement Sheets within the Bureau of Prisons;

F. Records on any assaultive conduct by an inmate in the "Control Unit" at Florence ADMAX from November 1994 to present date, showing the inmate involved, inmate number of the inmate involved, date of occurrence and description of the conduct, and the staff member victim of

-2-

JA 62

each assault;

G. Names, prison numbers, assignment rationale and tenures of all inmates in the Control Unit at Florence ADMAX since opening in 1994 to present date showing date assigned, the reason assigned and date exiting the Control Unit to lesser security or release from BOP;

H. Disciplinary Incident Reports on all inmates in the Control Unit at Florence ADMAX from 1994 to present date showing inmate name, number, date of offense and details of disciplinary incident;

I. Correctional Services Significant Incidents Data on levels and frequency of violence at each security level at Florence ADMAX by year from 2001 through 2006;

J. All evidence which might tend to diminish the credibility of any of the persons that the government intends to call as witnesses at a possible capital sentencing proceeding;

K. Any statements, written or oral, of any government witnesses which are favorable to the defendant regarding sentencing;

L. The names and addresses of all potential witnesses who possess any exculpatory evidence regarding sentencing; and

M. All statements of witnesses which vary in material detail, either internally or with other statements of the same witness, or with statements of other witnesses.

2. The defendant's motion in limine to exclude from evidence an April 15, 2004, letter, (Docket Item No. 301), is **DENIED**; and

3. The defendant's motion to allow allocution before the jury without cross-examination, (Docket Item No. 312), is **DENIED**.

The Clerk shall certify a copy of this order to all counsel of record.

- 3 -

JA 63

ENTERED: November 8, 2006.


/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE

- 4 -

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | Criminal No. 1:06CR00001 |
| | ) | |
| CARLOS DAVID CARO | ) | |

### OBJECTION TO ORDER OF THE MAGISTRATE JUDGE

On November 8, 2006, the magistrate judge entered an order directing the United States to produce certain documents as more specifically described therein.

For the reasons set forth in its objections to the defendant's subpoenas duces tecum, the United States objects to the order of the magistrate judge compelling production of the documents, and requests a hearing before the district court on this objection on December 8, 2006.

Respectfully submitted,

JOHN L. BROWNLEE
UNITED STATES ATTORNEY

Dated: November 8, 2006

s/ Anthony P. Giorno
Assistant United States Attorney
VSB #15830
United States Attorney's Office
P.O. Box 1709
Roanoke, VA 24008
TEL (540) 857-2878
FAX (540) 857-2614

### CERTIFICATE

I hereby certify that a true and correct copy of the foregoing **OBJECTION TO ORDER OF THE MAGISTRATE JUDGE** has been electronically filed by CM/ECF system which will send notification of such filing to Stephen Kalista, Esq. and James Simmons, Esq., on this 8th day of November, 2006.

s/ Anthony P. Giorno
Assistant United States Attorney

JA 65

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION

UNITED STATES OF AMERICA ) 
 ) 
vs. ) Criminal Number
 ) 1:06CR00001
CARLOS DAVID CARO )

### CARLOS DAVID CARO'S OBJECTION TO MAGISTRATE JUDGE'S ORDER OF NOVEMBER 8, 2006, DOCKET NOS. 343 AND 344 AND FOR PROMPT HEARING

Comes now, Carlos David Card, through undersigned counsel, Stephen J. Kalista and James A. Simmons, pursuant to Federal Rule of Criminal Procedure Rule 59 (a) and files this objection to the Order of the Magistrate Judge (Docket Nos. 343 and 344) dated November 8, 2006, denying the Defendant's motions to issue subpoenas duces tecum (Docket Nos. 273, 274); denying Defendant's discovery motion regarding penalty phase (Docket No. 308); denying Defendant's motion in limine to exclude from evidence an April 15, 2004, letter (Docket No. 301); and denying Defendant's motion to allow allocution before the jury without cross-examination (Docket No. 312) on the grounds stated in Defendant's motions, responses, and documents filed in support of said motions; and moves this Court for a prompt hearing on these objections filed by the Defendant and filed by the government and other outstanding objections of the parties (Docket Nos. 289, 299) that have not yet been heard by the Court.

While the government indicated in its objection (Docket No. 345) to the Magistrate Judge's Order that it was requesting a hearing on December 8, 2006, the Defendant believes that given a trial date of January 22, 2007, and that there appear to be no other outstanding motions pending before the Magistrate

1

JA 66

Judge, the District Judge should hear and consider all the outstanding objections of the parties promptly and prior to December 8, 2006.

Wherefore, the Defendant prays that the Court sustain the Defendant's objections and grant Defendant's motions previously filed and identified herein; and for a prompt hearing on all outstanding objections of the parties.

CARLOS DAVID CARO
BY COUNSEL

s/_____
STEPHEN J. KALISTA, Esq.
Counsel for Defendant
VSB No. 15603
PO Box 1186
Big Stone Gap, VA 24219
Ph. 276-523-1950
Fax 276-523-1949
Email: skalista@mouent.com

s/_____
JAMES A. SIMMONS, Esq.
Counsel for Defendant
TN Bar ID No. 10107
1208 17th Avenue South
Nashville, TN 37212
Ph. 615-329-9122
Fax 615-320-4159
Email: jas52@earthlink.net

Certificate of Service

I hereby certify that on November 9, 2006, I have electronically filed the foregoing with the Clerk of the Court using the CM/ECF filing system which shall send the notification of such filing to the following:

John Brownlee, USA, and Anthony Giorno, AUSA

s/_____
Stephen J. Kalista

2

JA 67

```
        IN THE UNITED STATES DISTRICT COURT FOR THE
              WESTERN DISTRICT OF VIRGINIA
                    Abingdon Division

---------------------------x
                            :
UNITED STATES OF AMERICA,   :
                            :
      Plaintiff,            :
                            :
v.                          :   1:06CR1
                            :
CARLOS D. CARO,             :
                            :
      Defendant.            :   Abingdon, Virginia
                            :   November 13, 2006
---------------------------x   10:25 a.m.
```

PRETRIAL MOTIONS
BEFORE THE HONORABLE JAMES P. JONES
CHIEF UNITED STATES DISTRICT JUDGE

APPEARANCES:

ANTHONY GIORNO, Esquire
Assistant U.S. Attorney
P.O. Box 1709
Roanoke, Virginia  24008
    For the United States of America.

STEPHEN J. KALISTA, Esquire
P.O. Box 1186
Big Stone Gap, Virginia  24210
JAMES SIMMONS, Esquire
1208 17th Avenue South
Nashville, Tennessee  37212
    Counsel for the Defendant.

Proceedings recorded by Stenography, transcript
produced by computer.

**BRIDGET A. DICKERT**
**UNITED STATES COURT REPORTER**
**180 WEST MAIN STREET, ROOM 104**
**ABINGDON, VIRGINIA 24210**
**(276) 628-5116**

JA 68

(Proceedings commenced at 10:25 a.m.)

THE COURT: Good morning, ladies and gentlemen. The clerk will call the case.

THE CLERK: *United States of America* v. *Carlos Caro*, Case Number 1:06CR1.

THE COURT: We're here today on certain objections to the decisions of the magistrate judge in certain non-dispositive pretrial motions in this case. The Government is here represented by Mr. Giorno, and the defendant is here in person in the courtroom, and I believe that we have defense counsel on the telephone; is that correct?

MR. KALISTA: Yes, Your Honor. This is Steve Kalista, and I'm here.

MR. SIMMONS: Your Honor, this is Jim Simmons and I'm here from Nashville, Tennessee.

THE COURT: Very good. Now, the parties have requested a prompt hearing on at least certain of the decisions of the magistrate judge. We do have a full pretrial conference in this case scheduled for December 8th, I believe, and Mr. Giorno, what is your understanding of what we're going to take up today?

MR. GIORNO: Your Honor, the Government is here, as I understand it, to discuss the magistrate's order to produce certain documents as set forth in

JA 69

her order which was entered on November 8th.

THE COURT: All right. And Mr. Kalista, or Mr. Simmons, what about you? What is your understanding of what we're here about today?

MR. KALISTA: Judge, the decision of the magistrate judge, I believe, dated November 8, 2006, and I believe that that is some objections that were filed by the Government, by the defense.

I am also wondering if the Government is ready to take up some objections that were filed previously, I think, concerning the mental health examination. They haven't been heard by the judge yet, but they are still pending, and I did not know from the notice that I received whether those were going to be taken up today. I think I did put in my objections a reference to certain outstanding objections that have not yet been heard by the court.

THE COURT: Well, that's right. There are a number of, of magistrate judge's decisions that have been objected to and are ripe. I guess I understood that we were going to hear on an expedited basis the Government's discovery objections to the magistrate judge's discovery order because that, my decision on that may make, is important in terms of trial preparation, or may be important in terms of

trial preparation.  But are there other motions that need a decision before our regular pretrial conference on December 8th, I guess, is really my question.

MR. KALISTA:  I would say that as far as objections, and I guess to refer to the record, docket number, it appears 295, regarding the matter 296 and 299, I believe those probably could wait until our December 8th hearing, Judge.

THE COURT:  Well, Mr. Kalista, help me out here now.  Does the defendant have any motions or objections to motions that need, for time purposes, to be decided today, or at least heard today, or can the defendant's objections and motions wait until December 8th?

MR. KALISTA:  I think the ones that I just referred to, again, which refer to the mental health examination could wait.  I'm prepared to go ahead today, if the Government wants to hear those matters, have those matters heard today.  It may help their trial preparation.  But certainly in terms of, of the November 8th order of the magistrate judge we certainly agree that those should be heard right now.

THE COURT:  Well, I mean one of them, for example, that the magistrate judge ruled on that you

objected to was the introduction of the, or the motion, your motion to prohibit the introduction of the letter allegedly written by the defendant.

MR. KALISTA:  Oh, yes, sir.  Yes, sir. We're ready to go ahead on that, yes, sir.  But as far as time wise, that can wait --

THE COURT:  I'm not communicating, Mr. Kalista, I'm sure.  I think that's our problem. You know, I have a pretty busy schedule, particularly today.  But I, because of the discovery motions of the magistrate judge it might impinge on trial preparation, I granted the parties' joint request to hear that quickly, and not wait until December 8th, which is our long time regular scheduled pretrial motion day where I've set aside the whole day to consider pretrial motions and other things in this case.

So, my preference would be is to take those things up now that we need to take up for time purposes, and leave those things that we can leave until December 8th.

So, what I was trying to obtain from you was whether the defendant had any motions that for time purposes needed to be heard today rather than wait until December 8th.  So, am I making myself clear?

6

MR. KALISTA:  Yes, sir.  Now I understand, Judge.  I believe that we would need to take up the Government's objection and the defendant's objections to the magistrate judge's order now.

THE COURT:  Your objections to the magistrate judge's order with respect to discovery matters had to do with her denial of the request for subpoenas duces tecum, correct?

MR. KALISTA:  That's correct, Judge.  Also I believe the denial of a motion for discovery.

THE COURT:  All right.  Well, let's proceed then.  First, let me hear from the Government in regard to, to its objections.

MR. GIORNO:  If it please the court, the Government's objection went to the magistrate judge's order of November 8, 2006 in which she ordered a number of items to be produced mainly related to information in the custody and control of the Federal Bureau of Prisons.  And there I'm sure the court has had a chance to look at that order and what the Government has been ordered to disclose.

And the magistrate judge set a disclosure deadline of no later than November 20, 2006, which is a week from today.  The Government's objections basically are two-fold.  First, this material is not

JA 73

discoverable. I understand the basis of the magistrate judge's ruling was not that this was subject to a discovery order, but rather that this was deemed to be exculpatory evidence, and it's the Government's position it is not discoverable, it is not --

MR. KALISTA: This is Steve Kalista. I can't hear.

MR. GIORNO: Can you hear me now? It helps if I turn the mic on. Your Honor, the basis of the magistrate's ruling was this was exculpatory evidence, exculpatory evidence and she recites in her order what the exculpatory evidence is, material both favorable to the defendant and that is material to the preparation of their case.

In this instance we have Dr. Cunningham's affidavit. And Dr. Cunningham is saying I need this information because it will help me when the Government cross-examines me, when they ask me questions about have you looked at this, have you done that, that will help me respond to those questions.

Dr. Cunningham, as the court knows, is someone who is going to opine on the issue of future dangerousness; that the defendant can, in fact, be

JA 74

securely controlled by the Bureau of Prisons if he's given a life sentence.

The problem we have, Your Honor, is first of all we could not consider this information to be exculpatory. The information, specific information has never been requested by the defense, and had the case gone to trial and Mr. Caro was convicted, would Mr. Caro be able to appeal and say, well, the Government failed to turn over exculpatory evidence, and I think the answer is no.

First of all, there's no indication that the information requested by the defense is going to be favorable to the defense. We don't know what this information is going to show, whether it may support the Government's case, that there is simply no way in which Mr. Caro can be controlled, there's no way we can guarantee he's not going to harm another person, and I think what the defense is hoping somehow they can take this information and incorporate it into Dr. Cunningham's testimony.

So, for those reasons, Your Honor, we feel it is not exculpatory information, it is not otherwise discoverable for the reasons we've set forth in our response. But probably as important, Your Honor, is the accessibility of this information. I have had

several conversations over the last couple of days with the Bureau of Prisons as recently as this morning, and I know we, we like to sometimes think of the Bureau of Prisons as a business, but their business is geared toward what's going on in the prison today. They maintain records of their prisoners by something called a sentry system, and from what I'm told, the sentry system, the way it's set up can give you a snapshot of who is confined in a particular facility as of now. It is not designed to go back retrospectively to see what was going on in a particular institution in the country at any given time in history.

In order -- again, I'm getting this information from the Bureau of Prisons. In order for them to gather the information requested the sentry programmers would have to create a program for every day of the year since, for example, ADMAX was opened, and there would be over 400 separate computer programs, and run the programs over each day for the last 13 years from the time the facility opened, information, for example, that was ordered to be produced in paragraph 3(d), investigative reports on all inmate homicides within the Bureau of Prisons within the last 20 years.

Again, there is no, these files, as I understand it from what the Bureau of Prisons has told me, are maintained in all the many institutions. They follow the inmate. As the inmate goes through the system, they're maintained with the inmate. There's no central repository that has these investigative files.

Even if we could find investigative files, as the court knows from cases past, they're often very voluminous and would have to be produced in that regard. According to, to the attorney at ADMAX Florence, to produce this information, assuming it can even be done in any meaningful order, would literally take months assuming it can be produced. I will tell the court, too, and I'll mention for defense counsel, this information was imparted to me through conversations with Lara Crane who was the agency counsel for the Bureau of Prisons in Beckley, and she has spoken with the agency counsel in Florence, Colorado. I am prepared to submit to the court, I've asked them to prepare for the record an affidavit to confirm what I've represented to the court as being, as being accurate as far as what it would take to get these records and produce them in the form requested by the defense.

THE COURT: Let me ask you this, Mr. Giorno. The magistrate judge recites that the Government had agreed to make certain information available to the defense, that is, and I wonder if you could explain to me what that is. It's page three of the magistrate judge's opinion.

MR. GIORNO: Items A, B and C?

THE COURT: Yes, sir.

MR. GIORNO: Your Honor, those, as I understand it, those items A, A and B relate, it's basically procedures and protocols concerning the operation of the control unit, and the step down unit which I understand Florence has a number of different levels, and there's the high levels where they put people that are most, most dangerous, but eventually they'll step them down through Florence, and from what I understand ultimately a lot of these prisoners that come into Florence ADMAX are gradually matriculating to other Bureau of Prisons facilities depending on the severity of their conduct and other factors.

From what I'm told by the Bureau of Prisons, those items A and B are kind of the protocol, the procedure for how that's done. Item C, a current facts card given to official visitors, that recites

certain information about the facility and what they do, and what their role is, and things like that. That exists, those documents exist or are routinely given to people that come to tour the facility which tells about the institution, how it's run, something like that. Those are readily available and they have no problem producing those for the defense.

THE COURT: Let me ask you this, Mr. Giorno. In terms of my clear understanding of relevancy here, assuming for the purposes of the present motion that Mr. Caro is convicted by the jury and the case goes to the sentencing phase, I assume that's what we're talking about now?

MR. GIORNO: Correct.

THE COURT: And the Government has given notice that in the sentencing phase it will seek to prove Mr. Caro's future dangerousness? Mr. Caro is, as I understand, serving currently a long prison term with the Bureau of Prisons; is that correct?

MR. GIORNO: Yes, Your Honor.

THE COURT: So, the Government will seek to show that even confined Mr. Caro will be likely a danger to others; is that accurate?

MR. GIORNO: Yes, Your Honor.

THE COURT: Does the Government intend to

call an expert in that regard?

MR. GIORNO:  We do, Your Honor.  It's our intent to call an individual by the name of Gregory Hershberger.  Hershberger is a former, as I understand a former warden or Bureau of Prisons official who will talk about basically the limitations that exist in a prison setting.  He'll also talk about things, and will have evidence to establish -- I mean, there are actually regulations to talk about how long an individual can be confined in a control unit, for example.  Basically talk about the limitations as to what you can and cannot do with an individual even when he or she is confined.

THE COURT:  Now, is it, will the Government evidence show or concede that, assuming Mr. Caro was convicted, and not sentenced to death, that he would be transferred to the Florence ADMAX, or that he would be detained there?  Is that sort of the understood situation here?

MR. GIORNO:  Is the court asking will he definitely go to ADMAX?  I think the answer is we don't know.

THE COURT:  Well, I mean, the discovery material is all about Florence ADMAX, which is, I mean, for the record so to make sure I understand,

Florence ADMAX is the so-called super max prison where the most dangerous or notorious federal prisoners are held; is that correct?

MR. GIORNO:  That's correct.  But the order relates not just to ADMAX; it talks about, for example --

THE COURT:  Well, I understand, but a lot of it is about ADMAX?

MR. GIORNO:  Yes, Your Honor.

THE COURT:  So, my question is where do we get that?  Is that sort of understood that, I mean, that ADMAX is where it's going to be at for Mr. Caro? Not necessarily?

MR. GIORNO:  No, Your Honor.  I think that is the assumption of the defense.  I think what they're wanting to say is that there are facilities available, and ADMAX has become like a poster child for that, the federal government has this prison in Florence, Colorado and that's where the worst of the worst go, and if they wanted to, and maybe we will in this case, maybe we won't, but if the Government, but the Government has facilities available in Florence in which Mr. Caro can be safely confined.  Of course, there's no guarantee he's going to go there to start with.  There's no guarantee he'll stay there because

JA 81

the Bureau of Prisons, as we know, they, they have their own set of rules by which they do things.

THE COURT:  You also mentioned the control unit, and that's, that's part of some of these materials.  I take it the control unit at Florence ADMAX is like a SHU, like a segregation unit?

MR. GIORNO:  It is, Your Honor, and it is subject to a specific set of regulations under the C.F.R.s.  There are certain regulations that set out the procedures governing who goes into the control unit, how long he or she can stay there, and certain other things that are attached to people who go into the control unit.

THE COURT:  So, I take it Mr. Hershberger, or other evidence from the Government, would always be that, that it would be impossible to keep someone forever, or for their life, in a controlled unit at Florence ADMAX?

MR. GIORNO:  That's correct, Your Honor.

THE COURT:  Okay.  And so your argument is, the Government's argument basically is to the magistrate judge's order is that these, these things are not exculpatory because we don't know what the evidence is going to show.  I take it that, that Dr. Cunningham, whose affidavit has been filed, his,

his, his argument is I need, just because a person has been convicted of killing another inmate, that there's still sort of sub-classes of dangerousness, and if I know what information about other inmates and how they're held, I can determine better whether Mr. Caro falls within a class or sub-class of inmates who may be more dangerous?  Is that how you understand the argument?

MR. GIORNO:  As I understand it, Your Honor.

THE COURT:  And so the Government says that this information is not really exculpatory because we don't know what it's going to show, and it is burdensome, unduly burdensome, and could not be produced in adequate time?

MR. GIORNO:  Precisely, Your Honor.  Those are the two prongs of the Government's argument.

THE COURT:  Let me understand from you, and of course I want to hear from defense counsel, but let me understand from you about the magistrate judge's order, the defendants had first filed motions for subpoenas, and did those motions cover the same material sought?

MR. GIORNO:  Yes, Your Honor.  For the most part, yes, they did.  The subpoenas covered the same

materials with the exception of what has been described in the magistrate's order as items J through M which are, and those items J through M, Your Honor, to the extent that they are, they constitute Brady or Giglio material, it's the Government's position -- we didn't file an objection to those. The reason for that is we thought we were obligated to provide that in any case, and I will tell the court, and I think defense counsel will bear me out on this, we have turned over everything we have concerning the guards and any other information that would qualify as Brady or Giglio, which is the way I construe J through M in the magistrate's order.

THE COURT: I thought J through M are names of correctional officers at Florence ADMAX?

MR. GIORNO: Your Honor, again, I'm looking at the order --

THE COURT: I was looking at her opinion, I guess.

MR. GIORNO: The order, page three, Your Honor. I'm sorry, I should have been more specific on that. I apologize.

THE COURT: Yes. I see.

MR. GIORNO: Items J through M, Your Honor, the way as I understand it, would be, we'd be

obligated by that, in any case, and we have no problem doing that. I think we already have, to a large extent, provided what we have.

THE COURT: All right. Let me hear from the defendant's counsel now.

MR. KALISTA: I believe Mr. Giorno was probably referring on page three to, to items that are on the bottom paragraph that are marked A through E. I think that's what he's referring to, rather than J through M on pages two and three.

THE COURT: No, we're looking at Judge Sargent's order of November 8th.

MR. KALISTA: That would be the memorandum opinion, Judge.

THE COURT: That was my confusion, too, but Mr. Giorno was talking about the order, itself, and J through M, she's added those.

MR. KALISTA: Okay. Judge, in terms of your questions to Mr. Giorno as to Florence ADMAX and how we seem to focus on that, let me say first of all, it is a fact, and the evidence will be that Mr. Caro was actually transferred to Florence ADMAX from USP Lee in approximately October of 2005 before he was indicted. And the evidence will be that he was kept there and confined there until approximately

March of 2006.  He was indicted in January of 2006. He was transferred, then, from Florence ADMAX back to the USP simply to await trial.  So, this is an inmate who has, in fact, been at Florence ADMAX.  It's not a question of whether he'll go there.  He's been there.

In addition, Dr. Cunningham in his affidavit does state very clearly that in his experience as an expert witness in these capital cases that the Government has typically offered evidence that an inmate within the Bureau of Prisons who killed another inmate will spend six years in a control unit at Florence ADMAX.

Florence ADMAX, I think the evidence is also going to show, is a very distinct unit within the Bureau of Prisons as compared to all the other, all the other units or prisons within the Bureau of Prisons.  It would be the only federal, what might be called a super maximum facility.

The other categories of federal prisons include what are called federal correctional institutes which are medium security facilities.  There are some low security facilities, and the only maximum security facilities within the Bureau of Prisons are USPs, otherwise known as United States penitentiaries.  Lee USP is, for instance, a United States penitentiary.

What we're talking about, the SHU at USP Lee, where this occurred, that's often been described as a prison within a prison where inmates are locked down 23 out of 24 hours every day, and might have one hour out for some type of exercise.

When we talk about the levels of security at Florence ADMAX, beginning with the general population all the way up to the control unit, the general population at Florence ADMAX is similar to being in the SHU at a USP such as Lee USP since that the inmates there at Florence ADMAX are locked down 23 out of 24 hours out of every day in general population, and they have one hour of recreation.

Now, included within the data that's been requested is the fact, I think this is pointed out by Dr. Cunningham's affidavit, that there had been two inmate killings at Florence ADMAX. These occurred, as we understand it, in approximately the spring of 2005 within a very close time of one another, and we understand that the institution, in examining why these killings occurred, based upon the circumstances of the killings, made certain changes to their operation as to inmates in the general population unit.

And what happened basically was that for inmates

JA 87

in the general population who are locked down 23 out of 24 hours every day, these inmates in small numbers had a common exercise unit, both killings occurred during the time when these inmates were in that common exercise unit, and since these killings occurred we understand that the facility has basically changed their exercise area such that each inmate has their own run or pen, and they exercise basically solitarily and without contact with any other inmate.

THE COURT:  Let me interrupt you, Mr. Kalista, just to make sure I understand, if you know.  You told me that at Florence ADMAX the general population is like, is like a segregation unit at a United States penitentiary.  What is the additional restrictions in the control unit at Florence ADMAX?

MR. KALISTA:  Some of the additional restrictions have to do with the, I think it's a gradual loss of privileges, and a gradual increase in the security when these inmates are taken from one place to another.  And by gradual loss of privileges I'm saying that inmates in the general population, as I understand it, may have access in their cells to a radio and a television.  Inmates in the control unit do not have such privileges.  That is something that

JA 88

is taken away from them.  I think the number of guards that are required, then, to transport an inmate in the control unit from one place to another increases, so it is a, it is a series of steps to deny inmates who do commit violent acts within the prison system a loss of privileges.  There are other privileges, I understand, that are lost as well dealing, perhaps, with visiting, correspondence, perhaps, things of that nature, ability to purchase items, I think, from the canteen, so it is a gradual loss of privileges and a gradual loss of restriction on greater security in transporting inmates.

THE COURT:  And your understanding is that for the general population at Florence ADMAX they're single celled for 23 hours a day?

MR. KALISTA:  That's my understanding, yes.

THE COURT:  You believe that since the two inmate murders several years ago, or a year or so ago, that they have changed the procedure so there's no common exercise privilege now?

MR. KALISTA:  That each inmate would have his own exercise area that, or he would exercise basically solitarily, not in company with any other inmate.

THE COURT:  Okay.  Very well.  Go ahead.

JA 89

MR. KALISTA: Dr. Cunningham basically says in his experience when he testifies what he often hears is prosecutors bringing up, in fact, the fact that, well, in terms of being, the prosecutors bring up the facts about these two killings, inmate killings.

It is important, then, to have information not only about the kings which have occurred at Florence ADMAX, but killings within the Bureau of Prisons system altogether within the last 20 year period because we're dealing not only with the assaultive conduct of inmates at Florence ADMAX, specifically inmates who have been convicted or who have killed another inmate within the BOP, but we're also looking at their, at their history as far as movement within the Florence ADMAX and movement within the prison system.

THE COURT: Well, let me ask you this. What do you mean their movement? You mean their transfer to different institutions?

MR. KALISTA: It's like Mr. Giorno says, he is saying that there's no guarantee that Mr. Caro will go to Florence ADMAX. And if he goes there, how long he'll stay there in the control unit at Florence ADMAX is anybody's guess. Well, again, there is data

that is collected as to each unit at Florence ADMAX, as to each inmate at Florence ADMAX as to how long they got, how long they've stayed there.

One of the, one of the items of information requested is the movement history for inmates who have been at Florence ADMAX since it was first opened in 1994. Because the Government in, again, basically cross examining our expert witnesses are basically going to try to suggest to the jury that a stay at Florence ADMAX is going to be a temporary placement.

Again, inmate movement data, we believe, would tend to support our belief that, in fact, inmates stay a long time at Florence ADMAX. Inmates who have killed another inmate stay a long time at Florence ADMAX.

I guess I would look at this in two ways, Judge. We're talking about the Government offering evidence in its case in chief as a capital sentencing proceeding on future dangerousness that Mr. Caro, because of his history, and I'm sure they're going to offer evidence as to his institutional and non-institutional history in support of their expert conclusions that he is a danger based upon what he's done in the past, but there's another side of this, and that is, as Dr. Cunningham tries to point out in

JA 91

his affidavit, that predictions of future dangerousness also rest, in part, on group data, and that is what have other inmates who have committed violent acts, specifically killings within the Bureau of Prisons of another inmate, what has their, what has their conduct been after that point? What has their movement been within the system after that point?

Again, to rebut the Government's argument that this, since the Bureau of Prisons cannot adequately house and secure this inmate from other inmates, or from correctional staff, or from the general public while incarcerated, or that placement at Florence ADMAX is temporary, in addition to cross examining the Government's witness, we believe our testimony would buttress our expert, Dr. Cunningham, that the Bureau of prisons can adequately secure and house Mr. Caro, and keep other inmates and correctional staff safe, they can adequately handle him, and the death penalty, then, is, the jury should not impose the dealt penalty, that they should impose a sentence of life without release.

THE COURT: Well, Mr. Kalista, let me ask you this. Won't the defendant want to argue in his sort of best case that he will be kept at Florence

ADMAX for the indefinite future, and because that is the most secure prison in the system, and, and under the conditions that you've described it's going to be less likely to, he is going to be less likely to have opportunities to commit other violent acts?

MR. KALISTA:  That is correct, Your Honor.

THE COURT:  But I mean the Government, the Government says it doesn't really have the information that Mr., Dr. Cunningham wants, so I mean, it's going to be hard pressed to argue that Mr. Caro, you know, would be sent to another institution, isn't he?  I mean, Dr. Cunningham says he understands, and his experience is that people do stay in, in the Florence ADMAX for, and even in the control unit for a long period of time, and the Government is not going to have any statistics to cross examine him on that.

MR. KALISTA:  Judge, they may not have these statistics, but they are going to have, and we've learned today that there's going to be a former warden there at Florence ADMAX who says here is the situation, as I understand what Mr. Giorno is representing, again, apparently without having any data, but he's going to appear before the jury as having been a former warden of the very institution

we're talking about, and giving an opinion, and basically being bullet proof in the sense that we're not able to attack him other than maybe saying, well, have you examined any data as to, again, things that are listed in the, that are required to be provided right now by the magistrate judge. I suppose we could ask him, "Have you considered these, this data, that data," and I presume he is not, otherwise those would be things the Government would be required to provide as being the basis, but certainly again, in terms of Dr. Cunningham coming up and saying, "I studied the Bureau of Prisons system, and this is my understanding," and going into the fact that predictions of violence certainly are vastly overrated based on a person's prior conduct, and that you'd have to look at group data to come to a conclusion as to a prediction of violence as to a specific individual, certainly I think we're going to be at a disadvantage, unless we can bolster our expert with this data, with this information, and certainly I think we have had two murders at Florence ADMAX, certainly the Government knows who these inmates are, and certainly knows their history at a very minimum, their movement history, their subsequent history within the Bureau of Prisons after

these killings were committed.  I don't know how many inmates who have killed another inmate have actually been confined at Florence ADMAX, but that is something that you can find out, as well, and I don't know what figures you're talking about, I know we were told at one time in a hearing before the magistrate judge by Ms. Crane that she understood that within the last 20 years within the Bureau of Prisons system there have been 160 or so murders, inmate killings, but some things like inmate history, I received in discovery inmate history print outs and other information on inmates that appear to be perhaps very easily obtainable by just simply knowing the names of the inmate's registered number, and they are printed out pretty easily.

        But Judge, I look at this as exculpatory evidence, certainly.  I'm not sure where onerousness for the burden to the Government comes in on this when we're talking about a capital case.  The fact it may take several hours, or again I don't know how long, because there's been no representation as to how long it may take, I'm not sure where on the scale in a capital case something of an exculpatory nature becomes too burdensome or too onerous to the Government.

JA 95

But we're looking this from the perspective of dealing with the Government's case in chief where it's offering into evidence, of course, the records of our client showing his violence inside the prison system, an expert basically who reviewed that, and is giving an opinion who also apparently happens to have been a former warden of the very institution that we're saying Mr. Caro will be going to who is, I expect is going to opine that placement there will be temporary in some fashion. I don't know if this expert is going to say that the Bureau of Prisons, either in Florence ADMAX or without Florence ADMAX, has the ability to handle Mr. Caro. I suspect he's going to say that it does not for some reason. I'm not sure about that. But I'm also not sure what the basis of that opinion is.

THE COURT: Thank you, Mr. Kalista. Mr. Giorno, let me ask you this about Mr. Hershberger, your witness. If he's going to be testifying as an expert aren't you obligated to provide the defendant with --

MR. GIORNO: Absolutely, Your Honor.

THE COURT: But you have not done that yet?

MR. GIORNO: No, Your Honor. The due date for disclosure of expert testimony and all the things

that go along with it was set by the magistrate on December 18th, and we talked about doing an earlier disclosure of that, and we would be willing to do that.  Of course, we were obligated by his disclosure, what did he rely on, what is he going to do to form the bases of his opinions.

THE COURT:  Does he have experience at Florence ADMAX, do you believe?

MR. GIORNO:  Your Honor, I don't want to tell the court or defense counsel something that is not correct.  I know that he has Bureau of Prisons experience.  I want to say that I believe some of it in some capacity is at ADMAX, although I cannot tell the court with 100 percent certainty today.  I didn't bring his folder with me.  But I am prepared, if defense counsel is agreeable to some mutual exchange, earlier exchange of experts, and a basis for it.

THE COURT:  Well, getting back to the Florence, the -- is it, or do you know at this point will it be the Government's position that Mr. Caro, if not given the death penalty, would not necessarily be at Florence, or maybe, or will be for a while, or just nobody knows?  I mean, surely somebody in the Bureau of Prisons could make some prediction about where, where Mr. Caro would be.  Don't you, won't you

JA 97

sort of have to tell the jury that in your evidence?

MR. GIORNO: The only thing at this point, I think, Your Honor, that I'm sure I could tell the jury is if Mr. Caro is convicted and is given whatever sentence, that he will go to some facility as designated by the Bureau of Prisons.

Florence is certainly an option, but as far as being able to identify, Your Honor, an official in the Bureau of Prisons that can tell me with certainty what will happen in any scenario concerning Mr. Caro, I've not been able to, to find that yet. The only thing I think we can tell the jury is, ladies and gentlemen of the jury, if he's given life imprisonment Florence is an option, Lewisburg is an option, Beaumont is an option, any number of other secure Bureau of Prisons facilities.

THE COURT: Are there inmates who have committed murders and are serving life sentences at places other than Florence?

MR. GIORNO: I'm certain that there are, Your Honor.

THE COURT: I mean, inmates who have committed murders while in the federal system.

MR. GIORNO: I cannot answer that question, Your Honor. I don't think Bureau of Prisons has that

specific data.  As far as, you know, inmates who have committed murders while they're in prison, I don't know where they are.  I would assume they are at places --

THE COURT:  I would be surprised if there wasn't some policy that somebody in Washington at the upper levels was thinking about, "Now, we've had, we've had, you know, they have inmate killings, murders in prison.  What do we do with those people?  Do we, is there a protocol for them?"  But so far you haven't discovered any such?

MR. GIORNO:  All I know, Your Honor, from what Ms. Crane said at the last hearing there have been some 160 odd inmate killings in the Bureau of Prisons.

THE COURT:  Since when?

MR. GIORNO:  In the last 20 years.  But where they, what happens to those individuals, who those individuals are, if there is a specific policy that dictates where they go and how they are treated, I haven't been able to identify it yet, Your Honor.

THE COURT:  Okay.

MR. KALISTA:  Judge, I would point out, I might have mentioned this before, but Dr. Cunningham in his affidavit does say that his experience in

capital cases is that the federal government presents witnesses, or has provided information in the past that an inmate who kills another inmate within the Bureau of Prisons gets sent to Florence ADMAX to basically be placed in the control unit for a period of six years. I think that is in his affidavit.

MR. SIMMONS: Your Honor, this is Jim Simmons speaking. Just briefly, I think the data, to put it into a nutshell, the data we're asking for is we know there have been other inmate killings within the Bureau of Prisons. Of those, many are still being housed in the Bureau of Prisons and have not, we suspect have not committed further violent acts. And we know at ADMAX that they can be housed appropriately, and we're simply asking for the data for our experts to be able to analyze that and support our positions. And I can't believe the Bureau of Prisons wouldn't have some type of policy.

THE COURT: Yes, sir. Now, defense counsel, tell me about the, the, the other motions that you objected to that relate to discovery. Again, as I understand, the magistrate judge denied as untimely three motions. Is that the ones you're talking about?

MR. KALISTA: Yes, Judge. I guess one

would be, there are two subpoenas duces tecum.  One was directed to the warden of Florence ADMAX, and one was directed to the Director of Bureau of Prisons, and the other one was a motion for discovery pursuant to Rule 16 related to basically the capital sentencing proceedings.

The judge basically found that these motions were untimely, although she seemed to go into the merits of the motion for discovery, and, and basically ruled that the Government has indicated before her during argument that this expert would not be relying upon any of the data that we had requested in that discovery motion.

So, my understanding is while she may have said that that motion was untimely, the Government basically, because of that representation, that seems to be the end of the issue; that we were not entitled to that.  And I would certainly take the Government at its word that they were going to somehow use that data, either introduce it into evidence or provide it to its expert, and the Government's expert was going to rely upon that data, that his opinions would be provided pursuant to the rule.

THE COURT:  Let me interrupt you.  I'm just confused again, and I'm sure you can straighten me

out.   Looking at the magistrate judge's order here, I'm trying to find in paragraph two of her order -- this is not a memorandum decision, but her order -- she says the defendant's motions to issue subpoenas duces tecum which are 273 and 274, and motion for discovery, 208, are denied as untimely.

Now, you say the discovery motion, and I've got that in front of me, and it has, it looks to me like sort of a repeat of the information that you filed, that you want from, about all these other alleged assaults and killings, and so on, that she, she approved.   What is the difference?

MR. KALISTA:   The difference was, Judge, that discovery motion was related to, under a particular portion of Rule 16.   It was related to items that the Government would present in its case in chief.   And, again, it was directed to the extent that the Government was going to introduce that specific information, either directly to support its contention of future dangerousness, or would have been considered by its experts who would testify as to future dangerousness as supporting his conclusion that we believe under that portion of Rule 16 we are entitled to that.

And I might add, Judge, that there has been a

previous discovery order entered in the case which was agreed to by the parties, and that was on February the 10th of 2006, which essentially in general terms provided the same thing, that any books, papers, documents, photographs, tangible objects, buildings or places which are within the possession, custody or control of the Government, and which are material to the preparation of the defendant's defense or intended for use by the Government as evidence in chief at trial, would be produced, but this --

THE COURT:  Well, I mean that's right. Again, I don't understand.  I mean, whether or not it's used in the Government's case in chief is not the determining factor for discovery.  I mean, as you just pointed out, it's also whether it's material to preparing the defense, right?

MR. KALISTA:  Yes, sir, that's correct.

THE COURT:  And my question was what's the difference between this motion and the motions that the magistrate judge granted?

MR. KALISTA:  In terms of the information requested?

THE COURT:  Yes, sir.

MR. KALISTA:  I believe for some reason the

magistrate judge did leave off from one area, and that was the specific information as to -- let's see if I can find it, Judge, I believe it has to do with the inmate killings at Florence ADMAX, if I remember correctly. That seemed to be the only, the only paragraph that the magistrate judge may have omitted.

THE COURT: Well, I mean, I mean she granted, she granted a request that you get information on all inmate homicides in the BOP within the last 20 years which would, of course, include any at Florence ADMAX.

MR. KALISTA: That's correct, Judge. She may have decided that was simply a lesser included part of this, that is correct.

THE COURT: Well, but she did that, she did grant, you know, the exculpatory evidence, the 307.

MR. KALISTA: I guess, Judge, I've always considered exculpatory evidence as being, than evidence pursuant to Rule 16, an entirely different category, and, but you are correct that she did grant essentially the same information under the motion for exculpatory evidence that was requested in the motion for discovery, and for that matter --

THE COURT: All right. Now, 274 and 273 were subpoenas, requests for subpoenas under Rule 17,

right?

MR. KALISTA: That's correct, Judge.

THE COURT: All right. Anything you want to say about that? Your objection to her failure to grant those?

MR. KALISTA: Judge, in terms of why the judge denied those, which was the timeliness factor, while we did not put that in our motion, as I explained to the magistrate judge, basically we met with Dr. Cunningham, I believe it was in late August, and it was at that point that talking with him during trial preparation that he expressed a desire to obtain this information, and that is why we did not request this information before that time.

THE COURT: Well, yes, I understand. Anything else from counsel, Mr. Giorno?

MR. GIORNO: Not from the United States, Your Honor.

THE COURT: Mr. Simmons or Mr. Kalista, anything further?

MR. SIMMONS: Your Honor, this is Mr. Simmons. I believe it's been covered at this point as to the discovery issues.

THE COURT: Now, Mr. Giorno, you're going to, you say you're going to file an affidavit in

support of the Government's position?

MR. GIORNO:  Can I, Your Honor, with regard to the, those items that are requested by the defense and what it would take, even if it's possible for the Bureau of Prisons to produce them, and are there any other issues --

THE COURT:  When are you going to file that affidavit?

MR. GIORNO:  I asked that very question of Ms. Crane a few moments ago.  We anticipate filing at least one affidavit, that being from the counsel at ADMAX Florence, and he will address what we can find in Florence.  It may be necessary to find another official to address what can be done within the Bureau of Prisons as far as the availability of the information requested, but they have assured me, Your Honor, that can be done before the end of the week.

THE COURT:  Okay.  Well, you know, I need to resolve these motions, obviously, so we can keep everything on track here.  So, I'll allow you until the end of this week.  Well, let's see, Monday -- you mean Friday is the earliest you can do that?

MR. GIORNO:  That's the latest.  I have told them that for a lot of reasons we need this soon.

JA 106

THE COURT: What I would like you to do, actually, is file it by Wednesday of this week, and allow the defendants an opportunity to respond to anything in there by Friday. I mean, I just don't think we can extend this out, you know, this discovery question indefinitely. If I grant any part of it, you know, we just need to move along rapidly.

MR. GIORNO: As soon as we adjourn I will call Ms. Crane and tell her the court wants the information by Wednesday, and, and has directed me to have it by Wednesday, and I'll stay on them.

THE COURT: Very well. And then Mr. Kalista and Mr. Simmons, I'll, I'll allow you all until Friday to respond, if you wish to. Is that all right?

MR. SIMMONS: Very well.

MR. KALISTA: Thank you, Your Honor.

THE COURT: Then I'll make a prompt ruling on these motions and then, again, in the interests of time we'll take up any other, all the other motions on December 8th. So, is there anything else that we could profitably take up at this time?

MR. GIORNO: Nothing from the United States, Your Honor.

THE COURT: All right. Thank you, counsel.

And we'll recess court.

(Proceedings concluded at 11:30 a.m.)

CERTIFICATE

I certify the foregoing is an accurate transcript from the record of proceedings in the above-entitled matter.

7/9/07                          /s/ Bridget A. Dickert
Date

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION

UNITED STATES OF AMERICA, )
                             )

v.                                )
                             )     Case No. I:06cr00001

CARLOS DAVID CARO         )
                             )

     Defendant            )

## DECLARATION OF TOMAS J. GOMEZ

I, Tomas J. Gomez, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge and information made known to me from official records reasonably relied upon by me in the course of my employment, hereby make the following declaration relating to the above entitled matter.

1.      I am a Unit Manager with the Federal Bureau of Prisons ("Bureau"). I have been a Bureau employee since February 1992. I am currently assigned to the United States Penitentiary, Administrative Maximum ("ADX"), in Florence, Colorado. As a Unit Manager my duties and responsibilities include overseeing the operation of the Control Unit, the Special Security Unit, and the Step-Down Units at the ADX.

2.      Correctional institutions historically experience occasional disruption of regular activities due to the violent actions of other inmates. (Bureau Program Statement 5212.06, Control Unit Programs, p.1.) The Federal Bureau of Prisons (Bureau) recognizes that the vast majority of inmates in federal prisons do not involve themselves in violent incidents. (Id.) Instead, the majority of violent incidents involve a very small number of inmates. (Id.) The

1

Bureau determined that special programs were necessary to protect the majority of inmates from the more violent minority and to fulfill the Bureau's congressional mandate to provide for the safekeeping, care, and subsistence of all inmates. (Id.)

3.      While ordinary techniques involving separation and transfer of disruptive inmates are effective in some circumstances, there are other inmates who have not responded to such techniques. (Id.) The agency determined that established segregation programs for short periods of restriction were not effective for inmates whose behavior indicates a need for a longer period of physical control and a higher level of supervision. (Id.) The inability of that small group of inmates to function in general population facilities without engaging in violence precluded management through traditional means. (Id.) As such, the Bureau developed a Control Unit Program. Under this program, inmates who demonstrate an inability to function in the regular open population facilities without posing a threat to others or to the orderly operation of the institution are placed into a separate unit. 28 C.F.R. §541.40 et seq.

4.      Inmates are placed in the Control Unit only after a recommendation by the Warden at the facility where they are housed. Id. § 541.41(a). The Warden may not refer an inmate for placement in the Control Unit if the inmate shows evidence of a significant mental disorder or major physical disabilities as documented in a mental health evaluation or physical evaluation. Id. § 541.41(c)(1). There are very specific criteria which must be considered in making a Control Unit recommendation. Id. § 541.41(b) - (c). This recommendation is reviewed by the Regional Director for the region where the inmate is housed. If the sending Regional Director concurs with the recommendation, the referral is forwarded to the Regional Director for the North Central Region, the region where the Control Unit is located. Id. § 541.42.

2

JA 110

5.      A Hearing Administrator is designated by the North Central Regional Director to conduct an in-person hearing with the inmate as to his possible placement in the Control Unit. Id. §§ 541.42, 541.43. The inmate is provided advance notice of the hearing and the actions that form the basis for the recommendation. Id. § 541.43(b)(1). The inmate is also provided a staff representative to assist him, if he chooses. Id. § 541.43(b)(2). The inmate has the right to appear at the hearing, but may refuse to appear or be removed for security reasons. Id. § 541.43(b)(3). The inmate may present documentary evidence and may call witnesses, subject to some restrictions. Id. § 541.43(b)(4). At the conclusion of the hearing, the Hearing Administrator shall prepare a written recommendation as to whether Control Unit placement is warranted. Id. at § 541.44. The inmate receives a copy of this recommendation and may appeal it to the Executive Panel. Id. § 541.44(b). The recommendation is forwarded to the Executive Panel for final review and decision concerning placement. Id. §§ 541.44(c), 541.45.

6.      Upon admission to the Control Unit, inmates are advised of the projected duration of their confinement in the Unit, and other aspects of unit operations. Id. § 541.47. Duration of Control Unit placement is initially determined based upon the conduct which resulted in the placement. Id. Another factor to be considered is the inmate's behavior while awaiting Control Unit placement. Id. This period may range from one month to any definite period of months. Id. § 541.47(a).

7.      Inmates are advised that the duration of their assignment to the Control Unit may be increased or decreased based on their behavior while in the assigned Control Unit or while assigned to that Unit but away from the facility on writ or for some similar reason. Id. Control Unit inmates are advised that their time in the unit will be credited or not depending on their behavior each month. Id.

JA 111

8.    The ADX is the only Bureau institution with a Control Unit, and as such, the ADX Control Unit (B-Unit) houses the most dangerous, violent, disruptive and assaultive inmates in the Bureau's custody. Each cell in the Control Unit is approximately 87 square feet, which does not include the sallyport area of the cell, which is 17 square feet. Each cell has a solid outer door and an inner grill. Each cell solid outer door as a window, which looks out on to the range. Each cell also has a window that looks outside, providing the inmate with natural lighting. The inmates housed in the Control Unit receive a minimum of 7 hours of out of cell exercise per week. The inmates recreate individually in secure single recreation areas. The inmates consume their meals in their cells. The inmates receive one monthly social telephone call and may receive up to five social visits per month. Shower stalls are located within the cells.

9.    As previously stated, admission to the Control Unit is governed by 28 C.F.R. § 541.40, et seq., and Program Statement 5212.07, Control Unit Programs. On the other hand, the placement of an inmate in the Special Security Unit at the ADX is a classification decision made pursuant to 28 C.F.R. § 524.10, et. seq. and Bureau Program Statement 5321.07, Unit Management Manual. The Special Security Unit (H-Unit) currently only houses those inmates who have Special Administrative Measures imposed on them, pursuant to 28 C.F.R. § 501.2 and § 501.3, or restrictions imposed by a court, pursuant to 18 U.S.C. § 3582(d).

10.    Each cell in the Special Security Unit has approximately 75.5 square feet of living space and do not have a sallyport or a shower. Each cell has a solid outer door. Each cell solid outer door as a window, which looks out on to the range. Each cell also has a window that looks outside, providing the inmate with natural lighting. The inmates housed in the Special Security Unit receive a minimum of 5 hours of out of cell exercise per week. The inmates recreate

4

individually in secure single recreation areas. The inmates consume their meals in their cells. The inmates receive two monthly social telephone calls and may receive social visits.

11.     The ADX does not maintain in the ordinary course of business a record that identifies the inmates who have been assigned to the Control Unit since its inception or the rationale for such placement. Nor does the ADX, in the ordinary course of business, maintain a list of Control Unit inmates who have engaged in assaultive conduct while housed in the Control Unit, nor the date of occurrence or description of such conduct.

12.     In the absence of a list identifying the inmates that have been housed in the ADX Control Unit, the request for the names of such inmates, the prison numbers, assignment rationale and tenures of all inmates in the ADX Control Unit from its inception, is not maintained in a form that allows ADX staff to retrieve the information as requested. Moreover, although the Special Investigative Services ("SIS") Department may maintain a file for each assault committed by an inmate, they do not have a record, maintained in the ordinary course of business, that identifies whether the assault was committed by an inmate housed in the Control Unit.

13.     Thus, in order to provide the information requested as identified in ¶¶ 10-11, the Bureau would have to search through every single central file of every inmate who was incarcerated at each institution over almost a 12-year period. The Bureau does not maintain rosters that would allow the defendants to identify every single inmate who was housed at a particular institution during the relevant time period, nor does the computer system allow such rosters to be retrieved after 30 days.

14.     Inmates are frequently transferred between federal prisons for a variety of reasons. The responsive records would conceivably be located at any high, medium, or administrative

5

JA 113

level federal prison. They could also be located in any National Records Center, as the records of released inmates are transferred to those locations for storage.

15.      Additionally, even if ADX staff are provided with a list of inmates who have been housed in the ADX's Control Unit, ADX staff would have to search through hundreds of SIS files to ascertain (1) whether or not the file contained information regarding an assault by an inmate and (2) if so, whether or not the assault was committed by a Control Unit inmate.

Pursuant to the provisions of 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

Executed on this ____th day of November 2006, at Florence, Colorado.


_____
Tomas J. Gomez
Unit Manager
United States Penitentiary-Administrative Maximum
Florence, CO


6

JA 114

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION

UNITED STATES OF AMERICA      )
                              )      Case No. I:06cr00001
v.                            )
                              )
CARLOS DAVID CARO,            )
                              )
        Defendant.            )

---

DECLARATION OF JENNIFER BATCHELDER
SOCIAL SCIENCE RESEARCH ANALYST

---

J, Jennifer Batchelder, do hereby certify, declare, and state as follows:

1.      ·I am currently employed as a Social Science Research Analyst in the Office of Research and
        Evaluation for the Federal Bureau of Prisons ("BOP"), United States Department of Justice.
        I have held this position since August 1988. I have been employed with the BOP since June
        of 1986, as 1 was a contract research analyst from 1986 to 1988.

2.      In my official position, I have access to data and statistics created and held in the official
        course of business of the BOP.

3.      I have access to aggregated Correational Services Significant Incidents Data for the
        Administrative Maximum Facility in Florence, Colorado (AD-MAX). This data is hmited
        data, meaning that it shows only that the incident occurred and at what facility, in this case,
        AD-MAX. This data covers escapes, assaults, and deaths at the facility. Assaults data
        would indicate only whether a weapon was used and whether the victim was an inmate or
        staff member.

4.      I would need clarification as to the meaning of "each security level at ADX" to detennine
        whether further responsive data would exist.

        I declare, under penalty of perjury, pursuant to Title 28, United States Code, Section 1746,
that the foregoing is true and correct to the beat of my knowledge.

        Executed this 15th day of November, 2006, in Washington, D.C.

                                        Jennifer Batchelder
                                        Social Science Research Analyst
                                        Federal Bureau of Prisons

JA 115

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Case No. I:06cr00001 |
| v. | ) | |
| | ) | |
| CARLOS DAVID CARO, | ) | |
| | ) | |
| Defendant. | ) | |

DECLARATION OF LINDA THOMAS
CORRECTIONAL SERVICES BRANCH ADMINISTRATOR

I, Linda Thomas, do hereby certify, declare, and state as follows:

1. I am currently employed by the Federal Bureau of Prisons of the United States Department of Justice as the Administrator of the Correctional Services Branch. I have held this position since July 2003. My business office is located at the Central Office of the Bureau of Prisons, 320 First Street, N. W., HOLC Building, Washington, D.C. 20534. Prior to my current assignment, I was an Associate Warden at the Metropolitan Detention Center, Brooklyn New York from September 1999 to July 2003.

2. As the Administrator of the Correctional Services Branch, I am responsible for the safe, humane care, and custody of Federal inmates in Bureau facilities, including security, emergency preparedness, inmate transportation, inmate discipline, delivery of inmate programs, case management, and the provision of psychological and religious services. As part of my responsibilities for security of all institutions, I supervise the Special Investigative Supervisors Office (hereinafter SIS).

3. In my official position, I have access to records created and held in the SIS offices at BOP institutions.

4. An after-action review is not required for every inmate homicide which occurs within the Bureau of Prisons.

5. The Correctional Services Branch, Central Office is not required to maintain records on inmate homicides as far back as 20 years.

6. SIS investigative reports generated as a result of an inmate homicide within the Bureau of Prisons are kept at each BOP facility where the homicide occurred. Reports created on older

JA 116

homicides, however, may be archived and thus no longer at the facilities.

7. Some inmate homicides may be currently pending prosecution and referral to the Federal Bureau of Investigation. Additionally, there may not be an SIS investigative report if the FBI assumes responsibility for the investigation immediately after an incident.

8. Production of such reports for every inmate homicide within the last 20 years in the Bureau of Prisons would be an enormous undertaking requiring the coordination of more than 100 SIS offices nationwide. Staff would have to determine what files exist and where they are located. Additionally, I would have to cross-reference the information from the different SIS offices with the records maintained in my office to ensure accuracy.

9. I would estimate that the attempted production of all of these reports for the last 20 years would take months to accomplish.

10. SIS investigative files typically contain voluminous documents with highly sensitive information.

I declare, under penalty of perjury, pursuant to Title 28, United States Code, Section 1746, that the foregoing is true and correct to the best of my knowledge.

Executed this 16th day of November, 2006, in Washington, D.C.

Linda Thomas
Administrator
Correctional Services Branch
Federal Bureau of Prisons

JA 117

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION

UNITED STATES OF AMERICA )
                                       )    Case No. 1:06cr00001
v.                                     )
                                       )
CARLOS DAVID CARO,                     )
                                       )
        Defendant.                     )

DECLARATION OF JOETTA A. TERRELL
DISCIPLINE HEARING ADMINISTRATOR

I, Joetta A. Terrell, do hereby certify, declare, and state as follows:

1.    I am currently employed as the Discipline Hearing Administrator for the North Central
Regional Office (NCRO) of the Federal Bureau of Prisons (BOP), United States
Department of Justice. I have held this positions since May 8, 2006. Prior to this
position, I held the position of Discipline Hearing Officer in the NCRO from May 22,
2001, to May 7, 2006, and have been employed with the BOP since August 13, 1989.

2.    In my official position, I have access to records created and held in the official course of
business of the BOP. These records include both hard and electronic copies of records.

3.    As part of my official duties as the NCRO Discipline Hearing Administrator, I have
participated in Control Unit Hearings for placement of inmates at the Administrative
Maximum Facility in Florence, Colorado (AD-MAX). In accordance with BOP policies
and Title 28, Code of Federal Regulations, § 541.40, the BOP operates a control unit
program, intended to place into a separate unit those inmates who are unable to function
in a less restrictive environment without being a threat to others or to the orderly
operation of the facility. I also participated in such hearings since approximately 2004, as
a Discipline Hearing Officer.

4.    While no official records are required to be maintained under BOP policies, the NCRO
has maintained an informal log of both the Control Unit Hearings for the AD-MAX and
for Control Unit Hearings for the United States Penitentiary in Marion, Illinois (USP
Marion), prior to the AD-MAX Control Unit existence. The log is maintained in the
department in which I work, the Correctional Services Department, and contains brief
information, including the name of the inmate referred for placement in the Control Unit,
federal register number, institution inmate was housed at the time of the referral, date of

JA 118

referral, Hearing Administrator assigned to conduct the hearing, date of the hearing, other various dates related to the hearing process, and whether the inmate was denied or accepted for placement in the Control Unit.

5. A review of this Control Unit placement log reveals approximately 141 inmates have been referred for placement at the AD-MAX Control Unit since 1997. From the log, it is not certain if inmates listed prior to 1997 were also placed in the AD-MAX Control Unit. As such, it would be necessary to review the electronic or inmate file commonly referred to as the Central File, to determine if any of the 54 inmates from 1994 through 1997, were reviewed for placement in the AD-MAX Control Unit, as opposed to the Marion Control Unit.

6. In general, an inmate is referred by a Warden for placement in the AD-MAX Control Unit after consideration of seven factors, listed in Title 28, Code of Federal Regulations, § 541.41: (1) incidents causing injury during confinement, (2) incidents involving threats to life/well being of another person, (3) incidents involving possession of a deadly weapon or drugs, (4) incidents involving disruption of the orderly operation of a prison, jail or other correctional institution, (5) incidents involving escape from a correctional institution, (6) incidents involving an escape attempt, and (7) a review of the current offense for which the inmate is committed.

7. Additional information concerning the specific reasons for the referral of a particular inmate to the Control Unit would likely be included in the inmate's referral packet for consideration in the Control Unit. While not required by BOP policy, some information/files regarding the AD-MAX Control Unit referrals are currently maintained in the NCRO. However, these files, which take up approximately 4 file drawers, are sporadic, and only appear to be related to some, if not all, current AD-MAX Control Unit inmates and some files related to denials/release from custody. To identify records responsive to a request for specific reasons for placement in the AD-MAX Control Unit for each individual referral, a hand search through each of these files would need to be conducted, and would not be reflective of all AD-MAX Control Unit Referrals.

8. Some of these records may be maintained in an inmate's Central File, which is located in the current designated institution, or if released, his last designated institution or the National Archives Center. A placement in the AD-MAX Control Unit is not static, and an inmate can complete the program, to be transferred for placement in another facility. A review of the last ten inmates on the AD-MAX referral logs reveals only two are located currently at AD-MAX in Florence, Colorado. As such, to obtain such information, a computer search of each inmate on the list would need to be conducted to determine his current location, and then a hand search of the inmate's Central File would need to be done.

9. Information concerning an inmate's tenure, or period of time in the Control Unit, would also require a computer search individually, for each inmate (140 from 1997, 54 from 1994-1997).

JA 119

10.     Disciplinary Reports concerning each inmate referred to the AD-MAX would also require a search of both computerized records, location of the inmate's current location for his Central File, and a hand search for the reports.

I declare, under penalty of perjury, pursuant to Title 28, United States Code, Section 1746, that the foregoing is true and correct.

Executed this 15th day of November, 2006, in Kansas City Kansas.


_____
Joetta A. Terrell
Discipline Hearing Administrator
Federal Bureau of Prisons
North Central Regional Office

JA 120

JA 121

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION

UNITED STATES OF AMERICA )

vs.                         )       Criminal Number
                            )       1:06CR00001
CARLOS DAVID CARO           )

CARLOS DAVID CARO'S RESPONSE TO
GOVERNMENT'S AFFIDAVITS

Comes now, Carlos David Caro, through undersigned counsel, Stephen J. Kalista and James A. Simmons, and files this response to the Government's Affidavits (Docket Nos. 353, 354, 355, and 356), and files in support thereof a Second Declaration of Mark D. Cunningham, Ph.D., ABPP, with attachments.

The Government has filed four Affidavits in support of its claim that it would be too burdensome in this capital case for the government to comply with the Magistrate Judge's Order of November 8, 2006, granting the Defendant's Motion for Exculpatory Evidence Related to the Penalty Phase and requiring it to provide to the defense certain information from the Bureau of Prisons and/or ADX Florence. In support thereof, the government has filed Affidavits from Tomas J. Gomez (Unit Manager at ADX Florence); Joetta A. Terrell (Discipline Hearing Administrator for the North Central Office of the Federal Bureau of Prisons); Linda Thomas (Correctional Services Branch Administrator for the Federal Bureau of Prisons); and Jennifer Batchelder (Social Science Research Analyst in the Office of Research and Evaluation for the Federal Bureau of Prisons.

1

In looking at the affidavits and at Paragraph 3 of the Order of the Magistrate Judge dated November 8, 2006, it would appear that the government's affidavits do not cover the information identified in Items A., B., C. and E. ordered to be produced by the Magistrate Judge. None of the affidavits indicate any difficulty in producing any of the items required to be produced involving the two inmate killings at Florence ADX since it opened in 1994. The inmate killings purportedly occurred in 2005.

Ms. Thomas deals only with Item D regarding production of the "after action reports" and/or reports from SIS to the warden of the institution where the inmate killings have occurred. Ms. Batchelder refers only to Item I regarding production and availability of Correctional Services Significant Incidents Data at ADX Florence and indicates that other data may exist for each security level at ADX Florence. She could readily obtain information from Florence ADX as to each security level maintained there (Mr. Gomez affidavit reveals at least three security levels: general population, control unit, and special security unit). Mr. Gomez and Ms. Terrell refer only to the control unit at ADX Florence and Items F, G, and H. Indeed, Ms. Terrell's affidavit indicates clearly that a log of inmates placed in the control unit at ADX Florence is available for 141 inmates since 1997 and no more than 54 inmates from 1994 through 1997.

The Defendant files in support of this Response the Second Declaration of Mark Cunningham, Ph.D., ABPP, who has previously prepared a Declaration regarding the Defendant's motion for discovery and motion to obtain exculpatory evidence regarding a capital sentencing proceeding. The

2

JA 122

Defendant also relies upon the declaration of Dr. Cunningham with regard to the affidavits of Ms. Thomas, Ms. Batchelder, Mr. Gomez and Ms. Terrell.

The Court may set aside any part of the Magistrate Judge's order only if is contrary to law or clearly erroneous. Fed. R. Crim. P. 59(a). The Government filed nothing in opposition to the Defendant's Motion for Exculpatory Evidence at a Capital Sentencing Proceeding. The Government filed no affidavits at the time the matter was pending before the Magistrate Judge indicating any difficulty in providing the requested data. The Magistrate Judge found that the Government did not contest the Defendant's claim that the data was exculpatory. The Magistrate Judge found that the Government intends to present information by way of expert opinion at a capital sentencing proceeding asking the Defendant be put to death because he is a danger to others and cannot be adequately secured within the BOP even at the control unit at ADX Florence. The Government intends to present expert opinion that a placement in the control unit at ADX Florence is a temporary placement. The Magistrate Judge found that specific documents and information requested by the Defendant are exculpatory in that it is material on the issue of punishment in a capital case and favorable in that it may be used to impeach government witnesses. The Defendant would assert that the information and documents would be favorable in presenting information to rebut the government's assertion of future dangerousness and to establish a mitigating factor in support of a sentence of life without release. The order of the Magistrate Judge dated November 8, 2006, requiring the government to provide to the Defendant certain information and documents is not clearly erroneous nor contrary to law.

3

JA 123

The affidavits filed by the Government do not effect that portion of the Magistrate Judge's order dealing with Items A, B, C, E, J, K, L, M. The affidavits do not deal at all with the inmate killings at ADX Florence since it opened in 1994. To the extent that the Court is convinced that the ordered documents and information do not exist, the Court can still order the Government to provide the documents and information that do exist. Because the Government is seeking the death penalty in this case, and indeed asserting future dangerousness and the inability of the Bureau of Prisons to adequately control the Defendant as factors supporting a sentence of death, the Court should require the Government to timely provide the Defendant with the information and documents previously ordered by the Magistrate Judge, and should not be easily swayed by claims that providing such information and documents is onerous and takes too much time.

Wherefore, the Defendant requests that the Court overrule the Government's objections to the Magistrate Judge's order of November 8, 2006.

CARLOS DAVID CARO
BY COUNSEL


S/_____
STEPHEN J. KALISTA, Esq.
Counsel for Defendant
VSB No. 15603
PO Box 1186
Big Stone Gap, VA 24219
Ph. 276-523-1950
Fax 276-523-1949
Email: skalista@mouent.com

4

JA 124

s/_____

JAMES A. SIMMONS, Esq.
Counsel for Defendant
TN Bar ID No. 10107
1208 17th Avenue South
Nashville, TN 37212
Ph.  615-329-9122
Fax 615-320-4159
Email: jas52@earthlink.net

## CERTIFICATE OF SERVICE

I do hereby certify that on November 17, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF filing system which will send the notification of such filing to the following:  Anthony Giorno, AUSA, and John Brownlee, USA.

s/_____

STEPHEN J. KALISTA, Esq.

5

JA 125

# MARK D. CUNNINGHAM, PH.D., ABPP

Clinical & Forensic Psychology

*Board Certified in Forensic Psychology, American Board of Professional Psychology*
417 Oak Bend, Suite 260    Lewisville, Texas 75067
972-459-0658  Fax 972-459-0958  mdc@markdcunningham.com

*Licensed psychologist: Arizona #3662, Arkansas #98-17P, Colorado #2305, Connecticut #846,*
*Idaho #PSY-379, Illinois #071-006010, Indiana #20041376A, Louisiana #794, New Mexico #0768,*
*Oklahoma #1002, Oregon #1333, South Carolina #764, Tennessee #2255, Texas #22351*

## 2ND DECLARATION OF MARK D. CUNNINGHAM, PH.D., ABPP

Re: *U.S. v Carlos David Caro*, Case No. 1:06cr00001 in the United States District Court for the Western District of Virginia, Abingdon Division

I, Mark D. Cunningham, Ph.D., ABPP do hereby certify, declare, and state as follows:

1. I am a forensic psychologist and criminal justice researcher, with particular expertise and experience in violence risk assessment at federal capital sentencing. I am the same Mark D. Cunningham, Ph.D., ABPP who previously filed a declaration in this case. In the course of my violence risk assessments in other federal capital cases, I have received and reviewed discovery from the federal Bureau of Prisons (BOP) and the U.S. Department of Justice. This exposure has resulted in some familiarity with inmate data, records, and documentation maintained by BOP.

2. I have reviewed the declarations recently filed in *U.S. v Carlos David Caro* by Tomas J. Gomez (Unit Manager at ADX Florence), Joetta A. Terrell (Discipline Hearing Manager), Linda Thomas (Correctional Services Branch Administrator), and Jennifer Batchelder (Social Science Research Analyst).

3. Ms. Terrell reported (paragraph #4) that she has access to a log of Control Unit hearings that include: "the name of the inmate referred for placement in the Control Unit, federal register number,…and whether the inmate was denied or accepted for placement in the Control Unit." From these logs, Ms. Terrell has ascertained (paragraphs 5 and 9) that 140 inmates were referred to the Control Unit from 1997-date, and 54 from 1994-1997). There exists, then, a readily available list of inmates who have been assigned to the Control Unit during the modern era. The declaration of Mr. Gomez asserting that "In the absence of a list identifying the inmates that have been housed in the ADX Control Unit," an exhaustive search of every inmate's central file at every institution at every level of security would be required (paragraphs #12-14) is an irrelevant and less than candid hypothetical. As Ms. Terrell makes plain, such a roster does exist in the North Central Regional Office of BOP where Control Unit designations are made.

4. Ms. Terrell acknowledged (paragraph 9) that "information concerning an inmate's tenure, or period on the Control Unit, would also require a computer search individually, for each inmate." This is not an overly burdensome task. With the name and federal

JA 126

register number of an inmate in BOP, a number of relevant computer generated screens/reports can be called up that provide much of the requested data. For example, a computer-generated document entitled "Inmate History: ADM-REL" (Appendix A) details the movement history and associated unit designation/release/transfer of an inmate in BOP.

5.  Accessing the prison disciphnary history of each of the inmates who have been assigned to the Control Unit is also simply a matter of a few computer key strokes. A computer-generated document maintained on each inmate entitled "Inmate Disciplinary Data: Chronological Disciplinary Record" (Appendix B) details the disciplinary offense number, description, date, and sanctions of each misconduct during the inmate's entire tenure in BOP. In combination with the date of admission and release from the Control Unit as described in the above paragraph, production of this "Inmate Disciphnary Data" document on each of the 194 past or current Control Unit inmates (i.e., 140, 54) would allow determination of each inmate's assaultive misconduct prior to, during, and following Control Unit placement.

6.  The assertion of Mr. Gomez that the ADX staff would have to "search through hundreds of SIS files to ascertain (1) whether or not the file contained information regarding an assault by an inmate, and (2) if so, whether or not the assault was committed by a Control Unit inmate" is inconsistent with the above. It is also inexplicable in light of discovery provided to me in another federal capital case. More specifically, in that discovery the actual narrative misconduct reports of every assault by an inmate while on the Control Unit from December 1994 to June 2001 were provided. I am simply seeking an update of such previously provided misconduct reports. The apparent ease with which these were previously accessed, and their sharply limited number, point to their being in a much more accessible form than Mr. Gomez represents. I summarized the assaultive misconducts of Control Unit inmates 1994-2001 in a document attached (Appendix C). I would also note that in two prior federal capital cases I was provided with the actual unredacted narrative misconduct reports of all disciplinary misconduct at ADX from 1994 to 2000 (excepting 1999), suggesting that such ADX misconduct report files are stored centrally and would be accessible without requiring a system-wide search of every inmate's central file.

7.  The above information regarding the tenure of inmates on the Control Unit, and information regarding assault-related inmate misconduct while on the Control Unit, is critical to Mr. Caro's capital jury having an accurate understanding of the confinement measures that can be applied to him, their potential duration as reflected in historical and contemporaneous tenures on the Control Unit, and the success of such security measures in preventing subsequent assaults. This information is also fundamental to a violence risk assessment of Mr. Caro, as such risk is always a function of context. The requested data regarding the Control Unit is essential to testimony regarding the full capability that BOP has to confine and contain Mr. Caro in a fashion that almost entirely negates any opportunity to successfully perpetrate serious violence.

JA 127

8. Regarding inmate-on-inmate homicide in BOP, I have been provided in past discovery from BOP with the names of perpetrators and victims of such homicides and a brief synopsis of the homicide incident (see Appendix D). With such a roster (e.g., see Appendix E) in hand, it is again only a matter of a few computer keystrokes to generate the following inmate-specific reports that would allow determination of demographic data, offense of conviction, BOP movement, and disciplinary history prior to and following the inmate homicide. These computer-generated forms are:

> Sentence monitoring computation data (see Appendix F)
> Inmate profile (see Appendix G)
> Inmate history: ADM-REL
> Inmate disciphnary data: Chronological disciplinary record

9. I have previously requested information regarding the Security Threat Group (STG) membership or affiliation of these inmates.

10. The above data on each offender is necessary to identify correlates and rates of prison violence preceding and following the inmate-on-inmate homicide. In the absence of this information, it is not possible to make a data-informed determination of the long-term level of risk posed by a federal prison homicide perpetrator; or to definitively speak to how such offenders are managed post-inmate homicide in BOP. These factors are again fundamental to a reliable violence risk assessment of Mr. Caro and to the jury's informed evaluation of his risk.

11. The declaration of Ms. Thomas speaks to what is "required" by BOP, not what is available or in her possession as a function of her position. Acknowledging that BOP is not *required* to conduct after-action reviews and that such may not be available in all instances, I would request the after-action reviews that *are available* for inmate-on-inmate homicides in BOP. Similarly, acknowledging that the Correctional Services Branch, Central Office is not *required* to maintain records on inmate homicides as back as 20 years, I would request that such records be provided for as many years as are *available*.

12. I recognize that complete SIS investigative files may be voluminous. It is inconceivable, however, that a summary or synopsis of that investigation is not prepared to facilitate administrative review and inform ongoing improvements in BOP procedures and security. I would request that summary document. If such after-action summaries are not available for all inmate homicides, I would request those reports that are available. Information regarding the perpetrators/victims of these offenses and summaries of the associated circumstances will allow analysis of whether prison gang membership, particular contextual/interaction factors surrounding the inmate homicide, or prior history of institutional assaults is meaningfully predictive of *post inmate homicide* misconduct in BOP. Such information is essential to scientifically illuminating the anticipated assertions of the Government at Mr. Caro's capital sentencing. Denial of such information would

make it impossible to scientifically rebut assertions by the Government that such factors are predictive of future prison violence among inmate homicide offenders.

13.  I recognize that some information in these reports may be sensitive. It is conceivable that the names of some persons would need to be redacted (though not the perpetrator(s) or victim). In my analysis of associated information provided to me, only group statistical data from the aggregated summaries would be reported, and all names would be kept confidential.

14.  Inmate-on-inmate homicide in BOP occurs only a handful of times each year and at decreasing frequency over the past 20 years. Based on information provided by the Government in this case, the total number of inmate-on-inmate homicide offenders in BOP during the past 20 years is estimated to be 165. Retrieval of the after-action reports should not require months. The institutions are readily identifiable where these inmate homicides occurred and where the investigation summaries are stored. It is not necessary for me to have an exhaustive, cross-referenced file, rather the synopsis. If it is not practical to retrieve archived records, then I request those that are not archived. It is also probable that a summary of the inmate homicide investigation would be part of each respective offender's central file, much simplifying production of this information.

15.  A separate issue involves the SIS after-action reports on the two inmate-on-inmate homicides that occurred last year at ADX Florence, as it is anticipated that the Government may raise these to assert that it is unable to provide reasonable security even in this super-maximum facility. These after-action reports of these two homicides are critical in illuminating any representation of correctional impotence. Of course, should the Government agree not to introduce these homicides in any way at trial there would be no reason to review the reports regarding the context and precipitating factors giving rise to these offenses or the subsequent modifications in staffing and security procedures.

16.  Ms. Batchhelder indicated that she required clarification as to the meaning of "each security level at ADX" in order to determine whether responsive data would exist regarding assault data. There are a number of different unit types at ADX, reflecting different security procedures. I am requesting inmate assault data from ADX that is disaggregated by these unit categories:

> General population units
> Intermediate unit
> Transitional unit
> Pre-transfer unit
> Special housing unit
> High security unit
> Control unit

17.  If disciplinary or assault data is disaggregated within ADX in a different form or in different categories, I would request that data. I am aware that in addition to the assault

JA 129

data in BOP being aggregated/disaggregated with/without weapon use and against staff/inmate victim, that the assault misconduct data can specify the specific 100 level or 200 level misconduct and the degree of injury (see Appendix H). Please provide this information disaggregated by the above (paragraph #16) categories at ADX or in whatever similar relevant categories can be specified.

18. Names of Control Unit inmates and inmate-on-inmate homicide offending inmates and their victims must not be redacted on the requested records so that their files can remain linked. This linking is essential to analyzing the chronology of movement and prison behavior associated with these offenders, and to the analysis of predictive correlates. However, the names would remain confidential and only group data would be reported. Such analysis could also be performed if each inmate were given a code number that would be placed on each record or document pertaining to that inmate. The Control Unit inmate and homicide offender records should be separately identified through a roster of names or listing of code numbers. It is recognized that some offenders would be on both lists.

19. I will be participating in a tour of ADX and associated briefing on Monday, November 20, 2006. Additional requests for information and data may follow that tour and briefing.

I declare, under penalty of perjury of the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed this 17th day of November 2006, in Lewisville, Texas.

Mark D. Cunningham, Ph.D., ABPP

JA 130

USCA4 Appeal: 16-1    Doc: 32-1    Filed: 12/27/2016    Pg: 137 of 606

APPENDIX A

```
 NYM2K  531.01 *           INMATE HISTORY           *    05-09-2001
 PAGE 001        *           ADM-REL                *    10:53:47

    REG NO..: 08157-031 NAME....: NICHOLS, TERRY LYNN
    CATEGORY: ARS       FUNCTION: PRT      FORMAT:

 FCL    ASSIGNMENT DESCRIPTION                START DATE/TIME STOP  DATE/TIME
 FLM    IAD        INTERSTATE AGRMNT ON DETAINERS 01-30-2000 2031 CURRENT
 P00    A-ADMIT 05 ADMITTED TO IN-TRANSIT, MAY  05-29-2000 0530 CURRENT
 5-Z    RELEASE    RELEASED FROM IN-TRANSIT FACL 05-29-2000 0530 05-29-2000 0530
 5-Z    A-ADMIT    ADMITTED TO AN IN-TRANSIT FACL 01-30-2000 2231 05-29-2000 0530
 FLM    A-DES      DESIGNATED, AT ASSIGNED FACIL 07-08-1999 0746 01-30-2000 2031
 5-Z    RELEASE    RELEASED FROM IN-TRANSIT FACL 07-08-1999 0946 07-08-1999 0946
 5-Z    A-ADMIT    ADMITTED TO AN IN-TRANSIT FACL 07-06-1999 1308 07-08-1999 0946
 FLM    FED WRIT   RELEASE ON FEDERAL WRIT       07-06-1999 1108 07-08-1999 0746
 FLM    A-DES      DESIGNATED, AT ASSIGNED FACIL 07-29-1998 0934 07-06-1999 1108
 2-S    RELEASE    RELEASED FROM IN-TRANSIT FACL 07-29-1998 1134 07-29-1998 1134
 2-S    A-ADMIT    ADMITTED TO AN IN-TRANSIT FACL 07-29-1998 0918 07-29-1998 1134
 ENG    HLD REMOVE HOLDOVER REMOVED             07-29-1998 0718 07-29-1998 0718
 ENG    A-HLD      HOLDOVER, TEMPORARILY HOUSED  06-11-1998 1112 07-29-1998 0718
 0-Y    RELEASE    RELEASED FROM IN-TRANSIT FACL 06-11-1998 1312 06-11-1998 1312
 0-Y    A-ADMIT    ADMITTED TO AN IN-TRANSIT FACL 06-11-1998 1306 06-11-1998 1312
 CDE    ADMIN REL  ADMINISTRATIVE RELEASE        06-11-1998 1106 06-11-1998 1106
 CDE    A-ADMIN    ADMINISTRATIVE ADMISSION      06-11-1998 1005 06-11-1998 1106
 2-S    RELEASE    RELEASED FROM IN-TRANSIT FACL 06-11-1998 1205 06-11-1998 1205
 2-S    A-ADMIT    ADMITTED TO AN IN-TRANSIT FACL 06-11-1998 1203 06-11-1998 1205
 ENG    ADMIN REL  ADMINISTRATIVE RELEASE        06-11-1998 1003 06-11-1998 1003
 ENG    A-HLD      HOLDOVER, TEMPORARILY HOUSED  06-04-1998 1942 06-11-1998 1003
 ENG    COURT      COURT APPEARANCE W/SCHED RETRN 06-04-1998 0956 06-04-1998 1942
 ENG    A-HLD      HOLDOVER, TEMPORARILY HOUSED  06-04-1998 0954 06-04-1998 0956
 2-S    RELEASE    RELEASED FROM IN-TRANSIT FACL 06-04-1998 1154 06-04-1998 1154
 2-S    A-ADMIT    ADMITTED TO AN IN-TRANSIT FACL 06-04-1998 1153 06-04-1998 1154
 ENG    FED WRIT   RELEASE ON FEDERAL WRIT       06-04-1998 0953 06-04-1998 0954
 ENG    A-HLD      HOLDOVER, TEMPORARILY HOUSED  05-13-1998 1952 06-04-1998 0953
 2-S    RELEASE    RELEASED FROM IN-TRANSIT FACL 05-13-1998 2152 05-13-1998 2152
 2-S    A-ADMIT    ADMITTED TO AN IN-TRANSIT FACL 05-13-1998 1218 05-13-1998 2152
 ENG    HLD REMOVE HOLDOVER REMOVED             05-13-1998 1018 05-13-1998 1018
 ENG    A-HLD      HOLDOVER, TEMPORARILY HOUSED  05-13-1998 1016 05-13-1998 1018
 2-S    RELEASE    RELEASED FROM IN-TRANSIT FACL 05-13-1998 1216 05-13-1998 1216
 2-S    A-ADMIT    ADMITTED TO AN IN-TRANSIT FACL 05-13-1998 1215 05-13-1998 1216
 ENG    ADMIN REL  ADMINISTRATIVE RELEASE        05-13-1998 1015 05-13-1998 1015
 ENG    A-PRE      PRE-SENT ADMIT, ADULT         05-13-1998 1013 05-13-1998 1015
 ENG    ADM CHANGE RELEASE FOR ADMISSION CHANGE  05-13-1998 1012 05-13-1998 1013
 ENG    A-PRE      PRE-SENT ADMIT, ADULT         03-25-1998 1934 05-13-1998 1012
 ENG    PRE REMOVE PRE SENT DETAINEE REMOVED     03-25-1998 1010 03-25-1998 1934
 ENG    A-PRE      PRE-SENT ADMIT, ADULT         01-07-1998 2023 03-25-1998 1010
 ENG    PRE REMOVE PRE SENT DETAINEE REMOVED     09-17-1997 0707 01-07-1998 2023
 ENG    A-PRE      PRE-SENT ADMIT, ADULT         09-08-1997 1932 09-17-1997 0707

 G0002        MORE PAGES TO FOLLOW . . .
```

JA 131

A-2

```
   NYM2K  531.01  *           INMATE HISTORY          *     05-09-2001
   PAGE 002        *            ADM-REL               *     10:53:47

   REG NO..: 08157-031 NAME....: NICHOLS, TERRY LYNN
   CATEGORY: ARS      FUNCTION: PRT        FORMAT:

FCL    ASSIGNMENT DESCRIPTION                   START DATE/TIME STOP  DATE/TIME
ENG    PRE REMOVE PRE SENT DETAINEE REMOVED     09-08-1997 1038 09-08-1997 1932
ENG    A-PRE      PRE-SENT ADMIT, ADULT         08-28-1997 1932 09-08-1997 1038
ENG    PRE REMOVE PRE SENT DETAINEE REMOVED     08-28-1997 0645 08-28-1997 1932
ENG    A-PRE      PRE-SENT ADMIT, ADULT         08-22-1997 1427 08-28-1997 0645
ENG    PRE REMOVE PRE SENT DETAINEE REMOVED     08-22-1997 0723 08-22-1997 1427
ENG    A-PRE      PRE-SENT ADMIT, ADULT         08-21-1997 1925 08-22-1997 0723
ENG    PRE REMOVE PRE SENT DETAINEE REMOVED     08-21-1997 0633 08-21-1997 1925
ENG    A-PRE      PRE-SENT ADMIT, ADULT         08-13-1997 1938 08-21-1997 0633
ENG    PRE REMOVE PRE SENT DETAINEE REMOVED     08-13-1997 1014 08-13-1997 1938
ENG    A-PRE      PRE-SENT ADMIT, ADULT         08-06-1997 1932 08-13-1997 1014
ENG    PRE REMOVE PRE SENT DETAINEE REMOVED     08-06-1997 1020 08-06-1997 1932
ENG    A-PRE      PRE-SENT ADMIT, ADULT         07-30-1997 2018 08-06-1997 1020
ENG    PRE REMOVE PRE SENT DETAINEE REMOVED     07-30-1997 1116 07-30-1997 2018
ENG    A-PRE      PRE-SENT ADMIT, ADULT         07-21-1997 2011 07-30-1997 1116
ENG    PRE REMOVE PRE SENT DETAINEE REMOVED     07-21-1997 1120 07-21-1997 2011
ENG    A-PRE      PRE-SENT ADMIT, ADULT         07-14-1997 1405 07-21-1997 1120
ENG    PRE REMOVE PRE SENT DETAINEE REMOVED     07-13-1997 0718 07-14-1997 1405
ENG    A-PRE      PRE-SENT ADMIT, ADULT         02-20-1997 1946 07-13-1997 0718
ENG    COURT      COURT APPEARANCE W/SCHED RETRN 02-20-1997 0531 02-20-1997 1946
ENG    A-PRE      PRE-SENT ADMIT, ADULT         02-05-1997 2039 02-20-1997 0531
ENG    COURT      COURT APPEARANCE W/SCHED RETRN 02-05-1997 0550 02-05-1997 2039
ENG    A-PRE      PRE-SENT ADMIT, ADULT         01-09-1997 1712 02-05-1997 0550
ENG    ADM CHANGE RELEASE FOR ADMISSION CHANGE  01-13-1997 1038 01-13-1997 1038
ENG    A-DES      DESIGNATED, AT ASSIGNED FACIL  01-09-1997 1711 01-13-1997 1038
ENG    COURT      COURT APPEARANCE W/SCHED RETRN 01-06-1997 2256 01-09-1997 1711
ENG    A-PRE      PRE-SENT ADMIT, ADULT         12-20-1996 1735 01-06-1997 2256
ENG    ADM CHANGE RELEASE FOR ADMISSION CHANGE  12-20-1996 1734 12-20-1996 1735
ENG    A-DES      DESIGNATED, AT ASSIGNED FACIL  12-20-1996 1733 12-20-1996 1734
ENG    COURT      COURT APPEARANCE W/SCHED RETRN 12-15-1996 2100 12-20-1996 1733
ENG    A-PRE      PRE-SENT ADMIT, ADULT         11-15-1996 1747 12-15-1996 2100
2-S    RELEASE    RELEASED FROM IN-TRANSIT FACL  11-15-1996 1947 11-15-1996 1947
2-S    A-ADMIT    ADMITTED TO AN IN-TRANSIT FACL 11-12-1996 2158 11-15-1996 1947
ENG    TRANSFER   TRANSFER                       11-12-1996 1958 11-12-1996 1958
ENG    A-PRE      PRE-SENT ADMIT, ADULT         10-04-1996 1955 11-12-1996 1958
2-S    RELEASE    RELEASED FROM IN-TRANSIT FACL  10-04-1996 2155 10-04-1996 2155
2-S    A-ADMIT    ADMITTED TO AN IN-TRANSIT FACL 10-01-1996 2139 10-04-1996 2155
ENG    TRANSFER   TRANSFER                       10-01-1996 1939 10-01-1996 1939
ENG    A-PRE      PRE-SENT ADMIT, ADULT         07-15-1996 1858 10-01-1996 1939
ENG    COURT      COURT APPEARANCE W/SCHED RETRN 07-15-1996 0534 07-15-1996 1858
ENG    A-PRE      PRE-SENT ADMIT, ADULT         06-29-1996 2017 07-15-1996 0534
ENG    COURT      COURT APPEARANCE W/SCHED RETRN 06-25-1996 1911 06-29-1996 2017
```

   G0002      MORE PAGES TO FOLLOW . . .

JA 132

USCA4 Appeal: 16-1    Doc: 32-1    Filed: 12/27/2016    Pg: 139 of 606

A-3

```
NYM2K  531.01 *            INMATE HISTORY        *       05-09-2001
PAGE 003 OF 003 *            ADM-REL             *       10:53:47

   REG NO..: 08157-031 NAME....: NICHOLS, TERRY LYNN
   CATEGORY: ARS        FUNCTION: PRT        FORMAT:

FCL    ASSIGNMENT DESCRIPTION                  START DATE/TIME STOP  DATE/TIME
ENG    A-PRE      PRE-SENT ADMIT, ADULT        06-18-1996 1439 06-25-1996 1911
ENG    COURT      COURT APPEARANCE W/SCHED RETRN 06-18-1996 0534 06-18-1996 1439
ENG    A-PRE      PRE-SENT ADMIT, ADULT        05-01-1996 1554 06-18-1996 0534
ENG    COURT      COURT APPEARANCE W/SCHED RETRN 05-01-1996 0512 05-01-1996 1554
ENG    A-PRE      PRE-SENT ADMIT, ADULT        05-01-1996 0511 05-01-1996 0512
ENG    COURT      COURT APPEARANCE W/SCHED RETRN 05-01-1996 0510 05-01-1996 0511
ENG    A-PRE      PRE-SENTENCE ADMISSION       04-09-1996 1925 05-01-1996 0510
ENG    COURT      COURT APPEARANCE W/SCHED RETRN 04-09-1996 0535 04-09-1996 1925
ENG    A-PRE      PRE-SENTENCE ADMISSION       04-01-1996 0942 04-09-1996 0535
2-S    RELEASE    RELEASED FROM IN-TRANSIT FACL 04-01-1996 1142 04-01-1996 1142
2-S    A-ADMIT    ADMITTED TO AN IN-TRANSIT FACL 04-01-1996 1141 04-01-1996 1142
ENG    ADMIN REL  ADMINISTRATIVE RELEASE       04-01-1996 0941 04-01-1996 0941
ENG    A-HLD      HOLDOVER, TEMPORARILY HOUSED 03-30-1996 0120 04-01-1996 0941
ERE    PRE REMOVE PRE SENT DETAINEE REMOVED    03-29-1996 2341 03-30-1996 0120
ERE    A-PRE      PRE-SENTENCE ADMISSION       02-27-1996 1857 03-29-1996 2341
ERE    COURT      COURT APPEARANCE W/SCHED RETRN 02-27-1996 0612 02-27-1996 1857
ERE    A-PRE      PRE-SENTENCE ADMISSION       02-02-1996 1410 02-27-1996 0612
ERE    COURT      COURT APPEARANCE W/SCHED RETRN 01-29-1996 1820 02-02-1996 1410
ERE    A-PRE      PRE-SENTENCE ADMISSION       12-13-1995 1610 01-29-1996 1820
ERE    COURT      COURT APPEARANCE W/SCHED RETRN 12-13-1995 0610 12-13-1995 1610
ERE    A-PRE      PRE-SENTENCE ADMISSION       08-15-1995 1410 12-13-1995 0610
ERE    COURT      COURT APPEARANCE W/SCHED RETRN 08-15-1995 0610 08-15-1995 1410
ERE    A-PRE      PRE-SENTENCE ADMISSION       06-15-1995 0904 08-15-1995 0610
2-T    RELEASE    RELEASED FROM IN-TRANSIT FACL 06-15-1995 1004 06-15-1995 1004
2-T    A-ADMIT    ADMITTED TO AN IN-TRANSIT FACL 06-15-1995 1001 06-15-1995 1004
ERE    ADMIN REL  ADMINISTRATIVE RELEASE       06-15-1995 0901 06-15-1995 0901
ERE    A-PRE      PRE-SENTENCE ADMISSION       05-11-1995 1110 06-15-1995 0901
```

JA 133

USCA4 Appeal: 16-10   Doc: 32-1   Filed: 12/27/2016   Pg: 140 of 606

APPENDIX B

```
NYM2K          *        INMATE DISCIPLINE DATA        *      05-09-2001
PAGE 001 OF 001 *   CHRONOLOGICAL DISCIPLINARY RECORD  *      10:53:29

REGISTER NO: 08157-031 NAME..: NICHOLS, TERRY LYNN
FUNCTION...: PRT       FORMAT: CHRONO    LIMIT TO    MOS PRIOR TO 05-09-2001


--------------------------------------------------------------------------
REPORT NUMBER/STATUS.: 431104 - SANCTIONED  INCIDENT DATE/TIME: 08-31-1996 1610
UDC HEARING DATE/TIME: 09-04-1996 1348
FACL/UDC/CHAIRPERSON.: ENG/JAIL/STRICKLAND
APPEAL CASE NUMBER(S): 117871
REPORT REMARKS.......: INMATE REFUSED AN ORDER TO STAND-UP FOR COUNT.
    307  REFUSING TO OBEY AN ORDER - FREQ: 2
         RESTR QTRS / 7 DAYS / CS / SUSPENDED 14 DAYS
         COMP:    LAW:    7 DAYS RESTRICTION TO QUARTERS, SUSPENDED.
--------------------------------------------------------------------------
REPORT NUMBER/STATUS.: 430903 - SANCTIONED  INCIDENT DATE/TIME: 08-30-1996 1600
UDC HEARING DATE/TIME: 09-04-1996 1340
FACL/UDC/CHAIRPERSON.: ENG/JAIL/STRICKLAND
APPEAL CASE NUMBER(S): 117873
REPORT REMARKS.......: INMATE REFUSED A DIRECT ORDER TO STAND-UP FOR COUNT.
    307  REFUSING TO OBEY AN ORDER - FREQ: 1
         RESTR QTRS / 7 DAYS / CS
         COMP:    LAW:    7 DAYS RESTRICTION TO QUARTERS EXCEPT RECREATION,
                         SHOWERS AND VISITS
--------------------------------------------------------------------------
REPORT NUMBER/STATUS.: 430504 - SANCTIONED  INCIDENT DATE/TIME: 08-28-1996 1600
UDC HEARING DATE/TIME: 09-03-1996 1540
FACL/UDC/CHAIRPERSON.: ENG/JAIL/MAY
APPEAL CASE NUMBER(S): 117868
REPORT REMARKS.......: INMATE REFUSED TO STAND UP FOR COUNT AFTER BEING ORDERED
                       TO STAND-UP.
    320  FAILING TO STAND COUNT - FREQ: 1
         LOSE PRIV  / 7 DAYS / CS
         COMP:    LAW:    7 DAYS COMMISSARY RESTRICTION




G0005      TRANSACTION SUCCESSFULLY COMPLETED - CONTINUE PROCESSING IF DESIRED
```

JA 134

APPENDIX C

## December 1994 to June 2001
# Assaults on Staff in ADX Control Unit

**14 minor assaults on staff:**

- 9 throwing unknown liquid/feces or spitting in face of officer
- 1 kicking foot forward as leg shackles removed, jerking officer's hand into bars
- **1** pulling away and then throwing ice tray full of water and carton of milk at officer
- 1 throwing head back against officer's face
- 1 attempting to pull away from officer while being escorted, causing cuffs to scrape officer's hand
- 1 grabbing officer's shirt and pulling him into the bars

**3 attempted/threatened minor assaults on staff:**

- 2 attempting or threatening to throw liquid
- 1 attempted head-butt

**10 of the above 17 involved a single inmate**
**6 total inmates involved**

JA 135

APPENDIX D

U.S. Department of Justice

Federal Bureau of Prisons

Intelligence Section

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

Strategic Intelligence Key Indicator System

*Incident Summary*                                    October 17, 2000

INCIDENT:              INMATE HOMICIDES FY 95

Leger, Charles
Reg. No. 03185-078
Homicide Date: 8-25-1995
Facl: LVN
Alleged Assailant(s): ████████████████████

At approximately 9:00am on 8-25-1995, inmate Leger was assaulted and repeatedly stabbed by inmate ███████ in the SHU Recreation Pen. Immediately after inflicting life threatening wounds; ███████ turned to staff and relinquished the weapon without incident. ██████████ assaulted inmate Leger with an 8-10 inch long, rod type weapon which was sharpened at one end and had a cloth handle with a loop at the other end. Approximately six inmates and two staff members witnessed the assault.

Charles Leger was a 36 year old white male serving a 180 month sentence for Felon in Possession of a Firearm out of the Eastern District of Texas. He began his sentence on 06/11/1991. Inmate Leger was a HIGH level inmate with IN custody. He had a Good Conduct Time Release of 06/24/2003. He had no CMC assignments or known detainers. He did have SENTRY STG assignments of Dirty White Boys Associate and well as Hells Angels Motorcycle Gang Associate. Inmate Leger had received a total of 24 I/R's for a variety of incidents which include Possessing Drugs or Drug Items, Possessing Unauthorized Items, Insolence, Refusing to Take Drug Test, Being in an Unauthorized Area, Threatening Bodily Harm, Refusing Programs, and Failing to Follow Regulations.

███████████ is a 32 year old white male serving a 300 month concurrent sentence for Armed Bank Robbery and Escape out of Nevada. He began his sentence on 08/18/1992. Inmate Storey is a HIGH level inmate with MAXIMUM custody. He has a Good Conduct Time Release of 10/22/2015. He has a CMC assignment of Separation and a detainer filed with the Nevada Department of Parole & Probation for additional Bank Robbery charges. ██████████ has SENTRY STG assignments of Aryan Brotherhood Suspect, Dirty White Boy Suspect, Escape Risk (actual - NV DOC 1985), and Posted Picture Card File. ██████████ has six I/R's, five for Possessing Drugs or Drug Items, and one for Possessing Intoxicants.

The case has been referred to the FBI for investigation.

39

JA 136

11/17/2006  11:10  9724590958   MARK CUNNINGHAM
3032941192

T-288  P.0111/021  F-018

DEFENDANT'S
EXHIBIT
I



APPENDIX E

## Inmates found guilty of 100 code - killings
(September 1994 - present)  8/20/01

| | Name | Register number |
|---|---|---|
| 1. | Stancell, Jack | 97502-131 |
| 2. | Masters, Henry | 01413-046 |
| 3. | Herle, Edgar | 13950-116 |
| 4. | Breese, Michael | 13380-039 |
| 5. | Pierce, Bruce | 04097-000 |
| 6. | Storey, Gregory | 26818-048 |
| 7. | Montgomery, David | 30866-083 |
| 8. | Mc Calla, Hurby | 07051-067 |
| 9. | Hammer, David | 24507-077 |
| 10. | Flores, Ruben | 39920-080 |
| 11. | Rodriguez-Balderas, Guadalupe | 65683-080 |
| 12. | Cardona, Jose | 68482-080 |
| 13. | Cuyler, Niely | 01690-097 |
| 14. | Fields, Jerome | 01068-000 |
| 15. | Georgaearakos, Peter | 03029-036 |
| 16. | Kowaalski, Mark | 23642-086 |
| 17. | Reddick, Lamont | 44359-066 |
| 18. | Green, Larry | 40026-004 |
| 19. | Padgett, Jermaine | 10772-058 |
| 20. | White, Mammix | 31405-037 |
| 21. | Reed, Albert | 90558-071 |
| 22. | Riddle, Joseph | 09083-017 |
| 23. | Black, Douglas | 16907-057 |
| 24. | Casto, Daniel | 60992-065 |
| 25. | Vasquez, Eduardo | 26212-080 |
| 26. | O'Driscoll, Michael | 04221-016 |
| 27. | Bridgewater, Wayne | 20220-148 |
| 28. | Houston, Henry | 94434-012 |
| 29. | Wilson, Kevin | 57468-097 |
| 30. | Lindsey, Matt | 02331-061 |
| 31. | Taylor, Lonnie | 95147-071 |
| 32. | Jones, Anthony | 32124-037 |
| 33. | Shofler, Scott | 52371-004 |
| 34. | Johnson, Damion | 14980-047 |
| 35. | Mosher, Ellis | 02875-087 |
| 36. | Yost, Randy | 02190-087 |
| 37. | Mc Intosh, Richard | 02012-028 |
| 38. | Knorr, Carl | 13161-075 |
| 39. | Bailey, Shane | 07857-041 |
| 40. | Gray, Isa | 13342-058 |

061414

E - 2

| 41. | Jackson, David | 13567-039 |
|-----|----------------|-----------|
| 42. | Gulley, Arzell | 18249-039 |
| 43. | Riley, Kevin | 04522-067 |
| 44. | Remington, James | 80124-038 |
| 45. | Clark, Willie | 97815-024 |
| 46. | Morris, Larry | 01557-043 |
| 47. | Cook, Damani | 16668-016 |

061415

JA 138

APPENDIX F

```
NYM2K  540*23 *           SENTENCE MONITORING         *     05-09-2001
PAGE 001        *           COMPUTATION DATA           *     10:51:41
                           AS OF 05-09-2001
```

REGNO..: 08157-031 NAME: NICHOLS, TERRY LYNN

```
FBI NO...........: 272530XA5           DATE OF BIRTH: 04-01-1955
ARS1.............: FLM/IAD              ARS2.........: P00/A-ADMIT 05
UNIT.............:                      QUARTERS.....:
DETAINERS........: YES                  NOTIFICATIONS: NO
```

THE FOLLOWING SENTENCE DATA IS FOR THE INMATE'S CURRENT COMMITMENT.
THE INMATE IS PROJECTED FOR RELEASE:  LIFE

REMARKS........: DETN: OK COUNTY SHERIFF'S - CONSP COMMIT FELONY; PLACING
                EXPLOSIVE DEVICE, MURDER I, AND MANSLAUGHTER I, UNTRIED

--------------------------CURRENT JUDGMENT/WARRANT NO: 010 --------------------------

```
COURT OF JURISDICTION...........: COLORADO
DOCKET NUMBER...................: 96-CR-68-M
JUDGE..........................: MATSCH
DATE SENTENCED/PROBATION IMPOSED: 06-04-1998
DATE COMMITTED..................: 07-29-1998
HOW COMMITTED...................: US DISTRICT COURT COMMITMENT
PROBATION IMPOSED...............: NO
```

```
                   FELONY ASSESS  MISDMNR ASSESS  FINES        COSTS
NON-COMMITTED.:    $450.00        $00.00          $00.00       $00.00
```

RESTITUTION...:  PROPERTY:  NO  SERVICES:  NO     AMOUNT:  $14,500,000.00

--------------------------CURRENT OBLIGATION NO: 010 --------------------------
OFFENSE CODE....:  123
OFF/CHG: 18:2332A - CONSPIRACY TO USE WEAPON OF MASS DESTRUCTION, CT 1;
         18:1112 - INVOLUNTARY MANSLAUGHTER, CTS 4-11

```
SENTENCE PROCEDURE..............: 3559 VCCLEA VIOLENT SENTENCE
SENTENCE IMPOSED/TIME TO SERVE.: LIFE
DATE OF OFFENSE.................: 04-19-1995
```

REMARKS.......: CT 1 - LIFE; CTS 4 THRU 11 - 6 YRS CC ON EACH CT

G0002      MORE PAGES TO FOLLOW . . .

JA 139

USCA4 Appeal: 16-1    Doc: 32-1    Filed: 12/27/2016    Pg: 146 of 606

F-2

```
     NYM2K  540*23 *          SENTENCE MONITORING          *     05-09-2001
     PAGE 002 OF 002 *          COMPUTATION DATA           *     10:51:41
                                AS OF 05-09-2001


     REGNO..: 08157-031 NAME: NICHOLS, TERRY LYNN


     ------------------------CURRENT COMPUTATION NO: 010 ------------------------

     COMPUTATION 010 WAS LAST UPDATED ON 11-16-1998 AT FLM AUTOMATICALLY

     THE FOLLOWING JUDGMENTS, WARRANTS AND OBLIGATIONS ARE INCLUDED IN
     CURRENT COMPUTATION 010: 010 010

     DATE COMPUTATION BEGAN..........: 06-04-1998
     TOTAL TERM IN EFFECT............: LIFE
     TOTAL TERM IN EFFECT CONVERTED..: LIFE

     JAIL CREDIT.....................:      FROM DATE    THRU DATE
                                            04-21-1995   06-03-1998

     TOTAL PRIOR CREDIT TIME.........: 1140
     TOTAL INOPERATIVE TIME..........: 0
     TOTAL GCT POSSIBLE..............: 0
     TOTAL GCT AWARDED...............: 0
     STATUTORY RELEASE DATE (CURRENT): N/A
     SIX MONTH /10% DATE.............: N/A
     EXPIRATION FULL TERM DATE.......: LIFE


     PROJECTED SATISFACTION DATE.....: N/A
     PROJECTED SATISFACTION METHOD...: LIFE

     REMARKS.......: 11-16-1998 CHG DATE OF OFFENSE
```

```
     S0055       NO PRIOR SENTENCE DATA EXISTS FOR THIS INMATE
```

JA 140

APPENDIX G

```
   NYM2K  535.03 *              INMATE PROFILE              *    05-09-2001
   PAGE 001 OF 001                                              10:53:01
           08157-031                 REG
REGNO: 08157-031                    FUNCTION: PRT DOB/AGE.: 04-01-1955 / 46
NAME.: NICHOLS, TERRY LYNN                      R/S/ETH.: W/M/O
RSP..: P00-PROLONGED I-T FOR 2000              MILEAGE.:    .
PHONE: N/A                  FTS: N/A
ARS ASSIGNMENT..: ADMITTED TO IN-TRANSIT, MAY   FBI NO..: 272530XA5
ARS DATE/TIME...: 05-29-2000/0530                INS NO..: N/A
 PROJ REL METHOD: LIFE                           SSN.....: 371684869
 PROJ REL DATE..: N/A                            DETAINER: YES      CMC..: YES
         - - - - - - - - RELEASE DESTINATION - - - - - - - -
             AGENCY...............:
             DST ASSIGNMENT.......:
             ADDRESS..............: OKL CO DA
                                    OKLAHOMA CITY, OKLAHOMA 73102
OFFN/CHG RMKS: 18 U.S.C. CONSP TO USE WEAPON OF MASS DESTRUCTION-LIFE
OFFN/CHG RMKS: 18 U.S.C. 1112 INVOLOUNTARY MANSLAUGHTER-SIX YEARS CONCURRENT
    FACL CATEGORY    - - - - - CURRENT ASSIGNMENT - - - - - - EFF DATE   TIME
    FLM  ADM-REL    IAD         INTERSTATE AGRMNT ON DETAINERS 01-30-2000 2031
    P00  ADM-REL    A-ADMIT 05 ADMITTED TO IN-TRANSIT, MAY    05-29-2000 0530
    P00  CASE MGT   CFSR        CERT FOOD SINCERITY REMOVAL    12-12-1999 1723
    P00  CASE MGT   PROG RPT    NEXT PROGRESS REPORT DUE DATE  11-29-2002 1023
    P00  CASE MGT   VWP PEND    VICTIM/WITNESS PROGRAM PENDING 04-02-2001 1301
    P00  CASE MGT   V94 CVA913 V94 CURR VIOL ON/AFTER 91394   08-14-1998 1009
    P00  CUSTODY    MAX         MAXIMUM CUSTODY               08-13-1998 1121
    P00  DRUG PGMS  DRG I NONE NO DRUG INTERVIEW REQUIRED      08-14-1998 1015
    P00  EDUC INFO  ESL HAS     ENGLISH PROFICIENT            08-03-1998 0913
    P00  EDUC INFO  GED HAS     COMPLETED GED OR HS DIPLOMA    08-03-1998 0914
    P00  FIN RESP   REFUSE      FINANC RESP-REFUSES           07-30-1998 1728
    P00  LEVEL      HIGH        SECURITY CLASSIFICATION HIGH   06-11-1998 1047
    P00  MED DY ST  REG DUTY    NO MEDICAL RESTR--REGULAR DUTY 08-21-1998 1713
    P00  RELIGION   PROTESTANT PROTESTANT                     09-09-1999 1551


  G0017       WARNING : NOTIFICATIONS ARE REQUIRED PER P.S. 1490.04
  G0000       TRANSACTION SUCCESSFULLY COMPLETED
```

11/17/2006  11:10    9724590958    MARK CUNNINGHAM    PAGE  13

ALLENWOOD USP

Page 1 of 2

Print Me

APPENDIX H

**Number of Months Found:** 1

**Summary Period:**
12/2002

**Institution:** ALLENWOOD USP

**Region:** NER

**Security Level:**
HIG

**Number of Inmates in Population:**
1079

(Average Daily for the Month)

# Injury Assessment For Acts of Inmate Misconduct

| Incident and Victim | No Injury | | Minor Injury | | Moderate Injury | | Major Injury | | Fatal Injury | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Count | Rate/5000 | Count | Rate/5000 | Count | Rate/5000 | Count | Rate/5000 | Count | Rate/50 |
| **Killing (100)** | | | | | | | | | | |
| Staff | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0. |
| Inmate | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0. |
| Other | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0. |
| **Serious Assault (101)** | | | | | | | | | | |
| Staff | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0. |
| Inmate | 0 | 0.00 | 0 | 0.00 | 3 | 13.90 | 0 | 0.00 | 0 | 0. |
| Other | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0. |
| **Hostage Taking (107)** | | | | | | | | | | |
| Staff | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0. |
| Inmate | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0. |
| Other | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0. |
| **Threats (203)** | | | | | | | | | | |
| Staff | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0. |
| Inmate | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0. |
| Other | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0. |
| **Sex Acts (205)** | | | | | | | | | | |
| Staff | 6 | 27.80 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0. |
| Inmate | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0. |
| Other | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0. |
| **Sex Proposals (206)** | | | | | | | | | | |
| Staff | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0. |

file://E:\BOP\Correctional Services Incidents Data\BOP150449D.HTML    11/17/2006

JA 142

ALLENWOOD USP

H-2

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Inmate | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0. |
| Other | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0. |
| **Lesser Assault (224)** | | | | | | | | | | |
| Staff | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0. |
| Inmate | 0 | 0.00 | 1 | 4.63 | 0 | 0.00 | 0 | 0.00 | 0 | 0. |
| Other | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0.00 | 0 | 0. |

Note: The "Extent of Injury for Guilty Findings" represents the number of prohibited acts, not necessarily the number of victims. The rate/5,000 is the rate per 5,000 inmates, based on the average daily population.

For best results with printed output, use either the landscape mode, or change the Printer Base Font Selection size (in the Print pull-down menu). Check the Print Preview to make sure that it looks the way you would like it. If not, make the necessary adjustments to the Printer Base Font.

JA 143

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | Case No. 1:06CR00001 |
| v. | ) | |
| | ) | **OPINION AND ORDER** |
| CARLOS DAVID CARO, | ) | |
| | ) | By: James P. Jones |
| Defen    nt. | ) | Chief United States District Judge |
| | ) | |

*John L. Brownlee, United States Attorney, and Anthony P. Giorno, Assistant United States Attorney, Roanoke, Virginia, for United States of America; James A. Simmons, Nashville, Tennessee, and Steven J. Kalista, Big Stone Gap, Virginia, for Defendant.*

The present question before the court in this capital case concerns the defendant's discovery motions relating to Bureau of Prisons ("BOP") data and records, particularly as to the system's maximum security penitentiary located in Florence, Colorado, known as Florence ADMAX.

The defendant Carlos David Caro is a federal inmate, charged in this case with the first degree murder of his cellmate, Roberto Sandoval, Jr., at the United States Penitentiary Lee, situated in this district. *See* 18 U.S.C.A. § 1111(a) (West Supp. 2006). The government has filed a Notice of Intent to Seek the Death Penalty, in which it advises that it will seek to prove the defendant's alleged future dangerousness as an aggravating factor, among others. In connection with this

JA 144

allegation, the defendant has filed four separate discovery motions seeking data from BOP records. The motions seek the same information, but on different grounds. Two of the motions seek subpoenas duces tecum directed to the director of BOP and the warden of Florence ADMAX pursuant to Rule 17 of the Federal Rules of Criminal Procedure. One of the motions seeks an order from the court requiring the government to produce the information under Federal Rule of Criminal Procedure 16(a)(1)(E), and the final motion seeks an order to produce the information as exculpatory within the meaning of *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny.

These nondispositive motions were referred to the magistrate judge for decision. *See* Fed. R. Crim. P. 59(a). After a hearing, in which the magistrate judge received a lengthy declaration from a defense expert, Mark D. Cunningham, Ph.D., the magistrate judge granted the motion based on *Brady*, and denied the other motions. *See United States v. Caro*, No. 1:06CR00001, 2006 WL 3251738 (W.D. Va. Nov. 8, 2006) (Sargent, J.). The parties have filed objections to the magistrate judge's order, which objections have been argued.[1] In addition, the government has

---

[1] I assume that the defendant's objections are conditional, since the motion that the magistrate judge granted gave the defendant all of the relief requested by the other motions.

- 2 -

JA 145

filed several declarations from BOP personnel in support of its objection and the defendant has filed a second declaration from Dr. Cunningham in response.[2]

The government agreed to produce some of the information requested by the defendant. However, it objects to the bulk of the requests. The data directed by the magistrate judge to be produced that is objected to by the government is as follows:

A.     Data showing median length of stay, range of length of stay and standard deviation of the distribution of length of stay at Florence ADMAX for all inmates since it was opened in 1994 to the present time;

B.     Data showing how many inmates who were admitted to Florence ADMAX in 1994 or 1995 continue to be confined there, broken down by offense conduct that caused them to be transferred to Florence ADMAX;

C.     Movement sheets from the central inmate file on every inmate who has killed another inmate within the Bureau of Prisons, ("BOP"), within the last 20 years;

D.     Investigative reports on all inmate homicides within the BOP within the last 20 years including any "after action reports" indicating any operational or institutional changes in response to each killing and any final memoranda from Special Investigative Services to the Warden of each institution regarding each killing;

---

[2] While review of a magistrate judge's decision on nondispositive motions does not normally permit the admission of evidence not considered by the magistrate judge, the district judge has the discretion to do so. *See United States v. Frans*, 697 F.2d 188, 191 n.3 (7th Cir. 1983).

- 3 -

E.    Regarding each inmate involved in an inmate killing within the BOP within the last 20 years, the respective inmate's "Chronological Disciplinary Record" and Inmate History ADM-REL and/or movement Sheets within the Bureau of Prisons;

F.    Records on any assaultive conduct by an inmate in the "Control Unit" at Florence ADMAX from November 1994 to present date, showing the inmate involved, inmate number of the inmate involved, date of occurrence and description of the conduct, and the staff member victim of each assault;

G.    Names, prison numbers, assignment rationale and tenures of all inmates in the Control Unit at Florence ADMAX since opening in 1994 to present date showing date assigned, the reason assigned and date exiting the Control Unit to lesser security or release from BOP;

H.    Disciplinary Incident Reports on all inmates in the Control Unit at Florence ADMAX from 1994 to present date showing inmate name, number, date of offense and details of disciplinary incident; and

I.    Correctional Services Significant Incidents Data on levels and frequency of violence at each security level at Florence ADMAX by year from 2001 through 2006.

(Order, 11/8/06, ¶ 3 (A) through (I).) In essence, the defendant requests BOP records and data concerning (1) all inmates who have ever been confined in the Florence ADMAX Control Unit[3]; (2) all inmate homicides that have occurred in the BOP

---

[3] The Florence ADMAX Control Unit, a separate housing unit, contains "the most dangerous, violent, disruptive and assaultive inmates." (Gomez Decl. ¶ 8, 11/06.)

- 4 -

JA 147

nationwide in the last twenty years; and (3) all incidents of inmate violence at Florence ADMAX.

The government objects to being required to produce this data on the grounds that the information requested is not exculpatory and is unduly burdensome to produce. The government has represented to the court that it does not intend to offer any of the contested information into evidence itself.

If the defendant is convicted, the government will likely introduce evidence in the sentencing phase of the trial that he poses a threat of danger to prison staff and other inmates if he is imprisoned, rather than put to death. In rebuttal, the defendant may produce evidence that if the defendant is incarcerated at Florence ADMAX, particularly in the Control Unit, he will not be a future threat to others.[4]

The information sought by the defendant is based on the opinions of Dr. Cunningham. In his declaration, he avers that he is engaged in scientific research examining "violence risk assessment in a prison context"; that a "reliable individualized assessment can be made of the likelihood that Mr. Caro will commit acts of serious violence from this point forward while confined for life in the [BOP]";

---

[4] The date for disclosure of expert testimony by the parties has not yet expired, but Dr. Cunningham, a forensic psychologist, testified to this effect in at least one other federal capital case. *See United States v. Johnson*, No. 96 CR 379-1, 1998 WL 321503, at *1 (N.D. Ill. June 12, 1998), *aff'd*, 223 F.3d 665, 671 (7th Cir. 2000).

- 5 -

JA 148

and that the group data as requested is necessary for this assessment. (Cunningham Decl. ¶¶ 6, 10, 20, 10/13/06.)

The government has the obligation, upon request, to disclose material evidence favorable to the accused. *Brady*, 373 U.S. at 87. While the defense obviously hopes that the information requested here will support its expert's opinion, there is no indication before me that it will do so, and thus the information cannot be said to be material. *See United States v. Agurs*, 427 U.S. 97, 109-10 (1976) ("The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense.").

The other grounds urged by the defendant in support of obtaining this data are likewise unavailing. Rule 16(a)(1)(E)(ii) of the Federal Rules of Criminal Procedure does require the government to produce upon request, data "material to preparing the defense." Even assuming that this obligation applies to the sentencing phase of a capital case—and the government does not contend otherwise—materiality in this context requires at least "some indication that the pretrial disclosure of the disputed evidence would have enabled the defendant significantly to alter the quantum of proof in his favor." *United States v. Ross*, 511 F.2d 757, 762-63 (5th Cir. 1975) (quoted in

- 6 -

JA 149

*United States v. Kirk*, No. 88-5095, 1989 WL 64139, at *2 (4th Cir. June 2, 1989) (unpublished)).

As to the remaining ground, it is established that use of a Rule 17 subpoena duces tecum cannot substitute for the limited discovery otherwise permitted in criminal cases and the hope of obtaining favorable evidence does not justify the issuance of such a subpoena. *See United States v. Hang*, 75 F.3d 1275, 1283 (8th Cir. 1996).

For these reasons, I will sustain the government's objection (Dkt. No. 346) to the magistrate judge's order and deny the defendant's objection (Dkt. No. 345). I point out, however, that I do so in light of the government's representation that it does not intend to introduce any of the requested data in its own case. Otherwise, Rule 16 might very well require its prior disclosure to the defendant. Accordingly, absent proper disclosure, the government may not rely on specific instances of inmate violence (other than the defendant's own) in seeking to prove his future dangerousness.

It is so **ORDERED**.

ENTER: November 20, 2006

/s/ JAMES P. JONES
Chief United States District Judge

-7-

JA 150

```
         IN THE UNITED STATES DISTRICT COURT FOR THE
               WESTERN DISTRICT OF VIRGINIA
                    Abingdon Division

---------------------------x
                           :
UNITED STATES OF AMERICA,   :
                           :
      Plaintiff,            :
                           :
v.                          :   1:06CR1
                           :
CARLOS D. CARO,            :
                           :
      Defendant.           :   Abingdon, Virginia
                           :   February 5, 2007
---------------------------x   9:05 a.m.


                      JURY TRIAL
        BEFORE THE HONORABLE JAMES P. JONES
  CHIEF UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:


      JOHN BROWNLEE, Esquire
      U.S. Attorney
      ANTHONY P. GIORNO, Esquire
      Assistant U.S. Attorney
      P.O. Box 1709
      Roanoke, Virginia  24008
          For the United States of America.


      STEPHEN J. KALISTA, Esquire
      P.O. Box 1186
      Big Stone Gap, Virginia  24210
      JAMES SIMMONS, Esquire
      1208 17th Avenue South
      Nashville, Tennessee 37212
          Counsel for the Defendant.



Proceedings recorded by Stenography, transcript
produced by computer.
```

**BRIDGET A. DICKERT**
**UNITED STATES COURT REPORTER**
**180 W. MAIN STREET, ROOM 104**
**ABINGDON, VIRGINIA 24210**
**(276) 628-5116**

JA 151

(Proceedings commenced at 9:05 a.m.)

THE COURT: Good morning, ladies and gentlemen. Before we have the jury in, there have been several motions filed since we adjourned court on Thursday. The Government filed a motion objecting to the court's proposed preliminary instructions in the eligibility phase, or part one of the sentencing phase, and I've reviewed that. Does the defendant have any response?

MR. KALISTA: Judge, just our response is we've looked at the instructions and we certainly have no objection to the court's instruction. We would oppose the Government's motion. We believe that the portion of the instruction that they object to is the correct statement of the law, and we would ask that the instruction be given as proposed and written by the court.

THE COURT: Well, I'm going to sustain the Government's objection. I think technically the Government is correct. These are preliminary instructions in any event, and I, I, for the reasons stated by the Government, I'm going to revise my preliminary instructions to the jury in the manner objected to.

Now, the, the defendant has filed several

JA 152

motions.  I take it that at least two of these motions will apply under the circumstances of this case only to the part two or the selection phase of the sentencing hearing, and I suggest that we take those up afterward, the first part, assuming we proceed further.

There is one motion that was filed yesterday, I guess, with respect to the contention that the Supreme Court's opinion in *Crawford* relating to the Sixth Amendment excludes certain Government evidence. And I take it that that would not apply to part one either, but perhaps we ought to make sure about that.

MR. BROWNLEE:  That's correct, sir.  As far as part one, the only thing we'll put in is by stipulation, and if you'd like to discuss it at this time, we'll do that.

THE COURT:  All right.  Well, we'll take up, then, these motions by the defendant after we conclude part one.  Is there anything else, then, before --

MR. KALISTA:  Judge, I'm not sure if you were addressing one of the motions we had filed concerning the issuance of witness subpoenas.  We had filed a motion for, under seal, for travel orders for our witnesses, and we had had some contact with Judge

JA 153

Sargent about that.  And the subsequent motion to be filed concerning amending orders is a kind of a follow up to that motion and conversation and e-mail with Judge Sargent.  I guess for our purposes we need to know from the court whether we should take that up with you or take that up with Judge Sargent.

THE COURT:  Well, I've asked Judge Sargent to handle that simply because of the press of time here.  I take it that she will enter that order, but, again, I'm going to leave that to her.

So, is there anything further, then?  The way we're going to proceed, we'll have the jury in, including the four alternates, all 16 of the jurors. I will give them some preliminary instructions as indicated, and then we'll hear any opening statements and evidence as to this phase.  And then I will give the final -- or you'll have argument, and I'll give final jury instructions in the manner that I provided to counsel.  All right.  If we'll have the jury in, please.

(The jury entered the courtroom and was seated in the jury box.)

THE COURT:  Morning, ladies and gentlemen. I hope you had a calm weekend.  As you know, you have unanimously found the defendant guilty of first

degree murder. And accordingly, we, today, begin a new phase of the trial, the sentencing hearing.

As I told you when you were selected as jurors, the purpose of the sentencing hearing is to determine whether or not Mr. Caro is to be sentenced to death, or imprisoned for life without the possibility of release. The decision whether or not to impose a death sentence is left exclusively to you, the jury. I will not be able to change it. You, and you alone, must resolve the question.

I will now instruct you as to the process that you must follow. I remind you that at the time you were selected as jurors each of you assured me that if this case required a capital sentencing hearing you would follow the law as I told you it applied. It is imperative that you do so.

Although the law has left to you the decision whether Mr. Caro should be executed, it has narrowed and channeled your decision by requiring certain findings to be made before the death penalty is even considered.

Thus, you are not free to substitute your own views about circumstances that might warrant capital punishment for those specific ones chosen by the law. On the other hand, you should clearly understand that

even if you make the findings provided for by law, no jury is ever required to impose the death penalty. Moreover, you may decline to impose the death penalty without giving any reason for that decision.

The sentencing hearing will be divided into two parts. In the first part you will consider whether the Government has proved beyond a reasonable doubt that Mr. Caro is eligible to be sentenced to death.

The law limits consideration of the death penalty to cases in which the Government can prove beyond a reasonable doubt that the defendant was at least 18 years old at the time of the offense, and in which the Government can prove beyond a reasonable doubt the existence of certain factors drawn from two specific statutory categories.

Only if you are unanimously persuaded beyond a reasonable doubt that at least one factor from each of the two statutory categories has been proved will we go on to the second part of the capital sentencing hearing in which you will consider actually imposing the death penalty on Mr. Caro.

In seeking to establish these factors, the Government may rely on your recollection of certain evidence presented at trial, and need not repeat it to you now.

The parties may, however, present further evidence at the sentencing hearing specifically related to your consideration of these factors.

I direct that during the sentencing hearing you continue to observe all of the instructions about your own conduct as jurors that I gave you earlier in the trial.

In the event that you find that the Government has proved beyond a reasonable doubt that Mr. Caro is eligible to be sentenced to death, we will proceed to the next and final part of the sentencing hearing after which you will decide whether Mr. Caro is to be sentenced to death or imprisoned for life without the possibility of release.

In short, you will not be making that decision in this part, but only deciding whether Mr. Caro is eligible for the death penalty.

Ladies and gentlemen, I will now ask the attorneys to make opening statements to you.  I remind you that these statements and any other statements by the lawyers in the sentencing hearing are not evidence unless they are in the form of a stipulation or agreement by the parties.

Very well.  The Government may make an opening statement.

MR. BROWNLEE: Morning, ladies and gentlemen. Once again I want to thank you for being here on a cold Southwest Virginia morning, and I appreciate you being here.

As Judge Jones has just told you, we now are entering the final phase of this trial. As you know, this trial is broken down into really two parts: The guilt phase, as we call it; and the sentencing phase.

You have found Mr. Caro guilty of premeditated murder, and so now we're moving to the sentencing phase. As Judge Jones has told you, the sentencing phase is broken down into two parts. One we call the eligibility part. You will need to determine whether or not the Government has proven beyond a reasonable doubt by a unanimous jury whether he, in fact, is eligible for the death penalty.

It makes sense that not every person who is convicted of premeditated murder is eligible for the death penalty in the United States. For instance, juveniles are not. You have to be 18 or older at the time you committed the offense to be eligible. So, the first part we'll talk about is whether Mr. Caro is eligible. The Government must prove that beyond a reasonable doubt to a unanimous jury.

If you find him eligible, we'll then move on to

the final, final phase which is the justification phase. At that time you will determine whether or not the death penalty is, in fact, justified for this defendant.

So, eligibility. Let me talk to you very briefly what the Government intends to establish. There are three parts to eligibility. The first is age. The Government must prove beyond a reasonable doubt that Mr. Caro, at the time he killed Mr. Sandoval, was at least 18 years of age. We have stipulated to that. He has agreed to that. He's acknowledged that. So that will be pretty straight forward.

The second, as Judge Jones has told you, are the intent factors. You have to have a certain threshold of intent when you commit a murder or crime to be eligible for the death penalty.

Once again, we believe you have already done that by finding he killed Mr. Sandoval with premeditation and with malice aforethought. We believe you have satisfied that element.

We must prove that he intentionally killed Roberto Sandoval. There are four levels of intent, and Judge Jones will describe each one of them for you. If you find just one of them, you move on. We

JA 159

believe that we have established beyond a reasonable doubt in the trial, in the guilt phase of the trial that he intentionally killed Roberto Sandoval. That's the second one.

The last one is what we call aggravating factors. The defendant has to conduct certain aggravating factors to be eligible for the death penalty.

In this case we have alleged two aggravators. One is that the defendant has been, has two prior convictions for, essentially, drug trafficking crimes from which he could be punished a year or more. He has to have two prior convictions for drug trafficking crimes from which he could be punished for a year or more. Mr. Caro has three.

The United States will introduce evidence that in 1988 he was convicted of possession with intent to distribute approximately 30 kilograms of marijuana. In 1994 he was convicted of conspiracy to possess with intent to distribute more than 100 kilograms of marijuana. And in 2001 he was convicted of possession with intent to distribute cocaine.

In the first one he received 24 months incarceration; in the second one he received 71 months; and the third one he received 360 months.

So, we believe that we've satisfied the first aggravator.

The second aggravator, we allege that he's been convicted of one drug trafficking offense from which he could receive a penalty of five years. Again, we think these convictions will satisfy that, and he has stipulated that he does, in fact, have these convictions.

So, three things: That he's 18; that when he killed Mr. Sandoval he intentionally did so; and third, that he has sufficient convictions to warrant the statutory aggravators. If you find that we proved those beyond a reasonable doubt, then you'll return a verdict that he is eligible for the death penalty, and then we'll move on to the last phase, which is the justification phase. Thank you.

MR. KALISTA: Ladies and gentlemen, good morning. On behalf of Mr. Caro, as the Government has said and the judge has told you, this is the eligibility phase. And I think the judge and, of course, Mr. Brownlee have correctly explained to you the process by which you now decide whether Carlos Caro is eligible for the death penalty.

As far as the three issues that you have to decide, yes, it is stipulated that Mr. Caro was over,

was 18 or over at the time he committed this offense. And certainly we stipulate as to his convictions. The third factor, which would be called the statutory aggravating factors, there certainly is no dispute over those two issues that you would have to decide at this point in time.

As far as the second factor regarding statutory intent, the judge will give you some choices concerning your recollection of the circumstances regarding Mr. Sandoval's death. Again, at this stage of the proceeding the Government bears the burden of proving these factors beyond a reasonable doubt, and there still attaches a presumption in favor of Mr. Caro even at this stage.

We will have no additional evidence to present on these issues, and we would rely upon your decision based upon the facts as you recollect them from the first part of this, of the trial, and also the instructions the court will give you. Thank you.

THE COURT: Thank you, Mr. Kalista and Mr. Brownlee. The Government may proceed.

MR. GIORNO: If it please the court, there is a stipulation in this case between the parties. The parties stipulate that at the time of commission of the alleged offense that the defendant, Carlos

Caro, was over the age of 18 years.  That has been stipulated.  There are additional stipulations, Your Honor, as follows:  It is stipulated between the parties that Carlos David Caro has been convicted of the following offenses, one, the United States District Court for the Southern District of Texas for the offense of possession of marijuana with the intent to distribute, and sentencing on April 15, 1988; two, conviction in the United States District Court for the Northern District of Texas for the offense of conspiracy of possession with intent to distribute more than 100 kilograms of marijuana, sentencing on January 5, 1994; three, conviction in the United States District Court for the Southern District of Texas for the offense of possession of cocaine with the intent to distribute, sentencing on May 7, 2001.

It is further stipulated, Your Honor, that each of the convictions previously agreed to, stipulated to are federal offenses, punishable by a term of imprisonment of more than one year committed on different occasions involving distribution of a controlled substance, and involved violations of Title 2 or Title 3 of the Comprehensive Drug Abuse Prevention and Control Act of 1970 for which a

sentence of five or more years may be imposed.

Those are the stipulations between the parties. We also have, and move into evidence, certified copies of the convictions with regard to each of those. They are labeled and identified as Government's Exhibits CVNA, CVNC, and CVND as Government exhibits.

THE COURT: Very well. Without objection, they will be admitted.

(Government's Exhibit Nos. CVNA, CVNC and CVND were received in evidence.)

THE COURT: Does the Government have any further evidence?

MR. GIORNO: No, Your Honor.

THE COURT: Does the defendant have any evidence to present?

MR. KALISTA: No, Your Honor.

THE COURT: Very well. We'll hear any arguments that the attorneys wish to make.

MR. GIORNO: Thank you, Your Honor. Ladies and gentlemen of the jury, good morning. As Mr. Brownlee told you, and the judge told you, and also Mr. Kalista, in this part of case the penalty phase of this trial is divided into two stages. The first stage, the stage we are now, is called the

eligibility stage. At this stage you're not making decisions whether Carlos Caro should be sentenced to death. Rather, you make a determination as to whether he's eligible for the death penalty.

As the court told you, and Mr. Brownlee and Mr. Kalista told you, you have to make three findings in that regard. And the judge will give you a form, and we'll have each of those findings, you'll have each of the factors that the Government has to prove, and you'll check yes or no.

There are basically three things you have to decide. The first thing is, is whether or not the defendant was 18 years of age or older at the time of the commission of the offense. And of course, that's been stipulated. Everyone agrees, as Mr. Kalista told you. There's really no issue about that. So, when you get the form, the verdict form you would simply check that box yes if you, in fact, find that stipulation is valid, and based on your observations of Mr. Caro.

The, the second thing that you have to find is that the lawyers refer to, the court refers to as the requisite mental state, the intent of Mr. Caro in committing the offense. Basically what that asks you to do is, did the defendant, Mr. Caro, intend to kill

Roberto Sandoval?

There are basically four levels of intent. The first one is, you, the jury, unanimously find, and the Government has proved beyond a reasonable doubt, the defendant intentionally killed Roberto Sandoval, yes or no.

It goes down, there are other mental states below that. For example, do you, the jury, find the Government has proved beyond a reasonable doubt that the defendant intentionally inflicted serious bodily injury which resulted in the death of Roberto Sandoval?

With regard to that intent factor, the statutory intent, you can consider, and should consider, all the evidence you heard in this case in the guilt phase. And of course, ladies and gentlemen, as a result of your verdict in this case, by finding Mr. Caro guilty of willful, deliberate, intentional first degree murder, that's, that would suggest that, in fact, you have found that he had the intent to kill Roberto Sandoval, to harm him in such a way that resulted in his death.

I will tell with you regard to section number two, that is to say the requisite mental state, you're to find only one of those. Once you find, if

you, in fact, find one of those exists in this case you then move on to the third section, which is another statutory aggravator.

The other statutory aggravators basically relate to Mr. Caro's prior convictions. Again, you have heard the stipulations of the parties that Mr. Caro, in fact, has three prior convictions; that those convictions involve the distribution of controlled substances; they were committed on occasions different from one another; at least one case was imprisonment for more than one year; they are felony offenses; and also that they violate Title 2 or 3 of the Comprehensive Drug Abuse prevention and Control Act of 1970. And those are things that, that Mr. Kalista, on behalf of Mr. Caro, told you there's really no argument about that. That is the stipulation, that's the gist of the stipulations we talked about in this case, cover that third requisite stage.

I think what Mr. Kalista said, the only thing he's asking you to consider whether the Government has proved is the requisite mental state. And again, ladies and gentlemen of the jury, in making that decision you can consider all the evidence in the guilt phase.

JA 167

I would submit to you that based on your verdict, based on the evidence in this case, and the guilt phase, there's certainly sufficient evidence for you to find that Carlos Caro intended to kill Roberto Sandoval, thus satisfying the requisite mental state required to get past his first part, the eligibility phase of the sentencing phase, to get to the phase where we present additional evidence as to what will ultimately be the punishment in this case. Thank you.

THE COURT:  Thank you, Mr. Giorno. Mr. Simmons?

MR. SIMMONS:  Good morning.  This is a procedural stage in the process.  This is the second procedural stage where, again, you're narrowing the focus of those defendants who would be eligible, ultimately, to be sentenced to death.

We have stipulated as to the prior offenses.  We have stipulated to the age of Mr. Caro at the time of the offenses.  You have heard the proof as far as what his mental state was.  You have heard the evidence as to what happened and how it's happened, and you've made your decision.  And we would, at this stage, ask you again to keep an open mind.  This is only a procedural stage; this is not the stage where

the ultimate decision will be made, and we ask you to hear all the proof as you proceed through the process. Thank you.

THE COURT: Thank you, Mr. Simmons. Mr. Brownlee?

MR. BROWNLEE: Yes, Your Honor. Very briefly. The question is is he eligible for the death penalty. You're going to go back after the court instructs him to make that determination. If you find him eligible, you'll come back and we'll present additional evidence for the justification phase.

Just to review one final time, the defendant was 18 at the time he killed Roberto Sandoval. The evidence is he intentionally killed him. This, remember, this is a man, this man right here, took a towel, put water on it, snuck up behind him and strangled him to death for four to five minutes. We believe he intentionally intended to kill him.

Lastly, does he have under the statutory aggravators, does he have those convictions that satisfy two aggravators? And we believe that he does. Thank you.

THE COURT: Thank you, Mr. Brownlee. Ladies and gentlemen of the jury, I'm going to give

you instructions now regarding the law which you are to follow when determining whether Carlos David Caro is eligible for the death penalty.  I will also send a written copy of these instructions with you.

You are to base your decision only upon the law as I give it to you, regardless of any opinion you may have as to what the law should be.

While the lawyers may have properly commented during the hearing on some of these rules, you are to be guided only by what I say about them.  You must follow all the rules as I explain them to you.  You may not follow some and ignore others.

It would be a violation of your oaths as jurors to base your verdict upon any view of the law other than that given to you in these instructions.

Some of the legal principles that you must apply during the sentencing phase duplicate those that you followed in reaching your verdict as to guilt or innocence.  For example, you should follow my earlier instructions to you regarding the types of evidence in the case, and the weight to be given direct and circumstantial evidence, and how to determine the credibility of witnesses.

Some of the legal rules applicable to your decision today will be different from my previous

JA 170

instructions.  I have prepared the following instructions to ensure that you are clear in your duties at this stage of the case.  I have also prepared a special verdict form for you to complete. The form details special findings you are asked to make in this case, and will help you perform your duties properly.

To find the defendant eligible for the death penalty you must be convinced that the Government has proved each of the following beyond a reasonable doubt:  One, the defendant was at least 18 years old when the capital offense was committed; two, the defendant acted with a level of intent sufficient to allow consideration of the death penalty, which may be different than the intent required to convict the defendant of the offense; and three, the existence of at least one statutory aggravating factor.

Aggravating factors reflect circumstances that tend to support imposition of the death penalty.  If you find that any one or more of these three eligibility conditions has not been proved beyond a reasonable doubt by the Government, the defendant is not eligible for a sentence of death, and your deliberations are over.  If you find that the Government has proved beyond a reasonable doubt that

all of these conditions are satisfied, the defendant is eligible for a death sentence.

The parties have agreed that Carlos David Caro was at least 18 years old when he killed Roberto Sandoval. In order for Carlos David Caro to be eligible for the death penalty, you must unanimously find beyond a reasonable doubt that the Government proved that, in committing the offense charged in count one, the defendant committed at least one of the following acts: A, he intentionally killed Roberto Sandoval; B, he intentionally inflicted serious bodily injury that resulted in the death of Roberto Sandoval; C, he intentionally participated in an act contemplating that the life of a person would be taken, or intending that lethal force would be used in connection with a person other than one of the participants in the offense, and Roberto Sandoval died as a result of the act; or, D, he intentionally and specifically engaged in an act of violence knowing that the act created a grave risk of death to a person other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and Roberto Sandoval died as a direct result of the act. These are the alternatives set out in the section two

of the special verdict form, and you must consider and resolve them separately.

If you answer yes to one of the alternatives, stop your deliberations for this section and proceed to the next step in your deliberations.  If you answer no to all four alternatives, then your deliberations are over.

Your next task is to consider the statutory aggravating factors.  You must unanimously find beyond a reasonable doubt that the Government has proved at least one of the following aggravating factors prescribed by Congress and alleged by the Government in this case:  A, the defendant has been previously convicted of two state or federal offenses punishable by a term of imprisonment of, of more than one year committed on different occasions involving the distribution of a controlled substance; B, the defendant has been previously convicted of violating Title 2 or Title 3 of the Comprehensive Drug Abuse Prevention and Control Act of 1970 for which a sentence of five or more years may be imposed.

The statutory aggravating factors are set out in section three of the special verdict form, and you must consider and resolve them separately.

The parties have agreed that Carlos David Caro

has been previously convicted of two state or federal offenses punishable by a term of imprisonment of more than one year, committed on different occasions, involving the distribution of a controlled substance.

The parties have also agreed that Carlos David Caro has been previously convicted of violating Title 2 or Title 3 of the Comprehensive Drug Abuse Prevention and Control Act of 1970 for which a sentence of five or more years may be imposed.

In considering whether Carlos David Caro is eligible for the death penalty, you shall not consider the race, color, religious beliefs, national origin or gender of the defendant or of any victim.

You are not to find the defendant eligible for the death penalty unless you conclude that you would do so no matter what the race, color, religious beliefs, national origin or gender of the defendant or the victim may be.

Whatever decision you reach, each of you is required by law to sign a certification attesting to the fact that you have followed this instruction. The certification is set out in section four of the special verdict form.

Now, ladies and gentlemen, I'm going to just show you briefly the special verdict form, which I

will send with you to the jury room.  And as you'll see, this verdict form is a little more complicated than the one you filled out in connection with the earlier phase of the trial.  But it is divided into sections, and again, the first section is section one in which you must make a finding as to the age of the defendant.  And, again, you answer yes or no, the defendant was 18 years of age or older at the time of the offense committed in count one.  So, when you determine that, that's marked, and the foreperson must sign.  There's instructions that follow that section about that.  And if you answer yes, that he was 18 years or older, then you proceed to section two.  And section two concerns the requisite mental state.  And again, it has the four possibilities, and a yes or no for each of them.  Again, if you find any one of these yes, then you move on to the next section.  You find all of them no, then you've concluded your work.  And again, the instructions tell you that.  Section three is the statutory aggravating factors.  And again, these relate to the prior criminal offenses for which there's been a stipulation.  And again, you answer these.  And finally, no matter what your findings, you must fill out section four which is a certification.  Again,

each of you must sign that -- there are places for 12 people to sign -- and date it, and that certification is in the manner that I've indicated to you.

So, that's the special verdict form, ladies and gentlemen, and I'm going to also send with you to the jury room a copy of the instructions that I gave you.

Now, again, as in the earlier phase we're going to separate the alternates who will not be able to participate in the deliberations unless and until they replace a regular juror. And those alternates, again, are jurors number 18, 55, 65 and 72.

So, the bailiff is going to take the jury out. The alternates will be placed in another room. Do not begin your deliberations until the alternates have left, and the bailiff has delivered to you the documents that I've just described, and then you can begin your deliberations.

So, Mr. Bailiff, we're going to remain in session, but if you'll take the jury out, ladies and gentlemen, if you'll follow the bailiff out, and again place the alternates in a separate room, and then if you'll come back in and I'll give you these documents.

(The jury retired to the jury room, after which the following occurred:)

JA 176

THE COURT:  Now, before I give the form and the written instructions to the bailiff, are there any objections to the form of the court's instructions?

MR. BROWNLEE:  Not from the United States.

MR. KALISTA:  No, Your Honor.

THE COURT:  Very well.  Mr. Bailiff, if you'll deliver those so the jury can begin its deliberations.

And counsel, let's now take up the motions that have been filed by the defendant.  The, I think I'd like to take up the *Crawford* motion first.  That may subsume at least parts of the other motions.  And Mr. Simmons or Mr. Kalista, you have anything further you'd like to say in that regard?

MR. SIMMONS:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. SIMMONS:  Your Honor, this is a motion pertaining to an incident which occurred in Oakdale. Apparently the incident was a, a confrontation between the Texas Syndicate and the Border Lords when a group of fresh inmates had come on to the Oakdale facility.  There was an incident, there were injuries, and then there was an investigation conducted by the Bureau of Prisons.  And we've been

given a copy of that, and a summary of that investigative report.  And we've been given notice that two witnesses, a John Gordon and a John Blaze are anticipated to testify at this phase of the proceedings.

There are two aspects of the report that we are objecting to, and the conclusions.  The first are statements that are attributed to Mr. Caro.  From the report it's unclear who he made the statements to. It simply indicates in a summary report Mr. Caro made some very damaging statements, particularly he did not have anything to do with it, just Texas Syndicate, I don't give a fuck if they send me to a United States penitentiary, my brothers follow orders, they know what they're getting into, doesn't matter even if we're prosecuted, I have 30 years to do, I certainly don't care about myself.

THE COURT:  Let me interrupt you.  I take it that if the Government called a witness who testified that the witness had been present when the defendant made these words, that there would be no objection?

MR. SIMMONS:  There would be no *Crawford* issue.

THE COURT:  Would there be any objection?

MR. SIMMONS:  It's certainly highly prejudicial, and we'd object on those terms.

THE COURT:  Aside from a sort of prejudicial balancing factors, there wouldn't be any other evidentiary objections?

MR. SIMMONS:  There's no Sixth Amendment issue.  If the person is here today and testified that he interviewed Mr. Caro, and Mr. Caro voluntarily made those statements, then we can cross examine that witness.  Again, it's just from the report it's unclear as to whom he made those statements to, whether it's one of these investigators or some other person.

Your Honor, further in the report it indicates two things, based upon information that had been gathered.  It doesn't indicate who provided that information.  We're assuming it's confidential inmate informants, but the conclusion was that Mr. Caro was the leader of the Texas Syndicate; that he had authorized or ordered the attack on the Border Lords. Again, we don't know where the information came from, we don't know the reliability of that information.

We assert we have a Sixth Amendment right, number one, to confront those persons and to cross examine them.  And also, Your Honor, as a gatekeeper

under the function of this court, this court must make a determination that that information is reliable, and in the absence of a competent person here today that this court can view and judge the credibility, it would simply be impossible.

THE COURT:  I take it that would be sort of a two level, I mean, objection.  I mean, your first, assuming that it was presented by hearsay, you would contend that the Sixth Amendment precludes the introduction of it?

MR. SIMMONS:  Correct.

THE COURT:  As testimonial.  But in any event, you would say it's unreliable and under the Federal Death Penalty Act it should be excluded?

MR. SIMMONS:  That's correct, Your Honor. I think this court has a gatekeeping function that it must perform under the Death Penalty Act.  And the gatekeeping function is to ensure that the evidence is reliable, and to make that determination there must be some factual basis.

THE COURT:  Let's hear from the Government.

MR. BROWNLEE:  Morning, Your Honor.  We filed a response brief, I think it was electronically filed this morning, but we've given a couple copies of it out.

THE COURT:  All right.  I haven't seen it yet.

MR. BROWNLEE:  Basically just to cut to the chase, I don't think that under the current case law in the Fourth Circuit or the Supreme Court that the confrontation clause under the Sixth Amendment would apply to this proceeding.  Nevertheless, I'm certainly not a wise enough Constitutional student to guess where it's going, but my sense is that may be where it ends up.  So, what we tried to do, Mr. Giorno and I, and the agents, is build a case so we'd have that protection.  Traditionally we would just put the report in and that would be it.  We're not doing it, we're not going to introduce the report in and of itself.  We're actually going to have two witnesses to get the evidence we need in.  One is from a guy by the name of John Gordon, who actually interviewed the defendant after the assault. Mr. Caro told him the statement that he wrote down, the quote.  Mr. Caro also told him three weeks before that that he was the leader of the Texas Syndicate for Oakdale.  So, that evidence will come straight from the witness, straight from Mr. Caro's mouth. And then we'll call another witness who actually responded to the yard who saw the victims of the

assault, who testified as to what they looked like. We're going to put a couple of pictures in of the victims of, of that assault through that witness. This is Lieutenant Blaze, who was the operations lieutenant that day for Oakdale, and then kind of what he saw that day out there on the yard. So, we're trying to, again, we don't concede the legal point, but at the same time, I think the evidence that the United States will put forward will satisfy those Sixth Amendment concerns.

THE COURT: All right. Any response?

MR. KALISTA: Judge, just in terms of the statement --

THE COURT: If you wouldn't mind coming to the podium?

MR. KALISTA: Judge, just in terms of the statement that Mr. Brownlee just made concerning, I think it's the witness Gordon who interviewed Mr. Caro after the incident, and I think he made the statement allegedly attributed to him in the report, we were unaware from discovery materials that there was an earlier conversation where Mr. Caro allegedly said he was the leader of the Texas Syndicate. That certainly had not been disclosed in the report, or provided to us. So, I mean that is news to us.

JA 182

THE COURT:  All right.

MR. BROWNLEE:  As far as the Government's intent to establish that Carlos Caro was leader of the Texas Syndicate at Oakdale, that has already been part of this.  That particular statement we learned two days ago when the witness came out to Virginia.  So, that is out there.  But I think it's always been clear that the United States intended to establish, through this witness, that Mr. Caro was the leader of the TS at that time at Oakdale.  Thank you.

THE COURT:  Thank you.  There is another, the defendant has also filed a motion in limine to preclude reports regarding incidents of other misconduct on the part of capital defendants who are incarcerated or housed in the Bureau of Prisons.  And I'll be glad to hear any argument on that.  I think that relates to the testimony of, in particular to potential Government witness Anthony Davis.

MR. SIMMONS:  Your Honor, I think we have resolved this in that the Government has indicated they're not intending to introduce documents -- the basis of the motion was they had an expert witness in a prior proceeding to come to court with a number of documents and reports, and then testify using those documents and reports.  As the court is aware, we had

JA 183

requested certain documents from the Bureau of Prisons' earlier proceeding, and the Bureau indicated those records simply weren't available.  And we would object at this time, the Bureau of Prisons, one of those experts have the documents when they indicated they did not.

THE COURT:  Very well.  So, I take it that motion is not, is moot?

MR. GIORNO:  Your Honor, subject to this caveat, in telling the defense lawyers I wasn't going to try to go down that road, right now we don't have the intent to go down that road, but that assumes when Dr. Cunningham testifies either on direct or cross examination, he's asked about, "Are you aware there have, in fact, been instances of violence carried out by capital defendants in national locations," I understand the answer to that question is, "Yes, I am aware of that, and such incidents do exist," and then Dr. Cunningham is going to say in response to those the Bureau of Prisons took some prophylactic measures and as long as Cunningham acknowledges those instances, we do not intend to introduce the reports.

MR. SIMMONS:  Your Honor, that's the testimony we anticipate from Dr. Cunningham.

JA 184

THE COURT:  I think I have all the motions. I'm going to, the, the motion in limine to preclude reports regarding incidents and other misconduct, et cetera, will be denied as moot based on the understanding of counsel that has been related to me.

The motions in limine to exclude the report regarding the incident at FCI Oakdale, Louisiana, there's a motion in limine, and a second motion in limine, will be denied based on the Government's representation that it does not intend to introduce hearsay testimony in the form complained of in the motions.

The jury has returned its, is ready to return its verdict.  If there's nothing further, then, we'll have the jury in, please.

(The jury entered the courtroom and was seated in the jury box.)

THE COURT:  Ladies and gentlemen, I have received the special verdict form, which has been completed, and I'm now going to announce that verdict form, if you'll listen carefully.

In the case of *United States of America* v. *Carlos David Caro*, Case Number 1:06CR1, Special Verdict Form Regarding the Age of the Defendant, Requisite Mental State of the Defendant, and

Statutory Aggravating Factors of the Defendant for the Killing of Roberto Sandoval.  Number one, Age of the Defendant.  Question, the defendant was 18 years of age or older at the time of the offense committed in count one?  Answer, yes.  Signed by the foreperson.

Part two, Requisite Mental State.  Question one, do you, the jury, unanimously find the Government has proved beyond a reasonable doubt that the defendant intentionally killed Roberto Sandoval?  Answered yes, signed by the foreperson.

And you also answered the remaining three questions yes, and signed by the foreperson.

Part three, Statutory Aggravating Factors. Question one, do you, the jury, unanimously find that the Government has proved beyond a reasonable doubt that the defendant has been previously convicted of two state or federal offenses punishable by a term of imprisonment of more than one year committed on different occasions involving controlled substances? Answer, yes.  Signed by the foreperson.  Question two, do you, the jury, unanimously find that the Government has proved beyond a reasonable doubt that the defendant has been, previously been convicted of violating Title 2 or Title 3 of the Comprehensive

JA 186

Drug Abuse control Act of 1970 in which a sentence of five years or more may be imposed?  Answered, yes. And by the foreperson, and the certification is signed by all 12 of you, and dated this day.

Now, ladies and gentlemen, is that your special verdict so say you all?  Ladies and gentlemen, I'm going to, again, ask by number each of you to answer yes or no whether that is your own individual special verdict.  Juror Number Eight?

JUROR NUMBER EIGHT:  Yes.

THE COURT:  Twelve?

JUROR NUMBER TWELVE:  Yes.

THE COURT:  Juror Number 24?

JUROR NUMBER TWENTY-FOUR:  Yes.

THE COURT:  Juror Number 30?

JUROR NUMBER THIRTY:  Yes.

THE COURT:  Juror Number 32?

JUROR NUMBER THIRTY-TWO:  Yes.

THE COURT:  Juror Number 33?

JUROR NUMBER THIRTY-THREE:  Yes, sir.

THE COURT:  Juror Number 39?

JUROR NUMBER THIRTY-NINE:  Yes.

THE COURT:  Juror Number 47?

JUROR NUMBER 47:  Yes.

THE COURT:  Juror Number 62?

JUROR NUMBER SIXTY-TWO:  Yes.

THE COURT:  Juror Number 67?

JUROR NUMBER SIXTY-SEVEN:  Yes.

THE COURT:  Juror Number 79?

JUROR NUMBER SEVENTY-NINE: Yes.

THE COURT:  And Juror Number 97?

JUROR NUMBER NINETY-SEVEN:  Yes.

THE COURT:  Very well.  I'll declare the verdict unanimous and direct that it be recorded.

Ladies and gentlemen, we're going to take a break right now before we go to the second and final phase of the capital sentencing hearing.  So, if you'll, if you'll follow the bailiff out, and I will also ask the bailiff to have the alternates rejoin you in the jury room so that they can come back in when we start that second phase.

So, Mr. Bailiff, if you'll go out, please. Ladies and gentlemen, if you'll follow the bailiff.

(The jury retired to the jury room, after which the following occurred:).

THE COURT:  Will counsel then be ready to go?  We'll take a short break, and anything before we begin?

MR. BROWNLEE:  We do have one issue, Your Honor.  I know the court intends to instruct the jury

some preliminary instructions as it comes back in, and we had submitted some to the court, I think it was the fifth, or something, whatever date that was, and I think the defendant had submitted some, and they do seem to be somewhat different --

THE COURT:  Are we talking about preliminary instructions?

MR. BROWNLEE:  I think in the preliminary instructions the court is going to set up what the standards are for review of the evidence, and I wanted to clear one line to make sure that the court was comfortable with the United States making the statement before --

THE COURT:  I'm, I -- if you'll repeat that?

MR. BROWNLEE:  With a line the United States was going to use before we said it, I was going to explain to the jury now that we're in the final phase, is the death penalty justified, and there's a certain framework that Congress has set out, and I'll talk about the framework, the aggravators, mitigators, the standards each party must prove, and then the balancing test which is substantially outweighed.  Under 3591, what the statute says is that the jury finds that the sentence

of death is justified, it shall impose it.  And in the Tenth Circuit instructions we use as our model, that line was in there, but I want to make sure I don't get out in front of the court, and so if the court hasn't made a decision I won't say it, and so I just wanted to let the court know.  Thank you.

THE COURT:  Well, I think I provided counsel with a copy of the proposed preliminary instructions, not the final instructions, but the preliminary instructions, but I'll, I'll give you another copy of it, and I do not use the word justified, but let me hear from the defendant's counsel in that regard.

MR. KALISTA:  Well, Your Honor, we have no objection with the proposed court's preliminary instructions, so we would certainly have no objection to the court giving the instructions.

As far as Mr. Brownlee, just like any other lawyer, making an opening statement that is not evidence.  The court is going to instruct the jury at the conclusion of the case, and to a certain extent what we say at this time is at our peril, so certainly in terms of how he wants to phrase it, that's, that's up to him, but I think in terms of final jury instructions I think that's something

we'll argue and the court, will present to the court.

THE COURT:  Well, Mr. Brownlee, I do not find that the use of the word justified in your opening is improper, or contrary to anything that the court tells the jury, or intends to tell the jury. As you point out, it is used in the statute. Anything else then?

MR. SIMMONS:  Your Honor, just a couple of housekeeping matters.  We were going to clean up the floor during the break and get the tape off the floor.  And also, Your Honor, we need to make a couple of phone calls about this witness situation. Our witnesses will not be in until Tuesday night, so we'll be ready, I anticipate, to go Wednesday morning at the earliest.  So, if the Government finishes tomorrow, we're not going to have any witnesses ready to proceed.

THE COURT:  Well, I think we've understood that.  And perhaps in our break you could contact Judge Sargent's chambers and see if there's any difficulty in regard to the amended orders that you desire.

MR. SIMMONS:  Very well.

THE COURT:  All right.  Anything further, then?  Very well.  We'll take about a 20 minute

recess.

(Recess from 10:05 a.m. to 10:30 a.m.)

THE COURT:  Are we ready for the jury now? All right.  Mr. Bailiff, if you'll have the jury in.

(The jury entered the courtroom and was seated in the jury box.)

THE COURT:  Ladies and gentlemen, since you found that Mr. Caro is eligible for the death penalty, we will now proceed to the second and final part of the sentencing hearing, after which you will decide if Mr. Caro should be sentenced to death or imprisoned for life without the possibility of release.

Before the parties begin their presentations, I wish to give you a summary or overview of the law, and I will give you more detailed instructions at the conclusion of the hearing.

This part of the hearing, which focuses on all relevant and aggravating and mitigating factors, is broken down into two steps.  First, you must determine what factors have been proved.  As for the aggravating factors, you must unanimously determine whether the Government has proved beyond a reasonable doubt any additional statutory or non-statutory factors relied upon to support the death penalty.

In contrast, the defendant may prove mitigating factors by just a preponderance of the evidence. Moreover, it is up to each juror to decide individually whether any mitigating factor exists. There's no requirement that the defendant establish mitigating factors unanimously.

The second step involves a weighing process. You must decide whether the proved aggravating factors outweigh the proved mitigating factors sufficient to justify the death sentence. If you do not find any mitigating factors, you still must decide whether the aggravating factors are sufficient to justify imposition of a death sentence. If you determine as a result of this weighing process that the factors do not justify such a death sentence, such a sentence may not be imposed and your deliberations are over.

Weighing aggravating and mitigating factors is not a mechanical process, and the judgment involved is exclusively yours. Whatever findings you make with respect to aggravating and mitigating factors, remember that a jury is never required to impose a sentence of death. Any decision to impose a sentence of death must be unanimous.

I direct that during the sentencing hearing you

continue to observe all of the instructions about your own conduct about jurors that I gave you earlier in the trial.

Ladies and gentlemen, you will now hear opening statements. I remind you that any statements by the lawyers in the sentencing hearing are not evidence unless they are in the form of a stipulation or agreement of the parties. You may proceed.

MR. BROWNLEE: Please the court, ladies and gentlemen of the jury, once again, good morning. We now enter into the final phase of this trial. You have found the defendant guilty beyond a reasonable doubt of premeditated murder of Roberto Sandoval. You have now found him eligible beyond a reasonable doubt through a unanimous verdict that he, he's eligible for the death penalty. So, now this final phase is for you to decide is the death penalty for Carlos Caro justified under the circumstances and the facts.

Now, the court will tell you, and has told you, that the law provides you a framework from which you should rely on to decide is the death penalty justified. You should be asking yourself, "How do I determine that?" Well, the law has a framework. Let me walk you through the framework and tell you a

little bit about some more evidence because, as you will soon hear, there is more to this story about Mr. Caro. He's an extremely violent man.

The framework is this. There are things called aggravators, and you have heard about aggravating factors. The Government must prove these aggravators beyond a reasonable doubt to you. If we do that, you can consider an aggravating factor. Remember, the crime, itself, is an aggravator. His three convictions of drug trafficking are an aggravator.

The defendant then can, if he so chooses, put forward mitigation, things that would tend to influence you not to impose the death penalty. Once all that is in, aggravators and mitigators, you weigh them. If the aggravating factors substantially outweigh the mitigating factors, then you can find the death penalty justified and impose it. It's just that simple. It's up to you.

So, what are some of the aggravators that the United States intends to put forth? There's really two, they fall into two categories. First is victim impact. The Sandoval family, Roberto's family, is here from Texas and they're sitting here in the courtroom today. You will hear from one of them, interestingly enough, the youngest, 17 years old.

JA 195

Kirsten Sandoval will take the stand. She is Mr. Sandoval's daughter. She will tell you what her life has been like without her dad. She will tell you that she loved him, and she's going to tell you that she misses him. That is one thing you can consider.

The second thing you can consider was what we call future dangerousness, that Carlos Caro is a future danger to human life. What will that evidence be? First of all, it is this crime. You should never forget why we're here in the first place. It is the premeditated murder of Roberto Sandoval. He took that towel, he wet it, he wound it, he ambushed him from behind and he strangled him to death. That's an aggravator.

Second, that he has three prior convictions for drug trafficking. The first one he received two years, the second 71 months, almost six years, and the third, 30 years in prison.

But there is more. You will hear evidence this morning that Carlos Caro can communicate in code, which makes him more dangerous. He can write a letter, and it's in code, and it's an indentation-type letter, and you'll hear evidence from FBI experts that will connect that letter to the

JA 196

fingerprint analysis of his own signature to him, and it demonstrates the abilities that he's not just a danger with his hands on the throat, that he can reach out.

But there's more. You will hear that in July of 2002 while he was an inmate at a prison in Oakdale, Louisiana Carlos Caro directly ordered and participated in an assault on other inmates. You will see the photographs of what he did, and you will hear a statement about it.

But there's more. You will also hear evidence that on August 29, 2003, less than four months before he murdered Mr. Sandoval, he participated in an assault of a man named Ricardo Benavidez, a crime for which he's been convicted of conspiracy to commit murder. Will you see it on videotape. You will see the photographs of the victim. You will see he took this plastic shank, it had a taped handle and a lanyard from which he could hold on to it, and he stabbed that man 28 times with another member of his gang named Mareno. Again, he's been convicted of that conspiracy to commit murder less than four months before he strangled Sandoval. Not only did he stab him in the front, he stabbed him in the back.

Lastly, his lack of remorse, lack of remorse for

JA 197

this crime.  That is something you can consider in determining whether or not he is, in fact, of future danger.  You've heard the tapes, you've heard the evidence.  Twenty seconds after he strangled Mr. Sandoval, "Come get this out of my cell, he stinks."  You heard him talking to his wife and his buddy, laughing about it, boasting about it.  He was proud of it.  You can consider that when you determine whether or not he is, in fact, of future dangerousness.  All of that evidence, those aggravators you can consider and weigh them against mitigation.  That mitigation, that aggravation substantially outweighs that mitigation, then you can find the death penalty is justified.

Ladies and gentlemen, once again, I want to thank you for your patience.  I anticipate this phase of the trial will take a couple of days with the evidence.  And I know that we have taken time away from you in a third week, and I want to thank you.  I want to remind you that it is important, this is important, it's important to Mr. Caro, it's important to the Government, it is important that justice be done.  Thank you.

THE COURT:  Thank you, Mr. Brownlee.  Let me ask counsel to speak up.  It's a little difficult

to hear.

MR. KALISTA: Ladies and gentlemen, please forgive me. I took an anti-inflammatory medication, and I think it causes me to have some dry mouth. I guess it's draining all the fluids out of my system. So I occasionally have to take a sip of water every now and then, otherwise I just can't continue.

Both of us, or I should say all of us here today have a pretty awesome responsibility. I'm representing Carlos David Caro, who is basically fighting for his life. And you'll have to make a decision, each one of you has to make an individual decision about what the punishment should be in this case, whether it's going to be death or life imprisonment without the possibility of release.

Therefore, it's not to be a question of circumstances under which Mr. Caro will die. There's no question he's going to die in prison. The question is going to be when that will happen and under what circumstances, whether it will be by God's hands or by the hands of men. But you will have to make that decision.

Now, Mr. Brownlee did say, and touched on the aggravating factors and mitigating factors. I just want to say a word about that, and in light of what

the judge has told you in these preliminary instructions.

Now, again, aggravating factors simply stated are those reasons that tend to favor the imposition of the death penalty. And he's mentioned those. Primarily, the violence that Mr. Caro has exhibited in prison.

Mitigating factors are those factors that tend to support a lesser sentence, and in this case that's life imprisonment without the possibility of release.

So, you're only going to have two choices, and there is certainly a weighing process. Before you get to that weighing process, under our law you must find beyond a reasonable doubt the existence of an aggravating factor. In other words, the Government bears the burden of proving the existence of an aggravating factor, whether it's future dangerousness, or any other aggravating factor beyond a reasonable doubt.

Mitigating factors, reasons to impose a sentence less than death, life without the possibility of release, the defendant bears a burden of showing each mitigating factor by not proof beyond a reasonable doubt, but by proof by a preponderance of the evidence.

You have to decide whether the evidence, or whether the fact is more likely true than not. And you do not have to decide as a group, unanimously, that a mitigating factor exists. One member of the jury can find the existence of a mitigating factor if one juror is satisfied by a preponderance of the evidence that that mitigating factor exists.

As far as a weighing process is concerned, the judge has told you that, indeed, you can weigh aggravating factors against mitigating factors depending upon which factors you have found.

Even if you find, however, that there are no mitigating factors whatsoever, you still do not have to impose a death sentence. And that is a decision that each one of you, as an individual juror, can make for any reason or no reason, and as the judge said, you will never have to reveal the reason for your decision.

Now, nothing that I am going to say to you today, or over these next few days in terms of presenting evidence is going to justify in any fashion, whatsoever, what Mr. Caro did as far as the killing of Roberto Sandoval. There's going to be no excuses for any of his conduct. You're going to hear what it was, and what it involved, and no attempt is

made to justify or excuse any of his conduct throughout his lifetime. That is not the purpose of our presenting evidence in mitigation to you.

But what we do want you to understand is that the Carlos Caro you see over there today, he started out somewhere, and we want to tell you his story as to how he got to this point in his life. We're going to present evidence concerning his earliest days, growing up in Texas where he grew up, his immediate family, his greater family unit, the type of environment in which he was raised, the people that he came in contact with, and how he basically got into trouble. Because you have heard that he got involved in dealing drugs, marijuana a couple of times, and then cocaine eventually. You're going to hear that story about his life.

Now, there's no question, as I said before, that Mr. Caro, regardless of what you do, he is never going to get out of prison. He will die in prison. He, too, has a daughter that's in college, and he'll never see her graduate. He will never see her marry, he will never enjoy holding his grandchildren. He is going to die in prison. He will never get out of prison. Life without the possibility of release means life imprisonment, and also death in prison.

Please keep that in mind.

Now, again, the first phase of the trial, the guilt/innocence phase, is about what Mr. Caro did to Roberto Sandoval. This phase of the trial is going to be about who is Carlos David Caro. We're not going to offer any explanations, we can't offer you any answers, we can offer you facts by those people who know him, and you have to be the judges of those facts and make the decision.

Ladies and gentlemen, Mr. Caro was born in a little town in South Texas called Falfurrias. I have a map here, and I'm going to point to it. It's fairly close to the United States/Mexican border here, probably about 60 miles north of McAllen. It's about the same distance from Laredo in the west, and up to the northeast is Corpus Christi in this area.

Falfurrias is a very small town. It's approximately 5,000 people. It's in Brooks County. In Texas, as in other places, but especially in Texas, they name counties for significant people, and Brooks County is named in honor of a Texas Ranger. But Falfurrias is a small town. It exists in its present state, as far as its size, approximately the same as it was when Mr. Caro was growing up there. He was born on February 9, 1967 in Falfurrias. As I

mentioned in my opening, in the other phase, he's going to turn 40 years old.

Falfurrias is primarily an Hispanic community on the economic scale, the wages and income in that county are less than in the rest of Texas, and lower than the national average. The, unfortunately there's a high rate of drop outs from high school and schools, there's a significant drug problem in that area.

As you can tell from its location in South Texas, close to the Mexican border, it's a place where drugs can come from across the border and into the United States, and especially into South Texas, into Falfurrias. So, it has significant problems, just like any other community, but unique to Falfurrias, and that is the area in which Mr. Caro was born.

Furthermore, you'll hear from the witnesses referenced to an area of Falfurrias called Mexiquito. Now, Mexiquito, I believe, I understand that means Little Mexico, was an area of Falfurrias that was, perhaps, more economically and socially deprived than other areas. The houses were not quite as good as maybe the other portions of town. It was, again, primarily an Hispanic area. It had a significant

drug problem in that area. Houses were, were fairly small, not large. Some of them, of course, had outside facilities. The people there, you know, were not teachers, doctors, lawyers; they were people, perhaps blue collar jobs, just trying to get by, maybe working a couple of jobs as laborers, as domestics.

Falfurrias, South Texas, that area is not a mountainous area like we have around here, it's not a green area. It's a very hot and dry place for the most part. Very little air conditioning that existed at that time. Basically had to just try to keep cool any way you could. It's in that hot, dry area that Mr. Caro was raised, and in Mexiquito in Falfurrias where he was raised.

Now, Mr. Caro was born to Virginia and Jose Maria Caro. He was the second of four sons. He had an older brother named Jose who was about two years older than he was, and he had a younger brother named Noe who was two years younger than Mr. Caro. There was another boy, Abran, who I believe was approximately ten years younger, or so, than Mr. Caro.

While growing up and starting with his earliest years, Mr. Caro, when he was an infant, had a problem

JA 205

with basically trying to keep down food. His mother had to keep down goats milk because he kept spitting up and vomiting any food he was given, so he had some early problems as a child as far as medical problems.

He was fairly slow. His brothers, Joe and Noe, were very active. In fact, too active. His brothers were frequently in fights, frequently getting into trouble, loud and boisterous boys, and young adolescents. The kind of boys that get in your face type children whereas Carlos was quiet, he was reserved, he was obedient, he didn't get into trouble. He certainly was not violent. In fact, he was so quiet that he had a nickname called El Muto, which basically means the mute one, because he just didn't speak too much.

He was raised in a fairly chaotic environment. His father was, and mother had very little education. I think they both dropped out of elementary school. They were both trying to just struggle to survive. Both were working. Mrs. Caro worked as a domestic at times, trying to make money for her family, and Mr. Caro worked as a laborer at times. But Mr. Caro had a significant drinking problem. He oftentimes preferred, unfortunately, when he was paid to take that money and basically buy alcohol and drink the

JA 206

money away rather than provide for his family. And that caused frequent conflict between Carlos' parents, such conflict that he and his brothers were the witness to very many violent confrontations between his father, Jose, and his mother, Virginia. And as boys they tried to intervene, but as boys, they couldn't intervene really to protect their mother.

It also seemed that because of the fact that Jose and Noe were seeming to get into trouble quite a bit in that family, that the father also was disciplining those boys certainly by beatings, and things of a physical nature that perhaps are looked on a little bit differently today.

Carlos, however, didn't get much attention perhaps because he wasn't a trouble maker, maybe because he was the silent type, the obedient type, but he certainly perhaps didn't get that attention from his parents. But he was raised in a rather chaotic environment. They had frequent separations, his parents separated frequently, both of his parents came from very large families. His father had, I believe, eight brothers and sisters. His mother had approximately 11 other brothers and sisters. He had, of course, a relationship with his aunts and uncles,

JA 207

and they also tried to assist the family. But like families, of course, they would try to take sides, or take sides with their relative.

Mrs. Caro, when she would leave her husband, she would go to her mother's who also lived in Mexiquito, and perhaps rightly or wrongly, she would then prevent the relatives on her husband's side of the family from seeing the boys, so they would be kind of cut off from that relationship.

The problem with that was that some of her relatives, primarily Carlos' uncles, were into drugs, they were into dealing drugs, and at some point in time they basically got both Carlos and his brother, Noe, into dealing drugs, primarily marijuana.

So, he's raised in a fairly chaotic environment. The parents had little education. Maybe they want the best for their children, but they're kind of overwhelmed with their own problems, alcohol, and maybe just an inability to cope with those problems.

In school he's not a bright child, he's not someone who brings home straight As. Yet again, it appears that his parents weren't really supportive, even though they may have wanted to be, but they really weren't supportive of their children advancing in school, getting a high school degree, and trying

to make something of themselves, and get out of Mexiquito earning an honest living.

It appears that basically Carlos, because of his limited abilities, primarily when he was in the seventh grade, or so, was put into special education classes, and stayed in that special education classes primarily through the eighth and ninth grade when he dropped out of schools, just like his brothers had done.

As far as his case is concerned, Carlos certainly has very little education, dropping out of school in the eighth, ninth grade in that area, similar to his brothers.

We see at some point when Carlos is an early adolescent that his father dies of cirrhosis of the liver, and that's probably been, to have been expected because he was a heavy drinker. Even though his father had been pretty much a source of violence against Carlos' mother, Carlos naturally had affection for his father, I think children have affection for their parents for the most part, maybe they don't know that they're deprived economically and socially, but Carlos had respect for his father, and had a good relationship with both of his parents.

After his father died, his mother was pretty

much left alone trying to earn a living.  She has her own problems, diabetes, she has to deal with that, and Carlos gets into various jobs trying to help his mother.

Now, one of the activities around Falfurrias was basically farm work, picking melons.  At one time Falfurrias was known for its watermelons.  Over time, however, even though there still is a market there for that type of fruit, farmers in that region are undercut by production that comes out of Mexico that are sold for much cheaper than what can be produced in that area, even fruit that's coming from China that undercuts what can be raised in the United States domestically, so that's not a very productive area.  But he does try to work in the fields, trying to help his mother.

But that's hard work.  And he takes the easy way out.  He takes the easy way out and gets into drugs.  And again, he's basically enticed into drugs by the thought of easy money, basically being able to get what we need, and he becomes basically a pack mule hauling marijuana from one point to another, bringing it into various points in Texas, working for his uncle.  And he does that for a while.

I want to stop and show you, and we might say we

have very few pictures of Carlos when he's a young boy, I guess that's primarily due to the fact when his mother died, that was in the mid-nineties, she died in a house fire, as I mentioned she was diabetic, Carlos at that time was in prison, I think perhaps three of the boys, Noe, Joe and Carlos were all in prison, they were all incarcerated, but Mrs. Caro lived by herself, as I said, she was a diabetic, she used to burn candles basically as kind of like prayer symbols, praying for her boys in prison. But she suffered a diabetic attack, and unfortunately it appears that the candles were turned over, and she was burned to death in a house fire. And a lot of the memorabilia, photographs of her children were lost in that house fire. So, there really aren't a lot of photographs of Carlos as a young boy, but I do have one.

Now, this is taken in Falfurrias, and the boy in the center here, the one smiling, whose picture you see, maybe it's hard to see, maybe it's hard to believe now, but that's Carlos David Caro. He's there with his younger brother, Noe. That's one of his uncles, Felipe, one of the uncles who helped him get into the marijuana business, drug business, these. Other individuals are not related to the

JA 211

family, but that was taken in the Falfurrias area. And as I said, we don't have too many of these type of pictures. But you'll see this picture again.

Now, as I mentioned, when you're chasing easy money, especially hauling drugs, you might make some money, but criminals eventually get caught, and it's basically true that Carlos and his uncles and his brother do get caught and they get prosecuted, and Carlos gets sent to prison. And you've seen already one of those conviction orders where he got about 24 months in a federal prison. That was his first experience being incarcerated. Prior to that time he had absolutely no, certainly charges or convictions concerning any violent conduct, whatsoever, directed toward anyone. No problems in school regarding violent conduct to other students, and certainly not to any other teachers. He has no history of violence as a boy, as an adolescent and as a young man. Basically no history of violence, whatsoever, until he's in prison in the federal system. And the Government has already said what that violence is.

But we do want to emphasize while out of prison he was not a violent person. He was not a danger to other people. He was certainly dealing things in drugs that he shouldn't have been doing, but he did

JA 212

not have a history of violence outside of prisons.

Now, during this time Carlos met a young lady, I believe you'll meet that lady who is still his wife. Her name is LouYveth Caro. Carlos and' vet as she goes by were married in 1988. Carlos was around 20, or so. This is a picture of Carlos, and again, he's in the center there, I believe that's his brother, that's LouYveth, and again it's just hard to imagine that that's Carlos Caro when you look at him sitting across the room from you. That is when he's approximately, as I said, about 20 years old. There they are cutting the cake at their wedding.

Carlos has made bad choices. Even as a young person when he met LouYveth he did try to engage in an honest living. He did develop some type of skill working auto body. He also was skilled somewhat in cooking. He tried some work, but the lure of the easy money, basically he made the choice of continuing on in the drug trade. As he would do that, his pattern would be, over the years, that he'd go to prison, come out, resolve, resolve to do better, reunite with his wife, try to work, apparently, at some honest jobs, but again, the choice he made was then to again start using drugs, get back involved in drugs, and go back into the drug

JA 213

trade.  He'd separate from his wife, and basically she wouldn't see him, he'd be gone doing his thing. The next thing she would find out was, basically, he had been arrested again for drugs.  And he repeated that pattern, as I've mentioned, at least twice over the course of his life, resulting in his last conviction in approximately 2001.

Again, we agreed to the sentencing order that you had seen.  I believe that was out of the court in Dallas.  But he had this pattern of, again, coming out of prison, being with his wife and child, and you'll see a picture of his child in just a minute, and doing well for a while, but then for whatever reason, making bad choices, going back to the drug business, separating from his wife.  Next thing she knows, he's in prison.

This is Carlos with his daughter, Xinia.  I guess she must be about, I'm going to say, one.  I'm not a very good judge on age anymore, but it looks like a one year old child there.  I think Xinia was born some time about 1990.  You'll meet Xinia.  Xinia is now about 18 or 19 years old.  She's a freshman at Texas A&M, Kingsville.  I might say this about Carlos' wife, LouYveth, and the contrast on this is just amazing, LouYveth is a highly educated and

JA 214

skilled person. She is a certified speech therapist, has worked in the various school districts throughout Texas for a number of years dealing with children and their speech problems. She also deals with older people, such as in nursing homes or care facilities who, because of swallowing problems, have difficulty with speech, and she is involved in their rehabilitation. She is, as I said, a very educated person. It is just a contrast, and I'm sure a question that you'll ask yourselves as to how these seemingly two different people could have gotten together and remain married over time. You'll see her, and she will tell you her story about Carlos.

I think both Xinia and LouYveth, despite Carlos' time in prison, despite the fact that he hardly could be called a good father or good husband, they still have affection for him, they still care about him, and they will tell you about the effect that his execution would have on them. You will be able to see them, and they will testify about that.

As far as Carlos is concerned, going to prison, and we've talked before about life in prison, we've talked a little bit about what prison is like, and I think I've mentioned when a person violates the law, depending on what they've done, gone into the Bureau

JA 215

of Prisons system, they're not automatically sent to the highest level security facility. They usually start out at a low or medium security facility. As their needs change, the prison system adapts to those needs.

I believe you're going to hear evidence that the prison sentence certainly identified Carlos as a Texas Syndicate member very early on in his career. I think it would be some time during the second incarceration that he was identified as a Texas Syndicate member.

Why prison gangs form, we talked about some of those things earlier, in terms of people, when they're coming into a system like a prison system, joining with similar people. In this case the Texas Syndicate, I think you're going to hear, is primarily an Hispanic gang as distinct from some of the gangs that, of course, white and African Americans may be involved in.

Carlos, when he gets in the system, as I said, perhaps his second entrance into the system, he chooses to join a gang. The prison officials, of course, are aware of that. They monitor activity, they can monitor phone calls, they can monitor letters, they can identify individuals with whom

someone associates with in prison.

Furthermore, I think you're going to find that his brothers, while they weren't incarcerated in the federal system, they were incarcerated for other offenses in the Texas Department of Criminal Justice, again, the state correctional system in Texas, they were also Texas Syndicate members. Certainly it would be unusual for Carlos not to join a prison gang under those circumstances, or to join a gang, perhaps, that was different from that that his brothers were in.

But as an inmate, yes, he violated prison rules. Now, when you're looking at Carlos Caro, and you're looking at where he came from, I guess you have to ask yourself, was it predictable back when he was a young boy growing up in adolescence in the environment that he came from that he was going to violate the law? And I think you'll agree that if you hear testimony, as I related it to you, that it was fairly predictable that Carlos Caro would violate the law, and again, probably in the sense of being in the drug trade. Many young men like him did the same thing from the Falfurrias area. Easy money, lack of opportunity elsewhere, no education, and really no family guidance, no good father figure.

And I did forget to mention that Mr. Caro, Carlos' father, had his own problems with the law. He was at least a user of drugs. He was, again, had an alcohol problem. He had a couple of convictions for driving under the influence. He was confined for a while on a burglary conviction. He got a second burglary conviction, which resulted in his previous probation being violated.

But Carlos did not have a good, reliable male figure in his life to emulate. The people that he looked up to, they were alcoholics, substance abusers, they violated the law. Again, but Carlos was not violent, he was not violent as a young man or as a youth, and his first incidence of violence occurred when he's incarcerated within the Bureau of Prisons. And again, the Government is going to present those instances of violence that Mr. Brownlee told you about in his opening statement.

I mentioned about Carlos not being a very good father or a very good husband. That's not to say in any sense he was abusive, when he was there, to his wife or his daughter. I think we'll prove to you he, when he was there he was a good father, he was a good husband. But he was not, as it turned out, certainly as the evidence shows, a reliable husband or a

reliable father.  He was certainly gone more than he was present.  But he was, when he dealt with them, he dealt lovingly, he dealt respectfully, he was not abusive, he was kind, and those times that he was with them he was a good father and a good husband.

Outside of prison was he a gang leader?  No. Was he violent?  No.  Carlos Caro, unfortunately, became violent when he entered the prison system. And I'm not blaming the prison system, but I'm saying something happened, something happened that caused him to be violent within that system.  It looks like the gang, perhaps, took over his life.  He relied upon members of the gang, and they relied upon him.

I think we told you in opening statements that you were going to be entering a world about the prison system that perhaps you really hadn't thought of before, or had looked at in a certain way before. I think you're going to learn more about that world during this phase of the proceeding.  I think what you're going to learn, as well, and I think you've seen that already is, again, you've talked and you've seen officers from the United States Penitentiary at Lee County, and we mentioned that's a high security facility, and we talked about people in the general population there, and we talked about when they

JA 219

violate the rules where they are sent, and they're sent into the SHU, which is a prison within a prison, and we've drawn the outline of the small cell that they're confined in. We've also talked about the things that they lose, not only upon entering prison, but then being taken from the general population and put into the SHU.

Now, the evidence will further be that since December 17, 2003 the Bureau of Prisons, and specifically Lee USP, and another institution that you'll hear about, Florence ADMAX, have successfully secured and housed Carlos without incident in their facilities. So, since December 17, 2003 there haven't been any repeat violent outbursts by Mr. Caro toward anyone.

The way they've accomplished that, you probably have some idea already, but he is housed in a single cell by himself, and if he needs to leave that cell, you've heard testimony as far as from the SHU what the officers have to do in order to take him from one point to another, you back up to the cell door, you're cuffed, the cell door is opened, your legs are shackled and you have officers escort you here or there. But Mr. Caro lived in that fashion from December 17, 2003 until approximately October of 2005

at USP under those conditions. So, that was an almost two year period. From there he was transferred to Florence ADMAX in Florence, Colorado.

When they transport prisoners I think you'll hear evidence that basically what they do from Lee USP, they would bus them to Atlanta, and in Atlanta they would remain in a holding facility awaiting further transport. From there they are flown to Oklahoma City. I think you saw the very first officer that testified, Officer Watts, his job is at the transportation center in Oklahoma City. And basically that is a transportation point where, again, inmates who are traveling, they get to that point, they stay there for a while, and then they are sent out from that facility to their final destination.

Again, Carlos, again, this is approximately, it took about a month or so to transport him from Lee USP to Florence ADMAX, Colorado going through Atlanta and Oklahoma City.

He gets to Florence ADMAX, Colorado and you will hear about that facility, but basically that is the most secure facility operated by the federal Bureau of Prisons. That houses, I suppose it's been referred to as housing the worst offenders from all

JA 221

the facilities within the Federal Bureau of Prisons. He's admitted to that facility, and again, he's been basically locked down, similar to other inmates, because at that facility the general population, basically they're housed just like they're in SHU at a USP. In other words, that facility is designed for inmates to be housed in single cells, small cells and have minimal contact with each other, minimal contact with the guards. Exercise alone in small dog pens. And basically he was there from approximately late October, 2005 until March, 2006.

You may recall, or you may have looked at the indictment and seen Mr. Caro was indicted in January of 2006 for the killing of Mr. Sandoval. In March of 2006 he was returned from Florence ADMAX to Lee USP awaiting trial. And again, kept in the same type of conditions that he had been confined to before at Lee USP, single cell, sole exercise, sole exercise away from other inmates, and he has been successfully confined in that fashion since December 17, 2003.

Our evidence is going to be that the Bureau of Prisons has the means and ability to classify and secure Carlos Caro for the rest of his life.

Now, ladies and gentlemen, I just want to finish by just mentioning a couple of other things, but

JA 222

again, things that we do want you to remember when you're listening to the evidence. I talked a little bit about Carlos' upbringing. But again, it's important for you to remember that prior to being confined in the Bureau of Prisons he was not involved in any prior violent acts. Basically since December, 2003 the Bureau of Prisons has been successfully able to secure him under certain conditions of confinement, both at Lee USP and at Florence, ADMAX.

We believe our evidence will show that an execution of Mr. Caro will negatively impact the emotional well being of his daughter and his wife. He's never assaulted a Bureau of Prisons staff member or correctional officer. If he's not sentenced to death, he will be sentenced to imprisonment for life without the possibility of release.

And again, as I mentioned before, that means that he'll live the rest of his life in prison, and he'll die in prison.

Ladies and gentlemen, our evidence will probably take a couple of days. We believe we have several witnesses, all of our witnesses that you should listen to and hear their story, both family members and professional people alike. We ask for your attention, we ask for your patience, and we believe

JA 223

that once you've heard all this evidence, and weigh factors for and against the imposition of the death penalty, we believe your individual decision will be that Carlos Caro should be sentenced to spend the rest of his life in prison without the possibility of release.  Thank you.

THE COURT:  Thank you, Mr. Kalista.  The Government may call its first witness.

MR. GIORNO:  Call David Mrad, please.

DAVID MRAD, GOVERNMENT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. GIORNO:

Q     Morning, sir.

A     Good morning.

Q     State your full name again for the jury.

A     My name is David Christopher M-R-A-D, Mrad.

Q     Mr. Mrad, you previously testified in the guilt portion of the trial; is that correct?

A     Yes.

Q     Again, would you tell the ladies and gentlemen of the jury what you do out there at USP Lee?

A     I'm an intelligence officer with the Federal Bureau of Prisons, United States Penitentiary Lee County.

Q     USP Lee, that's a maximum security facility; is

it not?

A    It's maximum security, yes, sir.

Q    As part of your duties with the intelligence unit out there do you do things like monitor gang activities that might occur at USP?

A    Yes, I do.

Q    And as part of that action of monitoring activities with gang members, do you also have an opportunity to intercept letters that appear to be going between gang members?

A    Yes, I do.

Q    In connection with this particular case, the Carlos Caro case, did you have occasion to recover a letter that was sent to, from Carlos Caro, the defendant, to another fellow by the name of Eduardo Rivas?

A    Yes, I did.

Q    What caused you to be on the look out for that particular letter that went to Mr. Rivas?

A    After the homicide, phone conversations and mail from members of the Texas Syndicate were reviewed on a regular basis.  A telephone call was monitored between Mr. Caro and Mr. Rivas.  During the conversation --

Q    Let me stop you right there, if I could.  This

telephone conversation you're referring to, is that the one of January 21, 2004, the one the jury heard about, the one that's in Spanish?

A    Yes, it is.

Q    Okay.  And that's a conversation between Caro and Rivas?

A    Yes, it was.

Q    Go ahead.

A    Based on my extremely limited knowledge of Spanish, I contacted a translator, Federal Bureau of Prisons translator out of Beaumont, Texas, and sent that call to be translated, see if there was any pertinent information as it pertained to the homicide investigation.

Q    Who was that translator?

A    That was Ms. Jacoba Guzman.

Q    Jackie Guzman who testified during the guilt phase?

A    Yes.  Ms. Guzman contacted me back, rather quickly, actually, and asked me if I had received or had intercepted any letters from inmate Caro to a Mr. Rivas.  The call was dated on the 21st.  I monitored a couple of days later, because we regularly, on regular intervals I monitor the calls. I did look, and yes, a day prior I had received a

JA 226

letter that I had made a photocopy of from Mr. Caro to Mr. Rivas.

Q    Were you able to identify whether Mr. Rivas was identified in the Bureau of Prisons records system he was a Texas Syndicate member?

A    Yes, we ran the name in our data base and we were able to find Mr. Rivas as a Texas Syndicate member who had been released.

Q    I want to show you what I have marked for identification purposes as Carlos Caro Exhibit LTD01, 02, and 03.  Do you recognize this?

A    Yes, I do.

Q    This is a photocopy of the letter that you made that you made a photocopy that was sent to Eduardo Rivas after the January 24th after the January, 2004 telephone conversation?

A    Yes, those were the letters.

        MR. GIORNO:  Move for Government, introduction of Government's Exhibit LTD01 through 03.

        THE COURT:  They will be admitted.

    (Government's Exhibit Nos. LTD01, LTD02 and LTD03 were received in evidence.)

BY MR. GIORNO:

Q    I'm going to ask you, if I could, to take a look

JA 227

at LTD01.

A    This is the envelope.

Q    This is the envelope?

A    Yes, the envelope.

Q    It has up here in the upper left hand corner, Carlos Caro?

A    Yes.

Q    That is his registered number 37786-6494?

A    I believe that's a nine.

Q    A nine?  Okay.  My eyes are getting bad.

A    Yes, it is a nine.

Q    That is, in fact, his number?

A    Yes, the registered number.

Q    When, I believe when an inmate sends out a letter he is required to use that inmate number on as sender.

A    Yes.

Q    This went to P.O. Box 1062, Premont, Texas?

A    Yes.

Q    I want to show you what has been marked and introduced at Government LTD02.  Is that the back of the envelope?

A    Yes it is.

Q    Can you take a look at LTD03, please?  The bottom of the letter there, does it have a signature,

Caro?

A    Yes, it does.

Q    And this letter is, appears to be written partially in Spanish, partially in English; is that correct?

A    That is correct.

Q    Now, this letter, when you photocopied it, you photocopied these, the envelope, and also this one page; is that correct?

A    That is correct.

Q    At that time did you have any reason to think or suspect that there was any hidden messages or coded messages on the back when you first photocopied this particular letter?

A    At the time of photocopying, no.

Q    Okay.  After you, after you spoke with Ms. Guzman did she tell you anything that would suggest that there might be a hidden code or hidden message on this particular letter?

A    Yes.  Actually, Ms. Guzman contacted me back based on that translation, had asked if I had the letter.  I told her I did, indeed, have a photocopy of the letter.  Ms. Guzman stated to me, she said, "You really need to get the original letter." Apparently in the telephone call there was a mention

to Mr. Rivas about whether he can read what's called code, whether he can read a code, which generally indicates one of a couple of a different coding methods.

Q    That was the thing, is this in reference to the part of the tape where the jury heard where Caro asked, asked Rivas, "Do you understand the code?"

A    Yes.

Q    Was that part of the January 21st conversation she was referring to?

A    Yes, it is.

Q    Based on your experience, do inmates use codes when they communicate with people on the outside?

A    Frequently.  There are several methods.  One is acid writing, or orange juice, urine.  Essentially what will happen then, under a black light or under heat, that will raise up the lettering to where you can read it.  Or what's more commonly used is what's called indentation writing, in which case the person receives the letter will take a charcoal pencil or number three pencil and lightly wipe over the writing or indentation, take a cloth and read what is brought up.

Q    You mentioned something called acid writing, and you said orange juice or urine?

JA 230

A    Yes.

Q    How do they do that?

A    They'll take a pointed object and write using the orange juice or urine, basically, as an invisible ink, let it dry, will write over it, or leave it blank where there is no writing and, in turn, a heat source will be brought to that, or black light, an alternate light source, and you can read the writing. It's sort of like back when you were a kid using invisible ink.

Q    This indented writing, how do they do that?  How do they make indented writings?

A    A lot of times they'll take a sharpened object, whether it be the back of a regular Bic pen, something that has a point, and they'll write, or pencil without lead, will write and cause indentations.  And it will look relatively clear. Actually, it will look very clear.  You'd never be able to know unless you knew there was going to be coded, you would not know to see it.

Q    Okay.  So, when you received this information from Ms. Guzman concerning the possibility that this letter that I showed you, there might be something more to it, did you then, what did you do then?

A    I notified Special Agent Fender of the FBI in

JA 231

the Bristol office, and informed Agent Fender, who was also working the homicide case, of the possibility of information being sent from inmate Caro to Mr. Rivas based on this telephone call, in which case the telephone translation Agent Fender, in turn, used to go ahead and secure a search warrant for the Post Office box in Premont.

Q    To your knowledge was that original letter subsequently recovered on or about February 4th in Premont, Texas?

A    Yes, it was.

Q    We'll hear more about that from Agent Fender?

A    Right.

Q    Also, in furtherance of your investigation did you recover a letter from a Sammy Enriquez to a Mr. Gomez?

A    Yes.

Q    That letter also bore the signature of Mr. Caro?

A    Yes, it did.

Q    I want to show you what we have marked as Government's Exhibit Mrad Number One.  Do you recognize this document?

A    Yes, I do.

Q    What is it?

A    It's a letter sent from Sammy Enriquez, a known

Texas Syndicate member.

Q    He's another member of the Texas Syndicate gang?

A    Yes, he is.  To a Mr. Guzman in San Antonio, Texas.

Q    To who?

A    A Mr. Guzman.  I'm sorry, Gomez.  I'm sorry.  A Mr. Gomez in San Antonio, Texas.

Q    Did, is there, does it contain a single sheet letter inside?

A    Yes, it does.

Q    Is that, in fact, a photocopy of the letter that you intercepted?

A    Yes, it is.

Q    When was it that was intercepted?

A    3/29 of 2004.

MR. GIORNO:  Move introduction of Mrad One.

THE COURT:  It will be admitted.

(Government's Exhibit No. Mrad 1 was received in evidence.)

BY MR. GIORNO:

Q    Is this the envelope?

A    Yes, it is.

Q    Here's the sender, Sammy Enriquez, that's the known Texas Syndicate member?

A    Yes, it is.

Q     Going to Mr. Gomez in San Antonio, Texas?

A     Yes, it is.

Q     Then is this the contents of the letter, the single page letter?

A     Yes, it is.

Q     I notice it, to a large extent it is written sort of in a combination Spanish, Tex Mex, some part in English; is that correct?

A     Yes, it is.

Q     I want to show you the signature here.  Is that the signature of the defendant, Mr. Caro?

A     Yes.

Q     It's signed by other people down here at the bottom, someone named Snook, there's a Mareno.  Are any of those names familiar to you as knowledge of them being members of the Texas Syndicate at USP Lee?

A     Actually, yes.  They were all housed at USP Lee County, and they were all Texas Syndicate members.

Q     What about Mareno?  Do they have any particular relationship with Mr. Caro?

A     Actually, all those members were involved in a separate indictment.

Q     I'm going to ask you about that in a moment.

A     Yes, sir.

Q     Are you familiar with Mr. Caro's Bureau of

JA 234

Prisons file?

A    Yes, I am.

Q    It's kind of like a file maintained by the Bureau of Prisons, and what does it contain in terms of what type of data is found in a Bureau of Prisons file?

A    Sir, central file essentially follows the inmate wherever he goes.  It's a chronology of the inmate's life in the Bureau of Prisons, whether it be his case management functions, disciplinary functions, property, things of that nature.

Q    Okay.  And the jury has previously heard about, about Mr. Caro's three convictions relating to drug trafficking; is that correct?

A    Yes.

Q    Are you also familiar with Mr. Caro's involvement in another incident while he was incarcerated at USP Lee that occurred on August 29, 2003?

A    Yes, I am.

Q    And what was he convicted of at that time?

A    Conspiracy to commit murder.

Q    Conspiracy to commit murder?

A    Yes.

Q    Do you know how much time he received in

JA 235

connection with that offense?

A    His total sentence is 705 months with an eight year supervised release.

Q    What does Mr. Caro's Bureau of Prisons file indicate as far as his projected release date from, from his convictions not including this one?

A    His -- not including what he's here today for, you mean?

Q    Correct.

A    His projected release date with good conduct time is, prior to anything from now, is 2053.

Q    May of 2053?

A    That would be May 25, 2053.

Q    Just for the record, you heard the defense lawyers say that Mr. Caro's date of birth is February 9, 1967; is that correct?

A    Yes.  That would bring him in his eighties.

MR. GIORNO:  There is one matter I'd like to take up with Mr. Mrad and I'd like to reserve the right to recall him later.

THE COURT:  Yes, sir.  Cross examination?

CROSS EXAMINATION

BY MR. SIMMONS:

Q    Just a couple of questions, and I'll certainly try to speak up for the court reporter.  Mr. Caro was

transferred from USP Lee to ADMAX in October of 2005; is that correct?

A    Yes, it is.

Q    And he was returned in March of 2006?

A    Yes.

Q    Is he assigned to ADMAX now, and been brought back here for purposes of trial?

A    Yes.

THE COURT:  Let me interrupt you.  I think this ADMAX has been mentioned.  For the benefit of the jury, that's A-D-M-A-X, and that's an administration or administrative maximum; is that right?

THE WITNESS:  Yes.  Administrative maximum facility in Florence, Colorado, yes, sir.

BY MR. SIMMONS:

Q    As we're sitting in trial today, the Bureau of Prisons has permanently assigned him to ADMAX?

A    He is a signed to ADMAX.  I can't say he's permanently assigned.

Q    But that is what his assignment is?  He's brought back to Virginia for trial?

A    Yes, that's where his assignment is.

Q    Since the assault which occurred on December 17th of 2003, Mr. Caro has been confined in

Mrad - Cross

a single cell, his movement from the cell has been very tightly monitored by correctional officers?

A   Yes.

Q   He's been handcuffed any time he's moved out of the cell to another location; is that correct?

A   Yes.

Q   And leg shackled, I believe?

A   At ADX, I couldn't tell you their security measure there.

Q   At USP Lee?

A   Yes.

Q   That file you have in front of you, that file follows him wherever he goes?

A   This is the file as he left USP Lee County.

Q   Have you had an opportunity to review that file?

A   Not since he's been to ADX, no.

Q   To your knowledge were there instances involving him at ADX, any assault of that nature?

A   Yes.  I wasn't able to review it, but I've not been told that.

Q   To your knowledge there were no instances; is that correct?

A   Not that I know of.

Q   In fact, to your knowledge there have been no instances since December 17th of 2003; is that

Mrad - Cross

correct?

A    Instances of?

Q    Assault.

A    Assault, no.

Q    Okay.  And never in the file in front of you has he assaulted a Bureau of Prisons employee, either a guard, correctional officer, or a counselor, or any other staff member; is that correct?

A    Nothing in our file, no.

Q    The assaultive behavior between Mr. Caro has been with other inmates; is that correct?

A    Yes.

Q    You've reviewed that file, and in that file they have information regarding his conduct before he was sent to prison; is that corrects?

A    I looked at his file, yes.

Q    And based on the Bureau of Prisons file there are no documented instances of assault prior to his coming to the Bureau of Prisons; is that correct?

A    No, there are not.

Q    Okay.  Essentially, to your knowledge, he was non-violent, he did not engage in any violent behavior until he was incarcerated by the Bureau of Prisons; is that correct?

A    Not to my knowledge.

JA 239

Q    At this time at the Bureau of Prisons his telephone calls are monitored; is that correct?

A    As all inmates, yes.

Q    He has one 15 minute total call per month?

A    Yes.

Q    His mail was obviously monitored?

A    Yes.

Q    His visitors are monitored?

A    Yes.

Q    He's searched before and after he goes into his cell, or out of his cell?

A    Yes.

Q    Okay.  Under the conditions he is housed under now, the Bureau has prevented him from engaging in any violent behavior; is that correct?

A    He has not been in any violent behavior, no.

Q    Regarding the incident which occurred on August 29, 2003 Mr. Caro was placed in the SHU at USP Lee at that time; is that correct?

A    Yes, he was.

Q    And your office, along with other staff members, conducted an investigation?

A    Yes, sir.

Q    Okay.  And at the conclusion of that investigation, it's your recommendation or your

recommendation to the appropriate authorities that Mr. Caro be transferred from USP Lee to another institution; is that correct?

A    Yes.

Q    Okay.  Mr. Caro was identified as a TS member prior to being transferred to USP Lee; is that correct?

A    Yes.

Q    Along with many other individuals?

A    Yes.

Q    And after the assault on August 29th of 2003, which involved several other TS members; is that correct?

A    Yes.

Q    And in fact, Mr. Benavidez, the victim of the assault, was a TS member?

A    Yes, he was.

Q    All these members were placed into Special Housing Unit at USP Lee?

A    Yes.

Q    It wasn't until after the incident on December 17th of 2003 that Mr. Caro was convicted of the incident which occurred on August 29th; is that correct?

A    Yes.

Q    Just a sequence of events?

A    Right.

Q    Certainly in the Bureau of Prisons, in your experience, you have the ability at this time to identify gang members through various investigative techniques?

A    Yes, we have abilities to identify gang members.

Q    Okay.  You certainly have the ability to control those gang members once you have identified them through Special Housing Unit, or transfer to another appropriate institution; is that correct?

A    We have the methods in place to try to control them, yes.

Q    And those include monitoring telephones, mail, isolation, transfer, et cetera?

A    Those are some of them, yes.

Q    And you attend special training programs dealing with management of prison gangs?

A    Yes.

Q    And your employees receive special training as far as management of prison gangs?

A    Yes.

Q    And you're certainly aware that prison gangs are and can be violent?

A    Yes.

JA 242

Q     And the Bureau of Prisons then takes the appropriate steps to control that violence including transfer to the maximum security institution in Florence, Colorado?

A     When warranted, yes.

Q     That is where Mr. Caro is assigned today?

A     Presently, yes.

Q     To your knowledge, he's had no instances at Florence, Colorado?

A     Not to my knowledge.

Q     Thank you.

                    REDIRECT EXAMINATION

BY MR. GIORNO:

Q     Where has Mr. Caro been staying during the pendency of this trial?  Do you know where he's been housed?

A     Bristol City Jail.

Q     He's brought here back and forth to the courthouse for these proceedings?

A     I believe so.

Q     I'm curious, the letters, the one to Mr. Gomez, this is a copy?

A     Yes.

Q     And what I initially showed you that you made a copy of, the letter to Raoul Rivas was a copy?

JA 243

A    Yes.

Q    We know what happened to the original of the Rivas letter that was sent down to Premont.  What happened to the Gomez letter?

A    It was sent there.

Q    You got these letters that were sent from people that are known gang members to other gang members, and you just let them go through?  Why do you do that, Mr. Mrad?

A    Actually, we can't interfere with people's mail. We copy it for intelligence purposes, for investigative purposes, but somebody's right to send out their correspondence, we can't infringe on that.

Q    Are you telling this jury that you can't stop these letters being sent from gang members inside the prison to people, other gang members outside the prison, you can't stop that?

A    No, not independently we sure can't.

Q    What about, are gang members such as Mr. Caro, even when they're in the SHU, are they allowed to make phone calls to people on the outside?

A    Yes, they are.

Q    Can you stop them from doing that?  Can you cut off their phone privileges so they have no phone calls?

JA 244

A     No, I can't.

Q     Is there any restriction who they call on the outside?

A     As long as they're on the approved phone list and that person accepts the telephone call.

Q     Mr. Rivas, I take it, Raul Rivas was on Mr. Caro's approved phone list when he called him in January of 2004, another gang member?

A     Yes.

Q     The defense lawyer asked you about why you identified gang members.  The Bureau of Prisons has the ability to identify gang members.  Why do you do that, Mr. Mrad?  Why does the Bureau of Prisons care?

A     Gang members, there are certain gang members that, gangs that are antagonistic, and there are certain gang members that can be housed with other gangs.  It's our ability to identify those gang members which in a pro-active way will stop gang violence.  Certain gangs, if they see each other, and they are housed on the same prison yard, will automatically go and assault each other.  Others can just live a cohesive life.  And that's why we need to identify gang members.  That's why, that's why we do so by intake pictures, looking for tattoos, looking at where they're from, reading their pre-sentence

JA 245

investigation, utilizing intelligence material to go ahead and determine whether this person is, or why just ask them, and sometimes they'll say, "Yes, I am," so we'll utilize that and determine whether that person is a gang member, or not.

Q    Based on your experience does the Texas Syndicate have any special standing or status in the Bureau of Prisons?

A    Actually, yes.  They're one of the five disruptive groups in the Bureau of Prisons.  That would be one of the big five that we follow even more specifically, more intently because of their propensity toward violence and dangerousness.

Q    Texas Syndicate is one of the five?

A    Yes.

Q    Do you have an idea how many gangs have been identified in the Bureau of Prisons other than those five?

A    Jeez, our STG roster, Security Threat Group roster, itself, comes to something like 17 pages, or 18 pages.  It's quite lengthy, but five are considered the most dangerous, and they're referred to as disruptive groups.

Q    I guess the Texas Syndicate is one?

A    Mexicanemi.

JA 246

Q    Texas Syndicate, Mexicanemi, Mexican Mafia?

A    Yes.  The Aryan Brotherhood and the Black Gorilla Family, or the BGF is what it's known as.

Q    The rest of the gangs you deal with, people, what about the gang Disciples?

A    They'll are not considered one of the disruptive groups.

Q    What about the Latin Kings?

A    At one point they were a disruptive group, and they've been de-classified as to not being as a violent and disruptive group.

Q    You've got Bloods and Crips in the prison, too?

A    Yes.

Q    They're not in that disruptive group category?

A    No.  Again, it's not the level of sophistication and violence as those five.

Q    The defense lawyer asked you, he said something to the effect that gang members are violent.  Would you agree with that?

A    Yes.

Q    And it's said the purpose of the prison is you obviously want to control that violence; is that correct?

A    Yes, sir.

Q    Are you always successful?

JA 247

A    No, sir.

Q    Do gang members make shanks?

A    Yes.

Q    Do gang members assault other people in the compound?

A    Yes, they do.

Q    And is this something you let happen, or is it something you try to control but some things you just can't control?

A    It's something we try to control, but due to human nature it's not an exact science by any stretch.

Q    How do they make weapons in prison, Mr. Mrad? Prison is supposed to be a secure place. How do they make weapons?

A    There are various methods in which weapons are made. We have metal detectors throughout the prison. Inmates will circumvent that by making weapons out of Plexiglas, by taking a drum stick from the recreation music area and sharpening it to a point so it's essentially a wooden stake. People will, inmates will take styrofoam, melt it and let it harden, and in turn sharpen it to a point. Inmates will take razor blades, melt the end of a toothbrush, place the razor blade in the toothbrush, thus making a razor

cutting weapon. There are various numbers of weapons. A lock tied to a belt will be used as a weapon, essentially as a mace, to strike another person in their head. There are numerous ways that the inmate population will take what is available and be able to make a weapon out of that.

Q    Is this, this type of conduct goes on even in the United States Penitentiary, maximum security facility, they still do things like that?

A    Yes.

MR. GIORNO:  That's all the questions I have.

THE COURT:  Any further questions?

RECROSS EXAMINATION

BY MR. SIMMONS:

Q    The shanks you spoke of, prison made knives, essentially can be made out of anything that can be made out of, into a sharp object; is that correct?

A    Yes.

Q    You can't eliminate that?

A    Not at all.

Q    You can simply reduce the risk and ability for it to be made to the best of the ability of the Bureau?

A    Uh-huh.  I agree.

Q    You reduce it more in the more secure environment you place the inmate into?

A    Yes.

Q    For example, a minimum security work release or gang, work on the highway would have plenty of access to materials to make a shank out of?

A    Right.

Q    Someone working in a machine shop or kitchen would have access to material to fashion a shank?

A    Yes.

Q    But when you place that individual in a maximum security institution or housing unit such as ADX, where they're searched each time before they go into the cell, and they're searched before they go out of the cell; is that correct?

A    Yes.

Q    In fact the cell, itself, is searched for shanks, among other things, anything of contraband. So, while it's true that shanks cannot be eliminated, they can certainly reduce the ability of inmates in a properly controlled setting to either make or have access to a shank; is that correct?

A    Yes.

Q    Okay.  You were talking about the Texas Syndicate as a security threat group, I believe?

JA 250

A      No, I said it was a disruptive group.

Q      Okay, disruptive group.  And if I understand correctly, Syndicate members were transferred into USP Lee from another facility?

A      Yes.

Q      So, they were consolidated at USP Lee?

A      Not particularly.  They are in pretty much every United States Penitentiary that they can walk without having an antagonistic group.

Q      Are you familiar with an individual by the name of Gregory Hershberger?

A      Yes, I am.

Q      He had written an article regarding the techniques of controlling prison gangs either by dispersing them into different institutions or consolidating them into one institution.  Are you familiar with those two philosophies?

A      Yes, I am.

Q      Was the philosophy of the Texas Syndicate to disperse them into institutions throughout the United States or consolidate them into individual institutions?

A      At the time that the United States Penitentiary housed members of the Texas Syndicate they were placed there as based on normal transfers to populate

JA 251

a prison, to populate a penitentiary.  The purpose

for the number of which, I couldn't begin to tell

you.  I couldn't tell you whether -- I can tell you

we did not have any disproportionate number of Texas

Syndicate members.

Q    Proportionate to other gang members?

A    To other gang members, or other institutions

that have Texas Syndicate, yes.

Q    And those transfers made to USP Lee then were

based upon the normal transfer procedure, not

specifically because they were Texas Syndicate; is

that correct?

A    Yes.

Q    Had the Texas Syndicate then coming to USP Lee

from other institutions?

A    Yes.

Q    And based upon your investigation, the incident

that occurred on August 29th, was that incident,

instance between Texas Syndicate members?

A    Yes.

Q    Okay.  And I think the words you used in your

report was based upon a change in inmate group

dynamics?

A    I'd have to see which portion of the report.

Q    Certainly.  It's page 12.  Your recommendation,

three lines down?

MR. SIMMONS:  If I could show it to the witness, Your Honor?

THE COURT:  You may.

BY MR. SIMMONS:

Q    If you could read that?  This is your report of the incident?

A    Yes.

Q    That is your recommendation after you thoroughly investigated the facts surrounding that?

A    Yes.

Q    Okay.  And would you read your recommendation?

A    Sure.  "This threat is based on the change of inmate group dynamics.  All Texas Syndicate inmates have been removed from general population at USP Lee County."

Q    And the recommendation was that you transfer to another institution?

A    These particular inmates, or all Texas Syndicate inmates?

Q    Those particular inmates.

A    Those particular inmates, yes.

Q    They were Texas Syndicate members?

A    Yes.

Q    Were they, in fact, transferred at a later date?

A    Yes.

MR. SIMMONS:  I believe that's all.  Thank you, sir.

THE COURT:  Thank you, sir.  Anything further?

MR. GIORNO:  Nothing further of this witness, Your Honor.

THE COURT:  Thank you, sir.  You may step down.  Ladies and gentlemen, we're going to take our luncheon break at this time.  And if you could be back at, in one hour.

Please remember my instructions to you, which I gave at the beginning of the, of this case, but are still applicable now, that you are not to discuss the case with anyone, or permit anyone to discuss it with you or in your presence.  If anyone does try to discuss it with you, let me know about it right away.  Don't discuss anything at all with any of the participants in this case, any witnesses, the lawyers, or parties.  And if you'll take your -- you can leave your notebooks in your chairs, and if you'll follow the bailiff out we'll see you in one hour.

(The jury retired to the jury room, after which the following occurred:)

JA 254

THE COURT:  Counsel, is there anything you wish to bring to my attention?

MR. GIORNO:  No, Your Honor, not from the Government.

MR. SIMMONS:  No, Your Honor.

THE COURT:  Counsel, Juror Number 33, who is the young man seated in the back on the end, has been nodding off some.  And obviously I'm concerned about that, particularly in view of the importance of these proceedings.  And what I intend to do is see how he does after lunch, but I am concerned about his situation, and will be interested in any comments that counsel may have in that regard.  So, we'll, at this time we'll take our luncheon recess and we'll be in recess for one hour.

(Recess from 12:10 p.m. to 1:10 p.m.)

(The jury entered the courtroom and was seated in the jury box.)

THE COURT:  You may call your next witness.

MR. GIORNO:  Before we call our next witness we have some stipulations.  The first stipulation is that Carlos David Caro has been convicted in the United States District Court for the Western District of Virginia for the offense of conspiracy, assault with intent to commit murder,

sentencing on 11/1/2004. At this time, Your Honor, we move the court to receive into evidence what has been identified as CVN.F.01. That is the judgment in that case reflecting that conviction and reflecting on November 1, 2004 Mr. Caro was sentenced to a term of 327 months imprisonment to run consecutive with any other term of imprisonment the defendant was serving.

THE COURT: It will be admitted.

(Government's Exhibit No. CVN.F.01 was received in evidence.)

MR. GIORNO: Your Honor, we have the second stipulation. The stipulation will relate to the testimony of Jeffrey Nors, N-O-R-S. It's stipulated that Mr. Nors will testify that he is a special agent of the Federal Bureau of Investigation. On January 30, 2004 Mr. Nors was assigned to the Houston, Texas Division, Corpus Christi Resident Agency of the FBI, and on or about that date he received information from FBI Agent Douglas Fender which he then used to obtain a search warrant to seize an envelope containing a letter purportedly sent by Carlos David Caro to Eduardo Rivas at P.O. Box 1062, Premont, Texas 78375. On or about February 3, 2004, Agent Nors went to the United

States Post Office at Premont, Texas and recovered the subject letter and envelope which are identified in FBI laboratory examination reports as Q1 and Q2, and the original of which was then sent to Agent Fender.  At this time we would call Agent Douglas Fender.

THE COURT:  Before Agent Fender takes the stand, ladies and gentlemen, again, normally what the lawyers say is not evidence for you to consider, except when it's in the form of a stipulation or agreement.  And again, Mr. Giorno has stated to you the stipulation or agreement of the parties which you will consider as evidence in the case.  Very well, Mr. Fender, you may come forward and be sworn.

DOUGLAS FENDER, GOVERNMENT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. GIORNO:

Q    Good afternoon, sir.

A    Good afternoon.

Q    Would you state your full name for the jury?

A    Douglas Fender.

Q    I believe you previously testified in connection with this case in the guilt phase; is that correct?

A    Yes, sir, I did.

Q    You are a special agent with the Federal Bureau

JA 257

of Investigation; is that correct?

A    Yes.

Q    You were the lead FBI agent in connection with this investigation the murder of Mr. Sandoval; is that correct?

A    Yes, I was.

Q    You worked with Agent Mrad at USP Lee?

A    Yes, I did.

Q    In connection with that investigation on or about January 21, 2004 were you advised of a telephone conversation between Carlos Caro, the defendant, and another known TS member named Rivas?

A    Yes, I was.

Q    And who did you learn about that conversation from?

A    From Officer Mrad.

Q    Okay.  Did Officer Mrad subsequently contact you in connection with a letter that was sent from Caro to Rivas?

A    Yes, sir, he did.

Q    What did Agent Mrad tell you, and what did he ask you to do in connection with obtaining the original of that letter?

A    He basically told me where the letter had been mailed in Premont, Texas and requested my office

attempt to obtain a search warrant to retrieve that letter in Texas.

Q    After you received that information did you contact one of your colleagues with the FBI in Corpus Christi, Texas?

A    Yes, sir, I did.

Q    Would that be the resident agency that would work the Premont, Texas area?

A    Yes, it is.

Q    Who did you contact down there?

A    Special Agent Jeff Nors.

Q    What did you ask Agent Nors to do?

A    I provided him with some of the basic factual information that had been developed at USP Lee, and asked him if he would go before a judge and attempt to obtain a search warrant in order to seize the letter that had been mailed from USP Lee.

Q    Okay.  I want to show you what's been marked for identification purposes, this is Q1, and this document here that was the letter inside the Q1 envelope; is that correct?

A    Yes, sir, that's correct.

Q    Can you identify these for the ladies and gentlemen of the jury, where you got them from?

A    This is the letter and the envelope that Special

Agent Nors was able to seize in Texas and eventually sent back to me. This is the letter, itself. And this is the envelope that it was contained in. It's addressed to Eduardo Rivas, P.O. Box 10262, Premont, Texas 78375 with a return address of Carlos Caro, and then it has his inmate number there, also.

MR. GIORNO: We move the court to receive these into evidence at this time.

THE COURT: They will be admitted.

(Government's Exhibit Nos. Q1 and Q2 were received in evidence.)

BY MR. GIORNO:

Q    Agent Fender, did you compare this original envelope and the original letter with the copy of the letter and the envelope that Agent Mrad talked about before?

A    Yes, I did.

Q    And are they identical?

A    They are. Matter of fact, these were made from these photographs.

Q    Okay. For what purpose were you asked to obtain the original of the letter written by Caro to Eduardo Rivas?

A    I'm sorry, can you repeat the question?

Q    For what purpose, why were you told there was a

need to get the original of the envelope and the letter as opposed to a copy?

A     There was a two-fold purpose.  First of all, to get the actual content of the letter, I guess, from it; and more importantly was that it was believed that the letter contained a coded message.

Q     Okay.  So, after you got the original letter back from your colleague in Texas, Agent Nors, what did you do with it?

A     It was submitted to the FBI laboratory located in Quantico, Virginia.

Q     Okay.  So basically you sent it up there to be examined to see if there was, in fact, a coded letter on it?

A     Yes, sir, that's correct.

Q     From looking at the back of the letter there is anything apparent to the naked eye?

A     We examined it just with the naked eye and regular light, could not observe anything on there. We also placed an alternate light source on there and still could not see anything.  And at that point we sent it to the lab, so no, you could not see anything from the naked eye on the back of that.

Q     Did you also request, or was it decided you would check these particular items, that is to say,

JA 261

Q1, the envelope and the attached letter?  Did you find any fingerprints on it?

A    Yes, we did.

Q    In that connection did you obtain from the defendant, Carlos Caro, his known fingerprints and also latent palm prints?

A    Yes, sir, I did.

Q    You personally did that?

A    Yes, I did.

Q    I want to show you what has been marked as Government's Exhibit 22.  It also has K4 on the outside of it.  Can you tell the ladies and gentlemen of the jury what these are?

A    What this is is a set of fingerprints, and also what we call major case prints for Caro, Carlos Caro. These were taken on approximately June 18th of '04. This card contained just the tips of the fingerprints for all ten fingers, and then, as I said, the major case impressions which included the entire palm, the sides, tips, and so on that would cover all the ridge detail on the hands.

Q    Okay.  And did you send those case prints designated as K4 marked as Government's Exhibit 22, did you send these to the lab for comparison purposes?

JA 262

A    Yes, I did.

MR. GIORNO:  Move to introduce Government's Exhibit 22.

THE COURT:  It will be admitted.

(Government's Exhibit No. 22 was received in evidence.)

MR. GIORNO:  That's all the questions I have of this witness.

THE COURT:  Cross examination?

CROSS EXAMINATION

BY MR. SIMMONS:

Q    Good afternoon, sir.

A    Good afternoon.

Q    Earlier I think you were seated here at the table when Mr. Brownlee gave an opening statement, and talked to the jury about the inmates communicating in code; is that correct?

A    Yes, sir, I was here.

Q    This is what he was referring to, was a letter such as this?

A    That is correct.

Q    Where the code is written on the back where it's not visible to the naked eye?

A    That's one method of coding.

Q    And when the Bureau of Prisons then suspected a

letter was written in code they contacted you; is that correct?

A    Yes, sir.

Q    Okay.  And you, in turn, then contacted the resident agent at the destination where that letter was sent?

A    That's correct.

Q    The resident agent then obtained a search warrant to intercept that letter?

A    Yes, sir.

Q    The letter was then intercepted, examined and then sent to Washington, D.C.?

A    Yes, sir.

Q    At that point it was decoded?

A    Yes, sir.

Q    And your office worked with the Bureau of Prisons in matters regarding inmates, breach of security, and inmate gangs; is that correct?

A    Yes, sir.

Q    So, in fact, based upon the exhibit in front of you, your office, in connection with the Bureau of Prisons, in fact did intercept those letters and did have them decoded; is that correct?

A    We have the ability to, not myself, but to send it to the laboratory to have those letters decoded.

I do not have the ability to intercept letters from the penitentiary.

Q    Right.  You are notified by the Bureau of Prisons, an official, saying, "There's probably cause that a letter contains contraband or code," is that the procedure?

A    Yes.

Q    And then you'll notify an agent in the particular jurisdiction who will obtain a warrant based upon the information that's been obtained, probable cause to intercept that letter?

A    Yes, sir.

Q    Okay.  Once the letter is intercepted it is then sent to the FBI laboratory in Washington, D.C. to be decoded?

A    Yes.

Q    Okay.  Is that the procedure that was followed?

A    Yes, sir.

Q    So, the Bureau of Prisons, working with the FBI, does have the ability to intercept and decode these messages?

A    Based upon probable cause, if the prison is able to identify those letters, or even suspect that they have a code to begin with.

Q    Then you have the ability to go forward and to

JA 265

intercept those letters and have them analyzed

through the FBI in Washington, D.C.?

A    That's correct.

        MR. SIMMONS:  That's all.  Thank you, sir.

        THE COURT:  Redirect?

                REDIRECT EXAMINATION

BY MR. GIORNO:

Q    Agent Fender, to your knowledge is there any

particular reason why there was particular scrutiny

paid to, or particular effort put into locating

letters going out from Mr. Caro?  Was there a

particular reason why he was being, his

correspondence and communications were being watched

closely?

A    Yes.

Q    Why is that?

A    That's because, of course, the murder that had

occurred, and his affiliation with the Texas

Syndicate.

Q    Okay.  You, you put this type of effort, did the

Bureau put this type of effort into every single type

of correspondence that goes out either from Mr. Caro

or other inmates at USP?

A    It would be, I think, virtually impossible to

monitor every piece of mail and give it that type of

scrutiny from a federal penitentiary.

Q    Thank you, sir.

THE COURT:  Anything further?

MR. SIMMONS:  Nothing further.

THE COURT:  Thank you, sir.  You may step down.  You may call your next witness.

MR. GIORNO:  Call Jeanette Brown, please.

JEANETTE BROWN, GOVERNMENT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. GIORNO:

Q    Good afternoon.

A    Hi.

Q    Would you state your full name, please, for the jury?

A    Jeanette B. Brown.

Q    Ms. Brown, what is your occupation or profession?

A    I'm a document examiner.

Q    A document examiner?

A    Yes.

Q    By whom are you employed?

A    The FBI Laboratory.

Q    And how long have you been so employed?

A    I've been a document examiner there for approximately 12 and a half years, but I've been with

the Bureau for a total of 22 years.

Q    Okay.  Can you tell the ladies and gentlemen of the jury, first of all, what does a document examiner do at the FBI?

A    I examine cases that are submitted to the laboratory for the Questioned Document Unit, the majority of them involve handwriting, handprinting-type writing and other document processes such as obliterated writing, writing that's been scratched through and we have to try to determine how to pull it up, and altered writing. Pretty much anything dealing with paper.

Q    Does that include, Ms. Brown, examining documents in terms of whether or not they contain any type of indented writing, or acid writing, or some other message that's not readily observable by the human eye?

A    Yes.

Q    Can you tell the ladies and gentlemen of the jury, please, what type of training and education you've had that qualifies you for that position?

A    I started in the laboratory as a document technician, and as a technician I prepared the case for the document examiner at that time.  Up until September of '95 only agent examiners were in the

JA 268

laboratory.  And I was, like I said, a technician for approximately eight and a half years.  As a technician I prepared the case for the examiner, conducting indented writing exams, searching any reference files, such as the National Anonymous Letter File, National Fraudulent Check File, those are files in a laboratory based on cases that are submitted, and usually at that time -- now the cases are scanned, but at that time the cases were photographed and the technician, which I was, would take a copy of, for example, a signature and compare it to other signatures in the file to see if they matched or were associated.  I prepared work sheets, inventoried evidence, pretty much anything preparing the case for the examiner to examine.  After that I went to the State of Virginia.  There was a document examiner trainee position there, and I went there and I worked there for approximately four and a half years.  And during that time, which I didn't mention before, I was trained by qualified examiners in the laboratory, I examined actual cases that the examiner had, we were tested on the cases, we had classroom training, pretty much anything dealing with the history of questioned documents I had during that time.  And then returned back to the Federal Bureau

of Investigation in September of '94 as a regular document examiner. Again, I had approximately five months of training then. Because of my past experience I didn't have to have the whole two years. It's normally a two year program if you don't have any background at all in documents. After that I was qualified as an examiner. And I've been with the lab since.

Q    In the lab is there peer review of the work that you do when you prepare a report concerning a questioned document?

A    Yes. All of our examinations are peer reviewed by a technical reviewer, and then there's administrative review. I'm a technical reviewer. There are four technical reviewers in the Questioned Document Unit, and I review cases from four examiners, technically review them, and that's to see if everything corresponds with the conclusions they have, if their notes correspond, chain of custody, pretty much everything dealing with the document corresponds before it's sent out.

Q    As a technician and as, as a document examiner can you tell the ladies and gentlemen of the jury approximately how many documents you've had occasion to examine to determine the presence of writings or

JA 270

other issues related to questioned documents?

A    Probably hundreds, because that's a basic exam that's done on most paper items, especially letters, envelopes, anything where there's any question about the origin, not just a, quote, regular handwriting case.

Q    And have you been accepted as an expert in the field of the examination of questioned documents by federal and state courts?

A    Yes, I have.

MR. GIORNO:  Your Honor, move at this time that Ms. Brown be accepted as an expert in the field of examination of questioned documents.

THE COURT:  Any voir dire required?

MR. SIMMONS:  No, Your Honor.

THE COURT:  Very well.  You may proceed.

BY MR. GIORNO:

Q    Ms. Brown, in connection with this case, the case of *United States* versus *Carlos Caro*, were you called upon by the FBI, specifically Agent Doug Fender, to examine certain documents to determine whether that document contained any kind of hidden writing?

A    Yes.

Q    I want to show you what's been previously marked

and introduced into evidence, this Government exhibit.  On the front it says Q1, that being an envelope and also a letter.  Do you recognize these documents?

A    Yes, I do.

Q    How do you recognize them, Ms. Brown?

A    I initialed the JB on each one of the documents, and I wrote Q1 on the envelope and Q2 on the letter.

Q    When you received those documents at the lab, Ms. Brown, what, what were you asked to do?  What was your task concerning those two documents?

A    I was asked to determine whether any comparisons could be done such as handwriting or indented writing, anything we could find on the documents.

Q    When you were initially sent these documents by Agent Fender were you asked to look for anything in particular as far as a methodology that might have been used to hide the writing?

A    In the incoming letter that comes with all of the document cases that we receive, they suggested that there may be coded writing or something like that in the document.  Like I said, because these are letters and envelopes, indented writing is automatically done on them.

Q    On the back of that letter that sits there in

front of you, is there anything, any letters, codes, or anything that's visible to the naked eye as you sit there and look at it?

A    No.

Q    And what test did you initially perform on that letter to determine whether or not it contained any form of hidden writing?

A    Initially with letters, envelopes or any type of documents I check the letters and envelopes, or whatever, using a microscope to determine how the writing, if there is writing, was placed on the paper, or if there are any indentations that I could see with the lighting for the microscope or with my naked eye.  I normally record all physical characteristics.  In this case it was ink, and I record that in my notes it was ink.  I record whether there are water marks, and those are designs that are placed in normally better grade papers, not notebook-type papers, that are put in the paper during the manufacturing process.

Q    Did you, did you perform any tests on the letter, Ms. Brown, to try to determine whether or not there, the letter contained what was referred to as acid writings?

A    Yes.

Q    Tell the ladies and gentlemen of the jury what is meant by acid writing.

A    That's writing that's written on the paper that, again, you can't see with the naked eye.  Normally the person is using some type of body fluid, lemon juice, vinegar, milk, some other writing material is used other than your normal pen or pencil.

Q    And typically how would, would the recipient locate that?  If, in fact, acid writing had been used how would he raise that?

A    In the laboratory we have what is called iodine fuming, and that's a chamber that brings up, if there is any secret writing in the document, brings up the writing, and I'll have to explain, defuming the actual letter or envelope, or whatever the document is, will be placed in a chamber and is held with two metal clasps, and underneath crystals of actual iodine are placed in a container, and that sits on top of a hot plate that's in that same chamber.  Then the, or I, whoever conducts the exam -- in this case I did -- would close the chamber, lock it, and there's a switch on the chamber that times the heat, normally I would heat the document or whatever it is for approximately two minutes, and if there is anything visible it will then appear from the vapors,

JA 274

and you'll actually be able to, hopefully, read anything that's there, if there is anything there.

Q    But the, the guy on the street, how would you raise the acid writing?  Would that be the heating process that raises it?

A    The guy on the street, again, could use some type of lighter, something with fire that would hopefully raise that.

Q    Okay.  And you said that you, you ran basically this heat test on that letter, back of the letter. Did you find anything at that time as a result of the heat?

A    No.

Q    Okay.  Now, you said you also looked for things like indented writing?

A    Yes.

Q    That's not something you would necessarily find using this iodine method you described for the jury; is that correct?

A    No.

Q    There is, in fact, another device there at the lab that you use for purposes of raising located indented writing?

A    Yes, we do have a machine called the electrostatic detection apparatus, ESDA for short.

JA 275

Q    Can you explain to the jury how that process works, what you do with the questioned document when you get it?

A    Indented writing, again, is writing sometimes seen with the naked eye, sometimes not seen with the naked eye, and it would occur when someone has written on top of a stack of papers, or on top of the notebook, the indentation's underneath, all the pages beneath, not all, but most of the pages beneath would show indentations from that top page.  Again, it depends upon how hard the person wrote, the pressure that the person used.  The machine is, the actual document would be placed on top of a plate on the machine, and when it's turned on there is a vacuum pump underneath that holds the document or paper on the machine, and it has what looks like Saran Wrap but it isn't, it's called imaging film that's pulled over the piece of paper.  Then the machine has a wand that's connected to it that contains corona, and --

Q    Corona?  You're not talking about the Jimmy Buffett Corona, are you?

A    No.

Q    What is corona?

A    That's an electrical charge that emits ozone, and that would help bring up any typewriting that's

on the paper if there is any.  That particular wand is spread across the entire document, and then set down.  Then the, another sheet of transparent paper is then placed over that document, and that particular sheet -- I'm sorry, before that sheet is placed over it toner is placed on top of the document, and the combination of the toner and that corona will bring up any writing, if there is any writing on the document.  An adhesive sheet is then placed on top, and that adhesive sheet would lift any indented writing, if there is any, off.  And then I would place that adhesive sheet on a plain sheet, and you'd actually see the writing.  In order for this to work, there has to be enough moisture in the paper, and before any of that occurs, the paper or envelope is placed in a humidifying chamber which would add enough moisture to the paper which, again, would enable me to, or whoever the person is, to see any indented writing on the paper.

Q    That sounds like a fairly sophisticated process. Again, to the guy on the street, could you take like charcoal and rub it over the top of it and raise the writing that way?

A    The guy on the street could do it that way, yes.

Q    This is just a fancy way to, like, to raise

indented writing that could otherwise be done by rubbing charcoal or something over the top of the writing?

A    That's correct.

Q    Did you, in fact, do that process in the machine, the Government letter there?

A    I didn't do the actual test.  I instructed one of the technicians to conduct the test.

Q    That was done under your supervision; is that correct?

A    Yes.

Q    Did you, in fact, locate indented writing on the back of the letter?

A    Yes, it was.

Q    I'll show you what has been marked for identifications purposes as Q23.  Can you describe that for the jury?

A    That was the actual indented writing that was taken from the back of Q2.

Q    That's the actual writing, itself?

A    Yes.

        MR. GIORNO:  We move the court to receive into evidence Government's Exhibit 23.

        THE COURT:  It will be admitted.

    (Government's Exhibit No. 23 was received in

evidence.)

BY MR. GIORNO:

Q   Ms. Brown, I'm going to ask you, I'm going to ask you to take a look there to the screen to your right, and ask if you can identify that.  You previously identified Government's Exhibit 23 as being the indented writing.  What does that show on the screen to your right?

A   That's the actual indented writing from the back of Q2.

Q   Okay.  Until you ran that particular piece of paper, the letter from Carlos and Rivas, until you ran it through this machine to perform these other tests, were you able to see that writing on the back of it?

A   No.

Q   What did you do with this original letter in the envelope after you finished your testing on it?

A   It would go to the next unit.  I think that would have been the Latent Fingerprint Unit would have gotten the documents.

Q   To have the fingerprint examinations done?

A   Yes.

          MR. GIORNO:  Thank you.  That's all the questions I have of this witness.

THE COURT:  Cross examination?

CROSS EXAMINATION

BY MR. SIMMONS:

Q    Good afternoon, Ms. Brown.  Very briefly, the equipment and the methods which you described are very sophisticated; is that correct?

A    Yes, they are.

Q    And you also described how the man on the street would decipher or decode the same document?

A    Yes.

Q    Certainly it's true that if the man on the street can decipher it, the FBI laboratory can also decipher that and read that code; is that correct?

A    Sometimes.

Q    Do you have any examples where a man on the street could decipher something the FBI laboratory could not?

A    I would think that we could.

Q    Are you aware of anything that you couldn't?

A    No, I'm not, no.

Q    They're pretty unsophisticated techniques; is that correct?

A    Yes.

Q    Anything further?

        MR. GIORNO:  No Your Honor.

THE COURT:  Thank you, ma'am.  You may step down.  You may call your next witness.

MR. GIORNO:  Call Ty Summers.

TYRONE SUMMERS, GOVERNMENT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. GIORNO:

Q    Good afternoon, sir.

A    Afternoon.

Q    Would you state your full name, please, for ladies and gentlemen of the jury?

A    My name is Tyrone Summers.

Q    What is your occupation or profession?

A    I'm a physical scientist, forensic examiner at the Latent Print Operations Unit at the FBI Laboratory.

Q    What is your job there?  What do you do?

A    I examine evidence, items of evidence for the presence or development of latent prints.  I'll compare latent prints to the known prints of individuals that are known or suspected of having touched an item in an effort to make an identification or exclude the individual as a source of the prints.  I'll generate reports of my findings and testify to them when requested to do so.

Q    Could you explain to the ladies and gentlemen of

the jury your background and qualifications for that position?

A    My undergraduate degree, which I earned from Illinois Wesleyan University in 1998 in biology. After that time I worked for approximately a year and a half as a research fellow at the National Institute of Health, after which I attended graduate school at the University of Chicago.  I earned my master's degree in 2003 from the Division of Biological Sciences.  That's really the training that prepared me for a career as a scientist.  My training, specifically as it relates to fingerprints, consists of the approximately 18 month training program that I undertook at the FBI Laboratory in the Latent Print Unit.  Through the course of this training I learned the principles and the history of fingerprints as a means of identification.  I also learned proper evidence handling, and latent print development techniques.  I also actually examined hundreds of items, if not thousands of items, of evidence through case work under the supervision of a mentor.  I completed comparison exercises, connecting approximately 200,000 comparisons of latent prints during this training.  I passed periodic proficiency tests in latent print comparison.  I also

participated in moot courts, and I passed a final

certification examination that covered all aspects of

the 18 month training program.

Q    Mr. Summers, have you previously testified as an

expert in the field of fingerprint identification in

federal courts?

A    Yes, I have.

Q    Have you been accepted as an expert in those

fields?

A    Yes, sir.

MR. GIORNO:  We move Mr. Summer be received

as an expert in the field of fingerprint examination

and identification.

THE COURT:  Any voir dire?

MR. SIMMONS:  No, Your Honor.

THE COURT:  Very well.

BY MR. GIORNO:

Q    In this case, *United States* versus *Carlos Caro*,

were you asked to examine a document or documents to

determine whether or not the defendant, Mr. Caro's,

prints appeared on those documents?

A    Yes, I was.

Q    Mr. Summers, in front of you there's an envelope

and a letter.  Do you recognize those?

A    Yes.  My initials appear on the corner of each

JA 283

of these.  These are two of the documents I was requested to examine.

Q    What examination were you requested to make?

A    I was requested to process them for latent prints, which involves using alternate light sources, doing a simple visual examination to see if any latent prints are immediately apparent.  I'll also use alternate light sources such as a laser, sometimes latent prints will fluoresce, and on this particular specimen I also performed a couple of chemical processing techniques which help make latent prints which are normally invisible, visible.  The techniques I used react with amino acids that might be present in a latent print and cause a change in color that allows them to be visualized.

Q    What exactly is a latent print?

A    The skin that's present on the end of your fingers, on the palms, palms of your hand, even on the soles of your feet and your toes is a special type of skin.  This is known as friction ridge skin. That's because of the skin on these portions of your body, as opposed to the smooth skin that's present on the rest of your body, is actually raised ridges between which lay furrows or valleys.  A latent print is an impression of these ridges a lot like an ink

JA 284

stamp, and an area of friction ridge skin comes in contact with an object, normally they're left in dirt or oil or grease or sweat, there's actually sweat pores that line these ridges, that are transferred from the tops of the ridges to the object that's touched.  Latent prints are normally invisible, and so they'll require some sort of alternate light source or the chemical processing to make them visible.

Q    Just for my own information, for benefit of the jury, will I leave a latent print every time I touch something?

A    No, there are many reasons why a latent print wouldn't be left.  One thing would be, the simplest thing is to wear gloves, but even if friction ridge skin does come in contact with an object, the, if the skin is particularly dry or clean, then there's no material to be transferred.  The transferred material is key to a latent print being left, so oftentimes even though an object was touched a latent print won't be left.

Q    Okay.  Is it fair to say, too, that as items, for example this envelope, as different people touch it there's potential for them to leave fingerprints on it?

A    Yes, there's always potential for that.

Q    I take it you were able to identify latent prints on the envelope and the letter in front of you; is that correct?

A    On the envelope during our examination when we, the identification process, we analyze prints to determine if they're of value.  We then compare prints that are of value that can be identified to these prints of known or suspected of having touched an object, the people that did that, and so during the course of this I determined that there were two latent prints of value that were present on the envelope and on the, these were palm prints, the latent prints on the envelope.  On the letter I determined there were two latent palm prints of value, as well as a latent fingerprint that I determined to be of value for comparison.  Of these, when I compared these two -- pardon me, did you ask if I compared these?

Q    We're getting to that.  You told the ladies and gentlemen of the jury the first step in the process is to develop latent prints, see if the particular document has latents.  I'm assuming from what you told the jury that you, in fact, developed latent prints on the envelope and also the letter that you

JA 286

have in front of you; is that correct?

A     That's correct.

Q     Now, the next step in the process is did you compare that to what are called known prints?

A     Correct.

Q     What are known prints?

A     A known print is an intentional reproduction of the friction ridge skin.  The most common way that a known print is made is to roll a finger, for example, in a thin layer of black printer's ink, then to roll that same finger on to a contrasting background such as a white fingerprint card.  This creates a permanent record of an individual's fingerprints.

Q     And then you compare the known print of the latents to see if you can make an opinion about whether the person who made the known also made the latents?

A     Yes.  This is the comparison phase.  So with a known print of value I would do a side by side magnification to look for characteristics that are in common between the two prints.

Q     I want to show you what has been previously marked and introduced into evidence as Government's Exhibit 22, these being the known fingerprints of Carlos David Caro.  Would you take a look at those,

JA 287

please, and see if you can confirm those as being the known that you used in this case.

A     These are the known prints.  My initials appear on the back of each, of these yellow sheets.

Q     The known prints of the defendant, Mr. Carlos Caro?

A     These are the known prints.  The name on the prints is Carlos Caro.

Q     Okay.  Did you compare those to the latent prints that you found, first of all, on the envelope?

A     Yes, I did.

Q     And can you tell the ladies and gentlemen of the jury whether you were able to form an opinion as to who left the palm prints on the envelope?

A     The palm prints that, of value that were developed on the envelope -- I'm not sure of the exhibit numbers.  Is this Exhibit Eight?

Q     Should be Q, those referred to in your notes as Q1.

A     On the envelope it's referred to as Q1.  The palm prints on here, I identified one as having come from the left palm of the known prints of the same individual that made the known prints of Carlos Caro, so the left palm of Carlos Caro, and I identified one as coming from the right palm of Carlos Caro.

Q     The two palm prints were found on the envelope were the known palm prints of the defendant?

A     Correct.

Q     Turning to the letter, I believe you've designated that as Q2, the letter that was in the envelope?

A     Yes.

Q     You also identified latent prints on that; is that correct?

A     That's correct.

Q     Did you compare those to the known samples of the defendant, Carlos Caro?

A     Yes, I did.

Q     Can you tell the ladies and gentlemen of the jury what you found as far as the known fingerprints of Mr. Caro on that letter?

A     I determined that the two palm prints that were developed on Q2 were made by the left palm of Carlos Caro, and the fingerprint that is also present on Q2, that was developed on Q2 I identified with the right index finger of Carlos Caro.

Q     Okay.  And I probably should ask this, is it possible for someone other than Mr. Caro to, to have the same fingerprints as him?

A     No, it's not.  Due to complex biological forces

that go into the development of fingerprints, no two areas of friction ridge skin are alike even in very small areas.

Q    So, everybody in this courtroom would have different fingerprints that would be directly identifiable?

A    That's correct.

Q    Thank you, sir.  Answer any questions that defense counsel may have of you.

THE COURT:  Cross examination?

MR. SIMMONS:  No, Your Honor.

THE COURT:  Thank you, sir.  You may step down.  If you'll wait outside, sir.  You may call your next witness.

MR. BROWNLEE:  Your Honor, could we have just a short break, and then we'll call our final witness.

THE COURT:  Very well.  Ladies and gentlemen, if you'll follow the bailiff to the jury room, please, we'll be in recess for 15 minutes.

(The jury retired to the jury room, after which the following occurred:)

(Recess from 1:55 p.m. to 2:10 p.m.)

THE COURT:  Are we ready for the jury? We'll have the jury, in please.

MR. GIORNO:  Your Honor, may the FBI lab witnesses who have already testified be excused?

MR. SIMMONS:  Without objection.

MR. BROWNLEE:  The United States has three witnesses remaining for today.

THE COURT:  All right.

(The jury entered the courtroom and was seated in the jury box.)

THE COURT:  You may call your next witness.

MR. BROWNLEE:  Thank you, Your Honor.  The United States calls Kirsten Sandoval.

KIRSTEN SANDOVAL, GOVERNMENT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. BROWNLEE:

Q    Good afternoon, ma'am.  If I could ask you when you speak if you could speak into that microphone so all the members of the jury can hear you, as well as Ms. Dickert, okay?

A    Yes, sir.

Q    Would you please state your first and last name?

A    My name is Kirsten Sandoval.

Q    How old are you, Ms. Sandoval?

A    I'm 17.

Q    Where do you reside?

A    Pearland, Texas.

Q    How do you spell Pearland, Texas?

A    Pearland, P-E-A-R-L-A-N-D.

Q    And do you go to school?

A    Yes, I do.

Q    What grade are you?

A    I'm a senior.

Q    So, you are a high school senior?

A    Yes, sir.

Q    Okay.  And are you missing school today because you're here?

A    Yes.

Q    Okay.  Did you fly out from Texas yesterday to be here and have an opportunity to talk to this jury?

A    Yes, sir, I did.

Q    Okay.

        MR. BROWNLEE:  If I may approach the witness, Your Honor?

        THE COURT:  You may.

BY MR. BROWNLEE:

Q    I just want to show you some things, and ask you a couple of questions about it, and then I'll show them to you a little later.  Okay.  First I want to show you what's been marked as Government's Exhibit 15.  Have you seen that before?

A    That's my grandmother's name.

Q    Is your grandmother Felipa Sandoval?

A    Yes.

Q    Have you had an opportunity to see what, the letter inside?

A    No, not really.  She, it was sent to her.

Q    Did you have a chance to take a look at it before today?

A    Yeah.

Q    And do you recognize this handwriting?

A    That's my daddy's handwriting.

Q    Is this is from your father?

A    Yes, sir.

        MR. BROWNLEE:  I'd offer Government's Exhibit Number 15.

        THE COURT:  It will be admitted.

    (Government's Exhibit No. 15 was received in evidence.)

BY MR. BROWNLEE:

Q    I'd like to show you what's been marked as Government's Exhibit 14.  Is that, once again, a card to your grandmother?

A    Yes.

Q    On the inside do you recognize that handwriting?

A    That's my dad's.

Q    Okay.

JA 293

THE COURT:  I move Government's Exhibit Number 14 into evidence.

THE COURT:  It will be admitted.

(Government's Exhibit No. 14 was received in evidence.)

BY MR. BROWNLEE:

Q    I'd like to show you some photographs, Government's Exhibit Number 16, Government's Exhibits 17, 18, 20, 21, and 19.  Do you recognize these photographs?

A    Yeah, they're all of my dad.

Q    And your family?

A    Uh-huh.

Q    Okay.

MR. BROWNLEE:  I'd move all those exhibits in, Your Honor.

THE COURT:  They will be admitted.

(Government's Exhibit Nos. 16, 17, 18, 19, 20 and 21 were received in evidence.)

BY MR. BROWNLEE:

Q    Lastly, I'd like to show you what's been previously marked as Government's Exhibit LTA.01.  Do you recognize this?

A    Yeah, that's a letter I sent to my daddy.

Q    You wrote this?

JA 294

A    Uh-huh.

Q    When you sent this letter to your father did you attach some pictures?

A    Yeah, I sent him like four or five.

Q    I'd like to show you LTA.03, LTA.04, .05, and .06.  Do you recognize those pictures?

A    Uh-huh.

Q    Those are the ones you sent your father in that letter?

A    Yes, sir.

Q    The last thing I want to show you is the envelope which has been marked as LTA.02, and this is the front copy of the envelope, and are you K. Sandoval?

A    Yes, I am.

Q    Is your father Roberto?

A    Uh-huh.

        MR. BROWNLEE:  At this time I move that evidence in, as well.

        THE COURT:  It will be admitted.

    (Government's Exhibit Nos. LTA.01, LTA.02, LTA.03, LTA.04, LTA.05 and LTA.06 were received in evidence.)

        MR. BROWNLEE:  Thank you, sir.

BY MR. BROWNLEE:

JA 295

Q    Ms. Sandoval, you did not travel here by yourself, did you?

A    No.  My family is with me.

Q    Are members of your family here in the courtroom today?

A    Yes.

Q    If you would, for the jury, with the permission of the court, would you just introduce the members of the family that are here?

A    That's my dad's brother, my Uncle Sammy; my dad's sister, Chavela, my Aunt Chavela; my dad's sister, Delia; and my grandmother, Felipa.

Q    And that's your father's mother?

A    Uh-huh.

Q    Okay.  Is it fair to say --

A    And we're missing a brother.  His name is Lupe.

Q    Is it fair to say you are going to speak on behalf of all your family here today?

A    Pretty much, yes, sir.

Q    Okay.  If I can, I'd like to begin by showing the jury some photographs and having you tell us what they are, okay?

A    Okay.

Q    First of all, I'd like to show you what's been marked as Government's Exhibit Number 19.  Can you

tell the jury who that is?

A    That's a picture of my daddy.

Q    That's Roberto Sandoval; is that correct?

A    (Nodded yes.)

Q    I want to show you another picture that's been marked as Government's Exhibit Number 20.  Can you tell us what that is?

A    That's a picture of my cousin and my dad.

Q    Is this when your cousin turned 15?

A    Yes, sir.

Q    They have a big party; is that right?

A    Yeah, a quincera.

Q    Is that your father in the cowboy hat?

A    Uh-huh.

Q    Thank you.  I'd like to show you what's been marked as Government's Exhibit Number 18.  If you can, please tell the jury who, who that is?

A    That's a picture of my dad and his mom.

Q    That's your grandmother who is here today?

A    Uh-huh.

Q    I'd like to show you Government's Exhibit Number 17.  Can you tell us who is in that picture?

A    That's a picture of my dad and my older brother.

Q    Taken a while ago, I guess?

A    Yeah.

Q    Okay.  Let me show you Government's Exhibit Number 16.

A    That's a picture of my dad when he was little with his brother, Lupe.

Q    I have one more picture.  It's Government's Exhibit 21.

A    That's a picture of me and my dad and my little brother.

Q    Thank you.  Now, I'd like to show you a couple of the exhibits that are in Government's Exhibit Number 14.  I think you stated this was a letter from your father to his mother.  Do you remember seeing this?

A    Uh-huh.

Q    Do you recognize that handwriting?

A    Uh-huh.

Q    Who wrote that?

A    My daddy.

Q    I want to show you one more.  This was Government's Exhibit Number 15.  Another card from your dad to your grandmother; is that correct?

A    Yes.

Q    Do you recognize that handwriting?

A    That's my daddy's handwriting.

Q    Kirsten, if you can, I'd like to show you what's

been marked as Government's Exhibit LTA.01.  First thing I want to do, you remember this was a letter you wrote your dad, and you attached some pictures, and these are you and your friends from school; is that right?

A    Yes.

Q    Let me show you some of these pictures.  First is LTA.03.  Is that you?

A    Yes.

Q    Who is your friend?

A    Amanda.

Q    Amanda.  Here's LTA.04.

A    That's me and Lucia.

Q    Who is that with you?

A    Lucia.

Q    LTA.05, who is that?

A    Me and Lolly.

Q    Is that your best friend?

A    Yes.

Q    And let me show you LTA.06.

A    That's Chelsea, me, Stephanie and Kristen.

Q    You sent all these pictures to your dad; is that right?

A    Yes, I did.

Q    The last thing I want to show you is a copy of a

letter you wrote on December 7th.  If you can, I'd like you to read your letter.

A    Okay.  It says, "Dad, hey, what's up?  Nothing much here.  So what's new in Virginia?  Is it snowing there?  It's cold here, but it's not snowing.  I am sending you four pictures.  Those are some of my friends.  I need more pictures, but I haven't gotten film for my camera yet.  The one picture of me holding a girl, that is Lolly.  She is my very best friend.  She knows everything that has ever happened to me, and I know like everything about her.  Anyways, I don't have anything to say.  Oh, yeah, I went to the Valley Thanksgiving Week and I had a lot of fun.  I guess I will let you go now.  I love you and I miss you.  Love always, Kirsten."

Q    You sent that to your father on December 7th when he was in Virginia; is that right?

A    Yes.

Q    Kirsten, I just have a couple more things.  Did you love your father?

A    Yeah.

Q    Do you miss him?

A    We all do.

        MR. BROWNLEE:  I have nothing further, Your Honor.  Thank you, very much.

JA 300

MR. KALISTA: No questions, Your Honor.

THE COURT: Thank you, you may step down.

JOHN P. BLAZE, GOVERNMENT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. BROWNLEE:

Q    Good afternoon, sir.

A    Good evening.

Q    Would you please state your full name and spell your first and last names for the members of the jury?

A    John P. Blaze, J-O-H-N, B-L-A-Z-E.

Q    Where are you currently employed, sir?

A    I'm currently employed at the Federal Detention Center, Federal Correctional Institution, Oakdale, Louisiana.

Q    How long have you been employed there?

A    I have been stationed at Oakdale for approximately four years, five years, somewhere between four and five years.

Q    And I'm going to direct your memory back to July of 2002. Did you work at FCI Oakdale at that time?

A    Yes, sir, I did.

Q    In July of 2002, specifically July 11, 2002, what was your title and duties at the prison?

A    I was the operations lieutenant. My duties was

Blaze - Direct

I was in charge of the entire institution, basically all security aspects.

Q   Okay.  Now, you stated this is what you call an FCI, Federal Correctional Institute, Oakdale.  Where does an FCI fit in the range of prisons within the Bureau of Prisons?  Is it high security, medium security?

A   At the current time the FCI was considered a medium security institution.

Q   A more secure facility would be USP or United States Penitentiary?

A   Yes, sir.

Q   Sir, did there come a time on July 11th of 2002 in which you responded to an incident involving the defendant, Carlos Caro?

A   Yes, sir, I did.

Q   Would you please tell the ladies and gentlemen of the jury what happened on that day?

A   I responded to a call for assistance from the recreation staff, and they had stated that they had a large fight on the lower recreation yard.

Q   A large fight?

A   Fight.  Okay.  I proceeded to the recreation yard, and upon entering it I was met by inmates who were bleeding, who had injuries, and I specifically

JA 302

Blaze - Direct

remember one inmate telling me that, "They're trying to kill us, you know, we need help." I continued running to the lower recreation yard where I was met by recreation staff.

Q    What did you do next?

A    She advised me that the fights, et cetera, were taking place near the soccer field.

Q    Was there a set of bleachers near the soccer field?

A    Yes, sir, it was.

Q    What did you do next?

A    As I approached the bleacher, I saw inmates sitting on the bleachers bleeding, had very obvious injuries, and I knelt down basically and began questioning them as to what had happened.

Q    Okay.  What did you do next?

A    As I was speaking with them -- you have to understand, during an emergency it's kind of hectic you have a lot of radio transmissions going on, I received calls from some of my officers asking for instructions stating that they had several inmates at the gate, the exit gate of the recreation who was trying to get out and wanted further advice on what they needed to do, and they also informed me that several of these inmates had blood on their clothes

JA 303

and shoes.

Q    What did you do next, sir?

A    I advised them to hold them there, keep the gate secured until I could get there, and upon getting to the gate at that time we, I organized my staff, and we began to do checks, body checks, looking at inmates' shoes, clothing for blood stains or injuries, anything that might indicate that they were involved in this altercation.

Q    All right.  And was one of the inmates that you inspected at that time the defendant, Carlos Caro?

A    Yes, sir, it was.

Q    And was blood found on the clothing or the boots of Carlos Caro?

A    Yes, sir it was.

Q    And essentially is it fair to say what you did was you held these inmates in check, and then as they left the yard you were able to inspect them?

A    Yes, sir.

MR. KALISTA:  Judge, could we take these up with the court?

THE COURT:  Very well.  Ladies and gentlemen, I'll ask you to follow the bailiff out, please.

(The jury retired to the jury room, after which

JA 304

the following occurred:)

THE COURT:  Yes, sir?

MR. KALISTA:  May we take this up outside the presence of the witness?

THE COURT:  Yes, sir, if you'd step outside, please?

MR. KALISTA:  Judge, Mr. Brownlee has handed me several pictures, and it appears to be some pictures of possibly three inmates who appear to have some injuries, as well as pictures of, looks like dark red substance on grass, as well as a dark red substance near what I would call a bleacher area.  I just don't think the Government has laid a proper foundation yet for the introduction of these pictures, specifically as it relates to Mr. Caro.

THE COURT:  Well, I know.  I mean, I don't think there's been any mention of, of these pictures, has there?  The witness hasn't mentioned the pictures yet, has he?

MR. BROWNLEE:  I've not asked him any questions about them.

MR. KALISTA:  Maybe my objection is premature, but certainly there's no tying that to Mr. Caro.

THE COURT:  Well, I don't know what the

JA 305

witness is going to say, but let's have the witness back in.  Yes, sir, if you'd take the stand again, please, sir.  Mr. Brownlee, if you'll ask the witness, if you would lay a foundation for the introduction?

MR. BROWNLEE:  May I approach the witness?

THE COURT:  You may.

BY MR. BROWNLEE:

Q    Sir, I'm going to show you some photographs. These are marked Oakdale.01, .02, 03, 04, 05, 06, 07, 08 and 09.  Sir, have you seen these before?

A    Yes, sir.

Q    Okay.  Now, the first, Oakdale.01, .02 and .03, can you tell us what those are pictures of?

A    Those are pictures of the inmates who were assaulted that night on the recreation yard on July 11, 2002.

Q    These are some of the victims of the assault that was, well, these are victims of the assault that you responded to that you just testified?

A    Yes, sir.

Q    I want to show you 04, 05, 06, and 07.  What are those of?

A    Those are photographs of blood on the grass and dirt area of the recreation yard.

JA 306

Q    Again, this comes from the victims of that assault; is that correct?

A    That is correct, sir.

Q    And then 08 and 09, what are those of?

A    Those are photographs of the blood that are on the bleachers that are adjoining the soccer field of the lower recreation yard.

Q    Okay.  Did you prepare a report as far as your, what you did that day?

A    Yes, sir, I did.

Q    What you saw that day?

A    Yes, sir.

Q    And you kind of talked to us a little bit in your initial testimony about that there were a group of inmates that were stopped that had blood on their boots and clothing; is that correct?

A    Correct, sir.

Q    Inmate Carlos Caro was one of those; is that correct?

A    Yes, sir.

Q    Based upon the investigation, did you determine if Mr. Caro played a role in this?

A    Yes, sir.  It was my determination through, you know, the word I'm looking for here is with the evidence being that blood on the shoes and the

JA 307

clothes made it very obvious that he was involved in some way in this fight or assault.

MR. BROWNLEE: Your Honor, we believe at that point there's sufficient evidence --

THE COURT: Any objection?

MR. KALISTA: We would object to his conclusion that it, that Mr. Caro was involved. He had blood on his boots. As far as I understand, there were some inmates that had blood on their boots and clothes. We would object to the conclusion he's making that he was involved in some way in the assault.

THE COURT: Yes, sir. Do you intend to ask him that? I don't believe the U.S. Attorney intends to ask him that in front of the jury. The question is the admissibility of these photographs, and I'll --

MR. KALISTA: I believe he's laid the proper foundation.

THE COURT: There's no objection. Any other evidentiary matters that we can profitably take up then at this time?

MR. BROWNLEE: That's the only evidence we intend to introduce from this report unless for some reason it's challenged --

MR. SIMMONS:  If that's where it's going to stop, then --

THE COURT:  All right.  We'll have the jury, in please.

(The jury entered the courtroom and was seated in the jury box.)

MR. BROWNLEE:  May I approach the witness, Your Honor?

THE COURT:  You may.

BY MR. BROWNLEE:

Q   Sir, I want to show you a series of documents that have been previously marked as Oakdale.01 through Oakdale.09.  I'd like to begin by showing you Oakdale.01, .02 and .03.  Would you please look at those and tell the ladies and gentlemen of the jury what those are?

A   These are photographs of the inmates who were assaulted on the evening of July 11th on the lower recreation yard.

Q   Let me show you Oakdale .04, .05, .06 and .07. What are those, sir?

A   Those are photographs of the blood that is in the grass and on the dirt that is from the victims of the assault on the lower recreation yard.

Q   All right.  And Oakdale .08 and .09?

A    That is photographs of the blood that is on the bleachers that is on the lower recreation yard by the soccer field.

Q    Okay.

MR. BROWNLEE:  At this time we would move those exhibits into evidence.

THE COURT:  They will be admitted.

(Government's Exhibit Nos. Oakdale.01 through Oakdale.09 were received in evidence.)

BY MR. BROWNLEE:

Q    All right, sir.  If you would please look to the monitor to your right.  We're looking at Oakdale.09. Would you please tell the ladies and gentlemen of the jury what that is a photograph of?

A    That's a photograph of the blood and the blood stains on the bleachers that is located in the soccer field, the recreation yard.

Q    This is the area you responded to when you got alerted there was a fight on the yard?

A    Correct, sir.

Q    And once again, sir, what are we looking at here?

A    Once again that is the blood that was on the bleachers of the recreation yard soccer field.

Q    This is, this is the same picture, just of a

JA 310

different angle?

A    Different angle, yes, sir.

Q    Did you also have an opportunity to look at some of the grassy area near this bleacher set up?

A    Yes, sir.

Q    Would you please pull up Oakdale.06.  Tell us what this is a photograph of, sir?

A    That is a photograph of the blood that is from the victims on the lower recreation yard in the grass and dirt.

Q    What is that, sir?

A    That is a photograph of one of the inmates who was assaulted on the afternoon of July 11th.

Q    And Oakdale.02, what are we seeing here?

A    That is another photograph of another inmate who was assaulted that afternoon.

Q    Now, do you recall that one of the inmates that was assaulted had to be taken to the hospital?

A    Yes, sir, and that was this inmate that is present right there.

Q    Oakdale.02.  That's Jose Reas?

A    Yes, sir.

Q    Thank you, sir.  I have no further questions.

        THE COURT:  Any cross examination?

                CROSS EXAMINATION

BY MR. KALISTA:

Q    Just so we're clear, in terms of the photographs, I noticed that there were two different angles of the blood near the stands, the soccer field; is that correct?

A    Yes, sir, it did appear to be.

Q    And then there was a separate photo of some blood on some grass?

A    Yes, sir.

Q    The two photos of the blood on the stands and below the stands were from different angles?

A    To my best knowledge.  I did not personally take the photographs.  My staff members did.  I had staff members assigned to do certain duties and to my knowledge they were taken from different angles.

Q    And the photo of the blood on the ground, again, was that just a photo of the blood on the ground underneath the stands depicted in the earlier two photos?

A    No, sir, I don't think so.  I cannot answer that.  I do not know exactly.

Q    You do not know?

A    I do not know.

Q    All right.  The only thing that you observed about Mr. Caro is that he had some blood on his

boots?

A     Boots and clothing.

Q     Okay.  And where on his clothing?

A     I cannot exactly tell you where it was at on his clothing, but he did have blood on his boots and clothing.  I didn't take each inmate that was there and actually specify where the blood was located.

            MR. KALISTA:  Thank you, sir.

            THE COURT:  Anything further?

            MR. BROWNLEE:  No, sir.

            THE COURT:  Thank you, sir.  You may step down.  You may call your next witness.

            MR. BROWNLEE:  The United States calls John Gordon, sir.

        JOHN GORDON, GOVERNMENT'S WITNESS, SWORN

                    DIRECT EXAMINATION

BY MR. BROWNLEE:

Q     Good afternoon, sir.

A     Good afternoon, sir.

Q     Would you please state your first and last name for the court reporter?

A     John Gordon.

Q     And Mr. Gordon, where do you reside?  Where do you live?

A     I reside in Louisiana.

Q    And where are you employed, sir?

A    Federal Bureau of Prisons.

Q    Are you assigned to a particular prison?

A    I'm assigned to Oakdale Federal Correctional Complex.

Q    And that's in Oakdale, Louisiana?

A    Correct.

Q    And I want to take your memory back to July 11, 2002.  Do you remember that day?

A    Yes, I do.

Q    Can you tell us what your duties were on that day?  What did you do for the prison in July of 2002?

A    I was assigned as an SIS lieutenant.

Q    What does SIS stand for?

A    That's a position where you conduct special investigations.

Q    Are you essentially a police officer within the prison?

A    Yes.

Q    You conduct investigations of potential criminal activity within a prison; is that correct?

A    Correct.

Q    And on July 11, 2002 was there an incident at Oakdale Prison involving the defendant, Carlos Caro, that you investigated?

JA 314

A    Yes, there was.

Q    And can you tell the ladies and gentlemen of the jury essentially what happened?

A    There was a, I was informed there was assaults with numerous injuries.  One inmate was transported to the hospital.  Initial information was between the Texas Syndicate and Paisa.

Q    In July of 2002 were you aware that there were certain gangs at Oakdale?

A    Yes.

Q    Okay.  Was the Texas Syndicate already at the prison?

A    Yes, they were at the prison.

Q    Were members of TS at Oakdale in July of 2002?

A    Yes, sir.

Q    Tell us about this other gang that was involved in this incident?

A    The other gang is Paisa, Border Brothers, and they're originally from Mexico.  They do not reside in Texas.  Most of the gangs that we had at Oakdale at that time were gangs from, that resided in Texas: Texas Syndicate, Barrios Aztecas, of that nature.

Q    Now, how long -- what did you call Paisa?

A    P-A-I-S-A slash S.

Q    How long had the victims of that assault been at

JA 315

your prison before this assault occurred?

A    They came to Oakdale that afternoon, and they were there approximately two hours.

Q    They were there about two hours?

A    Yes, sir.

Q    Okay.  Now, I want to walk your memory back about three weeks before this assault, okay?  In your capacity as the SIS lieutenant, did you reach out to various members of the gangs, various leaders of the gangs to try to create or establish a dialogue?

A    Yes, I did.

Q    Did you do that with the Texas Syndicate?

A    Yes, I did.  I did that with all the Texas based gangs, along with other gangs that were there, Latin Kings, and Aryan Brotherhood, and some of the other ones.

Q    Tell the ladies and gentlemen of the jury what you did, what you were trying to accomplish by doing this?

A    What I tried to accomplish and did accomplish in most of the circumstances was I was opening up a line of communication between the SIS department and the leadership of these gangs.

Q    SIS is you?

A    SIS was me, that's correct.

JA 316

Q    Federal authorities; is that correct?

A    That's correct.

Q    So, open up a line of communication between people who run the prison and the leaders of these gangs; is that correct?

A    Correct.

Q    What were you trying to accomplish with this line of communication?

A    I was trying to accomplish that we had a lot of gangs that were coming in, or possible gang members that were coming in that were not affiliated with Texas based gangs, and that we were not going to have assaults take place, and people would be hurt.  My main objective was inmate and staff safety.

Q    So, you were trying to keep the peace?

A    I was trying to keep the peace.

Q    You stated that you reached out to leadership of various gangs.  Did you reach out to the leadership of the Texas Syndicate?

A    Yes, I did.

Q    Did you have a discussion with one member of the Texas Syndicate?

A    Yes, I did.

Q    Who was that?

A    That was Caro.

JA 317

Q    Carlos Caro?

A    Yes, sir.

Q    And when, when you reached out for leadership and who showed up from the Texas Syndicate?

A    Caro showed up.

Q    Tell the ladies and gentlemen of the jury about this conversation you had with Mr. Caro.

A    I had a conversation in the SIS office with Caro.  I was trying to open up the communications between, as it was said earlier, the SIS Department, which I represented at the Federal Bureau of Prisons, and the Texas gangs.  I was trying to explain that I needed to know who the membership was in the Texas Syndicate and also, at Oakdale, and also that there would be no assaults on people or inmates that they believed were Paisa or Border Brothers.

Q    How did Mr. Caro respond to your out reach?

A    He responded that the Texas Syndicate were going to do what they had to do, and I had to do what I had to do as a supervisor in the SIS Department in the Bureau of Prisons.

Q    Did Mr. Caro make it clear that he was the leader of the Oakdale branch, I guess, of the Texas Syndicate?

A    Yes.  That is the understanding I had after that

conversation.

Q     Okay.  Did he also, was he comfortable with the way, the manner in which he was talking to you in the sense did he want other people there, or --

A     He mentioned at the end of the conversation if I needed to talk to him in the future that he would like to have another Texas Syndicate member or associate to be present, and --

Q     Okay.  Is it fair to say, how much, after you had that conversation with Caro how much longer after that did this incident occur, or did this assault occur?

A     That was approximately three to four weeks prior to July 11, 2002.

Q     Okay.  And so you had this conversation, this out reach, Caro tells you he's going to do what he's going to do, you've got to do what you've got to do, and three weeks later the assault was instigated?

A     Yes, sir.

Q     Were you the lead investigator for the assault?

A     Yes, sir, I was.

Q     Sometime after the assault did you have the opportunity to talk to Carlos Caro about the assault?

A     Yes, sir.  I believe it was on the 27th.

Q     Okay.  And did you memorialize that in your

JA 319

report?

A    Yes, sir, I did.

Q    Okay.  Tell the ladies and gentlemen of the jury what Carlos Caro said about the assault on July 11th.

A    During our interview Caro informed me that there was an inmate in there named Caldera who had been locked up initially during the investigation, he didn't have anything to do with it because he was a Barrios Azteca, and the Texas Syndicate were the ones that were responsible for the assaults on the Paisa and Border Brothers.  He also informed me that his brothers take orders, they follow orders, they know what they're, what the consequences are to that.  He was not afraid of prosecution or being transferred to a United States Penitentiary.

Q    And in your report did you actually take what he said, put it in quotes, and type it out in your report?

A    Yes, I did.

Q    Sir, I want to show you a document that's been marked as Oakdale.10.  Do you recognize this page?

A    Yes, sir.

Q    Is this part of your report?

A    That's part of my SIS report.

Q    Okay.  And on the bottom there do you have the

JA 320

date, and the quote from Carlos Caro concerning this investigation?

A    Yes, sir.

Q    Would you please read that quote to the jury?

A    "On August 27, 2002 inmate Caro, Carlos David, registered number 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, provided the following summarized statement:  'Caldera, he is an Azteca.  He did not have anything to do with it, just the Texas Syndicate.  I don't give a fuck if they send me to the United States Penitentiary.  My brothers follow orders.  They know what they're getting into.  It doesn't even matter if we're prosecuted.  I have 30 years to do.  I certainly don't care about myself.'"

Q    That's what Mr. Caro told you about his involvement in this assault; is that correct?

A    Yes, sir.

Q    Now, after your investigation did you form an opinion as to, if anyone did, which individual ordered this assault to occur?

A     I had no doubt in my mind, after conducting the investigation that, number one, the Texas Syndicate were responsible, and that was based on eye witness accounts, victims' statements, and Caro's statement, and that also Caro was in the leadership at FCI Oakdale, at the time initiated the assaults on the

JA 321

Paisas and Border Brothers due to the simple fact that the Texas Syndicate doesn't do anything without following orders.

Q    All right.  So, a couple other questions.  On that statement you said August 27th; is that correct?

A    Yes, sir, that's correct.

Q    Okay.  And the incident happened July 11th, so there's -- I don't do math in public -- but that's about six weeks, or so?

A    Uh-huh.

Q    Why the time period between the two, the incident and the interview of Caro?

A    I believe on July 18th it was released by the U.S. Attorney's Office for me to proceed if I needed to do Bureau of Prisons disciplinary action incident reports, things like that.  I can conduct interviews up to that point to ascertain if further inmate or staff safety is in jeopardy, and that's what I did. And the report of the incident was not released until the 18th.  From the 18th to the 27th I was gathering information from victims, witnesses, things of that nature, and building my case, which resulted in the SIS report.  That's the reason why the time frame was like that.

        MR. BROWNLEE:  Thank you, sir.  Please

JA 322

answer any questions from the defense attorneys.

THE COURT:  Cross examination?

CROSS EXAMINATION

BY MR. KALISTA:

Q    Yes, sir, I just have a few questions.  My understanding was that you prepared a rather lengthy report; is that correct?

A    Yes, sir.

Q    And you said that you were trying to build a case to provide this information to the United States Attorney; is that right?

A    No.  What I meant was this type of case has, has implications of being prosecuted.  I cannot go ahead with Bureau of Prisons internal infractions as far as incident reports that would result in disciplinary action against the inmate until the U.S. Attorney's Office releases it to me to do.  So, I can conduct an investigation on the outside, but I cannot proceed with any incident reports, or anything like that.

Q    But the matter was referred to the United States Attorney for prosecution, and the United States Attorney declined to prosecute?

A    Yes, sir.

Q    I want to go back and ask you in terms of the meeting that you say you had with Mr. Caro about

JA 323

three weeks prior to the incident, you said you had sent out some feelers?

A    Right.

Q    I'm unclear about that.  Did you go up to Mr. Caro and say, "I want to meet with you in my office concerning some issues regarding the Texas Syndicate"?

A    No, I don't recall that, sir.  What I had done was, I had kind of established in the SIS Department who the possible leaders would be.  Since there was no communication between the Texas Syndicate and myself, I had sent word out with known Texas Syndicate members or associates that I'd like to speak to whoever the leader was in the leadership role.  That's how the conversation came about.

Q    Okay.  But I mean, you sent out some feelers that you wanted to speak to someone in the leadership role, and you're saying that Mr. Caro showed up, and you had this conversation?

A    Correct.

Q    Again, you prepared a rather lengthy report concerning the, this violence at Oakdale FCI; is that correct?

A    Yes, sir, I did.

Q    Do you normally try to document your contacts

with, let's say, TS members like you did with the interview with Mr. Caro in that report?

A    Is the question that I only have Caro in the report and not any other TS?

Q    No, I'm sorry.  Maybe that was a poor question. When you were preparing your report, and it was a rather lengthy report on the incident in Oakdale, I guess my question is you did not put in any information concerning your contact with Mr. Caro three weeks prior to the incident, did you?

A    No, sir, I did not.

Q    If I understand the quote directly from Mr. Caro he said, "My brothers follow orders," is that right?

A    Yes, sir, that's correct.

Q    The purpose of a written report was, I believe, to provide the warden and associate warden information concerning what happened in order to take disciplinary action against certain inmates, and also to try to take steps within the institution to prevent such an occurrence in the future; is that right?

A    Yes, sir.

Q    And you wanted to put in there all available information concerning Mr. Caro, the other inmates involved in the incident; is that right?

A    As much as it was necessary.

Q    And you did not put in any details of your earlier conversation with Mr. Caro in that report?

A    No, sir, I didn't.

Q    Thank you.

THE COURT:  Anything further?

REDIRECT EXAMINATION

BY MR. BROWNLEE:

Q    Sir, do you remember making some summary and conclusions as part of your report?

A    Yes, sir, I do.

Q    Okay.

MR. KALISTA:  Judge, I guess we need to take this up with the court.

THE COURT:  All right.  Ladies and gentlemen, if you'll follow the bailiff out, please.

(The jury retired to the jury room, after which the following occurred:)

MR. KALISTA:  We have an objection that I believe the Government is going to attempt to redirect this particular witness to the summary and conclusions page of his report, and they've highlighted for us in yellow apparently what they intend to ask this witness.  Now, this witness did say, and it came into evidence that it was his

JA 326

opinion that the fight was caused by Texas Syndicate, and that Mr. Caro was head of the Texas Syndicate. We brought out on cross examination that he had not put his earlier conversation with Mr. Caro into his written report. The Government now intends to apparently ask him, if I understand correctly from the Government, the basis for his conclusions as to why, I believe, why Mr. Caro was considered to be the leader of the Texas Syndicate, and responsible for the assaults on the Paisa Border Brothers. I believe he's getting ready to answer that question again based upon eye witness statements, or accounts, or information provided to me by unknown sources. This is the same issue, as I understand it, that we had gone through earlier concerning the proffered matter. I don't -- two things. I think that the Government should not be able to get into it for that reason; and secondly, it exceeds the scope of my cross examination.

THE COURT: Well, I mean, the witness has already testified, as I understand, that you, he believed the defendant was head of the Texas Syndicate at the prison because the defendant said so, at least implied so when he showed up and talked officially to him, if that can be the word, and he,

based on his conversation with the defendant afterward in which the defendant told him that the Texas Syndicate was responsible.  I mean, I'm not sure if I understand what the issue is.

MR. BROWNLEE:  The Government's position is we agreed not to put this report in.  They raised the issue, we decided not to put the report in.  So, on cross examination there was this give and take about the fact that they didn't put in the report about this conversation where Mr. Caro said he was a member of TS.  What we want to be able to do is rehabilitate the witness with the sentence that says, "Inmate Carlos Caro is considered the leader of the Texas Syndicate at FCI Oakdale," and that's in the report. And so we should be able to show to the jury that he did, in fact, include in his report his belief that Caro was the leader of TS.  And we just think it's fair to try to rehabilitate him.

THE COURT:  Well, I mean, if all you're going to ask him to do is say, "Look at your report again.  In fact, didn't you say in the summary of the report that he was the leader of the, of the TS?"

MR. KALISTA:  He had a lot more outlined there, Judge, in yellow, so it looked to me like he was getting ready to go into much more detail than

that.

THE COURT: Well, I'll overrule the objection to that extent. I've think this is maybe a tempest in a tea pot, frankly. Yes, sir, Mr. Simmons?

MR. SIMMONS: No, as long as it's that one sentence, and he's not going to show that paragraph, then that's correct. We've got one sentence, but then it goes on to talk about inmate sources, unnamed sources that he relied upon which that would be the basis of the objection. That is in the paragraph but not the sentence.

THE COURT: Maybe I'm missing something. The evidence is that the defendant told him he was head of the Texas Syndicate. Why does, I mean, how does that hurt you if -- what could be more direct than that? But anyway, mine is not to reason why.

MR. BROWNLEE: It will be very narrow. I'll ask him to read the underlined portion. I won't put it on the board, and that will be all.

THE COURT: Yes, sir. I'm going to allow that. We'll have the jury back in.

(The jury entered the courtroom and was seated in the jury box.)

THE COURT: You may proceed.

BY MR. BROWNLEE:

Q   Officer Gordon, you were asked on cross examination that you had prepared a report; is that correct?

A   That's correct.

Q   And you were asked about your earlier testimony about the fact that Mr. Caro was, in fact, the leader of the Texas Syndicate at Oakdale; is that correct?

A   Yes, sir.

Q   I'm going to ask you, if you would, sir, just take a look at this page of your report, and we will mark it, Your Honor, and this is your report, is it not?

A   Yes, sir.

Q   Would you please just read the underlined sentence for the jury?

A   "Inmate Caro Carlos David, registered number 37786079, is considered the leader of the Texas Syndicate at the Federal Correctional Facility in Oakdale, Louisiana, and initiated the assaults on the Paisa Border Brothers."

Q   Thank you.  I have nothing further, Your Honor.

        THE COURT:  Thank you, sir.  You may step down.  If you'll wait outside, please, sir.

        MR. BROWNLEE:  That's all we have for

JA 330

today, sir.

THE COURT:  All right.  Ladies and gentlemen, we're going to end our trial day at this time.  It will be necessary for you to return tomorrow promptly at 9:00 so that we can begin.

Please remember my instructions to you about not discussing the case, or permitting it to be discussed in your presence.  Drive carefully, and we'll see you tomorrow morning at 9:00.  If you'll put your notebooks in the jury room, please.

(The jury retired to the jury room, after which the following occurred:)

THE COURT:  Is there anything further, then, before we adjourn for the day?  What is the Government's -- remind me again about the Government's procedures tomorrow.  Approximately how many witnesses, and so forth?

MR. GIORNO:  I have a witness list.  It has seven witnesses, but they will, some of them, I think we can stipulate.  I believe I've mentioned briefly the testimony of at least one of the witnesses, at least two of them, the witnesses will take no more than five minutes, and looking at this I suspect, Your Honor, if we start at 9:00 and things move along, we should be done by the lunch hour.

JA 331

THE COURT: All right. And then, as I understand, the defense is going to be ready to go on Wednesday morning; is that correct?

MR. SIMMONS: Yes, Your Honor. We should be ready at 9:00 Wednesday morning to proceed. If there's nothing further, then, we'll adjourn court for the day.

(Proceedings concluded at 3:15 p.m.)

CERTIFICATE

I certify the foregoing is an accurate transcript from the record of proceedings in the above-entitled matter.


3/14/07                     /s/  Bridget A. Dickert
Date

JA 332

```
          IN THE UNITED STATES DISTRICT COURT FOR THE
                 WESTERN DISTRICT OF VIRGINIA
                      Abingdon Division

    ----------------------------x
                                 :
    UNITED STATES OF AMERICA,    :
                                 :
         Plaintiff,              :
                                 :
    v.                           :   1:06CR1
                                 :
    CARLOS D. CARO,              :
                                 :
         Defendant.              :   Abingdon, Virginia
                                 :   February 6, 2007
    ----------------------------x   9:10 a.m.
```

                         JURY TRIAL
           BEFORE THE HONORABLE JAMES P. JONES
     CHIEF UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

        JOHN BROWNLEE, Esquire
        U.S. Attorney
        ANTHONY P. GIORNO, Esquire
        Assistant U.S. Attorney
        P.O. Box 1709
        Roanoke, Virginia  24008
            For the United States of America.

        STEPHEN J. KALISTA, Esquire
        P.O. Box 1186
        Big Stone Gap, Virginia  24210
        JAMES SIMMONS, Esquire
        1208 17th Avenue south
        Nashville, Tennessee  37212
            Counsel for the Defendant.


Proceedings recorded by Stenography, transcript
produced by computer.

**BRIDGET A. DICKERT**
**UNITED STATES COURT REPORTER**
**180 WEST MAIN STREET, ROOM 104**
**ABINGDON, VIRGINIA 24210**
**(276) 628-5116**

JA 333

(Proceedings commenced at 9:10 a.m.)

THE COURT:  Morning, ladies and gentlemen. I'm sorry I was delayed.  Are we ready for the jury?

MR. GIORNO:  We are, Your Honor.

THE COURT:  The court staff advises me we are having a little construction right behind the courtroom, so if we hear some noises we'll try to keep it so it doesn't interfere, but just to remind counsel to speak up, and we'll have the jury in.

(The jury entered the courtroom and was seated in the jury box.)

THE COURT:  Morning, ladies and gentlemen. I hope you had a good evening.  We're ready to go again, and the Government may call its next witness.

MR. GIORNO:  Please the court, first order of business this morning would be a stipulation.  The parties in this case have agreed and stipulated as follows:  The Government would have called a witness named Thomas O'Neill.  Mr. O'Neill would testify that he is a United States Probation Officer.  He will explain that after serving a federal term of imprisonment, a person is on supervised release for a period of time after his release.  During that time, he is to be of good behavior and may not violate any of the conditions of his release.  If he violates the

JA 334

conditions of release, he may again be imprisoned by the court.

The parties also stipulate that on April 15, 1988 the defendant, Carlos David Caro, was sentenced by the United States District Court in the Southern District of Texas to a term of 24 months imprisonment, to be followed by a three year term of supervised release.

On March 22, 1992, Carlos David Caro was found to have violated the terms of his supervised release and was ordered incarcerated for an additional term of six months in accordance with the order entered on that date.

The parties further stipulate that on January 5, 1994, Carlos David Caro was sentenced by the United States District Court in the Southern District of Texas for a term of 71 months imprisonment to be followed by a term of, a four year term of supervised release.

On November 27, 2001, Carlos David Caro was found to have violated the terms of his supervised release and was ordered incarcerated for an additional term of 18 months in accordance with the order entered on that day.

THE COURT: Again, ladies and gentlemen,

JA 335

you will consider this statement by the attorney as evidence in the case.

MR. GIORNO:  Your Honor, in connection with that stipulation, we would move into evidence two documents.  Number one is labeled CVN-B-01, and that is the order revoking the term of supervised release referenced in the stipulation, and CVN-E-01 is the second order to revoke supervised release, both of which entered by the courts in Texas.

THE COURT:  They will be admitted.

(Government's Exhibit Nos. CVN-B-01 and CVN-E-01 were received in evidence.)

MR. GIORNO:  The United States would call as a witness, Jackie Guzman.

JACKIE GUZMAN, GOVERNMENT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. GIORNO:

Q    Good morning, ma'am.

A    Good morning.

Q    Would you state your full name again for the jury?

A    Jacoba Guzman.

Q    You go by Jackie?

A    Yes.

MR. GIORNO:  Your Honor, this witness has

been previously qualified in Spanish.  Do you wish me to qualify her again?

THE COURT:  No, that won't be necessary.

BY MR. GIORNO:

Q    You previously testified in the guilt phase of this case, and you told the jury that you were an expert in translating Spanish to English; is that correct?

A    Yes.

Q    And I believe you also testified about some tapes that you translated; is that correct?

A    Yes.

Q    I want to ask you about some additional documents that have been introduced to the jury in this penalty phase.  First of all, are you familiar with a letter that was sent from Carlos David Caro addressed to Eduardo Rivas at P.O. Box 1062, Premont, Texas in January of 2004?

A    Yes.

Q    Can you tell the ladies and gentlemen of the jury how you came into possession, talking about the original of that letter, what your experience with it was?

A    I came upon this letter through a phone call that Carlos Caro had made to Eduardo Rivas.  In that

JA 337

phone call he had asked him if he could read code, and he stated yes, Rivas did.

Q    Excuse me, just to refresh my memory, this was in the telephone conversation that you testified to in the guilt phase?

A    Yes.

Q    Who was it that was asking if, if the other person could read code?

A    Inmate Caro was asking Mr. Rivas.

Q    If he could read code?

A    Yes.

Q    What happened after that?

A    Raul Rivas said yes.  At that time when I listened to the phone call in my office I called Lee County back and asked the staff there if they had seen a letter going out from inmate Caro to Rivas, and they stated to me yes, that he had sent a letter out.  And they had had a copy of it.  I said, "We need the original because by what they're saying in the phone call the letter is coded."  At that time they sent me a copy of the letter, because they did have a copy of it, but the original was in Premont, Texas in the Post Office.  They subpoenaed the letter, the letter was sent to Quantico, Virginia to bring out the code in it, and they had sent it to me

JA 338

and I translated it.

Q    Before we get to that part, Ms. Guzman, you told the ladies and gentlemen of the jury that, of course, you were contacted by Officer Mrad about this telephone conversation?

A    Yes.

Q    That's the one entirely in Spanish, and you translated that?

A    Yes.

Q    Was it Mrad that you spoke with about the letter that was referenced in the code?

A    Yes.

Q    And did, and you say Mrad told you they had a copy of that letter?

A    Yes.

Q    Did he send you a copy of that letter?

A    Yes.

Q    I want to show you what's been previously introduced into evidence as a Government exhibit.  Do you recognize this letter, Ms. Guzman?

A    Yes, I do.

Q    And can you tell the ladies and gentlemen of the jury what this is?

A    You want me to read it?

Q    First, if you would just identify it?

JA 339

A     This letter is from inmate Caro to Raul Rivas.

Q     That was the letter in the envelope?

A     Yes.

Q     Is this a copy that Agent Mrad sent you initially?

A     Yes, sir.

Q     At that time there was nothing on the back; is that correct, that you were aware of?

A     That I was aware of, no.

Q     At that time?

A     At that time.

Q     And you told the jury that from the telephone conversation that you had translated between Caro and Rivas you had reason to believe through the use of this language about code that there was a coded letter here?

A     Yes.

Q     Is there anything in this letter, this being the non-coded part of the letter, that furthered or heightened your suspicion that perhaps the original letter, the original letter contained something hidden in code?

A     Yes.

Q     Can you tell the jury, point out to the jury where that is?

JA 340

A    Inmates tend to write in code, and sometimes they use invisible ink, and there's a statement in here, something about pissed, and then something about a lighter.  I'm going to have to find it in the letter, itself.  Where it says the lighter, it should be toward the bottom of the letter, and they're making reference to a lighter and they're also making reference to pissed, and I can't find it.

Q    I'll point out down here at the bottom?

A    Yes.

Q    You can touch on the screen there, and it will leave a mark where the word lighter appears.

A    Yes, I already touched it, sir.

Q    Okay.  And you said there's some reference in there to someone being pissed?  Is that the line right here?

A    Yes, right there.

Q    When you saw the words pissed and lighter in the context of this prison letter, did that signal anything to you based on your experience with the Bureau of Prisons?

A    Yes.

Q    What did that tell you?

A    At that time I thought the letter had invisible ink in it.

JA 341

Q    When you say invisible ink, do you mean you guys give invisible ink to the inmates in the prison?

A    No, sir.  The inmates make their own.

Q    What do they use to make their own?

A    Usually they use urine, or some kind of juice, citrus juice, water, salt, and how they bring the message out, they have to heat it up, and the inmates used to use lighters back in the day when they had lighters for a form of heating the letter up to bring the invisible ink up.

Q    Did the inmates use this to communicate with other inmates in the prison system?

A    Yes.

Q    As well as their associates outside the prison?

A    Yes.

Q    And Mr. Rivas was at this time out of prison, correct?

A    Excuse me?

Q    Mr. Rivas was, at that time, out of prison, correct?

A    Correct.

Q    So, after you got this copy, is that when you called Mrad and told him you needed to see the original, and we should get the original?

A    Yes.

Q    Now, you ultimately you said you did get the original?

A    Yes.

Q    And there was something showing the raised writing that the FBI lab was able to raise?

A    Yes.

Q    I want to show you what's been marked and introduce into evidence as LTD05.  Do you recognize this, Ms. Guzman?  You can hit the screen there, I believe, in the lower corner and clear the arrows, lower right hand corner.  If you would just press it?

         THE COURT:  Just press the screen just at the lower right hand corner.  Just press it.  There we go.

BY MR. GIORNO:

Q    Do you recognize this, Ms. Guzman?

A    Yes.

Q    Can you tell the jury what this is?

A    This is the coded letter that was on the back of the original letter.

Q    The one that was raised by the FBI laboratory?

A    Exactly.  It wasn't invisible ink.  It was indentions, I believe.

Q    It appears from what's there, it appears to be written in Spanish, combination of Spanish and

English.  And were you called upon to translate that?

A    Yes, sir.

Q    And do you have a copy of the indented writing there?

A    I have a copy of the translation.

Q    Okay.  I'm also going to hand you, just so you have it up there, Ms. Guzman, just for your reference, a copy of what appears there on the screen.  I want to go through this coded letter with you for the jury.  Beginning at the top there, the letter, it says -- I can't speak Spanish very well.  Can you tell the ladies and gentlemen of the jury what it says in Spanish and what the translation is?

A    Yes.  It states, "Wacha los que votaron para pegarle al R. fueron El P., Snook y Rigo.  Nomas he did not want me to know" -- oh, god, it's hard to read.

Q    Let's start at the beginning.  You told the jury what it says in Spanish.  What does the first sentence of that coded letter say in English?

A    He says, "Look, the ones that voted to hit R. were P., Snook and Rigo."

Q    Based on your familiarity with Texas Syndicate and their members?

A    Yes, sir.

Q    You know who is El P.?

A    El P., they're referring to Francisco Tijerina.

Q    For the record, T-I-J-E-R-I-N-A?

A    Yes, sir.

Q    And the next name there is Snook?

A    Snook.

Q    Who is Snook?

A    That's inmate Garza, Richard.

Q    G-A-R-Z-A?

A    Yes.

Q    And then it mentioned Rigo, R-I-G-O?

A    That would be inmate Altamirano,
A-L-T-A-M-I-R-A-N-O.

Q    So, it says the ones that voted to hit R. were
these inmates?

A    Correct.

Q    Okay.  Let's pick up with the next line after he
mentions Rigo.  What does it say in English?  What is
the English translation of the rest of that coded
letter?

A    It says, "Only he did not want me to know
because I was going to fight it.  When I got here to
this institution the guy" -- he's referring to inmate
Tijerina, El Vato -- "wanted to wire me up to hit R.,
but I told him show me some paper.  From there we

JA 345

were bumping heads.  To everyone that would arrive here he would run with the same marano" -- meaning pig -- "and would tell them I wasn't worth shit and I shouldn't have been picked up.  El Rigo bought his lie.  Apparently that El P." -- meaning panchito, El Tijerina -- "saw in the computer that R. was a rat. Look, that jura" -- meaning officer -- "was playing with the mind of P., and he told him that this institution was for nothing but chatas" -- meaning snitches -- "and El P. went on that trip.  I was at work when they told me we're going to hit someone. At that time I didn't know who."

Q    Just before we leave that, "I was at work when they told me we were going to hit someone."  In that context what is hit?  How is that used, we were going to hit someone?

A    They're going to assault somebody.

Q    Okay.  "At the time I did not know who"?

A    "I did not know who."

Q    Okay.  Go ahead.

A    "I got to the yard.  P. told me I had to hit R., that the decision was already made.  I had to do it then, and now I saw Rigo and Snook, that they drew near.  I knew what was going on.  If I was to fight them, they were going to hit me.  That's why I had to

do it.  And they got us on status because of P., the carnales on the compound."

Q    You mentioned the names of these other people. You mentioned the names of certain other TS members: Tijerina and Garza and  Moreno-Marquez as being people who voted to hit this R.  Are you familiar with them also being named along with Mr. Caro in another case?

A    Yes.

Q    I want to show you for identification purposes this document.  Do you recognize this to be a superseding indictment in connection with the assault on Ricardo Benavidez?

A    Yes.

Q    It mentions Carlos Caro as a defendant.  Are there other people who are mentioned in that letter who were also shown as defendants with Caro in connection with the assault on inmate Ricardo Benavidez?

A    Yes.

Q    Who is that?

A    Juan Moreno-Marquez, Francisco Tijerina --

Q    That's El --

A    Sammy Enriquez, Richard Garza, and Rigoberto Altamirano and Reymundo Escamilla.

JA 347

Q    Some, those people were the same ones that voted to hit R.?

A    Correct.

Q    Okay.  Now, as a, after you received and translated that letter that was sent by Mr. Caro to Raul Rivas in January of 2004, a couple of months later were you given a letter sent, intercepted that was going to a Mr. Gomez at 131 Continental, San Antonio, Texas 78228 written by Sammy Enriquez, or at least the return address was Sammy Enriquez?

A    Yes.

Q    I want to show you what's been previously marked and introduced into evidence as Mrad01.  Do you recognize the document there, Ms. Guzman?

A    Yes.

Q    What is that?

A    That is the envelope of Sammy Enriquez from Lee County to Mr. Gomez in San Antonio, Texas.

Q    Do you know Sammy Enriquez?

A    Yes, I do.

Q    Is he a TS member?

A    Yes.

Q    Was he one of the individuals named in the indictment along with Mr. Caro that I asked you about that charged them with the assault on Ricardo

Benavidez?

A    Yes.

Q    Are you familiar with Mr. Gomez?

A    I'm familiar with a Mr. Gomez from San Antonio, yes.

Q    Who is Mr. Gomez?

A    I believe it's inmate Nick Gomez.  He's a leader for the Texas Syndicate in the free world in San Antonio, Texas.  We call it the free world.  That means he's not locked up; he's outside of prison.

Q    So, he's leader of the free world of the Texas Syndicate?

A    In San Antonio, or from that region.

Q    Also from this experience are you familiar with this address being 131 Continental, San Antonio, Texas?

A    Yes.

Q    What address is that?

A    That address belongs to Rick Benavidez's brother -- his name is Juan Benavidez -- in San Antonio, Texas.  It is a well known mail drop address for the Texas Syndicate.

Q    What do you mean mail drop?

A    The Texas Syndicate tend to write letters to inmates in other institutions.  In order to do so

they have to write the letters to somebody that is not incarcerated. Then those people, for instance in this case in San Antonio he will, in turn, send the letter to another institution to pass on information for the Texas Syndicate.

Q   So, it's kind of like a conduit to get information out to the other TS members?

A   Correct.

Q   All right. Did you have occasion to review the letter that was contained in that envelope addressed to Mr. Gomez at that drop box?

A   Yes.

Q   I want to show you again what's part of Government Mrad01. Do you recognize this document?

A   Yes.

Q   I want to start first of all with the bottom, the signature. The first line it says CTR Caro. What is CTR?

A   It stands for with all due respect.

Q   The next line says respect?

A   C. Snook.

Q   Who is Snook?

A   Snook is inmate Garza.

Q   Okay. He's one of the inmates named in the Benavidez indictment?

JA 350

A    Yes.

Q    And then the next line, alto respeto Moreno?

A    Moreno, he's Moreno-Marquez.

Q    He's one of the inmates in connection with the Benavidez stabbing?

A    Yes.

Q    The next one is Chivo?

A    Chivo is the author of the letter.

Q    What does Chivo mean in Spanish?

A    Goat.

Q    And then the next line down it says respetablemente, Rigo.  That's inmate Altamarino?

A    That's inmate Altamarino.

Q    And then respetablement Mick.  All those people are in connection with the Benavidez stabbing, correct?

A    Correct.

Q    I want to ask you to read the letter, and see if we can -- again, it's written partially in English, partially in Spanish.  Can you tell the ladies and gentlemen of the jury what this letter says?

A    Yes.  It says, "Respectable" -- and it has a blank referring to carnales or brothers.  It's my experience that they do use carnales and brothers, but sometimes they try to leave it out so they won't

draw heat to themselves.

Q    When you say carnales or brothers, are they talking about their blood brothers or their gang brothers?

A    Gang brothers.

Q    Is that something typically a point of reference word the Texas Syndicate guys use in referring to other gang members?

A    Yes.

Q    Go ahead, please.

A    "The present is to greet everyone system wide."

Q    What is that system?

A    This letter is being sent to one person, but it's supposed to go to everybody incarcerated.

Q    Shall -- all people incarcerated, or the TS members?

A    The Texas Syndicate members.

Q    Okay.  So, it's supposed to go to someone system wide that's incarcerated?

A    Yes.

Q    What system is this they're referring to?

A    Excuse me?

Q    What system?

A    The federal system.

Q    Bureau of Prisons?

A    Bureau of Prisons.

Q    Go ahead.

A    "Or wherever you all may receive this present. Greetings and respects are being sent from this side of the feds.  With all respect and moving to the purpose of the present it's necessary sincerely to clear without a doubt the matter that's been placed on the procedure in respect to blank Benavidez," meaning Rick Benavidez.

Q    When it talks about it's necessary to clear without a doubt the matter that's been placed under procedure with respect to Benavidez, do you know what they're trying to do there, trying to accomplish?

A    Inmate Benavidez had been stabbed by the Texas Syndicate members, and they had done this attack on him without purpose, there was no reason to do it, so now they're trying to send word to clear that Benavidez is in good standing.

Q    Trying to get themselves in good standing, as well?

A    Exactly.  "At this moment it's asked and let be clear that everything is good or clear with this person.  Therefore, there is no or doesn't exist any testification against one or any brothers of ours Texas Syndicate.  Made or declared by this firm and

strong" -- and then he's put a blank there, but I don't know what he was referring to.  "Your full attention and patience is asked.  For always we try to obtain black and white with respects to this matter for which is still under process by the Government.  We ask respectably the notation of the present, as a must, and receive greetings and sincere respects from all brothers here present."

Q    And then it has the signed, where it says with all due respect it has the other signatures of the individuals?

A    Correct.

Q    With regard to these translations of the letters did you prepare reports containing the translations?

A    Yes.

Q    Let me have first the one you did on Mr. Rivas's letter.

A    Yes.

Q    Do you have that there?

A    Yes.

Q    Ms. Guzman, I'm going to show you what I have marked as Government's Exhibits 25 and 26.  Beginning first with Number 25, is that the translation of the Raul Rivas letter that you've testified for the jury today?

A    Yes.

Q    And 26 is that your translation of the Mr. Gomez letter that you testified to today?

A    Yes.

MR. GIORNO:  Move for introduction of Government's Exhibits 25 and 26.

THE COURT:  They will be admitted.

(Government's Exhibit Nos. 25 and 26 were received in evidence.)

MR. GIORNO:  Those are all the questions I have of this witness.

THE COURT:  Cross examination?

CROSS EXAMINATION

BY MR. KALISTA:

Q    I just have a very brief question.  My understanding -- are you able to recall what the date of your report for Exhibit Number 25 was which concerns the translation of the letter to Eduardo Rivas?  In other words, when did you do that and make your report?

A    I made one draft back in January of '04.

Q    Okay.  But this draft would be, this draft, Government's Exhibit Number 25 would have been made approximately when?

A    In January of '04.

Q    Okay.  And basically that is your final draft?

A    No, my final draft was made in January of '07.

Q    Okay.  Just as far as I understand it in terms of looking at Government Exhibit Number 25, when the, under the translation, and I'm looking at the first line, "Look, the ones that voted to hit are," am I understanding you correctly that refers to Ricardo Benavidez's number 57639-080?

A    Yes, sir.

Q    Thank you.

THE COURT:  Thank you, ma'am.  You may step down.  If you'll wait outside.  You may call your next witness.

MR. GIORNO:  Call Dan Olson.  May this witness be released?

MR. KALISTA:  If she could stay around.

THE COURT:  If you'll wait outside, ma'am, you're not released yet.

DANIEL B. OLSON, GOVERNMENT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. GIORNO:

Q    Good morning, sir.

A    Morning.

Q    Would you state your full name for the jury?

A    Daniel Burton Olson.

Q    Mr. Olson, what is your occupation or profession?

A    I'm a Unit Chief of the Crypto Analysis Section and the Racketeering Records Division.

Q    What do people in the Crypto Analysis Unit do of the lab?

A    We're basically code breakers.  We're a group of 20 individuals in the unit that break coded messages from any type of criminal terrorism, any type of case that the FBI brings to us.

Q    Does that include breaking codes devised by inmates who are incarcerated at various state and federal penal institutions?

A    I would say a good 50 percent or more of our work is with inmates.

Q    Okay.  From your experience do inmates use code to communicate with other inmates and also with people on the outside?

A    Yes, they do.

Q    Are these codes fairly sophisticated or are they fairly rudimentary?

A    Sometimes extremely sophisticated.

Q    Now, you've said you had occasion to intercept and break codes coming from both federal and state penitentiaries; is that correct?

A    That's correct.

Q    Are you familiar with the United States penitentiary in Florence, Colorado referred to as ADMAX?

A    Yes, I am.  I've been there.

Q    How many times have you been out to ADMAX?

A    I did a survey of their communication, of the ability of inmates to communicate out there on one occasion for about a full day at ADMAX.

Q    How long ago was that?

A    Approximately three years ago.

Q    What was the purpose of that visit out there? What were you asked to do?

A    I was asked to assess the, basically look at the inmates, the way they're housed from a communication point of view, how easy or difficult would it be for them to communicate, and what efforts would we need to know if we were going to either intercept or exploit their communications.

Q    Okay.  Did you learn whether or not inmates can communicate both internally to ADMAX and also from ADMAX to places outside ADMAX?

A    They can do both.

Q    Typically how do they do that?

A    Internally, we found that inmates could

communicate from cell to cell.  They could speak and hear each other, messages could flow in and around between cells, possibly even between blocks.  We also found that they communicate regularly outside the prison through letters.  Although their letters are often photocopied or looked at, there were ample opportunities for them to communicate outside the prison, as well.

Q    Okay.  Are you aware of any instances based on your experience where the coded letters have gotten past the SIS office at ADMAX and been communicated to people outside the prison?

A    Unfortunately, yes.

Q    Okay.  And -- okay.  I want to ask you about one case in particular involving a code that was sent in 1997, a coded letter?

A    Yes.

Q    Can you tell the ladies and gentlemen of the jury about that how that was done and who did it?

A    That incident basically involved members of the Aryan Brotherhood which, I believe, is identified as a disruptive group.

Q    One of five disruptive groups?

A    I believe so.  A letter was written by a member of the Aryan Brotherhood.  It actually had two

JA 359

concealed messages in it.  The letter was sent from ADX.  It was photocopied.  However, there was nothing by looking at the letter that would indicate there was a code or cypher in the letter if you just glanced at it.  And it was sent out, the results of which later on there was an assault that ended up in another institution across the country in which two inmates were killed.  That assault was tied back to that letter.

Q    Okay.  How did you get the letter, the original letter if it went out?

A    We didn't.

Q    So, this --

MR. SIMMONS:  Your Honor, may we have the jury out, please?

THE COURT:  Ladies and gentlemen, if you'll follow the bailiff out, please?

(The jury retired to the jury room, after which the following occurred:)

THE COURT:  Yes, sir, Mr. Simmons?

MR. SIMMONS:  Your Honor, I talked to the Government about this witness earlier today.  It was my understanding he had decoded this letter, he had actually seen the letter and he decoded it.  And based upon the answer I've just received, it's my

understanding that, in fact, he never saw the letter. It's simply based upon hearsay, upon hearsay. I'm going to object to his entire testimony in regard to this letter. If I could voir dire the witness I think I can make it very clear the basis of that objection.

THE COURT: What letter are we talking about? The Aryan Brotherhood letter?

MR. GIORNO: Yes, Your Honor. I discussed this with defense counsel earlier. Technically, if we were going to call Mr. Olson he would be a rebuttal witness. We had time today, and Olson is here, we anticipate Dr. Cunningham is going to testify about certain procedures at ADMAX, we heard some of that through Officer Mrad. What Agent Olson's testimony is going to relate to is the types of codes used to show that in spite of the best measures at ADMAX inmates are able to communicate in code, and we'll explain one of the codes that he, as I understand it, personally worked on and personally broke, and explain to the jury briefly how that works.

THE COURT: So, again, what's the dispute, Mr. Simmons? This is in the form of, I guess, expert testimony about the workings of the prison system.

Tell me what the objection is.

MR. SIMMONS:  It's my understanding he is testifying about a letter in 1997, certainly is very remote, that according to my information was sent from an inmate at ADX supposedly to a person on the street who then supposedly sent it to another inmate in Lewisburg, and as a result of that perhaps someone was killed, someone was not.  There's an inmate by the name of Benton who testified about receiving a letter, but the letter, itself, according to Benton's testimony, was destroyed and the letter, itself, was never analyzed by anyone from the FBI.  Nobody ever saw the letter.  It's simply based upon an inmate's testimony who was testifying on behalf of the Government.  So, I don't think there's a factual basis for him to testify concerning a specific letter in 1997 that was never analyzed by the FBI, nor even seen by the FBI.  And the basis of this is a witness who is not here today who was an inmate who testified that he destroyed the letter.  That's the basis of my objection, is this particular letter has never been seen or analyzed by the FBI.

MR. GIORNO:  As I understand it, this letter, I mean it didn't have indented writing, like the one of Mr. Caro's in this case.  It was strictly

a letter that on its face was coded.  They had the copy, and this agent personally talked about, will talk about the code, and how it went out, but they have the copy of the letter, after the fact.  They learned about this letter and picked it up.  But it bears the return address from Florence, Colorado.

THE COURT:  Well, I'm going to overrule the objection.  The, I think the witness has been adequately qualified to testify as to practices, criminal practices in federal facilities through his experience, and he can relate the knowledge that he has learned through that experience, and he is subject to cross examination.  And his, his testimony, like all other witnesses, can be attacked in that way.  And so I'm going to overrule the objection.  Are we ready, then?

MR. GIORNO:  Yes, sir.

THE COURT:  If you'll have the jury back, in, please.

(The jury entered the courtroom and was seated in the jury box.)

BY MR. GIORNO:

Q    Mr. Olson, you started telling the jury about this coded letter that was intercepted in 1997, sent by a member of the Aryan Brotherhood who was in

Florence ADMAX at the time; is that correct?

A    That's correct.

Q    I asked you about whether inmates used codes, either very simple or fairly sophisticated. You said some of them are fairly sophisticated. This letter that got by the SIS, was it simple or was it sophisticated?

A    It was extremely complex.

Q    Is it possible to explain to the jury, and perhaps with the consent of the court demonstrate for the jury briefly what this type of code was used in this particular letter? It's my understanding you personally worked on this code and broke the code; is that correct?

A    Yes, I received copies of the message, itself, in 2005, and issued a laboratory report as to the coded message in the report.

Q    Would you explain to the jury, if you could, please, what that type of code that was used by the inmate in that particular case that got out of ADMAX?

A    It was actually cypher, what we would call a concealed cypher. Codes and cypher, we use the term code all the time, and I'll use it today, but there's really three different types of encrypted communications, we call them. There's codes,

cyphers, and concealments. A concealment would be, for example, secret ink, or hiding a message within a document. That's a concealment. Concealments, the security of a concealment involves not being aware the message is there at all.

There's another type of encrypted communication called a cypher. A cypher involves replacing letters of the alphabet with a, in a message with some other value. It could be a number, a word, it could be a character. Something is being replaced.

The third method is called codes, themselves, code words. That would be something as simple as pre-arranging to use, if I wanted to conceal the fact that we had a birthday party scheduled for my daughter, it was a surprise party, we could talk about the dentist's visit and my daughter wouldn't know what we were talking about but my wife would. That's an idea, example of a code.

The letter that was intercepted or actually photocopied at ADX that I was able to examine actually contained code, cypher and concealment, all three.

The concealment, actually the message -- let me step one step back. The message was enciphered, meaning it was changed. The characters in the

message were changed into something else, and then it was concealed within the letter, itself.

Q    Okay.  And so on its face, to some Bureau of Prisons official or SIS official, would there be anything insidious or alarming in the letter as it went out as it was originally written?

A    No.  It's a very innocent looking letter.

Q    Okay.  Do you have the letter there?

A    I do.

Q    What does the letter say if you read it on its face?

A    The letter says, "Bubba, just a line to let you know all is well and hoping you are the same.  Well, I am a grandfather at last.  My boy's wife gave birth to a strapping eight pound seven ounce baby boy, of course.  Being a grandfather does not necessarily mean I feel like one.  After all, you're only as old as you feel, right?  My own son should be having pictures soon, and I'll be sure to get you one. Speaking of old, only arthritis is kicking up so I'm going to go.  Before I forget, tell your mama I'll try to get to answering her letters this week.  Love, me."

Q    Okay.  That was again sent from, according to the envelope, it was sent by whom?

A     This letter is sent from the address, it's from T.D. Bingham from Florence, Colorado to Mr. Byron Guthrie in Oakland, Colorado.  It's date stamped August 26th, ADX Florence.

Q     Did the SIS folks there at Florence photocopy it and let the original go out?

A     That's my understanding.

Q     When was it that you were asked to examine that letter?  Was it long after the fact?

A     It was in March 8th of 2005 that we received the letter with the request to examine it for presence of the coded message, and try to break any code we might find.

Q     I believe you told the jury it contained different types of codes.  By way of illustration, without going through all the different kinds of codes, can you give the jury an example of what you were talking about?

A     Yes.  In this case we found two different codes. The first one was code words.  We found in the message, itself, a reference, the reference to my boy's wife gave birth to a strapping eight pound seven ounce baby boy.  Being a grandfather -- it goes on.  The mention of a strapping eight pound seven ounce baby boy is believed to be a code for, to

conduct a murder hit.  The strapping eight pounds, seven ounce, eight seven is a known and recognized code within the Aryan Brotherhood for murder.  It's actually based on California's penal code for murder, which is Penal Code 187.  So, for them to say strapping eight pound seven ounce is a reference to a murder hit.

The mention to a baby boy is recognized in the Aryan Brotherhood as an acknowledgement that it is going to happen, or it is what they call a green light.  It's on, it's approved.  If it was a baby girl, it would be, the murder is not approved, or the hit is denied.  So, we have two, basically two codes here, 87, meaning murder, and baby boy acknowledging that it will occur.

Q    You said there was another type of code contained in that letter that further elaborated on that?

A    Yes.  There's actually a second code within the message, itself.  It's actually a concealment.  The words and the individual letters -- I'm sorry, the characters in this letter are actually concealing another message embedded within the letter, itself.  It's called a Baconian cypher.  It was invented by Sir Francis Bacon at the time of William Shakespeare,

JA 368

and it was actually used to conceal a message in here.

Q    After you broke that code, using the Baconian cypher what does that message say?

A    The Baconian message says, "Confirmed message from Chris to move on.  DC."

Q    Okay.  You, you said there were a couple of people that were assaulted.  Would those have any affiliation to DC?

A    What I understand, in Lewisburg, Pennsylvania two African American inmates were assaulted and killed following this letter.  Both were associated with what they call DC Blacks, or DC Crew, or any number of names.  They are federal inmates from the District of Columbia that were in the federal system.

Q    You say this letter got out of ADMAX?

A    It did.

Q    Now, from your examination, your experience down there at ADMAX did you find other methods that the inmates used to communicate to send messages to the outside world from ADMAX?

A    They can make phone calls.  They can write letters.  The letters, although many of them are photocopied, the actual letters actually do leave ADMAX, so we identified the possibility that they

JA 369

could use indented writing on the envelopes, or on the documents, themselves. They could also use invisible ink on the documents, or within the information or contents. They could write underneath stamps. There's any number of different methods that you could still use to communicate in and out of Florence ADX.

Q    Is there any way you can guarantee that the officials there at the Bureau of Prisons at ADMAX, or any other institution for that matter, can intercept all the coded messages out of an institution?

A    There's no way of knowing.

Q    Answer any questions of defense counsel.

THE COURT:  Cross examination?

CROSS EXAMINATION

BY MR. SIMMONS:

Q    Good morning, sir. I'll try to speak up. The letter that you were talking about, that letter was written in 1997; is that correct?

A    Correct.

Q    It was written by Aryan Brotherhood?

A    Yes.

Q    It had nothing to do with the Texas Syndicate?

A    No.

Q    And Mr. Carlos Caro, who is seated at the table,

any of the testimony here today has nothing to do with him as an individual; is that correct?

A    That's correct.

Q    Know nothing about him, whatsoever?

A    I have been privy and examined letters written by Mr. Caro.

Q    Is that the letter that's been previously testified to today?

A    I believe so.

Q    Okay.  Other than that letter, are you familiar with any letters that Mr. Caro had written?

A    No, I'm not.

Q    I believe that letter would go into the category of being very unsophisticated?

A    I wouldn't consider that unsophisticated.

Q    Written in secret ink, I believe?

A    That one I would classify as indented writing actually, but it would not be considered unsophisticated.

Q    Certainly those means are very common within the Bureau of Prisons between inmates and inmates?

A    They are.

Q    And the security staff of the Bureau of Prisons, they are trained to detect these; is that correct?

A    They are.

Q    And the codes that you testified about today, have you shared that information with the Bureau of Prisons, and they are trained to detect these codes; is that correct?

A    We do our best to train them.

Q    In fact, you went to ADMAX three years ago and conducted a security survey?

A    Essentially.

Q    And the weaknesses which you then would detect you would discuss, and this could change or implement policy in response to your survey?

A    Unfortunately I observed many weaknesses, but I don't know that there's any policy you could do to stop the weaknesses we saw.

Q    Could certainly identify, though, weaknesses?

A    Yes.

Q    Course, you can't guarantee that inmates cannot communicate with other inmates or people in the outside world?

A    No.

Q    But you can reduce the risk of that; is that correct?

A    Sure.

Q    And that's the goal of the Bureau of Prisons, is to reduce that risk to an acceptable level?

JA 372

A    I don't know what's an acceptable level, but I would suppose, yes.

Q    And Florence ADMAX is the most secure facility in the Bureau of Prisons; is that correct?

A    That's what I've been told.

Q    And the letter you have from 1997, is that the only example you have of a letter from the ADMAX that you have -- let me ask you, you received that letter in 2005?

A    Correct.

Q    Okay.  Is that the only letter you have from ADMAX?

A    No, it's not.

Q    The other letters, what other letters do you have, and how many?

A    I've probably reviewed close to 1,000 or 1,500 letters from ADMAX.

Q    From ADMAX?

A    Yes.

Q    Those are letters that were intercepted by the Bureau of Prisons and then sent to you?

A    They're generally photocopied and we get copies.

Q    So, in fact, their security measures are working and they are identifying them and sending them to the FBI for analysis?

JA 373

A    They're doing photocopies, but unfortunately we're not able to receive the originals.

Q    Sometimes you receive the originals; is that correct?

A    That's correct.

Q    The Bureau of Prisons can notify the FBI that they want a letter intercepted, and then the FBI can then obtain a search warrant to get the original letter?

A    I'm not sure of the exact procedures how it works on their side.  If they know, if they happen to notice a coded message, they would certainly send it to us.  But what our fear is, the number of messages that they are not noticing.

Q    You have no idea what those numbers are?

A    No.

Q    You gave the example of the one letter in 1997 that apparently resulted in an assault or a killing in another institution; is that correct?

A    That's correct.

Q    Other than that one letter, you don't have any examples of a letter from ADMAX that resulted in a killing in another prison; is that correct?

A    That's the only one I've been involved with.

Q    That was over ten years ago?

A    Yes.

Q    And in your visit to ADMAX, their means of communication is their telephone calls are monitored; is that correct?

A    I understand they are.

Q    And letters obviously can be opened and photographed before they're sent?

A    I understand that.

Q    Visits are monitored?

A    I don't know anything about visits.

Q    Okay.  Have you ever worked at ADMAX?

A    No.

MR. SIMMONS:  I believe that's all I have. Thank you.

MR. KALISTA:  One second.

THE COURT:  Yes, sir.

BY MR. SIMMONS:

Q    Do you know when the ADMAX facility was opened?

A    I don't.

Q    Okay.  Thank you.

THE COURT:  Anything further?

MR. GIORNO:  Nothing for this witness.

THE COURT:  Thank you, sir.  You may step down.  You may call your next witness.

MR. BROWNLEE:  The United States calls

Kevin Dye, sir.

MR. GIORNO:  May this witness be excused?

THE COURT:  Any objection?

MR. KALISTA:  No, sir.

THE COURT:  You may be excused, sir.  Thank you.

KEVIN DYE, GOVERNMENT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. BROWNLEE:

Q    Good morning, sir.

A    Good morning.

Q    Would you please state your first and last name, and spell both for the court reporter?

A    My name is Kevin Dye.  K-E-V-I-N, D-Y-E.

Q    How old are you, sir?

A    I am 32 years old.

Q    Where do you live?

A    I live in Kingsport, Tennessee.

Q    I'd like to take you back to August of 2003, if I can, and ask you where were you working at that time?

A    At that time I was working for United States Penitentiary, Lee County.

Q    If I could ask you to speak up?

A    I was working for United States Penitentiary,

Dye - Direct

Lee County.

Q    What was your job at Lee, at USP Lee?

A    I was a Recreation Specialist.

Q    Would you tell the ladies and gentlemen of the jury what does a Recreation Specialist do at USP Lee?

A    Recreation Specialist, we would supervise and work the recreation yard, recreation activities for the inmates.  We would design programs and different recreational type activities for the inmates to participate in when they were not working or doing other things in the institution.

Q    Okay.  Tell the ladies and gentlemen of the jury the kind of activities that are offered by USP Lee for the inmates.

A    USP Lee, at that time we offered intramural sports such as basketball, volleyball, softball, flag football, handball.  We had a leisure services activities that consisted of what we call hobby craft, which would be anything from arts, leather working, sewing.  We also had instruments for musicians to play and practice.  We also provided a movie a few times a week.  We had board games, we had a television set up in the main activity room for sports, to watch the major sporting events, things of that nature.

Dye - Direct

Q    Now, in August of 2003 how long had you worked at USP Lee?

A    Approximately two to two and a half years.

Q    Okay.  I want to direct your attention, if I can, to August 29th of 2003.  Were you working at USP Lee that day?

A    Yes, I was.

Q    Specifically, at around 6:00 that evening, where were you working?

A    I was working in the leisure services area which we call passive recreation.

Q    Go ahead?

A    Passive recreation was where movies, board games, the arts and crafts, and those type of activities were held.

Q    And so passive recreation is an area within the prison.  Is it like a big room with rooms off of it?

A    Yes.  It consists of one large room surrounded by several smaller rooms, and a main office in the middle of that area.

Q    The inmates, when they're in passive resistance (sic), are they handcuffed or shackled in any way?

A    It's passive recreation, and no, they're not.

Q    They're able to, essentially they could play ping pong, they could play cards, they could watch a

movie, work on a musical instrument, all things

within passive recreation?  And were you there that

day?

A     Yes, I was.

Q     Were you essentially the supervisor that day?

A     Yes, I was.

Q     Did you have an office in that facility?

A     Yes, I do.  The recreation specialist office in,

within that area is centrally located with windows on

all sides so you can see all the various areas and

what was going on.

Q     When you were working there are you armed in any

way?

A     No, just have, have a radio.

Q     Just have a radio?

A     Uh-huh.

Q     On 6:15, August 29, 2003 did something occur

within passive recreation that drew your attention?

A     Yes, there was.

Q     Tell the ladies and gentlemen of the jury what

happened.

A     That night we had had a movie scheduled to show

starting approximately between 6:15 and 6:30,

depending on when the moves were over.  At the

institution we run moves every hour, and we try to

start the programs when the moves are finished. Sometimes --

THE COURT: Tell the jury what you mean by moves.

THE WITNESS: A move is when over -- the institution has a PA system, and on the hour, the, the Ops personnel would say a move at this time. A move is when an inmate can go from one area of the institution to another through various corridors and metal detectors and check points. At that, on that night we had had a movie scheduled for 6:30, which if things were going on schedule, which they were that night, that meant the move would be over about 6:15 and that would give the inmates time to get themselves settled, situated what they wanted to do for that hour of activity. And we were having a movie scheduled that night. Around 6:15, 6:30, right after everything had, the move had finished and we had got the program up and running, there's a lot of noise and commotion, and a fight had started to break out.

BY MR. BROWNLEE:

Q    And that fight was at, coming from the movie room?

A    Yes.

JA 380

Q     Now, do the inmates like to have the lights off when the movies are playing?

A     Yes, they do.

Q     And that's a constant struggle, I understand?

A     Yeah.  It's a struggle between officers and the inmates.  They like to have the light off to watch the movie because the television, it's not a large television, but it's good enough for a room of about ten by about 15 feet, and they would like to have the lights off to watch the movie, which we didn't like that because you can't see very well in there.  So, the officers were constantly trying to turn the lights on.

Q     So you said some fight broke out in the movie room.  What did you do, and tell us what you saw?

A     When the fight broke out I had heard just some loud, loud noises, which were plastic chairs being scattered about on a, on a linoleum, concrete type floor.  It's a very distinct sound.  When I had gotten up to see what was happening I noticed several inmates getting out of the movie room.  That, in that response I knew something was going on, and I saw an inmate come out with two other inmates hitting him, and looking like they were stabbing at him.  He was covered in a sufficient amount of blood, so, I had

Dye - Direct

called for assistance, and when an officer sees something of that happen, we're trained to go on your walkie talkie, your radio and ask for assistance. When an officer says, "Officer needs assistance," that lets everybody know working at the institution that there's something very serious going down. At that time I just said over my radio, "Officer needs assistance in passive recreation." Recreation is so large I wanted to be sure the officers who would be responding would know where to come. I repeated that two or three times.

Q    What did you see?

A    I saw an inmate with a white tee shirt on getting hit and stabbed in the chest and the facial areas, and he was trying to fight back. After I made the call for assistance, I just started yelling really loud for them to stop, quit fighting, break it up.

Q    Did they stop?

A    No, no. And the inmate that was being assaulted made some eye contact toward my direction when he heard my voice, and he started to back his way toward me. And once he got to my office, I grabbed his shirt and shut the door, and locked it. The other two inmates, while he was getting there, were still

JA 382

trying to come at him, and they hit him a few more times as he got to the door. And that's why I slammed it and shut the door. I didn't want the fight coming into the office with everyone in there.

Q    Now, was one of the inmates who was attacking the other inmate Carlos Caro?

A    Yes.

Q    Sir, the first thing I'd like to show you is a disk that's been marked as Video 4.1 and Video 4.2. Have you had an opportunity to review the video of this incident from both angles before court here today?

A    Yes, I have.

Q    Do those videos fairly and accurately depict on, what you saw on August 29, 2003 in passive recreation?

A    Yes, they do.

        MR. BROWNLEE:  Your Honor, at this time I would move the disk, it's a disk with two different angles, Video 4.1 and Video 4.2.

        THE COURT:  It will be admitted.

    (Government's Exhibit Nos. Video 4.1 and Video 4.2 was received in evidence.)

BY MR. BROWNLEE:

Q    Have you also had an opportunity to review some

photographs?

A    Yes, I have.

Q    First thing I want to show you is RB.26, RB.27, 28, 34, 35, 36, 38, 39, 31, 32, 64, 68, 69, 60, 33, 48, 75, 76, 85 and 89F.  Have you had an opportunity to review those before coming here to court today?

A    Yes, sir, I have.

Q    What are those photographs of?

A    The Passive Recreation and Leisure Services Center.

Q    These were taken after the assault; is that correct?

A    Yes.

Q    Do they accurately reflect what you saw on that day?

A    Yes.

Q    We'd move those into evidence.

        THE COURT:  They will be admitted.

    (Government's Exhibit Nos. RB.26, RB.27, 28, 34, 35, 36, 38, 39, 31, 32, 64, 68, 69, 60, 33, 48, 75, 76, 85 and 89F were received in evidence.)

BY MR. BROWNLEE:

Q    The next series is RB.01, 02, 03, 04, 05, 08, 09 and 15.  And have you had an opportunity to review these photographs, sir?

A    Yes, I have.

Q    And generally what are these photographs of?

A    Those are photographs of the inmate that was assaulted.

Q    Okay. And you've had an opportunity, and you actually saw him in this condition after he was assaulted; is that correct?

A    That's correct.

Q    Did those pictures fairly and accurately depict his condition at that time?

A    Yes, sir.

       MR. BROWNLEE:  We move those into evidence.

       THE COURT:  They will be admitted.

    (Government's Exhibit Nos. RB.01, 02, 03, 04, 05, 08, 09 and 15 were received in evidence.)

BY MR. BROWNLEE:

Q    Sir, I'd like to begin by showing you Video 4.2. Now, if you can, if you look to the right on your screen, can you show us where the movie room is as we're looking at this video? If you'll just touch the screen I think a green dot will come up.

A    Okay.

Q    So, in the upper right hand corner, that's the movie room?

A    Yes, sir.

Q     Is it fair to say that your office is on -- put a line where your office would be.  I don't think you can see it on this.  Your office is there?

A     Uh-huh.

Q     Okay.  So, when you heard this assault break out you looked down toward the movie room; is that correct?

A     That's correct.

Q     Okay.  Now, are these the inmates pouring out of the movie room?

A     Yes, sir.

Q     That's what drew your attention to it; is that correct?

A     Yes, sir.

Q     Now, where that movie room is, you see an individual will come out with a white tee shirt on?

A     Yes, sir.

Q     Do you know who that is?

A     Yes, that is inmate Benavidez.

Q     Is that the victim in this case?

A     Yes.

Q     What did you see happening down there at that time?

A     He was, he was, he was trying to fight back and defend himself.  I think in this frame here, he's got

JA 386

his leg up, in a kicking motion, and he's kind of got his arms crossed to block.

Q    Could you see inmate Caro at that time?

A    In a few seconds.  Right now it's only showing some darkness in the doorway.  They come, as they come out a little bit you can see Caro.  Okay.

Q    Okay.  And which one is inmate Caro?  Okay.  And there's another defendant, as well; is that correct?

A    That's correct.

Q    There were two who assaulted Mr. Benavidez?

A    That's correct.

Q    And Mr. Benavidez is in the white tee shirt there?

A    Right here.

Q    Okay.  If you will hit the bottom right hand, those green dots should go away.

THE COURT:  Just touch the corner, lower right hand corner of the screen.

BY MR. BROWNLEE:

Q    Okay.  Is that inmate Caro right toward the front?

A    Yes, right there.

Q    Okay.  Go ahead.  Now, on the video here you see inmate Caro place something on the television, near where there's a television.  There.  Were you able to

see that at the time?

A    At the time I didn't see that.  I was, Benavidez, I had the door locked and he was in the office.

Q    Go ahead.  What's going on now, sir?

A    The officers that, those are the officers that are responding to the call, and that is inmate Caro and the other assailant being secured.

Q    Is that you in the picture there?

A    Yes.

Q    Now I want to show you from a different angle, and this is essentially the opposite angle that, from this angle we're going to be able to see your office; is that correct?

A    That's correct.

Q    Stop it there.  Can you show by touching where your office is, sir?  Okay.  So, your office is there.  And in which direction is the movie room?

A    Movie room is back here in this far corner.

Q    Okay.  Now, I noticed that when Mr. Benavidez, when you were able to pull him in, what were you thinking at that time?

A    To get the door shut.

Q    Could you see inmate Caro and the other inmate coming toward you?

Dye - Direct

A    Yes.

Q    All right.  Did inmate Caro do anything to try to stop you from closing the door, or anything like that?

A    I was acting really fast, and I just knew they were as close to him as I was, so I really just tried to slam the door.

Q    Is it a big door?

A    It's a big door.  It's a heavy door.

Q    And you were able to swing it and get it shut and lock it?

A    Yes.

Q    Did they do anything on the outside of the door?

A    No.  They had, they stood there for a few moments, just looking through.  It seemed like a few moments.  It was probably really fast.

Q    What was the condition of Mr. Benavidez?

A    He was tore up pretty bad.  He had a lot of wounds.

Q    I want to go through some of these photographs, sir, if we can.  RB26.  What is this, sir?

A    That's the main door into Passive Recreation Leisure Center.

Q    RB27?  What is that, sir?

A    That's the main room.  That's where the common

JA 389

area is where there's tables for cards, backgammon, chess, Scrabble, ping pong table.

Q    So, those two inmates we saw playing ping pong there in the video, that's the photograph of that table?

A    Correct.

Q    RB28T.  What do we see here, sir?

A    You're looking from the perspective below the ping pong table across the room to your left.  In this area behind this door is where the movie room is located.

Q    So, those chairs outside, they came from the movie room; is that correct?

A    Yes.

Q    RB34, what is that?

A    That's the music room.  That is in the corner beside the movie room.

Q    Okay.  RB35.  What is that?

A    That's inside of the music room.

Q    Okay.  And so all this is inside passive recreation?

A    Yes, it is.

Q    RB36?

A    That is a game room, just another common area.

Q    RB38?

JA 390

A    That's the issue room.  It's a room where inmates can use their inmate identification to check out different board games, or a musical instrument to take it to the music room.

Q    There's a wall there.  Is that the wall that the two inmates were on the side to the left of them?

A    Yes.

Q    RB39, that's inside of that room; is that correct?

A    Yes.

Q    RB31?

A    That is the door going into the movie room.

Q    Okay.  So, when we saw that door to the movie room, it's this door here?

A    Yes.

Q    RB32?

A    That is inside the movie room.

Q    RB64.  What do we have here, sir?

A    That's blood on the floor.

Q    RB68?  What room are we looking at now, sir?

A    It's still the movie room.  That's the doorway that you have to go through to get into that room to watch the movie.

Q    What is on the door frame, the movie room?

A    That's blood.

Q    Okay.  RB69?

A    That's blood on the floor outside of the entrance way to the movie room.

Q    RB60 now, this is a photograph -- what room are we in now?

A    You're still in the movie room, but you're standing beside the television looking out into the main activity room.

Q    Can you see your office there?

A    Yes.  My office was right here.

Q    Okay.  RB48, now, is this, what is this a picture of?

A    That's the picture of the Recreation Office.  It's the supervisor's office.

Q    Now, this is the frame to the door to your office?

A    Yes.

Q    What's on both sides of that?

A    Blood.

Q    Okay.  RB75, is that another picture of the blood outside of your office?

A    Yes.

Q    RB76, that's more blood on the outside of your office?

A    Yes, sir.

JA 392

Q    RB85, now, are we inside your office now?

A    Yes.  That's standing inside the office looking out at the common room.

Q    And RB89, what is this, sir?

A    That's blood.

Q    That's inside your office?

A    Yes.

Q    Now, you testified that you had an opportunity to see the victim of the assault after it was over; is that correct?

A    That's correct.

Q    And they were providing him medical attention at that time?

A    That's correct.

Q    RB.01, is that the victim of Mr. Caro's assault?

A    Yes.

Q    RB.02, RB.03, RB.04, RB.05, RB.08.  Did the victim have puncture wounds to his back?

A    Yes, he did.

Q    And were you there when the medical staff was trying to clean some of these wounds?

A    Yes.

Q    Can you tell the jury what they had to do to them?

A    They had to clean them, dress them, disinfect

them.  They also had to use common swabs to check the depth of the wound.

Q    Were they deep?

A    Yeah, some of them were pretty deep.

Q    RB.09, another photograph of his back.  RB.15. Did he also have a wound to the back of his head?

A    Yes.  He had one here, and then another one up here.

Q    Do you still work for the prisons, sir?

A    No.

Q    Thank you.

THE COURT:  Cross examination?

MR. KALISTA:  Judge, we have no questions.

THE COURT:  Thank you, sir.  You may step down.  May this witness be excused?  You may be excused, sir.  Thank you, ladies and gentlemen. We're going to take a break now.  If you'll follow the bailiff out, please, we'll be in recess for about 15 minutes.

(The jury retired to the jury room, after which the following occurred:)

THE COURT:  Is there anything before we take a break?

MR. BROWNLEE:  No, Your Honor.

THE COURT:  Very well.  We'll be in recess.

(Recess from 10:35 a.m. to 11:00 a.m.)

THE COURT:  Are we ready for the jury?

MR. GIORNO:  Yes, Your Honor.

THE COURT:  We'll have the jury in, please.

(The jury entered the courtroom and was seated in the jury box.)

THE COURT:  You may call your next witness. If you'll be sworn again, sir.

DAVID MRAD, GOVERNMENT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. GIORNO:

Q    Mr. Mrad, good morning, again.

A    Hello, sir.

Q    Officer Mrad, were you the lead Bureau of Prisons investigator in connection with an incident that occurred at USP Lee on August 29, 2003 involving the stabbing and assault on inmate Ricardo Benavidez?

A    Yes, I was.

Q    I believe you were seated here in the courtroom when that assault was shown on the video; is that correct?

A    Yes, I was.

Q    When did you arrive on the scene to commence your investigation for what happened to Mr. Benavidez?

JA 395

A    It was approximately 7:30 I received a phone call, and on that phone call it said I would need to process a crime scene, and we had had a major assault at the US Penitentiary at Lee County, Virginia. I arrived approximately, approximately 15, 20 minutes later, so prior to 8:00, between 7:30 and 8:00 I arrived on scene.

Q    On that same day, August 29, 2003?

A    Yes.

Q    And were you charged with processing the crime scene?

A    Yes.

Q    And what exactly does that mean?

A    Sir, what we do is we go ahead and during the processing of the crime scene is we try to capture the appearance of that scene to where we'll be able to go ahead and reconstruct it, or be able to present it later on at a criminal proceeding if need be. We'll take sketches, we'll photograph the scene, we'll take pictures of possible evidence prior to placing down placard cards which, in turn, depending on if there are blood evidence we'll take pictures from possible different angles, and then, in turn, we will go ahead and we will also take physical evidence, place them in bags, assign them evidence

JA 396

control numbers.  We will take blood evidence such as we did in the crime scene in our Special Housing with the, with the sterilized water, the control sample swabs, things of that nature, and essentially what we do is, and after this is all done we'll go ahead and note this on recovery logs so that during a criminal proceeding we would be able to take each and every piece of evidence and be able to say where it came from if we have photographs of that evidence, which photographs they are, where it was located throughout the crime scene.  Generally, with this -- of course, we use universal precautions, gloves, we use surgical booties in the crime scene so as not to traipse anything from outside the crime scene into the crime scene, or take anything from, out from inside the crime scene out into the other area.  So, essentially when that is all completed and we've gone ahead and documented the crime scene, documented every aspect of it, it's after that that we can decide then on whether to release that to be cleaned and to allow inmate population back into it.

Q    As part of your investigative duties does that involve identifying those who might have been responsible for carrying out this assault?

A    Yes.

Q    The jury and yourself viewed this video of the incident?

A    Yes.

Q    I believe you described the victim as Ricardo Benavidez?

A    Yes.

Q    Was he a member, what, was he known to be a member of a particular gang there at USP Lee at that time?

A    Yes, sir.  He was a validated member of the Texas Syndicate.

Q    Were you able to recognize and identify the individuals who were stabbing and assaulting him in that video?

A    Yes, I was.

Q    Can you tell the ladies and gentlemen of the jury who they were?

A    A prospect of the Texas Syndicate, Juan Moreno, and a validated member, being Carlos Caro.

Q    That being the defendant in this case?

A    Yes.

Q    In furtherance of your investigation did you recover any weapons from there on the crime scene?

A    We recovered two weapons from the crime scene, yes.

JA 398

Q    Can you describe what these weapons were, in the vernacular, what are they called in the Bureau of Prisons jargon?

A    Shanks.

Q    Homemade knives?

A    Yes.

Q    How many shanks did you recover there at the crime scene?

A    We recovered two separate weapons or shanks.

Q    Can you tell the ladies and gentlemen of the jury physically was there a shank located in the TV room, inside the television room?

A    There were two shanks.  One located in the common area, and one located in the television room, itself.

Q    The television room, did you see either Moreno-Marquez or Caro on the videotape go into the TV room following the assault on Benavidez?

A    Yes.  You're able to see inmate Caro place an item to the television stand, to the right, which is where I found one weapon.  And in the television room, itself, I found a second weapon.

Q    Who, did you see Moreno-Marquez go into the television room where the second weapon was found?

A    Yes, Moreno-Marquez did enter the television

JA 399

room where the second weapon was found.

Q    I want to focus, if I could, on the television stand where the video shows inmate Caro going.  I assume that in furtherance of your investigation you looked at the video; is that correct?

A    Yes, I did.

Q    Then did you go to the television stand where inmate Caro is shown going after the assault on Ricardo Benavidez?

A    Actually while processing the scene was prior to going ahead and watching the video, and we were able to locate, during the search of the area we were able to locate the weapon.  Then subsequently during a search for the weapon I was able to identify the area where, and identify where inmate Caro placed that weapon and, in turn, were able to utilize the weapon that he had to the weapon that was placed on that particular television stand.

Q    I want to show you, sir, what's been marked for identification purposes as Government Exhibit RB72.  Do you recognize this, sir?

A    Yes, I do.

Q    And what is that?

A    That is a Plexiglas prison made or shank weapon that was utilized to stab Ricardo Benavidez.  That

was the weapon that I recovered from the television stand in the common area which inmate Caro was observed placing.

MR. GIORNO:  Move for the introduction of Government's Exhibit RB72.

THE COURT:  It will be admitted.

(Government's Exhibit No. RB72 was received in evidence.)

BY MR. GIORNO:

Q    I also wanted to show you what was marked for identification purposes, Government Exhibit 24.  Do you recognize this?

A    Yes, sir.  That is the weapon in the photograph.

Q    So, this is the weapon that is shown in the photograph?

A    Yes, sir.

MR. GIORNO:  Move for introduction of Government's Exhibit 24.

THE COURT:  It will be admitted.

(Government's Exhibit No. 24 was received in evidence.)

MR. GIORNO:  Ask consent for the jury to pass this among themselves as they're looking at the photograph.

THE COURT:  Yes, sir, you may.  Ladies and

gentlemen, if you'll just pass that around, please.

BY MR. GIORNO:

Q    Agent Mrad, while the jury is looking at that, you say this is called a shank?

A    Yes, sir.  That's what it's referred to in the prison vernacular.

Q    It's a homemade knife?

A    Yes, sir.

Q    In the photograph it shows that the handle part is covered by some type of a blue object.  It looks like a string off the end of it.  Can you tell the ladies and gentlemen of the jury what that is?

A    When an attack is planned, and an individual wants to, they're going to stab somebody, what they'll do is they'll wrap a cloth handle and a lanyard, and they'll place that lanyard around their wrist and use that cloth handle because when an individual starts bleeding after being stabbed the knife will become rather slippery, and so they will not drop the weapon, and then they, in turn, have to be able to continue their attack, and they use that lanyard to hold the weapon in their hand, and the cloth to remain a grip on to the weapon.

Q    Is this some type of plastic material?

A    That's a Plexiglas material which can't be

JA 402

Mrad - Direct

detected by our metal detectors.

Q    That would be my next question.  Why would they use plastic instead of a metal object?

A    It's to circumvent the security systems we have in place in an effort to locate metal objects.

Q    Were you able to determine if there were any other Texas Syndicate members in the area at the time the assault on Benavidez took place?

A    As Mr. Dye had said, there are controlled movements through the institution.  Again, being a certain period of time which inmates are allowed to go from one area of the prison -- an example would be education -- at a certain set time, whether it be five to the hour or five after the hour, the inmates have the ability to go from education back to their housing unit, or education to the recreation yard. During those movements it gives them the ability that's the time they can move.  During the movement, prior to the stabbing, there were five Texas Syndicate members across the hall in the gymnasium. The officer in the gymnasium locked the door to the gymnasium before the movement was actually over, and those five inmates across the hall actually all had weapons on them when they were taken to the Special Housing Unit.

Q    When you say those five Texas Syndicate members did?

A    Yes, they did.

Q    Do you know who those five Texas Syndicate members were?

A    Those were the five individuals mentioned in the Mr. Gomez letter.

Q    In the Mr. Gomez letter?

A    Yes.

Q    And were the weapons that they possessed similar to the weapon depicted there in Government Exhibit RB72 being examined by the jury?

A    Yes.

Q    Okay.  In furtherance of your investigation did you have occasion to see inmate, inmate Benavidez after the fact?

A    Yes, I did.

Q    And from your investigation were you able to ascertain how many times he was stabbed?

A    Yes, I was.

Q    How many?

A    Twenty-nine.

Q    Twenty-nine times?

A    Yes.

Q    Have you been at USP Lee since it opened?

JA 404

A     Yes, I have.

Q     When did it open?

A     It opened -- I arrived in 2001; we received inmates in 2002.

Q     Okay.  Since it opened in 2002 how many murders have there been at USP Lee?

A     One, this one.

Q     That being this one, the murder of Roberto Sandoval?

A     Yes.

Q     Answer any questions the defense may have of you.

        THE COURT:  Cross examination?

                CROSS EXAMINATION

BY MR. KALISTA:

Q     The photograph that you had of the shank, the weapon that Mr. Caro used, was that the actual photo of the weapon as it was found in the rec room?

A     It was as I found it in the rec room, yes, sir.

Q     All right.  And to the best of your knowledge had anyone, any officer, let's say, cleaned it up or cleaned it off?

A     Cleaned it up or cleaned it off?

Q     Prior to your looking at it.

A     Not cleaned it up or cleaned it off, no.

Q    That was the state in which it was left; is that right?

A    I'm sorry?

Q    That is a photo of the shank that was recovered from the stabbing of Mr. Benavidez; is that correct?

A    Yes.

Q    It was not altered in any fashion, or cleaned up in any fashion?

A    No.

Q    All right.  Now, my understanding, I believe as we saw on the video, Mr. Caro submitted to restraints peacefully, and was cuffed up?

A    Yes.  That is what I saw.

Q    He was placed in the SHU at that time?

A    Yes, he was.

Q    All right.  He was confined in the SHU from August 29, 2003 until he was transferred to ADX Colorado in October of 2005?

A    That is correct.

Q    I'm sorry, one more question.  Mr. Benavidez was transferred to the local hospital and seen at the emergency room?

A    Yes, he was.

Q    And he was not admitted to the hospital, but treated there, and then sent back to the facility; is

that correct?

A   Yes, for convalescence back at the facility, yes, sir.

MR. KALISTA:  That's all.

THE COURT:  Redirect?

REDIRECT EXAMINATION

BY MR. GIORNO:

Q   Mr. Mrad, the defense lawyer asked you about this photograph, Government's Exhibit RB72, and wanted to know if that was in -- is that the way you found it?

A   Yes, sir.

Q   And he asked if it was cleaned up, or changed in any way?

A   Yes, sir.

Q   Did you see the reddish, the reddish stains here at the end?  Was it like that when you found it?

A   Yes, it was.

Q   Of course, you've been around assaults, and blood, and stuff.  What did that appear to be on the end of that shank?

A   It appeared to be blood, yes.

THE COURT:  Anything further?  Thank you, sir.  You may step down.  Let's see, we'll get the exhibit, Mr. Giorno, from the jury.

JA 407

MR. GIORNO:  If I could have just one moment, Your Honor.  Subject to the Government's review that the Government has entered all its exhibits, the Government rests its case in chief.

THE COURT:  Ladies and gentlemen, we're going to end our court day today.  I'll ask you to come back tomorrow, and we'll begin to hear the defendant's evidence in this sentencing phase. You've heard the Government's evidence in chief.  So, if you'll leave your notebooks in the jury room, please remember my instructions to you about not discussing the case, or permitting it to be discussed in your presence.  And if you'll follow the bailiff out, please, we'll see you in the morning at 9:00.

(The jury retired to the jury room, after which the following occurred:)

THE COURT:  Is there anything that counsel needs to bring to my attention before we recess for the day, adjourn for the day?

MR. GIORNO:  No, Your Honor.

MR. KALISTA:  No, Your Honor.

THE COURT:  Very well.  We'll adjourn this case for the day.

(Proceedings concluded at 11:15 a.m.)

CERTIFICATE


      I certify the foregoing is an accurate transcript

from the record of proceedings in the above-entitled

matter.



3/14/07                                /s/ Bridget A. Dickert
Date

JA 409

```
          IN THE UNITED STATES DISTRICT COURT FOR THE
                  WESTERN DISTRICT OF VIRGINIA
                       Abingdon Division

---------------------------x
                           :
UNITED STATES OF AMERICA,   :
                           :
        Plaintiff,          :
                           :
v.                          :    1:06CR1
                           :
CARLOS D. CARO,             :
                           :
        Defendant.          :    Abingdon, Virginia
                           :    February 7, 2007
---------------------------x    9:05 a.m.
```

                          JURY TRIAL
           BEFORE THE HONORABLE JAMES P. JONES
     CHIEF UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

        JOHN BROWNLEE, Esquire
        U.S. Attorney
        ANTHONY P. GIORNO, Esquire
        Assistant U.S. Attorney
        P.O. Box 1709
        Roanoke, Virginia  24008
            For the United States of America.

        STEPHEN J. KALISTA, Esquire
        P.O. Box 1186
        Big Stone Gap, Virginia  24210
        JAMES SIMMONS, Esquire
        1208 17th Avenue South
        Nashville, Tennessee  37212
            Counsel for the Defendant.


Proceedings recorded by Stenography, transcript
produced by computer.

                    **BRIDGET A. DICKERT**
                **UNITED STATES COURT REPORTER**
                **180 WEST MAIN STREET, ROOM 104**
                  **ABINGDON, VIRGINIA 24210**
                      **(276) 628-5116**
```

JA 410

(Proceedings commenced at 9:05 a.m.)

THE COURT:  Morning, ladies and gentlemen. Are we ready to proceed?  Are there any matters that counsel needs to bring to the court's attention?

MR. KALISTA:  Judge, there are two matters I'd like to bring to the court's attention.  One concerns a scheduling issue, and it concerns one of our expert witnesses, Dr. Mark Cunningham. Dr. Cunningham is currently in Los Angeles -- and I've discussed this matter with Mr. Giorno. Dr. Cunningham is currently in Los Angeles.  He started his testimony yesterday in that case, and believes that he would conclude it today.  However you, he is committed to go to New York to testify in a capital case in Brooklyn, and also of course is under subpoena --

THE COURT:  Just too many capital cases for Dr. Cunningham.

MR. KALISTA:  That's what it looks like, Judge.  In terms of the Government's problem, perhaps, with a witness of theirs is Warden Hershberger, who is one of the Government's expert witnesses in this case to follow Dr. Cunningham when he testifies in Los Angeles.  I don't know if Warden Hershberger is going to New York, or not.  It doesn't

look like Warden Hershberger would be available on Thursday, either, if we were to conclude our case early on that day.

So, we've discussed with the Government the best way to proceed, perhaps, is to have Dr. Cunningham here as very likely our last witness on Monday, and then the, the Government can present its rebuttal evidence which we anticipate will be one or two extra witnesses and one or two correctional officers.

THE COURT:  Let me see if I understand. You anticipate that your evidence will be concluded tomorrow?

MR. KALISTA:  Well, with the exception of Dr. Cunningham, very likely.  That's what we would anticipate.

THE COURT:  All right.  What does the Government say about that?

MR. GIORNO:  Your Honor, we had been speaking with the prosecutor's office out in Los Angeles.  We were prepared to have Mr. Hershberger here tomorrow at 10:00 a.m. when he finishes the trial in Los Angeles.  But he is a rebuttal witness to Dr. Cunningham, so it's our thought that if they can't have him here until Monday, we'll be prepared as soon as he finishes to put on Hershberger and any

JA 412

other witness we may have in rebuttal.

THE COURT:  All right.  Well, we'll anticipate that schedule, then.

MR. KALISTA:  Judge, the second matter is this morning, probably ten or 15 minutes ago, Mr. Brownlee brought to our attention a problem with one of our witnesses, Mr. Caro's brother, Abran, and he advised us allegedly Mr. Abran Caro was seen in the parking lot apparently writing down something, and he believed, Mr. Brownlee believed he was writing down a license plate number of the car in which the Sandoval family may have been riding.  And Mr. Brownlee advised us he intended to ask Mr. Abran Caro about that on cross examination.  We believe that, we would like the court, before Mr. Abran Caro takes the stand, to have some type of a hearing on that matter.  Because we certainly believe that that would be prejudicial to our client.  We also would object to that coming into evidence, as far as our client is concerned, at this stage in the proceeding. We believe that that's a collateral matter, certainly not related to this issue involving Mr. Caro, the defendant.

THE COURT:  All right.  Mr. Brownlee?  His name is -- would you spell his first name?

MR. KALISTA:  A-B-R-A-N.

THE COURT:  Thank you.

MR. BROWNLEE:  This was brought to our attention from the agent this morning.  The individual, I don't know who he is, apparently he was out there purportedly writing down license plate numbers of the Sandoval vehicle, and of course I know that one of the brothers is a validated member of the Texas Syndicate, so we're obviously, based upon the violence that comes from that on one level.  As far as asking him questions, we certainly think it goes to bias, and it certainly, with the evidence in this case, it, I think the jury should know about that, and he be queried about that.  And the defendant elects to bring a member of the Texas Syndicate to come testify for him, that's fine, but --

THE COURT:  Well, is Abran Caro a member of the Texas Syndicate?

MR. BROWNLEE:  That's a little unclear whether he's been validated, or not.  I'm fairly confident the other brother, Noe, is.

THE COURT:  Let me see if we can be as specific as we can.  You said an agent.

MR. BROWNLEE:  Officer Mrad brought it to my attention.

JA 414

THE COURT:  Who?

MR. BROWNLEE:  Officer Mrad, Dave Mrad.  He spoke with a member of the Sandoval family.

THE COURT:  Did Mr. Mrad actually see this?

MR. BROWNLEE:  I don't believe so.

THE COURT:  Members of the Sandoval family brought it to his attention?

MR. BROWNLEE:  That's correct, sir.

THE COURT:  And your understanding is that they observed Abran writing down their license number?

MR. BROWNLEE:  That's what I was told through the officer.  Counsel apparently spoke to the gentleman, and I have no idea what he told them.  Maybe he was, maybe he wasn't.

MR. KALISTA:  Judge, we did speak to Mr. Abran Caro.  He denied writing down the license plate numbers.

THE COURT:  Well, Mr. Brownlee, let me ask you this.  I'm not sure what that shows.  I mean, I, I'm also concerned, certainly about the allegation.  I mean, it is a potentially serious matter in a case like this, and I don't, I don't mean to lessen the possible seriousness of it, obviously, depending on what the facts are.  Witness intimidation is a

serious crime in which all of us, certainly including the court, are naturally anxious to prevent. It carries very serious penalties, as the attorneys know. But my concern is particularly this case, what, what is the nature of the bias that it would show?

MR. BROWNLEE: I think if he's related to the defendant, if he's out there trying to intimidate Government witnesses or members of the victim's family, I think that goes to his bias. This case, quite frankly, Your Honor, has all kinds of stuff. We have intercepted notes between members of the Texas Syndicate that the defendant brought down under subpoena, and it's amazing the intelligence they have. They know who Government witnesses are. In these notes they know where Sean Bullock is. I don't even know where he is at all times. Members of TS know that. We haven't brought that up in the case because we've been putting on a guilt phase, and we've been trying to streamline this. When they call a witness and they have this kind of evidence, it concerns us.

THE COURT: I agree with you there. I want to emphasize that. But the question is what is the nature of the bias? I mean, this is a brother, after

all.  I mean, that's certainly an interest enough, you know.  What is he going to testify to?  You don't know.  I think at this point I'm going to direct the Government not bring this up in cross examination. I'd like to determine, first, what the witness is going to testify to, and then I'll make a determination after that, although I frankly am doubtful, particularly under the circumstances of this case, there is a sufficient foundation to show something relevant as to the witness's credibility or bias, and also there is the question of undue prejudice.  So, I'll direct the Government not to get into it.  I will leave the question open, and I'll make a determination after I hear the witness's testimony.

MR. BROWNLEE:  Thank you, sir.

THE COURT:  Anything further, then?  All right.  We'll have the jury in.

(The jury entered the courtroom, and was seated in the jury box.)

THE COURT:  Morning, ladies and gentlemen. Good to see you again.  Hope everyone had a good evening.  We're ready to go again, and as I understand the Government has rested, so we'll hear the next witness for the defendant.

MR. SIMMONS:  Thank you, Your Honor.  Your Honor, the defense would call James Aiken.

JAMES AIKEN, DEFENDANT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. SIMMONS:

Q    Good morning, sir.

A    Good morning.

Q    If you could speak up for the court reporter, and also state and spell your name?

A    My name is James Evans Aiken, A-I-K-E-N.

Q    And Mr. Aiken, what is your current occupation and address?

A    I'm president of James E. Aiken & Associates, Inc., Brevard, North Carolina.

Q    Mr. Aiken, where did you go to school?

A    I went to elementary and high school in Camden, South Carolina.  Upon graduation I entered Benedict College, and graduated from there, and also received a master's degree in criminal justice from the University of South Carolina.  This is located in Columbia, South Carolina.

Q    After receiving your bachelor's degree where did you go to work?

A    I obtained employment with the South Carolina Department of Corrections in Columbia, South

JA 418

Carolina.

Q     What year was that?

A     I started there in 1971.

Q     What was your initial position with the Department of Corrections?

A     I was a substance abuse counselor in the social work area with the Manning Correctional Institution, which was a medium security prison within the South Carolina Department of Corrections located in Columbia, South Carolina.

Q     And how long did you hold that position?

A     Approximately a year, sir.

Q     And from there did you move on to another position in corrections?

A     Yes, I did.

Q     And what was that?

A     I was promoted to the rank of administrative assistant to the warden of that same facility.

Q     How long did you hold that position and what were your duties?

A     Well, back in those days an administrative assistant was the individual that got to do what everybody else didn't want to do, so I helped feed inmates in cell blocks, I broke up fights, I worked gun towers, I helped in conducting investigations,

JA 419

internal administrative investigations as well as criminal matters. I was involved with classification of inmate population, discipline of inmate population, as well as learning about the emergency response, as well as violence control and things of that nature at this facility. I then had to write letters for the warden.

Q    And what was your next position with the Department of Corrections?

A    At this same facility, that's the Manning Correctional Institution, I was promoted to the rank of deputy warden.

Q    And how long did you hold that position? What were your duties?

A    I held that position from 1976 to 1979, if I'm not mistaken. In that position I was second in command of that facility. I interpreted policy, I insured that security protocols were in place, I was involved with criminal investigations, disturbance control, gang management as well as classification of inmate population. I was also in charge of programatic and treatment activities within that facility, as well as the administrative functions of that facility.

Q    What was your next position in the Department of

Corrections?

A    I was promoted to the rank of deputy warden at the state penitentiary, and even though I was a deputy warden at the Manning Correctional Facility it was a smaller medium security prison; that is, maximum security on the outside, but inmates had a little freedom to move from point A to point B depending on their behavior.  And then I was promoted to the rank of deputy warden at the State Penitentiary Central Correctional Institution in Columbia.  This facility housed anywhere between 1,800 to 2,000 inmates.  Being a deputy there would just about be the rank of a warden of a smaller facility.  It housed the most dangerous predator, disruptive population within the South Carolina criminal justice system.  We even took inmates from the county that were so disruptive and so dangerous that even the county jails could not manage this population.  We had forensically impaired criminal population, we had death row population, we had gangs, we had predators, we had people that continued with random as well as systematic violence within that facility, as well as in the community.

Q    And how long were you in that position, sir?

A    Well, I was in that position from '76 to '79, I

think it was.

Q    And then did you continue on in your career in corrections from there?

A    Yes.  Well, I kind of picked up the reputation in a way of being a fix it person.  I, from that, working at that prison I went to the women's prison and became the warden of that facility.  The administrators over the system wanted to shore up the security protocols, as well as the programatic activities of that facility, and they selected me to go and fix it, so to speak.  And I became the warden of the women's prison, which was the chief policy maker.  I was in charge of security, programming, treatment, administrative services and all the activities that I've shared with you previously.

Q    And from there were you asked to go fix another institution?

A    Yes.  I was asked to go back to the state penitentiary, and they were not satisfied with the operations there, and they put me as the chief executive officer of that facility that I explained to you, and also death row population was housed there, as well as the, the predator, most dangerous population in the South Carolina criminal justice system.

Q    Was the South Carolina criminal justice system, at that time, under federal court order to correct deficiencies?

A    Yes.

Q    And you also were in the facility that housed the death row inmates?

A    That's correct.

Q    Did you actually participate in executions?

A    Yes.  Part of my function as warden of the state penitentiary was to carry out executions, and I was charged to put two inmates to death, to which I did.

Q    How long were you at that facility?

A    I was there until 19, I was there from 1982 until 1987, if I'm not mistaken, sir.

Q    And from there what was your next position in corrections?

A    Well, I was promoted to the rank of deputy regional administrator.  In that position I was the chief administrator over 16 prisons within the South Carolina criminal justice system.  And those facilities ranged from minimum security, those people that posed the least amount of danger to the public, to the prisoners that I just described to you, the predator, the dangerous, the disruptive, violent inmate population.

JA 423

Q    And after that position did you accept a position in another state?

A    Yes, I did, sir.

Q    And where was that, and why did you change from one state to another?

A    Well, I was approached by the state of Indiana. It was a new governor coming in, and I had, as I shared before, developed an approach in going and straightening out systems, and making them more accountable, to make them safer, and that's what they wanted in Indiana. So, I was appointed to the governor's cabinet as Commissioner of Corrections for the state of Indiana. That included adult facilities such as the prisons we've discussed, as well as juvenile facilities and parole services.

Q    How long were you in Indiana, sir?

A    I was in Indiana from 1989 until 1992, if I'm not mistaken, sir.

Q    Are you familiar with the Federal Bureau of Prisons?

A    Yes, I am.

Q    How are you familiar with the Federal Bureau of Prisons?

A    Well, from, from Indiana I was promoted to the, the position of Director of Prisons for the United

States Virgin Islands.  In there I had jail services, juveniles, as well as adults, and housed not only regular criminal population, but the gangs that were operating in the Carribean and running contraband or drugs into the United States, as well as other sort of international type of activities.  Additionally, with the Federal Bureau of Prisons I worked very closely with them in that capacity, also.  In fact, this system was so diminished that I asked the Federal Bureau of Prisons to provide me staff to come down to train people how to better manage and how to ensure that we have a safe, secure environment, to which they did gladly, and did an excellent job.  Also, if I could digress a little bit, in the state of Indiana I called upon United States Federal Bureau of Prisons for staff again, and they sent me a top notch warden to run the state penitentiary there in Indiana, as well as a deputy commissioner, as well as additional support in training, as well as other techniques in managing disruptive and dangerous population.  Additionally, with the Federal Bureau of Prisons, when I was the warden of the state penitentiary in South Carolina, CCI, I approached the Federal Bureau of Prisons in relationship to their internal classification system and they were able to

provide me assistance, and I had an opportunity to look at their system, and implement it, and we were one of the first state systems to implement this internal classification system of managing inmates. Now, also, with the federal level they approached me in the mid 1980s in relationship to looking at new ways to manage our prison systems, to reduce costs, to improve productivity, to improve security, and this was through the United States Department of Justice, National Institute of Corrections, as well as the National Academy of Corrections. And I was able to provide technical assistance not only to the Federal Bureau of Prisons, but correctional services all over the United States in relationship to classification of inmate population, gang control, riot control, managing the hard to manage violent inmate, managing the young offender in an adult facility, leadership development, teaching existing wardens new approaches in managing their prisons, teaching new wardens how to be wardens, as well as to teach wardens how to be wardens of super maximum security prisons, and I did that at ADX which is the super max for the federal system. Additionally I had an opportunity to travel to many, many correctional facilities and jail operations throughout the United

States.  In assessing their facilities in relationship to not only the facilities, but also their staff, the staff came to us and we went to facilities.  In looking at how to better manage in a, better manage in a seamless fashion our prisons, our security systems, and also taught them how to be leaders, to identify and improve staff so they could take leadership positions within their systems, as well as a number of other security related activities in that capacity.  Also, it provided me an opportunity in my private practice to provide assistance in other countries, and I've done that in Costa Rica, of course Puerto Rico is part of the United States, back to the Virgin Islands, Canada, as well as the Dutch Kingdom.

Q    After serving as the director in the Virgin Islands did you begin a consulting firm?

A    Yes.

Q    Would you briefly tell the jury how that evolved into what your activities are today?

A    Yes.  It goes back to, back in the mid 80s I started doing this, providing expert technical assistance to these facilities, and, and I wanted to get a midwest background, and that's why Indiana.  I got a southern background, and that's why South

Carolina.  And I needed an international background, that's why the Virgin Islands and Puerto Rico.  That gave me the foundation to move to James E. Aiken Associates, Inc. in providing technical assistance to these facilities, to these people in relationship to better security, and reducing the costs of operating these facilities and making them more secure.

Q    Are you also a member of any national commissions at this time?

A    Yes, sir.  It's called the Prison Rape Elimination Act of 2003, and it's kind of unusual.  I had no direct involvement in the creation of this commission.  What happened is Congress, and as I understand it, approved this unanimously, every member of Congress, the House as well as the Senate had a unanimous vote in approving that we would have the Prison Rape Reduction Act in 2003.  What this does is that the President of the United States, the leadership of the Senate, and the leadership of the House have appointed nine members, to which I am a member of, to develop standards and to complete research and evaluation of prisons systems, not just federal, not just state, not just city or metropolitan, but every entity within the United States, and how can we reduce prison rape and sexual

aggression, and this type of violence within the prisons. And not only that, the Congress went back and changed the law to the Prison Rape Elimination Act versus the Prison Rape Reduction Act. And this was not from prompting from the Commission. And they want it eliminated it. So, what we have to do is to develop standards, and we will be coming out with these standards that federal, state and local facilities must adhere to in order to make their prisons and jails safer. Failure to do such would cause them to possibly lose federal funding. And we are granted subpoena powers to gather whatever information we need to gather, and enter any place that we need to enter.

Q    In addition to those duties do you also provide expert testimony on behalf of the defense throughout the United States?

A    Yes, sir. In criminal matters as well as civil proceedings.

Q    And have you testified on behalf of the United States Government, also, or been prepared to testify?

A    Yes. I have been prepared to testify and assisted in civil proceedings, yes, sir.

Q    And approximately how many times have you been qualified as an expert in --

A    At least 50 or more times, sir.

Q    Both state and federal court?

A    That is correct, sir.

Q    Mr. Aiken, I'll hand you a copy of a current resume, and ask you if you could identify this?

A    Yes, sir.  This is basically a more in depth synopsis of what I've discussed this morning, yes, sir.

MR. SIMMONS:  Your Honor, at this time I tender Mr. Aiken as an expert in corrections management.

THE COURT:  Does the Government wish to voir dire the witness?

MR. GIORNO:  It's my understanding his expertise is in the field of corrections, generally.

MR. SIMMONS:  Corrections management and also as to the issue of future dangerousness of inmates in general, and the Department of Corrections to manage it.

MR. GIORNO:  State department?

MR. SIMMONS:  Federal and state.

MR. GIORNO:  May I voir dire on that?

THE COURT:  Yes, sir, you may.

                VOIR DIRE EXAMINATION

BY MR. GIORNO:

JA 430

Q    Mr. Aiken, good morning.  My name is Tony Giorno.  I'm an Assistant United States Attorney.  I have just a couple of questions about your experience in the Federal Bureau of Prisons.  Looking at your resume, am I correct you've never worked for the Federal Bureau of Prisons?

A    I was never an employee, that's correct, sir.

Q    You've never managed a Federal Bureau of Prisons facility, have you?

A    Not as warden.

Q    Have you ever managed any Federal Bureau of Prisons facility?

A    No, sir, not directly as, as a federal employee.

Q    I take it then your experience with anything to do with Federal Department of Corrections is when facilities you're working at, the state facilities, were under some type of management or control of some federal officials, correct?

A    That's not correct, sir, if I understand your question.

Q    I guess my question is, what I'm trying to get at, Mr. Aiken, is you have never been an employee of the Federal Bureau of Prisons?

A    That is correct, sir.

Q    You've never managed a Federal BOP facility?

JA 431

A     That is correct, sir.

Q     Your knowledge, then, of the Federal Bureau of Prisons would come from, from dealing with individuals who worked for the Federal Bureau of Prisons?

A     Not necessarily, sir.

Q     I guess maybe I'm unclear about where your experience with the federal system comes from.

A     My experience with the federal comes directly from my actually being in federal prisons, my direct relationship to teaching people that are working for the Federal Bureau of Prisons how to run their facilities.  My activities also included going into federal facilities to include super maximum security prisons, as well as U.S. penitentiaries, as well as like, for example, death row and observing the activities that go on within the federal system. Also, doing my tenure in the state systems I had a very close and continual relationship with the Federal Bureau of Prisons in relationship to their operations, their techniques of managing inmate population, as well as to look at their classification processes in the management of long term inmates as well as medium, as well as minimum security inmate population.  I have been in a number

of these facilities over the years.  I have had very close relationships with the director of the Federal Bureau of Prisons, as well as a number of the wardens in order to understand, learn, get first hand knowledge of how the federal system operates, and also have been able to, as I stated in previous testimony here, to get this cross fertilization with federal and state because of the things that the federal system have done.

Q    So, I take it then, Mr. Aiken, as a result of all these things you've told the jury about you've become familiar with the regulations that govern the operation of the Bureau of Prisons, all the different facilities, the different levels of classification in the federal system, you're familiar with all those rules and regulations as well; is that correct?

A    I can't repeat all of them verbatim to you.

Q    But you're familiar with them?

A    I have familiarity with them, yes, sir, and I've also been able, I can't go into too much detail for obvious reasons, looked at their special management procedures of disruptive or potentially disruptive and dangerous inmate population, and obviously I can not share a lot of that information because it's very sensitive.

Q    But you do have familiarity with those procedures?

A    Familiarity, yes.

MR. GIORNO:  Those are all the questions I have, Your Honor.

THE COURT:  You may proceed.  Ladies and gentlemen, let me just give you some brief advice. The rules of evidence provide that if specialized knowledge might assist you in understanding the evidence, or determining a fact that's in issue in this case, a witness qualified by knowledge, skill, experience, training or education may testify and give his or her opinion concerning such matters. Normally, a witness is not allowed to give opinions, but only testify as to facts.  Now, you'll hear throughout this case, I believe, testimony from such persons, and you should consider such opinion received into evidence, and give it such weight as you think it deserves.  It is up to you to decide whether the opinion of such a witness is based on sufficient education, experience, and that the reasons given for the opinion are sound.  If you conclude that, by reason of training or experience, the witness's opinion is not sound, or if you believe that the reasons given for the opinion are not sound,

then, or the opinion is outweighed by other evidence, then you may disregard that opinion. In short, it is entirely up to you to decide whether to accept, reject all or part of the opinion of such a witness. You may proceed.

BY MR. SIMMONS:

Q    Let me follow up just for a moment. As far as the Bureau of Prisons regulation of Mr. Caro, any classification of Mr. Caro would be done by the Bureau of Prisons?

A    That's correct, sir.

Q    That would be reviewed periodically by Bureau of Prison officials?

A    That's correct, sir.

Q    You certainly can't predict or direct the Bureau of Prisons as to what they will or may or may not do?

A    That's correct, sir.

Q    Let's talk about classification for a minute. Could you explain the classification process to the jury?

A    Well, I will explain it in layman's terms. Classification is a system that decides the proper treatment, the proper programming, and the proper security, and the proper housing of inmate population, to put them in the right place, at the

JA 435

right amount of security, as well as to insure accountability. And classification systems do that on a continuous basis. They reevaluate, and reevaluate, and I've classified thousands and thousands of inmates.

Q    And are you, based upon your experience, do you have familiarity with the different types of facilities maintained by the Federal Bureau of Prisons as specifically their maximum security facilities?

A    Yes. I have familiarity with the federal level -- in fact, the federal system, and here I go again, developed classification. The states and local systems really didn't have them. I guess I'm telling my age now, but they were the leaders in developing classification systems, as I understand it. They are the people that says minimum security, or medium, or high security, and also maximum and super maximum security levels. You've may call them different things, different nomenclature, but basically they are all the same.

Q    You have reviewed certain material regarding Mr. Caro; is that correct?

A    That's correct.

Q    You're aware of his prior record in prison?

JA 436

A    Yes, I have familiarity with that.

Q    Are you familiar with his conduct at Oakdale?

A    Yes, sir.

Q    And you're familiar with an incident that occurred here at USP Lee?

A    Yes, sir.

Q    Regarding Mr. Benavidez?

A    Yes, sir.

Q    And you're familiar with the matter regarding Mr. Sandoval?

A    That's correct.

Q    And you're also familiar with his alleged activity in the Texas Syndicate?

A    Yes, sir.

Q    As well as his activity prior coming to prison in that he was convicted on three occasions of drug offenses, he had no violent conduct, and you're familiar overall with what his situation is?

A    That's correct, sir.

Q    And in anticipation of your testimony today, have you visited the United States penitentiary in Florence, Colorado?

A    No.  I visited ADX, which is different.  That's the Super Max, administrative maximum security prison which is a higher security level than the U.S.

penitentiary, even though one is located out in Colorado.

Q    Your testimony would be primarily regarding ADX, which is one of the facilities in Florence?

A    That is correct, sir.

Q    It's a complex of facilities?

A    That is correct, sir.

Q    Tell the jury about the facility ADX, the maximum security facility.

A    Well, I have to be very careful, for obvious reasons.  This is, in my professional opinion, the most secure prison in the United States, certainly, and probably throughout the world.  This facility houses disruptive, dangerous, predatory population. It excludes them from other high security institutions because basically their behavior within the facilities, as well as individuals that have such a high degree of involvement with international or high visibility-type crimes, that these individuals must be housed.  Understanding that, there are very confidential security protocols and procedures that are undertaken at that facility to ensure that the inmate population is properly managed, secured, and controlled.  Also, there are extreme design implementations at that facility to better protect

JA 438

staff, other inmates, and especially the public. Also, there are special equipment that's in operation at that facility, special procedures that are, are implemented at that facility that are probably not implemented at other facilities. This is a facility that has constantly gone through evolution to look at the new type of criminal behavior, and not only just manage it, but to control that behavior.

Q    If you could look at the screen. This is one example of the security measures. Can you tell the jury what that is?

A    Yes, sir. This is basic, as we call it, the yard, but it's not a yard like you would find in a regular prison. It is a concrete walled, covered at the top with obviously heavy steal, as well as a mesh wiring, and it's not, I can assure you it's not chicken wire up there. Also, you have a concrete floor, and in the concrete floor -- it's covered by snow at this particular time -- on this concrete floor you can't penetrate it. So, you can't penetrate the wall, you can't penetrate from down in. Now, these areas here are individual outdoor containment cells, and inmates are placed there for their outdoor recreation. And what you mean by outdoor recreation, they can go out and breathe fresh

air.  Obviously you can see there's snow on the ground.  It's in the elements.  This is not what a regular inmate would encounter in a state penitentiary, in a federal penitentiary.  This is directly related to controlling of behavior.  You will see that there's a heavy mesh door.  It's very heavy.  It's made of very hard hardware.  An individual is placed there, the door is closed, and only he can go in there.  What I mean by that is they recreate inmates individually.  And another inmate goes there, and they're very careful about what inmate goes here, versus what inmate goes there.  And they're constantly under supervision.  You'll find that the locks on these doors are very, very high security.  Commonly all of this is called the dog run, because in some facilities, you just have a linear fence that's enclosed, and you have to recreate separately.  The inmates are carefully chosen as to who recreates with whom.  They're carried out to this area in full restraints with, with obviously close supervision.  I don't want to go into too much more of the detail of precautions that are used, and things that are available to manage behavior.

Q    Could you briefly describe to the jury what the

cells are like at the administrative maximum security facility?

A    I'll try to explain it to you in layman's terms.

Q    Certainly.

A    They're self contained cells, and I don't have the exact measurements, but what it is is a fairly close cubicle that's heavily laden with security hardware.  There's not a regular light bulb, there's not a regular sink and toilet.  It's stainless steel. The bed is secured.  Everything in it is secured. What I mean by secured, I mean you just don't screw in a screw because the inmates get that and make weapons out of them.  Special screws are used. Special lighting is used.  Special monitoring is employed.  Total accountability is continuous, 24 hours a day, seven days a week, 365 days a year.  And inmate population is constantly monitored as to what they have, what they can have, and how they communicate with each other.  And I don't want to go into too much detail beyond that.

Q    You mentioned weapons, shanks, I believe, is what we call a prison made weapon.  That is a constant problem within a prison population?

A    It's a continuous problem.  It's a continuous problem.  It's manageable, it's controllable, but a

JA 441

warden is not worth his or her salt to say we have a weapons free facility.  Inmates are constantly looking at new ways of doing it, and we're constantly staying one step ahead of it as much as we can.  But it's not a lost cause, and we have a way to control inmates, if necessary, if their involvement with weapons manufacturing, as well as weapons use is chronic.

Q    And also the communication.  You've reviewed the records that Mr. Caro is a member of the Texas Syndicate prison gang?

A    Yes, I have familiarity with that, sir.

Q    Could you tell the jury basically how the control of communication can be implemented to prevent gang members from communicating with each other by phone, by letter, or other correspondence, or visitation?

A    Well, I kind of hesitate in a way because I don't want to get into giving out trade secrets. I'll put it this way.  The law allows prison officials, and holds prison officials responsible and accountable to maintain a safe, secure environment. With that, we can do things to a person in order to put them in a sterile environment, we call that security enveloping.  If an inmate is so dangerous,

and an inmate is so, and uses communications in order to carry out this dangerous activity, we can, for all practical purposes, other than what is allowed access to the court, cut off all of his communications with the outside world, if necessary.

Q   And you call that a security envelope?

A   I call it a security envelope.  It's, it's one in which we monitor every aspect of that inmate's behavior 24 hours a day, seven days a week, 365 days a year, year in, year out, decade in, decade out. We're constantly monitoring their behavior, and we're constantly looking at new ways to control that behavior.  And I don't want to go into minute situations with that.

Q   Mr. Caro, I think, is almost 40 years of age. Of your experience in corrections have you had the, have you observed older inmates and what happens under these conditions?

A   Yes, sir.  Well, you don't have to have a medical degree to understand this; I'm not the person I was when I was 17 years old.  You get old.  We're talking about an incident, not an incident, but a situation where a person is placed in the security envelope, but the variable that would, that we're not putting to this is that we can keep them in that

envelope as long as necessary, and days turn to weeks, weeks to months, months turn into years, years turn into decades, and what that does is deteriorates the person, it breaks them down because they begin to realize that because of their behavior, that these type of control mechanisms have been employed, and they have no real control on when they will be released, or whether they will be released, for that matter, because a review process takes place, staff makes that decision.  The Texas Syndicate does not run the prison system.  People that are employed there run the prison system.  We decide where you go, where you stay, who you talk to, and how you communicate.  And if we find that we have to take extraordinary measures to control that behavior, we'll do it.

Q     You spoke of control mechanisms within the cell at maximum security.  Do they have TVs?

A     Yes, sir, in some cells, yes.

Q     Is that a control mechanism?  What is the purpose of that?

A     That's a control mechanism in relationship to giving somebody some hope, maybe let them look at a television, or giving them an opportunity to learn something if they're desirous of doing that.  But the

point is that looking at television in a prison setting is not anywhere near looking at television in our communities.  We can't get up and walk to the refrigerator.  Oftentimes we can't see what we want to necessarily see.  Number three, we don't have anything else.  Read a book.  But the point is that if your behavior and conduct is at a level that even that is taken away, that can be taken away, also.

Q    You're aware that Mr. Caro was transferred to administrative maximum security in October of 2005?

A    Yes, sir, I believe so.

Q    And the security conditions which you described, is that your understanding of the conditions he was housed under?

A    Yes, sir.  Administrative maximum is a very high security place, and, and as a result, no matter where he's placed there, he is under extreme scrutiny, and those screws can get tighter, if necessary.

Q    And it's your understanding he's administratively, today, he's assigned to Florence, Colorado administrative maximum security?  He's here on a writ for this trial?

A    That is correct.  What is meant is his home base is ADX, administrative maximum.  He's here for this proceeding, but he belongs to ADX.

Q    Even though it is a Bureau of Prisons decision, you would assume he'll be returned there should he receive a sentence of life in prison?

A    That is correct, sir.

Q    But again, that's a Bureau of Prisons decision?

A    That is correct, sir.

Q    Are you aware of any instances that have occurred at the maximum security facility regarding the death of inmates?

A    Yes.

Q    Can you tell the jury of your knowledge of that situation?

A    Again, my knowledge of it is this, that a total of two inmates have been killed at administrative max, and the reason or the response to that, with which I'm in full concurrence, that there were programs in operation at that facility that allowed inmates during the end of their period of time, those people that are demonstrating good behaviors were to begin to start reintegration into a normal high security environment, so therefore they had opportunities to commingle for certain periods of time and that's where the deaths occurred, as I understand it.  And my understanding, also, from the staff there is that those particular programs have

been changed and placed into other facilities such as United States penitentiary. So, they are no longer in existence in ADX, and I think that's a very prudent and productive move, myself.

Q    Again, it's your understanding that after that the procedures were changed, the procedures were evaluated where it couldn't happen again?

A    That is correct, sir.

Q    Or reduced the likelihood or risk?

A    We put it this way. To the lowest common denominator.

Q    It's my understanding there are no guarantees as to the safety of Mr. Caro or other inmates ever as to a guaranteed at 100 percent?

A    Mr. Simmons, planes still crash.

Q    And in your opinion is Mr. Caro a dangerous inmate?

A    Yes, sir.

Q    To other inmates?

A    Yes, sir.

Q    Other inmates to him?

A    Yes, sir. That's a variable that a lot of people don't consider, you know. He's getting old, like I am, he gets vulnerable, he's got a name, and people will take him out just as quick.

Q    And in your opinion is the Federal Bureau of Prisons have the ability to control Mr. Caro for the rest of his life?

A    Yes, sir.  Not only the ability; they have the authorization, they have the equipment, and they have the ability, technically, to manage this population. And I'm sorry I'm not at liberty to discuss some of those indices.

Q    Based upon your expertise you know those abilities exist?

A    Yes, sir.

Q    Life without the possibility of parole means life?

A    As long as you have a blood pressure.

Q    Okay.  Mr. Aiken, you're compensated to assist defense counsel; is that correct?

A    That's correct, sir.

Q    How much are you being paid to share your expertise and knowledge?

A    Sure.  $150 per hour.  That's a flat rate.  I do not increase my rate for being here today.  Plus parking expenses as authorized by you and the court.

Q    Thank you.

        MR. SIMMONS:  I have no further questions.

        THE WITNESS:  Thank you, sir.

THE COURT: Cross examination?

CROSS EXAMINATION

BY MR. GIORNO:

Q    Mr. Aiken, I think one of the last questions the defense lawyer asked you about was is Mr. Caro a danger to other inmates, and your answer to that question was yes?

A    Yes, sir.

Q    He's a danger to other inmates because of things like his gang membership?

A    Well, not exactly.  If I can explain that.

Q    Well, let me ask a couple of questions to make sure --

A    Sure.

Q    What about his, his past instances of violence in the Bureau of Prisons?

A    There you go.  Yes.

Q    And things like, have in mind his role in the, the attack on the rival gang members at Oakdale, the FCI?

A    Yes, sir.

Q    His being involved in this hit on Benavidez along with other members of his gang, the Texas Syndicate?

A    Yes, sir.

Q    His crafting and possessing and using a prison made weapon within a maximum security federal prison?

A    Yes, sir.

Q    His use of a towel to, in the Special Housing Unit, to strangle a cellmate?  Those are all indicia of violence?

A    That is correct, sir.

Q    And I take it from what you've said, too, I think you talked earlier and said in your experience you've dealt with, even in maximum security prisons in South Carolina, you described it as random and systematic violence?

A    Yes, sir.

Q    Which occurs in prisons no matter how secure they are, correct?

A    The possibility of that happening, yes.

Q    Okay.  In fact, not just possibility, but it actually does happen in facilities no matter how secure they are?

A    The possibility of that is yes.  We can reduce it to the lowest level of probability, but there's no way I can predict the future.  I don't know where I'm going to be ten minutes from now.

Q    That's true for all of us, Mr. Aiken.  What I'm trying to get at, I want to make sure I understand,

JA 450

the jury understands exactly what your opinion is. As I understand it, Mr. Aiken, you tell me if I'm wrong, you can never eliminate violence in prisons?

A    Totally, no, sir.

Q    And even the best prisons, even ADMAX, people get assaulted there?

A    Yes, sir.

Q    People get murdered there?

A    Yes, sir.

Q    And you've talked before about procedures that exist in these prisons to prevent inmates at those facilities from sending out, from communicating with other inmates and from people on the outside, right?

A    I didn't understand the question.

Q    It was probably a badly asked question, Mr. Aiken, I apologize.

A    I'm probably a little hard of hearing.

Q    One of the things the prisoners want to do, or try to do, is they try to control the ability of the inmates to communicate with other inmates inside the prison?

A    If necessary, yes, sir.

Q    And they also try to prevent inmates from communicating with their gang buddies on the outside, right?

JA 451

A    Yes, sir.  Control that and monitor that, also.

Q    And again, that's something that they endeavor and strive to do for the most part, do relatively well?

A    Yes, sir.

Q    But again, it's, you would agree with me, Mr. Aiken, that even with their best efforts at the most secure institutions that communications get out from the inmates?

A    You have to assume that because you never get to absolute zero.

Q    Well, not only assume; you know, in fact, there are instances where members of violent gangs send out coded messages to their associates on the outside from even the best facilities, correct?

A    Yes.  There's, it's a continual learning process but they do a very good job of it.

Q    Would it be fair to say, Mr. Aiken, in your experience as the prison officials get better at interdicting letters and preventing violence, the inmates also adapt their ways to circumvent the controls that are in place?

A    Yes.  But I have a little more power than they do.

Q    Well, your power, though, Mr. Aiken, as with the

JA 452

power of the Bureau of Prisons, as you know, is circumscribed by the law. You can only do what the law allows you to do, correct?

A    Certainly correct. In my experience with the law they have granted me a large level of flexibility to ensure the safety and well being of those people housed there and work there.

Q    That's true. The inmates, although the law grants you certain rights and flexibility, the law also, also grants inmates certain rights; is that correct?

A    That is correct, sir.

Q    In fact, inmates in even ADMAX have certain rights?

A    Certainly. Like access to the courts, certainly.

Q    They're entitled to work assignments, right in the Bureau of Prisons in ADMAX?

A    Not necessarily so, sir.

Q    Well, isn't there a regulation that allows them to have work assignments there, even in administrative maximum?

A    The key to that is the administrator makes that decision on whether a person is employed within administrative max, and the main issue there is

control and safety.  And administrators are not going to let a person out of a cell to be employed if, indeed, there is specific risk of harm for them to communicate, to inflict violence, or anything of that nature.  And in fact, we can tie them down in the bed in the cell to control that behavior, if necessary.

Q    You can?

A    Yes, sir.

Q    And let me make sure I understand this.  Would you agree with me that the prisoners, the inmates at ADMAX, there are work programs there?

A    Yes, sir.  But it's not for everybody.  Some people are just going to be put away.

Q    I understand.  But the people who are at ADMAX, they're there because they've been difficult in other institutions, caused problems, they're believed to be violent people right?

A    Sure.

Q    So, even people who have been shown to be violent in prison can be allowed to work on the grounds, have contact with other inmates, right?

A    Not necessarily so.  I mean, just because a person is violent and disruptive in another facility, and comes to this facility called administrative max or super max, whether it's on the state or federal

level, if that behavior has been rectified and people feel, based on empirical as well as their experience, to allow this person the opportunity that can be granted, but I don't know of a circumstance where an administrator in the Federal Bureau of Prisons, or any other bureau system, that knows a violent, dangerous, predator inmate that's going to demonstrate that violence, to let them out of the cell door to work.  That's not right.

Q    These inmates that killed the other inmates at ADMAX, they were obviously, they had contact with other inmates, did they not?

A    That is correct.  They were, as I understand it, at the other end to get out, and they went back and reverted to that behavior, so those programs have been eliminated, which I think is correct.

Q    Is it your testimony, Mr. Aiken, that what's referred to as the step down procedures with regard to the administrative maximum facility in Colorado have been eliminated?

A    I'm not saying that, sir.  What I'm saying, the programs in relationship to the ones in which these incidents took place are now at USPs instead of administrative max, which I agree with.  That does not say that there are different levels of security

Aiken - Cross

at administrative maximum.  I do not want to get into
the nuances of that for obvious reasons.

Q    Would agree with me most murderers and most gang
leaders are not at ADMAX?

A    Depending on the murder in prisons.

Q    Most murderers and gang leaders in federal
prison are not at ADMAX?

A    Those prisoners that are gang leaders and
murderers present a specific threat to the general
community that have to be controlled to that level
are located there.

Q    All of them?  Is that your testimony?

A    Every person that has demonstrated to the
Federal Bureau of Prisons that level of predator
activity, and that they still believe that that
activity is prevalent, those people are housed there
or in similar places in order to control that
behavior.

Q    Now, by similar places what are you talking
about, Mr. Aiken?  Are you talking about a, a United
States penitentiary?

A    I'm saying he could be at Lee, he could be at
Atlanta, he could be in a number of other facilities
to control that.  But the point, the key is this.  If
I have an inmate, or if the Federal Bureau of Prisons

has an inmate that is so dangerous that they cannot come out of ADX, they're not coming out of ADX.

Q    How many people does ADX hold?

A    I don't have the specific count on that, but it's 400 something, I guess.

Q    So, 400 inmates.  And how many inmates are in the Federal Bureau of Prisons, Mr. Aiken, if you know?

A    Thousands.

Q    So, this group, I mean ADMAX is reserved for, relatively speaking, a handful of federal prisoners, right?

A    What we found is that when you control that level of population you will find that that population is very minute.  I mean, history tells you, I mean, look at Alcatraz.  Alcatraz, they built Alcatraz why?  Because they wanted to put the worst of the worst there.  That was a small population.  I mean, the reason and the understanding that we must acknowledge here is that every inmate in the system is not a disruptive, violent person to the level that they have to receive the type of control that's at ADX.

Q    Ultimately isn't it the goal, if you go in ADX, Bureau of Prisons decides, well, he hasn't shown any

JA 457

violence, they try to, what the Bureau of Prisons tries to do is step them down by moving them out to a less secure facility?

A    That's a very careful process, and that's a very tedious process.  It's objective as well as subjective.

Q    Isn't that process, Mr. Aiken, set forth in the regulations governing the operation of the administrative maximum?

A    I don't want to go into the details with that, but I would assume that, yes.

Q    When I asked you on voir dire if you were familiar with the procedures that govern the operation the ADMAX, you said you were.  I want to ask you about that, if I could?

A    If you want to show it to me to refresh me, I'll be glad to take a look at it.

Q    Mr. Aiken, I'm showing you this document here, and just for the record it is, it says, "United States Penitentiary Administrative Maximum Facility, Florence, Colorado."  It has a number.  It's called an Institution Supplement.  What is an institution supplement?

A    It's additional supplement to the operational aspects of security protocols and procedures in

relationship to management of the inmate population,

as well as other security matters.

Q    What is the subject of this particular

institution supplement which, for the record, is

Number FLM5321-06F(1).  What is the subject?

A    General Population and Step Down Unit

Operations.

Q    You've told the ladies and gentlemen of the jury

you're familiar with these type of regulations in

institutional governance; is that correct?

A    I have a general knowledge of it, yes, sir.

Q    Based on your familiarity with that document,

that basically outlines the different levels of

security at ADMAX?

A    In very general terms, yes, sir.

Q    Well, it's also fairly specific.  If you would

turn, sir, to page three, paragraph D, that talks

about something that's referred to as a Pre-transfer

Unit; is that correct?

A    Yes, sir.

Q    And that basically sets out the protocol to

prepare an inmate to go to a less secure facility,

correct?

A    Yes, sir.  The only thing that I would, would

address here, when I was physically at ADX, and

physically at that location, the individual that led me on that tour says that that is now in the USP. Now, whether this is in writing here -- I did not see any inmates moving around, I did not see any inmates assigned to UNICOR, I did not see any inmates eating together. Also, I might add, during my previous tours of ADX --

Q    Before you move on, let me ask you, when was it that you were at ADMAX and talked with this unnamed individual and had this tour?

A    This was, this was, I think, the Monday or Tuesday before Thanksgiving of 2006.

THE COURT:  Mr. Giorno, do you need to stand by the witness?

MR. GIORNO:  Only to get this, if I could. But I'll go back there and just come up forward.

THE COURT:  All right.

BY MR. GIORNO:

Q    Were you there in Thanksgiving of 2006?

A    No, sir.

Q    Before Thanksgiving in 2006?

A    Yes, sir.

Q    For how long?

A    I spent most of the morning there, and did receive a very in depth tour.  Obviously, I didn't

see every nuance of operations there, but I remember distinctly, and I stand corrected, but there were no inmates there, and that was my understanding that was moved, yes, sir.

Q    You were there for a morning, most of a morning, and, and you didn't see any inmates going to the UNICOR programs, or any other programs that are proscribed in that institution supplement?

A    To the best of my knowledge that is correct, sir.

Q    But that institution supplement, you would agree with me, Mr. Aiken, does provide basically the outline and framework of how an institution operates based on your experience?

A    Yes, but that's constantly evolving.

Q    What does that institution supplement say about the step down units?  What type of constraints, what rights and freedoms do the inmates have when they're in that stage?

A    It's not necessarily a right and freedom; it's a privilege.

Q    What privileges do they have, Mr. Aiken?

A    Well, if it was, they were allowed to eat, if I'm not mistaken, bear with me a moment, they can be unrestrained when they're out of their cell.  Now, I

did see some inmates on the last end of it, not in the UNICOR area, I did see some inmates that were ready to go to the USPs that were walking around. But this was not the population that was most secure.

Q   Okay.  When you say the population that's most secure, I assume you're referring to ADMAX.  Is there something more secure than ADMAX?

A   No, sir.  It depends on the inmate's behavior. An example being, okay, I'm in ADMAX, and I'm showing out at ADMAX.  That doesn't say that we can't use chemical munitions on you, we can't use force on you, we can't use cell extraction teams on you, we can't tie you down to the bed, if necessary, to control your behavior, we can't put you in restraint devices where you can't move.  So what I'm saying, just being in administrative max is just one general setting. But what I'm saying is that we can physically tie you down if necessary to control your behaviors.

Q   Mr. Aiken, first of all, to make sure I understand you, those things you describe, the use of physical violence against the inmate, you can only do that, assuming you could, you can only do that after the inmate does something like commits an act of violence that would warrant such a response, right?

A   No, sir.

JA 462

Q    Tell me what, tell me when you could use non-lethal force, Mr. Aiken, against an inmate who has not shown to be violent or disruptive?

A    What I'm saying, basically, if there's an inmate that's going to demonstrate behaviors that are so disruptive, I don't have to sit back as a prison warden or official and wait until that person does that.  I can take preventive, preemptive measures in order to ensure that that individual has the lowest level of probability of committing this.  I've taken inmates that haven't done anything and locked them up and kept them locked up, and the reason why is because I have the authority, and I also have the responsibility to operate a safe and secure environment.

Q    You said you did that in the state system.  You never did that in a federal facility?

A    No, I've not ordered an inmate in those things, but I learned it all from the federal.  I have put in my emergency operations, for example, I have ordered an inmate killed in, in a hostage situation, and a sniper killed him.  Well, my training and my understanding and my philosophy was built around the federal system.  And did that inmate kill somebody before I ordered him killed?  No.  He had an officer

JA 463

hostage. He wouldn't let the officer go. I ordered him killed; he was killed while he was still holding the hostage.

Q    Mr. Aiken, you're not telling this jury that you, or any warden, or any person has the right to take an inmate and tie him down indefinitely, are you?

A    What I'm saying is -- no, we just can't decide one morning to go grab somebody and tie them down, but what I am saying is we have a responsibility and flexibility through the courts to control behavior, and to maintain a safe, secure environment. Another example of it, if the place is not running right and it's not to the level of security that I feel comfortable with, I've locked prisons down for years. We're going to close it down until we get it right. And I've done that. And I've not had the court or anyone else to interfere with that to the extent that I couldn't accomplish the mission. It's my responsibility to insure a safe, secure environment. That's what I get a paycheck for.

Q    That was done in a maximum security facility like the United States penitentiary?

A    It wasn't done in a USP. It was done at the state system, state level, territorial level. Where

JA 464

did I get that from?  Understanding my responsibilities and my close relationship all of these 30 some years of looking at the Federal Bureau of Prisons.  They are the leaders in this profession, in my opinion.

Q    I take it, Mr. Aiken, of course you haven't been involved in operating any facility, state or territorial, since 1994 when you left the corrections field to start your consulting business, you haven't had any hands on, direct responsibility at any correctional facility?

A    I can understand I've not drawn a pay check, no, but I go through a lot of facilities, I evaluate, like I say, these standards that are coming out, very, very intimately being involved, and it's an advantage, too, because it's not just working in one system continuously.  I'm in and out of systems, the south, the north, the east, west.  When I say looking at, I'm not talking about reading a piece of paper; I'm talking about going into those facilities and looking at how the doors lock, and how the people interact.

Q    And your going into those facilities, is that like when you go into ADMAX you go in there for most of the morning to evaluate the facility?

A    You say most of the morning.  I was there a good amount of time.  But also what was in there was 34 years of experience, and you don't have to spend a whole week there to understand what's going on.

Q    Well, would you agree with me, Mr. Aiken, as the penal systems have evolved, and court rules have come out, and regulations have come out, how prisons are run has changed over the years; is that correct?

A    Yes.  And I'm glad in many ways, and I'm up looking at my computer every morning at what's new, what's coming out, what new standard, what critical event took place, how can we fix that.  That's my whole life, sir.  You're exactly right.

Q    And as in the interest of more humane treatment of inmates they're allowed things like exercise privileges, visits from prison medical staff, visits from clergy, all of those things are afforded to them; is that correct?

A    Because it's mandated by law that persons have a right to their religion, persons have a right for medical care, persons have a right for exercise.  But I would add one thing.  Security overrules all of that.  I have denied inmates their exercise, I've denied inmates their right to religion, I have denied inmates their access to medical when security was

jeopardized, and I have prevailed with that.  So, what I'm saying to you, security is number one over those things, and if you go out and kill an inmate we're not going to let you go out for rec this afternoon, no, sir.

Q   What's the difference, Mr. Aiken, between the cell you saw at ADMAX and a cell in the Special Housing Unit at a United States penitentiary?  There isn't any difference, is there?

A   Well, you will find that the Federal Bureau of Prisons are revamping their whole security structures, and the older facilities are being moth balled and newer facilities are coming on, and the newer facilities have the capabilities, and I'm not going to get into the nuances of hardware, and hydromatic, and those kinds of things, but they have the security capability to house inmates that are very high security, yes, sir.

Q   Like USP in Lee County which opened in 2002?  That's a pretty modern facility?

A   Relatively speaking, yes, sir.

Q   So, they should have all the latest bells and whistles out there to control these inmates, right?

A   Again, I don't want to go into the technology of how we can manage inmates now.  It's quite, you know,

JA 467

it's just like a computer, let's face it.  A computer
is three years old, you can throw it away for all
practical purposes for the business that I do.  The
same thing with the technology and relationship on
how we control human behavior.

Q    Going back to my original question, Mr. Aiken,
can you tell the ladies and gentlemen of the jury, is
there any difference between the Special Housing Unit
at the United States Penitentiary at Lee County and
ADMAX?  Is there any difference?

A    I would like to say there are many similarities,
but the point is that I cannot adequately say that
they are both exactly the same.  They can control
behavior, okay?  Don't get me wrong.  Both of them
can.  They meet a minimum standard of restraints of
the inmate population.  But the point is, that when
you go to ADX, that's all they're concerned with.
Nothing but that.

Q    You talked about the prisons, and one thing is
about control.  You want to insure that the inmate is
held accountable?

A    Yes, sir.

Q    Is that correct?

A    Yes, sir.

Q    And when you say accountability, if he does

JA 468

certain things there are consequences, correct?

A    Very definitely.

Q    If the inmate has no fear of consequences and has told the prison that, that person is hard to control if he has no concern about the consequences?

A    He's hard to control in relationship to other inmates that want to go with the program.  The point is, I've got time, and if you want to do that for 30 years, I'm with you, partner, because in my business that's one thing we've got a lot of, and that's time. And we've got ability and authorization to control your behavior, and we'll do that.  And you know something, he'll break.  They rot.  I've seen them being rebellious for years and years and years, and then they break.  I haven't found one that hasn't broke yet.

Q    I want to ask you one last area, Mr. Aiken, if I could.  You mentioned something about age.  As we get older, we don't have quite the energy we used to have.  Would that be -- you don't have to be a medical doctor to figure that out?

A    I agree with you.  I wish my situation was just energy.  I'm just getting old.

Q    I share your pain.  But along those same lines, you certainly would agree, Mr. Aiken, that even

JA 469

prisoners age 40 and older have committed acts of violence, they've killed guards, they've killed other inmates, even at age 40 and beyond?

A    Yes, sir.  Yes, sir.  Yes, sir.  But the probability of that is greatly diminished.  But the point is that they did it.  Some break early, some break late.  The key is this, is they break.

Q    It's just a question of what they do before they break?

A    And what I do to make sure that that doesn't happen.

         MR. GIORNO:  That's all the questions I have of this witness.

                 REDIRECT EXAMINATION

BY MR. SIMMONS:

Q    Very briefly, Mr. Aiken, the regulation which you were shown has a date of January 31st of 2005; is that correct?

A    I did notice that, sir.

Q    When were you at the facility?

A    I was at the facility either Monday or Tuesday between, before Thanksgiving, 2006, November.

Q    And the two deaths which occurred at the ADX occurred after January 31st and before your visit; is that correct?

A     If what I read is correct, and everything says that it did occur at that time you mentioned.

Q     And it was your understanding after that visit that the regulation and procedures had changed as a result of that conduct?

A     To the best of my knowledge, sir.

Q     And of course, the Bureau of Prisons always has that discretion to change their regulations and policies in response to inmate conduct?

A     Not only in response, but also in the preventive mode, also.  They don't just wait until something happens; they change things if they find out there's a possibility that it is, and it's a continuous process.

Q     As far as Mr. Caro, any change in his security level, or the conditions of his confinement, would be made by the Bureau of Prisons officials; is that correct?

A     As you asked me before, and I said yes, and I say yes again.

Q     It is reviewed by them, they have a process, they have procedures, and they would make the determination either to leave him in a cell by himself or to move him to another step down, or facility, but that decision is made by the Bureau of

Prisons officials who have the expertise to make those decisions?

A    And expertise is the key word.

Q    And they asked you the differences between ADX and USP Lee.  Well, one difference would be they're single celled at ADX; isn't that correct?

A    Everybody is single cell.

Q    And did you notice at ADX whether they could send kites under the door, or that facility made it impossible to do so?

A    I don't want to get in too much detail, but the design structures of the facility limits communications and interactions between inmates unless it's allowed by staff.

Q    Okay.  And bricks and mortar, they're talking about bricks and mortar at USP versus bricks and mortar at ADX.  Bricks and mortar is only one aspect of inmate control?

A    One aspect.  Another is the classification, another is review process, another is emergency response, training of staff, selection of staff, the rotation of cells.  It's many, many variables that are involved, and tools that people have to control this behavior.

Q    Is it your understanding at ADX they have more

JA 472

staff per inmate?

A    My understanding, that is correct.  And also well trained staff for that particular population.

Q    And that particular population is inmates who demonstrated a danger to other inmates or to staff?

A    And the public.

Q    And they're essentially the worst of the worst in the federal system?

A    That's correct, sir.

Q    And the federal system has all the resources, the knowledge, and expertise, and the bricks and mortar to control that behavior?

A    And authorization.

Q    Authorization.  We talked about, of course, an inmate always has a right to medical care?

A    That's correct.

Q    Legal resources and legal visits?

A    That's correct.

Q    Clergy?

A    That's correct.  With the understanding that security and safety overrides all of that.

Q    Is it your opinion that the Federal Bureau of Prisons has the ability and expertise to house Mr. Caro and other similar people to Mr. Caro at, within their facilities, at this ADX?

A    They have that, yes, sir, total control.

Q    You cannot guarantee he would never be a future danger, but it can be reduced?

A    That is correct.  I don't have a crystal ball.

MR. SIMMONS:  That's all.  Thank you.

THE COURT:  Any further questions?

MR. GIORNO:  No, Your Honor.

THE COURT:  Thank you sir.  You may step down.

THE WITNESS:  Am I excused, sir?

THE COURT:  Yes, with no objection.

THE WITNESS:  I'm going to leave the resume here, sir.

THE COURT:  Do you want to introduce that?

MR. SIMMONS:  Yes, Your Honor.

THE COURT:  It will be introduced as Government's Exhibit Four.

(Defendant's Exhibit No. 4 was received in evidence.)

THE COURT:  Ladies and gentlemen, we're going to take a break at this time.  If you'll follow the bailiff out, we'll be in recess for about 15 minutes.

(The jury retired to the jury room, after which the following occurred:)

THE COURT:  Counsel, we're still having a problem with juror number 33 who appears to continue to sleep.  He's near me at the end of the second row.  He has his hand in front of his face, and his eyes closed, and he did that a lot this morning.  He was better yesterday, but as I indicated, we had another problem today.  And I'm inclined to, to discharge that juror.  I want to give counsel an opportunity to give me their views, either now or before we come back.

MR. BROWNLEE:  The United States would oppose that.  We just think -- has the court had an opportunity to talk to him?  I have kind of been watching him since we were first alerted a few days ago.  He does tend to, they close, they open, and he kind of rubs his head, puts his hands on his face, drinks water, he does a lot of movements.  I don't know, I would say that if you talk to him and ask him is he okay, is he paying attention, before we just discharge him.

MR. SIMMONS:  Your Honor, that would also, I think, I have not observed him today, I observed him yesterday.  He did seem to be awake and alert yesterday.  I think it would be appropriate for the court to question him.  If he's on medication, is he

working night shift, or something, I don't know.

THE COURT:  Well, let's ask him.  I'm going to ask the bailiff to bring in juror number 33.

(Juror No. 33 entered the courtroom, after which the following occurred:)

THE COURT:  Yes, sir, juror number 33, seems to me you've been having a little problem this morning.  Are you feeling all right?  Are you having any difficulty?

JUROR NO. 33:  Just a little bit.  I'm just been having trouble sleeping.  I have a little bit of anxiety problem, sir.

THE COURT:  Have you been able to stay awake during the course of the proceedings?

JUROR NO. 33:  Yes, sir.

THE COURT:  So, you're hearing everything?

JUROR NO. 33:  Yes, sir.

THE COURT:  You understand how important it is every member of the jury hear the evidence?

JUROR NO. 33:  Yes, sir.

THE COURT:  If you'll let me know if you're having any difficulty, if you're not being able to concentrate, will you do that?

JUROR NO. 33:  Yes, sir.

THE COURT:  All right.  You may return to

JA 476

the jury room.

(The juror retired to the jury room, after which the following occurred:)

THE COURT:  We'll see, ladies and gentlemen.  Mr. Simmons, do you have something?

MR. SIMMONS:  Your Honor, I would like to make this photograph an exhibit.  I inadvertently forgot to do that.

MR. BROWNLEE:  No objection.

THE COURT:  It will be the defendant's next exhibit.

(Defendant's Exhibit No. 5 was received in evidence.)

THE COURT:  We'll be in recess for 15 minutes.

(Recess from 10:45 a.m. to 11:00 a.m.)

THE COURT:  Are we ready for the jury? Mr. Bailiff, if you'll have the jury, in please.

(The jury entered the courtroom and was seated in the jury box.)

THE COURT:  Very well.  You may call your next witness.

MR. KALISTA:  Judge, we call Susannah Rodriguez.

SUSANNAH RODRIGUEZ, DEFENDANT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. KALISTA:

Q    Good morning, Ms. Rodriguez.

A    Good morning.

Q    What is your name, please?

A    My name is Susannah Rodriguez.

Q    Where do you live, ma'am?

A    I live in Zapata, Texas.

Q    How old are you?

A    Fifty-two.

Q    Where were you born and raised?

A    I was born in Falfurrias, Texas, Brooks County.

Q    In terms of Zapata, Texas in relationship to Falfurrias, Texas, where are they in relationship to one another?

A    They're about 90 miles.

Q    If you would, ma'am, please look to your right on the screen.  I believe over to the right is Falfurrias?

A    Yes, sir.

Q    That is in south Texas?

A    Yes, sir.

Q    Zapata is to the lower left hand corner there, that's where you live now; is that right?

A    Yes, sir, that's correct.

Q    But you were born in Falfurrias, Texas?

A    Yes.

Q    I believe Falfurrias is approximately 150 miles or so south of San Antonio, Texas?

A    Correct.

Q    Now, how big is Falfurrias, Texas, and how big was it when you were living there?

A    Population, 7,000.

Q    Okay.  More or less?

A    More or less, yes, sir.

Q    All right.  Could you describe the type of community it is?

A    Mostly Hispanic.

Q    What is the main business there?

A    We grow mostly crops.

Q    Fruits?

A    Fruits, yes.

Q    Livestock?

A    Some livestock, yes.

Q    What is the lay of the land, so to speak, the mountains, what is it like?

A    Out there it's hot and dry, a lot of brush, mesquite, cactus.

Q    Pretty much flat land?

A    Yes.

JA 479

Q    If you'd again look to your right, ma'am, on the screen.  Does that appear to be just a basic map of Falfurrias, Texas?

A    Yes.

Q    Do you see where I've marked on the map Falfurrias High School?

A    Yes.

Q    Could you tell the jury the area in which you lived in Falfurrias, Texas, where you were born and raised?

A    Right here.

Q    Could you just touch the screen, basically?  And you can draw on that if you want to.  Was that area known by a particular name?

A    Yes.  Mexiquito.

Q    Could you draw in a little area of Mexiquito on the screen?  So, approximately that area right around the high school.  You mentioned you lived in Mexiquito.  What was the address?

A    509 West Candella.

Q    Who did you live with in that household?

A    With my parents.  That's where I grew up.

Q    I believe you had a number of brothers and sisters?

A    Yes, sir, that's correct.

Q    How many other brothers and sisters did you have?

A    Two brothers and six sisters.

Q    All right.  So, approximately eight of you all together?

A    Nine of us.

Q    Nine.  All right.  Could you tell me basically why that area of town was known as Mexiquito?

A    It was like little Mexico.  It was a poor side of town, poor section of town.

Q    So, it was basically highly Hispanic and a very poor area of town?

A    Yes, sir, that's correct.

Q    Are you related to Carlos David Caro?

A    Yes.  He's my nephew.  He's my brother's son.

Q    Do you see him in the courtroom here today?

A    Yes, sir, I do.

Q    And you mentioned that he was your brother's son.  What was your brother's name?

A    Jose Maria Caro, Jr.

Q    I believe your father was Jose Maria Caro; is that correct?

A    Yes, sir.

Q    Your mother's name was what?

A    Mathilde.

Q    Let me put a picture up on the screen and ask if you can identify those pictures for us, please.  Let me zoom out a little bit, give it a little bit of depth here.  Now, the two, the couple that is seated in the chairs, who is that?

A    That would be my mother and my father.

Q    So, the gentleman would be Jose Marie Caro. Your mother, her name again?

A    Mathilde.

Q    Does this photograph show Carlos's father?

A    No, sir.

Q    Where was Carlos's father at the time this photograph was taken?

A    He was deceased.

Q    He was deceased?

A    Yes, sir.

Q    I believe he died in approximately 1984; is that correct?

A    Yes.

Q    Does this photograph show yourself and your brother and sisters?

A    Yes.

Q    Was that taken on some special occasion?

A    Yes.  My parents' 50 anniversary.

Q    And the people depicted in this photo, again,

your parents would be Carlos' paternal grandparents?

A    Correct.

Q    And of course the other people depicted, your brother and sisters, would be his aunts and uncle; is that correct?

A    Yes, sir.

Q    You mentioned you lived in a house in Mexiquito with your siblings and your parents; is that right?

A    Yes.

Q    Is this a picture of that house?

A    Yes.

Q    And, again, what is the address there in Mexiquito?

A    509 West Candella.

Q    And basically you and your brothers and sisters and parents lived in that house; is that right?

A    Yes.

Q    Okay.  Now, did you live near Carlos and your brother, Carlos's father, while residing on Candella Street?

A    Yes.

Q    How near did they live to you?

A    They lived three houses away from where I did, but opposite side of the street.

Q    All right.  What was that address occupied by

Carlos and his family?

A    603 Palo Blanco.

Q    The house they resided in, is that house still in existence?

A    No, sir.

Q    What happened to it?

A    It was taken down.  Somebody else bought the property and built on it.

Q    Basically they tore the house down and then rebuilt on the property?

A    Yes.

Q    Could you describe the house that your brother and Carlos and the family lived in?

A    It was small, one bedroom home with a kitchen, a living room and a bathroom.

Q    All right.  Was the bathroom an out house?

A    Yes, it was an out house when they first moved in there, and then later on they added a small bathroom to the house.

Q    And basically it was your brother, his wife, and I believe they had four children lived in that house; is that right?

A    Yes.

Q    When did you last see Carlos?

A    I saw Carlos about ten years ago.

JA 484

Q    Where was that?

A    That was at my father's house.

Q    And was he alone at that time?

A    No.  No, sir.  He had his wife and his daughter with him.

Q    His wife, LouYveth?

A    Yes.

Q    And his daughter, Xinia?

A    Yes.

Q    I believe you said you lived in Falfurrias for how many years, approximately, until you moved to Zapata?

A    Thirty years.

Q    And I may have neglected to ask you this, but how old are you again, ma'am?

A    Fifty-two.

Q    Now, do you and your husband have any children?

A    Yes, sir.  We have two sons.

Q    Okay.  Before I get into that, are you employed, ma'am?

A    Yes.

Q    And what kind of work do you do?

A    I'm a secretary and a bookkeeper for Redi-Mix Concrete Plant.

Q    About how long have you done that?

A     Ten years.

Q     And what other types of work have you done in your working life?

A     I worked for a newspaper, I managed a Dairy Queen, I've done some housework, housekeeping, and some field work.

Q     Did you graduate from high school?

A     No, sir.

Q     How far did you get in school?

A     I was a junior.

Q     So, you dropped out before you graduated in your junior year?

A     Yes.

Q     I asked you about your children, and I think you said you had two children?

A     Yes.

Q     Could you tell the jury their names and ages?

A     My son, Robert, is 33 years old; and my son, Mark, is 20 years old.

Q     What kind of education do they have?

A     My older son, Robert, is a graduate of St. Mary's University, and he's an administrative director of operations for Washington Mutual in San Antonio.

Q     What is Washington Mutual?

JA 486

A    It's a bank.

Q    I believe you have another child, as well?

A    Yes, sir, that would be Mark.  He's 20, and he's a junior at Texas State University in Texas.

Q    I want to turn your attention to your brother, Jose.  And again, he was known as Jose Marie Caro, Jr.; is that correct?

A    Yes.

Q    Did he have a problem with alcohol or drugs?

A    Yes.

Q    And how old was he when he began having this problem?

A    He started drinking as a teenager.

Q    And how would you describe the level or intensity of his drinking?

A    It was pretty heavy, pretty heavy drinking.

Q    Did he drink to become intoxicated?

A    Yes.

Q    And how often did he become intoxicated?

A    Four, five times a week.

Q    How did he act when he drank heavily?

A    My brother was an aggressive drunk, a violent drunk.

Q    Who would he be violent toward when he was drinking?

A    He would get into fights with other people where he was at, or toward his wife when he came home.

Q    Did he get in fights with your parents?

A    Yes.  Arguments, and fights with my dad.

Q    Did they approve of his drinking?

A    No, sir.  No, they did what they could to get him to stop it.  He wouldn't listen.

Q    Was that pretty much a life long problem for him, excessive use of alcohol?

A    Yes.

Q    When he did that he became violent?

A    Yes.

Q    Did your brother have a criminal record?

A    Yes.

Q    And what had he been arrested for and served time in prison for?

A    Burglary, and he also got caught with illegal drugs a couple of times.

Q    Was that before he got married in terms of the burglary charge or conviction?  Was that afterward he got married, or do you know?

A    The burglary charge was before he got married. The, the drug, when he got caught with drugs was after he was married.

Q    And was he arrested at other times, but didn't

JA 488

serve any time?

A    Yes.  Mostly for public intoxication, or for fighting, or --

Q    And were there times when he was picked up by the police then and never charged with a crime?

A    Yes, mostly when he would fight with my sister-in-law they would just take him away and let him sleep it off, release him in the morning.

Q    By your sister-in-law you're talking about Carlos' mother?

A    Yes.

Q    Her name was?

A    Virginia.

Q    I believe Virginia's parents also lived in the Mexiquito section of Falfurrias, as well; is that correct?

A    Yes.

Q    You described it a little bit as being kind of a poor community, Hispanic community.  Back when Carlos was being raised and you lived there, can you describe the -- you mentioned that Falfurrias was hot and dry; is that correct?

A    Yes.

Q    In the summertime it could be very, extremely hot; is that right?

JA 489

A    Yes.

Q    And their winters are a lot shorter or a lot milder than our winters here.  Is that fair to say?

A    Yes.

Q    Did this cold catch you by surprise?

A    Yes, it did.

Q    Is that something you're not used to in Falfurrias?

A    Right.

Q    Back then, I mean, did they have air conditioning in Mexiquito?  Did people air condition their homes?

A    No.

Q    Didn't have air conditioners running in their homes, and close all the windows and seal themselves in to escape the heat?

A    No.

Q    Basically what did they do to deal with the heat?

A    We'd open up the windows.  We didn't even have a fan.  We'd open up the windows.  We spent a lot of time sitting on the porch outside until it got dark, and we went in and went to bed.

Q    Was that typical of that section of Falfurrias, Mexiquito, people just didn't have air conditioning

JA 490

there?

A    Oh, no.

Q    They didn't have air conditioning?

A    No, sir, they didn't.

Q    So, you could hear what was going on in the house next door, or down the street; is that correct?

A    Yes.

Q    Wasn't a lot of background noise to prevent hearing things?

A    No.

Q    Now, I want to put up on the screen -- can you look at the screen for me, please?  And I believe you've seen this particular diagram before; is that correct?

A    Yes, sir.

Q    Does this basically show kind of a family tree with your parents, and then beginning, let's say, with your brother, Jose, his wife Virginia, their four children, and right on down the line, basically the family tree for the nine children of Jose Marie Caro and Mathilde Caro?

A    Yes.

Q    Now, in terms of, and again, you've seen this before; is that correct?

A    Yes, sir, I have.

JA 491

Q    And are you able to tell us, looking at this, in terms of the education level of the paternal side of Carlos' family?

A    I don't understand the question, I'm sorry.

Q    Okay.  In other words, look at the screen, please.  Does this screen attempt to show the level of education of the various members of the children and grandchildren of Jose Marie Caro and Mathilde Caro?

A    Yes, sir, it does.

Q    First of all, your parents, I mean basically they were elementary school drop outs?

A    Yes.

Q    They didn't have much formal education?

A    No, they didn't.

Q    Please look at the screen, ma'am.  Beginning with your brother, Jose, and his wife, Virginia, again, were they, did they have much education?

A    No, sir.

Q    Did your brother, did he drop out of grade school?

A    Yes.

Q    And how about Virginia?

A    Yes.

Q    She was a grade school drop out?

A     Yes.

Q     Did, could Virginia even read or write?

A     No.

Q     What was her, what was the language that she used?

A     Spanish.

Q     How about your brother?

A     Spanish.

Q     And the children of Jose and Virginia, basically they dropped out before they graduated from high school; is that right?

A     Yes.

Q     Including Carlos dropped out, basically he was a high school drop out along with his brother, Noe, and his brother, Joe?

A     Yes.

Q     And his brother, Abran, he was an elementary or junior high school drop out; is that right?

A     Yes.

Q     I believe that in order of age, your brother's and Virginia's children, Jose or Joe, Jose Marie Caro III, he was the oldest of your brother's children; is that right?

A     Yes.

Q     And then was followed by Carlos, Noe and Abran?

JA 493

A    Yes.

Q    And again, have you looked at that screen in terms of the education levels of the other members of your family, and does that appear to be accurately represented on that screen?

A    Yes.

Q    In terms of looking at this next screen, compared to the rest of the members of your family, I'm talking now about your brother and sisters and their children, looking at the family, just about, well, all of Jose and Virginia's children were high school drop outs; is that correct?

A    Yes, sir.

Q    There were very few high school drop outs in the other children of the family; is that right?

A    Right.

Q    In terms of using alcohol or drugs, you reviewed this diagram before, haven't you?

A    Yes, sir.

Q    And was your brother, you mentioned that he was heavily addicted to alcohol; is that right?

A    Yes.

Q    And as far as you know, at various times in their life were all the children of Jose and Virginia involved with alcohol or drugs?

JA 494

A    Yes.

Q    Again, were any other members of the family from your other brother and sisters, as far as you know, did they have any type of substance abuse or alcohol problem?

A    No, sir.

Q    As far as a criminal record, you mentioned that your brother had a criminal record; is that correct?

A    Yes.

Q    And, again, you've reviewed this diagram before, haven't you?

A    Yes.

Q    And apart from, again, all the children of your brother, Jose, and his wife, Virginia, again, Joe, Carlos, Noe and Abran, they all had criminal records; is that right?

A    Yes.

Q    As far as you know, did any other members of the family and their children have any criminal records or problems with the law?

A    No.

Q    Now, in terms of profession, I wonder if we could please look at this.  Is it fair to say that your brother, Joe, and Virginia, they were employed from time to time, but their work history was fairly

erratic, they had a history of short term jobs, or not being employed? Would that be fair to say, ma'am?

A    Yes.

Q    And to the best of your knowledge is that true of all four of their children:  Jose, Carlos, Noe and Abran?

A    Yes.

Q    Just looking at the other members of your family, for instance your sister, Lucia, she has two children, basically she's got one child that's in the military and one that's a manager?

A    Yes.

Q    There are quite a few of those children that have fairly substantial or skilled jobs; is that correct?

A    Yes.

Q    Would it be fair to say, in summary, in terms of looking at, again, your whole side of the family, Carlos's paternal side of the family, again, your brother and his wife, and their children, all four of them, compared to the rest of the family, they were all essentially mostly unemployed or had very short term jobs during their working lives as compared to the rest of the children?

JA 496

A     Yes, sir, that's correct.

Q     Now, I asked you about your brother, Jose, Carlos's father.  You said that he left school, I think, some time in elementary school; is that right?

A     Yes.

Q     And do you know why he left school at that time?

A     He pushed one of his teachers.

Q     Was he expelled from school?

A     Yes.

Q     Did he ever go back?

A     No.

Q     What kind of work did your brother, Jose, do?

A     He was a laborer for a local company, a pipeline company there in Falfurrias.

Q     Was this kind of erratic work history, again, not really employed for any one company for very long at all?

A     He worked for that company for about a year or two, and then the company closed down.  And after that, then, he was just, yeah, erratic.

Q     For many of the jobs that he had did he really earn enough to support his family?

A     No.

Q     And did his drinking interfere with his ability to support his family?

A    Yes.

Q    And how did it, how did it affect his ability to support his family?

A    Well, he'd spend money on drinking that he really should have been spending on his family.

Q    Mentioned that your parents attempted, in their own way, to deal with the situation, but were they ever really able to influence him to stop drinking or cut back on his drinking to help him at all in that problem?

A    No.

Q    How did his continued drinking affect your parents and affect the rest of the family?

A    Well, we, we went through a lot, we went through a lot.  My dad would get angry, and my mom, he blamed her most of the time for my brother being the way he was because we would help him out, and he always knew that he could come to us to bail him out of trouble. So, that caused problems between my mom and my dad.

Q    In other words, your brother would come to her, asking for some money, she, wanting to help him out, would give him money, and then he'd go out and drink it up and your dad would get mad at your mom for having done that?

A    Yes.

JA 498

Q    And that happened several times?

A    Yes.

Q    At some point did your dad just stop even doing much of anything about your brother's drinking in terms of trying to interfere in his life, or be involved in that?

A    Yeah.  We would beg him to not say anything because it was then that they would get into fights and it would terrify the family.  We always ended up at, in the street crying, or at the neighbor's house because we were always afraid to be at home when my brother was drunk.

Q    Did it seem like your mother had more influence over your brother than your dad did?

A    Yes.

Q    Now, you've mentioned your brother's problems with alcohol.  Did that problem with alcohol affect his marriage to Virginia and his relationship with her?

A    Yes.

Q    How did it affect that relationship?

A    They would always, when he came home drunk they would always end up in a fight.

Q    When you say fights, I mean could you be more specific?

JA 499

A    Well, it would start with an argument, and not all of them, but a lot of them ended up physical, that he would actually hit her.

Q    How would people know that there was a fight going on at Jose and Virginia's house?

A    Well, mostly she would run out in the street crying out for help.

Q    So, it would be something that happened in the house that spilled out on the street?

A    Yes.

Q    And again, could people in the neighborhood hear all that?

A    Yes.

Q    Was that a very frequent occurrence?

A    Yes.

Q    How often did that happen?

A    Two or three times a week.

Q    And over the course of how long?

A    Maybe like ten years, 12 years.

Q    Did this cause them to separate from time to time?

A    Yes.

Q    And about how many separations did they have over the course of their marriage?

A    Gosh, I don't remember.  It was a lot.  They

were separated quite a bit.

Q    When you say a lot, so many you can't count them?

A    Pretty much, yeah.

Q    Did they have a particular pattern that they followed in terms of they'd separate, and what would happen after that?

A    A few days later they'd be back together and they were fine for a day or two.

Q    Now, did this, this argument and violence in the home, was Carlos and his brothers in that home?

A    When they were younger, yes.

Q    When you say they were younger, you're talking about when?

A    When they were little; five, six, seven years old.

Q    Now, did your nephews, I'm talking now about Carlos, and Jose, and Noe and Abran, did they have bad behavior problems like your brother Jose?

A    All of them except Carlos.

Q    Could you be a little bit more specific?

A    My other nephews, they were always involved in fighting, they were trouble makers in school.  We always got complaints from the teachers about their behavior in school, but we never got one about

JA 501

Carlos.

Q    In terms of explaining to the jury the differences between his brothers and Carlos, again, what would you say were the differences between them?

A    Carlos was a lot, he was very quiet, he kept to himself, he was alone a lot.  He was a loner.  A lot of the time he spent by himself.

Q    Was he violent toward anyone?

A    No.

Q    Was he getting into fights like his brothers?

A    No.

Q    Was he getting in trouble like his brothers?

A    No.

Q    Now, you mentioned something about Carlos being quiet and alone.  Now, was that something that you noticed and concerned you in any fashion?

A    Well, it concerned me, yes.  I didn't want him to feel left out when we got together for the holidays.  I mean, we always encouraged the kids to bring him in on what they were doing, to play, or whatever.  He would always keep to himself.

Q    Did you think that that was unusual so that you were concerned about that?

A    Yeah, yes, I did.

Q    Now, do you remember Carlos when he was a very

young infant, in other words when he was born?

A    Yes.

Q    And did he have any health problems as a baby and as an infant?

A    Yes.  As a baby, yes.  He was very sick the first year of his life.

Q    What were his problems?

A    Mostly it was an allergy to the milk.  He couldn't, he couldn't hold down his milk, his formula.

Q    And what steps were taken to deal with that problem?

A    Well, we would take him to the doctor, and he'd be okay, they would change his formula, he'd be okay for a couple of days, and it would start all over again.  Until one of my mom's friends recommended we give him some goat's milk, and my mom looked around, we found some, we got him on it, and that seemed to help him.  He did better after that.

Q    Now, he did better after that?

A    Uh-huh.

Q    Would you describe him as an active baby or inactive?

A    Inactive.

Q    And how did you notice this?

A    He was a lot slower learning to crawl, learning to walk, to speak, and compared to the other kids more or less his age.

Q    Did you ever babysit for Carlos?

A    Yes, I did.

Q    Do you remember anything specific about that?

A    The one thing that I remember is that when he was, he was like nine years old when he, when I took care of him, and he didn't know how to tie his shoes. I realized that he didn't know how to tie his shoes, and he didn't know how to tell time.

Q    How did you realize that?

A    Because I was getting him ready for school, and I asked him to start getting dressed, and his other brothers started dressing themselves, the other two, and he did, too.  But I realized that he had his shoes on backward.

Q    When you say he had his shoes on backward, you mean the left shoe was on his right foot, the right shoe was on his left foot?

A    Yes.

Q    So, did you correct him about that?

A    Yes, I did.  I took him aside because, and I whispered it to him because I didn't want his brothers picking on him, and he corrected them, and I

JA 504

asked him to tie them and he didn't know how.

Q    When you say he didn't know how to tell time, what do you mean by that, and how do you know that?

A    Well, I was in the kitchen cooking them breakfast, and they were getting ready for school. So, I yelled at him to let me know what time it was to see how much time we had left, and he said he couldn't, and I asked him why, he said he didn't know how.

Q    Do you recall worrying about Carlos because he couldn't do those things?

A    Yes, I did.

Q    Why were you worried?

A    It broke my heart because I worried if other kids found out about it that they would pick on him.

Q    Now, did you notice anything else about Carlos in terms of not behaving normally for his age?

A    Well, no.  The only thing, like I said, he would spend too much time alone.  He didn't have too many friends, or he didn't like spending time with his friends.

Q    Now, because he was different, did you think he had a kind of different life than his brothers?

A    Yes.

Q    What did you think?

JA 505

A    I thought that he was the one that we were never going to have to worry about, that he would do good.

Q    Why was that?

A    Because he was never in trouble.  He never got in trouble.

Q    Do you remember when he got married?

A    Yes.

Q    And what, what did you think about Carlos and his future at that point in time?

A    I thought he'd be happy the rest of his life, that he was actually going to have a normal life.

Q    Did you ever think he'd be violent toward anyone?

A    No.

Q    Now, you mentioned that your sister-in-law, Virginia, didn't have much education?

A    Right.

Q    She really spoke Spanish, but she couldn't read or write in Spanish or English?

A    Right.

Q    When she received letters from school, notes from school, bills, other things like that, were they in English or Spanish, the way that they were communicated to her from school?

A    It was English.  It was all English.

Q    Did she ask you for assistance in helping responding to those things?

A    Yes.

Q    And did you give that assistance?

A    Yes.

Q    Basically what did you do?

A    I would read them, I would explain them to her, and if we needed to make an appointment or we needed to make an appearance, or anything, I'd let her know.

Q    Did she follow through on those things?

A    No.

Q    Was she involved in her children's education?

A    No.

Q    Was your brother involved in his children's education?

A    No.

Q    In other words, I take it that being a parent yourself, you tried to encourage your children to go as far as they could as far as education is concerned; is that right?

A    Yes.

Q    But Virginia and your brother were not like that?

A    No.

Q    Did you become aware of their financial

situation because of the fact that you were helping her with the correspondence she was getting, or getting from, let's say, bill collectors or just ordinary bill payments?

A    Yes.  That was one, and another one was they always came over to my house.  We were very close.

Q    Tried to help her with those, interpreting the bills or trying to see if they had money to pay them, and that type of thing?

A    Yes.

Q    What was their financial situation for the most part?

A    They struggled.  They struggled very, very much.

Q    Would you say that they were poor?

A    Yes.

Q    Now, your brother wasn't helping the situation any by drinking, was he?

A    (Nodded no.)  No, he wasn't.

Q    Now, did there ever come a time during this period when you became aware that your brother all of a sudden had a bunch of money, or he was flush with money?

A    Yes, I was.

Q    Can you tell us about that, when that was, approximately?

JA 508

Rodriguez - Direct

A    No, sir, I don't remember around what time it was.

Q    Your brother died, I think in 1984?

A    Yes.

Q    Do you remember, let's say, was it during the later years of his life, or in the seventies or in the sixties when that was?

A    It, it was the seventies, seventies, yeah.

Q    What was it that you noticed about your brother and his wife concerning having a lot of money?

A    They started, they bought a couple of cars. She, my sister-in-law redid the house, she bought new furniture and carpet for the house. She always had a lot of cash. My brother always had a lot of cash.

Q    Were you suspicious about that?

A    Yes.

Q    Did something else happen that caused you some concern?

A    Well, he took me a bag of money, a bag with a lot of stacks of money, and he asked me to hold it for him. And I did, and when my sister-in-law found out she came over to my house and demanded I handed it back to her. And I did.

Q    Now, where did you conclude that this money came from?

A    We, we suspected that he was dealing drugs.

Q    Did you ever ask him or ask Virginia about that?

A    Virginia, no.  My brother, yes.

Q    You suspected your brother of dealing drugs?

A    Yes.

Q    Did you ever talk to either one of them about that new found cash and where it came from?

A    My brother, I would talk to my brother.

Q    Did he admit that or deny it?

A    He told me it was better that I not know, and for me to not worry, that everything would be okay.

Q    Were you aware if he, at this point in time, was also keeping cash inside his house?

A    Yes.

Q    How do you know that?

A    Because he told me.

Q    Did you actually see it, as well?

A    No.

Q    Now, do you know if the children were aware their father was dealing drugs, or into any type of illegal activity like that?

A    I'm sure they knew.

Q    When sometimes they would fight, would Virginia make any mention about drugs and drug dealing?

A    Yes.

JA 510

Q    What would happen, how would she express that?

A    She would, she would say she was going to call the police and she was going to turn him in.

Q    And was this, again, in a loud voice?  Was this softly, or what were the circumstances under which this would happen?

A    Well, when they were fighting, and she would tell the neighbors, then tell the neighbors who call the police because she was going to tell them that he was into drugs.

Q    So basically she called him a drug dealer and she was going to turn him in?

A    She was going to turn him in, yes.

Q    Did the neighbors and children hear this?

A    Yes.

Q    When your brother and sister would get into it, I mean, would anybody call the police?

A    Yeah, the neighbors would.

Q    And did they, again, during these situations usually take him away, or what would happen in terms of the end result?

A    Every time they would take him away, or if not they would let my mom take him home with her.

Q    Now, you mentioned that they would have those arguments, and it would lead to a lot of shouting, it

would spill out on to the front porch, out on to the outside of the house, neighbors would hear, someone would call the police. Was Virginia, was she, were they actually fighting or hitting one another?

A    Yes.

Q    And who would usually get the better of the situation?

A    Well, my brother. He was stronger.

Q    So, basically he would hit his wife, slap her, pull her hair, things like that?

A    Yes.

Q    Now, did you ever, do you recall in your mind any specific incident that you recall about this violence occurring, anything that stands out?

A    There was one time in particular that he was out of control, and I ran across the street, I ran over to their house, and he was sitting on top of her and he was choking her.

Q    Do you remember where the boys were?

A    They weren't around. I don't know where they were.

Q    Were they in the household, though, at that time?

A    Yes.

Q    How would -- and again, in terms of this period

in time did you ever observe Mr. Caro, your brother, hit his children, or anything involved in that, or involved in trying to protect their mother?

A    No, I never did.

Q    Now, do you recall your brother's death?

A    Yes.

Q    And what did he die from?

A    Cirrhosis of the liver.

Q    And I believe that at some point in their marriage he and Virginia finally separated?

A    Yes.

Q    And about how many years was that prior to his death?

A    It was about two years before he died.

Q    And how old was he when he died?

A    Thirty-nine.

Q    He died, I think, in 1984?

A    Yes.

Q    Were you present actually in the room when he died?

A    Yes.

Q    Who was present with you?

A    Carlos.

Q    Was this in a hospital, in a home, or where?

A    It was at the hospital.

JA 513

Q   And basically how long had your brother been hospitalized up to that point?

A   It had been three and a half days.

Q   What was his condition?

A   Critical, serious.

Q   Was he having trouble breathing, was he having trouble being conscious?

A   Yes, he was having trouble breathing, and that's why we put him in, and then he just lost consciousness, yes.

Q   And how did Carlos react?

A   He was there, we were there with him right up until the time he died, and Carlos was just sitting in a chair in the corner staring at the floor.

Q   Did you do anything to Carlos after you realized his father died?

A   Yes.  I went over to him, I put my arms around him, I told him how sorry I was.  He broke down, and he cried, and then he left and I didn't see him again until the funeral.

Q   Now, we talked a little bit about your brother and his drinking problem, but would you say he was a faithful husband to Virginia?

A   No.

Q   And when you say he was not faithful, what do

you mean by that?

A    Because he had affairs.

Q    In other words, he had affairs during his marriage with other women?

A    Yes.

Q    Do you know of anyone in particular?

A    There was one particular that a lot of the fights were about, and her name was Rosa Munoz.

Q    Did your brother even have a child with Rosa?

A    She says, yes, they have a child.

Q    Now, in terms of Virginia, and I'm talking now about when Virginia and your brother were separated, what would, where would Virginia go, where would your brother go?

A    My brother would go to my mom's house.

Q    Virginia would stay in the house?

A    Yeah.

Q    And she would stay in the house, and did she, as far as the children were concerned, did she do anything as far as allowing you and the other family members on your brother's side to continue to see the children, or what?

A    No, she wouldn't let us see them.

Q    So, she would kind of cut you off for visitation?

JA 515

A    Yes.

Q    Was Carlos and his brothers, were they closer or more exposed to their mother's side of the family or your side of the family?

A    When they were small, when they were little they were close to my side of the family.  After, after they grew up, my brother passed away, then they were closer to her side of the family.  We didn't see very much of them.

Q    Now, you mentioned that they did spend time with their mother's family.  Are you familiar with some of the members of Virginia's family, particularly her brothers?

A    Yes.

Q    And do you remember the names of her brothers?

A    Yes.

Q    What was that?

A    Rosendo (phonetic), Felipe, and Daniel Rodriguez.

Q    Did they have good reputations, or not?

A    No.

Q    What kind of reputations did they have?

A    Mostly drug dealing.

Q    Were you able to see any influence, then, that these uncles had on Carlos and his brothers?

JA 516

A    We thought that they did, that they had an influence on him.

Q    In terms of what way?

A    In a bad way, that they might encourage them to do what they were doing, what my brother did.

Q    And how did your, how did you and your family react to that?

A    We talked to them, my mom would cry and tell them to please don't do that, to stop if they were doing it, and they told her not to worry, that if anything ever happened that they would be taken care of.

Q    Now, after your brother died, Virginia lived on in Mexiquito?

A    Yes.

Q    Do you remember the circumstances under which she died?

A    She died in a house fire.

Q    I believe that she had problems with diabetes most of her life?

A    Yes.

Q    And she was burned in a house fire at the residence?

A    Yes.

Q    Who was living with her at that time?

A    Her youngest son, which is Abran.

Q    Where was Joe, Noe and Carlos at that point?

A    They were in prison.

Q    Did you take any steps to try to see if the authorities would permit them to attend their mother's funeral?

A    We wanted to, we went over to speak to my sister-in-law's family, and they wouldn't let us. They said it wasn't any of our business anymore.

Q    Now, how do you feel about Carlos?

A    I love Carlos.

Q    What would it be like for you if he were executed?

A    I pray every day that I don't have to deal with that.

Q    Thank you, ma'am.

        THE COURT:  Any further questions?

        MR. KALISTA:  No, Your Honor.

        THE COURT:  Cross examination?

                CROSS EXAMINATION

BY MR. BROWNLEE:

Q    Good morning, ma'am?

A    Good morning.

Q    My name is John Brownlee, and I'm the United States Attorney.  I just have a few questions for

you.  Okay?

A    Okay.

Q    Are you aware that Mr. Caro has a daughter, Xinia?

A    Yes.

Q    Do you know Xinia?

A    Not very well, no.

Q    Do you know of her?

A    Yes.

Q    Have you heard about her?

A    Yes.

Q    She's in college, isn't she?

A    Yes.

Q    And isn't it true that she's a pretty exceptional young woman, is she not?

A    Yes.

Q    She's really done well, hasn't she?

A    Yes.

Q    And even though her father is a drug dealer, he's killed people, and he has tried to kill people, she's turned out really well, hasn't she?

A    Yes.

Q    Now, I want to talk to you a little bit.  You kind of gave the jury a sense of what it was like when Carlos grew up.  Is it fair to say that there

JA 519

were some good times, as well?

A     Yes.

Q     And some happy times?

A     Happy times, yes.

Q     And is it fair to say that when Carlos would go to his grandparents' home that that was a really loving environment for not only Carlos, but for his other cousins when they went to your parents' home?

A     Yes.

Q     And I guess by all accounts your parents really loved all these kids and would bring them in, and make hot chocolate for them, and ride horses and all kinds of neat things?

A     Yeah.

Q     It was a really loving environment?

A     Yes.

Q     And Carlos got to participate in that?

A     Yes.

Q     Now, you said that growing up as a boy Carlos was not violent; is that correct?

A     That's correct.

Q     So maybe even some others were, when he was small, and he was living in the house with an alcoholic father, he was not violent at that time; is that correct?

A    He wasn't violent, that's correct.

Q    And it's fair to say that you thought he would grow up to be okay.  I think you used the word normal, whatever that means?

A    Yes.

Q    You had a lot of hope for him?

A    Yes, I did.

Q    And you also stated that when he was growing up that, and maybe I missed this, that his parents had a lot of money?

A    Uh-huh.

Q    They had finances, cars, they redid the home and that kind of stuff?

A    Yes, sir.

Q    Now, you stated at some point it came to your attention that Carlos was unable to tie his shoes and unable to read a clock; is that correct?

A    Yes.

Q    Carlos certainly, as he developed, learned how to read and write; is that correct?

A    Yes.

Q    Actually, he became a good writer; isn't that correct?

A    Yes.

Q    Very careful writer?

JA 521

A     Yes.

Q     And had no trouble writing letters to his friends and colleagues?

A     No, not as far as I know.

Q     Now, you said that his father passed away in 1984; is that correct?

A     Yes, sir.

Q     And then I think you said, and I may have been wrong, but after that you kind of, you kind of lost contact with him, you really didn't see the kids much after their father passed away; is that correct?

A     That's correct, yes.

Q     So, that's been about 23 years that you've kind of lost contact with Carlos; is that fair?

A     Yes.

Q     And a lot of time has passed since his father passed away, has it not?

A     Yes, a lot of time.

Q     Said the last time you saw Carlos was ten years ago?

A     Yes.

Q     And a lot of times have passed since then, have they not?

A     Yes.

Q     And a lot of things have gone on since then?

A    (Nodded yes.)

Q    And you understand that Carlos has done a lot of bad things since then?

A    Yes.

        MR. BROWNLEE:  Thank you, very much, ma'am.

                REDIRECT EXAMINATION

BY MR. KALISTA:

Q    If you know, ma'am, and I'm not sure that you do, do you know Xinia, or you know of her?

A    Yes.

Q    Okay.  Do you know Carlos's wife, Xinia's mother, LouYveth?

A    Yes.

Q    LouYveth is fairly well educated; is that correct?

A    Yes.

Q    And I believe her mother is a school teacher?

A    Yes.

Q    And her father was a social worker for over 30 years?

A    Yes.

Q    They're both very fine people?

A    Very fine people.

Q    They had a very positive influence on Xinia?

A    Yes.

JA 523

Q    Somebody that she could look up to; is that right?

A    Yes.

Q    Somebody that would encourage her to achieve, or get an education and make something of her life?

A    Yes.

Q    But Carlos didn't have that, did he?

A    No.

Q    His parents weren't interested in his education, were they?

A    No.

Q    Thank you, ma'am.

THE COURT:  Anything further?  You may step down.  If you'll wait outside, please.  Ladies and gentlemen, we're going to take a luncheon break at this time.  And if you'll follow the bailiff out, we'll see you in one hour.  One hour, please.

(The jury retired to the jury room, after which the following occurred:)

THE COURT:  Is there anything from counsel before we take our luncheon recess?

MR. BROWNLEE:  Yes, Your Honor.  The United States had not objected during this testimony, but we would ask the court if counsel could watch the leading questions.  Also, it appears that the court's

discussion may have had some impact on number 33.  I don't know if you put a Red Bull back there, or something.

THE COURT:  Yes, sir.  I would ask counsel not to lead the witness.  I understand in some circumstances it may move the matter along, where there are uncontested matters, but obviously on direct examination counsel can't do the testifying and simply have the witness nod yes, so I'll ask counsel to watch that closely, please.  Yes, sir?

MR. BROWNLEE:  One other thing.  We received an order from the court this morning, and in light of the fact that we're coming back Monday, is there --

THE COURT:  Why don't we see how we go.  If we have some time this week we'll try to take that up.  But I would like to resolve as many questions about the instructions as we can before next week because we may move quickly.

MR. BROWNLEE:  Could the parties have until tomorrow morning to file a response?

THE COURT:  Yes, sir, that will be fine. We'll try to take these jury questions that I've proposed up tomorrow.

MR. BROWNLEE:  Yes, sir.

THE COURT:  If there's nothing further, then, we'll be in recess for one hour.

(Recess from 12:05 p.m. to 1:05 p.m.)

THE COURT:  Are we ready for the jury?

MR. SIMMONS:  We've got a short matter we need to take up before the jury comes in.

THE COURT:  Yes, sir.

MR. SIMMONS:  Your Honor, the next witness, Yomieda Martinez, is now a guidance counselor and was a teacher when Mr. Caro was in school in Falfurrias. She was an eighth grade school teacher.  I'm putting it on to show the educational opportunities and general situation, very similar to what's already been testified to.  She, we have provided to the Government a copy of Mr. Caro's educational records, as well as a letter which we received from Mr. Alphonso Martinez, Director of Special Education, which indicates the special education Mr. Caro was in for several years in the school district. Ms. Martinez is not a special ed teacher.  She did not teach special ed.  She can simply testify as to the records, as to these records indicate he was in special ed classes, and in those classes there is special testing which occurred before the student is placed in the classes.  And that would be the extent

JA 526

of her testimony.

Now, I've talked to the prosecution regarding these issues, and they are objecting, one, to the letter; and two, have indicated we're opening a door about psychological issues which then would, perhaps, raise an issue of 12(b(2) testing which we have not noticed we're going to offer any proof, psychological testing or any expert testimony regarding that issue.

So, we simply wanted, and if the court rules that we're opening a door, then I'm not going to ask her any questions regarding his placement in special education classes which are apparently in the seventh, eighth grade, sixth grade at Falfurrias.

THE COURT:  Yes, sir.  Mr. Giorno?

MR. SIMMONS:  Your Honor, I could pass the letter up, or do you have it?

THE COURT:  I think I saw it.  You can put it back on the screen, if you wish.  Yes, sir?

MR. GIORNO:  We would object to the introduction of the letter.  The letter, it talks about Mr. Caro being in special education.  I know there's at least one school teacher on this jury. Special education, of course, it's pretty well known in a school setting, particularly if you're talking about learning disability, that requires some type of

JA 527

psychological, or at least a suggestion of a psychological impairment. In fact, this letter is addressed to the Augustus Institute Mental Health Clinic. Mr. Selvog was one of the witnesses who performed the mental health testing on Mr. Caro. It talks about he received special education services. To be placed in that program he would have to be placed in that program by the special education diagnostic team. The fact that Mr. Caro was in special education suggests some, again, suggests some type of a mental issue, and I don't know that it's relevant to these proceedings at this point. School records, no problem. If they want to put in that he did poorly in school, we wouldn't object to that. But to the extent it talks about mental health issues, learning disabilities, we'd object to the letter and testimony.

THE COURT: Any response?

MR. SIMMONS: Dr. Selvog, he's present, he's our mitigation specialist. He did not perform any psychological or educational testing, whatsoever. He primarily was gathering documentation of school records and things of this nature. This letter is in response to a request for records.

THE COURT: I thought the question, isn't

the question whether the introduction of this letter or the testimony concerning special education classes for the defendant is expert evidence relating to a mental condition of the defendant on the issue of punishment?  Is that the question, Mr. Giorno?

MR. GIORNO:  I think under the language of 12.2(b) that's exactly the question, Your Honor.

THE COURT:  If it is, then that has other results.  The defendant hasn't confirmed the introduction of such testimony within the time limits permitted.  Even if that were waived then the Government would have an opportunity to rebut that and review the sealed material.  So, I guess the question is, is whether this is expert evidence relating to a mental condition of the defendant bearing on the issue of punishment, and I guess, Mr. Giorno, how is this expert testimony?  I mean, it's a fact that the defendant was in, quote, special education classes.  I mean, nobody is saying what that means, or is, or just that it's a fact that he was in a special education class.

MR. GIORNO:  And I would agree with that, but it's a conclusion which, of necessity, would suggest it was based on some type of a mental condition, or some mental issue that caused him to be

placed in that setting. It would be like if someone walks in and says, "I think he's mentally retarded." It's a conclusion. It's a fact. But it's based on some psychological testing. He mentions in here he was placed in these classes based on diagnostic testing which suggests there is a mental component to it. Require testing to document his learning disability. Again, because there's a teacher, at least one teacher on this jury they're going to know the reason why you get in there, particularly in a learning disability class there has to be some mental component to it.

THE COURT: Well, I guess, Mr. Simmons, I mean there are some problems here. He says, "As Director of Special Education I know for Mr. Caro to be placed in a special education setting he would then be processed and this would require testing." Seems to me that's, that's pretty close to expert testimony about a learning disability. In other words, it's an opinion as to, to perhaps as to learning disabilities. Other than -- what do you say to that?

MR. SIMMONS: Your Honor, we are not going to have any expert testimony regarding any learning disabilities, nor do we have any testing results, or

JA 530

records, or any hard copies.  In fact, we weren't able to locate any.  They apparently were destroyed. What we asked for were school records, and the records indicated placement in a special education program.  We then obtained this letter or Dr. Selvog, obtained this letter indicating that yes, there was a special education program, and in order to be put in the program these prerequisites would have occurred. It's a simply engineered statement.  Because, again, we do not have any records indicating the exact testing that was done, or the results of that test.

THE COURT:  Did the last witness, Mr. Caro's aunt, didn't she testify he was in special education classes, or did he dream that?

MR. SIMMONS:  I don't recall.

MR. BROWNLEE:  I think she testified that he couldn't tie shoes at age nine, he couldn't tell time.  I think she gave some indicia of his ability, but I don't think she went as far as special education.

THE COURT:  Well, I'm going to overrule the Government's objection.  I do not find this to be expert testimony.  It is a statement of fact concerning the circumstances at the time.  There's no opinion here as to what the effect of the so-called

JA 531

learning disabilities are, or, or any other specialized knowledge. It's simply a fact that's, that the defendant is entitled to introduce in mitigation. So, I'm going to overrule the objection.

MR. SIMMONS: Thank you, Your Honor.

THE COURT: Anything further?

MR. GIORNO: No, Your Honor.

THE COURT: All right. We'll have the jury in.

(The jury entered the courtroom and was seated in the jury box.)

MR. SIMMONS: We call Yomieda Martinez.

YOMIEDA MARTINEZ, DEFENDANT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. SIMMONS:

Q    Good afternoon.

A    Good afternoon.

Q    If you would state your name, and spell it for the court reporter, please, and speak up where everyone can hear you?

A    Yomieda Martinez. It's Y-O-M-I-E-D-A, Martinez, M-A-R-T-I-N-E-Z.

Q    Ms. Martinez, you're from Falfurrias Texas; is that correct?

A    Yes I am.

Q    Where were you born?

A    Falfurrias, Texas.

Q    Where did you grow up?

A    Born and lived in Falfurrias all my life except for the years, except for the few years I left to go to college.

Q    Okay.  When did you graduate from high school?

A    1976.

Q    After 1976 where did you attend college?

A    Kingsville, Texas.  I attended Texas A&I University which is now Texas A&M University.

Q    I know you're nervous, you've never testified before, have you?

A    No.

Q    You arrived here yesterday evening and had quite an adventure getting here; is that right?

A    Yes, we did.

Q    Thank you for coming.  After you graduated from college, where did you go to work?

A    I came right back to Falfurrias, Texas and started teaching.

Q    Where was the college located in relation to Falfurrias?

A    It's the university closest to our home town. It's 36 miles away from Falfurrias.

JA 533

Q    What year did you begin teaching?

A    1979.

Q    Have you been employed by the school system continuously since that time?

A    I have.

Q    Are you married?

A    I am, happily married.

Q    Your husband, where is he employed?

A    He's a store manager at a local lumber company, Ace Hardware.

Q    And you have two children?

A    We have two daughters.

Q    What are they doing?

A    They're both students at Texas State University in San Marcos.

Q    What is your current position?

A    My current position, I am a high school counselor.

Q    How long have you had that position?

A    This is my third year.

Q    Prior to that what did you do?

A    I taught mathematics for 25 years.

Q    In which grade?

A    Thirteen years at the junior high level, eighth grade, and 12 years at the high school.

JA 534

Q    Falfurrias is a small town in southeastern Texas?

A    South south Texas, very small.

Q    Approximately what is the population?

A    Over the years I think it's gotten smaller instead of, you know bigger, but we're at about 5,000.

Q    And the size of a graduating class at Falfurrias high is?

A    We graduate between 90 and 100 students every year.

Q    I'm going to focus your attention back to 1979 or 1980, if you would?

A    Okay.

Q    At that time were there problems in the high school as far as drop outs?

A    Our drop out rate was definitely greater then than it is now.  It's because of the different state standards and mandates that are in place now.  But yes, our drop out rate was significantly larger and higher.

Q    Were there problems involving the students at that time involving drugs and alcohol and things of that nature?

A    Yes, back then, and we still have problems.

Q    If you would briefly tell the jury about the economics of Falfurrias, where people work, what the main employment is?

A    Okay.  In our small little town most people, they either do, they either work in the school system or they work in ranches.  We have two, three small local banks, and so we have people working there.  We have a few, we have a small Wal-Mart, and one department store, Bell's.  We have an AGB, a grocery store, and we have a lot of little convenience stores.  That's just about it.  There's not a lot.

Q    Is it a primarily Hispanic population?

A    Yes.  We have, I would say, like 80, 95 percent of the population is Hispanic.

Q    Does the poverty level exceed the national average?

A    The poverty level is very, very high.  I know working in the school system, most, you know, being with the students, and we see this, and I know I can tell you right now we have 100 percent of our students that are in the school district now receive free lunch, and I would say about 98, 95 percent of them are economically disadvantaged, and I know that because we have to go through all of those, look at all those different aspects when we're trying to

qualify students for scholarships and different, different things at the high school level now. We always have to look at those things.

Q    And in your capacity as an eighth grade math teacher, did you come in contact with Carlos Caro?

A    I did, as his mathematics teacher.

Q    Do you recognize him in the courtroom today?

A    I do.

Q    When was the last time you saw Mr. Caro?

A    I would have to say it was when he was a student, many years ago.

Q    Did you come in contact with Mr. Caro's brothers, older and younger brothers?

A    I taught all three of his brothers.

Q    Can you tell the jury the difference between Mr. Caro and his brothers? First tell the jury, what type of boy was Carlos?

A    Carlos was a very timid young boy. I can still picture where he would sit in my classroom, and that was at the very back on the very back seat. I didn't, I never assigned seats when I was teaching. I liked the students to sit where they felt comfortable. And I allowed them to, unless I saw later on that there was some type of problem with whom they were sitting next to, then I would make the

JA 537

adjustment.  But he always sat in the back of the room, and he was very timid, he was very quiet, always respectful.  I do not have any memories of him being anything but polite, and quiet, and respectful to me or to any of my colleagues.

Q    Do you recall his brothers?

A    I definitely recall his brothers.

Q    Would you tell the jury what type of students his brothers were?

A    Teaching all four boys within a very, they all seemed to be very close in age.  His brothers were very different.  I was a young teacher, and I, they really were a handful.  They were disobedient, disrespectful, used vulgar language, impolite in the classroom, and in the halls, in the whole school. They were just a handful.  A handful.

Q    Totally different from Carlos?

A    Totally different.

Q    Was Mr., young Carlos, was he ever violent or in any fights, or anything to your knowledge, in your class?

A    Not that I recall, sir.

Q    And you had Carlos in the eighth grade?

A    Yes, sir.

Q    And subsequently I believe he dropped out of

JA 538

school in maybe what year, what grade?

A   I want to say that I thought I saw in his records he might have gotten to maybe ninth grade.  I know he started high school.  I'm not really sure at what point he dropped out.

Q   But you do know he dropped out?

A   Yes.

Q   And after he dropped out, you have no personal knowledge as to what happened to him?

A   None, whatsoever.

Q   You, of course, you have knowledge as to what has happened to him at this point?

A   Yes, sir, only because of this trial.

Q   What was your reaction when you found out the conduct he had engaged in?

A   I was speechless.  I was absolutely shocked.  I would have never, in my wildest dreams ever, I would just never have thought that Carlos would be in the position that he is in today.

Q   You've had an opportunity to read his school records?

A   Yes, I have.

MR. SIMMONS:  I'd like to make these an exhibit.

THE COURT:  Very well, if you'll hand them

to the clerk.  Are they already marked?

MR. SIMMONS:  No, Your Honor.

THE COURT:  If you'll hand them to the clerk to mark them for identification.  How many exhibits are there, Mr. Simmons?  Two, three?  Or do you want one collective exhibit?  Why don't we mark them as a collective exhibit if they are single sheets.

MR. SIMMONS:  They're nine pages in addition to one letter, consisting of two pages.

(Defendant's Exhibit Nos. 8 and 9 were received in evidence.)

BY MR. SIMMONS:

Q    Could you identify these documents, please, ma'am?

A    Okay.  This first one is from the special ed department from our school system.

Q    And it's a letter, who signed the letter?

A    Mr. Alphonso Martinez, who is the Director of Special Education in our school system.

Q    No relationship?

A    No, not at all.

Q    Can you identify these other documents?

A    Yes.  These documents I'm looking at here are Carlos's school records.  We call them the Cum

JA 540

Records.  They've have his grades, his pictures, and the Cum Records.  It's like a history of the student from kindergarten on through the school years with grades, years, teachers' names, attendance records and so on.

Q    What type of student do they indicate Mr., Carlos was?

A    Looking at these records, even in his early years, I see that in the early years the grades are with A, B, C, D, and there is a lot of Ds, which I think at that time were passing.  Now they're not, Ds are not passing anymore.  But he had a lot of Cs and Ds.  Bs, and I don't see any As.  There's a few As in mathematics.  I notice that in third grade.

MR. SIMMONS:  I'd ask these be made exhibits.

THE COURT:  Very well.  They will be admitted.

(Defendant's Exhibit No. 10 was received in evidence.)

BY MR. SIMMONS:

Q    Certainly you have seen students in Falfurrias who have dropped out and haven't gone to prison?

A    Right.

Q    You've seen students who have graduated and have

gone to prison?

A    I have.

Q    As far as Mr. Caro's situation, other than what you testified to, you simply have no knowledge of it?

A    Absolutely none.  I have no idea where he was, what had happened to him.

MR. SIMMONS:  One moment, Your Honor. That's all the questions I have.

THE COURT:  Thank you.  Cross examination?

CROSS EXAMINATION

BY MR. GIORNO:

Q    Ms. Martinez, good afternoon?

A    Good afternoon, sir.

Q    My name is Tony Giorno.  I'm an Assistant United States Attorney.  I have some follow up questions for you.  You say you grew up in Falfurrias?

A    I did.

Q    You went to Falfurrias High School?

A    I did, and graduated from there.

Q    Went to college and came back as a school teacher?

A    I did.

Q    And are raising a family there in Falfurrias still to this day?

A    Yes.

Q    Obviously you turned out very well?

A    I did, if I could say so.

Q    And you said, I believe, this is the first time you had to testify in court, right?

A    Yes, sir.

Q    So, you've never had to go to court for any other students who were in a similar situation for Mr. Caro, right?

A    Never.

Q    Is it fair to say a lot of kids grew up in circumstances, it was a poor community, lots of families suffering from poverty for different reasons?

A    Yes, sir.

Q    They've all gone through the system, gone on with their lives, fair to say?

A    Correct.

Q    In fact, some stayed in Falfurrias, some have gone other places, but as far as you know they've done well, a lot of them?

A    A lot of them.

Q    And you've not seen Carlos Caro since the eighth grade?

A    I cannot recall seeing him past that year.

Q    Did you have him just that one year, the eighth

grade math?

A    Yes, sir.

Q    I believe you said he was described as being timid?

A    Yes, sir.

Q    And respectful?

A    Yes.

Q    I think you used the word obedient?

A    Yes.

Q    And used the word nonviolent.  So, you wouldn't expect him to be involved in gang assaults on people, would you?

A    No, sir.

Q    Or murdering someone else?

A    No.

Q    You wouldn't expect him to be involved in joining a gang or writing coded letters?

A    Are you referring to this going on while he was living in Falfurrias?

Q    No.  My question to you is the boy that you saw in the eighth grade, you wouldn't expect him later in life to be involved in these different activities, based on what you saw of him, this timid, obedient child that you described in the eighth grade?

A    I would not have expected that.

JA 544

Q    So, the person that you knew in the eighth grade is not the same guy that would commit acts like that?

A    In the environment at school, the way I knew him, you know, of course it's different.

Q    People change?

A    People change, and depending on the circumstances, and where you're at, I would say, you're going to act differently.  I know as a student in the eighth grade in the environment that he was, he was not violent.

Q    And I believe you told the jury his involvement in these things that you've been told about, that I've asked you about, say that came as shock to you based on what you saw as from the boy in the eighth grade?

A    Correct.

Q    Thank you, ma'am.

            THE COURT:  Anything further?

            MR. SIMMONS:  No, Your Honor.

            THE COURT:  Thank you, ma'am.  You may step down.  If you'll take those papers that you have in front of you and give them to this young lady seated in front of me, and then you may be excused.  May this witness be excused?

            MR. SIMMONS:  She may.

JA 545

THE COURT:  Thank you, ma'am.  You may call your next witness.

MR. KALISTA:  Your Honor, we call Delia Contreras.

DELIA CONTRERAS, DEFENDANT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. KALISTA:

Q    What is your name, ma'am?

A    Delia Contreras.

Q    Could you please spell that for the court reporter?

A    D-E-L-I-A, C-O-N-T-R-E-R-A-S.

Q    Where do you live, ma'am?

A    I live in Premont, Texas.

Q    Where is that in relationship to Falfurrias, Texas?

A    It's about six miles from Falfurrias.

Q    How old are you?

A    I'm 53.

Q    So, you were born some time in 1953, or so?

A    Fifty-three, yes.

Q    How are you related to Carlos Caro?

A    I'm his aunt.

Q    And do you see Carlos in the courtroom today?

A    Yes, I do.

Q    And are you related to Carlos's father or mother?

A    Father.

Q    I believe that Susannah Rodriguez, who previously testified, is your sister?

A    Yes.

Q    And Jose Marie Caro and Mathilde Caro are your parents?

A    Yes.

Q    How many children did your parents have?

A    Nine.

Q    And where are you in the birth order among those nine?

A    I'm the fourth from the oldest.

Q    Where was your brother in that birth order?

A    The first.  He was the oldest.

Q    And what level of education do you have?

A    Ninth grade.  I went to the ninth grade.

Q    Did you start working after leaving school in the ninth grade?

A    Yes.

Q    What kind of work did you do?

A    Well, we handed out food for the poor.  It was a secretarial job, but that's what it came out to in Falfurrias.

JA 547

Q    Approximately how long did you do that?

A    About a year.

Q    And since that time how would you describe your occupation or your work?

A    I'm a housewife.

Q    About how long have you been a housewife?

A    About 30 years.

Q    Are you married?

A    Yes, this is my second marriage.

Q    How old were you when you first married?

A    Nineteen.

Q    And what did your first husband do as far as employment?

A    He was a counselor for the high school.

Q    Where was that?

A    In Edinburg, Texas.

Q    I believe that's by McAllen?

A    Yes.

Q    Close to the Texas, Mexico border?

A    Yes.

Q    Do you have any children?

A    Yes, I have two boys.

Q    And could you tell us their names and the level of education that they have?

A    Okay.  Rene Cantu, Jr., he's a production

JA 548

manager for an oil company in south Texas, and high school graduate and some college; and Daniel Cantu, he's a chef for HEB in south Texas.

Q    I believe HEB is a super market chain.  He's employed as a chef?

A    Yes.  He was a high school graduate, and college, some college.

Q    Do your children have a criminal record?

A    No, sir.

Q    And you were born and raised in Falfurrias?

A    Yes.

Q    Now, besides Falfurrias where else have you lived?

A    In Edinburg.

Q    Approximately how long did you live in Edinburg?

A    About 26 years.

Q    When did you move to Edinburg from Falfurrias?

A    Seventy-three.

Q    Seventy-three.  So, you were about 20 years old at that point?

A    Right.

Q    When you were living at Edinburg with your first husband.  Did one of your nephews come and live with you?

A    Yes, Joe.

Q    I'm referring to one of your brother, Jose's, children?

A    Yes.

Q    And which one of the boys came to live with you?

A    Joe, the oldest.

Q    What relationship is Joe to Carlos?

A    He's his brother.

Q    And I believe he's an older brother; is that right?

A    Yes, he's the oldest.

Q    What were the circumstances that led Joe to come to live with you in Edinburg?

A    He got into some trouble, and they were going to send him to a correctional facility. So they told, somebody had to take him in besides the parents, so, we told, we decided to take him in, me and my husband. We took him to Edinburg, and we put him in school. He started getting into some trouble after a while. We had him, there he started getting into some trouble, I don't know, fights in school, and so, and we had a son, and that's why we decided to take him back to my brother.

Q    What reason was it that he came to you to begin with?

A    Because he had gotten into some trouble with the

law there in Falfurrias.

Q    Do you know what the trouble was?

A    I don't know.  I think it was drugs.

Q    And did that placement with you work out?

A    Excuse me?

Q    Did that placement of Joe in your home at Edinburg with you and your husband and children, did that work out?

A    Well, no.  Well, we did take him in, but then we decided to take him back because of my son, because he was with him all the time, he was picking up bad habits.

Q    Who was picking up bad habits?

A    My son.

Q    From whom?

A    From Joe.

Q    What type of bad habits was he picking up, or you were afraid he was going to pick up?

A    His manners, he was always mad, and I was afraid he might, I don't know, pick up his, Joe's manners. That's why we decided.

Q    Again, what were the specific problems, the trouble that Joe was getting into while he was getting into your home?

A    He was getting into fights in school, and drugs.

I don't know where he would get them from, but he would bring them to the house.

Q    Now, when Joe was placed with you, had he been placed, or had he been living with his parents, your brother and Virginia, your sister-in-law, at that time?

A    Yes.

Q    And where did you, where did Joe go after he left your residence?

A    Back to his parents.

Q    Do you know why Joe was getting in trouble?

A    I guess because of how he was raised.  He had a lot of problems at home.

Q    Now, I want to focus on your brother, Jose. Now, did your brother, Jose, have a drinking problem?

A    Yes, he did.

Q    And could you tell us something about this disposition and demeanor?

A    Well, he was, he started drinking when he was 16, so he was abusive, he, with his wife and they would get into fights and stuff, and he drank.

Q    Now, in your family you mentioned Joe drank, your brother.  Did your father drink?

A    Sometimes, not -- it was occasionally.

Q    I mean to excess.

JA 552

A    No.

Q    Did any of your brothers, did any of your sisters and your other brother, did they have a drinking problem?

A    No, sir.

Q    Did your brother, Joe, have a criminal record?

A    Yes.

Q    And what type of criminal record did he have?

A    I think it was burglary.

Q    Burglary?

A    Yes.

Q    Did he go to prison?

A    Yes.

Q    And what kinds of crimes besides burglary, if any, was he arrested for or involved?

A    In drugs.

Q    Now, did he do some things that he wasn't arrested for?

A    Yes.  Like take my dad's car.  My dad would call the police, and they would bring him back, but he wouldn't get arrested.

Q    And did your brother, did he have a certain reputation?

A    Yes, for being a tough guy.

Q    Could you explain that a little further for the

JA 553

jury?

A    Well, a lot of people were afraid of him.  His friends.  And I don't know, he's known for being a tough guy.  He wasn't with us, but he was with everybody else.  I don't know.

Q    You mentioned something about him being abusive to his wife?

A    Yes.

Q    Did he, did he treat other people outside of the family as kind of a tough guy?

A    Well, not really.  I mean, if somebody did something to him he would, he would take care of it or, I don't know what you would call it, but in his house, in his home he was, sometimes they would get into fights, he and his wife.

Q    What would usually cause that?

A    His drinking.

Q    Would that be the source of the disagreement between him and his wife, his drinking?

A    Yes, sir.

Q    Was he a good provider for his wife?

A    Well, well, sometimes -- well, he didn't work much, but sometimes he did provide for his family.

Q    Now, was your brother faithful to his wife?

A    No.

JA 554

Q    And what do you mean he was not faithful?

A    Well, we heard that he had, was going out with somebody, and the reason we found out was because the lady shot him in the park, and that's how we found out he had been unfaithful to his wife.

Q    And who had shot him?

A    I don't know her name.  They call her the, that was her nickname, the gavilana (phonetic).

THE COURT:  How do you spell that?

A    I don't know.

Q    You said this woman shot your brother?

A    Yes.

Q    Was this a woman he was having an affair with?

A    Yes.

Q    Did she wind up going to prison because of shooting him?

A    Yes, I think she did.

Q    And what injuries did your brother receive?

A    Well, besides he had problems with his liver from the drinking, and he, he had complications with the shot, and everything.  That's what caused his death in the end.

Q    Please speak up, ma'am.  Now, you mentioned that your brother drank?

A    Uh-huh.

Q    Him and his wife had arguments?

A    Yes.

Q    And would these arguments lead to any type of violence?

A    Yes.

Q    Could you describe that, please?

A    Well, sometimes they would get into arguments, and they would, they'd fight.  He would hit her.  And they would have to call my mom so she could come and stop him.  He would listen to my mom.

Q    Why didn't your dad go down?

A    Because it would make it worse.  You know, because my dad would try to tell him stuff, and he didn't want to listen, so it would make it worse if he would go.  So my mom is the one that went most of the time.

Q    When you say would make it worse, make it worse between whom?

A    Between my dad and my brother.

Q    Did your dad and brother get into fights, as well?

A    Yes, in my house.

Q    Did your brother hit his father?

A    I don't know.  We usually would run outside.  We didn't know what was going on inside.

Q    Now, when Virginia and Jose would get into these disagreements and these fights were the children around?

A    Yes, they were around all the time.

Q    I'm talking about Carlos, Jose and his brothers.

A    Yes.

Q    What would they do?

A    Usually we would bring them outside with us.

Q    What would be their emotional state?

A    Crying.  They would be real upset and crying.

Q    Did you ever witness your brother hit his children, or beat his children?

A    Yes.  Once I saw him beat Joe, the oldest.  He had done something outside, and he beat him with an electrical cord.  But the other times, I know they would spank them, but I didn't see him spank them.

Q    How often did these fights or disagreements between Joe and his wife occur?

A    Oh, about, I'd say, about three times a week.

Q    And over --

A    Three or four times a week.

Q    Over what period of time are we talking about?

A    Years, I guess.

Q    What was their pattern, or did they have a pattern as far as staying together, or separating, or

what can you tell the jury about that?

A    Well, they would, they would get into fights and they would separate, and then after a couple of days later they would get back together again.  She wouldn't press charges on him.

Q    Now, in looking at Jose and Virginia's children, were his boys, his sons just like him?

A    Yes, except for Carlos.

Q    Why do you say that?

A    Because Carlos was very shy.  He was, he kept to himself, his brothers would pick on him, but he was a loner.  He didn't, he didn't hang around with his brothers, or anything.

Q    Now, when you knew Carlos as a child, did you ever expect him to get into trouble?

A    No.

Q    Was he a violent person?

A    No, a very gentle person.

Q    Was he disrespectful?

A    No, not at all.

Q    Now, did you expect Carlos's brothers to end up in trouble?

A    Yes.

Q    When did you last see Carlos?

A    Well, I got married and moved away back in '72,

JA 558

and I think Carlos was about six years old.  That's when I stopped seeing how he was raised.  But we would come back on holidays to see him, and we'd see each other on and off.

Q    Now, did your parents, did they stay in Falfurrias until their deaths, or did they move away?

A    No, they stayed in Falfurrias until their death.

Q    Did you have sisters and a brother who stayed around the Falfurrias area, or did they move away?

A    I have some sisters and a brother that stayed in Falfurrias.

Q    You said you would see Carlos at family gatherings?

A    Yes.

Q    Now, what kind of a father would, or how would you describe your brother in terms of being a father?

A    Well, he was never there for them.  I mean, the attention they needed, he was, he worked, he worked sometimes, but I guess the boys needed more attention than what my brother was giving them.

Q    And did you believe that Virginia was a good mother?

A    Well, she was, well, they needed attention from their mom, too, and I guess Virginia didn't give them the attention that they needed.

Q    Now, in terms of, as far as helping her children, let's say, get ready for school, make sure they get to school, and do their home work, was she that type of a mother?

A    No, she was not.

Q    Did she dress them when they were younger?

A    They'd get dressed the way they could, and we lived close by so they would go for breakfast in the morning to the house, and we'd iron their clothes and get them ready for school.

Q    Now, what do you remember about, or did they finally separate at some point and stay apart?

A    Yes.  I think it was three years before my brother died.

Q    And your brother died in what year?

A    I think '82.

Q    Approximately 1982?

A    Approximately 1982.

Q    So, they had separated for about three years prior to that time?

A    Excuse me?

Q    They separated for about three years prior to that time?

A    Yes.

Q    Did they reside in the same town, Falfurrias?

JA 560

A    Yes, they did.

Q    What did your brother do once he finally separated from his wife?  Where did he live?

A    He lived with my mom and dad.

Q    What was his condition?

A    He was very sick.  He had cirrhosis of the liver, and then he had complications with the shot, I mean the lady that shot him, and I guess that was the complications were the ones that caused his death.

Q    Now, do you remember Carlos as a young infant?

A    Yes.

Q    And what do you recall about that?

A    That he was very sick, he was a very sick child. He was very malnutrition.  They told my mom, somebody told my mom to give him goat's milk, and that was the only milk he would take.  So, I guess we gave him the goat's milk until he was about a year old, and then he, he was okay after that.

Q    Now, what would it be like for you if Carlos were executed?

A    I can't even think about that.

MR. KALISTA:  That's all the questions I have, Your Honor.

THE COURT:  Cross examination?

CROSS EXAMINATION

JA 561

BY MR. BROWNLEE:

Q     Good afternoon, ma'am.  How are you?

A     Just fine.

Q     My name is John Brownlee.  I'm the United States Attorney.  I just have a couple of questions for you.  Now, how many brothers and sisters did you have?

A     Nine.

Q     Nine?

A     Uh-huh.

Q     And Mr. Caro's father was your brother; is that correct?

A     Yes.

Q     And you've kind of described what he was like; is that correct?

A     Yes.

Q     And now, is it fair to say that your parents, your mother and father, provided you with a loving home?

A     Yes.

Q     Okay.  And you had a good mother; is that correct?

A     Yes, we did.

Q     And a good father?

A     Yes, we did.

Q     And they provided for you and your eight

brothers and sisters as well as they could?

A    Yes.

Q    And they loved you?

A    Yes, they loved us.

Q    And they loved your brother?

A    And they loved my brother.

Q    And despite that love and support, he turned out the way he did; is that right?

A    Uh-huh.  Yes.

Q    Is that true?

A    Yes.

Q    And they loved him, right?

A    Yes.

Q    And they cared for him?

A    Yes.

Q    Okay.  And you don't blame your parents for how your brother turned out, do you?

A    No.

Q    He did that on his own, didn't he?

A    He did that on his own.

Q    And he made those choices to drink?

A    Yes.

Q    Correct?

A    Yes.

Q    And everything else that he did, he made those

choices on his own, did he not?

A     Yes.

Q     Now, you stated that you lived in Falfurrias until 1972?

A     Seventy-two, yes.

Q     Then you moved away?

A     I moved away.

Q     How far away did you move?

A     It's about an hour and a half.

Q     About an hour and a half?

A     Yes.

Q     So, you would come back and visit, but on a day to day basis you were at your new home; is that correct?

A     Yes.

Q     So, on a day to day basis you didn't see how Mr. Caro grew up at that time, did you?

A     No.

Q     And if I were to tell you that, that he grew up in an environment, particularly when he was at his grandparents' home, your parents' home, that that would be a loving environment, that there were good times in his life?

A     Yes.

Q     Would you agree with that?

JA 564

A    Yes.

Q    And your parents loved him?

A    Yes.

Q    And they loved all their grandchildren, didn't they?

A    Yes, they did.

Q    And they provided a lot of love and support during their lives.  Did they not?

A    Yes.

Q    And there were times when the grandchildren would go over to your parents' home and ride horses and have hot chocolate, and all those things?

A    Yes.

Q    Those were good times, were they not?

A    Very good times.

Q    And Mr. Caro got to experience that; is that correct?

A    Yes.

Q    I want to ask you a little bit about, you stated that at some point when he was a baby, his mother decided to feed him goat's milk; is that correct?

A    Uh-huh.

Q    Isn't it that his mother did that because he couldn't hold down his other milk, and they went to the doctor, and the doctor recommended that; is that

JA 565

correct?

A    Well, as I understood, somebody had told my mom, and my mom was the one that suggested that they, they give him goat's milk, because they had already taken him to the doctor.

Q    So, if another witness came in and said it was a doctor who recommended that, would you disagree with that?  You don't know?

A    I don't know.

Q    That's okay.  I know it's a long time ago. Thank you, very much, ma'am.

THE COURT:  Redirect?

REDIRECT EXAMINATION

BY MR. KALISTA:

Q    Mr. Brownlee asked you questions about your parents, and you've described your parents as providing you a loving environment; is that correct?

A    Yes.

Q    Do you think that Carlos and his brothers had the same loving environment in their home from their parents?

A    No.

Q    Was your brother a good role model for his sons?

A    No.

Q    Why do you say that?

JA 566

A    Because of all the trouble my brother had gotten into, and the way he was with being a tough guy, he wasn't a good role model for his kids.

Q    Do you think that Virginia was the type of mother that -- let me rephrase that, I'm sorry.  Did Virginia do things as a mother that you would have done as a mother for your children?

A    No.

Q    And why do you say that?

A    Because she didn't give them the attention that they needed.

Q    Okay.

        THE COURT:  Anything further?

        MR. BROWNLEE:  No, Your Honor.

        THE COURT:  Thank you, ma'am.  You may step down.  You may call your next witness.

        MR. KALISTA:  Diamantina Razo.

        THE COURT:  Are you going to call the last witness any further?

        MR. KALISTA:  No, Your Honor, she can be released.

    DIAMANTINA RAZO, DEFENDANT'S WITNESS, SWORN

                DIRECT EXAMINATION

BY MR. KALISTA:

Q    Would you state your name, please, ma'am?

A     Diamantina Razo.

Q     Would you spell that?

A     D-I-A-M-A-N-T-I-N-A, R-A-Z-O.

Q     Where do you live, ma'am?

A     I live at 10900 County Rode 40, Concepcion, Texas.

Q     Where that is in relationship to Falfurrias, Texas?

A     It's about 16 miles away.

Q     How old are you.  Ma'am?

A     Fifty-nine.

Q     And my understanding is your parents were Jose Marie Caro and Mathilde Caro?

A     Yes, sir.

Q     And where are you in the birth order?

A     Third.

Q     Third of nine children?

A     Uh-huh.

Q     Where was your brother, Jose, in that order?

A     He was the first born.  He was the oldest.

Q     Now, what did your father do for work?  In other words, what type of employment did he have?

A     My father was an electrician.  He drove a truck, and he drove a school bus for about five years.

Q     What did your mother, Mathilde do?

JA 568

A    She was a housewife.

Q    And where were you all raised?

A    509 West Candella in Falfurrias.

Q    What is your relationship to Carlos Caro?

A    He's my nephew.

Q    His father, Jose, would be your brother?

A    He was my brother, yes.

Q    And what is your education level?

A    I only went to the sixth grade.

Q    Dropped out after the sixth grade?

A    Yes.

Q    What did you do after leaving school?

A    Well, I worked, helped my parents support the younger kids.

Q    Are you married?

A    Yes.  Well, I'm a widow now.

Q    And how old were you when you got married?

A    Twenty-four.

Q    How long did you stay married?

A    Almost 30 years.

Q    What did you and your husband do during that 30 year time?

A    We were farmers, vegetable producers, we raised cattle.  We had a dairy farm.

Q    And what, basically, caused your husband's

JA 569

death?

A     He had a massive heart attack.

Q     And that's been approximately how long ago?

A     Ten years.

Q     What happened to the farm after that?

A     Well, we couldn't find anybody else to work the farm, so we kind of sold the cattle, closed the dairy and, well, we didn't plant anymore.

Q     Do you have children, ma'am?

A     Yes, I have three.

Q     Could you state their names and ages?

A     Jessica Florez, 35; Jose Razo is 32, and Leno Razo, Jr. is 21.

Q     What is Jessica's educational level?  How far has she gone in school?

A     She went four years to college.

Q     Where did she go to school?

A     Falfurrias.

Q     I meant for college, ma'am, after Falfurrias.

A     Oh, I'm sorry, I'm sorry.  She went to -- oh, my goodness, sorry.  I'm so nervous.  She went to Kansas City.  That's where she had her education.

Q     What does she do?

A     Right now?

Q     Yes.

A    She's a manager at the Paradise Hills.  It's, she's a wedding planner, in other words.

Q    And you have another son, I think, Angel.  How far did he get in school?

A    He had four years in college, too.

Q    What does he do?

A    He manages storage units, two companies in Dallas.

Q    You have a third, youngest son?

A    That's Leno.  He's in the Marines.  He's been in there for two years.

Q    Did he serve overseas?

A    Yes.  He just got back from Iraq.

Q    And I believe in terms of, you've said how, how much younger are you than your brother, Jose?

A    About six years.

Q    All right.  Now, how did you get from Texas to Virginia here to testify?

A    We drove.

Q    Who did you drive with?

A    My two sisters and my nephew.

Q    All right.  The two sisters that you're talking about, I think they've just testified?

A    Yes, sir.

Q    Delia and Susannah?

JA 571

A       Yes, sir.

Q       How long did it take you?

A       It took us three days to get here.

Q       Now, tell us about your brother, Jose.  Did he have a problem with alcohol?

A       Yes, he did.  Yes, he did.

Q       How would you describe his personality?

A       My brother, he was, how I would tell you, he was a nice guy and stuff with you.  When he drank, that's when the problems began.

Q       How often did he drink?

A       Well, weekends, sometimes during the week.

Q       Did he, when did he start drinking, as far as you know?

A       His teenage years.

Q       Teenage years?

A       Uh-huh.

Q       Did it get worse over time, better over time?  Did he stop at some point?

A       No, no, it never got better.

Q       Was he able to work in spite of the drinking?

A       Yes.  Yes, he did.

Q       What types of jobs did he have?

A       Well, he had all types of jobs.  He used to work with a company there in Falfurrias for a few years,

but then he did odd jobs, worked in the fields, water melons, stuff like that.

Q    So, he had basically short term employment with a variety of employers?

A    Yes.

Q    Were there times that he was not employed?

A    Yes.

Q    Was Virginia employed?

A    No.

Q    What was your brother like again when he drank?

A    Well, I guess once they started fighting, that's when he, that's when, I guess, the abuse began.  I don't know how to describe it.

Q    You're talking about the fighting.  Who and who?

A    Virginia and my brother.

Q    What do you know generally about your brother's treatment of his wife, Virginia?

A    Well, I never did see him lay a hand on her, I didn't.  I found out later, well, she said he did.  I guess that's what happened.

Q    Was your brother able to support his wife and children adequately?

A    Yes, he did, when he worked.

Q    But that was kind of like a hit and miss proposition?

A    Well, I guess, yes.

Q    Now, did he become unable to work at some point?

A    Well, I guess, yeah, a short time before he died.

Q    And what, what was his problem?

A    Alcoholism.

Q    And that led to complications --

A    Cirrhosis of the liver, yes.

Q    When did it get to a point where he simply couldn't do much of anything anymore?

A    Well, that happened right before, right before we put him in the hospital.

Q    Was he living with his wife at that time?

A    No, he had separated.

Q    About how long had he been separated?

A    I don't have an idea, sir.

Q    Now, what happened to Virginia and the boys after your brother died?

A    Well, well, I guess she moved toward her family, her family.  I think she moved with her mother and dad for a few years, or something.  I'm not sure.

Q    Now, when you say she moved toward her family, did Virginia's parents live in the Mexiquito section of Falfurrias?

A    No.  They lived a few more blocks away.

JA 574

Q    A few blocks out of that?

A    Yeah.

Q    About how close to where, let's say, your brother and Virginia lived?

A    Let me see.  I'd say about maybe six blocks.

Q    Six blocks away?

A    Yeah, uh-huh.

Q    Half a mile?

A    Something like that.

Q    Now, after your brother died, did you get to see Carlos and his brother as much anymore?

A    Not very much.

Q    Do you know if your brother and his wife separated much during their marriage?

A    Yes, they did.

Q    Was that on a regular basis?

A    Well, I don't know how often.  I can't tell you how many times, but I know they did.  But they always got back together again.

Q    Now, what kind of mother was Virginia?

A    Well, well, I guess to them she was a good mother, but -- I'd say she was a good mother to them.

Q    Pardon me?

A    She was a good mother to them.

Q    Do you think she provided for their needs, what

JA 575

Razo - Direct

they needed appropriate to their age?

A    Not all of them.

Q    Were they, were they cared for by her, dressed for school, got ready for school, that type of thing?

A    I guess she did the best she could.

Q    Well, was Virginia raising her children different from the way you raised your children?

A    Well, I guess.

Q    How is that?

A    I don't know.  I only know that I always knew where my kids were.

Q    Did you say, are you saying, then, that she didn't know where her children were?

A    Well, sometimes she didn't.

Q    What type of child was Carlos?

A    Carlos was a very quiet boy.  He's always been a quiet loner.

Q    Was he violent?

A    No.

Q    Was he disrespectful?

A    No.

Q    Did he have a lot of friends?

A    No, not Carlos.

Q    How was he different than his brothers?

A    Well, like I tell you, he was a loner, he never,

JA 576

he, he always liked to play, you know, with his little cars, or whatever he played with all by himself. I don't know why he didn't have any more friends.

Q    Now, did you ever expect Carlos to get into any trouble?

A    Oh, no.

Q    Why was that?

A    He doesn't have it in him, he didn't.

Q    Did you expect his brothers to get into trouble?

A    Well, yes. They're a little bit more aggressive than Carlos. Carlos is not.

Q    By more aggressive, what do you mean?

A    Well, in other words, they won't stay with anything. If you tell them something, they're going to throw it right back at you. I don't know if you can understand what I'm trying to tell you.

Q    And Carlos was not like that?

A    No, no, he wasn't.

Q    You mentioned that after at some point when they separated you wouldn't see Carlos as much as when they were together; is that correct?

A    Right.

Q    At some point when your brother died you really didn't see them much at all at that point?

JA 577

A    Right.

Q    Did Virginia's family, did they have a certain reputation in the community?

A    Well, we heard things, you know.  We heard things about them, but I can't tell you for sure.

Q    What was their reputation?

A    Well, they were, you know, they drank.  I don't know if they did drugs.  I don't know.

Q    Besides your brother, you or your children, your sisters, other brother and their children, as far as you know do any of them have any criminal records?

A    Not that I know, no.

Q    Any alcohol or drug problems?

A    (Nodded no.)

Q    You're shaking your head no?

A    No.

Q    What would it be like for you if Carlos were executed?

A    Oh, God, I don't know.  I don't know what to tell you.

Q    Thank you, ma'am.

A    I'm sorry.

THE COURT:  Cross examination?

CROSS EXAMINATION

BY MR. GIORNO:

JA 578

Q   Ms. Razo, good afternoon.  You said you grew up fairly close to Mr. Caro and his family, close proximity?

A   We lived close together.

Q   I think you said your brother, Jose, was a nice guy who just drank sometimes?

A   Yeah.

Q   And when, when you described Mr. Caro's mother, Virginia, I think you said she was a good mother?

A   Yeah.

Q   And I think you used the words she did the best she could?

A   She did the best she could.

Q   Perhaps not the ideal mother, but she looked after her kids as best she possibly could?

A   Right.

Q   And after your brother, Jose, died in 1984, you really haven't seen much of Mr. Caro or his brothers, or anybody else in that family, you don't know what happened to them, or where they went, what their lives were like after?

A   We heard about them once in a while.  We saw them once in a while when they came over to see my mother.

Q   But your contact, I take it, was infrequent

after 1984?

A    Right.

Q    Thank you.

          MR. KALISTA:  No further questions.

          THE COURT:  Thank you, ma'am.  You may step down.

          MR. KALISTA:  Judge, may we take our afternoon recess now?

          THE COURT:  Yes, sir.  We're going to take a break now.  If you'll follow the bailiff out, please, we'll be in recess for about 15 minutes.

     (The jury retired to the jury room, after which the following occurred:)

          THE COURT:  If there's nothing from counsel, then we'll be in recess for 15 minutes.

     (Recess from 2:25 p.m. to 2:45 p.m.)

          MR. KALISTA:  Judge, I have talked about this with the Government.  We are asking to recess for today.  We do need to talk to witnesses that came in late last night.  We also have inmate witnesses that we need to interview now, and we will do so when we leave here.  We will finish tomorrow, except for Dr. Cunningham.  I believe the Government has no objection to that.

          THE COURT:  All right.  We also need to

talk tomorrow about our instructions. Counsel, be prepared for that. One other thing, I need to start court tomorrow at 9:30, 9:30. So, we'll be starting a half hour late so that I can get a quick dentist appointment. So, we'll have the jury in, please.

(The jury entered the courtroom and was seated in the jury box.)

THE COURT: Ladies and gentlemen, in terms of the witnesses, I'm going to, because of the witnesses, I'm going to let you go for the day now. And the, that way we'll, we'll be able to get all the witnesses lined up, and, so that you can hear them tomorrow, and it, it appears right now, just in terms of our schedule, that you'll hear evidence tomorrow, probably for the full day, and then you'll need to come back on Monday, and it may be that we'll be finished with the evidence on Monday. So, that's just a tentative look into the future. Tomorrow we're going to start at 9:30 rather than 9:00, 9:30 tomorrow. So, have a good evening, drive carefully, and we'll see you at 9:30 in the morning.

(The jury retired to the jury room, after which the following occurred:)

THE COURT: All right. If there's nothing further, then, we'll adjourn until 9:30.

JA 581

(Proceedings concluded at 2:50 p.m.)

CERTIFICATE

I certify the foregoing is an accurate transcript from the record of proceedings in the above-entitled matter.

3/18/07                          /s/  Bridget A. Dickert
Date

```
          IN THE UNITED STATES DISTRICT COURT FOR THE
                 WESTERN DISTRICT OF VIRGINIA
                      Abingdon Division

---------------------------x
                           :
UNITED STATES OF AMERICA,   :
                           :
      Plaintiff,            :
                           :
v.                         :   1:06CR1
                           :
CARLOS D. CARO,            :
                           :
      Defendant.            :   Abingdon, Virginia
                           :   February 8, 2007
---------------------------x   9:30 a.m.
```

JURY TRIAL
BEFORE THE HONORABLE JAMES P. JONES
CHIEF UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

JOHN BROWNLEE, Esquire
U.S. Attorney
ANTHONY P. GIORNO, Esquire
Assistant U.S. Attorney
P.O. Box 1709
Roanoke, Virginia  24008
      For the United States of America.

STEPHEN J. KALISTA, Esquire
P.O. Box 1186
Big Stone Gap, Virginia  24210
JAMES SIMMONS, Esquire
1208 17th Avenue South
Nashville, Tennessee  37212
      Counsel for the Defendant.


Proceedings recorded by Stenography, transcript
produced by computer.

**BRIDGET A. DICKERT**
**UNITED STATES COURT REPORTER**
**180 WEST MAIN STREET, ROOM 104**
**ABINGDON, VIRGINIA 24210**
**(276) 628-5116**

JA 583

(Proceedings commenced at 9:30 a.m.)

THE COURT:  Morning, ladies and gentlemen. Are we ready for the jury?  Very well, Mr. Bailiff, if you'll have the jury in.

(The jury entered the courtroom and was seated in the jury box.)

THE COURT:  Morning, ladies and gentlemen. We're ready to go again.  You may call your first witness.

MR. KALISTA:  Judge, we call Laura Perez.

LAURA PEREZ, DEFENDANT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. KALISTA:

Q    What's your name, ma'am?

A    Laura Perez.

Q    Ma'am, if you could pull that microphone, make sure you speak into it so that everybody in the courtroom can hear, especially the jury, please?

A    Yes, sir.

Q    What is your name, ma'am?

A    Laura Perez.

Q    Could you please spell that for the court reporter?

A    L-A-U-R-A, P-E-R-E-Z.

Q    What is your date of birth?

JA 584

A    9/2/70, September 2, 1970.

Q    Please speak up.  And so how old are you now?

A    Thirty-six.

Q    And where do you live, ma'am?

A    In Falfurrias, Texas.

Q    Are you related to Carlos David Caro?

A    Yes, sir.

Q    How are you related to him?

A    We're cousins.  Our mothers are sisters.

Q    All right.  I believe that Carlos's mother was Virginia?

A    Yes, sir.

Q    And your mother was her sister?

A    Sylvia.

Q    Sylvia?

A    Uh-huh.

Q    All right.  And do you have brothers and sisters?

A    Yes, sir.

Q    And could you name them, their ages and what they do?

A    My brother is Joe Rodriguez.  He's 37, and he is currently in prison.  My sister is Francisca Trevino, and she works for the state.  She is a janitor.

Q    Now, let's talk about -- you, are you married,

ma'am?

A    Yes, sir.

Q    And what's your current marital status?

A    Separated.

Q    And how long have you been married?

A    Twenty-two years.

Q    And do you have children?

A    Yes, sir.

Q    How many children do you have?

A    Four.

Q    And what are their ages?

A    Twenty-one, 13 -- sorry, 17, 13 and nine.

Q    Twenty-one, 17, 13 and nine?

A    Yes, sir.

Q    Are you employed, ma'am?

A    No, sir.

Q    And how would you describe your occupation?

A    Stay at home mother.  My husband supports my children and I.

Q    How much education do you have, ma'am?

A    Ninth grade.

Q    Dropped out after ninth grade?

A    That's correct.

Q    Now, you mentioned that your mother was Sylvia; is that correct?

Perez - Direct

A    Yes, sir.

Q    I want to show you a document, and have you seen that document before?

A    Yes, sir.

Q    Have you gone over that to make sure it's accurate and correct?

A    Yes, sir.

Q    Is that basically a family tree of, of your family concerning your aunts and uncles and your grandparents?

A    Yes, sir.

Q    And that would be on your mother's side?

A    Yes, sir.

        MR. KALISTA:  Judge, I'd like to have this marked as an exhibit.

        THE COURT:  It will be marked for identification as Number Nine.

        THE CLERK:  I think it's Number Nine, Your Honor.

        THE COURT:  Defendant's Exhibit Number Nine.

        THE CLERK:  I'm sorry, Your Honor, it will be Number Ten.  I apologize.

        THE COURT:  Very well.  It will be marked for identification as Exhibit Number Ten.

JA 587

BY MR. KALISTA:

Q    Can you see that, ma'am, up on the screen to your right?

A    Yes, sir.

Q    All right.  And I don't want to go over everything in this exhibit, but I believe that shows at the top your grandfather, Felipe; is that correct?

A    Yes, sir.

Q    And then your grandmother, Christina?

A    Yes, sir.

Q    All right.  And then this shows basically all of their children; is that correct?

A    Yes, that's correct.

Q    And that includes, and how many children basically did your grandparents have?

A    Twelve.

Q    All right.  And you are Carlos's first cousin, as I understand it?

A    That's correct.

Q    All right.  And this geneogram, I think, at this point shows Virginia Caro, your aunt, and her four boys:  Joe, Carlos, Noe and Abran; is that correct?

A    Yes, sir.

Q    And then I believe over on the right, in fact the very last one on the right, it shows Sylvia, do

you see that?

A    Yes.

Q    And that's your mother?

A    Yes, sir.

Q    And Sylvia, your mother, had three children?

A    That's correct.

Q    And you're one of Sylvia's children?

A    Yes.

Q    And also have you looked at this document, and is it accurate in terms of showing the criminal record of members, again, your maternal family?

A    Yes, sir.

MR. KALISTA:  Judge, I would ask this be admitted as Defendant's Number Ten.

THE COURT:  It will be admitted.

(Defendant's Exhibit No. 10 was received in evidence.)

BY MR. KALISTA:

Q    Now, your mother, Sylvia, did she graduate from high school?

A    No, sir.

Q    What kind of education did she have?

A    I believe it was the third grade.

Q    All right.  And what kind of lifestyle did your mother lead?

JA 589

A    I guess not a very good one.  She liked to go out and party a lot.

Q    Was your mother married to your father?

A    No, sir.

Q    All right.  And was your mother, did she have a substance abuse problem?

A    Yes, sir.

Q    And you said she liked to go out and party a lot.  When you say substance abuse problem, what type of substances did she use?

MR. BROWNLEE:  I'm going to object.  I'm not so sure this witness's mother has any relation to this defendant.  Thank you.

THE COURT:  Yes, sir.  Ladies and gentlemen, if you'll follow the bailiff out, please. I need to talk with the attorneys a moment.

(The jury retired to the jury room, after which the following occurred:)

THE COURT:  Mr. Kalista, what is the relevancy of the background of the witness's mother?

MR. KALISTA:  Judge, what we intend to show is her mother had a kind of a wild lifestyle, and that resulted in her being placed by her mother with various babysitters, and as a result of that she was placed and babysat by Virginia and Jose Caro, and

spent time then with Carlos and his brothers when they were babysitting her. And that happened frequently over time. She is then going to testify about the violence that she witnessed from a child's perspective.

THE COURT: Well, she can certainly testify to that, but I think the question is, you know, to go into details --

MR. KALISTA: I didn't want to go into details --

THE COURT: You asked her what substances she was addicted to.

MR. KALISTA: Maybe I misspoke, but I was asking her as far as her mother.

THE COURT: That's right. And so what particular substances her mother was addicted to, it's just a problem, we need to obviously move along in the case.

MR. KALISTA: I didn't intend to dwell on that.

THE COURT: Well, let's sharpen our focus here, and the things you told me about are relevant, I assume the Government would have no objection to that.

MR. KALISTA: I didn't intend to get into

detail, Judge.

THE COURT:  All right.  Just so that's clear, and we need to apply that to other, other witnesses and family members also, of course.  So, we'll have the jury back in.

(The jury entered the courtroom and was seated in the jury box.)

BY MR. KALISTA:

Q    You mentioned your mother had a certain lifestyle, and she had a substance abuse problem.  As a result of that did she make arrangements for other people to care for you?

A    Yes, sir.

Q    How frequently did that happen during your childhood?

A    A lot.

Q    And were you ever staying in the home with Virginia, your aunt, Virginia, and her husband, Jose, and their children, which included Carlos Caro?

A    Yes, sir.

Q    Did that, how many times did that happen?

A    I can't tell you exactly how many, but it did happen often.

Q    Approximately what age period were you when you were in the home, their home, and again, they're

watching you for your mother?

A    I'd say between four and seven.

Q    What are your memories of being in the home of Jose and Virginia Caro along with your cousins?

A    I just remember my aunt being very sweet, and just a very nice lady, and her husband having a drinking problem, and being abusive with her.

Q    How often did that happen?

A    All I can say is a number of times.  I can't tell you exactly, an exact number, just that it did happen several times.

Q    What did you actually observe going on?  Can you describe that to the jury?

A    Just him getting upset whenever he had been drinking and stuff, and fighting with my aunt and pushing her around.

Q    Did you actually witness that yourself in terms of physical violence?

A    I can't say I actually saw him punch her, but I did see him argue with her, and push her around. Other than that, I cannot tell you that I actually saw him, you know --

Q    Was this a big house or small house?

A    It was a small house.

Q    Were your cousins, including Carlos, present at

that time?

A    I know they were there. I just don't know if they were in the same room.  I just witnessed it from like being in the same room with them.  I don't remember where exactly everybody was, just myself, and my aunt and uncle.

Q    When they argued and he was pushing her around, were they loud or was it done in a quiet voice, or what?

A    No, they were loud.

Q    What usually would happen and what was usually the end?

A    All I can tell you is from what I remember, just them, him drinking and, you know, just arguing with her, pushed her around, and then I just went to bed and didn't stay up to see any more.  I was scared.  I was very young.

Q    How did that make you feel?

A    Just terrified.

Q    How did you feel about your Uncle Jose?

A    I guess I just didn't like the fact that he treated my aunt that way because I just loved my aunt so much.  She was a very good lady.

Q    How did, what reaction did you have when you heard that your Uncle Jose had died?

A   First of all, I felt relief because I knew he wasn't going to be being mean to my aunt anymore because I'd hear my mother and everyone discussing what he would do to her, he'd beat her up, and stuff, but I also remember feeling, you know, sad and hurt for, you know, the kids, especially for like Abran. I remember he cried a lot for his dad, Abran.

Q   Let me show you Exhibit Ten again, and just focus on -- now, you mentioned that your grandparents had 12 children, and also showing you on the screen, was one of their children Danny Rodriguez?

A   Yes, sir.

Q   That was your uncle; is that correct?

A   Yes, sir.

Q   And then I think another of your uncles was Felipe; is that correct?

A   Yes, sir.

Q   Did they have a particular reputation in the family?

A   Yes, sir.

Q   What was that reputation?

A   They were drug dealers.

Q   All right.  Let me show you a picture, and do you recognize that photograph?

A   Yes, sir.

Q    And do you know the people in that photograph?

A    Yes, sir.

MR. KALISTA:  I'd like to have this marked as Defendant's next exhibit.

THE COURT:  All right.  It will be marked for identification.

BY MR. KALISTA:

Q    Ma'am, if you'd look at the screen, please. First, can you tell, are you able to tell where that picture was taken?

A    I'm not sure.

Q    Okay.  Can you identify, then, the people in that photograph?

A    Yes, sir.

Q    Let's start with the gentleman on the right, the -- who is that gentleman dressed kind of in a brown jacket?

A    That's, that's Felipe Rodriguez.

Q    Let's say the gentleman on the far left with the long hair, who is that?

A    Joe Robert.

Q    What did you know about that gentleman?

A    He was just a party animal.

Q    Pardon me?

A    He was just like someone that would go hang out

JA 596

Perez - Direct

there at my grandparents' house.  He was a party animal.

Q    He was a party animal?

A    Uh-huh.

Q    What do you mean by that?

A    Just one of the guys that hung out and smoked pot and drank beer.

Q    All right.  The children there, let's start with the one on the left, the boy in the white tee shirt, who is that?

A    That was my brother.

Q    Your brother?

A    Uh-huh.

Q    What's his name?

A    Joe Rodriguez.

Q    Okay.  The little girl on the right, who is she?

A    That's Lisa Rodriguez, Felipe's daughter.

Q    And let's see, the two boys in the middle who are they?

A    That's Carlos Caro, my cousin, and that's --

Q    Can you touch the screen and show us Carlos? And next to him, who is that?

A    That's Noe, his younger brother.

Q    Carlos is the taller of the two with his left arm around Noe?

A      That's correct.

          MR. KALISTA:  I'd ask that this be admitted as Defendant's Exhibit Number 11.

          THE COURT:  It will be admitted.

      (Defendant's Exhibit No. 11 was received in evidence.)

BY MR. KALISTA:

Q      Let me show you one more picture I'll have the clerk mark as Defendant's Exhibit Number 12.  I would just ask you, ma'am, if you could identify that photograph for me?

A      Yes, sir.  That was my mother with my cousin, Carlos.

Q      If you would touch the bottom right of the screen.  I think that will erase the marks that you made.  So, the lady on the right of the photograph, that's your mother?

A      That's correct.

Q      And the gentleman on the left, again with his left arm around her, who is that?

A      That's my cousin, Carlos Caro.

Q      Do you remember anything about the circumstances under which that photo was taken?

A      I have no idea.

Q      All right.

Perez - Direct

MR. KALISTA:  Judge, I'd ask that Defendant's Exhibit Number 12 be admitted.

THE COURT:  It will be admitted.

(Defendant's Exhibit No. 12 was received in evidence.)

BY MR. KALISTA:

Q    I believe your mother died at a fairly young age; is that correct?

A    Yes, sir.

Q    Do you know what she died from?

A    Several heart attacks.

Q    How old was she when she died?

A    I think it was 51.

Q    And your aunt, Virginia, I believe, do you know the circumstances of her death?

A    Yes, sir.

Q    What were those circumstances?

A    She died in her home as it burned.

Q    Pardon me?

A    Her house burned down to the ground.  She was in it.

Q    She died in a house fire?

A    (Nodded yes.)

Q    Now, how long has it been since you've seen Carlos?

A    About seven years, seven and a half.

Q    Seven and a half years ago, ma'am?  Please speak up.  What were the circumstances under which you last saw him?

A    He stopped by my house to look for someone, and to tell me hi when he was in town.

Q    And since that time, basically, have you had any contact with him?

A    No, sir.

Q    How do you feel about Carlos?

A    I love him.  He's my cousin.

Q    How would his execution affect you?

A    I think it would just hurt my whole family a lot.  We're just not, we're not prepared for this.  I'm worried about how it would hurt my cousin, his daughter.  And I never had a father growing up, and I think that would just devastate her.  I am not prepared for that.  I just don't think that's going to fix anything.

Q    Thank you, ma'am.

            THE COURT:  Cross examination?

                 CROSS EXAMINATION

BY MR. BROWNLEE:

Q    Good morning ma'am.  My name is John Brownlee.  I'm the United States Attorney.  I just have a couple