No. 16-1

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA, Plaintiff-Appellee,

vs.

CARLOS DAVID CARO, Defendant-Appellant.

Appeal from the United States District Court for the Western District of Virginia
Hon. James P. Jones, District Judge, Presiding
Dist. Ct. No. 1:06CR00001

## JOINT APPENDIX TO OPENING BRIEF
## VOLUME 2 JA 601 – JA 1200

JON M. SANDS
Federal Public Defender
District of Arizona
TIMOTHY M. GABRIELSEN
Nevada Bar No. 8076
Assistant Federal Public Defender
407 West Congress Street, Suite 501
Tucson, Arizona 85701
tim_gabrielsen@fd.org
Tel. (520) 879-7614
Facsimile (520) 622-6844

FAY F. SPENCE
Virginia Bar No. 27906
First Assistant Federal Public Defender
210 First Street, SW, Suite 400
Roanoke, Virginia 24011
fay_spence@fd.org
Tel. (540) 777-0880
Facsimile (540) 777-0890

BRIAN J. BECK
Virginia Bar No. 78049
Assistant Federal Public Defender
201 Abingdon Place
Abingdon, Virginia 24211
brian_beck@fd.org
Tel. (276) 619-6080
Facsimile (276) 619-6090

*Counsel for Defendant-Appellant Carlos David Caro*

## U.S. District Court Docket and Transcripts

JA 1        Dkt. 2 - Indictment, *United States v. Caro*, W.D.Va. No.
            1:06CR00001-JPJ (Jan. 3, 2006);[1]

JA 4        Dkt. 8 - Notice of Intent to Seek the Death Penalty (Jan. 11, 2006);

JA 8        Dkt. 19 - Motion for Exculpatory Evidence (Jan. 27, 2006);

JA 13       Dkt. 29 - Order (Discovery and *Brady*) (Feb. 6, 2006);

JA 15       Dkt. 307 - Carlos David Caro's Motion for Exculpatory Evidence
            Related to Penalty Phase Information (Oct. 3, 2006);

JA 22       Dkt. 316 - Notice of Filing of Affidavit of Declaration of Mark
            Cunningham, Ph.D. (Oct. 16, 2006);

JA 49       Dkt. 343 - Memorandum Opinion (Magistrate Judge) (Nov. 8, 2006)
            (granting Defendant's Motion at Dkt. 307);

JA 61       Dkt. 344 - Order (Nov. 8, 2006) (re: Dkt. 343);

JA 65       Dkt. 345 - Objection to Order of the Magistrate Judge (Nov. 8, 2006);

JA 66       Dkt. 346 - Carlos David Caro's Response to Objection to Magistrate
            Judge's Order of November 8, 2006 (Nov. 9, 2006);

JA 68       Transcript, Hearing November 13, 2006 (District Court ruling on Dkt.
            307 and Government objection to Magistrate Judge's Memorandum
            Opinion, Dkt. 343);

JA 109      Dkt. 353 – Declaration of Tomas J. Gomez (Nov. 16, 2006);

JA 115      Dkt. 354 – Declaration of Jennifer Batchelder (Nov. 16, 2006);

JA 116      Dkt. 355 – Declaration of Linda Thomas (Nov. 16, 2006);

JA 118      Dkt. 356 – Declaration of Joetta A. Terrell (Nov. 16, 2006);

---

[1] All references to Case No. 1:06CR00001-JPJ are to "Dist. Ct." and the docket number.

JA 121        Dkt. 358 – Response to Government's Affidavits (Nov. 17, 2006);

    JA 126        Dkt. 358-1 Declaration of Mark Cunningham (Nov. 17, 2006);

    JA 131        Dkt. 358-2  Appendix A-H (Nov. 17, 2006);

JA 144        Dkt. 363 - Opinion and Order (Nov. 20, 2006) (District Court re: objections to Magistrate Judge's ruling at hearing on Nov. 8, 2006);

JA 151        Transcript, Capital Sentencing Hearing, Feb. 5, 2007;

JA 333        Transcript, Capital Sentencing Hearing, Feb. 6, 2007;

JA 410        Transcript, Capital Sentencing Hearing, Feb. 7, 2007;

JA 583        Transcript, Capital Sentencing Hearing, Feb. 8, 2007;

JA 661        Transcript, Capital Sentencing Hearing, Feb. 12, 2007;

JA 880        Dkt. 639 – Special Verdict (Feb. 13, 2007);

JA 890        Transcript, Capital Sentencing Hearing, Feb. 13, 2007;

JA 1015       Transcript, Capital Sentencing Hearing, Mar. 30, 2007;

JA 1020       Dkt. 790 - Redacted Motion for Collateral Relief Pursuant to 28 U.S.C. § 2255 & exhibits (Mar. 22, 2013):

    JA 1220       Exhibit 1 Declaration of Mark A. Bezy (Jan. 1, 2013);

    JA 1230       Exhibit 4 Declaration of Larry A. Hammond (Jan. 8, 2013);

    JA 1255       Exhibit 5 Declaration of Stephen J. Kalista (Dec. 29, 2012);

    JA 1260       Exhibit 7 Declaration of Hans Selvog, Ph.D. (Dec. 31, 2012);

JA 1286     Exhibit 8 Declaration of Donna Marie Schwartz-Watts, M.D. (Jan. 7, 2013);

JA 1307     Exhibit 9 Declaration of James Simmons (Dec. 29, 2012);

JA 1309     Exhibit 10 Declaration of D. Malcolm Spica, Ph.D. (Jan. 4, 2013);

JA 1336     Exhibit 11 Report of Thomas M. Hyde, M.D., Ph.D. (Dec. 22, 2012);

JA 1338     Exhibit 48 Affidavit of Jeanne Dvorak (Nov. 11, 2011);

JA 1347     Dkt. 791 - Gov't's Motion to Dismiss in Response to Motion for Relief & Exhibits (June 11, 2013);

JA 1475     Exhibit 1 to Motion to Dismiss, copies of defense emails (Jan. 24, 2006);

JA 1478     Exhibit 2 to Motion to Dismiss, copies of defense emails (Dec. 12, 2006;

JA 1482     Exhibit 3 to Motion to Dismiss, copies of defense emails (June 20, 2006);

JA 1484     Exhibit 4 to Motion to Dismiss, defense Memorandum Re: Potential Caro Witnesses and Other Issues;

JA 1489     Exhibit 5 to Motion to Dismiss, copies of defense emails (Sept. 25, 2006);

JA 1491     Exhibit 6 to Motion to Dismiss, Memorandum, Carlos Caro, Witnesses/Records by Location (May 15, 2006);

JA 1497     Exhibit 7 to Motion to Dismiss, Timeline Narrative - Chronological Critical Incidents and Developmental History of Carlos Caro;

JA 1513    Dkt. 797 - Carlos David Caro's Response to Motion to Dismiss (Oct. 9, 2013);

    JA 1687    Ex. 61 Letter from A. Giorno to Carlos David Caro (Dec. 30, 2004);

    JA 1689    Ex. 62 Supplemental Declaration of Mark Bezy (Oct. 8, 2013);

    JA 1692    Ex. 63 Letter from James W. Marquart to Stephen Kalista (Dec. 6, 2006);

    JA 1695    Ex. 64 Letter from A. Giorno to S. Kalista (Dec. 29, 2006);

    JA 1697    Ex. 65 Letter from D. Malcolm Spica, Ph.D. to Robin Konrad (Sept. 10, 2013);

    JA 1700    Ex. 66 Email from H. Selvog to S. Kalista (with Selvog CV attached) (Mar. 15, 2006);

    JA 1710    Ex. 67 Email from A. Giorno to S. Kalista (Sept. 28, 2006);

    JA 1712    Ex. 68 Supplemental Declaration of Donna Marie Schwartz-Watts, M.D. (Oct. 7, 2013);

    JA 1739    Ex. 69 Memorandum from H. Selvog to D. Mullikin, S. Kalista, and J. Simmons (May 15, 2006), re: Witnesses/Records by Location;

    JA 1745    Ex. 70 Memorandum from W. Johnson re: Special Handling Instructions for Carlos David Caro (Dec. 19, 2003);

    JA 1747    Ex. 71 Declaration of Juror #33 (Sept. 26, 2013);

    JA 1750    Ex. 72 Declaration of Susan Richardson (Oct. 9, 2013);

JA 1770    Ex. 73 Federal Bureau of Prisons Transfer Order for Carlos David Caro (Oct. 11, 2005);

JA 1772    Ex. 77 Declaration of Petra Herrera (Oct. 2, 2013);

JA 1774    Dkt. 800 - Defendant's First Motion for Leave to Conduct Discovery and Preliminary Request for an Evidentiary Hearing and Expansion of the Record (Oct. 25, 2013);

JA 1809    Dkt. 803 - Government's Response to Defendant's First Motion for Leave to Conduct Discovery and Preliminary Request for an Evidentiary Hearing and Expansion of the Record (Nov. 15, 2013);

JA 1816    Transcript, Oral Argument, Nov. 25, 2013;

JA 1889    Dkt. 808 – Opinion (May 4, 2015);

JA 1984    Dkt. 810 – Certificate of Appeability (May 4, 2015);

JA 1985    Dkt. 811 – Carlos David Caro's Motion to Alter or Amend Judgment Pursuant to Federal Rule of Civil Procedure Rule 59(e) (June 1, 2015);

JA 1997    Dkt. 813 – Government's Response to Motion to Alter or Amend Judgment (June 18, 2015);

JA 2008    Dkt. 816 – Reply to Government's Response to Motion to Alter or Amend Judgment (July 6, 2015);

JA 2015    Dkt 818 – Order Denying Rule 59(e) Motion (Nov. 6, 2015);

JA 2019    Dkt. 819 – Carlos David Caro's Notice of Appeal (Jan.4, 2016).

of questions.  Do you remember not too long ago some folks came out to visit you, and they made a video; is that correct?

A    Yes, sir.

Q    And in that video do you remember when you were talking about your life at your grandparents' house?

A    Uh-huh.

Q    And those were good times, were they not?

A    Yes, sir.

Q    In fact, I think you said that you recounted the story when it was you, and Mr. Caro, his brothers, and they were riding a horse, and I think one of his brothers was going too fast and you became concerned; is that right?

A    Yeah.

Q    Where were you riding the horses?

A    At my grandparents' house.

Q    And they had horses there?

A    They had two horses.

Q    And were you able to go there and ride the horses and have a good time?

A    They had a little stable in the back of the house, and we'd go feed them every day after school and ride them.

Q    And Mr. Caro was able to go over there, as well,

JA 601

and have fun and enjoy that?

A     Yes, sir.

Q     I think you also recounted a story of when your grandmother would make a big pot of hot chocolate of some sort?

A     Uh-huh.

Q     Talked about you were there, and Mr. Caro was there, and others, and what a great time; is that correct?

A     That's correct.

Q     And I think you described it as just a loving environment; is that correct?

A     Yes.

Q     In fact, I think if I recall, you stated that you hoped that your children would be able to grow up in that same environment that you and Mr. Caro had at your grandparents'; is that right?

A     That's correct.

Q     Now, you also talked about your Aunt Virginia, Mr. Caro's mother.  You had a nickname for her.  What did you call her?

A     I can't remember right now.

Q     And you talked about when you'd go over there and you described her as a sweet woman, I think you said?

A    (Nodded yes.)

Q    And you loved her very much?

A    Yes, I did.

Q    And she loved you?

A    I hope so.  I believe so.

Q    But you were close?

A    I loved my aunt, yes.  I was close to her until the end.

Q    And I know this is difficult, but you had talked about her death -- in fact, was it true that she had candles in her home that she would light and then she would pray with them for her sons?

A    They were incarcerated.

Q    When they were incarcerated she would pray for them?

A    (Nodded yes.)

Q    Isn't it true one of the candles tipped over and that's what started the fire?

A    They believe it caught the curtain on fire, and that's how the house caught on fire.

Q    And she had diabetes, so she wasn't able --

A    She was going blind.  So, I believe that's why she couldn't find the door to get out.

Q    Mr. Kalista showed you a chart that had many of your family members, and he pointed out to you that

some of them have been arrested and incarcerated; is that correct?

A    That's correct.

Q    One member of your family has had to go through that; is that correct?

A    (Nodded yes.)

Q    But many have not.  Is that true?

A    I would say a big percentage of my family has been incarcerated.

Q    There was a lady who testified yesterday who had, I believe, two or three sons, and all three sons had graduated from college.  So, you have those success stories within your larger family; is that right?

A    I think it's maybe two or three out of the 12 children that my grandparents had, about two or three of their families were able to graduate and do something with themselves.

Q    You're a mother?

A    Yes, sir.

Q    You have four children?

A    Yes, sir.

Q    And you've been married for 20 plus years.  I know you're maybe going through a time, but you've certainly done well with yourself, have you not?

A    I would say.

Q    I would, too.  Thank you, very much, ma'am.

REDIRECT EXAMINATION

BY MR. KALISTA:

Q    I think Mr. Brownlee asked you about your grandparents.  You have a lot of fond memories of the home that your grandparents maintained; is that right?

A    That's correct.

Q    Would you want your children raised in the environment in the home of Jose and Virginia Caro?

A    I don't think I'd want that type of an environment where the father would be constantly drinking, no.  But I would want a loving mother the way my aunt was.

Q    So, the home that your grandparents maintained --

MR. BROWNLEE:  Objection, leading.

THE COURT:  Yes, sir, I'll sustain the objection.

MR. KALISTA:  That's all.  Thank you.

THE COURT:  Thank you, ma'am.  You may step down.  May this witness be excused?

MR. KALISTA:  Yes, Your Honor.

THE COURT:  Very well.  You may be excused,

ma'am.  You may call your next witness.

MR. SIMMONS:  Your Honor, we would call LouYveth Caro.

LOUYVETH CARO, DEFENDANT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. SIMMONS:

Q    Good morning.

A    Good morning.

Q    Would you please state and spell your name for the court reporter, please?

A    LouYveth L-O-U-Y-V-E-T-H, C-A-R-O.

Q    What is your date of birth?

A    8/23/66.

Q    Speak into the microphone.

A    8/23/66.

Q    What is your relationship to Carlos Caro?

A    He's my husband.

Q    Ms. Caro, would you tell the jury briefly what your educational background is?

A    I have a master of arts degree in communication disorders, and hold my certificate of clinical competence.

Q    You also have a bachelor's degree?

A    Yes, sir, I have a bachelor of science degree in communications disorders.

Q    Where did you obtain your degree?

A    I obtained my bachelor degree at Texas A&I University in Kingsville, Texas.  And I received my master's degree at University of Texas Pan American at Edinburg, Texas.

Q    Where are you employed now?

A    I'm currently employed with Southwest Independent School District in San Antonio, Texas and I also have a part time job where I do speech therapy as well in the homes, it's a home health, restorative health care.  That's my part time job.

Q    Would you tell the jury briefly about what your job is, what you do as a speech therapist?

A    Well, in my capacity as a speech language pathologist working in the school district I help children who have communication impairments, so we work with children with Down Syndrome, autism, mental retardation, also children that have problems with fluency, they stutter, also problems with certain sounds and work on improving their articulation. When I work in a nursing home, I work with adults who have had strokes, and have had some kind of apraxia, aphasia, problems swallowing, trying to help them with their communication.

Q    You supervise other employees?

L. Caro - Direct

A    Yes, I currently supervise three speech therapy assistants, and we work with children that are three years of age, and I have one of the junior highs, so up until eighth grade.

Q    I think maybe you're the only bilingual speech therapist?

A    I'm the only bilingual speech supervisor that we have.

Q    Tell the jury how you met Carlos Caro, your husband?

A    Carlos and I met in the fall of 1985 at a fiesta in Premont, Texas.  We have some mutual friends, and we were there, and so we saw each other, liked each other.  Our friends introduced us.

Q    Did you date for a while?

A    Yes.  We dated for approximately a year, and we were engaged for approximately a year after that.

Q    Did you get married?

A    Yes, we did.

Q    I'll show you four photographs.  Do you recognize these?

A    Yes, these are our wedding photographs.

Q    A long time ago?

A    Long time ago, yes.

          MR. SIMMONS:  Your Honor, if I could have

JA 608

these marked.

THE COURT:  They will be marked.  There are how many photographs?

MR. SIMMONS:  Four photographs.

THE COURT:  They'll be marked collectively as Defendant's Exhibit Number 13.

BY MR. SIMMONS:

Q    I'll hand you another document which appears to be a marriage certificate.  Do you recognize this?

A    Yes, it's our marriage certificate.

MR. SIMMONS:  If I could have that marked, Your Honor, as Defendant's Exhibit.

THE COURT:  It will be marked for identification as Exhibit 14 for the defendant.

BY MR. SIMMONS:

Q    That was on your wedding day?

A    Yes, yes, it was.

Q    When was that?

A    That would be December 19, 1987.

Q    What were you doing at that time?  Were you in school?

A    Yes, I was currently at southwest Texas State University in San Marcos, Texas.

Q    Shortly before your marriage on December 4, 1987 do you recall what happened on that day shortly

thereafter?

A    Well, I was not informed on that day, I was taking finals at the university, and was scheduled to be getting married in a couple of weeks after that, about two weeks after that, and so was expecting Carlos to pick me up and pack up my things from the dorm room.  My stepdad showed up to pick me up and get my belongings, and so I knew something was wrong. And when we got to the room and we were getting my things, he didn't say anything, and I didn't say anything, and then I asked, well, where Carlos was, and they told me he had been arrested.  And at that time I believe he was going to be meeting up with me back in Falfurrias, so that was why he wasn't able to go pick me up.

Q    You were with your stepfather then?

A    Yes.

Q    What is his name?

A    Israel Villareal, Jr.

Q    Who was Carlos arrested with?

A    His brother, Noe.

Q    And do you know any of the circumstances regarding what he was doing?

A    They were what's called back packing, and they had marijuana, and that is what they were arrested

with.

Q    What is back packing, for the benefit of the jury, as you understand it?

A    My understanding is you have a duffle bag or a back pack where you have marijuana, and you're carrying it, and walking through the woods around the check point.

Q    There should be a time line on the screen next to you?

A    Yes.

Q    What I'd like to do is sort of follow your relationship with your husband.  You were married in the photograph, as scheduled?

A    Yes.

Q    Then what happened to Carlos?

A    I was eight months pregnant, and he was due in court in Corpus Christi for the marijuana charges, and we went to court, and at that time they went ahead and they took him in, and so he was arrested, taken into custody at that time.

Q    Was he sentenced?

A    Yes.

Q    What type of, sentenced to what?

A    I believe it was two years imprisonment.

Q    Federal prison?

A    Yes.

Q    What happened after that when Carlos went to prison?  What did you do?

A    Well, I was eight months pregnant, so that following month in May our daughter, Xenia, was born. We were able to set up a visit with him, and took him so that he could meet his daughter.  My parents, and my brother, and myself and my daughter, we drove approximately 13 to 15 hours to El Paso to be able to go and see him.

Q    So, the first time he saw his daughter he was incarcerated?

A    Yes.

Q    What were you doing during this period of time? You were a student?

A    I was a student.

Q    And your daughter was living with you?

A    My daughter was living with me, yes.

Q    When was Carlos released?

A    I believe he was released in December of '89.

Q    1989.  Do you remember when he was released?

A    Yes.  We were very excited, holiday time, to have him home with our new family, and being able to be there with his daughter and see her.  She's taking her first steps, and everything.

JA 612

Q    What was your, what was your relationship like at this period?

A    It was great.  I mean, we were young and in love, and we had just had our baby girl, and I was working on finishing my bachelor's degree, and he was working for one of my uncles, helping to deliver merchandise to different companies.

Q    What town were you living in?

A    We were living in Falfurrias.

Q    And then did you move to Ft. Worth at some point?

A    Once I graduated with my undergraduate degree we went to Ft. Worth where I was accepted into the university, Texas Christian University.

Q    Was Carlos working?

A    Yes, he was able to find a job working in an electronics factory.

Q    Was Carlos a good father to your child?

A    Yes.  Because I was a full time student, so I was gone all day pretty much for classes, and we also did practicum where you're working on your skills with children, and working with people who have communication impairment, so that took up most of my day, and so Carlos would be the one to give our baby a bath, and be at home cooking and cleaning, and

JA 613

L. Caro - Direct

helping her with her one, two, three and A, B, Cs.

Q    He was a good dad?

A    Yes, he was.

Q    Then in February of 1992 what happened?

A    Well, at that time I was not able to finish my studies at Texas Christian University, it was expensive, and I didn't have a scholarship, and so we moved to Edinburg, and that's where I was accepted into the university, the master's program there.  And at that time we, we started having some problems. Carlos didn't want to go back to the valley.  The valley would be anything pretty much south of McAllen and the Rio Grande, that whole area is called the valley, so we were doing well in Ft. Worth and he wanted to stay.  I wanted to go ahead and finish with my degree, and felt we needed to move at that time.

Q    Did Carlos, he was on supervised release?

A    Yes.

Q    And was that release violated?

A    Yes, yes, it was.

Q    What happened?

A    He tested positive for drug usage.

Q    Was his release revoked?

A    Yes, it was.  He had to serve the remaining six months of his time.

L. Caro - Direct

Q     He went back to prison?

A     He went back to prison.

Q     You've never used drugs; is that correct?

A     That's correct.

Q     You've never been arrested?

A     That's correct.

Q     Did Carlos get out after serving a number of months?

A     Yes, he was released after serving approximately six months.

Q     What happened, where was he released from, if you recall?

A     Well, I went to go pick him up at the airport in Harlan General, I believe, again in the valley area.

Q     Again, describe the relationship with your husband?

A     Well, it was a bit rocky at the time.  I wasn't aware of the drug usage, so was surprised when he tested positive.  He was coming home late, early mornings, you know, sleeping during the day, not holding down a regular job, so we were having some marital problems at that time.

Q     August of 1993, August 16th, do you remember that morning?

A     Yes, I do.

JA 615

Q    Tell the jury what happened.

A    Well, at that time Carlos and I were separated, and he was living in the valley but not with me.  I was getting dressed in the morning, getting the baby ready for school, getting myself ready for class, and we had the radio on, and on the radio I heard that there was an arrest, and I heard Carlos's name, and just didn't think that I had heard correctly.  I mean, you were listening to the radio in and out of the bathroom and dressing, and just was surprised, I mean I couldn't have heard that, that couldn't have been right, but that was the way I initially found out.

Q    That it was right?

A    It was right.

Q    He was arrested for what?

A    I'm not exactly sure if it was possession or smuggling, but again related to drugs.

Q    He was sentenced again?

A    Yes, he was.

Q    For 71 months this time?

A    Yes.

Q    So, your husband is back in jail.  Tell the jury what you did, and your daughter, while he's in prison.

L. Caro - Direct

A     Well, in August of '93 I graduated with my master's degree, and I went ahead and I got a job with La Jolla Independent School District which is, again, part of the valley, and so we moved from Edinburg to La Jolla, and I worked there in the capacity as a speech language pathologist for three years.

Q     Was your daughter living with you this entire time?

A     Yes.

Q     Carlos's mother was killed in a fire on March 20th of 1997?

A     Correct.

Q     Was, Carlos was in prison?

A     Yes, he was.

Q     His older brother was where?

A     He was also incarcerated.

Q     His younger brother was where?

A     Incarcerated.

Q     Three of the four brothers were in prison?

A     Yes.

Q     Could not attend the funeral?

A     Correct.

Q     You knew his mother?

A     Yes.

Q    Nice lady?

A    Wonderful woman, wonderful lady.

Q    What happened to Abran, Carlos's younger brother after his mother died?

A    Well, he had been living with his mom, and because the fire destroyed the house he didn't have a place to live.  He was staying with some relatives, some cousins off and on, and so I invited him to go live with my daughter and myself in Laredo.  At that time I had gotten another job and was living in Laredo, Texas.

Q    So, Carlos's younger brother came to live with you after the fire and tragedy and death of their mother?

A    Yes.

Q    Were you able to visit Carlos while he was in prison?

A    Yes.  Initially he was, I believe, out of state and we weren't able to see him.  But subsequently he was moved to Three Rivers, Texas, which was about an hour and 45 minutes, more or less, from Laredo.  So, we were able to see him pretty regularly there.

Q    And there came a time when you decided for your daughter to live with your mother and your stepfather?

A    Correct.

Q    Could you briefly tell the jury about that decision?

A    Well, when I was living in Laredo I was working for Team Care Rehab, and they had a contract with a nursing home facility, and we were given two weeks notice when the company decided not to renew the contract with the facility, and our options were either to move with the company wherever they put us, or to find another job.  And the company I had been working for had been very good to me, and I enjoyed working for them, so I opted to go ahead and move with the company.  And when they decided where they were going to put us, they let me know they were moving me to Waxahachie, which is close to Dallas, Texas.  And they found me an apartment, everything was really quick because I didn't have time to go and do that for myself it was such short notice, and when I got there and investigated the schools and the programs, they didn't have any kind of after school or latch key program.  And being that I was going to be working in nursing home facilities I would probably be doing breakfast, lunch and dinner to help some of the patients with swallowing problems and would not be home in order to take care of my

daughter when she got home from school, and did not want her alone at home. And so my parents spoke with me, and they offered that she could stay with them. And just knowing that Carlos was going to be getting out, and we were looking at getting together again and trying again, that we just decided to leave her for the whole school year, not to uproot her in the middle of the school year and move her. And we all decided that was agreeable, and she was fine with that, as well.

Q    And Xinia has been with your mother since that time until she graduated from high school?

A    Yes, she stayed there with my parents.

Q    Carlos got out?

A    Yes, he did.

Q    What happened?

A    Well, it was great. We were looking again at about Thanksgiving time, so he was at Beaumont at that time, so I drove to Beaumont to go pick him up. We went to the apartment and met with his probation officer to request permission to go to Falfurrias so that he could see our daughter, and see where his mother was buried, and see my family, and see his brother and his family. And so, yes, we're looking at time has gone by, we're older, think, you know,

we're going to give this another try, and know better, and very happy, actually, very happy and very excited.

Q    How did the relationship progress?

A    It was great for approximately maybe about a year and a half.  We moved from Waxahachie, from an apartment into a home in Grand Prairie.  We were thinking about possibly buying a home there, maybe possibly even having another child.  He had several different jobs, but always had a job, not having a problem getting a job, so life was beautiful, it was great.

Q    Carlos, he was on supervised release?

A    Yes, he was.

Q    He was being regularly tested for drugs?

A    Correct.

Q    Which they were all negative?

A    Right, correct.

Q    Everything is going fine?

A    Yes.

Q    During this entire relationship, the entire time you knew Carlos was he ever violent to you?

A    No, never.

Q    Did you ever observe him being violent to anyone?

JA 621

A   No, never.

Q   February of 2000.  You said you thought the relationship was going fine?

A   Yes, I thought everything was great.

Q   What happened?

A   Well, he left the house one day and didn't come back.

Q   In May of 2000 -- what did you do when he didn't come back?  Were you worried?

A   Yes, I was very scared.  I was very worried.

Q   What did you do?

A   Well, when my brother-in-law got home from work, I let him know that Carlos had been gone, and he didn't come back, and I was scared, I didn't know what was wrong, I didn't know what had happened.  He said he would look into things for me to see what he could find out from some of the people that he knew, and apparently found out that Carlos was fine, that I guess he just didn't want to come home.

Q   Did you see him again in May of 2000?

A   Yes, I did.

Q   What happened?

A   I was involved in a car accident.  A car ran a red light, it was a hit and run, they hit my car, and my car was totaled.  And so I didn't have a way to

get to work.  There's not like a bus line that I could have taken, or anything.  And so my brother-in-law let my husband know, and I said that I needed a vehicle to be able to finish out the school year, and so he gave me the work truck that he had so that I would be able to do that.

Q    That was May of 2000?

A    Yes.

Q    Almost seven years ago?

A    Correct.

Q    When was the next time you saw Carlos, your husband?

A    Today.

Q    Did you learn something else had happened, he was arrested again?

A    Well, yes.  When I had that separation with Carlos I was obviously upset that, you know, he had left and things didn't go the way I had expected.  I moved from Grand Prairie, did not want to stay up there so far from my family, and not having my husband with me, I moved to San Antonio, and I guess about six months after he left in February, I guess it was August of that year, my daughter said that he had called to my parents' home and had stated that he had been arrested.

JA 623

Q    Was he subsequently convicted and sentenced to 30 years?

A    Yes.

Q    Again, involving drugs?

A    Correct.

Q    You do not know the details of the arrest or the conviction?

A    No, no, I don't.

Q    What was your reaction?

A    Well, I was disappointed, I was angry, I was upset. Again, based on the conversations we had had previously, and the amount of time he had been incarcerated before, just again upset that here we were again, looking at such a long sentence and, you know, just angry, angry and upset, disappointed.

Q    What was your daughter's reaction?

A    She was angry, upset. I don't know if she was disappointed, but I know she was very angry and upset.

Q    How did you begin to communicate, if you communicated with Carlos again?

A    Initially I was not speaking with Carlos. I was still very hurt, angry, upset with him. My daughter has always spoken to him. There was a time, though, when she was very angry and she didn't want to write

to him or send him any pictures, and you know, she had to work through that, I guess. Some time between August and December is when I started speaking with him again on the phone. I felt bad. Well, again, he's Xinia's father and she loves him, and I still love him, and I care about him, and I didn't think it was fair for her to be talking to him, and then telling me, "Well, Dad said," or, "Dad's doing fine," or, "Where Dad is," or, "They moved him." I kind of felt she was being a go between, and I didn't think that was fair for her. And I figured there were probably some things we needed to talk about as husband and wife, and as adults that she didn't have to deal with, so around December I started speaking with him on the phone.

Q   That's continued up until the present time?

A   Correct.

Q   And Xinia, your daughter, she went through high school?

A   Yes, she graduated already high school.

Q   She was involved in sports?

A   She was involved in volleyball and basketball in high school.

Q   She went to the prom, and she's done well?

A   Correct.

JA 625

Q    And now she's attending college?

A    She's currently a freshman there at Kingsville, Texas A&M at Kingsville.

Q    I'll ask you if you recognize this picture?

A    Yes.  That's my husband and my daughter.

MR. SIMMONS:  If I could have this numbered and admitted as the next numbered exhibit.

THE COURT:  I will admit the other exhibits that you've offered.

(Defendant's Exhibits were received in evidence.)

BY MR. SIMMONS:

Q    A number of years went by.  You did not see Carlos?

A    Correct.

Q    You received a phone call in December of 2003?

A    Yes.

Q    Tell the jury briefly about that phone call.

A    Well, initially it was light conversation, it's the holidays, we're talking about what we're going to be doing for the holidays, we're talking about, I believe, highlights from my daughter, and probably her wardrobe, or something, just chit chat in general.  The operator comes on, and so we know you only have a few minutes left of the telephone

JA 626

conversation.  Again, continue with some light conversation.  And then Carlos tells me that he's in trouble.

Q    Do you remember what he said?

A    Yes.  He said, "I killed a guy."

Q    What was your reaction?

A    It was disbelief.  I was stunned.  I just kept thinking, "Oh, my God, I can't believe this."  I'm just like, "Oh, my God."  I don't think I said anything at the time.  I think I was just thinking that in my head just like what happened, this can't be real, this can't be happening, it can't be what I just heard, you know.  That's just not my husband.

Q    And since that time you've learned of his involvement in other violent conduct in prison; is that right?

A    Correct.

Q    Is that inconsistent with any conduct he displayed when he was out of prison?

A    No, never.

Q    He was never violent?

A    I've never been afraid of him.  He's never been violent with myself or my daughter.

Q    As far as gang activity in the Texas Syndicate, when Carlos was living with you was he ever involved

L. Caro - Direct

in any gangs?

A    I don't know anything about any gang activities. Like I said, we were happy, he was working, we were together, just a regular family.

Q    As far as his involvement in selling drugs, you've never been involved in any of that kind of activity?

A    No.

Q    You're aware that his brothers are in prison for selling drugs?

A    Correct.

Q    He became involved in selling drugs through his uncles, I believe?

A    Yes, I believe so.

Q    And they're still in prison?

A    Yes.

Q    And you're aware as we sit here today that Carlos will never get out of prison?

A    Yes.

Q    Are you aware he's facing a possible death sentence?

A    Yes.

Q    Would you tell the jury what impact that would have on, on you if he's executed, on you and your daughter?

A    We would be devastated.  I know he's been in and out of our lives a lot, and we haven't been consistent with a family life, but I know he's always been there in that we can visit him, you can hear his voice on the phone, you can write letters, let him know what's happening, have some kind of communication to be able to just know that he's there in some shape, form or fashion, that he can be involved in our lives.  You know, even the times I haven't spoken to him it hasn't been that long a period of time, I could not imagine not having him in our lives, not having him with us.

Q    As far as his violent conduct, do you have any explanation of why that has occurred?

A    I'm sorry?

Q    As far as, far as his violent conduct, do you have any explanation as to what's happened?

A    No, not at all.  Like I said, I've never been afraid of him, he's never raised his hand to us, or yelled at us, anything like that.  He's always been very easy going, very soft spoken, very loving with us.

        MR. SIMMONS:  Thank you.

        THE COURT:  Cross examination?  First, let's make sure we have all the Defendant's exhibits

admitted that have been identified today. First, can we have the exhibits just to make sure we keep them together? Madam Clerk, all those exhibits which have been previously identified today by the defendant will be admitted.

THE CLERK: Yes, Your Honor.

THE COURT: All right. Cross examination?

MR. GIORNO: Thank you.

CROSS EXAMINATION

BY MR. GIORNO:

Q    Mrs. Caro, good morning.

A    Good morning.

Q    My name is Tony Giorno. I'm an Assistant United States Attorney. I just want to follow up on some of the questions that the defense lawyer asked you on direct.

A    Okay.

Q    As I understand it, Ms. Caro, you're a fairly well educated young lady, and have a good job with the San Antonio School District?

A    Correct.

Q    You worked pretty hard to get there?

A    Yes, I did.

Q    And you met Mr. Caro in 1985 while you were still a student?

A    Yes, sir.

Q    And after dating for a period of time you, did you marry him, you said, December 19, 1987?

A    Correct.

Q    And you said it was two weeks before that that Mr. Caro was arrested for the first time on these drug trafficking charges?

A    Correct.

Q    That surprised you, didn't it?

A    Yes, it did.

Q    And you learned what he did, you obviously decided to forgive him, and try to basically hope he would change, right?

A    Correct.

Q    And you decided to go ahead with the marriage, and I believe he was sentenced in April of 1988 to two years confinement; is that correct?

A    That is correct.

Q    And then your daughter, whose name is Xinia?

A    Xinia.

Q    She was born in May, the month after Mr. Caro went to prison?

A    Yes.

Q    And so when she was born, he was, he was not there?

JA 631

A    Correct.

Q    And how old was, was your daughter when Mr. Caro got out of prison the first time?

A    She was approximately a year and a half.

Q    Okay.  So, he comes out of prison, he's on -- you're familiar with the term supervised release?

A    Correct.

Q    And you decide to take him back in, and again hope that things would get better?

A    Oh, yes, definitely.

Q    And I take it at that time the plan was you believed that Mr. Caro was going to straighten up and you guys were going to have a normal family life, and your daughter would have a father to look after her?

A    Correct.

Q    I take it during that time after he got out of prison while he was on supervised release you obviously wanted it to work very much, you did everything you could to make sure things were good for Mr. Caro?

A    Correct.

Q    And his, his supervised release, though, was later on revoked because he was using drugs?

A    That's correct.

Q    Did you have any idea he was using drugs?

JA 632

A    No.  That was when we had moved to the valley, we had already been, had gotten my degree as an undergrad and gone to Ft. Worth, and subsequently that's when we came back.  And as I stated previously, he didn't want to move.  We were doing well in Ft. Worth.  But I wanted to finish my degree, and so from once we got into the valley, or that section of Texas, started having some problems, like I said, you know.  He hadn't been working, he had been staying out late, those kinds of things.

Q    When you went back to the valley, you went back to finish your education?

A    Correct.

Q    And at that time Xinia was still with you; is that correct?

A    Correct.

Q    You say Mr. Caro was not working during that time?

A    Once we got to the valley, that's correct, he was not working.

Q    How long did he go without a job?

A    As far as I know, he didn't have a job.

Q    He never got a job after you moved back to the valley?

A    Correct.

Q    But he apparently had cash from different sources?

A    He was in and out of my house, so to my understanding he had money, and he wasn't working.

Q    So, he was in and out of your house, so after you moved back to the Valley he was not living there with you and your daughter?

A    He was, but he would say he was going to go into Falfurrias and go visit his family, or he would be gone for a couple of days, and then come back.

Q    So, really the primary duty of raising Xinia and going to school fell to you?

A    That's correct.

Q    And Mr. Caro just drifted in and out from time to time, and would show up on an intermittent basis; is that correct?

A    Yes.

Q    So, again, you're still hoping, though -- you told this jury that you loved Mr. Caro, you said you still do, you're again still hoping that Mr. Caro would see the light and come back to the family unit?

A    I do still love him, yes.

Q    But even then, after he was, when he was out using drugs and staying around, he was still, you were trying to make the relationship work with

Mr. Caro?

A    Sure.

Q    But his supervised release gets revoked because he tested positive for drugs.  He got about a six month sentence, right?

A    Correct.

Q    He got out some time in about September of 1992?

A    That sounds about right.

Q    When did you and he officially separate?

A    He got out, and he must have been home a couple of months, I guess right after the holidays, maybe, like between January and February.

Q    So, he gets out of jail in September, stays through the holidays of 1992, and then he's gone again?

A    Pretty much.

Q    And at that time did you have any idea that he had become involved with any gangs, or anything like that?

A    No, not at all.

Q    No indication.  So, how much time did Mr. Caro spend with you after he got out in September of '92?  Was he there all the time, or was he back to the same old habits?

A    Initially started out at home, and didn't take

JA 635

too long, within a couple of weeks, a few weeks, and again started, "I'm going to go back to, you know, Falfurrias for a couple of days," or, "I'm going to go see my mom," or, "I'm going to go, you know, be over there, see my family for a little bit."

Q    And to your knowledge he still didn't have a job during that time?

A    Correct.

Q    And then you were urging him to try to come back and get a job and take care of yourself and Xinia?

A    Sure.

Q    At this point, again, the responsibility for taking care of Xinia is yours, isn't it?

A    Yes.

Q    So, Mr. Caro, again, kind of disappears.  Then you said you heard on the radio --

A    That's correct.

Q    -- that Mr. Caro was arrested?

A    That's right.

Q    When you heard that on the radio that he was arrested, did that again cause you surprise and disappointment?

A    Definitely.

Q    Now, Xinia was, at that time, she would have been about five years of age?

A    Approximately.

Q    Did you try to explain to her, or did you say anything to her, to a five year old child about where her father was, why he wasn't there?

A    No, not at that time because he had already been out of the house, so the fact that he was incarcerated, I didn't have to deal with that until we actually looked at visitation, and then having to explain why we were going to visit.

Q    And you learned, you told the jury that he was back in the drug smuggling business and was sentenced in January of 1994 to 71 months?

A    Right.

Q    But during that time did you still hold out hope that you could put things back together with Mr. Caro when he got out?

A    Yes.

Q    And you encouraged your daughter to hold out hope that Mr. Caro would come out and be a loving father?

A    Yes.

Q    And you encouraged her to believe that, and you hoped that, as well?

A    Of course.

Q    Okay.  And so he goes in, he's sentenced in

JA 637

January, 1994 to 71 months.  When did he get out?

A    He got out Thanksgiving time, more or less, like the 20th of November of 1997, 1997 or '98.

Q    Okay.  I think you told the jury that even after he got this second, this longer term, apparently he was close enough by that you could visit him with some frequency?

A    Correct.  There was a time he was in Three Rivers, and so we were able to take advantage of that opportunity and see him more frequently.

Q    During that time, again, you had Xinia, and you were basically taking care of her for, at least for part of the time that Mr. Caro was in prison?

A    Yes.

Q    And at some point you say because of work constraints and your need to support yourself and the family that you had to ask your parents to watch Xinia?

A    Correct.

Q    When, approximately, was that?

A    That would have been in June of 1998.

Q    Was Mr. Caro still in jail then?

A    Yes.

Q    When did he get out?

A    It would have been November of '98.

JA 638

Q    November of '98.  You said for about a year, or so, after that it was good?

A    Yeah, about a year and a half, or so.

Q    When you say good, was Mr. Caro there on some regular basis?

A    Oh, yeah.  It was perfect.  It was just a regular, normal family life, just exactly what everyone wants and has, and hopes to have.

Q    During that time Xinia was still with your parents?

A    Correct.

Q    And did you talk with Mr. Caro about, about possibly getting Xinia to come back and live with the two of you?

A    Definitely.  We had thought that once the school year was up, as we had originally agreed with my parents that Xinia would come live with us in Grand Prairie.

Q    So, again, you were still hoping and trying with everything that you had to try to make a go of it with Mr. Caro, correct?

A    Correct.

Q    And did Mr. Caro have a job during that time when he got out?

A    Initially when he first got out he didn't have a

job when we were living in Waxahachie, but by December we moved to Grand Prairie, and yes, he was able to get a job.

Q   Did he work that job for a period of time?

A   Yes, he had several different jobs, and he worked at each one for a while, I guess felt maybe that wasn't quite the job he wanted, or the job for him which was, which was fine with me.  I didn't care what job he had as long as he had a job and he was willing to try.  He definitely was.  He tried several different jobs, and was at them for a good while and was pretty good at all of them, actually.

Q   Did you have any indication that there was anything wrong -- from what you're saying he was working these jobs, things were going good -- did you have any indication that anything was wrong or missing in your relationship?

A   No, actually I thought life was beautiful, I thought it was great.

Q   I believe you told the jury that in February of 2000 that Mr. Caro just left the house and never came back?

A   That's correct.

Q   Did you have any, did you see that coming?

A   No, no, I didn't, not at all.

Q    Do you know, did he contact you to tell you where he was, or anything like that?

A    No, no, he didn't.

Q    To your knowledge did he contact your daughter who, at this point, would have been approximately 11 years of age?  Did he contact her and tell her where he was?

A    No, not to my knowledge.

Q    You said you had basically to get some family member of yours to find where he was?

A    His brother, my brother-in-law.

Q    So, that was in February of 2000.  And I believe you said you learned in August of 2000 that Mr. Caro had been arrested for a third time?

A    Correct.

Q    For, again, for drug trafficking?

A    Correct.

Q    And did that, that arrest devastate you and impact you?

A    It actually did.  I mean, again, you're looking at his third arrest, and I knew it was serious, and I was upset and disappointed even though I was angry at him still, I still was very upset and hurt and angry.

Q    I take it one of the reasons you were upset, Ms. Caro, from the sounds of it you had been trying

to make a go of this relationship for some number of years, looks like beginning in '87 up to now, we're now in August of 2000, you had continued to try and make things work with Mr. Caro hoping he would change, didn't you?

A    Yes.

Q    And when, when he was arrested for yet this third time, that told you pretty much he had not changed; is that true?

A    True.

Q    And I believe you told the jury that, you said you hadn't seen him until today?

A    That's correct.

Q    So, the last time you had laid eyes on your husband would have been some time in, was it February of 2000?

A    May of 2000.

Q    May of 2000.  Okay.  And has, to your knowledge has Xinia seen him?

A    No.

Q    Not since May of 2000?

A    Actually, it would have been like December of 2000 we would have been in Falfurrias, or she would have been in Grand Prairie with us for the holidays, and would not have seen him again until today.

Q    So, I take it, then, Mr. Caro has surprised you in many things.  He surprised you with his drug trafficking, he surprised you with his return to drug trafficking, you were surprised today to learn that he was a member of the Texas Syndicate?

A    That's correct.

Q    And you said you are still his wife.  Are you still married to him?

A    Yes, that's correct.

Q    Do you know someone named Theresa Saenz?  I want to show you a document marked as Government's Exhibit 28.  It's a prison form signed by Carlos Caro in August of 2000, and it has your name there, LouYveth, and ex-wife?

A    I had not seen that.

Q    Had not seen that.  This is a form that talks about disposition, notification of death or illness.  "In the event I should die I direct that my girlfriend, whose name is Theresa Saenz, be notified."  Were you aware of that?

A    No, not at all.

Q    How do you know this Theresa Saenz?

A    Once Carlos was not living with me, and didn't come home or anything, some of my friends who still lived in Falfurrias, I had talked to them and said I

JA 643

didn't know what was going on, didn't know what had happened, and so they subsequently, Falfurrias is a very small town, and everybody knows everything about everybody else, and they found out that he was living with Theresa, and that's how I know the name. I don't know her.

MR. GIORNO: Your Honor, I move the introduction of Government's Exhibit 28.

THE COURT: It will be admitted.

(Government's Exhibit No. 28 was received in evidence.)

BY MR. GIORNO:

Q    Now, this Theresa Saenz whose address is listed as Route 1 -- excuse me -- it says Falfurrias, Texas. Do you know whether or not he had a child with her?

A    My understanding, again from what my friends had told me, was she did have a child. Whether it's his, or not, I don't know. That's a possibility because they were together. But I don't know who the father of her child is.

Q    And even after all that, Ms. Caro, you're saying you still, you still care for Mr. Caro?

A    Yes. I mean, the times that we had together, he was good to me when we were together. The fact that he made mistakes and bad choices, I mean, I can

acknowledge that, but I do still love him, yes.

MR. GIORNO:  That's all the questions I have.  Thank you, ma'am.

MR. SIMMONS:  No further questions, Your Honor.

THE COURT:  Thank you, ma'am.  You may step down.  May this witness be excused?

MR. SIMMONS:  Yes, sir.

THE COURT:  You may be excused, ma'am. Ladies and gentlemen, we're going to take a break at this time.  If you'll follow the bailiff out, and we'll be in recess for about 15 minutes.

(The jury retired to the jury room, after which the following occurred:)

THE COURT:  Is there anything from counsel before we take a break?  If not, we'll be in recess for about 15 minutes.

(Recess from 10:55 a.m. to 11:10 a.m.)

THE COURT:  Are we ready for the jury?

MR. KALISTA:  We do not have any more witnesses we're going to put on today.  However, I believe with agreement with the Government we would be able to introduce Xinia Caro to the members of the jury by simply having her stand and acknowledge her presence in the courtroom.

THE COURT:  So, in other words, you do not intend to call any further witnesses other than Dr. Cunningham?

MR. KALISTA:  Yes, sir.

THE COURT:  All right.

MR. BROWNLEE:  Obviously that includes Mr. Silverstein?

MR. KALISTA:  Mr. Silverstein would be a potential rebuttal.

THE COURT:  Sur-rebuttal.

MR. BROWNLEE:  Very well.

THE COURT:  All right.  Well, and you want to do that now?

MR. KALISTA:  Yes, sir.

THE COURT:  Is she in the courtroom?

MR. KALISTA:  Yes, sir.  She's right there.

THE COURT:  Oh, I see.  Very well.  If you'll have the jury in, please.

(The jury entered the courtroom and was seated in the jury box.)

THE COURT:  Very well.  Mr. Kalista, you may proceed.

MR. KALISTA:  Yes, Your Honor.  By agreement with the Government we would like for the court and the jury to acknowledge the presence in the

courtroom of Xinia Caro, the daughter of LouYveth Caro and Carlos Caro.

THE COURT: Very well. You may be seated, ma'am.

MR. KALISTA: Judge, we have no further witnesses today.

THE COURT: Ladies and gentlemen, we've exhausted all our available witnesses today. As I indicated to you yesterday, there will be evidence on Monday. And so I'm going to excuse you now to return Monday morning at 9:00 so that you can hear the remainder of the evidence in this case. I hope you have a good weekend.

Please remember my instructions to you about not discussing this case, or permitting it to be discussed in your presence. If you'll leave your notebooks in the jury room we'll see you Monday morning at 9:00. Thank you.

(The jury retired to the jury room, after which the following occurred:)

THE COURT: Is counsel prepared now to take up the jury instructions question?

MR. KALISTA: We'd like to make a request on that, but we would request that we resume at 1:00, give us an opportunity perhaps to do that. I know

Mr. Giorno filed his response about, it was almost 10:00 last night. I think I did mine, it was early this morning, I was working on it late last night along with dealing with witnesses, and I'm really not prepared to tell the court.

THE COURT: That will be fine. Let's say 1:30, if that's all right. And then if there's nothing further, then, we'll reconvene with the defendant present at 1:30 this afternoon. Is there anything further, then? Very well. We'll be in recess until 1:30.

(Recess from 11:20 a.m. to 1:30 p.m.)

THE COURT: Counsel, I've had an opportunity to read the memoranda that have been filed by the parties in regard to the jury instructions questions that I posed to the parties, but I'll be glad to hear any further comments or argument that counsel wishes to make. First, the Government? Anything further?

MR. BROWNLEE: Yes, Your Honor. The United States filed proposed jury instructions earlier in the month of January for this penalty phase, and we would, it kind of dovetails into the court's first question about what the standards are for this phase, whether or not it's beyond a reasonable doubt, and

the United States, as you have seen, has filed an objection to including the reasonable doubt standard. It's not anywhere in the statute, but that would be the standard -- the Eighth Circuit doesn't include it, the Tenth Circuit doesn't include it, I found no case law that the Fourth Circuit mandated. I did find the *Sampson* case where the District Court in that case did give it, even though I think the court has some reservations. It appears the Government conceded the point at some time, and they went ahead and gave the instructions.

I talked to the Capital Crimes Unit in Justice about it, in fact Mr. Sampson was sentenced to death, he has appealed claiming that was error, and I guess at this point everything is error, but I think the structure that the statute lays out is pretty clear, that the question now before the jury is the death penalty justified. They have to prove the aggravators unanimously beyond a reasonable doubt. The defendant only has to establish any mitigating evidence by a preponderance of the evidence to one juror. They then balance that.

The question is does the aggravators sufficiently outweigh the mitigators? If they do, and then the jury can find the death penalty is

justified. And as we submit, at that time we believe it's appropriate for the court to instruct the jury that if they find the death penalty is justified then they shall impose it. And so we would ask that that be done. The rest of it, I believe, was relying on papers. Mr. Giorno answered the final two questions, if he has anything.

THE COURT: Mr. Giorno?

MR. GIORNO: We've set out our position in the brief. If the court has questions --

THE COURT: Let me ask you about the life without possibility of release as a mitigator. Now, the defendant has not submitted to the court specific language in regard to its claim to mitigating factors. But I, I would guess that one possible mitigator is that the defendant, based on the evidence presented by the defendant, could be controlled while in prison. Now, would the Government concede that that would be a proper mitigator?

MR. GIORNO: The fact that he could be controlled?

THE COURT: In other words, the defendant's position is going to be, I take it, while serving life in prison without release that the likelihood

that he would commit further acts of violence can be minimized by the Bureau of Prisons.

MR. GIORNO:  Yes, sir.  I would agree, I think from Aiken's testimony, and from what I know of Cunningham's testimony in cases past, that is a mitigator they've introduced evidence on.

THE COURT:  And I wonder, and the defendant can respond to this, isn't that sort of tied up with this life in prison without possibility of release? I mean, it's more than just life in prison without release; it's life in prison without release where he will be controlled, or likely to be controlled is a mitigating factor.

Now, again, that doesn't have anything to do with the offense or, or the background of the defendant, but it is a, it does seem to me to be a proper mitigating factor viewed as a whole, not just the life imprisonment, but viewed from the evidence presented by the defendant.

MR. GIORNO:  Your Honor, my view is that I would agree with the court's observation, would have no quarrel with the fact that if the jury finds that the Bureau of Prisons could control Carlos Caro in a prison setting, for however a period of time, that's a mitigator, but that part of that that talks about,

well, life without parole, that sentence in and of itself is a mitigator we disagree with. I mean, that is, the fact that he could be sentenced to life without parole is something that the jury could do, and the jury could be aware of as a consequence if they find he can be controlled. I mean, if they find that all the circumstances warrant a sentence of life without the possibility of parole, that is a sentence they could impose.

The fact that sentence is available is not in and of itself a mitigator. All things would lead to that conclusion, such as the fact that he could be controlled are mitigators, but we take the position, Your Honor, that that sentence, the availability of that sentence in and of itself is not a mitigator.

THE COURT: Okay. Thank you. Mr. Kalista?

MR. KALISTA: Judge, as to that, we do intend, of course, to offer to the court and to the Government our proposed instructions concerning our mitigating factors. After having heard the court speak about life without parole in the context of being able to be adequately and securely confined by the Bureau of Prisons, I don't know what we'll do in terms of combining an instruction incorporating both life without parole and the ability of the Bureau of

Prisons to adequately confine Mr. Caro.

THE COURT:  Well, it, it just, it seems to me that it's clear, and I think the Government has conceded that it is a proper mitigator, that the defendant can be, if the jury finds by a preponderance of the evidence, that he can be confined safely, that that would be a proper mitigator.

But the sentence, alone, I have more trouble with.  I mean, you know, would a sentence of 30 years -- suppose this was not first degree murder, but it was a drug offense in which a homicide had occurred, and the court theoretically then would have the ability to impose a lesser sentence than life imprisonment.  Would, would a sentence of 30 years be a mitigator?  I just, I guess I have difficulty reviewing that alone as a mitigator.  Certainly the, the, combined with the other factors, it seems to me --

MR. KALISTA:  I know that this case is unique in the sense that this was an inmate killing while he's incarcerated serving that sentence.  The court has consistently told the jury you're only going to have two choices, death and life without possibility of release, and I trust those are

certainly going to be the two choices that are going to be explained to the jury.

THE COURT: Yes, well, I think that's the law. I mean, first degree murder has a mandatory minimum of life in prison.

MR. KALISTA: I guess what we have to think about, we, especially in the memorandum that was prepared by the Washington League for Professor Groot in the *Plunkett* case is based upon studies that jurors sometimes don't believe that life without release truly means life without release. I agree in the context of this case where we already know a release date for the sentence he's already serving is 2053, perhaps our arguments including that as a mitigating factor are less sound, but we certainly are going to explore that.

THE COURT: Well, I don't have any, I mean I will tell the jury, and I propose to give the jury those two alternatives, either the death sentence or life imprisonment without possibility of release. I think those are the alternatives. I think the Government has conceded that from the beginning.

MR. KALISTA: Your Honor, just very briefly about the first argument, that has to do with the burden upon the Government to prove beyond a

JA 654

reasonable doubt that aggravating factors outweigh mitigating factors, I think we've listed in our argument to that first point a couple of different types of argument. One is the argument based upon the *Apprendi* line of cases that talks about that part of it, and of course the Eighth Amendment argument we've put in there, as well, where we're talking about the need for reliability in sentencing individuals who are accused of a capital offense, and in making sure that the sentence is, in fact, reliable. And then, of course, we've cited a number of states that require language of proof beyond a reasonable doubt as far as measuring, or weighing, or putting upon the Government, I should say, the burden of proof beyond a reasonable doubt that statutory aggravators outweigh mitigating factors in a number of state cases that so hold. So, I'm sure the court has read that, but I did want to point that out to the court.

I think the second point concerning the so-called mercy instruction, we've cited a case *United States* v. *Haynes* which pretty much speaks for itself, I think that's a very detailed analysis of the Federal Death Penalty Act and why that court came to the conclusion that certainly such an instruction

is proper and was given in this case. So, for those reasons, and for the reasons cited in our written materials, we would ask the court to rule.

THE COURT: Let me ask you this, Mr. Kalista. When do you believe you might be able to supply the court with your specific language as to mitigating factors, and opposing counsel?

MR. KALISTA: Judge, I think the court knows pretty much what Dr. Cunningham is going to testify about, so I don't think there's going to be a brand new mitigating factor. I think the court has probably heard the evidence, and whatever mitigating factors are there are there. I think we would like to file that certainly be Monday.

THE COURT: All right. Well, I think --

MR. KALISTA: Unless the court directs otherwise.

THE COURT: It seems the question, obviously, as to how many you break down, and I understand the defense has a natural desire to make as many mitigating factors out of the evidence as possible so that there's at least a mathematical balance here, I understand that, but basically aren't we talking about, you know, the reverse of future dangerousness, that is, that he can be safely

controlled in prison, and his background, however you cut that? I mean, aren't those the mitigators in this case?

MR. KALISTA: Those are certainly the two general mitigators, and we believe certainly under his background, if you break it down --

THE COURT: I understand, you can cut that in different ways. But that's basically what we're talking about, and I would only say that, I mean, I'm open to how you, you know, the various ways you can describe his background. But on the other hand, I don't think it's fair to cut it too, you know, thinly. I mean, you know, to say the same thing in five or ten different mitigators, I think, I think we have to have some rule of reason there.

MR. KALISTA: Yes, sir, I understand.

THE COURT: So, perhaps counsel would keep that in mind. Let me ask the Government in terms of its aggravators, and in terms of instructing the jury, in my description of them, the Government has already provided me with those, and those are basically as set forth in the notice.

One question I have, though, is in terms of victim impact. Aren't we talking here, at least, only about the victim's family? Is there any

evidence about his friends?  I think that was, you know, there was a description of his friends, but I think here we're limited to his family.

MR. GIORNO:  I agree with that, Your Honor. That's all the evidence we've put on in connection with that aggravator.

THE COURT:  All right.  Well, what I would propose to do is provide counsel, at least by tomorrow, make a decision on the issues that have been presented, and provide counsel by tomorrow, at least, with a form of proposed instructions.  And as soon as I get the mitigators, I'll look those over, also.  And then we'll have an opportunity, before the argument, to go over the instructions once again, and hear any other and different objections that might be made.

MR. KALISTA:  Judge, this does not concern instructions.  I wanted to ask about closing argument.

THE COURT:  Yes, sir.

MR. KALISTA:  I haven't discussed this with the Government, and I'll just throw this out, we have not talked about time, and that's something I'm sure we can talk about, but we would like to have the court's input whether we would be permitted to split

up our argument.  We're not asking for additional time, but we're asking for the ability for both of us to speak on behalf of Mr. Caro.

MR. GIORNO:  That's fine with the United States if that's what they want to do.

THE COURT:  I have no problem with that.  I would like counsel to confer about a length of time.  I think counsel has been cooperative so far, and perhaps you can come to that, but obviously I can make that decision.  I do want a time limit on the argument.

MR. KALISTA:  I do understand, Judge, we're going to finish the evidence on Monday and begin closing argument on Tuesday?

THE COURT:  Let's talk about that.  Do we anticipate we're going to finish the evidence on Monday?  We have Dr. Cunningham.

MR. GIORNO:  The United States has three rebuttal witnesses, two very, very short ones.  There are two guards that will give testimony about statements made by Mr. Caro's reference to ADMAX.  The only lengthy witness, and I'm not sure how lengthy he'll be, is Hershberger, Greg Hershberger.  He'll talk about ADMAX, and as far as I can tell, Your Honor, that will be the entirety of the

Government's rebuttal.

THE COURT:  I guess we anticipate that probably we'd be able to get to argument, submit the case to the jury on Tuesday?  So, we'll, we'll try to do that.  And again, if counsel would confer about a length of time for argument, I'll allow defense counsel to split that up however they, however they wish.  And of course the Government would have closing, and then I'll instruct the jury and we'll see from there.

Anything further?  All right.  Well, if there's nothing further, then, we'll adjourn this case for the day.

(Proceedings concluded at 1:50 p.m.)

CERTIFICATE

I certify the foregoing is an accurate transcript from the record of proceedings in the above-entitled matter.

3/18/07                    /s/ Bridget A. Dickert
Date

```
        IN THE UNITED STATES DISTRICT COURT FOR THE
             WESTERN DISTRICT OF VIRGINIA
                  Abingdon Division

---------------------------x
                            :
UNITED STATES OF AMERICA,   :
                            :
      Plaintiff,            :
                            :
v.                          :   1:06CR1
                            :
CARLOS D. CARO,             :
                            :
      Defendant.            :   Abingdon, Virginia
                            :   February 12, 2007
---------------------------x   9:05 a.m.


                     JURY TRIAL
        BEFORE THE HONORABLE JAMES P. JONES
  CHIEF UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:


      JOHN BROWNLEE, Esquire
      U.S. Attorney
      ANTHONY P. GIORNO, Esquire
      Assistant U.S. Attorney
      P.O. Box 1709
      Roanoke, Virginia  24008
          For the United States of America.


      STEPHEN J. KALISTA, Esquire
      P.O. Box 1186
      Big Stone Gap, Virginia  24210
      JAMES SIMMONS, Esquire
      1208 17th Avenue south
      Nashville, Tennessee  37212
          Counsel for the Defendant.



Proceedings recorded by Stenography, transcript
produced by computer.
```

**BRIDGET A. DICKERT**
**UNITED STATES COURT REPORTER**
**180 WEST MAIN STREET, ROOM 104**
**ABINGDON, VIRGINIA 24210**
**(276) 628-5116**

JA 661

(Proceedings commenced at 9:05 a.m.)

THE COURT:  Morning, ladies and gentlemen. Are we ready to proceed?  Silence is acquiescence, I assume.  I understand we may have some technical difficulties with our monitors, not in the jury box, but as I understand from the clerk, the technical problem is the court's monitor and the witness stand monitor somehow are not working.  We have a call in to our technical folks, but the question is whether we can proceed under those circumstances.  Is the defense witness, Mr. Kalista, Mr. Simmons -- what's your call?

MR. KALISTA:  Mark Cunningham.

THE COURT:  The question I posed to you is can we proceed under the current existing technical problem?

MR. KALISTA:  I believe we can if the Government has no problem with that.

MR. GIORNO:  We have no problem with that, Your Honor.

THE COURT:  If we're ready for that, we'll have the jury in, please.

(The jury entered the courtroom and was seated in the jury box.)

THE COURT:  Good morning, ladies and

gentlemen.  Hope everything is fine with you this morning.  And we're ready to proceed, and the defense may call its next witness.

MR. KALISTA:  Yes, Your Honor.  We call Mark Cunningham.

MARK CUNNINGHAM, DEFENDANT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. KALISTA:

Q    Good morning, sir.

A    Good morning.

Q    Would you please state your name?

A    Mark Douglas Cunningham.

Q    And could you spell that for the court reporter?

A    Mark, M-A-R-K, Douglas, D-O-U-G-L-A-S, Cunningham, C-U-N-N-I-N-G-H-A-M.

Q    And where are you from, Dr. Cunningham?

A    From the Dallas area.

Q    And what is your occupation?

A    I'm a clinical and forensic psychologist and independent researcher.

Q    How long have you been a psychologist and independent researcher?

A    About 29 years.

Q    Could you please explain to the jury what a clinical psychologist is?

A     Yes, sir.  A clinical psychologist is what you would expect a psychologist to do, it's the evaluation and treatment of psychological disorders, interviewing, testing, counseling, that sort of thing.

Q     What's a forensic psychologist?

A     Forensic psychology is any way that psychology, as a science, can be helpful to some issue that's before the court, all the way from parenting capabilities in child custody matters, or psychological injuries in civil cases, or in criminal court things like competency to stand trial, or mental state at time of offense, or sentencing considerations such as are being considered today.

Q     And where are you licensed as a psychologist?

A     I'm licensed as a psychologist in Texas, Louisiana, Arkansas, Oklahoma, South Carolina, Connecticut, Illinois, Indiana, Idaho, Colorado, Oregon, Arizona, New Mexico.  I may have left one out.  I'm licensed, I think, in 14 states.

Q     Dr. Cunningham, have you received any recognition or awards for research activities and publications?

A     Yes, sir, I have.

Q     And what award did you receive in 2005?

A    In 2005 I was honored with the Texas Psychological Association Award for Outstanding Contribution to Science for having made a significant contribution to the body of knowledge in psychology.

Q    And how many psychologists will receive that type of award in one year, typically?

A    Only one.

Q    And has your research and scholarship resulted in any research and scholarship awards in 2006?

A    Yes, sir, it did.  I was honored with the American Psychological Association Award for Distinguished Contribution in Research and Public Policy, which is research that informs some issue of importance to legislators or courts, or to the public in general, and this could either be as a result of a singular extraordinary achievement or lifetime of research.

Q    Now, Dr. Cunningham, to provide some additional perspective on these awards, how many members are there in the Psychological Association?

A    About 160,000 of whom about 80,000 hold doctorate degrees.

Q    And so there's one award each year for research in public policy among all of those members?

A    Yes, sir, that's correct.

Q     Now, have you been recently recognized with any other professional honors or distinctions?

A     Yes, sir, I have.  This fall I was elected as a fellow of the American Psychological Association, which is a distinction that indicates unusual and outstanding contribution to the field of psychology on a national level.

Q     Could you give us a brief summary of your educational background?

A     Yes, sir.  I received my undergraduate degree with majors in psychology and mass communications and a minor in Bible from Abilene Christian College.  I went on and got my master's and doctorate degree in clinical psychology from Oklahoma State University in a program that was accredited by the American Psychological Association as a doctoral training site.  I did a one year psychology internship at the National Naval Medical Center in Bethesda, Maryland, which is the large naval hospital in suburban Washington, D.C.  And I was an active duty Navy officer and clinical psychology intern.  I was then assigned as a staff psychologist at the Naval Submarine Medical Center in Groton, New London, Connecticut.  At that time the submarine base at Groton was the primary submarine base on the Atlantic

JA 666

coast. Again, I was an active duty Navy officer and clinical psychologist there. While there I did two years of part time post doctoral study at the Yale University School of Medicine and also taught in the evening college course in the community college system. I left the Navy in 1981, and took a full time academic position for two years at a small private university as a full time assistant professor of psychology. And since 1983 I've participated very heavily in continuing education.

Q    Have you ever been published in the areas of clinical and forensic psychology?

A    Yes, sir, both in peer reviewed scientific journals and in edited books.

Q    What are peer reviewed journals?

A    Peer reviewed journals are the primary ways that scientists exchange information with each other, and the way that works is that the existing literature or knowledge in a given field may be, consisting of many studies, may be integrated and critically reviewed like into a research paper that summarizes that research in one spot, or a study may be performed and the findings of that study are written up into like a research paper. That is submitted to the editor of the scientific journal who is typically a nationally

JA 667

recognized scientist himself, and he reviews this paper for whether it makes an important contribution in the soundness of the methodology, and also sends it out to several nationally recognized experts, scientists in the area that this paper is written in, and they review it for scholarly merit, whether the method that was used is correct, and whether it accounts for research that's been done in the field up to that point. That's a very rigorous review process, so that in the leading journals only about ten percent of the papers that are submitted pass that review process. If they do, then it's said to have passed peer review, and it's published in the scientific journal.

Q    Can you describe any peer reviewed papers you have authored or co-authored?

A    Yes, sir. Some of the papers that I have written have, have taken all of the research, specifically about how capital offenders behave in prison, and has integrated that into a single paper, and there are a couple, several that approach things from that way. There are also direct studies of violence in prison, rates of violence, factors associated with violence in prison, things prisons can do to reduce that incidence of violence. For

example, we looked at 2,600 inmates in a high security prison in Missouri over an 11 year period of time. In another study we looked at 51,000 inmates in the Florida Department of Corrections, comparing the offenses that sent them to prison and seeing whether that had anything to do with their misconduct rates in prison. And then there have been other studies that have investigated other samples of inmates looking at their prison conduct, rates of violence, factors that are predictive of the violence experience.

Q    Could you describe to the jury the contributions you have made to any forensic psychology books?

A    Yes, sir. I, I co-authored the chapter in the Handbook of Psychology on capital sentencing evaluations. The Handbook of Psychology is a 12 volume series that was published in 2003 that was intended to represent the state of the art of psychology at this time. One of those volumes is on forensic psychology, and I co-authored the chapter on evaluations at capital sentencing. There's another chapter on capital sentencing that is currently in press. Then some of the reports that I prepared have been used as model reports, and have been published in a case book, as well.

JA 669

Q    Now, what does the term in press mean?

A    In press means that it has passed the peer review, or passed the editing process and is simply awaiting being printed.

Q    Now, to your knowledge in the past eight years, or so, are you aware of any psychologists publishing more papers relevant to evaluations for capital sentencing and death row than you have?

A    No, sir, I'm not.

Q    Now, how much time does this research and publishing take?

A    It takes a great deal of time.  A single paper or study may require well in excess of 100 hours.

Q    And are you compensated for this research and publication?

A    Not economically, not with money, no.

Q    If you're not getting paid for it, why do you do it?

A    Well, my wife asks me that sometimes.  For several reasons.  In a nerdy sort of way, this is what I like to do.  Some people play golf, and I like to write research papers.  I like to pull together research, and do a study, and have a question that's out there and then collect data that answers it. It's part of my identity as a scientist to not only

be learning, but to also make some contribution when I can. I almost always co-investigate or co-write these studies, so it gives me an opportunity to interact with colleagues and form friendships. And it also contributes to my professional stature.

Q    Would you agree that university professors are usually involved in this type of research as part of their jobs?

A    Yes, sir, that's a significant part of the role of being a university professor. You may teach very few classes and primarily do research and writing.

Q    Is it unusual, however, for a practicing professional to be so heavily involved in, so heavily involved in research and publishing?

A    Yes, sir, it is.

Q    Now, is there sound scientific methodology and research data regarding rates and correlates of violence in prison?

A    Yes, sir, there is.

Q    Are you familiar with that research?

A    Yes, sir, I am, both as a student and also as a scientist who has contributed to it.

Q    And is that some of the research that resulted in the awards that you received from the Texas Psychological Association and the American

Psychological Association?

A      Yes, sir, it is.

Q      Now, are you board certified in any particular area?

A      Yes, sir.  I'm board certified in forensic psychology by the American Board of Professional Psychology, which is the board certification organization that's recognized by the American Psychological Association.

Q      Now, can you explain the board certification process to the members of the jury?

A      Yes, sir.  To briefly summarize, the very rigorous process, you have to be at least five years out from your Ph.D. before you could even sit for it. It's intended to represent the highest levels of sophistication of practice.  It requires a submission of examples of your work that are heavily supplemented by research and study of legal cases and ethical considerations.  You're then allowed to sit for, if you pass that screen, you're allowed to sit for an oral exam that I spent eight or nine months studying 30 or 40 hours a weeks for.  The failure rate at this oral exam is about 40 percent, so it's a very rigorous examination process.

Q      Now, how many board certified forensic

psychologists are there in the United States?

A    Approximately 220.

Q    Have you served as a work sample reviewer, or oral examiner of a psychologist seeking to become board certified in forensic psychology?

A    Yes, sir, I've done both of those.

Q    Now, have you instructed in any continuing education for psychologists?

A    Yes, sir, I have.

Q    Would you tell the jury about that?

A    Yes, sir.  A major, a major goal of the American Academy of Forensic Psychology, which is this scholarly association of board certified forensic psychologists, is to raise the standard of practice of psychology in the courtroom.  That doesn't mean to teach psychologists to talk better, be more persuasive, but instead to give them the best understanding of the issues that they're evaluating, the most appropriate techniques for evaluating that, and the best science that will inform and illuminate those determinations.  I have been asked to present full day workshops on capital sentencing evaluations at different cities around the country.  I think across the last eight years, or so, I think that I have presented six or seven of those:  Dallas,

Cincinnati, Milwaukee, Monterey, San Diego, La Jolla, various cities around the country where I've given those various workshops for psychologists to educate them how to better form evaluations at capital sentencing?

Q    I think you said there were about 200 board certified psychologists in the United States?

A    Yes, sir, about 240 at this time.

Q    How many are on this teaching faculty?

A    Thirty or 40, I would estimate.

Q    Have you provided any continuing education classes to prosecutors, those who prosecute cases?

A    Sometimes prosecutors have attended this workshop that's intended primarily for psychologists. I've also spoken to joint conferences of defense attorneys and prosecutors and judges, and those have also been attended by prosecutors. One of the papers that I co-wrote that is not peer reviewed was published in *The Prosecutor's Brief*, which is a magazine that goes to all the district attorneys in California. It was intended to educate them about a particularly, about a specific diagnostic issue that is sometimes present in criminal cases, and so we wrote that as a way of contributing to their knowledge base about this issue.

JA 674

Q    Now, would you be willing to address a prosecutor's organization if you were asked?

A    Oh, yes, sir.  In fact, I've offered the U.S. Attorney's Office to provide continuing education and training without charge.

Q    Now, do you attend continuing education as a student, as well?

A    Yes, sir, very heavily.  In any given year I will have 50 to 100 hours of continuing education that I have attended as a student.

Q    And to what professional organizations do you belong?

A    I'm a fellow of the American Psychological Association, I'm a fellow of the American Academy of Forensic Psychology, I'm a member of the Texas Psychological Association, the Texas District Attorneys Association, American Correctional Association.  As I recall, I'm listed in the National Register of Health Service Providers in Psychology, which is a designation intending to reflect psychologists whose training has been in a medical setting so they're better equipped to treat more serious disorders.  I hold what's called a CPQ.  It's a professional qualification that is intended to help you get licensed in other jurisdictions beyond where

JA 675

you're licensed now, which is only operated in theory at this point. It hasn't been of much practical benefit, but that's another credential that I hold. Then there may be some other associations, as well.

Q    Have you ever testified in any military, criminal, family or civil court proceedings?

A    Yes, sir, on many occasions.

Q    And before what courts?

A    Before state and/or federal courts in Texas, Louisiana, Arkansas, Alabama, Georgia, Florida, South Carolina, North Carolina, Virginia, Maryland, New Jersey, New York, Michigan, Ohio, West Virginia. We can move across the United States. I think there are about 27 or 28, maybe 30 different states or territories where I've testified.

Q    Now, have you been recognized as an expert witness in those courts?

A    Yes, sir, on all of those occasions.

Q    In what areas?

A    In clinical and/or forensic psychology, in violence risk assessment for prison, in conditions of confinement that are available within the Bureau of Prisons, on a number of different issues related to this, to either psychology in general or to risk assessment in prison, conditions of confinement in

prison more specifically.

Q    Are you appearing here today as an expert in prison violence and security measures within the Bureau of Prisons?

A    Yes, sir.

Q    I'm going to show you what's been marked as, I believe it's Defendant's Exhibit Number 16, and ask you if that is your curriculum vitae, qualifications, education and experience?

A    Yes, sir, it is.  This is a curriculum vitae, is just a fancy word for resume, but this reflects the current edition of that.

MR. KALISTA:  I would ask this be admitted as Defendant's Exhibit 16.

THE COURT:  It will be admitted.

(Defendant's Exhibit No. 16 was received in evidence.)

MR. KALISTA:  Your Honor, we move to have Dr. Cunningham testify as an expert in prison violence and security measures in prisons.

THE COURT:  Does counsel desire to voir dire the witness?

MR. BROWNLEE:  Yes, Your Honor.  Thank you.

THE COURT:  Very well.

VOIR DIRE EXAMINATION

BY MR. BROWNLEE:

Q    Good morning, sir.  I'm John Brownlee, the United States Attorney.  I want to welcome you to Virginia.

A    Thank you, sir.  Beautiful state.

Q    Thank you, very much.  We love it.  I have a couple of questions.  I want to make sure the jury is clear.  You've not performed a psychological evaluation of the defendant, Carlos Caro; is that correct?

A    That's correct.

Q    Will not be offering any psychological evaluation testimony today concerning Carlos Caro; is that correct?

A    That's correct.

Q    Now, I want, you talked about board certification.  Is it accurate, sir, that in forensic psychology there is no board certification for individuals for assessing the ability of prisons to handle or control dangerous inmates like Carlos Caro?

A    That's correct.

Q    So, whatever board certification you have, it's not going to apply to what we're going to talk about here today, which is prisons controlling inmates like Carlos Caro; is that correct?

JA 678

A    No, sir, that's not correct.  There's not a specific board certification in this subspecialty issue.  This issue of --

Q    Let me clarify.  You just testified to Mr. Kalista that your testimony here today is going to be about the ability of the prison system to control inmates like Carlos Caro; is that correct?

A    Yes, sir, that's correct.

Q    There is no board certification; is that correct?

A    That's within the larger board certification of forensic --

MR. KALISTA:  Judge, he's arguing with the witness.

THE COURT:  I don't agree.  Overruled.

BY MR. BROWNLEE:

Q    You don't have a certificate on your wall that says board certificate in how prisons can control inmates?

A    No, sir.

Q    Okay.  Now, I went through your resume.  Is it true, sir, you've never worked for the Bureau of Prisons?

A    That's correct.

Q    You've never worked inside a prison?

JA 679

A    That's correct.  I've done consultations in prison.  I've never been employed by a Department of Corrections.

Q    Right.  You've never supervised an inmate within a prison?

A    That's correct.

Q    And you've never been responsible, then, for protecting inmate or staff inside a prison?

A    That's correct.

Q    And so just so the jury is clear, your knowledge of how a prison works and is operated is based upon your review of some documents, a review of the applicable statutes -- I'm assuming you reviewed those before you came today?

A    Yes, sir.

Q    And in some cases you've actually toured the prisons?

A    Yes, sir.

Q    Essentially what you've done in order to come in here today and testify, is that correct?

A    Yes, sir, as well as reviewed an extensive body of statistical data that's been provided to me over the years by the Bureau of Prisons, as well as extensive disciplinary files related to ADX.

Q    Now, did you prepare a report today for your

JA 680

testimony?  Typically, experts provide reports and they provide them to counsel and the United States.  Have you prepared a report?

A    I've not prepared a report.  I've prepared a detailed series of slides that will illustrate my testimony.

Q    Made slides, not a report?

A    That's correct.

MR. BROWNLEE:  Thank you, very much, sir.  We'll have an opportunity to talk in just a moment.

THE WITNESS:  Yes, sir.

THE COURT:  You may proceed, Mr. Kalista.

DIRECT EXAMINATION

BY MR. KALISTA:

Q    Now, Dr. Cunningham, just to follow up on a couple of questions by Mr. Brownlee, you did have information and materials provided to you by the defense concerning Carlos David Caro; is that correct?

A    That's correct.

Q    And I believe that included his, his central inmate file from the Federal Bureau of Prisons?

A    Yes, sir, that's correct.

Q    Did that include information concerning an assault that occurred at Oakdale FCI, Louisiana in, I

believe it was 2001?

A     Yes, sir, it did.

Q     Did that include information, as well, concerning a stabbing at USP Lee of Carlos Benavidez in 2003?

A     Yes, sir, it did.

Q     Were you also supplied material supplied by the Government to the defense concerning the killing of Roberto Sandoval in December 17, 2003?

A     Yes, sir, I was.

Q     Very briefly, in terms of Mr. Caro's inmate history since December 17, 2003, where has he been confined by the Federal Bureau of Prisons?

A     He was initially confined on the Secure Housing Unit at Lee County U.S. Penitentiary.  He continued to be housed there following the murder of Mr. Sandoval until mid-November of 2005.  So, he continued to remain on that Secure Housing Unit at Lee for almost two years, single cell.  Then he was transferred to a facility called Administrative Maximum Florence, and he was there from November 15, 2005 until March, 2006.  And then since that time he has been back at Lee, or in a local jail facility so that it's convenient to transport him to these proceedings.

Q    And is it your understanding he's been single celled when he was returned to Lee, and basically temporarily housed regarding these proceedings?

A    Yes, sir, it's my understanding he has continuously been single celled since that time, since the murder of Mr. Sandoval.

Q    Now, Dr. Cunningham, are there mechanisms available within the Bureau of Prisons to control disruptive or violent inmates?

A    Yes, sir, there are.

Q    Are you familiar with those mechanisms?

A    Yes, sir, I am.

Q    I believe you prepared some slides, you said, in connection with that?

A    Yes, sir, I have.

Q    And could you please describe, then, the mechanisms that are available within the Federal Bureau of Prisons to control disruptive or violent inmates?

A    Yes, sir.  The methods available to control disruptive or violent inmates are largely of three categories.  One is treatment related, the second is discipline, and the third is the imposition of greater security.  The first question is whether or not there is some sort of mental health issue that is

JA 683

driving the misconduct, or is contributing to it so that if you address that mental health issue you could substantially reduce or contain the disruptive misconduct or the violence. That's kind of the first order of business. And if you did identify a mental health issue, then you would respond to that with counseling or medication, or things like anger management, coping skills, training, that sort of thing. A second approach is one of discipline, that you respond to misconduct by making the inmate's life in prison more unpleasant than it already was, and that's through things like restricting the inmate to his cell so that he's locked down 23 hours a day, or the loss of privileges like ability to purchase small food items from the commissary, or the ability to have visitation or use the telephone, that kind of thing. Or you might lock the person down as a sort of punishment for 30 days, 60 days, that kind of thing. Another response is to identify that this is somebody who requires a greater degree of security than they have been having up to that time. And so you would then move them to a higher level of security, to a secure housing unit or to a single cell status in a secure housing unit, or to a facility that has been developed for inmates that are

JA 684

disruptive and are management problems, and that's a super maximum facility called Administrative Maximum or ADX Florence, Colorado. And then there is a prison within the prison there in ADX called the Control Unit, which is a unit for inmates who have committed particularly serious acts of violence in the Bureau of Prisons and may require longer term placement in a highly restricted status.

Q    Dr. Cunningham, let's first start with a United States penitentiary such as Lee United States Penitentiary.

A    Yes, sir.

Q    That is a high security facility; is that correct?

A    Yes, sir it is.

Q    Could you briefly describe to the jury again the security, security conditions in the general population of a United States penitentiary like Lee County?

A    Yes, sir. This is a, a high security facility that's going to have double fences around it. I think the fencing is about 16 feet tall, with about a 20 foot gap between them that has, oh, 15 or so coils of razor wire within the space between the fences. Razor wire is a thin razor edged metal that has

JA 685

regular protrusions in it that have kind of a trapezoidal shape with sharp points so it falls on to the person and impales them or their clothing to make it very difficult to move through. There will be perimeter detection devices as well as gun towers. All of that is to provide security against someone trying to break out an inmate, or the inmate getting out. That's the final barrier. Then there are concentric layers of security within the institution, itself. The inmates are double celled, typically, means two people to a cell. Most of the day they're out of their cell. They're going to be locked down from about 10:00 at night until about 6:00 in the morning. Otherwise, there is a count that's done typically each day at 4:00, that they would be back in their cells for, to make sure that you've counted them. And then there are counts at, I think at 10:00 when you lock them down again, 3:00, 5:00 in the morning kind of thing, there are four or five counts a day where they have them back in their cells and they're counting them. The rest of the day they're out in programming, they've got jobs they go to, or they are in yard or recreation areas, or going to education classes so that they are interacting with each other in larger groups and have quite a bit of

access to each other.  So, when we talk about general population in a U.S. penitentiary, we're talking about people that are out of their cell the biggest part of the day with lots of interaction with each other, and jobs they're going to, and that sort of thing.  The video of the Benavidez stabbing reflects a recreation area at USP Lee where you would see the inmates interacting with each other in a large room with tables, they've come out of a TV room, as I recall, but that gives you an idea of kind of the openness of interaction that they have.  There is controlled movement from different places within the prison, but within a recreation area there's quite a bit of movement and contact they would have with each other.

Q    Now, if an inmate requires greater security than the general population of a United States penitentiary like USP Lee, what are some of the common measures of increased security?

A    Well, those include these features, that you would, you would single cell them; in other words, the inmate is in a cell all by himself with very limited movement, often what we call 23 and one, which means the inmate is locked in a cell by himself 23 hours a day and comes out to exercise one to two

hours a day, five days a week, he gets his meals in a cell, is handcuffed any time he's moved, typically backing up, either putting his hands forward through the food slot in the solid front door, there's a trap that drops where a food tray can be passed, where the inmate would either put his hands out in front of him, or would kneel and put his hands out behind him up against or through that trap so that he's handcuffed before the cell door is opened up. The exercise would either be by himself or with just his, just a few other inmates. And there are frequent searches, searches of the inmate, pat searches when he comes out of his cell, strip searches where he takes his clothes off and hands them through the slot, and they check the clothes and hand them back where he puts them on while the staff is observing him, and also frequent searches of the cell that he's in. All of those are features as you would move up into higher custody than a general population.

Q    Now, I believe you said previously that according to inmate Caro's history when he was at Lee USP in the SHU he was single celled; is that correct?

A    He was double celled when this offense occurred. Since that time he has been single celled, as I said, for about two years there on the SHU, this is your

JA 688

housing unit at Lee, and then he was moved to ADX where he was also single celled.

Q    And the same way with recreation, was there a difference between his recreation prior to the killing of Roberto Sandoval in December 17, 2003?

A    I'm not familiar with how he took recreation prior to the killing of Mr. Sandoval.  Since that time his recreation has been solo, by himself, but I'm not familiar with how he took recreation prior to the killing of Mr. Sandoval.

Q    Dr. Cunningham, have you prepared a chart of custody options available within the Bureau of Prisons?

A    Yes, sir, I have.

Q    Could you please explain this chart to the members of the jury?

A    This is a chart that reflects the levels of custody within the Bureau of Prisons.  At the top is the very lowest level of minimum security that are called federal prison camps.  Then you have above that low security and medium security, which are the FCIs, and then U.S. penitentiaries or high security. Then the Secure Housing Unit or the SHU, the prison within the prison, at the U.S. penitentiary, then ADX.  Now, I have ADX general population, but general

population has a completely different meaning at ADX than it does at a U.S. penitentiary. General population at ADX is single celled, 23 and one, with shackled movement and solo exercise. So, it has nothing to do with general population at a U.S. penitentiary. Then there's the Control Unit at ADX, which is more secure in terms of now having three staff escorting instead of two, and having your legs shackled as well as your hands before the cell door is opened. Otherwise, it's the same as general population. It's hard to impose greater security than what's already being done in a general population unit as it exists at ADX. And then there are special security arrangements that can be maintained either at ADX or in other facilities.

Q    Now, who determines whether an inmate who has killed another inmate within the Bureau of Prisons is placed in a higher level of custody than the general population at a USP?

A    That's a determination that's up to the Bureau of Prisons, and to the United States Department of Justice. The Bureau of Prisons is an agency within the Department of Justice, and so that placement will be under the advisement of the Department of Justice, and the Bureau of Prisons, as they determine the

JA 690

security needs of that inmate.

Q   So, if the Bureau of Prisons determined that Mr. Caro represented a disproportionate risk to staff or other inmates, they could escalate the security measures they place on him?

A   Yes, sir, certainly could.

Q   How would they do that?

A   There would be, I mean there are several mechanisms.  The classification process is part of the determination of the security needs that an inmate has.  There is input from the, the Department of Justice as they're participating in that and providing background information or consultation. Under some provisions a federal judge can order features of the confinement, not where the inmate goes, but some of the communication capabilities that the inmate may have.  If the inmate is, is considered for designation to the Control Unit, then there is a, a review that occurs at a regional level within the Bureau of Prisons.  There is a due process hearing that is by senior staff within the Bureau of Prisons as they make that determination.  Whether somebody is at ADX or in a Secure Housing Unit or on the Control Unit, it's not as if you just lock somebody up and throw away the key.  There is regular review of this

JA 691

Cunningham - Direct

inmate, where he is and what his security needs are, and depending on where he is in that process, that may happen monthly, or quarterly with additional reviews semi-annually or annually.  Those reviews, though, are entirely performed by Bureau of Prisons personnel, or if there were special communications restrictions that were applied by a federal court, the court would periodically review the ongoing necessity of those procedures.

Q   Now, let's turn your attention to the bottom portion of the chart there beginning where it says ADX Florence, General Population Unit.

A   Yes, sir.

Q   What is ADX Florence?

A   ADX Florence is a super maximum prison that is located in, just outside the town in Florence, Colorado, which is about 80 miles southwest of Colorado Springs.  It represents the highest level security facility within the Bureau of Prisons, and is intended to, to be a, a mechanism to control inmates that cannot be managed safely and securely at a lower level of security.  It has a capacity of 490 inmates.  Now, that's 490 out of a total population within Bureau of Prisons facilities of about 165,000. And so this is a small group of individuals who have

been identified as having the greatest security requirements.

Q    I believe you previously testified that Mr. Caro was transferred from Lee USP to ADX Colorado in approximately October, 2005 and was there until approximately March of 2006?

A    Yes, sir.  My recollection, as I'm recalling the processing documents, I believe the processing documents are dated November 15, 2005.  It could be October, but my recollection was it was November, and then he was there until March of 2006.

Q    ADX Florence, Colorado, have you toured this facility?

A    Yes, sir, on three occasions.  The first two were individual tours and intensive briefings.  I think the first one was in 1997 or '98, the second one was in January of 2004, as I recall, and the last one was this November.

Q    And so this was the last occasion that you had such a tour in November of 2006?

A    Yes, sir, about three months ago.

Q    What did this tour involve?

A    Well, on all occasions it involved a senior staff member there at ADX taking me on the first two occasions, or a small group of six or seven

individuals on this last time, taking us through the facility, giving us an opportunity to look at a number of different representative units within the facility, to talk to the unit staff who were manning the unit on that day to respond to questions about procedures and security and capabilities within the facility.  My recollection is on each occasion those lasted anywhere from two to four hours, although I don't have a specific recollection exactly of the time.

Q    Now, are these tours routinely available to the general public?

A    No, sir.  To my knowledge there are only three or four psychologists outside the employ of the Bureau of Prisons who have ever been given these tours.  It has required a court order from a federal court judge on each occasion to have this access and to receive this kind of tour.  I'm familiar with federal judges and their staff touring these facilities, defense counsel on occasion getting access, Congressmen, that sort of thing, but it's a very restricted facility to get entrance into, as you would expect.

Q    Now, you have photographs of ADX Florence, Colorado?

A    Yes, sir, I do.

Q    Do these accurately depict the facility?

A    Yes, sir, I do.

Q    Would showing these pictures of Florence, Colorado in your description increase the jury's understanding of your testimony?

A    Yes, sir, it would.

Q    Dr. Cunningham, do you have a picture of ADX Florence?

A    Yes, sir, I do.  This is the, the entrance building of this facility that sits outside the double fencing.  So, there's no break in the fence line instead of entering this facility, and the corridor that connects this entrance building into the interior of the prison is underground so that you don't have any break in the perimeter of the fence line.  This is a map of Colorado, and the star illustrates where ADX Florence is.  You see Colorado Springs just above and to the right of the mapping star, and Denver above that.  It's located in a very remote, kind of high desert, desolate, open, rolling hill area in the foothills of the Rocky Mountains which are just immediately to the west.  This is a satellite view of the facility.  ADX is a complex that is on a larger campus of prison facilities.

JA 695

There is also a U.S. penitentiary on that same campus and, as well as a lower level security institution, each with its own perimeter and existing as an independent institution within that larger campus. This is a diagram of, of the, you can see the fence line, the gun towers. Each one of those Ls is a unit. And you'll see those in the graphics in a few minutes that show kind of a star pattern with an L forming an area for an outside recreation yard between each of these.

Q   Dr. Cunningham, let me ask you again to clarify, ADX, of course, you've described is a self contained super max facility within the Bureau of Prisons?

A   Yes, sir.

Q   But again, at the correctional complex at Florence, Colorado there is a USP, as well?

A   Yes, sir.

Q   With its own separate complex; is that correct?

A   Yes, sir, that's correct.

Q   There's also an FCI?

A   I'm trying to remember whether there's an FCI or camp there, as well. There may be four facilities that are there within that complex. I can't recall.

Q   All right. Now, Dr. Cunningham, do you have information regarding what sort of inmates are housed

JA 696

at ADX?

A    Yes, sir, I do.  This is information that was provided as part of the, of the tour that we took, and I've gotten these, similar information each time I've been to the facility.  This is updated as of November, 2006, and reflects a capacity of 490, and a current census, as of November, of 470.  This is a higher census than has historically been present at ADX.  When I was there in '97, '98, and again in 2004, the census was running about 390, or so.  So, there are more inmates at ADX now than there have been historically.  The facility has nine housing units.  Most of these units are identical in the architecture of the cells and the layout of the units, and that kind of thing.  There are a couple of units there that have a single door on the front of the cell, instead of a double door, vestibule arrangements, but for the most part the units walking on to them and through them are indistinguishable from each other.  Then there's an indication of, of the make up of the inmates that are within this facility, that 32 percent of the inmates at ADX have killed another inmate in prison, and 74 percent have been involved in a serious assault in prison.  Forty percent were involved in escape related

activities.  Thirty-seven percent had been found guilty of a murder in the community.  So, of the population there at ADX, 56 percent have either killed in the community and/or in prison.  And then you see the range of sentences that these inmates are facing, and also the reason for their referral.  Twenty-three percent for assaults on inmates, about 20 percent for the murder of an inmate, about six percent of, I think as of this November, 2006, 6.3 percent were direct commitments from court.  In other words, they went from their trials to ADX as opposed to going out into some other place in the Bureau of Prisons and then making their way to ADX eventually.  That's a small portion.  Most people at ADX have earned their way into the facility by the seriousness and chronic nature of their conduct, but there are times when folks have gone directly into the facility.

Q    Concerning Carlos Caro, are you aware of reading his BOP history that he's ever attempted to escape or escaped from any correctional facility?

A    No, sir, there's no indication of that.

Q    Are you aware of any incidence of assault upon correctional officers or staff within a prison?

A    No, sir.

Q    Now, if I'm reading this slide correctly, almost one third of the inmates at ADX have killed another inmate in prison?

A    Yes, sir, that's what it reflects, 32.2 percent.

Q    Dr. Cunningham, how often does that happen?  How often does one inmate kill another at a United States penitentiary?

A    The rate of that in the U.S. penitentiaries, there are about 25,000 inmates currently in 18 U.S. penitentiaries.  The rate of inmate on inmate murder varies from three to six in any given year.  So, of that population of 25,000, there are three to six inmate homicides.  That translates, the rate that we typically talk about homicide occurring is the rate per 100,000.  So, depending on the year, that rate is someplace between 18 and 24 per 100,000 inmates per year.  But the actual numbers are more like three to six in the U.S. penitentiary system.

Q    Now, Dr. Cunningham, is ADX intended to be a permanent placement for all inmates who are sent there?

A    No, sir.  The facility is intended for most of the inmates that are there to be a, not an indefinite -- temporary sounds too short, but it's not intended to be a permanent placement, the idea

40

Cunningham - Direct

being that experience of being there is sufficiently unpleasant, and those years of being locked down in a cell by yourself are going to wear the person enough, and the exposure to the rehabilitative program and that kind of thing, the hope is that you could cycle these folks back out into the Bureau of Prisons some day, that they, you could modify this person sufficiently, or get their attention sufficiently that they could be returned to a lower level of security at some point. Now, we have individuals at ADX, though, for whom there is no foreseeable plan for their return to a lower level of security. For example, all of the Al Qaeda terrorists are there now, prison gang leaders are at ADX if they're not out facing trial somewhere. So, you have -- Kozinski is there. So, you have individuals for whom there is not a plausible kind of idea about how these guys are ever going to leave, what's going to happen that they aren't going to need this level of security. But many of the inmates that are there they hope they can send out some day. Now, I have limited information on average length of stay at ADX. I have requested from the Department of Justice and Bureau of Prisons very specific statistical information on length of stay at ADX, and range of stay in the facility as a

JA 700

whole, and also on the Control Unit, and have not been provided that. During the last tour the, the individual who was providing that, one of the senior staff members there, indicated that of the inmates that do successfully exit the facility on what's called a step down program, that their average length of stay there has been five years. That's an average. Your range must be much greater. He also described that there were five individuals he could think of immediately who had been there since the facility opened in December, 1994, been there 13 years, effectively, 12 years. I have some information about graduation rates, based on the number of individuals leaving the facility to lower security each year, and that indicates that across the last, you know, six or seven years, five or six years, that anywhere from five percent of the population within the facility to nine percent have left on an annual basis. Now, the step down program requires that you would be in this facility for a minimum of three years. That's as fast as you could exit, is a three year period of time. Mr. Synsvoll described of the individuals who successfully make it out their average is five years. To give you some idea, if, if everybody in the facility was on the

JA 701

three year plan you'd graduate 33 percent a year.  If half of them were on the three year plan, you'd graduate 16 percent a year.  So, at best, only a quarter of the inmates are approaching a three year plan on this, and it may well be that Synsvoll described they're averaging at least five years, the ones that make it out, and that's a minority.  As we would look at this step down program, it consists of three different phases.  The first phase is general population, which, again, is nothing at all like general population at USP Lee.  The inmate is in a cell by himself, and remains in that cell except for the hours a week when he comes out to exercise by himself.  Before the cell doors open he's shackled behind his back, and is escorted by two staff members, one of whom is holding on to the handcuffs behind his back, and the other one is carrying a baton, a riot baton with a metal cap to it.  He either eats his meals in the cell, he has a stainless steel shower at the back of the cell so he can shower within that cell.  The inmate remains on general population for a minimum of 12 months.  Now, in order to move up to the intermediate level, several things have to have happened.  He has to have been discipline free for that year, he has to have a

JA 702

positive relationship with the staff, he has to have participated in the rehabilitative programming that's beamed in through the television in his cell, and most importantly, the reason why he was sent to that level of security in the first place has to have been sufficiently mitigating. In other words, whatever it is that caused him to be single celled like this at ADX, that reason has to have gone away or faded sufficiently that you can now consider that he could interact with other inmates again. If, if that is achieved, then he could go, if you have met all those standards, then he could go to an immediate level.

Q   That would be at ADX?

A   That's at ADX. This is all still within that facility. The immediate level is just the same, except now the inmate comes out 21 hours a week instead of ten hours a week, and now when he's out he can interact with up to seven other inmates.

Q   Is that immediate level a separate area of ADX in the facility?

A   Yes, sir, that's its own unit that the inmate would be physically moved to. And again, it works just the same, cells are the same, meals in the cell, everything is the same except now when he comes out he interacts with up to seven others for that

recreation time. The same thing happens at this level. He has to be discipline free for that year, positive relationship with staff, participating well in the programming, and the reason for holding him at an immediate level has to have been mitigated. In other words, whatever that security concern was has to have been satisfied before he can move forward. So it, it isn't just you play nice and you work your way out. The staff is also looking at who you are, and what your history is, and what they think you still need. Now, a third of the guys at the immediate level end up fouling up at this level, and get sent back to go, to the general population to start their year there again. So, a third of them end up failing and going back. If the inmate does move on to the next level that's a transitional unit, and now the inmate is out of his cell for six hours a day, he eats his meals out on a range, an open area within the unit with 15 other inmates. For the first time these inmates will have contact with staff without their hands being handcuffed behind their back. And they're escorted off the unit in small groups to exercise, and that kind of thing. That requires a 12 month minimum, again, discipline free, no infractions, positive relationship with staff,

participation in programming.  And again, last, to have mitigated the reason why they're there at ADX before they could exit the facility to what's called a pre-transfer unit that's on the U.S. penitentiary that's adjacent to ADX.  Then they would spend another year in a pre-transfer unit, segmented off from the rest of the general population at the USP working with them for that year to try to move them, see if they could be moved back into a general population setting.  Of the inmates, even those that have worked their way up to this transitional unit, a fourth of those guys fail and go all the way back to start to begin this general population process all over again.

Q    Now, Dr. Cunningham, when you took your tour in November of 2006, you mentioned a, I think, a Mr. Synsvoll?

A    Yes, sir.

Q    Was that the gentleman from the ADX Florence, Colorado who conducted the tour?

A    Yes, sir.  Chris Synsvoll, who is a legal representative and senior staff member at ADX Florence.

Q    In connection with the tour did you find out information about two inmate killings at ADX?

JA 705

A     Yes, sir, I did.

Q     Was one of those killings in the general population?

A     Yes, sir.  One of those was in the general population, one of the general population units. This happened in April of 2005.  Two inmates beat another inmate to death.  You might ask how did that happen if they exercise by themselves.  Well, that was the difference prior to April, 2005.  Inmates on the general population units, while they're locked down in a cell by themselves 23 hours a day, that one hour of exercise, or ten hours a week, could be with up to 12 other inmates.  And so they could then have recreation contact with other inmates.  In response to this inmate, two inmates beating another inmate to death, they're on the general, they're on the general population unit, they stopped allowing them to exercise with other inmates.  In what was formerly, and we'll see photographs of this in a minute, in what was formerly an open recreation area, they built metal mesh cages or dog runs so that you could have a number of inmates out at the same time, but separated from each other in their own cage so that they could talk, or call out exercise commands, or even play a game if they sat a board down on either side of the

JA 706

mesh.  They just don't have contact with each other.  So, you haven't stopped interaction, but you have stopped any opportunity for inmate on inmate violence throughout most of the facility.

Q    So, if I understand correctly, that killing occurred in the general population, in a common exercise area, and the response of the Bureau of Prisons and the officials at Florence, Colorado was to eliminate exercise of an inmate with other inmates in the general population and to create those dog pens for sole and single exercise by inmates?

A    Yes, sir, that's correct.  Now, that's what the Control Unit always had, was solo recreation.  So, now the general population and a number of units within the facility are operating like the Control Unit did in terms of exercise as solo.  This is what is done in other super maximum prisons around the country.  It's pretty typical that those inmates exercise in dog runs alone, and not with access to other inmates.

Q    Dr. Cunningham, you testified that the, the pre-release third step down unit was transferred from ADMAX Florence, Colorado to the adjoining USP at Florence, Colorado; is that correct?

A    That was the fourth stage.  You have general

population, and immediate and transitional.  Then there was another stage called a pre-transfer stage, and another homicide happened there at ADX a month after this one in general population, first homicide that had taken place in the facility since it opened in 1994.  In response to that, and because of the population mix, and I think space requirements, the Pre-transfer Unit was out sourced, it was sent out, it was taken out of ADX Florence and sent over to the U.S. penitentiary, where I think they thought they were better equipped to manage that particular, that group of inmates in that process of trying to transfer them as, as Synsvoll described, that second homicide that was also two inmates beating another inmate.  He described that the intention was not to kill the inmate, but that it went too far, and the inmate died.  But they didn't set out to commit a homicide as the staff understands it.

Q    Now, that occurred in which portion of the step down process?

A    That happened in a portion that is no longer at ADX.  It was called the Pre-transfer Unit.  There it was like it's own little mini U.S. penitentiary. They had a little UNICOR factory where the inmates worked several hours a day, and they ate their meals,

they walked to a common mess hall, small mess hall to eat, and it was, it was kind of, it was, it was similar to what they would experience in a U.S. penitentiary on a smaller scale, and they simply call that entire unit, moved it to the U.S. penitentiary on that same larger campus on Florence, Colorado.

Q   And that is where the second inmate killing occurred?

A   But before the transfer.  It occurred in that unit, and then that unit was taken out of ADX and transferred.

Q   Do any inmates at ADX Colorado in the general population and the immediate and transitional units, do they work inside the prison at UNICOR, have access to the hallways at the prison at ADX?

A   No, sir.  There are no inmate jobs that are occurring on these units.  The, on the general population, and immediate unit, the inmate is shackled behind his back and double escorted any time he's out of his cell until he's put into that recreation cage, backs up to the door of the cage, gets the handcuffs taken off, then he's in there by himself so there's no access that those inmates have on the transitional unit there.  The inmates do have access to each other, but there's no UNICOR or work

related opportunity there.

Q    Dr. Cunningham, let me show you what's been marked as Defendant's Exhibit Number 17, and just ask you to identify that document for the jury, please?

A    Yes, sir.  This is an institutional supplement. The number of this supplement is FLM5321.06F(1), and this is a, essentially an instruction about how the general population and step down units at ADX will work.  It's a publication of the Bureau of Prisons. This one is dated January 31, 2005, and it reflects the policy at ADX in the contact general inmates had in January of 2005 prior to the two homicides that took place in April and May of 2005.  This has since been superseded by a more recent instruction that describes the current security and status.  This is an older instruction now out of date.

Q    That is identified as Defendant's Exhibit Number 17, the one that is out of date?

A    Yes, sir.

Q    Let me show you what's been marked as Defendant's Exhibit Number 18, and ask you to describe that for the jury, please?

A    Yes, sir.  This is the, essentially the same kind of instruction.  This one is numbered FLM5321.066G -- the other one was F, this is G --

JA 710

(1).  This is dated October 13, 2006, and also is entitled To General Population and Step Down Unit Operations, and it provides a summary of, of how these, how general population will be managed and how the Step Down Unit program will operate, and the considerations for whether an inmate is moved from one stage to the next.

Q    I want to turn your attention to that document and ask you, please, to read a portion of that document, I think you identified before, an important consideration that the Bureau of Prisons and the officials at the Florence, ADMAX place upon the inmates' reasons for being at the facility?

A    Yes, sir.

Q    Can you locate that portion of the policy in the document, please?

A    Yes, sir.

Q    All right.  Would you please read that to the jury?

A    This is within the context of how it is that an inmate is considered for movement, and describes their cooperation first, and then says --

Q    When you say movement you're talking about --

A    I'm sorry, their progress through the Step Down Program from general population to immediate to

JA 711

transitional.

Q    "The most critical factor in determining an inmate's readiness to progress to and through the Step Down Unit program will be whether the factors which originally led to the inmate's placement at ADX have been sufficiently mitigated to indicate the inmate can function successfully in a less restricted unit without posing a threat to the security or orderly running of the institution.  Due to the very serious nature of the original placement factor, which is frequently complicated by the inmate's criminal history, or involvement with criminal organizations, it may be appropriate for some prisoners to be deferred from the Step Down Unit program for longer periods of time."

          MR. KALISTA:  Judge, I'm asking that Defendant's Exhibits, I'm sorry, I believe that would be 17 and 18 be admitted into evidence.

          THE COURT:  They will be admitted.

     (Defendant's Exhibit Nos. 17 and 18 were received in evidence.)

BY MR. KALISTA:

Q    Now, Dr. Cunningham, could we continue with the slides, please?

A    Yes, sir.  This one I've already described in

terms of graduation rates.  This is looking at the perimeter of ADX, from a vantage point of a hill, an adjacent hill.  In the foreground of the picture you see the various substantial gun towers that surround the facility.  ADX is intended both to defend against an inmate breaking out, as well as inmates that might have external resources from having people that would try to break in.  This is a close up of that fence line, and so you see the gun tower in the foreground, then the double fencing, and in between you see this, these stacks of razor wire that would be three or four or five coils on one level, three on four on the next, two or three on the next, and one on the top.  So you've got this mass of coils of razor wire.  You see the Rocky Mountains in the background.  This is within the facility looking at the control bubble, where a staff member would electronically control the, the doors on the unit while he is secure within this, this reinforced room.  There is a stairway that you see here in the foreground that, that reflects a hallway, or a run that goes off of this, half a floor up and half a floor down so that you've got two, a stacked hallway that protrudes off of this.  This is a diagram looking at the control bubble in the center of that diagram, and then you see the hallways, then,

JA 713

radiating off of this like spokes.  You'll also notice that the cells are only on one side of the hall.  Those are the smaller representative enclosures along one side of each of the three of the four hallways.  That's so the inmates can't stand in the door and signal to each other.  It also makes it harder to fish or Cadillac to each other.  That's where you attach a weighted piece of paper or something on a string and slide it out from under the door, and somebody slides something out from their door, they try to catch it, your line, hook it and pull into their cell.  It makes it harder to do when they're adjacent to each other.

Q    Is this a slide showing the general population units?

A    All of the units look like this with the exception of the Transitional Unit where the inmates are coming out of their cell on a, to a shared recreation.  The area that you see in this zone right here is the outside recreation area that is now, the area where the dog runs are placed.  You see the basketball court markings, now dog runs have been built over that.  That is a high, two story wall that's there so the inmate windows look out into that recreation area that is, itself, enclosed by a two

JA 714

story wall.  So, they never have any vantage point of the exterior of the facility, or the rounds of the staff, or that kind of thing.  And then you see a small cut away of the cell arrangement there.  This is looking down one of those runs, down one of those hallways, and you see that, that the access to that hallway is controlled by a grill, a wall of bars that have a sliding door in it that's controlled electronically.  And then I think I have a picture that I can call up on the computer that would show looking at that double arrangement of the stairs up and down, if I could step down.  This reflects --

THE COURT:  Yes, sir, if you wouldn't mind coming back so we can make sure we hear you.

THE WITNESS:  In this photograph, it's as if you are standing in front of the control bubble, and you're looking at the stairs half a floor up, and half a floor down, and then the hallways where the, the cells are on one side of the hall, and there are interior recreation rooms or programming areas on the other side of the hall.

BY MR. KALISTA:

Q    Now, Dr. Cunningham do you have a diagram, slide of a typical cell at ADX?

A    Yes, sir, I do.  If I might point this out this

will save me having to get up again after this trip. This is looking at the outside of the recreation area with the beginning of those dog runs, with those mesh cages the inmates exercise in.  While we were there in November they were actively constructing more of these, they had inmates exercising in four or five, and then had additional ones that they were in the process of building.  Previously, this was all just one big open area, and they're retrofitting it with these individual dog runs.

Q    Just to follow up on that, again, they eliminated the common exercise area and created these dog runs for individual exercise?

A    Yes, sir, that's correct.  This is a diagram of a typical cell at ADX Florence.  This is what a general population cell looks like, and most of the other units have cells that are identical to this, the Control Unit, the Secure Housing Unit, the other units that are there with the exception of this Transitional Unit have cells that are this same configuration.  And these are the dimensions of the cell, as well.  There is a single bed that you see in the left hand, back left hand corner, and the window at the back of the cell faces that interior recreation yard.  If you stand in the window and

JA 716

crane your head you can see just a little bit, just a little patch of blue sky. This, this cell is poured in a single continuous pour of rebar reinforced concrete. In other words, the bed is poured at the, and the stool are poured at the same time as the floor and the wall, so that there's no crevice that you could slide something under. It's all one continuous rebar reinforced concrete floor, the wall, the floor, the stool, the bed. The, it's all one pour. The inmate has, again, a solo recreation in one of these dog runs, or one of the interior rooms across the hall from the cells, eats his meals in the cell, the hallway is, is in this, is where you see the line that says 5'9", that's the hallway going down the hall. Then there is a solid steel door that slides, there's an inner vestibule that is almost three feet deep. Then there is a wall of bars that has, or a grill that has a sliding door on it. There is a one piece sink, bubbler to get a drink of water, toilet. Stainless steel. No toilet seat so you don't have anything you could rip off and use as a weapon. The toilet paper goes in the slot, the dark circle you see on the side of the sink arrangement. That way there's not even an axle for the toilet paper. There is a nine inch black and white

JA 717

television that sits on the shelf, and that's how the inmate gets the, the instructions about what's going on in the institution, meal information, procedures, anything they want to educate the inmates about. That saves them having to come hand them a piece of paper because it's all there on the television. The rehabilitation programming comes in over the television, the GED classes come over the television. The inmate is required to spend 240 hours working on his GED before he's allowed to stop working on his, stop working on his GED if he wants to ever progress in the system. Then there are also commercially available channels that are there. The cost of the cable TV for the facility is paid for through the money that's made on the inmate commissary. In other words, as they're purchasing potato chips or that kind of thing, the money that that makes, the profit that makes funds the cable television that comes into the facility. The, the television is really a critical part of being able to maintain the security of the institution. If you had human beings in these cells 23 hours a day with no contact with other people, and nothing to keep them stimulated, you would begin to see mental break downs in them. Then you couldn't keep them at this level of security

because they'd have psychiatric issues that you'd have to treat, so this is part of how you can maintain somebody in this kind of security for many, many years, is that you have the stimulation of a television. Now, the idea of people being at ADX is not to make their life torturous; it is to provide the degree of security necessary to protect the public, and staff, and other inmates. They aren't trying to pile it on in making this horrendous; they're trying to operate this in a way that allows them to maintain people for years, if they need to, at this level of security. That's part of what the stimulation of the television allows. Any time the inmate is taken out of the cell, he backs up to that grill, and his hands are handcuffed behind his back. Then he's double escorted, one officer holding his handcuffs from behind and the other carrying the baton. He gets one or two 15 minute phone calls a month. Now, this assumes that there are not special communication restrictions that are in place, what are called SAMS, Special Administrative Measures, that might restrict the telephone calls that the inmate has. For example, Chris Synsvoll described that there had been three inmates that immediately came to mind whose only communication could be with

JA 719

their attorney of record.  One of those had finally been allowed to begin to send and receive mail to his mother.  That's an example of communication restrictions that were imposed because they were identified as being at high risk to make communications that were going to create a security problem.  There's no contact visits, it's across a glass over a phone, and the mail is x-rayed, opened and read.  The telephone calls that they do have are, are all recorded, and depending on what security concerns there may be, they may be actively monitored by an intelligence officer, the FBI made be involved in routinely monitoring the, those, as well.  They're monitored by people speaking that language.  And these, there have been significant improvements in this monitoring of phone and mail as a result of some security issues that were happening at ADX. In other words, security is always dynamic, so whenever a lapse in security is identified then the system adjusts to try to meet that.

Q    This is a typical cell in the general population unit?

A    Yes, sir.

Q    And I notice that the diagram shows double doors; is that correct?

A    Yes, sir, it's a vestibule cell.  Most of the cells in the facility have two doors between the inmate and the hallway.

Q    Now, other than going out to recreate alone, is there any other reason for an officer to move an inmate who is in general population from point A to point B?

A    It doesn't happen very much.  If there were a medical need, typically as the staff is making their rounds, they do that at the cell front.  In other words, you can look through the door, make sure that the inmate doesn't have anything in his hands or have him back away from the grill if you need him to, then give the order for that door to be opened, step into the vestibule, there will be one staff member who is, is interviewing the, the inmate, say it's one of the medical personnel or psychologist, or it's an administrative staff, one person is going to be there to interview them and the other is an officer with a baton who has that at the ready should the inmate make some move to try to grab the staff member.  But you may need to move them for medical or dental. Should you move them if they had a visit, then you would escort them to the visiting area.  But there's not a lot of need to move inmates up and down the

JA 721

hall apart from recreation.

Q    Well, for instance, if an inmate says, "I want to go on sick call; I want to see the doctor," does the, do the officers immediately escort that inmate out of his cell over to a medical area?

A    No, sir.  Those consultations are done at a cell front, unless it's identified that something more substantial is needed.  Then there is their own infirmary there at ADX, and then they would shackle the inmate and transport them to the, to that infirmary area.

Q    You talked about mail and telephone calls.  Can there also be restrictions placed by the Bureau of Prisons and by the officials at Florence ADMAX on visitors to an inmate at Florence ADMAX?

A    Yes, sir.  Those individuals with the SAMS that I described, the only visitors that was allowed was the attorney of record.  That was their restriction on the telephone call, as well.

Q    The inmates take their meals in the cells, so there's no taking them to a common dining area?

A    That's correct, not until they are on the Transitional Unit, then they would eat their meals out in the, the range that is just outside the door of their cell.

JA 722

Q   Again, that's in a separate area of the facility?

A   Yes, sir.  This is a larger cut away of the cells.  The photos that you're about to see are taken with a wide angle lens, and make these cells seem larger than they are, so this gives you a better sense of the, of how narrow the cell is.  Standing in the middle of the cell with my arms stretched out on either side I could almost touch either wall, so it's a rather narrow space that this gives a better representation of.  You'll also see a cut out between each cell.  That's a pipe chase so they can go in and work on the plumbing, or even change the light without physically entering the cell, and without taking the inmate out.  So, it reduces handling of inmates and reduces a likelihood of leaving a tool or something behind.

Q   Does that also increase the space between cells other than just a wall?

A   It makes the cell somewhat narrower at the point of cell front, and I suppose that allows some additional sound insulation there in that vestibule area, but I think it's primarily a maintenance related issue.  The same kind of pipe chase is present at the cells at the U.S. penitentiary at

Florence on that same campus, so, while the cells in the U.S. penitentiary look very different than this, they have that same pipe chase arrangement facing the hall.

THE COURT:  Mr. Kalista, I'm going to interrupt you now.  We're going to take our regular break at this time, ladies and gentlemen.  If you'll follow the bailiff out.

(The jury retired to the jury room, after which the following occurred:)

THE COURT:  Is there anything before we take a break?  We'll be in recess for 15 minutes.

(Recess from 10:30 a.m. to 10:55 a.m.)

THE COURT:  Are we ready to proceed? Mr. Bailiff, if you'll have the jury, in please.

(The jury entered the courtroom and was seated in the jury box.)

THE COURT:  You may proceed.

BY MR. KALISTA:

Q    Now, Dr. Cunningham, you have photographs of a typical cell at ADX Florence, Colorado?

A    Yes, sir, I do.

Q    Could you put those up?

A    This is standing in the doorway of the cell looking toward the back.  You see on the left hand

side the stainless steel shower.  On the right back is the concrete bed that has a cut away in it that's a shelving or storage area.  It has a plastic mattress on it, and you see the stool and just the edge of the sink/toilet arrangement.  This is standing in the back of the cell looking back toward the grill wall, that wall of bars.  One of the things I would point out to you, as you look at that wall of bars in that grill door that is part way open is that when you look at the slot that's in that grill door it's open on the end.  It doesn't have a piece of metal that closes that off.  What that allows is so when the inmate backs up to that cell front to be handcuffed, the officer gives the signal for the door to be open, he can keep his hand holding on to those handcuffs while the door moves past his hand.  So, he doesn't have to turn loose of the inmate.  Same thing happens when he's putting the inmate in the cell. The inmate steps in the cell, the officer gives the signal for the door to be shut, and the door shuts right past his hand while he still has ahold of the inmate.  That way the inmate can't spin around on him in the process of having his handcuffs part way on or off.  Keeps better control of the inmate.

Q    Now, you did say that there were typically two

guards, at least, escorting an inmate to and from his cell?

A    Yes, sir.  There will always be two staff members at a cell front.  There are two on the units except for the Control Unit where there are three, and then once we get to the Transitional Unit before they leave the facility, then they are not handcuffed in the presence of staff as they're being escorted in small groups on and off the unit.  This is looking at that two person escort, one officer holding the inmate's hands, the handcuffs behind him, the other carrying a baton.  The baton can be used as either a blocking instrument to bring the inmate under control or as a thrusting instrument, either into the hands or wrists at the cell front should the inmate try to grab an officer, or under escort like this, into the rib cage where it could bring the inmate under very rapid control.  The baton is sometimes referred to as a rib spreader.

Q    Can you describe the shackling of the inmate?

A    Yes, sir.  The inmate will be handcuffed behind his back when he's being escorted within the facility, within the unit, itself.  If he's taken off, then they're going to typically have a belly chain so that the handcuffs are anchored to a chain

JA 726

around the inmate's waist.  A black box may be applied around the handcuffs to help protect the locking device, and leg shackles would be applied, as well.  Or in the case of someone on the control unit, the leg shackles are put on each time the inmate is removed from his cell.  This is looking at the inmate visitation area.  The inmate would come in and sit down on the steel, pick up the phone, and the visitor would come around from the other side and sit down on the other side of this very thick glass.  The glass has a very high hammer rating.  It's rated that you could beat on the glass for an hour with a hammer to create a hole the size of a quarter.  Assuming there are not communication restrictions, there are ample periods of visitation that an inmate might have.  But because the facility is so remote in its location, the visitation requirements to the facility are not terribly high.

Q    In terms of the view, is that a view that the inmate sees, or is that a view that the visitor sees?

A    That's a view the inmate would see.  The inmate would come in and sit down on that concrete stool.

Q    And basically they communicate by way of phone?

A    By way of telephone that you see lying on the concrete counter of that visitation area.  They're

JA 727

talking over the phone across the glass, and that communication is monitored, as well. Then this is looking at the outdoor recreation area prior to the dog runs being installed. So, this is what it would have looked like when those inmates in general population would have recreation up to 12 at a time. Again, now you have dog runs for solo rec. Above you see the steel girders, and on top of the girders is a metal mesh. That's to prevent, not only does it keep an inmate from attempting to scale the wall, but also prevents a helicopter extraction.

Q    Approximately how high are those walls?

A    They're two story, so that's about 20 feet tall. This is looking at the kind of cells that they would have on the Transitional Unit, and you notice that there is only a single sliding steel door now, instead of a vestibule where you have two doors, now there's only one, and then the inmates would take their meals out in the range area which you see just a corner of in this area, common area that the cells are built around on either, cells are on either side, and the range is in the center area between.

Q    Now, Dr. Cunningham, in terms of prison made weapons, what is the availability of prison made weapons at Florence, ADMAX?

JA 728

A    It's extremely restricted compared to, for example, a U.S. penitentiary because the inmates are not out circulating with each other, and don't have access to the same kind of materials.  So, for example, in a U.S. penitentiary there may be quite a bit of access to Plexiglas because of the trays they're eating their meals from, and other things.  That kind of thing, the inmates at ADX don't have Plexiglas that they can get to.  There's no metal strips in their cell, there's no shelving that can be dismantled.

Q    What about their food trays?

A    The food trays are collected at the, you know, they pass the tray to you, and then they take the tray back on the other side, and so you don't have possession of that, or you're carrying it around a facility or working in a kitchen, or that kind of thing.

Q    What about food utensils?

A    Same thing.  Those are being passed back to the staff.  I'm trying to recall, and I think I have asked about this, whether they eat with like a plastic spork, which is a spoon with a little serrated front to it, I can't recall with certainty.  But again, all of that is inventoried again when it's

JA 729

picked up, when it's collected from them. I'm familiar with a couple of instances where inmates did fashion a shank in the history of ADX. In one, a typewriter that had been in the legal area, a rod within the typewriter was taken out, and the response to that was to remove the typewriters from the legal areas. You took away that source. There was another report that I'm familiar with where an inmate had fashioned a shank out of a piece of wood, and it was not, it's, as far as I understood it, they weren't able to determine where the wood had come from, but had fashioned a sharpened instrument from that. And another incident, as I recall, where an inmate formed a paper pole by rolling up paper real tight. But those instances where they were able to fashion a weapon of some kind in this facility at ADX are extremely rare compared to that being a more routine occurrence at a U.S. penitentiary that weapons contraband is confiscated.

Q   You talked about the general population and the Transfer Unit, the Transition Unit?

A   Yes. There's a general population, then if you enter the Step Down Program, then there's an immediate and Transitional Unit, and then there are other units within the facility that are also

operating under a, under pretty tight, under conditions that are very similar to general population, Special Housing, Special Security.

Q    I wanted to get into that.  What are the higher levels of security within ADMAX?

A    Well, there is a Disciplinary Unit that inmates can be taken to if they have an infraction that warrants it, taking them out of general population. That cell would not have a television or radio in it because it is, it's intended to be punitive, it's intended to be punishment.  And so there is a unit like that, a Disciplinary Unit.  There is a unit that inmates are placed in when they first arrive in the facility until they determine what unit to place them on on a longer term basis, so there are several of these Special Security or Special Housing Units that are there.  And then there's a Control Unit that has cells that look like general population, but where you bring even additional security to bear in terms of escort.

Q    Now, is there a policy or instruction that addresses the purpose and operation of the Control Unit?

A    Yes, sir, there is.

Q    Could you describe this purpose, please?

JA 731

A    Yes, sir.  The purpose of the Control Unit is described in this instruction, 541.40H1.A, period. "In an effort to maintain a safe and orderly environment within its institutions the Bureau of Prisons operates Control Unit Programs intended to place into a separate unit those inmates who are unable to function in a less restrictive environment without being a threat to others or to the orderly operation of the institution."

Q    Now, is there also an instruction that describes the factors that go into the consideration of whether to place an inmate in a Control Unit?

A    Yes, sir, there are.  That's this instruction, which is 541.41G5.B, period, and it identifies seven factors that would be considered by a warden in referring someone for placement on the Control Unit. That referral from the warden is only the first step. Then that, that Control Unit decision is reviewed at a regional level within the Bureau of Prisons for senior, where senior staff examines this case, and ultimately there would be a hearing by the internal staff, not an external legal authority, but by the internal staff that would look at whether this person is, in fact, an appropriate placement on the control unit at ADX.

JA 732

Q     You talked about the warden initiating placement on the Control Unit?

A     Yes, sir.

Q     Is the warden just runs around himself investigating matters as to what inmates should be placed in a Control Unit?

A     No, sir, he has a staff, and their investigative services are also involved, and these are decisions, again, ultimately that are going to be reviewed at a regional level in the Bureau of Prisons, and that is another place that such a referral might originate as that is indicated if an inmate is behaving in a way that makes him a candidate.

Q     The warden, basically, within the institution has a say or voice in placing an inmate in a Control Unit?

A     He can make the referral.

Q     You talked about his staff.  Could you talk about the layers of staff that are involved in providing information to the warden concerning an inmate to be placed in the Control Unit?

A     Yes, sir.  A warden has a significance, hierarchy of, of prison administrators and correctional officers under him.  There is an assistant warden that would likely be involved who

JA 733

often has supervision over operations, and that kind of thing.  There are, you know, is a captain and lieutenants, there are intelligence officers, typically, at the facility, as well as elsewhere in the Bureau of Prisons, that also may provide information, for example, about gang affiliation.  So that the security requirements of this inmate are clarified as much as possible, so that there's a realistic view of who this person is and what they may require.  He has a staff within the facility, as well as resources elsewhere in the Bureau of Prisons.

Q   Is this the same staff that would also be considering whether an inmate should be transferred from a general population to a Step Down Unit?

A   Well, the, the warden, as it's described here, this is not typically the warden at ADX.  This is the warden at a USP, or elsewhere in the Bureau of Prisons, who is making a referral to the Control Unit.  Now, it's possible there could be an incident of such severity at ADX, for example, these two inmates kill another inmate, that warden then might consider a referral to the Control Unit that is there at ADX, but more often it's a warden somewhere in the Bureau of Prisons who is making a referral to the Control Unit, not the warden at ADX who is making

that referral.

Q    What are the factors that determine whether an inmate should be placed on a Control Unit?

A    The first factor addresses where there's an incident during confinement that's occurred where the inmate has caused injury to another person; or the second factor where there have been threats against another person; the third factor involving possession of a deadly weapon or dangerous drugs; the fourth factor where the inmate's involved in an incident that disrupts the orderly operation of the institution; number five, an escape from a correctional institution; number six, an escape attempt; and number seven, the nature of the offense that this person was originally sent to prison for. Now, that can be considered as a factor, but never the sole factor.  In other words, the offense that sent you to prison, particularly an offense committed in the community, that, alone, would not result in your referral to the Control Unit.  It might result in your referral to ADX, but not to your Control Unit.  That also requires one of these issues about what's happened in prison in custody.

Q    Now, an inmate who murders another inmate, do you have information as to how long such an inmate

JA 735

could be assigned to the Control Unit?

A    Well, the length of stay at the Control Unit as per instruction, down at the bottom of this slide, is until the inmate is able to function in a less restrictive environment without posing a threat to others in the orderly operation of the institution. So, that length of stay is a determination that's up to the Bureau of Prisons.  Now, I have asked for average length of stay on the Control Unit, and the range of how long people are there, and have been declined to receive that information.  I've asked for it, I haven't gotten it.  Testimony in other cases by wardens from ADX reflects that the typical policy of the Bureau of Prisons is to confine an inmate who has killed another inmate on the Control Unit for six years, and then look up and decide what they're going to do then.  But that, that is the typical, typical automatic makes it, this is with review and that kind of thing, but that is a typical length of stay on the Control Unit before they then look at it to say, "Now where are we going to put this guy?  Now what does he need?"

Q    Now, could you describe the basic security procedures on the Control Unit?

A    Yes, sir.  Essentially it's the same as what now

exists in general population.  Except that there are three officers escorting instead of two any time the inmate is taken out of the cell, and the inmate's feet are shackled with a chain between the ankles as well as the hands being handcuffed behind the back before the cell door is opened, as they're moving him on the unit.  But otherwise, it's 23 hours -- well, and you get less recreation.  The Control Unit inmate comes out five hours a week, the general population inmate comes out 12 to 20 hours a week.

Q    With exception of the triple escort as opposed to double escort in general population, and number of hours out per week for exercise, is the general population now at Florence ADX, in fact, a Control Unit?

A    Virtually.  I might amend this.  In fact, I think the control unit gets seven hours instead of five hours, but it's less than general population.  Yes, sir, effectively you have created the same kind of security in general population as you have on the Control Unit with the exception of the triple escort and the feet being shackled.

Q    And in terms of how long an inmate might remain in the Control Unit, what can you tell the jury about that?

A     That's a decision that will be made by the Bureau of Prisons on the basis of whether that inmate continues to require that degree of security.

Q     And do you have information regarding the frequency of assaults by inmates on the Control Unit?

A     Yes, sir, I do.  This is information that was provided to me by the Bureau of Prisons regarding assaultiveness conduct that took place on the Control Unit from the time ADX opened in December of 1994 through June of 2001.  This is about a six and a half year period of time, looking at any assaults on the Control Unit.  All of the assaults that occur in the Control Unit are going to be inmate on staff because the inmates have no contact with each other to assault anybody, so that's the totality of the assaults, are just those that are directed toward the staff that are interacting with them on their cell front or moving them to recreation, that kind of thing.  There are about 70 beds on the Control Unit, 70 cells.  During that six and a half year period of time, there were 14 minor assaults on staff, and I've detailed what each of those 14 consisted of.  Nine involved throwing unknown liquid, or feces, or spitting in the face of the officers.  One involved kicking the foot forward as the leg shackles were

JA 738

being applied so it scraped the officer's hand. One was pulling away from the officer there at the cell front and then running and throwing a tray of ice water and a carton of milk back through the cell front at the officer through the grill. One, throwing the head back against the officer's face, or head butting the officer. One, attempting to pull away from the officer while being escorted causing the cuffs to scrape the officer's hand. One, grabbing the officer's shirt and pulling him into the bars. Then there were three attempted or threatened minor assaults during this six and a half year period of time. Two attempting or threatening to throw liquid, and one attempted head butt that missed. Now, of those 17 incidents, ten were committed by one inmate. And in fact of the 17, there were only six total inmates involved of the 70 capacity with people coming and going, of course, during that six and a half year period of time. So, this, in a sense, is, if, if the worst of the worst are sent to ADX, then this is even a more severely maladapted group that's placed on the Control Unit. So it gives you a sense of the worst of the worst of the worst, these are what we have in a six and a half year period of time are these minor assaults.

Q    Did I understand you to say you had requested from the Bureau of Prisons information from the assaultive conduct from 2001 to the present as well as information on assaultive conduct in the general population?

A    Yes, sir.  The assaultive misconduct in the general population I have statistical data on.  In fact, at one point I was provided with all the assaultiveness conduct that had taken place in the whole facility over a seven year period of time.  I have asked specifically for an update on assaultiveness conduct on the Control Unit, as well as length of stay information on the Control Unit because it's so critical to this question of how long can an inmate be held, what's typical in terms of holding them.  I have been refused that information.

Q    Now, Dr. Cunningham, is there an even higher level of security at ADX Florence, Colorado than the Control Unit?

A    Yes, sir, there is.

Q    Could you describe these capabilities and the cells they occupy?

A    Yes, sir.  This is called Range 13, which is at the back of the Secure Housing Unit, and this range of cells is designed to minimize the need to have

physical contact or handle the inmate.  And you'll see, looking at the arrows, that there are four cells across the back of that range, and between each cell is a recreation area, and then you also see three areas that have lines over the top of them.  Those would be outdoor recreation areas.  So, essentially what you can do is by opening doors electronically within this unit that is sealed off from the hall, the inmate would move out of his cell and into either outdoor recreation or indoor recreation, and then close the doors behind him.  There's also a, you notice going down the hallway there that there is a closet that looks like it has the door open.  That's where a visitor would come down the hall, step into that closet, and sit down.  That's a visitation area.  And the inmate, again, with the doors opening electronically would make his way out of his cell, then cross over through other doors, sit down in a stool opposite that closet, and is then able to have visitation across a glass.  So, you have a situation where the inmate can be moved to indoor/outdoor recreation, and even to visitation without the necessity of shackling the inmate and having to handle them.  This is also a mechanism for further isolating inmates from being able to communicate with

each other if they were trying to shout through the pipes, or that kind of thing.

Q    Dr. Cunningham, do you have an opinion as to the ability of the Bureau of Prisons to adequately and safely house Carlos Caro for the rest of his life?

A    Yes, sir, I do.

Q    What is that opinion?

A    There's a level of security that's available within the Bureau of Prisons that can house Carlos Caro, or any inmate, so the likelihood of serious violence is very low.

Q    Doctor, do I understand you were appointed by the court to assist the defense in this matter?

A    I was appointed to consult with the defense in this matter.

Q    And you are paid for your work done on this case by the court?

A    I'm paid for my time that I've spent on this case, yes, sir.

Q    And do you charge at a certain hourly rate?

A    Yes, sir, I do.

Q    What is that, please?

A    The rate in this case is $270 per hour.

Q    Is that, as far as your experience is concerned, is that more or less than the typical expert of your

experience that the Government would hire to testify

as an expert on their behalf?

A    It's far below the rate of the experts that have

been retained by the Government testifying on a

national basis.  Their rates have been $400 to $600

an hour.

MR. KALISTA:  Thank you, Dr. Cunningham.

THE WITNESS:  Thank you, sir.

THE COURT:  Cross examination?

CROSS EXAMINATION

BY MR. BROWNLEE:

Q    Good morning again, sir.

A    Good morning.

Q    You just testified, you testified you were paid

by the court.  I want to make sure this jury

understands.  The judge didn't hire you, correct?

A    Mr. Kalista and Mr. Simmons --

Q    You weren't hired by the court?  You weren't

interviewed by the court?

A    No, sir.

Q    When you tell the jury --

MR. KALISTA:  Judge, he's not letting him

finish his answer.

THE COURT:  Ladies and gentlemen, let me

explain the situation to you since the attorneys have

brought this matter up.  In this case the lawyers for the defendant, Mr. Caro, asked the court to authorize them to hire a person like Dr. Cunningham, and the court agreed and approved his hiring.  But he was determined, and requested to be hired by counsel for the defendant.  And his fee will be paid out of Government funds.  You've may proceed.

MR. BROWNLEE:  Thank you very much, sir.

BY MR. BROWNLEE:

Q   Let's talk about your fee for a second, sir.  Is it fair to say for the past five or six years your net yearly income is about $250,000?

A   It was five years ago.  Last year it was, I haven't finalized it, but it will probably be closer to $400,000.

Q   Is it fair to say between 70 and 80 percent of your income comes from essentially what you're doing here today; that is, you're hired by lawyers who represent capital defendants, and you assist them in many cases, actually come and testify before juries like you're doing here today?  Is that fair?

A   With just minor modifications.  About 80 to 90 percent of my income is derived from consulting at capital cases at one stage or another.  I may or may not be called to testify, but about 80 percent of my

income is derived from capital consultations.

Q    Eighty percent of $400,000, I don't do math in public, but we'll let the jury figure that out.  Many of those cases, or some of those cases you received up to $34,000 per case; is that correct?

A    Yes, sir.

Q    In the Hardy case in 1996, $34,763?

A    Yes, sir, that's correct.

Q    Rodriguez case, 1997, $26,000, Spidey (phonetic) case, 1993, $21,000?

A    It wouldn't have been '93.  The number is probably right, but the year is wrong.

Q    Ingle (phonetic) case 1997, $21,940?

A    Yes, sir.  I don't have a specific recollection, but I wouldn't disagree with any of those totals.

Q    Beckford case, 1997, $34,991; is that correct?

A    Best I recall.

Q    Is it fair to say, sir, that it really doesn't matter who sits in this chair where Carlos Caro is sitting, that for the right price you'll come in, like you have here today, and you'll tell this jury, or any jury, that whoever sits in that chair is a low likelihood of future violence in any prison; is that correct?

A    No, sir, that's incorrect.

JA 745

Q    For instance, if a member of Al Qaeda was sitting in this chair here, sworn enemy of the United States, you would come in, would you not, to a court of law and testify on their behalf; is that right, sir?

A    I never testify on anyone's behalf.  Whether I accepted that case, and there was something that the defense determined was helpful to their position is uncertain --

Q    So, you're not testifying on behalf of Mr. Caro today?

A    I've been called by Mr. Caro.  I'm never testifying on anyone's behalf.

Q    You were put on this stand by Mr. Kalista and Mr. Simmons and Mr. Caro, right?

A    Yes, sir.  They --

Q    There's two --

          MR. KALISTA:  Judge, I'd like him to be able to finish his answer, please.

          THE COURT:  Go ahead, sir.  Mr. Brownlee, if you'll give him an opportunity to finish.

          THE WITNESS:  The defense may find it to be on their behalf.  Alternatively they may not have found my testimony to be helpful and not called me. It makes no difference to me whether they call me to

JA 746

testify or not.  They may find it helpful, they may not find it helpful.

BY MR. BROWNLEE:

Q    But my point is, sir, it doesn't matter who is sitting in the chair, it doesn't matter who the defendant is, you'll come into a court of law and testify that they're a low likelihood of future violence; isn't that correct?

A    No, sir, that's not correct.

Q    Let me ask you this.  Do you know where you were on June 26, 2001, 75 days before September 11th?  Do you remember where you were?

A    No, sir, I don't?

Q    Isn't it true, sir, you were on the witness stand in Manhattan testifying on behalf of, or you were called on behalf of a guy by the name of Kafan Mohammed (phonetic)?

A    Yes, sir, I did testify in that case in the summer of 2001.

Q    That's 75 days before 9/11, right?

A    Approximately, yes, sir.

Q    And Kafan Mohammed, is he a member of any organization that you can recall from your testimony?

A    Yes, sir.

Q    What organization is that, sir?

A    He was identified as being associated with Al Qaeda --

Q    He admitted to being a member of Al Qaeda; is that correct?

A    I wasn't there during the guilt phase.  It's my understanding he was demonstrated to be a member of al Qaeda who participated in the bombings of the embassies in Tanzania and Kenya.

Q    Those are the American embassies?

A    Yes, sir.

Q    Fact, Mr. Mohammed actually built the bomb, is that correct, sir, that was used to blow up the American embassies in Africa; is that correct?

A    I don't -- I recall, and again my recollection from the case is not very specific, I recall him being involved in manufacturing some of the components.  I don't recall his having sophisticated technical knowledge in building the device, but he was involved in, in some stages of manufacturing.

Q    And he was convicted of conspiring to blow up the American embassies in Africa; is that correct?

A    Yes, sir.

Q    He was a member of Al Qaeda?

A    Yes, sir.

Q    And you testified, like you're testifying here

JA 748

today, for Mr. Caro, however you define it, those lawyers representing that member of Al Qaeda called you to the stand, just like these lawyers called you to the stand; is that correct?

A    I was called to testify in that case by the defense.

Q    Now, do you remember testifying for a guy by the name of Trinity Ingle in Arkansas in 1997?

A    Again, I never testified for anyone.  I was called in the case of Trinity Ingle.

Q    Mr. Ingle robbed and --

MR. KALISTA:  I'm going to object to this line of questioning.  This has nothing to do --

THE COURT:  Ladies and gentlemen, I need to talk with the lawyers for a moment.  If you'll follow the bailiff out, please.

(The jury retired to the jury room, after which the following occurred:)

MR. KALISTA:  Judge, I object to this line of questioning.  Mr. Brownlee is essentially impugning the integrity of the whole justice system. Dr. Cunningham was called as a witness in a case, and to suggest that somehow he is aligned with the defendant is simply an attempt to inflame the passions of the jury against him, and not deal with

JA 749

the substance of the information brought out on our direct. And I think it's unfair to the defendant to allow this to continue.

THE COURT: Yes, sir. Mr. Brownlee?

MR. BROWNLEE: Your Honor, this is proper bias cross examination. This witness's evidence is he makes a living coming in here testifying on behalf of, or however he wants to define it, criminal defendants charged with capital murder. It doesn't matter who sits over there. And the jury should know that that's what he does. And so we think it's proper bias cross examination.

THE COURT: Well, what is, what is the connection between the, the witness's testimony for other accused and his opinion in this case, though? I mean, isn't that, isn't that the key? I mean, you could, you know, if, if the Government intends to go through, you know, the cases that the witness has testified on behalf of the defense, and say that because these offenses were so horrible that the witness's testimony is, opinion testimony is subject to attack, I think I have a problem with that. Now if, on the other hand, for example, Mr. Mohammed, this Al Qaeda accused, if the question was did you testify that he was, could be held safely in prison,

that might be a different matter.

MR. BROWNLEE:  And he has.  He's testified in all these cases --

THE COURT:  The problem is every capital case, or most of them involve horrible facts, and this witness has not indicated that he is, does not believe that the death penalty is inappropriate, or not, in particular individual cases or that particular defendants are, their acts were bad or wrong or horrible.  In fact, I'm sure he would agree, I'm sure he would agree that they are.

MR. BROWNLEE:  I have no idea what he'd say.

THE COURT:  Well, I'm sure he would agree they are, but to simply tag him with the horrible offenses of every person that he has testified for, I don't understand the relevance of that as to his opinion.  How does that make a difference?

MR. BROWNLEE:  It's the Government's position that this defendant, all of this is biased testimony, that the jury should understand, and he has made an opinion as to Carlos Caro, and they should be able to put that opinion into the context of this witness, who he is and what he does, and the fact that he essentially, from the Government's

JA 751

perspective, would come in here and say anyone is a low likelihood of future violence.

THE COURT: But isn't that the key? He's not testifying to the jury, "Ladies and gentlemen of the jury, Mr. Caro doesn't deserve the death penalty in this case because what he did does not rise to a sufficient level of horrible crime." I mean, that's not what he's saying at all. What his testimony is, is that the Bureau of Prisons can control Mr. Caro sufficiently to make his risk of future violence unlikely, or a low level, I believe his testimony was, a low likelihood of serious violence in the future. And so how does the facts, whether the defendant, in a particular case, killed an 82 year old woman, or not, how does that make a difference as to his, his opinion? I mean, you might very well say anybody who testifies on behalf of the defendant is condoning murder. Isn't that what you're saying?

MR. BROWNLEE: We're not making that argument. All we're saying is he is more than willing to come in for pretty much anybody, testify that they're a low likelihood of having future violence in the prison system.

THE COURT: There's nothing wrong with that, is what I'm saying. It's not what the

defendant did, necessarily, and, it's the likelihood of violence.  For example, the person who killed an 82 year old woman, I mean that wasn't in prison.  The Government doesn't contend that Mr. Caro is ever going to get out and kill in the community.

MR. BROWNLEE:  But that's our point, that according to this witness it doesn't matter, is that they're inside and outside, and they can be members of gangs, they can be members of Al Qaeda, he'll come in here and say they're a low likelihood of violence. We think that demonstrates his bias and why he, when you couple that with the finances that he's making on it, is that he has to keep it going, and so he comes in here, he's says what he's got to say, he picks up the paycheck and he's off to the next case --

THE COURT:  All of that is theoretically fine.  What I object, what I find objectionable is, is the characterization of the defendant -- excuse me -- characterization of the witness as being less subject to credibility because in some way he stands up for people who have committed horrible acts.  And I agree with counsel that that, that simply cannot --

MR. BROWNLEE:  It's our position that he not just stands up for them; he comes into court and says they're a low likelihood of future violence in a

JA 753

prison setting, so it's that connection, that next step that's relevant toward the bias.

THE COURT:  Well, what do you propose to do, Mr. Brownlee?  Are you going to go through, you know, I don't know how many cases the witness has testified to, but I expect he's testified in a lot of them.

MR. BROWNLEE:  Some more egregious ones.

THE COURT:  The facts of the case were more egregious?

MR. BROWNLEE:  Absolutely.

MR. KALISTA:  Wouldn't the relevant factor be what has this person done after he's received the sentence, presumably, after a sentence of life without release?

THE COURT:  Not necessarily.  For example, someone who was in a position that the Government contends that the defendant is in, that is a gang leader, the Government has presented evidence that persons in his situation can communicate, and so on, you know, that, that might be a relevant factor.  You know, I will permit the Government to ask him, you know, how many capital cases he's testified in, how many he has found the defendant to not be, to be a low likelihood of violence in prison, but unless,

JA 754

unless the Government can tie the facts of a particular crime to, similar to Mr. Caro's, that is, an in prison murder, I'm not going to permit the Government to get into the facts of the case for two reasons. One, I think it's, it's not relevant bias in that sense; and secondly, I think it's inflammatory and may unfairly prejudice the defendant.

MR. BROWNLEE: Well, all we would say, Your Honor, is this is a unique ruling in the world of Dr. Mark Cunningham. If you study the transcripts of these prior cases, they called him, they have to live with who they called, and now the jury is going to be sitting up here thinking wow, this guy has got all these awards, that's why all this psychology, and stuff, that we filed these motions to begin with, we noted it would be problematic, he sits here as a clinical forensic psychologist with all these great awards, this is what he does, the United States in many ways is now hamstrung --

THE COURT: I'm not limiting you to ask him about all of the capital cases that he's testified in, has he ever testified the defendant was capable, and so on, and so on, and so on, but I'm going to repeat it just once more, to get into the

horribleness of the cases, I don't think has any relevance to his possible bias, and is unduly inflammatory.

MR. BROWNLEE: Very well, Your Honor. Thank you.

THE COURT: All right. Anything further then? All right. We'll have the jury back in, please.

MR. KALISTA: Judge, would the court consider a curative instruction?

THE COURT: Well, not at this time. I'll consider it.

(The jury entered the courtroom and was seated in the jury box.)

BY MR. BROWNLEE:

Q   Sir, you testified that you had an opportunity to view the information, some records about Carlos Caro; is that right?

A   Yes, I did.

Q   How old is Mr. Caro?

A   Approximately 40 years old, as I recall.

Q   He grew up where, sir?

A   I believe in south Texas.

Q   And can you tell us what was his first conviction, and what year it was, what was his

sentence, his first conviction?

A    Yes, sir, I can turn to that specifically.  He was convicted of trafficking in marijuana, I think in the weight of hundreds of pounds, and then has a subsequent conviction for trafficking in cocaine, and I have that --

Q    He has three drug convictions; is that correct, sir?

A    I'm sorry?

Q    He has three drug trafficking convictions; is that right, sir?

A    I believe that was the case.

Q    The first one was in 1988, for which he received a two year sentence; is that correct?

A    I believe that's correct.

Q    And then he was placed on a period of supervised release, and that supervised release was revoked; is that correct?

A    That's my recollection.

Q    Then he was arrested again and convicted of dealing in marijuana one more time; is that correct?

A    I think there is, there is a very significant weight of marijuana.  There's a subsequent conviction for cocaine.

Q    So, the second marijuana conviction he received

a 71 month sentence; is that correct?

A    As I recall.

Q    I'm not trying to ask you trick questions; we're just walking through his background.

A    Yes, sir.

Q    And then he was released, placed on supervised release, and then that probation was revoked; is that correct?

A    Yes.  He got a 30 year sentence, or close to it, for cocaine.

Q    Once again he was trafficking cocaine at this time and received a 30 year sentence?

A    Yes, sir.  I believe it was in that offense that there was another charge pending in state court that was dismissed given that he had been convicted and received this term in federal court.

Q    And once he was convicted of a 30 year sentence, or sentenced to 30 years, he was sent to FCI at Oakdale, Louisiana?

A    Yes, sir.

Q    It's there that you're aware he became the leader of the Texas Syndicate?

A    Yes, sir.

Q    Texas Syndicate is one of the top most violent prison gangs within the prison system; is that

correct?

A    It is one of the violent prison gangs within the Bureau of Prisons.  There is a study that looks at them comparatively in terms of rates of violence.  It is considered to be a disruptive group, not simply a security threat group.

Q    How many disruptive groups are there?

A    As I recall about ten, but I don't --

Q    We had prior testimony in the trial that there was five.  Would you disagree with that?

A    No, sir.

Q    And he became a leader of that organization, at least at Oakdale, when he was there in 2002; is that correct?

A    Yes, sir, at Oakdale he was.

Q    And then while he was at Oakdale you're aware that he had a conversation with the head of the investigative group, and the investigative agent was trying to reach out to the prison gangs to open up a dialogue?

A    Yes, sir.

Q    And the conversation he had with Mr. Caro, basically what Mr. Caro told him is, "Listen, you've got to do your job, and I've got to do mine," and according to him, his job was conducting violence in

the prison.  That's what he told that SIS officer?

A    I'm aware of him saying something to the effect that he was going to do what they needed to do, and other people needed to do what they needed to do.  I don't recall whether it was specified exactly what that was going to be, but the inference of violence is certainly there.

Q    Three weeks later Mr. Caro ordered and participated in an assault on other inmates.  Those inmates had only been in the prison a couple of hours, and one of those inmates had to go to the hospital after the beating; is that correct?

A    Yes, sir.

Q    And you're aware that Mr. Caro was found to have blood on his boots and clothing when he left the yard; is that correct?

A    Yes, sir.

Q    Now, are you aware that Mr. Caro made a statement following that beating?

A    That's my recollection.

Q    Are you aware this is the statement that he made?  Please read that.  I think it's to your right, sir, if it's on.

A    I can see the one in the back.  "Caldera, he is an Azteca.  He didn't have anything to do with it,

just the Texas Syndicate.  I don't give a fuck if they send me to a United States penitentiary.  My brothers follow orders.  They know what they're getting into.  It doesn't even matter if we are prosecuted.  I have 30 years to do.  I certainly don't care about myself."

Q    You're aware that's what Mr. Caro said after he participated in and ordered that beating; is that right?

A    Yes, sir.

Q    Now, after that beating they transferred him to a USP; is that correct?

A    Yes, sir.

Q    USP Lee?

A    USP Lee County.

Q    That's a fairly new facility.  I think it opened in 2002?

A    Yes, sir.

Q    You would consider that a fairly new facility?

A    Yes, sir.

Q    And you're aware that on August 29th of 2003 at the age of 36 Mr. Caro attacked a fellow inmate and gang member with a prison made shank and stabbed him 29 times in the back, chest and head?

A    With the co-defendant, they jointly did that and

JA 761

inflicted those wounds, yes, sir.

Q    So, you're aware that Mr. Caro did that?

A    Yes, sir.

Q    And you're aware that he was convicted of conspiracy to commit murder after that time?

A    Yes, sir.

Q    And sentenced to 27 years?

A    Yes, sir.

Q    There's no parole in the federal system, right?

A    Yes, sir.

Q    That's 27 years to serve?

A    That's correct.

Q    And after that stabbing he was then transferred to the Special Housing Unit at a USP; is that correct?

A    He was transferred into the Special Housing Unit at USP Lee County, into that same prison in their Secure Housing Unit.

Q    And less than four months later he ambushed his cellmate, Mr. Sandoval, and this time using a towel strangled him from behind and killed him; is that right?

A    I don't know if he ambushed him, but he certainly did murder him within that cell.

Q    Snuck up behind him?

A    I don't know how it happened.  I don't know whether there was a statement of whether he snuck up, or what the conversation was, but he did strangle him with that towel.

Q    You understand that is why we are here?

A    Yes, sir.  I don't know whether there's been testimony about how that took place, whether he snuck up or ambushed him, or there was a confrontation in some fashion but he did get a towel around his neck and did strangle him.

Q    You are aware that there was a knot on the back of his neck?

A    Yes, sir.

Q    Well since, I don't know what you know, would it matter, in your analysis, the fact that you don't know how Mr. Caro strangled Mr. Sandoval, the fact if he did ambush him, if he did jump him from behind and strangled him by placing a wet towel, and not, would that affect your final judgment concerning his future dangerousness here today at all?

A    It does not affect my final judgment regarding the capabilities of the Bureau of Prisons.  I believe that if, in the general population of a U.S. penitentiary, there is a very high risk that Mr. Caro would seriously injure someone else, so if at large

in a U.S. penitentiary there is grave risk of serious violence. My testimony is that there is a security level that he can be held at. Risk is always a function of conditions of confinement. There is a security level that he can be held in where that risk becomes very low. But if at large, that risk is quite high.

Q   We're going to look at that in just a second. Basically what you said, if Carlos Caro is ever back at a USP your testimony is he poses a great risk to the lives of other inmates?

A   At the present time he poses that risk. Now, I don't know what effect being in solitary for five or ten years might have on him. I certainly wouldn't expect the risk to be the same when he's 80 years old as it is when he is 40 years old. But for the foreseeable future, I would certainly say for the next five to ten years that he would pose a significant risk if at large in a U.S. penitentiary.

Q   Okay.

A   And perhaps beyond that. That would need to be assessed as time goes on. But I would say for at least that period of time, and perhaps much further out.

Q   All right. Now, were you aware, as well, that

JA 764

Mr. Caro has the capabilities of writing coded letters and mailing them out of the prison?

A     He has had that capability in the past.  I don't know that that capability continues to exist, but that has happened.

Q     If he had the capability of doing it, I mean, did he forget it?

A     No, sir.  Capability, I'm looking at in terms of what security is brought to bear.  Capability is relative.  In other words, does he have the capability of writing, writing something in urine or some other substance?  Yes, he could still do that. Could he successfully mail that out now that he's been identified as someone who has done that in the past, I don't think the Bureau of Prisons is negligent or incompetent.  While he did do that in the past, I don't know that that's a continuing reasonable capability.

Q     Your testimony is he still has the capability. You're just hoping that maybe the Bureau of Prisons can stop it?

A     No, sir.  My entire testimony is about the ability of the Bureau of Prisons to bring security to bear on someone wherein the absence of that security there would be significant risk if he is allowed to

write to whoever he wants to in an unmonitored way, if he is allowed to roam about in a general prison population and continue to interact with the Texas Syndicate, if there's no action taken then there is significant risk.  It is inconceivable that the Bureau of Prisons would respond in that sort of impotent, incompetent fashion in the face of this prison history.

Q    When he sent the letter, coded letter out of the prison while he was in the SHU at USP Lee, you're not saying they were incompetent, were you?

A    There was a lapse in security to that degree.  I think that has now been addressed.  It's not incompetence, but that was a security lapse.

Q    You used the word incompetence.

A    I said incompetent if there was no response, whatsoever, to the degree of security this man currently requires.

Q    Sitting at USP in the Special Housing Unit, and he got a coded letter out and it was sitting in the mailbox of a friend of his who is a member of the Texas syndicate?

A    Yes, sir.

Q    You're not saying it's because they're incompetent?

JA 766

A    That was a security failure that allowed that to occur.

Q    A failure -- it's not a failure; he defeated it. I mean, Carlos Caro was able to defeat the measure, right?

A    There's always that interaction any time there is a security lapse that occurs, there is something the inmate has done, and there's the way the administration has responded to that.  That response is dynamic.  In other words, things may, things may happen that represent lapses.  The gauge of professionalism of an organization is their dynamic response to that, so they then address the security that they bring to bear in the face of the risk that's been present.

Q    And your opinion is ADMAX is better than USP Lee down in the SHU?

A    Yes, sir.

Q    Okay.

A    As it exists today.

Q    USP Lee has been open since 2002.  Do you know how many murders have happened at USP Lee since it opened?

A    I probably have that data in that case, but have not calculated it.

Q     The evidence in this case was one, committed by him.  Now, how many murders have there been in ADMAX in the last 20 months?

A     There have been two since the facility opened in 1994.

Q     Interesting.  So, there's one death in USP Lee where the incompetents work, yet there's been two murders at ADMAX where it's supposed to be so great?

A     I would not ascribe the murder that occurred at Lee with regard to incompetence with his having written a letter out in code urine; I would ascribe that there was a security failure in allowing that correspondence to occur.

Q     Let's talk about weapons a little bit, sir.  In August of 2003 Carlos Caro -- let me back up.  In July of 2002 Carlos Caro, according to the evidence, used his fists and boots and other things to beat inmates?

A     Yes, sir.

Q     You would consider your fists and boots as weapons, correct?

A     I don't think that would have been written up as a weapons assault.  Obviously, functionally they're being used as weapons.  From an assault classification standpoint, typically your feet and

your head are not being written as a weapons assault.

Q    You might consider getting your head knocked in --

A    Yes, sir, I'm not attempting to be an apologist for Mr. Caro, but I'm simply trying to respond precisely to the way the prison addresses and classifies different assaults.

Q    In August of 2003 he used a Plexiglas shank, and to stab this guy 29 times, Mr. Benavidez?

A    He and his co-defendant stabbed Mr. Benavidez 29 times.

Q    They each had shanks?

A    They had two shanks.

Q    A shank being, Plexiglas shank being Plexiglas would not trigger the metal detector?

A    That's correct.

Q    So they took him away and put him in the SHU, and he used a towel to strangle his roommate?

A    Yes, sir.

Q    Is it fair to say Mr. Caro would pretty much use the weapons at his disposal to, that were at his disposal to commit violent acts?

A    Yes, sir, that's a fair characterization.

Q    Lets go back to ADX.  You talked about ADX, showed pictures, and all this stuff.  At one time

JA 769

prisoners at ADX got typewriters; is that correct?

A    Yes, sir.  Not in their cell, but in the legal area.

Q    Isn't it true that one of the inmates out there removed a metal, piece of metal from the spinning dial of a typewriter, and then when the guard opened the food tray, was placing the food in, he took it and moved up, and had the guy not gotten out of the way it would have come right up under his chin and stabbed him?

A    I'm familiar with an attempted assault on a staff member with that shank.  The exact circumstances with the food tray, and that sort of thing, I don't know.  But the officer was able to avoid that assault.

Q    So, here we are at ADMAX, and an inmate is able to make a shank and almost stab an, an inmate, I mean a guard?

A    On that occasion, yes, sir.

Q    The response is no more typewriters, right?

A    That's correct.

Q    So, this was, this was ADX, I mean this was the super max that you talk about.  And you had a prisoner that was able to defeat the measure at the time; is that correct?

A    No, sir.  The security and the procedure defeated the inmate.  The officer was not injured. Now, the inmate certainly got much further along in this progression than anybody would have liked, and to be able to get a piece of metal like that was a significant problem.  The operation there at the cell front was successful, and the officer avoided being severely hurt.  But the defendant, certainly the inmate defeated the security in getting possession of a shank.

Q    Okay.  Let me just go on to another topic here, sir.  When an inmate is not serving a life sentence they can get things called good time credit; is that correct?

A    Yes, sir, to a limited degree.  I don't have a clear --

Q    Well, if an inmate is not serving a life sentence and that inmate behaves him or herself, their sentence can be reduced for conduct up to a certain percentage?

A    Yes, sir.

Q    And I think you've testified in other cases that that provides that inmate an incentive to behave; is that correct?

A    That's an available incentive, yes.

Q    At least it is an incentive for typical inmates, generally speaking, to behave.  So, if they behave, hopefully they get out a little bit early?

A    Hopefully, that's why that exists, to try to provide some additional incentive for good behavior.

Q    Mr. Caro is serving a 30 year sentence at FCI Oakdale.  Those incentives were available to him.  If he behaved himself he possibly could have gotten his time cut; is that correct?

A    I don't know that one way or the other.  I would accept your representation of it.

Q    He was doing 30 years, so, that's 360 months, and had he behaved himself and had good conduct some of that time could have been reduced, say, two or three years, maybe, and he could have gotten out early?

A    Yes, sir.

Q    It's fair to say based on the evidence in this case, and particularly the statement, that incentive, getting out of prison, had absolutely no effect on him?

A    That's correct, based on his self report.

Q    And based upon his statement?

A    Yes, sir.  He essentially saw 30 years, effectively, as the rest of his life it looks like.

JA 772

"It doesn't matter about me; I'm going to be in prison." Thirty years is as far as he could see.

Q So, the threat of taking away time, or getting out of jail, or any of that stuff, it didn't matter to him, he's going to do what he wants to do including violent acts?

A Yes, sir.

Q Were you aware that they did not prosecute him for that in Oakdale, he was not prosecuted?

A There was not a free world charge that occurred as a result of that, that's my understanding.

Q It was not brought into a federal court and prosecuted?

A That's correct.

Q And then, of course, he shanked Benavidez?

A Yes, sir.

Q So, once again, even though he had the opportunity to receive good time, it didn't have any effect on him, he didn't care about getting out. If he needed to stab somebody, he's going to stab somebody?

A Yes, sir, that's correct.

Q So, then he got another 27 years, and now as he sits here today, he's serving 57 years, he's scheduled to get out in his eighties, not counting

this Sandoval charge, and then he strangles Mr. Sandoval; is that correct?

A    Yes, sir.

Q    So, once again, time like that is not going to deter him at all, is it?

A    By the time he was facing 57 years, I don't know if there was any realistic functional parole capability, but that potential out when he was 80 or 90 years old obviously did not have any deterrent effect.

Q    No.  So, would you then agree with me that another life sentence, effectively, by this jury would have absolutely no deterrent effect on him whatsoever?

A    I don't think that Mr., based on the record, I don't think that Mr. Sandoval is deterred --

Q    Caro?

A    I'm sorry, Mr. Caro is deterred by length of sentence that he's facing.  That were he facing 20 years at this point, or 100 years at this point, that doesn't appear, that length of sentence doesn't appear to have anything to do with how he conducts himself in prison.

Q    So, the answer is no, another life sentence by this jury would have no deterrent effect on future

acts of violence by this defendant, correct?

A    Only to the extent of the security that will be brought to bear as part of that life sentence.  The life sentence in and of itself doesn't have a positive or negative deterrent effect, I think.  The security that would be a part of that life sentence is what I've addressed.

Q    Okay.  So, what you're saying, sir, is that punitive measures, use the word punitive but not as a term of art, the measures that can be applied to Mr. Caro at ADX, in your opinion, will that have a deterrent effect on him?

A    An incapacitating effect, not a deterrent effect.  Eventually, if he's sitting in solitary for five or ten years, that may ultimately have a deterrent effect.  In other words, that may get his attention, but primarily I'm talking about what can be done to incapacitate him, not to, at this juncture, provide a deterrent.

Q    Okay.  So, is it fair, then, to say that nothing we can do, whether it's send him out to ADX, or anything else short of a sentence of death, will deter him from future violence?

A    No, sir.  If he were sentenced to death he would go to Terre Haute where he would be in a prison there

JA 775

during the period of time that his appeals took.  It may be seven years, and if he behaves well there he could move into their own partial step down program where he had interactions with other inmates, and unshackled contact with staff.  So, he is going to be, to be in prison somewhere, and a decision will be made about what level of security to hold him in when he's there.  That's the case whether he goes to Terre Haute, or whether he goes to ADX.

Q    Let's talk about Terre Haute since you raised it.  Are you aware they constructed a new facility at Terre Haute for death row, and everyone that stays out there is in a single cell, and there is no Step Down Unit anymore, and that they will remain there until their sentence is imposed?

A    I'm not familiar with there being no Step Down Program.  They've changed some things about it.  They kind of had their own little jobs that they could do, and that program has been discontinued.  But it is not my understanding that they have taken away the two phase aspect of death row.  At least when I was out there about two months ago it was still in place.  They still did have a two phase operation.

Q    But you are aware there's a new facility for death row at Terre Haute?

JA 776

A    There was a new facility that didn't open in the last two months. When they moved the federal death row to Terre Haute they constructed a new unit for it. At that new unit at Terre Haute they are having a dynamic response to what degree of security those death sentence inmates require. Now, they are segregated from the rest of the inmate population, but they may move to a second level where they are allowed to come out of their cell more and interact with other inmates and have contact with staff members, as well.

Q    Now, I had asked you earlier about, you testified for a defendant by the name of Trinity Ingle; is that correct, sir?

A    I was called to testify in the Trinity Ingle case.

Q    My apologies, you were called to testify for Mr. Ingle in Arkansas; is that correct?

A    I was called by the defense to testify in Mr. Ingle's capital sentencing trial. I never testify for or on anyone's behalf.

Q    Did you testify the probability of his future dangerousness was very low?

A    I described the probability of future violence at Hillman Prison was very low.

Q    Did you ever follow up to see how he was doing in prison?

A    I have some data regarding that.  It is within attorney/client privilege in another case.

Q    Would it surprise you to learn that Mr. Ingle's committed three assaults during that time, including one which resulted in serious injury?

A    There was a serious -- again, you've mischaracterized it somewhat.  There was a serious attempted assault and three other assaults of a lesser severity.

Q    Would it surprise you to learn that Mr. Ingles was twice caught in possession of dangerous weapons?

A    I understand that.

Q    A total of 11 different violations since you testified on his behalf?

A    I did not testify on his behalf.  I do understand the history he has subsequently had in the Bureau of Prisons.

Q    Now, do you know where he is?

A    He is at a U.S. penitentiary.  I have, I have seen where he is.  I don't recall it off the top of my head.

Q    Would it surprise you to learn he's at USP Beaumont?

A    No, sir, I believe that's correct.

Q    He's not at ADMAX, is he?

A    No, sir.

Q    Now, let's talk about communications outside the prison.  We talked about Mr. Caro's ability to write letters in code, and get them to his colleagues, we'll call them, in the Texas Syndicate; is that correct?

A    Yes, sir.

Q    Are you aware that federal authorities intercepted that coded letter that Mr. Caro wrote while he was in the SHU at USP Lee; is that correct?

A    Yes, sir.

Q    Were you aware of a 2006 Department of Justice report that stated that three terrorists involved in the 1993 World Trade Center plot had managed to send over 90 letters to terrorists overseas without those letters being stopped by the authorities?

A    Yes, sir, I'm aware of that Inspector General report.

Q    Those terrorists were linked to the '04 Madrid bombs, and one letter sent from ADX was used as a recruiting tool for suicide bombers in Spain.  Were you aware of that, sir?

A    Yes, sir.

Q    Were you aware that during one week there were two BOP employees staffing the mail room, they managed to read less than two percent of over 2,000 pieces of mail that came through; is that correct?

A    I didn't recall the specifics of it, but it was under staffed.

Q    So, it's fair to say that inmates at ADX can get their messages out through the mail system as hard as they try out at ADX, as professional as they are, that inmates, cunning, smart inmates like Carlos Caro can get their messages out and get their codes out?

A    No, sir.  There were staffing cuts that occurred at ADX so the facility no longer provided the security that their procedures called for.  That has been addressed by an Inspector General report, and the funding levels, the staffing levels at ADX are being aggressively addressed.  Congress is concerned with it, and the Bureau of Prisons has that on their radar screen as well.  But in response to those staffing cuts, and a failure to apply the security procedures that were in place, there were incidents that did happen.

Q    So, it's, it's the fault of staffing cuts and incompetent BOP employees, right?  It's not the fault of inmates and murderers like Carlos Caro, and these

other folks out at ADX, or wherever they are, who are just, make a decision to get their messages out?  You blame the prison?

A    No, sir, I don't.  The inmates are certainly responsible for their own misconduct, and the Bureau of Prisons is responsible for securely containing them, and for following the procedures and instructions that are in place.  If the Bureau of Prisons does not follow the security procedures that they have in place, then there is grave risk to employees and other inmates in the community throughout the system.  The security of this entire organization rests on them following the procedures that are in place.  And when they do that, when those procedures are well conceived and they do that, then there is a, then you can effectively contain this population.  If they do not do that, if they fail to do that, then there will be violence and problems at all levels within that system, and so I don't blame, I'm not putting the blame on anybody.  There is a criminal population that the Bureau of Prisons is managing that are going to behave criminally.

Q    Aren't they to blame?

A    Well, they are criminals, and they are in prison, and they certainly deserve to be sanctioned

or additionally prosecuted for additional misconduct that they do. They are criminals, they're going to behave in a criminal way. The Bureau of Prisons is charged with containing those individuals and largely does that very effectively and very professionally. When lapses are identified that occur then they respond dynamically to those to address them, and that's what's happening in this circumstance, as well.

Q   You're familiar with the case concerning Tyler Bingham; is that correct?

A   I believe so. I believe that Bingham is an Aryan Brotherhood leader that was involved in sending messages out of ADX, ordering the homicide of another inmate, I believe that was in Lewisburg.

Q   And so however dynamic all of that is, Mr. Bingham got a coded message in invisible ink to his friends on the outside who got word to other inmates in Lewisburg, and people were killed, right?

A   That happened at one time. That also has been addressed by prosecution of the Aryan Brotherhood, by beefing up the security and the investigative services at ADX. All of these things are things that have happened that have been addressed.

Q   And they addressed them after people die,

JA 782

correct?  I mean, they didn't address the Tyler Bingham problem until after someone was killed?

A    That's correct.  I think they didn't realize the problem until after that had occurred.

Q    And when you go to see, when you find out whoever these people were killed were, and we want to blame someone for their death, don't we blame the inmate?

A    Absolutely.  Mr. Bingham is responsible for the death of that inmate in Lewisburg.

Q    That's right.  When Mr. Caro sends out coded messages to his friends on the outside in the Texas Syndicate we blame him, right?

A    Yes, sir, that was his misconduct.  Now, I would differentiate, there's no indication he was ordering a hit in that message.  Rather, he seems to be explaining his own conduct, that he was following orders, but it was his misconduct in writing a letter that is against policy and violates security.

Q    Let me move on to a couple more things here, sir, and I'll wrap this up.

A    Yes, sir.

Q    You stated Carlos Caro was approximately 40 years old.  Within your threshold that's certainly a young enough age where you still consider him to be

JA 783

of great danger to other inmates and staff within the prison system. I understand that you believe they can control him, but just focusing on his age, 40 is certainly within the realm of being very, very violent; is that correct?

A   For him. With many inmates you see a reduction in their involvement in serious violence with age. You're not observing that currently with Mr. Caro. And so, I don't see age as being a factor to consider in evaluating whether he would be violent in the future, at least not for the next ten to 15 years of age. So, for him, I think, being 40 is not a factor that points to less violence in the future because he has serious violence in the last five years. So, I don't see rage as a reducing factor. That's why I'm speaking about confinement that can be brought to bear.

Q   Right. And outside the confinement that you believe can be brought to bear, he will remain a danger to other inmates and staff for at least up until, another 15 years, maybe even 20 years; is that correct?

A   If at large in a general prison population barring, again, whatever effect it might have, spending five or ten years in solitary confinement in

JA 784

ADX, from an age factor I would not expect him to age out of a zone of risk in less than ten or 15 years.

Q    I wanted to ask you just a couple of questions on the Control Unit.  You understand federal law regulates who goes into the Control Unit?

A    Yes, sir, those are the instructions I placed on the screen.

Q    You testified here, I want to make sure everyone understands, the warden out at ADX cannot wake up one morning and say you go to Control Unit?

A    That's correct.

Q    That decision has to be made by the higher ups including people back in Washington, D.C.?

A    It's made at a regional level and people on that committee come from Washington.

Q    Someone from Washington, D.C. will control who goes into the Control Unit?

A    A committee will decide that.

Q    There's only 78 beds in the Control Unit; is that correct?

A    Seventy something, approximately, correct.

Q    So, out of 165,000 federal inmates, there's only 70 or so slots in this Control Unit; is that correct?

A    Yes, sir, that's correct.

Q    If the inmate is placed in the Control Unit they

JA 785

can appeal that, can they not?

A    Yes, sir, they can.

Q    That's provided to them under federal law?

A    Yes, sir.  Not an appeal to an external court, but an appeal within that due process that's occurring within the Bureau of Prisons.

Q    So, they could win an appeal, and even though the decision was made to put them in a Control Unit, the inmate could win the appeal and be sent somewhere else; is that correct?

A    If that security rationale that sent them there were demonstrated to be unfounded by the people that are sitting on that committee, then it makes sense that he would not go there because that rationale didn't remain.  But if the rationale that they used in the first place to send him was sound, then his appeal would do nothing except the papers would cross somebody's desk again.

Q    So, if the warden decided that he needed to go to the Control Unit, that could be overruled, that could be denied?

A    Yes, sir, that's correct.  The referral of a warden is just that; it's just a referral.  It doesn't mean he's going to go to the Control Unit. Now, effectively by putting general population in

JA 786

this kind of lock down status, you've essentially made the whole facility operate with near the same security as the Control Unit does, and so the warden can simply put him, keep him in a general population status.  The warden doesn't have to let him go to a Step Down Program.  So, the warden can effectively hold him at the functional equivalent of Control Unit security.

Q    The warden can be overruled, right?

A    Yes, sir.  There is review, always, and if the warden's decisions are, are arbitrary and unfounded, then there well might be scrutiny about those decisions.

Q    Okay.  So, let me ask you one more time, the warden can be overruled?

A    Well, yes, sir.  There's the commissioner of prisons, there's the Attorney General, there's the President of the United States.  The warden is not the final authority, but does have significant authority over the management of the inmates that he has within his facility.

Q    All right.  I want to show you something, sir. This is from a testimony that you did at a trial up in New York.  I highlighted the middle section in yellow.  This is your testimony about the ADX, and

JA 787

the philosophy at ADX. I was wondering if you could take a look at that and read that to the jury.

A    "The official philosophy at ADX is not that most of these inmates will be kept there permanently, but instead it will be tried to move them back into the general population at some point, although there are inmates there that have been there a long time. The general philosophy for most of the population is to try to move them back out into a U.S. penitentiary."

Q    That's your testimony?

A    Yes, sir.

Q    Now, let me ask you --

A    And I've said the same thing today.

Q    You filed an affidavit in this case, Declaration of Affidavit, Mark D. Cunningham, I believe the date was 13 October, 2006. Do you remember filing a couple of affidavits in this case?

A    Yes, sir, I do.

Q    In that affidavit on page seven, eight and nine, you listed many of the defendants that you had testified for -- excuse me -- you have been called in their cases and testified in, going back several years?

A    Yes, sir.

Q    Okay. And I just wanted to ask you, this is the

statement that you made about the philosophy.
Essentially, that philosophy is that ADX will bring them in and we'll get them out.  What we want to have happen at ADX is, according to you, "The general philosophy for most of the population is to try to move them back out into a United States penitentiary."  That's correct, that's your statement, right, sir?

A    You've asked a very long compound question.  Let me address it in pieces.

           THE COURT:  Do you wish to rephrase the question?

BY MR. BROWNLEE:

Q    Let me ask you, the last sentence that you put up here, "The general philosophy for most of the population is to try to move them back out into a U.S. penitentiary," that's your statement; is that correct, sir?

A    Yes, sir.  As a general intention, that's correct.  As I testified, there are individuals for whom there is no thought, there's no good reason to think that they're, to that what took them to ADX can be effectively mitigated, but for those that it can, the hope is they will not be at ADX permanently, that they will, instead, transition back out some day.

Q    And look at this list of people that you have been called in their cases.  And is it fair to say that you have found that philosophy and that policy to be true; that most of the people that you have been, that you have testified in their cases for are either, well, they were either sentenced to death or they're not in ADMAX.  Is that your general findings?

A    Yes, sir.  The, in all of these others, I think, without exception involve cases where there were murders in the community, and in those cases, despite the Government alleging future dangerousness at trial, when they actually came into the Bureau of Prisons, when the professionals looked at them they determined that they were not as bad as they were represented to be at their hearings, and they were sentenced to life terms -- well, they were assigned to U.S. penitentiaries with about three exceptions. I think there were three or four that went directly to ADX from the courtroom, but for the most part the others were sent to U.S. penitentiaries.  These are individuals that killed in the community, not in prison.

Q    So, let me make sure I understand you, sir.  I asked you, we laid out this philosophy that you testified about, about the philosophy of ADX which is

JA 790

to get these guys back out into the USPs?

A    No, sir, the philosophy is to provide security for the Bureau of Prisons and for the public with the idea that if these individuals can be restored to lower levels of security, they will attempt to do that.  But the primary purpose of ADX is to provide a level of security to contain individuals that could not be safely contained at a lower level of security. Within that, of course, the goal is that that level of security will not always be necessary.

Q    All right.  So, I asked you about, I had you read this, I read it, and you agree, the general philosophy for the general population is to try to move them back into a U.S. penitentiary, correct?

A    Yes, sir.  I would also say this is one paragraph out of an entire testimony where I'm confident that the rest of this context was a part of that.  But I would stand by this.

Q    And I asked you has it been your experience that even though you've testified for all these people over the years, that most of those people are not at ADX, they're either on death row at Terre Haute or they're at some other prison?

A    Yes, sir, they are largely at the U.S. penitentiaries if they were not sentenced to death.

JA 791

Q    And then you said that's because they killed out in the population, they didn't kill in the prison; is that correct?

A    That's an important difference, yes, sir, that their victims were in the community, they did not have a history of killing someone in prison.

Q    Okay.  Now, you filed a second affidavit; is that correct?

A    Yes, sir, I did.

Q    Do you remember attaching this to it?  Inmates found guilty of 100 code dash killings?

A    Yes, sir.

Q    It lists 47 names.  There's page two.

A    Yes, sir.  I was asking for the follow up of these individuals, and what their rates of violence were after they had killed in prison, in the Bureau of Prisons, so I might be better informed about the track record, about what happens to people in the BOP after they've committed murder, where do they go, for how long, held at one level of security, and then what's their disciplinary history after that so that my testimony would be specifically informed about how federal inmate homicide offenders behave in prison.

Q    All right.

A    I was not allowed to have that data.

JA 792

Q    Do you know how many of these 47 are at ADMAX?

A    No, sir.

Q    So, you didn't follow up to try to find out where they are?

MR. KALISTA:  Judge, I object.  They would not provide us with the data.

THE COURT:  I'll overrule the objection. Go ahead, sir.

BY MR. BROWNLEE:

Q    Let's look at Bruce Pierce.  He's number five on your list.  I went to the website this weekend. You've been to the BOP website?

A    Yes, sir.

Q    You've gotten some of that information off that website; is that correct?

A    Yes, sir, I have.

Q    You used some of that information in these slides?

A    Not in these slides, but at times I have used data that I obtained from the web site.

Q    Okay.  So, Bruce Pierce, according to you, inmate found guilty of 100 code killings, Bruce Pierce is at Lewisburg, correct?

A    Yes, sir, that's what it reflects.  I haven't double checked your math to make sure the registered

number is the same as the inmate that committed this, but I would accept your representation.  The critical issue is what happened to him between the time he was guilty of the killing, and now that he's, now that he's at Lewisburg what happened to him during that period of time, where did he go for how long, why did they decide to put him in Lewisburg, at what level of Lewisburg is he in with what disciplinary history. So just to put his name up and show where he is is misleading, at best, in the face of the data that I requested from you that would have fully informed this issue for me and for the jury.

Q   Now, I don't know how it's misleading, Doctor. You're the one that came in here and told the jury that Carlos Caro, if he was put at ADMAX, would pose a low likelihood of future violence, and the reality is you've got a guy here, Bruce Pierce, take either one of them, two Bruce Pierces, it doesn't really matter, he killed in prison and he's not at ADMAX, and he's only 35 years old.  We know he was killing people at 36?

A   Yes, sir, simply putting the facility that he's in doesn't tell whether he's kept on the SHU there, it doesn't tell us --

Q   How about David Fleming?

A    You have the same issue.  Simply showing where the individual is today does not address how many years did they spend at what kind of custody, what's their disciplinary --

Q    The disciplinary record --

A    Sir, let me finish.

THE COURT:  Wait, Dr. Cunningham.  I'll referee here.  This is what we're going to do.  Dr. Cunningham, just answer the questions that he asks, and the attorneys for the defendant will have an opportunity to redirect, and they'll bring out anything that they feel is important.  So, you answer the questions that, directly answer the questions that are asked.  You'll get plenty of time to answer those questions, and then we'll proceed in that fashion.

THE WITNESS:  Yes, sir.

BY MR. BROWNLEE:

Q    So, let me get this straight.  I was prepared to go through these, but for sake of time I won't.  I want to make sure we're correct.  What you're telling the jury now is that simply by me showing you where the defendant is, that's not important; is that correct?

A    That is a piece of much more data that is

JA 795

required to analyze what's occurring here.

Q    I thought, I thought the whole point of your testimony was that the only thing that was important was where he is?

A    No, sir.  There is David Caro, and his background in the Texas Syndicate, and his prior violence, and his violence on this occasion.  The Bureau of Prisons will look at him as an individual, and the risk those factors present independent of what was happening in these instances.  There was also a judgment that was made about these individuals, as well.  I'm saying that given that background there is an extraordinarily high likelihood he will be placed in a highly restrictive setting, that he'll go to ADX, that he can remain there for as long as the Bureau of Prisons decides he requires that, that if he's locked down in that setting that his likelihood of serious violence is very low, not based on who he is apart from these are factors that will take him to ADX, and are likely to keep him there for a long time based on the security that can be brought to bear.

Q    Let me get this straight.  Who he is is not important to your assessment, and where he is is not important to your assessment?

JA 796

A    No, sir.  Who he is is how he will get to ADX, and what they will look at in deciding how long to keep him there, and those factors normally indicate that he is highly likely to go there, and to remain there for a very long time.  When he leaves --

Q    But you will concede?

A    When he leaves will be determined by the Bureau of Prisons as they look at his security needs at that time.

Q    And you would concede, then, that in these 47 that you submitted very few were at ADMAX, and most of them were out either in USPs or Terre Haute; is that correct?

A    I do not know the specific outcomes of these individuals.  I asked for a great deal of data that I have, I simply cannot comprehend why that simple scientific data would be something that the U.S. Department of, Department of Justice would resist.  I would think that all of us would want to know the follow up of these offenders so it could best illuminate these proceedings.

Q    They're not at ADMAX?

A    I need to know what their disciplinary records are, and security levels they were held at, and I can't understand what the reluctance is to provide

JA 797

that information.

Q    I have one more question.  Well, maybe more than one.  Does remorse have anything to do with this?  If you have a defendant who has shown absolutely no remorse, whatsoever, for his crime, and has shown the ability to not be deterred at all, nothing will deter him, would that affect your opinion about the ability for him to harm others in the future?

A    No, sir.  I'm assuming that he does not have functional remorse at this time for these actions.  He is going to be contained by the security, not by any personal remorse.

Q    Thank you, sir.  No further questions.

THE COURT:  Any further questions?

REDIRECT EXAMINATION

BY MR. KALISTA:

Q    Dr. Cunningham, I think you've basically testified that you are a scientist; is that correct?

A    That's correct.

Q    The slides that were put up here by the Government where you asked in the declaration for, I believe it was a list of 47 names, or so, that had committed murders within the Federal Bureau of Prisons; is that right?

A    Yes, sir, that's correct.

JA 798

Q    What was the purpose of your wanting follow up data on what has happened to these inmates within the Federal Bureau of Prisons?

A    If I want to know -- the best way of gauging the risk that killing another inmate in prison has for future conduct, if I want to know what effect does it have for somebody to kill another inmate in prison, how does that affect the rest of their time in prison, and how much violence they commit, then I need to collect the data on individuals who have done that.  If I want to know what the risk is of a 16 year old male unmarried driver, then I need to track 16 year old male unmarried drivers and their driving records so I will know whether being 16 is a risk factor for driving, or not, and how much of a risk factor it is.  This is fundamental to accurate risk assessment, is to collect data about individuals that have a similar background.  The same thing happens in medicine.  If I want to know what the prognosis is for a given disease, I need to track the outcomes of people with that disease.  So, that's what I asked for here, is -- there are computer print outs, it's relatively easily obtained, there are three or four computer print outs that would show the inmate's movement history within the Bureau of Prisons, so I

JA 799

could identify whether they were being held at a SHU, or went to ADX, or went to some other facility. I also want the print out of their chronological disciplinary record that would have let me view what offenses they had gotten in prison before the homicide, and what offenses they had in prison after the homicide. Then I would have a body of data about prison homicide offenders in the Bureau of Prisons so that we wouldn't have to speculate about how long are inmates held, going to be held at ADMAX, and does it make any difference whether they have a gang affiliation, or those kind of things. We would have data about that, and would also have data about what to expect from those offenders over time when they came out from under being locked down on a SHU or ADX. It was fundamental scientific data to inform a risk assessment of Mr. Caro. Now, in the absence of that data, it's not possible to do that kind of risk assessment. It's only possible to talk about what conditions of confinement are available that the Bureau of Prisons can bring to bear, and what the effect of those conditions are on what, on rates of violence on the Control Unit, which is the kind of unit where, essentially, ADX is functioning as at this point. It's simply critical to informing this,

informing an understanding of the future prison behavior of an inmate homicide offender.

Q    That's basically what you want it to do, you wanted to --

THE COURT:  Don't let's repeat, Mr. Kalista.  I think the witness has explained the circumstances.

BY MR. KALISTA:

Q    The United States Government has that data; is that correct?

A    Yes, sir.  It's easily available.  There's a list of names, there's a list of registered numbers, there's a few key strokes it would take to print up those two or three forms to send up -- I would be surprised if it would take more than two hours time to do, yes, sir.

Q    They could provide that to you?

A    Yes, sir.

Q    They refused to do that; is that correct?

A    Yes, sir.

Q    Simply showing that a man who committed, an inmate who committed a murder in prison who is not at ADMAX, does that tell you anything about that inmate's history after he committed that murder in prison?

A    No, sir.  It doesn't tell me how long he was at ADMAX after that.  It doesn't tell me what his misconduct was after that.

Q    Does it tell you anything about the conditions of his confinement at USP if he happens to be at USP?

A    No, sir, it doesn't tell me whether he's kept on the SHU, or not.

Q    Now, Carlos Caro, and this is correct, is it not, sir, from his record, since the date of the killing of Mr. Sandoval he has been kept in a single cell, is that right, wherever he's been confined?

A    Yes, sir.

Q    Whether that's at Lee USP or ADX Colorado; is that right?

A    That's correct.

Q    Is that a significant factor in providing adequate security for Carlos Caro as it affects violence toward other inmates and correctional staff?

A    Yes, sir.  For him it's essential in terms of his violence toward other inmates, and he has no record of violence toward correctional staff.

Q    No history of escape?

A    No, sir.

Q    No attempt at escape?

A    No, sir.

Q    And in terms of his institutional history since December 17, 2003, the day of the killing of Mr. Sandoval, are you aware of any incidence of violence where he's been kept under those conditions?

A    There are no reports of incidence of violence since he's been single celled.

THE COURT:  Mr. Kalista, again, I think we've been through this in his earlier testimony, and I would prefer if you not repeat anything.

BY MR. KALISTA:

Q    Now, in terms of the testimony, I believe that -- have you ever been called by the prosecution to testify in a criminal case?

A    Yes, sir, I have on many occasions.

Q    Have you ever been called to testify by the prosecution in a capital case?

A    No, sir, I have not.

Q    Now, do you have any personal --

MR. BROWNLEE:  Objection.

THE COURT:  I'll overrule.  I don't know what the question is.  And please, when you make an objection, Mr. Brownlee, please stand.

BY MR. KALISTA:

Q    Do you have any personal opposition to the death penalty?

JA 803

MR. BROWNLEE:  Objection.

THE COURT:  Ladies and gentlemen, I need for you to follow the bailiff out so I can discuss something with the attorneys.

(The jury retired to the jury room, after which the following occurred:)

MR. KALISTA:  Dr. Cunningham has been attacked by the Government on the issue of bias as far as simply appearing and testifying, and again not to use the words on behalf of, but certainly appearing as a witness for someone charged with a capital offense, and --

THE COURT:  Let me hear what the basis of the Government's objection is.

MR. BROWNLEE:  His personal opinion concerning the death penalty is not relevant, and I don't know how we would cross examine him.  The same question was raised in New York in 2001.  The Government objected, it was sustained.  We believe his personal opinion, he's here to testify purportedly about the prison system, and his own personal belief, we believe it's inappropriate.

THE COURT:  I don't think the Government has suggested in any of its questions that the witness is opposed to the death penalty in any

fashion, and I think it introduces extraneous matters. What we want the jury to do is consider Dr. Cunningham's testimony on its merits, and not by innuendo. The Government has not suggested that he's, he's a crusader against the death penalty. Their testimony, their questions have related to the amount of money he's received, not as to his personal feelings. I'm going to sustain the objection. Anything further, then?

MR. KALISTA: Just a few more questions, Your Honor, yes.

THE COURT: All right. We'll have the jury back, in please.

(The jury entered the courtroom and was seated in the jury box.)

THE COURT: All right. You may proceed.

BY MR. KALISTA:

Q    Dr. Cunningham, would you be willing to testify in a capital case if you were called by the Government?

A    Absolutely. I've offered, I've offered my testimony to the U.S. Attorney's Office to consult in capital cases. They simply have not called.

Q    So, they have not called on you even to consult on capital cases?

JA 805

A     That's correct.

Q     Are you surprised that you're not called by the Government to testify in a capital sentencing even though you are well familiar with that --

THE COURT:  I'm not sure what the witness's surprise has to do with it.  I believe that's objectionable.

MR. KALISTA:  Judge, let me have one minute, please.

BY MR. KALISTA:

Q     Dr. Cunningham, Carlos Caro is actually assigned to ADMAX; is that correct?

A     Yes, sir.

Q     Thank you.

THE COURT:  Anything further?

MR. BROWNLEE:  Nothing further.

THE COURT:  Thank you, sir.  You may step down.  And I take it this witness may be excused?

MR. KALISTA:  Judge, we need him subject to recall.

THE COURT:  All right.  Doctor, if you'll wait outside, please.  Ladies and gentlemen, we're going to take our luncheon break at this time, and if you'll be back in one hour we'll see you then.  If you'll follow the bailiff out.

JA 806

(The jury retired to the jury room, after which the following occurred:)

THE COURT:  Counsel, there is a question of whether the court should give any cautionary instruction to the jury concerning the matters about which the court did sustain the defense objection. The, the thing that concerns me, I want to give counsel an opportunity to respond before I make a decision in that regard, the thing that concerns me, I guess, is the, the Government's interjection of Al Qaeda and 9/11 into this case.  On the other hand, the Government did elicit testimony from the witness that, in which he agreed that terrorists confined in federal prison have, in fact, been able to deliver coded messages to the outside, which is relevant, I think, to the Government's contention in this case that levels of security that might be imposed upon the defendant would not prevent him from directing or suggesting, or otherwise being involved in, violent acts through coded messages in view of his membership in a prison gang.  So, the question is whether I ought to give any instruction to the jury that they are not to consider the Al Qaeda and 9/11 reference in terms of its, any impeachment of Dr. Cunningham's testimony.  Counsel have any comments in that regard?

MR. SIMMONS:  Your Honor, I just have one comment on that, and what my concern is, as I understand the testimony on cross examination about the letters which had been sent from ADMAX, I believe, in code by terrorists, which had, in fact, gotten out, somewhere they were detected, but what I think is misleading is as a result of that action there was an investigation, and the policies that were being followed at the time these letters were sent is not the policy and is not the procedure that Mr. Caro will be housed under.  I think that's terribly misleading.  It leaves a false impression that ADMAX is just letting all these letters going out, and I am very confident the policy has been changed, the procedures have changed and those letters aren't getting out anymore.

THE COURT:  That's not really my question, but you can certainly argue or present evidence in that regard.  The question is whether, one question is whether the defense wishes me to, in effect, bring up this question again by telling the jury they're not to consider that, this case has nothing to do with Al Qaeda or 9/11, and the jury is not to consider that it does.  That's my concern, because that's a searing experience for everybody, including

the jury, and I don't want them to get off the track in this case because of that in their consideration of Dr. Cunningham's testimony.  The defense may not, may have plenty of arguments that they want to make to the jury, and may not want me to remind the jury --

MR. KALISTA:  Judge, I think we would ask the court to make that instruction to the jury.  I'm also concerned about the implication that simply because a witness is called to the stand to testify in a capital case on the side of the defense, that somehow they are not to be believed, and we, as lawyers, because we're representing someone charged with a capital offense, I think the connection that Mr. Brownlee suggested to the jury can be made we are not worthy of belief when we argue our case to the jury because we are just somehow getting a paycheck, and it's just another case for us, and we're not really to be believed or taken seriously because we're appearing on behalf of a murderer.

THE COURT:  I don't think there's any such implication in this case.  I mean, the Government is fair game for any expert witness's monetary interest in testifying, and you also brought out that he's not testified for the prosecution in a capital case but

would be willing to do so if asked.  He's never been asked.  So, I'm not concerned about that factor, frankly.  Anything further from the Government?

MR. BROWNLEE:  As far as the Al Qaeda, I mean I do think there is a link to it.  He testified on behalf of them before, and he acknowledged this DOJ report.  I think I asked him, he said he was aware of it, three terrorists involved in the 1993 world terrorist plot had managed to send out over 90 letters to terrorists overseas without these letters being stopped.  He said he was aware of it.  I think there's a connection there.  I don't recall specifically, but I think in going through the slides, I think there was a mention of this is where we house terrorists, or something like that, so when you get into that ADX world, by definition, it's going to come out.  But the United States would have no opposition to the court informing the jury that this trial is not about Al Qaeda.  We agree.

THE COURT:  Well, I think it would be prudent to do that just, again, to make sure the jury doesn't get its eye off the ball here, and kind of clear the air as far as that reference is concerned.  So, I'm going to caution the jury in that regard when we return.  Is there anything further, then, before

we take a luncheon recess?  Do I understand when the jury returns the defense will rest; is that correct?

MR. KALISTA:  Judge, we were going to ask, in terms of witnesses I believe that's correct.  I think we have some documents that perhaps, I'm not sure we have talked with them about, but I think that would be a very small matter.

THE COURT:  All right.  If you'll go over that, then, and then the Government will be ready to proceed with its rebuttal testimony.

Now, there was a motion filed by the defense in regard to what I assume was their anticipation of a rebuttal evidence, and that was a motion in limine to suppress alleged statements about the, of the defendant about access to television at Florence, ADMAX.  As I understand, the defense wants me to exclude any testimony from the Government witnesses on rebuttal that the defendant allegedly made statements in response to questions by officers that he missed his television at Florence, ADMAX and wanted to be returned there.  So, you want to bring that up later?

MR. GIORNO:  I can address it now, Your Honor, if the court wishes.  With Cunningham, his testimony on direct talked about the fact that there

was a TV in the Control Unit, in the general population, but it was his representation to the jury this is there for education purposes. There was no mention of the fact that this also contains --

THE COURT: I thought he testified, in fact, that they had cable television, and the purpose was to make sure that the inmates didn't go crazy, and have a lot of psychiatric problems, which they have to deal with.

MR. GIORNO: The impression I got from Cunningham's testimony was that this cable was piped in, was kind of like all BOP all the time, but as far as, there was also a follow up as far as television, so it was there so they don't go crazy, they don't go nuts there in the cell, and he also talked about one of the things ADX is supposed to be so unpleasant because the individual will behave, he doesn't want to stay at ADX, he wants to go someplace else. The testimony in this case that Mr. Caro represented to these guards when they were asking how were things going, he said, "Well, I really hope my trial is over with quickly. I'd like to go back to ADX. I miss my TV. I like ADX." Although to the average individual ADX may be construed to be an unpleasant experience, it is not unpleasant to Mr. Caro. He prefers it to

USP Lee.

THE COURT:  What does that have to do with any of the issues in the case?

MR. GIORNO:  If one of the purposes of ADMAX is to make life unpleasant, that's not working on Carlos Caro.  To the contrary, he actually likes it.  We'd be rewarding him by sending him there.

THE COURT:  I understood, though, the defense did not contend that life imprisonment was any sort of deterrence to him, or that, that Dr. Cunningham, in fact, I think he indicated it would not be a deterrent, that you couldn't deter Mr. Caro no matter what sort of sentence you gave him other than death, but his whole argument, and the defense is that, that he can be controlled there. Now, if the defense is going to argue that life imprisonment is a terrible punishment, you know, and you're in this little cell, and it's just going, it's much worse than death, it's worse than death argument, maybe that would be relevant.  But I don't -- maybe they're going to argue that.  They can tell us, I guess, if they want.  They don't have to.

MR. GIORNO:  I don't know what they're going to argue, but I would anticipate this is one of these, I would say this is a terrible thing, ADMAX

must be this unpleasant place, their movement is restricted, they can't do this, they can't do that, they have all these punitive things out there to make it unpleasant, but according to what Mr. Caro says to the guards, if they're to be believed, all those punitive things, it's really not punitive to him.

THE COURT:  Well, of course Dr. Cunningham testified that none of those are supposed to be punitive, at least in ADMAX.  It's security only. What do the defendants say about this?

MR. SIMMONS:  Your Honor, initially I think it was a mischaracterization of Mr. Cunningham's testimony.  He did not only testify as to the programmatic purpose of the television, but also there was commercial television available.  The purpose, first the TVs that are at ADMAX, is not within the control of Mr. Caro.  Those TVs were placed there by the Bureau of Prisons for the Bureau of Prisons' purposes.  Those purposes are control of the inmate, education, reduced contact with, personal contact with the inmates.  The fact that the Mr. Caro would like to see TV, the fact that he enjoyed the TV and would like to go back is not relevant to any aggravating factor in this case.  This is a sentencing hearing in a capital case, and Mr. Caro is

being held here on a writ back to USP Lee, and some county jails where they are very limited, very primitive conditions he's been held under, and I think any person in their right minds would like to get back to a position where they are housed under humane and very, very controlled conditions. So, it's our position it's not relevant to anything, it's not rebuttal with anything, and it's certainly prejudicial to suggest to this jury that somehow Mr. Caro enjoys being housed at ADX. Mr. Caro is going to be housed wherever the Bureau of Prisons chooses to house him, and it's not an enjoyable experience. What it is, he's going to be housed under those conditions which will control his conduct and the Bureau of Prisons made a decision that closed circuit TV is part of the control mechanism, and to turn around and use it against him would be prejudicial.

THE COURT: Well, I'm going to sustain the objection and grant the motion in limine. I do not believe it is relevant to any of the issues in this case, and I think it interjects a, a matter that is unduly prejudicial to the defendant. So, I'm going to sustain the objection. Anything further, then?

MR. GIORNO: Your Honor, the only other

matter that's outstanding is the motion for mistrial. We filed written responses to that. Also, Your Honor, I'd like to supplement the written response. I think one of the representations I made to the court was we didn't find out about the modified regulation until after Mr. Aiken's testimony, and I have something I've marked as Government's Exhibit ADX2. This is the fax sheet where the October, '06 --

THE COURT: Rather than an exhibit, let's make it an attachment because this is not a jury exhibit. So, instead of an exhibit, this will, I'll direct the clerk to file it and it will be part of the Government's response to the motion for mistrial. I've read the briefs. Any further argument that counsel wishes to make?

MR. KALISTA: No further argument, Your Honor.

THE COURT: I'm going to deny the motion for mistrial for essentially the reasons stated by the Government in its response. Very well. We'll be in recess until 1:45.

(Recess from 1:00 p.m. to 1:45 p.m.)

THE COURT: Are we ready for the jury? Mr. Bailiff, if you'll have the jury, in please.

(The jury entered the courtroom, and was seated in the jury box.)

THE COURT:  Ladies and gentlemen, I remembered I needed to talk to the lawyers before we begin, so if you wouldn't mind going back to the jury room, please.

(The jury retired to the jury room, after which the following occurred:)

MR. SIMMONS:  Your Honor, we're not at this point intending to present any additional proof. We're not going to call Mr. Silverstein.  Again, I had talked to Mr. Caro, explained to him his right to testify, and he does not choose to do so.  There are some documents that I would like to introduce.  The authenticity is not objected to.  The Government objects to each document.  Your Honor, there's been a great deal of testimony, and this court has previously ruled that the incident report regarding Mr. Sandoval, and the fact that he was caught in possession of a shank, was not admissible.  We are again asking that incident report be admissible.  I would, if, if allowed to do so, I would call the appropriate BOP official simply to testify that on December 16, 2003 Mr. Sandoval was leaving his employment in the kitchen, he was shaken down by a

prison employee, and was discovered in possession of a shank, the shank was taken from him and he was placed into the SHU as a violation of a policy of possession of weapons, and then Mr. Caro was not involved in any way regarding that shank.

THE COURT:  What would be the relevance of that?

MR. SIMMONS:  Your Honor, I think this is a sentencing proceeding where the jury is entitled to know all the facts and circumstances regarding Mr. Caro, and the facts of the offense, and one of the facts and circumstances regarding this offense is Mr. Sandoval was placed into the SHU because of his own conduct.  And but for him being placed in the SHU, this murder would not have occurred.  I think it is relevant, and we, we would offer that testimony --

THE COURT:  Well, you could argue if Mr. Sandoval hadn't committed a federal offense he wouldn't have been there either, and we could try his case and see all about that.  Well, unless the Government consents, and I take it it objects, I do not believe that it is relevant, and I'm going to refuse it.

MR. SIMMONS:  Your Honor, I would simply like to make the incident report a part of the

JA 818

record.

THE COURT: You may. Yes, sir, it will be marked as the next Government's -- excuse me -- the next Defendant's exhibit, Madam Clerk, and it will be a separated and refused exhibit, and not allowed to go to the jury.

THE CLERK: Number 19, Your Honor.

THE COURT: Number 19, refused.

MR. SIMMONS: As one of the mitigating circumstances of this case we would like to be able to demonstrate in June of 2006 Mr. Caro, through his attorneys, offered to enter a plea of guilty and accept a consecutive life sentence. We communicated that offer to Mr. Brownlee. The offer was not accepted. And we would like to, for the jury to know that Mr. Caro was willing to accept responsibility for his conduct, and accept a life sentence. And we would offer the letter which was written to the U.S. Attorney's Office communicating that offer to plead guilty and to accept a life sentence.

THE COURT: Well, but Mr. Caro denied his, his guilt.

MR. SIMMONS: Mr. Caro did proceed to trial. I think had he been allowed to enter a plea in exchange for something other than a sentence of

JA 819

death, he would have petitioned this court to change his plea from not guilty to guilty and accepted that sentence.

THE COURT: What does the Government have to say to that?

MR. BROWNLEE: We would object. First of all, under Rule 410 it says use it against the defendant. We just belief in this context the plea letter such as this should not be admitted. First of all, it's not a statement of the defendant; it's a letter from his lawyer to us. So, it's not even direct evidence of his own statement. We believe that if the defendant wants to testify, he has a right to testify, but to put in something like this, we believe, falls under, it's a kind of allocution that the court has already denied. We think it would be inappropriate. Thank you.

THE COURT: I'm going to refuse the exhibit for the reasons stated by the Government, and I don't believe that it is relevant to any of the issues before the jury currently in this sentencing hearing.

MR. SIMMONS: Yes, Your Honor, I would like to make that an exhibit.

THE COURT: Very well. It will be Defendant's Exhibit 20, refused, and it will be kept

separate and not submitted to the jury.

MR. SIMMONS:  Your Honor, the final few documents which I would like to have admitted into the record are the death certificates of Mr. Caro's mother and father.  There had been testimony to their deaths, but this would simply be to verify the dates and the cause of death.

THE COURT:  All right.  Any objection?

MR. BROWNLEE:  Yes, Your Honor.  The United States would object.  I believe that there is evidence in the record that both parents are deceased, and evidence as to both causes of death, but we believe these documents, at this point in time, trying to come in is inappropriate and we would object.

THE COURT:  Let me see the documents, if you'll hand them to the clerk.  Well, I'm going to overrule the objection and admit them.  There's no question about their authenticity, and I believe while there is some evidence about their cause of death, I think it is relevant to, to the sentencing hearing and any mitigating factors.  So, they will be 21 and 22, admitted.

(Defendant's Exhibit Nos. 21 and 22 were received in evidence.)

MR. SIMMONS:  Your Honor, the only other matter I would have before the jury returns, I'd ask that any additional witnesses be instructed not to discuss 9/11 or terrorism, or anything that's not related to --

THE COURT:  I'm sorry?

MR. SIMMONS:  Any additional witnesses, Government witnesses be instructed, the Government not ask, nor they answer, any question regarding terrorism or September 11th.

THE COURT:  Does the Government anticipate that we're going to get into any 9/11 issues?

MR. GIORNO:  No, Your Honor, unless the defense brings it up.

MR. SIMMONS:  No, Your Honor, we're not going to bring it up.

THE COURT:  All right.  Well, we'll have the jury in, then.  Why don't you formally offer these two exhibits, 21 and 22; is that right?

THE CLERK:  Yes, Your Honor.

THE COURT:  And I will admit them before the jury, and then the defendant can rest.  We'll have the jury in.

(The jury entered the courtroom and was seated in the jury box.)

THE COURT:  Ladies and gentlemen, during the testimony of Dr. Cunningham there was some mention of Al Qaeda and 9/11.  I want to emphasize to you there's nothing involving Al Qaeda or 9/11 in this case, it doesn't have anything to do with the case, and you should not be concerned that it does, and should not consider that it does.  So, you can put that out of your minds.

Do you have any further evidence, Mr. Simmons, on behalf of the defendant?

MR. SIMMONS:  We have no further witnesses. I do have two documents I'd like to introduce into evidence.  That would be the death certificate of Mr. Jose Marie Caro, who died on February 21, 1984, and Virginia R. Caro, who died on March 20, 1991, the mother and father of Carlos Caro.  Your Honor, we'd like these as the next numbered exhibits.

THE COURT:  They will be admitted.

MR. SIMMONS:  Your Honor, we have no further proof.

THE COURT:  The defendant rests, ladies and gentlemen.  And any rebuttal evidence by the Government?

MR. GIORNO:  Yes, Your Honor.  We call Gregory Hershberger, please.

GREGORY HERSHBERGER, GOVERNMENT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. GIORNO:

Q    Good afternoon, sir.

A    Good afternoon.

Q    Would you state your full name for the jury?

A    Gregory L. Hershberger.

Q    And that's H-E-R-S-H-B-E-R-G-E-R?

A    That's correct.

Q    What is your occupation or profession currently?

A    Currently I'm retired from the Bureau of Prisons.

Q    When did you retire from Bureau of Prisons?

A    I retired in October of 2004.

Q    Okay.  And how long did you work for the Bureau of Prisons?

A    It was a little bit more than 26 years.  I started in 1978, and until October of 2004.

Q    And can you describe briefly for the jury what kind of experiences you had, kind of jobs you held in the Bureau of Prisons during your tenure with the Bureau?

A    I had a lot of different jobs.  I started in the financial area.  I went out to various institutions, moved around the country, was an associate warden in

Petersburg, Virginia, El Reno, Oklahoma, then I was warden in Otisville, New York, began a new institution in Brooklyn, New York, a detention center. I was a warden at the Medical Center for federal prisoners in Springfield, Missouri, and then went to the United States Penitentiary Administrative Maximum which we typically refer to as ADX in Florence, Colorado as warden. And following that I was promoted to Regional Director of the North Central Region, which is headquartered in Kansas City, and as part of that responsibility I was over 18 federal prisons in the north central part of the country.

Q    In your role as Director, North Central Regional Director were you over Terre Haute?

A    Yes, sir.

Q    That's where federal death row is located?

A    Yes.

Q    You told the jury that at least for a period of time you were the warden at ADX in Florence, Colorado. That's the high security prison out there.

A    That's the most secure penitentiary that we have in the federal prison system.

Q    What exactly do wardens do? What is a typical warden's responsibility?

JA 825

A    Well, it's a job where you have a lot of responsibilities, essentially, for everything that goes on inside the facility.  You're responsible for hiring people, for disciplining staff.  You're responsible for making sure that all of the operations at the facility occur, the food is prepared correctly, the maintenance of the facility is done.  It's just a broad range of responsibilities, but essentially everything that goes on at that particular location is the responsibility of the warden.

Q    I take it that part of that includes making sure the facility is secure both for the inmates that are there, the staff that are there, and also make sure the inmates don't commit any further criminal acts?

A    That's correct.  It's always a very high priority to make sure that we operate safe and secure institutions to, as you suggest, not only to protect the people working there, but also the public outside these facilities.

Q    From your training and experience did you become aware of the basic premises, the basic philosophy that governs the operation of the BOP facilities?

A    I believe I have, yes.

Q    During your tenure as warden and at the North

Central Regional Office were you also aware of the regulations, both internal and those promulgated by Congress, to govern the operation of BOP facilities?

A    The Bureau is governed by a variety of regulations, and in some sense we're a policy driven agency because we operate based on those policies rather than on personalities in various positions.

Q    Okay.  Have you previously testified, Mr. Hershberger, as an expert with regard to the operations, facilities that are available within the Federal Bureau of Prisons?

A    Yes, I have.

Q    You've been accepted as an expert by various federal courts?

A    Yes, I have.

MR. GIORNO:  At this time we'd offer Mr. Hershberger as an expert in the operation of the, operation of the Federal Bureau of Prisons.

THE COURT:  Does the defendant desire any voir dire?

MR. SIMMONS:  No, Your Honor.

THE COURT:  Very well.  You may proceed.

BY MR. GIORNO:

Q    I notice with regard to the operation of the Bureau of Prisons, does the Bureau of Prisons view

JA 827

confinement as a punishment?

A    Well, we have a saying, or I learned it when I went to my first training class down in Georgia, and that was that inmates are sent to the Bureau as punishment, not for punishment.  The implication being that we don't punish inmates by the way we treat them inside the facility.  They're already there as part of the punishment of their sentence.

Q    Okay.  So, basically they're treated as human beings even though they may be confined for some offenses?

A    Yes, we strive very hard to create a humane environment where we preserve the dignity of the individual.

Q    Do you have things called dog pens in the various federal prisons?

A    No.  We had some dogs that we used for drug sniffing, and things like that, but they no longer use them.

Q    Okay.  You don't have dog pens to secure the inmates in any prison; is that correct?

A    No.  That's an absolutely inappropriate use of the term, and I think is very demeaning and unprofessional.

Q    I know you are aware of the different levels of

community, and the jury has heard something about camps, and that's the low level; is that correct?

A    Yes.

Q    There are FCI, Federal Correctional Institution?

A    The Federal Correctional Institutions are low security, medium security.  Camps are minimum, USPs, United States Penitentiaries are high security facilities.  There's also another category to kind of lump the institutions that don't fit in those four securities, we call them Administrative Facilities. They could be Metropolitan Detention Centers where we hold pretrial inmates where they're awaiting trial, it could be Medical Facilities where inmates go for medical treatment, and then the ADX in Florence is also considered Administrative, and by definition, Administrative Facility can handle any type of inmate that is sent there.

Q    Is it fair to say that the, when inmates are classified -- the wardens don't do classification of the inmates, do they?

A    No.  They review, their staff reviews the classification on a regular basis, but the initial classification is not done by the wardens.

Q    When you're classifying an inmate, or deciding where to send him or her, what is the intent of the

Bureau of Prisons as far as where they place them with regard to the level of security?

A    Well, what we do is, is we take the orders of the court, we look at the background information of the inmate, the severity of the offense, past criminal history, whether there's been any escapes, the types of things you would imagine we would look at.  We put this into a, to essentially it's a computer program that spits out a level, and what we're trying to do is match up the needs, the security needs of that inmate with the institutions that have that security.  So, if an inmate scores out as a low security inmate, then we want to put him in a low security institution; a high security inmate in a high institution, and so forth.  It's just a process that's done, and there are certain checkpoints in the system to make sure that we don't have a very serious offender who may score out very low in this system, that gets into an institution where he can harm the public.  So, we have a system called Public Safety Factors, you may have heard of that, and all that does is to make sure that we protect the public by putting them in the appropriate institution, even if the score isn't quite correct.

Q    So, it's basically, I'll use the term least

JA 830

restrictive environment, you want to put someone in a level of security that Bureau of Prisons deems appropriate to control that particular individual?

A    The reason is the higher you go up on the security continuum, the more intensive the resources it takes to operate those facilities, you have more staff, there's more infrastructure, so we want to put people where they need to be.  If the person needs high security, we want them there, but also if they need low security we don't want to tie up a high security bed because it costs a lot more to do that.

Q    When you place an inmate in an FCI you assume he can be controlled there?

A    Yes.

Q    What happens in those instances where someone misbehaves in an FCI?  Can you consider placement in a USP?

A    Well, there's, there's a disciplinary process that, again, is in policy.  An inmate is advised of those responsibilities when they enter the institution.  If there is misbehavior that is documented in what we call an incident report. There's a hearing process, and as part of that hearing process various sanctions can be given.  It could range from anything from not allowing an inmate

to have telephone calls, or commissary, or restricting them to a Special Housing Unit for a period of time, but it could also include a disciplinary transfer to a higher security facility, as well.  So, there's a range of options.

Q    But one of the options is, you call is a disciplinary transfer to a USP.  I'm assuming there's more control over the inmates, more monitoring out of a USP?

A    That's correct.  There's greater numbers of staff.

Q    Is there a more secure part of a USP?  If someone misbehaves at a USP are there places within the USP where that person could be sent to for discipline or other reasons?

A    You may be thinking of a Special Housing Unit. We have Special Housing Units in virtually every facility, and that's the most secure portion of that facility in any institution.  Penitentiaries have Special Housing Units, as well.  But generally all of our Special Housing Units are designed for short term interventions.  An inmate may be placed in a Special Housing Unit while an incident report is being investigated and adjudicated.  They may serve a period of disciplinary segregation there.  But

generally they're in and out of there in a relatively short time.  The exception may be is if there's conflict between that inmate and other inmates on the compound in the general population, the inmate may be in the Special Housing Unit for his own safety for a period of time until an adjustment can be made either by transfer or whatever they work out.

Q    Generally speaking, though, the United States penitentiary is an open environment, the inmates can, they have their jobs, they come into regular contact with other inmates and staff; is that correct?

A    It's a very open environment.  A person gets up in the morning, they go to breakfast in a large dining hall with four or five hundred other people, they go to work, generally have a job assigned to them during the day, go to work, and at the conclusion of that they go back for the noon meal.  I mean, it's, it's all kind of movement going on, and our staff are, are right in the middle of our inmates supervising them, and so forth.

Q    If you take someone from that open environment in the USP and put them in the SHU, there is more control of that inmate's activities there in the SHU, Special Housing Unit?

A    Well, yes.  A SHU, by definition, is a

JA 833

restricted entry and exit for the inmate.  Even a supervisor has to sign the person in there.  They can't just be released on their own, and so forth. And then they're typically confined in a cell with either by themselves, or with one other person, and, you know, there's not much exit from that cell other than recreation.  So, it's a much higher level of security than the open population status.

Q    Now, you mentioned that you were the warden out at the ADX?

A    Yes, sir.

Q    And how long were you the warden out there?

A    Oh, probably about a year and a half.

Q    Okay.  And you became familiar with all the facilities out there at ADX?

A    Yes.

Q    Can you describe for the ladies and gentlemen of the jury who goes, who goes to ADMAX?  Do they send everybody, all the bad guys, do they go to ADMAX?

A    Well, no.  That's not quite the way it works. The ADX is designed to house those individuals who can't function in open United States penitentiary settings, so using your example from a medium to a USP, and a person who is working there, and then he can't function in a USP, the ADX, then, is an

JA 834

opportunity for that person to go, work himself through a program, demonstrate some responsibility, and then we can perhaps put him back into an open population, you know, after a period of time.

Q    Okay.  Is ADX intended to be a permanent placement?

A    No, no, not at all.  The ADX is, you know, it's primarily for those who assault other inmates, have killed other inmates, assaulted staff, been involved in escape attempts.  They need more security than an open population.  They're a little bit older than, than our population in our other facilities.  They're serving longer sentences.  It's just a more violent group of individuals.  But given that, they still go to the ADX, and the expectation is that they will return to an open population after a period of time. We don't have a permanent assignment to the ADX.

Q    Just to give the ladies and gentlemen of the jury some perspective of the relative size of the ADX, approximately 490 cells?

A    Yes.

Q    That includes 78 cells in the Control Unit?

A    Yes, it does.

Q    And the total inmate population, federal inmate population would be --

A    Well, in federal facilities within the last couple of weeks there's about 163,000 inmates, so, you know, you do the math, it's between a fourth and a third of one percent.

Q    Does the Bureau of Prisons operate any facilities in the country that are identical in terms of their confinement to the ADX?

A    No, they don't.

Q    I know they have a prison at Marion and Leavenworth.  Aren't those pretty high security places?

A    Well, yes and no.  Let me explain.  There's been mission changes at Marion recently, and it's my understanding it had served the function of the ADX, prior to the ADX opening, so it was a very high security facility.  It has been changed now, and it's my understanding that's going to be a medium security facility.  At Leavenworth, similarly, that was one of our old line penitentiaries.  I think we've all heard of Leavenworth.  It's kind of a symbol of federal prisons, and served a function for a number of years in a very positive way.  But due to population changes, and so forth, the Bureau made the decision that that's going to become a medium facility, as well.  So, right now neither one of those are going

JA 836

to be penitentiaries.

Q    Where will the people from, who were in the higher levels of security in Marion and Leavenworth, where will they go?

A    Well, what's happened, and it's already happened at Marion, many of those inmates were sent to other institutions such as USP Lee, and USP Beaumont, and Terre Haute, and various places around the country. And then there were a number of them sent to ADX, as well.

Q    So, those, like Marion, Leavenworth go off line, some of those inmates are going into ADX?

A    That's correct.

Q    All right, sir.  I believe there's been testimony here about the ADX, and there's something called general population at ADX?

A    Well, let me explain what that is.  There's essentially a couple of programs at the ADX.  One is the Control Unit, which you may want some information on later, but right now the primary program at the ADX os a program where the inmates come in for violating various rules, as I've described, assaulting other inmates, killing other inmates, escaping, so forth.  And the program there is to get them in, work them through a minimum three year

JA 837

program and out to another open penitentiary.

Q    Wait a second.  Did you say that also includes inmates that have killed other inmates?

A    Yes.

Q    Okay.

A    And the general population part of this is the first step that they go to.  It's a little bit of a misnomer because we think of general population being out in the open, and walking around, and so forth. But there's four general population units, 64 cells each, and an inmate goes in there first, and stays in that unit for a minimum of up to one year, or a minimum of one year, and then they're eligible for a movement through the Step Down Units there at the institution.

Q    Okay.  So, there are Step Down Units, as well, from general population?

A    Yes, sir, there are.

Q    Are you familiar with the regulations governing the operation of the Step Down Units?

A    I'm not sure it's in regulation.  I know it's in Bureau policy.

Q    Probably an institution supplement?

A    Yes, sir, I'm familiar with that.

Q    This, I believe, has been introduced as a

defense exhibit.  This is a copy of a defense

exhibit.  It is an institution supplement, and it

says, "To establish application guidelines for the

units which are designated as the general population

and Step Down Units"?

A    Yes, sir.

Q    Can you tell the ladies and gentlemen of the

jury what the date of that document is?

A    October 13, 2006.

Q    Okay.  This institution supplement, this is

something that's internal to the Bureau of Prisons?

A    An institution supplement is a local policy that

supplements a national policy.  So, an institution,

it references, probably references on the front page

BOP policy that it's a supplement to, so that's all

it means, an institution supplement is specific to

that institution.

Q    But you, as a warden are, as with all the folks

out there, since you worked at the Bureau of Prisons,

these are intended to guide your actions as far as

how a particular program is administered at a

particular institution; is that correct?

A    That's correct.

Q    This document I asked you about specifically

relates to the ADX in Florence, Colorado?

A      Yes, it does.

Q      You mentioned general population, you talked about Step Down.  I want to show you, this is paragraph B, this talks about an Immediate Unit, and are these the regulations that govern the Immediate Unit, or the type of protocols for people on the Immediate Unit?

A      Yes, that would appear that's the case.

Q      When it talks about the Immediate Unit, I believe the next one below that is called the Transitional Unit.  What is the role of the Immediate Unit and the Transitional Unit in as far as the step down process?

A      Essentially what you have in this ADX program is you begin an inmate with very limited contact with other inmates, and very limited contact with staff while they're unrestrained.  As they progress through these Step Down Units they have increasing amounts of unrestrained contact with other inmates first, then with staff.  By the time they get into this last level, whatever it's called, Transitional, they have much more unrestrained contact with staff and with other inmates than they did in the general population units.  It's an attempt to have inmates demonstrate some responsibility, that they can behave around

other people, other staff, follow their instructions, and so forth.

Q    So, it goes from general population, to immediate, to transition, and then from there, when they finish the transition period, and they've had this additional contact with inmates and staff, where do they go after that?

A    It's my understanding that they now go to the, to a special unit at the institution next door to the ADX.  It's on the same site there in Florence, but it's a separate institution.  And you may be aware there's four institutions at Florence, so they would go to that one for the last year of confinement in the program.

Q    If you look at the screen there to your right, Mr. Hershberger, this is paragraph D, talks about Step Down Unit program placement and advancement, the third full paragraph down, it talks about when an individual leaves that three stage, the transition stage, it says he goes to placement in the Pre-transfer Unit at USP Florence.  USP Florence is not ADX; is that correct?

A    No, no.  It's an institution next door to the facility.

Q    Okay.  So, once they complete these, looks like

each of the programs according to this, 12 months each, 12 months in general population, 12 months in the immediate, and 12 months in transition, then it's anticipated they would leave ADX to go to this pre-transfer unit at USP Lee; is that correct?

A    That's correct.

Q    From that Pre-transfer Unit, what is the goal of the Pre-transfer Unit?  Where are the inmates expected to be?

A    From that unit they would be transferred back to other open units in United States penitentiaries throughout the country.

Q    They would be back in a USP like USP Lee?

A    Yes.

Q    This process you've described from general population through the step down to a, to a USP, you mentioned something called the Control Unit?

A    Yes.

Q    Now, as far as the, the conditions of confinement, the security, if you will, and the Control Unit, how would you compare that to the level of security in the general population at ADX?

A    Well, the physical security is virtually identical.  The cells are, are constructed the same, the layout of the unit is very similar, there's a

little, it's a little bit different than the general population units, but the cells are the same. The primary difference is that the inmates are escorted out of their cells under different requirements than they are in the general population, for example there's a third officer present versus two in the general population unit, and so forth. So, it's a higher level of supervision, is the primary difference between the Control Unit and the general population. The other thing is the exit from the Control Unit, that process is much different than the general population Step Down Unit process.

Q    Okay. So, it's a separate process?

A    Yes.

Q    What is the end goal? If a person is in a Control Unit as opposed to general population, do you stay at ADX forever, either in one of those places -- what's the goal of an inmate put in the Control Unit?

A    The goal of each program, and specifically the Control Unit, is to, to return the inmate to an open population institution. The Control Unit just does it differently than the other program, the general -- when I say the other program, I'm not sure what to call it, I guess it's the ADX program where you go from the general population through Step Down Units.

JA 843

In the Control Unit, you're placed in the Control Unit for a number of months based on the seriousness of the charge that brought you to the Control Unit, and then each month their behavior is evaluated to see what kind of responsibility that they have, and so forth, and, you know, whether they're programming, whether they're taking the advice of staff, and getting involved in education and psychology programs, and various opportunities for self improvement, and at the end of that process, then, they are returned to an open population in the penitentiary.

Q   Okay.  Does, does an inmate have the right to appeal his placement in the Control Unit?

A   Yes.  He has a right to appeal the decision of the hearing officer initially, and then he has the right to appeal the decision of the executive panel that formally puts him into the Control Unit.

Q   Okay.  I want to -- but ultimately, the goal of ADX, whether it be the general population or Control Units,  is to get them back into an open environment for USP?

A   Well, yes.  And control their behavior such that they can function successfully in an open population.

Q   Okay.  Now, with regard to federal prisoners

assigned to, to ADX, you said they have certain services, the right to certain services?

A   Yes.

Q   Okay.  And can you tell the ladies and gentlemen of the jury, briefly, what types of rights they would have if they're there in the ADX and the Control Unit?

A   Every federal inmate in the system has the opportunity for visits, they have the opportunity for correspondence out, receiving correspondence, magazines, so forth.  They have opportunity to purchase commissary.  The items on the commissary list may vary a little bit depending on what institution you're in.  They have a right to medical care, to make sure that their health is being looked at.  Obviously, food service, and recreation, and education, and religious services, and so forth are all provided to inmates.  Now, at the ADX it's a little different than in an open population.  In an open setting people can travel to where religious services are, or walk, in other words, to where education -- at the ADX we bring those services to the cell and provide them there, usually over a closed circuit television.  But the services, the opportunities are essentially the same.  They're

JA 845

provided in different methods from, at the ADX versus an open population.

Q    Okay.  And in the ADX, too, I take it during this step down transition process, talking about someone who is in general population, they have increasing contact with staff and with their fellow inmates; is that correct?

A    Yes.

Q    The size of the group just progresses as they progress along?

A    That's correct.

Q    Even when they're in the Control Unit they have access to someone who cuts their hair; is that true?

A    I'm sorry, I didn't catch that.

Q    Even when they're in Control Unit they have hair cuts?

A    Yes, sir.

Q    If they need medical assistance do they get medical assistance?

A    Yes.

Q    Do they have access to clergy in the Control Unit?

A    Yes.

Q    Do they have a right to have work assignments in the Control Unit?

A   But the staff in the Control Unit will select, perhaps, one inmate on each range to clean the floors and pick up whatever trash, and so forth, so the range orderly would be about the only work opportunity, realistically.

Q   In the Control Unit?

A   Yes.

Q   What about when you're in the step down process? Do you have work opportunity there?

A   That's fairly limited, as well.  There was a UNICOR program, and UNICOR is the factory program in the Bureau of Prisons, that's what it's called, but I believe that that has been changed now since they moved the Pre-transfer Unit to the USP Florence.

Q   So the UNICOR and that pre-transfer step is no longer within the physical confines of ADX, it's now at USP?

A   I can't testify with certainty to that, but that's what I believe to be true.

Q   To your knowledge does that program exist at USP or ADX --

A   Oh, at the USP it definitely exists, I know that.

Q   We talked about levels of security at these different places.  Is the concept or the use of a

JA 847

Control Unit something that's new with ADX, or has there been, has the Bureau of Prisons used Control Units in the past?

A    Well, we've used a Control Unit for a number of years.  I don't know the exact year that it started, but we used a Control Unit back at Marion when Marion had the mission that the ADX now has.  So, it's been a number of years.

Q    The conditions of confinement similar at Marion before they moved it to ADX Florence?

A    Yes, they were.

Q    Okay.  And based on your experience were there problems with inmates committing crimes or engaging in disruptive behavior at Marion?

A    Yes.  We, we had some problems at Marion. Perhaps the most significant was we had two officers murdered in the Control Unit in two separate incidents on the same day, and two staff members very seriously wounded in those attacks.

Q    In response to those did the Bureau of Prisons implement policy to make sure that did not happen again?

A    Well, we looked at what happened.  I wasn't in a position to be on an after-action at that point because it was early in my career, but what the

Bureau of Prisons did was change the restraint procedures on inmates. At that time inmates were restrained in front, we would handcuff inmates in front when we were transporting them. We changed that to handcuff inmates in the back, to have an officer hold on to the handcuffs as they're being transported. Things like that were done. I believe, also, at that point we authorized the staff in a Control Unit, and in a Marion type setting, later ADX setting to carry the batons for personal protection, and to help if there was an assault, and so on. So, there were some changes made.

Q    I take it the security, I mean, in terms of the physical plant, is very secure at both ADX as it was at Marion; is that correct?

A    Yes.

Q    And even at ADX, have there been any problems there since it opened?

A    Well, inmates occasionally lash out at staff. One of the things we try very hard to do at ADX, and I say we've been mostly successful, you're never 100 percent successful, but mostly successful in keeping weapons making material away from inmates. If they don't have any metal, they can't make a metal shank to use against staff. The net result of that

JA 849

is they use whatever is available, and so it's not uncommon for an inmate, if they want to strike out at staff, to throw their own bodily fluids, and so forth, on a staff member. Or a food tray, we pass a food tray into the inmate three times a day, to keep a food tray and throw it out at the officer, or to break it and use it somehow as a weapon, so those are generally the types of situations that we see.

Q   Okay. Would it be fair to say that no system that the Bureau of Prisons has been able to devise to control the inmates is completely failsafe?

A   Well, in my career, and based on my experience, I would say that's accurate. It seems like as far as we try, these guys will, will come up with something that we haven't thought of.

Q   Is, from your experience, is the -- of course, you guys go to great trouble to train guards and staff out there at these facilities; is that correct?

A   Yes.

Q   With all this training that you give them, are they able, in your experience, to prevent inmates from doing anything that would jeopardize either other inmates or, or staff, or anything like that?

A   Well, we do a lot of training in how to talk with an inmate, how to defuse situations, how to

identify situations.  Just for instance, there's been a great push in the last few years in terms of suicides, in reducing inmate suicides, so we did a lot of training with our staff, how to notice things, what's the protocol you go through once that's identified, and I think as a result of that our level of suicides in the prison system declined.  So, training can be very helpful in these high security operations.

Q   I take it, though, that you're not in the business of giving guarantees as far as the Bureau of Prisons?

A   No, no.

Q   And if an inmate like Carlos Caro were to go to ADX, where the intent is to matriculate him out into USP, while he's at ADX is there any way you can guarantee he won't send out coded messages to his associates?

A   We can try to prevent it, but I don't think we could guarantee it.

Q   Could you guarantee someone like Mr. Caro would not use proxies to send messages to his gang members on the outside?

A   It's very difficult to do that.

Q   Can you completely prevent him from using the

JA 851

mail, or abusing the telephone to communicate to other gang members or family members on the outside, send messages through them?

A   No, I don't believe we could.

Q   Is there any way you can guarantee that someone like Carlos Caro at ADX could not obtain some type of material from which he could either make a weapon or use that particular item, itself, as a weapon?

A   No.

Q   Are you familiar with the death row on, at Terre Haute, Indiana?

A   We refer to that as the Special Confinement Unit within the Bureau of Prisons.

Q   Special Confinement Unit?

A   Yes.

Q   Is Special Confinement Unit, who goes there?

A   Well, inmates who have been sentenced to death are housed at Terre Haute, and there's a unit there, it's been two years now so I have to remember numbers, but I think it's a little in excess of 50 beds, there night be 100.  But it's a fairly substantial number of beds that are there.  Each one of them is single celled.  The security is very similar to the ADX type cells.

Q   When you say very similar to the ADX, are they

single cells out there in Terre Haute?

A    Yes, they're single cells with a, double grills on the front of most of the cells in the Special Confinement Unit.

Q    The only people who go there are people who have received death sentences?

A    In that particular unit, yes.

Q    Is there a step down in that particular unit, where you go back into the USP from that particular facility?

A    No.  The only people that have left that unit have been those who have been executed, or those who have, for whatever reason, had court proceedings that pull them out, and those were changed.

Q    Otherwise will you stay in those conditions of confinement, let's say single cells, is it like the Control Unit at ADX?

A    Well, I never thought of it that way, but the cells are very similar in design, yes.

Q    But that person, unlike the person from the Control Unit, would not step down or matriculate out?

A    There's no step down because we would have to follow the sentence of the court for that individual.

Q    In the absence of any kind of a court intervention on someone who is at that special unit

JA 853

at Terre Haute, what is the only way an inmate could get, get off of that particular row?

MR. SIMMONS:  Your Honor, I object.

THE COURT:  I'll overrule the objection.

THE WITNESS:  The only way that I can think of would be through execution, natural death, or an order of the court that would change the original order.

MR. GIORNO:  That's all the questions I have of this witness.

THE COURT:  All right.  Cross examination?

CROSS EXAMINATION

BY MR. SIMMONS:

Q    Good afternoon, Warden.  My name is Jim Simmons, and I'm going to try to speak up.  I tend to speak a little soft.  I've just got a few brief questions. I'm going to try not to repeat what you've already testified about the Special Confinement Unit, which is at Terre Haute, I believe?

A    Yes, sir.

Q    In the event an inmate were, for whatever reason, taken off that unit, say the sentence was overturned or something, he would then go back through a classification process; is that right?

A    Well, yes.

Q    The classification within the Bureau of Prisons is really the heart of the system, is appropriately classifying an inmate to an appropriate facility with appropriate security and appropriate programs; is that correct?

A    That's correct, yes.

Q    In preparation for this case have you reviewed any documents specific to Mr. Caro?

A    About the only thing I've seen, Mr. Simmons, is a referral of the warden to the ADX, and I'm sure I saw some other documents in the U.S. Attorney's Office, but nothing that stands out.  I did have a chance to briefly look at his Central file.  I was just looking for the disciplinary type history, but it was a very cursory review.

Q    Sure.  And just to make it clear, at this point Mr. Caro is permanently assigned to ADX; is that correct?

A    That's my understanding, yes.

Q    He's already been assigned to ADX, and he's back here simply for the purposes of this trial?

A    That's my understanding.

Q    And again, that's the classification system has determined that given his behavior, his conviction, ADX at this time is the appropriate facility?

JA 855

A     That's correct.

Q     And in the prison business, there are never any 100 percent guarantees?

A     Unfortunately not.

Q     When predicting human behavior, you do the best you can with the procedures you have, the policies you have, the classification, you take all the information you can get and you make what you determine at that time is an appropriate placement decision?

A     That's correct, yes.

Q     And I think your words were, in running a prison, high security prison, you, you are a policy driven agency.  When there's an incident, let's say they find a shank on an inmate, as an agency, as a warden you will then want to review what happened, investigate; is that correct?

A     That's correct.

Q     And then based upon that investigation, find out not only what happened, but how and why it happened; is that correct?

A     That's correct.

Q     And based upon the investigation, and the why and how, what you would do is review your policy to determine how to prevent it in the future; is that

JA 856

correct?

A    That's correct, yes, sir.

Q    So, there are instances at ADX and at FCI, and at USP, the procedure will be followed by every warden in the system?  What happened, why did it happen, how do we change that; is that correct?

A    That's correct, yes.

Q    It's always been that way, dealing with prisons, and it always will be that way?

A    I can't say that it will always be that way, but it has been that way in the past.

Q    Just like plane crashes, they still crash, they still investigate, they still try to reach conclusions?

A    I prefer we not talk about plane crashes since I'll be on one here in a couple of hours.

Q    We've talked about the mails, the phones, the visits, et cetera.  Just very briefly, at ADX, or any high security institution, mail is monitored, telephone is monitored, visits are monitored in an effort to control communications, contraband and any illegal activity; is that correct?

A    That's correct.

Q    There's a flaw in the system, the system is reviewed and changes can be made in the policy; is

that correct?

A    Yes.

Q    Again, never 100 percent.  You testified concerning the two officers who were killed in Marion?

A    Yes, sir.

Q    I believe that was approximately 20 years ago?

A    It was in October of 1983.

Q    And in response to that, the Bureau of Prisons made policy changes; is that correct?

A    Yes.  I was thinking one of those changes I described were in policy, but I believe they are.

Q    Procedure and policy changes in order to prevent the, it in the future?

A    Uh-huh.

Q    In fact, at ADX there hasn't been a security offense, correct?

A    No, thank God.

Q    I believe one of the inmates was Tommy Silverstein.  Are you familiar with him?

A    He was one of the killers.

Q    Mr. Silverstein was at ADX while you were warden?

A    No, he was not.

Q    Was he still at Marion?

A    Yes.  No, he was not.

Q    Do you know where he was?

A    Yes, I do.

Q    Where was he?

A    He was at USP Leavenworth.

Q    He was held in solitary confinement; is that correct?

A    Solitary in the sense of not having contact with other inmates, and not having direct contact with staff.  But he had extensive contact with staff.

Q    And Mr. Silverstein now is at ADX?

A    That's my understanding, yes.

Q    So, in spite of your testimony today about all of the programs that are available in the philosophy and goals of ADX which is to be a temporary assignment; is that correct?

A    I missed the question, sir.

Q    Your earlier testimony was that at ADX the goal is to go through a series of programs with the, where the objective is to integrate that inmate back into a less secure facility; is that right?

A    Yes, sir.

Q    Mr. Silverstein, I believe, has killed a guard; is that correct?

A    Yes.

JA 859

Q    He has killed an inmate; is that correct?

A    He's killed more than one inmate.

Q    He's killed two inmates?

A    Yes.

Q    And the Bureau of Prisons, then, will periodically evaluate his security placement; is that correct?

A    That's correct.

Q    Based upon that evaluation, they can either put him into a Step Down Program or they can leave him where he is; is that correct?

A    Well, I'm not sure that I would agree with the Step Down Program, but they could evaluate his housing and make changes as necessary, whether it's in the same place or to another institution, or what the case may be.

Q    Or they can evaluate his housing and make no changes?

A    Well, that's what's happened, yes.

Q    He is still housed in solitary confinement in very secure conditions to your knowledge?

A    Well, I, I react a little bit to the term solitary confinement, because I'm not used to using that term, but he is housed in a manner that is, it's a very high security setting with very limited

JA 860

contact, and no contact with other inmates.

Q    Right.  And the Bureau of Prisons will continue to evaluate him in the future as far as security level?

A    As far as I know they will, yes.

Q    And if it's determined that that's appropriate, then that's the security level where he will remain; is that correct?

A    I believe so, yes.

Q    The point being those decisions were made by the Bureau of Prisons officials as to whether he's taken to any different program than he's in now?

A    Well, his case is a very special case, and the review is a very special review, as well.

Q    Okay.  So, for the policies that you spoke about concerning the ADMAX, in a special case there can be a special review process; is that correct?

A    Well, I guess you could say that.

Q    There are exceptions to all the policies?

A    (Nodded yes.)

Q    And at ADMAX you have testified against the different levels of programs, and I'm not going to go over those again.  But the point being is there's nothing automatic about going from the highest level of security into a Step Down Program; is that

correct?

A    Well, it's not automatic if there's misbehavior, or so forth, but if an inmate shows us some responsibility, then he is progressed down.

Q    And if he doesn't show the responsibility and the conduct which is required or anticipated, he's not stepped down?

A    That's correct, yes.

Q    Okay.  His conduct is reviewed, and a decision is made by the Bureau of Prisons officials?

A    That's correct.

Q    And you were, there was some testimony about an appeal, but actually that appeal was an internal review of the decision making process; is that correct, to your knowledge?

A    What I testified to was, but once that process is completed, then the inmate could appeal that decision into federal court if they wished.

Q    The normal review process is the administrative review within the Bureau of Prisons, and then it will progress to wherever it progresses to?

A    Yes.

Q    Briefly, you testified about the rights of inmates.  Certainly, as far as visitation, telephone, commissary, if an inmate is not behaving

JA 862

appropriately those types of privileges can be withheld, suspended or revoked; is that correct?

A    Well, they can only be withheld or revoked if we go through the hearing process.  They can't just arbitrarily be taken from him.

Q    There are certain rights inmates have, medical care, religious services, which can be revoked, can't be revoked, can they?

A    We have inmates who refuse medical care, which I guess is their right, as well, but yes, I would agree.

Q    Was there a period of time when an inmate who was sent to ADX for killing another inmate, what would be the length of stay at that facility, the initial length of time?

A    In the facility?

Q    At ADX.

A    Well, they'd be in the three year program.

Q    Three year program.  At one time was that a seven year program?

A    There's never been a seven year program at the ADX.

Q    You talk about the design of ADX and all prisons.  They're designed in order to prevent inmates from getting access to materials where they

JA 863

can make weapons; is that correct?

A    Yes.

Q    Okay.  You indicated there are 163,000 inmates now in the federal system?

A    Well, that's just within Bureau of Prisons facilities.  The Bureau of Prisons is actually responsible for 193,000 inmates, but about 30,000 of those inmates are either in half way houses or they're in privately managed facilities.

Q    And are you aware of the approximate number of inmate killings there are each year?

A    Yes.

Q    What is that number?

A    Well, it varies.  If you go back to the early eighties, we've been as high as 16 murders in one year.  Then it can drop down to seven, and back to ten.  It bounces around.  In the most recent past we've had two and three.  I believe last year, 2005, the statistic I saw was 12 murders in the system.  It varies by year.

Q    So, even though it cannot be eliminated, it is being controlled at a minimal level?

A    Well, we can't control totally an inmate's behavior that's intent on murdering another inmate.  But we try to do everything we can to prevent it.

JA 864

Q    In Mr. Caro's situation, I believe, he was originally assigned to an FCI, Oakdale, which is a lower level of security institution; is that correct?

A    It's a medium level security facility.

Q    From there, based upon his behavior, he was sent to a higher level of security which would be a USP, in his case USP Lee?

A    Yes.

Q    Again, based upon security behavior, he was then placed within the SHU at USP, at Lee USP?

A    Okay.

Q    And now he has been transferred to ADMAX based upon his conduct and behavior.  Is that your understanding?

A    Yes, that's my understanding.

Q    Again, that is the classification process within the Bureau of Prisons, is to evaluate an inmate's behavior and then to assign him to an appropriate institution; is that correct?

A    That's correct, yes, sir.

Q    Would you agree that based upon your knowledge of this case, that ADMAX is the appropriate institution for Mr. Caro at this time?

A    At this time, yes.

Q    And as the former warden of ADMAX, would you

agree that ADMAX has the appropriate facilities,

staffing and programs to handle Mr. Caro at this time

based upon his conduct?

A     Yes.

Q     And if Mr. Caro is transferred from ADMAX it

will be based upon a review and a decision made by

Bureau of Prisons officials who make that decision;

is that correct?

A     You mean out of the institution to another

institution?

Q     That's correct.

A     Yes, that is correct.

Q     It is a review process, and if he doesn't meet

the criteria to where the Bureau of Prisons believes

that there's another appropriate placement, he will

remain there?

A     That's correct, yes.

          MR. SIMMONS:  Thank you, sir.

          THE COURT:  Redirect?

                REDIRECT EXAMINATION

BY MR. GIORNO:

Q     Mr. Hershberger, I talked to you before about

the, about security measures at these different BOP

facilities, and I think you said even the best

security is not fail safe.  Is the classification

system fool proof?  In other words, when you assign inmates to what you believe to be an institution, an appropriate institution, that is also failsafe?

A    No, I don't think anything is failsafe when you're dealing with human behavior.

Q    I believe you also made the statement before that if an inmate is, is intent on murdering or harming, it's difficult, if not impossible, to control or prevent that; is that correct?  Where there's a will there's a way?

A    I hate to say that, because I'd like to prevent every murder, but unfortunately I think you're correct.  It's very difficult in that these guys have seemed to have a way of waiting until the opportune time, and taking advantage of staff, or advantage of procedure, or advantage of the facilities.

Q    These 12 murders the defense asked you about, they took place in institutions where the Bureau of Prisons determined, using their best judgment, would be an appropriate level of security?

A    Yes.

Q    The defense asked you about a guy named Silverstein, and he's one of the guys at ADX; is that correct?

A    Yes.

Q    And I wanted to ask you about Silverstein.  Do you recall when it was he was convicted of his first murder?

A    Well, he had -- no, I don't recall when that happened.  It was probably in the late seventies.

Q    Late seventies.  Was that Leavenworth?

A    I believe it was at Leavenworth, and then he was sent to Marion and he had one or two other murders at Marion.

Q    Let me start, first of all, at Leavenworth, his first murder.  Who did he murder in Leavenworth?  Was it an inmate or was it staff?

A    No, it was an inmate.

Q    Okay.  Did he receive a life sentence for that?

A    I believe he did.

Q    Okay.  And after receiving that life sentence you say he went to Marion?

A    Yes.

Q    Was he put in the Control Unit at Marion?

A    I don't believe he went into the Control Unit initially, but my memory is not real good on that exact sequence.

Q    Okay.  But did he murder, after getting this life sentence, and being sent to Marion, did he murder another inmate at Marion?

A    Well, I know he murdered another inmate at Marion in the Control Unit.

Q    Okay.

A    And that's not supposed to happen, either, but it did.

Q    Was he punished for that?  Did he receive an additional term of confinement?

A    I believe he did receive another life sentence for that.  But again, my memory is a little hazy on his sentencing.

Q    Were there alternatives, were there laws in effect at the time that would allow something greater than life back then?

A    There was no federal death penalty for murdering inmates or staff at that time.

Q    So, when he murdered the second person there was no death penalty as an option?

A    No.

Q    After murdering the second person did Silverstein murder yet again after being punished for the second murder?

A    Yes, that's when he murdered our staff member at Marion.

Q    Was there any death penalty at the time he committed his third murder?

A    No, there was no death penalty for that murder, either.

Q    And since committing these three murders, and since the implementation of the federal death penalty Silverstein hasn't committed any more murders?

A    Well, no.  That's why I say we took extraordinary precautions with this individual because he murdered inmates and a staff member in the most secure unit that we had at the time in the Bureau of Prisons, so he needed special security precautions that we just don't give other inmates.

Q    When, after Mr. Silverstein committed these murders, were efforts made within the Bureau of Prisons to use its best efforts, based on all the information they had at the time, to secure Silverstein to make sure he wouldn't kill another inmate or he wouldn't kill any guards?

A    Yes.

Q    I take it despite that you weren't able to stop him from killing another inmate and a guard?

A    After he killed the officer, he has not killed again.

Q    Okay.  And is there, from what you know of Mr. Caro, is he going to be treated the same way as Silverstein?

A    No.

MR. GIORNO:  Thank you, sir.

THE COURT:  Anything further?

RECROSS EXAMINATION

BY MR. SIMMONS:

Q    Briefly, Mr. Caro has been housed single celled since this incident on December 17th of 2003; is that your understanding?

A    I just have no knowledge of that.  But I have no reason to doubt that.

Q    Okay.  It's your understanding since he has been housed in a single cell, and he's been transferred to ADMAX, since that time there have been no further incidents involving Mr. Caro; is that correct?

A    I just have no knowledge of that because I didn't review any of those records.

Q    You met with the United States Attorney prior to your testimony?

A    Yes.

Q    And they didn't advise you of any problems about his housing since this incident; is that correct?

A    I don't believe so, no.

Q    So, apparently since, since this incident the Bureau of Prisons has safely and securely housed Mr. Caro, to your knowledge?

A    Yes.

Q    Thank you.  No further questions.

THE COURT:  Anything further?

MR. GIORNO:  No, Your Honor.

THE COURT:  Thank you, sir.  You may step down.  Anything further from the Government?

MR. BROWNLEE:  Your Honor, just subject to reviewing our documents, at this time the United States would rest.

THE COURT:  Any further evidence?  No further evidence.  Ladies and gentlemen, you've heard all the evidence now in the case.  And I'm going to let you go for the day.  And let me explain to you about what we'll be doing tomorrow.  I'm going to ask you to come tomorrow, be here at no later than 9:30.  You'll hear, then, the closing arguments of the attorneys.  And following that, I'll instruct you as to the law that you are to follow in reaching your decision.

So, ladies and gentlemen, if you'll remember my instructions to you, if you'll leave your notebooks in the jury room, we'll see you tomorrow at 9:30, 9:30 a.m.

(The jury retired to the jury room, after which the following occurred:)

THE COURT: Counsel, is there anything further before we go over the court's instructions to the jury?

MR. KALISTA: Judge, we need to submit our list of mitigating factors.

THE COURT: Yes, sir. When are you going to be able to do that?

MR. KALISTA: I think we would just need a little bit of time to look that over, but I think we would do that this afternoon.

THE COURT: All right. Let me, let me briefly go over the instructions. I've read the written submissions that have been filed by the parties in response to the proposed draft that I sent on February 8th to counsel. One of the questions that has been raised by the defendant is an instruction that would tell the jury that in the event that they are not able to reach a unanimous verdict, as to either the death penalty or to life imprisonment without the possibility of release, in other words, if the jury is not able to determine unanimously between those two options, that the court would automatically sentence the defendant to life imprisonment without possibility of release. As I understand, the Government opposes such an

instruction.  And on reflection I am, I am not going to give such an instruction for the reasons stated by the Government in its opposition.  I think there is an important value in urging, through the instructions, that the jury, too, reach a unanimous decision.  And for that reason, among others, I'm not going to tell them, at least in these initial instructions, of that possibility or alternative.

Let me go over briefly, and some of the decisions I've reached on the submissions.  And again, this afternoon I'll supply counsel with another draft of the instructions, and we'll have an opportunity in the morning to briefly discuss any further questions.

The, the defendant objected to the Government's proposed change to the court's initial draft in which the Government appeared to indicate that the statutory intent factor was an aggravating factor, and I think the defendant is correct on that.  That is not an aggravator, but a necessary intent factor. But I will instruct the jury as to the other statutory aggravators that the Government has earlier proved to the jury.

The, so that I will include in the instructions the Government's suggested change number one, except

as to the intent factor, and that involves the other prior offenses.

The Government also objected to the repeat in instruction number eight that the law never presumes or assumes that a defendant should be sentenced to death on the ground that that is a repeat of other provisions, but I think I'm going to overrule that objection, and I think it's appropriate to place it there in addition to the language in the instructions.

The Government also pointed out that I need a plural "finds" rather than "find" on page three of the verdict form, and I will do that.

Now, the defendant also objected on the verdict form to the description of the victim impact mitigator, and requested that it be described as a significant impact, and that does follow the instructions, and I think that's an appropriate change.

The, similarly as to the future dangerousness, I'll revise that to the following form of the instruction.

The defendant objected to the verdict form regarding remorse, or lack thereof. I, I do intend to instruct the jury that silence, alone, is not

sufficient remorse, or is not to be considered as lack of remorse, and actually was already included in the court's proposed instructions.

The defendant objected to the verdict form language in regard on page five as to the effect that the, whether or not they choose to make written findings regarding mitigating factors, and I agree with the defendant, that I'll revise it to provide that they are to make written findings, regardless of what those written findings are.

And I believe those are the principal objections that have been made. I may also make some additional changes. The form of the verdict form did contain some inconsistent language, upon my further review, because it was originally written to provide a third alternative, that is, a sentence less than life imprisonment. And as I've already ruled, that's not available in this case. And I'll need to make some additional revisions there. So, I'll provide another copy of the proposed instructions to counsel this afternoon by e-mail, if that's agreeable, and then counsel for the defendant is going to provide the form of the mitigators to me this afternoon, and we'll have an opportunity to, then, to finally discuss these instructions tomorrow at 9:00.

So, is there anything further, then, before we adjourn for the day?

MR. GIORNO:  Yes, Your Honor, one final matter.  I think there is a question of how much time the lawyers will be permitted for closing.  I think we've talked to counsel for the defendant, and what we talked about was outside limit of 90 minutes per side.  I don't know that we'll need that long, but at least as we have that as an outer limit we'll know where the lines are; is that correct?

THE COURT:  Yes, sir.  Let's bring up one other point.  Earlier in the trial we had discussions about Juror Number 33.  And is there any further comment from counsel?  What about the defendant?

MR. BROWNLEE:  I think, based upon our observations of him, I think the court's admonition to him was sufficient.  He seems to be doing well.  We have nothing.

MR. SIMMONS:  Your Honor, we have no problem.  We think the admonition was apparently taken to heart, and he seems to be paying attention.

THE COURT:  For the record, let me reiterate what transpired there.  On the first day of the sentencing phase of this trial it did appear, and again, that was during the Government's case in chief

in the sentencing hearing, it did appear that Juror Number 33 was having some difficulty in staying awake in the morning.  It was all right in the afternoon.  And then on the third day of the, again, continuing in the Government's evidence in the morning, he had another problem.  At that time the court indicated that it was considering removing him as a juror.  Counsel, counsel for both parties requested I interview him in the courtroom, and I did.  He, he indicated that he had been not sleeping very well, but that he had been following the evidence, and I admonished him to let me know if he was having any problems.  And since then, and particularly since the defense evidence, he appears to have done all right.  So, based on that, and on the request of the parties in the case, I will not remove him as a juror.

All right.  Is there anything further, then?  Very well.  I'll see counsel at 9:00 in the morning with the defendant, and we'll go over the jury instructions for the final time.  We'll adjourn court for the day.

(Proceedings concluded at 3:15 p.m.)

CERTIFICATE


    I certify the foregoing is an accurate transcript

from the record of proceedings in the above-entitled

matter.



3/22/07                          /s/ Bridget A. Dickert

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION

CLERK'S OFFICE U.S. DIST COURT
AT ABINGDON. VA
FILED

FEB 13 2007

JOHN F. CORCORAN, CLERK
BY:
    DEPUTY CLERK

UNITED STATES OF AMERICA    )
                            )
                            )
    v.                      )    Case No.1:06CR00001
                            )
                            )
                            )
CARLOS DAVID CARO           )

SPECIAL VERDICT FORM REGARDING THE PUNISHMENT TO BE IMPOSED
UPON THE DEFENDANT FOR THE KILLING OF ROBERTO SANDOVAL
(PART TWO)

I.    **AGGRAVATING FACTORS:**

Instructions: For each of the following, answer "Yes" or "No."

Do you, the jury, unanimously find that the government has established the existence of the

following aggravating factors beyond a reasonable doubt:

1.    Do you, the jury, unanimously find that the government has proven beyond a

      reasonable doubt that the defendant caused a significant impact on the family of the

      victim as a result of the murder of Roberto Sandoval?

      Yes: ___✓___            No: _____

                                              _____
                                                  FOREPERSON

Page 1 of 10

JA 880

2.    Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant is likely to commit acts of violence against other inmates or staff within the federal prison system if imprisoned for life without possibility of release?

Yes: ✓_____        No: _____

*[Signature]*
FOREPERSON

3.    Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant has not expressed remorse for killing Roberto Sandoval?

Yes: ✓_____        No: _____

*[Signature]*
FOREPERSON

Instructions: Regardless of whether you answered "Yes" or "No" with respect to the three aggravating factors in this Section I, then proceed to Section II, which follows:

## II.    MITIGATING FACTORS:

Instructions: For each of the following mitigating factors, in the space provided, indicate the number of jurors who have found the existence of that mitigating factor to be proven by a preponderance of the evidence.

Page 2 of 10

JA 881

A finding with respect to a mitigating factor may be made by one or more of the members of the jury, and any member of the jury who finds the existence of a mitigating factor must consider such factors established in considering whether or not a sentence of death shall be imposed, regardless of the number of other jurors who agree that the factor has been established.

The mitigating factors that the defendant contends have been proved by a preponderance of the evidence are:

1.    If not sentenced to death, Mr. Caro will spend the rest of his life incarcerated in a secure federal institution.

Number of jurors who so find: _9_

2.    Mr. Caro exhibited symptoms of failure to thrive as he was a listless and inactive baby.

Number of jurors who so find: _0_

3.    Throughout his childhood, Mr. Caro was exposed to repeated instances of domestic violence and household disruption.

Number of jurors who so find: _12_

4.    Mr. Caro's father was a corrupting influence in that his father's alcoholic, violent, criminal and neglectful behavior was so severe and longstanding that it had a pervasive, devastating influence on the lives of his four sons in that all four sons have criminal records and three of the four have been incarcerated and are currently incarcerated.

Number of jurors who so find: _1_

5.    Mr. Caro was raised in a home where education was not valued.

Number of jurors who so find: _12_

Page 3 of 10

JA 882

6.     Mr. Caro was raised in a poverty-stricken community with limited economic opportunities.

Number of jurors who so find: _12_

7.     Despite the environment in which he was raised, Mr. Caro, throughout his childhood, was an obedient, respectful, well-behaved child at home, in school and in the community.

Number of jurors who so find: _12_

8.     Mr. Caro required special education services and eventually dropped out of school without having completed the ninth grade.

Number of jurors who so find: _12_

9.     According to his 8th grade math teacher, Mr. Caro was a shy respectful student in contrast to his brothers, and their parents showed no interest in their academic progress.

Number of jurors who so find: _12_

10.     The ability of Mr. Caro's mother to nurture her sons was impeded by her repeated victimization at the hands of her violent and abusive husband.

Number of jurors who so find: _0_

11.     Mr. Caro's maternal uncles involved him in illegal drug trafficking.

Number of jurors who so find: _12_

12.     For certain periods of time, Mr. Caro proved himself to be a good father and husband.

Number of jurors who so fmd: _0_

JA 883

13. Mr. Caro has never been physically violent or abusive toward his wife, Yveth, or their daughter, Xinia.

Number of jurors who so find: _12_

14. If Mr. Caro is executed, his wife, children and extended family will suffer grief and loss.

Number of jurors who so find: _5_

15. Mr. Caro was not involved in gangs or gang-related activity while in the community.

Number of jurors who so find: _0_

16. Mr. Caro was not involved in gang-related activity in prison until he was sentenced to thirty years incarceration in 2001.

Number of jurors who so find: _0_

17. Mr. Caro was never a violent or aggressive individual until after he received the 30-year sentence to be served in the Federal Bureau of Prisons.

Number of jurors who so find: _12_

18. During his entire history of incarceration, Mr. Caro has never assaulted or harmed a correctional guard, counselor, or other prison staff member.

Number of jurors who so find: _12_

19. Mr. Caro has never attempted to escape from any correctional officer or from any correctional facility.

Number of jurors who so find: _12_

JA 884

JA 885

20.    Since December 18, 2003, the Federal Bureau of Prisons has properly and securely housed Mr. Caro at various high security federal institutions.

Number of jurors who so find: _____ *12* _____

21.    Mr. Caro is 40 years old, and is less likely, as he ages, to engage in violent behavior.

Number of jurors who so find: _____ *0* _____

22.    Mr. Caro's life has value to his wife, daughter and family.

Number of jurors who so find: _____ *8* _____

The following extra spaces are provided to write in additional mitigating factors, if any, found by one or more jurors. If none, write "None." If more space is needed, write "Continued" and use the reverse side of this page.

1.    _____

_____

_____

Number of jurors who so find:_____

2.    _____

_____

_____

Number of jurors who so find:_____

Page 6 of 10

3. _____

_____

_____

Number of jurors who so find:_____

Instructions: Regardless of your written findings regarding mitigating factors in Section II above, proceed to Section III and Section IV which follow:

III.   **DETERMINATION:**

A.   **Death Sentence:**

Based upon our consideration of the evidence and in accordance with the court's instructions, we find by unanimous vote that a <u>sentence of death shall be imposed</u> on the defendant for the killing of Roberto Sandoval.

YES:   ✓

NO:_____

If you answer "Yes," sign your names here, and then proceed to Section IV.  If you answer "No," the Foreperson alone should sign, and you should proceed to Section III(B):

_____        _____
                                 Nancy Hayden

_____        _____
Kim Woodby                       Patricia Jackson

Page 7 of 10

JA 886

*[Six handwritten signatures:]* Herbert A Davenport, Jo Ella Bray, Roger Church, Janet O. Williams, *[illegible signature]*, *[illegible signature]*, Greg D Philbeck, *[illegible signature]* **FOREPERSON**

Date: 2/13/07

## OR

B.    **Sentence of Life in Prison Without Possibility of Release:**

Based upon our consideration of the evidence and in accordance with the court's instructions, we find by unanimous vote that a <u>sentence of life in prison without possibility of release shall be imposed</u> on the defendant for the killing of Roberto Sandoval.

YES: _____

NO : __✓_____

If you answer "Yes," sign your names here, and then proceed to Section IV.

_____        _____

Page 8 of 10

JA 887

_____          _____

_____          _____

_____          _____

_____          _____

                                   _____
                                          **FOREPERSON**

              Date: _____

IV.    <u>Certification</u>:

By signing below, each juror certifies that consideration of the race, color, religious beliefs, national origin, or sex of the defendant or victim was not involved in reaching his or her individual decision, and that the individual juror would have made the same recommendation regarding sentence for the crime in question no matter what the race, color, religious beliefs, national origin, or sex of the defendant, or the victim, would have been.

_____          _____

_____          _____

Page 9 of 10

JA 888

Nancy Hayden

Roger Church

Greg D Philbeck

Kim Woodby

Date: 2/13/07

JA 889

THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF VIRGINIA
Abingdon Division

```
---------------------------x
                           :
UNITED STATES OF AMERICA,   :
                           :
        Plaintiff,          :
                           :
v.                          :   1:06CR1
                           :
CARLOS D. CARO,             :
                           :
        Defendant.          :   Abingdon, Virginia
                           :   February 13, 2007
---------------------------x   9:00 a.m.
```

JURY TRIAL
BEFORE THE HONORABLE JAMES P. JONES
CHIEF UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

JOHN BROWNLEE, Esquire
U.S. Attorney
ANTHONY P. GIORNO, Esquire
Assistant U.S. Attorney
P.O. Box 1709
Roanoke, Virginia  24008
    For the United States of America.

STEPHEN J. KALISTA, Esquire
P.O. Box 1186
Big Stone Gap, Virginia  24210
JAMES SIMMONS, Esquire
1208 17th Avenue South
Nashville, Tennessee 37212
    Counsel for the Defendant.

Proceedings recorded by Stenography, transcript
produced by computer.

**BRIDGET A. DICKERT**
**UNITED STATES COURT REPORTER**
**180 WEST MAIN STREET, ROOM 104**
**ABINGDON, VIRGINIA 24210**
**(276) 628-5116**

(Proceedings commenced at 9:00 a.m.)

THE COURT: I have provided the parties with revised jury instructions, and I'd like to take those up. In addition, counsel for the defendant has provided the court with proposed instructions regarding mitigating factors.

I have to say, in candor, that these instructions are not helpful to the court. I mean, counsel has presented exactly what I requested not be done, carving these mitigating factors into 34 separate instances, which are overlapping, duplicative, so it looks like we have more work to be done on those. But I'll be glad to hear what counsel has to say. First from the Government.

MR. BROWNLEE: Thank you, Your Honor. As far as the instructions, themselves, the United States has no objections. As far as the mitigation, we filed a response last night --

THE COURT: I haven't seen that yet.

MR. BROWNLEE: We just argued comparable to the court, many of these are overlapping, some of them are not based on the evidence, and so we'd note our objections to many of them. And I think they should be compressed into kind of more narrowly targeted mitigators. I'm not sure how helpful that

is either, quite frankly.

THE COURT: Yes, sir. All right. Mr. Kalista?

MR. KALISTA: We have previously filed a motion urging the court to give certain instructions we had proposed. I think we had done that on a couple of other occasions, and certainly we stand by the instructions we previously offered. Therefore, in terms of objecting to specific instructions, certainly I guess, Judge, we would object to instruction number one, and we would object on the basis in that instruction the court does not instruct the jury as we had requested that they must --

THE COURT: Well, let me interrupt you. I think your previous objections are on the record. I considered all of the previous arguments, and to the extent that the court does not follow your requests, I think those are a matter of record. And I don't, it's really not helpful at this point, at least, to reargue those. And I would prefer if you could focus on any additional matters not earlier raised.

MR. KALISTA: No, sir, there would not be any additional matters not earlier raised by counsel for the defendant.

THE COURT: Now, in regard to the

mitigating factors, as I've indicated, and I'll review the Government's response, but --

MR. KALISTA: Judge, just for what it's worth, I would say that we have considered some of the Government's objections, and I think I've withdrawn a couple of those. For instance, we have withdrawn number four on our list.

THE COURT: Well, I mean, just give me, to give you an example, and I don't want to prolong this, but number six: Mr. Caro was raised in a home environment dominated by his father's alcoholism and drug abuse. Number eight: Mr. Caro's father was a corrupting influence in his father's alcoholic, violent, criminal, neglectful behavior. Number 19: Mr. Caro's father was a violent and abusive alcoholic. How can those not be repetitive? I don't think that's helpful to the jury to ask them to, to instruct them on, on duplicative traits of Mr. Caro's father. And it would be so easy to combine these, these matters.

I mean, certainly Mr. Caro is entitled to a proper instruction about these mitigators, and that's certainly a mitigator in which evidence has been admitted, but just to string it out so that we, you know, you have a whole lot of them, it's just not

helpful.  So, I don't know what else to do except we're obviously not ready to go with the argument here.  Since I'm not getting any help from counsel on this I'm going to have to do it myself.

MR. KALISTA:  I think the court, of course, the Government has indicated they filed some written objections, and I think some of those do address some of these matters.  They have objections to some, and not to others, so we're prepared to take those up with the court when the court is ready to do that.

THE COURT:  Well, you know, I would hope in the spirit of moving this along that counsel could consult, frankly, but I don't know whether that's possible, or not, and present some reasonable number of discrete mitigating factors that the court can instruct the jury on.

But in any  event, what we're going to do is go into recess.  I don't know when we'll be able to get to the jury for closing arguments.  So, we'll be in recess.

(Recess from 9:10 a.m. to 9:55 a.m.)

THE COURT:  I'm advised that the parties have reached some understanding as to some instructions as to the mitigating factors; is that correct?

MR. KALISTA: We've agreed on all of the mitigating factors. We've combined some. I think we have some to argue to the court about, but I think we've substantially taken care of the issue.

THE COURT: Why don't you go over with me, then, what your agreement is. I have your proposed mitigating factors.

MR. KALISTA: We don't have a clean copy of that.

MR. BROWNLEE: That's one with handwriting on it.

THE COURT: Yes, I have that.

MR. BROWNLEE: That's all we have.

THE COURT: Let's go over them briefly here. I have a marked up copy that I assume that counsel has had some input in, as I understand. And again, I'm going over attachment one, jury instructions, mitigating factors that were, was filed on behalf of the defendant. Number one, if not sentenced to death, Mr. Caro will spend the rest of his life incarcerated in a secure federal institution.

MR. BROWNLEE: No objection.

THE COURT: Why don't we do it this way. If I misspeak, or it's not the agreement of the

parties, if you'll advise me.  Number, and I'm using the numbers that appear on the attachment -- of course they'll be renumbered -- number three, Mr. Caro was a listless and inactive baby.

MR. BROWNLEE:  I believe what the language was agreed was Mr. Caro exhibited symptoms of failure to thrive as he was a listless and inactive baby.

THE COURT:  Number five, throughout his childhood Mr. Caro was exposed to repeated instances of domestic violence and household disruptions.

MR. BROWNLEE:  Yes, sir.

THE COURT:  Number eight, Mr. Caro's father was a corrupting influence, and that his father's alcoholic, violent, criminal and neglectful behavior was so severe and long standing that it had a pervasive, devastating influence on the lives of his four sons, and that all four sons have criminal records, and three of the four have been incarcerated and are currently incarcerated.

MR. BROWNLEE:  No objection.

THE COURT:  Number 11, Mr. Caro was raised in a home where education was not valued.

MR. BROWNLEE:  No objection.

THE COURT:  Number 13, Mr. Caro was raised in a poverty stricken community with limited economic

opportunities.

MR. BROWNLEE:  No objection.

THE COURT:  Number 14, despite the environment in which he was raised, Mr. Caro throughout his childhood, was an obedient, respectful, well behaved child at home, in school and in the community.

MR. BROWNLEE:  No objection.

THE COURT:  Number 17, according to his eighth grade math teacher Mr. Caro was a shy, respectful student.

MR. BROWNLEE:  I think it says in contrast to his brothers, and their parents showed no interest in their academic progress.

THE COURT:  In contrast to his brothers -- whose parents?  I'm sorry?

MR. BROWNLEE:  I think it would read according to his eighth grade math teacher Mr. Caro was a shy, respectful student, in contrast to his brothers, comma, and their parents showed no interest in their academic progress.

MR. SIMMONS:  Your Honor, the number six above that, there was no objection to Mr. Caro required special education services.

MR. BROWNLEE:  No objection.

JA 897

THE COURT: Number 21 -- well, am I correct, number 18, the ability of Mr. Caro's mother to nurture her sons was impeded by her repeated victimization at the hands of her violent and abusive husband?

MR. BROWNLEE: United States is objecting to that. We believe that's covered in number eight.

MR. KALISTA: We believe this one is directed specifically to the mother, whereas number eight, I think, is directed primarily to the lives of the four sons.

THE COURT: Well, I'll grant number 18. I think if we're going to go this route, we might as well throw them all in, frankly. Number 21, Mr. Caro's maternal uncles involved him in illegal drug trafficking.

MR. BROWNLEE: United States would object. We believe the evidence in the record is that the maternal uncles were involved in illegal drug trafficking, but there was no evidence in the record that they involved him. It was made in opening statement, but --

THE COURT: I'm going to grant it. Number 22, for certain periods of time Mr. Caro proved to be a good father and husband.

JA 898

MR. BROWNLEE: No objection.

THE COURT: Number 23, Mr. Caro has never been physically violent or abusive toward his wife or their daughter.

MR. BROWNLEE: No objection.

THE COURT: Number four, if Mr. Caro is executed his wife, children and extended family will suffer grief and loss.

MR. BROWNLEE: No objection.

THE COURT: Twenty-five, Mr. Caro was not involved in gangs or gang related activity while in the community.

MR. BROWNLEE: We object to that. We believe the evidence is he was able to send out messages to other TS members in the community.

MR. KALISTA: Judge, he was incarcerated then, and we were actually --

THE COURT: I'm going to grant it. I'm going to grant them all. Number 26, Mr. Caro was never a violent or aggressive individual until after he received the 30 year sentence to be served in the federal Bureau of Prisons.

MR. BROWNLEE: We believe that's not the evidence, Your Honor.

MR. KALISTA: We believe it is, Your Honor.

Basically, that's the starting point as far as the Government's evidence --

THE COURT: Isn't that correct, Mr. Brownlee?

MR. BROWNLEE: Well, Mr. Caro joined the Texas Syndicate in 1995. I'm not so sure that's in evidence, but I think it's improper to make an assertion that we all know is not accurate.

MR. KALISTA: Again, I don't think the joining of the Texas Syndicate is in evidence.

THE COURT: I'm going to grant it. Number 20, since December 18, 2003, the federal Bureau of Prisons has properly and securely housed Mr. Caro at various high security federal institutions.

MR. BROWNLEE: Again, the United States objects. Drug trafficking crimes are defined as crimes of violence in the federal statute, so we believe that's not accurate.

THE COURT: I'm going to grant it. And 28, 29, 30, 31 and 34, I understand the Government doesn't object to?

MR. BROWNLEE: No objection to 34. They've changed that to Mr. Caro's life has value to his wife, daughter and family, and we object to 32 and 33.

JA 900

MR. KALISTA: Judge, we believe that 32 and 33, we're asking that those be given. Thirty-three, I believe, we inserted in there just to make clear what we're asking for, other relevant factors in Mr. Caro's life and background mitigate against the death penalty and for life in prison with no possibility of release. So, that would be the complete statement of 33.

THE COURT: Well, I'm going to refuse 32 and 33. I don't think they're proper mitigating factors. And now these are going to be inserted in the instructions at the, in instruction number seven, beginning at line six, and they will also be placed in the special verdict form in instruction, in part two. And of course I'm going to instruct the jury after argument.

And one other thing, counsel, before we get the jury in and begin argument. The court security officer advised me this morning that Juror Number 33 advised him yesterday as they were leaving, I believe, that he, the juror, had felt very anxious during the afternoon's session; that he felt that he was having some anxiety problems and he might have to leave the courtroom today. That's all I know. I'm advising counsel of that. All right. Mr. Bailiff,

JA 901

if you'll bring the jury in, please.

(The jury entered the courtroom and was seated in the jury box.)

THE COURT: Ladies and gentlemen, we're just putting mics on the lawyers so that we can make sure we can all hear them.

As you know, ladies and gentlemen, you've heard all of the evidence in the case, and now we're going to proceed to the closing arguments. And in their closing arguments the lawyers will attempt to summarize the case that you've heard, and in order to help you in your deliberations.

Of course, remember that what the lawyers say is not evidence in the case, but it's important that you listen carefully to them as they present their closing arguments to you.

Now, the, because the Government has certain burdens of proof in this case, the Government's attorneys will go first, and then we'll hear from the defense lawyers, and then finally the Government lawyers will have an opportunity to make final closing arguments to you. So, and we'll, we'll take breaks as we go along. So, if we're ready, then, counsel may proceed.

MR. GIORNO: Thank you, Your Honor. Ladies

and gentlemen, good morning.  At the outset I wanted to thank you sincerely on behalf of the United States for your continued attention throughout this trial. I know it's been, been a long time, a time away from your families, time of driving through the weather, but I want you to know that we appreciate your service.

And we also appreciate the type of case that this is, the fact that you've expressed willingness to sit as jurors in this case, and to discharge your duties in a case of this nature.  That's something that's certainly necessary, and we appreciate your willingness to take on the task.

We are now at the stage of the proceedings, ladies and gentlemen, one of the stages, basically, where it all comes together, where you have to decide whether from the evidence in this case, whether the death penalty for Carlos David Caro is justified based on the evidence in this case.

And I want to make just a couple of observations up front.  You remember in his opening of the penalty phase, the defense attorney told you this penalty phase would be about who is Carlos David Caro. That's only partially true, ladies and gentlemen. Because as Judge Jones is going to tell you, that in

looking at this case you're going to look at what he will describe as aggravating factors, that being those factors that justify the imposition of the death penalty, and mitigating factors which are those that mitigate against the imposition of the death penalty.

But really to get to that process, it's just not a question of who is Carlos David Caro, that's one of the components, certainly, but this case is certainly about what has David Carlos Caro done. We should never lose sight of the fact, ladies and gentlemen, of the fact because Carlos David Caro cold bloodedly, with premeditation, murdered Roberto Sandoval. We should also look at why he did it. We'll talk about the circumstances as to why he did it. Keep in mind the motive: A disagreement over breakfast. And Mr. Sandoval had the audacity to disrespect Carlos Caro.

And then we put all that together, and consider the who, and the what, and the why, and when it comes to the final thing what you have to decide is how do we punish Carlos David Caro? What is a justified sentence? And I will submit to you, ladies and gentlemen, after you've heard all the evidence and done the weighing, and the factors in this case, that

you will come to a conclusion the only justifiable sentence in this case would be the imposition of a death sentence on Carlos David Caro.

The process that the judge is going to describe for you will be basically a two-step process. The first step is you have to determine what aggravating and mitigating factors have been proven by the evidence. And in making that determination, you can consider, and you should consider, ladies and gentlemen, the evidence from the guilt phase, as well as the penalty phase.

Let's say you have to consider all the evidence that you heard during the guilt phase about the circumstances of the particular offense, and also in addition to the guilt phase, the first part of the penalty phase.

When you do that, you have to make a further determination, do the aggravating factors outweigh the mitigating factors sufficiently to justify the death sentence?

In that regard, ladies and gentlemen, the judge has told you, and I think you consider it, it's not just a matter of a mechanical process of saying, well, let's count up the number of mitigators as opposed to counting up the number of aggravators.

It's a weighing process, and all the factors, ladies and gentlemen, that you consider don't necessarily have equal weight.

You could find the factors exist, but you decide the that factor exists but doesn't really have much weight, with me it's a circumstance that I can consider; but when I weigh that group of mitigating factors, for example, there may be one aggravating factor that in and of itself outweighs those mitigating factors, so it's for you to determine not only do those mitigating factors exist, but what weight to attribute to them.

The judge is also going to tell you, and there will be specific language from one of his instructions, instruction number one, he's going to tell you that if you determine the weighing process does justify a death sentence, you should impose that sentence.

Ladies and gentlemen, I want you always to be mindful of this task. If it is your decision that Carlos David Caro should be sentenced to death, if in fact the weighing process justifies the death sentence, you would not be the first jury to come to that conclusion. It's something that other juries have done. You would not be alone in that regard.

It's something I just want you to remember. And I'm not asking you to do something, you shouldn't feel like you're doing something that has not been done before.

I want to talk about the aggravating factors in this case, and their first category are statutory aggravating factors. Those statutory aggravating factors, if you look at the court's instruction number six, the first set of aggravating factors, which you have already found, by the way, that the Government has proved beyond a reasonable doubt, which is to say that Caro has committed three serious federal drug trafficking crimes, the exact language of those aggravators are set forth in the court's instruction number six. And I'm not going to belabor by reading that to you.

But these actually identify two separate and distinct aggravating factors, both relating to Caro's involvement in drug related activities. You have already found those in the first part of the penalty phase, and you should weigh them in the weighing process as you go along.

The Government has also alleged and offered evidence of what is referred to as non statutory aggravators, and they are, there's an instruction

also instruction number six also talks about that, and is also described in the special verdict form which Judge Jones will give you, take back with you during your deliberations.

The first one referred to is victim impact. Victim impact focused on that non statutory aggravator is the Sandoval family. You heard the testimony of Kirsten Sandoval, if you recall, was the young lady, the daughter of the victim in this case, Roberto Sandoval. She was the spokesperson for the Sandoval family who were all present in the courtroom on the day she testified.

If you recall, his mom was here, his brother, and his surviving sisters. But Kirsten, the youngest of the family, was in here to tell you about the impact the murder of her dad had on the family. No more letters being written back and forth, no more phone calls between father and daughter, no more contact between mother and son. And you remember when Mr. Brownlee showed her photograph of Roberto Sandoval and asked her, "Who is this," her response was, "That's my daddy. That's my daddy."

And as a result of that actions of this man, Carlos Caro, her daddy is no longer with her. She can't communicate with him anymore. A significant

impact on the family.

You will also, ladies and gentlemen, hear non statutory aggravators referred to as future dangerousness. This is the part that focuses on the defendant, Carlos Caro. We've alleged, first of all, that Mr. Caro has been engaged in a continuing pattern of violence and recidivist conduct, and you recall we introduced evidence to establish the following. First of all, there were two prior revocations of supervised release. When I talk about this, when I go through recidivist conduct, ladies and gentlemen, there's a theme in this case. We have tried, we being the Bureau of Prisons, the justice system as such, have tried to control Carlos David Caro, and we have tried to get Carlos David Caro to conform his conduct to what is acceptable in society. And you try different things.

The first time he goes off to jail, commits a drug trafficking crime, he gets back out, he's on what's called supervised release. You remember, we had a stipulation what the probation officer would say. Supervised release is basically something where you're under the supervision of the court, and during that time they try to help you walk the straight and narrow, to be of good behavior. It's an opportunity

JA 909

for you, with the help of the court, to conform your conduct.

But what happened to Carlos David Caro? Two drug trafficking convictions, two terms of supervised release. Both times, both times he gets back into trouble, his supervised release, he's locked up, and he goes back to jail for an additional period of time.

We know that during, during one of his tenures, one of his terms in the Federal Bureau of Prisons, at some point in his life Carlos David Caro assumed not only membership in, but a leadership position in, the Texas Syndicate.

What do we know about the Texas Syndicate? It's not just any group that we see on the street corners in our cities; the Texas Syndicate is labeled and classified by the Bureau of Prisons as a disruptive group, one of the five most violent, difficult gangs in the Bureau of Prisons system.

The Bloods, the Crips, the gangs we hear about, they don't make the disruptive group; the Texas Syndicate is one of the five disruptive groups classified by the Bureau of Prisons, and this man is not just a member, but he's a leader in that.

How do we know he's a leader in that? Because

JA 910

he said so.  You recall the testimony of John Gordon, one of the guards from down at USP, or FCI Oakdale, Louisiana.  Gordon's testimony, I think, was very instructive in this regard, and it also reflects a lot on Caro's attitude.

You remember that Gordon said that he had worked, back in the summer he had worked, back in the summer of 2002, potentially some problems between the Texas Syndicate and rival gangs, the Border Brothers. What he did was he said he wanted the leaders of these gangs to, "Come talk to me so maybe we can resolve this, so we can avoid this violence and bloodshed that's sure to follow if, in fact, these gangs clash."

Who does Texas Syndicate send in?  They send Carlos Caro.  Gordon says, "Look, we need to avoid this.  You need to call off the boys, and stuff, see if we can't talk this out."  What does Carlos Caro say?  "You do what you've got to do, I've got to do what I've got to do."  Three weeks later, three weeks later, ladies and gentlemen, what do we have?  In July of 2002 we have the assault by members of the Texas Syndicate led by Carlos David Caro on members of the Border Brothers and Paisa who had just arrived in the institution.  Okay?

He's in FCI now. They said, "Okay, let's transfer you to a more secure place. Let's send you to someplace where there's more control." And if you recall the testimony of Hershberger, Mr. Hershberger and also Cunningham, what's more security than FCI? United States penitentiary. So, in May of 2003 Carlos Caro is sent to the USP, they're thinking if we send him there, we, the Bureau of Prisons, have more control, we can control them, we can deter his criminal conduct, we can maybe try to conform his conduct to what's acceptable in the Bureau of Prisons. Does that work? No. Because on August 29, 2003, while he's in this more secure, greater control facility, United States penitentiary, he shanks, he and his buddies, they get together and they coordinate and plan and carry out an attack on a rival gang leader, Ricardo Benavidez. They stabbed him 29 times in front of everybody, in front of the cameras. They carried it out. He gets another 27 year sentence for that.

They move him after the shanking of Benavidez in August, they move him to the Special Housing Unit, to the SHU. Again, the SHU was being described as a prison within a prison, the most secure place in the United States penitentiary. No access to weapons,

JA 912

you can't get any plastic shanks, you can't do anything. He doesn't have any access, theoretically. And what happens when he's in the Special Housing Unit, the most secure part of the United States penitentiary where there's the greater amount of control over these guys in the USP? He strangles, excuse me, he strangles Roberto Sandoval on December 17, 2003 with a towel, with a towel. Why? Because Sandoval disrespected him. And those components the Government talks about, we talk about future dangerousness, ladies and gentlemen, with low rehabilitative potential. Again, this is also on the verdict form.

We know, ladies and gentlemen, that the threat of incarceration simply does not deter Carlos Caro's criminal misconduct. We know that, that when he was in Oakdale that he had a 360 month, 30 year sentence. That didn't deter his being involved in the assault. In fact, the defense witness, Cunningham, talked about the fact that another, the threat of incarceration is not going to be punishment, is not going to be a deterrence to this guy's continued involvement, or tends to be involved in criminal misconduct. Just doesn't work on this guy. Locking him up is simply not going to have any deterrent

effect.

To the contrary, ladies and gentlemen, as the evidence has shown in this case, every time the Bureau of Prisons has attempted to control Carlos Caro, to, to bring whatever pressure they had to bear, whatever security they had to bear on him, his response has been that he has defeated those attempts and, and he has been increasingly violent. A gang assault, which led to the shanking, which led to a strangulation homicide, all in increased levels of security brought to bear by the Bureau of Prisons using their best efforts to try to control, to try to deter Carlos Caro.

In fact, ladies and gentlemen, from that I think it would be fair to say in this particular case, based on what you've heard, based on the pattern that Mr. Caro has, is, is that life imprisonment, a life sentence in this case for Carlos Caro would, in fact, encourage more violent acts in the future because what you'd be telling him, essentially, ladies and gentlemen, is that, "I can do whatever I want." His release date, ladies and gentlemen, if he had never been charged with this, we know from the evidence based on the Benavidez incident, and the prior drug trafficking convictions, Carlos Caro would not get

out of jail until May of 2053. If we had never brought this, if you would have found him not guilty he would have been in jail until 2053, at 86 years of age.

Life imprisonment in this case, ladies and gentlemen, for Carlos Caro would actually be no punishment, would be no deterrent. And, in fact, it would validate the boast that he made to the prison officials at Oakdale. I'm going to talk about that in a little bit.

But, basically you recall he told John Gordon at Oakdale after, after the attacks on Paisa, "You really can't do anything to me. You can't do anything to me because I'm already pulling this long sentence so I'm going to do whatever I want." And if you tack on another life sentence with this man, Carlos Caro, it will be like water off a duck's back. You'd basically be telling him, you know, "You killed Roberto Sandoval. We're going to give you a sentence that really doesn't mean anything." An additional life sentence to this guy is validating what he said. It encourages him. "See, I told you. You can't do anything to me. So, instead of getting out in 2053 when I'm 86 years old, I'll get out some time later, assuming I live that long." So, the killing of

Roberto Sandoval would be for naught.  He'd be basically getting a pass for that.

We talk about lack of remorse as being an aggravator.  You know, a lot of times we do things, and you sit around and you say, "Gee, boy, I shouldn't have done that.  I'm sorry I did that."  All of us do things like that.  We, many times we apologize to our family members, our friends, and say "Gee, what was I thinking?  I didn't mean to do that."  Have we seen any remorse at all from Carlos Caro with regard to any of the bad stuff that he's ever done?  No.

Basically, after the murder of Sandoval we had, we had Carlos Caro saying, "Come and get this guy out of my cell, this piece of shit out of my cell.  He stinks.  He's a dead man."  And he's talking to the people there, people there at the prison.  He's talking to his wife.  He's talking to his gang buddy, Raul Rivas.  What's the theme that runs through that, ladies and gentlemen?  The theme is, "Hey, he disrespected me."  It's like his attitude with Gordon, "I've got to do with what I've got to do.  No problem for me, baby.  I've got to do what I've got to do.  Sandoval got in the way and disrespected me. That's what you've got to do."

There's no remorse, there's no regrets.  This is a man who uses violence casually, and then has no remorse about it.  In fact, Cunningham, the defense witness, Mr. Brownlee asked what role does remorse play.  Cunningham says, "Well, I'm assuming Carlos Caro has no remorse."  That's what the evidence tells you.  He simply has no remorse for what he's done.

We know, in regard to the lack of remorse, he taunted guards.  "When am I going to get a new cellie?"  And after the Benavidez stabbing, what does he do?  He sends out letters to this Mr. Gomez who, according to Jackie Guzman, was like the godfather of the Texas Syndicate.  Does he say in there, "Gee, I'm really sorry I had to kill Roberto Sandoval."  He said sorry as far as the Benavidez deal, "We're sorry, that was just a mix up.  We didn't know we weren't supposed to take orders from Tijerina, and please let me back in good standing with the gang."

In fact, ladies and gentlemen, his standing in the gang was more important than the stabbing or strangling of another human being.  That's the priority of Carlos David Caro.

Now, I'm going to talk briefly, if I could, ladies and gentlemen, about the mitigators.  And they fall basically into three areas.  The first area

deals with Mr. Caro's upbringing.  And we heard testimony from a number of people, Mr. Caro's cousins, aunts, an eighth grade teacher.  They talked about poverty, they talked about growing up with an alcoholic father, but they also, ladies and gentlemen, talked about a very loving extended family that Mr. Caro had.

And you know, all of us, we look in our communities, and we don't have to look very far, we look in our schools and we see children, unfortunately, every day in the United States who have circumstances as bad, if not worse, than Carlos David Caro.  A lot of kids that grow up in our communities don't have the advantage of a loving home.  They don't even have the advantage of an extended family.  They don't have grandma and grandpa, and aunts and uncles look after them.

Carlos Caro, growing up in Falfurrias, Texas had that.  You recall the testimony almost to a person from the aunts, cousins, "We'd get together, we'd go to grandma and grandpa's house, we would ride horses together, we would play, we would drink hot chocolate."  There were good times there.  He had that safety net to look after him.  A lot of our kids don't have that.  Even the kids in Falfurrias, I'm

JA 918

sure Carlos Caro wasn't by himself in the circumstances there. Yet you recall the testimony of the eighth grade teacher, Yomeida Martinez. I think the defense lawyer asked her, "Are you nervous about being here?" "Yes, I am." Of all the students that passed through her class for many, many years that she has been teaching in Falfurrias, Texas, Carlos Caro is the only person that she has had to come to a federal court to testify on his behalf because he's facing a capital murder charge, the only one.

And when you talk about Mr. Caro's mom and dad, I don't know, I wasn't there, but it sounds like the dad was, he drank too much and had a propensity to violence sometimes. He was never violent with the kids, but he probably treated the mom worse than he should have, definitely treated the mom worse than he should have.

But the mother, Mr. Caro's mom, I'm struck by the words of Diamantina Razo, one of the aunts. What did she tell you, ladies and gentlemen? She and some of the other family members described her as her being, the mom as being a very sweet lady, a sweet lady, and her exact words from Ms. Razo, you know, "She did the best she could." That's really at this day and time all you can expect from a parent. They

did the best they could.

But then, ladies and gentlemen, it falls to the child, at some point the child grows up. And it's time to stand up on your own two feet to be a man and take responsibility for what you do. You can't blame your parents, you can't blame your upbringing for all the bad things you do. The man, or a woman, you have to take responsibility at some point when you grow up. You make your own choices, your own decisions.

The second area that has an impact on Mr. Caro's family, I want to talk about that in a moment. The third area, the ability of the Bureau of Prisons to control and deter his violent behavior. When you talk about the third impact, you talk about who is Carlos Caro. You heard the family speak about Carlos Caro, and they described him as they knew him on the outside. You have to remember, though, ladies and gentlemen, almost to a person these family members, these aunts and uncles and cousins have not seen Carlos Caro for approximately 20 years. In fact, even his wife, LouYveth Caro has not seen this defendant since 2000. He's not seen his daughter since 2000. And, you know, again, people change. But Carlos Caro today is not the person that they know. The Carlos Caro that they know, ladies and

JA 920

USCA4 Appeal: 16-1    Doc: 32-2    Filed: 12/27/2016    Pg: 327 of 606    32

gentlemen, is the individual who is shown in this defense photograph, the man who, on his wedding day, even though he was facing drug charges at that time, he looks pretty good, he's, he's the Carlos Caro back then, the student they described as shy, the man they described, at least he was for a period of time leading up to that.

But this person shown in this photograph here doesn't exist anymore, ladies and gentlemen. Down through the years, for whatever reason, and through whatever process, what we have in this particular case is this man shown here. This is the Carlos Caro that you have.

You know, at some point Mr. Caro reached a Y in the road. He reached that crossroads, and what he chose to take, ladies and gentlemen, was a path that aligned him not with his family, not with his aunts and uncles, not with his wife, not with his daughter; he aligned with the gangsters. Carlos Caro has cast his lot with the gangsters, ladies and gentlemen. From the mid-eighties on, he was going to be a Texas Syndicate man, and that's where he put his energies, and that's what you have here today, a logical conclusion. And in fact, the gangster, ladies and gentlemen, we're asking you to sentence in connection

JA 921

with these proceedings here today.

Now, the question comes, well, can he be controlled in the Bureau of Prisons?  I suspect the answer to that question is no.  The answer, the next one is why?  The reason he can't be controlled is because the system is not failsafe, and past efforts and controls which I've described for you have all failed.

Every time the Bureau of Prisons, despite their best efforts, their most diligent efforts, they have all failed.  He was involved in the Oakdale riots, the Benavidez shanking, and after that he actually sent coded letters out to his buddies on the outside to communicate with his gang members when he's on the inside.  And again, past efforts and controls have resulted in escalating violence.

You say can he be controlled at ADX in Florence?  You have to remember, ladies and gentlemen -- we talked about Florence.  You have to remember Florence is a very small facility.  It has less than 500 beds, and there are a total of 193,000 individuals who are subject to some Bureau of Prisons confinement.  Even at the ADX it's governed by rules and regulations.  The warden is out there, the people who run that facility have got to operate by those rules.

What do we know?  We know that if, if Carlos Caro goes to that facility he's not going to stay there.  Whether it's through the Control Unit, or whether it's through the general population at the ADX, he eventually, ladies and gentlemen, will, will graduate out, be stepped down out of that facility back into a United States penitentiary just like the United States Penitentiary in Lee County.  If he goes, he can probably still communicate with his gang buddies because we know that despite the best precautions at the ADMAX facility, people send out coded letters.  They have certain privileges which would allow the communication, and also increasing contact.  He can use the telephone.  He can have visitation with his buddies.  He has exercise.  He can use a library.  We know that he can write letters.  He has a right to medical services, and as all those contacts increase, particularly as we go to the step down, that his contact, his access to inmates, his access to staff is going to increase, ladies and gentlemen, and we also know that he will eventually end up back in the USP just like USP Lee unless he harms someone else before going there.  How long is it going to take to do that?

You saw the regulation.  You heard the testimony

of Mr. Hershberger.  Three years, three years for him to be stepped down out of ADX and into a USP.  Can he be controlled with ADMAX?  We know ADMAX is the most secure federal prison, but it's not failsafe, and I think what Mr. Hershberger said, where there's a will there's a way.

And even Mr. Cunningham, the defense expert, said if Caro is at a USP he will present a grave risk of violence.  That's the defense expert.  Cunningham, himself, also said, the testimony was, that risk, that he will continue to be a grave risk for ten to 15 years.  And Hershberger told you, based on his experience as a warden, if Mr. Caro was given a light sentence, he may initially go to ADMAX, but he will be moved out to the USP on a three year program, well within the life of violence of Carlos Caro.

Well, what about this classification system that the BOP has?  The question is can we rely on the BOP to send Caro to a place where he won't kill?  Again, ladies and gentlemen, the Bureau of Prisons, it's their job to protect the community and also protect the inmates.  That's what they do.

I believe Mr. Hershberger said something I found to be instructive, which is people are sent to prison as punishment; they're not sent to prison for

punishment. There are human beings who just so happen to be sent to a particular facility to pull time for a crime they've committed. They deserve to be protected there, and they have rights there. And we know that the system for classification is not failsafe.

How do we know that? Remember Thomas Silverstein, the one who was brought up by the defense attorneys in their examination of Mr. Hershberger? Thomas Silverstein is the man who, at the time he committed his crimes, his murders, there was no federal death penalty. His crimes started in 1979. And what did he do in 1979? He murdered an inmate in prison. And what did he get? Life imprisonment. So, what happened? Okay, you've got life now, Mr. Silverstein, but we know you're a dangerous guy so we need to make sure we control you.

The Bureau of Prisons, using their best efforts, they don't want Silverstein to harm anybody else, but what happens in 1982? He murders another inmate. Well, gee, the system broke down. Silverstein figured out a way to defeat, to beat the system despite their best efforts. They send him, then, to a control unit just like the one at ADX, the most secure part of the most secure federal system in

Marion. What does he do? He murders a guard in the Control Unit.

There was no death penalty during any of these crimes, ladies and gentlemen. If Thomas Silverstein had received the death penalty for the 1979 killing, it certainly would have prevented him from killing the guard, the guard and the other inmate in the later years.

What about Carlos Caro? Can he be controlled, can he be deterred? I think it goes without saying, ladies and gentlemen, we all know deterrence is part of control. Cunningham has told you life sentences will not deter Caro from committing acts of violence. We know that the possibility of obtaining benefits in prison will not deter Caro from committing acts of violence. Fear of sanctions, of any sanctions that the Bureau of Prisons, or this court, can impose will not deter Carlos Caro from committing acts of violence.

What did he tell the people at Oakdale? This is a quote. "I don't give a fuck if they send me to USP. My brothers follow orders. It doesn't even matter if we are prosecuted. I have 30 years to do. I certainly don't care about myself." What's to deter him, ladies and gentlemen, the next time

JA 926

someone disrespects him, the next time someone calls him a name, the next time someone does something he doesn't like?  What's the deterrence?  What can the Bureau of Prisons do that can deter him, to control him?  What's, what makes Carlos Caro afraid?  What is his fear?  He has none.  There is simply nothing the Bureau of Prisons can do to deter him.

There is one thing that we can do.  We know that Carlos Caro, basically, is a predator.  He's a predator through his gang, he's a predator individually, and he will remain a predator unless we can deter him.  How do we deter him?  How can we guarantee, what is the way that we can deter Carlos Caro?  When I say we, this is something I can't do, the judge can't do it, because the question of the death penalty, ladies and gentlemen, is left exclusively to you, the jury.  It's your decision.

He can be deterred if, and only if, ladies and gentlemen, he is sentenced to death in this case. Because if he's sentenced to death, we know from what Mr. Hershberger said that he'll go to death row, which is located in the United States Penitentiary in Terre Haute, Indiana.  They have a special section there for individuals who have been sentenced to death.

What will happen there is he'll be housed in conditions similar to the ADMAX Control Unit, single cell, no access to other inmates, no access to guards, and he will stay there, ladies and gentlemen, until he dies. That, ladies and gentlemen, is the only way, the only way that you can control Carlos Caro. All the other options have been tried, all the other options have been exhausted to no effect on Carlos Caro.

Ladies and gentlemen, I would ask, again, when you go back on your deliberations, and you consider the aggravating factors and the mitigating factors, I would ask you to consider and find that, in fact, the aggravators in this case, aggravating factors outweigh the mitigators.

And if you find that, ladies and gentlemen, as the judge has told you, you should confer the sentence of death because that really is the only fair, just and justified sentence in this case.

THE COURT: Thank you, Mr. Giorno. Mr. Simmons?

MR. SIMMONS: Good morning, ladies and gentlemen. I will try to speak up. In fact, I would like to sit down and simply have a conversation with you, but those are not the rules that we are governed

by. So, I'm going to make a few remarks, Mr. Kalista is also going to address you, make a few remarks. But I would like to be able to answer your questions, and since I can't, I'm going to do the best I can as to telling you what this case is about as we perceive it.

What this case is about, as the prosecution indicated, is it's about choices. And at this stage of the case it's about a choice of not whether Mr. Caro dies in prison. Mr. Caro, by your earlier verdict, by his previous sentences, Mr. Caro will die in prison. The only question is when he will die.

Choices. Mr. Caro has made choices. His wife, LouYveth has made choices, Xinia, his daughter, made choices, the Bureau of Prisons, they made choices. And now you on the jury will make choices.

Carlos Caro, this is the Carlos Caro that is here today. This is the Carlos Caro before he went into the Bureau of Prisons. Carlos Caro, human being. Carlos didn't wake up one day and say, "I want to spend the rest of my life in prison." No, something changed. You heard the proof. I'm not going to go through it all again.

He was born in Falfurrias, Texas in the panhandle, a quiet, shy young man, and never violent.

JA 929

That's uncontradicted. As a young man he just wasn't violent. He was quiet, he was shy, unlike his brothers. His brothers, disruptive, abusive to the school system, to his teachers, in trouble, in prison.

What happened to Carlos? Why did he drop out of school? We know he was in special ed classes, we know he dropped out, we know the brother dropped out, his younger brother dropped out. His mother, his mother tried. I think that's the testimony, she was a good person and she tried. His father, he was an alcoholic, he had a criminal record, he was abusive.

Something happened, something went terribly wrong in that family. You heard the proof. His mother died in a tragic fire. Three of her sons are in prison and couldn't attend the funeral. There may have been good times, but there was something horribly wrong in that family. And I don't know what it was. I'm sure it was a combination of many things: The economy, lack of education, the alcohol, the drugs, the peer influence. But Mr. Caro didn't wake up one morning and decide to be sitting here facing a penalty of death.

He drops out of school, and I think it's very, very predictable at this point in Mr. Caro's life

that he is going to become involved in illegal activity. All the risk factors are there. And in fact, he does. He begins backpacking. Backpacking in Falfurrias, Texas, as you heard, is simply taking bags of marijuana around the borders. And he does it with his brother, and he gets caught.

He went to prison. He got married right before he went to prison, had a child. He got out of prison. When he gets out of prison, what happened? He got out. He got a job, he worked. He violated supervised release. He went back to prison. He got out, he went back to work. He tried. He went back to prison. He got out again, went back to work, and this time he, the marriage fails. He leaves, he deals drugs, he goes back to prison. At this point, again, Carlos Caro is not a predator. Carlos Caro is a drug dealer. A drug dealer who is unsuccessful, but he's not a predator. He gets a 30 year sentence. For Carlos Caro 30 years is the equivalent of a life sentence.

In opening statement, throughout the trial we put on the floor tape and cones to put you into the world of the Bureau of Prisons. It's a world you've never been in, a world you've never experienced. It's an unknown world to those who don't live it,

JA 931

much less do, have no expectation of ever being out of it.

Carlos goes to prison for the final time.  He goes to Oakdale FCI.  You heard the testimony.  FCI, he becomes involved in violent activities, he's involved in a fight, he is put in the SHU, he was transferred to USP, a higher secure institution, USP.  He's involved in a fight, Mr. Benavidez, he's put in the SHU, and Mr. Sandoval is killed.  Surely nothing Mr. Sandoval did justified what happened to him.  We're not here to justify  Mr. Sandoval's death.

And then the BOP isolates Mr. Caro, puts him in a single cell, and they transfer him to ADX.  Since Mr. Sandoval was killed, Mr. Caro, in fact, has been controlled by the Bureau of Prisons.  All of the talk about he can't be controlled is simply not true because, and listen to the testimony, and the fact is that he can be controlled.  He has been controlled, and he will be controlled.

Choices by the Bureau of Prisons, you have heard all of the testimony from experts, from correctional officers, and the truth of the matter is, the Bureau of Prisons has a very, very difficult job, but they are a very efficient and effective organization.  They house over 163,000 inmates, and of those there

are only a handful of inmate deaths each year, and there has been no testimony of deaths of security officers or guards.

You've heard over and over again the testimony about ADX. I'm not going to repeat that. Mr. Caro is assigned to ADX. He's simply in this courtroom for the purposes of this trial. You've heard the testimony there's no absolutes, no guarantees if Mr. Caro receives a life sentence that he will not harm again, that he will not be involved in other activities. Of course, there are no guarantees. There are no guarantees. The analogy we used, you do the best you can, but planes still crash.

Well, the Bureau of Prisons, and I think Warden Hershberger, who is a retired warden, ADX, he was a Regional Administrator, a very articulate, very sincere person, and I think he put it well when he talked about the procedures for the Bureau of Prisons, a very effective organization, their classification system, not perfect, but very effective. It's a cat and mouse game with the inmates. It always has been and always will be.

But if there's an incident the Bureau will investigate it, they will change their policy, they will change their procedure, and they will correct.

JA 933

They are effective in managing violent inmates, as Mr. Caro has demonstrated he is. The Bureau of Prisons will make choices, the Bureau of Prisons will choose where Mr. Caro stays. The testimony wasn't that he would be at ADX for 12 months, or six months, or three months; the testimony was that Mr. Caro will remain in an appropriate institution as determined by the Bureau of Prisons, and if the Bureau of Prisons determines it is not appropriate for him to ever be in a cell with another inmate, he will never be in a cell with another inmate. There are no guarantees, but that's the testimony.

You heard the proof. I think Dr. Cunningham, Warden Hershberger, Jim Aiken, they all said the same thing. Mr. Caro has demonstrated by his conduct that he's a dangerous individual who will require maximum control by the Bureau of Prisons. The Bureau of Prisons has the ability, they have the facilities, and they will control him.

The final choice I wanted to talk about is the choice that you and the jury will make. You will choose whether Mr. Caro dies as a result of his actions. You will choose when he leaves prison. It will be an individual decision that each one of you must make because, as the judge will instruct you,

the prosecution must prove certain aggravating factors by unanimous decision.  Each of you must agree.

Mitigating factors are not excuses; they are simply any fact in Mr. Caro's life and background which would justify a sentence other than death.  And each of you can make that decision on your own as to what is a mitigating factor.

And once you decide there is a mitigating factor, each of you, on your own, can decide whether that mitigating factor or no mitigating factors outweigh everything that is an aggravator.  It is an individual decision that you will make as to what Mr, whether Mr. Caro dies as a result of this incident.

And again, it is not a question of Mr. Caro leaving prison.  Mr. Caro will leave prison in a pine box.  He will never get out.

You saw Mr. Caro's wife, you saw Mr. Caro's daughter, you saw Mr. Sandoval's daughter and family. Killing would simply create more victims.  It's not necessary, it's never required.  You can stop the killing.  You can impose a life sentence.  The Bureau of Prisons can control David Caro; he will not control the Bureau of Prisons.  Thank you.

THE COURT:  Thank you, Mr. Simmons.

Mr. Kalista?

MR. KALISTA: Thank you, very much, ladies and gentlemen. I'm going to be talking, and probably will cover some of the same ground that Mr. Simmons tried to cover. But we both represent Mr. Caro, and we are both individual attorneys with our own individual thoughts about this stage of the process, and you may hear some of these things again that I'm going to go over, but you're going to be making a decision, of course, which is going to be a final decision. You're going to be making a decision about whether someone lives or dies. I'm going to cover some areas, and please bear with me.

Now, I want to follow up on the idea of the individual responsibility that you have, and of course you came here about four weeks ago from a variety of different places, and from a variety of different backgrounds, went through a process and were selected to serve on this jury. You sat here now for approximately two to three weeks listening to evidence, and seeing exhibits, and making decisions that have led to this point in the trial. And now very shortly, of course, the life or death of Carlos Caro is going to be in your hands.

And the judge is going to instruct you on

JA 936

certain things, and as I mentioned, you've been sitting together as a group, and those instructions that the court will give you, of course, you will hear together as a group. And after instructing you, you'll go back to the jury room, and certainly you can take the instructions the court gives you, and ask for any exhibits, and talk about this very important decision that you have to make.

But ultimately, as the court will tell you in this instruction, each of the you must decide the case for yourselves, each of you must decide the case for yourselves but only after impartial consideration of the evidence in the case with your fellow jurors.

In the course of your deliberations, don't hesitate to reexamine your views, and change your opinion if you're convinced it's erroneous, but don't surrender your honest conviction solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

That, ladies and gentlemen, means that each of you, for yourself, has to make the individual decision of whether Carlos Caro lives or dies.

I want to talk a little bit about the instructions as it relates to the aggravating and mitigating factors. Again, very briefly, as far as

the aggravating factors, the Government must prove the existence of the aggravating factors beyond a reasonable doubt.  As far as mitigating factors, the defense, and you will see in the instructions and we'll talk about some here, the defense need only convince you individually by a preponderance of the evidence whether the fact more, it is more likely true than not.  And basically any one of you, any one of you jurors that will be deciding this case can find the existence of a mitigating factor.  And you can even consider factors that are not listed in the instructions if you find some factor that in some way may be mitigating.  And you must consider these mitigating factors.

Now, in the weighing process, when you're trying to weigh, weigh out the decision of aggravators versus mitigators, the court will tell you that's not a mechanical process, it's not simply adding up the numbers and then making a decision.  You have to individually decide what weight to give each factor. And even if you find that all the aggravating factors outweigh the mitigating factors, or that there are no mitigating factors, it doesn't mean that you have to impose a sentence of death.

Death is never required, and you will never have

to explain your verdict to anyone should you decide upon what individual decision you may make.

Now, one of the standards, and it's in the instruction that the court will give you, is that you are deciding, based upon this weighing process, whether there's sufficient justification for a sentence of death. But that decision, what constitutes sufficient justification is left exclusively to each of you. And again, that means that, the term sufficient justification is something you must individually decide based upon consideration of aggravating circumstances and mitigating circumstances. And again, always in the context that a death sentence is never required.

Because of the finality of your decision as it relates to death, I'm sure that you want to be absolutely correct that what you're doing is, is basically going to be a decision that you will have to live with for the rest of your life, and you want to be absolutely correct of the soundness of that decision.

And I mentioned, I think, in opening statement at one point in time, way back, that when you're considering evidence and you're trying to make decisions, you have to make those decisions based

JA 939

upon, and in just the same way that you would make decisions in the most important affairs of your life, and we would ask you to, to decide the fate of Carlos Caro, whether he lives or dies, in that same context. Again, each of you making that decision for yourself.

Now, because death is so final, because, as the judge has told you, that he can't change your verdict, he has to impose that sentence, we believe that you should reserve the death sentence for the worst offenders and the worst offenses. And we believe that Carlos Caro is not the worst offender, and he is has not committed the worst offenses.

I want to look at that a little bit. Now, let's look at Carlos Caro. He is not a thoroughly corrupt individual. And again, I'm going back to the start of his life, raised in poverty, and we all know the importance of a good start for a child in life. The responsibility of every one of us as far as dealing with our children is to make sure they have a loving environment, and as parents we try to give them as much as we possibly can, but we certainly want to have a good family unit with positive values, instilling in those children respect for law, respect for authority, nonviolence, honesty. I mean, we want for our children to be virtuous and good people.

Now, the importance of a father to his son, the importance of having a positive male role model in the family, I think, can't be overstated. Sure, we, we have testimony that Carlos, on his father's side, has basically eight other aunts and uncles. On his mother's side he has approximately 11 other aunts and uncles. His grandparents on both sides sound like very wonderful people. They have large families, apparently they, they enjoy having family gatherings, and it was a loving environment in terms of his grandparents' homes for their children, and certainly I'm sure when this their grandchildren came to visit them.

But Carlos Caro did not live with his grandparents. He lived basically with Virginia and Jose Marie Caro, Jr. in that household, along with his three other brothers.

You've heard the testimony of, first of all we started with the paternal aunts, we started on his father's side, Carlos's father, again, had eight brothers, one brother, and I believe seven sisters. You saw three of those sisters. And they testified about the fact that essentially in terms of being involved in crime, that their brother was involved in crime, he was involved in burglaries, he was involved

in drugs.

And while he was, apparently, not charged with any type of domestic violence that might have occurred back in those days, he certainly was, and I think you'd agree with me, he certainly appeared to be a very abusive spouse toward his wife. And certainly abusive to his children in the sense of their having to witness this abuse of their mother.

Carlos was raised in a fairly chaotic environment, and his father appears to be the black sheep of the family as far as his father's side is concerned.

Education, I think they testified about the other members the family, basically, while they may have had little education, their children certainly went on to have college degrees, but Carlos, Carlos himself, and all his brothers, basically drop out in high school or in junior high school.

The other members of the family were not involved in criminal activity, but again, Carlos and his brothers are involved at some point in criminal activity.

Substance abuse, the other members of the family are, on the paternal side are not involved in substance abuse, but Carlos and his brothers are

JA 942

involved in some point in their lives in that.

And in looking at and deciding whether Carlos deserves the death penalty, I think you've got to consider his upbringing and the type of male role model he had which may have led him upon the path of criminal activity.

His father was a corrupting influence in his life, instead of being the positive, the very positive role model and father that he should have been, or at least tried to be.

Now, again, his mother, good person, did the best she could, but her role as mother had to be affected in some way because of the bad influence of her husband.

Now, let's look a little bit on the maternal side. That's not so clear. We only had one witness there, and that was Laura Perez. Laura testified from a child's perspective, again, she said that her mother was a party gal, and therefore she got left a lot of times being babysat by other members of the family. And Virginia and Jose were her aunt and uncle, and she got left by her mother at their house babysitting her. She mentioned that that was, that occurred several times over the course of her early years that she could recall. And she basically said

that she witnessed personally from her perspective the abusive, first of all, the drunken abusive conduct of Jose Marie Caro, Jr. toward his wife, Virginia. And it terrified her. She just wanted to go in the bedroom and hide. She felt relieved, she felt relieved for her aunt when she found out that he had died. That's how much it had affected her.

And these were conditions under which Carlos and his brothers had to live during their formative years. Again, Carlos, being different from his brothers, you saw the teacher who testified, Ms. Martinez, and she basically said that Carlos in the classroom was respectful, he was not aggressive, he was not violent, he was totally unlike his brothers. He wasn't a good student, but he was totally unlike his brothers who were a handful. They were, his brothers were disrespectful. But Carlos was different.

I think that is a factor that you have to consider in deciding whether Carlos Caro is the worst of the worst offenders that deserves the death penalty. So, please look at that and please consider that.

I want to put up a picture just to illustrate this, and I think it is in evidence, and you've seen

it before. And again, I know Mr. Giorno says, well, you know, this is the Carlos Caro when he's getting married, and this is the Carlos Caro as he is today. But this is Carlos Caro the person, and you can't separate the two. He's subject to every experience we have, ladies and gentlemen, during our lives, affects us in some way. We are the person we are today because of the experiences we suffered in the past, or have occurred to us in the past. Every person that we meet has some influence on us to some degree. And our parents certainly have the greatest influence on us.

Now, again, we talked about, we talked about Carlos's father as being a bad influence on him, but look on the maternal side, and I think Laura Perez identified the people in this photograph, and that was her uncle, Felipe. In fact, this was Laura's brother right there. This she described as a pot head, party guy, pot head. Carlos is right in the middle there with his arm around his brother.

We've heard evidence that Felipe basically, and his brother, Danny, were drug dealers. They were drug dealers. And that is the kind of influence that the maternal side, unfortunately, had on Carlos in his formative years, as well. And is it, is it

JA 945

unusual, or should, would you say, would it be unexpected that a child born under those conditions, and living under those conditions would, at some point, violate the law, especially as it relates possibly to drugs?  And I think you can say to yourselves that that is what led Carlos on the point of being involved in drugs.  And, indeed, what happened when he was a young man, he was backpacking marijuana for his uncles, Felipe and Danny.

If you recall, that was testified to by, by his wife, LouYveth.  So, Carlos Caro is certainly not a thoroughly corrupt individual that has been totally corrupt from the time he was a little boy being involved in violent circumstances throughout his early years, adolescent teenage years.  He was not involved in violence during the time he was with his wife.  He may not have been a very good husband, over all, of course, or very good father because he wasn't there, but when he was there he was not abusive to them, he was not abusive to his wife, he was not abusive to his child.

We get to the point where we're talking about Carlos coming into the federal system as having violated the law regarding drugs.  There's no evidence during his first two incarcerations, I'm

talking about the 24 months he served initially for one drug conviction, and the second drug conviction where he received approximately 71 months, that he was violent, whatsoever in prison at those times. Certainly there's no evidence that he was violent outside of prison even when he was involved in, in drugs. There's no evidence of that, whatsoever.

There's no evidence that he has ever been an escape threat or attempted escape from any correctional institution. And there's no evidence, certainly, that he has ever assaulted or been violent toward a policeman, a correctional officer, or any staff at any institution. Again, he's not a thoroughly corrupt individual that you have to kill.

We get to the point where he enters the system for the third time, though, and that's at Oakdale. I think you have certainly heard evidence about what happened at Oakdale. He's out at FCI, that's a medium security facility, while at FCI basically he introduces himself to the gentleman, Mr. Gordon, that talked to you, as head of the Texas Syndicate there.

You've seen pictures of the fight on the yard, apparently happened at the soccer stands. You saw the picture of the, some blood on the stands, and some blood on the grounds underneath there. It

appears to have been a fight between several inmates. And that case is not prosecuted. And you saw pictures, I think three people hurt, one of those sent to the hospital. Now, again, simply being sent to the hospital doesn't necessarily mean that the person was admitted to the hospital, and I'm sure if he had been admitted to the hospital the Government would have offered that evidence to you. But believe me, we can assume the person was treated at the hospital and released.

But for that he was put in the SHU and transferred to the USP. And that appears to have been his first significant gang activity while he was incarcerated. We come to, he's at USP Lee, August of 2003.

And if you recall, there's the evidence of the stabbing involving Benavidez. The officer testified as to what he saw. You saw videos as to the stabbing, you saw pictures of Mr. Benavidez as a result of the stabbing. You've heard evidence, basically, that Mr. Caro was charged, eventually, with that. He was put in the SHU, certainly on that date, August 29, 2003, and eventually pled guilty to conspiracy to commit murder of Mr. Benavidez.

Again, the pictures that he saw of Mr. Benavidez

where he had been stabbed a number of times, and that involved, that involved an attack upon Mr. Benavidez who was then head of the Texas Syndicate at Lee USP. There were two people involved in the stabbing, Mr. Caro and another gentleman, both of them having shanks. There were apparently five others, Texas Syndicate members who were stopped and found with shanks in the, I guess you would call it the rec area that included the basketball court, trying to get into the passive recreation area.

I want to show you, or read to you, this is the letter that was translated by Ms. Guzman, and in that letter, basically, and if you recall, this is the letter that was written in some type of invisible ink that was sent out of Lee USP, and then because of the, of the front part of the letter there was some suspicion that perhaps this letter was in some type of code, some fashion, and that was the letter that never got to its recipient, but then was sent to the FBI lab, and they were able to raise up on the other side of the letter as to what it said.

The Government certainly offered that as evidence as what could be done as far as sending letters out in prison in some type of concealed fashion, but the text of the letter, I think, is

JA 949

significant, as well, as it relates to what happened to Mr. Benavidez. This is a letter written by Mr. Caro to this Rivas, and it talks about what happened concerning the attack on Ricky Benavidez. It says, "Look, the ones that voted to hit R" -- referring again to Benavidez -- "were LP" -- and that refers to Tijerina, Pancho, another TS member, Snook, another TS member and Rigo, another TS member -- "only he -- referring to Tijerina -- "did not want me to know because I was going to fight him. When I got here to this institution, Tijerina wanted to wire me up to hit R. But I told him to show me some paper. From there on we were bumping heads. To everyone that would arrive here he would run with the same pig lie and tell them I wasn't worth shit, and I shouldn't have been picked up. El Rigo bought this lie. Apparently Tijerina saw in the computer that R was" -- referring to Benavidez -- "a rat. He said look, the officer was playing with the mind of Tijerina. He told him that this institution was for nothing but snitches, and Tijerina went on that trip. I was at work when they told me we were going to hit someone. At the time I didn't know how, who, when. I got to the yard, Tijerina told me I had to hit R, that the decision was already made. I had to do it

JA 950

then, and now I saw Rigo and Snook, that they drew near. I knew what was going on. If I was to fight them, they were going to hit me. That's why I had to do it."

I think that puts in context basically what happened to Mr. Benavidez. Apparently this was an internal thing among Texas Syndicate members at that institution. Not to minimize whatever what Mr. Caro did there, you saw the shank, you saw the injuries to Benavidez, but don't you have to wonder in your mind, given what you heard in that letter, whether Caro was really intending to kill Benavidez at that time? Doesn't it seem odd to you that a guy with a shank like that who is out to kill somebody wouldn't have been able to accomplish it had they really put their mind to it? Was it simply a type of message that was being sent to Benavidez?

You have to think about that when you're deciding whether you're going to impose a death sentence based upon that type of activity.

Anyway, we have Mr. Caro in the SHU. And he gets put in there right after Benavidez's stabbing, August 29, 2003. He's in the SHU at the time -- I'm sorry, December 16, 2003. Mr. Sandoval, also a TS member, was still in the SHU.

And again, when you're trying to decide the death sentence, even though you've already considered and found Mr. Caro guilty of first degree murder, you have to go back and look at the circumstances surrounding that.

Maybe with this additional fact that at the time Caro was in the cell, that he had, he had been put in that cell and was in that cell because of the stabbing of Mr. Benavidez.

And again, he's not out in the general population trying to stir up trouble against somebody else, he's not trying to get into Mr. Sandoval's cell, he's in his cell, Sandoval is assigned to that cell. There's, there's a refusal, basically, "I don't want a cellie," Sandoval is put in another cell.

Then I think, if you recall the evidence, again it's unclear what happened there. Was there some word about a bus coming in? You know, why was it that Sandoval wanted to be placed, why was it that he wanted to be placed in Caro's cell? Again, he's put in a cell, apparently they shake hands.

But again, ladies and gentlemen, you've got to examine those facts and circumstances individually going back and thinking about that in terms of what

happened in that cell, and whether what happened in that cell is an aggravator that you're going to use and satisfy to a degree that you're going to put someone to death. That's what you have to do, ladies and gentlemen, the choice for life and death. You have to go back and think about this. Again, it's not to minimize what happened in any way, but again, you had two people locked in a cell together, can't get out, having an argument, and you don't know what went on in that cell, we would say with any certainty, to make the decision for yourselves in imposing the death sentence.

Now, let's look at what's happening. I think that we all know that after December 18th, or from December 18, 2003 Mr. Caro has been single celled either at the SHU, at ADX Colorado where he was transferred about October of 2005, he was there at ADX, single celled, until he was sent back to Virginia, basically awaiting trial. And he's been here since March of approximately 2006 confined, essentially, at Lee USP in a single cell. And he's had no violations, whatsoever, no incidents of assault against other inmates, and certainly it appears that the Bureau of Prisons has been able to adequately secure him based upon their classification

of him, and based upon what his inmate record has been.

Now, I take a little bit of issue with the Government in terms of suggesting to you that at ADX it's going to be a three year program and he's going to be out. That's not correct, ladies and gentlemen. I think I can show you something that's going to prove that.

You recall when Jim Aiken testified, he was our first witness, he was the gentleman that was a former warden, he got up there and basically said as a former warden, and being an expert in security, that the Bureau of Prisons had the ability, specifically with ADX, and other procedures to adequately and securely house Mr. Caro for the rest of his life. He was shown a policy which turned out to be a policy that was out of date, and that's an exhibit, I'm not going to go into it, but I think it's Exhibit Number 17 which you could see.

He was shown a policy regarding January, 2005, regarding general population at Step Down Units at ADX Florence, Colorado. Exhibit 18 is the current policy, and has been since approximately October 13, 2006.

What happened between the time that you had the

January 31, 2005 policy and October 13, 2006?  Well, we heard from the evidence that there were two inmate killings at ADX Colorado.  ADX was opened some time in 1994.  And again, we're talking about, and you heard Warden Hershberger talk about this, and Mr. Aiken and Dr. Cunningham, ADX is the most secure facility within the entire Federal Bureau of Prisons system.  I mean, that is where they send the most disruptive inmates in the inmate population, whatever figure you want to adopt, 160 to 190,000 federal inmates in the country, and Mr. Aiken told you the federal system is the model upon which the state systems are built in terms of custody levels:  Low, medium, high security facilities, and then super max facilities.

But I want to, I want you to look at this document, certainly, and I just want to read a portion of it because I think this is the written policy, this is, this is the written policy, and Warden Hershberger admitted we're a policy driven organization.  I mean, we have a written policy covering things.  And this talks about the general population unit.  And I want to just touch on that a little bit.

But if you recall, one of those inmate killings

was in general population. There's no dispute that that killing occurred. I can't remember if it was April or May, 2005, two killings occurred within about a month's time, one of those in general population. And what happened was in general population they used to exercise inmates together. And it appears that there would be as many as 12 inmates exercising together at one time in, in the big yard that we saw. I could show you a picture, but it was in the big yard that they had for exercise in the general population. And apparently there were, there might have been at that time basketball, hand ball, maybe some basic exercise. But those were the circumstances under which that inmate was killed.

So, what did the Bureau of Prisons do, specifically ADX? What did they do? And there's no rebutting this, this is the testimony, what they did, again, that happened, inmates were exercising together, one inmate is killed, and as far as general population, then they changed their policy. They changed their procedure so that as far as inmates in general population, they would exercise individually.

And you saw the pictures. The only way I know to describe them, and that they were described by some of the witnesses, as dog runs. Maybe that's

JA 956

offensive to some individuals. Warden Hershberger didn't seem to like that term. But basically that's what they are. People aren't locked in there, kept in there and confined in there, but that's where they exercise. They exercise individually in those pens. That was in response to the inmate killing in general population.

Now, the second, the second thing that happened within about a month, May or so, 2005, there was a killing in one of the step down units at ADX. And if you recall, at that time there were three Step Down Units. Just so I have the names right, there was the Immediate Unit, the Transitional Unit, and then the Pre-transfer Unit. And it was inmates in that last unit, the Pre-transfer Unit that had the most freedom in their unit in the institution. They could have jobs at UNICOR, they could actually maybe walk the halls and go to some appointments, they were in the last step down program ready to be transferred to a USP. Doesn't necessarily mean USP general population, but transferred at least to a USP. And again, security levels mean, are made as far as their particular needs are concerned.

But the killing occurred in that last unit. So, what did ADX do in response to that? They eliminated

that from their program.  They took it out of the institution entirely.  They made it so that those inmates would not be operating in UNICOR, they transferred that to another institution.  So, again, it happened, and they responded to it, and this basically is the written policy that reflects those changes.

Now, the issue that I take a exception about is the testimony that you've heard differs a little bit from, I'm sorry, the information concerning the Step Down Units is different from what you've been led to believe by the Government.  You've been led to believe that in three years Carlos Caro is going to be out, he's going to be at USP.  I think that is absolutely wrong.  And I'll show you why.

Now, this policy talks about Immediate Units, well, starts out with General Population Units, D, E, F and G, and then it talks about Immediate Unit J, it talks about the Transitional Unit.  So, again, general population, two Step Down Units, the Pre-transfer unit has been taken out of the system as far as ADX Colorado is concerned.

But then it talks about Step Down Unit Program Placement Advancement and Removal.  I just wanted to read that to you.  Maybe I can put it up on the Elmo

and we can read it together. "Ordinarily an inmate must have a minimum of 12 months" -- a minimum -- "Ordinarily an inmate must have a minimum of 12 months clear conduct while housed in the ADX's General Population Units before being considered for placement in the Step Down Unit program. An inmate must also actively participate in and complete all programs recommended by their unit team to be considered for placement in the Immediate Unit. Additionally, positive overall institutional adjustment, personal hygiene, cell sanitation, as well as recommendation for placement in the Immediate Unit. Ordinarily, an inmate must have a minimum of 12 months clear conduct while housed in the Immediate Unit before being considered for placement in the Transitional Unit. As required by Federal Bureau of Prisons' policy, an inmate must also actively participate in and complete all programs recommended by their unit team prior to being placed in the Transitional Unit." Goes on to say, "Ordinarily a minimum of 12 months clear conduct, appropriate programming and institutional adjustment is required for consideration of placement in the Pre-transfer Unit at USP Florence." And USP Florence is that other institution adjoining but separate from ADX.

JA 959

"The Associate Warden of Programs will consult with the Warden for a final decision." Then it goes on to say, "The most critical factor in determining an inmate's readiness to progress to and through the Step Down Unit program will be whether the factors, which originally led to the inmate's placement at ADX have been sufficiently mitigated to indicate the inmate can function successfully in a less restricted unit without posing a threat to the security or orderly running of the institution. Due to the very serious nature of the original placement factor, which is frequently complicated by the inmate's criminal history or involvement with criminal organizations, it may be appropriate for some prisoners to be deferred from the Step Down Unit program for longer periods of time." And then it talks about who is on the committee that considered all this. "Inmates whom the unit team judges to meet these criteria as appropriate for movement to the Step Down Unit program and progression through the program will be referred to the Step Down Unit Program Screening Committee for approval. This committee will consist with the Associate Warden of Programs, Associate Warden of Operations, Unit Manager, Psychology, Special Investigative Agent,

JA 960

Case Management Coordinator and the Captain.  Inmates will be informed of the outcome of their cases after the various reviews.  Inmates denied placement into the Step Down Unit program will be reconsidered in six months provided they continue to meet all eligibility requirements."

I think you can see, ladies and gentlemen, this three years, three years is a minimum, and there's plenty of things that an inmate has to do to be even considered or placed in that program, and the big factor, I mean, they consider primarily the reason why they're at ADX to begin with.

Carlos Caro is at ADX because he murdered another inmate.  Bureau of Prisons officials, and we've heard this over and over, are constantly reevaluating the policy, procedure, and reevaluating the classification of inmates.  So, again, I want to create, I want to tell you and show you and dissipate some of the misinformation that perhaps you've been getting.  Now, let's look a little bit at ADX.

THE COURT:  Mr. Kalista, I'm going to interrupt you now.  The jury has been in the box for a while.  We're going to take a break, ladies and gentlemen, if you'll follow the bailiff out.  We'll be in recess for about 15 minutes.

JA 961

(The jury retired to the jury room, after which the following occurred:)

THE COURT:  Very well.  We'll be in recess for 15 minutes.

(Recess from 11:40 a.m. to 12:00 p.m.)

THE COURT:  Mr. Bailiff, if you'll bring in the jury.

(The jury entered the courtroom and was seated in the jury box.)

THE COURT:  Mr. Kalista, you may proceed.

MR. KALISTA:  I was talking about that policy supplement, and I'll just say one more word about it.  You know, ladies and gentlemen, what I think is significant about that policy statement, even when you're talking about the super maximum facility, in the Federal Bureau of Prisons, where they send the worst of the worst offenders, those who have been most disruptive and violent in their other institutions, if they still believe in the power of redemption, that Step Down Unit program is proof of that.  They believe that people can change.  They believe that people can change their conduct, and eventually get out of ADX Florence, Colorado.  Bureau of Prisons believes in the power of redemption.

Let's look at ADX a little bit closer.  I'm not

JA 962

going to show you all the slides that Dr. Cunningham put on there. You have plenty of testimony what it looks like on the outside, but I do want to go over a couple of different things. This may be a little hard to see because, if you recall, this was one of the slides that Dr. Cunningham had, and basically this was an institutional profile in November of 2006 when he went for his tour.

This is basically from a card that they hand out to people who take the tour. And this gives you a little bit of the, at least the statistical data on ADX at any one day.

And I think what's significant is that out of the individuals who were incarcerated at the time of that tour, fully 56, more than half had committed murder. About 33 percent of those had committed a murder in prison. So, about 150, or so, of those inmates at Florence ADMAX Colorado had committed a murder in prison of some type. And that could be in their history, it could have been in the state system.

Some of these inmates to come in, of course, have both state and federal records. The reason for the referral, fully 20 percent of them, or about, let's say, 95 inmates, are referred for murder of

inmates. As you can tell, that's a very violent inmate population at that facility. Fully a third of them are serving life sentences when they get to ADX Colorado. That's about 150, or so. More than 150.

Now, in terms of that Step Down Unit, one thing about Dr. Cunningham, and I think you were impressed by him, I mean he was, he's received awards in 2005 and 2006 recognizing the single outstanding psychologist from the American Psychological Association for research and for work that he has done, he's received distinctive awards, and he tells you that he's interested in studying corrections and studying, basically, people who have committed murder, especially murderers in prison. He's interested in getting data in that, and studying those statistics, and studying, basically, that evidence as to following them, what has happened within the Bureau of Prisons as to their institutional conduct, what offenses had they committed within the institution after having committed an inmate murder, and where, where have they been placed.

Now, as he has told you, some of his, of his data, of course, is dated because he just can't always get information from the Bureau of Prisons.

But basically he did tell you that as far as leaving ADX for another facility, the information he had was approximately 2003, 2004, almost nine percent left annually during each of those years, so that's almost ten percent, so that's probably close to 45 inmates, might have left the facility at any one time during those years. 2001 to 2002 was five percent annually. In 1999 to 2000, nine percent annually. So, again, again, the Step Down Program isn't boom, three years and you're out. That was misinformation that was provided to you by the Government.

Furthermore, the Government doesn't hesitate to cite Dr. Cunningham when it helps them. You saw him on the witness stand. He was attacked, certainly, by the Government. To a certain extent his patriotism was even attacked, and he was a former Navy officer.

But Dr. Cunningham made it clear to you that he had asked for data on 45 or so individuals who had committed murder in the federal system, wanting to get from the Bureau of Prisons, who are at ADX, wanting to get from the Bureau of Prisons information as to the follow up history.

Again, what did they, what crimes did they commit inside prison after they had committed this murder, and where were they placed? What was their

JA 965

placement history, and what were, were the security conditions of their placement? The Government has that data, and refused to provide it to him. And he believes that that would be information that is useful to you in deciding a case like this. And not relying upon speculation as to what Carlos Caro might or might not do if he's released from, eventually, or ever, from ADX Colorado. If you had data where you could see data as to follow up, of people who had convicted, who had committed murder in prison, Dr. Cunningham certainly felt that that would be of value to you. The Government has that data and wouldn't provide it to him.

Now, I need not go into the, the conditions of confinement at ADX. I think you can tell and remember that the typical general population cell is much more secure than at the USP. I was particularly impressed by the fact that there's double doors. There's a sliding outer door, and then there's that inner typical cell door.

And basically at ADX those people are isolated. They don't have any cells on the other side of the hallway, difficult for them to communicate with anyone because the closest that they can get to an outer door is, at least, there's a three foot area,

there's that inner door, cell door, there's a three foot vestibule, and then there's that outer door with a small window, and there's no cells across the other way so it would be extremely difficult for them to send out these messages on a string. I mean, that would be almost, and I believe he said that the outer doors were secured much better than, to prevent that type of thing. So, there's going to be very little chance of communicating between one cell and another, plus between each cell there's that space for the plumber to go in and do his work that he needs to do.

So, you can tell those cells are much more secure than they were at the SHU at Lee USP. Again, single cell. They have the basics in there. They have shower, toilet, sink, stool, poured concrete bed, all, again, one unit. They have a television small nine inch television which is actually a security measure. Again, inmates get information, and I think it's mentioned in this policy statement, but inmates get information about menus, about classes, religious services that are broadcast to the cells. So, they don't have to be transferred or transported to attend those things. So, the contact of inmate to inmate is minimal, the contact of guard to inmate is minimal.

JA 967

They do have one hour of recreation, and he showed you the picture of the recreation area. Again, single, sole recreation in one of those dog pens, and basically that's it.

Now, Jim Aiken testified to you, again, based upon his experience in corrections, and this is a man who has executed two prisoners, he told you about that while he was a warden in South Carolina, he's actually executed two prisoners, and he's told you that those conditions at ADX are the most secure in the United States of America as it exists today, Federal Bureau of Prisons entire system, state system, that is the most secure facility, and that those conditions are harsh.

And why are they harsh? Because again, isolation of that individual. And he said that can break them. If you remember what he said, days turn into weeks, weeks turn into months, months turn into years, years turn into decades, decades. People working at the Bureau of Prisons, all they have is time. They can outlast any inmate as far as time is concerned.

Now he also said that at some point, because of those conditions, again, inmate sitting in that cell, minimal, minimum human contact, isolated area in

Colorado, not easily accessible for visitors to get there -- you saw a little bit about the visiting area, how they talk, if they get a visitor, through a glass telephone, limited calls per month back home. You know, an inmate sitting in those conditions, so limited socially, so little stimulation, according to the words that Dr. Cunningham used, you know at some point they might think to themselves, you know, how could I get some type of better visit with my family? What could I do to insure that I have similar contact with other individuals as far as people that I love? Maybe I want to, you know, work toward having a contact visit with my grandchild, or my wife, or my loved one. And that is the motivation which gets people to work on programs to try to leave ADMAX.

Now, if they don't do that, Mr. Aiken said, they'll just sit there and they're going to rot. He's seen it time and time again. They'll sit there and they'll rot. Time will go by, it will just be being a jar on a shelf. That will be their life.

Again, I realize that things can happen, and there are no guarantees, but again, one of the instructions that you're going to get from the court is, as far as future dangerousness is concerned, is you have to find beyond a reasonable doubt that

future dangerousness refers to the allegation by the Government if Mr. Caro is sentenced to life in prison without the possibility of release he's likely to commit acts of violence against other inmates or staff within the federal prison system.  That's what you have to decide.  But he is assigned at ADX Colorado.  That's his assignment, given his, the crime he's committed, and his criminal history. That's where he is now.  And unless he does something to earn the privilege of even trying to get into a Step Down Unit, that's where he's going to stay, at ADX Colorado.  It may not be designed for a long term facility because, again, apparently that facility believes in the power of redemption, people can change if the conditions are harsh enough, people will want to change.  But if he doesn't change, that's where he's going to stay.

Now, there are people there that, again, Dr. Cunningham, I think Warden Hershberger, Jim Aiken referred to as people who are never going to get out of ADX, Moussaoui, Kozinski, Silverstein, those people are never going to see the light of day.  They are never, they're in harsh conditions, and I guess I should mention, they're not in general population as far as we're aware, they are certainly under special

conditions of confinement, but people like that are probably never going to get out of ADX Colorado, and that's pretty much agreed.

Is Carlos Caro any more dangerous than those people? Think about that when you're deciding about taking his life. Again, people can change. Carlos can be broken. Those conditions are harsh.

Let me just see -- I don't want to touch on this, but as we all know, I mean, if you violate a rule at ADX, they even have a more restrictive environment they can put you into. You lose your TV, you lose your radio, you go into the Control Unit, and again, they even have units that I think were described that Silverstein is under at ADX Colorado. So, again, if you violate a rule at ADMAX, there's the Control Unit, and you can be reclassified and placed in that. Sure, there's a right to a hearing, administratively within the Bureau of Prisons, but again, the Bureau of Prisons officials are making decisions, and deciding whether that person should be placed in the Control Unit just like -- again, it's not some, some ordinary correctional officer that one day Carlos Caro's in the general population, and they see one another off and on for a few months, or few years, no problems, and that correctional officer

says to himself, "Well, I'm going to take Carlos and put him in the Step Down Program because he's been a pretty good guy." It's not that way. There are layers and layers of officials making determinations about his progress. Certainly they are getting input from the guys that walk the beat every day at the prison as to what's going on, unit managers, other staff, but there's a whole layer of people making that decision, wardens involved, associate warden is involved. And again, the Bureau of Prisons is composed of dedicated, fine people. Again, they are constantly reviewing their security procedures in the prison as a whole, in the unit as a whole, and dealing with specific inmates. So, again, Dr. Cunningham has testified, basically, that given the security needs that have been applied to Carlos Caro, and his specific placement at this time, that he will not, the likelihood of him being a danger to other inmates or correctional staff is very low. Again, given those security conditions of confinement. You don't have to kill this man.

Ladies and gentlemen, I'd like to conclude by just talking a little bit about some of the, I guess, mitigating factors. And I'm certainly not going to go through all of them. And I'm going to talk about

that in connection with your, again, individual decision that only you as an individual can make regarding whether Carlos Caro should be put to death or life imprisonment without release. Those are your two choices. Again, you individually have to make that decision. Now, I wish there was some way whereby if you put Carlos to death, that Roberto Sandoval's life could be restored. I wish there was some way you could do that. We all know that's not possible. Putting him to death is not going to accomplish that. You're not going to destroy the Texas Syndicate by putting Carlos David Caro to death. You're not going to affect the ability of the Bureau of Prisons to run its prison system. You're not going to deter people going into prison gangs. That's a fact of life.

Mr. Mrad, when he was asked about the number of prison gangs in the federal Bureau of Prisons system, he did talk about the big five, but he mentioned there were like 17 typewritten pages of gangs within the federal Bureau of Prisons system, I'm just guessing 20 per page, that's 340 prison gangs within the system. You're not going to cut out gangs by putting Carlos Caro to death.

Now, if what, what harm will there be in putting

him to death?  Well, I think, ladies and gentlemen, the harm is going to be to the people that love him. I mean, you've seen his wife, LouYveth.  She got up there and testified.  And in spite of everything, she loves him.  In spite of everything, she is still married to him.  She still has feelings for him, she wants him, she has testified as far as the effects of his death upon her and her daughter, Xinia.  And why should you cause the death of Carlos Caro and cause them grief?  Why should you make them victims in this case?  Aren't there already enough victims?  The Sandoval family, true, was victimized, but why should you make Carlos, his family, his wife, his wife, LouYveth, Xinia, the people that drove here from Texas, they expressed their affection for Carlos, why should you make them victims?

Please think about that when you're making your individual decision about whether you should put Carlos David Caro to death.

Now, ladies and gentlemen, I just want to conclude and say that we, we appreciate your consideration, and we do want you to think about these issues very carefully.  As I said before, you are trying to make this decision individually, you as an individual juror.  Going back to that jury room,

obviously discussing this with your fellow jurors, but somewhere, at some point in time you're going to go to the side in that little place where you make the most important decisions in your life, you're going to have to make a life or death decision, and the question is can you live with that decision that you make? Can you live, especially, with the finality of the death verdict? Are you so satisfied that Carlos Caro is so, so corrupt as an individual that he's beyond redemption? Are you satisfied that Carlos David Caro is so criminal that the only solution, the only alternative you have is to put him to death? You don't have to make that decision. Even if those aggravators outweigh those mitigators, you don't have to make that decision. Death is never required. You've got to make that decision.

You come from different backgrounds, you came in here with probably barely thinking about the death penalty on the outside before you came to this courtroom, and you're asked to fill out a questionnaire, and then you're asked some questions. But now it has come to the reality that you, individually, have to consider this issue.

Carlos is not a thoroughly corrupt individual. He's not the worst of the worst. You're not going to

accomplish anything by putting him to death. You're just going to create more victims. Please render your verdict for life imprisonment without the possibility of release.

THE COURT: Thank you, Mr. Kalista. Mr. Brownlee?

MR. BROWNLEE: May it please the court, Mr. Kalista, Mr. Simmons, and ladies and gentlemen of the jury, good afternoon. I want to end with the way I started, and that's by telling you thanks. We've all done that. But we have taken a lot of your time, taken you away from your lives and your families, and your jobs, and we've taken you to places you didn't want to go, like federal prisons, ADMAX, USP, the SHU. And we've shown you things that you didn't want to see, autopsy photos of Roberto Sandoval, stabbing victim, Benavidez. I want to thank you for your time, your patience, your energy, and I would like to tell you on behalf of the United States Government that I'm grateful for your attention.

Now, I want to respond, if I may, to some points that were raised during closing argument of Mr. Simmons and Mr. Kalista. I think what happens here, the facts matter, and there are facts in this case. Mr. Simmons referred to these as fights.

JA 976

These are not fights.  These are assaults.  And there's a big difference.  Mr. Caro did not take his opponent standing in front of him and say, "Let's fight."  He snuck up behind him and stabbed him with a shank.  He snuck up behind him with a wet towel, tightened it up, put a knot in it and for four minutes strangled the life out of him.  This was not a fight.  It was an assault.  That's a significant difference.

Mr. Simmons said these were cat and mouse games, was his words.  These are not cat and mouse games. Kirsten Sandoval wouldn't be here over a cat and mouse game.  This is life and death.  Just that simple.

Mr. Simmons says that Mr. Caro will be carried out of a federal prison in a pine box.  That's true. No matter what you do, that's true.  The question you must ask yourself is this.  How many others will join him?  Do you have any doubt in your mind, any doubt, anyone in this courtroom, have any doubt that this man will kill again?  Look at his history, what he has done.  Do you have any doubt about what he will do?

He talked about Mr. Benavidez, and he read a letter that Mr. Caro wrote about Benavidez, and then

he asked you this question. Maybe he wasn't trying to kill him. Maybe he wasn't trying to kill him. Stabbed him 29 times, ladies and gentlemen. The man was watching a movie. He snuck up behind him with this Plexiglas shank with a taped handle and a lanyard so he wouldn't drop it when the blood made his hand slippery. Maybe he wasn't trying to kill him. You decide. You're the judge of the facts. You decide. Mr. Kalista, right? Just a cat and mouse game? What are the facts? What matters? You decide.

They make a big point about December 18th, which is the date following the murder. They say since that time he's done nothing wrong. Ladies and gentlemen, since that time he's had this case hanging over his head. He's had the possibility of a sentence of death hanging over his head.

Now, ask yourselves, what happens if you release that person? What happens if you sentence him to life, send him back into the prison system, a conquering hero. Ask yourselves why is he behaving himself since December 18th? This case.

Then what happens if we just send him back there? What will he do? ADX, big discussion about administrative maximum. You're the judges, you're

JA 978

the judge of the facts.  You have to decide what ADX means.

There were three witnesses called from ADX, two by the defendant, one by the Government.  They called Mr. Aiken, a nice man, never worked at ADX, never worked there, never been responsible for inmates at ADX.  They called Dr. Cunningham.  He's a psychologist.  He's never even worked at a prison.  Okay?  Who did the Government call?  We called the former warden at ADX.  What was his job after that?  He got promoted up where he was the Regional Director over all of those prisons, including Terre Haute, and including ADX.  Again, you decide what the facts are.  you decide, is he going to get out in three years as Warden Hershberger says from ADX, or is he going to get out in five years as Dr. Cunningham says?  Does that really matter?  Everyone agrees, every witness agrees he's getting out of ADX, that in some time within three to five years he will be back at a USP, right where he stabbed Rick Benavidez, and right where he strangled Roberto Sandoval.  That is the evidence.  Those are the facts.  You have to decide what significance that is.

They raised this question, why did Mr. Caro kill Roberto Sandoval?  He said we weren't in the cell.

JA 979

That's true, we're not there, and we don't know what went on. Well, again, what's the evidence? We do know what went on, because he told us. Carlos Caro told us. On the phone to his wife, on the phone call to Mr. Rivas, and in the letters. He disrespected him. Sandoval called him a curse world. In Carlos Caro's world you die. Do any of you really think that's going to change? Do you think so? Their own expert, Dr. Cunningham, testified nothing will deter him, nothing.

Ladies and gentlemen, I know this is hard. I know we're asking you to do something difficult, but nothing will deter him. Nothing.

Ladies and gentlemen, I'd like to talk to you a little bit about the victims. The first set of victims in this case was the Caro family. They're victims. They've had to live with Carlos Caro all their lives, the disappointment, the pain, the suffering, the humiliation. His wife came in here and told you what life with him was like. They're just as much victims as anybody. But you need to understand this. Nothing you do in that jury box can cause them any greater pain than he's already caused them. You will not, through your verdict, make these family members victims. He did that a long time ago.

He decided to sell drugs.  He decided to be locked up when his baby girl was born.  He decided to sell cocaine.  He decided to join the Texas Syndicate. All along the way he could have made other options. He didn't.  He chose violence every single time. Nothing you do will victimize them, nothing you do will hurt them more than he's already done.

The next set of victims, all the people that he's harmed, the inmates in Oakdale that he beat, it wasn't a fight; it was an assault.  You saw Jose Rivas.  He went to the hospital because he was beaten up, kicked in the head, beaten about the face.  You saw the blood in the bleacher.  Why?  That's his world.  What did he say about it?  "I'm going to do what I've got to do."  This is to an officer who runs the prison.  The prison system, the authorities for the prison system reaches out to him to try to have a dialogue, and what's he saying?  "You do what you've got to do; I'm doing what I have to do."  That's Carlos Caro.

Do you have any doubt in your mind if, given the opportunity, he will either order someone killed, he will code a letter, or he will kill again?  Any doubt in your mind?

And you know the other victims.  Benavidez,

stabbed. Then there's another set of victims, the Sandoval family. When you go back into the jury room, I ask you to remember Kirsten Sandoval, that young, brave 17 year old high school student who walked into a court of law in Abingdon, Virginia and stared down her father's killer, and told you she loved her dad, and she missed him. You remember her.

This case, this whole thing is about, has one purpose. No more victims. No more victims of Carlos Caro. That's the only reason we're here. As we've said here today, when he walked in here, as Mr. Simmons said, he's doing life. Before you were ever even called as a juror he was doing life. Judge Jones took care of that. Our goal is simple. No more Kirsten Sandovals. I don't want to have to call some other 17 year old girl to take the stand to weep about her lost father because Carlos Caro killed him.

If you have any doubt that that's what will occur if he's given a life sentence, is there anything in his background that would challenge that?

I want to talk about punishment. This is the penalty phase. We call it the penalty phase for a reason, because it's time to assess the penalty for murder.

In America, if you kill someone, you must be

JA 982

punished. Now, what Mr. Kalista and Mr. Simmons have asked you to do is not punish him. That's what they want you to do. They want you to say, "Well, we know you strangled him, we know you've got this violent past, but we're not going to punish you." A life sentence is zero punishment. As Mr. Simmons said, you walked in here today, you walked in here before it all happened, it's still the same. That's what they're asking to you do, zero punishment for premeditated murder.

That decision for you has consequences, and they're serious. The first one, what does that message send to the Sandoval family? It tells them that their son's life was meaningless, it meant nothing if we fail to punish him for murder.

What message does it send Carlos Caro? What does it tell him about what he did? Remember what he said. "I don't care about myself. I'm going to do what I've got to do." You tell him the taking of a human life has no consequences, zero. You return to that prison system a hero. And it tells him he can kill and kill and kill and no one will do anything. No punishment.

And what does it tell the members of the Texas Syndicate? They're out there waiting to hear. It

says you can kill and it's okay. There's no punishment. And what does it tell the other inmates? What does the tell the staff that work in the prison? It's open season because in this community there's no punishment for murder. You can kill, and that's okay. We'll find you guilty, but we're not going to punish you. And to the other inmates out there at that prison who just want to do their time, try to get out and go home, tell them its open season. It tells the other Texas Syndicate members they can kill and there will be no punishment, and it tells these guards that they better be careful, that the inmates say there's no punishment for murder. That decision, ladies and gentlemen, it may be easier than the alternative, but it has serious consequences, as well. All I ask is you consider all those facts when you make your decision.

Control. Mr. Giorno talked a lot about it. It's been an overriding theme in this case. Really from the very beginning his family, his friends, police officers, agents, parole officers, probation officers, correctional officers, wardens, prosecutors, judges have all been trying to control Carlos Caro. When he got busted in 1988 the judge gave him two years. That was an effort to deter him,

JA 984

to control him.  His wife said she hoped that would teach him a lesson, and he could come back and be a husband and father.  It did no such thing.  He denied that, got his probation revoked, went right back out there hustling drugs.  So, he got caught again.  He got 71 months.  Same kind of thing, effort to control him, effort to teach him.  He ignored it, he defied it, he's out there selling cocaine.  This time he gets 30 years.  They send him to a medium security prison.  That's enough, they thought, to control him.  What did he do?  He became a leader of the Texas Syndicate and he orders a hit.  Defeated whatever means was out there.  It was his show, he was in control of that prison.  So they shipped him off to higher security, USP Lee.  They put him in general population.  They thought now we've got him, now we can control him.  And what does he do?  He becomes a player in the Texas Syndicate, no doubt.  Whether he's a leader, whether he's an enforcer, don't know.  But he was a player.  When they needed somebody for a hit on Benavidez, they picked him.  How did he do it?  He stabbed a man in the back of the head.  You saw the video.  So, then what did they do?  Well, number one, they convicted him of conspiracy to commit murder.  Judge Jones sentenced him to another 27

years.  Now they put him in the SHU, the Housing Unit, the most secure area of the USP.  Now we can control him.  In fact, when he was down there he was in control.  "Do you want a cellie?"  "No, I'm not taking a cellie."  "Okay."  They didn't want any trouble from this guy.  These are the guys, these guys are supposed to be in charge.  That's fine.  Later in the day, Sandoval said he wanted to go in, asked Caro, "Is that okay?"  "Sure, I'll take him."  What happened?  Twenty-two hours later, Sandoval is strangled.

Every time his family held out hope that he would change, he disappointed them.  Every time the judge sentenced him hoping that that punishment would alter his behavior, he defied it.  Every time the prison officials tried to control them, he defeated their measures.  Every single time.

So, ladies and gentlemen, we now come to you.  You're it.  I'm the United States Attorney, powerless to control Caro.  United States District Judge, federal judge, powerless to do it.  The law allows one last option, and that is you.  And only you.  Judge Jones will do what you say.  You go back there and find a unanimous verdict for life, that's what he will impose.  You find death, that's what he'll do.

The authority and the responsibility for the control of Carlos David Caro is in your hands. We have done all we can do. And so we come to you.

The last thing I would like to talk about is the law. Mr. Kalista talks about and uses words like kill. You will not hear Judge Jones use that term. The job is not to kill anyone. It's not the law. You'll be asked to make one judgment, and it's this: Is the death penalty for Carlos Caro justified? Is it justified? And you have this balancing test of aggravators and mitigators, and you must come to a decision. And if you collectively and unanimously find that the death sentence is, in fact, justified, then what do you do? Well, the law tells you, Judge Jones will tell you, and it's before you, if you determine that the weighing process does justify a death sentence, you should impose that sentence. That's the law. The law commands if you find it to be justified, you should impose it.

Ladies and gentlemen, once again, I want to thank you for your time and your service. And I ask you to return a verdict of justice. Do justice. Thank you, very much.

THE COURT: Thank you, Mr. Brownlee. Ladies and gentlemen of the jury, I'm going to allow

JA 987

you to go to lunch now.  I'd like you to be back at 1:30, so it will be a little over 45 minutes.  When you return I will give you the final instructions on the law that you're to follow in reaching your decision.  So, if you'll follow the bailiff out, we'll see you at, in 45 minutes.

(The jury retired to the jury room, after which the following occurred:)

THE COURT:  We'll be in recess for 45 minutes.

(Recess from 12:45 p.m. to 1:30 p.m.)

THE COURT:  Are we ready, then, for the jury?

MR. BROWNLEE:  Yes, Your Honor.

THE COURT:  Mr. Bailiff, if you'll have the jury, in please.

(The jury entered the courtroom and was seated in the jury box.)

THE COURT:  Ladies and gentlemen, you must now consider whether imposition of a sentence of death is justified, or whether the defendant should be sentenced to life imprisonment without the possibility of release.  Those are the only choices of punishment available under the law in this case. There is no parole in the federal system.

The law leaves this decision exclusively to you, the jury.  If you determine that the defendant should be sentenced to death, or to life imprisonment without possibility of release, the court is required to impose that sentence.

I will now instruct you as to the process you must follow in making your verdict.  Let me summarize the deliberative process you must follow in considering the sentencing decision before you.  After this broad summary, I will discuss specific matters in more detail.

May I remind you that you previously unanimously found that the defendant is eligible for the death penalty.  We then proceeded to the so-called justification stage of the sentencing hearing.  Consideration of the evidence at this stage, which focuses on all relevant aggravating and mitigating factors, is broken down into two steps.  First, you must determine what factors have been proved.  As for the aggravating factors, you must unanimously determine whether the Government has proved beyond a reasonable doubt any additional aggravating factors relied upon by the Government to support the death penalty.  In contrast, the defendant may prove mitigating factors, that is, factors that tend to

show the defendant should not be sentenced to death by just a preponderance of the evidence.

Moreover, it is up to each juror to decide whether any mitigating factor exists.  There is no requirement that the defendant establish mitigating factors unanimously.

The second step involves a weighing process. You must decide whether the proved aggravating factors outweigh the mitigating factors sufficiently to justify the death sentence.  If you do not find any mitigating factors, you still must decide whether the aggravating factors are sufficient to justify imposition of a death sentence.

If you determine, as a result of this weighing process, that the factors do not justify a death sentence, such a sentence may not be imposed.  If you determine that the weighing process does justify a death sentence, then you should impose that sentence.

But as I will instruct you, weighing aggravating and mitigating factors is not a mechanical process, and the judgment involved is exclusively yours. Whatever findings you make with respect to aggravating and mitigating factors, the result of the weighing process is never decided in advance.  For that reason, a jury is never required to impose a

sentence of death.

At this last stage of your deliberation it is up, it is up to you to decide whether, for any proper reason established by the evidence, you choose not to impose such a sentence on the defendant.

Any decision to impose a sentence of death must be unanimous. You will be called upon to make findings on various matters. In doing so you are to consider only the testimony and exhibits admitted into evidence during the trial on the offense charged and the sentencing proceeding that has just concluded.

I remind you that the statements, questions and arguments of counsel are not evidence, except those statements made as a stipulation or agreement of the parties. And, of course, anything else you may have seen or heard outside the courtroom is not evidence and must be disregarded.

During these proceedings I have ruled on objections to certain testimony and items of evidence. The admissibility of evidence is a legal matter for the court to resolve, and you must not concern yourselves with the reasons for my rulings. In your deliberations you may not draw any inferences from my decision to exclude or admit evidence.

As you recall, the Government and the defendant have stipulated or agreed to certain matters which were explained to you by one or more of the attorneys.  You may consider such matters as proved, even though there was no actual witness who testified about them.  The rules of evidence provide that if specialized knowledge might assist the jury in understanding the evidence or in determining a fact in issue, a witness qualified by knowledge, skill, experience, training or education may testify and state his or her opinion concerning such matters. You should consider each such opinion received in evidence in this case, and give it the weight you may think it deserves.

If you should decide that an opinion of such a witness is not based upon sufficient education and experience, or if you should conclude that the reasons given in support of the opinion are not sound, or that the opinion is outweighed by other evidence, then you may disregard the opinion in whole or in part.

The process by which you must reach your decision requires that you make and record certain findings in a specific order.  To ensure that your findings are stated clearly, and in the required

JA 992

sequence, you will be given a special verdict form to which I will refer throughout my instructions. You will also be given a copy of my instructions.

In light of the complexity and importance of your task, it is essential that you consider and follow the instructions and verdict form together as you conduct your deliberations.

Moreover, if any statement by counsel about the law guiding your deliberations appears to be different, you must be guided by the instructions and form that I give you. It would be a violation of your sworn duty as jurors to base your decision upon any view of the law other than that reflected in the instructions and form.

Although it is left solely to you to decide whether the death penalty should be imposed, the law has narrowed and channeled discretion in specific ways, particularly by directing you to consider and weigh aggravating and mitigating factors presented by the case. These factors guide your deliberations by focusing on certain circumstances surrounding the crime and personal traits, character and background of the defendant.

Aggravating factors are considerations that tend to support imposition of the death penalty. The

Government is required to specify the factors it relies on, and your deliberations are strictly limited by its choice. Even if you believe that the evidence reveals other aggravating factors, you must not consider them.

Mitigating factors are considerations that suggest that a sentence of death should not be imposed. They need not justify or excuse the defendant's conduct, but they do suggest that a punishment less than death may be sufficient to do justice in the case.

Your task is not simply to decide whether, which, or how many aggravating and mitigating factors are present in the case. You also must evaluate and weigh each such factor and ultimately make a unique, individualized judgment about the justification for and appropriateness of the death penalty or of life imprisonment without possibility of release as a punishment of the defendant.

The United States has alleged several aggravating factors in this case. Those include, A, that Carlos David Caro has previously been convicted of two or more state or federal offenses punishable by a term of imprisonment of more than one year, committed on different occasions, involving the

JA 994

distribution of controlled substances; and, B, that Carlos David Caro had previously been convicted of violating Title 2 or Title 3 of the Comprehensive Drug Abuse Prevention and Control Act of 1970 for which a sentence of five or more years may be imposed.

The additional aggravating factors alleged by the Government in this case are as follows:  A, victim impact.  The Government has alleged that Roberto Sandoval maintained close contact with his family, and the murder of Roberto Sandoval had a significant impact on his family.  Specifically, the surviving members of the victim's family have been deprived of the benefits of having their son and father in their lives.  As a result, their lives have changed, and they have experienced significant emotional trauma.

B, future dangerousness.  Generally speaking, future dangerousness refers to the allegation by the Government that Carlos David Caro, if sentenced to life imprisonment without possibility of release, is likely to commit acts of violence against other inmates or staff within the federal prison system.

The following aspects of future dangerousness are alleged by the Government:  One, continuing

JA 995

pattern of violence and recidivist conduct.  The Government has alleged that Carlos David Caro, while imprisoned, has occupied a leadership position in a violent gang called the Texas Syndicate, and through his connection with the gang, has been involved in physical assaults on other inmates, including conspiracy to commit murder.

The Government has also alleged that Carlos David Caro has committed numerous prior felony drug offenses.

Two, low rehabilitative potential.  The Government has alleged that Carlos David Caro has a lengthy history of illegal conduct outside a prison setting, and a significant history of violent and nonviolent rules violations while incarcerated.

The Government asserts that through his words and recidivism, Carlos David Caro has demonstrated that the threat of incarceration does not deter his misconduct.

C, lack of remorse.  The Government has alleged that Carlos David Caro has not expressed remorse for his violent acts, including the murder of Roberto Sandoval, the stabbing and attempted murder of Ricardo Benavidez, and the gang based assault at Oakdale.

Remember that the defendant has a constitutional right to remain silent, and mere silence, alone, by the defendant should not be considered as proof of lack of remorse.

These aggravating factors are set out in the special verdict form, and you must consider them separately. You must decide for each one whether you unanimously agree that it has been proved by the Government beyond a reasonable doubt, indicate your answer on the form, and continue until you have finished with them all.

Regardless of your findings on these aggravating factors, you must proceed to the next step in your deliberations, which involves consideration of mitigating factors. The law never assumes or presumes that a defendant should be sentenced to death.

Accordingly, the defense is under no obligation to establish the existence of any mitigating factors or disprove the existence of any aggravating factors.

The defendant may, of course, choose to argue specific mitigating factors and the defendant has offered evidence on the following factors in this case. One, if not sentenced to death Mr. Caro will spend the rest of his life incarcerated in a secure

federal institution; two, Mr. Caro exhibited symptoms of failure to thrive as he was a listless and inactive baby; three, throughout his childhood Mr. Caro was exposed to repeated instances of domestic violence and household disruption; four, Mr. Caro's father was a corrupting influence in that his father's alcoholic, violent, criminal and neglectful behavior was so severe and long standing that it had a pervasive, devastating influence on the lives of his four sons in that all four sons have criminal records, and three of the four have been incarcerated and are currently incarcerated; five, Mr. Caro was raised in a home where education was not valued; six, Mr. Caro was raised in a poverty stricken community with limited economic opportunities; seven, despite the environment in which he was raised, Mr. Caro throughout his childhood, was an obedient, respectful, well behaved child at home, in school and in the community; eight, Mr. Caro required special education services and eventually dropped out of school without having completed the ninth grade; nine, according to his eighth grade math teacher, Mr. Caro was a shy, respectful student in contrast to his brothers, and their parents showed no interest in their academic

progress; ten, the ability of Mr. Caro's mother to nurture her sons was impeded by her repeated victimization at the hands of her violent and abusive husband; 11, Mr. Caro's maternal uncles involved him in illegal drug trafficking; 12, for certain periods of time Mr. Caro proved himself to be a good father and husband; 13, Mr. Caro has never been physically violent or abusive toward his wife, LouYveth, or their daughter, Xinia; 14, if Mr. Caro is executed his wife, children and extended family will suffer grief and loss; 15, Mr. Caro was not involved in gangs or gang related activity while in the community; 16, Mr. Caro was not involved in gang related activity in prison until he was sentenced to 30 years incarceration in 2001; 17, Mr. Caro was never a violent or aggressive individual until after he received the 30 year sentence to be served in the federal Bureau of Prisons; 18, during his entire history of incarceration Mr. Caro has never assaulted or harmed a correctional guard, counselor, or other prison staff member; 19, Mr. Caro has never attempted to escape from any correctional officer or from any correctional facility; 20, since December 18, 2003, the federal Bureau of Prisons has properly and securely housed Mr. Caro at various high security

JA 999

federal institutions; 21, Mr. Caro is 40 years old and is less likely, as he ages, to engage in violent behavior; 22, Mr. Caro's life has value to his wife, daughter and family.

The defendant need only prove these mitigating factors by a preponderance of the evidence; that is, by evidence sufficient to persuade you that the factor is more likely present than not present. And the law does not require unanimous agreement with regard to mitigating factors.

Any juror may find the existence of a mitigating factor, and must then consider that factor in weighing the aggravating and mitigating factors even though other jurors may or may not agree that the particular mitigating factor has been established.

Moreover, any juror may consider a mitigating factor found by another juror, even if he or she did not concur in that finding.

Your discretion in considering mitigating factors is much broader than your discretion in considering aggravating factors. The law permits you to consider any other relevant mitigating information presented in this proceeding, in addition to the specific factors recited above, so long as its existence was proved by a preponderance of the

evidence.

Relevant mitigating information includes anything in the defendant's background, record, character or any circumstances of the offense which suggests that a sentence of death should not be imposed.

Throughout these instructions references to mitigating factors should be understood to include other relevant mitigating information.

Record your finding as to the mitigating factors as indicated by the special verdict form. Regardless of your findings as to these factors, however, you must proceed to the next step in your deliberations which involves weighing aggravating and mitigating factors.

After completing your findings regarding aggravating and mitigating factors, you must engage in a weighing process to determine whether a sentence of death is justified. In this process, you must consider only those aggravating factors that you unanimously found to exist. P.

Ach of you must also consider any mitigating factors that you individually found to exist, and you each may consider any mitigating factors found by any of the other jurors.

You must determine whether the proven aggravating factors sufficiently outweigh any proven mitigating factors to justify a sentence of death. The task of weighing aggravating and mitigating factors against each other, or weighing aggravating factors, alone, if there are no mitigating factors, is not a mechanical process. You must not simply count the number of factors, but consider the particular character of each, which may be given different weight or value by different jurors.

What constitutes sufficient justification for sentence of death in this case is exclusively left to you. Your role is to be the conscience of the community in making a moral judgment about the worth of an individual life balanced against the societal value of what the Government contends is deserved punishment for the defendant's offense.

Whatever aggravating and mitigating factors are found, a jury is never required to conclude the weighing process in favor of a sentence of death, but your decision must be a reasoned one, free from the influence of passion, prejudice, or arbitrary consideration.

If you unanimously find that the comparative weight of the aggravating factor or factors is

sufficient to justify a sentence of death, answer yes on the special verdict form, part 3A, death sentence, sign the form, and certify your decision as described in Section 4 of the form.

On the other hand, if you do not unanimously find that the aggravating factors sufficiently outweigh the mitigating factors to justify a sentence of death, or in the absence of any mitigating factor, that the aggravating factor or factors considered alone justify a sentence of death, answer no on the special verdict form, and proceed to verdict 3B, sentence of life in prison without possibility of release.

In considering whether a sentence of death is justified, you shall not consider the race, color, religious beliefs, national origin or gender of the defendant or of the victim.

You are not to impose a death sentence unless you conclude that you would do so no matter what the race, color, religious beliefs, national origin or gender of the defendant or victim may be.

Whatever sentencing decision you reach, each of you is required by law to sign a certificate attesting to the fact that you have followed this instruction.  The certification is set out in

JA 1003

Section 4 of the special verdict form.

At the end of your deliberations, if you unanimously decide that the defendant be sentenced to death or to life imprisonment without possibility of release, the court is required to impose that sentence.

Remember that these are the only two choices of punishment available in this case. Any verdict must represent the considered judgment of each juror.

In order to return a verdict, it is necessary that each juror agree to it. In other words, your verdict must be unanimous. It is your duty as jurors to consult with one another and to deliberate in an effort to reach agreement, if you can do so, without violence to individual judgment. Each of you must decide the case for yourself, but only after impartial consideration of the evidence in the case with your fellow jurors.

In the course of your deliberations, do not hesitate to reexamine your own views, and change your opinion if convinced it is erroneous. But do not surrender your honest convictions solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

The defendant did not testify. The law gives

JA 1004

him that right.  There is no burden upon a defendant to prove that he should not be sentenced to death.  The burden is entirely on the Government to prove that a sentence of death is justified.  Accordingly, the fact that the defendant did not testify must not be considered by you in any way, or even discussed in arriving at your decision.

If you should desire to communicate with me at any time during your deliberations, please write down your message or question and pass the note to the court security officer who will bring it to my attention.

If you wish to see any or all of the exhibits, please advise me.  If you have any other questions, I shall respond as promptly as possible, either in writing or by having you return to the courtroom so that I can address you orally.

I caution you, however, with any message or question you might send, that you should not tell me any details of your deliberations or how any jury member is leaning in his or her decision.

It is proper, again, to add a final caution.  Nothing I have said in these instructions, and nothing I have said or done during the trial has been said or done to suggest to you what I think your

decision should be. What the decision should be is your exclusive duty and responsibility.

Now, ladies and gentlemen, I'm also going to send with you, as I indicated, the verdict form, and I'm going to go over briefly the verdict form with you. I'm not going to read it in its entirety, but you need to consider it closely before you answer the questions.

The first part, Roman Numeral One, is the aggravating factors, and there are three aggravating factors that you are to answer yes or no whether the Government has established the existing, existence of those aggravating factors beyond a reasonable doubt. Then you go to part two, which is the mitigating factors. And I've explained to you what those are, and those are, those mitigating factors that the defendant contends have been proved by a preponderance of the evidence are listed, and beside each one is a place for you to list the number of jurors who so find that it has been proved by a preponderance of the evidence.

There is also, at the end of that listing, extra spaces provided to write in additional mitigating factors, if any, found by one or more jurors.

And then finally, part three is your

determination, part 3A is the determination that a sentence of death should, shall be imposed, yes or no.  If you answer yes, you must sign your names, and if you answer no, the foreperson, alone, should sign and you proceed to Section 3B, which is the sentence of life in prison without possibility of release where the same course might be followed.

The final part is the certification, and you recall that you signed a similar certification at the earlier stage of these proceedings.  Each juror must certify that his or her verdict was reached in accord with that certification.

So, ladies and gentlemen, I'm going to send with you to the jury room the copy of the instructions I just read to you, and the verdict form.  Before I do so, ladies and gentlemen, I'm going to remove the alternates.  Again, the alternate's job is not completed.  It may be necessary for them to replace a regular juror.  The alternates, as you know, are jurors number 18, 55, 65 and 72.  Those jurors, those alternate jurors will be taken to a separate room.  Please do not discuss, alternate jurors, the case in any manner unless you are asked to replace a regular juror and go into the deliberations.  The remaining 12 of you will begin your deliberations, as soon as

the court security officer has separated the alternates and provided you with the written materials that I've just described.

So, ladies and gentlemen, if you'll follow the bailiff out.

(The jury retired to the jury room, after which the following occurred:)

THE COURT: Is there anything further before we recess awaiting return of the verdict?

MR. BROWNLEE: Nothing from the United States.

MR. KALISTA: Nothing, Your Honor.

THE COURT: Very well. We'll be in recess awaiting return of the verdict.

(Recess from 2:30 p.m. to 4:35 p.m.)

THE COURT: Counsel, I'm advised that the jury has reached a verdict. And Mr. Bailiff, if you'll bring the jury, in please.

(The jury entered the courtroom and was seated in the jury box.)

THE COURT: Ladies and gentlemen, I'm advised that you have reached a verdict. If so, would the foreperson hand the verdict form to the bailiff? Ladies and gentlemen, I'm going to announce your verdict. If the defendant will stand, please.

In the case of *United States of America* v. *Carlos David Caro*, Case Number 1:06CR1. Part one, aggravating factors. The jury unanimously finds that the Government has established the existence of the following aggravating factors beyond a reasonable doubt: Factor one, yes, signed by the foreperson. Factor two, yes, signed by the foreperson. Factor three, yes, signed by the foreperson.

Mitigating factors. The jury finds mitigating factors, that certain of the jurors have found mitigating factors one, three, four, five, six, seven, eight, nine, 11, 13, 14, 17, 18, 19, 20 and 22. There are no extra or additional mitigating factors found.

Determination, based on our consideration of the evidence, in accord with the court's instruction, we find by unanimous vote that a sentence of death shall be imposed on the defendant for the killing of Roberto Sandoval? Yes, signed by all of the jurors and foreperson. Sentence of life in prison without possibility of release? No. Certified by the jurors.

Ladies and gentlemen, is this your verdict so say you all?

THE JURY: Yes.

THE COURT:  Ladies and gentlemen, I'm going to again call your number, each of you, and you tell me individually if the verdict that I just read in which you directed that the defendant be sentenced to death is your own, individual verdict.  Juror Number Eight.

JUROR NUMBER EIGHT:  Yes.

THE COURT:  Twelve?

JUROR NUMBER TWELVE:  Yes.

THE COURT:  Juror Number 24?

JUROR NUMBER TWENTY-FOUR:  Yes.

THE COURT:  Juror Number 30?

JUROR NUMBER THIRTY:  Yes.

THE COURT:  Juror number 32?

JUROR NUMBER THIRTY-TWO?  Yes.

THE COURT:  Juror Number 33?

JUROR NUMBER THIRTY-THREE:  Yes, sir.

THE COURT:  Juror Number 39?

JUROR NUMBER THIRTY-NINE:  Yes.

THE COURT:  Juror Number 47?

JUROR NUMBER FORTY-SEVEN:  Yes.

THE COURT:  Juror Number 62?

JUROR NUMBER SIXTY-TWO:  Yes.

THE COURT:  Juror Number 67?

JUROR NUMBER SIXTY-SEVEN:  Yes.

THE COURT:  Juror Number 79.

JUROR NUMBER SEVENTY-NINE:  Yes, sir.

THE COURT:  Juror Number 97?

JUROR NUMBER NINETY-SEVEN:  Yes, sir.

THE COURT:  Very well.  I'll declare the verdict unanimous.  You may be seated.  I'll direct the clerk to record it.

Ladies and gentlemen, your duties are now ended in this case.  And I want, on behalf of the court, to thank you for your service.  I realize how difficult this case was.  Only you, and you alone, could decide this matter.

Nowhere else in the world do men and women from all walks of life get an opportunity to participate in the judicial process as in our country, nowhere else.  And that's one of the great strengths of our country, that you make decisions such as this.

I want to thank you, again.  You are now discharged and you may leave.  And the alternates are also released with the court's thanks.  You may follow the bailiff out, ladies and gentlemen.

(The jury retired to the jury room, after which the following occurred:)

THE COURT:  Now, counsel, I want to set a date for the imposition of sentence in this case.

And I will, counsel for the defendant may wish to file post verdict motions.

MR. KALISTA:  That's correct, Your Honor.

THE COURT:  But I want to set the sentencing date in approximately 30 days, and I'm going to ask the clerk to suggest a date in that regard.

THE CLERK:  Your Honor, the court would have available Tuesday, March 13th.

MR. BROWNLEE:  Would Monday be available, the 12th?

THE CLERK:  Yes, that's available.

THE COURT:  Very well.  I'm going to set sentencing in this case for Tuesday, March 13th.

THE CLERK:  I'm sorry, Your Honor.  I think they wanted Monday, March 12th.

THE COURT:  Oh, I'm sorry, Monday March 12th, 2:00 p.m.

MR. SIMMONS:  Your Honor, I have a trial scheduled to begin that day in Nashville, Tennessee. If Mr. Kalista can handle it, that's fine, or it may continue, I don't know.

THE COURT:  Well, I think counsel ought to be here.  How about the week before?

MR. SIMMONS:  The week before, Your Honor.

JA 1012

THE COURT: Friday, Madam Clerk?

THE CLERK: That would be Friday, March 9th, Your Honor.

THE COURT: Very well. I'll set sentencing on Friday, March 9th at 2:00 p.m. in this courthouse, and obviously counsel knows they have a certain limitation of time in terms of filing any post verdict motions, and those should be filed, obviously, on time.

Is there anything further then at this point that the court needs to resolve?

MR. BROWNLEE: Nothing from the United States, Your Honor.

THE COURT: Very well. We will adjourn court.

(Proceedings concluded at 4:45 p.m.)

CERTIFICATE


I certify the foregoing is an accurate transcript from the record of proceedings in the above-entitled matter.


3/27/07                          /s/ Bridget A. Dickert
Date

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF VIRGINIA
Abingdon Division

----------------------------x
                            :
UNITED STATES OF AMERICA,   :
                            :
      Plaintiff,            :
                            :
v.                          :    1:06CR1
                            :
CARLOS D. CARO,             :
                            :
      Defendant.            :    Abingdon, Virginia
                            :    March 30, 2007
----------------------------x    1:02 p.m.

SENTENCING
BEFORE THE HONORABLE JAMES P. JONES
CHIEF UNITED STATES DISTRICT JUDGE

APPEARANCES:

        JOHN BROWNLEE, Esquire
        U.S. Attorney
        ANTHONY P. GIORNO, Esquire
        Assistant U.S. Attorney
        P.O. Box 1709
        Roanoke, Virginia  24008
             For the United States of America.

        STEPHEN J. KALISTA, Esquire
        P.O. Box 1186
        Big Stone Gap, Virginia  24210
        JAMES SIMMONS, Esquire
        1208 17th Avenue South
        Nashville, Tennessee  37212
           Counsel for the Defendant.


Proceedings recorded by Stenography, transcript
produced by computer.

**BRIDGET A. DICKERT**
**UNITED STATES COURT REPORTER**
**180 WEST MAIN STREET, ROOM 104**
**ABINGDON, VIRGINIA 24210**
**(276) 628-5116**

JA 1015

2

(Proceedings commenced at 1:02 p.m.)

THE COURT: Good afternoon, ladies and gentlemen. The clerk will call the case.

THE CLERK: *United States of America v. Carlos Caro*, Case Number 1:06CR1.

THE COURT: This is the day scheduled for the sentencing of the defendant. First, let me ask the Government if there are any, any representatives of the victim present who wish to speak?

MR. GIORNO: No, Your Honor.

THE COURT: Very well. And before I pronounce sentence in the case, I'll hear anything that counsel has to say. First, from the Government?

MR. BROWNLEE: Very briefly, Your Honor, on February 13th the jury returned a sentence of death for Mr. Caro pursuant to statute. We would ask that the court impose that sentence.

THE COURT: Thank you, Mr. Brownlee.

MR. KALISTA: Nothing from the defense, Your Honor.

THE COURT: Very well. Mr. Caro, if you'll stand, please, sir. Mr. Caro, is there anything you wish to say to me before I pronounce sentence in your case?

THE DEFENDANT: No, sir.

JA 1016

THE COURT: Pursuant to the provisions of the Federal Death Penalty Act, and the recommendation of the jury that the defendant be sentenced to death, it is hereby adjudged and ordered that the defendant, Carlos David Caro, is hereby sentenced to death. There's also imposed on the defendant a special assessment in the amount of $100.

Pursuant to law, it is ordered that the defendant is committed to the custody of the Attorney General until exhaustion of the procedures for appeal of the judgment of conviction and review of the sentence.

Thereafter, the Attorney General shall release the defendant to the custody of a United States Marshal, who shall supervise implementation of this sentence in the manner prescribed by the law of the Commonwealth of Virginia.

I advise Mr. Caro of his right of appeal. Any notice of appeal must be filed within ten days. I advise Mr. Caro of the right of a person who is unable to afford the costs of an appeal to appeal without pre-payment of such costs, and to the appointment of counsel. Is there anything further?

MR. KALISTA: I have a motion. It concerns the notice of appeal. Pursuant to Rule (b)(4) of the

Federal Rules of Appellate Procedure the court has the authority to extend the time for filing the notice of appeal. I have discussed this matter with the Government. I'm making a motion to extend the time to filing of appeal in this case to Monday, April 23rd. The Government has no objection to that.

Basically, good cause would be I have a long scheduled vacation that I'm going to be beginning this next week lasting for two weeks, and would simply need that time basically to be gone, of course, and once I'm back, by filing a notice of appeal there are certain things that have to be done to basically deal with the Fourth Circuit. So, the Government has no objection to that motion.

THE COURT: And that date again is?

MR. KALISTA: Monday, April 23rd.

THE COURT: Very well, I will grant that motion and enter an order in that regard. Is there anything further, then, in this case?

MR. BROWNLEE: Nothing from the United States, Your Honor.

THE COURT: We will adjourn court.

(Proceedings concluded at 1:06 p.m.)

JA 1018

5

CERTIFICATE

I certify the foregoing is an accurate transcript from the record of proceedings in the above-entitled matter.

12/12/07                  /s/ Bridget A. Dickert
Date                          U.S. Court Reporter

JA 1019

CLERK'S OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED

MAR 22 2013

JULIA C. DUDLEY, CLERK
BY:
DEPUTY CLERK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>vs.<br><br>CARLOS DAVID CARO,<br><br>Defendant. | Case Number 1:06CR00001-JPJ<br><br>DEATH-PENALTY CASE |

## DEFENDANT'S MOTION FOR COLLATERAL RELIEF PURSUANT TO 28 U.S.C. § 2255

JA 1020

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................. i

INTRODUCTION ...................................................................................................................... 7

STATEMENT OF THE CASE ................................................................................................. 8

    A. Procedural Overview ........................................................................................................ 8

    B. Background Information, Offense and Trial ................................................................. 9

JURISDICTION ...................................................................................................................... 15

STATEMENT REGARDING BRIEFING AND LEGAL ARGUMENT ........................... 15

    A. The *Brady* Test Regarding the Government's Failure to Disclose Evidence ............... 16

    B. The *Strickland* Standard for Ineffective Assistance of Counsel ................................ 17

GROUNDS FOR RELIEF: PRETRIAL ............................................................................... 20

CLAIM ONE: THE GOVERNMENT VIOLATED MR. CARO'S FIFTH AMENDMENT DUE-PROCESS RIGHTS BY DELIBERATELY AND TACTICALLY DELAYING THE INDICTMENT OF THE CAPITAL CASE UNTIL AFTER THE GOVERNMENT HAD NEGOTIATED A DISPROPORTIONATE PLEA AGREEMENT IN THE BENAVIDEZ ASSAULT WHICH IMPAIRED MR. CARO'S CAPITAL DEFENSE. ............................................................ 20

    A. The Benavidez Assault and Disproportionate Plea Agreements ................................ 20

    B. A Tactical Advantage for the Government and Prejudice to Mr. Caro ........................ 24

CLAIM TWO: MR. CARO WAS DEPRIVED OF HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY 18 U.S.C. § 3006a AND THE SIXTH AMENDMENT OF THE CONSTITUTION AT THE DEATH-CERTIFICATION STAGE OF THE CASE. ...................... 26

    A. What is the Death-Certification Process? .................................................................... 26

    B. The Sixth Amendment Right to Counsel Applies at the Death-Certification Stage ....... 28

    C. Duties of Counsel at Death-Certification Stage ........................................................... 30

        1. Duty to Investigate ................................................................................................. 31

        2. Duty to Argue Mitigating Facts .............................................................................. 32

    D. Counsel's Deficient Performance ................................................................................. 33

        1. Deficient Performance of Duty to Investigate ........................................................ 33

        2. Deficient Performance of Duty to Argue Mitigating Evidence ................................ 35

    E. Prejudice to Mr. Caro .................................................................................................. 38

JA 1021

**GROUNDS FOR RELIEF: GUILT/INNOCENCE PHASE** ......................................................... 38

CLAIM THREE: MR. CARO'S RIGHT TO A FAIR TRIAL WAS INFRINGED BY JUROR MISCONDUCT, IN VIOLATION OF THE FIFTH AND SIXTH AMENDMENTS ........................... 38

A. Juror Deceit in *Voir Dire* ............................................................................... 39

    1. Juror # 62 ................................................................................................... 40

    2. Juror # 32 ................................................................................................... 41

B. Juror Predetermining Decision Before Hearing the Evidence ...................... 42

CLAIM FOUR: MR. CARO WAS DEPRIVED OF HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL AS GUARANTEED BY 18 U.S.C. § 3006a AND THE SIXTH AMENDMENT OF THE CONSTITUTION DURING THE GUILT/INNOCENCE PHASE BECAUSE COUNSEL FAILED TO ADEQUATELY INVESTIGATE, DEVELOP, AND PRESENT A THEORY WITH SUPPORTING EVIDENCE IN MR. CARO'S DEFENSE. ................................. 43

A. Trial Counsel Failed to Develop a Cohesive Theory of Defense ................... 43

B. Trial Counsel Failed to Adequately Investigate and Impeach the Government's Only Purported Eyewitness, Sean Bullock ............................................................................................ 46

C. Trial Counsel Failed to Adequately Investigate and Present Evidence of the BOP's Negligence Regarding the Decision to Grant Mr. Sandoval's Request to be Placed in Mr. Caro's Cell ................. 53

D. Trial Counsel Failed to Adequately Investigate and Present Evidence In Support of Self-Defense, Second-Degree Murder, or Manslaughter .......................................................................... 57

E. Counsel's Deficiencies Both Individually and Cumulatively Prejudiced Mr. Caro ...................... 61

CLAIM FIVE: BY WITHHOLDING MATERIAL EXCULPATORY AND IMPEACHMENT EVIDENCE, AND MISLEADING DEFENSE COUNSEL, THE GOVERNMENT VIOLATED MR. CARO'S RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS. ................................................................................................................... 62

**GROUNDS FOR RELIEF: PENALTY PHASE** ......................................................................... 65

CLAIM SIX: MR. CARO WAS DEPRIVED OF HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL AS GUARANTEED BY 18 U.S.C. § 3006a AND THE SIXTH AMENDMENT OF THE CONSTITUTION AT THE PENALTY PHASE .......................................... 65

A. Trial Counsel Failed to Challenge the Government's Deliberate and Tactical Delay of Mr. Caro's Indictment ................................................................................................................ 65

B. Trial Counsel Failed to Adequately Investigate, Develop, and Present a Compelling Mitigation Story about Mr. Caro's Life ....................................................................................... 66

    1. Factual Background ........................................................................................ 66

        a) Pretrial Preparation .................................................................................. 66

        b) Trial ......................................................................................................... 82

JA 1022

2.    Counsel's Performance was Deficient ........................................................ 87

  a)    Counsel never developed a reasoned and cohesive  mitigation theme for trial ..................... 89

  b)    Counsel failed to appropriately request, adequately  develop, and present testimony of
  mental-health  experts ...................................................................................................... 90

  c)    Counsel's failure to obtain a mental-health expert to  explain the effects of Mr. Caro's
  childhood trauma was  unreasonable ................................................................................... 98

  d)    Counsel's failure to present testimony of Mr.  Caro's brothers: Jose and Noe.................... 100

  e)    The limited mitigation case that counsel presented  was undermined by counsel's own
  argument to the  jury and by counsel's introduction of a witness who  previously recorded a
  statement that was used  against her and other witnesses ............................................. 104

      (1)    Opening and closing statements............................................................... 104

      (2)    Witnesses who were undermined on cross- examination............................ 106

  3.    Counsel's deficient performance prejudiced Mr. Caro ........................................... 109

C.    Trial Counsel Failed to Adequately Investigate Prison Culture and Failed to Subject the
Government's Evidence Regarding Mr. Caro's Purported Gang Leadership Position to Meaningful
Adversarial Testing.............................................................................................................. 113

D.    Trial Counsel Failed to Adequately Investigate Relevant Facts and Law Regarding the BOP's
Ability to Control Improper Inmate Communications, and failed to Subject the Government's Evidence
to Meaningful Adversarial Testing ...................................................................................... 116

E.    Trial Counsel Failed to Adequately Investigate and to Present Mitigating Evidence Concerning
Prison Culture and Statements of Remorse........................................................................ 118

F.    Trial Counsel Failed to Adequately Investigate Mr. Caro's Underlying Conviction for Conspiracy
to Commit Murder and Failed to File a Collateral Challenge to that Unconstitutional Conviction ..... 119

  1.    Mr. Caro's Prior Counsel Failed to Advise Him that a  Guilty Plea for Conspiracy to Murder in
  the Benavidez  Assault Could and Likely Would be Used Against Him by  the Government as an
  Aggravating Circumstance in the  Sandoval Case ........................................................ 119

  2.    Trial Counsel Could Have Timely Challenged the Prior  Conviction and Sentence, But Failed
  To Do So ....................................................................................................................... 124

  3.    Trial Counsel's Failure to Investigate and Challenge the  Prior Conviction in the Benavidez
  Assault Prejudiced Mr.  Caro........................................................................................ 126

  4.    This Court Should Stay Its Decision in This Case Pending  Its Decision on the § 2255 Motion
  filed in Case No.  2:03- cr-10115-JPJ ......................................................................... 127

G.    Trial Counsel Failed to Present *Skipper* Evidence To Rebut Aggravating Evidence .................. 128

  1.    Evidence of Circumstances Surrounding Guilty Plea in  the Benavidez Assault..................... 128

  2.    Evidence that the BOP Considered Mr. Caro a "Good  Inmate," Appropriate for Housing at
  USP-Marion or  ADX-Florence...................................................................................... 129

  3.    Mr. Caro's Concern for the Well-Being of Others ................................................. 131

JA 1023

H.    Trial Counsel Failed to Adequately Investigate and Present Evidence of the BOP's Negligence Regarding the Decision to Grant Mr. Sandoval's Request to be Placed in Mr. Caro's Cell ................. 132

I.    Trial Counsel Failed to Object to the Government's Presentation of Evidence of Specific Instances of Violence By Persons Other than Mr. Caro ...................................................................... 133

J.    Trial Counsel Failed to Object to the Government's Improper Arguments Made During Closing Statement ....................................................................................................................... 136

    1.    The Government Improperly Argued to the Jury that It Should Control Mr. Caro by Imposing the Death Penalty ................................................................................................... 137

    2.    The Government Improperly Argued to the Jury that Unless Mr. Caro Received the Death Penalty There Would Be No Punishment for the Death of Roberto Sandoval ............................. 137

    3.    The Government Violated the Eighth Amendment and the Rule in *Caldwell v. Mississippi* by minimizing the jury's responsibility ................................................................................. 138

    4.    Defense Counsel Was Ineffective for Failing to Object to the Prosecutor's Unconstitutional and Prejudicial Statements ................................................................................................... 139

K.    Trial Counsel Failed to Accept the Invited Excuse of a Frequently Sleeping Juror, and the Court Violated Mr. Caro's Fifth and Fourteenth Amendment Due-Process Rights and Sixth Amendment Jury Trial Right by Failing to Excuse the Juror ................................................................................ 141

L.    Counsel's Deficiencies, Both Individually and Cumulatively, Prejudiced Mr. Caro ................... 146

CLAIM SEVEN:    BY WITHHOLDING MATERIAL EXCULPATORY AND IMPEACHMENT EVIDENCE, AND PRESENTING MISLEADING PREJDUCIAL ARGUMENT REGARDING FUTURE DANGEROUSNESS, THE GOVERNMENT VIOLATED MR. CARO'S RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS. ....................................... 147

A.    The Government Violated Mr. Caro's Constitutional Rights under *Brady v. Maryland* by Withholding Material Exculpatory and Impeachment Evidence that the BOP Has Housed Many Inmates at ADX-Florence and Its Predecessor Prison, USP-Marion, for More than Three Years. ....... 148

B.    The Government Violated Mr. Caro's Constitutional Rights under *Brady v. Maryland* by Withholding Materially Exculpatory Evidence that Mr. Caro was Not a Gang Leader at USP-Lee.... 153

C.    The Government's Failure to Produce Material Exculpatory Evidence Considered Cumulatively Violated Mr. Caro's Constitutional Rights ............................................................................. 155

D.    Mr. Caro's Death Sentence, Which Relied on Incomplete, Misleading and Irrelevant Information Regarding Future Dangerousness Violated Mr. Caro's Rights Under the Eighth Amendment ............ 157

CLAIM EIGHT: THE GOVERNMENT VIOLATED THE EIGHTH AMENDMENT AND THE RULE IN *CALDWELL V. MISSISSIPPI*, BY MINIMZING THE JURY'S RESPONSIBILITY........ 157

**GROUNDS FOR RELIEF: DIRECT APPEAL** ................................................................... **159**

CLAIM NINE: MR. CARO WAS DEPRIVED OF HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL ON DIRECT APPEAL AS GUARANTEED BY 18 U.S.C. § 3006a AND THE FOURTEENTH AMENDMENT OF THE CONSTITUTION. ........................................................ 159

JA 1024

A.    Appellate Counsel Failed to Challenge the Court's Refusal to Instruct the Jury that the Aggravating Factors Must Outweigh the Mitigating Factors Sufficiently and Beyond a Reasonable Doubt, in Violation of Mr. Caro's Fifth, Sixth, Eight, and Fourteenth Amendments ......................... 159

B.    Appellate Counsel Failed to Challenge the Exclusion for Cause of Qualified Jurors with Misgivings as to the Death Penalty ................................................................................................... 162

C.    Appellate Counsel Failed to Raise a Meritorious Argument Regarding Trial Counsel's Failure to Object to Specific Instances of Violence Committed by Persons Other Than Mr. Caro ................. 168

D.    Appellate Counsel Failed to Raise the Claim that the Government Violated the Eighth Amendment and the Rule in *Caldwell v. Mississippi* by Minimizing the Jury's Responsibility .......... 170

E.    Appellate Counsel Failed to Raise Systemic Challenges to the Death Penalty ............................ 170

**GROUNDS FOR RELIEF: SYSTEMIC CHALLENGES** ................................................................ **170**

CLAIM TEN: THE USE OF THE "FUTURE DANGEROUSNESS" AGGRAVATING FACTOR AT SENTENCING, WHICH RESULTED IN AN UNRELIABLE PREDICTION OF MR. CARO'S FUTURE DANGEROUSNESS BY THE JURY, VIOLATED MR. CARO'S RIGHT TO A NON-ARBITRARY SENTENCING PROCESS UNDER THE EIGHTH AMENDMENT AND 18 U.S.C. § 3595(C)(2)(A) ..................................................................................................................................... 170

CLAIM ELEVEN: THE ABSENCE OF A PRINCIPLED BASIS FOR DISTINGUISHING CASES IN WHICH THE FEDERAL DEATH-PENALTY IS IMPOSED FROM THOSE IN WHICH IT IS NOT IMPOSED RENDERS THE FEDERAL DEATH PENALTY ACT UNCONSTITUTIONAL. ......... 179

CLAIM TWELVE: THE FEDERAL CAPITAL PUNISHMENT SYSTEM, IN WHICH CAPITAL PUNISHMENT IS IMPOSED ON BOTH THE INVIDIOUS BASIS OF RACE AND THE IRRATIONAL BASIS OF GEOGRAPHY, SHOULD NOT BE ENFORCED.  THIS COURT SHOULD VACATE MR. CARO'S SENTENCE ON THIS BASIS ALONE .................................... 185

CLAIM THIRTEEN:  MR. CARO'S DEATH SENTENCE IS CATEGORICALLY CRUEL AND UNUSUAL PUNISHMENT IN VIOLATION OF THE EIGHTH AMENDMENT .......................... 188

CLAIM FOURTEEN: THE FEDERAL CAPITAL PUNISHMENT SYSTEM AT THE TIME OF MR. CARO'S TRIAL VIOLATED INTERNATIONAL LAW ................................................................. 189

CLAIM FIFTEEN:  THE PRECLUSION OF "PLAIN-ERROR" REVIEW BY THE FEDERAL DEATH-PENALTY ACT RENDERS THE STATUTE UNCONSTITUTIONAL ............................. 191

**GROUND FOR RELIEF: CUMULATIVE ERROR** ........................................................................ **194**

CLAIM SIXTEEN: MR. CARO'S CONVICTION AND SENTENCE MUST BE VACATED DUE TO THE CUMULATIVE PREJUDICIAL EFFECT OF THE ERRORS IN THIS CASE .................. 194

JA 1025

**PRAYER FOR RELIEF**................................................................................................ 195

**CERTIFICATION** .................................................................................................... 196

JA 1026

COMES NOW Defendant CARLOS DAVID CARO, by and through his undersigned counsel, pursuant to 28 U.S.C. § 2255, Federal Rule of Criminal Procedure 33, and Rules 2 and 3 of the Rules Governing Section 2255 Proceedings, and respectfully requests that this Court vacate the judgment entered against him, grant him a new trial, and/or vacate, set aside, or correct his sentence.

## INTRODUCTION

There is an ancient parable about a group of blind men and an elephant. They each touched the elephant to learn what it was like. After each man felt a part of the elephant, the king asked, "Tell me, what sort of thing is an elephant?" The men avowed that the elephant was either like a wall (side), tree (leg), snake (trunk), spear (tusk) or a rope (tail). Without seeing the entire elephant, no one knew what it was. The jurors in this case were much like the blind men. Because they were not shown the entire elephant, they did not "see" all that was necessary to understand either Mr. Caro or the offense, and thus there can be no confidence in their conclusions.

The evidence that the jury never saw, or heard, was significant. The jury never learned that Mr. Caro suffers from an organic brain impairment and has the reasoning ability of a 10-year-old child. The jury never learned that the government's only eye-witness, Sean Bullock, had a cellmate at the time of the offense and that had he been called to testify would have stated that neither he nor Mr. Bullock saw the offense because they were playing cards at the time. The jury never heard from an expert on prison culture, whose testimony would have allowed them to perceive and understand the

JA 1027

offense within its cultural context. The jury never learned that, contrary to the government's innuendos, Mr. Caro was not a leader of any gang. Finally, the jury never learned that the Bureau of Prisons ("BOP") not only has the authority and ability to house inmates in highly secure and restrictive facilities for extended periods of time, but that, contrary to the government's assertions, the BOP was doing so at the time of Mr. Caro's trial.

Both parties were responsible for the jury not "seeing" the entire story. The government withheld critical documents that would have impeached its witnesses. Defense counsel failed to conduct a thorough investigation, overlooking a key witness and impeachment evidence. Defense counsel also failed to develop and present a meaningful defense and mitigation story that incorporated all of the relevant facts, including Mr. Caro's brain impairment.

Without this evidence, Mr. Caro could not and did not receive a fair and reliable trial.

## STATEMENT OF THE CASE

### A. Procedural Overview

Carlos Caro (Reg. No. 37786-079) is currently confined at the United States Penitentiary ("USP") in Terre Haute, Indiana. He challenges his conviction and sentence, including his death sentence, imposed by the Honorable James P. Jones, District Court Judge for the Western District of Virginia at Abingdon. (Case No. 1:06-cr-00001-JPJ (W.D. Va.).) Mr. Caro pled not guilty and was convicted after a jury trial. He was represented at trial by Stephen J. Kalista and James A. Simmons.

JA 1028

The Fourth Circuit affirmed his conviction and sentence on appeal. *United States v. Caro*, 597 F.3d 608, *reh'g denied*, 614 F.3d 101 (4th Cir. 2010). On January 9, 2012, the United States Supreme Court denied his petition for a writ of certiorari. *Caro v. United States*, 132 S. Ct. 996 (2012).

This Court, pursuant to 18 U.S.C. § 3599, appointed the Federal Public Defender's Offices in the District of Arizona and the Western District of Virginia to represent Mr. Caro in this action. (Order, 05/11/2011, Dkt. 768.)[1] That order became effective upon the Supreme Court's denial of Mr. Caro's petition for a writ of certiorari.

This is the first motion that Mr. Caro has filed challenging the conviction and sentence in this matter.

## B. Background Information, Offense and Trial

On August 29, 2003, Mr. Caro was placed in the Special Housing Unit (SHU) at USP-Lee after he and another inmate Juan Moreno-Marquez assaulted a third inmate, Ricardo Benavidez (the "Benavidez assault"). Five other inmates were implicated in the Benavidez assault and all seven were placed in the SHU. According to the government, all seven inmates were members of the same gang, the Texas Syndicate. The BOP determined that the victim, Mr. Benavidez, was the leader of the gang.

Several months later, on December 16, 2003, the SHU officers attempted to place inmate Roberto Sandoval, also a member of the same gang, into Mr. Caro's cell. Mr. Caro refused to take a cellmate, and the officer placed Mr. Sandoval in a nearby cell

---

[1] All citations to the docket refer to the docket in this matter. Where another case docket is referenced, counsel will indicate the case number in that citation.

JA 1029

instead.    Contrary to standard operating procedures, the officer did not write up a disciplinary report regarding the refusal or communicate the refusal to the next shift. When the next shift officers arrived, Mr. Sandoval, ignoring Mr. Caro's recent refusal, asked to be put in Mr. Caro's cell.  This time Mr. Caro did not refuse, and Mr. Sandoval was placed into Mr. Caro's cell.

During the evening of the next day, December 17, 2007, Mr. Caro called an officer over to his cell, where the officer saw the body of Mr. Sandoval lying on the ground.  Mr. Sandoval, who had an orange towel wrapped around his neck, was dragged by the officers into the hallway.   Attempts to revive Mr. Sandoval failed, and the medical examiner determined the cause of death as strangulation.  Mr. Caro was interviewed by Douglas Fender, an FBI agent, who testified that Mr. Caro told him that he had killed Mr. Sandoval over breakfast.   Agent Fender testified that he began to question Mr. Caro further because he did not believe the killing was related to a breakfast tray, but rather that the killing had something to do with the gang.  Mr. Caro stopped the interview at that point.  Mr. Caro also made other statements indicating that he had killed Mr. Sandoval because Mr. Sandoval had disrespected him.

The government did not immediately pursue prosecution of the Sandoval homicide, but did pursue prosecution of Mr. Caro and the other six defendants for the Benavidez assault.  While there had been two "knife-men" who attacked Mr. Benavidez, Mr. Caro and Mr. Moreno-Marquez, the government believed that one of the other codefendants, Francisco Tijerina, had planned the attack in an effort to become the leader of the gang.  All seven defendants were charged with conspiracy to commit murder, as

10

well as possession of weapons. In the end, the government focused its efforts on Mr. Caro. The government offered the other defendants—including Mr. Moreno-Marquez, the other knife-man who was a career offender, and Mr. Tijerina, the inmate who had planned the attack in order to gain power—plea agreements that allowed them to plead to the lesser charge of possession with a weapon, while the government required Mr. Caro to plead to conspiracy to commit murder. The six defendants received sentences between 24 and 57 months, while Mr. Caro received a sentence of 327 months.

It was not until about two months after Mr. Caro was sentenced in the Benavidez assault, and over one year after the death of Mr. Sandoval, that the government contacted this Court about prosecution of Mr. Caro in this capital case. On January 27, 2005, the Court appointed two counsel to represent Mr. Caro, Mr. Simmons and Mr.Kalista. The Department of Justice ("DOJ") scheduled its death certification hearing for June 6, 2005, during which time the defense had the opportunity to argue that it should not seek death for Mr. Caro. During March and April, counsel sought and secured funding for a mitigation specialist and fact investigator in order to assist counsel in preparing for the meeting, but little was done. Counsel appeared at the hearing, but did not prepare anything for submission in writing to the Review Committee.

The United States Attorney General certified the case for death in October, and on January 3, 2006, a grand jury returned an indictment for first-degree murder, alleging statutory aggravators based on three prior drug convictions and premeditation (the premeditation aggravator was later dropped). On January 11, 2006, the government filed a Notice of Intent to Seek Death Penalty that included two non-statutory aggravators,

11

JA 1031

victim impact and future dangerousness.

Voir dire began on January 22, 2007, and lasted for four days. The jury trial began on January 29, 2007, and also lasted four days, for a total of approximately 13 hours—which included opening statements, closing arguments, all evidence, and deliberations. The government's theory at trial was that Mr. Caro had waited until Mr. Sandoval turned his back, then snuck up behind and ambushed him and strangled him with a towel. The government presented one purported eyewitness, inmate Sean Bullock, who had been housed in the cell immediately across from Mr. Sandoval. Mr. Bullock testified that he had seen Mr. Caro standing behind Mr. Bullock strangling him. The government presented Mr. Caro's statement, in which he stated that he had killed Mr. Sandoval over breakfast and disrespect. The government argued that Mr. Sandoval asked to go into Mr. Caro's cell because a new busload of inmates was coming in and he did not want to be celled with a new inmate.

Defense counsel did not call any witnesses at trial. Defense counsel conceded that Mr. Caro had killed Mr. Sandoval, but argued that the killing was not premeditated. Rather, it was the result of two men in a small cell having a heated argument that escalated into a "killing of hot blood." They argued that Mr. Caro was guilty only of second-degree murder or voluntary manslaughter. They questioned why Mr. Caro refused a cellmate and why Mr. Sandoval wanted to go into Mr. Caro's cell, but did not provide any answers. They argued that the jury should look at the offense within the context of prison culture, but did not present any expert on the subject. Defense counsel also pointed out that Mr. Sandoval had two injuries, which might indicate two separate

12

JA 1032

physical altercations.   Defense counsel cross-examined Mr. Bullock, but failed to impeach him with testimony from Mr. Bullock's cellmate, who, if called, would have testified that he and Mr. Bullock were playing cards at the time of Mr. Sandoval's death and did not hear or see anything until the officers dragged Mr. Sandoval's body into the hallway.

The jury found Mr. Caro guilty of first-degree murder. The penalty stage of trial began on February 5 and lasted for six days. The government presented 13 witnesses: one victim witness, the daughter of Roberto Sandoval, and 12 witnesses who testified about various aspects of future dangerousness.  The government introduced evidence that Mr. Caro had been a leader of the gang when he was housed at the Federal Corrections Institute ("FCI") in Oakdale, Louisiana, and might still be a leader, that he had assaulted Mr. Benavidez, and that he previously had sent out coded letters.  While none of Mr. Caro's letters had contained threats or orders to kill, the government introduced evidence that another inmate who was a member of the Aryan Brotherhood gang had once sent a coded letter from a BOP prison that resulted in a murder.  The government argued that the BOP could not securely house Mr. Caro, and that even if he was sent to the BOP's most secure facility, Administrative Maximum Facility ("ADX") Florence, BOP policies would require them to move Mr. Caro back into open population in three years, even if he remained dangerous.

Defense counsel presented eight witnesses: one witness testified generally about BOP security conditions; one witness testified that Mr. Caro was dangerous, but that the BOP could securely house him; and the remaining six witnesses, who were members of

13

JA 1033

Mr. Caro's extended family and a teacher, testified briefly about Mr. Caro.    Defense counsel did not present any mental health evidence, even though they knew that Mr. Caro suffered from a brain impairment which left him with the reasoning ability of a 10-year-old.  They did not rebut the proposition that Mr. Caro had been and might still be a gang leader.  They did not rebut testimony about the ability of ADX-Florence to house inmates for extended periods of time in part because they were unable to obtain the relevant information despite their efforts through discovery. The jury unanimously found that the government had proven beyond a reasonable doubt that Mr. Caro was likely to commit acts of violence against inmates or staff in the federal prison in the future, that he had not express remorse for the death of Mr. Sandoval, and that he caused significant impact on the victim's family.  The jury sentenced Mr. Caro to death.

Had the jury been allowed to "see the entire elephant," they would have heard a story much different from that presented at trial:

- The jury would have heard that Mr. Caro's initial refusal to take a cellmate could have been an attempt to avoid retribution for the Benavidez assault.

- The jury would have heard that Mr. Sandoval's subsequent request to be housed with Mr. Caro after an earlier refusal, when interpreted through the eyes of prison culture, was a violation of prison etiquette that could have been interpreted as aggressive conduct by Mr. Sandoval.

- The jury would have heard impeaching evidence from Mr. Bullock's cellmate, Joseph Bland, contradicting Mr. Bullock's testimony and effectively eliminating the government's foundation for a finding of premeditation.

14

JA 1034

- The jury would have heard that the BOP's conclusion that Mr. Caro had been a gang leader in the past was premised on faulty assumptions, and that grand jury and BOP internal documents (never disclosed to the defense) at the time of Mr. Caro's trial reflected that the BOP never believed Mr. Caro was a gang leader at USP-Lee and, to the contrary, believed he might be in bad standing with the gang.

- The jury would have heard that, contrary to testimony presented by the government, ADX-Florence, at the time of Mr. Caro's trial, had at least 43 inmates who had been there more than five years.

- Finally, the jury would have heard that Mr. Caro suffered from a brain impairment, which left him with the reasoning ability of a 10-year old.

These and many other parts of the case would have supported a conviction for a lesser crime, such as second-degree murder or voluntary homicide, or even an acquittal based on self-defense, and a sentence less than death.

## JURISDICTION

This Court has jurisdiction to hear this Motion and to provide the relief requested herein pursuant to 28 U.S.C. § 2255, 28 U.S.C. § 2241, and the Rules Governing Section 2255 Proceedings for the United States District Courts (hereinafter "Section 2255 Rules").

## STATEMENT REGARDING BRIEFING AND LEGAL ARGUMENT

In accordance with Section 2255 Rule 2, this Motion sets forth the facts and grounds entitling Mr. Caro to relief. While the motion contains some legal argument and citations, these arguments and citations are not intended as comprehensive legal analyses

15

JA 1035

of the claims.  With regard to Mr. Caro's allegations of *Brady* and *Strickland* violations, the following general principles are set forth below:

**A.     The *Brady* Test Regarding the Government's Failure to Disclose Evidence**

In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the Supreme Court held that the "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilty or punishment, irrespective of the good or bad faith of the prosecution."  These rights have been recognized both in federal cases under the Fifth Amendment and state cases brought under the Fourteenth Amendment.  *See Brady*, 373 U.S. at 86 (holding that suppression of exculpatory evidence was a violation of the defendant's Fourteenth Amendment rights); *United States v. Agurs*, 427 U.S. 97, 107 (1976) (analyzing a *Brady* claim in a federal prosecution under both the Fifth and Fourteenth Amendments).

A *Brady* claim lies when the requested evidence is (1) favorable to the defense; (2) material; and (3) within the possession or control of the government or its agents, and was not disclosed.  *Moore v. Illinois*, 408 U.S. 786, 794-95 (1972).  Evidence is deemed "material" if "there is a reasonable possibility that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  A reasonable possibility is a possibility sufficient to undermine the confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985).

Finally, the fact that the government, in the form of any of its departments that were involved in Mr. Caro's prosecution, had in its possession the exculpatory

JA 1036

information is sufficient to support Mr. Caro's claims. *Kyles v. Whitley*, 514 U.S. 419, 437 (1995) ("the individual prosecutor has a duty to learn of any favorable evidence known to the others *acting on the government's behalf in the case*") (emphasis added); *United States v. Andrews*, 824 F. Supp. 1273, 1289-90 (N.D. Ill. 1993) (prosecution team responsible under *Brady* for exculpatory and impeachment information known to the BOP, and the prosecution's failure to disclose the impeaching material "deprived defense counsel of the opportunity to independently investigate and fully develop a defense to these serious charges.") (internal citations omitted); *see also Schneider v. Estelle*, 552 F.2d 593 (5th Cir. 1977) (holding prosecution responsible for information known to government agent who testified for the prosecution).

## B.    The *Strickland* Standard for Ineffective Assistance of Counsel

The Supreme Court outlined the standard for determining when counsel has provided ineffective assistance in *Strickland v. Washington*, 466 U.S. 668, 686-87 (1984). As described by the Court, "the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relief on as having produced a just result." *Id.* at 686. Under *Strickland*, counsel is ineffective if: (1) "representation fell below an objective standard of reasonableness"; and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 688, 694. Effective assistance of counsel is ultimately concerned with the fundamental right to a fair trial—"a trial whose result is reliable." *Id.* at 687.

17

JA 1037

The inquiry under the deficiency prong is "whether counsel's assistance was reasonable considering all the circumstances." *Strickland*, 466 U.S. at 688. Performance is deficient when the attorney fails to render the performance of a reasonably competent attorney. *Id.* at 687. Although defense counsel has broad discretion when making strategic decisions, those decisions must be both reasonable and informed. *Id.* at 691. When assessing counsel's performance, this Court should look to guides such as the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases. *See Bobby v. Van Hook*, 130 S. Ct. 13, 17 (2009); *Strickland*, 466 U.S. at 688-89 ("Prevailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable . . . "); *Meyer v. Branker*, 506 F.3d 358, 372 (4th Cir. 2007) (noting that ABA Guidelines "may be of some relevance in determining what constitutes reasonable performance in a capital trial"). The court can also consider the opinion of a standard of care expert when assessing the reasonableness of counsel's actions or inactions. *See, e.g., Gray v. Branker*, 529 F.3d 220, 235 (4th Cir. 2008) (noting that petitioner presented an "expert on the practice of criminal law"); *Johnson v. United States*, 860 F. Supp. 2d 663, 690 (N.D. Iowa 2012) (discussing testimony from evidentiary hearing of experts, including "a *Strickland* expert"); *Bell v. King*, No. 7:04CV00752, 2006 WL 938730, at *4 (W.D. Va. Apr. 11, 2006) (noting that courts consider "legal expert testimony regarding attorney standard of care when evaluating ineffective assistance claims").

Prejudice, the second prong, exists if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

18

JA 1038

*Strickland*, 466 U.S. at 694. A reviewing court must evaluate "the totality of the evidence before the judge or jury." *Id.* at 695. The prejudice analysis does not depend on whether the outcome of the proceeding would have been different. *Id.* at 694. Rather, prejudice is shown by "a probability sufficient to undermine confidence in the outcome" of the proceeding. *Id.* "[A]n analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective." *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993). "The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Strickland*, 466 U.S. at 694.

In assessing prejudice during the penalty phase of a capital case, the Court should determine whether "there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695. That is, where "there is a reasonable probability that at least one juror would have struck a different balance." *Wiggins v. Smith*, 539 U.S. 510, 537 (2003).

The *Strickland* standard is also applied when considering counsel's performance on direct appeal. *Smith v. Robbins*, 528 U.S. 259, 285 (2000). In assessing prejudice on appeal, the presumption of effective assistance of counsel will generally be overcome if the issues counsel failed to present are stronger than the issues that were presented. *Bell v. Jarvis*, 236 F.3d 149 (4th Cir. 2000). Counsel has provided the declaration of Larry Hammond, which sets forth the standard of care for the attorneys involved in this case.

19

JA 1039

Mr. Caro incorporates by reference all information provided in Mr. Hammond's declaration.

**GROUNDS FOR RELIEF: PRETRIAL**

**CLAIM ONE: THE GOVERNMENT VIOLATED MR. CARO'S FIFTH AMENDMENT DUE-PROCESS RIGHTS BY DELIBERATELY AND TACTICALLY DELAYING THE INDICTMENT OF THE CAPITAL CASE UNTIL AFTER THE GOVERNMENT HAD NEGOTIATED A DISPROPORTIONATE PLEA AGREEMENT IN THE BENAVIDEZ ASSAULT WHICH IMPAIRED MR. CARO'S CAPITAL DEFENSE.**

The government did not notify the Court of its intention to prosecute Mr. Caro for the murder of Mr. Sandoval until December 30, 2004—over one year after the death of Mr. Sandoval and two months after Mr. Caro was sentenced in another criminal case before this Court. *United States v. Caro*, No. 2:03-cr-10115-JPJ (W.D. Va.) (the "Benavidez assault"). One reason for this delay appears to have been the government's interest in convicting and sentencing Mr. Caro to the longest possible sentence in the Benavidez assault—Mr. Caro's only prior conviction for a crime of violence—so it could set up the Sandoval case for death, including the argument that the only effective punishment available in this capital case was death, as Mr. Caro already was serving a de facto life sentence.

**A.      The Benavidez Assault and Disproportionate Plea Agreements**

On August 29, 2003, inmate Ricardo Benavidez was attacked and received multiple stab wounds at United States Penitentiary ("USP")-Lee. Seven inmates, including Mr. Caro, were implicated in the stabbing and charged with conspiracy to

20

commit murder and possession of weapons. (Case No. 2:03-cr-10115-JPJ, Indictment, 01/03/2006, Dkt. 2.) Two of the defendants, Mr. Caro and another inmate named Juan Moreno-Marquez, were equally involved in the stabbing. The other five defendants had been armed and standing close by at the time of the offense.

Less than two months later, the Special Investigative Services ("SIS") intelligence officer at USP-Lee, testified under oath before a grand jury about a gang called the Texas Syndicate. (Grand Jury Tr. 10/22/2003, attached as Sealed Ex. 28.) The officer testified that the victim, Ricardo Benavidez, had been the leader of the Texas Syndicate at USP-Lee prior to his assault, but that the current leader of the gang was an inmate by the name of Francisco Tijerina. (Sealed Ex. 28 at 15.) When a juror asked "why the [gang] would attack their own leader," the officer testified that he believed that inmate Tijerina wanted to "assume the leadership role of the Texas Syndicate" as USP-Lee. (Sealed Ex. 28 at 18.)[2]

The SIS Officer also concluded that all seven of the inmates conspired in the crime, but that the "attack was planned by inmate Tijerina . . . in an attempt to gain control of the Texas Syndicate Leadership" at USP-Lee. (BOP Memorandum from ▇ with attached SIS Report (Case No. 2:03-cr-10115-JPJ), 10/08/2004, attached as Sealed Ex. 51 at 12.)

There is no mention or implication anywhere that Mr. Caro was, at any time, the leader of the Texas Syndicate at USP-Lee.

---

[2] Inmates Benavidez and Tijerina were released from prison subsequent to the Sandoval offense. Mr. Benavidez is now deceased.

21

JA 1041

On November 19, 2003, the government charged the seven inmates with conspiracy to commit the murder of Ricardo Benavidez and possession of weapons. Inexplicably, six of the seven inmates were allowed to plead to the lesser possession of a weapon charge, including both Mr. Moreno-Marquez and Mr. Tijerina.  (Docket, Case No. 2:03-cr-10115-JPJ.)

The government, however, required Mr. Caro to plead to the most serious charge, conspiracy to commit murder.  Mr. Moreno-Marquez, who had been the other knife-man and was a career offender, was given a deal to plead to possession of a weapon, but his deal was contingent on Mr. Caro pleading guilty to conspiracy to commit murder.  (Plea Agreement of Moreno-Marquez (Case No. 2:03-cr-10115-JPJ), 06/02/2004, attached as ███ Ex. 53 at 2.)  Mr. Caro received no benefit from the deal, and ultimately was sentenced to 327 months, consecutive to the 30-year sentence he was already serving.  A three level reduction for acceptance of responsibility had no practical impact. (Presentence Report (Case No. 2:03-cr-10115-JPJ), 09/30/2004, attached as Sealed Ex. 50; Judgment, 11/01/2004 Dkt. 168).  Co-defendant Tijerina, who the government believed planned the attack, received a sentence of 30 months, while Mr. Moreno-Marquez, the other knife-man, was sentenced to 57 months.  (Docket, Case No. 2:03-cr-10115-JPJ.)

To convince the Court to accept these disparate plea agreements between Mr. Caro and Mr. Moreno-Marquez, the government changed its story depending on the particular proceeding before the Court.  For example, during Mr. Moreno-Marquez's change of plea hearing, the government told the Court that the evidence would show:

22

JA 1042

this defendant, Moreno-Marquez, participated in an assault on a fellow inmate by the name of Ricardo Benavidez, and during the assault defendant Moreno-Marquez and his co-defendant, Mr. Caro, were observed to be in possession of homemade knives which they were using for the assault. The evidence would include the testimony of a Bureau of Prisons employee who witnessed the assault and witnessed the defendant, Moreno-Marquez, using a homemade knife in the course of the assault, as well as a videotape showing the defendant participating in the assault. In addition, the evidence would include the results of DNA testing that established that the victim's blood was on the clothing of both this defendant and his co-defendant . . . .

(Transcript of Moreno-Marquez Change of Plea Hearing (Case No. 2:03-cr-10115-JPJ), 08/03/2004, attached as ▮▮▮ Ex. 54 at 13.)

At the time of Mr. Moreno-Marquez's sentencing, the Court questioned why it should impose such a low sentence after imposing such a "very lengthy term of imprisonment for attempted murder" to Mr. Caro the previous day. (Transcript of Moreno-Marquez Sentencing Hearing, Case No. 2:03-cr-10115-JPJ, 06/30/2008, Dkt. 184, attached as ▮▮▮ Ex. 55 at 5.) The government's response was vastly different from that at the previous change of plea hearing. There was no mention of the BOP eyewitness or the DNA evidence. While acknowledging that there was a video, that video now was not "of high quality." The government also referred to the problem of uncooperative victims in prison cases, and that Mr. Caro "appeared to be the most culpable of all of the defendants." (*Id.* at 6.) Upon information and belief, the government never informed the Court of its belief that codefendant Tijerina had planned the assault.

The government, at the time of Mr. Caro's sentencing in the Benavidez assault, also apparently failed to inform the Probation Office and the Court of the Sandoval

23

JA 1043

homicide, as it is not referenced in either the Presentence Report or the transcript of the sentencing hearing. (Sealed Ex. 50; Transcript of Caro Sentencing Hearing (Case No. 2:03-cr-10115-JPJ), 11/01/2004, attached as ████ Ex. 52). While the government mentions a "lengthy criminal history involving drugs," and the probation office references a 1993 arrest for possession of marijuana where there was no prosecution, not a single reference is made to the Sandoval homicide. (Sealed Ex. 50 at 8; ████ Ex. 52 at 4.)

**B.    A Tactical Advantage for the Government and Prejudice to Mr. Caro**

The above facts lead to the conclusion that the government delayed prosecution of this case until after it had negotiated its disproportionate plea agreement in the Benavidez assault and sentenced Mr. Caro to the maximum possible sentence. By so delaying, the government gained a tremendous advantage during the penalty phase of Mr. Caro's capital case. By waiting, the government could argue that given Mr. Caro's punishment in the Benavidez assault, a punishment less than death in this case would be "no punishment" and that a death judgment was necessary to "control" Carlos Caro. *See* Claim Six-J. This argument was prejudicial to Mr. Caro. As noted by Juror # 33, the "single most important factor in [his] decision for the death penalty was that Carlos Caro was already serving a sentence that amounted to life in prison, so giving him a life sentence would have been, in effect, giving him no punishment for the homicide. That was not acceptable." (Declaration of Juror # 33, 11/20/2012, attached as ████ Ex. 30 (hereinafter "Juror # 33 Decl.").)

24

JA 1044

Mr. Caro was also prejudiced by the fact that his capital counsel were not appointed until after the Benavidez case was over. Had capital counsel been appointed earlier, before Mr. Caro pled guilty, they could have worked closely together with Mr. Dene, Mr. Caro's counsel in the Benavidez case, and collectively advised Mr. Caro to go to trial on the Benavidez assault.

Conduct like the government's here has been deemed by the Supreme Court to be an outright violation of the Fifth Amendment. In *United States v. Marion*, 404 U.S. 307, 324-25 (1971), the government conceded and the Supreme Court agreed that tactical delay for the purpose of prejudicing a defense in a non-capital case constituted a violation of the Fifth Amendment. This principle has remained a feature of Fifth Amendment jurisprudence and has in fact been expanded by the Fourth Circuit. *See Howell v. Barker*, 904 F.2d 889, 895-896 (4th Cir. 1990) (holding that provided that pre-indictment delay was proven to have actual prejudice, then the defendant need not show an illicit government motive as a condition for relief); *see also United States v. Automated Med. Labs.*, 770 F.2d 399, 403-04 (4th Cir. 1985).

The above circumstances and evidence show that the government tactically delayed its prosecution of Caro, made misrepresentations to the Court, and withheld information from the probation office and Court, all for the purpose of obtaining a plea agreement that did not reflect the relative culpability of the defendants in the Benavidez assault. These acts and omissions prejudiced Mr. Caro in his capital defense efforts. Under *Howell* and *Marion*, Mr. Caro is entitled to relief.

JA 1045

**CLAIM TWO: MR. CARO WAS DEPRIVED OF HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY 18 U.S.C. § 3006a AND THE SIXTH AMENDMENT OF THE CONSTITUTION AT THE DEATH-CERTIFICATION STAGE OF THE CASE.**

The death certification process is the first step in a federal capital prosecution at which the defense can persuade the government not to seek the death penalty. A binding plea agreement that takes the death penalty off the table must be approved by the United States Attorney General through this proceeding, making it a critical stage in the prosecution of a capital offense. Mr. Caro's counsel failed to adequately investigate mitigating evidence before the death certification hearing and failed to submit any written argument in favor of taking the death penalty out of the equation. This performance fell below the competent representation reasonable defense counsel is expected to provide in a capital case, and as a result of this deficient performance, Mr. Caro was prejudiced by losing any meaningful opportunity to negotiate a plea agreement for life.

**A.      What is the Death-Certification Process?**

The death certification process is a procedure mandated by the United States Attorney General, in which *all* cases punishable by death must be reviewed by the Attorney General's Review Committee on Capital Cases (also called the "Capital Review Committee"). After considering the recommendation of the Capital Review Committee, the recommendation of the U.S. Attorney prosecuting the case, and materials submitted by the defense in mitigation, the Attorney General makes the final decision on whether the government may seek the death penalty. *United States Attorneys' Manual* ("*USAM*")

JA 1046

§§ 9-10.040-.050 (2006).[3]  The United States Attorney may not enter a binding plea agreement not to seek the death penalty unless authorized to do so by the Attorney General. *Id.*, § 9-10.100.  Thus, any chance of negotiating a binding plea agreement that removes the death penalty from consideration requires that the Attorney General be persuaded to waive the death penalty.

Before the U.S. Attorney makes a decision and recommendation to the Attorney General, the *USAM* required, at the time of Mr. Caro's case, the U.S. Attorney to give the defense a reasonable opportunity to present any facts, including any mitigating factors, for the U.S. Attorney to consider.  If the U.S. Attorney then decides not to seek the death penalty, he submits a "Death Penalty Evaluation form" with a brief statement of the reasons for not seeking the death penalty. If he wishes to recommend the death penalty, he must still complete the "Death Penalty Evaluation Form" and a prosecution memorandum explaining the case, including any impact on the victim's family, and including the mitigation material submitted by defense counsel. *McGriff*, 427 F. Supp. 2d at 257; *see also United States v. Lopez-Matias*, 522 F.3d 150, 155 (1st Cir. 2008).

After the Capital Review Committee reviews the material and makes a recommendation, the Attorney General makes the final decision.  A final decision to authorize the death penalty cannot be made if the defendant has not been afforded an opportunity to present mitigating evidence and argument.  U.S. Dep't of Justice, *USAM*

---

[3] The *USAM* has been updated in 2007 and in 2011, but the basic process described above was part of the protocol in and before 2006. *See, e.g., United States v. McGriff*, 427 F. Supp. 2d 253, 257-58 (E.D.N.Y 2006).

JA 1047

§ 9-10.120 (2011).  The U.S. Attorney cannot file a "Notice of Intent to Seek the Death Penalty" until the Attorney General authorizes seeking the death penalty.  There is also a procedure for the defendant to request reconsideration and withdrawal of a notice of intention to seek the death penalty.  *Id.* at § 9-10.150(c); *McGriff*, 427 F. Supp. 2d at 258.

**B.     The Sixth Amendment Right to Counsel Applies at the Death-Certification Stage**

The Sixth Amendment to the United States Constitution guarantees effective assistance of counsel at critical stages of a criminal proceeding.  A critical stage is "any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial." *United States v. Wade*, 388 U.S. 218, 226 (1967).  For purposes of determining effective assistance of counsel, the defense's mitigation presentation to the Attorney General/Department of Justice at the "death certification" determination is such a critical stage.  *United States v. Peña-Gonzalez*, 62 F. Supp. 2d 358, 363 (D.P.R. 1999).  Failure to provide competent representation at this stage is ineffective assistance of counsel in violation of the Sixth Amendment right to counsel. *Id.*; *Basciano v. Martinez*, No. 07-cv-00421-NGG, 2007 WL 2119908, at *11 (E.D.N.Y. May 25, 2007) (noting that non-contact attorney visits, without appropriate justification, violate the Sixth Amendment right to counsel at a time when it was "of the utmost importance that [defendant] be capable of working with his attorneys as they attempt to dissuade the Attorney General from seeking the death penalty against him") (*quoting United States v. Basciano*, 369 F. Supp. 2d 344, 352 (E.D.N.Y. 2005)); *United States v. Baquedano*, No. 10-20338, 2011 WL 1743742, at *2 (E.D. Mich.

28

JA 1048

May 5, 2011) ("[F]or defense counsel to short circuit the DOJ mitigation process that could result in a death penalty declination would amount to ineffective assistance of counsel.").

These lower court decisions are supported, indeed mandated, by United States Supreme Court decisions requiring effective assistance of counsel during plea negotiations. "[W]e have long recognized that the negotiation of a plea bargain is a critical phase of litigation for purposes of the Sixth Amendment right to effective assistance of counsel." *Padilla v. Kentucky*, 130 S. Ct. 1473, 1486 (2010) (*citing Hill v. Lockhart*, 474 U.S. 52, 57 (1985)). In the plea context, the Court has recognized that, given the overwhelming percentage of criminal matters resolved through plea bargaining, "the negotiation of a plea bargain, rather than the unfolding of a trial, is almost always the critical point for a defendant." *Missouri v. Frye*, 132 S. Ct. 1399, 1407 (2012).

The death certification process is a special opportunity early in the plea negotiation process for defense counsel to persuade the U.S. Attorney and the Attorney General that the death penalty is not an appropriate penalty for this particular defendant in this particular case. As discussed previously, only the Attorney General can authorize a binding plea agreement that takes the death penalty off the table.

In a capital case, defense counsel has an ongoing "obligation to take *all steps* that may be appropriate in the exercise of professional judgment . . . to achieve an *agreed-upon disposition*." Am. Bar Ass'n, ABA Guidelines for the Appointment and Performance of Counsel in Capital Cases (2003) ("ABA Guidelines"), No. 10.9.1 (2003) (emphasis added). The commentary to that Guideline refers to the formalized process

29

JA 1049

adopted by the federal government for defendants to present mitigating evidence and to explain why the death penalty would not be appropriate in the particular case. Failing to avail oneself of this opportunity to argue for a sentence less than death clearly falls below the standard of care required of attorneys in capital cases, as will be discussed more fully below.

In discussing whether counsel's performance during the plea agreement prejudiced a defendant, the Supreme Court has noted that "*any amount* of additional jail time has Sixth Amendment significance." *Lafler v. Cooper*, 132 S. Ct. 1376, 1386 (2012) (*quoting Glover v. United States*, 531 U.S. 198, 203 (2001)) (brackets omitted) (emphasis added). Likewise, in *Padilla*, the Court found it "critical" for counsel to inform non-citizen clients about the risk of deportation as a consequence of a conviction (whether by plea or otherwise). Failure to do so constituted ineffective assistance of counsel. The Court noted that its decision was compelled by the severity of deportation, which is equivalent to banishment or exile. *Padilla*, 130 S. Ct. at 1486. If extra jail time and deportation have constitutional significance, then certainly loss of life at the hands of the government has even greater constitutional significance, mandating effective assistance of counsel at the death certification stage of a capital case.

### C.    Duties of Counsel at Death-Certification Stage

Once counsel is appointed in a capital case, "an all-important first step for defense counsel is to prepare a mitigation package to submit to the local United States Attorney who has the first call on whether to seek the death penalty." *United States v. Baquedano,*

30

JA 1050

No. 10-20338, 2011 WL 1743742, at *1 (E.D. Mich. May 5, 2011). The mitigation package will usually include interviews with friends and family, school and work records, and any other best evidence supporting defendant's position that the death penalty not be sought. *Id.* Preparation of an effective mitigation package requires "significant time and effort" by defense counsel and by mitigation specialists on the defense team. *Id.* "Capital cases have specific standards regarding the . . . precise requirements as to what must be accomplished by learned counsel to dissuade the Attorney General from seeking the death penalty." *United States v. Colon-Miranda*, 985 F. Supp. 31, 33 (D.P.R. 1997). "In presenting the case that a sentence of death is not justified, defense counsel must carefully investigate and argue the mitigating factors listed in 18 U.S.C. § 3592 . . . . " *Id.* at 34; *United States v. Peña-Gonzalez*, 62 F. Supp. 2d 358, 361 (D.P.R. 1999).

### 1.    Duty to Investigate

The contours of the duty to investigate mitigating evidence are well-established. At every stage, counsel must conduct a "thorough and independent investigation," not only of issues related to guilt but also related to penalty. ABA Guidelines No. 10.7. Because of the extraordinary penalty applicable to capital cases, defense counsel in a capital case "must . . . make extraordinary efforts on behalf of the accused." Am. Bar Ass'n, *ABA Standards for Criminal Justice* No. 4-1.2 cmt. (3d ed. 1993).

Counsel may not "sit idly by, thinking that investigation would be futile." *Voyles v. Watkins*, 489 F. Supp. 901, 910 (N.D. Miss. 1980). Failure to investigate and present mitigating evidence at the penalty phase of trial based on the belief that it would not do any good constitutes ineffective assistance of counsel. *See Austin v. Bell*, 126 F.3d 843,

31

JA 1051

849 (6th Cir. 1997).

The mitigation investigation should begin as quickly as possible. "[I]mmediately upon counsel's entry into the case, appropriate member(s) of the defense team should meet with the client" to discuss the case, explore the existence of potential sources of information regarding mitigating factors, and obtain necessary releases for securing confidential records. ABA Guidelines No. 10.7, cmt. (2003). Because of the personal nature of much mitigating information, a mitigation specialist "who has the skills to help the client cope with the emotional impact of such painful disclosures . . . is invaluable" to this part of the investigation. *Id.*

Mitigation evidence includes "anything in the life of a defendant which might militate against the appropriateness of the death penalty for that defendant." *Id.* Developing and preparing this evidence "requires extensive and generally unparalleled investigation into personal and family history . . . [beginning] with the moment of conception." *Id.* At a minimum, counsel must explore medical history (including substance use/abuse, pre-natal and birth trauma, malnutrition, developmental delays, and neurological damage); family and social history; educational history, learning disabilities, and related limitations; employment and training history, including barriers to employability; and prior juvenile and adult correctional experience. *Id.*

### 2.    Duty to Argue Mitigating Facts

All of the mitigating evidence in the world can do no good if it is not presented effectively to the U.S. Attorney and Attorney General. This requires submission of a package of written argument and supporting documentation displaying the best evidence

JA 1052

in support of defendant's position that the death penalty ought not to be sought. *United States v. Baquedano*, No. 10-20338, 2011 WL 1743742, at *1 (E.D. Mich. May 5, 2011).

**D.    Counsel's Deficient Performance**

Trial counsel's performance at the death certification stage fell below reasonable standards of care in many ways. The defense team was dilatory in conducting a mitigation investigation and failed to make any written submission to the U.S. Attorney or to the Attorney General.

**1.    Deficient Performance of Duty to Investigate**

Although appointed on the case on January 25, 2005 (Appointment Order of Stephen J. Kalista, No. 2:05-mc-00001-JPJ, 01/27/05, Dkt. 4; Appointment Order of James Simmons, No. 2:05-mc-00001-JPJ, 01/27/05, Dkt. 5), trial counsel made no effort to get approval and funding for a mitigation specialist until nearly two months later, March 22, 2005. (Ex Parte and Sealed Mot. for Authorization for Expert Servs., No. 2:05-mc-00001-JPJ, 03/22/2005, Dkt. 9)   The Court approved the request the very next day.   (Sealed Order, No. 2:05-mc-00001-JPJ, 03/23/2005, Dkt. 9.)   Counsel did not request funding for an investigator until April 13, 2005 (Ex Parte and Sealed Mot. For Appointment of Investigator, No. 2:05-mc-00001-JPJ, 04/13/05, Dkt. 14), and the Court granted that motion the same day as well (Sealed Order, No. 2:05-mc-00001-JPJ, 04/13/2005, Dkt. 15). Given the importance of an investigator and mitigation specialist to developing the kind of evidence needed to persuade the Attorney General not to seek the death penalty, the delay in seeking an investigator and mitigation specialist was not

33

professionally reasonable. (Declaration of Larry Hammond, 01/08/2013, attached as Ex. 4 ¶¶ 31, 39-42.)

From the time the mitigation specialist was appointed, she spent approximately 50 hours on the case, all during April 2005. (Invoice of Norton & Moody, Inc., 05/02/2005.) She spent one day traveling to the prison, where she met with Mr. Caro and spent two days traveling to Texas, where she met with Mr. Caro's wife and a few associates; this accounted for 31 hours of her time. (*Id.*) Likewise, the investigator interviewed Mr. Caro for approximately 1.5 hours on or about April 28, 2005. (Invoice of Advanced Private Investigations, LLP, 05/06/2005.) In May, the investigator determined the whereabouts of several inmates on the BOP locator, including co-defendants in the prior case arising out of an assault at USP-Lee and inmates involved in a prior alleged incident at FCI Oakdale. He took notes on Mr. Caro's BOP file that had been provided to counsel in pre-indictment discovery and attempted contacts with USP-Lee. (Invoice of Advanced Private Investigations, LLP, 06/02/2005.) He spent approximately 40 hours prior to the DOJ meeting. This was the extent of the mitigation investigation conducted before the death certification administrative hearing. No mental health experts were consulted or evaluated Mr. Caro before the certification hearing. This falls well below the professional expectations for mitigation investigation in a capital case.

A proper mitigation investigation would have revealed Caro's frontal lobe brain damage and numerous other mitigating factors that are discussed at length elsewhere in this petition, including the domestic abuse Mr. Caro experienced and witnessed at the hands of his father, his educational and developmental delays, and the violent prison

34

culture where Mr. Caro lived. Counsel's failure to properly investigate and discover these mitigating factors fell below the standard of competence owed to a defendant in a capital case.

**2.    Deficient Performance of Duty to Argue Mitigating Evidence**

Counsel made no written submission to the Capital Review Committee. (Declaration of Stephen J. Kalista, 12/29/2012, attached as Ex. 5, ¶ 6 (hereinafter "Kalista Decl."); Declaration of James Simmons, 12/29/2012, attached as Ex. 9 (hereinafter "Simmons Decl.").)   As previously discussed, preparation of an effective mitigation package is the first step required of defense counsel in a capital case. Counsel had four months to prepare for the certification hearing. That amount of time has been considered "objectively reasonable" notice for the defense to prepare for a capital case in the context of prosecutors filing their notice of intent to seek the death penalty at trial. *See, e.g., United States v. Le*, 311 F. Supp. 2d 527, 534-35 (E.D. Va. 2004) (113 days was considered reasonable notice). The standard of care in death penalty cases, however, suggests that more time to prepare a case would be valuable. (*See* Hammond Decl. ¶ 40.)

Regardless, trial counsel did not have a complete appreciation for the death certification process. E-mail correspondence between trial counsel Kalista and trial counsel Simmons reflects a casual attitude towards the process. On March 24, 2005, Kalista queried whether an investigator was even needed pre-authorization, asking what there would be for a fact investigator to do before they got discovery or had more information. (Email to Simmons from Kalista, 03/24/2005.) On April 25, 2005, Mr.

35

JA 1055

Kalista talks about possibly getting together with Mr. Simmons to brainstorm about the DOJ meeting and what to present. "Right now, I don't see us having or presenting anything much about Caro personally, but perhaps present some general arguments: one might be simply citing the cases supplied to us by McNally concerning the cases authorized/not authorized by Ashcroft, and the other might be a plea of sending him to ATX [sic] Colorado and put him in a box there (although the recent inmate killing there may have some negative effect.)" (Email to Simmons from Kalista, 04/25/2005.)

On May 25, 2005, in response to an inquiry from Assistant U.S. Attorney Anthony Giorno as to whether they were making a written mitigation submission, Mr. Kalista replied that they did not plan at that time to send a written submission. Mr. Simmons responded that he agreed they might not want to submit anything in writing, adding "I think the authorization is just a formality." (Email to Kalista from Simmons, 05/25/2005.) Mr. Simmons was in another trial at the time, and indicated he would get ready for the DOJ hearing once trial was over. He remained in trial until the evening of June 1, 2005, at which time they planned to meet in Washington, D.C., on Sunday evening, June 5, or Monday morning, June 6, before the 1:00 p.m. hearing the afternoon of June 6, 2005. (Email to Kalista from Simmons, 05/27/2005; Email to Kalista from Simmons, 05/29/2005; Email to Kalista from Simmons, 06/02/2005.)

Even if counsel had been unable to obtain all of the mitigating background documentation on Mr. Caro, they certainly had other information they could have submitted a written document outlining evidence that the death penalty was not generally sought for inmate homicides, and in the few cases that were authorized, one-fourth

36

JA 1056

subsequently received plea agreements for life. Another factor that counsel could and should have presented in writing is the effect of prison culture as mitigation for the crime itself. They could have also presented in writing the argument that confinement in a maximum security facility like the one in Colorado is very punitive. Counsel could and should have argued that the BOP was negligent for placing Mr. Sandoval in Mr. Caro's cell after Mr. Caro declined him the first time, particularly since Mr. Caro was in the SHU because of a prior incident involving within-gang violence.

Finally, letters from Mr. Caro's family members, particularly his daughter, could have been introduced to show that the family would be devastated by Mr. Caro's execution. This argument and the ones above were easily available to counsel to present, with documentation and with relatively minimal effort, but they failed to do so. By appearing in person only, they failed to memorialize their arguments in an organized fashion and failed to provide anything tangible for the Capital Review Committee to pass along to the Attorney General.

"As with other effective presentations in capital cases, the *importance of a written* as well as an oral *presentation should not be understated*." (Hammond Decl. ¶ 41.) By considering the death certification process a formality, failing to vigorously pursue mitigation investigation during the four months before the hearing, and failing to submit any written argument or evidence in mitigation, counsel failed to perform as reasonable defense counsel in a capital case. (Hammond Decl. ¶ 39.)

37

JA 1057

## E.    Prejudice to Mr. Caro

Under Attorney General Ashcroft, the death penalty was *not* authorized in 78.3% of eligible cases.  In cases involving BOP inmate homicides, 29 defendants were not authorized for the death penalty, compared to 12 that had been authorized.  While it is impossible to know with certainty that competent representation would have resulted in the Attorney General deciding not to authorize the death penalty, the statistics were significantly in Mr. Caro's favor until the death penalty was authorized.  Even after that point, 25% of the BOP-inmate-homicide defendants who had been authorized for the death penalty were able to negotiate a plea agreement taking death off the table, meaning that the Attorney General withdrew a previous death notice.  By failing to adequately investigate and argue mitigating factors before the death certification hearing, or even presenting written evidence to the Attorney General after the death authorization, counsel deprived Mr. Caro of any opportunity to resolve the matter without the government seeking the death penalty.

### GROUNDS FOR RELIEF: GUILT/INNOCENCE PHASE

### CLAIM THREE: MR. CARO'S RIGHT TO A FAIR TRIAL WAS INFRINGED BY JUROR MISCONDUCT, IN VIOLATION OF THE FIFTH AND SIXTH AMENDMENTS.

Two jurors provided factually inaccurate answers about their attitudes towards the death penalty and/or their ability to follow the instructions of the Court at the penalty phase of the trial, thereby violating Mr. Caro's Fifth Amendment right to due process and Sixth Amendment right to an impartial jury.

JA 1058

A.    **Juror Deceit in** *Voir Dire*

Among the rights guaranteed by the Sixth Amendment is the right to trial "by an impartial jury" in criminal prosecutions. U.S. Const. amend. VI.   Due process also demands that the defendant, if provided a jury, must be provided a jury that is impartial. *Morgan v. Illinois*, 504 U.S. 719, 727-29 (1992).  The defendant is entitled through *voir dire* to ask relevant questions to determine if a juror is biased.  *Id.* at 735-36.  When a juror's answer to a material question is false, whether intentionally or inadvertently, a defendant may be entitled to a new trial.  The Supreme Court has identified a two-part test for determining when a new trial is required under these circumstances:   the defendant must show that (1) a juror failed to honestly answer a material question, and (2) if the correct answer had been given, the defendant would have a valid basis to challenge the juror for cause. *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556 (1984).  That same test has been adopted in the Fourth Circuit for habeas review of criminal cases. *Jones v. Cooper*, 311 F.3d 306, 310 (4th Cir. 2002).

Two jurors in the present case gave inaccurate answers on their juror questionnaires, indicating that they could be fair and impartial and could consider a sentence other than death for a defendant convicted of a capital crime.  In fact, statements they provided after trial about their beliefs reveal that they believed the death penalty should automatically be imposed if a defendant is clearly guilty of premeditated first-degree murder.  A juror who will automatically vote for the death penalty in every case is not impartial.   Such jurors will not consider evidence of aggravating and mitigating circumstances as required by law. *Morgan*, 504 U.S. at 729.  Failure to remove such a

39

JA 1059

juror for cause is constitutional error. "If even one such juror is empaneled and the death sentence is imposed, the State is disentitled to execute the sentence." *Id.*

### 1.    Juror # 62

In her juror questionnaire, Juror # 62 indicated that she neither favored nor opposed the death penalty and that "sometimes its [sic] deserved," and "each case is individual." (Questionnaire of Juror # 62, attached as ███ Ex. 44, at 26.) She further answered that she would not "always vote for a sentence of death as a punishment for someone convicted of a death penalty eligible offense, regardless of the facts and circumstances." (Juror Questionnaire, attached as ███ Ex. 44, at 27.) In a subsequent affidavit, this same juror said "It was obvious from the evidence that Carlos Caro was guilty of first-degree murder. I am now, and was at the time of the trial, strongly in favor of the death penalty in cases where evidence of guilt is obvious. There is nothing that the defense offered, or could have offered, that would have changed my mind about the sentence because Mr. Caro committed the crime." (Declaration of Juror # 62, 11/19/2012, attached as ███ Ex. 32 (hereinafter "Juror # 62 Decl.").)

"Neither favoring nor opposing the death penalty" is a far cry from being "strongly in favor of the death penalty in cases where guilt is obvious." Combined with her statement that nothing the defense could have offered would have changed her mind about the sentence, it becomes clear that this juror, in fact, automatically favored the death penalty for defendants who are obviously guilty of premeditated first-degree murder. Even though she stated that she could follow the Court's instructions, by definition, she could not perform her duties in accordance with the law. *Morgan,* 504

40

JA 1060

U.S. at 735 (jurors who are "unalterably in favor of . . . the death penalty in every case—by definition are ones who cannot perform their duties in accordance with the law, their protestations to the contrary notwithstanding."). Even though Juror # 62 may have believed that she was fair and could follow the Court's instructions, her statements that the death penalty is warranted whenever someone is obviously guilty of premeditated murder and that nothing could change her mind about that, reveal that she was not qualified to serve on a capital jury. *Id.* Her inaccurate answers to *voir dire* questions meet the first prong of the *McDonough* test, even if her inaccuracies were not deliberate concealment. *Jones*, 311 F.3d at 310. Whether deliberate or not, her answers were factually untrue.

The second prong of the test, that correct answers to the question would subject her to dismissal for cause, is equally clear. A juror who would automatically impose the death penalty for premeditated first-degree murder is not an impartial juror, and Mr. Caro would have been entitled to excuse Juror # 62 for cause on those grounds. Failure to excuse her would have been constitutional error. *Morgan*, 504 U.S. at 729. This establishes prejudice as a matter of law, entitling Mr. Caro to a new sentencing trial.

### 2.    Juror # 32

Juror # 32 acknowledged being strongly in favor of the death penalty on his juror questionnaire. However, he said he felt it should only be used in clear cut cases, and he said he would not always vote for a sentence of death as a punishment for someone convicted of a death penalty eligible offense. He also said he would be able to follow the judge's instructions. (Questionnaire of Juror # 32, attached as ▮▮▮ Ex. 38, at 26-27.)

41

JA 1061

After trial, however, he stated that the evidence was "conclusive" that Carlos Caro was guilty of first-degree murder, and once he reached that conclusion, he had made up his mind about the death penalty, noting that the Bible states "An eye for an eye." After trial he also said nothing the defense could have offered would have changed his mind.

As with Juror # 62, Juror # 32 may have believed that he was impartial and capable of following the court's instructions, but his belief that the death penalty should apply if guilt is conclusive, without being willing to consider any mitigating evidence to change his mind, belies his claim. In actuality, Juror # 32 was an automatic death penalty juror for defendants "conclusively" guilty of premeditated first-degree murder. His claim to be able to follow the Court's instructions was inaccurate and misleading, whether deliberately or through honest mistake. Either way, the inaccurate answer establishes the first prong of the *McDonough* test. That failure to strike an automatic death penalty juror is constitutional error and satisfies the second prong. Juror # 32's misleading answers to *voir dire* resulted in the seating of a clearly unqualified juror, biased in favor of the death penalty, which is constitutionally impermissible.

**B.    Juror Predetermining Decision Before Hearing the Evidence**

Juror #32 indicated after trial that he decided to vote for the death penalty as soon as he knew in his mind that Mr. Caro was conclusively guilty. He reached this determination during the guilt phase of the trial, even before jury deliberations began on guilt or innocence. Having decided that the death penalty was the only appropriate punishment in this case, Juror # 32 did not think any evidence would or could change his

42

JA 1062

mind. Having predetermined his decision on sentencing, even before the sentencing phase evidence was presented, he cannot be considered an impartial juror in the cause. *Morgan*, 504 U.S. at 727 ("A juror who has formed an opinion cannot be impartial.") (citation omitted).

One who pre-determines the case, before hearing the evidence, cannot be impartial. By making up his mind about the penalty before hearing anything about the mitigating factors, he could not follow the Court's instructions and consider the evidence of aggravating and mitigating factors as the law requires. Because this juror was biased, not impartial, and failed to follow the Court's instructions, Mr. Caro was denied his constitutional right to an impartial jury. *Id.* at 729.

**CLAIM FOUR: MR. CARO WAS DEPRIVED OF HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL AS GUARANTEED BY 18 U.S.C. § 3006a AND THE SIXTH AMENDMENT OF THE CONSTITUTION DURING THE GUILT/INNOCENCE PHASE BECAUSE COUNSEL FAILED TO ADEQUATELY INVESTIGATE, DEVELOP, AND PRESENT A THEORY WITH SUPPORTING EVIDENCE IN MR. CARO'S DEFENSE.**

**A.    Trial Counsel Failed to Develop a Cohesive Theory of Defense**

The need to formulate a defense theory is so critical that there is a separate Guideline for that exact principle: "As the investigations mandated by Guideline 10.7 produce information, trial counsel should formulate a defense theory. Counsel should seek a theory that will be effective in connection with both guilt and penalty, and should seek to minimize any inconsistencies." ABA Guidelines No. 10.10.1; *see also* Hammond Decl. ¶ 27. An integrated defense theory should be formulated "well before trial" and is necessary because of the uniqueness of the bifurcated proceedings in a capital case. *Id.*

JA 1063

cmt.

As a standard-of-care expert in death penalty defense explains, "several key principles should have dominated the defense effort from the outset: (1) defense themes must be developed on an ongoing basis; (2) those themes must permeate all aspects of the defense work in the case; and (3) the investigation essential to the development of defense themes must commence immediately and inevitably will require time and resources." (Hammond Decl. ¶27.)

In this case, counsel failed to develop a compelling theme that would be presented during Mr. Caro's guilt/innocence phase of trial. Counsel's opening statement lacked a persuasive theory of defense and failed to integrate any potential story that would be brought out during the penalty phase. (Tr. 01/29/2007 at 28-46.) The story that counsel told the jury was that Mr. Caro acted out of passion, rather than premeditation, because of the small confined cell in which Mr. Caro and Mr. Sandoval were housed. (*Id.* at 37-39). Counsel also stressed how both men were in a gang (*id.* at 31) and that prison life was violent (*Id.* at 31-32.) Based on this theory, counsel asked the jury to convict Mr. Caro of second-degree murder because "this was a case of a pot boiling over." (*Id.* at 43.) Counsel, however, admitted to the jury that "there may not be, apparently, any report of a problem between Mr. Sandoval and [Mr.] Caro" (*id.* at 42). Counsel failed to present a single defense witness in support of their theory.

Counsel's failure to develop and present a compelling story to the jury from the outset of trial deprived Mr. Caro his right to a fair trial. Instead of using the facts gathered from the investigation to create a reasonable defense, the jury was left with

44

JA 1064

evidence that would only support a conviction of first-degree murder. As discussed below, had counsel conducted adequate investigation and consulted with appropriate experts, they would have been able to present a compelling story for conviction of a lesser-included offense.

Based on evidence that was available to counsel, or that could have been available to counsel with the proper experts, defense counsel could have presented the following explanation of Mr. Caro's actions (supported by evidence as discussed in this motion) at the guilt/innocence phase at trial:

Mr. Caro is a member of a dangerous prison gang known as the Texas Syndicate. Less than three months before Mr. Sandoval's death, Mr. Caro had assaulted the leader of this gang. After an assault like this comes the real fear of retribution for assaulting a gang leader. Mr. Caro was protected while single-celled in the SHU, but that protection vanished when the BOP negligently placed another gang member into his cell. Moreover, this was a gang member who was slightly larger than Mr. Caro and whose placement in the SHU resulted from his possession of a weapon. Mr. Caro tried to prevent Mr. Sandoval from coming into this cell by refusing a cellmate. It worked once, and Mr. Sandoval was placed in another cell by himself. However, Mr. Sandoval would not give up, and, in an act that was considered aggressive by prison culture, tried to get into Mr. Caro's cell the very next shift. This time Mr. Caro did not object and the officers placed Mr. Sandoval in the cell with Mr. Caro.

Things were quiet until the next day. No one knows what happened in that cell, or what motivated the killing. No one heard or saw anything. While Sean Bullock, the

45

government's only purported eyewitness, will testify that he saw Mr. Caro behind Mr. Sandoval strangling him with a towel, Mr. Bullock's cellmate will testify that he and Mr. Bullock were playing cards at the time and that neither or them saw or heard anything until the officers pulled Mr. Sandoval out of the cell. Moreover, Mr. Bullock's story has changed. He told one story during his first interview with the government. He told another story to the grand jury. And, now he tells yet a third story that is not supported by and is contradicted by the testimony of the prison officers.

While we do not know what happened in that cell, we do know that Mr. Caro suffers from a brain impairment and anxiety disorder. Under calm circumstances, he has the reasoning abilities of a 10-year-old child, and he gets by. Under stress, his judgment leaves him and, although he is an adult man, he thinks and responds as a child would. These circumstances do not support a finding of premeditation.

**B.    Trial Counsel Failed to Adequately Investigate and Impeach the Government's Only Purported Eyewitness, Sean Bullock**

The only purported eyewitness in this entire case was an inmate by the name of Sean Bullock—a.k.a. Derek Taylor, Big Man, Kenneth Taylor, and Tyrone Harris. (Tr. 01/30/2007 at 81.) Mr. Bullock was housed in cell 146 of the SHU at USP-Lee immediately across from cell 123, which housed Mr. Caro and Mr. Sandoval. Mr. Bullock had a cellmate by the name of Joseph Bland at the time of this incident, but the jury never heard from Mr. Bland at trial. Had Mr. Bland testified, he would have contradicted Mr. Bullock's testimony. He would have testified that instead of standing by the cell door, Mr. Bullock was sitting at the bed with Mr. Bland playing cards at the

46

time of the offense, and that neither he nor Mr. Bullock saw or heard anything and were "completely unaware of the incident until inmate Sandoval was removed from the cell." (Declaration of Joseph Bland, 04/20/2012, attached as Ex. 2 (hereinafter "Bland Decl.").)

On December 20, 2006, the government sent defense counsel a copy of Mr. Bullock's grand jury testimony, in which Mr. Bullock clearly stated that he had a cellmate at the time of the incident. (Letter to Kalista from Giorno, 12/29/2006; Grand Jury Tr. 02/19/2004, attached as Sealed Ex. 26, at 18.) Yet, defense counsel made no attempts to identify or interview the cellmate. And, while defense counsel may have been misled by the government's earlier misrepresentations in this case, *see* Claim 5, *infra,* to the point that they overlooked information in the logs that should have prompted further investigation, at the very least they should have recognized the existence of a cellmate when they received the grand jury testimony.

Defense counsel's failure to investigate this witness was not a strategic call or impossibility; it was an oversight. (Kalista Decl.¶ 21.) At the time of trial, Mr. Bland was still housed at USP-Lee. (BOP Assignment History Report for Joseph Bland.) Defense counsel missed this significant fact.

Equally puzzling is why defense counsel said nothing at trial during the examination of Mr. Bullock. Mr. Bullock testified at trial that he had a cellmate the day before the offense. (Tr. 01/30/2007 at 71.) Later, he testified that immediately after the offense, he did not report anything to the correctional officers or "tell [his] cellie." (*Id.* at 75.) At this point, defense counsel should have objected, asked for a side-bar and requested a short continuance so they could interview the cellmate. Yet, they did

47

JA 1067

nothing, missing the import of Mr. Bullock's testimony.

During re-cross, the defense asked Mr. Bullock the name of his cellmate, but did not pursue the issue when Mr. Bullock responded that he couldn't recall who it was, but that he thought he was with him only one day. (*Id.* at 114-15.) Defense counsel made no effort to go back to either the SHU logs, the prosecution, or the BOP to gather more information about the identity of Mr. Bullock's cellmate.

Not only did the defense miss this critical witness, but they also failed to follow up on or to effectively impeach Mr. Bullock with the information they did have. For example, the government questioned Mr. Bullock and other inmates for the first time on December 22, 2003, five days after the incident. (Mass Interview Form ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮, attached as Sealed Ex. 25.)  At that time, Mr. Bullock stated that "[i]t seems like I saw some tussling.  This whole thing happened about 45 minutes before Caro told the Officer." (Mass Interview Form ▮▮▮▮▮▮▮▮▮▮▮▮▮ attached as Sealed Ex. 25.)  He was interviewed again on January 20, 2004 at the prison with the prosecutor and various unknown prison officers. (Tr. 01/30/2007 at 66-67.)  No notes or reports were ever produced regarding this meeting in spite of counsel's prior request for witness statements pursuant to Rule 26.2 of the Federal Rules of Criminal Procedure and 18 U.S.C. § 3500.  (Motion for Production of Witness Statements, 01/27/2006, Dkt. 22.)

Mr. Bullock testified before the grand jury on February 19, 2004.  Much of Mr. Bullock's testimony to the grand jury, however, changed by the time he reached trial. Other testimony was flatly contradicted by other evidence introduced at trial. For example:

- Mr. Bullock told the grand jury that the officer who attempted to place Mr. Sandoval in Mr. Caro's cell the first time told Mr. Caro his refusal to take a cellmate would result in an "incident report." (Tr. 02/19/2004 at 11.) At trial, Officer Gilley testified about his interactions with Mr. Caro and his refusal to take a cellmate. (Tr. 01/29/2007 at 96-111.) Contrary to Mr. Bullock's testimony, Mr. Gilley said nothing about threatening to write up an incident report for Mr. Caro. In fact, Mr. Gilley stated that he did not write up an incident report because "[i]t's a real minor infraction as far as the rules and regulations of the prison," and in his discretion he chose not to do so. (Tr. 01/29/2007 at 103.) Defense counsel failed to point out this inconsistency at trial.

- Mr. Bullock told the grand jury that the offense occurred about four or five hours after Mr. Sandoval was placed in cell 123. At trial, he corrected his prior inaccurate testimony, and now stated that the offense did not occur until the following day. (*Compare* Grand Jury Tr. 02/19/2004 at 15-16 *with* Tr. 01/30/2007 at 72.) Defense counsel never impeached Mr. Bullock with this inconsistency.

- Mr. Bullock testified at trial that the officers came back to Mr. Caro's cell and asked if he would take a cellmate because "a bus was coming in, inmates. They said they needed space, they needed room." (Tr. 01/30/2007 at 70-71.) The guard who placed Mr. Sandoval in the cell, Brian Laster, however never mentioned anything about a bus. (Tr. 01/29/2007 at 115.) At trial, Mr. Laster was specifically asked what he said to Mr. Caro. He answered, "I asked him if it was all right if Mr. Sandoval moved in with him. He was requesting to move in and cellmate with him." (Tr. 01/29/2007 at 116.) Contrary to Mr. Bullock's testimony, Mr. Laster made no mention of a bus to Mr. Caro. And, in truth, there was no shortage of space in the SHU on December 16, 2003, even after the bus arrived. (*Compare* Tr. 01/29/2007 at 98-99 (SHU capacity of "approximately 220" per Officer Gilley) *with* SHU Running Count Log Book, showing only 161 inmates on the SHU after the bus arrived on 12/16/2003.) Defense counsel never impeached Mr. Bullock with this inconsistency.

- Mr. Bullock told the grand jury that Mr. Caro was behind Mr. Sandoval with "something around his neck, hands up around his neck." Mr. Bullock said nothing about an orange towel. At trial, Mr. Bullock never mentioned anything about hands around Mr. Sandoval's neck, but rather testified he saw Mr. Caro choke Mr. Sandoval with an orange towel. (*Compare* Tr. 02/19/2004 at 17 *with* Tr. 01/30/2007 at 74.) Defense counsel never impeached Mr. Bullock with this inconsistency.

- Mr. Bullock told the grand jury that the guard who first noticed that Mr. Sandoval was on the ground "grabbed his walkie-talkie and ran." (Tr. 02/19/2004 at 20.) The video of the SHU hallway after the offense, however, shows Officer Teters

49

JA 1069

looking into cell 123 and then calmly walking down the hallway. Mr. Teters did not run, or even jog. (Tr. 01/30/2007, Trial Exhibit Video 01.) Defense counsel did not impeach Mr. Bullock with this inconsistency.

- At trial, when asked to describe what he saw, Mr. Bullock got confused. He initially said that he "seen out of [his] rear view," and that Mr. Caro "like go forward, like down out of the view of the mirror." He quickly then corrected himself and stated, "I mean out of the glass, so I was looking forward." (Tr. 01/30/2007 at 74.) Again, defense counsel never impeached Mr. Bullock with this telling misstatement.

There is a saying, "the devil is in the details." Mr. Bullock's "details" were all over the board. He got the day wrong, the weapon wrong, the statements made by Officer Gilley wrong, the statements made by Officer Laster wrong, the response by Officer Teters wrong, and, initially, his own viewpoint wrong. In light of these errors regarding the specific details of the offense, his testimony is highly suspect. His contention that he saw Mr. Caro choke Mr. Sandoval with an orange towel was based on information that was available to all of the inmates housed near cell 123, as the officers dragged Mr. Sandoval's body with an orange towel around his neck into the hallway for all to see. This fact was never brought out during his cross-examination, or argued in closing. Such performance fell below the standard of care, as counsel "must be able to challenge zealously the prosecution's evidence . . . through effective cross-examination." ABA Guidelines No. 1.1 cmt.

Mr. Bullock testified at trial that the government did not offer him any deal in exchange for his testimony. Mr. Bullock, however, clearly was more than a disinterested witness. After he testified before the grand jury on February 19, 2004, he heard nothing from the government for some time. So, on April 5, 2005, he wrote a letter to the Court

JA 1070

in an attempt to find out the trial date, publically stating that he had testified before a grand jury, but could remember neither the name of the U.S. Attorney nor the case number. (Def. Trial Ex. 5, Letter to the Court from Bullock, 04/05/2005.)  After testifying at Mr. Caro's trial, Mr. Bullock, who was facing a mandatory life sentence, received an illegal reduction to his sentence in 2009, purportedly due to changes in the crack cocaine guidelines; he now will be released in less than seven years, on October 14, 2019.  In his case, the government initially agreed to the illegal reduction, but then after sentencing, claimed to have made a mistake and filed a late motion for reconsideration. Mr. Bullock conceded that he had been facing a mandatory life sentence and that his sentence had been a mistake, but argued that the court lacked authority to correct the mistake.    The court denied the motion, agreeing with the defense that it lacked jurisdiction to correct the sentence, but in a 16-page order noted that the Fourth Circuit had not addressed this issue. In spite of the fact that this was an issue of first impression for the circuit, the government did not appeal.

Counsel's failure to investigate evidence that would have impeached the only and key eyewitness in the case, and their failure to then effectively impeach Mr. Bullock with existing evidence constitutes ineffective assistance of counsel. *See, e.g., Huffington v. Nuth*, 140 F.3d 572, 580 (4th Cir. 1998) (explaining that counsel has a duty to "investigate possible methods for impeaching prosecution witnesses"); *United States v. Mason*, 481 F. App'x. 815, 818-19 (4th Cir. 2012) (unpublished opinion) (remanding case for further proceedings because defendant's *Strickland* claim that trial counsel was ineffective for failing "to investigate evidence that would have impeached the

51

JA 1071

government's key witness" arguably had merit).

Counsel had no reason for failing to interview Mr. Bland, the cellmate of the only purported eyewitness in the case (Kalista Decl. ¶ 21), or meaningfully impeach Mr. Bullock during trial regarding all of the known inconsistencies and false testimony. Counsel's failure to investigate the cellmate of the government's snitch fell below the standard of care. *See* ABA Guidelines No. 10.7 cmt. ("Counsel should investigate all sources of possible impeachment of defense and prosecution witnesses."); (Hammond Decl. ¶34.)

Counsel's deficient performance prejudiced Mr. Caro. As the only purported eyewitness to the offense, Mr. Bullock's testimony was critical for the government. Mr. Bullock's testimony was the only evidence that supported the government's proposition that Mr. Caro ambushed Mr. Sandoval from behind. The government repeated this theme throughout the trial to support both premeditation and a death sentence. (Tr. 01/29/2007 at 15 ("snuck up behind"); *id.* at 15 (waited until he turned his back and "snuck up behind"); *id.* at 16 (this was a "sneak attack"); *id.* at 21 ("sneaks up behind"); *id.* at 26 ("sneaking up behind"); Tr. 02/1/2007 at 13 (saw Caro behind Sandoval); *id.* at 18 ("ambushed" Mr. Sandoval and "came up from behind"); *id.* at 45 ("from behind with a towel"); *id.* at 49 ("comes up behind him"); *id.* at 49 (had his back turned to him and "came up behind him"); Tr. 02/05/2007 at 19 ("snuck up behind him"); *id.* at 46 ("ambushed him from behind"); Tr. 02/13/07 at 88 ("snuck up behind him").)

Testimony from Mr. Bland stating that he and Mr. Bullock were playing cards at the time of the offense, and neither saw nor heard anything until the officers pulled Mr.

52

Sandoval's body into the hallway, as well as a meaningful cross-examination of Mr. Bullock exposing his inconsistent and false statements, would have made a difference. Juror # 47 stated that "[i]f another inmate had testified that Sean Bullock was playing cards at the time of Sandoval's death and didn't see what happened, that would have made a difference." (Declaration of Juror # 47, 11/13/2012, attached as ▮ Ex. 31 (hereinafter "Juror # 47 Decl.").) Similarly, Juror # 79 reported that "[t]he inmate eye-witness account of the murder was essential to my decision." (Declaration of Juror # 79, 11/20/2012, attached as ▮ Ex. 33 (hereinafter "Juror # 79 Decl.").)

**C.    Trial Counsel Failed to Adequately Investigate and Present Evidence of the BOP's Negligence Regarding the Decision to Grant Mr. Sandoval's Request to be Placed in Mr. Caro's Cell**

Common sense dictates that Mr. Sandoval should not have been placed in Mr. Caro's cell. As recognized by a grand juror hearing the evidence before issuing an indictment in this case:

> GRAND JUROR: One other question. Based upon the, the history of Mr. Caro and the fact that he had stabbed another person numerous times, why would anybody be put in the cell with this, this person? That is, that is the burning question.
>
> THE WITNESS: It–that–it is not unusual to house two people in a jail cell in the special housing unit just due to the availability of space.
>
> GRAND JUROR: But this guy is violent.
>
> THE WITNESS: Right.
>
> GRAND JUROR: He had already stabbed somebody numerous times. I don't understand why they would put anybody in the cell with him.

53

JA 1073

THE WITNESS: Right.

(Grand Jury Tr. 01/03/2006, attached as Sealed Ex. 27 at 20-21.)

Policy considerations also dictate that the BOP should not have placed Mr. Sandoval in Mr. Caro's cell. Had the officials at USP-Lee followed sound correctional practices they would not have done so. (Declaration of Mark A. Bezy, 01/01/2013, attached as Ex. 1, ¶¶ 13-15, (hereinafter "Bezy Decl.").)[4]

Prior to Mr. Sandoval's death, the BOP knew that both Mr. Caro and Mr. Sandoval are members of the same gang, the Texas Syndicate, and that there was internal fighting within the Texas Syndicate at that time. (Tr. 01/29/2007 at 67, 70; Sealed Ex. 28 at 5, 15-19, 25.) There had been two prior inmate-on-inmate assaults, in July 2003 and August 2003, in which both the perpetrators and victims were believed to be members of the Texas Syndicate. (Sealed Ex. 28 at 13-17; Sealed Ex. 51 at 2-3.)

In the August assault, the BOP believed the victim, Ricardo Benavidez, had been the leader of the Texas Syndicate and that Mr. Caro, who was one of the assailants, had thus hit the leader of not just any gang, but the Texas Syndicate. The BOP had designated the Texas Syndicate as a "Disruptive Group," one of the five most dangerous prison gangs. (Tr. 02/05/2007 at 92-96.) Based on these circumstances, the BOP should have anticipated that Mr. Caro likely would be targeted for retribution. For this reason, and until the BOP understood the reasons behind the two inmate-on-inmate assaults and

---

[4] Mark Bezy worked for the Bureau of Prison for over 28 years and is knowledgeable about both Bureau of Prison's facilities and procedures, and also prison culture.

54

JA 1074

the reason for the turmoil within the Texas Syndicate, the officers should have housed Mr. Caro in a single cell. (Bezy Decl. ¶¶ 13-15.)

The BOP reached this same conclusion after it completed its investigation of the August 2003 assault, in which they recommended that Mr. Caro be separated from other Texas Syndicate gang members. (Sealed Ex. 51 at 12.) This was the appropriate recommendation, but based on the red flags and their unanswered questions, the BOP should have immediately implemented this recommendation while the investigation was ongoing, and not waited until after the report was issued 14 months after the assault. (Bezy Decl. ¶ 15.)

Before assigning a cellmate to Mr. Caro, the officers in the SHU should have contacted the Special Investigative Services ("SIS"), which is responsible for investigating gang activities within USP-Lee. The SIS officers also should have communicated to the SHU immediately after the August 2003 assault that Mr. Caro was to be single celled (as they did after the death of Mr. Sandoval). (Internal BOP Mem., 12/19/2003; Bezy Decl. ¶ 14.)

Trial counsel's failure to retain and present testimony of a prison culture expert to provide an alternate explanation to counter the government's evidence constitutes ineffective assistance. ABA Guidelines 4.1 cmt. (stressing the need for experts as part of the team in defending capital client); (Hammond Decl. ¶ 35.) Counsel recognized the need to present this type of information to the jury. During opening statement, counsel explained that prison has "its own set of rules and its own set of values" and that "respect has a great deal more significance . . . than it may have out on the streets." (Tr.

55

JA 1075

01/29/2007 at 30-31.) But counsel's statements were nothing more than lip service, and the defense presented no evidence to support those theories.

Had counsel consulted with a prison culture expert, they would have learned that Mr. Caro's initial refusal to take a cellmate should have been a red flag for the officers at the SHU. When an inmate refuses a cellmate, it is important for the BOP to determine the reason for the refusal. Here, in light of the potential for retribution, it was not surprising that Mr. Caro refused a cellmate. Unfortunately, the BOP made no attempt to understand the reason for his refusal. Not only did they not attempt to understand the reason for the refusal, the officer who witnessed the refusal did not document this refusal in the SHU log book, as required by standard operating procedures, and did not communicate this fact to the next shift. Thus, when Mr. Sandoval requested to be put into a cell where the inmate had just refused a cellmate, the second-shift correctional officer had no reason to question the specific request.

Counsel also would have discovered that Mr. Sandoval's subsequent request to be placed in Mr. Caro's cell—after Mr. Caro's refusal—was more than a benign request. This request was disrespectful of Mr. Caro's earlier refusal and revealed a potentially improper motive to get into Mr. Caro's cell. It would not have been unreasonable, viewing the conduct within the culture of prison, for the jury to interpret this request as an aggressive challenge to Mr. Caro. (Bezy Decl. ¶ 17.)

Finally, Mr. Sandoval was placed in the SHU because he had been caught possessing a weapon. Possession of weapons by inmates indicates tension within the prison. As explained by a former warden at various federal correctional facilities,

56

JA 1076

"Inmates want to do peaceful time. If inmates are arming up, the prison needs to find out the source of the tension and address it." (Bezy Decl. ¶ 18.) The SHU officers should have considered Mr. Sandoval's possession of a weapon when they were deciding whether to place Mr. Sandoval in Mr. Caro's cell.

This information is important not because it shifts the blame for Mr. Sandoval's death to the BOP. Rather, an understanding of prison culture could have explained the significance of Mr. Sandoval's possession of a weapon and request to be placed with Mr. Caro. Counsel moved for the introduction of the fact that Mr. Sandoval was placed in the SHU because he possessed a weapon, but the Court denied the motion on the ground that counsel had not laid a proper foundation for its introduction. (Tr. 01/29/07 at 4-5) Had counsel retained a prison culture expert, such evidence would have laid the foundation for introduction of Mr. Sandoval's possession of a weapon prior to his placement in the SHU. It also could have shown that Mr. Caro was attempting to prevent an altercation by rejecting the offer to have a cellmate. Finally, it would have supported a claim of self-defense and negated a finding of premeditation.

Counsel's failure to present this type of evidence to the jury prejudiced Mr. Caro. There is a reasonable probability that testimony from a prison culture expert would have made a difference in the outcome of Mr. Caro's trial.

D.    **Trial Counsel Failed to Adequately Investigate and Present Evidence In Support of Self-Defense, Second-Degree Murder, or Manslaughter**

This case had sufficient evidence for a prima facie case of self-defense based on circumstances at the prison during the previous five months, Mr. Sandoval's conduct,

JA 1077

prison culture, and Mr. Caro's brain impairment and anxiety disorder. Counsel's failure to adequately investigate and present a viable defense fell below the reasonable standard of care. *See* ABA Guidelines No. 1.1 cmt. ("[D]efense counsel may need to investigate possible affirmative defenses—ranging from absolute defenses to liability (e.g., self-defense or insanity) to partial defenses that might bar a death sentence (e.g., guilt of a lesser-included offense).").

As described in Claim Four-C, *supra*, there had been two inmate-on-inmate serious assaults among members of the Texas Syndicate within the five months preceding Mr. Sandoval's death. Mr. Caro was believed to have assaulted the leader of the gang. The government knew that Mr. Caro might be facing "a cold dose of revenge by Inmate Benavidez." (Sealed Ex. 28, at 27.) Under prevailing professional norms, "it is important for defense counsel to thoroughly investigate whether any prison-related homicide is most properly understood as deserving of an instruction on lesser included offenses and/or on self-defense." (Hammond Decl. ¶ 33)

During the morning of December 16, 2003, Roberto Sandoval was caught with a weapon, a six-inch long shank of hardened yellow plastic. He was placed in the SHU as punishment. Because Mr. Sandoval and Mr. Caro were believed to be "affiliated with the same gang," Officer Dustin Watts assigned Mr. Sandoval to Mr. Caro's cell. (Tr. 01/29/2007 at 70.) Mr. Caro refused the placement, stating that he did not want a cellmate. (Tr. 01/29/2007 at 101.) The guard placed Mr. Sandoval in a different cell but failed to write up Mr. Caro's refusal in any of the prison logs and failed to communicate the refusal to the next shift of correctional officers. When the new shift arrived, Officer

58

Laster knew nothing of Mr. Caro's prior refusal and placed Mr. Sandoval in Mr. Caro's cell at the request of Mr. Sandoval.

Mr. Sandoval's request to be placed in Mr. Caro's cell after Mr. Caro refused him was not an innocent or coincidental request.  As explained by a prison culture expert, refusal to take a cellmate is significant. Even if there was a doubt as to why Mr. Caro refused a cellmate, the proper and respectful course of action for Mr. Sandoval, who was standing outside Mr. Caro's cell door when he refused a cellmate would have been to not press the matter with another request.  (Bezy Decl. ¶ 17.)  Viewed in the light of prison culture, Mr. Sandoval's later request to be celled with Mr. Caro was not benign, but indicated an intense desire to get inside Mr. Caro's cell, even at the risk of offending Mr. Caro.

Mr. Caro's callous statements in the SHU after the offense do not negate this story of self-defense.  In the environment of the SHU, it was crucial that Mr. Caro not appear weak, especially in light of recent events.  After the death of Mr. Sandoval, Mr. Caro was being closely watched and scrutinized not only by correctional officers, but also by all of the other inmates on the SHU, including a large number of gang members.  Any sign of weakness or remorse would have invited future attacks.  (Bezy Decl. ¶ 19.)  The best way to stop the strife that had been going on for the last few months was to appear strong.[5]

---

[5] All of these events must be viewed in light of Mr. Caro's brain impairment.  Under the best circumstances, when things are calm, Mr. Caro has the reasoning ability of a 10-year-old child. *See infra* Claim Six B-1.  Under the chaotic conditions at that time at USP-Lee, Mr. Caro, who suffered from an anxiety disorder or top of brain impairment and facing a possible challenge by Mr. Sandoval, would have had a difficult time quickly processing information and navigating the troubled waters around him.

JA 1079

When preparing for trial, counsel should "carefully consider whether the jury could come to appreciate that an inmate-on-inmate homicide involves mental state and unique stresses warranting a finding of second-degree homicide, manslaughter, or in some cases an acquittal based on self-defense." (Hammond Decl. ¶ 33.)  In this case, however, trial counsel failed to investigate and present this critical evidence to the jury. Trial counsel, with the help of an expert, would have had sufficient evidence to support the self-defense instruction they initially provided to the Court.  Counsel started this trial with the question, "Why did Sandoval want in the cell with Caro?"  (Tr. 01/29/2007 at 46.)  They repeated in again in closing.  (Tr. 02/13/2007 at 63.)  Yet, counsel never presented available evidence that would have answered this question.  In fact, defense counsel stated that they never considered a defense of self-defense. (Kalista Decl. ¶ 11.)

Some of the evidence that would have supported this defense actually came out at trial.  For example, the jury heard from the government that Mr. Caro was a member of the same gang as Roberto Sandoval (Tr. 01/29/2007 at 21), that he had been convicted of the Benavidez assault (Tr. 02/13/2007 at 23), and that Mr. Sandoval asked to go into Mr. Caro's cell after Mr. Caro refused to take a cellmate (Tr. 01/29/2007 at 19).  Because trial counsel never consulted with a prison culture expert, however, they were unable to appreciate the significance of these and other facts.  As a result, the jury was deprived of understanding and "seeing" how these disparate pieces of evidence came together.

The jury never heard evidence regarding prison culture that would have explained the significance of Mr. Sandoval's decision to ignore Mr. Caro's previous refusal of a cellmate.  (Bezy Dec. ¶ 17.)  The jury never heard prison culture evidence explaining

60

JA 1080

why Mr. Caro's statements after the homicide were bravado necessary to protect himself from future attacks. (Bezy Dec. ¶ 19.) Instead, the jury only heard the government's argument that these were the statements of a remorseless killer. Having failed to lay this foundation and show relevance, counsel also was precluded from introducing evidence that Mr. Sandoval was sent to the SHU for possession of a weapon. (Tr. 02/12/2007 at 158-59.)

Trial counsel's failure to investigate prison culture and present this evidence to the jury was deficient and prejudiced Mr. Caro. Had the jury heard this evidence, there is a reasonable probability that a juror would have concluded that Mr. Caro acted in response to a real or perceived threat, and not with premeditation. Indeed, at least one juror indicated that knowing Mr. Sandoval was sent to the SHU because he possessed a shank would have affected that juror's decision. (Juror # 47 Decl.)

**E.      Counsel's Deficiencies Both Individually and Cumulatively Prejudiced Mr. Caro**

Even if a single deficiency in counsel's performance does not result in prejudice, the cumulative impact of all failures resulted in Mr. Caro having an unfair trial. By failing to provide evidentiary support to defense arguments, failing to adequately challenge the veracity of the essential and damaging eye witness testimony, and by failing to elucidate to the jury the unique nature of prison life, trial counsel prejudiced Mr. Caro by leaving the jury with only evidence to consider that supported the prosecution's theory of premeditated murder, and no basis on which to consider self-defense or manslaughter theories. Further, by asserting arguments at the outset of trial

JA 1081

regarding the nature of the offense and circumstances in which it occurred, which they then failed to provide evidentiary support for, trial counsel undermined their own credibility. Had counsel presented evidence at trial and effectively cross-examined Mr. Bullock, the jury would have heard a quite different story that could have been the difference between a conviction for first-degree murder or a lesser-included offense. *See* Sealed Juror # 47 Decl. (declaring that it would have made a difference if another inmate testified that Bullock "didn't see what happened" and if "Sandoval was sent to the SHU because he had a shank"); Sealed Juror # 79 Decl. (stating that "inmate eye witness account of the murder was essential to my decision"). The failure to present this evidence undermines confidence in the verdict, and Mr. Caro is entitled to a new trial.

## CLAIM FIVE: BY WITHHOLDING MATERIAL EXCULPATORY AND IMPEACHMENT EVIDENCE, AND MISLEADING DEFENSE COUNSEL, THE GOVERNMENT VIOLATED MR. CARO'S RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS.

The government knew almost three years before trial, when Mr. Bullock testified before a grand jury on February 19, 2004, that he had a cellmate at the time of the offense. (Grand Jury Tr. 02/19/2004, attached as Sealed Ex. 26, at 18.) Yet, in subsequent communications with defense counsel, they misrepresented this fact to the defense.

Early in the case, defense counsel requested "a list of all inmates with their prison numbers in the SHU on December 16 and December 17, 2003, showing the specific cells in which they were housed." (Mot. for Issuance of Subpoena Duces Tecum, 03/27/2006, Dkt. 72.) The Court granted that request. (Oral Order, 03/30/2006, Dkt. 76.) The

62

JA 1082

government "complied" by stating that it had no such per se list of inmates in the SHU on December 16-17, 2003, and instead provided "records from which this information might be gleaned." (Letter to Kalista from Giorno, 06/08/2006; Daily Log and Roster, 12/20/2003.) The government then disclosed the SHU daily logs for Dec. 17-20 and a SHU roster for December 20, 2003, which did not reveal the requested information. (*Id.*). The roster did show the names of the inmates and their cell locations, but for December 20, 2003, three days after the offense, instead of for December 16-17, 2003. The December 20 roster indicated that Mr. Bullock was the only inmate in cell 146, and did not show the presence of Mr. Bland, who had been moved from cell 146 on December 19. (Assignment History Report, 08/06/2012.) Had the government provided a roster for December 17, 2003, it presumably would have shown the existence of both Mr. Bullock and Mr. Bland in cell 146.

The SHU daily logs for December 17- 20, 2006, showed only that Mr. Bland was moved from cell 146 on December 19, 2006, two days after the offense, to another range and cell. (Daily Log, 12/20/2003.) These records did not reflect the fact that Mr. Bland was in cell 146 on December 16 and 17. Had the daily log for December 16 been produced, it would have shown that Mr. Bland was moved into cell 146 on December 16. The government, however, did not produce this document in response to the discovery request.

One month before trial, the government produced a copy of Mr. Bullock's grand jury testimony. (Letter to Kalista from Giorno, 12/28/2006.) In that same letter, the government provided the report of Mr. Bullock's first interview—his "mass interview"

JA 1083

form. The government asserted that this interview was "done as part of a mass interview of *all of the inmates on the SHU. Copies of all the interviews conducted at that time are attached.*" (*Id.* (emphasis added).) The government provided mass interview reports for at least 43 SHU inmates, including Mr. Bullock, but did not include an interview report for Mr. Bland.

While, on the eve of trial, the government finally disclosed the existence of the cell mate through a couple passing references in Mr. Bullock's grand jury testimony, the government never overtly corrected the misconception. Lulled by these misrepresentations by the government, defense counsel was rendered ineffective and failed to appreciate that Mr. Bullock had a cellmate until trial.

The evidence was "material to the preparation of the defense" under Federal Rule of Criminal Procedure 16 and was exculpatory under *Brady*. The evidence had been ordered by the court, and was responsive to Mr. Caro's Motion for Discovery (Dkt. 18) and Motion for Exculpatory Evidence (Dkt. 19). The government should have provided this information sooner, especially since the disclosure did not pose any potential harm to Mr. Bland. *See, e.g., United States v. Rittweger*, 524 F.3d 171, 182 (2d Cir. 2008) (holding that the government should have disclosed the *Brady* material before the eve of trial, "particularly when earlier discovery would not have had the potential to harm the witness"). The government also should have corrected the misperception it had created. Yet, it did neither. This failure by the government undermines confidence in the outcome reached by the jury.

JA 1084

## GROUNDS FOR RELIEF: PENALTY PHASE

**CLAIM SIX: MR. CARO WAS DEPRIVED OF HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL AS GUARANTEED BY 18 U.S.C. § 3006a AND THE SIXTH AMENDMENT OF THE CONSTITUTION AT THE PENALTY PHASE.**

**A.      Trial Counsel Failed to Challenge the Government's Deliberate and Tactical Delay of Mr. Caro's Indictment**

Mr. Caro incorporates herein the facts and law stated in Claim One, *supra*. The government ensured that Mr. Caro was convicted of the Benavidez assault before indicting him for offense in the instant case. Trial counsel failed to raise this meritorious claim and pursue a pretrial remedy that would prevent the government from either seeking the death penalty or arguing facts related to the Benavidez assault as an aggravating factor in support of a death sentence. Counsel has a duty to not only investigate but to challenge aggravating circumstances. ABA Guidelines No. 10.7 cmt. (noting that counsel "must also investigate prior convictions . . . that could be used as aggravating circumstances"). Counsel also "must raise every legal claim that may ultimately prove meritorious." *Id.* Indeed, "[b]ecause of the possibility that the client will be sentenced to death, counsel must be significantly more vigilant about litigating all potential issues at all levels in a capital case than in any other case." ABA Guidelines No. 10.7 cmt. As explained in Claim One, the challenge to the government's conduct in delaying the indictment in this case would have proved meritorious.

Counsel's failure to raise this meritorious claim before trial prejudiced Mr. Caro. As the government informed trial counsel before the DOJ certification hearing, Mr. Caro was permitted any time up until trial to offer facts or circumstances to the Attorney

65

JA 1085

General that would make imposition of the death penalty inappropriate. (Letter to Kalista from Giorno, 03/14/2005.) If counsel could have prevented the government from using the Benavidez assault as support for seeking death, then there is a reasonable probably that Mr. Caro would not have been sentenced to death—either because death would not have been authorized or because the jury would not have voted for death.

**B.      Trial Counsel Failed to Adequately Investigate, Develop, and Present a Compelling Mitigation Story about Mr. Caro's Life**

        **1.      Factual Background**

            **a)      Pretrial Preparation**

In late March 2005, two months after being appointed pre-indictment to represent Mr. Caro, Mr. Kalista and Mr. Simmons asked the court to appoint Lee Norton, Ph.D., M.S.W., L.C.S.W., as a mitigation specialist to begin work on the case. (Ex Parte and Sealed Mot. for Authorization for Expert Servs., No. 2:05-mc-00001-JPJ, Mar. 22, 2005, Dtk. 9) They told the court that a mitigation specialist was necessary to "effectively represent the Defendant at this stage of the proceedings and to provide reasons to the [Attorney General's Death Penalty Review] Committee why the government should not seek the death penalty." (*Id.* ¶ 3.) Dr. Norton explained that in preparation for the Committee meeting scheduled for June 6, 2005, she would need to collect critical records, interview relatives and other potential mitigation witnesses, and "spend a significant amount of time with Mr. Caro." (Aff. of Lee Norton, Ph.D., L.C.S.W., No. 2:05-mc-00001-JPJ, 03/22/2005, Dkt. 9-2, ¶ 12.) The court granted the motion the

66

JA 1086

following day, and ordered that Dr. Norton's fees and expenses not exceed $7,500, or 75 hours. (Sealed Order, No. 2:05-mc-00001-JPJ, 03/23/2005, Dkt. 10.)[6]

The following month, Mr. Kalista and Mr. Simmons asked the court to appoint D.A. Mullikin as a fact investigator for the defense, noting that they only needed $2,500, or 50 hours (at $50/hour). (Ex Parte and Sealed Mot. for Appointment of Investigator, No. 2:05-mc-00001-JPJ, 04/13/2005, Dkt. 14.) They requested Mr. Mullikin's assistance to "help locate and interview individuals who may have mitigating information helpful to the Defendant at this stage of the proceedings." (*Id.* ¶ 3.) That same day, the court granted the motion and ordered that consistent with counsel's request, Mr. Mullikin's fees not exceed $2,500). (Sealed Order, No. 2:05-mc-00001-JPJ, 04/13/2005, Dkt. 15.) Dr. Norton only spent a total of fifty hours on the case, which was all performed in April 2005. (Invoice of Norton & Moody, Inc., 05/02/2005.) Mr. Mullikin spent less than fifty hours on the case in the entire year of 2005. (Invoice of Advanced Private Investigations, LLC, 05/06/2005; Invoice of Advanced Private Investigations, LLC, 06/02/2005; Invoice of Advanced Private Investigations, LLC, 07/15/2005; Invoice of Advanced Private Investigations, LLC, 09/06/2005.)

As discussed in Claim Two *supra*, counsel did little to prepare for the meeting with the Death Penalty Review Committee. Counsel had indicated before that meeting that they would not have much to present about Mr. Caro "personally." (Email to

---

[6] While the Motion requested up to $10,000 in expenses (at $100/hour), Dr. Norton's supporting affidavit indicated that she could conduct a "preliminary investigation[]" in 75-100 hours. (Aff. of Lee Norton, Ph.D., L.C.S.W., No. 2:05-mc-00001-JPJ, 03/22/2005, Dkt. 9-2, ¶ 12.)

JA 1087

Simmons from Kalista, 04/25/2005.)   Before the meeting, Mr. Simmons asked his cocounsel Mr. Kalista, who practiced in this jurisdiction, how much time he expected they would have to prepare for trial if an indictment was returned. (Email to Kalista from Simmons, 05/03/2005.) Mr. Kalista advised him that the Court would likely set a trial six months—or, maybe "as much as 9 mo[nth]s"—after the indictment. (Email to Simmons from Kalista, 05/03/2005.)[7] Even though both counsel were aware, and in fact expected, this case to be set for trial quickly, they did not take advantage of their pre-indictment appointment to investigate and develop a defense. In fact, Mr. Simmons indicated that he planned to wait to hear from DOJ regarding death certification before doing more extensive work on the case. (Email to Kalista from Simmons, 07/15/2005.)

Four months after the meeting with the DOJ, the U.S. Attorney informed defense counsel that the case had been certified as a death penalty case. (Email to Simmons from Kalista, 10/11/2005.) At that time, Mr. Kalista indicated that he spoke with Mr. Giorno and discussed a potential trial date; Mr. Kalista indicated that the summer of 2006 was not "too early." (*Id.*) On January 3, 2006, Mr. Caro was indicted for first-degree murder (Indictment, 01/03/2006, Dkt. 2), and one week later he was provided notice of the government's intent to seek the death penalty (Notice of Intent to Seek the Death Penalty, 01/11/2006, Dkt. 8). The court set the trial to begin on July 31, 2006. (Tr. 01/23/2006 at 7.)

---

[7]"It is inconceivable that an appropriate investigation into [critical mitigating] issues could be accomplished in as little as six months." (Hammond Decl. ¶ 28.)

JA 1088

The attorneys began to prepare a budget in anticipation of the indictment. (Email to Kalista from Simmons, 11/19/2005.) They were aware that they would need experts to assist them in defending Mr. Caro. (Aff. of Lee Norton, Ph.D., L.C.S.W., Dkt. 33, ¶ 2.) Indeed, before their budget was even approved, they requested expert services of mitigation specialist Dr. Norton (Ex Parte and Sealed Mot. for Authorization for Expert Services of Mitigation Specialist, 01/30/2006, Dkt. 25), as well expert services of James Aiken and Mark Cunningham for the purpose of beginning a "risk evaluation" of Mr. Caro's ability to evaluate alternatives to a death sentence (Ex Parte and Sealed Mot. for Authorization for Expert Services, 02/03/2006, Dkt. 27, ¶3).[8]

While the budget was pending, Mr. Kalista began seeking out referrals from local associations for a forensic neuropsychologist. (Email to Doris Nevin, Ph.D., from Kalista, 01/24/2006; Email to Nancy Davis from Kalista, 01/24/2006.) He happened upon a psychologist who had recently relocated to Tennessee, D. Malcolm Spica, Ph.D. (Email to Kalista from Spica, 01/26/2006; Email from Simmons to Kalista, 01/31/2006.)[9] Without committing to Dr. Spica, Mr. Kalista kept him in mind to work on the case. (Email to Spica from Kalista, 03/04/2006.)

After submitting the initial proposed budget (*see* Tr. 01/23/2006 at 12), Magistrate Judge Sargent emailed counsel with questions. In particular, she questioned whether

---

[8] Defense counsel first contacted James Aiken on December 2, 2005. (Letter to Aiken from Simmons, dated 12/02/2005.) Defense counsel appears to have first contacted Mark Cunningham in April 2005. (Letter to Cunningham from Kalista, 04/04/2005.)

[9] Mr. Kalista's file indicates that he conducted internet research and found a source called, "20 Questions (and answers) about Traumatic Brain Injury." (www.brainsource.com/TwentyQ.htm, printed 01/24/2006.)

JA 1089

counsel had lined up mental health experts and if they knew a cost of the evaluations to be performed, and asked if a social historian and gang expert were lined up. (Email to Kalista and Simmons from Sargent, 02/04/2006.)[10] In their initial budget, counsel only requested $30,000 for mental health experts and stated, "We may need to use a neuro-psychologist and a psychiatrist." (Proposed Budget Ex Parte and Under Seal, 01/23/2006, Dkt. 15.) Further, counsel focused on "issues such as competency, criminal responsibility, impaired capacity, disturbance, and other mental health related factors." (*Id.*) Nowhere in their initial request for mental health experts was it contemplated that an expert would be needed for the penalty phase to explain their client's life.[11]

On February 15, 2006, defense counsel submitted their revised proposed budget. (Revised Proposed Budget Ex Parte and Under Seal, 02/17/2006, Dkt. 42-1.) Consistent with the magistrate judge's request, counsel broke down the request for mental health experts into two categories: $10,000 for a neuropsychologist and $20,000 for a psychiatrist. (*Id.* at 6.) The psychiatrist would only be needed if Mr. Caro had brain damage. (*Id.*) Nowhere in the revised budget did counsel explain how and why the

---

[10] The ex parte budget-related conferences with defense counsel in front of Magistrate Judge Sargent were not recorded. The ABA Guidelines make clear: "If requests for the resources needed to provide high quality legal representation at any stage of the proceedings are denied, counsel should make a full record to preserve the issue for further review." ABA Guidelines No. 10.4 cmt. Counsel's failure to preserve the record of conferences related to the budget was below the standard of care. *See* Hammond Decl. ¶ 31.

[11] While counsel budgeted $10,000 (100 hours at $100/hour) for a social historian, they anticipated that person would only be necessary to testify as to facts in Mr. Caro's background. (Dkt. 42-1, at 8-9.) Indeed, counsel noted that their intention was to use family members or other sources in describing Mr. Caro's life history. (*Id.* at 8.)

JA 1090

mental health experts would be useful during the penalty phase of Mr. Caro's trial, that is despite counsel recognizing in their request for funding for a mitigation specialist that "mitigation may be especially important in this case, because there is strong evidence of our client's guilt." (*Id.* at 5.)

At the same time the proposed budget was approved (*see* Letter from Judge Wilkins approving Proposed Budget, 03/01/2006, Dkt. 54), the court indicated that it was applying a hold-back provision whereby it would pay two-thirds of a voucher upon receipt and would pay the remainder upon completion of the trial (Mem. Order, 03/01/2006, Dkt. 55). This caused concern for mitigation specialist Dr. Norton, who indicated that she would not work under any hold-back provisions. (Ex Parte and Sealed Mot. for Authorization for Expert Services, 03/20/2006, Dkt. 65, ¶ 3.) Because of this, counsel asked the court to authorize services of mitigation specialist Hans Selvog, Ph.D., L.C.S.W., to replace Dr. Norton. (*Id.* ¶¶ 4-5.) Dr. Selvog's background is in clinical and forensic social work; he has a doctorate degree in social work and is a licensed clinical social worker. (Vitae of Hans H. Selvog, Ph.D., L.C.S.W., 03/20/2006, Dkt. 65-1.) At the time, he had eighteen years of experience as a forensic social work evaluator in capital sentencing hearings. (*Id.*)

When Dr. Selvog began work as the mitigation specialist on the case in March 2006, he received no file from prior mitigation specialist Dr. Norton nor any notes from the one month she worked on the case one year earlier. (Declaration of Hans Selvog, PH.D., L.C.S.W., 12/31/2012, attached as Ex. 7, ¶ 3 (hereinafter "Selvog Decl.").) Shortly after being appointed, Dr. Selvog was told that Mr. Kalista scheduled a meeting

71

JA 1091

with Dr. Spica for April 17, 2006. (Email to Selvog from Kalista, 04/13/2006.)[12] After that meeting, Dr. Spica informed counsel that he would be willing to serve as a neuropsychologist. (Letter to Kalista from Spica, 04/18/2006.) In that regard, Dr. Spica explained that he would need to meet with Mr. Caro for two days, each day consisting of four hours, and that he would need time to score and analyze the results as well as review records and prepare a report. (*Id.*) He also explained that the neuropsychological examination was "aimed toward obtaining quantified measurements of [Mr. Caro's] performance in various neurobehavioral domains." (*Id.*) Based on these representations, counsel asked for funding for Dr. Spica up to forty hours (Ex Parte and Sealed Mot. for Authorization for Expert Services, 04/19/2006, Dkt. 94), which was granted (Oral Minute Order, 04/24/2006, Dkt. 99).

Dr. Spica made arrangements to see Mr. Caro on June 9 and 16, 2006. (Email to Kalista from Spica, 05/25/2006.) Prior to his evaluation, counsel provided Dr. Spica with records consisting primarily of Mr. Caro's BOP file. Counsel did not instruct Dr. Spica to develop a social or developmental history. Dr. Spica only sent six hours reviewing records before evaluating Mr. Caro. (Invoice of D. Malcolm Spica, Ph.D., 06/07/2006.)

During the month of May, the mitigation specialist was gathering information about the family and attempting to locate records. On May 3, 2006, Dr. Selvog met with Mr. Caro for the first *and only* time. (Def.'s Mot. for Leave to File Mot. for Continuance and Mot. for Continuance, 06/27/2006, Dkt. 203, ¶ L.) He spent a total of six hours with

---

[12] According to Mr. Kalista's billing records, this meeting lasted approximately one hour. (CJA Voucher Worksheet, 06/05/2006.)

JA 1092

Mr. Caro. (Authorization of Payment, 06/02/2006, Dkt. 159 at 2-3.) Dr. Selvog then traveled to Falfurrias, Texas to interview Mr. Caro's family members and gather information about Mr. Caro's background. (Mot. for Leave to File Mot. for Continuance and Mot. for Continuance, 06/27/2006, Dkt. 203, ¶ N; Authorization of Payment, 06/02/2006, Dkt. 159, at 2-3.) Based on his mitigation investigation, Dr. Selvog prepared a Time-Line Narrative of Mr. Caro's developmental history. (Time-Line Narrative Chronological Critical Incidents and Developmental History of Carlos Caro.) Dr. Selvog believed a narrative was critical to assist experts in explaining Mr. Caro's life story. (Selvog Decl. ¶ 6.)

Around this time, Dr. Selvog also drafted a memorandum to counsel noting that there were other issues that needed to be explored. (Mem. to Simmons, Kalista, and Mullikin from Selvog, 06/13/2006.) In particular, Dr. Selvog recommended retaining other experts, including a child psychiatrist to investigate Mr. Caro's "shut-down, autistic behavior" and a neonatologist. (*Id.*) These experts were never retained. That same memorandum stressed to counsel that there were "a lot of open areas to investigate and no time." (*Id.*) Dr. Selvog also stressed that if a continuance is granted, they need to "increase family contact and get face-to-face contact set up with as many family members as possible." (*Id.*) This never happened.

In June 2006, Dr. Spica met with Mr. Caro. Dr. Selvog informed trial counsel that Dr. Spica's tests indicated that Mr. Caro has brain damage. (Email from Selvog to Kalista and Simmons, 06/15/2006.) Dr. Spica liked the idea of using a neonatologist and child psychiatrist. (*Id.*) But he suggested other experts that also may be helpful. (*Id.*)

JA 1093

Dr. Spica reported his test results to counsel on June 20, 2006. (Email to Kalista, Selvog, Simmons from Spica, 06/20/2006.) He indicated that Mr. Caro has frontal lobe dysfunction, which "makes him highly suggestible, believing that information presented to him is familiar." (*Id.*) He further reported that Mr. Caro appears to "lose track of what he's doing" and then misunderstand why his "behavior results in a certain outcome." (*Id.*) After learning this information, counsel sought to retain psychiatrist Keith Caruso, M.D. (Email to Caruso from Simmons, 06/24/2006.)

Dr. Spica completed his report on June 26, 2006. (Neuropsychological Consultation of Carlos David Caro by D. Malcolm Spica, Ph.D., 06/09/2006, 06/16/2006, attached as Ex. 10-C (hereinafter "Spica Consult.").) On June 27, 2006, defense counsel moved for a continuance of the trial date. (Mot. for Leave to File Mot. for Continuance and Mot. for Continuance, 06/27/2006, Dkt. 203.) In that motion, counsel indicated that they understood that brain damage is "highly relevant to mitigation in a capital sentencing proceeding." (Def.'s Mot. for Leave to File Mot. for Continuance and Mot. for Continuance, 06/27/2006, Dkt. 203, ¶ O.) Counsel further indicated that Mr. Caro would be seeking to hire a psychiatrist and neonatologist as recommended by Dr. Selvog. (Def.'s Mot. for Leave to File Mot. for Continuance and Mot. for Continuance, 06/27/2006, Dkt. 203, ¶ P.)[13] These experts, counsel suggested, "may be able to further explain to the jury if and how [Mr. Caro's] mental conditions affected his development as

---

[13] Counsel subsequently filed an Ex Parte and Sealed Motion for Authorization for Expert Services (07/10/2006, Dkt. 210), seeking $15,000 in funding for Dr. Caruso's services, but did not file a request for funding for a neonatologist.

JA 1094

a child, his earlier criminal activity, and life history within and without the Bureau of Prisons." (Def.'s Mot. for Leave to File Mot. for Continuance and Mot. for Continuance, 06/27/2006, Dkt. 203, ¶ R.)

The court continued the trial until January 22, 2007. (Order Granting Mot. for Continuance, 06/27/2006, Dkt. 206.) It ordered Mr. Caro to provide notice to the government of its intent to present a mental health defense no later than September 15, 2006, and if experts would be used as to the issue of guilt, then Mr. Caro was ordered to provide a written summary of expert opinions by October 1, 2006. (Order, 07/12/2006, Dkt. 229.)

Dr. Caruso examined Mr. Caro in August. Before his examination, counsel provided him with documents related to the offense for which Mr. Caro was facing the death penalty, as well as other incident reports. (Letter to Caruso from Kalista, 07/31/2006.) The information was related to Mr. Caro's time in the BOP and his criminal activity. In this letter, no information related to Mr. Caro's upbringing or childhood was provided. In fact, counsel had retained Dr. Caruso to consider Mr. Caro's mental state at the time of the crime. After Dr. Caruso completed his examination, he informed counsel that he would not be helpful. (Selvog Decl. ¶ 10; Kalista Decl. ¶ 15.) Despite knowing nearly five months before trial that they would not call Dr. Caruso, counsel made no attempt to locate another psychiatrist or other mental health expert who could testify during the penalty phase of Mr. Caro's trial to provide background related to Mr. Caro's traumatic childhood.

75

JA 1095

On September 15, 2006, counsel gave notice of their intent to present a mental health defense at both the guilt/innocence and penalty phases of Mr. Caro's trial. (Carlos David Caro's Notice to the Government's Attorneys Pursuant to Rule 12.2(b), 09/15/2006, Dkt. 279.) Immediately upon receiving notice, the government sought to have Mr. Caro evaluated by its experts (Mot. for Immediate Disclosure of Report of Mental Health Examination and to Compel Def. to Submit to Mental Health Examination by Government Experts, 09/15/2006, Dkt. 281), and the court ordered that evaluation to occur beginning September 25, 2006 (Order, 09/22/2006, Dkt. 294). On the same day, defense counsel withdrew their intention to introduce evidence related to Mr. Caro's mental condition as it related to the issue of guilt. (Withdrawal of Notice to Government's Attorneys of Intent to Present Evidence Pursuant to Rule 12.2(b)(1) on the Issue of Guilt, 09/21/2006, Dkt. 292.) Defense counsel also objected to the Court's order requiring Mr. Caro to submit to testing by the government's expert and requested that such examination be stayed until certain procedures were in place regarding firewalling and testing. (Objection to Magistrate Judge's Order of Sept. 21, 2006 [Dkt. 289] and Request for Stay and for Immediate Hr'g, 09/23/2006, Dkt. 295; Carlos David Caro's Mot. for Stay of Order Directing Government Mental Examination of Def., 09/23/2006, Dkt. 296.) This request was denied. (Order, 09/25/2006, Dkt. 298.)[14]

---

[14] Although a hearing was held on this motion (Order, 09/25/2006, Dkt. 298 at 1 ("Counsel was heard on the Motion by telephone conference call")), there is no transcript of the proceedings.

JA 1096

On September 25, the government revealed that psychiatrist Robert T.M. Phillips and clinical psychologist Paul Montalbano would be evaluating Mr. Caro. (Email to Kalista from Giorno, 09/25/2006.) Defense counsel immediately reached out to the community to determine if others had experience with either of the government's experts. (Email from Kalista, 09/25/2006.) Defense counsel learned that Dr. Phillips was described as bright, smooth, and capable. (Email to Kalista, 09/25/2006.) They also learned that Dr. Montalbano, who would be performing the testing, had done bad psychological testing in another case and had been discredited by the authors of the tests he had misused. (Email to Kalista and Simmons, 09/26/2006.)

On September 28, 2006, Mr. Kalista and Mr. Giorno had a conversation regarding Dr. Phillips's evaluation of Mr. Caro. (Email to Kalista from Giorno, 09/28/2006.) Defense counsel advised Mr. Giorno that the defense mental health expert based his opinion solely on testing of Mr. Caro and did not question him about the incident involving Mr. Sandoval, Mr. Benavidez, or the incident at Oakdale. (*Id.*) As a result, Mr. Caro would not be answering any of Dr. Phillips's questions related to those matters. (*Id.*)

Pursuant to the Court's order, after completing his evaluation in September, Dr. Phillips did not disclose his findings to either the government or the defense. (Order, 09/22/2006, Dkt. 289, ¶5.)[15] The defense, therefore, continued to prepare for trial

---

[15] The order also required that the Government expert "shall preserve all notes taken during their examination of the defendant." (Order, 09/22/2006, Dkt. 289, ¶6.) Mr. Caro's current counsel contacted Dr. Phillips, and despite this order, he indicated that his records in this case have been destroyed.

without knowing details from the government expert's report but only knowing that the governments expert would do well on the stand.

As time drew closer to trial, the defense had to seek additional funding and submitted a revised budget. (Second Revised Budget Ex Parte and Under Seal, 11/03/2006, Dkt. 332.) The magistrate judge noted during the pretrial conference that the trial was continued because of mental health issues, but the expenses that have been incurred do not "seem to be related to those issues at all." (Tr. 11/03/2006 (in camera) at 3.) Indeed, as Judge Sargent noted, "I would have anticipated that there would be some increased spending related to that issue." (*Id.*) But there was not. There was, however, a statement that counsel "believe[d] that Dr. Spica would be a witness in the case," (Second Revised Budget Ex Parte and Under Seal, 11/03/2006, Dkt. 332 at 9),[16] indicating that counsel anticipated using his testimony at trial.

There was also discussion of Dr. Selvog's budget being increased so that he could travel to Texas again to meet with family and assist in making a videotape of Mr. Caro's hometown. (Tr. 11/03/2006 (in camera), at 21, 26.)[17] This would be his third trip to

---

[16] The second budget was further revised in light of Magistrate Judge Sargent's request for additional information. (Letter from Sargent to Kalista and Simmons, 11/16/2006, Dkt. 352.) The New Second Revised Budget provided additional written support for the funding requests. (New Second Revised Budget Ex Parte and Under Seal, 11/27/2006, Dkt. 367.) The budget requested additional funds for Dr. Selvog to travel to Chicago to interview family witnesses (Dkt. 367 at 15), but this never occurred. (Selvog Decl. ¶ 12; *see also* Mem. to Mullikin, Kalista, and Simmons from Selvog, 05/15/2006; Letter to Hernandez from Selvog, 10/20/2006.)

[17] Counsel filed a motion seeking funding for the videotape, indicating that the video would be prepared for "use at the trial" and that Mr. Caro's life history would be "incomplete without a complete presentation of his environmental and social history

JA 1098

Texas. (*Id.* at 28.)[18] The revised budget showed an increase in both the mitigation specialist's and fact investigator's fees, as well as attorneys' fees, but the only increase in expert fees was for Dr. Cunningham and Mr. Aiken—the future dangerousness experts. (Second Revised Budget Ex Parte and Under Seal, 11/03/2006, Dkt. 332 at 16-17.)

This is true even though defense counsel retained an expert that was not previously included in the budget—neurologist Russell Swerdlow, M.D. (Second Revised Budget Ex Parte and Under Seal, 11/03/2006, Dkt. 332 at 9.) The need for a neurologist came about from the request to have Mr. Caro undergo an EEG and MRI. Both government and defense counsel agreed that it was necessary to have their respective experts "review and interpret the EEG record and the MRI record in order to fully conduct their evaluation of [Mr. Caro]." (Agreed Order Regarding MRI and EEG, 11/03/2006, Dkt. 334.)

In light of the EEG and MRI, the government's expert sought to conduct a follow-up neurological examination of Mr. Caro (Letter from Phillips to Judge Jones, 11/29/2006, Dkt. 373-2), which defense counsel opposed (Mot. for an Order to Prohibit Subsequent Psychological Exam. by Dr. Phillips and to Prohibit Videotape, 11/22/2006, Dkt. 364). When arguing the motion to the Court, counsel recognized that they would,

---

associated with his developmental years." (Ex Parte Sealed Motion for Authorization and Funds to Employ Videographer, 11/16/06, Dkt. 351 at 1.) The video was not shown to the jury.

[18] Dr. Selvog went to San Antonio, where Mr. Caro's wife and daughter resided, in April 2005 (Out-of-Court Hourly Worksheet, 04/06/2006 to 04/17/2006) and he went to various parts of Texas, including Mr. Caro's hometown Falfurrias, in May 2005 (Out-of-Court Hourly Worksheet, 05/12/2006-05/26/2006).

JA 1099

"assuming that Mr. Caro is convicted, . . . have an opportunity at least to review the Government's report and see what all the testing they did." (Tr. 11/28/2006 at 8.) Despite defense counsel's attempt to prevent this examination from occurring, Dr. Phillips and Dr. Montalbano were permitted to examine Mr. Caro again. (Order, 11/29/2006, Dkt. 372.) Counsel were aware that the government's experts conducted a neurological examination of their client, but never asked to have an expert also conduct similar testing.

In December as trial grew near, defense counsel began seeking subpoenas for witnesses. Magistrate Judge Sargent asked for explanation regarding the need for mitigation witnesses, which counsel provided. (Ex Parte Sealed Documents in Support of Motion for Issuance of Subpoenas and Writs of Habeas Corpus Ad Testificandum, 12/12/2006, Dkt. 409.) In particular, Dr. Selvog submitted a declaration supporting the need for testimony from Mr. Caro's brothers, Noe and Jose. (Decl. of Hans Selvog, Ph.D., L.C.S.W., 12/11/2006, Dkt. 409-3.) Jose and Noe could provide first-hand eyewitness accounts of the violence in the house where Mr. Caro grew up. (*Id.* at 5-6.) They could also provide intimate details about Mr. Caro's unusual behavior as a child. (*Id.*) At the end of his declaration, Dr. Selvog noted: "In my opinion, the absence of these witnesses would prevent the jurors from viscerally knowing and appreciating the full extent of Mr. Caro's personal history." (*Id.* at 6.) The court granted defense

JA 1100

counsel's request and issued subpoenas for these key witnesses. (Sealed Ex Parte Order, 12/29/2006, Dkt. 443.)[19]

One month before trial, defense counsel learned from their neurologist Dr. Swerdlow that the EEG report was "worthless" and that it was impossible to conclude anything from it. (Email from Swerdlow to Selvog and Kalista, 12/12/2006.)[20]  Upon review of the EEG tracing itself, Dr. Swerdlow concluded that the tracing was inadequate for interpretation but it was essentially normal. (Email from Swerdlow to Kalista, 12/14/2006.)[21]  Upon review of the MRI, Dr. Swerdlow indicated that it was a good quality study and, according to his reading, it was "normal." (Email from Swerdlow to Kalista, 12/20/2006.)[22]  Dr. Swerdlow spent eighteen minutes reviewing the EEG and MRI, and twelve minutes consulting with counsel on his findings. (Authorization for Payment, 01/23/2007, Dkt. 522.)

In preparation for the penalty phase, defense counsel sought travel orders for their witnesses. (Carlos David Caro's Ex Parte and Sealed Mot. For Travel Order for Defense Witnesses, 02/02/2007, Dkt. 580.) Notably, in that motion, counsel indicated that Amada Fergason, Mr. Caro's mother's social worker, could not travel due to medical conditions.

---

[19] The Magistrate Judge denied the request for subpoenas for Melissa Caro, Veronica Caro, Edna Balderas, and Laura Perez, but the District Court overruled that finding. (Sealed Order, 01/05/2007, Dkt. 466.)

[20] Dr. Phillips noted similar conclusions regarding the EEG report. (Report of Forensic Evaluation by Robert T.M. Phillips, M.D., Ph.D., D.F.A.P.A., and Paul Montalbano, Ph.D., 01/30/2007, Dkt. 561, at 34 (hereinafter "Phillips Report").)

[21] Dr. Phillips noted that the EEG was of poor quality. (Phillips Report at 34.)

[22] Dr. Phillips noted that the MRI was "technically satisfactory and appears to be normal." (Phillips Report at 34.)

JA 1101

(*Id.* ¶ 6.) They indicated that they would confer with the government about her testimony. (*Id.*) She did not testify at trial; no arrangements were made for her to present testimony through alternate means.[23]

### b) Trial

On January 22, 2007, Mr. Caro's trial began. At that time, there was no plan regarding the use of mental health experts during the penalty phase of trial. Dr. Selvog, concerned by this, called a meeting on January 24. (Selvog Decl. ¶ 14.) It appears that during that meeting, the decision was made that it was not likely that Dr. Spica would be called as a witness. This was based primarily on concerns related to the government's expert, Dr. Phillips. Neither Dr. Selvog nor counsel reviewed Dr. Phillips's report before this decision was made. (Selvog Decl. ¶ 14; Kalista Decl. ¶ 18.)

After Mr. Caro was convicted of first-degree murder, he was found eligible to receive the death penalty based on his prior convictions, which counsel did not challenge. That same day, counsel indicated that Mr. Caro had not yet decided whether to call a mental health expert at the penalty phase of trial but agreed to notify the court by 2:00 p.m. the following day if an expert would be used. (Tr. 2/1/2007 at 89-90.) If counsel gave notice, then they would be permitted review the government's expert's report. (*Id.*)

---

[23] Ms. Fergason provided a statement on the videotaped recording that counsel prepared (Ex Parte Sealed Motion for Authorization and Funds to Employ Videographer, 11/16/06, Dkt. 351), but that was not played for the jury.

82

JA 1102

No notice was ever filed. And counsel went forward with the penalty phase without the benefit of mental health experts.

During the penalty phase, defense counsel submitted a list of 22 mitigating factors to the jury. (Special Verdict Form, 02/13/2007, Dkt. 639 (hereinafter "Special Verdict Form").)[24] In support of those factors, counsel put on a total of eight witnesses. Two of those witnesses, Mr. Aiken and Dr. Cunningham, were "experts" who were called to testify regarding the BOPs ability to safely house Mr. Caro for the rest of his life. These experts, however, were greatly undermined and ended up confirming the government's position: that it could not be guaranteed that Mr. Caro could be safely housed. The only testimony presented to explain Mr. Caro to the jury was via lay witnesses. This testimony lasted approximately four hours and came from three of Mr. Caro's paternal aunts; one of Mr. Caro's teachers; one of Mr. Caro's maternal cousins; and Mr. Caro's wife.

Susannah Rodriguez was the first person with knowledge regarding Carlos's[25] childhood to testify during the penalty phase. Ms. Rodriguez described the town where Carlos was raised and provided background information on the family. (Tr. 02/07/2007 at

_____

[24] Not a single juror found that the following mitigating factors were proven: (2) Mr. Caro exhibited symptoms of failure to thrive as he was a listless and inactive baby; (10) The ability of Mr. Caro's mother to nurture her sons was impeded by her repeated victimization at the hands of her violent and abusive husband; (12) For certain periods of time, Mr. Caro proved himself to be a good father and husband; (15) Mr. Caro was not involved in gangs or gang-related activity while in the community; (16) Mr. Caro was not involved in gang-related activity in prison until he was sentenced to thirty years incarceration in 2001; and (21) Mr. Caro is 40 years old, and is less likely, as he ages, to engage in violent behavior. (Special Verdict Form, 2/13/2007, Dkt. 639 at 3-6.)

[25] For purposes of clarity when discussing the Caro family, first names will be used.

JA 1103

69-76, 82-88.) She told the jury that her brother (Carlos's father) was a "pretty heavy" drinker and he was "an aggressive drunk, a violent drunk." (*Id.* at 78.) While she testified that her brother would hit Carlos's mother when he was drunk (*id.* at 91), the only incident that she described in detail was when she saw Carlos's father choking Carlos's mother (*id.* at 103). But she said that Carlos and his siblings were not around to witness this event. Ms. Rodriguez only painted a cursory overview of the family dynamics.

Ms. Rodriguez described Carlos as being a sickly infant who was ill the first year of his life. (*Id.* at 94.) She described Carlos as quiet and a loner. (*Id.* at 93.) She also explained that he was slow at learning to crawl, walk, and speak. (*Id.* at 95.) At age nine, Carlos did not know how to tie his shoes or tell time. (*Id.*) On cross-examination, however, Ms. Rodriguez agreed that Carlos became a good writer, a "very careful writer." (*Id.* at 112-13.) There were no questions asked to explain what this meant on redirect.

The two other paternal aunts who testified after Ms. Rodriguez did not add much new information to the mitigation story. Delia Contreras told the jury how Carlos's older brother Jose came to live with her after he got in trouble. (Tr. 02/07/2007 at 141.) Ms. Contreras also testified that she saw Carlos become "real upset and cry[]" when his parents would fight. (*Id.* at 148.) Diamantina Razo testified that she never saw Carlos's father beat his mother, but she heard about it. (*Id.* at 164.) Ms. Razo testified that Carlos's mother did the best she could. (*Id* at 167, 170.) The common facts presented from the three aunts were that Carlos was a quiet, non-violent, respectful boy who was a

84

JA 1104

sickly infant; that Carlos's father was an alcoholic; that his parents were abusive toward each other; and that Carlos's father and uncles were involved in illegal drug trafficking.

The other three mitigation witnesses were Carlos's teacher, cousin, and wife. Yomieda Martinez was Carlos's mathematics teacher while he was in junior high school. (Tr. 02/07/2007 at 128.) Her testimony was very brief. She described Carlos as timid, quiet, and respectful. (*Id.* at 129.) Ms. Martinez identified Carlos's school records and noted that he received a lot of Ds, but she did not explain anything regarding the records. (*Id.* at 132.)

Laura Perez is Carlos's maternal cousin. Ms. Perez briefly discussed Carlos's maternal family tree but her testimony was limited by the government's objection when describing her mother's substance addiction. (Tr. 02/08/2007 at 4-10.) She told the jury that she used to stay at her cousin Carlos's house and his father drank and physically fought with his mother. (*Id.* at 11.) But, she said she could not say that she actually saw his father go so far as to punch his mother. (*Id.*) Ms. Perez identified a few pictures of Carlos (*id.* at 13-16), and told the jury that Carlos's mother died in a fire (*id.* at 17-18). On cross-examination, Ms. Perez was questioned about the video statement she provided and admitted that she remembers having a loving environment at her grandparents' home. (*Id.* at 19-20.)

The last witness to provide testimony regarding Carlos was his wife, LouYveth. She told the jury how she met Carlos and how they were married and had a child—a child that was born while Carlos was serving his first stint in prison for his involvement in the family drug business. (Tr. 02/08/2007 at 26-30.) While she described her

85

JA 1105

relationship with Carlos as "great" (*id.* at 31) and described him as being a "good dad" when he was released from prison the first time (*id.* at 32), she also told the jury that Carlos's supervised release was revoked because he used drugs (*id.* at 32). After Carlos was released from prison again, their relationship was "rocky," and he would come home late and did not have a regular job. (*Id.* at 33.) She told the jury that she learned on the radio that her husband had been arrested again for drug-related activity. (*Id.* at 34.) Carlos was sentenced to almost six years in federal prison. (*Id.*) Yveth was left to care for the daughter on her own, with the help of her parents. (*Id.* at 35, 37-38.)

After Carlos got out of prison the second time, Yveth said things were "better" and they were "very happy and very excited." (*Id.* at 39.) This lasted for about one-and-a-half years. (*Id.*) Until one day, Carlos left the house and did not return. (*Id.* at 40.) She saw him once several months later because she was in an accident; Yveth had not seen Carlos since that day until the day she testified at his trial. (*Id.* at 40-41.) She was very angry and upset when Carlos was arrested again; she does not know the details regarding his third time in prison. (*Id.* at 42.)

The brief testimony by Yveth that Carlos was a good father and husband was undermined on cross-examination. She said that after his first release from prison, Carlos was "in and out of [her] house" and "drifted in and out from time to time." (*Id.* at 52.) He didn't have a job, and Yveth was the primary caretaker for their daughter. (*Id.* at 54.) She said that when Carlos got out of prison the second time, things were perfect—until "he just left the house and never came back." (*Id.* at 57-58.) And then, the prosecutor asked Yveth about the girlfriend Carlos had while they were married (*id.* at 61) and the

86

possibility that Carlos was the father of her child (*id.* at 62). No redirect occurred. The testimony of these six witnesses was the only evidence presented to the jury to humanize Mr. Caro.

The jury spent approximately two-and-a-half hours deliberating to make the decision whether Mr. Caro should be put to death by the United States Government. (Minute Entry, 02/13/2007, Dkt. 636.) It was obvious that there was factual support for several of the mitigating factors. The jury unanimously found that Mr. Caro was exposed to repeated instances of domestic violence and household disruption during his childhood; that he was raised in a home where education was not valued; that he was raised in a poverty-striken community with limited economic opportunities; that he was an obedient, respectful, well-behaved child at home, in the school, and in the community; that he was a shy, respectful student in contrast to his brothers, and that his parents showed no interest in their children's academic progress; that his maternal uncles involved him illegal drug trafficking; and that he has never been physically violent or abusive toward his wife or daughter. (Special Verdict Form at 3-5.)

The jury all agreed that Mr. Caro had a troubled childhood, but there was no expert testimony to explain *why that mattered.* Because the bulk of the evidence presented at the penalty phase related to the debate over Mr. Caro's future dangerousness, and what little mitigating evidence was offered failed to sufficiently humanize and explain Mr. Caro as an individual, it is not surprising that the jury voted for death.

## 2.   Counsel's Performance was Deficient

Mr. Caro's trial attorneys determined from the outset that the best they could do

87

JA 1107

for their client was a sentence other than death. (Mem. to File from Simmons, 03/23/2005.) Yet they failed to take the reasonable and necessary steps to present a compelling mitigation case that would convince at least one juror to vote for life. Counsel failed to understand the need to obtain consulting mental health and behavioral experts early in the case and in their initial budget request. The rest of the case was hampered by the fact they only sought two mental health experts.

Despite this failure from the outset, counsel did gather sufficient information to tell a story of a little boy who was born into a traumatic and chaotic home environment and who had no real choice in life except to become a drug mule. But, they did not use their expert who determined Mr. Caro had brain damage and functioned on the level of a ten-year-old. Nor did they obtain another expert who could have explained the impact of Mr. Caro's traumatic childhood on his development. The only expert evidence presented at the penalty phase related to Mr. Caro's future dangerousness, and not only failed to sufficiently humanize and explain Mr. Caro as an individual, but also asserted he was dangerous. Counsel also did not present critical lay witness testimony—preventing the jury from hearing from Mr. Caro's brothers who witnessed first-hand the violence between their parents. What little evidence that counsel did present in attempting to humanize their client was inadequate.

Counsel's deficiencies resulted in the jury having an incomplete portrait of the man they were sentencing. Instead of knowing the true story, the jury was left to believe that Mr. Caro was a violent criminal unworthy of having his life spared. We know now that had Mr. Caro's attorneys presented evidence of their client's brain damage, then

88

there is a likelihood that Mr. Caro would have received a sentence less than death.

<strong>a)  Counsel never developed a reasoned and cohesive mitigation theme for trial</strong>

During the penalty phase, "defense counsel must both rebut the prosecution's case in favor of the death penalty and affirmatively present the best possible case in favor of a sentence other than death" ABA Guidelines No. 1.1 cmt. Further, "counsel should begin to develop a theme that can be presented consistently through both the first and second phases of the trial." ABA Guidelines No. 10.11 cmt. Because of this, it is critical that mitigation investigation "begin as quickly as possible." ABA Guidelines No. 10.7 cmt. The theme that is developed must humanize their client and present him as more than the terrible crime for which he is standing trial.

Indeed, it is critical for counsel to recognize that "capital trials require a defense that is cognizant of the reality that the defendant is likely to be found guilty by the jury and that the same jury will then weigh aggravating and mitigating evidence." (Hammond Decl. ¶ 25.) "Inescapably, however, much of the foundation for the presentation of both aggravating and mitigating evidence will have been laid during the presentation of evidence at the guilt/innocence stage." (Hammond Decl. ¶ 27.) It is because of the uniqueness of death penalty cases that is imperative for a capital defense to develop themes that permeate all aspects of the work. (Hammond Decl. ¶ 25.) This work must begin immediately and requires both human and financial resources. (Hammond Decl. ¶ 27.)

In Mr. Caro's case, as counsel indicated, "[t]here was not much in Mr. Caro's

89

JA 1109

personal life that we felt we could present to a jury to humanize him. He cheated on his wife; he was not a good father; he was a three-time loser as far as drugs; and he had difficulty while incarcerated." (Kalista Decl. ¶ 20.) Counsel admitted that, "in the end, I don't think we were able to sufficiently humanize him." (*Id.*) This statement couldn't be more true. But the reason why counsel were unable to sufficiently humanize Carlos was because they did not do their job as required under prevailing professional norms.

As explained in the first page of one the training manuals in counsel's file: "Part of [a capital defense attorney's] job, of course, is to learn our clients' stories in great detail, and from as many different sources as possible. But another part involves recognizing the possible meanings of what we are uncovering as we probe." David Freedman, Capital Resource Counsel Project & Federal Death Penalty Resource Counsel, Guide to Mental Health Mitigation 1 May 2004. Here, despite having a mitigation specialist who was gathering information and advising counsel on several types of experts who should be retained, counsel never had a strategy for presenting a compelling mitigation story. (Selvog Decl. ¶ 20.) Counsel fell short in requesting mental health experts, creating a persuasive narrative of Mr. Caro's life story, and ultimately in presenting their case to the jury.

        **b)**    **Counsel failed to appropriately request, adequately develop, and present testimony of mental-health experts**

"[M]ental health experts are essential to defending capital cases." ABA Guidelines No. 4.1 cmt. Mental health experts "gather facts, through professional

JA 1110

examination, interviews, and elsewhere, that they will share with the judge or jury." *Ake v. Oklahoma,* 470 U.S. 68, 80 (1985). Indeed, the *Ake* court recognized that psychiatry plays a "pivotal role" in criminal proceedings. *Id.* at 79.

As the ABA Guidelines explain, "an understanding of the client's extended, multi-generational history is often needed for an understanding of his functioning," and "[e]xpert witnesses may be useful for this purpose and may assist the jury in understanding the significance of the observations." ABA Guidelines No. 10.11 cmt. In determining what experts are needed, counsel should select experts who fit the specific needs of the case "rather than relying on an 'all-purpose' expert who may have insufficient knowledge or experience to testify persuasively." *Id.* "Although mental health issues are so ubiquitous in capital defense representation that the provision of resources in that area should be routine, it bears emphasis that every situation will also have its own unique needs." *Id.* No. 4.1 cmt. Indeed, "counsel should structure the team in such a way as to distinguish between experts who will play a 'consulting' role, serving as part of the defense team covered by the attorney-client privilege and work product doctrine, and experts who will be called to testify, thereby waiving such protections." *Id.* No. 10.4 cmt.

Developing a mental health defense is an undisputed key aspect of capital defense. (Hammond Decl. ¶¶ 28, 46.) In the instant case, counsel's performance was deficient from the outset. Counsel's initial funding request to the court denotes a cursory understanding, at best, of mental health experts. At the time that counsel submitted the budget for this case, they had been representing Mr. Caro for over a year; mitigation

91

JA 1111

specialist Dr. Norton had met with their client and their client's family. They should have known by then that Mr. Caro had a history of trauma and that additional mental health experts should be expected. But in their budget submitted to the court, counsel recognized that in capital cases, "it is essential to consider psychological evaluation and testing." (Refused Proposed Budget Ex-Parte and Under Seal, 02/17/2006, Dkt. 42-1 at 6.) The remainder of their budget request for mental health experts (one paragraph) lacks a true understanding of the need to explore any mental health defense for purposes of the penalty phase.

The only two mental health experts listed were a neuropsychologist "and perhaps, a psychiatrist." (Dkt. 42-1 at 6.) They told the court that a psychiatrist would be needed *only* if the neuropsychological testing shows signs of brain damage. (*Id.*) "While this investigation may well properly involve a neuropsychological evaluation, there is no substitute for a thorough mental state evaluation, which may require—as it did here—a combination of experts and consultants." (Hammond Decl. ¶ 30.) There was no recognition that they could potentially need other experts to explain their client—experts such as a psychiatrist or a neonatologist to explain Mr. Caro's childhood and his being mute. There was no request for consulting experts, in addition to testifying experts. And there was no request for experts for the purpose of educating the jury on specific topics. Counsel's performance was deficient under the ABA Guidelines and standard of care existing at the time they represented Mr. Caro. (Hammond Decl. ¶¶ 46, 48.)

In their preparation, counsel retained only two mental health experts: Dr. Spica, who determined through neuropsychological testing that Mr. Caro has brain impairment,

JA 1112

and Dr. Caruso, a forensic psychiatrist of questionable background[26] who indicated he had learned information about the offense that counsel did not believe would be helpful. (Kalista Decl. ¶ 15.) Counsel never retained an alternative psychiatrist even though they knew that Dr. Caruso could not testify at trial.   They also never sought to increase the budget for mental health experts, which even the magistrate judge thought odd.   (Tr. 11/03/2006 (in camera) at 3.)

Nor did counsel seek other types of mental health experts as recommended by the mitigation specialist.   On June 13, 2006, Dr. Selvog recommended obtaining other experts, including a child psychiatrist and a neonatologist to explain the significance of the narrative Dr. Selvog prepared about Mr. Caro's developmental history and the critical incidents of his childhood. (Mem. to Simmons, Kalista, and Mullikin from Selvog, 06/13/06.) Trial counsel never retained these experts.

Of the two mental health experts counsel did retain, one provided counsel with mitigating evidence.   Over six months before trial, Dr. Spica diagnosed Mr. Caro with Cognitive Disorder NOS.   In lay terms, this means that Mr. Caro has brain damage. (Spica Consult at 7.) In particular, Mr. Caro has frontal lobe dysfunction that impairs his daily functioning and makes him highly suggestible. (*Id.* at 6.) Dr. Spica opined that Mr. Caro has "unreliable judgment skills, and an inability to sort through information provided to him." (*Id.* at 7.)   He further explained that Mr. Caro's reasoning ability

___

[26] While in medical school, Dr. Caruso manipulated research data.  Because of this, he was required to repeat his last year.  This information was made public during a capital trial in Tennessee, where Mr. Simmons is licensed to practice law, in May 2006—before Dr. Caruso was retained in this case.

JA 1113

"under calm, controlled conditions ranks at the level of a 10-year-old" but that if he is under pressure, he will perform at a much more impaired level. (*Id.*)

Instead of using this critical information to build a defense that could help explain Mr. Caro to the jury, counsel decided not to present any mental health expert testimony. Dr. Spica was never called to testify at sentencing, and he was never told why he was not called to testify. (Spica Decl. ¶ 7.)  After the trial started but before Mr. Caro was convicted, counsel made the decision not to call Dr. Spica *without even reviewing the report* of the government's expert, Dr. Phillips. (Kalista Decl. ¶ 18.)  Counsel indicates that their decision was based on Dr. Phillip's reputation, his anticipated testimony, and a "feeling" that his testimony could not be rebutted. (Kalista Decl. ¶ 18.)

Counsel's decision to forego presentation of evidence of Mr. Caro's brain damage was neither informed nor reasonable.  First, counsel's decision not to present evidence of brain damage was inherently unreasonable because their inadequate development of a mental health defense before trial was unreasonable.  As discussed above, from the beginning of the case, counsel never sought funding for or retained the necessary experts to build a defense.  Their mitigation specialist Dr. Selvog indicated that expert testimony was critical to present information about Mr. Caro's brain impairment to the jury. (Selvog Decl. ¶ 9.)  Shortly upon his involvement in the case, Dr. Selvog had identified various experts, including a psychiatrist, who he believed would be helpful in explaining Mr. Caro's brain impairment and other mitigating factors to the jury. (*Id.* ¶ 9; Mem. To Simmons, Kalista, and Mullikin, from Selvog, 06/13/2006.)  Counsel were also aware, because Dr. Spica had informed them upon being retained, that he would only perform

94

JA 1114

the testing; Dr. Spica recommended initially, and again in his report, that a psychiatrist should be consulted to assess Mr. Caro's psychiatric, neurocognitive, and adaptive functions.   (Spica Decl. ¶ 6; Spica Consult at 7; Letter to Kalista from Spica, 04/18/2006.)

Once counsel learned in August that Dr. Caruso would not be able to serve as a testifying psychiatrist at the penalty phase, they should have—but did not—find another psychiatrist to explain how Mr. Caro's brain impairment affected him throughout his life. (Hammond Decl. ¶48.) As a result, when counsel went to trial, the only one of the two mental health experts who was available to testify was Dr. Spica.  At that point, however, it was too late to make strategic decisions regarding a mental health expert.  (Selvog Decl. ¶ 15.)   There were no other options besides Dr. Spica who had never testified in a criminal case (Spica Decl. ¶ 3.), and who had not been prepared to testify. As his billing records indicate, he had not consulted or billed for work on this case since early September, 2006.  (Invoice of D. Malcolm Spica, 01/24/2007.)

Any decision that counsel made based on purported concerns about Dr. Phillips's opinion were also unreasonable and uninformed.  Notably, Dr. Phillips was not the expert who conducted neuropsychological testing; the prosecutor informed counsel months prior to trial that Dr. Montalbano would be performing psychological testing in September 2006.  (Email from Giorno to Kalista, 09/25/2006.)  Counsel had learned information challenging Dr. Montalbano's procedures in another case (Email to Kalista and Simmons, 09/26/2006) and therefore knew, or should have known, well before trial that the government's expert who conducted the testing could be discredited on cross-

95

JA 1115

examination. If this were a concern, counsel should have filed a motion in limine to limit the government to presenting only testimony relevant to only rebut Dr. Spica's testimony regarding brain damage. Counsel's failure to do this demonstrates again that they lacked a cohesive strategy for presenting mitigating mental health evidence. What is more, it also suggests that counsel lacked a true understanding of the difference between the various mental health experts that they had retained and that the government had retained.[27]

Compounding the unreasonableness of counsel's decision is that it was based on a "feeling" that Dr. Phillip's anticipated testimony could not be rebutted. But counsel did not review Dr. Phillips's report. (Kalista Decl. ¶ 18; Spica Decl. ¶ 7; Selvog Decl. ¶ 14.) Nor did counsel consult with Dr. Spica about the government's experts. (Declaration of D. Malcolm Spica, 01/04/2013, attached as Ex. 10, ¶ 7 (hereinafter "Spica Decl."); Invoice of D. Malcolm Spica, 01/24/2007.).) Had they review Dr. Phillips's report and consulted with Dr. Spica, they would have learned that Dr. Phillips's opinion relying, in part, upon Dr. Montalbano's testing was problematic for two reasons. First, Dr. Montalbano did not administer the appropriate tests that would have shown deficits and demonstrated that Mr. Caro has brain impairment. (Spica Decl. ¶ 11.) Second, Dr. Montalbano administered some of the same tests that Dr. Spica administered, less than

---

[27] Dr. Spica, who is a psychologist (Ph.D.), conducts neuropsychological testing to determine whether one has brain impairment. In contrast, Dr. Caruso, who is a psychiatrist (M.D.), conducts an interview and mental status assessment of an individual. Dr. Phillips who is a psychiatrist, *not* a psychologist, did not and could not perform the testing that that psychologists Dr. Montalbano (Ph.D.) or Dr. Spica performed.

JA 1116

six months earlier. (*Id.* ¶ 12.) This resulted in what is termed "practice effect," where some scores are artificially higher due to the fact that the second test was given shortly after the first test. (*Id.*)

Further, had counsel reviewed Dr. Phillips's report, they could have obtained an opinion to undermine the neurological examination performed by Dr. Phillips. Indeed, they indicated in the first approved budget that if testing "suggests a possibility" of brain damage, then counsel would ask for funding for a "full neurological examination." (Dkt. 42-1 at 6.) But they did not. Had they simply consulted an expert to review Dr. Phillips's neurological examination, they would have learned that Dr. Phillips's examination was "cursory" and lacked "many of the tests routinely performed on forensic cases, especially those where there might be a suspicion of frontal lobe dysfunction." (Letter from Thomas M. Hyde, M.D. Ph.D., to Robin Konrad, 12/22/2012, attached as Ex. 11.) Moreover, even though Dr. Phillips's administration of neurological testing was "substandard," some of the tests he administered to Mr. Caro revealed abnormal results. (*Id.*) Such evidence is at odds with Dr. Phillips's conclusion that Mr. Caro's performance was "superior." (*Id*; *see also* Phillips Report.)

Mr. Caro's trial counsel's performance fell below the standard of care by failing to present evidence of brain damage to the jury. "Counsel must be experienced in the utilization of expert witnesses and evidence, such as psychiatric and forensic evidence, and must be able to challenge zealously the prosecution's evidence and experts through effective cross-examination." ABA Guidelines No. 1.1 cmt. Had counsel adequately prepared in advance of trial in accordance with the standard of care for capital defense

97

JA 1117

attorneys, they would have been able to present evidence of Mr. Caro's cognitive deficits and would have been able to cross-examine Dr. Phillips regarding his opinions. Counsel's decision to prevent the jury from hearing this evidence was unreasonable and their performance was deficient.

**c)**      **Counsel's failure to obtain a mental-health expert to explain the effects of Mr. Caro's childhood trauma was unreasonable**

Counsel also learned that Mr. Caro had a traumatic childhood filled with violence and neglect. Mitigation specialist Dr. Selvog interviewed many family members and learned much of this information six months before trial. He prepared a timeline detailing the trauma Mr. Caro suffered as child. But rather than find proper experts who could educate and explain this to the jury, counsel picked one expert—Dr. Caruso. Neither counsel nor Dr. Selvog had worked with Dr. Caruso in the past. Neither Dr. Caruso's resume nor his personal report of his qualifications demonstrate that he was the appropriate expert for this case. Moreover, counsel did not ask Dr. Selvog to conduct any research on Mr. Caruso's background or reputation. (Selvog Decl. ¶ 10.) Indeed, counsel should have been aware before retaining Dr. Caruso that his opinion could be undermined on cross-examination because he was required to repeat his last year of medical school.

But counsel used Dr. Caruso as a catch-all expert who evaluated Mr. Caro to not only determine whether there were any mental disease or defects that could be used as a defense during the guilt/innocence phase of trial, but also whether there were any

98

JA 1118

mitigating circumstances that could be presented to the jury. (Kalista Decl. ¶ 15.) The bulk of records that they provided Dr. Caruso related to Mr. Caro's BOP record and the incidents in which he was involved. (Letter to Caruso from Kalista, 07/31/2006.)

Dr. Caruso met with Mr. Caro and reported back to counsel that he learned information that would not be helpful in developing a defense for the guilt/innocence phase. He told counsel that they did not want to use him. Counsel followed Dr. Caruso's advice, but at that point, they ceased to develop *any* expert mental health testimony that could have been provided at the penalty phase beyond the existing evidence of brain damage. (Kalista Decl. ¶ 15.) While counsel indicated that they relied upon their mitigation specialist to advise and recommend mental health experts (Kalista Decl. ¶ 12), that does not appear to be the case. Dr. Selvog, who is a licensed clinical social worker (Selvog Decl. ¶ 2), advised them of the need to consult with and retain additional experts. Counsel, however, did not seek another psychiatrist or expert with a relevant background who could explain the impact of Mr. Caro's traumatic childhood on him, in spite of the mitigation specialist's strong recommendation that this type of expert should be retained. (Email from Selvog to Kalista, Simmons, 06/15/2006; (Mem. to Simmons, Kalista, and Mullikin from Selvog, 06/13/2006.) While the mitigation specialist was attempting to carry out his role under the ABA Guidelines,[28] counsel disregarded his guidance and

---

[28] *See, e.g.,* ABA Guidelines No. 4.1 cmt. ("The mitigation specialist compiles a comprehensive and well-documented psycho-social history of the client based on an exhaustive investigation; analyzes the significance of the information in terms of impact on development, including effect on personality and behavior; finds mitigating themes in the client's life history; identifies the need for expert assistance; assists in locating appropriate experts; provides social history information to experts to enable them to

99

expertise.

Counsel's performance fell below the standard of care. Where counsel had documented evidence of not only brain impairment, but also evidence that Mr. Caro was in special education classes, that his nickname was "el mudo" (the mute) because he did not speak, and that his father was a severe alcoholic who frequently beat his mother, their failure to retain an expert to present testimony regarding the impact of these factors was unreasonable. (Hammond Decl. ¶ 48) It is Dr. Selvog's opinion that at least one expert was necessary to testify as to how Mr. Caro's brain impairment and traumatic childhood impacted his life and his functioning. (Selvog Decl. ¶ 9.)

d)    **Counsel's failure to present testimony of Mr. Caro's brothers: Jose and Noe**

While counsel called six witnesses to help tell the story of Mr. Caro's childhood and likely developmental trajectory, they failed to call two of the most critical witnesses: Carlos's brothers Jose and Noe. Unlike any of the other witnesses they did present, Jose and Noe lived with of Carlos in the violent and chaotic household. The fact that counsel did not present the testimony of these available witnesses underscores their failure to understand and adequately present Mr. Caro's mitigation story.

Mr. Caro's brother Jose is almost two years older than Carlos and his brother Noe is one year younger than Carlos. Both boys witnessed the abuse that Carlos witnessed.

conduct competent and reliable evaluations; and works with the defense team and experts to develop a comprehensive and cohesive case in mitigation.").

JA 1120

As counsel explained in their pretrial request for subpoenas, Jose and Noe were two critical witnesses to help the jury "appreciat[e] the full extent of Mr. Caro's personal history." (Decl. of Hans Selvog., 12/11/2006, Dkt. 409.) Counsel's mitigation specialist believed that they were critical witnesses. (Selvog Decl. ¶ 19.) Even though the subpoenas were issued, and Jose and Noe were at the local jail waiting to testify, counsel did not call them to the stand.

Jose and Noe could have shown the jury another side to Carlos's life that was not sufficiently described by people who did not live under the same roof as Carlos. Jose and Noe both could share memories of their alcoholic father. Both men would describe how their father would beat their mother at least once a week on pay day, and how their father was drunk daily. They both would describe how their father would slap their mother in front of the three boys and how their mother would have black eyes. They would also testify how they would get into fistfights with their father when he beat their mother.

Jose said that one of the worst beatings happened during a period where his parents were separated. Their mother had gone to a dance at a wedding and had taken Jose, Carlos, and Noe with her. Their father showed up drunk at the dance and grabbed his mother and the boys out of the dance and into his car. As their father drove home, he slapped their mother repeatedly while the boys in the back seat cried and screamed, telling their father to stop. When they arrived home, their father continued to beat their mother. The next day, the violence was ignored; no one spoke of it.

Noe Caro said he and his brothers could easily overhear his parents arguing because the house was small. Noe and his brothers cried when his parents fought.

101

JA 1121

Sometimes they tried to help their mother and then their father would hit them too. Noe remembered once when his mother struck his father with an object and lacerated his forehead. Noe remembers that the police were called at times to the house because of the commotion.

In addition to being an abusive husband, Carlos's father was also an adulterer. Both Jose and Noe could have told the jury about their father's affair with Rosa Munoz, whom they called "Gavi." She was a regular customer at a local beer joint where their father frequented. Both Noe and Jose think that Rosa's son is their half-brother. And they remember when Rosa shot their father in the chest with a rifle after he slapped her.

The brothers could also provide insight to Carlos that was more intimate than the aunts and cousin who testified. Both of them would have explained that their brother did not talk to anyone and kept to himself. He rarely talked with either of them. At times, Carlos did not even respond when they spoke to him. Carlos was often in his own little world, staring into space.

Noe and Jose would have been able to tell the jury how different Carlos was from them; Carlos was not a troublemaker. He was not violent, did not get into fights, and did not steal or use drugs—things which they both did from a young age. They could have said how much Carlos loved their mother, and he looked out for her, more so than Noe and Jose.

Finally, Noe and Jose could have given the jury more information about the drug culture to which they were introduced at a young ago. Jose was only in elementary school when he witnessed the use and trade of illegal substances. Both Noe and Jose

JA 1122

knew as children that their father was involved in dealing drugs. They also knew that their maternal uncle, Rosendo Rodriguez, was in prison for a federal drug offense involving heroin. Noe and Carlos acted as drug mules for their uncles when they were only 14 or 15 years old. They made very little money compared to their uncles, who abandoned them when they were arrested.

Counsel's failure to call these available witnesses to the stand was unreasonable. The ABA Guidelines instruct that "[c]ounsel should ordinarily use lay witnesses as much as possible to provide the factual foundation for the expert's conclusions." ABA Guidelines No. 10.11 cmt. Here, even though counsel did not present experts, they could have called these two key witnesses. "[Carlos's] brothers would have been able to describe the violence they each endured and/or witnessed in their childhood family home. They have been described as more verbal and social than [Carlos]." (Declaration of Donna Marie Schwartz-Watts, M.D., 01/07/2013, attached as Ex. 8, ¶ 29 (hereinafter "Schwartz-Watts Decl.").) Moreover, the brothers' testimony could have provided a context for Carlos's involvement in drug activity, which could have been explained through expert testimony. (Schwartz-Watts Decl. ¶ 40.) Instead of learning that substance abuse is often a symptom of anxiety, the jury only heard that Mr. Caro made a choice and left his wife to use drugs.

That counsel did not call Jose and Noe further demonstrates that they never "develop[ed] a strategy for presenting a compelling mitigation story." (Selvog Decl. ¶ 20.) Without the testimony of witnesses who had first-hand accounts of the violence in the house, the prosecutor was able to discount the hostile and chaotic environment where

103

JA 1123

Carlos lived. (Tr. 02/13/2007 at 29-30.) In fact, the prosecutor said that Carlos's father was never violent with the children, which Noe and Jose would have disputed. (*Id.* at 30.) Counsel's failure to present their testimony to the jury was deficient performance.

> **e)** **The limited mitigation case that counsel presented was undermined by counsel's own argument to the jury and by counsel's introduction of a witness who previously recorded a statement that was used against her and other witnesses**

"[I]t is critically important to construct a persuasive narrative in support of the case for life, rather than to simply present a catalog of seemingly unrelated mitigating factors." ABA Guidelines 10.11 cmt. Here, the latter rather than the former happened. The jury was provided a list of twenty-two mitigating factors. (Special Verdict Form.) Of the total, thirteen of them (numbers 2–14) related to facts that were, or should have been, provided by the family and teacher witnesses. One factor that was not found by any juror—that Carlos proved to be a good father or husband at times—is a direct result of counsel's own argument. Moreover, counsel's decision to present testimony from cousin Laura Perez, who had previously described wonderful and loving childhood memories with Carlos, allowed the jury to discount the true severity of the home life in which Carlos was raised.

> **(1)** **Opening and closing statements**

Because counsel did not present testimony from an expert to explain Mr. Caro's childhood and how it affected him, the only opportunity to provide a narrative to the jury was during opening and closing statements. Rather than take this opportunity to show the

jury how their client developed and his all-too-inevitable destiny, they told their jury that their client made "choices" and that he took the "easy" way out.

In opening statements, counsel emphasized to the jury on at least three occasions that Mr. Caro took the "easy" way out by choosing the drug trade. (Tr. 02/05/2007 at 60, 62, 63.) Rather than explaining the realities of prison culture and prison life, they said that Mr. Caro chose to join a gang. (Tr. 02/05/2007 at 66.)  Counsel also told the jury that Mr. Caro could "hardly" be called a good father (Tr. 02/05/2007 at 65), even though they listed "be[ing] a good father" as a mitigating factor (Special Verdict Form at 4).

During closing statements, defense counsel told the jury that the case was about choices. (Tr. 02/13/2007 at 40.)  And, counsel told the jury that something went "terribly wrong in that family" but he "do[es]n't know what it was." (*Id.* at 41.)  Counsel talked about the importance of having a positive loving environment (*id.* at 51), but the jury never heard any testimony about how a violent, abusive household can impact a child. Counsel also said that Carlos's mother's role "had to be affected in some way because the bad influence of her husband" (*id.* at 54), but the jury never had evidence explaining how it could have been affected.  Counsel admitted that Carlos "may not have been a very good husband . . . or a very good father because he wasn't there." (*Id.* at 57.)

Counsel fell short in attempting to present a compelling argument supporting a life sentence.  Their statements to the jury did little to explain and humanize Mr. Caro. Instead, their statements underscore their failure to develop a consistent theme in defense of Mr. Caro.

105

JA 1125

### (2) Witnesses who were undermined on cross-examination

Counsel chose to present testimony from Mr. Caro's cousin, Laura Perez, despite knowing that such decision would result in her videotaped statement being produced. In a videotaped interview prepared by defense counsel before trial, *see* n.17 *supra*, Ms. Perez described her childhood, explaining how she, Mr. Caro, and his brothers spent time with their grandparents. Ms. Perez emphasized the loving environment her grandparents provided. She gushed over how fortunate she was to have this experience as a child, and said that she wished her own children could have had such as wonderful environment. When counsel decided to call Ms. Perez as a witness, counsel provided her videotaped statement to the government. *See* Fed. R. Crim. P. 26.2.

Ms. Perez answered the government's questions on cross-examination:

> Q:    An in that video do you remember when you were talking about your life at your grandparents' house?
>
> A:    Uh-huh.
>
> Q:    And those were good times, were they not?
>
> A:    Yes, sir.
>
> * * * *
>
> Q:    And were you able to go there and ride the horses and have a good time?
>
> A:    They had a little stable in the back of the house, and we'd go feed them every day after school and ride them.
>
> Q:    And Mr. Caro was able to go over there, as well, and have fun and enjoy that?
>
> A:    Yes, sir.

106

JA 1126

Q:    I think you also recounted a story of when your grandmother would make a big pot of hot chocolate of some sort?

A:    Uh-huh.

Q:    Talked about you were there, and Mr. Caro was there, and others, and what a great time; is that correct?

A:    That's correct.

Q:    And I think you described it as just a loving environment; is that correct?

A:    Yes.

Q:    In fact, I think if I recall, you stated that you hoped your children would be able to grow up in the same environment that you and Mr. Caro had at your grandparents'; is that right?

A:    Yes.

(Tr. 02/08/2007 at 19-20.) Counsel's attempt to minimize this testimony on redirect was unsuccessful; counsel gave up after one objection was sustained due to a leading question. (*Id.* at 23.) What is more, on redirect Ms. Perez emphasized that she would want a loving mother like Mr. Caro's. (*Id.*) This testimony, as well as other similar testimony, likely resulted in no juror finding as a mitigating fact that the ability of Mr. Caro's mother to nurture her sons was impeded by the victimization she suffered from her husband. (Special Verdict Form at 4.)

Ms. Perez's direct testimony did not provide the jury with any new information regarding Mr. Caro's story, but the government used her video statement not only against her but also others on cross-examination. Ms. Contreras was asked on cross-

107

examination, "And there were times when the grandchildren would go over to your parents' home and ride horses and have hot chocolate, and all those things?" and she responded, "Yes." (Tr. 02/07/2007 at 157.)   Ms. Rodriguez was asked on cross-examination, "And is it fair to say that when Carlos would go to his grandparents' home that that was a really loving environment for not only Mr. Caro, but for his other cousins when they went to your parents' house?" and she responded, "Yes." (Tr. 02/07/2007 at 111.) Ms. Rodriguez was further asked, "And I guess by all accounts your parents really loved all these kids and would bring them in, and make hot chocolate for them, and ride horses and all kinds of neat things?" to which she responded "Yeah." (*Id.*)

While Mr. Caro certainly may have had a loving environment at his grandparents' home, this should not have been the end of the story—yet the government made sure the jury repeatedly heard that information.  In fact, in his closing statement, the prosecutor reminded the jury about Mr. Caro's "very loving extended family" and that a lot of children grow up in worse circumstances and "don't have grandma and grandpa, and aunts and uncles to look after them." (Tr. 02/13/2007 at 29.)  The prosecutor reminded the jury how it heard testimony from aunts and a cousin who talked about the good times and how the extended family provided Mr. Caro with a "safety net to look after him." (*Id.*) Counsel failed to put this evidence in the context of the rest of Mr. Caro's life, and failed to explain that it did not negate the trauma and damage caused by the majority of his child hood experiences.

And in any event, it was unreasonable for counsel to present the testimony of Ms. Perez where the harm outweighed what benefit—if any—she provided.  Ms. Perez did

108

JA 1128

not present new or compelling mitigating testimony. When weighed against the risk that the government would seize on this misleading evidence, counsel's decision to present her testimony was unreasonable and further supports the fact that counsel lacked a mitigation strategy in this case.

### 3.    Counsel's deficient performance prejudiced Mr. Caro

Despite the fact that the mitigation specialist developed a compelling factual story to tell the jury, it did not get fully presented at trial. That was because counsel deprived the jury of the opportunity to hear from expert witnesses and from the relatives closest to Carlos: his brothers. In addition to presenting testimony from a neuropsychologist, counsel should have also retained and presented testimony from a forensic psychiatrist who has extensive and relevant experience, such as Donna Schwartz-Watts, M.D. Dr. Schwartz-Watts is an educator and also has been qualified as a forensic expert in hundreds of cases. (Schwartz-Watts Decl. ¶¶ 4-6.)    She also has a background in evaluating and treating individuals with trauma history, including PTSD. (*Id* ¶ 5.) An expert with this type of specialized background relevant to the particularities in Mr. Caro's case would have been able to explain to the jury how his brain impairment and traumatic childhood has affected him. Had the jury been allowed to hear the true story of Carlos David Caro, there is a reasonable probability that this information would have tipped the balance of aggravating and mitigating circumstances in favor of a life sentence.

Here, the jury heard no expert testimony to provide context to the facts presented by the lay witnesses. An expert like Dr. Schwartz-Watts could have explained that Mr.

JA 1129

Caro has an anxiety disorder as a result of his traumatic childhood. (Schwartz-Watts Decl. ¶¶ 12, 30-32.) Through an expert opinion, the jury would have heard how witnessing the violence between his parents and being abused by his older brother resulted in him being avoidant and a loner. (*Id.* ¶¶ 30, 32, 40.) Mr. Caro's avoidant behavior results in him being neither a leader nor a follower. (*Id.* ¶ 40.) This information would have been critical to counter the government's accusation that Mr. Caro was a gang leader.

Dr. Schwartz-Watts also could have explained the impact of Mr. Caro's mother's neglect on her young son. The jury heard testimony describing how Mr. Caro's mother did not help her young son get dressed or feed him breakfast; instead he would get dressed as best as he could and walk to a family member's home to eat. (Tr. 02/07/2007 at 151.) Dr. Schwartz-Watts could have provided significance to Mr. Caro's odd behavior as a child—being mute and staring into space—and explained that this could have been a psychiatric symptom called "frozen watchfulness." (Schwartz-Watts Decl. ¶ 37.) This lack of attachment can be associated with pathological care—and could have been a direct result of his mother's neglect. (*Id.*) An expert could have also told the jury that his developmental delays—such as being severely late in learning how to talk, tie his shoes, or tell time—"can be seen in children with cognitive impairments and in children who are exposed to trauma." (*Id.* ¶ 19.)

Dr. Schwartz-Watts could have also explained Mr. Caro's responses, which may seem unusual to some people. Mr. Caro has a constricted affect, which is a result of trauma. (*Id.* ¶¶ 14, 31.) What this means is that he does not outwardly express internal

JA 1130

emotions with full range and as one may expect. (*Id.* ¶ 31.) For example, Mr. Caro inappropriately smiled when he became frustrated by being unsuccessful in performing a task (*id.* ¶ 14), and despite reporting being sad about his own mother's death, his outward emotional expression was not on par to the sadness he expressed (*id.* ¶ 31). Dr. Schwartz-Watts's explanation of Mr. Caro's behaviors would have been relevant for the jury to hear because one of the aggravating factors alleged by the government was that Mr. Caro expressed no remorse for Mr. Sandoval's death. If, however, an expert had explained to the jury that Mr. Caro suffers from anxiety disorder because of his childhood trauma and one of the symptoms is a constricted affect, then the jury may not have found that aggravating factor beyond a reasonable doubt.

Dr. Schwartz-Watts could have explained to the jury that substance abuse is often associated with exposure to trauma. (*Id.* ¶ 40.) She could have also explained that Mr. Caro was born into an impoverished family and community with limited options. (*Id.*) As a result, due to his environment and his mental limitations, Mr. Caro began transporting drugs for financial security. (*Id.*)

What is more, the jury could have heard from both Dr. Schwartz-Watts and Dr. Spica that Mr. Caro suffers from brain damage. They both diagnosed him with Cognitive Disorder NOS. (Spica Consult at 7; Schwartz-Watts Decl. ¶ 12.) Dr. Spica's testing indicated that Mr. Caro's "abstract reasoning abilities are variable, depending on his level of distress while attempting a task." (Spica Consult at 4.) In explaining Mr. Caro's deficits, Dr. Spica noted that it "is likely impairing in [Mr. Caro's] daily life, as it makes him highly suggestible, believing that information presented to him is familiar.

111

He likely has difficulty discriminating between actual facts and information that is close but distorted." (Spica Consult at 6.)  Dr. Spica could have informed the jury that individuals who have brain deficits like Mr. Caro (i.e., frontal lobe dysfunction) "tend to have difficulty organizing, processing, and comprehending new information provided to them." (Spica Decl. ¶ 8.)

Put more bluntly, Mr. Caro's reasoning ability is akin to that of a ten-year-old. (Spica Consult at 7.)  Dr. Schwartz-Watts could have explained and supplemented Dr. Spica's test results with her medical opinion that her mental status examination shows that Mr. Caro has cognitive dysfunction.  (Schwartz-Watts Decl. ¶ 17.)  Mr. Caro's brain impairment, coupled with his anxiety disorder, makes him more likely than others without these impairments to exercise poor judgment.  (*Id.* ¶ 41.)

The information that could have and should have been presented by experts and other lay witnesses would have changed the story that the jury would have heard about Mr. Caro.  If this evidence had been presented at trial, counsel would have had a physiological and psychological explanation for Mr. Caro's behavior in this case.  Mr. Caro, who avoids others as part of his disorder, was likely under increased anxiety when Mr. Sandoval was placed in his cell after he had refused Mr. Sandoval earlier that day. His already impaired brain and heightened anxiety left Mr. Caro functioning at a level significantly below that of a 10 year old.  While counsel argued in closing to the jury that this case was about Mr. Caro's choices, the circumstances as they truly occurred represented anything but a reasoned choice. These facts about how his traumatic childhood and dysfunctional brain affects him on a daily basis would have given the jury

JA 1132

an opportunity to vote for life over death.

Juror # 79 and Juror # 24 (the foreperson) have *both* indicated that expert evidence of brain damage could have made a difference in their sentencing decision. How much more compelling that evidence would have been if jurors were told not only about his brain damage, but how that damage affected his ability to reason and his judgment and how his childhood trauma further affected his perception of life choices. (Sealed Juror # 79 Decl.; Declaration of Juror # 24, 11/20/2012, attached as ▮ Ex. 29 (hereinafter "Juror # 24 Decl.").) Had the jury heard the evidence above, "there is a reasonable probability that at least one juror would have struck a different balance." *Wiggins*, 539 U.S. at 537.

### C. Trial Counsel Failed to Adequately Investigate Prison Culture and Failed to Subject the Government's Evidence Regarding Mr. Caro's Purported Gang Leadership Position to Meaningful Adversarial Testing

At trial, government witness Officer John Gordon testified. Mr. Gordon, an SIS Lieutenant at FCI-Oakdale in July 2002, testified that, at that time, Mr. Caro was the leader of the Texas Syndicate at FCI-Oakdale. He concluded this based on a meeting he had with Mr. Caro after he "reached out" in some unspecified fashion to leadership of the prison gangs to try to open up a "line of communication" between the SIS department and the leadership of these gangs. (Tr. 02/05/2007 at 166-67). At the time that he "reached out," Mr. Gordon did not know who was the leader of the Texas Syndicate. (Tr. 02/05/2007 at 174). In response to Mr. Gordon's "reach[ing] out," Mr. Caro showed up for a meeting. During this meeting, Mr. Caro told Mr. Gordon that the Texas Syndicate

113

JA 1133

was going to do what it had to do and Mr. Gordon had to do what he had to do. (Tr. 02/05/2007 at 167-68.) Based on Mr. Caro's appearance at the meeting and his statement, Mr. Gordon concluded that Mr. Caro was the leader of the Texas Syndicate. (Tr. 02/05/2007 at 174.)

Mr. Gordon also testified that a gang fight occurred between members of the Texas Syndicate and members of another gang known as Paisa/Border Brothers several weeks after his meeting with Mr. Caro on July 11, 2002. (Tr. 02/05/2007 at 163-80.) Mr. Caro later told him that the gang was responsible for the assault and that his brothers follow orders. Mr. Gordon deduced that Mr. Caro ordered the gang assault because he believed Mr. Caro was the leader at the time and the gang does not do anything without following orders. (Tr. 02/05/2007 at 171-72.)

Trial counsel were provided notice over a year before trial that the government would attempt to prove the future dangerousness aggravator by presenting evidence of Mr. Caro's connection to a gang and his involvement in assaults on other inmates. (Notice of Intent to Seek Death Penalty, 01/11/2006, Dkt. 8, at 2.) Defense counsel anticipated that the government would attempt to introduce this particular evidence in support of the future dangerousness aggravator and had filed two motions *in limine* to exclude it, arguing that it was unreliable and violated the confrontation clause. (Mot. in Limine to Exclude Report Regarding Incident at FCI Oakdale, Louisiana, 02/03/2007, Dkt. 589; Second Mot. in Limine to Exclude Report Regarding Incident at FCI Oakdale, Louisiana, 02/04/2007, Dkt. 590.) The Court denied their motions. (Oral Order, 02/06/2007, Dkt. 600.) Even though they knew that the government would present this

JA 1134

information, trial counsel presented no evidence to rebut the assertion that Mr. Caro had been a gang leader during the assault that occurred at Oakdale in 2002.

Trial counsel had hired a "gang expert," however, they never developed an overall defense that integrated the relevant gang facts that they knew or should have known would be introduced at trial by the government, and the jury was never presented with evidence that would have helped them appreciate these facts in a way that was beneficial to Mr. Caro. For example, counsel could have presented testimony that Mr. Gordon's conclusion that Mr. Caro was the leader of the gang and ordered the attack were based on erroneous assumptions. In fact,

> There is an inherent level of distrust between prison gangs and prison officials that must be overcome before any meaningful dialogue can occur between a gang and a prison. This was the first meeting between the Texas Syndicate and the prison. Under these circumstances, where there has been no prior dialogue or the establishment of mutual respect between the gang and the prison, it is highly unlikely that the leader of the Texas Syndicate, a "Disruptive Group," would blindly walk into a one-on-one meeting with Mr. Gordon. It is much more likely that the leader would have sent someone else in his place to "test the waters."

(Bezy Decl. ¶ 21.) Mr. Caro's statement that the Texas Syndicate was going to do what it had to do and that Mr. Gordon had to do what he had to do was nothing more than a typical inmate response. (Bezy Decl. ¶ 20.)

Mr. Gordon also testified that he told Mr. Caro during their meeting that he needed to know "who the membership was in the Texas Syndicate." (Tr. 02/05/2007 at 168.) This was an extremely inappropriate question to pose to any gang member. In essence, it was asking Mr. Caro to "snitch" on his brothers by disclosing their identity. Yet, defense

115

JA 1135

counsel failed to challenge the ignorance of asking this question, which would have revealed that Mr. Gordon was not experienced with working with gang members and therefore his assumptions and conclusions were questionable. (Bezy Decl. ¶ 22.)

Had defense counsel discredited Mr. Gordon's testimony, the government would have been left with nothing to support its assertion that Mr. Caro was, or had been, a leader of a gang. Instead, the jury was left with the uncontested assertion that Mr. Caro was a gang leader and had ordered an assault. Counsel's failure to investigate this matter and meaningfully impeach Mr. Gordon was prejudicial to Mr. Caro.

### D. Trial Counsel Failed to Adequately Investigate Relevant Facts and Law Regarding the BOP's Ability to Control Improper Inmate Communications, and failed to Subject the Government's Evidence to Meaningful Adversarial Testing

The government presented expert testimony through Gregory Hershberger, a retired BOP employee and former warden, that in spite of security concerns, Mr. Caro inevitably would have future access to a telephone, mail correspondence, and visitors, and that the BOP could only take away an inmate's privilege for telephone calls, mail correspondence and visitors after a hearing. (*See, e.g.*, Tr. 02/12/2007 at 191 (BOP cannot guarantee that Mr. Caro will not send out coded messages); *id.* at 191 (difficult to guarantee that Mr. Caro would "not use proxies to send messages to his gang members on the outside"); *id.* at 191-92 (does not believe that the BOP could "completely prevent" Mr. Caro from abusing the telephone); *id.* at 202-03 (privileges such as visitation and telephone can only be withheld after a hearing).)

In closing, the government argued that if Mr. Caro goes to ADX-Florence, he "can

116

JA 1136

probably still communicate with his gang buddies." (Tr. 02/13/2007 at 34.) The government misleadingly stated that inmates "have certain privileges which would allow the communication, and also increasing contact. He can use the telephone. He can have visitation with his buddies. . . . We know that he can write letters." (Tr. 02/13/2007 at 34.)

Due to their failure to investigate relevant facts and law, trial counsel were unable to refute the government's evidence. Contrary to the government's argument, the BOP did have both the authority and the ability to control Mr. Caro's future communications. Defense counsel, however, did not bring out this information either through its own witness or through a meaningful cross-examination of the government's witnesses.

For example, while Dr. Cunningham made brief references to Special Administrative Measures ("SAMs"), defense counsel failed to provide details about the regulations that authorize these measures. *See* 28 C.F.R. § 501.3. Section 501.3 authorizes the government to construct individualized conditions of confinement, including limitations on correspondence, visiting and use of the telephone, in order to protect persons. There is no requirement in section 501.3 that the inmate first receive a hearing. While these conditions must be periodically reviewed, they can be extended for as long as they are warranted. (Bezy Decl. ¶ 33.)

Similarly, BOP has numerous program statements that describe the authority of prison officials to take away an inmate's telephone, visitation, and mail privileges. *See* BOP Program Statements No. P5264.08 (Inmate Telephone Restrictions); BOP Program Statement No. 5264.14 (Correspondence); and BOP Program Statement No. 5267.08

117

JA 1137

(Visiting Regulations); *see also* Bezy Decl. ¶ 36. Because of their failure to adequately investigate and research, counsel was unable to effectively cross-examine and dispel the misleading impressions left by Mr. Hershberger and the government. Counsel's failure to research and present this information to the jury constitutes deficient performance that prejudiced Mr. Caro. *See, e.g., United States v. Darryl Lamont Johnson*, Case No. 02-cv-06998, Mem. Opinion and Order, Dkt. 112 (N.D. Ill. Dec. 13, 2010).

### E. Trial Counsel Failed to Adequately Investigate and to Present Mitigating Evidence Concerning Prison Culture and Statements of Remorse

At trial, the government portrayed Mr. Caro as a "predator" who lacked remorse and must be "controlled" by use of the death penalty. (Tr. 02/13/2007 at 22, 27-28, 37-38, 92, 94.) In support of its argument that Mr. Caro lacked remorse, the government referred to several statements by Mr. Caro, as well as themes running through these statements: "Come and get this guy out of my cell, this piece of shit out of my cell," "He stinks," "He's a dead man," "Sandoval got in the way and disrespected me. That's what you've got to do," "I've got to do what I've got to do," and "when am I going to get a new cellmate?" (Tr. 02/13/2007 at 27-28.)

The evidence supporting this portrayal, however, should have been examined in light of the culture of its environment—prison. Had counsel developed a cohesive and complete defense that explored and explained the impact of the surrounding prison culture on the offense, the jury would have heard evidence that these statements were typical to inmates and necessary for survival. Had counsel presented relevant evidence regarding prison culture, the jury would have learned that an inmate's survival in prison

118

depends on portraying an image of strength. This image of strength, which is necessary to prevent future attacks, is based not only on an inmate's actions, but what he tells others about those actions. (Bezy Decl. ¶ 19.) Any statements or sign of remorse by Mr. Caro after the death of Mr. Sandoval would have been viewed as weakness by other inmates and would have opened the door to possible future attacks on Mr. Caro. (Bezy Decl. ¶ 19.)

This failure by defense counsel to place Mr. Caro's statements in the context of prison culture prejudiced him. The jury found beyond a reasonable doubt that Mr. Caro had not expressed remorse for killing Mr. Sandoval. (Special Verdict Form at 2.) Juror # 24 stated that Mr. Caro's apparent lack of remorse influenced her decision. (Juror # 24 Decl.) Had counsel presented evidence of prison culture and the need for "bravado," there is a reasonable likelihood that a juror would have determined that Mr. Caro's statements did not reflect a lack of remorse and the aggravating factor would not have been found by the jury.

### F. Trial Counsel Failed to Adequately Investigate Mr. Caro's Underlying Conviction for Conspiracy to Commit Murder and Failed to File a Collateral Challenge to that Unconstitutional Conviction

1. **Mr. Caro's Prior Counsel Failed to Advise Him that a Guilty Plea for Conspiracy to Murder in the Benavidez Assault Could and Likely Would be Used Against Him by the Government as an Aggravating Circumstance in the Sandoval Case**

Mr. Caro was represented by Louis Dene in the Benavidez assault. (Declaration of Louis Dene, 11/09/2012, attached as Ex. 3, ¶ 2 (hereinafter "Dene Decl.").) Mr. Dene

119

JA 1139

negotiated a plea agreement on Mr. Caro's behalf that required Mr. Caro to plead to Conspiracy to Commit Murder, the most serious charge, as a condition for co-defendant Juan Moreno-Marquez to receive a guilty plea to the lesser charge of weapons possession. (Caro Plea Agreement, ██████ Ex.49, at 2.)[29]  Mr. Moreno-Marquez's plea agreement was made contingent on Mr. Caro's guilty plea to conspiracy to commit murder. (██████ Ex. 53 at 2.) Mr. Caro did not benefit from the deal. Mr. Caro received a consecutive sentence of 327 months, while his co-defendants, including Mr. Moreno-Marquez—who was one of the knife men and who was a career offender—received sentences ranging from only 24 months to 57 months. (Docket Sheet Case Information, No. 2:03-cr-10115-JPJ.)

Mr. Dene recognized that this plea agreement provided no real benefit to Mr. Caro, though it did benefit his co-defendant, Mr. Moreno-Marquez. (Dene Decl. ¶ 5.) Mr. Caro's only apparent reason for signing this plea agreement was to help a younger man, Mr. Moreno-Marquez, receive a lesser sentence and be released from prison while still relatively young. (Dene Decl. ¶ 5.) Mr. Dene did advise Mr. Caro that he would likely receive a long sentence for the conspiracy to murder conviction. (*Id.* at ¶ 6.)

This guilty plea agreement was signed on June 29, 2004 (more than six months after the death of Roberto Sandoval). (██████ Ex. 49 at 7.) At that time, Mr. Dene was aware that Mr. Sandoval had been killed and he believed that the government intended to proceed with a capital case against Mr. Caro. (Dene Decl. ¶¶ 3, 4.) Nevertheless, Mr.

---

[29] The circumstances surrounding the Benavidez assault are set forth more fully in Claim One, *supra.*

JA 1140

Dene failed to advise Mr. Caro that the conspiracy to commit murder conviction and resulting sentence would be used against him in the later capital case and, for that reason, he should not sign the plea agreement. (*Id.* ¶ 6.)

Mr. Dene knew that Mr. Caro was of limited education, had not completed high school, and had no understanding of the legal proceedings without the benefit of counsel. (*Id.* ¶ 7.) Mr. Dene also knew, because he had spent considerable time with Mr. Caro that Mr. Caro liked and trusted Mr. Dene. (*Id.* ¶ 8.) For this reason, Mr. Dene believes that if he had advised Mr. Caro to go to trial, then Mr. Caro would have gone to trial. (*Id.* ¶ 8.)

The consequence to Mr. Caro for Mr. Dene's failure to properly advise him was death. This consequence is so severe that defense counsel had a Sixth Amendment obligation to warn Mr. Caro in connection with his guilty plea. The Supreme Court recognized this obligation in *Hill v. Lockhart*, 474 U.S. 52 (1985). Similarly, the American Bar Association stated, as early as 1999, that it was a standard of practice for guilty pleas that attorneys should advise clients of the collateral consequences of guilty pleas. Am. Bar Ass'n, *ABA Standards for Criminal Justice: Pleas of Guilty* No. 14-3.2(f) (3rd ed. 1999). Indeed, numerous legal organizations had recognized this as a standard of competent guilty plea practice before Mr. Dene represented Mr. Caro in the Benavidez assault. *See Padilla v. Kentucky*, 130 S. Ct. 1473, 1482-83 (2010) (citing several professional standards from 1980s and 1990s as a basis for the *Strickland* finding that defense counsel was ineffective in failing to warn of the deportation consequences of a guilty plea).

The *Hill* and *Padilla* cases, as well as the ABA standards, have established that

121

severe consequences, such as parole ineligibility, deportation, or additional incarceration, even if collateral, must be warned. Moreover, subsequent federal cases have held that the *Padilla* holding was only a clarification of the *Strickland* duties, such that it applied to cases pre-dating *Padilla*. *See, e.g., United States v. Orocio*, 645 F.3d 630, 641 (3d Cir. 2011). Indeed, the *Orocio* decision, quoting *Padilla*, further observed that the Supreme Court's decision in *Hill v. Lockhart*, 474 U.S. 52 (1985), which applied a duty to warn of the consequences of a guilty plea to parole eligibility, did not "open the flood gates" as to such claims. *Id.* at 641. In other words, it has long been the case that such a failure to advise of significant collateral consequences was ineffective under professional standards and warranted habeas relief when prejudice results.

Prejudice is shown when there is a reasonable probability that, but for counsel's errors, a defendant would have gone to trial. *Hill*, 474 U.S. at 58-59; *see also Missouri v. Frye*, 132 S. Ct. 1399, 1409-10 (2012) ("In cases where a defendant complains that ineffective assistance led him to accept a plea offer as opposed to proceeding to trial, the defendant will have to show 'a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.'") (*quoting Hill*, 474 U.S. at 59); *United States v. Akinsade*, 686 F.3d 248, 253-54 (4th Cir. 2012) (applying *Hill* standard to defendant who received bad advice as to immigration consequences, and assessing prejudice based on the strength of the government's trial case); *United States v. Mooney*, 497 F.3d 397, 404-05 (4th Cir. 2007) (applying *Hill* and finding prejudice where defendant pled guilty because counsel failed to advise him of a potentially successful affirmative defense); *United States v. Gajendragadkar*, No. 97-

122

JA 1142

7267, 149 F.3d 1171, at \*2 (4th Cir. June 3, 1998) (unpublished opinion) (applying *Hill* to context of defendant who did not receive advice as to immigration consequences and who had a strong interest in remaining in the United States); *United States v. Lewis*, 477 F. App'x, 79, 81-82 (4th Cir. 2012) (unpublished opinion) (applying *Hill* to context in which defense counsel incorrectly advised defendant as to his criminal record (that he was a career offender) when he was not, and finding prejudice where this negated *Lewis* reason for pleading guilty). Mr. Caro would have gone to trial if his attorney had so advised him. (Dene Decl. ¶ 6.)

Had Mr. Caro proceeded to trial, there is a good chance the jury would have found him not guilty on the conspiracy to commit murder charge. As asserted by the government at the sentencing of co-defendant Moreno-Marquez, the evidence in this case was not particularly strong. In answering the Court's question as to why the government negotiated a plea agreement with Mr. Moreno-Marquez, Assistant U.S. Attorney Mountcastle stated: "because of the problems of going forward with proof in a jury trial with a totally uncooperative victim." (*See* ███ Ex. 55 (Moreno-Marquez Sentencing Transcript in case no. 2:03-cr-10115-JPJ), at 4-6.) That fact applied equally to Mr. Caro's case.

Not only was the proof of the case difficult, as admitted by the government, but the case was strikingly similarly to another USP-Lee prison assault case which was tried shortly before the guilty pleas were taken in this case. *See United States v. Edgar Garcia*, Case No. 2:03-cr-10110-JPJ (W.D. Va.). In that case, the government charged two defendants with a video-taped shank assault at USP-Lee. (Case No. 2:03-cr-10115-

123

JA 1143

JPJ, Indictment, 01/03/2006, Dkt. 2.) Like Mr. Caro, the defendants were charged with conspiracy to commit murder, assault with intent to commit murder and weapons possession. *Id.* The victim had many superficial shank cuts. (Declaration of Joseph Rasnic, 11/30/2012, attached as Ex. 6 at ¶ 4 (hereinafter "Rasnic Decl.").) Unlike the defendants in the *Benavidez* matter, defendants Edgar Garcia and Gilberto Jaramillo both went to trial. (Case No. 2:03-cr-10115-JPJ, Docket.) The jury's verdict acquitted each of the defendants of the serious charges, and convicted them on only the weapons possession charges. (*Id.* at Dkt. 26.) The rationale for doing so, even though the defendants were admitted knife men, was because the wounds were all superficial no serious injury had been intended. (Rasnic Decl. ¶ 6.) That same argument was available to Mr. Caro given the superficial nature of the wounds to Mr. Benavidez (Sealed Ex. 60 at 1 (Benavidez Treating Physician Note ██████████████, 08/30/2003 noting that there was "no evidence of deeply penetrating injury")) and it is equally likely that he would have been convicted of a lesser offense.

### 2. Trial Counsel Could Have Timely Challenged the Prior Conviction and Sentence, But Failed To Do So

Mr. Caro's judgment in the Benavidez assault was entered on November 1, 2004. Less than three months later, on January 25, 2005, the Court appointed both Stephen Kalista and James Simmons to represent Mr. Caro in the predecessor administrative case, Case No. 2:05-mc-1. The purpose of those appointments was to protect Mr. Caro's interests during the period in which the DOJ decided whether to file the case as a capital or non-capital case. The DOJ scheduled their death authorization meeting for June 6,

JA 1144

2005. (Letter to Kalista from Giorno, 03/18/2005).) Before this meeting, however, defense counsel knew that there was a significant possibility that the government would seek death in this case.

Defense counsel requested a copy of Mr. Dene's file early in the case (due to its importance), though the file which was provided did not contain discovery from the Benavidez assault.[30] There is no evidence, though, that defense counsel made any further efforts to get the Benavidez discovery. Mr. Kalista, who talked with Mr. Dene about his file by telephone, never asked Mr. Dene about his legal advice to Mr. Caro regarding the Benavidez assault guilty plea and failed to obtain a complete copy of Mr. Dene's file. (Dene Decl. ¶ 10.) This failure was not strategic.

Both Mr. Kalista and Mr. Simmons knew or should have known from the time of their appointment that the conviction and sentence in the Benavidez assault would be significant, if not the *most* significant, evidence in the government's aggravation evidence pertinent to Mr. Caro's prior record. Mr. Caro's three previous drug convictions from Texas were non-violent. Mr. Caro was involved in a gang fight while at FCI-Oakdale, but that incident did not involve serious injuries and did not result in any criminal charges. Only the Benavidez assault involved a prior conviction for a significant crime of violence. This prior case also was a local one, over which the very same judge had presided. Considering these circumstances, counsel had sufficient red flags and time to investigate the Benavidez case and timely file a motion to vacate or set aside the

_____

[30] This belief is based on undersigned counsel's review of trial counsel's files.

125

JA 1145

conviction pursuant to 18 U.S.C. § 2255.

Mr. Kalista and Mr. Simmons had a duty to investigate aggravating evidence, including obtaining the full file of Mr. Dene and fully interviewing Mr. Dene. *See* ABA Guidelines No. 10.7.B.1 (2003), *Rompilla v. Beard*, 545 U.S. 374, 383-86 (2005). Trial counsel also had an obligation to move to set aside the conviction pursuant to 28 U.S.C. § 2255 as invalid due to Mr. Dene's ineffectiveness in representing Mr. Caro in the Benavidez assault. ABA Guidelines No. 10.7cmt. (stating that "Counsel must investigate prior convictions . . . that could be used as aggravating circumstances . . . .If a prior conviction is legally flawed, counsel should seek to have it set aside."); *see also* Hammond Decl. ¶ 35. "Whether within the criminal case or outside of it, counsel has a duty to pursue appropriate remedies if the investigation reveals that such conditions exist." ABA Guidelines No. 10.7 cmt.; *cf. Johnson v. Mississippi*, 486 U.S. 578, 586 (1988) (holding that denial of post-conviction relief violated the Eighth Amendment when the aggravating evidence included a conviction that was later vacated); *Amadeo v. Zant*, 486 U.S. 214, 219 (1988) (federal habeas corpus petitioner pursued independent litigation to establish a factual predicate that was then used to establish a jury discrimination claim in his habeas petition). Trial counsel's failure to adequately investigate the Benavidez assault and pursue a collateral attack on the prior conviction fell below the standard of care for capital defense attorneys. (Hammond Decl. ¶ 45.)

> **3.    Trial Counsel's Failure to Investigate and Challenge the Prior Conviction in the Benavidez Assault Prejudiced Mr. Caro**

Trial counsel's failure to challenge Mr. Caro's underlying conviction in the

Benavidez assault prejudiced Mr. Caro. It allowed the government to present Mr. Caro as a violent inmate, who, due to his lengthy consecutive sentences, was already facing prison for the rest of his life. It allowed the government to argue that Mr. Caro must receive the death penalty or otherwise he would receive "zero punishment" for his offense. (Tr. 02/13/2007 at 26, 89, 94.) Several jurors stated that the fact that Mr. Caro was facing a *de facto* life sentence already influenced their decision to vote for death, and without this existing sentence, they might not have voted for the death penalty. (*See, e.g.,* Juror # 33 Decl.; Juror # 24 Decl.) Each of these arguments, under the holding in *Johnson*, 486 U.S. at 586, could have been "undone" by a proper § 2255 motion to vacate the conviction. As such, the failure to advise Mr. Caro and challenge the prior conviction constitutes prejudice within the meaning of *Strickland*, *Hill*, *Padilla* and *Wiggins*, 539 U.S. at 537.

### 4. This Court Should Stay Its Decision in This Case Pending Its Decision on the § 2255 Motion filed in Case No. 2:03-cr-10115-JPJ

Mr. Caro will file a separate § 2255 motion in Case No. 2:03-cr-10115-JPJ (W.D. Va.), for the reasons discussed *supra*. Mr. Caro is entitled to an order either staying this matter pending the resolution of the § 2255 motion in Case No. 2:03-cr-10115-JPJ, or for a joint scheduling order which results in a resolution of the 28 U.S.C. § 2255 motion in Case No. 2:03-cr-10115-JPJ before the § 2255 motion in this case. The Supreme Court has concluded that the power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel and for litigants. *Landis v. North Am. Co.*, 299 U.S. 248,

127

JA 1147

254 (1936). Federal courts have wide ranging powers to shape relief and procedures to effectuate habeas corpus jurisdiction. *Harris v. Nelson*, 394 U.S. 286, 291 (1969). Here, Mr. Caro requests that the Court stay these proceedings so that the holding in *Johnson v. Mississippi* can be given full effect while he challenges his underlying conviction. *See* 486 U.S. at 584-87.

### G. Trial Counsel Failed to Present *Skipper* Evidence To Rebut Aggravating Evidence

The Eighth Amendment requires the sentencer in a capital case to consider, "*as a mitigating factor*, any aspects of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586 604-05 (1978); *Skipper v. South Carolina*, 476 U.S. 1, 4 (1986). Likewise, due process requires that a defendant not be sentenced to death "on the basis of information which he had no opportunity to deny or explain." *Gardner v. Florida*, 430 U.S. 349, 362 (1977). Trial counsel's representation fell below the standard of care in failing to present such explanatory, mitigating evidence on behalf of Mr. Caro.

### 1. Evidence of Circumstances Surrounding Guilty Plea in the Benavidez Assault

During the penalty phase of the case, the government presented—by unchallenged stipulation—that Mr. Caro had been convicted in Case No. 2:03CR10115 (W.D. Va.) of conspiracy to commit murder, for which had had received a consecutive sentence of 327 months (over 27 years). (Tr. 02/05/2007 at 105-06.) What the jury was not told, and

128

JA 1148

should have been told by defense counsel, was that Mr. Caro's guilty plea to conspiracy to commit murder was a selfless act by Mr. Caro, which carried no benefit and every disadvantage for him. (*See* Claim Six-F; Claim One, *supra,* incorporated herein by reference.)[31]   Unbeknownst to the jury, Mr. Caro's plea agreement was specifically tailored to give an equally culpable co-defendant, Mr. Moreno-Marquez, a chance to get out of prison as a young man. Mr. Moreno-Marquez's plea to possession of a weapon was contingent on Mr. Caro pleading guilty to conspiracy to commit murder. With the deal, Mr. Moreno-Marquez, still a young man with little time left to serve, faced a maximum sentence of five years. Without the deal, Mr. Moreno-Marquez, a career criminal with 28 criminal history points, faced a sentence comparable to the 27-year sentence received by Mr. Caro.

> 2.    **Evidence that the BOP Considered Mr. Caro a "Good Inmate," Appropriate for Housing at USP-Marion or ADX-Florence**

Throughout the sentencing phase of the trial, from opening argument and direct testimony through rebuttal testimony of Mr. Hershberger and closing argument, the government presented Mr. Caro as a dangerous person who could not be safely housed in the Bureau of Prisons. (Tr. 02/5/2007 at 46; Tr. 02/12/2007 at 163; Tr. 02/13/2007 at 20, 34, 38-39.) Trial counsel had a professional obligation to use all reasonably available evidence to rebut that evidence and argument. Once such piece of evidence, never

---

[31] While Mr. Caro is now challenging the validity of that conviction, but trial counsel did not. It was therefore imperative for counsel to use circumstances of that case to assist them in mitigating the crime.

129

JA 1149

introduced by counsel, is the opinion of Dr. M. Geyer, the psychologist who evaluated

Mr. Caro monthly from the time of Mr. Caro's placement in the SHU until his transfer to

ADX-Florence more than a year later. In particular, Dr. Geyer evaluated Mr. Caro on

09/07/2004 to determine his suitability for placement at ADX-Florence or USP Marion.

In his discussion of Mr. Caro's history and background, Dr. Geyer stated:

> His violence while incarcerated appears to be gang related and tied directly to his involvement with the TS. . . . Inmate *Caro has not been a disruptive inmate or violent in any other settings* unless he was involved with TS activities.

(Psychological Evaluation ████████, 09/07/2004, attached as Sealed Exhibit 56 at

2.) Later, when discussing Mr. Caro's risk of future violence, Dr. Geyer opined:

> With regards to violence prediction, it appears that Inmate Caro has only acted aggressively with other Texas Syndicate gang members. His violence appears to be instrumental rather than impulsive. Inmate Caro is pleasant to interact with professionally and *other staff at this facility have described him as a "good inmate."*

(*Id.* at 3 (emphasis added).)

This report and numerous others reflect a person who is amenable to supervision

within the correctional system and who is not violent by nature. It is inconceivable that

this information would not be placed before the jury to rebut the government's

characterization of Mr. Caro as a dangerous, violent individual. Dr. Geyer, the prison's

own psychologist, did not consider him violent ordinarily. Dr. Geyer reported that other

staff at the prison considered Mr. Caro to be a good inmate. This totally contradicts the

image portrayed by the government at trial. Further, this information was *known* to trial

counsel. By letter half a year before the government filed its indictment against Mr.

130

JA 1150

Caro, Mr. Kalista wrote a letter to his co-counsel, enclosing a copy of the 09/07/2004 report, stating that they should talk to Dr. Geyer. (Letter to Simmons from Kalista, 06/06/2005.) Regrettably, nothing in counsel's file indicates that this was ever followed up on, and Dr. Geyer's observations and opinions were never presented to the jury.

### 3.    Mr. Caro's Concern for the Well-Being of Others

Instead of the cold-blooded, uncaring person that the government portrayed, incidents in Mr. Caro's BOP file revealed him to be a caring person with redeeming qualities. For example, Psychology Round Notes of 01/22/2004 noted that Mr. Caro "initiated a conversation to advise that another inmate was experiencing psychological distress." (Psychology Round Notes, 01/22/2004, attached as Sealed Ex. 57.) Again, this side of Mr. Caro was not presented to the jury.

None of the above facts were presented to the jury during Mr. Caro's trial. Moreover, there was no valid strategic reason for counsel's failure to do so. Rather, it appears that the failure to offer this evidence was attributable to counsel's failure to obtain, review, and understand the importance of the information available to counsel. The demands of capital defense investigation and competent understanding of mitigation evidence is not met by superficial inquiries which fail to seek and present ready sources of information. *Wiggins*, 539 U.S. at 525. All of the above information was readily available to trial counsel, in review of attorney Dene's file in the conspiracy to murder case and in the discovery provided by the government in this case. Counsel's failure to appreciate the significance and follow up on this information was not effective assistance of counsel under the controlling legal standards.

131

JA 1151

Counsel's failure to present mitigating evidence to rebut the government was gravely prejudicial to Mr. Caro, allowing the government to mischaracterize Mr. Caro as a violent, selfish person who killed over breakfast, when in fact, Mr. Caro was a caring person who was willing to spend the rest of his life in prison so that a younger man, Mr. Moreno-Marques, could leave prison quickly. There is a reasonable probability that "at least one juror would have struck a different balance" at the penalty phase if this evidence had been presented. *Wiggins*, 539 U.S. at 537.

### H. Trial Counsel Failed to Adequately Investigate and Present Evidence of the BOP's Negligence Regarding the Decision to Grant Mr. Sandoval's Request to be Placed in Mr. Caro's Cell

As discussed in Claim Four-C *supra*, trial counsel failed to present evidence related to the BOP's placement of Mr. Sandoval in the cell with Mr. Caro. Mr. Caro's counsel's deficient performance as discussed in Claim Six-H, also prejudiced him at the penalty phase. Had this evidence been presented, there is a "reasonable possibility that, but for counsel's unprofessional errors, the result of the proceedings" would have been different and "at least one juror would have struck a different balance" as to the evidence. *Wiggins*, 539 U.S. at 534, 537. Juror # 24 has stated that information that "Sandoval had been caught with a prison shank" and that "the guards acted negligently and contrary to sound correctional practices in regards to the housing of Caro and Sandoval" "would have made a difference" and "could have influenced [the juror's] decision." (Juror # 24 Decl.) Juror # 47 similarly has stated that knowledge that "Sandoval was sent to the SHU because he had a shank" "would have affected [the juror's] decision." (Juror # 47 Decl.)

132

JA 1152

## I. Trial Counsel Failed to Object to the Government's Presentation of Evidence of Specific Instances of Violence By Persons Other than Mr. Caro

Before trial, defense counsel sought discovery regarding future dangerousness, including information about violent acts by other inmates. *See United States v. Caro*, 461 F. Supp. 2d 478, 480-81 (W.D. Va. 2006). This Court denied the discovery request, but did so in reliance on the government's representation that it did not intend to introduce such data. *Id.* at 482. This Court further ordered that the "government may not rely on specific instances of inmate violence (other than the defendant's own) in seeking to prove his future dangerousness." *Id.* Despite the Court's order, the government still introduced specific acts of violence through its witnesses. Trial counsel, however, failed to object to the government's introduction of evidence of specific instances of violence, evidence that was in clear violation of the district court's order. Had trial counsel objected, the Court would have had no choice but to sustain the objection. Counsel's failure to object to these errors was deficient performance that prejudiced Mr. Caro by allowing jurors to be influenced by these harmful facts.

Contrary to the district court's order, the government did in fact use instances of violence by third parties to suggest to the jury that Mr. Caro receive the death penalty. For example, Daniel Olson, an expert crypto-analyst employed by the government, testified at trial that inmates other than Mr. Caro—Aryan Brotherhood inmates—used a coded letter to transmit an order from ADX-Florence to USP-Lewisburg which resulted in the death of two African-American inmates. (*See* Tr. 02/06/2007, Dkt. 683 at 25, 35, 37.) Defense counsel objected to the testimony based on hearsay, but failed to argue that

133

this use of "specific instances" violated the district court's prior order as well as the holding in *Zant*. *Id.* at 29.

The evidence about Aryan Brotherhood inmates was prejudicial and wholly unrelated to a Hispanic-American inmate with no association to the Aryan Brotherhood. Eight of the government's twelve witnesses—Mrad, Nors, Fender, Brown, Summers, Blaze, Gordon and Guzman—discussed various aspects of two coded letters that involved Mr. Caro. (*See,e.g.*, Tr. 01/31/2007 at 57-59; Tr. 02/06/2007 at 16-21; Tr. 02/05/2007 at 111-13; Brown testimony Tr. 02/05/2007 at 122-29.) However, none of these witnesses testified that Mr. Caro's letters contained any threats of violence or ordered killings; nor could they have because the letters contained no such threats or orders. After the testimony and cross-examination of these eight witnesses, the government called Daniel Olson, who did not testify about Mr. Caro or his letters or the ability of inmates in general to send out coded letters. Instead, he testified about a specific coded letter sent by an Aryan Brotherhood inmate to order a killing. (Tr. 02/06/2007 at 27-38.) This specific instance of violence was not only not necessary for the government's argument, it was highly prejudicial, and was intended to inflame the fears and confusion of the jury. No longer were the jurors considering the possible future danger of Mr. Caro, but considering the danger of a completely different person.

This was not the only time in this trial that the government violated the court's order and presented evidence of violent acts by others. To counter the government's aggravating factor of future dangerousness, the defense called Mark Cunningham, who argued that Mr. Caro, though dangerous, would pose no danger at ADX-Florence because

134

JA 1154

he would be single-celled and would not have access to other inmates. (*See* Tr. 02/12/2007 at 65-80.) During the cross-examination of Dr. Cunningham, the prosecutor, without objection, asked questions about another defendant's case in which Dr. Cunningham was an expert. The prosecutor asked if that defendant was a member of Al Qaeda (*id.* at 87-88), and then further asked if he built the bomb to blow up American embassies (*id.* at 88). Despite this irrelevant and prejudicial evidence being introduced, trial counsel did not object. (*Id.*)[32]

The government also introduced, without objection, evidence that three terrorists managed to send out coded letters from ADX. (*Id.* at 119.) Neither the government nor defense counsel included the additional information that this occurred in 2002-2004 and that the DOJ study cited by the government for this information also stated that, "Since issuance of the report, the BOP has reported that it is now monitoring 100 percent of terrorist inmates' mail and telephone calls and is translating and screening all correspondence to and from terrorist inmates written in a foreign language."[33]

The government's witness Mr. Hershberger continued with additional irrelevant and prejudicial evidence, without objection, that twenty years earlier, an inmate at USP-Marion murdered two officers and seriously wounded two other officers. (*Id.* at 188, 198.) Mr. Hershberger also testified, without objection, that another inmate murdered an

---

[32] The Court, on its own, gave a limiting instruction regarding this testimony but such instruction could not "unring" the bell that counsel could have easily prevented through a timely objection.

[33] DOJ, Top Management and Performance Challenges in the Department of Justice § 6 (2006), *available at* http://www.justice.gov/oig/challenges/2006.htm (last visited 01/07/2013).

135

JA 1155

inmate at USP-Leavenworth, an inmate at USP-Marion, and an officer at USP-Marion. (*Id.* at 208.) None of this testimony about other violent inmates had anything to do with Mr. Caro, and violated the district court's order, yet defense counsel failed to object to any of it.

The failure to object to the improper "specific instances" testimony constitutes ineffective assistance of counsel. *See Strickland*, 466 U.S. at 687; *see also Lyons v. McCotter*, 770 F.2d 529, 535 (5th Cir. 1985) (holding that failure to raise a meritorious objection was below professional standards and prejudiced the defendant); ABA Guidelines, No. 10.8 cmt. & n. 227 (noting duty of counsel to preserve error to prevent wrongful convictions and death sentences).

The introduction of violent conduct by other inmates removed from trial any possibility that Mr. Caro would be sentenced solely on his own conduct and was prejudicial in and of itself and also when considered in light of the cumulative error in this case. *See* Claim 16 *infra*.

### J. Trial Counsel Failed to Object to the Government's Improper Arguments Made During Closing Statement

The Government made several improper arguments during closing statement that prevented Mr. Caro from receiving a fair sentencing. Counsel should have objected to the prosecutor's unconstitutional arguments. Had they done so, Mr. Caro's jury may not have been improperly influenced by these statements.

JA 1156

1.    **The Government Improperly Argued to the Jury that It Should Control Mr. Caro by Imposing the Death Penalty**

The government argued in its closing, without objection, that it was the responsibility of the jury to "control" Carlos Caro and the only means to do so was by imposing the death penalty. (Tr. 02/13/2007 at 97-98.) The Court of Appeals held that this argument was improper. *United States v. Caro*, 597 F.3d 608, 625-26 (2010). The argument was improper because it invited the jury to take on the role of "law enforcement" rather than the neutral role assigned to the jury. *Id. (citing United States v. Young*, 470 U.S. 1, 18 (1985); *see also Viereck v. United States*, 318 U.S. 236, 247-48 (1943) (holding that prosecutor's argument that jury had to "do your duty" by convicting the defendant was "highly prejudicial"). The Fourth Circuit, however, found that this error did not prejudice Mr. Caro.[34]

2.    **The Government Improperly Argued to the Jury that Unless Mr. Caro Received the Death Penalty There Would Be No Punishment for the Death of Roberto Sandoval**

During trial, the government also argued on several occasions, without objection, that the death penalty was necessary for Mr. Caro because otherwise he would receive "zero punishment" by the imposition of a life-without-parole sentence. (Tr. 02/13/2007

---

[34] *But see United States v. Wilson*, 135 F.3d 291, 297-98 (4th Cir. 1998) (*citing Darden v. Wainwright*, 477 U.S. 168, 181 (1986)) and holding that improper jury argument which infected the trial was a violation of due process under the Fifth Amendment); *see also Lesko v. Lehman*, 925 F.2d 1527, 1540-41 (3rd Cir. 1991) (granting habeas relief where prosecution argued that the jury had a "duty" to even the "the score" by putting the defendant to death); *Cargle v. Mullin*, 317 F.3d 1196, 1220-21 (10th Cir. 2003) (holding that cumulative error in jury arguments and ineffective assistance, which so infected the trial as to deny due process, required habeas relief).

JA 1157

at 26, 89 and 94.)  In fact, the government went so far as to argue, without objection, that the failure to return a death verdict would mean that Mr. Caro would return to prison as a "conquering hero." (*Id.* at 89.)  The Fourth Circuit, on direct review of the conviction, agreed that the government's arguments about sending a message that you could kill without punishment were "improper," because they diverted the jury from an "individualized [sentencing] determination on the basis of the character of the individual and the circumstances of the crime" as required by federal law.  (*quoting Zant v. Stephens*, 462 U.S. 862, 879 (1983)).  *Caro*, 597 F.3d at 626 n.17.  Nevertheless, no remedy was ordered because the panel determined that, in light of the other facts of record, there was no prejudice.  *Id.*

> **3.    The Government Violated the Eighth Amendment and the Rule in *Caldwell v. Mississippi* by minimizing the jury's responsibility**

As discussed in Claim Eight, *infra*, trial counsel failed to argue that the government violated Mr. Caro's rights under the Eighth Amendment and *Caldwell v. Mississippi*, 472 U.S. 320 (1985), when it made improper statements in closing argument that attempted to minimize the jury's responsibility regarding Mr. Caro's sentence, and by making other misleading statements to the jury regarding the capital sentencing process.  The government was able to minimize the severity of a death sentence by shifting the emphasis away from the act of putting a defendant to death, and encouraging the jury to focus instead on what it called "the law." (Tr. 02/13/2007 at 98.)  Counsel's failure undermines confidence in the outcome of the penalty phase because had they objected to the government's misleading statements about the applicable law and the

138

JA 1158

significance of a death verdict, it might have influenced at least one juror to vote for a life sentence.

4.   **Defense Counsel Was Ineffective for Failing to Object to the Prosecutor's Unconstitutional and Prejudicial Statements**

Such appeals to the passion and prejudice of a jury violate the right to due process of law under the Fifth and Fourteenth Amendments. *See United States v. Wilson*, 135 F.3d 291, 297-98 (4th Cir. 1998) (*citing Darden v. Wainwright*, 477 U.S. 168, 181 (1986) and holding that improper jury argument which infected the trial was a violation of Due Process under the Fifth Amendment); *Cargle v. Mullin*, 317 F.3d 1196, 1220-21 (10th Cir. 2003) (holding that cumulative error in jury arguments and ineffective assistance, which so infected the trial as to deny due process, required habeas relief). The Federal Death Penalty Act of 1994 likewise provides that no judgment of death may be affirmed when imposed "under the influence of passion." 18 U.S.C. § 3595(c)(2)(A); *see also People v. Kuntu*, 752 N.E.2d 380, 403-04 (Ill. 2001) (holding that the prosecution argument that a life sentence for a killer of multiple persons would give him five "free" murders was an improper appeal to passion and citing cases); *United States v. Solivan*, 937 F.2d 1146, 1148, 1153-55 (6th Cir. 1991) (holding that prosecution's remarks to "tell her [the defendant] and all of the other drug dealers like her that we don't want that stuff in Northern Kentucky" were extremely prejudicial and violated defendant's right to a fair trial); *United States v. Sanchez*, 659 F.3d 1252, 1256-57 (9th Cir. 2011) (reversing jury verdict based on an improper "send a message" argument by the government and citing cases).

139

JA 1159

The failure of defense counsel to object to clearly improper arguments was deficient performance. *See* ABA Guidelines No. 10.8 cmt. & n. 227 (noting duty of counsel to preserve error to prevent wrongful convictions and death sentences); *Lyons*, 770 F.2d at 535; *Northrop v. Trippett*, 265 F.3d 372, 383-84 (6th Cir. 2001) (holding that failure to move to suppress evidence constituted ineffective assistance and prejudiced the defense).

The Fourth Circuit's conclusions that there was no prejudice from counsel's failure to object (Subclaims J1 and J2)[35] must now be re-weighed in light of the additional facts and arguments presented on this modified record. *Cf. Wiggins*, 539 U.S. at 537. In this case, the errors in jury argument (including both the error in commenting about the defendant's silence and the error in asserting that the jury had a law enforcement role, as well as the prosecutor's attempt to minimize the jury's responsibility) by themselves or when coupled with the other errors in these proceedings, constitute more than enough error to create a reasonable probability of a different result by a single juror. For example, Juror # 33 stated that the "single most important factor in [his] decision for the death penalty was that Carlos Caro was already serving a sentence that amounted to life in prison, so giving him a life sentence would have been, in effect, giving him no punishment for the homicide. This was not acceptable." (████ Ex. 30 (Decl. of Juror # 33.)) Juror # 24 similarly stated that one of the factors influencing her decision was that giving Mr. Caro a life sentence would not be any punishment. (Juror #

---

[35] The Fourth Circuit did not review Subclaim J3 because, as alleged in Claim Nine D, appellate counsel failed to raise the issue.

JA 1160

24 Decl.)

### K. Trial Counsel Failed to Accept the Invited Excuse of a Frequently Sleeping Juror, and the Court Violated Mr. Caro's Fifth and Fourteenth Amendment Due-Process Rights and Sixth Amendment Jury Trial Right by Failing to Excuse the Juror

Juror # 33 first introduced himself to the Court during voir dire as the sole operator of a used car lot in Tazewell, Virginia. (Tr. 01/22/2007 at 99-100; *see also* Questionnaire of Juror # 33, attached as ▮▮▮▮ Ex. 39.) As sole operator of a used car lot, he asked the Court to excuse him because other family members were not available to operate the used car lot in his absence. (Tr. 01/22/2007 at 99-100.) Based on that explanation, defense counsel asked that Juror # 33 be excused because he could not concentrate on the trial given his work situation. (*Id.* at 139-40.) The government objected because it believed, contrary to Juror # 33's assertion, that his father and brother could assist in the business and in any case placing the hardship on the juror was appropriate. (*Id.* at 138-39.) After this exchange, the district court determined not to excuse Juror # 33. (*Id.* at 140-42.)

Juror # 33 later had multiple problems staying awake during trial. The first problem noted on the record occurred on February 5, 2007, when the district court voiced the following concerns:

> THE COURT: Counsel, Juror Number 33, who is the young man seated in the back on the end, has been nodding off some. And obviously I'm concerned about that, particularly in view of the importance of these proceedings. And what I intend to do is see what he does after lunch, but I am concerned about his situation, and would be interested in any comments that counsel may have in that regard. So, we'll take our luncheon recess and we'll be in recess for one hour.

141

JA 1161

(Tr. 02/05/2007 at 105.)   Several noteworthy events occurred during the morning of February 5, 2007.   The jury heard stipulations and instructions as to its "eligibility findings" and returned a verdict on eligibility; the jury heard opening statements from counsel regarding the penalty phase; and the jury heard the direct and cross-examination of government witness David Mrad about the use of coded letters in prison.   (*Id.* at 1-104.)   Counsel did not comment on this issue upon return from lunch. (*Id.* at 105.) Counsel also did not comment at the end of the day. (*Id.* at 181-82.)

The problems with Juror # 33 were again noted on the record two days later, on February 7, 2012, when the district court voiced additional concerns:

> THE COURT: Counsel, we are still having a problem with juror # 33 who appears to continue to sleep. He's near to me at the end of the second row. He has his hand in front of his face, and his eyes closed, and he did that a lot this morning. He was better yesterday, but as I indicated, we had another problem today. And I'm inclined to, to discharge that juror. I want to give counsel an opportunity to give me their views, either now or before we come back.

(Tr. 02/07/2007 at 66.)   The government opposed excusing the juror and suggested that the district court talk with him before excusing him. (*Id.*) Defense counsel agreed with the suggestion to question the juror, and noted that he might be affected by medication or nighttime work. (*Id.* at 66-67; *see also* ████ Ex. 39 at 20 (juror noting that defendant takes medication for asthma.))

When the juror was questioned, he said that he was having trouble sleeping and also having trouble with an anxiety problem. (*Id.* at 67.) He said that he heard the evidence and that he would bring to the court's attention any further problems he might

142

have. *Id.* at 67. Before the court's comment in the morning of February 7, 2012, the defense had presented the testimony of expert James Aiken about control measures in maximum security.

Later in the proceedings, the district court noted that Juror # 33 seemed to be following the court's admonitions and "had done alright" such that he would not be removed. (Tr. 02/12/2007 at 218.) However, the very next day the Court brought to the parties' attention yet a third issue regarding Juror # 33, when the juror advised the Court's security officer that he had had anxiety problems yesterday and that his anxiety may force him to leave the courtroom today. (Tr. 02/13/2007, Dkt #687 at 12-13.) On February 12, 2007, the day Juror # 33 suffered anxiety problems, the jury heard from defense expert Mark Cunningham about security measures at ADX-Florence and the ability of the BOP to control Mr. Caro without future danger. On February 13, 2007, the jury heard final argument and jury instructions and then returned its verdict of death.

Notwithstanding the multiple warnings of Juror # 33's anxiety, sleeping, and lack of attention, defense counsel never moved to strike him. This failure to strike cannot be excused as a strategy call as counsel, during jury selection, had rated the first alternate, Juror # 18, favorably with a "+", and Juror # 33 negatively, with a "-". (Juror Rating Sheets, 01/25/2007.) Moreover, as of February 7, 2012, Juror # 33 already had returned two negative verdicts against Carlos Caro in very quick succession.

The failure of defense counsel to object to the continued sitting of Juror # 33 violated Mr. Caro's Sixth Amendment right to effective assistance of counsel. *See Strickland*, 466 U.S. at 687; *Lyons*, 770 F.2d at 535; ABA Guidelines No. 10.8 cmt & n.

143

JA 1163

227 (noting duty of counsel to preserve error to prevent wrongful convictions and death sentences); Hammond Decl. ¶ 51.)

The continued presence of Juror # 33 on the jury denied Mr. Caro his right to a fair trial and reasoned jury verdict by 12 impartial jurors.   This "right to an impartial adjudicator, be it judge or jury" is "'so basic to a fair trial that its infraction can never be treated as harmless error.'"  *Gray v. Mississippi*, 481 U.S. 648, 668 (1987) (*quoting Chapman v. California*, 386 U.S. 18, 23 (1967)).  The Supreme Court further explained that: "As was stated in *Witherspoon*, a capital defendant's constitutional right not be sentenced by a 'tribunal organized to return a verdict of death' surely equates with a criminal defendant's right not to have his culpability determined by a 'tribunal "organized to convict."'"  *Id.* (*quoting Witherspoon v. Illinois*, 391 U.S. 510, 521 (1968).  The right to an impartial jury determination is so strong that when a single juror is affected prejudice must be presumed.  *See, e.g., Stone v. United States*, 113 F.2d 70, 77-78 (6th Cir. 1940).

These principles have been applied to sleeping jurors in non-capital cases.  One such example is *United States v. Barrett*, 703 F.2d 1076, 1082-83 (9th Cir. 1983).  In *Barrett*, a juror admitted that he was sleeping during trial, but the trial judge decided not to inquire into the matter because the juror was not, in his opinion, sleeping.  The Court of Appeals reversed because, on such error, it was plain error to not further inquire into the juror's conduct.  Similar holdings have been reached by the state courts in instances of sleeping jurors and require reversal of verdicts reached by sleeping jurors.  *See, e.g., People v. Simpkins*, 792 N.Y.S. 2d 170, (N.Y. App. Div. 2005) (holding that a juror who

144

JA 1164

repeatedly slept was grossly unqualified and that the resulting verdict must be reversed for new trial); *People v. Evans*, 710 P.2d 1167, 1168 (Colo. App. 1985) (requiring new trial in case of sleeping juror); *People v. Jones*, 861 N.E.2d 276, 280 (Ill. App. Ct. 2006) (requiring new trial or hearing for sleeping juror).

Perhaps the clearest statement of the law as to sleeping juror was given in *State v. Majid*, 914 N.E.2d 1113 (Ohio Ct. App. 2009), a capital case.   It established the following: (1) sleeping by a juror is a form of jury misconduct; (2) a juror who sleeps during trial cannot be expected to perform his duties; (3) the removal of such a juror is a prerogative of the trial court and does not require the consent of the parties; (4) numerous instances of sleep by a juror constitute a denial of due process of law and require reversal of the conviction (since the prejudice flows from the substantial nature of the juror misconduct). *Id.* at 1115-16.

In the instant case, the situation was worse than in *Barrett* and like that in *Majid.* Juror # 33, as observed on multiple occasions during trial, was either sleeping or otherwise inattentive.   This was observed during the presentation of crucial testimony, instructions and argument.   Juror # 33 announced on the last day of the penalty phase trial that he was "anxious"–the same term he had used earlier to describe his inattentiveness or sleepiness.   Given such circumstances, defense counsel's failure to challenge the juror constitutes ineffective assistance of counsel and prejudice because such a juror cannot, consistent with *Witherspoon*, *Barrett* and *Majid*, and the other cases cited, fairly

145

JA 1165

adjudicate the death penalty.[36]

## L. Counsel's Deficiencies, Both Individually and Cumulatively, Prejudiced Mr. Caro

Counsel's performance, as described above, was deficient. The Supreme Court has instructed that when making a prejudice determination in a claim of ineffective assistance of counsel, the "must consider the totality of the evidence before the judge or jury." *See, e.g., Strickland*, 466 U.S. at 695. All of the information that has been alleged throughout this motion must be considered. In this case, evidence rebutting the government's aggravating factor of future dangerousness and presenting mitigating evidence about Mr. Caro himself was essential to mitigate the government's argument that Mr. Caro was a remorseless killer whom the BOP could never control. While Mr. Caro may not have "overcome a finding of future dangerousness," the information that was presented was never presented to the jury "might well have influenced the jury's appraisal of his moral culpability." *Williams v. Taylor*, 529 U.S. 362, 398 (2000).

---

[36] This argument is also consistent with the Fifth Circuit's ruling in *Burdine v. Johnson*, 262 F.3d 336, 341 (5th Cir. 2001) (en banc). In that case, when defense counsel slept through not insubstantial portions of the trial, the Court of Appeals presumed prejudice because of his inability to assist the defendant during those times. In the same way, when a juror, as is apparent from this record, sleeps on multiple occasions during a trial, the resulting verdict must be viewed as both the product of ineffective assistance (in failing to challenge the juror) and prejudice, since it cannot be known with certainty how the omitted testimony, argument or instructions may have influenced the consideration of the many aggravating and mitigating factors presented.

JA 1166

**CLAIM SEVEN:   BY WITHHOLDING MATERIAL EXCULPATORY AND IMPEACHMENT EVIDENCE, AND PRESENTING MISLEADING PREJDUCIAL ARGUMENT REGARDING FUTURE DANGEROUSNESS, THE GOVERNMENT VIOLATED MR. CARO'S RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS.**

On January 11, 2006, the government filed its Notice of Intent to Seek the Death Penalty, listing future dangerousness as one of two non-statutory aggravating factors. (Notice of Intent to Seek Death Penalty, 01/11/2006, Dkt. 8.)   One of the main future dangerousness disputes during the penalty phase was the BOP's ability—or inability—to securely and safely house dangerous inmates at ADX-Florence or other USPs.   In an ironic twist, the government argued that the BOP was *not* capable of safely and securely housing its inmates, while the defense argued the opposite.   The government specifically argued that, in spite of how dangerous it claimed Mr. Caro to be, the BOP could only *temporarily* house him it its most secure facility, ADX-Florence.   In support of this aggravating factor, the government also alleged that Mr. Caro "has occupied a leadership position in a violent gang." (*Id.* at 3.)

Defense counsel made numerous requests for *Brady* material.   Counsel first sent a letter to the government on March 14, 2005, thanking the AUSA for providing Mr. Caro's Central BOP file, and also specifically requested "any other materials . . . relevant to mitigation." (Kalista Letter, 3/14/2005.)   Counsel next filed a Motion for Exculpatory Evidence, requesting both information that may be favorable to Mr. Caro on the issues of guilt and punishment, as well as impeachment evidence that would tend to diminish the credibility of the government's witnesses. Counsel requested the disclosure of "any statements, written or oral, of any government witnesses which are favorable" to Mr.

147

JA 1167

Caro. Counsel further requested that the government provide the material in sufficient time before trial to allow the defense to "use such evidence in a meaningful way." (Mot. for Exculpatory Evidence, Dkt. 19.)

Finally, counsel filed a second Motion for Exculpatory Evidence that was specifically related to penalty phase information. In addition to repeating its general Brady claims, counsel specifically requested information regarding the length of stay of inmates at ADX-Florence. Counsel also noted, correctly, that they anticipated that the government would present evidence of Mr. Caro's "membership position in a prison gang." (Mot. for Exculpatory Evidence Related to Penalty Phase Information, 10/03/2006, Dkt. 307 at 2.)

A.   **The Government Violated Mr. Caro's Constitutional Rights under *Brady v. Maryland* by Withholding Material Exculpatory and Impeachment Evidence that the BOP Has Housed Many Inmates at ADX-Florence and Its Predecessor Prison, USP-Marion, for More than Three Years.**

A significant part of the government's future dangerousness argument rested on the proposition that if Mr. Caro was sent to ADX-Florence, the highest security facility within the BOP system, his stay would be temporary—three years—and that inevitably he would return to general population at another facility. Thus, the government urged the jury to find that there was no way to ensure that Mr. Caro would not kill again. (*See* Tr. 02/13/2007 at 35 (asking whether jury can rely on BOP to send Mr. Caro to "a place where he won't kill again"); *id.* at 88 (asking jurors whether they had any doubt that Mr. Caro will "kill again"); *id.* at 93 (same).)

In their second *Brady* request, defense counsel asked for specific information and

148

JA 1168

documents regarding the length of stay for inmates housed at ADX-Florence, as well as the disciplinary record of inmates after they had committed the murder of another inmate (Carlos David Caro's Mot. for Exculpatory Evidence Related to Penalty Phase Information, 10/03/2006, Dkt. 307.)  At a pretrial hearing on the motion, the government asserted that it intended to argue that an inmate's stay at ADX-Florence was temporary and conceded that the defense was entitled to documents that would refute this assertion. (Tr. 11/03/2006 at 29-30 (pretrial hearing).)  The government also generally agreed that the defense was entitled to data that refuted the government's opinion and that it was obligated to turn this information over to the defense.  (Tr. 11/03/2006 at 37 (pretrial hearing).)

The magistrate judge granted Mr. Caro's second *Brady* motion for specific documents and information (Order, 11/06/2006, Dkt. 344), but the government filed an objection (Objection to the Order of the Magistrate Judge, 11/08/2006, Dkt. 345).  The district court granted the government's objection on the ground that the defense could only speculate as to the content of the requested information and thus had not shown that it was material evidence favorable to the accused. (Opinion and Order, 11/20/2006, Dkt. 363.)

The government presented testimony through Mr. Hershberger, a retired BOP employee and former warden at the ADX-Florence for one-and-one-half years (Tr. 02/12/2007 at 174) that ADX-Florence could not keep Mr. Caro at ADX for an extended period of time.  Rather, ADX-Florence would be forced to place him in the three-year step down program where he would advance in the absence of misconduct and if he

showed responsibility, and within a relatively short period of time, BOP would have no choice but to move him back into an open population environment. (*See, e.g.,* Tr. 02/12/2007 at 177 (goal is to work inmates through a minimum 3-year program); *id.* at 183 (goal of the ADX control unit is to return the inmate to open population); *id.* at 202 (step down is automatic if there is no misbehavior and inmate shows responsibility); *id.* at 200-03 (inmate who killed another inmate would be in the three-year program).) Indeed, when asked about Thomas Silverstein, an inmate who had been housed at ADX for a longer period of time,[37] Mr. Hershberger explained that Mr. Silverstein was a "very special case." (*Id.* at 201.)

The government emphasized to the jury in its closing argument that Mr. Caro would eventually be transferred from ADX-Florence. (Tr. 02/13/2007 at 34 ("We know that if, if Carlos Caro goes to that facility, he's not going to stay there. . . . he eventually, . . . will graduate out, be stepped down out of that facility" back into a USP);[38] *id.* at 35 ("You heard the testimony of Mr. Hershberger. Three years, three years for him to be stepped down out of ADX and into a USP."); *id.* at 35 (Mr. Caro "may initially go to ADMAX, but will be moved out to the USP on a 3-year program"); *id.* at 90 ("Everyone agrees, every witness agrees he's getting out of ADX, that in some time within three to five years he will be back at a USP.").)

---

[37] Mr. Silverstein is a federal prisoner who has been convicted of four separate murders while he's been incarcerated. He has a specially designed cell where he is housed in ADX-Florence and has not been transferred to general population.

[38] The government's statement that "we know" represents vouching, which went unchallenged at trial, and counsel's failure to object constitutes ineffective assistance of counsel.

150

JA 1170

While the Court denied Mr. Caro's *Brady* motion requesting specific information, the government's obligation under *Brady* to disclose material exculpatory information continued. *See Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (*Brady* claim lies when the government fails to volunteer exculpatory evidence when the evidence is of "sufficient significance to result in the denial of the defendant's right to a fair trial") (*quoting United States v. Agurs*, 427 U.S. 97, 108 (1976). As the government conceded and represented to the Court during the pretrial hearing, evidence that would refute its argument that Mr. Caro could only be held for three years at ADX-Florence was exculpatory and that it was obligated to turn this evidence over to the defense.

As of this filing, Mr. Caro still has not received the data he requested from the government in preparation for trial. Mr. Caro, however, now has the benefit of an informal survey conducted by a law firm in New Mexico in November 2010. The survey questionnaire was sent to 129 inmates housed at ADX-Florence seeking information about the number of consecutive years each inmate had been housed at ADX-Florence. (Affidavit of Jeanne Dvorak, 11/11/2011, attached as ▮▮▮ Ex. 48.) While the survey involved only a portion of the inmates at ADX-Florence,[39] the results refute the government's evidence presented at trial.

The evidence now available to Mr. Caro, despite the government's failure to provide such information, shows that at the time of Mr. Caro's trial, there were many inmates other than Mr. Silverstein who had been housed at ADX-Florence more than

---

[39] As of November 2006, which was two months prior to Mr. Caro's trial, 470 inmates were housed at ADX-Florence. (Tr. 02/12/2007 at 37.)

151

JA 1171

three years. Of these 129 questionnaires, 14 were returned unanswered indicating that these prisoners were under Specialized Administrative Measures ("SAMs") (and thus BOP had limited their correspondence such that they could not respond to the survey) and 69 were completed and returned. Of these 69 inmates, 43 claimed they had been in ADX-Florence, or ADX-Florence and USP-Marion,[40] for eight or more consecutive years. Indeed, 22 of these inmates had been at ADX-Florence/USP-Marion for over 13 years.

Applying this data to 2007, the time of Mr. Caro's trial, these results show that when the government was claiming that BOP policies prevented it from housing Mr. Caro at ADX-Florence for more than three years, at least 43 inmates currently housed at ADX-Florence had been at ADX-Florence or ADX-Florence/USP-Marion for more than five years. The longest stay, as of Mr. Caro's trial, was 27 years, and 22 inmates had been there for at least 10 or more years.

What is more, Mr. Caro has learned through consulting with former BOP official Mark Bezy who retired in 2006, that he specifically recalls eight inmates who had been housed under very strict conditions of confinement due to security concerns and who are still housed at ADX-Florence today. (Bezy Decl. ¶ 28.)

The government, *i.e.*, the BOP, clearly had access to this information at the time of Mr. Caro's trial. In fact, the government had complete and sole access to all of the

---

[40] ADX-Florence was not opened until 1994. (Tr. 02/12/2007 at 41.) Prior to that time, USP-Marion served the same function as ADX-Florence and had conditions of confinement similar to ADX-Florence. (Tr. 02/13/2007 at 176, 188.)

JA 1172

relevant data. The evidence withheld by the government would have shown that in spite of the BOP's "goal" to move inmates out of ADX-Florence through its step-down and other programs, in reality, BOP often did not meet this goal; there was not just one exception in the form of inmate Silverstein, but many exceptions. Regardless, the government did not disclose this evidence, misrepresented the truth to the jury, and violated Mr. Caro's rights.

**B.     The Government Violated Mr. Caro's Constitutional Rights under *Brady v. Maryland* by Withholding Materially Exculpatory Evidence that Mr. Caro was Not a Gang Leader at USP-Lee**

During the penalty phase of trial, the government presented testimony that on July 11, 2002, Carlos Caro had been the leader of the Texas Syndicate at FCI-Oakdale and had ordered an attack on members of another gang. During argument, the government implied that Mr. Caro was, or might still be, a leader of the Texas Syndicate. (Tr. 02/13/2007 at 21-22 (arguing that Mr. Caro, "is not just a member [of the Texas Syndicate], but he's a leader"); *id.* at 96 (arguing that Mr. Caro "becomes a player" in the Texas Syndicate . . . "[w]hether he's a leader, whether he's an enforcer, don't know").)

At the time of trial, however, the government had information and documents indicating that Mr. Caro was not the leader of the Texas Syndicate at USP-Lee and indeed might not even be in good standing with the gang. The government did not disclose these documents to the defense.

On October 22, 2003, less than two months before the death of Mr. Sandoval, the SIS intelligence officer at USP-Lee testified under oath before a grand jury about the

153

JA 1173

Texas Syndicate. (Sealed Ex. 28.) He testified that at the time of the July 2003 inmate assault at USP-Lee, inmate Ricardo Benavidez was the leader of the Texas Syndicate and that after the assault on Mr. Benavidez, an inmate by the name of Francisco Tijerina became the leader. (Sealed Ex. 28 at 15.) The government did not disclose this information or grand jury transcript to the defense. And, while this SIS intelligence officer testified for the government at trial, the government never disclosed this prior testimony to the defense.

The government also possessed an internal BOP memorandum dated December 24, 2003, just one week after the death of Mr. Sandoval. This memo reflects that an inmate told a prison official that "whoever did this to Sandoval, if they come out, there's gonna be trouble. We have already met and the decision has been made." (Internal BOP Memorandum ▮▮▮▮▮▮▮▮▮, 12/24/2003, attached as Sealed Ex. 58.) The government never disclosed this document to the defense.

On November 14, 2006, just two months before the trial in this case, the BOP prepared another internal form regarding an escorted trip for Mr. Caro. That form provided the "additional information" that Mr. Caro "is believed to be in 'bad standing' with the [redacted] gang." (Internal BOP Transportation Report ▮▮▮▮▮▮▮, 11/14/2006, attached as Sealed Ex. 59.) The government also did not disclose this document, or any other information or documentations that led them to believe that Mr. Caro was in "bad standing" with the gang.

At trial, the government did not tell the jury that Mr. Caro might be in "bad standing" with the gang; instead the government said the exact opposite—that Mr. Caro

154

JA 1174

is a leader, or at minimum, an enforcer, in the gang. All of these non-disclosed documents were clearly exculpatory and refuted the government's assertions and implications that Mr. Caro at the time of trial was, or might still be, the leader of the Texas Syndicate. The government's failure to provide this information to Mr. Caro was a violation of *Brady*.[41]

### C.    The Government's Failure to Produce Material Exculpatory Evidence Considered Cumulatively Violated Mr. Caro's Constitutional Rights

As a result of the government's violation of its obligation under *Brady v. Maryland*—coupled with trial counsel's failure to investigate, research, and present contradictory evidence related to future dangerousness and prison communication[42]—the jury never heard critical information, and the government's future dangerousness evidence was never subjected to meaningful adversarial testing. The jury unanimously found beyond a reasonable doubt that if sentenced to life, Mr. Caro would commit acts of violence against other inmates or staff within the federal prison system, and that he had not expressed remorse for killing Mr. Sandoval. (Special Verdict Form at 2.)

The suppression of evidence that is material and favorable to a defendant violates due process. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Evidence is deemed "material"

---

[41] This *Brady* assertion is based on a review of trial counsel's file and discussions with trial counsel. However, if the information was disclosed to trial counsel and not presented to the jury, Mr. Caro makes the alternative claim that his capital defense was prejudiced by this ineffective assistance. *See Wiggins*, 539 U.S. at 525; *Gray v. Branker*, 529 F.3d 220, 229 (4th Cir. 2008). Moreover, the government had an affirmative duty to volunteer this information during the penalty phase and to not argue contradictory positions, to prevent a fundamentally unfair trial. *See Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (citing *United States v. Agurs*, 427 U.S. 97, 108 (1976).

[42] *See* Claim Six-D, *supra*.

155

JA 1175

if "there is a reasonable possibility that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable possibility' is a possibility sufficient to undermine the confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985).

The principal issue during Mr. Caro's penalty trial was future dangerousness. In closing, the government devoted the majority of its argument to this issue. (2/13/2007 Tr. at 20-28, 33-39, 88-92, 94-96.)  By withholding exculpatory documents and information, and presenting inaccurate testimony and argument, the government misled the jury on two critical points:  Mr. Caro purported "leadership" role in a gang and the BOP's current ability to securely house dangerous inmates.  This misleading evidence on such critical issues removes any confidence in the jury's sentence.

That this evidence was material also is supported generally by empirical research that suggests that future dangerousness is one of the most significant issues for jurors when deciding whether to impose a sentence of death. *United States v. Darryl Lamont Johnson*, 02-cv-06998, Dkt. 112, (12/13/2010 Memorandum Opinion and Order) (citing John H. Blume et al., *Future Dangerousness in Capital Cases: Always "At Issue,"* 86 Cornell L. Rev. 397, 404 (2001); Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What do Jurors Think?*, 98 Colum. L. Rev. 1538, 1559-60 (1998); Sally Costanzo & Mark Costanzo, *Life or Death Decisions:  An Analysis of Capital Jury Decision Making Under the Special Issues Sentencing Framework*, 18 Law & Hum. Behav. 151, 160 (1994) ("[N]early all jurors [surveyed] . . . offered the observation that the penalty decision hinged on the issue of whether the defendant would pose a

156

continuing threat to society.")).

**D.    Mr. Caro's Death Sentence, Which Relied on Incomplete, Misleading and Irrelevant Information Regarding Future Dangerousness Violated Mr. Caro's Rights Under the Eighth Amendment**

As stated above, Mr. Caro's death sentence was achieved, in material part, on the basis of inaccurate, incomplete and misleading "future dangerousness" testimony. Such testimony led to the jury's finding that Mr. Caro "is likely to commit acts of violence against other inmates or staff within the federal prison system if imprisoned for life without possibility of release." (Verdict, 02/13/2007, Dkt. 639.) Because such incomplete and misleading testimony was presented to and relied upon by the jury which determined his fate, Mr. Caro's sentence of death violates the Eighth Amendment to the United States Constitution. *Johnson v. Mississippi*, 486 U.S. 578 (1988).

**CLAIM EIGHT: THE GOVERNMENT VIOLATED THE EIGHTH AMENDMENT AND THE RULE IN *CALDWELL V. MISSISSIPPI*, BY MINIMZING THE JURY'S RESPONSIBILITY.**

Supreme Court jurisprudence on capital cases is premised on the assumption that "jurors confronted with the truly awesome responsibility of decreeing death for a fellow human will act with due regard for the consequences of their decision." *Caldwell v. Mississippi*, 472 U.S. 320, 329-30 (1985). Arguments that minimize this sense of responsibility violate the Constitution. *See, e.g., id.* at 335-41 (prosecutor's argument to the jury that its decision was not final was unconstitutional). "The uncorrected suggestion that the responsibility for any ultimate determination of death will rest with others presents an intolerable danger that the jury will in fact choose to minimize the

157

JA 1177

importance of its role." *Id.* at 333.

In its closing argument, the government made two arguments that diminished the jury's responsibility:

> If it is your decision that Carlos David Caro should be sentenced to death, if in fact the weighing process justifies the death sentence, you would not be the first jury to come to that conclusion. It's something that other juries have done. You would not be alone in that regard.
> . . .
> The last thing I would like to talk about is the law. Mr. Kalista talks about and uses words like kill. You will not hear Judge Jones use that term. The job is not to kill anyone. It's the law.

(Tr. 02/13/2007 at 17, 98.)

In this case, the implicit messages of the government were: You need not feel responsible for causing the death of Mr. Carlos Caro, other juries have done so. And, it is not your job to kill, it's the law. There can be no purpose for these statements other than to inappropriately lighten the jury's burden of determining whether to send Mr. Caro to his death. The jury, not the "law" or the Judge or the Fourth Circuit, was responsible for deciding whether Mr. Caro would live or die. The government statements likely achieved their intended purpose of minimizing the jury's sense of responsibility regarding a death sentence. Given these prejudicial statements, there can be no confidence in the verdict.

158

**GROUNDS FOR RELIEF: DIRECT APPEAL**

**CLAIM NINE: MR. CARO WAS DEPRIVED OF HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL ON DIRECT APPEAL AS GUARANTEED BY 18 U.S.C. § 3006a AND THE FOURTEENTH AMENDMENT OF THE CONSTITUTION.**

"One of the most fundamental duties of an attorney defending a capital case at trial is the preservation of any and all conceivable errors for each stage of appellate and post-conviction review. Failure to preserve an issue may result in the client being executed even though reversible error occurred at trial." ABA Guidelines No. 10.8 cmt. On direct appeal, counsel failed to raise the following claims. The failure to raise these challenges to Mr. Caro's conviction and death sentence fell below the standard of care. These errors both individually and cumulatively deprived Mr. Caro of his right to effective assistance of counsel on appeal. *See Evitts v. Lucey*, 469 U.S. 387 (1985); *cf. United States v. Peak*, 992 F.2d 39 (4th Cir. 1993).

A.    **Appellate Counsel Failed to Challenge the Court's Refusal to Instruct the Jury that the Aggravating Factors Must Outweigh the Mitigating Factors Sufficiently and Beyond a Reasonable Doubt, in Violation of Mr. Caro's Fifth, Sixth, Eight, and Fourteenth Amendments**

At trial, counsel requested a jury instruction that "the government must prove beyond a reasonable doubt that the aggravating factors sufficiently outweigh the mitigating factors in order to justify the death penalty." (Defendant's Response, Dkt. #611, at 1.) The legal authority cited in support of this instruction included the decisions in *In re Winship, Apprendi, Ring*, a variety of state cases, and other Supreme Court case law, including *Ford v. Wainwright*, 477 U.S. 399 (1986) and *Woodson v. North Carolina*, 428 U.S. 280 (1976), which emphasized, like *Ring*, that the Eighth Amendment's

159

JA 1179

requirements impose more duties, not less, to capital case findings. (Defendant's Response, Dkt. 611, at 1-6). The district court denied the request. (*See* Dkt. 640) Notwithstanding the preservation of this error by trial counsel, and the premise that the Eighth Amendment requires more, not less, in capital cases, *Ring*, 536 U.S. at 597, 606, appellate counsel failed to include this issue in Mr. Caro's appeal.

In 2000, the Supreme Court decided the landmark case of *Apprendi v. New Jersey*, 530 U.S. 466 (2000). Relying on bedrock principles of law, such as the right to a jury trial and the right to have the government prove all of the elements of a crime beyond a reasonable doubt, the Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490. *Apprendi* rejected the notion that an accusation could be treated as a "sentencing factor" for the purpose of evading the due process and the jury trial right since that notion was "unknown to the practice of criminal indictment, trial by jury, and judgment by court." *Id.* at 478. The Supreme Court also made clear that this tradition had continued since the Supreme Court's decision in *In re Winship*, 397 U.S. 358 (1970), which required proof of all statutory elements beyond a reasonable doubt. *Id.* at 484. The dissent in *Apprendi* specifically noted that the *Apprendi* holding cast "serious doubt" on "sentencing systems employed by the Federal Government and States alike." *Id.* at 523-24 (O'Connor, J., dissenting).

Next in the line of *Apprendi's* progeny came the Supreme Court's decision in *Ring*

160

JA 1180

*v. Arizona*, 536 U.S. 584 (2002), which applied *Apprendi* to capital sentencing. In doing so, the Supreme Court specifically rejected Arizona's argument that judge-made findings as to aggravation factors were sufficient under the Constitution:

> Apart from the Eighth Amendment provenance of aggravating factors, Arizona presents "no specific reason for excepting capital defendants from the constitutional protections . . . extend[ed] to defendants generally, and none is readily apparent." [*Apprendi*], at 539, 120 S. Ct. 2348 (O'C, J., dissenting). The notion "that the Eighth Amendment's restriction on a state legislature's ability to define capital crimes should be compensated for by permitting States more leeway under the Fifth and Sixth Amendments in proving an aggravating fact necessary to a capital sentence ... is without precedent in our constitutional jurisprudence." [*Id.*]

536 U.S. at 606. The third and fourth major *Apprendi*-based decisions from the Supreme Court were *Blakely v. Washington*, 542 U.S. 296 (2004), and *United States v. Booker*, 543 U.S. 220 (2005), which, as predicted by Justice O'Connor, held unconstitutional state and federal sentencing systems that did not require juries to find beyond a reasonable doubt all facts that increased a sentence above the statutory maximum.

Trial counsel's request has been supported by two subsequent federal courts of appeal decisions that have approved the "beyond a reasonable doubt" language as applied to the instruction that the aggravating factor or factors must sufficiently outweigh the mitigating factor or factors. *See United States v. Fell*, 531 F.3d 197, 234 (2d Cir. 2008) (approving instruction that "you may find . . . that the aggravating factors proven, do not, standing alone, justify the imposition of death beyond a reasonable doubt."); *United States v. Sampson*, 486 F.3d 13, 33 (1st Cir. 2007) (approving instruction that the

161

JA 1181

prosecution prove "beyond a reasonable doubt that the aggravating factor or factors sufficiently outweigh the mitigating factors to make death the appropriate penalty in [the] case"). While trial counsel did not have the benefit of the holdings in those cases as persuasive authority, appellate counsel did. Their opening brief was filed *after* both of those opinions were issued. (*See* Appellant's Br., 02/12/2009, App. Dkt. 89.)

In this case, appellate counsel had no reason not to raise this issue and the failure to do so constitutes ineffective assistance of counsel.

**B.      Appellate Counsel Failed to Challenge the Exclusion for Cause of Qualified Jurors with Misgivings as to the Death Penalty**

At the time of Mr. Caro's trial, it was well established that the government "may not entrust the determination of whether a man should live or die to a tribunal organized to return a verdict of death." *Witherspoon v. Illinois*, 391 U.S. 510, 521 (1968). Mr. Caro, however, did not get the neutral jury to which he was constitutionally entitled. Rather, the jury selected in this matter was composed of ten persons who favored the death penalty, most of them strongly, and two persons with neutral views. (*See, e.g.,* Questionnaire of Juror # 08, attached as ▮ Ex. 34; Questionnaire of Juror # 12, attached as ▮ Ex. 35; Questionnaire of Juror # 24, attached as ▮ Ex. 36; Questionnaire of Juror # 30, attached as ▮ Ex. 37; ▮ Ex. 38; ▮ Ex. 39; Questionnaire of Juror # 39, attached as ▮ Ex. 40; Questionnaire of Juror # 47, attached as ▮ Ex. 42; ▮ Ex. 44; Questionnaire of Juror # 67, attached as ▮ Ex. 45; Questionnaire of Juror # 79, attached as ▮ Ex. 46; and Questionnaire of Juror # 97, attached as ▮ Ex. 47.) There were no jurors who even slightly

162

disfavored the death penalty.

In *Witherspoon v. Illinois*, the Supreme Court held that the government in a capital case may challenge a juror for cause on the basis of an opposition to the death penalty only when the juror makes it clear that he or she "would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case." 391 U.S. at 522 n.21. "[A] sentence of death cannot be carried out if the jury that imposed it or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or conscientious or religious scruples against its infliction." *Id.* at 522. These principles are important to insure that the jury selection procedures do not result in a jury "uncommonly willing to condemn a man to die." *Id.* The improper exclusion of a single juror for cause is harmful *per se* and warrants relief without a showing of prejudice. *Gray v. Mississippi*, 481 U.S. 648, 659-60 (1987).

The Supreme Court's subsequent case law has confirmed the holding in *Witherspoon. See Lockhart v. McCree*, 476 U.S. 162, 176 (1986); *Wainwright v. Witt*, 469 U.S. 412, 424 (1985); *Gray*, 481 U.S. at 662-63 (plurality opinion). *Witherspoon* and its progeny have established the following test: A venireman "may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Adams v. Texas*, 448 U.S. 38, 45 (1980). The mere fact that a juror's views may "affect" his performance is not a sufficient ground to strike a juror. *Id.*

JA 1183

at 49-50.

Mr. Caro ended up with this death-leaning jury because those individual jurors who had philosophical questions about the death penalty were questioned in a manner that resulted in their disqualification, even when they were willing to follow the law. Two examples in particular demonstrate how this flawed process improperly excluded persons with conscientious disapproval for the death penalty but who were otherwise willing to follow the law: Jurors # 40 and # 57.

These two jurors indicated in their questionnaires that they were strongly opposed to the death penalty. (*See* Questionnaire of Juror # 40, attached as ▮▮▮ Ex. 41, at Question 59; ▮▮▮ Ex. 43 at 59.) Generally speaking, these jurors had religious or philosophical beliefs that it was wrong to kill another human being. *Id.* Notwithstanding these beliefs, these two jurors expressed during voir dire a willingness to follow the law and the Court's instructions. When Juror # 40 was questioned, he testified both that he would not automatically impose the death penalty and neither would he automatically vote against the death penalty. (Tr. 01/22/2007 at 113-14.) He was asked a second time by the Court and repeated that he would not be an "automatic" juror. *Id.* at 115. Juror # 40 was then asked a third time, at the request of the prosecution, was "put on the spot" by a question asking him to read his questionnaire answer about being strongly opposed to the death penalty. *Id.* at 136. Even so, his third answer to the question was that "I'm kind of mixed. I'm kind of iffy about that." *Id.* at 136. He was then asked a fourth time about his questionnaire answer and whether "you had changed your mind?" *Id.* at 136.

JA 1184

His fourth answer was that "it's kind of a touchy subject." *Id.* at 136. The fifth time he was asked, he started to answer the question and the Court completed his answer for him saying, "That you could not." *Id.* at 137. He then agreed with the Court and was excused. *Id.* at 137, 141. In other words, the predominance of Juror # 40's answers qualified him as a juror until the Court answered a question for him and then excused him based on the Court's answer. This is the very kind of exclusion that *Withspoon* and its progeny absolutely prohibit. While it is understood that the Court was acting in good faith in an attempt to obtain a qualified jury, the manner of this questioning and the exclusion of Juror # 40 violated the precepts of *Witherspoon* and *Gray*.

The second telling example is juror # 57. Juror # 57 initially told the Court that he would not consider the death penalty. (Tr. 01/23/2007 at 47.) Upon being asked again, he said that he would consider the death penalty. *Id.* at 47. He was then asked whether his mind was closed to the death penalty and he said, "No." *Id.* at 47-48. The Court then said, "Well, I'm not sure I understand your answer, Juror # 57. Again, the question to you is some people may believe for religious or philosophical or ethical reasons . . . that under no circumstances could they ever vote for the death penalty . . . their mind is closed to the death penalty as a possible punishment. Now is that your belief?" *Id.* at 48. His answer was "No, it's not." *Id.*

Despite the clear answer, the questioning of Juror # 57 continued, "In other words, you say that under some circumstances you could vote for the death penalty?" *Id.* at 48. He answered, "Maybe." *Id.* "In other words, there are circumstances your mind would at least be open to considering the death penalty as a possible punishment?" *Id.* He again

165

JA 1185

answered "Yes." Thus, in the initial questioning he confirmed for Court by four different answers that he would consider the death penalty.

Notwithstanding Juror # 57's repeated willingness to consider the death penalty, the government moved to strike him not based on his answers in open court, but based on his prior questionnaire answers which indicated religious beliefs in opposition to the death penalty. *Id.* at 52-53. The defense opposed him being stricken because of his unequivocal answers which indicated that he would consider the death penalty. *Id.* at 54.

The Court then questioned Juror # 57 further. *Id.* at 57-58. The Court asked Juror # 57 about his questionnaire answers in which he indicated that the Bible says thou shalt not kill. *Id.* at 57. He agreed that he had said that. *Id.* He also agreed that he had said that he strongly opposed the death penalty. *Id.* He then was asked about whether his "feelings" were such that he would never impose the death penalty, and he agreed. *Id.* He then was asked more about his feeling and said that, "It would just make me feel like that I killed this man." *Id.* He then agreed with the question that he could not vote the death penalty. *Id.* In other words, Juror # 57 was responsible and acknowledged his own religious beliefs which opposed the death penalty. However, the preponderance of his answers to the Court showed a willingness to impose the death penalty under appropriate circumstances. This is another instance where the "final answer"--which was the result of repeated questioning about the juror's religious beliefs and expressed skepticism of his earlier answers, was less reliable than the earlier answers of the juror because the later questioning invited a result whereas the earlier questioning was neutral. Like the exclusion of Juror # 40, the exclusion of Juror # 57 violated the precepts of *Witherspoon*

166

JA 1186

and *Gray*.

When appellate counsel fails to raise legal issues which are significant and supported by precedent, the courts deem such failures as ineffective assistance under *Strickland.  See, e.g., Bostick v. Stevenson*, 589 F.3d 160, 168 (4th Cir. 2009) (holding that failure of trial counsel to consult with defendant as to appeal of non-frivolous issues constituted ineffective assistance); *United States v. Butler*, No. 97-7299,1999 WL 25555, at *2 (4th Cir. 1999) (unpublished opinion) (holding that a legal issue which was "significant and obvious" was required to be raised on direct appeal and remanding for further proceedings and, citing *Jones v. Barnes*, 463 U.S. 745 (1983)).

While it is true that appellate counsel made a general challenge to the "reverse-*Witherspoon*" questioning in this case, including the lack of an individual voir dire by defense counsel, appellate counsel failed to challenge on appeal the particular exclusion of Jurors # 40 and # 57. (*See* Appellant's Br. 02/12/2009, App. Dkt. 89.)  Appellate counsel raised the issue of the adequacy of the jury questionnaire and the adequacy of the jury questioning given the district court's refusal to permit counsel to participate in an individual voir dire of jurors. (*See id.* at 36-55.)  Though that argument made several valid points about the limitations of the voir dire process used, it completely neglected to describe the particular voir dire of any jurors, including Jurors # 40 and # 57, and likewise failed to assert the claims that the exclusion of Jurors # 40 and # 57 violated Mr. Caro's rights under *Gray v. Mississippi*.[43] As such, relief is warranted due to ineffective

---

[43] Trial counsel adequately preserved this issue as to these jurors given the various objections made.  However, should this Court find that trial counsel failed to preserve

167

JA 1187

assistance of counsel.

**C.    Appellate Counsel Failed to Raise a Meritorious Argument Regarding Trial Counsel's Failure to Object to Specific Instances of Violence Committed by Persons Other Than Mr. Caro.**

As discussed in Claim Six-I, *supra*, Mr. Caro's trial counsel failed to object when the government introduced evidence of specific acts of other inmates, in violation of the trial court's order.  On appeal, the Fourth Circuit noted that it could not grant relief as to the use of specific instances of violence by persons other than Mr. Caro when that claim was never raised on appeal.  *United States v. Caro*, 597 F.3d 608, 621 n.14 (4th Cir. 2010) ("we cannot grant relief that Caro plainly failed to request.").  Here, the prejudicial impact of appellate counsel's failure to raise this meritorious issue is clear from the Fourth Circuit opinion.

Notwithstanding the Court of Appeals' refusal to grant relief that was not requested, its decision makes fairly plain that the government's use of specific instances of violence by persons other than Mr. Caro was error because it violated the district court's ruling.  *See id.*  In addition, the use of specific instances of violence was error because it contradicted the Supreme Court's controlling Eighth Amendment precedent in *Zant v. Stephens*, 462 U.S. 862, 879 (1983), which requires that aggravation evidence be considered as "an individualized determination on the basis of the character of the individual and the circumstances of the crime." *Caro*, 597 F.3d at 625 n.17 (*quoting*

---

such challenge, then it is Mr. Caro's alternative claim that trial counsel violated *Strickland* by the failure to preserve the error, and that such error is prejudicial *per se* under *Gray*.

168

*Zant*, 462 U.S. at 879). Such an "individualized determination" cannot be made when the government is allowed to improperly suggest that Mr. Caro receive the death penalty because of crimes committed by third parties with no connection to Mr. Caro. As such, the government has thwarted the "individualized determination" required by the Eighth Amendment.

The government violated the district court's order and Mr. Caro's constitutional rights by introducing specific acts of violence by persons other than Mr. Caro. As expressly noted by the Court of Appeals, appellate counsel failed to raise this argument on appeal and thus the court "[could not] grant relief that Caro plainly failed to request." *Id.* at 621 n.14.

Here, the performance of appellate counsel was beneath professional standards since the failure to raise what the Court of Appeals acknowledged was a strong issue was not based on tactic, but was based on oversight of the district court's own ruling and the holding in *Zant.* Upon the finding of such an Eighth Amendment violation, the appropriate remedy is to vacate the death penalty imposed. *See, e.g., Caldwell v. Mississippi*, 472 U.S. 320, 333, 340 (1985); *Riley v. Taylor*, 277 F.3d 261 (3rd Cir. 2001). Such a remedy is certainly appropriate in this instance because the government had notice of both the district court's contrary order and the governing Eighth Amendment standards under *Zant* before it took its detour into this inadmissible and prejudicial evidence and argument.

JA 1189

**D.**    **Appellate Counsel Failed to Raise the Claim that the Government Violated the Eighth Amendment and the Rule in *Caldwell v. Mississippi* by Minimizing the Jury's Responsibility**

Mr. Caro incorporates herein the facts and law stated in Claim Eight, *supra.* Appellate counsel should have raised, but did not, the claim that Mr. Caro was denied his right to a fair sentencing when the government made improper statements that minimized the jury's sense of responsibility regarding a death sentence. Appellate counsel's failure to raise this issue on appeal prevented the Fourth Circuit from reviewing this meritorious claim and granting relief.

**E.**    **Appellate Counsel Failed to Raise Systemic Challenges to the Death Penalty**

Appellate counsel should have raised, but did not, systemic challenges to the death penalty as discussed in Claims Ten, Eleven, Twelve, Thirteen, Fourteen, and Fifteen, *infra.* Mr. Caro should not be precluded from raising them in this motion because counsel's failure to raise these claims deprived him from his constitutional right to the effective assistance of counsel.

**GROUNDS FOR RELIEF: SYSTEMIC CHALLENGES**

**CLAIM TEN: THE USE OF THE "FUTURE DANGEROUSNESS" AGGRAVATING FACTOR AT SENTENCING, WHICH RESULTED IN AN UNRELIABLE PREDICTION OF MR. CARO'S FUTURE DANGEROUSNESS BY THE JURY, VIOLATED MR. CARO'S RIGHT TO A NON-ARBITRARY SENTENCING PROCESS UNDER THE EIGHTH AMENDMENT AND 18 U.S.C. § 3595(C)(2)(A)**

The United States Supreme Court has repeatedly stressed the imperative for reliability in capital sentencing. In *Woodson v. North Carolina*, 428 U.S. 280 (1976), the

170

JA 1190

Court explained that

> the penalty of death is qualitatively different from a sentence of imprisonment, however long. Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.

*Id.* at 305 (plurality opinion); *see also Ford v. Wainwright*, 477 U.S. 399, 411 (1986); *Beck v. Alabama*, 447 U.S. 625, 638 (1980) ("To insure that the death penalty is indeed imposed on the basis of 'reason rather than caprice or emotion,' we have invalidated procedural rules that tended to diminish the reliability of the sentencing determination."); *Lockett v. Ohio*, 438 U.S. 586, 604 (1978); *Gardner v. Florida*, 430 U.S. 349, 359 (1977). From this imperative flows the rule that "capital punishment be imposed fairly and with reasonable consistency or not at all." *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982). With that rule in mind, Mr. Caro contends that the jury's prediction of his "future dangerousness," which the Government alleged as a non-statutory aggravating factor at sentencing, is impermissibly unreliable. The utilization of the future-dangerousness factor, he asserts, therefore violated his right to a non-arbitrary sentencing process under the Eighth Amendment as well as his right a non-arbitrary sentencing process under 18 U.S.C. § 3595(c)(2)(A).[44]

The notion of future dangerousness as an aggravating factor originated with

---

[44] In Mr. Caro's case, the future-dangerousness factor was worded as follows: "Do you, the jury, unanimously find that the government has proven beyond a reasonable doubt that the defendant is likely to commit acts of violence against other inmates or staff within the federal prison system if imprisoned for life without possibility of release?" (Special Verdict Form, 02/13/2007, Dkt. 639 at 2.)

JA 1191

Texas's capital-punishment statute. *See* Tex. Code Crim. Proc. art. 37.071 (Supp. 1975–76). Reformulating the statute in the aftermath of *Furman v. Georgia*, 408 U.S. 238 (1972), the state legislature crafted a predictive question for sentencing juries: "[W]hether there is a probability the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Tex. Code Crim. Proc. art. 37.071(b) (Supp. 1975–1976). This and two retrospective questions concerning intent and provocation were put to the juries, and, if a jury found that the state had proven beyond a reasonable doubt that the answer to all three questions was yes, then the death sentence would be imposed.[45] *Id.* art. 37.071(b).

The United States Supreme Court upheld Texas's capital-punishment statute in *Jurek v. Texas*, 428 U.S. 262 (1976). Passing judgment on the nascent future-dangerousness factor, the Court analogized to other predictive tasks performed in the justice system, albeit none of them as grave as the task borne by capital juries:

> It is, of course, not easy to predict future behavior. The fact that such a determination is difficult, however, does not mean that it cannot be made. Indeed, prediction of future criminal conduct is an essential element in many of the decisions rendered throughout our criminal justice system. The decision whether to admit a defendant to bail, for instance, must often turn on a judge's prediction of the defendant's future conduct. And any sentencing authority must predict a convicted person's probable future conduct when it engages in the process of determining what punishment to impose. For those sentenced to prison, these same predictions must be

---

[45] The two retrospective questions were, one, "whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result" and, two, "if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased." Tex. Code Crim. Proc. art. 37.071(b) (Supp.1975-76).

172

> made by parole authorities. The task that a Texas jury must perform in answering the statutory question in issue is thus basically no different from the task performed countless times each day throughout the American system of criminal justice.

*Id.* at 274-76. In *Barefoot v. Estelle*, 463 U.S. 880 (1983), the Court's only other foray into future dangerousness, the Court held that the Constitution does not prohibit the introduction of expert evidence concerning future dangerousness. In doing so, however, the Court revealed a tentativeness not apparent in *Jurek*:

> We are unconvinced, however, *at least as of now*, that the adversary process cannot be trusted to sort out the reliable from the unreliable evidence and opinion about future dangerousness, particularly when the convicted felon has the opportunity to present his own side of the case.

*Id.* at 901 (emphasis added).

In the decades since *Jurek*, numerous studies have shown that it is not only "not easy to predict future behavior," it is impossible as far as dangerousness is concerned. *See United States v. Sampson*, 335 F. Supp. 2d 166, 222 (D. Mass. 2004) ("There are relatively recent studies that suggest that it is not just difficult for jurors to predict reliably whether a murderer is likely to commit violent crimes again, but that it is impossible."). Two of the most damaging studies focused on federal capital prisoners for whom juries considered future dangerousness as an aggravating factor at sentencing. One of the studies, published in 2008, examined inmates sentenced to life without the possibility of release ("LWOP"). *See* Mark D. Cunningham, Thomas J. Reidy & Jon R. Sorensen, *Assertions of "Future Dangerousness" at Federal Capital Sentencing: Rates and Correlates of Subsequent Prison Misconduct and Violence*, 32 Law & Hum. Behav. 46 (2008). The other study, published in 2009, examined inmates sentenced to LWOP as

JA 1193

well as inmates sentenced to death. *See* Mark D. Cunningham, Jon R. Sorensen & Thomas J. Reidy, *Capital Jury Decision-Making: The Limitations of Predictions of Future Violence*, 15 Psychol. Pub. Pol'y & L. 223 (2009). In both studies, juries displayed "alarmingly poor predictive performance." *Id.* at 240–41; *see* Mark D. Cunningham, Thomas J. Reidy & Jon R. Sorensen, *Assertions of "Future Dangerousness" at Federal Capital Sentencing: Rates and Correlates of Subsequent Prison Misconduct and Violence*, 32 Law & Hum. Behav. 46, 61 (2008).

For the 2008 study, the Bureau of Prisons provided the authors information concerning 145 capital inmates who had entered prison to serve an LWOP sentence between 1991 and 2005. *Id.* at 51. The study documented and compared the rates of violent and potentially violent disciplinary infractions, arrayed across 14 categories, for the LWOP inmates and other inmates housed in United States prisons. *Id.* at 54–57. One hundred and four of the LWOP inmates were tried in cases where, as with Mr. Caro, the government alleged as a non-statutory aggravating factor some variation or proxy of "whether there is a probability the defendant would commit criminal acts of violence that would constitute a continuing threat to society." *Id.* at 57, Table 1.

Most strikingly, the study compared the rates of infractions for the LWOP inmates against whom the government had alleged future dangerousness and the LWOP inmates against whom the government had not alleged future dangerousness and found that there were no statistically significant differences between the two groups. *Id.* at 57, Table 3. In other words, *the predictions of future dangerousness were completely unreliable.* The rates of violence were relatively low among those LWOP inmates against whom the

174

JA 1194

government had alleged future dangerousness, just as they were for the larger group of all LWOP inmates. *Id.* at 56–57, Table 3. For example, the rate of "assaults with moderate injury" among future-danger LWOP inmates was vanishingly low at 1.56 per 1000 inmates. The rate among all U.S. Penitentiary inmates, by comparison, was 4.70 per 1000 inmates. *Id.* at Table 3. In the 14-year period covered by the study, "just less than one in a hundred [future-danger LWOP inmates] had perpetrated an assault causing 'moderate' injuries (i.e., serious injuries requiring evacuation to an outside hospital, but not life-threatening)." *Id.* at 61; *see id.* at 55–57, Table 3. Furthermore, "[n]one had perpetrated an assault resulting in 'major' (i.e., life-threatening) injury." *Id.* In fact, 28% of these inmates had never been cited for a disciplinary infraction. *Id.*

Tellingly, the LWOP inmates were not a disproportionate source of misconduct or violence as compared to other inmates imprisoned in U.S. Penitentiaries. *Id.* at 60. Indeed, none of the comparisons between the LWOP inmates and other U.S. Penitentiary inmates were statistically significant. *Id.* at 56, 60, Table 2. As the authors of the study concluded:

> [S]cientific data demonstrate that only a minority of capital offenders perpetrate serious violence in prison, and that it is not possible to reliably identify at trial which of these defendants are more likely than not to commit these acts. . . . Quite the contrary, in the face of base rate data, it is only assessments of varying improbability of prison violence among these offenders that are reliable."

*Id.* at 61 (emphasis in original).

In the 2009 study, the participants were capital inmates who entered United States prisons with an LWOP sentence or, like Mr. Caro, a death sentence as early as August

175

JA 1195

1993.  Mark D. Cunningham, Jon R. Sorensen & Thomas J. Reidy, *Capital Jury Decision-Making: The Limitations of Predictions of Future Violence*, 15 Psychol. Pub. Pol'y & L. 223, 232–34 (2009).  The "follow-up" period for LWOP inmates and death-sentenced inmates ended, respectively, in June 2006 and August 2007.  *Id.* at 234.  Like Mr. Caro, all of the participants were sentenced under the Federal Death Penalty Act in cases where the government had alleged as a non-statutory aggravating factor some variation or proxy of "whether there is a probability the defendant would commit criminal acts of violence that would constitute a continuing threat to society."  *Id.* at 232.

The 2009 study bolsters many of the key findings of the 2008 study.  As with the 2008 study, the 2009 study revealed that the rates of serious violence among the participants was uniformly low.  For example, only 4.2% of the capital inmates from whom juries had predicted future dangerousness had been cited for a serious assault.[46]  *Id.* at 237–38, Table 2.  The 2009 study also found that "[t]he annual rate of serious and potentially violent rule violations is broadly similar to that of other inmates serving time in U.S. Penitentiaries."  *Id.* at 238.  The annual rate for serious assaults, for instance, was 7.29 per 1000 for the capital inmates and 10.07 per 1000 for other inmates.  *Id.* at Table 2.  Lastly, the study reinforced the finding of the 2008 study and earlier studies that

---

[46] The authors categorized disciplinary infractions according to Federal Bureau of Prisons disciplinary infraction code numbers: 100-Level (more serious) to 400-Level (least serious).  Mark D. Cunningham, Jon R. Sorensen & Thomas J. Reidy, *Capital Jury Decision-Making: The Limitations of Predictions of Future Violence*, 15 Psychol. Pub. Pol'y & L. 223, 235–36, Table 2 n.1 (2009).  "Serious assault" encompassed codes 100, 100A, 101, 101A, 107.  *Id.* at Table 3 n.1.  Generally stated, the study defined a "serious assault" as an "act[] involving the potential for serious injury."  *Id.* at 239.

176

JA 1196

the correlates of violence in prison are often counter-intuitive. In other words, "[t]he most obvious 'common sense' factors are not reliably predictive of serious prison violence, i.e., being a convicted murderer, being convicted of multiple murders, being involved in a continuing criminal enterprise, serving a life-without-parole sentence or exhibiting an Antisocial Personality Disorder." *Id.* at 227 (citations omitted).

The essence of the 2009 study is its well-founded conclusion that jurors cannot identify the relatively rare offender who will commit a serious act of violence while imprisoned. *Id.* at 239–40, Table 4. The authors arrived at this conclusion by comparing jury predictions of future dangerousness to actual behavioral outcomes for inmates serving an LWOP sentence and inmates sentenced to death. *Id.* at Table 4. The results show that "affirmative predictions of future dangerousness are wrong far more often than right." *Id.* at 239–40, Table 4. Predictions of future dangerousness for LWOP inmates were correct in less than one-third of the cases, *id.*, and among inmates sentenced to death "in no instance was the jury prediction of future dangerousness correct," *id.* And this, as the authors noted, "was in spite of some capital inmates having contact with each other." *Id.* In the aggregate, *jury predictions that capital defendants would commit future acts of violence were incorrect nine out of ten times. Id.*

The ramification of these and similar studies is clear: Future dangerousness as an aggravating factor cannot be predicted with sufficient reliability to assure that the death penalty is not being arbitrarily and capriciously imposed. *See Gregg v. Georgia*, 428 U.S. 153, 188-89 (1976) (plurality opinion) ("[W]here discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken

177

JA 1197

or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action."). As the authors of the 2008 study observed, "it is only assessments of varying *improbability* of prison violence among offenders that are reliable." Mark D. Cunningham, Thomas J. Reidy & Jon R. Sorensen, *Assertions of "Future Dangerousness" at Federal Capital Sentencing: Rates and Correlates of Subsequent Prison Misconduct and Violence*, 32 Law & Hum. Behav. 46, 61 (2008). The jury in Mr. Caro's case was no better equipped to predict his future dangerousness than any other jury, which is to say that it was not equipped at all. Juries—including the jury in Mr. Caro's case—that impose the death penalty based on the probability of future dangerousness do so unconstitutionally.

The Eighth Amendment strictly regulates the procedures by which death sentences are imposed, paying particular attention to their reliability. *See Lockett v. Ohio*, 438 U.S. 586, 604 (1978) ("[T]he qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed."). As study after study has shown, the utilization of the future-dangerousness factor could hardly be a less reliable procedure for determining whether a person should live or die. Indeed, "[t]he error rate of this 'future dangerousness' assertion . . . is sobering, both in its inability to discriminate who will and will not engage in violent misconduct in prison and in the minority who fulfill the prediction." Mark D. Cunningham, Thomas J. Reidy & Jon R. Sorensen, *Assertions of "Future Dangerousness" at Federal Capital Sentencing: Rates and Correlates of Subsequent Prison Misconduct and Violence*, 32 Law & Hum. Behav. 46, 61 (2008). The error rate unquestionably exceeds that which the Eighth Amendment

178

allows. *Lockett*, 438 U.S. at 604 (explaining that the Eighth Amendment demands an exceptionally high degree of reliability when a death sentence is imposed). The utilization of the future-dangerousness factor therefore violated Mr. Caro's right to a non-arbitrary sentencing process under the Eighth Amendment as well as his right a non-arbitrary sentencing process under 18 U.S.C. § 3595(c)(2)(A).

**CLAIM ELEVEN: THE ABSENCE OF A PRINCIPLED BASIS FOR DISTINGUISHING CASES IN WHICH THE FEDERAL DEATH-PENALTY IS IMPOSED FROM THOSE IN WHICH IT IS NOT IMPOSED RENDERS THE FEDERAL DEATH PENALTY ACT UNCONSTITUTIONAL.**

The Supreme Court has held that the Constitution will not tolerate sentences of death that are imposed arbitrarily or capriciously. *See Furman v. Georgia*, 408 U.S. 238, 295-306 (1972) (Brennan, J., Concurring). In *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982), the Court reaffirmed "that capital punishment be imposed fairly, and with reasonable consistency, or not at all."

The reality of the federal death penalty in practice is that there is no consistency or predictability in the manner in which federal courts have imposed the federal death penalty. In fact, there is no consistency in the cases that proceed to trial compared to those that plead out. Included as exhibits to this motion are summaries of the facts and circumstances of the status or resolution of every authorized federal death penalty case from 1988 until 2003, organized as follows: Federal Capital Prosecutions Awaiting Trial, attached as Ex. 12; Federal Capital Defendants Who Died Before or During Trial, attached as Ex. 13; Federal Capital Prosecutions Which Were Dismissed by the Judge for Legal Reasons, attached as Ex. 14; Federal Capital Prosecutions in Which the Attorney

179

JA 1199

General Withdrew a Notice of Intent to Seek the Death Penalty, attached as Ex. 15; Federal Capital Prosecutions Ending in Guilty Pleas to a Sentence Other than Death, attached as Ex. 16; Federal Capital Defendants Who Were Found Not Guilty of the Capital Charge or Were Innocent, attached as Ex. 17; Federal Capital Defendants Convicted of a Lesser Offense, attached as Ex. 18; Federal Capital Cases Where the Death Penalty Has Been Rejected by Juries or Judges, attached as Ex. 19; Federal Capital Cases Resulting in a Sentence of Death, attached as Ex. 20; Federal Capital Cases Resulting in Execution, attached as Ex. 21; A Listing of Former Federal Death Row Inmates, attached as Ex. 22.

One cannot read the descriptions of these cases without coming to the realization that *all* of the cases are by their own terms horrible, and *all* involved the infliction of agony on victims and survivors. Yet, for indiscernible reasons, some defendants were sentenced to death, but the vast majority were not. If any basis can be distinguished, it is race and region, as Mr. Caro argues in Claim 12. Fairness and consistency are the opposite of arbitrariness and caprice. In the demonstrated absence of fairness and consistency, the federal death penalty must be set aside.

This argument is not refuted by pointing out the difficulties inherent in comparing cases. Selected summaries of the cases quickly put that overly simplistic argument to rest:

1. *United States v. Timothy McVeigh* (D. Colo.). The Oklahoma City bombing case. 168 dead. Hundreds injured. Tried, convicted, sentenced to death, executed.

JA 1200