No. 16-1

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA, Plaintiff-Appellee,

vs.

CARLOS DAVID CARO, Defendant-Appellant.

Appeal from the United States District Court for the Western District of Virginia
Hon. James P. Jones, District Judge, Presiding
Dist. Ct. No. 1:06CR00001

## JOINT APPENDIX TO OPENING BRIEF
## VOLUME 3 JA 1201 – JA 1800

JON M. SANDS
Federal Public Defender
District of Arizona
TIMOTHY M. GABRIELSEN
Nevada Bar No. 8076
Assistant Federal Public Defender
407 West Congress Street, Suite 501
Tucson, Arizona 85701
tim_gabrielsen@fd.org
Tel. (520) 879-7614
Facsimile (520) 622-6844

FAY F. SPENCE
Virginia Bar No. 27906
First Assistant Federal Public Defender
210 First Street, SW, Suite 400
Roanoke, Virginia 24011
fay_spence@fd.org
Tel. (540) 777-0880
Facsimile (540) 777-0890

BRIAN J. BECK
Virginia Bar No. 78049
Assistant Federal Public Defender
201 Abingdon Place
Abingdon, Virginia 24211
brian_beck@fd.org
Tel. (276) 619-6080
Facsimile (276) 619-6090

*Counsel for Defendant-Appellant Carlos David Caro*

## U.S. District Court Docket and Transcripts

JA 1        Dkt. 2 - Indictment, *United States v. Caro*, W.D.Va. No.
            1:06CR00001-JPJ (Jan. 3, 2006);[1]

JA 4        Dkt. 8 - Notice of Intent to Seek the Death Penalty (Jan. 11, 2006);

JA 8        Dkt. 19 - Motion for Exculpatory Evidence (Jan. 27, 2006);

JA 13       Dkt. 29 - Order (Discovery and *Brady*) (Feb. 6, 2006);

JA 15       Dkt. 307 - Carlos David Caro's Motion for Exculpatory Evidence
            Related to Penalty Phase Information (Oct. 3, 2006);

JA 22       Dkt. 316 - Notice of Filing of Affidavit of Declaration of Mark
            Cunningham, Ph.D. (Oct. 16, 2006);

JA 49       Dkt. 343 - Memorandum Opinion (Magistrate Judge) (Nov. 8, 2006)
            (granting Defendant's Motion at Dkt. 307);

JA 61       Dkt. 344 - Order (Nov. 8, 2006) (re: Dkt. 343);

JA 65       Dkt. 345 - Objection to Order of the Magistrate Judge (Nov. 8, 2006);

JA 66       Dkt. 346 - Carlos David Caro's Response to Objection to Magistrate
            Judge's Order of November 8, 2006 (Nov. 9, 2006);

JA 68       Transcript, Hearing November 13, 2006 (District Court ruling on Dkt.
            307 and Government objection to Magistrate Judge's Memorandum
            Opinion, Dkt. 343);

JA 109      Dkt. 353 – Declaration of Tomas J. Gomez (Nov. 16, 2006);

JA 115      Dkt. 354 – Declaration of Jennifer Batchelder (Nov. 16, 2006);

JA 116      Dkt. 355 – Declaration of Linda Thomas (Nov. 16, 2006);

JA 118      Dkt. 356 – Declaration of Joetta A. Terrell (Nov. 16, 2006);

---

[1] All references to Case No. 1:06CR00001-JPJ are to "Dist. Ct." and the docket number.

JA 121          Dkt. 358 – Response to Government's Affidavits (Nov. 17, 2006);

            JA 126          Dkt. 358-1 Declaration of Mark Cunningham (Nov. 17, 2006);

            JA 131          Dkt. 358-2  Appendix A-H (Nov. 17, 2006);

JA 144          Dkt. 363 - Opinion and Order (Nov. 20, 2006) (District Court re: objections to Magistrate Judge's ruling at hearing on Nov. 8, 2006);

JA 151          Transcript, Capital Sentencing Hearing, Feb. 5, 2007;

JA 333          Transcript, Capital Sentencing Hearing, Feb. 6, 2007;

JA 410          Transcript, Capital Sentencing Hearing, Feb. 7, 2007;

JA 583          Transcript, Capital Sentencing Hearing, Feb. 8, 2007;

JA 661          Transcript, Capital Sentencing Hearing, Feb. 12, 2007;

JA 880          Dkt. 639 – Special Verdict (Feb. 13, 2007);

JA 890          Transcript, Capital Sentencing Hearing, Feb. 13, 2007;

JA 1015         Transcript, Capital Sentencing Hearing, Mar. 30, 2007;

JA 1020         Dkt. 790 - Redacted Motion for Collateral Relief Pursuant to 28 U.S.C. § 2255 & exhibits (Mar. 22, 2013):

            JA 1220         Exhibit 1 Declaration of Mark A. Bezy (Jan. 1, 2013);

            JA 1230         Exhibit 4 Declaration of Larry A. Hammond (Jan. 8, 2013);

            JA 1255         Exhibit 5 Declaration of Stephen J. Kalista (Dec. 29, 2012);

            JA 1260         Exhibit 7 Declaration of Hans Selvog, Ph.D. (Dec. 31, 2012);

JA 1286     Exhibit 8 Declaration of Donna Marie Schwartz-Watts, M.D. (Jan. 7, 2013);

JA 1307     Exhibit 9 Declaration of James Simmons (Dec. 29, 2012);

JA 1309     Exhibit 10 Declaration of D. Malcolm Spica, Ph.D. (Jan. 4, 2013);

JA 1336     Exhibit 11 Report of Thomas M. Hyde, M.D., Ph.D. (Dec. 22, 2012);

JA 1338     Exhibit 48 Affidavit of Jeanne Dvorak (Nov. 11, 2011);

JA 1347     Dkt. 791 - Gov't's Motion to Dismiss in Response to Motion for Relief & Exhibits (June 11, 2013);

JA 1475     Exhibit 1 to Motion to Dismiss, copies of defense emails (Jan. 24, 2006);

JA 1478     Exhibit 2 to Motion to Dismiss, copies of defense emails (Dec. 12, 2006;

JA 1482     Exhibit 3 to Motion to Dismiss, copies of defense emails (June 20, 2006);

JA 1484     Exhibit 4 to Motion to Dismiss, defense Memorandum Re: Potential Caro Witnesses and Other Issues;

JA 1489     Exhibit 5 to Motion to Dismiss, copies of defense emails (Sept. 25, 2006);

JA 1491     Exhibit 6 to Motion to Dismiss, Memorandum, Carlos Caro, Witnesses/Records by Location (May 15, 2006);

JA 1497     Exhibit 7 to Motion to Dismiss, Timeline Narrative - Chronological Critical Incidents and Developmental History of Carlos Caro;

JA 1513    Dkt. 797 - Carlos David Caro's Response to Motion to Dismiss (Oct. 9, 2013);

JA 1687    Ex. 61 Letter from A. Giorno to Carlos David Caro (Dec. 30, 2004);

JA 1689    Ex. 62 Supplemental Declaration of Mark Bezy (Oct. 8, 2013);

JA 1692    Ex. 63 Letter from James W. Marquart to Stephen Kalista (Dec. 6, 2006);

JA 1695    Ex. 64 Letter from A. Giorno to S. Kalista (Dec. 29, 2006);

JA 1697    Ex. 65 Letter from D. Malcolm Spica, Ph.D. to Robin Konrad (Sept. 10, 2013);

JA 1700    Ex. 66 Email from H. Selvog to S. Kalista (with Selvog CV attached) (Mar. 15, 2006);

JA 1710    Ex. 67 Email from A. Giorno to S. Kalista (Sept. 28, 2006);

JA 1712    Ex. 68 Supplemental Declaration of Donna Marie Schwartz-Watts, M.D. (Oct. 7, 2013);

JA 1739    Ex. 69 Memorandum from H. Selvog to D. Mullikin, S. Kalista, and J. Simmons (May 15, 2006), re: Witnesses/Records by Location;

JA 1745    Ex. 70 Memorandum from W. Johnson re: Special Handling Instructions for Carlos David Caro (Dec. 19, 2003);

JA 1747    Ex. 71 Declaration of Juror #33 (Sept. 26, 2013);

JA 1750    Ex. 72 Declaration of Susan Richardson (Oct. 9, 2013);

JA 1770      Ex. 73 Federal Bureau of Prisons Transfer Order for Carlos David Caro (Oct. 11, 2005);

JA 1772      Ex. 77 Declaration of Petra Herrera (Oct. 2, 2013);

JA 1774      Dkt. 800 - Defendant's First Motion for Leave to Conduct Discovery and Preliminary Request for an Evidentiary Hearing and Expansion of the Record (Oct. 25, 2013);

JA 1809      Dkt. 803 - Government's Response to Defendant's First Motion for Leave to Conduct Discovery and Preliminary Request for an Evidentiary Hearing and Expansion of the Record (Nov. 15, 2013);

JA 1816      Transcript, Oral Argument, Nov. 25, 2013;

JA 1889      Dkt. 808 – Opinion (May 4, 2015);

JA 1984      Dkt. 810 – Certificate of Appealibility (May 4, 2015);

JA 1985      Dkt. 811 – Carlos David Caro's Motion to Alter or Amend Judgment Pursuant to Federal Rule of Civil Procedure Rule 59(e) (June 1, 2015);

JA 1997      Dkt. 813 – Government's Response to Motion to Alter or Amend Judgment (June 18, 2015);

JA 2008      Dkt. 816 – Reply to Government's Response to Motion to Alter or Amend Judgment (July 6, 2015);

JA 2015      Dkt 818 – Order Denying Rule 59(e) Motion (Nov. 6, 2015);

JA 2019      Dkt. 819 – Carlos David Caro's Notice of Appeal (Jan.4, 2016).

2.   *United States v. Terry Nichols* (D. Colo.).  McVeigh's co-defendant. Tried, convicted, sentenced to life.

3.   *United States v. Khalfan Mohamed and Rashed al`-Owhali* (S.D.N.Y.).  Two defendants associated with Osama bin Laden and al Qaeda convicted in simultaneous terrorist truck bombings in 1998 of two American embassies in East Africa.  224 killed, including 12 Americans; thousands injured.  Tried, convicted, sentenced to life.

4.   *United States v. Theodore Kaczynski* (E.D. Cal.).  The Unabomber. Three murders by mail bombs. Plea agreement.  Sentenced to life.

5.   *United States v. Joseph Minerd* (W.D. Pa.).  Arson and pipe bomb used to kill pregnant girlfriend, her fetus and three-year old daughter. Tried, convicted, sentenced to life.

6.   *United States v. Coleman Johnson* (W.D. Va.).  Pipe-bomb used to kill pregnant girlfriend and their unborn child to avoid child support. Tried, convicted, sentenced to life.

7.   *United States v. Christopher Dean* (D. Vt.).  Defendant sent pipe bomb through the mail killing victim and disfiguring victim's mother. Plea agreement.  Sentenced to life.

8.   *United States v. Billy Cooper* (S.D. Miss.).  Carjacking killing of two victims.  Tried, convicted, sentenced to life.

9.   *United States v. Christopher Vialva and Brandon Bernard* (W.D. Texas). Carjacking double homicide. Tried, convicted, sentenced to death.

10.  *United States v. David Paul Hammer* (M.D. Pa.).  Prison inmate guilty of strangling to death cellmate at USP-Allenwood.  Sentenced to death.[47]

11.  *United States v. Michael O'Driscoll* (M.D. Pa.).   Prison inmate

---

[47] In 2005, the United States District Court for the Middle District of Pennsylvania vacated Hammer's death sentence and granted Hammer a retrial of the penalty phase, which has yet to commence. *See* Op. Concerning Fourth Amended § 2255 Mot. 263–73, *United States v. Hammer*, No. 4:CR-96-239, ECF No. 1216 (M.D. Pa. Dec. 27, 2005).

JA 1201

guilty of stabbing to death fellow inmate at USP-Allenwood. Same judge, same courtroom and same defense attorneys as *United States v. David Paul Hammer*. Sentenced to life.

12. *United States v. Storey* (D. Kansas). Prison inmate with Aryan Brotherhood ties killed fellow prisoner at USP-Leavenworth. Plea agreement. Sentenced to less than life sentence.

13. *United States v. Douglas Black and Steven Riddle* (D. Colo.). Inmates at USP-Florence attacked two suspected "snitches," one killed, one injured. Plea agreements. Substantially less than life sentences.

14. *United States v. Fu Xin Chen, Jai Wu Chen and You Zhong Peng* (E.D.N.Y.). Chinese gang members who kidnapped, raped, and murdered victims held for ransom. Fu Xin Chen and Jai Wu Chen entered plea agreements. Attorney General withdrew death authorization shortly before Peng trial. Peng convicted after trial. All three sentenced to life.

15. *United States v. Louis Jones* (N.D. Texas). Decorated Gulf War veteran with no prior record abducted, raped and killed young woman soldier. Tried, convicted, sentenced to death, executed.

16. *United States v. Cory Johnson, James Roane, and Richard Tipton* (E.D. Va.). 11 drug-related murders. Tried, convicted, sentenced to death.

17. *United States v. Dean Anthony Beckford* (E.D. Va.). Six drug-related murders. Tried, convicted, life sentence.

18. *United States v. Clarence Heatley and John Cuff* (S.D.N.Y.). 14 drug-related murders. Plea agreement. Sentenced to life.

19. *United States v. Thomas Pitera* (E.D.N.Y.). Seven drug-related murders in context of organized crime. Victims tortured and bodies dismembered. Tried, convicted, sentenced to life.

20. *United States v. German Sinisterra and Arboleda Ortiz* (W.D. Mo.). One drug-related murder and one attempted murder. Tried, convicted, sentenced to death.

JA 1202

21. *United States v. Kevin Grey and Rodney Moore* (D.D.C.). 31 drug-related murders. Tried, convicted, sentenced to life.

22. *United States v. Darryl Johnson* (N.D. Ill.). Two drug-related murders. Tried, convicted, sentenced to death.[48]

23. *United States v. Peter Rollock* (S.D.N.Y.). Eight drug-related murders, including some ordered by defendant while incarcerated. Plea agreement. Sentenced to life.

24. *United States v. Tommy Edelin* (D.D.C.). 14 drug-related murders. Tried, convicted, sentenced to life.

25. *United States v. Reynaldo Villarreal and Baldemar Villarreal* (E.D. Texas). Drug-related murder of law enforcement officer. Tried, convicted, sentenced to life.

26. *United States v. Juan Raul Garza* (S.D. Tex.). Three drug-related murders. Tried, convicted, sentenced to death, executed.

27. *United States v. Anthony Jones* (D. Md.). Six drug-related murders. Tried, convicted, sentenced to life.

28. *United States v. Chevy Kehoe and Daniel Lee* (D. Ark.). Three murders in connection with activities of white supremacist organization. Tried and convicted together. Kehoe—considered more culpable—sentenced to life. Lee sentenced to death.

29. *United States v. Gurmeet Singh Dhinsa* (E.D.N.Y.). Millionaire Sikh businessman hired killers of two employees cooperating with authorities in criminal investigation of defendant. Tried, convicted, sentenced to life.

30. *United States v. Trinity Ingle and Jeffery Paul* (W.D. Ark.). Murder of elderly, retired National Parks employee. Victim shot while bound and gagged. Tried separately. Ingle convicted and sentenced to life; Paul convicted and sentenced to death.

---

[48] In 2010, the United States District Court for the Northern District of Illinois vacated Johnson's death sentence and granted Johnson a retrial of the penalty phase, which has yet to commence. *See* Op. Concerning § 2255 Mot. 5–8, *United States v. Johnson*, No. 1:02-cv-06998, ECF No. 112 (N.D. Ill. Dec. 13, 2010).

JA 1203

31. *United States v. Kristen Gilbert* (D. Mass.).  VA nurse murdered four patients and attempted to murder three more.  Tried, convicted, sentenced to life.

32. *United States v. LaFawn Bobbitt and Rashi Jones* (E.D. Va.).  Fatal shooting of bank teller during robbery.  Security guard also shot and blinded.  Tried, convicted, sentenced to life.

33. *United States v. Billie Allen and Norris Holder* (W.D. Mo.).  Fatal shooting of bank teller during robbery.  Tried, convicted, and both sentenced to death.

Ultimately, the full force of this argument derives from the cumulative effect of examining, in their entirety, the case-by-case summaries of authorized cases compiled in the Exhibits.  By definition, because all of these cases were authorized by the Attorney General of the United States for capital prosecution, these are (or should be) the worst of the worst cases in the federal system.  Indeed, it is likely there is not a crime on the list as to which a prosecutor could not (or would not) argue in summation, "If this case doesn't call for the death penalty, what case does?"  And yet, in case after case—indeed, in the overwhelming majority of such cases—juries returned life verdicts or plea agreements were offered and accepted.  If one cannot discern a principled basis for distinguishing between cases where death is imposed and cases where death is not, the death penalty must be abolished as arbitrary and capricious.  If such a principled distinction exists, Mr. Caro challenges the Government to articulate it.  Should the Government prove unable to meet their burden of showing a legitimate distinction, then Mr. Caro's sentence must be set aside.

184

JA 1204

**CLAIM TWELVE: THE FEDERAL CAPITAL PUNISHMENT SYSTEM, IN WHICH CAPITAL PUNISHMENT IS IMPOSED ON BOTH THE INVIDIOUS BASIS OF RACE AND THE IRRATIONAL BASIS OF GEOGRAPHY, SHOULD NOT BE ENFORCED.   THIS COURT SHOULD VACATE MR. CARO'S SENTENCE ON THIS BASIS ALONE.**

In September 2000, the DOJ released a comprehensive study of how the federal death penalty has been administered from 1988 to mid-2000.  U.S. Dep't of Justice, *The Federal Death Penalty System: A Statistical Survey (1988–2000)* (2000) (hereinafter "DOJ Study") (2000), http://www.justice.gov/dag/pubdoc/_dp_survey_final.pdf.  The DOJ filed a supplemental report on June 6, 2001.  U.S. Dep't of Justice, *The Federal Death Penalty System: Supplementary Data, Analysis and Revised Protocols for Capital Case Review* (2001), attached as Ex. 23 (hereinafter "DOJ Supp Study").  The essence of the study's findings was that the federal death penalty had been disproportionately sought against minority-group defendants and irrationally sought on a regional basis.  As reported in the DOJ Study, after 12 years of discriminatory and irrational charging decisions, the federal death row consisted of 19 men, of whom four were white, 13 black, one Hispanic and one "other."  Consistent with the historical roots of the death penalty, 12 of the 19 defendants on federal death row at that time had been sentenced to death in the South.  Virginia and Texas had contributed four defendants apiece.  No other jurisdiction, at the time of the DOJ Study's release, had sentenced more than a single defendant to death.[1]

---

[1]  As of December 18, 2012, there were 58 inmates on federal death row. *List of Death Row Prisoners*, Death Penalty Information Center (Dec. 18, 2012), http://www.deathpenaltyinfo.org/federal-death-row-prisoners.  The federal districts in three "death friendly" states—Texas, Virginia and Missouri—account for almost half of

JA 1205

In terms of which defendants actually faced the federal death penalty, the DOJ Study showed that of the 159 cases in which the Attorney General had authorized a capital prosecution, 44 defendants were white (27.7%), 71 were black (44.7%), 32 were Hispanic (20.1%) and another 26 were categorized as "other" (7.5%). (*See* Ex. 9 at T-2, Table 1A.) Thus, more than 70% of the federal defendants targeted for the death penalty were non-whites.

In addition to the racial disparity in federal death-penalty prosecutions, the DOJ Study exposed a regional bias to enforcement of the federal death penalty.[49] The study revealed the following on the issue of regional disparity:

1.  From 1995 onward, of the 94 federal districts in the federal system, only 49 had ever submitted a case recommending capital prosecution.[50] (DOJ Study at 12.)

---

this population (25 out of 58). *Id.* With regard to racial composition, 26 of the inmates were black; 23 were white; 8 were Hispanic; and one was Native American. *Id.*

[49] Studies of state capital punishment systems also provide compelling evidence of the link between racial disparity and racial bias—particularly since no state in the country has as high a percentage of racial minorities condemned to death as the federal government. *See* Criminal Justice Project of the NAACP Legal Defense and Educational Fund, Inc., *Death Row U.S.A.*, 56 (Fall 2012), http://deathpenaltyinfo.org/documents/DR USAFall2012.pdf. In a congressionally mandated 1990 study, the General Accounting Office reviewed 28 previous studies of state capital punishment systems and concluded that the studies revealed "a pattern of evidence indicating racial disparities in the charging, sentencing, and imposition of the death penalty after the *Furman* decision." General Accounting Office, *Report to the Senate and House Committees on the Judiciary, Death Penalty Sentencing: Research Indicates Pattern of Racial Disparities* 5 (1990), attached as Ex. 24 (hereinafter "GAO Report.") It determined that these disparities remained even after statistically controlling for other factors such as aggravating circumstances, prior criminal record, and number of victims and that, in more than half of the studies reviewed, the race of the defendant was a factor in determining whether someone would receive the death penalty. *Id.* at 5–6.

[50] Any murder committed with a gun during a robbery is a potential federal death penalty

JA 1206

2.      Twenty-one federal districts, although submitting one or more cases for review, had never sought permission to seek the death penalty in any case.[51] (DOJ Study at T-59–62.)

The release of the report drew the following predictable public reactions from

officials at the Justice Department and the White House:

> Saying she was 'sorely troubled' by stark racial disparities in the federal death penalty, Attorney General Janet Reno today ordered United States attorneys to help explain why capital punishment is not applied uniformly across ethnic groups.

Marc Lacey & Raymond Bonner, *Reno Troubled by Death Penalty Statistics*, N.Y.

Times, Sept. 13, 2000, at A17.  In addition, Attorney General Reno called for "[a]n even

broader analysis."  *United States v. Bass*, 266 F.3d 532 (6th Cir. 2001), *rev'd*, 536 U.S.

---

case. *See* 18 U.S.C. § 924.  In *United States v. Chanthadara*, 230 F.3d 1237 (10th Cir. 2000), where the government proceeded on a Hobbs Act theory of federal prosecution, the defendant was sentenced to death for a murder committed in the course of the robbery of a restaurant.  That sentence of death was vacated on appeal on other grounds (and the defendant later sentenced to life imprisonment), but the potential number of cases that could be prosecuted on this theory is staggering.

[51] A recent report prepared at the request of the Defender Services Committee of the United States Judicial Conference and the Office of Defender Services of the Administrative Office of the U.S. Courts showed a slight easing in the regional bias to enforcement of the federal death penalty between 1998 and 2009.  Jon B. Gould & Lisa Greenman, *Report to the Committee on Defender Services: Update on the Cost and Quality of Defense Representation in Federal Death Penalty Cases* 12–16 (Sept. 2010), http://www.uscourts.gov/uscourts/FederalCourts/ AppointmentOfCounsel/FDPC2010.pdf .Sharp geographic disparities in the authorization of capital prosecutions nevertheless remain.  For example, as of 2009, the Fourth Circuit still had the largest federal capital caseload, representing about one-fifth of all federal death penalty cases brought nationwide.  *Id.* at 13.  Furthermore, while just six states—California, Maryland, Missouri, New York, Texas, and Virginia—accounted for nearly half of the 325 federal defendants authorized for capital prosecution, fourteen states had never seen a federal capital prosecution. *Id.* at 16, fig. 7.

187

JA 1207

862 (2002) (per curiam) (quoting Attorney General Reno). The New York Times also reported the reaction of Deputy Attorney General Eric Holder, at the time the highest-ranking African American at the Justice Department:

> "I can't help but be personally and professionally disturbed by the numbers that we discuss today," Deputy Attorney General Eric Holder said. "To be sure, many factors contributed to the disproportionate representation of racial and ethnic minorities throughout the federal death penalty process. Nevertheless, no one reading this report can help but be disturbed, troubled, by this disparity."

Marc Lacey & Raymond Bonner, *Reno Troubled by Death Penalty Statistics,* N.Y. Times, Sept. 13, 2000, at A17. During his confirmation hearings, Attorney General John Ashcroft also noted that evidence of racial disparity in the federal death penalty "troubled [him] deeply." *Bass,* 266 F.3d at 538 n.1.

"Troubled" and "disturbed" public officials, however, do not cure constitutional violations. Mr. Caro is entitled to know what is "behind the numbers" and that, in the absence of a convincing race-and region-neutral explanation for the Department of Justice's capital-charging practices, his death-sentence must be reversed. Mr. Caro seeks a hearing on this issue.

**CLAIM THIRTEEN: MR. CARO'S DEATH SENTENCE IS CATEGORICALLY CRUEL AND UNUSUAL PUNISHMENT IN VIOLATION OF THE EIGHTH AMENDMENT.**

Mr. Caro concedes that the United States Supreme Court has held that "the death penalty is not a form of punishment that may never be imposed, regardless of the circumstances of the offense, regardless of the character of the offender, and regardless of the procedure followed in reaching the decision to impose it." *Gregg v. Georgia,* 428

188

JA 1208

U.S. 153, 187 (1976).  The Court reached this conclusion because it believed that the death penalty could serve the "two principal social purposes" of "retribution and deterrence of capital crimes by prospective offenders." *Id.* at 183.  However, in the years since *Gregg*, a steady tide of empirical evidence has eroded these two justifications for the death penalty.  *See, e.g.*, John J. Donohue & Justin Wolfers, *Uses and Abuses of Empirical Evidence in the Death Penalty Debate*, 58 Stan. L. Rev. 791, 794 (2005) (reviewing statistical studies concerning death penalty and finding "not just 'reasonable doubt' about whether there is any deterrent effect of the death penalty, but profound uncertainty").

Mr. Caro submits that the death penalty serves neither the goal of retribution nor the goal of deterrence, and it should therefore be abolished in deference to the "evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 101 (1958).  Accordingly, Mr. Caro's death sentence is categorically cruel and unusual punishment in violation of the Eighth Amendment, and he is entitled to relief.

**CLAIM FOURTEEN: THE FEDERAL CAPITAL PUNISHMENT SYSTEM AT THE TIME OF MR. CARO'S TRIAL VIOLATED INTERNATIONAL LAW.**

The biased and disparate federal capital punishment system described *supra* in Claim Twelve offended not only the United States Constitution but international law as well.    Under both the Convention on the Elimination of All Forms of Racial Discrimination ("CERD"), *adopted* Dec. 21, 1965, 660 U.N.T.S. 195, and the International Covenant on Civil and Political Rights ("ICCPR"), *adopted* Dec. 16, 1966, 999 U.N.T.S. 171, statistical evidence of racial disparity is enough to warrant—and

JA 1209

require—corrective action by the United States.

The CERD, which the United States signed in 1966 and ratified in 1994, requires that signatory states "review governmental, national and local policies, and . . . amend, rescind or nullify any laws and regulations *which have the effect of creating or perpetuating racial discrimination* wherever it exists," CERD, pt. 1, art. 2, § 1(c), 660 U.N.T.S. 195 (emphasis added), and expressly extends that requirement to the administration of criminal justice systems, *id.* pt. 1, art. 5, § a. Further, the CERD defines "racial discrimination" as any distinction based on race or ethnicity that has "the purpose or *effect* of nullifying or impairing the recognition, enjoyment or exercise, on an equal footing, of human rights and fundamental freedoms." *Id.* pt. 1, art. 1, § 1 (emphasis added). In its ratification resolution, the Senate declared that the CERD "shall be implemented by the Federal Government to the extent that it exercises jurisdiction over the matters covered therein. . . . ." 140 Cong. Rec. S7634–02 (daily ed. June 24, 1994). Thus, under the plain language of the CERD, the United States must take action to correct governmental policies that have a discriminatory effect, regardless of whether they also have a discriminatory purpose.

The ICCPR, which the United States signed in 1977 and ratified in 1992, *see* 138 Cong. Rec. S4781 (daily ed. Apr. 2, 1992), specifically addresses the administration of capital punishment. It provides: "Every human being has the inherent right to life. This right shall be protected by law. No one shall be arbitrarily deprived of his life." ICCPR, pt. 3, art. 6, § 1, 999 U.N.T.S. 171. The United States ratified the ICCPR subject to a reservation on Article 6 allowing for the imposition of capital punishment, but the

190

reservation does not apply to the arbitrary deprivation clause. Because the available data reveal that the federal death penalty system has operated in an arbitrary manner, the ICCPR also provides a strong basis for vacating Mr. Caro's death sentence. *See United States v. Duarte-Acero*, 208 F.3d 1282, 1284–85 (11th Cir. 2000) (explaining that the ICCPR is "coexistent with the United States Constitution and federal statutes, the supreme law of the land").

Article 2 of the ICCPR speaks clearly of the role of domestic courts in protecting individual rights under the covenant:

> 3. Each State Party to the present Covenant undertakes:
>
> (a) To ensure that any person whose rights or freedoms as herein recognized are violated shall have an effective remedy . . .
>
> (b) To ensure that any person claiming such a remedy shall have his right thereto determined by competent judicial . . . authorities . . .
>
> (c) To ensure that the competent authorities shall enforce such remedies when granted.

ICCPR, pt. 2, art 2, § 3(a)–(c), 999 U.N.T.S. 171. Because Mr. Caro's death sentence is the product of a federal capital punishment system that stood in violation of international law at the time of his trial, this Court should grant relief.

**CLAIM FIFTEEN: THE PRECLUSION OF "PLAIN-ERROR" REVIEW BY THE FEDERAL DEATH-PENALTY ACT RENDERS THE STATUTE UNCONSTITUTIONAL.**

Meaningful appellate review is an indispensable component of a constitutional death penalty scheme. Such review provides a necessary check on the arbitrary and

JA 1211

capricious infliction of the death penalty. *Parker v. Dugger*, 498 U.S. 308, 321 (1991) ("We have emphasized repeatedly the crucial role of meaningful appellate review in ensuring that the death penalty is not imposed arbitrarily or irrationally"); *see also Clemons v. Mississippi*, 494 U.S. 738, 749 (1990) ("[T]his Court has repeatedly emphasized that meaningful appellate review of death sentences promotes reliability and consistency.").

In enacting the Federal Death-Penalty Act ("FDPA"), however, Congress actually curtailed the scope of appellate review and, thereby, rendered the statute unconstitutional. The relevant section reads as follows:

(b)     Review.  The court of appeals shall review the entire record on the case, including—

    (1)     the evidence submitted during the trial;

    (2)     the information submitted during the sentencing hearing;

    (3)     the procedures employed in the sentencing hearing; and

    (4)     the special findings required under section 3593(d).

(c)     Decision and disposition.

    (1)     The court of appeals shall address all substantive and procedural issues raised on the appeal of a sentence of death, and shall consider whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor and whether the evidence supports an aggravating factor required to be considered under section 3592.

    (2)     Whenever the court of appeals finds that—

        (A)     The sentence of death was imposed under the influence passion, prejudice, or any other arbitrary factor;

> (B)    the admissible evidence and information adduced does not
>        support the special finding of the existence of the required
>        aggravating factor; or
>
> (C)    the proceedings involved any other legal error requiring
>        reversal of the sentence *that was properly preserved for
>        appeal under the rules of criminal procedure*, the court shall
>        remand the case for reconsideration under section 3593 or
>        imposition of a sentence other than death.

18 U.S.C. § 3595 (emphasis added).

The doctrine of plain error is available in all criminal appeals, and gives an appellate court the option of noticing obvious errors that were not brought to the attention of the district court. *See, e.g., United States v. Frady*, 456 U.S. 152 (1982); *Silber v. United States*, 370 U.S. 717 (1962). Nevertheless, by its plain language, the above-quoted provision precludes plain-error analysis by a court of appeals reviewing a capital case.

By failing to allow for plain-error review, the FDPA ignores the line of Supreme Court cases requiring meaningful appellate review as a pre-condition to a finding that a death-penalty scheme is constitutional. It also ignores the fact that the Supreme Court has repeatedly recognized that "death is different" and, in recognition of that difference, has required heightened standards of reliability to justify death verdicts.

A statute that requires an appellate court to affirm a death verdict that was returned as a result of plain error in the proceedings below is antithetical to tenets of heightened reliability, meaningful appellate review, and equal protection. The FDPA is therefore unconstitutional.

193

JA 1213

## GROUND FOR RELIEF: CUMULATIVE ERROR

**CLAIM SIXTEEN: MR. CARO'S CONVICTION, AND SENTENCE MUST BE VACATED DUE TO THE CUMULATIVE PREJUDICIAL EFFECT OF THE ERRORS IN THIS CASE.**

Mr. Caro's convictions and sentence are unlawfully and unconstitutionally imposed, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, because the cumulative effect of the errors involved in Mr. Caro's guilt/innocence and penalty phases violated his rights to a fair trial, trial by jury, due process, effective assistance of counsel, presentation of a defense, a reliable determination of guilt and penalty, and fundamental fairness. *Taylor v. Kentucky*, 436 U.S. 478, 487 & n.15 (1978); *Chambers v. Mississippi*, 410 U.S. 284, 302-03 (1973). "Pursuant to the cumulative error doctrine, the cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error." *United States v. Basham*, 561 F.3d 302, 330 (4th Cir. 2009) (internal quotations and brackets omitted).

Mr. Caro incorporates by specific reference all facts, allegations, and arguments made elsewhere in this motion and the exhibits thereto. In addition, Mr. Caro re-urges all objections, arguments, and claims of error made at trial and during direct appeal proceedings, and incorporates by reference herein those prior objections, arguments and claims of error.

The cumulative effect of these errors resulted in an abridgment of the fundamental fairness of the trial process during all phases of the trial process. Each of these errors deprived Mr. Caro of important constitutional rights, including but not limited to his right

194

JA 1214

to due process, equal protection, effective counsel, to present a defense and confront the witnesses against him, an impartial jury, and to be free of cruel and unusual punishment.

If none of the claims presented in this motion individually justifies reversal, when considered cumulatively, these errors denied Mr. Caro his constitutional rights. These constitutional violations warrant the granting of this motion without any determination of whether these violations substantially affected or influenced the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619 (1993), 638 n.9. Furthermore, these constitutional violations so infected the integrity of the proceedings that the errors cannot be deemed harmless. In any event, these violations of Mr. Caro's rights had a substantial and injurious effect or influence on the penalty judgment, rendering it fundamentally unfair.

### PRAYER FOR RELIEF

WHEREFORE, Defendant Carlos David Caro asks that this Court provide the following relief:

1.  That Defendant be permitted to file a Memorandum of Law in support of this motion in accordance with a briefing schedule established by this Court;

2.  Require Respondent to file an answer to the motion in the form prescribed by Section 2255 Rule 5, identifying all proceedings conducted in Defendant's case, including any which have not been recorded or transcribed, and specifically admitting or denying the factual allegations set forth above;

3.  Permit Defendant to file a reply to Respondent's answer, responding to any affirmative defenses raised by the answer;

4.  Permit Defendant to utilize the processes of discovery set forth in Federal

195

JA 1215

Rules of Civil Procedure 26-37, to the extent necessary to fully develop and identify the facts supporting his motion, and any defenses thereto raised by Respondent's answer;

5.    Permit Defendant to amend this motion to include any additional claims or allegations not presently known to him or his counsel, which are identified or uncovered in the course of discovery, investigation, and litigation of this motion, and, to allow the amendment to relate back to the date of the filing of this motion;

6.    Conduct an evidentiary hearing to resolve any factual disputes raised by Respondent's answer to this motion, or by Defendant's response to any affirmative defenses raised by Respondent.  Because Defendant has alleged facts which, if true, entitle him to relief, he is also entitled to a full evidentiary hearing to establish the facts he alleges;

7.    Permit oral argument as appropriate and required;

8.    Vacate Defendant's conviction and sentence and order that appropriate retrial and/or sentencing hearings be conducted; and

9.    Grant such further and additional relief as may be just.


## CERTIFICATION

Pursuant to Rule 2(b)(5) of the Rules Governing Section 2255 Proceedings for the United States District Courts, undersigned counsel declare under penalty of perjury that they are attorneys appointed by the United States District Court for the Western District of Virginia to represent Carlos David Caro in his proceedings pursuant to 28 U.S.C. § 2255.  As such, undersigned counsel are authorized to file this motion pursuant to 28

196

JA 1216

U.S.C. § 2255 on Mr. Caro's behalf. This motion is signed by undersigned counsel under penalty of perjury.

Respectfully submitted this 8th day of January, 2013.

s/Karen M. Wilkinson_____
Jon M. Sands
Federal Public Defender
Karen M. Wilkinson (Arizona Bar No. 014095)
Robin C. Konrad (Alabama Bar No. 2194-N76K)
Office of the Federal Public Defender
District of Arizona
850 West Adams Street, Suite 201
Phoenix, Arizona  85007
karen_wilkinson@fd.org
robin_konrad@fd.org
Telephone:  602-382-2816
Facsimile:  602-889-3960

Fay F. Spence, Esquire (Virginia State Bar No. 27906)
Federal Public Defender's Office
210 First Street, SW, Suite 400
Roanoke, Virginia 24011
fay_spence@fd.org
Telephone:  540-777-0880
Facsimile:  540-777-0890

Brian J. Beck (Virginia Bar No. 78049)
Federal Public Defender's Office
201 Abingdon Place
Abingdon, Virginia 24211
brian_beck@fd.org
Telephone:  276- 619-6080

Attorneys for Defendant
Carlos David Caro

197

JA 1217

## CERTIFICATE OF SERVICE

I hereby certify that on January 8th, 2013, I filed the foregoing Defendant's Motion for Collateral Relief Pursuant to 28 U.S.C. § 2255 Under Seal with the Clerk of the Court by email, and also emailed a copy to the party listed below:

Anthony Giorno, AUSA.
Email: anthony.giorno@usdoj.gov

s/Stephanie Bame_____
Legal Assistant
Capital Habeas Unit

198

JA 1218

# EXHIBIT 1

# EXHIBIT 1

JA 1219

## DECLARATION OF MARK A. BEZY

MARK A. BEZY, declare as follows:

1.      I am the principal/owner of Mark A. Bezy and Associates, LLC, a consulting firm specializing in corrections management; conditions of confinement; correctional facility activation, operation, and management; inmate transportation; correctional work programs; prison gangs and security threat groups; and prison and inmate culture.

2.      I worked for the United States Bureau of Prisons ("BOP") for 28 years, from 1978 to 2006, starting my career as a Correctional Officer and working my way up. During that time, I held a number of positions, including (a) Warden of the Federal Correctional Complex ("FCC") at Terre Haute, Indiana from August 2004 through October 2006; (b) Warden of the FCC in Elkton, Ohio from December 2002 through August 2004; (c) Associate Warden at the United States Penitentiary ("USP") in Leavenworth, Kansas, from July 1999 through November 2002; (d) Correctional Services Administrator for the North Central Regional Office of the BOP in Kansas City, Kansas from May 1995 through July 1999; and (e) Captain at the maximum security USP in Marion, Illinois from February, 1992 through May 1995. Between 1986 and 1987, I was a representative on the BOP California Prison Gang Task Force.

3.      At the time I served as a captain at USP-Marion, that facility was the highest-security federal correctional facility in the country. It housed the majority of what were considered the most incorrigible and difficult inmates in the BOP, and did so under highly secure and restrictive conditions of confinement. At USP-Marion, I was a member of the review and classification committee for the movement of high-security inmates through facility's step-down process.

4.      While the hope and goal of the BOP was that inmates sent to the general population at USP-Marion would modify their behavior and cycle out of USP-Marion to a mainstream high-security facility after three years, there were many inmates who were housed at USP-Marion for much longer than three years and were unable to cycle out of the program. The BOP recognized that some inmates would likely require highly restrictive security measures during the entire term of their incarceration. These inmates, such as T.D. Bingham, Barry Mills, and Jeff Fort, were later transferred directly to the USP Administrative Maximum Facility ("ADX") in Florence, Colorado when that facility opened in 1994, and they remain housed at ADX today, over 18 years later.

5.      From 1995 to 1999, I served as Correctional Services Administrator for the BOP North Central Regional Office in Kansas City, Kansas. In that management position, I created and implemented the tactical inmate movement plan for "Flo-Max II," the final movement of high security offenders from USP-Marion to the ADX. In this position, I administered the disciplinary transfer program and was responsible for evaluating and classifying all disciplinary transfers and close supervision and protective custody cases - approximately 4,000 cases in all. I also oversaw the initial review process for inmates submitted for placement in the Central Unit and subsequent due process hearings.

1

JA 1220

6.      As Associate Warden at the USP in Leavenworth, Kansas, a prison that housed up to 2,500 inmates, I directed the "KC Model Program," which effectively managed disruptive and violent inmates within the general population through identification, classification, and housing changes. The KC Model Program has since been successfully implemented in other penitentiaries.

7.      As Warden of FCC-Terre Haute, I managed programs and services for the various facilities at Terre Haute, including a 1,500 adult male high-security USP, a 1,200 adult male medium-security FCI, a 450 minimum-security adult male Federal Prison Camp, and death row, which housed 37 adult offenders under death sentences. I oversaw 675 personnel, managed an annual budget of $64 million, and implemented a number of security enhancements that have now been adopted throughout the BOP. Moreover, I managed several emergency situations that occurred while I was Warden, including a homicide, and numerous inmate assaults and emergency lockdowns. As Warden, I received top-secret clearance to review classified documents relating to particular inmates.

8.      Between 1987 and 2006, I chaired and was a member of a number of "After Action Reviews" fact-finding committees to examine the causal factors leading up to serious prison incidents, homicides and disturbances.

9.      I received a number of awards during my service with the BOP, including being selected for the Senior Executive Services, a merit-based special compensation program; being named Associate Warden of the Year for the North Central Region in 2001; and receiving the Director's Award in 1997 for my contributions to security technology. As that honor demonstrates, I am very familiar with the security capacity of BOP facilities and have in fact pioneered the use of some of the security protocols and equipment that the BOP employs to this day.

10.      I retired from the BOP in October 2006. I have been certified as an expert in BOP policies and procedures, inmate culture, and/or prison management by the United States District Courts for the Eastern District of Missouri, Eastern District of Pennsylvania, Eastern District of Missouri, Northern District of Georgia, Eastern District of Texas, and the Western District of North Carolina.

11.      In the instant case, I have been retained by counsel for Carlos David Caro and have been asked to provide my opinion, based on my thirty-year history in corrections, regarding the following matters:

- The conduct of the BOP in placing Mr. Sandoval in the cell with Mr. Caro;

- The impact of prison and gang culture in this case;

- Conditions at the BOP, including the ADX-Florence, that are designed to neutralize inmates deemed to be a threat to institutional security and/or to alleviate the threat to the safety and well-being of other individuals, whether inside or outside prison walls; and

- BOP documentation of its investigation into the death of Mr. Sandoval.

2

JA 1221

12.    I have reviewed the following materials: Portions of the trial record, including the opening statements and closing arguments and the testimony of Gregory Hershberger, John Gordon, John Gilley, Brian Laster, James Aiken and Mark Cunningham, Ph.D.; BOP files for Mr. Caro and Mr. Sandoval; Mr. Caro's presentence reports; miscellaneous government documents concerning inmate on inmate assaults at FCI-Lee on July 15, 2003 (Case No. 03-cr-10110-JPJ) and on August 29, 2003 (Case No. 03-cr-10115-JPJ), the direct appeal opinion affirming Mr. Caro's convictions and sentences; and various BOP regulations and program statements.

### The Placement of Mr. Sandoval in Mr. Caro's Cell.

13.    With regard to this case involving the death of Mr. Sandoval, I was surprised for a number of reasons that the prison staff placed another inmate in Mr. Caro's cell on December 16, 2003. BOP records reveal that prior to the Sandoval incident there was some sort of tension at USP-Lee among the members of a prison gang known as the Texas Syndicate and that the BOP was aware of the tension. There had been two inmate-on-inmate assaults just a few months earlier in July 2003 and in August 2003. Both the victims and perpetrators of these offenses were members, or claimed members, of the Texas Syndicate. In August 2003, Mr. Caro and another inmate were videotaped assaulting the victim of the second incident, Ricardo Benavidez. In fact, the government knew that Mr. Benavidez was the leader of the Texas Syndicate at USP-Lee at the time of his assault. In light of Mr. Benavidez's status as a leader, the BOP should have anticipated the possibility that another inmate would attempt to assault or kill Mr. Caro in retribution for the Benavidez assault.

14.    The BOP also had designated the Texas Syndicate as a dangerous "Disruptive Group." The fact that the tension was occurring within a Disruptive Group should also have caused the BOP to take extra precautions. Until the BOP concluded its investigation and determined the source of the conflict, sound correctional practices dictated that Mr. Caro should have been single celled. Before placing a cellmate with Mr. Caro, the Special Housing Unit ("SHU") prison officers should have consulted with the Special Investigative Services ("SIS") (who investigated gang activities) at USP-Lee before placing another inmate in Mr. Caro's cell, both for Mr. Caro's own protection and the protection of the other inmate. The SIS Officer or Lieutenant also should have pro-actively directed the SHU officers to single cell Mr. Caro (such as they did after the death of Mr. Sandoval).

15.    The fact that sound correctional practices dictated that Mr. Caro be single celled after the Benavidez assault is borne out by the BOP's own SIS investigative report of the assault, which recommended that Mr. Caro be kept separate from other Texas Syndicate members. While this was an appropriate recommendation for these circumstances, the recommendation should have been immediately implemented after the Benavidez assault, not 14 months after the assault when the report finally issued.

16.    I also was struck by the fact that the SHU officers did not document or communicate Mr. Caro's refusal to take a cellmate to the next shift. The officers should have written Mr. Caro an Incident Report for refusing to accept a cellmate, which is in violation of Code 306—refusing to work or accept a program assignment, or Code 307—refusing an order of any staff member. The officers also should have documented Mr. Caro's refusal in the SHU log book. The failure to document this refusal was in violation of standard operating procedures and

3

JA 1222

sound correctional practices. When an inmate refuses a cellmate, it is vital for the BOP to document the incident and discover the reason for the refusal. In light of the Benavidez assault and the likelihood that Mr. Caro did not know how all of the Texas Syndicate members were reacting to the assault, his refusal was prudent.

17.     I also was struck by Mr. Sandoval's request to be placed with Mr. Caro after Mr. Caro had just refused a cellmate. In light of the prison culture, which demands respect among inmates, this subsequent request by Mr. Sandoval suggests to me that Mr. Sandoval had a strong and specific reason to want to be placed in Mr. Caro's cell. This second request after Mr. Caro's initial refusal could be interpreted through the eyes of prison culture as an aggressive challenge to Mr. Caro.

18.     The fact that Mr. Sandoval was armed before he went into the SHU should have been another red-flag to the prison that something was going on that needed to be addressed. The possession of weapons by inmates is a sign that there is some sort of tension within the prison. Inmates want to do peaceful time. If inmates are "arming up," the prison needs to find out the source of the tension and address it.

### Prison and Gang Culture.

19.     After Mr. Sandoval's death, Mr. Caro made numerous remarks that appear callous and cold-hearted. It is necessary to view these remarks within the context of the environment – prison. In prison, it is vital for inmates to maintain an image of strength. They need to create a bad and fearful image so other inmates won't prey on them. If they do not do this, they will become a victim. An inmate's reputation is based not only on his actions, but on what he tells others about those actions. To have shown remorse after killing Mr. Sandoval would have been viewed by other inmates as a sign of weakness.

20.     At trial, Officer Gordon testified about a gang fight at FCI-Oakdale on July 11, 2002 between members of the Texas Syndicate and members of another gang known as Paisa/Border Brothers. Mr. Gordon, who was an SIS Lieutenant at the time, stated that he had concluded that Mr. Caro was the leader of the Texas Syndicate at FCI-Oakdale at the time of this fight. This conclusion was based on the fact that four-to-five weeks before the fight, Mr. Gordon had reached out to leadership of the prison gangs to try to open up a dialogue between the prison and the gangs. In response to this reaching out, Mr. Caro showed up for a meeting. During this meeting, Mr. Caro gave Mr. Gordon a typical and very general inmate response, i.e., that the Texas Syndicate was going to do what it had to do and Mr. Gordon had to do what he had to do. Based on this meeting, Mr. Gordon concluded that Mr. Caro was the leader of the Texas Syndicate. Mr. Gordon also testified that after the assault, Mr. Caro stated that the Texas Syndicate was responsible for the assault, that another inmate who was a member of the Azteca gang was not involved, and that his brothers follow orders. Finally, Mr. Gordon deduced that Mr. Caro must have ordered the gang assault because he was the leader of the Texas Syndicate and the Texas Syndicate does not do anything without following orders.

21.     None of these facts, either taken alone or together, support the conclusion that Mr. Caro was a leader of the Texas Syndicate at FCI-Oakdale. In fact, they lead me to the opposite conclusion—that Mr. Caro was not the leader of the Texas Syndicate at FCI-Oakdale. There is an inherent level of distrust between prison gangs and prison officials that must be overcome

JA 1223

before any meaningful dialogue can occur between a gang and a prison. This was the first meeting between the Texas Syndicate and the prison. Under these circumstances, where there has been no prior dialogue or the establishment of mutual respect, it is highly unlikely that the leader of the Texas Syndicate, a "Disruptive Group," would blindly walk into a one-on-one meeting with Mr. Gordon. It is much more likely that the leader would have sent someone else in his place to "test the waters."

22.    Mr. Gordon also testified that he told Mr. Caro that he needed to know "who the membership was in the Texas Syndicate." As part of SIS Office, Mr. Gordon should have known that this was an extremely inappropriate question to pose to any gang member. It would be like asking the member to "give up" his brothers and cooperate with the prison. This question likely not only did not open up communications or dialogue, but likely shut the door on any future meaningful communications and hindered the development of any mutual trust.

23.    None of Mr. Gordon's testimony leads me to conclude that Mr. Caro was the leader of the Texas Syndicate at FCI-Oakdale on July 11, 2002, or that he ordered the assault.

### The Ability of the Bureau of Prisons to Neutralize Inmates Deemed to be a Threat.

24.    The BOP's primary mission is to safely and securely house individuals accused and/or convicted of federal criminal offenses, ranging from nonviolent drug and fraud-related offenses to more serious offenses, such as treason, acts of terrorism, racketeering, and murder. The approximately 200,000 plus inmates in federal custody are classified according to their criminal history; history and circumstances of incarceration; the circumstances of the current offense(s); affiliations with gangs, militant organizations, or other security threat groups; medical and mental health needs; and length of sentence(s) for the current offenses. The stated purpose of the BOP's classification system is to "place each inmate in the most appropriate security level institution that also meets their program needs and is consistent with the Bureau's mission to protect society." BOP Program Statement No. 5100.08 at 1 (9/12/2006, Inmate Security and Custody Classification).

25.    As it did during my entire tenure, the BOP retains a great deal of discretion to fashion conditions of confinement and classify inmates to meet its penological objectives and mission, including to ensure the safety of staff and inmates and the security of the prison and the public. The BOP's discretion is not absolute—it must comply with the United States Constitution, as well as those mandates handed down by Congress, the courts, and the Department of Justice. In keeping with these principles, however, the BOP has many tools it may use to deal with inmates presenting both commonplace and extraordinary threats to the security of prison staff, other inmates, and those in society at large.

26.    Based on my experience at the BOP, including the orders I gave and the conditions of confinement I observed, administered, and imposed, there is no doubt that the BOP had, at all times, the authority and ability to house inmates in severely restrictive conditions of confinement necessary to ensure security and/or to reduce or eliminate an inmate's ability to freely communicate with anyone outside the prison, whether by phone, in person, or by mail. These strict conditions can be, and were at the time of Mr. Caro's trial in 2007, imposed for as long as the BOP deemed necessary to ensure the security and safety of prison staff, other inmates, and the public.

JA 1224

27. As described further below, in my professional opinion, the ADX is a facility that maintains security protocols capable of neutralizing the threats of future danger that the government alleged warranted Mr. Caro's death sentence. Indeed, given the circumstance of his most recent conviction, his history and his status within a Disruptive Group, Carlos Caro was eligible for ADX placement if deemed necessary and appropriate by the BOP.

28. I strongly disagree with the government's witness testimony and argument at trial that Mr. Caro would necessarily have been housed at the ADX for only three-to-five years and then sent to another facility. As I stated previously, the main goal of the BOP is to safely and securely house inmates. If this goal required that inmates stay indefinitely at the ADX, then the inmate would not be moved to another BOP facility. I am aware of numerous inmates who, over the years, have been subject to special security measures due to the special challenges that they present, and they are still housed at the ADX. Inmates such as T.D. Bingham, Barry Mills, Thomas Silverstein, Eric Rudolph, Ramzi Yousef, Anthony Ayeni Jones, Terry Nichols, and Theodore Kaczynski have been housed under very strict conditions of confinement due to security concerns, and as of December 31, 2012, continue to be housed at the ADX. To my knowledge, the strict conditions of confinement detailed above have very successfully alleviated the risk that these inmates might pose a future danger to individuals inside or outside the prisons in which they are housed.

29. The proposition advanced by the government at Mr. Caro's trial that an inmate receives a great deal of freedom if not incarcerated at the ADX is, at best, a serious misstatement and, at worst, a gross distortion and mischaracterization of the BOP's role, function, authorities, and abilities.

30. Strict conditions of confinement are not solely the province of the ADX and are nothing unusual or novel in the BOP. Every prison in the federal system has the ability, policies, and procedures to guard against future acts of violence by prisoners confined in BOP prisons, including, as discussed further below, imposing restrictions on contact with people on the outside by telephone and mail. The BOP maintains specialty units at various prisons that are designed to deal with problematic inmates. For example, the Special Management Unit (SMU) at the United States Penitentiary in Lewisburg, Pennsylvania, as well as six other units, has controls similar to those found at the ADX and is designed to house inmates who have had difficulty abiding by the rules and regulations of other institutions, who participated in or had a leadership role in a geographical or gang related group, or who present unique security and management concerns.

31. Moreover, all high-security federal prisons contain a SHU where inmates can be placed when they have violated (or are suspected of violating) prison rules. A SHU is, in essence, a prison within a prison where security and conditions of confinement are stricter than those imposed on the general population within the high-security facility generally. Each BOP warden has the authority to place any inmate into a SHU if the inmate is under investigation for a serious violation of prison rules. Inmates can be housed in a SHU for a variety of reasons, including concerns about security and/or an inmate's future dangerousness. Inmates may be placed in the SHU for extended periods of time, with the only limitation being that facility administrators must periodically review placement to determine continued appropriateness.

32. Additionally, USP-Terre Haute and other BOP facilities, have Communications Management Units ("CMU") that isolate inmates away from the general population and are

6

JA 1225

designed to monitor any and all inmate communications. USP-Terre Haute also maintains the Special Confinement Unit ("SCU"). Although the SCU is home to the federal government's death row, the BOP may also place non-condemned inmates who pose unique security risks in that unit if deemed necessary and appropriate given the circumstances. Indeed, as FCC-Terre Haute Warden, I housed non-condemned individuals in the SCU who had been involved in an incident at another prison. For example, Hakeem Shaheed and Tyrone Davis were involved in a major disturbance at USP-Marion in 2005 and were immediately transferred to USP-Terre Haute, where I was Warden at the time. My superiors at the BOP instructed me to put Shaheed and Davis into the SCU indefinitely so they could be closely monitored. I followed these instructions, and these two men were not involved in any incidents, violent or otherwise, while they were in the SCU.

33.    Special Administrative Measures ("SAMs") also allow the BOP to construct individualized conditions of confinement "that are reasonably necessary to protect persons against the risk of death or serious bodily injury" and "may include housing the inmate in administrative detention and /or limiting certain privileges, including, but not limited to, correspondence, visiting, . . . and use of the telephone, as is reasonably necessary to protect persons against the risk of acts of violence or terrorism." See 28 CFR §501.3(a). Each SAMs order is totally unique and is nearly limitless in terms of the conditions of confinement available to be imposed by BOP personnel (subject to the constraints of the United States Constitution, of course). Although SAMs orders are required to be periodically reviewed, they may be extended for as long as conditions persist (i.e., indefinitely). A number of inmates have been held under SAMs orders for more than a dozen years. SAM's orders were available to the BOP and the Department of Justice at the time of Mr. Caro's trial in 2007.

34.    At trial, Mr. Hershberger admitted that the BOP had housed Thomas Silverstein in a very high security setting, but stated that this was a "very special case." While each inmate presents a unique circumstance that warrants unique conditions of confinement, highly restrictive and secure conditions of confinement were, and are to my knowledge, routinely imposed on other high-risk inmates by the BOP for as long as necessary to ensure the security and safety of BOP staff, other inmates, and the public.

35.    Federal prison inmates do not have unlimited rights to visitation, correspondence, use of telephones, or contact with other inmates. As a matter of policy, the BOP grants access to these privileges consistent with the requirement of sound correctional management. These privileges can be revoked if they are abused or are deemed to constitute a threat to the security of the institution or the safety of individuals, whether inside or outside the prison. There is no limit on the number of consecutive year-long revocations that can be imposed on a prisoner if it is deemed to be warranted.

36.    The BOP can, does, and did at the time of Mr. Caro's trial in 2007, take away inmates' ability to have visitors, to have mail privileges, and to make or receive phone calls whenever the BOP deems it necessary to do so for the security of prison staff, other inmates, or the public. See, e.g., BOP Program Statement No. P5264.08 at 14 (2/11/2008, Inmate Telephone Restrictions) ("Inmates may be subjected to telephone restrictions imposed by the Warden to protect the safety, security and good order of the institution."); BOP Program Statement No. 5264.14 at 10 (4/05/2011, Correspondence) ("The Warden may place an inmate on restricted general correspondence based on misconduct or as a matter of classification.); BOP Program

JA 1226

Statement No. 5267.08 at 1 (5/11/2006, Visiting Regulations) ("Warden may restrict inmate visiting when necessary to ensure the security and good order of the institution.").

37.     As a Captain, Associate Warden, and Warden at numerous federal correctional facilities, I recall numerous instances where prison management (myself included) completely suspended or otherwise severely restricted telephone privileges because of concern that an inmate was abusing the privilege. We were successful in curbing inmate abuse of telephones in the overwhelming majority of cases where the issue arose through the use of targeted and contemporaneous monitoring and severe restrictions on numbers of calls and to whom inmate calls could be made.

38.     The same can be said for inmate abuse of correspondence and visitation privileges. As a senior manager or head of numerous correctional facilities, I was involved in countless decisions to terminate or closely monitor the visitation of, and correspondence to and from, specific individuals where there was a concern about institutional or individual safety. Actions taken to deter or detect unlawful conduct included, among other things, real-time monitoring and recording of visitation, review of correspondence, and the interception and translation of letters written in foreign languages or code. For example, at USP-Marion, Yu Kikumura, a member of the terrorist organization Japanese Red Army, had all incoming and outgoing mail inspected and translated. It was not uncommon for prison officials to inspect every piece of incoming and outgoing mail pertaining to a targeted inmate. John Gotti and Luis Felipe are examples of inmates who also received this sort of treatment.

39.     Given the facts underlying Mr. Caro's convictions, intensive monitoring of and restrictions on his communications, whether they be in person or by telephone or mail, were available to the BOP in 2007, and remain available today.

### BOP Documentation of its Investigation of the Death of Mr. Sandoval.

40.     After an incident of this severity, the BOP should have created a roster of and interviewed all inmates housed on Mr. Caro's range at the time of the incident. These interviews should have been conducted as soon as possible after Mr. Sandoval's death to determine what the inmates saw or knew about the incident. These interviews are referred to as "Mass Interviews."

41.     Normally, after a suspected homicide, the BOP conducts an extensive review of the incident to determine the causes and to make thorough recommendations for preventing the recurrence of such incidents in the future. It is sound correctional policy after an incident of this nature to determine exactly what happened and why. The natural question is, "will there be more incidents?" These reviews and investigations begin at the local level (the prison) with an investigation that results in a document referred to as the "SIS Report." The SIS Report is an investigative summary of the incident, and includes an analysis of the circumstances and causes of the incident along with appropriate recommendations. The SIS Report is policy driven and is required by national BOP policy.

42.     It also is common for the BOP to conduct a regional investigation, which results in an "After-Action Report." Typically, such reviews are initiated by the Regional Director and conducted by a team of individuals from outside the institution in order to provide greater

JA 1227

objectivity and integrity to the review. It is normal protocol for these teams to look into causal factors for the incident and make recommendations for institutional corrective measures.

43.     I understand that I have been provided all of the BOP reports concerning the death of Mr. Sandoval that were provided by the government to defense trial counsel. I see no reference to any such investigation effort, which I find to be remarkable.


I declare under penalty of perjury that the foregoing is true and correct.


_____1/1/2013_____                            _____
Date                                          Mark A. Bezy

9

JA 1228

# EXHIBIT 4

# EXHIBIT 4

JA 1229

## DECLARATION OF LARRY A. HAMMOND

I, Larry A. Hammond, declare as follows:

1.      I am a member of the law firm of Osborn Maledon, P.A.  I am a member of the Bars of the States of Arizona (1975) and California (1971; inactive).  I am a graduate of the University of Texas School of Law (1970).

2.      I was asked to review materials in connection with the post-conviction proceeding in *United States v. Carlos Caro*, Case No.06-cr-00001-JPJ (W.D.VA.), and provide this Declaration.

3.      I was retained to serve as an expert on issues relating to the effective assistance of trial counsel in Mr. Caro's case.  I am being compensated at the rate of $300.00 per hour.  My current hourly rate for criminal defense-related work at Osborn Maledon is $550 per hour.  My background is briefly summarized below.  A copy of my CV is attached.

4.      After graduation, I served as a law clerk to the Honorable Carl McGowan on the United States Court of Appeals for the D.C. Circuit in 1970-71.  I then served as the last law clerk for Justice Hugo L. Black and the first law clerk for Justice Lewis F. Powell in 1971 through 1973.  In 1973 and 1974, I served as an Assistant Watergate Special Prosecutor.  In 1974, I began practicing in Arizona at the private law firm which was the predecessor of Osborn Maledon, the firm with which I am now affiliated.

5.      During the Administration of President Jimmy Carter, I served as First Deputy Assistant Attorney General in the Office of Legal Counsel (OLC) at the Department of Justice (1977-1980).

1

4633616v1

JA 1230

6.      Both as a Supreme Court law clerk and as a Deputy at OLC, I undertook responsibilities with respect to death penalty-related matters.

7.      In 1981, I rejoined my law firm, which is now known as Osborn Maledon in Phoenix, Arizona.  From 1981 to the present, I have been engaged in the practice of law primarily on the criminal defense side.  Throughout that time, my law firm has been engaged in death penalty work, including direct representation and policy-related work in that field.

8.      I have been a practicing lawyer for 42 years.  I have been engaged in civil litigation and criminal defense work continuously for the last 31 years.  I am a member of the American College of Trial Lawyers.

9.      From 1981 to the present, I have spent at least some portion of my time every year on capital cases.  The law firm of Osborn Maledon (and its predecessor firm) and I have been involved in capital litigation at every stage, including trial, sentencing, direct appeal, post-conviction review, federal habeas corpus, and clemency. I am one of the founders of this law firm and have been its senior criminal defense lawyer since its inception.  I have been personally involved in every capital case in which lawyers in this firm have been engaged.

10.     I have tried to verdict two Arizona capital cases and recently concluded a six-month involvement in a case in Yavapai County, Arizona, that began as a capital case but in which the prosecution elected to remove the death penalty as a possible penalty at the end of a one-month jury selection *voir dire*.

2

4633616v1

JA 1231

11.    I have also served as trial court counsel in eight federal death penalty cases, two in New Mexico, one in Nevada, four in the District of Arizona, and one in the District of Southern California. In each case, I was appointed as lead counsel pursuant to 18 U.S.C. § 3005's requirement that each defendant be assigned two attorneys, one of whom is deemed to be "learned in the law applicable to capital cases."

12.    Within the last 15 years, Osborn Maledon has consulted frequently with indigent defense offices in Arizona and in the mid-1990s I served as co-counsel in connection with two capital cases assigned to the Office of the Maricopa County Legal Defender (OLD), *State v. Pape* and *State v. Pilipow.* Both cases required extensive development of mitigation and mental condition information.

13.    Since 1998, I have served as lead counsel in the federal capital habeas corpus proceeding arising from an Arizona capital conviction (*Atwood v. Stewart,* Case No. CIV96-116 TUC JCC).

14.    In approximately 1989, I participated in the founding of the Arizona Capital Representation Project, and I have served as a Board member and/or officer of that organization since its inception. The Project has been involved, at one stage or another, in assisting virtually every member of Arizona's death row population. Congress defunded all capital resource centers in 1996, but since that time the Project's activities have continued and the Project remains a resource in all phases of capital litigation – particularly at the post-conviction stages.

15.    In approximately 1994, I was asked to serve as the Chair of the Arizona State Bar's Indigent Defense Task Force (IDTF), and I have continued in that position

3

4633616v1

JA 1232

since that time. The IDTF has been engaged in the development of rules promulgated by the Arizona Supreme Court dealing with capital defense funding and indigent defense funding generally. The IDTF has also been involved in developing and testifying in support of, or in opposition to, legislative proposals dealing with the funding of capital defense in Arizona. The Task Force participated in the development of legislation creating the standards for the appointment of counsel and for the funding of representation at the state post-conviction stage in capital cases. Among the most important undertakings of this Task Force has been the successful effort to secure an amendment to Rule 6.8 of the Arizona Rules of Criminal Procedure to require lawyers in capital cases to be guided by the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases.

16.    For several years I also served on the Arizona Supreme Court's Committee for the Appointment of Counsel to represent death row inmates at the State post-conviction relief stage. I participated in the drafting, review and ultimate establishment of the rules governing the appointment of death penalty counsel under A.R.S. §13-4041 and Rule 6.8 of the Arizona Rules of Criminal Procedure.

17.    I have co-authored several articles that have appeared in the *Arizona Attorney Magazine* relating to the funding of capital defense, and I have spoken and participated in numerous seminars and programs on this subject. As an adjunct member of the ASU Law School faculty, I team-taught the Death Penalty course in the spring of 2002. During the 2003-04 and 2006-07 school years, I team-taught a 4-hour credit seminar at ASU on the causes of wrongful convictions in Arizona and nationally.

4

JA 1233

Included in the curriculum was the study of ineffective assistance of defense counsel. In the fall of 2008, I taught a course entitled "Criminal Justice Failures and Reforms" at Elon University School of Law in Greensboro, North Carolina. A significant element of this course was the history of the law and practical realities of systems of indigent defense in capital cases.

18.    For the last 14 years, I have served as the Chair of The Justice Project of Arizona Attorneys for Criminal Justice, and in that capacity I have been involved in the evaluation of hundreds of cases alleging ineffective assistance of counsel at trial and sentencing in non-capital cases. The U.S. Supreme Court recently ruled in favor of one of the Justice Project's federal habeas corpus cases, *Martinez v. Ryan,* 132 S.Ct. 1309 (2012), in which the Court held that the ineffective assistance of counsel at the post-conviction stage could constitute good cause to excuse a procedural default.

19.    I testified in October 2002, as an expert witness on ineffective assistance of counsel in a post-conviction relief proceeding in *Lacy v. Arizona,* Case No. CR 1995-000713. In that case, the Maricopa County Superior Court reversed a homicide and assault conviction based in part on ineffective assistance of defense counsel. I have also testified and served as an expert in the capital post-conviction proceedings in *Arizona v. Kayer,* CR 1994-0694, in the Superior Court of Yavapai County, and as an expert in the post-conviction proceeding in *Arizona v. Murdaugh,* Case No. CR 1995-006472, in the Superior Court of Maricopa County. In December 2010, I testified as an expert witness in a post-conviction proceeding in Connecticut State Court, in *State v. Wargo,* 53 Conn.App. 747, 731 A.2d 768 (1999).

5

4633616v1

JA 1234

20.    At present, I am serving as a death penalty defense standard of care expert in four post-conviction cases; three in Arizona and one in Colorado.

21.    Most recently, I testified as a standard of care expert in the case of *United States v. Brandon Basham*, No. 02-cr-992-JFA (D.S.C.).

22.    My opinions are based in significant part on my experiences as "learned counsel" in federal death penalty cases. In addition to my direct involvement in federal death penalty cases, I have also conferred on numerous occasions with Federal Capital Defense Resource Counsel about the duties and responsibilities of capital trial counsel. In particular, I have conferred with federal defense counsel about the Department of Justice's process for the Government's consideration of whether to seek the death penalty.

23.    In the course of the federal death cases to which I have been appointed, and on other matters involving capital litigation, I have frequently been involved in the planning, development, and presentation of mitigating evidence, and the pre-trial investigation necessary in the course of developing mitigating evidence and preparing to address and respond to the Government's anticipated aggravating factors.

24.    Counsel for Mr. Caro have asked me to address questions with respect to the standard of care for attorneys representing a defendant in a federal death penalty case. I have undertaken a preliminary review of materials related to the representation of Mr. Caro at the pretrial, trial, and penalty phases, as well as direct appeal. Based on that review as informed by my experience and training summarized above, I offer the following opinions and observations.

6

4633616v1

JA 1235

25.     From the outset of the representation of a person charged with a federal death-eligible offense as was the case with Mr. Caro here, defense counsel must commence preparing for all phases of the case, including most importantly both the guilt/innocence and the penalty phases. Counsel must recognize that capital trials require a defense that is cognizant of the reality that the defendant is likely to be found guilty by the jury and that the same jury will then weigh aggravating and mitigating evidence. In this case, there was little doubt that Mr. Caro killed Mr. Sandoval. From opening statements through the conclusion of the penalty phases of the trial, the defense conceded Mr. Caro's responsibility for the killing of his cellmate.

26.     What was in doubt from the outset of the representation of Mr. Caro was both the level of his culpability for the death of Mr. Sandoval and whether that act warranted the penalty of death. The defense, from the outset, had to focus on attempting to save the client's life.

27.     Inescapably, much of the foundation for the presentation of both aggravating and mitigating evidence will have been laid during the presentation of evidence at the guilt/innocence stage. Given this reality, several key principles should have dominated the defense effort from the outset: (1) defense themes must be developed on an ongoing basis; (2) those themes must permeate all aspects of the defense work in the case; and (3) the investigation essential to the development of defense themes must commence immediately and inevitably will require time and resources.

28.     The simultaneous investigation of facts underlying the charged offense and the social history and mental health issues is always a challenging task for defense

4633616v1

JA 1236

counsel and their team members. It is inconceivable that an appropriate investigation into these issues could be accomplished in as little as six months. Many jurisdictions, including Arizona, routinely contemplate that pretrial preparation will require two years and in some cases more. There are many reasons why more time is required in capital cases than might be necessary in noncapital cases, but whatever the specific needs of any cases, it is virtually certain that competent investigation and preparation cannot be realized in a matter of months. As the American Bar Association's Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases underscored in 2003, a thorough investigation of the defendant's life history and mental development is both essential and time-consuming. In recognition of the critical role of mitigation development, the ABA published Supplementary Guidelines for the Mitigation Function of Defense Teams in Death Penalty cases in 2008. These Guidelines are a compilation of the standards and practices that guided death penalty defense counsel at the time of the appointment of the defense team in Mr. Caro's case. Taken together, and underscored by now hundreds of reported cases, the central importance of thorough mental health development is no longer doubted.

29. The standards of performance for defense counsel in death penalty cases are national standards. These standards are rooted in federal constitutional guarantees. Federal death penalty cases are most certainly subject to a single set of responsibilities for defense counsel. There is no basis for concluding that a defendant prosecuted in the Western District of Virginia is entitled to less time to prepare, less court-authorized financial assistance in order to prepare, or less effective defense counsel.

8

4633616v1

JA 1237

30.    The defense team in this case presented no mental health/mental defect testimony at either the guilt/innocence phase or at the penalty phase. The defense did secure the appointment of an expert to conduct a neuropsychological evaluation, but ultimately presented no mental health testimony. While this investigation may well properly involve a neuropsychological evaluation, there is no substitute for a thorough mental health evaluation, which may require—as it did here—a combination of experts and consultants.

31.    Since virtually every federal death penalty case requires court-authorized funding, an important part of the obligations of defense counsel is to begin from the outset to obtain adequate resources. This process often requires helping the court to understand why an extensive background investigation of the client's life history and mental state history is necessary. This is one of the reasons why it is indisputably true that case preparation in federal death penalty cases cannot be accomplished in six months or a year. Many federal courts are unfamiliar with the unique resource requirements of death penalty cases. The need for frequent, on the record, ex parte sealed proceedings may not be entirely evident to the Court. In my experience, federal judges are usually generally familiar with typical Criminal Justice Act (CJA) funding procedures, but these typical procedures are not predictive of the needs in capital cases. This is not intended as in any way a criticism of federal judges. Rather, it is a statement of an important element of the responsibility of defense counsel. Just as defense counsel needs specialized expertise, the court and those responsible for funding capital defense need to become educated on the requirements of capital defense.

9

4633616v1

JA 1238

32.    The representation of Mr. Caro may have presented challenges in terms of securing adequate time and resources.  The crime charged involved the presentation of only a few witnesses.  It may well have been the case that all parties—the prosecution, defense, and the court—began by assuming that the case could be brought to trial in a matter of months.  It was the duty of defense counsel, however, to work from the outset to assure that time was available, and resources secured, to undertake a thorough life history for Mr. Caro and to investigate fully his social and mental history.  The need for this full development is particularly important in a case in which it is apparent from the outset that the defendant grew up in a community and society where drugs and violence were a part of everyday life.

33.    Prison killing cases present special concerns.  First, as was the case here, the Government's case is likely to be based on the testimony of incarcerated informants.  Jailhouse or prison "snitch" testimony requires thorough investigation. It is now well established (thanks in significant part to the examination of DNA-based exonerations) that false and unreliable inmate testimony is one of the key causes of wrongful convictions.  Secondly, as was also the case here, there are often other inmate witnesses who the Government does not intend to call as witnesses, but who have relevant information that may contradict an informant's testimony.  Thirdly, it is important for defense counsel to thoroughly investigate whether any prison-related homicide is most properly understood as deserving of an instruction on lesser included offenses and/or on self-defense.  Many prison homicide cases—and this case is one good example—might well not be genuinely regarded as premeditated first-degree murders.  Defense counsel

10

4633616v1

JA 1239

must carefully consider whether the jury could come to appreciate that an inmate-on-inmate homicide involves unique mental health and other severe stresses warranting a finding of second-degree homicide, manslaughter, or in some cases an acquittal based on self-defense.

34.    This case presented a classic case of the difficulties that can be anticipated when the Government chooses to rely on inmate testimony to support an allegation of premeditated murder.  The only "eye-witness" offered in the case was Mr. Bullock, an inmate in the Special Housing Unit (SHU) who resided across the hallway from the cell in which Mr. Caro and Mr. Sandoval were housed.  Given that premeditation was the central issue at trial, Mr. Bullock's various descriptions of what he observed became key.  The necessary investigation and preparation for trial should have focused on the development of evidence that might undermine this inmate's testimony.  It is evident that Mr. Bullock had a cellmate.  What he may have observed and what Mr. Bullock may have told him about what Mr. Bullock observed would have been critically important.

35.    Prison killing cases charged as capital crimes almost inevitably will be based on a prosecution claim of future dangerousness.  Defense counsel must know this and plan to respond thoroughly to this non-statutory aggravating circumstance.  Competent responses to this aggravating factor require expert assistance on prison management.  The federal Bureau of Prisons (BOP) is equipped to eliminate the material risk of future assaults by inmates who pose the greatest internal security risks.  A thorough understanding of this topic is necessary in approaching the trial and penalty phases.  While the defense team was certainly aware of the importance of this

11

JA 1240

aggravating factor, it appears that they may have failed to appreciate the extent to which jurors are affected by concerns about the ability of a prisoner to inflict injury in the future.

36.     Similarly, gang-related capital cases also present predictable areas requiring defense preparation. Very typically the Government can be expected to argue that, unless executed, the defendant will continue to communicate with and instruct other gang members to commit acts of violence both inside and outside the prison. BOP also has in place systems and procedures to deal with security threat groups (prison gangs). Defense counsel should anticipate that it will be important to the jury to know that these systems and procedures can reduce if not eliminate the risk of future dangerousness. The defense effort in this regard—relying on Messrs. Aiken and Cunningham to rebut the testimony of the Government's expert, Mr. Hershberger—was deficient. (My opinions with respect particularly to prison homicide issues are informed by my experience as court-appointed counsel for inmates seeking protective custody in the Arizona prison system and by my direct involvement as plaintiffs' counsel in jail conditions cases. My opinions in this respect are also informed by my representation of defendants in federal death penalty cases in Arizona, New Mexico and California.)

37.     Another important part of defense counsel's obligation in capital cases is to investigate and to challenge where appropriate prior convictions that may be used by the Government as aggravating factors. This is an important obligation irrespective of whether the defendant was convicted after a trial or entered a plea of guilty in prior cases. In this case, the conviction of Mr. Caro in connection with the stabbing death of inmate

4633616v1

JA 1241

Benavidez became an important element of the Government's case in support of aggravation. Counsel had a duty to investigate and challenge that underlying conviction.

38.    I appreciate the difficulties that defense counsel in this case encountered, but I respectfully conclude that their performance fell below the standard of care for death penalty defense in the ways I have identified above. I also have the following additional concerns.

### The Department of Justice Death Penalty Certification Process

39.    It is my opinion that reasonably competent counsel in Mr. Caro's case should have aggressively pursued the opportunity afforded by the Department of Justice's Death Penalty Certification process to seek a determination that his case was not one in which the death penalty should have been pursued. My opinions on this question are informed by my participation in the process on numerous occasions and having consulted with other capital defense counsel who have been involved in making presentations to the Department of Justice's Death Penalty Review Committee.

40.    This phase of the capital defense is particularly important in cases in which the Department of Justice is necessarily considering whether this prison homicide should be treated differently from other prison-related homicides. A greater understanding of Mr. Caro's mitigating evidence, coupled with a greater appreciation of the prison environmental factors should have been presented so that the Attorney General might better evaluate both the aggravating and mitigating circumstances. Again, more time to prepare and to work with the development of the factual investigation and the penalty phase facts would have been valuable. It is apparent from a review of the documents

13

4633616v1

JA 1242

from early 2005 that the defense team had only begun to develop its case when they went to Main Justice for the Committee meeting. The fact investigator appears to have been engaged only a very few months before the Main Justice meeting and the mitigation specialist had not begun to actively develop Mr. Caro's personal history.

41.     I understand the argument sometimes made that defense counsel does not want to "give away" defense strategy and themes, but that argument needs carefully to be weighed against the importance of the opportunity to achieve a "no death" decision. As with other effective presentations in capital cases, the importance of a written as well as an oral presentation should not be understated. Especially where the Death Penalty Review Committee may be composed of members some of whom will be in attendance at the oral presentation and some of whom may not, the written presentation may be only way to assure that decision makers see defense counsel's arguments. In this case, it does appear that some of the Department of Justice participants were not physically present but appeared instead by videoconference. It also appears from a review of the relevant correspondence that the defense team was aware of this possibility. Effective presentation always suffers when important communications are handled by a combination of in-room and videoconference connections, but the loss in communication effectiveness might have been ameliorated by a written presentation.

42.     It is also important for defense counsel to keep in mind that the Attorney General is the ultimate decider, and particularly in cases like this one involving important policy questions (the BOP's ability to distinguish among homicide cases occurring in its institutions, etc.), the personal consideration by the Attorney General should be

14

4633616v1

JA 1243

anticipated. The views of counsel for Mr. Caro at this stage should not have been filtered through the Committee members. There have been dozens of homicides that have occurred in BOP. Only a very few have resulted in a decision by the Attorney General to seek the death penalty. The Justice Department claims to have a system for deciding which cases should precede as death penalty cases, *i.e.*, that the Government can differentiate whom among these defendants should be candidates for death. The defense team did develop a greater understanding of these issues as the case progressed, but at the time of the Committee presentation the defense team had not yet secured the assistance of experts and consultants to aid them in developing a theme for life.

**Advising the Client About the Consequences of a Guilty Plea**

43.    It is my opinion that defense counsel representing Mr. Caro in the Benavidez prosecution fell below the standard of care in failing to properly advise Mr. Caro of the consequences of his plea in that matter.

44.    One of the aggravating circumstances alleged and established by the Government in the Sandoval case involved Mr. Caro's plea of guilty to murder in another prison killing case. It is evident that Mr. Caro's plea in that case would be used by the Government as part of its aggravation case, yet it also appears that capital defense counsel took no steps to attack that plea. Reasonably competent capital counsel must examine all criminal convictions that may be used to enhance the client's sentence—especially any conviction that may be used to support an aggravating circumstance as was the case here. A proper examination of the circumstances surrounding Mr. Caro's plea in that case would have revealed that he was not advised of the important

15

4633616v1

JA 1244

consequence of his plea, *i.e.,* that it could be used in the Sandoval case as an important underpinning supporting the Government's successful effort to seek the death penalty.

45.     While the United State Supreme Court has focused greater attention on the critical importance of counsel in connection with guilty pleas, competent counsel have long known and emphasized the duty fully to advise a client of all of the direct and collateral consequences of a plea.  Mr. Caro was not advised by counsel in the Benavidez matter that pleading to conspiracy to commit first degree murder would have been used to support an aggravating factor in the Sandoval penalty phase.

### Development of Mitigating Evidence

46.     It is my opinion that defense counsel for Mr. Caro fell below the standard of care in failing fully to investigate and develop issues with respect to mental health  issues.  As noted above in this Declaration, the development of mitigating evidence with respect to a capital defendant's mental history is a critical component of the capital defense function.  In this case, it appears that defense counsel first secured the appointment of an expert consultant to perform a neuropsychological evaluation.  It further appears that defense counsel's plan was to defer considering other mental state experts until the neuropsychological evaluation was completed.  This approach falls far short of the standard of care. All of the relevant case law and secondary literature about the development of mitigation emphasizes that defense counsel must undertake a comprehensive examination of mental health issues.

16

4633616v1

JA 1245

47.     To whatever extent the failure to develop Mr. Caro's complete history was the result insufficient time, defense counsel should have been advocating the need for great time and greater resources. There is no substitute for a thorough life history as a foundation for expert testimony. Developing that history does take time and it takes money, but there is no reason to believe that both the time and the resources would not have been available.

48.     Defense counsel knew that Mr. Caro had brain damage. They knew that he had a traumatic childhood. Counsel nonetheless failed to secure the necessary experts to present this information to the jury. The standard of care for defense counsel requires the full development and appreciation of these issues. Had defense counsel developed the information there is no reason why they would have determined not to present it to the jury in this case.

### Failure to Conduct Appropriate Investigation

49.     It is also my opinion, as noted above, that defense counsel fell below the standard of care in failing to investigate information with respect to the testimony offered by the Government from an inmate housed directly across from Mr. Caro's cell with respect to the credibility of the incriminating testimony offered by that witness. I wish to emphasize this concern as it appears to have permeated this case from beginning to end. Exactly how the death of Mr. Sandoval occurred turned out to be the difference between a life or death sentence for Mr. Caro. The image of the planned and violently executed strangulation dominated the Government's closing arguments. The Government was able

17

4633616v1

JA 1246

to weave together the circumstantial evidence and Mr. Caro's incriminating statements with Mr. Bullock's account to paint a picture that could only have propelled the jury to find as it did - that this homicide deserved the death penalty.

50.    The record in this case reveals that the chief cooperating witness for the Government may have had a motive to provide inaccurate and misleading testimony. It is also apparent that this inmate had a cellmate. Grand jury testimony makes this evident, although presumably defense counsel would have known or expected that other inmates in the Special Housing Unit at the USP Lee would have had cellmates. For the reasons described above, a thorough investigation should have been undertaken prior to trial.

### Failure to Seek removal of Juror

51.    During the trial, the Court observed that one juror appeared to be sleeping during testimony. After conferring with counsel the Court decided not to remove the juror. Attention to all testimony is central to the role of jurors as fact-finders. Any juror who cannot maintain full attention should have been removed. Here, there were four alternates. There was no material risk that removing the juror would occasion a mistrial. Defense counsel should have moved and strongly advocated for the dismissal of that juror. (My opinion on this topic is informed by my participation in several lengthy trials in which sleeping or noticeably inattentive juror behavior occurred. The defense team in these cases debated the tactical pros and cons of seeking removal; we conferred with other defense counsel who had encountered similar situations; and we ultimately concluded that the defendant's entitlement to a unanimous jury required that all jurors were engaged in the hard job of receiving testimony.)

18

4633616v1

JA 1247

## Appellate Counsel's Duties

52.    Appellate and post-conviction defense counsel in death penalty cases have special duties not always encountered by defense counsel in noncapital cases. Most important among those duties is the duty to advocate for reconsideration and change in the law affecting the constitutionality of the death penalty. No other field of criminal defense representation has been so marked by dynamic change. The duty to advocate for reversal of the death sentence is especially important when the case is on direct appeal. The jurisprudence of the law of retroactivity has often distinguished between cases that have become "final judgments" and those that have not. New rulings may benefit those convicted defendants whose cases were on direct appeal—or who raised the same issue underlying that ruling on direct appeal.

53.    In this case, appellate counsel failed to allege that the jury was improperly instructed on the standard for weighing aggravation against mitigation. A good faith basis certainly existed in this case to claim that the jurors should have been instructed that aggravation must outweigh mitigation beyond a reasonable doubt. The jury in this case found mitigating circumstances, and they found them unanimously. Yet, the jury was never told to weigh those mitigators against the aggravators—especially future dangerousness—by any particular standard of proof. Had they been so instructed, given the relative weakness of the non-statutory aggravators, it is reasonable to conclude that the jury would not have found that this defendant deserved a sentence of death.

54.    Had the defense undertaken and presented a full mitigation case as contemplated by the ABA Guidelines, there could be little doubt that the jury would have

19

4633616v1

JA 1248

found it difficult to conclude that the Government's aggravating evidence outweighed that mitigation beyond a reasonable doubt. (My opinions on this topic are informed by my experience as part of the post-conviction team that ultimately succeeded in securing the reversal of the death sentence for Timothy Ring in *Ring v. Arizona*, 536 U.S. 584 (2002). The Court's decision in that case directly overruled its own precedent regarding the role of the jury as fact-finder—a decision that was only 10 years old. My opinions are also based on the increasing frequency in the numbers of cases in which Justices of the United States Supreme Court have come over time to change their views on the application of the Eighth Amendment. Justices Blackmun, Powell and Stevens are three prominent examples of the potential that opinions on the constitutionality of the death penalty both on its face and as applied are subject to change.)

### Concluding Observation

55.    My expectation based on my experience in providing standard of care opinions in other cases is that I should form additional opinions that will be informed by a consideration of the Government's Response to Mr. Caro's Petition and a further review of Declarations that may be presented by either party and by a further review of the materials in the file in this case.

DATED this 8th day of January, 2013.

Larry A. Hammond

20

4633616v1

JA 1249



## Larry A. Hammond

Phone: (602) 640-9361  |  Email: lhammond@omlaw.com



Larry has spent over 30 years practicing in the private sector, but regards his two tours with the Department of Justice as among his most satisfying professional experiences. He served as an Assistant Watergate Special Prosecutor in 1973-1974 and then returned to Justice during the Carter Administration where he worked in the Office of Legal Counsel as the First Deputy Assistant Attorney General under both Attorneys General Griffin Bell and Ben Civiletti.

### Education

- J.D., University of Texas, 1970; *Texas Law Review*, Editor-in-Chief, 1969-1970; Order of the Coif
- B.A., University of Texas, 1967

### Bar Admissions

- Arizona, 1975
- California, 1971

### Court Admissions

- U.S. Court of Appeals, Tenth Circuit, 2004
- U.S. Court of Appeals, Ninth Circuit, 1984
- U.S. Court of Appeals, Sixth Circuit, 1984
- U.S. Supreme Court, 1977
- Arizona Supreme Court, 1975
- California Supreme Court, 1971

2929 North Central Avenue
Twenty-First Floor
Phoenix, AZ 85012-2793

### Clerkships

- U.S. Supreme Court, Justice Lewis F. Powell, Jr., 1971 - 1973
- U.S. Supreme Court, Justice Hugo L. Black, 1971
- U.S. Court of Appeals, District of Columbia Circuit, Judge Carl McGowan, 1970 - 1971

### Practice Areas

- Commercial Litigation
- Criminal Defense
- Internal and Governmental Investigations

### Representative Matters

- *State ex rel. Napolitano v. Gravano*, 204 Ariz. 106, 60 P.3d 246 (App. 2002)

### Awards & Recognition

- 23 Osborn Maledon, P.A. Lawyers Named 'Best' in National Publication

  Twenty-three of the 51 attorneys in the Phoenix law firm of Osborn Maledon, P.A. have been singled out for national recognition in the new 2012 edition of Best Lawyers®, the oldest peer-review publication in the legal profession.
- Osborn Maledon, P.A. Attorneys Named to *Super Lawyers* List

  Fourteen of the 49 attorneys at Osborn Maledon, P.A., a Phoenix law firm, have been named to the *Southwest Super Lawyers 2011* list.
- Osborn Maledon, P.A. Practice Groups and Attorneys Ranked as Tops in Chambers Guide

  Three practice areas in the Phoenix law firm of Osborn Maledon, P.A. received the highest possible ranking among Arizona law firms for the seventh year in a row in the 2011 ranking by the prestigious legal resource guide, Chambers USA.

© Copyright Osborn Maledon, P.A., All Rights Reserved

JA 1250



*Order of the Samaritan for Public Service and Criminal Justice*, University of Alabama School of Law, March 2011

*The International Who's Who of Business Crime Defense Lawyers*, 2011

Morris Dees Justice Award, 2010

Larry Hammond Endowed Criminal Law Scholarship at the James R. Rogers College of Law at the University of Arizona, established in 2008

Justice Award, The American Judicature Society, 2008

John Flynn Award, Arizona Attorneys for Criminal Justice, 2008

Maricopa County Hall of Fame, 2008

Distinguished Honorary Alumnus Award, University of Arizona Law School, May, 2004

Judge Learned Hand Award for Community Service, Arizona Chapter of American Jewish Committee, March, 2003

Arizona State Bar Foundation Walter E. Craig Award for Career Service, 2001

President's Commendation, Arizona Attorneys for Criminal Justice, January, 1997 and 1999

Civil Libertarian of the Year, Arizona Civil Liberties Union, 1993, 2000

Pro Bono Service Award, State Bar of Arizona, 1991

Exceptional Service Award, U.S. Justice Department, 1980

Federal Younger Lawyer of the Year, 1980

Chambers USA, *America's Leading Lawyers for Business*, Litigation: White-Collar Crime & Government Investigations, 2004-2011

*The Best Lawyers in America®*, Appellate Law, Bet-the-Company Litigation, Commercial Litigation, White-Collar Criminal Defense, editions 1995-2012

Best of the Bar, *Business Journal*, Pro Bono, 2005

*Southwest Super Lawyers*, Top 50 Arizona Attorneys, 2007-2010

*Southwest Super Lawyers*, Criminal Defense: White Collar, 2007-2012

*Arizona's Finest Lawyers*

## Professional Activities

American College of Trial Lawyers, Fellow, 2011

American Judicature Society, President and member of Executive Committee, 2003-2005, Board of Directors, 1995-2007, Criminal Justice Reform Committee, Chair 1992-present

Arizona Attorneys for Criminal Justice, Justice Project Chair, 1998-present

American Bar Association, Biological Evidence Task Force, 2003-2005

American Bar Association, Task Force on War Crimes in the Former Yugoslavia, 1993-1995

© Copyright Osborn Maledon, P.A., All Rights Reserved

JA 1251



Arizona Capital Representation Project, of Directors, 1988-present, Vice President, 1988-present

Arizona State Bar Association, Indigent Defense Task Force, 1995-present

Human Rights First, Lawyer Steering Committee (formerly known as the Lawyers' Committee for Human Rights)

Elon University College of Law (Visiting Professor; Advanced Criminal Procedure) 2008

Sandra Day O'Connor College of Law at Arizona State University (Adjunct Professor of Law:   Advanced Criminal Procedure, Death Penalty, Presidential Powers,  Advanced Civil Discovery, and Ethics)

University of Arizona College of Law (Adjunct Professor of Law:  Presidential Powers), 1995

Arizona State University Undergraduate School (Guest Faculty Member:  Death Penalty, Practicum re: The Justice Project)

Birmingham City University, School of Law, United Kingdom, (Visiting Professor; Center for American Legal Studies)

St. John's College, Santa Fe, New Mexico (Tutor:  Seventeenth Century Literature - 1983)

University of New Mexico School of Law (Trial Practice - 1983)

## Publications

- Sentence Must be Fair: Death-Penalty Defendants Need Competent Attorneys
  The Arizona Republic, May 12, 2012
- Capital Case Crisis in Maricopa County, Arizona: A response from the Defense
  Judicature, March / April 2012
- Innocent Until Interrogated
  Law Journal for Social Justice, May 2, 2011
- John Sears, John J. Flynn Lifetime Achievement Award 2011
  The Defender, April 21, 2011
- Why Should You Oppose the Death Penalty?
  The Arizona Republic, April 15, 2011
- Opinion: What Did Jeffrey Landrigan's Execution Teach Us About Respect?
  Maricopa Lawyer, November 6, 2010
- Protecting Moscow from the Soviets -- Book Review
  Experience, 2009
- Napolitano will Defend State Death Penalty Law before Supreme Court
  The Arizona Republic, April 21, 2002

Opinion, *Ariz. case to test rights of convicted in Supreme Court*, The Arizona Republic, October 4, 2011

Viewpoint, *The failure of forensic science reform in Arizona*, Judicature, May-June 2010

*Sotomayor is Newest Face in a Long Line of Heroes*, The Arizona Republic, August 10, 2009 (author)

Editorial for Judicature, *Setting Forensic Science on a New Path*, March-April 2009 (unsigned editorial co-authored with Dr. Barry Fisher of the Los Angeles County Crime Laboratory)

*Counsel for The Indigent Accused in Death Penalty Cases*, The Defender (Winter 2006), co-author

Presentation:  Speech to the Harris County Bar *The Landscape of Criminal Justice:  Texas and Beyond*, May 21, 2004

© Copyright Osborn Maledon, P.A., All Rights Reserved

JA 1252



Justice Project Editorial, *Why Gideon Mattered to Hugo Black*, The Champion, January/February 2003 (reprinted in The Defender, April 2003)

Editorial, *Justice Project: 5 Year Report*, The Defender, January 2003

Editorial, *Restoring Confidence in the Criminal Justice System*, Judicature, 2002 (unsigned)

*Justice Project: Status Report and Update*, The Defender, July 2002

*Scrutiny a Must in Criminal Cases*, The Arizona Republic, January 2002 (Co-author)

*Capital Punishment in Arizona and The "New" Death Penalty Debate,* The Defender, June 2001 (Co-author)

*Popular Culture and The Death Penalty*, The Defender, July 2000 (Co-author)

*Aiding the Incarcerated*, Litigation Magazine, Winter 2000 (Co-author)

*Aryan Brother's legacy is safer prison system*, The Arizona Republic, February 6, 2000 (Co-author)

*The Justice Project: Y2 OK!*, The Defender, January 2000 (Co-author)

*Worldwide Concern: We Should Offer Global Support to Those Fighting for Human Rights Anywhere*, Arizona Journal, August 9, 1999 (Co-author)

Editorial on Felony Murder: *Bad Law Needs Reining in for Sake of Fairness*, Arizona Republic, May 14, 1999

*May God Have Mercy: A True Story of Crime and Punishment*, Judicature, November-December 1998

*U.S. Has Everything to Gain From an International Criminal Court*, Nov. 9, 1998 Arizona Journal (reprinted in the Colorado Journal, Nevada Journal, and Washington Journal)

*Prisons Lack Commitment to Safety*, Arizona Republic, April 12, 1998 (Co-author)

*Arizona's Crisis in Indigent Capital Representation*, Arizona Attorney, March 1998 (Co-author)

*Observations on the Mock Impeachment Trial of Abraham Lincoln*, 40 Ariz.L.Rev. 351 (1998)

Editorial on Capital Execution: *Jose Ceja Didn't Deserve to Die*, Arizona Republic, January 25, 1998

*New Rules, on Indigent Representations*, Arizona Attorney, February, 1997 (Co-author)

© Copyright Osborn Maledon, P.A., All Rights Reserved

JA 1253

# EXHIBIT 5

# EXHIBIT 5

JA 1254

## DECLARATION OF STEPHEN J. KALISTA

I, Stephen J. Kalista, declare under penalty of perjury the following:

1. I am an attorney and had licenses to practice in Virginia and Georgia. I am currently retired but practiced law from June, 1976 to December, 2007.

2. I, along with James Simmons, represented Carlos Caro in his capital murder case, No. 06-cr-00001-JPJ-1, in the United States District Court for the Western District of Virginia.

3. When I was appointed to represent Mr. Caro, I had represented four capital defendants who were prosecuted by the state of Virginia and one capital defendant who was prosecuted by the Federal Government.

4. I was appointed to represent Mr. Caro in January 2005, in the case involving the death of Roberto Sandoval. At that time, the Government had not yet indicted Mr. Caro nor had it received death certification from the Department of Justice (DOJ).

5. After Mr. Simmons and I were appointed, we sought and received funding so that investigation related to mitigation could begin.

6. Mr. Simmons and I did not present anything in writing to the DOJ but attended in person the meeting in June 2005.

7. In October 2005, we learned from the Government that the DOJ had authorized death.

8. In January 2006, Mr. Caro was indicted and charged with first-degree premeditated murder, as well as three statutory aggravating factors. At that time, a trial date was set for July 2006. I felt that was sufficient time to prepare for trial.

9. From the beginning, Mr. Simmons and I believed this would be a penalty-phase case and that our best result would be a life sentence. We did not divide the responsibilities in the case in a certain manner. We both worked on all aspects of the case.

JA 1255

10. We also knew from the beginning that this case involved gang activity and that the Government would be presenting information regarding this. We were aware that the Government would argue that Mr. Caro posed a future threat at least in part because of his gang activity and would use his prior actions in prison against him.

11. We attempted to present an argument during the guilt/innocence phase that Mr. Caro did not act with premeditation but rather acted in the heat of passion. I do not recall considering a self-defense argument.

12. Hans Selvog, Ph.D., ended up working as the mitigation specialist on Mr. Caro's case. Mr. Simmons recommended that we use Dr. Selvog after Lee Norton indicated that she would not be able to work under the court's hold-back provision. While Mr. Simmons and I relied upon Dr. Selvog for recommendations related to mitigation experts, I believe that I initially located neuropsychologist Malcolm Spica, Ph.D., before Dr. Selvog was retained.

13. Dr. Spica conducted neuropsychological testing of Mr. Caro. Dr. Spica provided a report that indicated Mr. Caro had brain impairment and suggested that we consult with forensic psychiatrist Keith Caruso, M.D.

14. Dr. Selvog may have recommended that we consult with a neonatologist. I do not recall speaking with a neonatologist.

15. We hired Dr. Caruso, who evaluated Mr. Caro. When Dr. Caruso was retained, we had not determined whether testimony from a mental health expert would be introduced during the guilt/innocence or the penalty phase or both. Therefore, Dr. Caruso interviewed Mr. Caro about the crime, and he learned information that was not helpful to the defense. We did not ask to hire another psychiatrist to specifically testify at the penalty phase. We did not ask to hire a consulting expert.

16. After Dr. Caruso's examination of Mr. Caro, we provided notice that we would introduce a mental health defense during both the guilt/innocence phase and the penalty phase. Shortly thereafter, we withdrew our notice of

JA 1256

the intent to introduce a mental health defense during the guilt/innocence phase.

17. We learned that the Government would be using Dr. Robert Phillips as its expert. We immediately sought information on Dr. Phillips, and found out that he had a good reputation and was known to present well on the stand.

18. At some point during trial, we decided that we were not going to present mental health testimony during the penalty phase. We did not review Dr. Phillips's report. We made this decision based on the reputation of Dr. Phillips, his anticipated testimony, and a feeling that we could not rebut that testimony.

19. We went to the penalty phase of Mr. Caro's trial without any expert mental health witnesses. I handled the opening statement for the penalty phase. I also handled the examination of several witnesses.

20. This was a difficult case. There was not much in Mr. Caro's personal life that we felt we could present to a jury to humanize Mr. Caro. He cheated on his wife; he was not a good father; he was a three-time loser as far as drugs; and he had difficulty while incarcerated. I think we did the best we could under the circumstances, although in the end, I don't think we were able to sufficiently humanize him.

21. I was aware that the Government was going to introduce testimony from Sean Bullock, who was housed across from Mr. Caro at the time Roberto Sandoval was killed. I received a copy of the grand jury transcript where Mr. Bullock testified. I reviewed the housing unit logs from USP Lee. I overlooked the fact that Mr. Bullock had a cellmate at the time of Mr. Sandoval's death. There was no strategic reason for not interviewing Mr. Bullock's cellmate.

22. I knew that Mr. Caro's other convictions and sentences would be used as both statutory and non-statutory aggravating circumstances. I did not pursue any collateral challenges to any of Mr. Caro's previous convictions and sentences. I had no strategic reason for failing to do so.

JA 1257

23. I recall that Mr. Caro pled guilty to conspiracy to commit murder of inmate Benevidez as part of a plea agreement but that an equally culpable co-defendant received a much lesser sentence. I was also aware that the principal co-defendant involved in planning the attack on Mr. Benevidez, and all other co-defendants in that case, pled guilty and received substantially lower sentences.

24. Prior to signing this declaration, I spoke with Mr. Caro's current counsel and reviewed various portions of his case file they provided to me. This declaration is not meant to be a complete description of every aspect of my representation of Mr. Caro.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Stephen J. Kalista

12/29/2012
_____
Date

Page 4 of 4

JA 1258

# EXHIBIT 7

# EXHIBIT 7

JA 1259

## Declaration of Hans Selvog, Ph.D., L.C.S.W.

I, Hans Selvog, do state the following:

1.   My name is Hans Selvog. I was retained as the mitigation specialist in United States v. Caro, 06-cr-00001, in the United States District Court for the Western District of Virginia. In connection with my appointment, I provided Mr. Caro's attorney Steven Kalista with a copy of my Curriculum Vitae and an affidavit I prepared for another purpose. I have attached to this declaration a copy of my then-current CV as Exhibit A and the affidavit as Exhibit B.

2.   I am a licensed clinical social worker. I have a master's degree and a doctorate degree in Social Work. I have assisted the defense on behalf of indigent capital (and non-capital) defendants by conducting comprehensive, documented, and corroborated psychosocial studies and mental health analyses.

3.   Before I was hired, Lee Norton had previously been the mitigation specialist on Mr. Caro's case. I do not personally know Ms. Norton, and I did not receive any documentation of what Ms. Norton may have done during her time on Mr. Caro's case.

4.   The typical duties that I perform as mitigation specialist are enumerated at pages 4-5, paragraph 10, of my affidavit (Exhibit B). My role in Mr. Caro's case, however, was limited to gathering information related to his childhood and his mental health. I was not instructed to focus on his adulthood and his incarceration, nor was I instructed to investigate mitigating information related to his prior convictions. It was my understanding that such information was being gathered by the other investigator on the case, Danny Mullikin.

5.   When I was retained in March 2006, the trial was scheduled for July 2006. It was continued to January 2007.

6.   After I gathered information through interviews, research, and record collections, I prepared a narrative, or social history, of Mr. Caro's childhood. The purpose of this social history was to provide information to a mental health expert to assist such expert in explaining to the jury the impact of Mr. Caro's life on his mental development and functioning.

Page 1 of 5

JA 1260

7. When I was retained, I was informed by Mr. Caro's attorneys that a neuropsychologist had been hired to conduct testing to determine whether Mr. Caro had brain impairment. The neuropsychologist was Malcolm Spica, Ph.D. I was not familiar with Dr. Spica and had not worked with him in the past.

8. After Dr. Spica tested Mr. Caro, he informed me that Mr. Caro had brain damage. In light of Dr. Spica's findings, in June 2006, I recommended that two additional experts were necessary in explaining Mr. Caro's developmental difficulties and his cognitive deficits: a forensic psychiatrist and a neonatologist.

9. It is my opinion that at least one expert was necessary to testify and explain to a jury how Mr. Caro's brain impairment and traumatic childhood has impacted his life and his functioning.

10. Forensic psychiatrist Keith Caruso, M.D., evaluated Mr. Caro in August 2006. I was not asked to do any background research on Dr. Caruso or his reputation in the community; that is something that the lawyers will generally do themselves. In a conference call with Dr. Caruso after his evaluation of Mr. Caro, I, Mr. Kalista, and Mr. Simmons learned that it was Dr. Caruso's opinion that Dr. Spica's findings of brain impairment were solid. Dr. Caruso also informed the defense team that Mr. Caro provided him with information regarding the offense that was not helpful. At that time, it was apparent that Dr. Caruso would not be able to serve as a mitigation witness. Despite this, I do not recall ever being asked for recommendations for another psychiatrist who could testify and provide the jury with an explanation of Mr. Caro's brain impairment or the impact of his traumatic childhood.

11. I do not know why a neonatologist was not hired. My notes indicated that I recommended Gary Gutcher, M.D. I may have spoken with him, but I do not recall. I most likely would have made notes if I had spoken to anyone else.

12. In conducting my investigation, it was my impression that the attorneys were hampered by financial concerns. At one point, I wanted to travel to Illinois to interview Mr. Caro's aunts and his cousin but was told that I could conduct the interview via telephone. I do not recall if I was ever able to

JA 1261

reach and speak with those relatives. It is not my practice to conduct a formal mitigation interview over the phone. I may make initial contact with a witness by phone but would then travel to a witness to meet face-to-face with them to conduct an interview. The reason for this is because the information and questions are such that human contact, rapport, and trust must be established to fully uncover possibly personal and embarrassing information that is unlikely to be available through phone call.

13.  As the January 2007 trial date grew closer, I had a conversation with Dr. Spica about him testifying. During our conversation, Dr. Spica raised concerns that he could not offer testimony regarding mens rea; I assured him that we did not want him to testify about the offense or Mr. Caro's state-of-mind at time of offense but as to only his test results showing brain damage and Mr. Caro's developmental background.

14.  After the trial began, I called a meeting to determine if Dr. Spica would be called as a witness. At that point, Dr. Spica was the only possible expert who could testify because there had been no other expert retained after the defense attorneys decided not to use Dr. Caruso five months earlier. During this meeting, the attorneys decided that Dr. Spica would not be called. I recall the biggest concern was that the attorneys were afraid of the Government's rebuttal expert, Dr. Robert Phillips. I had not seen Dr. Phillips' report.

15.  Based on my experience as a mitigation specialist in over 100 capital cases, at that point it was too late to make strategic decisions regarding a mental health expert. Without Dr. Spica's testimony, there was no presentation of brain damage to the jury.

16.  In addition to assisting with expert witnesses, I provided the attorneys with information from lay witnesses who would be able to explain facts regarding Mr. Caro's background to the jury. Prompted by the Magistrate Judge's response to the defense's request for witness subpoenas, I prepared a letter on December 8, 2006, that explained why it was important to have many lay witnesses testify.

17.  We made a videotape of Mr. Caro's hometown, Falfurrias. This recording did not turn out as I had expected, as it failed to provide an accurate picture of the impoverished neighborhood in which Mr. Caro was raised. I was not

JA 1262

aware that it would be provided to the Government despite the fact we were not admitting it as an exhibit at trial.

18. Another one of my duties during trial was to draft the direct examination questions for the lay witnesses. I did so and provided these questions to the attorneys. I did most of the preparation for witness testimony without the assistance of counsel. Defense counsel only met with each witness the night before their testimony, preparing them by using a copy of the direct exam guide I put together. I would describe the quality of preparation as poor because it was last minute and defense counsel did not seem to have their own sense of the mitigation story they were preparing to put into evidence. For example, when Stephen Kalista was going over the direct exam questions with a witness, he expressed confusion about the direction of the questioning and what it was we were trying to accomplish with the questions.

19. While it is always important for lay witnesses to provide a portrait of a capital defendant's childhood, it was especially critical in this case because the jury would hear no expert witness testimony. Mr. Caro's brothers, Jose Caro III and Noe Caro, were two critical witnesses in explaining the violence and trauma that occurred while they were children. They were not called, however, to testify at trial.

20. In my opinion, the attorneys failed to develop a strategy for presenting a compelling mitigation story.

21. The evidence that was presented at the penalty phase of Mr. Caro's trial presented a limited picture of Mr. Caro's childhood. There were also lay witnesses who did not testify but who could have added necessary facts to the story.

22. Moreover, notably absent from the penalty phase was an expert who would have presented evidence of Mr. Caro's brain impairment and who would have explained to the jury how his brain impairment, developmental delays, and his traumatic childhood impacted him.

Page 4 of 5

JA 1263

I declare under penalty of perjury that the foregoing is true and correct.

Hans Selvog, Ph.D.

12.31.2012

Date

JA 1264

# EXHIBIT A

# to Declaration of

# Hans Selvog

JA 1265

## CURRICULUM VITAE

## HANS H. SELVOG, PH.D., L.C.S.W.
### Augustus Institute/National Center on Institutions and Alternatives
3127 Mt. Vernon Drive
Alexandria, Virginia 22305
Office: (703) 684-0373; Facsimile: (703) 684-6037
Home: (703) 998-6278; Cell: (703) 926-2742
Email: hselvog@ncianet.org; Website: www.ncianet.org

### EDUCATION

2005    Ph.D. in Social Work – Virginia Commonwealth University. Dissertation title: *The Nature of Collaboration between Social Workers and Probation Officers in the Treatment and Management of Sex Offenders: A Co-operative Inquiry*. Directed by Michael Sheridan.

1986    M.S.W. – Virginia Commonwealth University. Concentration: Criminal Justice.

1976    B.A. - Bethel College, St. Paul, Minnesota. Major: Social Work and Sociology.

### CLINICAL LICENSES

1991    L.C.S.W., District of Columbia, Commonwealth of Virginia, and Maryland.

1996    Virginia-Certified Sex Offender Treatment Provider, Board of Psychology, Commonwealth of Virginia.

### U.S. SUPREME COURT CITATION

2003    U.S. Supreme Court decision, Wiggins v. Smith (June 26, 2003). The Honorable Sandra Day O'Connor wrote the 7-2 majority opinion in which my work as a forensic social worker was cited throughout. http://www.supremecourtus.gov/opinions/02pdf/02-311.pdf

### CLINICAL PRACTICE EXPERiENCE

- Eighteen years post-M.S.W. plus five years post-B.A. clinical experience with adults, couples, families, and youth in outpatient and residential mental health settings.
- Eighteen years experience as expert witness (as a forensic social work evaluator) in (1) capital murder sentencing hearings at the state and federal levels and in U.S. Military Courts including pre-trial through post-trial appellate stages; and (2) state and federal criminal sentencing hearings related to violent/aggressive and sexual abuse behaviors.

### TEACHiNG EXPERIENCE

- Ten years experience as advanced-placement field instructor of M.S.W. students.
- Taught graduate level seminar "Human Behavior in the Social Environment" (SLWK 610), 1999 Virginia Commonwealth University.
- Conducted death penalty mitigation trainings for defense bars in Louisiana (2000 & 1992) and Virginia (1999, 1994, & 1993), Naval Justice School (1996), and NAACP Legal Defense Fund (1988). See attached list of itemized professional trainings / presentations.

JA 1266

*Page 2*

- Taught continuing education seminars for the following Maryland entities: Mental Hygiene Administration, Department of Juvenile Justice, State Prosecutor Office, Public Defender Office, Probation and Parole Office, and Juvenile Correctional Staff (2002, 1997 &1996). See attached list of itemized professional trainings / presentations.

## RESEARCH

University of New Hampshire (1999), original research presented at the Sixth International Family Violence Research Conference, "Difference in the Degree of Impairment Associated with Childhood Sexual Abuse Scale (DIASAS) Between Adult Male Survivors of Child Sexual Abuse that are Sexual Offenders and Those that are Not."

## PROFESSIONAL EXPERIENCE

June 1985 to Present
National Center on Institutions and Alternatives (NCIA)
Alexandria, Virginia

    1989 to Present
    Clinical Director, Augustus Institute for Forensic Services, a program of NCIA.

    Manage private nonprofit outpatient mental health clinic. Supervise clinical staff. Write proposals and grant applications. Conduct psychosocial/psychosexual evaluations. Provide individual and group therapy services for a variety of populations including sexual offenders, persons with compulsive sexual behaviors, victims of sexual abuse (adolescents and adults) and chronically mentally ill, mentally retarded and dual diagnosed clients. Testify at sentencing on assessment and treatment recommendations. Conduct state-contracted clinical training and supervision of mental health professionals in the assessment and treatment of adult and adolescent sex offenders. Spokesperson for the Augustus Institute on issues related to sex offender treatment effectiveness and recidivism, laws governing sex offenders such as community notification, and the treatment of offenders and victims.

    1987 to Present,
    Mental Health Expert and Consultant in Capital Murder Cases.

    Assist the defense on behalf of indigent capital (and non-capital) defendants by conducting comprehensive, documented, and corroborated psychosocial studies and mental health analyses. Serve as member of the defense team by educating and advising defense counsel on mitigating factors. To date, completed evaluation of ca. 100 death penalty defendants in both state and federal jurisdictions at most stages of litigation from pre-trial to post-conviction to habeas to clemency. Qualified and testified as an expert witness in over 15 states at both the federal and state level.

    1990-1996
    Project Consultant, Community-Based Alternatives Initiative and Youth-In-Transition (residential programs of NCIA)

JA 1267

*Page 3*

Baltimore, Maryland

Prepared psychosocial assessments of and individual treatment plans for dual diagnosed population (court involved developmentally delayed and mentally ill) and chronic behavior disordered teenagers. Recommended comprehensive community-based program plan and provided weekly individualized therapy to select clients. Trained staff on assessment and treatment of compulsive sexual disorders.

1989-1990
Project Associate, NCIA Jail and Prison Overcrowding Technical Assistance
Alexandria, Virginia

Identified policies and programs to alleviate overcrowded prisons and jails for state and local governments. Comprehensive assessments provided to counties in Alabama, Delaware and Georgia.

1986-1989
Director, NCIA Southeast Regional Office
Atlanta, Georgia

Responsible for administration and management of regional office. Provided direct sentencing services to defense attorneys and the courts by investigating defendant's background and offense behavior and developing sentencing options for the consideration of state and federal courts. Conducted investigation and mitigation development in capital cases. Assessed jails and prisons and recommended methods of reducing overcrowding.

1985-1989
Case Developer, Client Specific Planning
Alexandria, Virginia

Developed comprehensive sentencing analysis reports for presentation to the courts and parole boards on behalf of felony defendants.

1985-1986
Case Developer, Parole Assistance Project
Alexandria, Virginia

Developed community-based release programs for technical violators of probation and parole for pilot program to reduce prison overcrowding. Assessed and evaluated methods of referral to the project. Developed and coordinated strategies to assure that inmate, correctional staff and the community were aware of the project. Interacted with the various  levels of the criminal justice system to develop a mutual flow of information.  Developed guidelines that ensured the acceptance of the project by the Courts, Parole Board, correctional staff and community.

1985
Project Coordinator
Summer Youth Employment Project, Virginia Home for Boys

JA 1268

*Page 4*

Richmond, Virginia

Coordinated employment project for court-referred youth. Interviewed applicants; assessed applicants' abilities; coordinated work projects and work assignments; supervised work site supervisors and youth employees; developed written framework of project philosophy and structure.

1984-1985
Case Manager
Henrico County Department of Mental Health and Mental Retardation
Richmond, Virginia

Provided case management services and supportive counseling for chronically mentally ill clients in a psychosocial rehabilitation setting. Performed psychosocial intake assessment of program applicants; developed community resources appropriate to client need; facilitated family support group and group work with clients. Developed comprehensive treatment plans.

1983-1984
Residential Counselor, Virginia Home for Boys
Richmond, Virginia

Provided supervision of and counseling for court-referred youth. Supervised youth in development of independent living skills; provided individual and family therapy; facilitated therapeutic and recreational group work in long-term treatment setting.

1982-1983
Caseworker, Youth Guidance
Rockford, Illinois

Provided individual and family therapy and supervised therapeutic and recreational group work for youth referred from the courts and state social service agencies. Provided treatment services as an adjunct to probation office; developed community resources; coordinated and supervised specially designed camping experiences for youth; testified in court about youth's behavior in treatment.

1975-1976
Chemical Dependency Counselor, Shoreview Treatment Center
St. Paul, Minnesota

Provided individual, family and group therapy in residential long-term substance abuse treatment center. Developed resources for reintegration of clients into community, supervised residents in daily treatment structure; assessed resident needs and abilities; provided educational lectures on substance abuse; monitored client progress in half-way house facility; supervised clients in community; provided aftercare out-patient counseling; coordinated therapeutic and recreational retreat for residents.

1973 to 1975
Youth Counselor, City of St. Anthony Village

JA 1269

St. Anthony, Minnesota

Provided individual and family counseling for youth referred from city juvenile office and high school counseling office. Supervised community youth center; provided consultation to community human services board on developing community resources for youth.

## PROFESSIONAL TRAININGS / PRESENTATIONS

Maryland Mental Hygiene Administration, 2002, "Risk Assessment of Sex Offenders."
Conducted three-day continuing education training on risk assessment instruments for adults and juveniles for 30 clinical staff.

Louisiana Association of Criminal Defense Lawyers, "Capital Defense Certification" seminar, Baton Rouge, Louisiana. Invited to speak on mitigation development in capital cases. September 2000.

University of New Hampshire, 1999, original research presented at the Sixth International Family Violence Research Conference entitled "Difference in the Degree of Impairment Associated with Childhood Sexual Abuse Scale (DIASAS) Between Adult Male Survivors of Child Sexual Abuse that are Sexual Offenders and Those that are Not."

Virginia Bar Association, Death Penalty Mitigation, in Charlottesville, Virginia. 1999. Lectured on recent research on the correlation between brain dysfunction in combination with environmental traumas in the first 33 months of life and later aggressive or violent behavior during adolescence or adulthood.

Offender Aid and Restoration, lecture to volunteer staff on the assessment and treatment of sexual offenders. Summer 1999.

"Advocacy Under Megan's Laws," the sixth national conference of The National Association of Sentencing Advocates in conjunction with The Sentencing Project: The Celling of America. Arlington, Virginia, April 1998.

"The Causes, Assessment and Treatment of Sex Offenders," two-day training presented to the Maryland Department of Juvenile Justice, Department of Social Services, Mental Hygiene Administration, State Prosecutor Office, Public Defender Office, Probation and Parole Office, and Juvenile Correctional Staff, September 1996. Continued one-day seminars on above topic at Chesapeake College, Easton, Maryland, and at Maryland Regional Mental Health Hospital in Cambridge, Maryland, November 1996, and January, March and May 1997.

"An Examination of the Disproportionate Number of African American Youth in the Maryland Juvenile Justice System," Coordinator and Moderator of two, two-day conferences in Ocean City, Maryland, October 1996 and April 1997, sponsored by The Augustus Institute and the Maryland Mental Hygiene Administration, Eastern Regional Office, with a grant from the Maryland Juvenile Justice Advisory Council in the Governor's Office of Crime Control and Prevention.

JA 1270

Capital Case Mitigation Training, invited faculty member to teach three-day death penalty litigation course, Naval Justice School Death Penalty Defense Seminar, Newport, Rhode Island, September 1996.

"Etiology, Assessment and Treatment of the Paraphilias: Compulsive Sexual Disorders," LaPlata, Maryland; Charles County Freedom Landing, Charles County Department of Mental Health, April 1996.

"Etiology, Assessment and Treatment of Sex Offenders," Alcohol and Drug Services Assessment Center, Fairfax County, Fairfax, Virginia, March 1996.

"Etiology, Assessment and Treatment of Compulsive Sexual Disorders," District of Columbia Department of Human Services, Child Welfare Agency, Washington, D.C., November and December 1995.

"Etiology, Assessment and Treatment of Compulsive Sexual Disorders," Loudon County Department of Mental Health, Leesburg, Virginia, September 1995.

"Etiology, Assessment and Treatment of Compulsive Sexual Disorders," Salvation Army, Men's Substance Abuse Residential Treatment Program, Annandale, Virginia, July 1995.

"Etiology, Assessment and Treatment of Adolescent Sex Offenders," Crossroads, Fairfax County Residential Substance Abuse Treatment Facility for Adolescents, Fairfax, Virginia, July 1995.

"Etiology, Assessment and Treatment of Adolescents and Adult Sexual Paraphilias," a two-day training/lecture presented to the Maryland Mental Hygiene Administration, Eastern Shore, Community Mental Health Professionals, October 1994; one-day training/lecture on continuation of above, Cambridge, Maryland, November 1994, and January, March and June 1995.

Death Penalty Mitigation lecture to criminal law class for Dean Jamie Ruskin, Washington College of Law, The American University, Washington, D.C., March 1995.

"Advocacy at Sentencing for the Adult Sex Offender," presentation at the ATSA 13th Annual Research and Treatment Conference, San Francisco, California, November 1994.

Death Penalty Mitigation lecture to the p-cap, post-conviction assistance project, University of Virginia, School of Law, Charlottesville, Virginia, November 1994.

"Sexual Abuse Treatment: Victims and Perpetrators," lecture at the 4th Annual Mental Health Networking Conference, Mental Health Association in Alexandria, Virginia, October 1994.

"Assessment and Treatment of Adolescent Sex Offenders," lecture to Fairfax County Juvenile Probation Office, January 1994.

USCA4 Appeal: 16-1    Doc: 32-3    Filed: 12/27/2016    Pg: 78 of 300

Virginia Capital Case Clearinghouse, Washington and Lee University, School of Law, Fifth Annual Continuing Legal Education Seminar, "Defending a Capital Case in Virginia V," Lexington, Virginia, April 1993.

Sexual Abuse Multi-Disciplinary Team, Child Protective Services, Department of Human Development, Fairfax County, Virginia, on assessment and treatment of sex offenders, January 25, 1993.

Louisiana Association of Criminal Defense Lawyers, "Question Authority" seminar, Baton Rouge, Louisiana. Invited to speak on mitigation development in capital cases. September 1992.

Third Annual Seminar, The Law and Treatment of Sexual Offenders, Arlington Bar Association and General District Court. Spoke on the treatment efficacy of therapy with sexual offenders. November 1992.

Pinebrooke Psychiatric Hospital, Inpatient Psychiatric Clinical Program, Culpeper, Virginia, on assessment and treatment of compulsive sexual disorders, June 1991.

Yale Conference on Alternative Sentencing for Alabama Circuit Court Judges. Invited to present a sentencing alternative of an actual case being considered by one of the participating judges as part of a statewide effort to utilize options to imprisonment, 1989.

NAACP Legal Defense Fund, annual training on defense work in capital cases. Invited to present methodology for conducting corroborated social background histories and mitigation development, Airlie House, Warrenton, Virginia, 1988.

Independent Council of Juvenile Court Judges Continuing Education Training Seminar. Invited to present alternatives to incarceration for juvenile offenders. Georgia Juvenile Judges, Albany, Georgia, 1987

Death Penalty Specific Continuing Education

Life in the Balance 2006, National Legal Aid & Defender Association, March 2006, Philadelphia, Pennsylvania.

National Consortium for Capital Defense Training, February 2006, Charleston, South Carolina.

Federal Death Penalty Resource Counsel Strategy Session, November 2005, Pittsburgh, Pennsylvania.

Making the Case for Life VII, October 2004, Arlington, Virginia.

Sex Offender Specific Continuing Education

University of New Hampshire, July 1999, Sixth International Family Violence Research Conference.

JA 1272

*Page 8*

University of New Hampshire, July 1998, Fifth International Family Violence Research Conference.

Behavioral Medicine Institute, Training Program in Evaluating Sex Offenders, Atlanta, Georgia, April 1997.

Penile Plethysmography Using the CAT System, three day training at the Offices of Behavioral Technology, Inc., Dr. Robert Card, Salt Lake City, Utah, April 1996.

ATSA 13th Annual Research and Treatment Conference, San Francisco, California, November 1994.

Proper Uses of Phallometric Assessment and Aversive Counterconditioning in Treatment, by William Marshall, Ph.D., former president and lifetime achievement award winner of ATSA, at the ATSA (Association for the Treatment of Sex Abusers) 12th Annual 1993 Research and Treatment Conference, Boston, Massachusetts, November 1993.

Judith Becker, Ph.D., The Sources and Treatment of Sexual Paraphilias of Adolescents, sponsored by The Augustus Institute with a grant from the Public Welfare Foundation, October 1993.

The Assessment and Treatment of Sex Offenders Using the Penile Plethysmograph, The Farrall Institute, Grand Island, Nebraska, June 1993.

Clinical Supervision and Training under Dr. Jerome G. Miller, President of the National Center on Institutions and Alternatives, August 1989 to Present.

Second International Conference on the Treatment of Sex Offenders, University of Minnesota, Minneapolis, Minnesota, 1991.

Judith Becker, Ph.D., New York State Psychiatric Institute, Seminar at Reaffirming Rehabilitation II: Beyond the "Nothing Works" Myth Conference, Arlington, Virginia, June 1990.

## MEDIA AND MISCELLANEOUS

Quoted in NASW News. O'Neill, J. V. (2003, November). Forensic field broader than most think: Sentencing mitigation part, but not all, of practice. *NASWNews*, *48*(10). Retrieved December 2, 2003, from http://www.socialworkers.org/pubs/news/2003/11/forensic2.asp

NET cable news channel, appeared live speaking about violence between children, May 16, 1997, Washington, D.C.

USA Today, quoted on violence between children, May 5, 1997.

Channel 8 News, Daytime Talk, with Monique Braxton, during sexual abuse awareness month, on treating victims of sexual abuse, May 1997, Springfield, Virginia.

JA 1273

*Page 9*

CNN, Burden of Proof, appeared live speaking about Megan's Law, April 8, 1997, Washington, D.C.

CNN Radio Detroit with Jimmy Barrett, appeared live speaking about sex offender treatment via telephone on February 27, 1997.

KNZR-1560, The Rob and Danielle Show, appeared live via telephone on the treatment of sex offenders, on February 19, 1997, Bakersfield, California.

Appeared on MSNBC cable news network on the effect of limiting appeals for death row inmates, October 1996.

Appeared on Fox Morning News on Community Notification of Paroled Sex Offenders, November 1996.

Quoted in the Virginia Child Protection Newsletter on Sex Offender Treatment Outcome, Volume 48, Summer 1996.

JA 1274

# EXHIBIT B

# to Declaration of

# Hans Selvog

JA 1275

COMMONWEALTH OF VIRGINIA
CITY OF ALEXANDRIA

## AFFIDAVIT OF HANS H. SELVOG

Personally appeared before the undersigned officer duly authorized to administer oaths, **HANS H. SELVOG**, who, after having been duly sworn, deposes and says on oath, that the facts set forth below are true and correct.

1.    My name is Hans H. Selvog.  I am the Clinical Director of the Augustus Institute, an outpatient mental health clinic of the National Center on Institutions and Alternatives.  Formerly, from September 1986 to June 1989, 1 was the Director of the Southeast Regional Office of the National Center on Institutions and Alternatives in Atlanta, Georgia.  My background is in Clinical and Forensic Social Work and, since 1973, includes case management services to the juvenile justice system in Illinois, Minnesota and Virginia, and direct sentencing services in adult and juvenile courts to attorneys and their clients throughout the Midwestern, Northeastern and Southeastern regions of the United States.  I also have clinical experience treating the chronically mentally ill, the chronic substance abuser, and the victims and perpetrators of sexual abuse, which includes juvenile, adult and developmentally handicapped populations.  I have provided therapeutic services to juveniles, adults, couples and families.  I have a Doctoral Degree in Social Work and I am certified as a Licensed Clinical Social Worker in both Virginia and the District of Columbia.  I have conducted hundreds of comprehensive social histories for use in the courts.  I have spent hundreds of hours per case investigating social backgrounds of capital case defendants in over 150 cases.  In most of these cases, I have provided testimony in court on the information I have gathered.  I have been qualified as an expert witness in six capital cases in Maryland, one capital case in Tennessee, one capital case in Louisiana, one capital case in Indiana, two federal capital cases in the Eastern District of Virginia, Richmond Division and Norfolk Division, a federal habeas corpus hearing before a

**KS-287**                                                        JA 1276

Affidavit of Hans Selvog   2
Capital Case Mitigation

magistrate in the Western District of Virginia in Roanoke, and in the United States Marine Corps'

general court-martial proceedings involving two capital offenses in North Carolina and one in

California. As Director of NCIA's Southeast Regional Office, I received a grant to utilize my

office as a national clearinghouse on expert mitigation development and assistance to attorneys

representing capital defendants. In 1988, I conducted a training seminar on mitigation

development and social history investigation for the annual NAACP Legal Defense Fund Death

Penalty Conference at Airlie House in Warrenton, Virginia. Subsequently, I have been an invited

lecturer on capital case mitigation to continuing legal education seminars for defense attorneys in

Louisiana and Virginia. Finally, I recently taught at the Naval Justice School in Newport, Rhode

Island, on death penalty mitigation preparation.


2.      The National Center on Institutions and Alternatives is a private, non-profit

criminal justice and mental health organization with 20 years experience providing penalty phase

services to defense counsel and their clients. Services in capital cases include a comprehensive

compilation of the defendant's psychosocial background, a clinical assessment of this data, and

expert testimony during the penalty phase.


3.      Capital defense experts unanimously agree that preparation of each and every

death penalty trial should include a realistic expectation that the case will progress to the penalty

phase. Therefore, it is imperative from the very beginning that the defense team aggressively

search out and put together a complete economic, educational, medical, mental health, and

psychosocial history of the client from several generations prior to the defendant's birth to the

present day. Otherwise, mitigating circumstances may go undiscovered or misunderstood. The

United States Supreme Court has clearly stated the purpose of presenting mitigation information

which I have an expertise in gathering and presenting. With the defendant's life in the balance, it

is incumbent upon trial counsel to conduct an adequate mitigation investigation which trial

counsel is obligated by law to do.


**KS-288**                                                                      JA 1277

USCA4 Appeal: 16-1    Doc: 32-3    Filed: 12/27/2016    Pg: 84 of 300

4.      Defense counsel asked me in my capacity as an expert mitigation specialist to estimate the cost and time of conducting a social history for the consideration of the court. Conducting a thorough investigation requires a minimum range of 250 to 300 hours and an expertise quite different in scope from that of most defense attorneys. My rate for providing this service is $150 an hour plus expenses. Expert testimony at sentencing is in addition to this estimate.

5.      First and foremost will be to interview the defendant. The initial interview will take two full days. At least two or more follow-up interviews will be conducted following the different phases of the investigation: interviewing witnesses and examining retrieved records.

6.      The defendant's formative and developmental years are critical and it will be required to interview family, friends and other witnesses who knew the defendant. These witnesses include but are not limited to medical doctors, school teachers, and neighbors. Documents such as medical, educational, social service, mental health, etc. pertaining to the defendant, which includes relevant records of family members, will be reviewed and attempts will be made to interview those who, as noted in the records, had direct contact with the defendant or his family. In the course of an investigation, many new leads are discovered that were not anticipated prior to the investigation's embarkment. Time must be allowed to follow-up on additional and potentially effective newly discovered witnesses.

7.      Once this information is obtained, an equal and usually greater amount of time is required to analyze it and to write a corroborated, comprehensive chronological narrative addressing the defendant's psychosocial development as well as the pertinent legal issues raised by defense counsel. All time and tasks will be carefully documented for the Court and filed on a regular and timely basis for payment.

**KS-289**                                                                                                          JA 1278

Affidavit of Hans Selvog 4
Capital Case Mitigation

8. A completed psychosocial history is foremost and critical to defense counsel by informing them of the issues in the defendant's background which point to other experts who will be needed to further investigate the effects of particular areas of mitigation specific to the defendant. A thoroughly investigated background report takes a minimum range of four to six months to complete.

9. Drawing on my clinical background in assessing symptoms of substance abuse, mental illness, mental retardation, learning disorders, domestic violence, physical/sexual abuse, and other emotional/psychological disorders and environmental/developmental stressors, the information derived from an investigation would be used to corroborate pertinent mitigating factors of the defendant's psychosocial background and developmental history. The facts obtained would be presented during the sentencing phase of the trial and do most certainly shape defense counsel's approach to the guilt/innocence phase.

10. A complete capital case social history investigation will include the following:

a) Interview Defendant.

b) Interview nuclear and extended family members, significant others, employers, co-workers, neighbors, friends, school teachers, classmates, co-defendants; if applicable, interview probation officers, foster parents, foster siblings, social workers, institutional staff: mental health, jails, prisons, medical.

c) Compile records of social service, mental health, criminal justice, educational, and medical documents to complete a psychosocial history and interview practitioners directly involved with defendant in each record.

d) Travel will be required for interviews and many interviews may need to be conducted several times. Also gather physical evidence (i.e., photographs, video tapes) to recreate background of defendant for jury.

e) Identify witnesses, prepare affidavits, identify custodian of records, obtain certified records to be used as evidence. Obtain

**KS-290**

JA 1279

Affidavit of Hans Selvog   5
Capital Case Mitigation

court order when defendant was raised in a different state than the state where the individual is being tried to have records released or when juvenile records are present.

f)      Assess symptoms of psychosocial/medical problems and alert defense attorneys of additional experts necessary to establish presence of mental handicap, learning disorder, substance abuse/addiction, physical/sexual abuse, neurological condition (i.e., temporal lobe disorder), mental illness, and other conditions or trauma significant to mitigation.

g)      Development of mitigation for presentation to jury.

h)      Investigate institutions:   Gather reports which describe conditions and practices of the treatment facilities in which the defendant was committed.

11.     In many cases, in order to provide assistance to indigent capital defendants, the Court has authorized funds for counsel to hire the Augustus Institue/National Center on Institutions and Alternatives for expert assistance in preparation of the penalty phase of a capital trial. Funds have been authorized in the following capital cases (the cases in bold face type are those in which I personally conducted the investigation): State of Georgia v. Carl Isaacs, Perry, 1987; State of Georgia v. Wayne Coleman, Atlanta, 1987; State of Georgia v. Larry Ragus, Gwinnett County, 1989; State of Georgia v. Danny Rucker, Royston, 1989; State of Georgia v. Johnnie Dee Jones, Lincoln County, 1992; Commonwealth of Virginia v. Frank Weston, City of Alexandria, 1986; Commonwealth of Virginia v. Ronald Henderson, Winchester, 1991; Commonwealth of Virginia v. Virgil Fox, Jr., Nelson County, 1991; Commonwealth of Virginia v. Joseph Wise, 1993;  Commonwealth of Virginia v. Russell Tross, Rockingham County, Harrisonburg, 1993; Commonwealth of Virginia v. Carlson Robinson, 1994; Commonwealth of Virginia v. Bruce Kenney, 1995; Commonwealth of Virginia v. Gregory Murphy, 2001; State of Tennessee v. Jay Cameron, Nashville, 1987; State of Tennessee v. David Scott Poe, Montgomery County, 1991; State of Tennessee v. Joe T. Baker Jr., Clarksville, 1992; State of Tennessee v. Courtney Mathews, 1995; State of New Hampshire v. Kenneth Johnson, Hillsborough County Superior Court, 1990; State of

**KS-291**

JA 1280

Affidavit of Hans Selvog 6
Capital Case Mitigation

Oklahoma v. Alfred Brian Mitchell, 1992; State of Indiana v. Rufus Averhart, Allen County, 1995, State of Ohio v. Rosalie Grant, Johnston, Ohio, 1985; and State of Indiana v. Rufus Averhart, 1995. In the federal courts, I have been appointed in the following cases: United States of America v. Private Ronnie Curtis, U. S. Court of Military Appeals, 1991; United States of America v. L.Cpl. Kenneth G. Parker, Onslow County, North Carolina, 1992; United States v. LCDR Michael W. Fricke, SC, USN, Naval Base Norfolk, Virginia, 1994; United States v. L.Cpl. Shannon Schlamer, Camp Lejeune, 1994; United States of America v. Srgt. Jesse Quintanilla, Camp Pendleton, 1996; United States of America v. Richard Tipton and United States of America v. Marvin Damon, Eastern District of Virginia - Richmond Division, 1992; United States of America v. Jean Claude Oscar, Eastern District of Virginia - Norfolk Division, 1994; United States of America, District of Columbia, v. Wayne Perry, 1994, United States of America, District of Columbia, v. Donzell McCauley, 1994; United States of America, Northern District Court of New York, v. Tyrone Walker, 1995; United States of America v. Terrance Boyd, Rhode Island, 1995; United States of America v. Cory Gist, Eastern District of North Carolina, 1996; United Stated of America v. Denis Rivera, Eastern District of Virginia – Alexandria Division, 2005; United States of America v. John Richard Mayhew Jr., Southern District of Ohio, 2005; United Stated of America v. Tommie Dorsey, Washington, D.C., 2005; and United States of America v. Donald York, Eastern District of Michigan, 2005.

12.     The State of Maryland through the Public Defender's Service has authorized expenditure of public funds for our services in the following cases: State of Maryland v. Derrick White, 1988; State of Maryland v. Michael Moore; State of Maryland v. James Bailey, Prince Georges County, 1984; State of Maryland v. James Calhoun El, Montgomery County, 1990; State of Maryland v. Timothy Deadrick, 1991; State of Maryland v. Marselle Bowers, 1991; State of Maryland v. Richard Tichnell, 1991; State of Maryland v. Ronald Scoates, Queen Anne County, 1991; State of Maryland v. Tyrone Gilliam, Towson, 1992; State of Maryland

**KS-292**

JA 1281

USCA4 Appeal: 16-1    Doc: 32-3    Filed: 12/27/2016    Pg: 88 of 300

v. Kenneth Collins, Somerset County, 1992; State of Maryland v. Damon Bowie, Prince George's County, 1992; State of Maryland v. Michael Warren, Montgomery County, 1992; State of Maryland v. Kevin Wiggins, 1993; State of Maryland v. Michael Whittlesey, Caroline County, 1993; State of Maryland v. Michael Bryson, Anne Arundel County, 1993; State of Maryland v. Alan Newman, Montgomery County, 1993; State of Maryland v. Rodney Solomon, Howard County, 1993; State of Maryland v. Scotland Williams, 1994; State of Maryland v. Wallace Ball, Towson, 1995; State of Maryland v. John Johnson, Cumberland, 1995; and State of Maryland v. Alexander Watson, 2005. The State of Louisiana, through the indigent defender offices has authorized expenditure of public funds for our services in the following cases: State of Louisiana v. Stanley Lay, New Orleans, 1986; State of Louisiana v. Willie Watson; State of Louisiana v. Floyd Carmouche, Lafayette, 1988; State of Louisiana v. Chad Lukas Young, Opelousas, 1990; State of Louisiana v. Andra Coleman, Opelousas, 1990; State of Louisiana v. Jeffrey William Simpson, Lafayette, 1989; State of Louisiana v. Gerald Wilson, Metarie, 1989; State of Louisiana v. Jimmy Charles, Opelousas, 1991; State of Louisiana v. Darrell Aucoin, Lafayette, 1991; State of Louisiana v. Kevin Touchet, Lafayette, 1991; State of Louisiana v. Tyjuane Williams, Baton Rouge, 1992; State of Louisiana v. Bartholomew Cross, Lake Charles, 1993; State of Louisiana v. Rickey Langley, Lake Charles, 1993; State of Louisiana v. James Christopher Hudson, Opelousas, 1993; State of Louisiana v. Albert Earl Lavalais, Opelousas, 1993; State of Louisiana v. Sidney Robinson, 1995; and State of Louisiana v. Eric Proctor, Lafayette, 1996.

13.    In the western region of the United States, NCIA has been appointed in the following cases: State of California v. Peter Fan, 1986; State of California v. Robert Massie, 1986; State of California v. Ernest Kirkwood, 1987; State of California v. Brian L. Marquess, 1988; State of California v. James O'Malley, 1988; State of California v. Fermin Ledesma, 1989;

State of California v. Carlos Avena, 1989; State of California v. Peter Edelbacher, 1989; State of California v. Edward Wilson, 1991.

14.    In addition, we have provided services through funding by the Louisiana Indigent Defense Board, the Florida Office of the Capital Collateral Representative, and the Virginia Capital Representation Resource Center.

15.    Finally, NCIA has been appointed in several cases at the federal habeas corpus level of appeal: Commonwealth of Virginia v. Herman Barnes, Oklahoma v. Wayne Thompson, several cases in Florida, Commonwealth of Virginia v. Roy Bruce Smith, 1994; Commonwealth of Virginia v. Larry Stout, 1994; Commonwealth of Virginia v. Ronald Watkins, 1994; and Commonwealth of Virginia v. Johnile Dubois, 1995.

**KS-294**

JA 1283

Affidavit of Hans Selvog   9
Capital Case Mitigation

FURTHER AFFIANT SAYETH NOT

THIS _____ day of _____, 2000.


_____
Hans H. Selvog


Sworn to and subscribed before

me this _____ day of _____, 2000.


_____
Notary Public

**KS-295**                                              JA 1284

# EXHIBIT 8

# EXHIBIT 8

JA 1285

## Declaration of Donna Marie Schwartz-Watts, M.D.

I, Donna Marie Schwartz-Watts, M.D., declare under penalty of perjury:

### Professional Background

1. I am a physician licensed to practice medicine.

2. I completed medical school in 1989, and graduated from the University of South Carolina School of Medicine.

3. I am Board Certified in General Psychiatry and have Added Qualifications in Forensic Psychiatry. My curriculum vitae is attached to my declaration as Exhibit A.

4. From June 1997 until June 2010, I was an Associate Professor and then Professor of Clinical Psychiatry and the Director of Forensic Services in the Department of Neuropsychiatry at the University of South Carolina School of Medicine. During my tenure at the University, I taught residents as well as treated patients. I conducted research and presented and published papers.

5. I am presently employed at Bryan Psychiatric Hospital as a Senior Psychiatrist. I treat people with post-traumatic stress disorder (PTSD) on a frequent basis. The treatment team I work with routinely screen all patients we treat for PTSD with a questionnaire. Many of our patients would not be diagnosed were it not for this specified form of screening. I remain a Department of Mental health Professor of Psychiatry at the University of South Carolina School of Medicine and a Clinical professor of Forensic Psychiatry at the Medical University of South Carolina. I continue to train medical students and residents in Forensic Psychiatry.

6. I also conduct psychiatric evaluations at the request of clients, attorneys, and courts in both criminal and civil cases. Throughout my career, I have conducted thousands of forensic evaluations. From November 1998 until June 2009, I served as a court-appointed psychiatrist (through a contract with the Department of Mental Health) under the South Carolina Sexually Violent Predator Statute. I

JA 1286

have been qualified as an expert in both state and federal court approximately 750 times.

**Involvement in Carlos David Caro's Case**

7.  I was contacted by Assistant Federal Public Defender Robin Konrad and retained in *United States v. Caro*, 06-cr-00001. I was retained to review the prior evaluations conducted in preparation for Mr. Caro's trial, and to review information regarding Mr. Caro's background that was collected and prepared by defense counsel in preparation for trial as well as information presented during his trial. Upon Ms. Konrad's request, I evaluated her client Carlos David Caro, reviewed documents that I have been provided, and am now offering my opinion.

8.  I evaluated Mr. Caro on January 3, 2013. I met with Mr. Caro for approximately two hours at USP-Terre Haute, where most federal death row inmates are housed. This was a contact interview conducted at a table separating the two of us in a legal visitation room. Mr. Caro was restrained in handcuffs, a waist chain, and ankle restraints, consistent with the policies of the United States Bureau of Prisons. My initial evaluation consisted of an interview and mental status examination.

9.  In addition to my evaluation of Mr. Caro, I have reviewed records related to Mr. Caro including, but not limited to:
    *   Neuropsychological Consultation, by D. Malcolm Spica, Ph.D., 06/19/2006 and 06/16/2006;
    *   DVD of evaluation of Mr. Caro on 11/30/2006, by Dr. Robert Phillips, M.D., Ph.D., D.F.A.P.A.;
    *   Report of Forensic Evaluation, by Robert Phillips, M.D., Ph.D., D.F.A.P.A., and Paul Montalbano, Ph.D., 01/29/2007;
    *   Letter from Dr. Phillips to Honorable James Jones, 11/29/2006;
    *   Declaration of Hans Selvog, Ph.D., L.C.S.W., 12/11/2006;
    *   Testimony of Susannah Rodriguez, 02/07/2007 Trial Transcript pp. 69-115;
    *   Testimony of Yomedia Martinez, Delia Contreras and Diamantina Razo, 02/07/2007 Trial Transcript pp. 123-171;

JA 1287

- Testimony of Laura Perez and Lou Yveth Caro, 02/08/2007 Trial Transcript pp. 2-63;
- Defense Trial Exhibit No. 8, Carlos Caro School Records;
- Defense Trial Exhibit No. 9, Letter from Brooks County ISD Director of Special Education to Dr. Hans Selvog;
- Time-line Narrative Chronological Critical Incidents and Developmental History of Carlos Caro.

10. I have not reviewed all of the documents that Dr. Phillips indicated in his report he reviewed. It is my understanding from counsel that Dr. Phillips has destroyed those records.

11. After conducting an evaluation and reviewing the records listed above, I offer the following information and opinions. I reserve the right to supplement this declaration and my opinions expressed here should I receive additional information.

**Background Information and Summary of Diagnoses**

12. After my initial evaluation of Mr. Caro and my review of his records, it is my professional opinion that Mr. Caro meets the criteria for the following disorders based on the Diagnostic and Statistic Manual of Mental Disorders (DSM-IV-TR).

| | |
|---|---|
| Axis I) | Anxiety Disorder NOS (PTSD), 300.00 |
| | Cognitive Disorder NOS, 294.9 |
| | Adult Antisocial Behavior, V71.01 |
| Axis II) | No diagnosis |
| Axis III) | No diagnosis |
| Axis IV) | Incarceration |
| Axis V) | 55 |

13. I also informed Ms. Konrad that it is my opinion that Mr. Caro should be given a more complete neuropsychological evaluation, a Positron Emission Tomography (PET), and a repeated Electrocephalography (EEG), to determine his present cognitive functioning. He has long term and short term memory deficits. He performed poorly on tasks of verbal fluency and visuospatial design. He had a history of impairments and a prior abnormal EEG, which may have been of poor quality according to Dr. Phillips report. His family reports he had a history of staring off into space when he was younger. Mr. Caro could

Page 3 of 10

JA 1288

benefit from neuroimaging. Neuroimaging (PET) delineates brain function, whereas the MRI that Mr. Caro had delineates brain structure. Since he does give up on tasks due to frustration, the neuroimaging will complement his neuropsychological testing. Having a normal MRI means that Mr. Caro's brain structure is intact, but it is not a study of brain function.

14. During my mental status examination of Mr. Caro, he was reserved and only answered questions asked of him. He rarely offered spontaneous speech. He did not appear anxious, although when he became frustrated at a task, he would smile inappropriately. His affect was generally constricted, although he smiled appropriately a few times and on one occasion appeared sad when discussing the death of his mother. He also smiled inappropriately when performing cognitive tasks that were difficult. Mr. Caro was not psychotic, suicidal, or homicidal, although he has a foreshortened sense of the future. He was able to maintain eye contact.

15. On the cognitive screening testing I conducted, Mr. Caro was alert and orientated to all but the date, which he missed by one day. He had difficulty performing a task of abstraction. He could not explain how a car and train were alike. Only when prompted, Mr. Caro was able to respond, "they move." He was unable to abstract the similarity between a fly and a tree. Mr. Caro registered three items but was only able to recall two after five and ten minutes. He was not able to recall the third object with a clue and forced choice. He was unable to name three wishes when asked. He did answer "freedom."

16. On further cognitive testing, Mr. Caro performed poorly on a test of verbal fluency. He was asked to provide as many words as possible beginning with the letter "D." Mr. Caro was only able to provide four words before becoming anxious and repeatedly saying, "I don't know," not realizing that "don't" begins with a "D." He gave up on this one-minute task after 40 seconds. Mr. Caro also had difficulty reproducing a visual spatial design. Although, Mr. Caro was handcuffed he did not appear mechanically limited when completing the task. When reproducing two intersecting pentagons, he did not complete angles, and he overshot angles.

JA 1289

17. Mr. Caro's performance on cognitive testing is indicative of dysfunction based on his age, lack of head injury, and his reported abstinence from alcohol since his confinement. His performance is consistent with the more sensitive testing performed by Dr. Spica. There was no evidence that he was intentionally trying to perform poorly. He would give up on more difficult tasks after an initial good effort.

18. In his mental status examination, Dr. Phillips does not report doing verbal fluency cognitive screening tests. Dr. Phillips did not note short term memory impairment. The cognitive screening testing, however, is only screening; it is not intended to be used for the purpose of determining the extent of cognitive deficits.

19. Mr. Caro's history is significant in regards to the trauma he experienced and was exposed to during his developmental and formative years. Furthermore, the developmental delays which were reported by various family members prior to and during his trial are multifactorial. Developmental delays can be seen in children with cognitive impairments and in children who are exposed to trauma.

20. The reports prepared by prior evaluators that I have reviewed fail to discuss a complete trauma history for Mr. Caro. Some evaluators noted his exposure to abuse but did not record or review any symptoms of post-traumatic stress disorder or other anxiety disorders. If they had taken a complete trauma history, they would have identified several symptoms of PTSD that were reported and/or exhibited. For instance, Mr. Caro has difficulty recalling specific details of traumas he witnessed; he has a poor memory of his childhood. Mr. Caro avoids discussing witnessing his mother's physical abuse and avoids describing his own abuse at the hands of his brother. He denies having a startle response but admits being hyper alert when he is in the general prison population, which he refers to as the compound. Mr. Caro has noted a decrease in his alertness since he takes recreation alone due to his status.

21. Mr. Caro was born in Falfurrias, TX on February 9, 1967, to Jose Maria Caro Jr. and Virginia Rodriguez Caro. Mr. Caro was the second born of four children. All four children born to Jose Jr. and Virginia were boys. According to several family members, Mr. Caro

Page 5 of 10

JA 1290

was a sickly infant who vomited frequently. He was unable to hold down milk or formula. After some time, the family realized that Mr. Caro was able to keep goats milk down. In addition to Mr. Caro being a sickly infant his mother was suffering from postpartum depression after giving birth to him. Mr. Caro did not walk until he was almost two years old. Family members reported that Mr. Caro stayed to himself and that he was known as "El Mudo," which means The Mute.

22. Mr. Caro's father was an abusive alcoholic with a criminal history who eventually died in 1987 from cirrhosis of the liver. Prior to his father's death, Mr. Caro endured a childhood filled with witnessing his father beat his mother. It was not uncommon for Mr. Caro's father to come home drunk to their small, one bedroom home and beat his mother severely. His father would beat his mother on a daily basis because he was drunk on a daily basis. Mr. Caro's siblings recall their father beating their mother and giving her black eyes.

23. It did not take long for Mr. Caro's older brother, Jose III, to learn from their father's physical abuse. Mr. Caro would often be punched or hit by his older brother Jose III. Mr. Caro never knew why his brother would beat him, but he recalls it happening frequently. He reports that he does not recall fighting back. As a child, not knowing when or why the beatings would come caused Mr. Caro great anxiety.

24. Not only was Mr. Caro's father physically abusive towards Mr. Caro's mother, but he had an extramarital affair. The affair ended with Mr. Caro's father being shot in the chest by his mistress, which almost caused his death. Mr. Caro's older brother, Jose III, witnessed their father being shot. Upon being asked, Mr. Caro said when he was a child he knew of his father's unfaithful behavior, as did his mother.

25. When Mr. Caro's mother was angry at his father she would abandon her children in order to go out to dance. According to family members, Mr. Caro's mother neglected her children because she did not provide the attention her boys needed. Mr. Caro's mother was not the type of mother who would help him get ready for school, make sure he got to school, or help with his homework. When Mr. Caro was little he would get dressed the best way he could and walk to a family member's house to get something to eat before school. Mr.

JA 1291

Caro's aunt reported that, at nine-years-old, Mr. Caro could not tie his shoes or tell time.

26. Mr. Caro struggled in school. Mr. Caro was given the Otis-Lennon Mental Abilities Test which yielded an IQ of 87 in the second grade, an 84 in fourth grade, and an 83 in 8th grade. According to his school records, when he was given the California Achievement Test in the sixth grade, he was functioning at a third grade level when it came to his vocabulary and comprehension. By sixth grade, Mr. Caro was placed in special education classes. He dropped out of high school before completing the tenth grade.

27. Mr. Caro was 17-years-old at the time of his father's death, but when asked, he was unable to recall his age. According to reports from his aunt, Mr. Caro was in the hospital room at the time of his father's death. Mr. Caro has no specific memory of his father taking his last dying breath.

28. Mr. Caro's mother passed away while he was incarcerated and he was unable to attend her funeral. He admitted to having one period of depression after the death of his mother. He stated he was "messed up" for a couple of months afterwards.

29. I reviewed the trial testimony describing Mr. Caro's childhood family home as reported by Mr. Caro's three aunts and one cousin. I also reviewed the Time-line Narrative of Chronological Critical Incidents and Developmental History of Carlos Caro, which I have been told was prepared by the mitigation specialist before Mr. Caro's trial. While Mr. Caro's extended family members reported some of the traumatic events that occurred in Mr. Caro's family, witnesses such as Mr. Caro's brothers would have been able to describe the violence they each endured and/or witnessed in their childhood family home. They have been described as more verbal and social than Mr. Caro.

## Discussion of Diagnoses

30. I have diagnosed Mr. Caro with Anxiety Disorder NOS (not otherwise specified), and determined that he meets some of the criteria for PTSD. As previously mentioned, Mr. Caro's family told prior counsel information which was consistent with symptoms of PTSD

JA 1292

such as his cousin describing Mr. Caro as being a reserved and quiet child who didn't volunteer information which is consistent with being avoidant; his maternal uncle Daniel noting that Mr. Caro stayed to himself and avoided groups; paternal aunts Delia and Veronica noting that Mr. Caro never talked to anyone. In addition, Mr. Caro's brother Noe stated that Mr. Caro liked to stay alone and be by himself.

31. Individuals who suffer from PTSD often have constricted affect. This means that they do not outwardly express emotions with a full range. In other words, their outward expression of emotions does not reflect their inner feelings. For example, when discussing the death of his mother, Mr. Caro remained reserved and reported feeling sad, but his outward expression of emotion did not reflect the sadness he reported.

32. In Dr. Phillip's report Caro, he mentioned that Mr. Caro saw his father beat his mother up during his childhood, but Dr. Phillips never addressed the trauma and the effect it had on Mr. Caro. Dr. Phillips noted Mr. Caro's potential for violence should decrease based on actuarial scales but that Mr. Caro felt disrespected and retaliated against. One of the major symptoms of PTSD is that the individual often re-experiences the traumatic events. While Mr. Caro denies that he has recurrent intrusive thoughts about childhood events, he does avoid thinking about traumatic events. In a letter Mr. Caro wrote to his wife, he prayed that other inmates would "stay the fuck away from him," which is indicative of the avoidance symptom of PTSD.

33. I have also diagnosed Mr. Caro with Cognitive Disorder NOS. He has problems with verbal fluency, short term memory, long term memory and reproducing a visuospatial design.

34. Dr. Spica conducted a neuropsychological evaluation of Mr. Caro prior to his trial and reported frontal lobe dysfunction. Dr. Spica tested Mr. Caro in the 1st percentile on management of information, maintaining cognitive set and concept formation. Mr. Caro scored in the 1st percentile on the Wisconsin Card Sorting – Categories Achieved. He scored in the 7th percent in Booklet Category Test. Dr. Spica ultimately diagnosed him with Cognitive Disorder, Not Otherwise Specified. On his present mental status examination, Mr. Caro continues to demonstrate difficulties with frontal lobe functioning. Neuropsychological testing is a more sensitive method to

JA 1293

delineate brain functioning compared to mental status examination and neurological evaluation.

35. On the Validity Indicator Profile (VIP) Dr. Spica found that Mr. Caro did not sustain consistent effort as the items got harder. He did poorly on Trails B which is another indicator of cognitive impairment.

36. I have also diagnosed Mr. Caro with Adult Antisocial Behavior. In reaching this diagnosis, it should be noted that he only meets the criteria for adult antisocial behavior because his current conviction consists of an act that imposed physical or psychological harm on another person. Mr. Caro does not have a life-long history or childhood history of engaging in such aggressive behavior. This diagnosis is different from a diagnosis of Antisocial Personality Disorder. Adult Antisocial Behavior is another condition that is the focus of clinical attention but is not indicative of mental illness. To be clear, this diagnosis is not a personality disorder, and was incorrectly coded on Axis II by Dr. Phillips.

37. Because Mr. Caro's mother is deceased, I did not have the opportunity to question her directly regarding her ability to parent her sons while dealing with a physically abusive alcoholic spouse. As discussed in paragraph 25 above, there are indications that Mr. Caro's mother was neglectful of her duties as a parent due, in part, to the abusive relationship she had with her husband. There is evidence that Mr. Caro failed to take initiative and respond to social interactions in an appropriate developmental way. He had symptoms of "frozen watchfulness," which is a lack of attachment that can be associated with pathological care. (DSM-TR p. 127). In other words, this behavior could be a direct result of his mother's neglect. His deficits may have also been indicative of a pervasive developmental disorder; however this is less likely since the symptoms of muteness and staring off into space have not persisted into adulthood.

38. As Dr. Phillips noted in his report, Mr. Caro has had no criminal history prior to the age of 20 years old despite his siblings and other family members having strong histories of criminal activity.

39. Mr. Caro also has a strong family history for substance abuse. Mr. Caro as well was a former substance abuser. I agree with Dr.

Page 9 of 10

JA 1294

Phillips's diagnosis of Polysubstance Dependence By History. Mr. Caro presently denies using any substances since his confinement at Terre Haute.

40.  In general, Mr. Caro is a reserved individual who tends to avoid conflicts and unnecessary interactions with others, although he is able to adapt. He was reared in an environment where domestic violence was common, and he was a victim of domestic violence. There is no evidence that Mr. Caro has been a follower or a leader. He describes himself as a loner and demonstrates avoidant characteristics. Being avoidant is one of the symptoms of PTSD. Mr. Caro was raised in poverty and became involved in transporting drugs as a means of financial security. He also had a comorbid substance abuse, which is often associated with exposure to trauma.

41.  As a result of Mr. Caro's brain impairment and anxiety disorder likely arising from his traumatic history, he tends to become more increasingly anxious and unable to use all of the cognitive strategies available to him. His baseline cognitive impairments are further exacerbated by his anxiety disorder. What this means is that when Mr. Caro becomes anxious, he is more likely to exercise poor judgment.

I declare under penalty of perjury that the foregoing is true and correct.

Signed this 7th day of January 2013, in the State of South Carolina.

Donna Marie Schwartz-Watts, M.D.

Page 10 of 10

JA 1295

# EXHIBIT A

# to Declaration of

# Donna M. Schwartz-Watts

JA 1296

# Curriculum Vitae
## *DONNA MARIE SCHWARTZ-WATTS, M.D.*
donnawattsmd@gmail.com

**PRESENT POSITIONS:**

**Senior Psychiatrist (certified)**
Bryan Psychiatric Hospital

**DMH Clinical Professor of Psychiatry**
University of South Carolina School of Medicine
Department of Neuropsychiatry and Behavioral Science

**Clinical Professor, Forensic Psychiatry Program**
Medical University of South Carolina
Department of Psychiatry and Behavioral Sciences

**PROFESSIONAL LICENSURE:**

Diplomate, Psychiatry, (Board Certification #40726), January 1995, recertified 7/05
Added Qualifications in Forensic Psychiatry, July 1996 #471, recertified 7/06
South Carolina Medical License # 16574

**EDUCATION:**

| | |
|---|---|
| 1981 - 1985 | B.A. Psychology<br>Furman University<br>Greenville, South Carolina |
| 1985 - 1989 | Doctor of Medicine<br>University of South Carolina School of Medicine<br>Columbia, South Carolina |

JA 1297

**POSTGRADUATE FELLOWSHIPS AND RESIDENCY POSITIONS:**

1989 - 1993            Resident in General Psychiatry
                       William S. Hall Psychiatric Institute
                       Columbia, South Carolina

1993 - 1994            Fellowship in Forensic Psychiatry
                       William S. Hall Psychiatric Institute
                       Columbia, South Carolina

**ACADEMIC POSITIONS/EMPLOYMENT/UNIVERSITY APPOINTMENTS:**

5/2012 to present      Clinical Professor of Psychiatry
                       Medical University of South Carolina
                       Department of Psychiatry

7/2010 to present      DMH Professor of Psychiatry
                       University of South Carolina School of Medicine
                       Department of Neuropsychiatry

7/2006-7/2010          Professor of Clinical Psychiatry
                       Director, Forensic Psychiatry Services
                       University of South Carolina School of Medicine
                       Department of Neuropsychiatry and Behavioral Science
                       3555 Harden Street Extension, Suite 102
                       Columbia, South Carolina 29203
                       (803) 434-4698 (803) 434-2367 (fax)

                       Consulting and Treating Forensic Psychiatrist
                       South Carolina Department of Juvenile Justice

                       Consulting and Treating Forensic Psychiatrist
                       South Carolina Department of Corrections

11/98-6/2009           Consulting and Treating Forensic Psychiatrist
                       Behavioral Disorders Treatment Program
                       (Sexually Violent Predator Program:  SC 44-48-110)
                       South Carolina Department of Mental Health

6/1997- 7/2006         Associate Professor
                       Director, Forensic Services
                       Department of Neuropsychiatry
                       University of South Carolina School of Medicine

1/2004-7/2004          Acting Assistant Director, Psychiatry Residency Program
                       University of South Carolina School of Medicine
                       Department of Neuropsychiatry and Behavioral Science

JA 1298

Donna Schwartz-Watts, MD
Curriculum Vitae

| | |
|---|---|
| 9/1995-5/1997 | Forensic Residency Training Director<br>University of South Carolina School of Medicine |
| 7 /1996 – 6/1997 | Psychiatrist C   William S. Hall Psychiatric Institute<br>Residential Treatment Director of NGRI Unit |
| 1/1995 – 6/1996 | Teaching Psychiatrist II   William S. Hall Psychiatric Institute<br>Out-patient Forensic Psychiatrist |
| 1/1995 – 12/1997 | Assistant Professor University of South Carolina School of Medicine<br>Department of Neuropsychiatry |
| 7/1994 –6/1995 | Instructor University of South Carolina School of Medicine<br>Department of Neuropsychiatry |
| 7/1994 – 12/1994 | Teaching Psychiatrist I   William S. Hall Psychiatric Institute<br>In-patient and Out-patient Forensic Psychiatrist |

## MEDICAL STAFF APPOINTMENTS:

Bryan Psychiatric Hospital (current)
South Carolina Department of Corrections (courtesy)
South Carolina Department of Juvenile Justice (inactive 7/2010)
William S. Hall Psychiatric Institute
Palmetto Health Richland Memorial Hospital (courtesy)
Palmetto Health Baptist Medical Center (courtesy)
Providence Hospital (pending)

## UNIVERSITY/ MEDICAL STAFF COMMITTEES:

| | |
|---|---|
| 2007-2010 | Member, Appointments and Promotions Committee |
| 2002- 2009 | Member, Alumni Committee, USC School of Medicine |
| 1996- 2010 | Member, Residency Selection Committee |
| 1995- 2010 | Member, Residency Training Committee |
| 2002- 2003 | Member, Search Committee, Chairman of Neuropsychiatry |
| 2000-2001 | Member, Committee on Women USC |
| 1997 | Member, Traditions Committee USCSM |
| 1997 | Member, Search Committee, Director Rehabilitation Counseling |
| 1997 | Physician Advisor, Environment of Care |
| 1996 | Member, Search Committee Chair of Department of Neuropsychiatry and<br>Director of Hall Institute |
| 1996 | Member, Finance Committee, University Specialty Clinics |
| 1994-1996 | Member, Infection Control Committee |
| 1993-1994 | Member, Research Committee |

3

JA 1299

Donna Schwartz-Watts, MD
Curriculum Vitae

## HONORS AND AWARDS:

| | |
|---|---|
| 2007 | Outstanding Female Physician Mentor Award |
| 2004-2005 | Outstanding Forensic Teaching Award<br>Presented by the USC SOM Forensic Fellowship Training Program |
| 1992 | Rappeport Scholarship in Forensic Psychiatry<br>Presented by the American Academy of Psychiatry and the Law |
| 1989 | Neurology Award, School of Medicine |
| 1985 | Cum Laude Graduate, Furman University |
| | Phi Beta Kappa, Furman University |
| | Alpha Epsilon Delta, Furman University |

## MEMBERSHIPS AND OFFICES IN PROFESSIONAL ORGANIZATIONS:

2002-2009    American Board of Psychiatry and Neurology
 Forensic Certification Committee

1999-Present    American Board of Psychiatry and Neurology
1999-Present    Board Examiner

1997-2003    Group for the Advancement of Psychiatry (GAP), General Member
1999                Chair

1992- Present   American Academy of Psychiatry and the Law  (AAPL)
1995-2000        Rappeport Committee (President appointed)
1995-2000        Education Committee (President appointed)
1998-2000        Program Committee (President appointed)
1999                Program Chair
1995-97            Mentor to Rappeport Fellow

1989-1998    American Psychiatric Association, General Member

1989-1998    South Carolina Psychiatric Association
1995-1998        Federal Legislative Representative (President appointed)
1995-1999        Executive Council
1996-1998        Secretary-Treasurer

1997    NAMI Advisory Board Physician Representative

## PUBLICATIONS:

Schwartz-Watts DM:  "Commentary:  Stalking Risk Profile."  The Journal of the American Academy
     of Psychiatry and the Law, 34:455-457, 2006.

4

JA 1300

Schwartz-Watts DM, Frierson RL:  "20: Crisis Stabilization in Correctional Settings." in Clinical Practice in Correctional Medicine , Second Edition, edited by Michael Puisis, D.O., S.C. Mosby, Inc affiliate of Elsevier, Inc   2005.

Schwartz-Watts DM.  "Asperger's Disorder and Murder." Analysis & Commentary   The Journal of the American Academy of Psychiatry and the Law  33:390-3, 2005.

Schwartz-Watts DM, Rowell CN. "Commentary: Update on Assessing Risk for Violence Among Stalkers." The Journal of the American Academy of Psychiatry and the Law  31:440-3, 2003.

Giorgi-Guarnieri D, Zonana HV, Schwartz-Watts DM.  "Practice Guideline: Forensic Psychiatric Evaluation of Defendants Raising the Insanity Defense."  Supplement to The Journal of the American Academy of Psychiatry and the Law   30:2, 2002.

Frierson R, Schwartz-Watts D, Malone T, Morgan D. "Capital Versus Noncapital Murderers" in revision The Journal of the American Academy of Psychiatry and the Law, 1998.

Schwartz-Watts D, Morgan D.  "Violent Versus Nonviolent Stalkers," accepted, The Journal of the American Academy of Psychiatry and the Law, 1998.

Schwartz-Watts D, Morgan D, Barnes C.  "Stalkers:  The South Carolina Experience,"  The Journal of the American Academy of Psychiatry and the Law,1997, 24:541-545.

Schwartz-Watts D, Montgomery L, Morgan D.  "Seroprevalence of Human Immunodeficiency Virus Among Pre-Trial Detainees," The Bulletin of the American Academy of Psychiatry and the Law, 1995, 23:285-289.

**POSTERS:**

Internet Chat Rooms: Who Solicits Children? R. Gregg Dwyer, MD, EdD, Donna Schwartz-Watts MD , William Burke, PhD, American Academy of Psychiatry and the Law 39th Annual Meeting, Seattle, WA October , 2008

**PRESENTATIONS:**

"Predators Among Us" University of South Carolina 2012 Mini Med School, October 2, 2012, Columbia, South Carolina

"How Death is Different-Using ABA Guidelines to Meet the Standard of Care in Death Penalty Cases and Social History Investigations: The team Approach" with Joe VonKallist, Capital Case Workshop, September 19, 2012, Wilmington, North Carolina

JA 1301

Donna Schwartz-Watts, MD
Curriculum Vitae

"Protecting Mental Health" South Carolina Attorney General's Continuing Legal Education Ethics Seminar, Blatt Building, Columbia, SC 12/2/11

"Autistic Spectrum Disorders and the Legal System ", DMH Annual CME, William S Hall Psychiatric Institute 9/11

"Issues of Mental Competency" South Carolina Circuit Court Judges Conference, Spartanburg, South Carolina, May 4-6, 2011

Stalking in the New Millennium": Department of Mental Health Day Long CME, Columbia SC, October 2009

"Internet Predators": South Carolina Psychiatric Association Annual Meeting, Myrtle Beach, South Carolina, 1/2009

"Internet Predators": Panel Speaker, South Carolina Bar Association Annual Meeting, Myrtle Beach South Carolina, 1/2009

Internet Predators: ICAC Quarterly Meeting, Columbia, South Carolina  11/21/2008

Project Safe Childhood, Advanced Online Child Exploitation Seminar, National Advocacy Center Columbia, SC, July 29, 2008

"Violent Crimes and the Commitment of Sexually Violent Predators, MUSC Judges and Attorneys Substance Abuse and Ethics Seminar, Charleston, South Carolina, December 7, 2007

"Autistic Spectrum Disorders and Corrections" South Carolina Department of Corrections Mental Health Seminar, Columbia, South Carolina, December, 2007

"Pitfalls in Sex offender Commitment Hearings" Panel Speaker, American Academy of Psychiatry and the Law 38th Annual meeting, Miami, Florida, October 22, 2007

"Treating the Untreatable" Panel Speaker, American Academy of Psychiatry and the Law 38th Annual Meeting, Miami, Florida,  October 19, 2007

"Risk Assessment in General Psychiatry: Department of Mental Health Annual Day Long CME, Columbia, SC September 21, 2007

"Mitigation in Noncapital Cases" SC Public Defender's Conference, Myrtle Beach, SC October 2007.

"Nuts and Bolts of Sexually Violent Predator Proceedings" SC Bar CLE, Columbia, South Carolina July 27, 2007

6

JA 1302

Donna Schwartz-Watts, MD
Curriculum Vitae

University of South Carolina School of Medicine Founder's Day Speaker for Woman in Medicine, Columbia, South Carolina, April 2007.

"Autistic Spectrum Disorders and Mitigation," Washington DC March 2007

"Sex Crimes and their Aftermath II" Panel Discussion and Presentation, Jack Swerling Moderator, South Carolina Bar Association Conference, Charleston, SC, January 25, 2007

"Psychiatry for the Brilliant Fact Finders" Invited Speaker, South Carolina Judges Conference, Greenville, SC, May 12, 2006.

"Sex Crimes and their Aftermath" Panel Discussion and Presentation, Jack Swerling Moderator, South Carolina Bar Association Conference, Charleston, SC January 27, 2006.

Habeas Institute, Guest Faculty Teaching for the Federal Defenders, US Department of Justice National Institute of Trial Advocacy, Atlanta Georgia , June 4-5, 2005

Habeas Institute, Guest Faculty Teaching for the Federal Defenders, US Department of Justice National Institute of Trial Advocacy, Atlanta Georgia , June 5-6, 2004

Habeas Institute, Guest Faculty Teaching for the Federal Defenders, US Department of Justice National Institute of Trial Advocacy, New York, New York, June 20-21,2003

Habeas Institute, Guest Faculty Teaching for the Federal Defenders, US Department of Justice, New York, New York. June 20-22,2002.

South Carolina Probation, Paroles and Pardons Annual Conference. "A State of Mind". Myrtle Beach, SC. November 11, 2002.

American Academy of Psychiatry and the Law, "Difficult Case? Consult your Colleagues." Newport Beach, California. October 26, 2002

South Carolina Public Defender's Conference, "Issues and Concerns Regarding the Sexually Violent Predator Statue" Litchfield Beach, South Carolina, September 30, 2002

Habeas Institute, Guest Faculty Teaching for the Federal Defenders, US Department of Justice, New York, New York, June 28-30-2002.

American Academy of Psychiatry and the Law, "Death Penalty"   Boston, MA, October 28, 2001

American Academy of Psychiatry and the Law, "Ask the Expert" and "The Difficult Case" Panel Discussions.  Boston, MA, October 28, 2001

JA 1303

Donna Schwartz-Watts, MD<br/>Curriculum Vitae

Habeas Institute, Guest Faculty Teaching for the Federal Defenders, US Department of Justice, New York, New York, June 14-17-2001.

Annual Capital Defense Training Seminar, "The Importance of Timing in the Presentation of Your Client's Story:  Frontloading Mitigation" with John Blume, Attorney,  Jekyll Island, Georgia, February 9, 2001

University of Texas, Department of Psychiatry Grand Rounds "Profile of a Stalker"  San Antonio, Texas, December 19, 2000

Willford Hall Medical Center, Lackland Air Force Base, Texas, "Death Penalty Evaluations," December 18, 2000.

Willford Hall Medical Center, Lackland Air Force Base, Texas, "Texas Sexually Violent Predator Statute,"  December 18, 2000

American Academy of Psychiatry and the Law, " Juveniles Who Carry Weapons on School Grounds"  Baltimore, Maryland, October 15, 1999

American Academy of Forensic Science, Workshop Presenter, San Francisco, 1998 "Classification and Typology of Stalkers."

Kansas City, Western Missouri Forensic Department, 1997 "Evaluation of Stalking."

University of South Carolina School of Medicine Women's Month Featured Presenter, 1997 "Stalkers:  The South Carolina Experience."

American Academy of Psychiatry and the Law, Denver, CO, 1997 "Psychotic versus Nonpsychotic Stalkers."

American Academy of Psychiatry and the Law, Denver, CO, 1997 "Harassing Telephone Callers."

American Academy of Psychiatry and the Law, Denver, CO, 1997  Panel on Maintaining Competence sponsored by Education Committee

American Academy of Psychiatry and the Law, Puerto Rico, 1996 "Violent Versus Nonviolent Stalkers",

American Academy of Psychiatry and the Law, Puerto Rico, 1996 "Capital Versus Noncapital Murderers"

American Academy of Psychiatry and the Law, Puerto Rico, 1996  "Treatment of Insanity Acquittees Across the United States."

8

JA 1304

Donna Schwartz-Watts, MD
Curriculum Vitae

William S. Hall Psychiatric Institute Forensic Forum, 1996 "Evaluation and Treatment of Sexual Offenders."

Georgia Regional Forensic Forum, 1996 "Evaluation and Treatment of Sexual Offenders."

American Academy of Psychiatry and the Law, Seattle, Washington, 1995  "Stalkers:  The South Carolina Experience"

South Carolina Psychiatric Association, Hilton Head Symposium, 1995 "What General Psychiatrists Need to Know About Forensic Psychiatry."

American Academy of Psychiatry and the Law Annual Conference, San Antonio, Texas   1993 "Seroprevalence of HIV Among Inpatient Pre-trial Detainees"

American Medical Association, North Carolina  1990 "Tertiary Metastases Presenting As Panhypopituitarism"

**PRESENT RESEARCH:**

Schwartz-Watts D. "Death Penalty"

Schwartz-Watts D, Barth E, Morgan D. "Harassing Telephone Callers"

Schwartz-Watts D, Morgan D.  "Psychotic Versus Nonpsychotic Stalkers"

Schwartz-Watts D, Morgan D.  "Comparing Stalkers to the Criminally Domestic Violent."

Schwartz-Watts D, Bloom J, Sloan C.  "Psychiatric and Legal Perspectives of Stalking."

**PRESENT GRANTS:**

Internet Crimes Against Children: Development of a Typology of Offenders for Use in Prevention, Investigations and Treatment; U.S. Department of Justice Office of Justice Programs Grant; 2010-MC-CX-003; Principle Investigator: RG Dwyer; Co-Principal Investigator: D DeHart; Co-Investigators/Consultants: R Moran, DM Schwartz-Watts, W Burke, DL Laufersweiler-Dwyer; 2010 - 2013

Internet Chat Room Solicitation of Children: A Study of Psychosocial and Criminal Justice Factors as They Relate to Public Safety Risk; American Academy of Psychiatry and the Law Institute for Education and Research (AIER) Grant; Principal Investigator: RG Dwyer; Co-investigators: D DeHart, DM Schwartz-Watts, W Burke & R Moran; 2009 - 2010

Co-author w Alicia Hall, PhD, Harry Wright, MD Autistic Spectrum Disorders and Corrections
(Revised 1/6/13)

JA 1305

# EXHIBIT 9

# EXHIBIT 9

JA 1306

## DECLARATION OF JAMES SIMMONS

I, James Simmons, declare under penalty of perjury the following:

1.      I am an attorney and have a license a practice in Tennessee.  I have been practicing law since October 1982.

2.      I, along with Stephen Kalista, represented Carlos Caro in his capital murder case, No. 06-cr-00001-JPJ-1, in the United States District Court for the Western District of Virginia.

3.      When I was appointed to represent Mr. Caro, I had represented approximately twenty (20) capital defendants at various stages of proceedings, including pretrial and post-conviction.

4.      I have met with Mr. Caro's current counsel and reviewed various portions of his case file. I have also reviewed the declaration signed by Stephen Kalista related to our representation of Mr. Caro.  I concur with the information provided in Mr. Kalista's declaration.

I declare under penalty of perjury that the foregoing is true and correct.

_____
JAMES A. SIMMONS

_12/29/12_____
Date

STATE OF TENNESSEE    )
COUNTY OF SUMNER      )

Personally appeared before me, the undersigned Notary Public, the within named JAMES A. SIMMONS, with whom I am personally acquainted or was proved to me on the basis of satisfactory evidence, and who acknowledged that he executed the within instrument for the purposes therein contained.

SWORN and SUBSCRIBED to before me on this the 29 day of December, 2012.

_____
NOTARY PUBLIC
My Commission Expires:  02/26/2013

LOUIS W. OLIVER III
STATE OF TENNESSEE
NOTARY PUBLIC
SUMNER COUNTY, TN

JA 1307

# EXHIBIT 10

# EXHIBIT 10

JA 1308

## Declaration of D. Malcolm Spica, Ph.D.

I, D. Malcolm Spica, do state the following:

1.  My name is D. Malcolm Spica. I have both a Master's Degree and a Doctorate in clinical psychology; my clinical practice and research have focused on neuropsychology, in which I served an internship approved by the American Psychological Association and recognized by the Division 40 (Neuropsychology). My current curriculum vitae is attached hereto as Exhibit A.

2.  I was retained by defense counsel in the case United States v. Caro, 06-cr-00001, in the United States District Court for the Western District of Virginia. I was retained to evaluate the information processing aspects of Mr. Caro's status via conventional neuropsychological examination. I have attached the curriculum vitae I submitted at the time I was retained as Exhibit B.

3.  When I was retained, this was either my first capital case or I may have been working on another capital case at the same time. At the time, I had never testified as an expert in a criminal case.

4.  I conducted neuropsychological testing of Mr. Caro. I saw Mr. Caro twice in June 2006, and prepared a report outlining my findings. I have attached my report hereto as Exhibit C.

5.  Based on my testing, I concluded that Mr. Caro has cognitive deficits clinically described as front lobe dysfunction.

6.  As is typically the case in my forensic work, it was beyond the scope of my role to conduct a full psycho-social history of Mr. Caro's background. Rather, it was my understanding that I was to perform the testing and describe how Mr. Caro's brain dysfunction impacts him. I recommended that a forensic psychiatrist be consulted so that my findings could be integrated with an assessment of Mr. Caro's psychiatric, neurocognitive, and adaptive functions.

7.  I recall having a conference call with the trial defense team after I evaluated Mr. Caro. They informed me that they would possibly need me to testify and that they would be in touch. At some point, however, I received a call

Page 1 of 3

JA 1309

USCA4 Appeal: 16-1 2013 4:02PM Doc: 32-3 Spica Psychology Filed: 12/27/2016 No. 0331 P. 2 Pg: 116 of 300

letting me know that they would not need me to testify. I think it may have been a voicemail message. I do not recall an explanation as to why they would not need me. I was not asked to formulate an opinion on the Government's experts, Dr. Phillips or Dr. Montalbano, and at that time I was not provided their work to review.

8.  If I had been asked to testify at Mr. Caro's trial, I would have testified to the information that I have described in my report. I would have explained that, practically speaking, Mr. Caro's reasoning abilities are at the level of a ten-year-old when conditions are calm and controlled. But those skills are unstable. If conditions are chaotic and he has to perform under pressure, Mr. Caro performs at a much lower level due to three mental deficits, typically associated with frontal lobe dysfunction; Management of information; Maintaining cognitive set; Concept formation. Overall, Mr. Caro's results provided converging and consistent evidence of cerebral frontal lobe dysfunction. Persons with frontal lobe dysfunction tend to have difficulty organizing, processing, and comprehending new information provided to them. Further, Mr. Caro's detected difficulty with concept formation results in poor understanding of cause-and-effect relationships.

9.  In 2012, I was provided a copy of the Report of Forensic Evaluation prepared by Robert T.M. Phillips, M.D., Ph.D., D.F.A.P.A. on behalf of the Government in Mr. Caro's case.

10. Paul Montalbano, Ph.D., conducted limited neuropsychological testing of Mr. Caro. Relying in part on Dr. Montalbano's testing, Dr. Phillips concluded that Mr. Caro does not suffer from brain impairment. This conclusion is faulty for two reasons.

11. First, Dr. Montalbano did not administer multiple tests for executive functioning. This was essential, as executive functioning represents Mr. Caro's chief deficit and indicator of frontal lobe dysfunction. The reason those tests were omitted is unclear, as they are part of the typical neuropsychological examination.

12. Second, Dr. Montalbano administered the tests less than six months after I performed my tests. This is problematic due to the phenomenon of practice effect, which is the issue that prior exposure to tests can artificially increase a person's performance on those tests, as they have become familiar with the task and learned how to respond correctly. That is, the validity of Mr. Caro's

Page 2 of 3

JA 1310

results with Dr. Montalbano was compromised by his recent exposure to the test stimuli.

13. Had I been a witness at Mr. Caro's trial, I would have testified as set forth above that Dr. Montalbano's testing was not sufficiently comprehensive to test for executive functioning, that the validity of any results was suspect as they were administered too close in time to the tests I administered, and that Dr. Phillips's conclusions based upon those tests would accordingly be faulty.

I declare under penalty of perjury that the foregoing is true and correct.

_D. Malcolm Spica, Ph.D._

D. Malcolm Spica, Ph.D.

_1/4/13_

Date

JA 1311

# EXHIBIT A

# to Declaration of

# D. Malcolm Spica

JA 1312

D. MALCOLM SPICA, PH.D.

**Curriculum Vitae**

SPICA PSYCHOLOGY, PLLC                              Tennessee Health Service Provider License #2558
220 Fort Sanders West Boulevard                     Michigan Clinical Psychologist License #6301008473
Medical Office Building 2, Suite 300
Knoxville, Tennessee   37922
Tel. 865.531.9088
Fax.865.531.9089

## EDUCATION

| 1986 | Bachelor of Science<br>Degree with Distinction | Major:  Psychology<br>University of Michigan<br>Ann Arbor, Michigan |
|------|------|------|
| 1991 | Master of Arts<br>Thesis Title:<br>"Detecting Late-Life Forgetfulness<br> Using the Brief SDAT Battery." | Clinical Psychology<br>Michigan State University<br>East Lansing, Michigan |
| 1994 | Doctor of Philosophy<br>Dissertation Title:<br>"Use of Executive Control in<br> Accessing Episodic and Semantic<br> Memory in Patients with Alzheimer's Dementia." | Clinical Psychology<br>Michigan State University<br>East Lansing, Michigan |

## CURRENT POSITIONS

**July 2011 - 2009**
**President – Knoxville Area Psychological Association**,
Director and Voting board member of the Knoxville Area Psychological Association to advance psychology on the city and state level, as well as to enhance the effectiveness of members as scientists and practitioners in the practice of psychology.

**Jan. 2007 - 2009**
**Vice President - East Tennessee - Tennessee Psychological Association**,
Represent East Tennessee as a voting board member of the Tennessee Psychological Association to advance psychology on the national and state level, as well as to enhance the effectiveness of members as scientists and practitioners in the practice of psychology.

**Jan. 2005 - Present**
**Medical Consultant - Neuropsychology**  – UnumProvident Insurance Corporation,
Chattanooga TN.  Conduct reviews of medical records to determine neurobehavioral status of claimants in complex cases of long-term disability.  Evaluate forensic evidence adduced in medico-legal cases for disability determinations/settlements.

JA 1313

MALCOLM SPICA, PH.D.   Page, 2

**June 2004 -**
**Present**

**Chief Neuropsychologist** – Behavioral Medicine Institute, P.C., Knoxville Tennessee
Examine outpatients with a variety of neurological and psychiatric conditions, and produce diagnostic reports of their neuropsychological functioning. Provide psychotherapy treatment to adults and adolescents utilizing a variety of approaches, including goal-directed time limited interventions.

**Jan. 2006 -**
**Present**

**Consulting Neuropsychologist** – Catholic Diocese of Knoxville, Tennessee
Conduct screening examinations of seminary candidates to determine character and fitness to serve. Make recommendation about formation and possible follow-up treatment.

**Nov. 1998 -**
**2009**

**Chief Psychologist** - Montcalm Center for Behavioral Health, Stanton Michigan
Supervise Masters Level psychologists in the treatment of individuals and families with psychological disorders and generalized problems of living. Provide psychological and neuropsychological examinations to patients with difficult diagnostic presentations.

**Nov. 2001 -**
**2009**

**Consulting Neuropsychologist** – Michigan Rehabilitation Services, Lansing Michigan
Conduct examinations of participates in a variety of rehabilitation programs funded by the state of Michigan. Determine the participants' current and potential levels of functioning.

**Sept. 2001-**

**Present**

**Director/Owner - Clinical Neuropsychologist** – Spica Psychology, PLLC, Knoxville, Tennessee
Examine outpatients with a variety of neurological and psychiatric conditions, and produce diagnostic reports of their neuropsychological functioning. Provide psychotherapy treatment to adults and adolescents utilizing a variety of approaches, including goal-directed time limited interventions.

**Jan. 2004 -**
**2009**

**Consulting Neuropsychologist** – Catholic Diocese of Lansing, Michigan
Conduct screening examinations of seminary candidates to determine character and fitness to serve. Make recommendation about formation and possible follow-up treatment.

**Dec. 1997 -**
**2008**

**Consulting Neuropsychologist** – Sacred Heart Mercy Health Care Center, Alma Michigan
Conduct examinations of clergy, seminarians, and nuns referred to the Scared Heart Health Care for treatment or evaluation. Psychodiagnostic procedures assess a broad range of conditions including paraphilias, personality disorders, and cognitive dysfunction.

**April 1995 -**
**2005**

**Lecturer** Human Medicine: Disorders of Development & Behavior - College Of Human Medicine, Michigan State University, East Lansing Michigan.
Provide lectures to second year medical students on topics including learning disorders and attentional disorders. Also provided original manuscript for course content and authored examination items for course (Human Medicine 512 Disorders of Development & Behavior Domain)

**Sept. 1993-**
**2001**

**Director - Clinical Neuropsychologist** - Neurobehavioral Associates, P.C., Okemos, Michigan
Examine outpatients with a variety of neurological and psychiatric conditions, and produce diagnostic reports of their neuropsychological functioning. Provide psychotherapy treatment to adults and adolescents utilizing a variety of approaches, including goal-directed time limited interventions. Organize a comprehensive data set gathered from patients with cortical dementia.

**Nov. 2000 -**

**Pediatric Neuropsychology Supervisor** – Department of Psychology, College of Social Science,

JA 1314

**2001**          Michigan State University, East Lansing Michigan.
                  Supervise graduate students in the clinical psychology program during their clinical
                  assessments of children with a wide variety of neurocognitive disorders.

**Spring 2000**   **Adjunct Assistant Professor** – Department of Psychology, College of Social Science, Michigan
                  State University, East Lansing Michigan.
                  Instructor for Behavior Disorders Course.  The course covers diagnostic and treatment issues
                  for the broad range of neurobehavioral syndromes; course designed for doctoral students in their
                  first year of training.

**Fall 1998-**   **Preceptor - Problem Based Learning Program** – College Of Human Medicine, Michigan
**2004**          State University, East Lansing Michigan.
                  Facilitate the Problem Based Learning process for second year medical students as they
                  attempt to diagnose and treat hypothetical clinical cases presented to them in step-wise fashion.
                  Their training requires reviewing principles of scientific method, logical/diagnostic reasoning, and
                  resource utilization as well as group dynamics.

**April 1995-**  **Adjunct Assistant Professor** - Department of Psychiatry, Michigan State University, East
**2004**          Lansing Michigan.
                  Teach the weekly Neuropsychiatry Seminar Series to medical residents in their third year of
                  psychiatry residency.  The seminar covers diagnostic and treatment issues for the broad range
                  of neurobehavioral syndromes psychiatrists encounter in clinical work.

### CLINICAL EXPERIENCE:

**Sept. 1992-**  **Neuropsychology Intern** - Long Island Jewish Medical Center-Hillside Hospital,
**Aug. 1993**    Glen Oaks, New York.
                  Conducted neuropsychological assessments of inpatients and outpatients with a variety of
                  neurological and psychiatric conditions and produced diagnostic reports of their functioning.
                  Treated persons through individual psychotherapy using a variety of insight-oriented approaches
                  (psychodynamic and cognitive-behavioral).  Training also included participation in the
                  Comprehensive Epilepsy Evaluation Clinic, supervised assessments in the Pediatric
                  Neuropsychology Service, and weekly individual sessions of cognitive rehabilitation for patients
                  with schizophrenia.  The site complies with all APA requirement guidelines including Division 40
                  guidelines for clinical neuropsychology pre-doctoral internship.

**June 1991-**   **Assessment Liaison** - Michigan State University Learning Disabilities Program;
**Sept 1992**    Office of Programs for Handicapper Services/MSU Psychological
                  Clinic, East Lansing Michigan.
                  Trained graduate students in the administration and reporting of a broad selection of
                  neuropsychological measures.  Coordinated, supervised, and conducted neuropsychological/
                  psychoeducational assessments of MSU students referred for learning disabilities.  Organized a
                  comprehensive data set gathered from college-aged learning disabled
                  individuals and matched normal controls.

**Sept. 1991-**  **Neuropsychology Consultant-Trainee** - Neurobehavioral Clinic and
**Sept. 1992**   Research Center (Michigan State University/Department of Psychiatry), East
                  Lansing Michigan.

JA 1315

MALCOLM SPICA, PH.D. Page, 4

Conducted neuropsychological assessments of outpatients with a variety of neurological and psychiatric conditions and produced diagnostic reports of their functioning. Organized a comprehensive data set gathered from patients with cortical dementia.

**June 1989-** **Inpatient and Outpatient Assessment Coordinator** - Michigan State University
**Sept 1992** Psychological Clinic, East Lansing Michigan.
Trained graduate students in the administration and reporting of a broad and flexible battery of neuropsychological and personality measures. Coordinated, supervised, and conducted neuropsychological/ personality assessments of patients referred from Lansing General Hospital, Ingham County Medical Center, as well as from private physicians in the community.

**March 1989-** **Teaching Assistant** - Neuropsychology Assessment Laboratory 852B (3 credit graduate level
**June 1991**; course), Clinical Psychology Program - Michigan State University Graduate School, East Lansing Michigan.

**Sept. 1989-** **Psychotherapy Trainee** (Practicum Student) - Michigan State University
**July. 1991** Psychological Clinic, East Lansing Michigan.
Conducted insight-oriented individual psychotherapy with outpatient community members seeking services from the MSU Clinic.

**June 1989-** **Neuropsychology Consultant-Trainee** - Ingham Medical Center/
**Sept. 1991** Michigan State University Psychology Graduate Program, Lansing, Michigan.
Conducted neuropsychological examinations of inpatients from general medical units and produced diagnostic reports of their functioning.

**June 1990-** **Student Trainee** - Neuropsychology Program (Department of Psychiatry),
**Sept. 1990** University of Michigan Medical Center, Ann Arbor, Michigan.
Conducted neuropsychological assessments of outpatients with a variety of neurological and psychiatric conditions and produced diagnostic reports of their functioning. Organized a comprehensive data set gathered from patients with Alzheimer's dementia and isolated memory impairment.

**June 1989-** **Neuropsychology Consultant-Trainee** - Tamarack Head Injury Rehabilitation Center
**Sept. 1989** East Lansing Michigan.
Conducted neuropsychological assessments of outpatients and rehabilitation center residents with a variety of conditions resulting from traumatic brain injury and produced diagnostic reports/treatment plans. Organized data set gathered from patients with mild head injuries.

**June 1988-** **Student Trainee** - Battle Creek Veterans Administration Medical Center,
**Sept. 1988** Neuropsychology/Department of Psychology, Battle Creek, Michigan.
Conducted neuropsychological assessments of inpatients and outpatients with a variety of neurological and psychiatric conditions and produced diagnostic reports of their functioning.

**Dec. 1986-** **Neuropsychology Testing Technician** - Neuropsychology Program
**June 1988** (Department of Psychiatry), University of Michigan Medical Center,
Ann Arbor, Michigan.
Administered neuropsychological assessment batteries to outpatients and inpatients with a wide range of neurological and psychiatric conditions.

**Jan. 1986-** **Neurology Volunteer** - Neurology Inpatient Unit [Spinal Cord

JA 1316

USCA4 Appeal: 16-1    Doc: 32-3    Filed: 12/27/2016    Pg: 123 of 300
Case 1:06-cr-00001-JPJ   Document 790-10   Filed 03/22/13   Page 10 of 27   Pageid#: 6631

MALCOLM SPICA, PH.D.   Page, 5

| | |
|---|---|
| **April 1988** | Rehabilitation Program] Department of Neurology, University of Michigan Medical Center, Ann Arbor, Michigan.<br>Assisted in the general care for acute spinal- and brain-injured patients. |
| **Jan. 1985-**<br>**April 1985** | **Mental Health Volunteer** - Psychiatry Adult Inpatient Unit [Depression Clinical Studies Program] Department of Psychiatry, University of Michigan Medical Center, Ann Arbor, Michigan.<br>Facilitated treatment plans through engaging patients in social tasks, activities and outings. Conducted one-to-one observations for suicidal individuals. |
| **Jan. 1983-**<br>**April 1983** | **Mental Health Volunteer** - Project Outreach - Child Development Center, University of Michigan, Dearborn, Michigan.<br>Supervised activities and lesson plans for healthy children ages 3 through 6 from the community. Administered Stanford-Binet Intelligence Scale tests. |
| **Feb. 1981-**<br>**May 1981** | **Mental Health Worker** - Ardmore Acres Psychiatric Hospital, Farmington, Michigan<br>Implemented the direct care of psychiatric patients as prescribed by staff psychiatrists, including maintenance of medication schedules, supervision of activities and visitation, charting of vital signs, and continuous formal reporting of patient behavior. |

## RESEARCH EXPERIENCE

| | |
|---|---|
| **Sept. 1990-**<br>**Sept. 1994** | Spica, D.M. (1994).  Use of executive control in accessing episodic and semantic memory in patients with Alzheimer's dementia. Unpublished dissertation, Michigan State University, East Lansing. |
| **Sept. 1988-**<br>**June 1991** | Spica, D.M. (1991).  Detecting late-life forgetfulness using a brief SDAT battery. Unpublished master's thesis, Michigan State University, East Lansing. |
| **Sept. 1988-**<br>**Sept. 1994** | **Research Consultant -** Michigan State University - Department of Psychology/Clinical Aging Research Project, East Lansing Michigan.<br>Train students in testing procedures and analyze data for ongoing study investigating the relationships of mood, memory, and physical health in normal aged persons.<br>    Norman Abeles, Ph.D. - Principal Investigator |
| **June 1989-**<br>**Sept. 1989** | **Research Consultant** - Ann Arbor Veterans Administration Medical Center, Neuropsychology/Department of Psychology. Ann Arbor, Michigan.<br>Recruited and ran subjects for an ongoing study of eye-tracking and attention.<br>    Henry Buchtel, Ph.D.- Principal Investigator |
| **May 1986-**<br>**Dec. 1988** | **Research Consultant** - Neuropsychology Program (Department of Psychiatry)/ Department of Neurology, University of Michigan Medical Center, Ann Arbor, Michigan.<br>Constructed computer file and processed data for ongoing study investigating the relationship of neurologic symptoms and neuropsychometric performance in patients with Alzheimer's Disease. |

## GRANTS

| | |
|---|---|
| **1991** | Coping with aging:  Quality of life among nursing home residents.  With N. Abeles, P.S. Fastenau, & L.A. Domitrovic.  Not funded.  Submitted to Sigma Kappa Foundation, Inc.,     Indianapolis, IN. |

JA 1317

MALCOLM SPICA, PH.D.   Page, 6

**1990**    Wechsler adult intelligence score patterns in learning disabled college students.  Not funded.  Submitted to the Michigan Health Care Education and Research Foundation, Detroit, MI.

**1989**    Detecting age-associated memory impairment using the brief SDAT battery.  Awarded by the Michigan Health Care Education and Research Foundation, Detroit, MI.

**1988**    Summer Traineeship (first ever without graduate education).  Awarded by the Veterans Administration, Washington, D. C.

**1986**    Altered metabolism in olivopontocerebellar atrophy studied with positron-emission tomography.  With S. Berent.  Awarded by the University of Michigan Medical School Summer Research Foundation, Ann Arbor, Michigan.

## RESEARCH PRESENTATIONS

Stawicki, J.A., Spica, D.M., Lount, R. (2001) The Importance of Thorough Examinations for Evaluation of Attention Deficit-Hyperactivity Disorder.  Poster presented at the meeting of the American Psychological Association, San Francisco.

Spica, D.M., Klotz, M, & Abeles, N. (Submitted).  Use of executive control in accessing episodic and semantic memory in patients with Alzheimer's dementia.  Poster submitted for the 1996 meeting of the International Neuropsychological Society, Chicago.

Spica, D.M., Klotz, M, & Abeles, N. (1995).  Differential episodic and semantic memory defects in patients with Alzheimer's disease.  Poster presented at the 1995 meeting of the National Academy of Neuropsychological, San Francisco.

Abeles, N., & Spica, D.M. (1994).  Mini inventory of right brain injury.  Test Critiques. *New York: Oxford University Press.*

Spica, D.M., Abeles, N, & Giordani, B. (1991, August).  Detecting age-associated memory impairment using the brief SDAT battery.  Poster presented at the meeting of the American Psychological Association, San Francisco.

Berent, S., & Spica, D.M. (1986, August).  Altered metabolism in olivopontocerebellar atrophy studied with positron-emission tomography.  Poster presented at The University of Michigan Summer Research Forum, Ann Arbor, MI.

## OTHER PRESENTATIONS

Spica, DM, Dawson, D. (2011, May).  What the Tests Mean & How to Use Them. Capital Defense Training.  Traversing the Recesses The Mind: Mental Health & Capital Cases, Co-Sponsored by the TN Office Post-Conviction Defender Public Defenders Conference.  University of Tennessee - College of Law Knoxville, TN.

Caruso, K.A., Spica, D.M., (2007, October).  Disability Evaluations: Dissimulation & Somatization.  38th Annual Meeting of the American Academy of Psychiatry and the Law, Miami, FL.

Spica, D.M., (2005, November).  Fighting procrastination in everyday life. 2005 Convention of the Tennessee Psychological Association, Nashville, TN.

JA 1318

USCA4 Appeal: 16-1    Doc: 32-3    Filed: 12/27/2016    Pg: 125 of 300
Case 1:06-cr-00001-JPJ   Document 790-10   Filed 03/22/13   Page 12 of 27   Pageid#: 6633

MALCOLM SPICA, PH.D.   Page, 7

Spica, D.M., (2005, October).  Procrastination?  Tools for memory testing & screening.  Wellness: A Healthy State of Being.  2005 EAPA Tennessee State Conference, Gatlinburg, TN.

Spica, D.M., (2005, July).  Introduction to neuropsychological assessment?  Cariten Employee Assistance Program Professional Address Series. Knoxville, TN.

Spica, D.M., (2002, November).  Fighting procrastination in students with attention and learning disorders.  Professional Information Series.  Learning Disabilities Association, Lansing, MI.

Spica, D.M., (1996, April).  Behavioral manifestations of learning disabilities.  E. Weinbolt (Chair), Community Information Series.  Meeting of Learning Disability Friends and Families, Lansing, MI.

Spica, D.M., (1996, January).  Treatment of attentional syndromes in adults.  L. Gorbis (Chair), Professional Presentations.  Meeting of Children and Adults with Attention Deficit Disorders [CH.A.D.D.] Lansing Area Chapter, Lansing, MI.

Spica, D.M., (1995, November).  Clinical assessment of neurobehavioral disorders.  J. Picone (Chair), Continuing Medical Education.  Meeting of the inpatient clinical service, Sparrow Hospital, Lansing, MI.

Spica, D.M., (1991, November).  Brain lesion localization:  The role of neuropsychological assessment.  V. Hulse (Chair), Nervous system lesions:  Localization and characterization:  A workshop for primary care physicians and health care providers.  Workshop conducted at the Seventh Annual Neurodiagnostics Conference, East Lansing, MI.

Spica, D.M., (1990, October).  Advances in research of memory for the aged individual.  N. Abeles (Chair), Coping with aging:  Mood and memory concerns.  Symposium conducted at the meeting of the Ingham Medical Center/Community Relations and Development Association, Lansing, MI.

Spica, D.M., (1989, November).  Special issues in cognitive rehabilitation.  W. Beecroft (Chair), Psychiatry service grand rounds presentations.  Meeting of the Department of Psychiatry, Ingham Medical Center, Lansing, MI.

Spica, D.M., (1989, August).  Clinical characteristics of multi-infarct dementia.  W. Beecroft (Chair), Psychiatry service grand rounds presentations  Meeting of the Department of Psychiatry, Ingham Medical Center, MI.


## PROFESSIONAL MEMBERSHIPS

Vice President - East Tennessee - Tennessee Psychological Association 2007
Member, American Psychological Association
Member, International Neuropsychology Society
Member, National Academy of Neuropsychology
Member, Society for Personality Assessment


JA 1319

# EXHIBIT B

# to Declaration of

# D. Malcolm Spica

JA 1320

D. MALCOLM SPICA, PH.D.

## Curriculum Vitae

BEHAVIORAL MEDICINE INSTITUTE
The Westfield Center
305 Westfield Drive
Knoxville, Tennessee
Tel.865.588.7598
Fax.865.588.6406

Tennessee Health Service Provider License #2558
Michigan Clinical Psychologist License #6301008473

## EDUCATION

| | | |
|---|---|---|
| 1986 | Bachelor of Science<br>Degree with Distinction | Major:  Psychology<br>University of Michigan<br>Ann Arbor, Michigan |
| 1991 | Master of Arts<br>Thesis Title:<br>    "Detecting Late-Life Forgetfulness<br>    Using the Brief SDAT Battery." | Clinical Psychology<br>Michigan State University<br>East Lansing, Michigan |
| 1994 | Doctor of Philosophy<br>Dissertation Title:<br>    "Use of Executive Control in<br>    Accessing Episodic and Semantic<br>    Memory in Patients with Alzheimer's Dementia." | Clinical Psychology<br>Michigan State University<br>East Lansing, Michigan |

## CURRENT POSITIONS

**Jan. 2005 - Present**   **Neuropsychology Case Analyst**  – UnumProvident Insurance Corporation, Chattanooga TN
Conduct reviews of medical records to determine neurobehavioral status of claimants in complex cases of long-term disability.  Evaluate forensic evidence adduced in medico-legal cases for disability determinations/settlements.

**June 2004 - Present**   **Chief Neuropsychologist** – Behavioral Medicine Institute, P.C., Knoxville Tennessee
Examine outpatients with a variety of neurological and psychiatric conditions, and produce diagnostic reports of their neuropsychological functioning.  Provide psychotherapy treatment to adults and adolescents utilizing a variety of approaches, including goal-directed time limited interventions.

**Nov. 1998 - Present**   **Chief Psychologist** - Montcalm Center for Behavioral Health, Stanton Michigan
Supervise Masters Level psychologists in the treatment of individuals and families with psychological disorders and generalized problems of living.  Provide psychological and neuropsychological examinations to patients with difficult diagnostic presentations.

**Jan. 2004 - Present**   **Consulting Neuropsychologist** – Catholic Diocese of Lansing, Michigan
Conduct screening examinations of seminary candidates to determine character and fitness to serve.  Make recommendation about formation and possible follow-up treatment.

JA 1321

USCA4 Appeal: 16-1    Doc: 32-3    Filed: 12/27/2016    Pg: 128 of 300

MALCOLM SPICA, PH.D.   Page. 2

| | |
|---|---|
| Nov. 2000 - 2001 | **Pediatric Neuropsychology Supervisor** – <u>Department of Psychology, College of Social Science, Michigan State University</u>, East Lansing Michigan.<br>Supervise graduate students in the clinical psychology program during their clinical assessments of children with a wide variety of neurocognitive disorders. |
| Nov. 2001 - Present | **Consulting Neuropsychologist** – <u>Michigan Rehabilitation Services</u>, Lansing Michigan<br>Conduct examinations of participates in a variety of rehabilitation programs funded by the state of Michigan.  Determine the participants' current and potential levels of functioning. |
| Dec. 1997 - Present | **Consulting Neuropsychologist** – <u>Sacred Heart Mercy Health Care Center</u>, Alma Michigan<br>Conduct examinations of clergy, seminarians, and nuns referred to the Scared Heart Health Care for treatment or evaluation.  Psychodiagnostic procedures assess a broad range of conditions including paraphilias, personality disorders, and cognitive dysfunction. |
| April 1995 - Present | **Lecturer** Human Medicine: Disorders of Development & Behavior - <u>College Of Human Medicine, Michigan State University</u>, East Lansing Michigan.<br>Provide lectures to second year medical students on topics including learning disorders and attentional disorders.  Also provided original manuscript for course content and authored examination items for course (Human Medicine 512 Disorders of Development & Behavior Domain) |
| Sept. 2001- Present | **Director/Owner - Clinical Neuropsychologist** – <u>Spica Psychology, PLLC</u>, East Lansing<br>Examine outpatients with a variety of neurological and psychiatric conditions, and produce diagnostic reports of their neuropsychological functioning.  Provide psychotherapy treatment to adults and adolescents utilizing a variety of approaches, including goal-directed time limited interventions. |
| Sept. 1993- 2001 | **Director - Clinical Neuropsychologist** - <u>Neurobehavioral Associates, P.C.</u>, Okemos, Michigan<br>Examine outpatients with a variety of neurological and psychiatric conditions, and produce diagnostic reports of their neuropsychological functioning.  Provide psychotherapy treatment to adults and adolescents utilizing a variety of approaches, including goal-directed time limited interventions.  Organize a comprehensive data set gathered from patients with cortical dementia. |
| Spring 2000 | **Adjunct Assistant Professor** – <u>Department of Psychology, College of Social Science, Michigan State University</u>, East Lansing Michigan.<br>Instructor for Behavior Disorders Course.  The course covers diagnostic and treatment issues for the broad range of neurobehavioral syndromes; course designed for doctoral students in their first year of training. |
| Fall 1998- Present | **Preceptor - Problem Based Learning Program** – <u>College Of Human Medicine, Michigan State University</u>, East Lansing Michigan.<br>Facilitate the Problem Based Learning process for second year medical students as they attempt to diagnose and treat hypothetical clinical cases presented to them in step-wise fashion.  Their training requires reviewing principles of scientific method, logical/diagnostic reasoning, and resource utilization as well as group dynamics. |
| April 1995- Present | **Adjunct Assistant Professor** - <u>Department of Psychiatry, Michigan State University</u>, East Lansing Michigan.<br>Teach the weekly Neuropsychiatry Seminar Series to medical residents in their third year of psychiatry residency.  The seminar covers diagnostic and treatment issues for the broad range of neurobehavioral syndromes psychiatrists encounter in clinical work. |

JA 1322

USCA4 Appeal: 16-1      Doc: 32-3      Filed: 12/27/2016      Pg: 129 of 300

Case 1:06-cv-01000-JDB   Document 94-1   Filed 03/22/13   Page 8 of 66637

## CLINICAL EXPERIENCE:

**Sept. 1992-**
**Aug. 1993**

**Neuropsychology Intern** - Long Island Jewish Medical Center-Hillside Hospital, Glen Oaks, New York.
Conducted neuropsychological assessments of inpatients and outpatients with a variety of neurological and psychiatric conditions and produced diagnostic reports of their functioning. Treated persons through individual psychotherapy using a variety of insight-oriented approaches (psychodynamic and cognitive-behavioral). Training also included participation in the Comprehensive Epilepsy Evaluation Clinic, supervised assessments in the Pediatric Neuropsychology Service, and weekly individual sessions of cognitive rehabilitation for patients with schizophrenia. The site complies with all APA requirement guidelines including Division 40 guidelines for clinical neuropsychology pre-doctoral internship.

**June 1991-**
**Sept 1992**

**Assessment Liaison** - Michigan State University Learning Disabilities Program; Office of Programs for Handicapper Services/MSU Psychological Clinic, East Lansing Michigan.
Trained graduate students in the administration and reporting of a broad selection of neuropsychological measures. Coordinated, supervised, and conducted neuropsychological/ psychoeducational assessments of MSU students referred for learning disabilities. Organized a comprehensive data set gathered from college-aged learning disabled individuals and matched normal controls.

**Sept. 1991-**
**Sept. 1992**

**Neuropsychology Consultant-Trainee** - Neurobehavioral Clinic and Research Center (Michigan State University/Department of Psychiatry), East Lansing Michigan.
Conducted neuropsychological assessments of outpatients with a variety of neurological and psychiatric conditions and produced diagnostic reports of their functioning. Organized a comprehensive data set gathered from patients with cortical dementia.

**June 1989-**
**Sept 1992**

**Inpatient and Outpatient Assessment Coordinator** - Michigan State University Psychological Clinic, East Lansing Michigan.
Trained graduate students in the administration and reporting of a broad and flexible battery of neuropsychological and personality measures. Coordinated, supervised, and conducted neuropsychological/ personality assessments of patients referred from Lansing General Hospital, Ingham County Medical Center, as well as from private physicians in the community.

**March 1989-**
**June 1991;**

**Teaching Assistant** - Neuropsychology Assessment Laboratory 852B (3 credit graduate level course), Clinical Psychology Program - Michigan State University Graduate School, East Lansing Michigan.

**Sept. 1989-**
**July. 1991**

**Psychotherapy Trainee** (Practicum Student) - Michigan State University Psychological Clinic, East Lansing Michigan.
Conducted insight-oriented individual psychotherapy with outpatient community members seeking services from the MSU Clinic.

**June 1989-**
**Sept. 1991**

**Neuropsychology Consultant-Trainee** - Ingham Medical Center/ Michigan State University Psychology Graduate Program, Lansing, Michigan.
Conducted neuropsychological examinations of inpatients from general medical units and produced diagnostic reports of their functioning.

**June 1990-**
**Sept. 1990**

**Student Trainee** - Neuropsychology Program (Department of Psychiatry), University of Michigan Medical Center, Ann Arbor, Michigan.
Conducted neuropsychological assessments of outpatients with a variety of neurological and psychiatric conditions and produced diagnostic reports of their functioning. Organized a

JA 1323

comprehensive data set gathered from patients with Alzheimer's dementia and isolated memory impairment.

**June 1989-**
**Sept. 1989**
**Neuropsychology Consultant-Trainee** - Tamarack Head Injury Rehabilitation Center East Lansing Michigan.
Conducted neuropsychological assessments of outpatients and rehabilitation center residents with a variety of conditions resulting from traumatic brain injury and produced diagnostic reports/treatment plans. Organized data set gathered from patients with mild head injuries.

**June 1988-**
**Sept. 1988**
**Student Trainee** - Battle Creek Veterans Administration Medical Center, Neuropsychology/Department of Psychology, Battle Creek, Michigan.
Conducted neuropsychological assessments of inpatients and outpatients with a variety of neurological and psychiatric conditions and produced diagnostic reports of their functioning.

**Dec. 1986-**
**June 1988**
**Neuropsychology Testing Technician** - Neuropsychology Program [Department of Psychiatry], University of Michigan Medical Center, Ann Arbor, Michigan.
Administered neuropsychological assessment batteries to outpatients and inpatients with a wide range of neurological and psychiatric conditions.

**Jan. 1986-**
**April 1988**
**Neurology Volunteer** - Neurology Inpatient Unit [Spinal Cord Rehabilitation Program] Department of Neurology, University of Michigan Medical Center, Ann Arbor, Michigan.
Assisted in the general care for acute spinal- and brain-injured patients.

**Jan. 1985-**
**April 1985**
**Mental Health Volunteer** - Psychiatry Adult Inpatient Unit [Depression Clinical Studies Program] Department of Psychiatry, University of Michigan Medical Center, Ann Arbor, Michigan.
Facilitated treatment plans through engaging patients in social tasks, activities and outings.
Conducted one-to-one observations for suicidal individuals.

**Jan. 1983-**
**April 1983**
**Mental Health Volunteer** - Project Outreach - Child Development Center, University of Michigan, Dearborn, Michigan.
Supervised activities and lesson plans for healthy children ages 3 through 6 from the community.
Administered Stanford-Binet Intelligence Scale tests.

**Feb. 1981-**
**May 1981**
**Mental Health Worker** - Ardmore Acres Psychiatric Hospital, Farmington, Michigan
Implemented the direct care of psychiatric patients as prescribed by staff psychiatrists, including maintenance of medication schedules, supervision of activities and visitation, charting of vital signs, and continuous formal reporting of patient behavior.

JA 1324

USCA4 Appeal: 16-1 Doc: 32-3 Filed: 12/27/2016 Pg: 131 of 300
Case Case 1:06-cv-01009-JPJ Document 94-1 Filed 03/22/13 Page 04/19/06 Page 5 of 66 639

## RESEARCH EXPERIENCE

**Sept. 1990-**
**Sept. 1994**
Spica, D.M. (1994). Use of executive control in accessing episodic and semantic memory in patients with Alzheimer's dementia. Unpublished dissertation, Michigan State University, East Lansing.

**Sept. 1988-**
**June 1991**
Spica, D.M. (1991). Detecting late-life forgetfulness using a brief SDAT battery. Unpublished master's thesis, Michigan State University, East Lansing.

**Sept. 1988-**
**Sept. 1994**
**Research Consultant -** Michigan State University - Department of Psychology/Clinical Aging Research Project, East Lansing Michigan.
Train students in testing procedures and analyze data for ongoing study investigating the relationships of mood, memory, and physical health in normal aged persons.
Norman Abeles, Ph.D. - Principal Investigator

**June 1989-**
**Sept. 1989**
**Research Consultant -** Ann Arbor Veterans Administration Medical Center, Neuropsychology/Department of Psychology. Ann Arbor, Michigan.
Recruited and ran subjects for an ongoing study of eye-tracking and attention.
Henry Buchtel, Ph.D.- Principal Investigator

**May 1986-**
**Dec. 1988**
**Research Consultant -** Neuropsychology Program (Department of Psychiatry)/ Department of Neurology, University of Michigan Medical Center, Ann Arbor, Michigan.
Constructed computer file and processed data for ongoing study investigating the relationship of neurologic symptoms and neuropsychometric performance in patients with Alzheimer's Disease.

## GRANTS

**1991** Coping with aging: Quality of life among nursing home residents. With N. Abeles, P.S. Fastenau, & L.A. Domitrovic. Not funded. Submitted to Sigma Kappa Foundation, Inc., Indianapolis, IN.

**1990** Wechsler adult intelligence score patterns in learning disabled college students. Not funded. Submitted to the Michigan Health Care Education and Research Foundation, Detroit, MI.

**1989** Detecting age-associated memory impairment using the brief SDAT battery. Awarded by the Michigan Health Care Education and Research Foundation, Detroit, MI.

**1988** Summer Traineeship (first ever without graduate education). Awarded by the Veterans Administration, Washington, D. C.

**1986** Altered metabolism in olivopontocerebellar atrophy studied with positron-emission tomography. With S. Berent. Awarded by the University of Michigan Medical School Summer Research Foundation, Ann Arbor, Michigan.

## RESEARCH PRESENTATIONS

Stawicki, J.A., Spica, D.M., Lount, R. (2001) The Importance of Thorough Examinations for Evaluation of Attention Deficit-Hyperactivity Disorder. Poster presented at the meeting of the American Psychological Association, San Francisco.

Spica, D.M., Klotz, M, & Abeles, N. (Submitted). Use of executive control in accessing episodic and semantic memory in patients with Alzheimer's dementia. Poster submitted for the 1996 meeting of the International Neuropsychological Society, Chicago.

JA 1325

USCA4 Appeal: 16-1    Doc: 32-3    Filed: 12/27/2016    Pg: 132 of 300
Case Case 1:06-cv-01000-JPDocDocument 94-1 FileF A3/12/13 Filea 04/19/16 27 Page 6 of 66640

Spica, D.M., Klotz, M., & Abeles, N. (1995). Differential episodic and semantic memory defects in patients with Alzheimer's disease. Poster presented at the 1995 meeting of the National Academy of Neuropsychological, San Francisco.

Abeles, N., & Spica, D.M. (1994). Mini inventory of right brain injury. Test Critiques. *New York: Oxford University Press.*

Spica, D.M., Abeles, N., & Giordani, B. (1991, August). Detecting age-associated memory impairment using the brief SDAT battery. Poster presented at the meeting of the American Psychological Association, San Francisco.

Berent, S., & Spica, D.M. (1986, August). Altered metabolism in olivopontocerebellar atrophy studied with positron-emission tomography. Poster presented at The University of Michigan Summer Research Forum, Ann Arbor, MI.

## OTHER PRESENTATIONS

Spica, D.M., (1996, April). Behavioral manifestations of learning disabilities. E. Weinbolt (Chair), Community Information Series. Meeting of Learning Disability Friends and Families, Lansing, MI.

Spica, D.M., (1996, January). Treatment of attentional syndromes in adults. L. Gorbis (Chair), Professional Presentations. Meeting of Children and Adults with Attention Deficit Disorders [CH.A.D.D.] Lansing Area Chapter, Lansing, MI.

Spica, D.M., (1995, November). Clinical assessment of neurobehavioral disorders. J. Picone (Chair), Continuing Medical Education. Meeting of the inpatient clinical service, Sparrow Hospital, Lansing, MI.

Spica, D.M., (1991, November). Brain lesion localization: The role of neuropsychological assessment. V. Hulce (Chair), Nervous system lesions: Localization and characterization: A workshop for primary care physicians and health care providers. Workshop conducted at the Seventh Annual Neurodiagnostics Conference, East Lansing, MI.

Spica, D.M., (1990, October). Advances in research of memory for the aged individual. N. Abeles (Chair), Coping with aging: Mood and memory concerns. Symposium conducted at the meeting of the Ingham Medical Center/Community Relations and Development Association, Lansing, MI.

Spica, D.M., (1989, November). Special issues in cognitive rehabilitation. W. Beecroft (Chair), Psychiatry service grand rounds presentations. Meeting of the Department of Psychiatry, Ingham Medical Center, Lansing, MI.

Spica, D.M., (1989, August). Clinical characteristics of multi-infarct dementia. W. Beecroft (Chair), Psychiatry service grand rounds presentations Meeting of the Department of Psychiatry, Ingham Medical Center, MI.

JA 1326

# EXHIBIT C
# to Declaration of
# D. Malcolm Spica

JA 1327

D. M A L C O L M   S P I C A, PH. D.
Licensed Clinical Psychologist
Neuropsychologist

## NEUROPSYCHOLOGICAL CONSULTATION

| | |
|---|---|
| Examinee: | **Carlos David CARO** |
| Laboratory Number: | 264841 |
| Age: | 39 |
| Date of Birth: | 2/9/1967 |
| Handedness: | Right |
| Education: | 9ᶜ |
| Date of Examination: | 6/9/06; 6/16/06 |
| Examiner: | D. Malcolm Spica, Ph.D. |

REFERRAL QUESTION:

Mr. Carlos David Caro is a 39-year-old, right-handed male referred for neuropsychological examination by attorneys Stephen Kalista and Jim Simmons. Attorneys Kalista and Simmons asked that I assess Mr. Caro's neurobehavioral status. This assessment is intended to serve as a contributing component to the broader evaluation of Mr. Caro's psychiatric, developmental, and adaptive functioning being conducted by Mr. Caro's defense team.

Mr. Caro is completing the evaluation at the request of his attorneys. No doctor/patient relationship was established, nor were there any expectations or guarantees of future contact or relationship. The limits of confidentiality were explained to Mr. Caro, and he stated that he understood those limits and consented to complete the testing. All testing and interviewing was conducted with the examinee at the United States Penitentiary - Lee in Jonesville, Virginia.

HISTORICAL INFORMATION:

In preparation for the evaluation, I reviewed Mr. Caro's medical record provided by attorney Kalista's office. Mr. Caro's history is summarized by other examiners, and will not be repeated here. On the days of the examination, Mr. Caro reported that he was in good health, adequately rested, and adequately fed. He stated that he is taking no medications.

He stated that he is not experiencing insomnia. Mr. Caro's appetite is reportedly normal. When asked about his mood, he stated, "It's good." He stated that he has not suffered any significant head injuries of which he was aware. He reported no history of serious illness, losses of consciousness, prolonged high fevers, seizures, or sensory disturbances. He reported that his family history is significant for diabetes in his mother, brother, and maternal uncle. Mr. Caro reported that he was a "sickly" child, but had trouble elaborating other than he was told that he was 'slow' to develop. He also reported that he "might have" had difficulty with developmental milestones; when asked at what age he learned to walk and talk, he stated, "I think it was a little later." When asked at what age he learned to tie his shoes, he stated, "That was later."

Mr. Caro stated that he spoke both English and Spanish in his home of origin. He was educated in English. He stated that he had no learning problems during his development: however, the record reflects that Mr. Caro demonstrated significant problems in spelling and writing since the first grade. Likewise,

220 Fort Sanders West Boulevard, MOB 2          ✦          Suite 300, Knoxville, Tennessee 37922
Tel. 865.531.9088                                                            Fax: 865.531.9089

JA 1328

RE: Carlos David CARO, page 2

his performances in courses such as geography were problematic since the fourth grade. Conversely, he obtained mainly A and B grades in arithmetic. During the fourth grade, an Otis-Lennon Mental Abilities test yielded an intelligence quotient of 84 (14th percentile). A Gates-MacGinitie reading test administered during the fourth grade yielded a 2.3 grade equivalent comprehension score. Achievement testing (California Achievement Test) during the sixth grade yielded scores at the 3rd grade equivalent for vocabulary and comprehension. Language mechanics and expression scales yielded grade equivalent scores of 2.6 and 2.7, respectively. Mathematics continued to be his strength. Achievement testing during the seventh grade yielded a mathematics grade equivalent score of 6.0. Overall, Mr. Caro's academic record reflects long-standing difficulties in linguistic abilities, while his arithmetic skill is within normal limits. Mr. Caro reported to me that he dropped out of school after the ninth grade. When asked why he dropped out, he stated, "I don't know."

Mr. Caro's occupational history reportedly includes, "I worked a little here and there." He stated that he delivered appliances for approximately one year, and that his favorite job was working in an automotive paint and body shop, where he was employed "a couple of months, on and off." Please refer to the examinee's extensive documentation for a more complete account of his history.

BEHAVIORAL OBSERVATIONS:

Mr. Caro presented as an adequately-groomed man in his United States Penitentiary - Lee uniform, and he appeared his age. Hygiene appeared adequate. Mood appeared generally euthymic with a broad range of appropriate affect. Spontaneous speech was normal in tone and prosody (with relatively low volume), and receptive language abilities appeared intact. The examinee's eye contact was initially minimal, although he appeared to engage more with the examiner as the testing sessions continued. Mr. Caro rarely spoke, aside from answering direct questions. Mr. Caro's interpersonal behavior --with shy and polite manner-- was highly consistent between both testing sessions.

Mr. Caro appeared to engage easily with me, and displayed a cooperative and considerate attitude (e.g., returned tests stimuli to my side of the table to assist me, listened to all instructions before beginning tasks, etc.). He did not decline to answer any questions and he worked without complaint during the testing sessions. He appeared to give his best effort on all tasks. The findings are considered a valid measure of his current cognitive/adaptive abilities.

EXAMINATION FINDINGS:

The face-to-face testing was conducted during one 4-hour session (6/9/06) and one 3.5-hour session (6/16/06). During the course of the examination, the following tests and procedures were administered:

21-Item Word Memory Test
Beck Anxiety Inventory
Beck Depression Inventory-II
Benton Facial Recognition Test
Boston Diagnostic Aphasia Examination: Commands; Complex Ideational Material
California Verbal Learning Test - II
Category Fluency Test
Controlled Oral Word Association Test
Finger Tapping Test
Grooved Pegboard Test
Halstead-Reitan Booklet Category Test
Judgment of Line Orientation Test
Nelson-Denny Reading Test
Repeatable Battery for the Assessment of Neuropsychological Status
Rey-Osterrieth Complex Figure Test
Ruff Figural Fluency Test

JA 1329

RE: Carlos David CARO, page 3

Symptom Checklist-90-Revised
Test of Memory Malingering
Trailmaking Test A & B
Wechsler Adult Intelligence Scale-III
Wechsler Test of Adult Reading
Wide Range Achievement Test-3
Wisconsin Card Sorting Test
Woodcock-Johnson Psychoeducational Battery: Analysis-Synthesis, Concept Formation

Validity/Motivation: Considering the Mr. Caro's bilingual background, his comprehension of English was assessed. His vocabulary score on the Nelson-Denny Reading Test ranked in the upper half of the Average range (64th percentile). Mr. Caro's vocabulary score on the WAIS-III was also Average (25th percentile). He provided perfect performances on comprehension subtests of the Boston Diagnostic Aphasia Examination: Commands = 15/15; Complex Ideational Material = 12/12. These scores suggest that language barriers did not hinder Mr. Caro's performances on the current examination.

Mr. Caro was administered both verbal and visual tests of validity/effort (one on each day of the testing sessions). He did not appear to withhold effort during his evaluation. Further, his performance of 14/21 on the 21-Item Word Test - Forced Recall ranked well within normal limits. Likewise, Mr. Caro provided a perfect performance on the Test of Memory Malingering:
        Trial 1    = 50/50
        Trial 2    = 50/50
        Retention = 50/50
Both symptom validity measures suggested Mr. Caro did not engage in impression management, symptom exaggeration, or other dissimulation efforts.

General Cognitive Functioning: Mr. Caro was administered the Repeatable Battery for the Assessment of Neuropsychological Status (RBANS) as a general measure of cognitive functioning. His Total Index of 75 ranked in the Borderline-Impaired range for overall neurocognitive function. This score places him below 95% of the general population for overall cognitive/adaptive functioning.

| Index | Standard Score | Percentile |
|---|---|---|
| Immediate Memory | 83 | 13th |
| Visuospatial/Constructional | 72 | 3rd |
| Language | 87 | 19th |
| Attention | 75 | 5th |
| Delayed Memory | 83 | 13th |
| Total | 75 | 5th |

This Total Index score compares unfavorably to statistical premorbid estimates that place Mr. Caro in the Average range: for example, his performance on the Wechsler Test of Adult Reading provided Predicted Full Scale IQ = 90 (25th percentile). Similarly, Mr. Caro's Barona Formula Premorbid IQ Estimate ranked in the Low Average range: Premorbid Full Scale IQ = 83 (13th percentile). However, considering the examinee's complex history of maladaptive behavior, it appears probable that these performances reflect long-standing deficits (rather than implicating a dementing process).

Intellectual Functioning: To further assess cognitive functioning, Mr. Caro was administered the Wechsler Adult Intelligence Scale-III (WAIS-III). Mr. Caro performed at the lower extreme of the Average range for overall intellectual functioning (Full Scale IQ = 91) with particular weaknesses in verbal processing (Verbal IQ = 87) ranking below 81% of the general population.

JA 1330

RE: Carlos David CARO, page 4

Full Scale IQ = 91               Verbal IQ = 87               Performance IQ = 98

| Subtest | Age Scale | Percentile | Subtest | Age Scale | Percentile |
|---|---|---|---|---|---|
| Information | 8 | 25th | Picture Completion | 11 | 63rd |
| Digit Span | 8 | 25th | Picture Arrangement | 7 | 16th |
| Vocabulary | 8 | 25th | Block Design | 11 | 63rd |
| Arithmetic | 8 | 25th | Digit Symbol | 11 | 63rd |
| Comprehension | 8 | 25th | Matrix Reasoning | 9 | 37th |
| Similarities | 7 | 16th | Symbol Search | 10 | 50th |
| Letter-Number Sequencing | 5 | 5th | | | |

Academic Skills: The examinee demonstrated spelling abilities at the 5th grade level on the Wide Range Achievement Test-3 (3rd percentile). Word recognition skills appeared in the Low Average range (21st percentile; high school level), and written arithmetic ranked at the 6th grade level (7th percentile; Borderline-Impaired).

Testing of reading proficiency revealed that the examinee is average for reading speed: Nelson Denny Reading Test - Rate, 39th percentile. Mr. Caro comprehended the material to a 5th grade level (10th percentile).

Attention and Executive Functioning: The examinee appeared alert throughout both testing sessions. He performed in the Low Average range on the Attention Index of the Wechsler Memory Scale-Revised; Standard Score = 83, 13th percentile. Visual scanning was Average: Trail Making Test-A 70th percentile; visual scanning combined with mental tracking was also Average: Trail Making Test - B, 32nd percentile.

During the WAIS-III, Mr. Caro demonstrated difficulty with the neuropsychological domain of executive functioning; he had difficulty organizing information he attempted to encode or express. This lack of organization or strategy resulted in relative weaknesses on tasks of working memory or processing that required mental organization: e.g., Working Memory Index = 82, 12th percentile. The examinee exhibited difficulty using social conventions to sequence pictorial stimuli in temporal order (Picture Arrangement, 16th percentile). Sequencing difficulties were found also in the verbal domain: Letter-Number Sequencing, 5th percentile. Such sequencing functions are believed to be mediated by the frontal territories of the cerebral cortex.

Additional signs of executive control dysfunction were seen on multiple tasks. For example, the examinee performed in the severely impaired range on a task requiring hypothesis testing and mental organization to solve a complex problem: Wisconsin Card Sorting Test-Categories Achieved, 1st percentile. During this task, Mr. Caro frequently lost track of his own method for solving the problem: Failure to Maintain Set, <1st percentile.

Higher-Order Reasoning: On the relatively unstructured Halstead-Reitan Booklet Category Test, Mr. Caro exhibited deficient concept formation abilities (73 errors; 7th percentile). He appeared to feel pressured during this task, and he exhibited increasing discomfort as he repeatedly made errors (and was provided corrective feedback). Overall, it appears that his abstract reasoning abilities are variable, depending on his level of distress while attempting a task. He actually performed within the Low Average range on a separate task of abstract reasoning that required only brief responses: Similarities, 16th percentile.

On additional tasks of higher-order reasoning, Mr. Caro again exhibited deficits. He performed at the second-grade level on the Analysis-Synthesis subtest of the Woodcock-Johnson Psychoeducational Battery; this performance corresponds to an age equivalent of 8 years old. Similarly, on the Concept

JA 1331

RE: Carlos David CARO, page 5

Formation subtest, which also requires higher order reasoning, the examinee performed at the level of a 14-year-old (9.2 grade equivalent). His Fluid Reasoning Index ultimately ranked at the 5.2-grade level, comparable to a person 10 years old.

Overall, it appears most accurate to describe Mr. Caro's judgment and reasoning abilities as unstable. Such instability of judgment/reasoning is often associated with frontal cerebral lobe dysfunction.

Language Functioning: Mr. Caro's vocabulary ranked in the average range: Nelson-Denny Reading Test, 64th percentile WAIS-III Vocabulary, 25th percentile. Expressive language abilities also ranked in the average range: e.g., WAIS-III Comprehension, 25th percentile. His semantic access abilities for generating words within a semantic category (i.e., exemplars of animals) ranked in the Average range: Category Fluency Test, 33rd percentile. However, verbal fluency for generating words within phonemic categories (i.e., beginning with a specified letter) ranked in the impaired range: Controlled Oral Word Association Test, 3rd percentile. This pattern of performance (phonemic fluency inferior to semantic fluency) is typically associated with frontal lobe dysfunction. Frontal lobe dysfunction could also account for the examinee's instability of concept-formation/reasoning skill, noted above.

The fact that Mr. Caro exhibited relatively normal verbal expression skills (e.g. Verbal Comprehension Index, 21st percentile) raises the probability that persons engaging in casual conversation with the examinee will overestimate his level of cognitive functioning. That is, simple discourse with Mr. Caro is likely to tap only his strengths, and may not reveal his deficits in executive functioning, reasoning, or his problems with discriminating information (a deficit described below).

Sensory-Motor Functioning: Mr. Caro reported being right-handed. Simple repetitive motor speed was normal, bilaterally: Finger Tapping-right hand, 58th percentile; left hand, 37th percentile. Mr. Caro also provided normal scores with each hand on a task requiring fine motor dexterity for placing pegs into a board: Grooved Pegboard Test-right hand, 20th percentile; left hand, 63rd percentile.

Visuoanalytic Functioning: The examinee demonstrated normal abilities for interpreting spatial relations in visual stimuli. For example, he performed in the average range on a test requiring recognition of faces portrayed in photographs: Benton Facial Recognition Test, 45/54. With more simplistic stimuli, he performed well within normal limits (e.g., Judgment of Line Orientation Test, 56th percentile). His visual spatial skills again appeared intact during subtest of the WAIS-III: Perceptual Organization Index = 101, 53rd percentile.

Memory and Learning Functioning: As noted above, Mr. Caro performed in the Low Average range on the Immediate Memory Index of the Repeatable Battery for the Assessment of Neuropsychological Status: Standard Score = 83, 13th percentile. The examinee's recall of the material after a delay also ranked in the Low Average range: Delayed Memory Index = 83, 13th percentile.

Mr. Caro was also administered the Wechsler Memory Scale-Revised. He demonstrated a disparity between his verbal and visual skills: Verbal Memory Index = 75, 5th percentile vs. Visual Memory Index = 114, 83rd percentile. During this task, Mr. Caro exhibited disorganization in his approach to memorizing the verbal material: e.g. Verbal Paired Associates, 3rd percentile (impaired). The examinee appeared to lack structure or method in his approach to encoding the material. This was less apparent on tasks involving visual material, as the requirement for mental organization was lower: e.g., Visual Paired Associates, 63rd percentile.

Verbal learning abilities were assessed additionally with the California Verbal Learning Test-II, which places demands on independent organization of encoding and retrieval strategies when dealing with a large amount of verbal material. During this task, the examinee demonstrated a deficit in discriminating between actual target words to which he had been exposed and plausible alternatives. Mr. Caro exhibited a problematic response bias in that he endorsed most material presented to him as seeming familiar. Consequently, he performed in the severely impaired range when asked to decide whether or not he had previously heard, and

JA 1332

RE: Carlos David CARO, page 6

was asked to memorize, individual words in a list (when he had been exposed to only a subset of the words previously): Response Bias, 2nd percentile. This deficit is likely impairing in the examinee's daily life, as it makes him highly suggestible, believing that information presented to him is familiar. He likely has difficulty discriminating between actual facts and information that is close but distorted.

Psychological/Mood Status: Mr. Caro reported no problems with mood, or vegetative signs of mood disruption (such as sleep or appetite disturbance). He was administered multiple scales of mood status. According to his responses, he ranked in the normal range for depression (e.g., Beck Depression Inventory-II, 4/63) and anxiety (e.g., Beck Anxiety Inventory, 0/63).
To assess a broader range of symptomology, Mr. Caro was also administered the quantitative Symptom Checklist-90-Revised. He endorsed no items, yielding to normal scores on every scale:

| Scale | Raw Score |
|---|---|
| Somatization | 0 |
| Obsessive-Compulsive | 0 |
| Interpersonal Sensitivity | 0 |
| Depression | 0 |
| Anxiety | 0 |
| Paranoid Ideation | 0 |
| Psychoticism | 0 |

On interview, the examinee denied psychotic features such as hallucinations, delusions, or ideas of reference.


## SUMMARY & CONCLUSIONS:

This 39-year-old man participated in a comprehensive neuropsychological examination to evaluate his neurobehavioral status. This assessment is intended to serve as a contributing component to the broader evaluation of Mr. Caro's psychiatric, developmental, and adaptive functioning being conducted by his defense team. Formal symptom validity/effort measures indicated that Mr. Caro provided his full effort on the neuropsychological measures and did not engage in symptom exaggeration, impression management, or other dissimulation.

The neuropsychological test results revealed converging signs of frontal lobe dysfunction. He performed as low as the 1st percentile on tasks requiring:
- Management of information
- Maintaining cognitive set
- Concept formation

His difficulty with managing information causes him to mistake actual information to which he has been exposed and plausible alternatives. This deficit is likely impairing in Mr. Caro's daily life, as it makes him highly suggestible, believing that information presented to him is familiar. He likely has difficulty discriminating between actual facts and information that is close but distorted.

His problems with maintaining cognitive set limit his ability to learn from his mistakes (gaining from experience). Mr. Caro appears to easily lose track of what he's doing and misunderstand why his behavior results in a certain outcome. For example, while attempting a task requiring him to sort cards according to an over arching rule, he repeatedly lost track of the rule (e.g., sorting by color) and was puzzled by the feedback that he was getting items wrong: Wisconsin Card Sorting Test - Categories Achieved, 1st percentile.

Persons with frontal lobe dysfunction tend to respond impulsively, without planning, and without proper consideration of competing information. Mr. Caro's difficulty with concept formation (Booklet Category Test, 7th percentile) results in poor understanding of cause-and-effect relationships.

JA 1333

RE: Carlos David CARO, page 7

Each of the above three neurocognitive activities fall under the general domain of Executive Control. Executive control has been found to be mediated by the cerebral frontal lobes throughout neuropsychological scientific literature. From my understanding of Mr. Caro's history, his frontal lobe dysfunction is likely life-long in nature; he reportedly demonstrated failure to thrive as an infant, and developmental milestone difficulties (e.g., speech fluency and motor programming such as tying his shoes), and he has had no clear cerebral insults later in life (e.g., no major head injuries).

Please note that these findings of frontal lobe dysfunction are not easily explained by external issues such as effort or mood disruption, as Mr. Caro demonstrated strong effort on formal symptom validity testing and ranked well within the normal range on tests of mood status.

During the current examination, Mr. Caro demonstrated verbal expressive abilities within normal limits. While these skills are likely beneficial to Mr. Caro, they may also cause persons who only interact with him verbally to overestimate his cognitive abilities.

I speculate that the cognitive deficits that cause the greatest maladjustment in the examinee's daily life are:
   a) instability of reasoning (disordered thinking when under pressure)
   b) deficits in discriminating between actual information and distorted approximations

Mr. Caro appears to be a man of only modest internal/intellectual resources, with unreliable judgment skills, and an inability to sort through information provided to him. His objective test scores revealed that his reasoning ability under calm, controlled conditions ranks at the level of a 10-year-old; when under pressure he performed much lower (impaired range). The examinee is likely easily overwhelmed by multiple sources of information, ambiguous signals, and any perceived pressure/threat.

DIAGNOSTIC IMPRESSION:

   Cognitive Disorder-NOS: see list above (DSM-IV Code 294.9)

RECOMMENDATIONS:

Considering the findings of cerebral frontal lobe dysfunction noted above, I recommend consultation with a forensic psychiatrist to integrate these findings with an assessment of Mr. Caro's psychiatric, neurocognitive, and adaptive functioning relative to the facts and legal issues regarding Mr. Caro's current criminal charges. I have found forensic psychiatrist Keith Caruso, M.D. to be particularly helpful in this regard (615-236-1119; 9005 Overlook Boulevard, Brentwood, TN 37027). Please feel free to contact me if I can further facilitate a referral.

It was a pleasure working with this examinee. If I can be of any further assistance to Mr. Caro, please do not hesitate to contact me.

D. Malcolm Spica, Ph.D.
Licensed Clinical Psychologist

JA 1334

# EXHIBIT 11

# EXHIBIT 11

JA 1335

RECEIVED

DEC 2 6 2012

Federal Public Defender
Capital Habeas Unit

## THOMAS M. HYDE, M.D., PH.D.

2829 GREENVALE STREET
CHEVY CHASE, MARYLAND 20815
301-652-8777
301-652-3959 (FAX)
HYDETM@AOL.com

Robin Konrad
Office of the Federal Public Defender
Suite 201
850 West Adams Street
Phoenix, Arizona 85007                                          December 22, 2012

Dear Ms. Konrad:

Per your request, I reviewed the video recording of the neurological examination of the defendant **Carlos Caro** performed by **Robert T. M. Phillips, M.D., Ph.D.** on November 30, 2006 **[United States v. Carlos Caro; Criminal No.: 2:03CR115]**. I am qualified to offer an opinion on Dr. Phillips' examination and conclusions, as I am a board certified neurologist.

As viewed on the video, as well summarized in the report by Dr. Phillips on January 29, 2007, the neurological examination was cursory, lacking many of the tests routinely performed on forensic cases, especially those where there might be a suspicion of frontal lobe dysfunction. The examination specifically lacked the full roster of frontal release signs, also known as primitive reflexes. These tests are useful when assessing the function of the frontal lobes at the bedside. In addition, both the 3-step Luria test and the go-no go test were administered incorrectly.

Additionally, regarding the tests of frontal lobe function performed by Dr. Philips, his assessment is at odds with the evidence on the video recording. Mr. Caro's performance on the 3-step Luria test, even with its substandard administration, was clearly abnormal bilaterally. This was also true for the go-no go test. Within a reasonable degree of medical certainty, Mr. Caro's performance on both of these tasks was abnormal, clearly at odds with Dr. Phillips' written characterization of a 'superior' performance. In his report, Dr. Phillips ignores an abnormality noted on his own examination report, with increased left-sided deep tendon reflexes in the upper and lower extremities. The classical clinical-pathological correlation of increased left-sided deep tendon reflexes is right frontal lobe dysfunction.

In conclusion, Dr. Phillips performed a substandard forensic neurological examination on Carlos Caro, and his interpretations of his examination are incorrect.

Yours truly,

Thomas M. Hyde, M.D., Ph.D.
Diplomat, American College of Psychiatry and Neurology
Board Certification in General Neurology

JA 1336

# EXHIBIT 48

# EXHIBIT 48

JA 1337

STATE OF NEW MEXICO     )
                              ) :

COUNTY OF SANTA FE   )

## AFFIDAVIT

I, JEANNE DVORAK, being first duly sworn, deposed and say:

1.     I am a resident of Santa Fe County, New Mexico and am over the age of 18.

2.     I am employed at Rothstein, Donatelli, Hughes, Dahlstrom, Schoenburg, & Bienvenu, LLP.

3.     On November 29, 2010 I caused a letter and questionnaire to be sent to 129 inmates housed at the ADX Supermax facility in Florence, Colorado. Of the 129 questionnaires mailed out, 14 were returned indicating the prisoners were under SAMS, and 69 prisoners responded. Attached as Exhibit 1 is a spreadsheet setting forth inmate responses to that survey.

4.     One of the purposes of the questionnaire was to determine how many consecutive years those prisoners had been confined in ADX or ADX and Marion. Attached as Exhibit 2 is a compilation of the results. As the chart shows 43 prisoners claimed they had been in ADX or ADX and Marion for 8 or more consecutive years as of the date they responded. The chart was prepared from the information contained in the responses received from the prisoners.

FURTHER AFFIANT SAYS NAUGHT.

Jeanne Dvorak

S:\MARK\7243\Survey 11-29-10\Affidavit .wpd       Page 1 of 2

JA 1338

SWORN TO AND SUBSCRIBED before me this 11th day of November, 2011

by Jeanne Dvorak.

_____
NOTARY PUBLIC

OFFICIAL SEAL
Richard A. Martinez
NOTARY PUBLIC - STATE OF NEW MEXICO
Notary Bond Filed with Secretary of State
My Commission Expires   12/16/13

My Commission Expires:

12/16/13

S:\MARK\7243\Survey 11-29-10\Affidavit.wpd

Page 2 of 2

JA 1339

# EXHIBIT A

# to Affidavit of

# Jeanne Dvorak

JA 1340

Michael Wayne Thompson #7243
Responses to Survey 11-29-10

| Inmate | Reg. No. | Letter | Survey | Attachment | Date Received | Scanned & Emailed | Retrnd Mail SAMS | Consecutive Time Marion to ADX | | | |
|--------|----------|--------|--------|------------|---------------|-------------------|-------------------|--------|--------|--------|--------|
| | | | | | | | | Marion | | ADX | |
| | | | | | | | | Enter | Leave | Enter | Leave |
| Abouhalima, Mahmud | 28064-054 | | | | | | Y | | | | |
| Akers, Montgomery | 02866-081 | Y | Y | N | 12/13/2010 | Y | | - | - | 2000 | 2010 |
| Al-Amin, Jamil | 99974-555 | Y | Y | Y | 12/9/2010 | Y | | - | - | 2007 | No |
| Alaniz, Alejando | 40581-079 | N | Y | N | 5/6/2011 | Y | | 2000 | 2001 | 2008 | No |
| Alvarez, Victor | 34848-054 | Y | Y | N | 12/9/2010 | Y | | 1997 | 2005 | 2005 | No |
| Ayyad, Nidal | 16917-050 | | | | | Y | Y | | | | |
| Barron, Percy | 04710-000 | N | Y | N | 12/8/2010 | Y | | - | - | 2003 | No |
| Bingham, Tyler | 03325-091 | | | | | | Y | | | | |
| Black, Clifford G. | 55458-097 | N | Y | N | 12/16/2010 | Y | | - | - | 1996 | No |
| Bond, Erving | 16203-083 | Y | Y | N | 12/20/2010 | Y | | 1999 | 2006 | 2006 | No |
| Bornman, Gary W. | 09219-014 | Y | Y | Y | 12/8/2010 | Y | | 2005 | 2006 | 2006 | No |
| Bridgewater, Wayne | 20220-148 | N | Y | N | 12/9/2010 | Y | | - | - | 1998 | No |
| Bruscino, Ronnie | 20168-148 | Y | Y | N | 12/13/2010 | Y | | 1993 | 1995 | 1995 | No |
| Buhl, Leroy G. | 40114-066 | Y | Y | N | 12/9/2010 | Y | | - | - | 2002 | No |
| Carlin, Paul E. | 04764-067 | Y | N | N | 12/8/2010 | Y | | ? | ? | ? | No |
| Casso, Anthony | 16802-050 | Y | N | N | 12/9/2010 | Y | | ? | ? | 1998 | No |
| Castro, Ruben | 03328-112 | N | Y | N | 12/7/2010 | Y | | - | - | 2008 | No |
| Crawford, John F. | 55891-097 | N | Y | N | 12/23/2010 | Y | | 1999 | 2005 | 2005 | No |
| Custard, Bob Allen | 02728-031 | N | Y | N | 12/7/2010 | Y | | 1998 | 2003 | 2003 | No |
| Davis, Melvin | 39574-133 | L | N | N | 12/20/2010 | Y | | - | - | - | 2010 |
| Deberry, Frederick D. | 09303-042 | Y | Y | N | 12/13/2010 | Y | | - | - | 2003 | No |
| Doughterty, Joseph | 01924-135 | Y | Y | Y | 12/10/2010 | Y | | - | - | 2001 | No |
| El-Hage, Wadih | 42393-054 | | | | | | Y | | | | |

EXHIBIT
tabbies
1

JA 1341

USCA4 Appeal: 16-1    Doc: 32-3    Filed: 12/27/2016    Pg: 148 of 300

Case 1:06-cr-00001-jPJ    Document 790-48    Filed 03/22/13    Page 6 of 10    Pageid#: 7263

| Inmate | Reg. No. | Letter | Survey | Attachment | Date Received | Scanned & Emailed | Retrnd Mail SAMS | Consecutive Time Marion to ADX | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Marion Enter | Marion Leave | ADX Enter | ADX Leave |
| Ellis, Charles | 07318-045 | Y | N | N | 12/7/2010 | Y | | - | - | - | No |
| Eusi, Maulana Modibo | 02218-045 | Y | Y | N | 12/13/2010 | Y | | - | - | 1997 | 2010 |
| Filkins, Glenn R. | 84015-012 | Y | Y | N | 12/13/2010 | Y | | 1991 | 1993 | 1995 | No |
| Gambina, Ralph | 12508-116 | N | Y | N | 12/9/2010 | Y | | 1992 | 1995 | 1995 | No |
| Georgacarakos, Peter | 03029-036 | Y | Y | N | 12/9/2010 | Y | | - | - | 2003 | No |
| Gibson, Christopher Overton | 81372-011 | Y | Y | N | 12/7/2010 | Y | | 1991 | 1995 | 1995 | No |
| Gometz, Randy | 35556-118 | Y | (Letter) | N | 12/7/2010 | Y | | 1980 | 1994 | 1994 | No |
| Hale, Matthew F. | 15177-424 | Y | Y | N | 12/9/2010 | Y | | - | - | 2005 | No |
| Hamrick, Rodney | 01192-087 | Y | N | N | 1/10/2011 | Y | | ? | ? | ? | ? |
| Hanssen, Robert | 48551-083 | | | | | | Y | | | | |
| Heisler, Donald P. | 05680-089 | Y | Y | N | 12/13/2010 | Y | | - | - | 2004 | No |
| Hevle, Edgar W. | 13950-116 | N | Y | N | 12/13/2010 | Y | | - | - | 1997 | No |
| Hicklin, Steven W. | 01242-097 | N | Y | N | 12/7/2010 | Y | | 1991 | 1995 | 1995 | No |
| Hoover, Larry | 86063-024 | N | Y | N | 12/15/2010 | Y | | - | - | 1998 | No |
| Houston, Henry | 94434-012 | | | | | | Y | | | | |
| Kaczynski, Theodore | 04475-046 | Y | Y | Y | 12/7/2010 | Y | | - | - | 1998 | No |
| Kitchen, Brandon | 85114-020 | N | Y | N | 12/27/2010 | Y | | 1997 | 2006 | 2006 | No |

JA 1342

USCA4 Appeal: 16-1    Doc: 32-3    Filed: 12/27/2016    Pg: 149 of 300
Case 1:06-cr-00001-jPJ    Document 790-48    Filed 03/22/13    Page 7 of 10    Pageid#: 7264

| Inmate | Reg. No. | Letter | Survey | Attachment | Date Received | Scanned & Emailed | Retrnd Mail SAMS | Consecutive Time Marion to ADX | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Marion | | ADX | |
| | | | | | | | | Enter | Leave | Enter | Leave |
| Kolb, Mitchell E. | 02689-081 | Y | Y | N | 12/7/2010 | Y | | 1994 | 1996 | 1996 | No |
| Knorr, Carl E. (Jr.) | 13161-075 | N | Y | N | 12/8/2010 | Y | | 1995 | 2009 | 2009 | No |
| Leon, Raul | 95335-198 | Y | | | 12/27/2010 | | Y | | | | |
| Lynn, Richard J. | 09748-004 | Y | Y | Y | 12/13/2010 | Y | | 1992 | 1995 | 1995 | No |
| Martin, Roy Ray | 26370-077 | Y | Y | N | 12/6/2010 | Y | | 2000 | 2006 | 2006 | No |
| Martinez, Francisco Ruiz | 91147-011 | Y | Y | N | 12/20/2010 | Y | | 2003 | 2006 | 2006 | No |
| Matthews, Norman | 88752-132 | Y | Y | N | 12/7/2010 | Y | | 1985 | 1995 | 1995 | No |
| McCallister, Timothy | 02659-087 | Y | Y | Y | 12/8/2010 | Y | | - | - | 2007 | No |
| McElhiney, Michael | 04198-097 | | | | | | Y | | | | |
| McIntosh, Richard | 02012-028 | N | Y | N | 12/13/2010 | Y | | 1995 | 2000 | 2000 | No |
| McKinney, Aaron | 10788-026 | Y | Y | N | 12/9/2010 | Y | | 2001 | 2005 | 2005 | No |
| McMillan, Shane | 07580-091 | Y | Y | N | 12/9/2010 | Y | | - | - | 2007 | No |
| Mills, Barry | 14559-116 | | | | | | Y | | | | |
| Moreno, Jesse | 03326-112 | Y | Y | Y | 12/9/2010 | Y | | - | - | 1997 | No |
| Moussaoui, Zacarias | 51427-054 | | | | | | Y | | | | |
| Narducci, John | 13680-014 | Y | N | N | 12/13/2010 | Y | | | | | |
| Nosair, El-Sayyid | 35074-054 | N | Y | N | 12/7/2010 | Y | | - | - | 2002 | No |
| O'Driscoll, Michael J. | 04221-016 | Y | Y | N | 12/7/2010 | Y | | - | - | 2003 | No |
| Oechsle, Raymond | 44776-066 | Y | Y | N | 1/7/2011 | Y | | 1996 | 2001 | 2001 | No |
| Ozsusamlar, Osman N. | 53271-054 | Y | Y | N | 12/15/2010 | Y | | - | - | 2007 | 2010 |
| Portee, Omar | 30063-037 | | | | | | Y | | | | |
| Reid, Richard Colvin | 24079-038 | Y | Y | N | 12/13/2010 | Y | | - | - | 2003 | No |
| Rodriguez, Osiel | 21136-018 | Y | Y | N | 12/7/2010 | Y | | - | - | 2007 | No |
| Rudolph, Eric | 18282-058 | N | Y | N | 1/18/2011 | Y | | - | - | 2005 | No |
| Sabatino, James | 30906-004 | Y | N | N | 12/20/2010 | Y | | | | | |
| Sablan, Rudy | 00074-005 | Y | Y | N | 1/14/2011 | Y | | - | - | 2000 | No |
| Sahakian, David | 54744-097 | | | | | | Y | | | | |
| Saleh, Mohammed | 34853-054 | Y | Y | N | 12/16/2010 | Y | | - | - | 2002 | No |
| Sattar, Ahmed | 53506-054 | | | | | | Y | | | | |
| Scott, Steve L. | 55341-065 | Y | Y | N | 12/9/2010 | Y | | 1992 | 1995 | 1995 | No |
| Segura, Phillip Ralph | 14801-116 | Y | Y | | 12/13/2010 | Y | | 2002 | 2006 | 2006 | No |

JA 1343

| Inmate | Reg. No. | Letter | Survey | Attachment | Date Received | Scanned & Emailed | Retrnd Mail SAMS | Consecutive Time Marion to ADX | | | |
|--------|----------|--------|--------|------------|---------------|-------------------|------------------|----------|----------|------------|------------|
| | | | | | | | | Marion Enter | Leave | ADX Enter | Leave |
| Shepard, Robert Dale | 04574-088 | Y | Y | N | 12/7/2010 | Y | | - | - | 2001 | No |
| Simas, Russell | 23188-086 | Y | Y | N | 12/7/2010 | Y | | - | - | 1995 | No |
| Shryock, Raymond | 03332-112 | N | Y | N | 12/7/2010 | Y | | 2002 | 2006 | 2006 | No |
| Stallings, Larry B. | 14534-057 | Y | Y | N | 12/13/2010 | Y | | - | - | 1996 | No |
| Tokash, Joe | 06373-097 | Y | Y | N | 12/9/2010 | Y | | 1996 | 2006 | 2006 | No |
| Tristan, Cornelio | 02550-748 | Y | Y | Y | 12/9/2010 | Y | | - | - | 2005 | No |
| Tuttamore, Timothy S. | 43018-060 | N | Y | N | 12/8/2010 | Y | | - | - | 2005 | No |
| Usher, John Derel | 07145-062 | Y | Y | Y | 12/15/2010 | Y | | 1998 | 2006 | 2006 | No |
| | | | | | | | | | | | |
| Von Moos, Jon | 79328-012 | N | Y | N | 12/7/2010 | Y | | 1997 | 2000 | 2000 | No |
| Yarbrough, Gary L. | 09883-016 | Y | N | N | 12/9/2010 | Y | | 2004 | 2007 | 2007 | No |
| Young, Timothy Doyle | 60012-001 | Y | Y | N | 12/16/2010 | Y | | 1994 | 1995 | 1995 | No |
| Yousef, Ramzi | 03911-000 | | | | | | Y | | | | |

JA 1344

# EXHIBIT B
# to Affidavit of
# Jeanne Dvorak

JA 1345

## 43 More Than 8

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | 13 | | | | | | | | |
| | | 10 | | | 13 | | | | | | | | |
| | | 10 | | | 13 | | | | | | | | |
| 8 | | 10 | | | 13 | | | | | | | | |
| 8 | | 10 | | | 13 | | | | | | | | |
| 8 | | 10 | | | 13 | | | | | | | | |
| 8 | 9 | 10 | | | 13 | | | | | | 20 (15A) | | |
| 8 | 9 | 10 (5A) | 11 | 12 | 13 (5A) | 14 | 15 | | | 18 (15A) | 20 (15A) | | |
| 8 | 9 | 10 (5A) | 11 | 12 | 13 (5A) | 14 (5A) | 15 | 16 | 17 | 18 (15A) | 20 (15A) | 26 (16A) | 30 (16A) |

Notation in parentheses indicates number of years at ADX, i.e., (16A) indicates prisoner was housed for 16 years at ADX.



EXHIBIT
2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | **Case No. 1:06cr00001** |
| | ) | |
| CARLOS CARO, | ) | |
| | ) | |
| Defendant-Petitioner. | ) | |

**UNITED STATES' MOTION TO DISMISS IN RESPONSE TO
PETITIONER'S MOTION FOR RELIEF PURSUANT TO
TITLE 28, UNITED STATES CODE, SECTION 2255**

The petitioner, Carlos Caro, has filed a motion for relief pursuant to 28, U.S.C. §2255 (hereinafter, "Petition") seeking the vacation of his conviction for the willful, deliberate and premeditated murder of Roberto Sandoval and the subsequent imposition of the sentence of death. He asserts sixteen claims in support of his motion. The United States responds to each claim, *seriatim.*

STATEMENT OF THE CASE

Carlos David Caro has been involved in the drug trade since at least 1987 when he was 20 years of age. On August 8, 2000, he was arrested and subsequently convicted of drug trafficking for the third time. On May 7, 2001, he was sentenced to 360 months imprisonment to run consecutive to an 18 month revocation sentence previously imposed.

Caro is a long term validated member of the Texas Syndicate, a violent prison gang and has been identified by prison officials in at least one institution as a person who carried great influence in the gang. In 2002, while Caro was incarcerated at Federal Correctional Institute (FCI)-Oakdale, Louisiana, prison officials attempted to secure his assistance in avoiding conflict

1

JA 1347

with newly arriving prisoners who were members of a rival gang. Caro rebuffed those efforts, stating, "the Texas Syndicate were going to do what they had to do." Subsequently, the Texas Syndicate members violently attacked the newcomers. Taking responsibility, Caro stated, "I don't give a fuck if they send me to the United States Penitentiary. My brothers follow orders. . . It doesn't even matter if we're prosecuted. I have 30 years to do. I certainly don't care about myself." *United States v. Caro,* 597 F.3d 608, 610 (4th Cir. 2010).

Following the 2002 incident at FCI-Oakdale, the Bureau of Prisons (BOP) transferred Caro to the United States Penitentiary-Lee, County (USP-Lee), a more secure facility. There, in August, 2003, Caro and another Texas Syndicate inmate, Juan Moreno-Marquez, used "shanks," to ambush and attack Ricardo Benavidez, stabbing him twenty-nine times before guards could intervene. Five other Texas Syndicate members, also armed with shanks, stood nearby but were unable to enter the room where Benavidez was stabbed. In November, 2003, Caro was indicted for attempted murder and weapons offenses in connection with his role in the assault on Benavidez. Caro pled guilty to the Benavidez assault on August 3, 2004 pursuant to a written plea agreement, proposed by Moreno-Marquez, which by its terms, was conditioned upon Moreno-Marquez receiving a more favorable disposition of his charges. On November 1, 2004, he was sentenced to 327 months imprisonment, which was ordered to run consecutively to any sentence that Caro was then serving.[1]

Caro was sent to the Special Housing Unit (SHU) after the Benavidez assault. The SHU is arguably the most secure part of the penitentiary which is, by nature and definition, the most secure facility in the BOP system. Penitentiaries are classified as "maximum security" and typically house inmates who cannot safely be held at less secure institutions such federal correctional institutions.

---

[1] The proceedings involving the Benevidez assault will be sometimes referred to herein as "the Benevidez case."

JA 1348

On December 16, 2003, Dustin Watts was the USP-Lee officer who was responsible for cell assignments in the SHU. He told the jury that, being mindful of potential conflicts that might arise from placing hostile inmates in the same cell, "careful thought" was given to placements based on the background and affiliations of the individual inmates who are considered as possible cellmates. *Trial Transcript (TT) 1/29/07 at 62-64*. When a bus carrying inmates arrives at USP-Lee, as one did on December 16, 2003, the incoming inmates are first placed in the SHU pending assignment to cells in the general population. *Id. at 64-65*. Of those prisoners received on December 16, eleven were released to the general population, but fifteen remained in the SHU. *Id*. The influx of new inmates, of necessity, required the institution to free up space in the SHU. *Id. at 66.*

Roberto Sandoval was admitted to the SHU on December 16, 2003. In order to create an open cell in the SHU, Watts decided to place Sandoval, who was also a member of the Texas Syndicate, with Caro. *Id. at 68-69*. The initial attempt to place Sandoval with Caro was done by Officer John Gilley. There is no evidence that Sandoval requested placement with Caro or that he previously attempted to procure placement with Caro for any reason. Gilley testified that when he approached Caro with Sandoval, Caro "calmly" stated, "I'm not accepting a cellmate." *Id. at 101-102, 110*. Gilley reported Caro's refusal to Watts who, because Caro did not give a reason for his refusal, assumed that Caro simply preferred to be in a cell by himself. *Id. at 71*. Nevertheless, Watts directed that Sandoval be assigned to a different cell which was then unoccupied.

Brian Laster worked the later shift in the SHU on December 16, 2003. During that shift, Sandoval asked if he could share a cell with Caro rather than be placed with one of the incoming prisoners. Before agreeing to Sandoval's request, Laster asked Caro specifically if he would

3

JA 1349

accept Sandoval.  Caro agreed stating, "We're brothers.  Done time together." *Id. at 115-116.*

Sandoval was placed in Caro's cell at around 9 p.m. on December 16, 2003.

The next day at 6:10 a.m., Sandoval and Caro were served breakfast in their cell. They later took approximately one hour of recreation outside and were last observed by prison staff at approximately 6:10 p.m.  There were no incidents between the two men and nothing suggested that there was any animosity or ill will between them.

At about 6:40 p.m. on December 17, 2003, Caro called a guard who was making his rounds in the SHU and stated, "Come and get this piece of shit out of here," and pointed at Sandoval lying next to the cell door.  The guard looked into the cell and observed Sandoval, who was lying motionless with blood on him and a towel wrapped around his neck.  Other guards quickly arrived and handcuffed Caro.  When asked whether Sandoval was still breathing, Caro replied, "No.  At this time he's stinking up the room, get him out." *United States v. Caro, 597 F.3d at 611.*

In a post-Miranda statement to FBI Special Agent Douglas Fender, Caro readily admitted that he killed Sandoval because, in his words, he had eaten Sandoval's breakfast that morning and Sandoval threatened to eat Caro's breakfast the following day.  The next day, Caro taunted a prison guard, grinning a calling out, "When are you going to get me a new cellie?" *Id.*

Caro later discussed the murder with his wife and others, including Texas Syndicate member Roel Rivas.  In one instance, Caro explained that he "killed a guy two weeks ago . . . (f)or being a fool."   In a subsequent telephone conversation, Caro reported that, "Sandoval called me mother fucker, that whore, that's why I fucked him up." *Id. at 631.* Later, Caro told Rivas that he murdered Sandoval because "they gave me a cell mate and he disrespected me, so I

4

JA 1350

took him down." *Id. at 611.* Caro never claimed that he acted in self-defense or that he had additional motivations when he strangled Sandoval.

On December 30, 2004, the United States Attorney sent a target letter to Caro in connection with the murder of Sandoval. Contemporaneously, the United States Attorney requested the court to appoint counsel for Caro in connection with the case. The court appointed Stephen Kalista and James Simmons (hereinafter sometimes referred to as "trial counsel") to represent Caro. On February 1, 2005, trial counsel was invited to appear before the Department of Justice Capital Case Review Committee ("CCRC") in order to present any evidence or information that they might have to persuade the Attorney General that the death penalty should not be authorized against Caro in the event he were to be indicted in connection with the Sandoval murder. Almost immediately, trial counsel applied for and obtained the court's permission[2] to retain a mitigation specialist, a private investigator and mental health experts including a licensed clinical psychologist / neuropsychologist and a psychiatrist.

A meeting with trial counsel, the United States Attorney and the CCRC was scheduled for June 6, 2005. Although their appearance was not mandated by the Department of Justice, the Constitution or by statute, trial counsel attended the meeting but did not make any prior written submission on Caro's behalf. On October 5, 2005, the Attorney General authorized the United States Attorney to seek the death penalty against Caro.

Caro was indicted on January 3, 2006. He was tried by a jury and convicted of capital murder on February 1, 2007. During the penalty phase, the jury heard evidence from the following defense witnesses:

---

[2] Since they were appointed to represent Caro, trial counsel was required to obtain court approval before expending any fees for travel, experts and other costs of litigation. Each cost had to be justified prior to receiving court authorization.

5

JA 1351

- James Aiken: a correctional specialist, and Dr. Mark Cunningham, a clinical and forensic psychologist.  Both agreed that Caro was "a dangerous inmate," *TT 2/7/07 at 38-39(Aiken); TT 2/12/07 at 103 (Cunningham),* but opined that the BOP had the ability to manage and control him safely if he received a life sentence.

- Susanna Rodriguez, Yomieda Martinez, Delia Contreras and Laura Perez: Caro's family and others who knew him as a child and a young man. They testified about his home and family life and the poverty he experienced. They reported Caro's father's long-standing problem with alcohol and drugs, describing him as "an aggressive drunk, a violent drunk" who would fight with others and his wife and spend his money on alcohol instead of supporting his family. They described his father's criminal activity including burglary, possession and suspected trafficking of illegal drugs, his "erratic" employment, the family's lack of education and the children's involvement with alcohol and drugs.  Each stated that, unlike his brothers, Jose and Noe, Caro was never a behavior problem, nor did he fight or get into trouble.  Through those witnesses, the jury learned that Caro's father died in 1984 of cirrhosis of the liver and his mother died in a house fire in 1997 while Caro and his brothers were in prison.  Although Caro's father was violent with his mother, there is no evidence that he was violent with Caro or his brothers.

- Louyveth Caro: Caro's wife.  She chronicled his involvement with drugs and their several separations as well as his infidelity.  However, she also said that he was never violent and while they were together, their relationship was "great."

6

JA 1352

Based on the evidence presented, the jury found twelve mitigating factors, including that Caro (a) was exposed to domestic violence growing up; (b) was not encouraged in school; (c) came from an impoverished community; (d) was well-behaved growing up; (e) failed to reach high school after needing special education; (f) was shy and respectful compared to his brothers; (g) was brought into illegal drug trafficking by his uncles; (h) never abused his wife or daughter; (i) was not violent or aggressive until he received his 30 year sentence for drug trafficking; (j) has never attacked prison staff; (k) has never tried to escape, and (l) had been securely detained since December 18, 2003.

The jury found two statutory aggravating factors had been proved beyond a reasonable doubt including (1) that Caro was previously convicted of two offenses involving distribution of illegal drugs committed on different occasions and punishable by imprisonment for over one year, and (2) Caro had been previously convicted of a federal drug offense punishable by five or more years. They also found three non-statutory aggravating factors including future dangerousness, impact on the family of the victim and lack of remorse. The penalty phase of Caro's capital trial lasted nine days, following which the jury returned a sentence of death. That sentence was imposed by the court on March 30, 2007.

THE *STRICKLAND* TEST FOR INEFFECTIVE ASSISTANCE OF COUNSEL

*Strickland v. Washington,* 466 U.S. 668 (1984) sets forth the standards to be applied in evaluating a claim of ineffective assistance of counsel. To prove ineffective assistance of counsel, Caro must satisfy a two-pronged test set requiring him to show (1) "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment[,]" meaning that counsel's representation fell below an objective standard of reasonableness, *Id*. at 687-88, and (2) that counsel's deficient performance prejudiced him. *Id*. at 694.

7

JA 1353

If a petitioner fails to satisfy either prong of the *Strickland* test, a court does not need to inquire whether he has satisfied the other prong. Id. at 697.

   *Strickland* established a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *Strickland*, 466 U.S. at 689; *see also, Fields v. Att'y Gen. of Md.*, 956 F.2d 1290, 1297-99 (4th Cir. 1992); *Hutchins v. Garrison*, 724 F.2d 1425, 1430-31 (4th Cir. 1983), and the petitioner must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.; see also, Bowie v. Branker*, 512 F.3d 112, 119 n.8 (4th Cir. 2008).   "Judicial scrutiny of counsel's performance must be highly deferential" and "every effort [must] be made to eliminate the distorting effects of hindsight . . . and to evaluate the [challenged] conduct from counsel's perspective at the time." Id. "[E]ffective representation is not synonymous with errorless representation." *Springer v. Collins*, 586 F.2d 329, 332 (4th Cir. 1978).

   In addition to proving deficient performance, a petitioner must show that he suffered prejudice as a result of his counsel's deficient performance, that is, he must establish that there is a reasonable probability that, but for counsel's unprofessional error, the outcome of the proceeding would have been different. "A reasonable probability is a probability sufficient to undermine the confidence of the outcome." *Strickland*, 466 U.S. at 694.  Caro bears the burden of proving *Strickland* prejudice.  *Fields,* 956 F.2d at 1290.

   Reasonableness is the benchmark by which Counsel's performance is measured. *Strickland,* 466 U.S. 668, 688–92.  The American Bar Association Guidelines for the Appointment and Performance of Counsel in Capital Cases (the "ABA Guidelines") are not the standards to determine what is "reasonable" for defense counsel in capital litigation.  Rather, the ABA Guidelines are merely meant to serve as models for what is reasonable; strict adherence is not required by the law. *Hummel v. Rosemeyer,* 564 F.3d 290, 302 (3d Cir.2009) ("The [ABA]

8

JA 1354

Standards are guides, but only guides, to what is reasonable."); *Showers v. Beard,* 635 F.3d 625, 633 (3d Cir.2011) (stating that the ABA Guidelines for Appointment and Performance of Counsel in Death Penalty Cases are "informative," although not "dispositive" for determining whether counsel was ineffective). Similarly, the declarations of legal "experts," while informative, do not set the standard to evaluate the performance of trial.

REPLY TO CLAIMS FOR RELIEF: PRETRIAL

Claim One: Caro asserts that the Government violated his Fifth Amendment due-process rights by deliberately and tactically delaying the indictment of the capital case until after the government had negotiated a disproportionate plea agreement in the Benavidez assault. He surmises that the reason for the delay in charging him in connection with the Sandoval murder "appears to have been the government's interest in convicting and sentencing Caro to the longest possible sentence . . . so it could set up the Sandoval case for death, including the argument that the only effective punishment available . . . was death, as Caro was already serving a de facto life sentence." *Petition* at 20.

There was no explicit or implicit plan by the government to lure Caro into a plea in the Benavidez case so that his plea could be used against him in the Sandoval case and Caro has not adduced any evidence suggesting that such a "plan" existed. To circumvent the absence of such evidence, Caro relies upon the delay between the time of the Sandoval murder and Caro's indictment for that offense.

To establish a Due Process violation, the defendant has the burden of showing that 1) the pre-indictment delay was an intentional device to gain some tactical advantage over the defendant or was done in reckless disregard of circumstances, known to the prosecution,

9

JA 1355

suggesting that there existed an appreciable risk that delay would impair the ability to mount an effective defense, and 2) the intentional delay caused the defendant actual prejudice.

The seminal cases regarding when pre-indictment delay deprives a defendant of due process are *United States v. Marion,* 404 U.S. 307 (1971) and *United States v. Lovasco,* 431 U.S. 783 (1977). In *Marion,* the Court found that a 38 month delay between the end of the criminal scheme charged and the time of the indictment that did not extend beyond the period of the applicable statute of limitations did not violate the defendant's rights under the Fifth Amendment Due Process Clause in the absence of a showing of intentional delay and actual prejudice.

*Lovasco* involved a 17 month delay during which two witnesses died. The Court reversed a lower court ruling dismissing the indictment, stating "while proof of actual prejudice makes a due process claim ripe, it does not automatically make it valid." Rather, the analysis requires consideration of the reasons for the delay as well as prejudice to the accused. The Court further observed that investigative delays do not deprive a defendant of his due process rights even if his rights may have been "somewhat prejudiced" by the lapse of time. *United States v. Automated Med. Labs, Inc.,* 770 F.2d 399, 402-404 (4th Cir. 1985). *See also*, *Jones v. Angelone,* 94 F.3d 900, 905 (4th Cir. 1996) (collecting cases).

The United States submits that Caro has failed to adduce any evidence to support a finding that the government intentional delayed the Sandoval indictment to gain some tactical advantage. The record also fails to establish an intentional delay done with "reckless disregard" for the consequences to Caro's ability to defend. To the contrary, the delay between the murder and the indictment was reasonable given the gravity of the crime, the need to investigate and the legal prerequisites to charge Caro with capital murder. Caro murdered Sandoval on December 17, 2003. The Bureau of Prisons SIS officers conducted mass interviews on December 22, 2003.

JA 1356

*Petition* at 48.   After conducting grand jury proceedings and follow up investigation, including forensic testing, the United States Attorney requested appointment of counsel on December 30, 2004, less than 13 months after the murder.  As Caro notes in his petition, the United States Attorney may not seek the death penalty unless and until the Attorney General authorizes him to do so.  *Petition* at 26.  Counsel appeared before the CCRC in June, 2005.   The Attorney General authorized the United States Attorney to seek the death penalty on October 5, 2005 and Caro was charged with capital murder in January, 2006.   Certainly, there can be no suggestion that pre-indictment proceedings were unduly delayed.

Caro claims government wrongdoing and prejudice arising from the "disproportionality" of his plea to a more serious offense than any of his co-defendants, including Moreno-Marquez, and the resultant 327 month sentence he received in connection with the Benavidez case. The apparent disproportionality does not, without more, establish government wrongdoing or actual prejudice.

Caro's plea in the Benavidez case was negotiated with the assistance of competent counsel, Lou Dene.  Dene states that while he was aware of the Sandoval homicide, that case "was separate from the (Benavidez) case in which I represented him."  *Declaration of Lou Dene, Caro Exhibit 3, paragraph 3*.  Contrary to Caro's claim that "the government . . . required Mr. Caro to plead to the most serious charge," *Petition* at 22, Dene states the plea agreement was proposed not by the government, but by Moreno-Marquez.  *Id., paragraph 5*.  Caro accepted the plea agreement, telling Dene the same thing he had told the prison authorities in Louisiana: that "he wasn't going anywhere, so the long sentence did not matter to him."  *Id. paragraph 6*.  The United States submits that Caro's claim that the delay in the Sandoval indictment was coerced by the government to gain some tactical advantage must fail.

11

JA 1357

At the penalty phase of the Sandoval case, the government relied upon Caro's involvement in the Benavidez case to argue that he was a future danger and that he was already serving the functional equivalent of life. His plea agreement in the Benavidez case did not change the calculus for either argument.  Excluding the conviction and sentence in the Benavidez case, at the time of the penalty phase of the Sandoval case, Caro was 37 years of age and was already serving a term of 378 months imprisonment. *Caro Exhibit 50 at paragraphs 32-33*. Regardless of whether he had been convicted or sentenced in the Benavidez case, the United States would have relied on his extant sentence and argued that when he murdered Sandoval, Caro was then serving the functional equivalent of life[3].  The evidence that he and his fellow gang member stabbed Benavidez twenty-nine times would have been offered as proof of future dangerousness.

Even assuming that Caro is able to demonstrate actual prejudice, Caro is not entitled to the relief he seeks. The court must balance the defendant's prejudice against the government's justification for delay. "The basic inquiry then becomes whether the government's action in prosecuting after substantial delay violates 'fundamental conceptions of justice' or 'the community's sense of fair play and decency.' " *Howell v. Barker,* 904 F.2d 889, 895 (4th Cir. 1996) .

Caro has admitted that he willfully and deliberately murdered Sandoval for a host of trivial reasons.  There is no basis to conclude that Caro's prosecution for murdering Sandoval and the resultant death penalty violates 'fundamental conceptions of justice' or 'the community's sense of fair play and decency.'

---

[3]  Caro's plea agreement in the Benevidez case did provide him with the admittedly limited benefit of receiving an adjustment for acceptance of responsibility, thereby reducing his guideline range from 360 months-life to 262-327 months. *Exhibit 50,* paragraph 63.   It is noteworthy that the court imposed the maximum guideline punishment available and stated that if the guidelines were not mandatory, he would have imposed "a life sentence based on the defendant's criminal record and the facts of this offense." *Caro Sentencing Hearing Transcript, Exhibit 52.*

JA 1358

For each of the foregoing reasons, the United States submits that Claim 1 is without merit and should be dismissed.

Claim Two:  Caro claims that he was deprived of his right to the effective assistance of counsel as guaranteed by 18 U.S.C. §3006a and the Sixth Amendment of the Constitution at the death certification stage. *Petition* at 26. The claim has no merit.

The United States Attorney's Manual (USAM) establishes a protocol which mandates review of all death eligible cases by a committee and the approval of the Attorney General before the United States Attorney may seek a sentence of death. §§9-10.040-.050.  *Petition* at 26-27. The existence of such a protocol does not, however, render the review committee process a "critical stage of a criminal proceeding" to which the Sixth Amendment right to effective assistance of counsel attaches. Nor is there any constitutional or statutory basis to support a claim that effective representation by defense counsel requires a thorough investigation and the submission of a package of written arguments and supporting documentation of mitigating evidence to the CCRC.

There is no Constitutional or statutory right to a hearing before the CCRC.  Rather, the protocol is established by the USAM and exists at the discretion of the Attorney General. Section 1-1.100 of the USAM states that its purpose is to provide "only internal Department of Justice Guidance. **It is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law or by any party in any matter civil or criminal**." (Emphasis added).

As the Court noted in *Marion,* the Sixth Amendment does not apply until Caro became an "accused," which only occurred at the time of his indictment.  The majority of the courts have found that the CCRC protocol "does not create substantive or procedural rights." *United States v.*

13

JA 1359

*Roman,* 931 F.Supp. 960, 964 (D.R.I. 1996).  Rather, "[t]he protocol articulates internal administrative procedures to be followed by DOJ personnel...." *Id.* It "provides for 'standards for determination' to guide the death penalty decision making process." *Id.* (citing DOJ Manual, § 9–10.000G).  *Accord: United States v. McVeigh,* 944 F.Supp. 1478, 1483 (D. Colo.1996) ("the decision to seek the death penalty under the Act is a matter of prosecutorial discretion [and] [t]he Protocol [does] not create any individual right or entitlement...."). *Cf. United States v. Craveiro,* 907 F.2d 260, 264 (1st Cir.1990), *cert, denied,* 498 U.S. 1015, 111 S.Ct. 588, 112 L.Ed.2d 593 (1990) ("the internal guidelines of a federal agency, that are not mandated by statute or the constitution, do not confer substantive rights on any party") (citations omitted); *United States v. Loften,* 518 F.Supp. 839, 856 (S.D.N.Y.1981), *aff'd,* 819 F.2d 1130 (2d Cir.1987) ("internal Government policies do not create rights in private citizens. The United States Attorney's Manual itself specifically states that it is not intended to, does not, and may not be relied upon to, create any rights whatever in any party").

Caro's reliance on *United States v. Pena-Gonzalez,* 62 F.Supp.2d 358 (D. Puerto Rico 1999) is misplaced.  In *Pena-Gonzalez*, defendant's counsel failed to submit any mitigating evidence to the government pursuant to the Protocol or to represent him at the death penalty certification process. 62 F. Supp. 2d at 359. The Attorney General subsequently certified that she would seek the death penalty against the defendant. *Id*. The defendant moved to strike the death penalty certification, arguing that his right to counsel and due process rights were violated because his counsel failed to represent him throughout the certification process. *Id*. In striking the certification, the court held that "a capital punishment certification hearing is a 'critical stage of a criminal proceeding where 'substantial rights of a criminal accused may be affected." *Id*. at 363.  The *Pena-Gonzalez* holding is incorrect for two reasons.  First, the court found authority

14

JA 1360

for its holding by analogizing the certification process to a sentencing hearing, *Mempa v. Rhay,* 389 U.S. 128, 134, 88 S.Ct. 254, 19 L.Ed.2d 336 (1967) (holding that a sentencing hearing is a critical stage), and to an adult certification hearing in which a court determines whether to try a juvenile as an adult. 62 F. Supp. 2d at 363.  However, both of these proceedings are judicial proceedings presided over by a judge, as opposed to the administrative, discretionary decision-making process of whether to seek the death penalty. Second, the court's analysis simply ignores the fact that a defendant does not possess any "substantial rights" in the discretionary decision-making process of an executive agency, as discussed above. *Accord: United States v. Torres Gomez,* 62 F. Supp. 2d 402 (D. Puerto Rico 1999) (criticizing rationale of *Pena-Gonzalez*  and holding that the death penalty certification process is not a critical stage of litigation). Accordingly, *Pena-Gonzalez* offers no support for Caro's position. *See also*, *U.S. v. Shakir*, 113 F. Supp. 2d 1182 (M.D. Tenn. 2000).

In addition to the lack of legal support for the argument that the CCRC review process is a "critical stage" of the proceedings, there are also practical obstacles.  To apply *Strickland* to the review process, the court would have to determine an appropriate standard of care for a defense attorney representing a defendant in a purely discretionary and unilateral protocol established by the Department of Justice.  Counsel for the defendant often will not provide mitigation or other information to the CCRC because of concerns that the prosecution will use that information to gain insights to strategy and evidence that the defense will use at trial.  This strategy is recognized by Caro's "expert," Larry Hammond. *See, Hammond Declaration, Caro Exhibit 4, paragraph 41*. In a case such as Caro's, where the evidence of his role in murdering Sandoval was never in dispute, and Caro was serving the functional equivalent of a life sentence when he murdered Sandoval, it was not unreasonable for defense counsel to approach the case with a

15

JA 1361

view toward obtaining a life sentence following a penalty phase hearing. *Kalista Declaration, Caro Exhibit 5, paragraph 9*. In such case, the failure to "tip one's hand" by disclosing mitigating information to the CCRC could not be considered ineffective assistance of counsel.

Caro's claim also fails to demonstrate that if trial counsel had presented mitigating evidence to the CCRC, the Attorney General would not have authorized the death penalty. Neither the meetings nor the deliberations of the CCRC are recorded, and the submissions of the United States Attorneys with regard to the death penalty are exempt from discovery. Moreover, a determination of prejudice would be impossible to make, given that the entire decision as to whether to seek the death penalty ultimately rests on the personal and entirely confidential discretion of the Attorney General. Accordingly, there is no basis to support the allegation that trial counsel was ineffective at the pretrial stage of the case.

### REPLY TO CLAIMS FOR RELIEF:  GUILT/INNOCENSE PHASE

Claim Three:   Caro charges that his right to a fair trial was infringed by misconduct on the part of Jurors  32 and  62[4] in violation of the Fifth and Sixth Amendments. *Petition* at 38.

As a preliminary matter, the record contains a thorough voir dire including questions to test whether each juror would automatically vote to impose the death penalty as required by the Sixth Amendment. *TT 1/22-23/07*; s*ee Morgan v. Illinois*, 504 U.S. 719 (1992).  Prior to empaneling a jury, the Court asked every prospective juror the following question to determine their capacity to sit on the jury under *Morgan*:

> On the other hand, would you automatically vote to impose the death penalty, or could you consider life in prison without possibility of release depending on the circumstances?

---

[4]  The petition attributes certain post-trial statements to juror 32. However, no declaration or other means to authenticate the statements has been submitted.  On June 7, 2013, counsel for Caro informed the government that no such declaration exists, but the allegation was made in good faith. The government accepts the representation that the allegation was made in good faith. Nevertheless, the government objects to any effort by Caro to utilize post-trial statements attributed to Juror 32 to support his claims.

JA 1362

*See*, *e.g.*, *TT 1/22/*07 at 28, 29, 31, 33, 34, 52.  Like the Court did with every prospective juror, with Jurors 32 and 62, the Court went beyond the mandate under *Morgan*—not only asking them if they would automatically vote for the death penalty—the Court also phrased the question in the form of whether a juror could consider life without the possibility of release.  The Court questioned Juror 32:

> THE COURT:     On the other hand, would you automatically vote to impose the death penalty?  In other words, would you consider life in prison without possibility of release depending on the circumstances?
>
> JUROR NUMBER THIRTY-TWO:  Yes.

*TT 1/22/07* at 109.   Likewise with Juror 62, the Court conducted the same colloquy:

> THE COURT:     On the other hand, would you automatically vote to impose the death penalty?
>
> PROSPECTIVE JUROR:     No.
>
> THE COURT:     In other words, could you consider life in prison without possibility of release, depending on the circumstances?
>
> PROSPECTIVE JUROR:     Yes, sir.

*TT 1/23/07* at 51.  This colloquy was designed to ensure that Jurors 32 and 62 would give individualized consideration to this crime and this defendant before voting to impose a sentence. Additionally, the colloquy alerted all jurors to the possibility of a sentence of life without the possibility of release.

Mr. Caro now claims that these jurors gave either factually inaccurate or misleading answers about their ability to consider a sentence other than death in a capital crime. *Petition* at 41-42.   In support of this claim, he submits a declaration by Juror 62 stating in relevant part:

17

JA 1363

> I am now and was at the time of the trial strongly in favor of the death penalty in cases where guilt is obvious….There is nothing the defense offered, or could have offered, that would have changed my mind about the sentence because Caro committed the crime.

*Petition* at 40, *Caro Exhibit* # 32.

> He further asserts that after the trial, juror 32 stated:

> the evidence was "conclusive" that Carlos Caro was guilty of first-degree murder, and once he reached that conclusion, he had made up his mind about the death penalty, noting that the Bible states "An eye for an eye." After trial he also said nothing the defense could have offered would have changed his mind.

*Petition* at 42.

Both jurors filled out jury questionnaires prior to trial, and answered questions relevant to their views on the death penalty. Juror 32, in answer to question 58, asking "[i]n general, what are your feelings about the death penalty (capital punishment), stated, "I feel the death penalty should only be used in clear cut cases." *Exhibit* 38, Juror 32 Questionnaire, p. 26. In answer to question 59, asking the prospective juror to assess the strong of their opinion about the death penalty, Juror 32 checked the box for "strongly favor." *Id*. In the space for explanation of this answer, Juror 32 wrote "as stated above," referring to question 58. *Id*. Question 60 asked if the juror's opinions on the death penalty were based on religious or moral beliefs, and juror 32 answered in the negative. *Id*. Juror 32 also answered "no," to questions 61 and 62, asking if the juror's feelings about the death penalty were such that the juror would always or never vote for a sentence of death as a punishment for someone convicted of a death penalty eligible offense, regardless of the facts and circumstances. *Id*. at 27.

In answer to question 58, asking "[i]n general, what are your feelings about the death penalty (capital punishment), Juror 62 stated, "sometimes its (sic) deserved." *Exhibit* 44, Juror 62 Questionnaire, p. 26. In answer to question 59, asking the prospective juror to assess the

18

JA 1364

strong of their opinion about the death penalty, Juror 62 checked the box for "neither favor or oppose." *Id*. In the space for explanation of this answer, Juror 62 wrote "each case is individual." *Id*. Question 60 asked if the juror's opinions on the death penalty were based on religious or moral beliefs, and Juror 62 answered in the negative. *Id*. Juror 62 also answered "no," to questions 61 and 62, asking if the juror's feelings about the death penalty were such that the juror would always or never vote for a sentence of death as a punishment for someone convicted of a death penalty eligible offense, regardless of the facts and circumstances. *Id*. at 27.

Caro has no declaration from Juror 32 and has no evidence to authenticate the post-trial statements attributable to him. The declaration from Juror 62 is inadmissible under Rule 606(b) of the Federal Rules of Evidence, which precludes consideration of any testimony or declarations of former jurors in which they speculate upon how their subjective thought processes might have differed had they been presented with additional or different mitigating evidence. *Tanner v. United States*, 483 U.S. 107, 121–22 (1987); *Bacon v. Lee*, 225 F.3d 470, 485 (4th Cir. 2000) (applying Fed. R. Evid. 606(b) to capital habeas proceedings); *Fullwood v. Lee*, 290 F.3d 663, 679-680 (2002); *Summers v. Dretke*, 431 F.3d 861, 873 (5th Cir. 2005) ("Under Rule 606(b) of the Federal Rules of Evidence, jurors' affidavits are inadmissible 'regarding the following four topics: (1) the method or arguments of the jury's deliberations, (2) the effect of any particular thing upon an outcome in the deliberations, (3) the mindset or emotions of any juror during deliberation, and (4) the testifying juror's own mental process during the deliberations.' ").

To the degree that the declaration speaks to the decision-making processes of the jurors, consideration of the declaration is barred by Rule 606(b). Specifically, the hearsay statements in juror 62's declaration concerning what the defense could have offered to change his mind concerns the mindset and mental process of jurors during the deliberative process. Consideration

19

JA 1365

of this portion of the declaration would invade the most sacred place in our criminal justice system: a juror's deliberative thought processes.  Consequently, that portion of the declaration should not be considered.

But even if the Court does consider that portion of the declaration, Mr. Caro's claim still fails as a matter of law because he cannot establish that the jury that convicted him and sentenced him to death was not impartial.

The Sixth Amendment guarantees defendants the right to an impartial jury in all criminal prosecutions. "[D]ue process alone has long demanded that, if a jury is to be provided the defendant, regardless of whether the Sixth Amendment requires it, the jury must stand impartial and indifferent to the extent commanded by the Sixth Amendment." *Morgan v. Illinois*, 504 U.S. 719, 727 (1992). This right is violated if "even one [partial] juror is empaneled and the death sentence is imposed." *Id.* at 728.  In capital cases, "a juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do." *Id.* at 729.

Now, Mr. Caro claims that two jurors at his trial and sentencing were *Morgan*-impaired, accusing them of factually inaccurate (Juror 62, *pet*. at 41) and misleading answers (Juror 32, *pet*. at 42) in their questionnaires, because they now say, among other things, that no amount of mitigating evidence could have changed their minds to impose the death-penalty.  *Pet*. at 40, 42. Mr. Caro's claim is governed by *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548 (1984).

In *McDonough Power Equip., Inc.* the Supreme Court established a two-part test for determining whether a new trial is required in the context of juror deceit during voir dire or on jury questionnaires. To prevail Mr. Caro must "first demonstrate that a juror failed to answer

20

JA 1366

honestly a material question ... and then further show that a correct response would have provided a valid basis for a challenge for cause." *Id.* at 556. This test applies equally to a deliberate concealment and an innocent non-disclosure. *Jones v. Cooper*, 311 F.3d 306, 313 (4th Cir. 2002).

Additionally, where a court considers post-verdict statements of jurors, courts are reticent to impeach verdicts based on post-trial juror statements, even where the statements are admissible under Federal Rule of Evidence 606(b). *See Tanner*, 483 U.S. at 118, citing and quoting *United States v. Dioguardi*, 492 F.2d 70, 79 n.12 (2d Cir. 1974). Indeed, "[c]onsideration of statements made by trial jurors after they experienced the entire trial and sentencing hearing and after deliberation of the verdict are not reasonably probative of … whether [jurors] could consider the evidence with open minds and follow the court's instructions on the law." *Neil v. Gibson*, 278 F.3d 1044, 1056 (10th Cir. 2001) (quoting *United States v. McVeigh*, 118 F.Supp.2d 1137, 1153 (D. Colo. 2000))

Caro's claim fails because the affidavits are consistent with the answers each juror gave during voir dire**.** As an initial matter, Mr. Caro cannot establish that either juror "failed to answer honestly a material question." See *McDonough Power Equip., Inc.*, 464 U.S. at 556. The responses in the questionnaires, during voir dire and in the declaration submitted by Mr. Caro (as well as the alleged post-trial declarations of Juror 32) are consistent with one another for three reasons.

First, the statements contained in the affidavits were made by each juror after they listened to evidence at the guilt phase, voted Mr. Caro guilty, listened to aggravating and mitigating evidence, and finally voted to impose the death penalty. As the Tenth Circuit recognized in *Neil*, statements of these jurors "after they experienced the entire trial and

21

JA 1367

sentencing hearing and after deliberation of the verdict are not reasonably probative of …

whether [jurors] could consider the evidence with open minds and follow the court's instructions

on the law." *Neil*, 278 F.3d at 1056.

Second, the jurors in their affidavits do not claim to have answered questions prior to the

trial inaccurately, and none of the statements in the affidavits contradict any of the statements

made during voir dire or in the questionnaires.  A juror's statement that the evidence offered

during the guilt phase of the trial was so persuasive and the crime so egregious that the death

penalty was warranted in no way establishes that the juror would impose the death sentence in

every capital case—which is consistent with the Sixth Amendment.  *See Morgan*, 504 U.S. at

727.  It is consistent with the Sixth Amendment for a juror, after listening to the evidence, to

state that they were convinced that death was the appropriate sentence.  It is inconsistent with the

Sixth Amendment for a juror to state that they formed an opinion before hearing evidence in the

case.  Neither juror in this case stated that they formed an opinion prior to hearing the evidence.

Neither affidavit contradicts the respective jurors' statements on voir dire or indicates that they

were incapable of considering all of the evidence, mitigators, or life imprisonment as a potential

sentence.

Third, the statements attributed to the jurors are not objective in nature; therefore, the

accuracy of the statements is not readily verifiable.  The circumstances presented by the

statements in this case are therefore distinguishable from many cases dealing with juror

dishonesty involving statements that are objective in nature—where the accuracy of the

statement is easily corroborated or disproven.  For example, such cases include: where a juror

lies about being a relative of a prosecution witness, *Williams, v. Taylor*, 529 U.S. 420 (2000);

where a juror fails to disclose during voir dire that their spouse was murdered, *United States v.*

22

JA 1368

*Faulks*, 454 F.3d 410 (4th Cir. 2006); or where a juror fails to disclose a blood relation to a co-defendant in the case, *Conaway v. Polk*, 453 F.3d 567 (4th Cir. 2006).  All these instances involve objective voir dire questions, and the facts which proved that  the responses were dishonest were clear.  On the other hand, the statements in the Caro jury affidavits are subjective in nature concerning jurors' feelings about a specific sentencing decision made in light of evidence considered and weighed during deliberations.  Because of the subjective, nebulous nature of the statements, one cannot make an objective assessment of their accuracy.

When presented with similar evidence of alleged juror dishonesty, the Fourth Circuit found similar declarations lacking.  *Jones*, 311 F.3d at 313.  In *Jones*, a petitioner sentenced to death claimed that a sentencing juror lied on a juror questionnaire.  *Id.* at 308.  The *Jones* juror failed to accurately respond to a question about whether any family members had been arrested or convicted of a crime, but in addition, according to an investigator's affidavit, the juror stated that she believed that "the Bible mandates imposition of the death penalty in every case of first-degree murder."  *Id.* at 312.  The Fourth Circuit held that the alleged statements, while troubling, did not prove juror bias.  *Id.*  The Court concluded that her statement was "fully consistent with the juror's voir dire responses, wherein she declared her support for the death penalty "when appropriate,"  . . .and where she stated that she could fairly balance aggravating and mitigating factors."  *Id.*  The *Jones* Court concluded that "[i]t cannot be inferred from any statement in the affidavit that the juror could not disregard her personal feelings about the death penalty or apply the law as written, or that the juror lied when she stated that she could be a fair juror."  *Id.*   The Court also stated, "That the juror strongly supported the death penalty does not raise an inference that she could not follow the court's instructions properly."  *Id.* at 313.  *See*, *also*, *Nicholson v. Branker*, 739 F. Supp. 2d 839, 870-71 (E.D.N.C. 2010) ("even if petitioner could show that with

23

JA 1369

different questioning [a juror] would now indicate she could not fully consider the mitigators or consider a life sentence, that would not establish he is entitled to relief. … Even if petitioner could establish ... that [a juror] had some misunderstanding of the application of the law, it would not establish she was not impartial.").

For reasons similar to those in *Jones*, Juror 32's statements that the evidence was "conclusive" that Carlos Caro was guilty of first-degree murder, and that once he reached that conclusion, he had made up his mind about the death penalty, and that the Bible states "an eye for an eye," are not inconsistent with his voir dire answers or his questionnaire. *See id.* In his questionnaire, Juror 32 stated that he felt the death penalty should only be used in "clear cut cases," and that he would not always vote for a sentence of death as a punishment for someone convicted of a death penalty eligible offense. *Sealed Exhibit* 38, Juror 32 Questionnaire, pp. 26-27. Further, and importantly, he stated that he would be able to follow the judge's instructions, and in the colloquy with the Court, he confirmed that he would consider life imprisonment as a punishment, depending on the circumstances. Trial Transcript, Jan. 22, 2007 at 109. In that light, the record does not establish that the juror was impartial. *See Jones*, 311 F.3d at 313.

Likewise, Juror 62's affidavit stating that she did not favor or oppose the death penalty, and that it was "sometimes . . .deserved," as well as noting that "each case is individual," is not inconsistent with the affidavit affirming that she is now, and was at the time of trial, "strongly in favor of the death penalty in cases where evidence of guilt is obvious," and that there is nothing the defense could have offered that would have changed her mind about the sentence, "because Mr. Caro committed the crime." As in *Jones*, in light of the court's colloquy and the juror's statement that she strongly favored the death penalty where guilt was obvious does not give rise

24

JA 1370

to an inference that she could not properly follow the Court's instructions. *Jones*, 311 F.3d at 313.

Mr. Caro's claim fails because the evidence offered does not establish that juror 32 or 62 was substantially impaired. The declaration and statements submitted by Caro discuss particularities of Caro's offense and each juror's consideration of the evidence presented at Caro's trial. Indeed, Juror 62's declaration states that she believed that death was the appropriate sentence "because Caro committed *the crime*." *Sealed Exhibit* 32 (emphasis added). The juror does not state that death is the appropriate sentence for any death eligible crime. Quite the contrary, Juror 62 states—given the nature of the crime and the weight of the evidence proving Mr. Caro committed it—that death was the appropriate sentence. Therefore, the affidavit does not disqualify Juror 62.

Likewise, Juror 32 allegedly states the evidence was "conclusive." *Petition* at 42. After hearing and considering the "conclusive" evidence of guilt, this juror determined—in light of that evidence—death was the appropriate sentence. This juror did not go into the trial with his mind made up; rather, he was persuaded that death was the appropriate sentence by "conclusive" evidence. *Morgan* forbids a juror sitting who, prior to any evidence, would automatically vote to impose the death sentence for any capital crime, not a juror who votes for the death sentence after hearing "conclusive" evidence.

Moreover, the statements are not indicative of jurors who had their minds made up before the first witness is sworn. On the contrary, they paint a picture of jurors who were actively listening and weighing evidence. Indeed, the statements show that each juror gave particularized consideration to Mr. Caro's offense and his individualized circumstances.

25

JA 1371

To illustrate a *Morgan*-impaired juror, the record offers an example.  Juror number 16 was excused for cause based on *Morgan*-based impairment:

> THE COURT: No, the question is whether you would always, if the defendant was found guilty of murder, whether you would always vote, regardless of the circumstances, to impose the death penalty? (sic) In other words, the jury would have found that the defendant had taken a life, and would you then feel that the only appropriate punishment was the death penalty?
>
> JUROR NUMBER SIXTEEN: I'd probably have to say yes, yes on that.

*TT 1/22/07* at 67.  Unlike Jurors 32 and 62—who considered the evidence prior to determining the proper sentence—the Court found that Juror 16 had formed a decision on the sentence before hearing any evidence and struck the juror for cause.

*Id.* at 73.

The Court properly found Juror 16 impaired because that juror would have imposed the death sentence in every capital case.  *Morgan v. Illinois*, 504 U.S. 719, 727 (1992).  As the Supreme Court stated, "a juror who will automatically vote for the death penalty in *every case*" cannot follow the instructions of the court.  *Morgan*, 504 U.S. at 729 (emphasis added).  Jurors 32 and 62, by contrast, do not state that they would impose a capital sentence in every death-eligible case; rather, they state that death is appropriate in cases as egregious and where guilt is conclusive as in Mr. Caro's.

The statements attributed to Jurors 32 and 62 are a far cry from the substantial impairment seen above for three reasons: 1) They specifically state that each juror listened and considered the evidence, 2) The statements refer to an opinion formed specifically about Mr. Caro's crime (not a categorical belief about capital crimes that applied generally), and most importantly, 3) The statements in no way indicate that either juror was unable to follow the

26

JA 1372

instructions given by the Court.  In sum, the statements do not indicate that Jurors 32 and 62 could not disregard their personal feelings about the death penalty, or apply the law as written, and Caro has failed to establish that these jurors denied him his constitutional right to an impartial jury.  *See Jones* 311 F.3d at 312-313.

Finally, Caro could have, but did not raise this challenge in his direct appeal to the Fourth Circuit Court of Appeals, and his claim is therefore procedurally defaulted.   A collateral attack under § 2255 may not substitute for an appeal.  *United States v. Frady,* 456 U.S. 152, 165 (1982).  Claims regarding trial errors that could have been, but were not raised on direct appeal are barred from review under § 2255, unless the defendant shows cause for the default and actual prejudice resulting from such errors or demonstrates that a miscarriage of justice would result from the refusal of the court to entertain the collateral attack because he is likely actually innocent of criminal conduct. *See United States v. Mikalajunas,* 186 F.3d 490, 492–93 (4th Cir. 1999) (citing  *Frady,* 456 U.S. 152, 167–68 (1982).  However, even if this claim were not defaulted, for the reasons above, Caro cannot prevail on the merits, and his claim should be denied.

Claim Four:  Caro claims he was deprived of his right to effective assistance of trial counsel as guaranteed by 18 U.S.C. §3006 and the Sixth Amendment of the Constitution during the guilt/innocence phase.  *Petition* at 43.  The thrust of Claim Four is that trial counsel "failed to develop a compelling theme" or to "create a reasonable defense" during the guilt / innocence phase.  *Petition* at 44.  Caro offers four specific instances which, collectively, he relies upon to support his complaint. They are:

A. Trial counsel failed to develop a cohesive theory of defense.
B. Trial counsel failed to adequately investigate and impeach the government's only purported eyewitness, Sean Bullock.

27

JA 1373

C. Trial counsel failed to adequately investigate and present evidence of the BOP's negligence regarding the decision to grant Mr. Sandoval's request to be placed in Mr. Caro's cell.

D. Trial counsel failed to adequately investigate and present evidence in support of self-defense, second degree murder or manslaughter.

None of these contentions have merit.

The claim that trial counsel failed to develop a cohesive theory of defense (Claim Four A, *Petition* at 43) is not supported by the record. The government submits that trial counsel did develop a *cohesive* theory of defense. They failed, however, to develop a *viable* theory of defense not due to any error or omission on their part, but rather due to the lack of any substantive evidence to support a viable defense.

Trial counsel was faced with a daunting task when they were appointed to represent Caro. Evidence was overwhelming that Caro murdered Sandoval willfully, deliberately and with premeditation:  only two men were in the cell; one, Sandoval, was dead, strangled by a towel; the other, Caro, was alive and suffered no injuries; the medical examiner testified that it would have taken several minutes for Caro to strangle Sandoval to death; there was no evidence of prior bad blood or arguments between the two men, who were both members of the same gang; Caro never claimed that he acted in self-defense or that he was provoked in any way by Sandoval; Caro admitted that he killed Sandoval because Sandoval threatened to eat Caro's breakfast; Caro bragged to his family and a fellow gang member that murdered Sandoval because Sandoval disrespected him; Caro taunted the guards after killing Sandoval, asking when he was going to receive a new cellmate.  Evidence of provocation, heat of passion, mutual combat or any other factor that would reduce the crime to anything other than first degree murder was wholly lacking. Despite the absence of any evidence to support their theory, trial counsel argued that Caro's actions were not premeditated and he acted in the heat of passion.  *Kalista Declaration, Caro*

28

JA 1374

*Exhibit 5 at paragraph 11.* Trial counsel requested and was granted an instruction that would have allowed the jury to find Caro guilty of second degree murder, and they argued for that finding. The jury rejected their argument.

The scenario posited by Caro to support "a compelling story for conviction of a lesser-included offense," *Petition* at 45-46, is fantasy. Disregarding Caro's numerous admissions, his petition asserts that "no one knows . . . what motivated the killing." *Id.* at 45. The allegation that Sandoval posed a danger because he "would not give up" in his quest to be celled with Caro, *id.,* runs contrary to the testimony of the SIS officers that the first attempt to place Sandoval in Caro's cell was initiated by the prison officials, not Sandoval. It was only after Sandoval was faced with the possibility that he would be celled with a member of a rival gang that he asked to be placed with Caro, who had no objection to the placement.

While "prison culture" might be relevant to the issue of punishment, it is wholly irrelevant to whether Caro was guilty of first degree murder. "Prison culture" does not negate premeditation. To the contrary, an argument could be made that a prisoner's desire to save face would be proof that the decision to harm another inmate was a volitional act. The whole "prison culture" theory is a red herring because there is no evidence that "prison culture" played any role in Caro's decision to strange Sandoval to death.

Caro charges that trial counsel failed to effectively cross-examine Sean Bullock and to impeach him with the testimony of his cell mate, Joseph Bland. (Claim Four B, *Petition at 46-53).* The government submits that Bullock was effectively cross-examined by trial counsel and their failure to identify and interview his cell mate, Joseph Bland, did not prejudice Caro. There is no reasonable probability that the results of the guilt phase would have been different if Bland had testified or if Bullock had been subject to further cross-examination.

JA 1375

Bullock was extensively impeached by trial counsel. *TT 1/29/07 at 81-111, 114-115.* In addition to the disclosure of Bullock's extensive criminal background and resultant life sentence, his violence and disciplinary problems in prison, *id. at 56-57, 60-62,* trial counsel established that Bullock used aliases "to deceive people." They pointed out inconsistencies in his testimony at trial and to the grand jury, and statements in his "mass interview form." They elicited Bullock's hope that he would receive benefits in exchange for his testimony. Trial counsel also examined Bullock about his cellmate, questioning why Bullock did not tell his "cellie" about what he saw in Caro's cell. *Id. at 101-102.*

Bland's affidavit is hardly compelling proof that Bullock's testimony was fabricated. Bland states that he and his unnamed "cell mate" were playing cards for about 30 minutes prior to learning of Sandoval's murder. Neither Bullock nor Bland can say with any certainty when the murder occurred in relation to when they were playing cards. Bland's conclusion that his cell mate "was not standing by the door prior to inmate Sandoval being removed from cell 123" is of minimal significance for two reasons. First, Bullock did not say he was standing at the door when Sandoval was removed from his cell. Rather, he stated that he was at that location earlier in the day when he observed Caro with the orange towel around Sandoval's neck.  Second, Bullock testified that did not tell his cellmate about what he saw concerning the incident, which he dismissed as "just playing," *TT 01/30/07 at 75.*

Caro cannot establish any prejudice arising from the failure to impeach Bullock.  Even if Bullock was further cross-examined or impeached to the point where the jury could discount his testimony in its entirety, there is still no reasonable probability that the outcome of the guilt phase would have been different.  The amount of other incriminatory evidence against Caro, including his admissions to Fender, his letters to and telephone conversations with his family and

JA 1376

fellow gang member, was substantial. Bullock's "rear view mirror. . . kind of quick, a second" observations were superfluous in the context of the great volume of evidence against Caro.

Caro faults trial counsel for failing to present evidence of the BOP's "negligence" in placing Sandoval in Caro's cell. (Claim Four C, *Petition* at 53). The United States submits that it was neither unreasonable nor negligent for the guards to place Sandoval in Caro's cell. Hence, there was nothing that trial counsel could present on that subject.

The testimony of Dustin Watts, John Gilley and Brian Laster, summarized at pages 2-4, supra, makes it clear that the placement of Sandoval with Caro was not random or without thought. The initial decision to place Sandoval with Caro was initiated by Watts, not Sandoval. It was only later that Sandoval requested placement with Caro rather than with one of the new inmates. At that time, Caro readily agreed to accept his "brother."

The scenario spun by Caro suggesting that Caro's initial refusal to take a cellmate, any cellmate as it turns out, should have been a "red flag" for the SHU officers, *Petition at 56*, is based solely on the opinion of Mark Bezy. In the face of overwhelming evidence to the contrary, Bezy charges that Sandoval's request to be placed Caro's cell was "more than . . . benign" and was "disrespectful" and the jury could somehow interpret Sandoval's request as "an aggressive challenge to Caro."

Perhaps the confusion is caused by Bezy's misunderstanding of the facts leading up to the placement. In his January, 2013 declaration, Bezy writes

> I also was struck by Mr. Sandoval's request to be placed with Mr. Caro after Mr. Caro had just refused a cellmate. In light of the prison culture, which demands respect among inmate, this *subsequent request by Mr. Sandoval* suggests to me that Mr. Sandoval had a strong and specific reason to want to be placed in Mr. Caro's cell. *This second request after Mr. Caro's refusal* could be interpreted through the eyes of prison culture as an aggressive challenge to Mr. Caro.

*Bezy Declaration, Caro Exhibit 1, paragraph 17.*

31

JA 1377

The evidence, of course, is that the placement was initiated by the guards.  Sandoval only asked to be placed with Caro after facing placement with a stranger.

Bezy further opines

The fact that Mr. Sandoval was armed before he went into the SHU should have been another red-flag to the prison that something was going on that needed to be addressed. The possession of weapons by inmates is a sign that there is some sort of tension within the prison.  Inmates want to do peaceful time. If inmates are "arming up," the prison needs to find out the source of the tension and address it.

*Id. paragraph 18.*

Bezy's conclusions are conjectural.  There is nothing to connect Sandoval's earlier possession of a shank and his death at the hands of Caro.  Nor is there any indication that officials at USP-Lee should have seen that unrelated incident as a "red flag" indicating something more sinister was afoot that created a conflict between Caro and Sandoval.  This court does not need an expert to know that the possession of weapons by inmates is, unfortunately, commonplace at USP-Lee.

Caro has never claimed to anyone that he murdered Sandoval because he feared for his safety or that the killing was in any way gang related.  Trial counsel had no evidence to support a claim that BOP was negligent in placing Sandoval with Caro and they were not ineffective in failing to pursue that argument.

Caro complains that trial counsel failed to adequately investigate and present evidence of self-defense, second degree murder or manslaughter. (Claim Four D, *Petition* at 57.)  He asserts that his defense counsel "had sufficient evidence for a prima facie case of self-defense based on circumstances at the prison during the previous five months."  That argument is specious.

To accept Caro's argument that events occurring months before the murder and for the most part having nothing to do with Sandoval would be the basis for a self-defense claim would

32

JA 1378

be to accept a premise that ALL murders at USP-Lee are arguably self-defense. The factors

cited by Caro, *Petition* at 57-59*,* are nothing more than a series of events unconnected to the

murder and are legally and factually insufficient to support a case of self-defense or

manslaughter. They are at odds with Caro's admissions that he killed Sandoval over breakfast

and because Sandoval "disrespected" him. They ignore his callous comments to the guards and

to his family members and fellow gang member after the murder. Trial counsel did, of course,

argue for second degree murder. However, their failure to argue self-defense or manslaughter,

given the complete absence of evidence to support those arguments, does not constitute

ineffective assistance of counsel. Nor does their failure to make those arguments support a

finding that, but for the alleged errors of trial counsel, there is a reasonable probability that the

outcome of the proceeding would have been different.

Claim Five: Caro charges that the government withheld exculpatory and impeachment

evidence in violation of *Brady / Giglio* and otherwise violated his constitutional rights.

Specifically, he claims that the government misrepresented the fact that Sean Bullock had a

cellmate at the time of the Sandoval murder in its communications with defense counsel.

*Petition* at 62. Prior to trial, defense counsel requested "'a list of all inmates with their prison

numbers in the SHU on December 16 and December 17, 2003, showing the specific cells in

which they were housed.'" *Petition* at 62, quoting Motion for Issuance of Subpoena Duces

Tecum, 3/27/2006, Dkt. 72. The Court granted Caro's request on March 30, 2006, by oral order.

The government provided "records from which this information might be gleaned" and also

notified Caro that it had no "per se" list of inmates in the SHU on December 16-17, 2003.

Giorno letter to Kalista, 6/8/2006; Daily Log and Roster, 12/20/2003. One of the documents the

government provided was a Roster dated December 20, 2003, and Caro correctly notes that the

JA 1379

Roster showed the names of the inmates and their cell locations for December 20, 2003, not for December 16-17, 2003. *Petition* at 63. As Caro points out, the December 20 roster shows Bullock as the only inmate in cell 146. The roster does not show the presence of Bland; this is consistent with Caro's allegation that Bland was moved from cell 146 on December 19. Caro acknowledges, however, that the SHU logs for December 17-20—that the government provided prior to trial—show that Bland was moved from cell 146 on December 19, 2003[5] "to another range and cell." *Petition* at 63. In spite of this roster, Caro alleges that the records did not reflect the fact that Bland was in cell 146 on December 16 and 17, and that the daily log for December 16, "would have shown that Mr. Bland was moved into cell 146 on December 16." *Petition* at 63. Caro alleges that the government did not produce the document in response to his discovery request, and that the mass interviews of the inmates did not include a report for an interview with inmate Bland, Bullock's cellmate. *Petition* at 63. However, Caro admits immediately thereafter, that "[o]ne month before trial, the government produced a copy of Mr. Bullock's grand jury testimony," and that "the government finally disclosed the existence of the cell mate through a couple passing references in Mr. Bullock's grand jury testimony." *Petition* at 63-64. Nonetheless, Caro claims that despite that disclosure, defense counsel was "lulled by these misrepresentations by the government," and "rendered ineffective" because counsel still failed to appreciate that Bullock had a cellmate until trial. *Petition* at 64. For three separate, and independent, reasons, Caro's claim in this issue should be denied.

---

[5] Caro's petition states "December 19, 2006, two days after the offense," which the undersigned notes is a typographical error. *See Petition* at 63.

JA 1380

I.      **Caro's claim is procedurally barred.**

Caro could have raised on direct appeal the challenge he presents in Claim Five of this habeas petition, and because he did not, his claim is procedurally defaulted in this § 2255 action. *See Bousley v. United States,* 523 U.S. 614, 622 (1998) (citing *Frady,* 456 U.S. 152). A collateral attack under § 2255 may not substitute for an appeal. Claims that could have been but were not raised on direct appeal are procedurally barred from review under § 2255, unless the defendant demonstrates cause for his default and actual prejudice or demonstrates actual innocence. *Id.* Caro has not presented any argument establishing cause for failing to raise the issue and actual prejudice or an actual innocence argument, and his claim should be denied on the basis of procedural default. *See id.*

II.     **The alleged *Brady* material was disclosed to defense counsel in a timely fashion; additionally, the evidence was available to Caro from other sources.**

Caro's petition should also be denied because he has failed to establish that the government violated *Brady/Giglio*, or that the evidence in question was material. Under *Brady v. Maryland,* 373 U.S. 83 (1963), and its progeny, the government must disclose material evidence favorable to the defendant. An extension of this rule also requires disclosure of evidence affecting the credibility of government witnesses. *See United States v. Bagley,* 473 U.S. 667, 676 (1985); *Giglio v. United States,* 405 U.S. 150, 154 (1972). Undisclosed evidence "is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley,* 473 U.S. 667, 682 (1985); *see also id.,* 473 U.S. at 685 (opinion of White, J., concurring); *Bond v. Procunier,* 780 F.2d 461, 464 (4th Cir. 1986). But when the evidence at issue was "available to the defendant from other sources," the defendant has no *Brady/Giglio* claim when the

35

JA 1381

government fails to produce it. *United States v. Wilson,* 901 F.2d 378, 380 (4th Cir.1990), citing

and quoting *United States v. Davis,* 787 F.2d 1501, 1505 (11th Cir.), *cert. denied,* 479 U.S. 852

(1986) (Furthermore, "the *Brady* rule does not apply if the evidence in question is available to

the defendant from other sources."); *see also United States v. Grossman,* 843 F.2d 78, 85 (2d

Cir.1988) (no *Brady* violation occurs when a defendant "knew or should have known the

essential facts permitting him to take advantage of any exculpatory evidence") (citations

omitted); *Lugo v. Munoz,* 682 F.2d 7, 9–10 (1st Cir.1982) (government has no *Brady* burden

when facts are available to a diligent defense attorney).

In his petition, Caro makes note of AUSA Giorno's letter to Mr. Kalista, in which AUSA

Giorno states that he had no list of inmates in the SHU on December 16-17, 2003, but was

providing "records from which this information might be gleaned."  Giorno letter to Kalista,

6/8/2006.  In other words, the government gave Caro's counsel what it had in its possession that

was responsive to his request.    Further, on December 28, 2006, a full month before trial, the

government produced a copy of Bullock's grand jury testimony, in which Bullock stated that he

had a cellmate on the day Caro killed Sandoval.  *Sealed Exhibit* 26, pp. 18, 22.  Caro

acknowledges in his petition that "on the eve of trial, the government finally disclosed the

existence of the cell mate . . .," *Petition* at 64.  There is no *Brady/Giglio* claim even when the

government fails to produce evidence, where the evidence is "available to the defendant from

other sources." *Wilson*, 901 F.2d at 380.

Caro also argues, "[t]he government should have provided this information sooner . . .,"

but given that Bullock clearly stated in the grand jury testimony which was provided on

December 28, 2006, and the trial in this case did not start until January 5, 2007, Caro had plenty

of time in which to make use of the information before Bland testified at trial. Moreover, the

36

JA 1382

documents that the government provided Caro's counsel, SHU logs for December 17-20, showed

that Bland was in cell 146 on December 19, and moved to another location on that date. This

information, in conjunction with Bullock's testimony, should have alerted counsel to the

question of when Bland was placed in cell 146. In fact, when he asserts that defense counsel was

ineffective for failing to identify or interview Bullock's cellmate Caro acknowledges that defense

should have known the identity based on the government's discovery. Petition at 47. In sum,

Caro argues that the government violated *Brady* by failing to disclose documents which would

have revealed the existence of Bullock's cellmate, but simultaneously admits that this

information was in fact disclosed in the grand jury testimony he received, and was so apparent to

defense counsel that they were ineffective for failing to identify and interview Bullock's

cellmate.[6] Because the alleged *Brady* material was actually disclosed prior to trial and available

to the defendant from other sources, Claim Five should be dismissed.

III.    **The evidence proving that Caro murdered Sandoval is so substantial that even if Caro presented the evidence he claims to be *Brady* material, this evidence does not undermine confidence in the outcome of the trial.**

Finally, for the reasons set forth earlier pertaining to Issue Four-B, Caro cannot establish

that the information he claims was not disclosed was material for purposes of his *Brady* claim.

Even assuming that he had had the logs and rosters for December 16-17, and had learned in that

manner, instead of through Bullock's grand jury testimony, that Bullock had a cellmate on the

day of the murder, and even further assuming that Caro had entirely discredited Bullock's

_____

[6] These arguments are completely inconsistent. The record does not suggest that the government withheld material evidence or that defense counsel was ineffective for failing to identify a material witness. Quite the contrary, the record reveals that defense counsel had the documents they needed to identify Bullock's cellmate, and whether they made a strategic decision or not, there was no prejudice to Caro, because even if Bullock were completely discredited at trial, it does not change the fact that police found Caro alone in his cell with his cellmate strangled, and discrediting Bullock could not change the overwhelming impact of the damning statements and admissions that Caro made after the murder.

37

JA 1383

testimony at trial, there is no reasonable probability that the outcome of the case would have been different.   Caro's callous statements in this case, in addition to the fact that Sandoval was found dead in the cell with Caro, strangled by the towel which remained around his neck, constitute overwhelming evidence proving that Caro murdered Sandoval.  *See Caro*, 597 F.3d at 611.  Undisclosed evidence "is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability that the outcome of the case would have been different "is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682.   Given the overwhelming evidence establishing that Caro murdered Sandoval, even if defense counsel could have completely discredited Bullock, it would not have undermined the other independent evidence that proved Caro murdered Sandoval.  Furthermore, in light of the particular facts of the case, any attempt to discredit Bullock at trial may have seemed frivolous and could have alienated defense counsel with the jury.  In sum, the evidence Caro claims to be *Brady* material offers no reasonable probability that the result of the trial would have been different.  Therefore, Caro's petition for relief based upon Claim Five should be denied.

REPLY TO CLAIMS FOR RELIEF: PENALTY PHASE

Claim Six:  Caro claims that he was deprived of his right to the effective assistance of trial counsel as guaranteed by 18 U.S.C. §3006a and the Sixth Amendment of the Constitution at the penalty phase. He relies upon twelve specific instances which, collectively, he relies upon to support his complaint.  Each will be addressed, *seriatim.*

Caro first claims that trial counsel was ineffective by failing to challenge his conviction and sentence for the Benavidez stabbing  based upon the government's deliberate and tactical delay of his indictment.  (Claim Six A, *Petition* at *65).* He asserts the challenge would have been

38

JA 1384

"meritorious" and would prevent the government from "seeking the death penalty or arguing facts related to the Benavidez assault as an aggravating factor in support of his death sentence."

For the reasons set forth in response to Claim One, *supra,* the United States submits that there was no basis for trial counsel to challenge Caro's conviction or sentence in the Benavidez case. No evidence supports his claim that the government delayed indicting Caro for the Sandoval murder to gain some tactical advantage or in reckless disregard of circumstances, known to the prosecution, suggesting that there existed an appreciable risk that delay would impair the ability to mount an effective defense. A challenge to the Benavidez conviction and sentence would have been futile and trial counsel was not ineffective in failing to pursue that course of action.

Even if the Benavidez case had not been concluded prior to the resolution of the Sandoval penalty phase, the United States would still have been able to introduce evidence of the facts and circumstances surrounding the assault as an aggravating factor in support of the death penalty. Accordingly, the United States submits that Caro has not demonstrated that, but for the alleged errors of trial counsel, there is a reasonable probability that the outcome of the penalty proceeding would have been different.

Caro faults trial counsel for failing to adequately investigate, develop, and present a compelling mitigation story about his life. (Claim Six B, *Petition* at 66*).* Again, the record does not support his complaint.

Caro's summary conclusion that trial counsel simply presented "seemingly unrelated mitigating factors" that failed to support their case for life, *Petition* at 104*,* ignores the limited options available to defense counsel, minimizes the quality and significance of trial counsel's investigative efforts and the evidence they offered and overstates the significance of the evidence

39

JA 1385

that was not presented.   Contrary to his claim, the record establishes that trial counsel adequately and effectively investigated, developed and presented relevant mitigating testimony from family members, his wife, one of his teachers in an attempt to humanize the man who had so brutally and callously strangled Sandoval to death for no reason.  They presented two prison experts who truthfully stated that although Caro continued to pose a danger to other inmates the BOP could effectively control him to guarantee he would not harm anyone else if he were to be imprisoned for life.  As more fully discussed below, the mitigation evidence presented was not random or haphazard, but rather the product of diligent investigation and preparation by trial counsel.

Mitigation Experts and a Private Investigator

Faced with uncontradicted evidence that Caro killed Sandoval, his admissions of guilt, the trivial reasons he gave for taking a human life and his words and actions evincing a lack of remorse for the murder, trial counsel properly concluded that Caro's "would be a penalty phase case" and that their best result would be a life sentence.  *Kalista Declaration, Caro Exhibit 5 at paragraph 9.*

Caro concedes, that despite these difficult circumstances, trial counsel made reasonable and diligent efforts to build a mitigation defense. Within two months of their appointment, trial counsel sought assistance from mental health experts to address "issues such as competency, criminal responsibility, impaired capacity, disturbance, and other mental health related factors." *Petition* at 66.  They retained a mitigation specialist, Dr. Lee Norton who undertook "to collect critical records, interview relatives and other potential mitigation witnesses."  She spent almost 50 hours in April, 2006 assisting trial counsel with the development of the case for mitigation. *Petition* at 66-67.

40

JA 1386

On March 20, 2006, and through no fault of trial counsel, Dr. Norton abruptly withdrew from the case. There is no evidence that Dr. Norton's investigation revealed anything that trial counsel could have presented that would be relevant to mitigation. Undeterred, trial counsel promptly obtained the appointment of another mitigation specialist, Hans Selvog, who assisted them for the duration of the case. *Id.* at 71.

In April, 2006, defense obtained the court's permission to hire D.A. Mullikin as a private investigator assist with the development of mitigation evidence. Although the record demonstrates that he performed services as evidenced by invoices dated May 6 and June 2, 2005, *id.* at 67, there is no evidence that his investigation revealed anything that trial counsel could have presented that would be relevant to mitigation.

<u>The Mental Health Experts</u>

Beginning in January, 2006, trial investigated mental health professionals who could "conduct testing on (Caro) to determine the possibility of organic brain damage and to do a routine psychological work up prior to a psychiatric evaluation." *Emails from Kalista to Drs. Doris E. Nevin and Nancy Davis, January 24, 2006, Government Exhibit 1.* On February 15, 2006, upon recommendation of Dr. Davis, President of the Knoxville Area Psychological Association, they retained Dr. Malcolm Spica,[7] a licensed clinical psychologist and neuropsychologist. Spica spent 7.5 hours with Caro over two days, June 9 and June 16, 2006. According to Spica's neuropsychological consultation report, Caro "stated that he has not suffered any significant head injuries of which he is aware. . . no history of serious illness, losses of consciousness, prolonged high fevers, seizures or sensory disturbances," *Exhibit C to Spica*

---

[7] Counsels' early requests also indicate an awareness that other experts might be necessary depending on how their investigation proceeded. They identified the possible need for a psychiatrist "only . . . if Caro had brain damage." *Id.* at 70.

JA 1387

*Declaration, Caro Exhibit 10 at 1*. Spica found no evidence of "major head injuries." *Id. at 7*. His evaluation makes no mention of "brain damage."[8] He reports that "neuropsychological test results revealed converging signs of frontal lobe dysfunction[9]," and diagnoses Caro with "Cognitive disorder – NOS (not otherwise specified)." He "speculates" that those "cognitive deficits" caused Caro to have "disordered thinking when under pressure," and "deficits in discriminating between actual information and distorted approximations." *Id. at 6-7*. At the conclusion of his report, Spica recommended consultation with "a forensic psychiatrist to integrate these findings with an assessment of Mr. Caro's psychiatric, neurocognitive, and adaptive functioning relative" to his case. He specifically recommended Dr. Keith Caruso, who he had "found. . . to be particularly helpful in this regard." *Id. at 7*. Spica's report does not mention the need for a neonatologist or an expert in any other medical specialty.

The mitigation specialist, Selvog, is a licensed clinical social worker, not a mental health expert. On June 13, 2006, he sent what may be described a "stream-of-consciousness" memorandum to defense counsel offering "random thoughts . . . about the case." *Selvog 6/13/06 Memorandum entitled, "Potential Caro Witnesses and other issues," Government Exhibit 4 at 3*. Unaware of or perhaps ignoring the absence of any mention in Spica's report that Caro suffered from "brain damage," Selvog suggested that the defense needed a neonatologist "to help us figure out Caro's diagnosis regarding post-natal Failure to Thrive problem (i.e. sensory disintegration) anecdotally reported by the family." He also conjectured that an occupational

---

[8] The absence of brain damage is supported by Dr. Swerdlow's reports to trial counsel on December 12, 2006 (EEG purporting to show abnormalities "worthless) and December 14, 2006 (EEG "inadequate . . . to establish interictal abnormality suggestive of focal lesion") and December 20, 2006 (MRI was "normal.") *Government Exhibit 2*.
[9] Spica's report regarding "frontal lobe dysfunction" is contrary to his June 20, 2006 email to Kalista and Selvog. *Government Exhibit 3*. In contrast to the report, Spica's email states, "Mr. C(aro) demonstrates converging *although somewhat inconsistent signs of frontal lobe dysfunction.*" Spica's declaration does not explain that inconsistency.

42

JA 1388

therapist or child psychiatrist might be needed regarding Caro's "muteness, isolation, almost autistic-like persona and behavior throughout childhood." *Id.*[10]

Trial counsel accepted the recommendations of Selvog and Spica. They hired Dr. Caruso, who examined Caro in August, 2006.  Other than a note that Caruso's examination was "not helpful to the defense," *Kalista Declaration, Caro Exhibit 5 at paragraph 15,* there is no report of Caruso's findings or recommendations to trial counsel.  In Selvog's December 31, 2012 declaration, he confirms that Caruso received certain unspecified information from Caro regarding the offense was "not helpful" and he would not be able to serve as a mitigation witness.  *Selvog Declaration, Caro Exhibit 7, at paragraph 10.*  He does not state when he learned this from Caruso. There is no indication that Selvog, Spica or any other expert recommended that trial counsel seek court approval to retain another forensic psychiatrist.

A discretionary decision not to offer evidence that is itself somewhat damaging, or will result in the presentation of damaging rebuttal, does not constitute ineffectiveness.  *See Wiggins v. Smith*, 539 U.S. 510, 525, 535 (2003) (counsel may reasonably decide not to present mitigating evidence which is double-edged), citing *Burger v. Kemp*, 483 U.S. 776 (1987) and *Darden v. Wainwright*, 477 U.S. 168 (1986); *cf. Gerlaugh v. Stewart*, 129 F.3d 1027, 1035 (9th Cir.1997) (counsel is not ineffective in failing to present psychological evidence which in "its best possible light ... is a basket of cobras").  Moreover, the defendant cannot demonstrate ineffectiveness when his attorney made a knowing decision to forgo evidence that would have opened the door to damaging rebuttal:

> In evaluating whether there is reasonable probability the additional mitigation evidence would have resulted in a different verdict, this court is charged with considering all of the relevant evidence that the jury would have had before it, not just the mitigation evidence.

---

[10] Selvog's overstatements of Caro's mental issues and attendant brain damage are not supported by any mental health or family member witness.

JA 1389

> The court finds that trial counsel pursued a reasonable trial strategy that would have been undermined by the expert testimony that Petitioner argues should have been presented. Trial counsel carefully investigated and considered all possible mitigation evidence before making a strategic decision not to present the testimony of Drs. Halleck, Morton, Melikian, and Hilkey. . . . [¶]The court finds that trial counsels' decision not to present the testimony of Drs. Halleck, Melikian, Morton, and Hilkey was a reasonable strategic decision made after a thorough mental health investigation and in light of the risks of opening doors to damaging evidence.

*Fulks v. United States*, 875 F. Supp. 2d 535, 560-61 (D.S.C. 2010); *see also Link v. Luebbers*, 469 F.3d 1197, 1203 (8th Cir. 2006) ("In the light of this damaging information, it would have been reasonable for Martin to believe that it would be better to avoid what Green would later call a "a battle of experts" over Link's psychological makeup"); *Bonnin v. Calderon*, 59 F.3d 815, 834 (9th Cir. 1995) (upholding a decision not to present mental health evidence that would have opened the door to damaging information).

The record establishes that the defense investigated, retained and developed appropriate mental health experts prior to trial. The fact that those experts failed to make a compelling mitigation case is not the fault of trial counsel.  Dr. Caruso's examination failed to provide evidence that would "integrate" Spica's findings into a meaningful case for mitigation, and was in fact harmful to their case. On September 15, 2006, relying on Spica to provide mitigating mental health evidence, trial counsel notified the court that they would present a mental health defense at both the guilt / innocence and penalty phases of the trial.  The government immediately moved the court to have Caro examined under procedures to be set by the court. Fed. R. Crim. P. 12.2(c)(1)(B). The court granted the government's request on September 25. Perhaps concerned that the damaging admissions made by Caro to Caruso regarding the offense would be repeated to the court designated expert, trial counsel modified its notice to limit mental health evidence to the penalty phase. *Petition* at 76.

JA 1390

The court's examination of Caro was conducted by Dr. Robert T.M. Phillips beginning on September 26, 2006. His report dated January 29, 2007 was filed with the court under seal in accordance with Fed. R. Crim. P. 12.2(c)(2) and was not disclosed to trial counsel or the government.

In January, 2007, apparently for the first time, Dr. Spica "raised concerns that he could not offer testimony regarding mens rea." Selvog "assured him" that the only things they wanted him to testify about were "his test results showing brain damage" and Caro's "developmental background." *Selvog Declaration, Caro Exhibit 7 at paragraph 13.* Despite knowing that Caruso was not a viable witness, and that no other mental health expert other than Spica was available, there is no indication that Selvog recommended that trial counsel hire other mental health experts.

There is no doubt that trial counsel was aware of Caro's potential mental health issues and in fact gave notice of intent to present that evidence at the penalty phase. *Kalista Declaration, Caro Exhibit 5, at paragraphs 15-18.* Caro challenges trial counsel's ultimate decision not to do so. *Petition* at 90-98. Specifically, he alleges, first, that trial counsel should have found another psychiatrist to testify "how Caro's brain impairment affected him throughout his life." He further charges that the decisions made by counsel concerning the report of Dr. Phillips "were unreasonable and uninformed." *Petition* at 95.

Caro offers a letter dated December 22, 2012 from Dr. Thomas M. Hyde, a neurologist, and a Declaration dated January 7, 2013 from Dr. Donna Marie Schwartz-Watts, a psychiatrist, witnesses then unknown to trial counsel, to argue that trial counsel should have continued to pursue other experts when they learned that Caruso and Spica would not provide the mitigating

45

JA 1391

mental health evidence they expected and hoped for.  The claim that trial counsel erred in failing to find a substitute for Caruso has no support in the law.

Trial counsel is "not required to pursue every path until it bears fruit or until all conceivable hope withers." *Huffington v. Nuth,* 140 F.3d 572, 581 (4th Cir. 1998).  Assessment of the reasonableness of counsel's actions must take into account "the practical limitations and tactical decisions that trial counsel faced. . . . Particularly when evaluating decisions not to investigate further, we must regard counsel's choices with an eye for 'reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Bunch v. Thompson,* 949 F.2d 1354, 1363 (4th Cir. 1991).

Trial counsel hired a neuropsychologist (Spica) and a mitigation specialist (Selvog).  Trial counsel followed the recommendations of those experts and hired a forensic psychiatrist (Caruso) in an attempt to establish the case for mitigation.  Caruso's inability to provide helpful information, and the failure of trial counsel to find the "right" psychiatrists, does not establish that their performance was deficient.

The argument that the decision of trial counsel not to proffer mental health evidence was unreasonable is also unfounded.  The failure of the defense to call certain witnesses is not sufficient grounds for a Sixth Amendment claim.  *United States v. Hughes,* 635 F.2d 449, 453 (5th Cir. 1981) (discussing failure to call alibi witnesses); *Lema v. United States,* 987 F.2d 48, 54 (1st Cir. 1993)(decision whether to call particular witness is almost always strategic); *Strickland,* 466 U.S. 668, 690 (strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable).  As trial approached, Spica was the only witness known to trial counsel who could proffer mental health evidence at the sentencing phase. Based at least in part on their research and investigation of Phillips' reputation and a review of

JA 1392

his testimony in prior cases, trial counsel concluded that they "could not rebut" his testimony[11], and they made the decision not to present mental health testimony at the penalty of the trial. *Kalista Declaration, Caro Exhibit 5, at 17-18; See also, Government Exhibit 5, email from redacted to Kalista dated September 25, 2006 (Phillips described as "very capable government witness"); email from redacted to Kalista dated September 26, 2006 enclosing "Phillips' testimony from EDVA MS-13 case).*

The decision to forego presentation of mental health evidence at the penalty phase was no doubt informed by two factors not within the control of the defense team. First, issues concerning a defendant's mental condition bearing on the issue of punishment in a capital case are governed by Fed. R. Crim. P. 12.2(b)(2) and (c). Under the provisions of Fed. R. Crim. P. 12.2(c)(2), the results of a capital sentencing examination of the defendant are sealed and may not be disclosed to counsel "unless the defendant is found guilty" of the capital crime, "and the defendant confirms an intent to offer during the sentencing proceedings" evidence of the defendant's mental health. Thus, while trial counsel knew that Caro's examination would be conducted by Phillips, a "very capable government witness," they did not have access to his report until after Caro was convicted. As a further condition to the review of Phillips' report, trial counsel had to "confirm" their intention to make his mental health an issue at sentencing. Second, trial counsel could reasonably conclude, based upon Caruso's examination, that Phillips would provide information that would be extremely damaging to their case for mitigation.[12] At

---

[11] The contention that Montalbano, who assisted Phillips in his testing of Caro, "could be discredited on cross-examination," *Petition* at 95-96, is speculative. The "discrediting" information came from a single source with only anecdotal information about Montalbano's work.

[12]  The concerns of trial counsel are validated by Phillips' findings in his report to the court dated January 29, 2007. He reports, among other things, that Caro "reported a happy childhood and denied any history of abuse." *Report of Robert T.M. Phillips, M.D., Ph.D., D.F.A.P.A at 14.* He concludes that "within a reasonable degree of medical and psychiatric certainty, . . . Caro is a man of low-average to average intellectual functioning who does not demonstrate any deficits in adaptive functioning. . . (t)here was no evidence that Mr. Caro suffers from any mental or emotional

47

JA 1393

the time of Caro's conviction, trial counsel lacked expert testimony to effectively rebut any adverse findings by Phillips and his team.  Certainly, neither Spica nor Caruso could do it. The lack of rebuttal testimony was not due to trial counsel's failure to exercise due diligence in investigating and identifying appropriate mental health experts, but rather to the inability of their selected experts to assist them.

Caro contends that trial counsel was ineffective because they failed to call Caro's brothers, Noe and Jose, as witnesses, and that failure prejudiced him at the penalty phase of his trial.[13] *Petition* at 100.  Neither contention is correct.

Relying entirely on Selvog's January, 2013 declaration, Caro argues that the failure to call the brothers deprived the jury of "eyewitness accounts of the violence in the house were Mr. Caro grew up" and "intimate details of Mr. Caro's unusual behavior as a child" thus preventing the jurors from "viscerally knowing and appreciating the full extent of Mr. Caro's personal history." *Petition* at 80. His claim is problematic for a number of reasons. First, there are no affidavits or other documents from the brothers stating a willingness to testify of the substance of their testimony.  Second, there is no indication that Selvog recommended the brothers as "crucial witnesses" or witnesses at all before his December 31, 2012 declaration.  Their names are absent from his May 15, 2006 memorandum to trial counsel, *Government Exhibit 6,* and his June 13, 2006 "stream-of-consciousness" memorandum to trial counsel. *Government Exhibit 4.*  His "Timeline" is consistent with the testimony of Caro's aunts, cousin, teacher and wife and

---

condition that . . . impairs his capacity to meet the tasks of day-to-day living." *Id.* at 12.  Further, "twelve psychological reviews performed by seven different psychologists at five different federal correctional facilities consistently found that his mental status was within normal limits." *Id.* at 16.

[13]  Caro also cites the failure to present testimony from Amada Fergason, Mrs. Caro's mother's social worker who could not travel due to medical reasons but did provide a statement on videotape that was not played for the jury. The petition does not reveal the content of the videotape or provide any indication of how, if at all, it would be relevant to mitigation. *Petition* at 82-83.

JA 1394

portrays Noe and Jose as criminal miscreants and ne'er-do-wells. *Selvog Timeline (undated), Government Exhibit 7 at 2-4.*

Third, any testimony the brothers may have offered would have added nothing to the story presented by the other mitigation witnesses and may well have been detrimental to his case. Caro's family members presented a fulsome look at Caro's life and it is pure speculation to claim that the testimony of Jose and Noe would have materially added to the mitigation case.

Interestingly, Caro attacks trial counsel's decision to present mitigation evidence from witnesses who painted a very sympathetic picture of his early years. Those witnesses, he complains, "were undermined on cross-examination."  For example, he complains that Laura Perez, Caro's cousin, provided testimony that included information that ran counter to his contention that Caro had a difficult and traumatic childhood. *Petition* at 106-109.  Perez, of course, was among the "potential Caro witnesses" identified by Selvog in his June 13, 2006 memorandum.  Nevertheless, because the testimony of Perez and other family members included information that both helped and hurt Caro, he claims their decision to call those family members as witnesses made them ineffective. Caro could not be more wrong in that claim.  Trial counsel did not have the luxury of choosing witnesses who could portray Caro as a saint. Nor could they choose witnesses who would not be subject to the crucible of cross-examination. It is not the fault of trial counsel that the jury received a "complete portrait" of the man they were sentencing.

By overstating the significance of Caro's mental health issues and the testimony of Noe and Jose, while faulting the strategic decisions not to introduce mental health evidence, Caro concludes that trial counsel's "deficient performance" in failing to present a "compelling" mitigation story prejudiced him at the penalty phase. *Petition at 109.* The United States disagrees.  The record shows that trial counsel conducted a thorough investigation and made

JA 1395

reasonable attempts to present a mitigation story about Caro's life. As Mr. Kalista points out, they did not have much to work with: Caro "cheated on his wife; he was not a good father; he was a three time loser as far as drugs; and he had difficulty while incarcerated." *Kalista Declaration, Caro Exhibit 5, paragraph 20.* The inability to "humanize" Caro is more the product of the lack of any humanizing characteristics than by any errors or omissions of trial counsel.

Based on the foregoing, the United States submits that trial counsel was not deficient as charged in Claim Six B. In any event, there is no reasonable probability that, but for those alleged deficiencies the outcome of the penalty proceeding would have been different.

Caro faults trial counsel for failing to investigate prison culture and to subject the evidence of Caro's leadership position in the Texas Syndicate to "meaningful adversarial testing." Claim Six C, *Petition* at 113. The argument is not supported by the record.

Caro concedes, as he must, that trial counsel (1) properly anticipated that the government would argue that Caro was not a mere foot soldier, but rather occupied a position of authority in the gang, at least as it relates to incident at FCI-Oakdale; (2) that trial counsel made reasonable efforts to exclude that evidence, and (3) that trial counsel hired a "gang expert" to assist them with addressing gang related issues that might arise during the trial. *Petition* at 114-115. Discounting those efforts, he relies on Bezy, an expert that was not known to trial counsel, to propose, based entirely on conjecture, that Caro was not a leader of the Texas Syndicate at FCI-Oakdale. Bezy's conjecture is belied by the evidence.

SIS Lieutenant John Gordon was working at Oakdale in July, 2002. Gordon was soon expecting to intake inmates who were members of the Paisas, a gang that clashed with the Texas Syndicate. *TT 2/5/07 at 165.* Prior to the arrival of the Paisas, Gordon undertook to open "a line

50

JA 1396

of communication between (prison officials) and the leadership of these gangs" and, hopefully, avoid any physical confrontations between them. When Gordon reached out to the leadership of the Texas Syndicate, "Caro showed up." *Id. at 168.* According to Gordon, Caro made it clear that he was the leader of the Texas Syndicate at Oakdale. *Id.* Caro rebuffed Gordon's plea to keep the peace, responding in no uncertain terms that "the Texas Syndicate was going to do what it had to do." *Id.* True to Caro's words, the Texas Syndicate attacked the Paisas the afternoon of their arrival at the facility. Caro told Gordon, "his brothers take orders, they follow orders." *Id. at 170.* Caro's words and actions speak for themselves and the jury could properly infer that he exercised a leadership role in the gang. Based upon their conversations, Gordon viewed Caro as a gang member who, in his opinion, had the ability to prevent a confrontation between the Texas Syndicate and the Paisas but refused to do so.

There is no reason to believe that Bezy's opinion about Caro's role as a leader would be sufficient to impeach Gordon's conclusions. Even it had been presented to the jury, there is no reasonable probability that the result of the penalty hearing would have been different.

Caro claims that trial counsel was ineffective in failing to challenge the government's claim that the BOP lacked the ability to control improper inmate communications. He argues that trial counsel should have relied upon the existence of BOP policies and program statements to "dispel the misleading impressions" left by the government witnesses. Claim Six D, *Petition* at 116, 118.

Evidence presented at Caro's trial of the inmates' ability to communicate with individuals outside of the facility was not inaccurate or misleading. Experts for both the prosecution and the defense stated that inmates at even the most secure federal correctional facilities, including ADX, were able to communicate with persons outside of the institution despite the best efforts to

51

JA 1397

prevent such communications.  *See, e.g., Testimony of James Aiken, "you never get to absolute zero" in the ability to control inmate communications.  TT 02/07/07 at 42-43.*

The government has never claimed that BOP lacks program statements, policies and other administrative procedures that are intended to prevent such communications. Rather, the point is that despite the existence of such procedures, BOP can never fully control an inmate's access to those outside of the facility.  Those same program statements, policies and other administrative procedures were in place while Caro was incarcerated, yet the uncontradicted evidence is that Caro himself communicated with family and gang members by letter and telephone while he was incarcerated at USP-Lee.  Even if trial counsel had brought out the details of the BOP intended prophylactic measures, there is no reasonable probability that the outcome of the penalty proceeding would have been different.

Caro argues that counsel was ineffective in failing to present evidence of "prison culture" that would somehow explain that Caro's statements and lack of remorse were "typical to inmates and necessary for survival."  Claim Six E, *Petition at 118.*  His argument fails because there is no reasonable probability that the results of the penalty proceeding or the jury's findings with regard to lack of remorse would have been different had Caro introduced the proffered testimony.

As Caro points out, the United States at trial portrayed Caro as a "predator' who lacked remorse. Caro cannot and does not dispute the accuracy of the evidence adduced at trial, including Caro's role in the melee' at FCI-Oakdale and the callous comments he made in the wake of that incident.  He cannot dispute his role in the stabbing of Benavidez He cannot dispute that he strangled Sandoval to death over a trivial matter. More importantly, he cannot dispute his callous remarks and his matter-of-fact discussion of the murder with his family and friends.

52

JA 1398

No evidence in the record suggests or intimates that Caro made the callous statements because of some need for self-preservation, and Bezy's attempts to explain them as such are conjectural.  Let us assume, arguendo, that "bravado" might explain his comments to the guards ("Come and get this piece of shit out of here." . . . "(H)e's stinking up the room, get him out." . . . "Caro taunted a prison guard, grinning and calling out, 'When (are) you . . . going (to) assign (me) a new cellie?". . . "Several days later, again grinning, Caro requested fellow inmate Ortiz for his next cellie,"). Bravado does nothing to explain or justify his numerous oral and written statements to family and a fellow gang member, which are totally devoid of remorse. (Letter to family member: "I killed a guy two weeks ago . . . for being a fool"; Statement to his wife, laughing: "(Sandoval) called me a mother fucker": Statement to fellow gang member, Role Rivas: "It's because they gave me a cell mate and he disrespected me, so I took him down;" "Sandoval called me mother fucker, that whore, that's why I fucked him up." *Caro,* 597 F.3d at 611, 631.  From this evidence, there is no reasonable probability that the proffered testimony from Bezy would have caused the result of the penalty proceeding to be different.

Caro charges that trial counsel failed to adequately investigate Caro's underlying conviction for conspiracy to commit murder and failed to file a collateral challenge to that unconstitutional conviction.  Claim Six F, *Petition at 119.*  As part of that charge, he states that Caro's counsel in the Benavidez case, Lou Dene, failed to advise him that a guilty plea to the conspiracy would likely be used against him as an aggravating factor in the Sandoval case. He claims that Dene's alleged error should have been used by trial counsel to challenge the prior conviction and sentence but they failed to do so and that failure prejudiced him.

The government agrees that, in some cases, counsel's failure to advise a defendant of collateral consequences of a plea could be a basis to invalidate the guilty plea in that case.

53

*Padilla v. Kentucky,* 559 U.S. 356 (2010); *United States v. Akinsade,* 686 F.3d 348 (4th Cir. 2012). However, the government is unaware of any case holding that a defendant may claim prejudice arising from the alleged failure of defense counsel to advise the defendant of the consequences of a guilty plea can be used to invalidate the resultant judgment and sentence in a different case.

The government concedes that Dene did not advise Caro that the Benevidez plea "would likely be used against him" in the Sandoval case. *Dene Declaration, Caro Exhibit 3, paragraph 6.* However, in order to demonstrate resultant prejudice in the Sandoval case, he must establish that a) if Dene had advised him that his guilty plea in Benevidez would be used as an aggravating factor in the Sandoval case, he would not have pled guilty; b) that he would have been acquitted or convicted of a lesser offense in the resultant Benevidez trial; and c) there is a reasonable probability that his acquittal or conviction of a lesser offense would have convinced the jury to impose a life sentence. He cannot meet that burden.

The interlocking plea agreements between Moreno-Marquez and Caro were proposed by Moreno-Marquez and acquiesced in by Caro. The government had no role in formulating that proposal, but merely accepted it for reasons unconnected to the Sandoval case. The pleas in the Benevidez case benefitted both men, Moreno-Marquez certainly more so than Caro. Moreover, Dene does not state that he would have recommended that Caro plead not guilty and proceed to trial in the Benevidez case if he had known that his guilty plea would be used against him in the penalty phase of the Sandoval case. Also lacking is any evidence whatsoever that Caro would have accepted Dene's recommendation. From the record, it appears that the motivating factor for Caro's plea was not Dene's failure to advise, but rather Caro's desire to benefit his fellow gang member, Moreno-Marquez.

JA 1400

The United States again submits that there is no reasonable probability that the results of the penalty phase would have been different had Caro not accepted the plea agreement in the Benevidez case. At the time of the Benevidez stabbing, Caro was 37 years of age and was already serving a term of 378 months imprisonment. He told officials at FCI-Oakdale and Dene that he had no concerns about the effect that his actions would have on the length of his confinement. After the stabbing, and while housed in the Special Housing Unit, arguably the most secure part of a maximum security facility, Caro strangled Sandoval to death with a towel. In the highly unlikely event that Caro would have been convicted of a lesser offense or acquitted in the Benavidez case, Caro's *actions* in that case would still have been admissible against him in the Sandoval case. Regardless of the outcome of the Benevidez case, the United States still had a compelling basis to argue that when he murdered Sandoval, Caro was then serving the functional equivalent of life and would remain a danger to inmates and others around him if he was not sentenced to death. Even if the evidence of his plea and sentence in the Benavidez case had been excluded, there is no reasonable probability that the outcome of the penalty proceeding would have been different.

Caro alleges that his trial counsel was ineffective for failing to offer *Skipper* evidence to rebut aggravating evidence. Claim Six G, *Petition at 128.* His claim has no merit.

Under the Eighth and Fourteenth Amendments to the Constitution, the sentencer in a capital case may "not be precluded from considering *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett,* 438 U.S. at 604 (emphasis in original). In *Lockett,* the Supreme Court declared an Ohio death penalty statute unconstitutional because it specified only three factors that could be considered by the sentencer in mitigation of

55

JA 1401

the offense. *See id.* at 608.  In *Eddings v. Oklahoma,* 455 U.S. 104 (1982), the Court extended

*Lockett* to a case in which the state court refused to consider, as a matter of law, any mitigating

evidence of the defendant's violent family history and abuse. *See id.* at 112-13. "Just as the State

may not by statute preclude the sentencer from considering any mitigating factor," the Court

held, "neither may the sentencer refuse to consider, *as a matter of law,* any relevant mitigating

evidence." *Id.* at 113-14.  In accordance with those precedents, in *Skipper v. South Carolina,* 476

U.S. 1, 6-8 (1986), the Court reversed the imposition of a death sentence where the trial judge

had excluded as irrelevant, evidence of the defendant's good behavior in jail while he awaited

trial.  In reliance upon *Skipper*, Caro does not allege that the court excluded any mitigating

evidence, but that his trial counsel was ineffective, in violation of his Sixth Amendment rights,

for failing to offer certain mitigating *Skipper* evidence on his behalf.  *Petition* at 128.  When a

petitioner alleges, as Caro does here, that his counsel should have put forth additional evidence

in mitigation, the Court assesses prejudice by "reweigh[ing] the evidence in aggravation against

the totality of available mitigating evidence." *Wiggins v. Smith,* 539 U.S. 510, 534 (2003).

Caro argues that his counsel should have ensured that the jury heard that Caro plead

guilty to the Benavidez assault in order to help co-defendant Moreno-Marquez have an

opportunity "to get out of prison as a young man."  *Petition* at 129.  Caro claims that his plea in

that case "was a selfless act . . .  which carried no benefit and every disadvantage for him."  *Id*.

Caro also claims that his counsel was ineffective for failing to present evidence that "the BOP

considered Caro a 'good inmate,' appropriate for housing at USP-Marion or ADX Florence."

*Petition* at 129.  Caro also argues that opinions of Dr. M. Geyer, a psychologist who evaluated

Caro monthly from the time of Caro's placement in the SHU until his transfer to ADX-Florence,

JA 1402

should have been presented. *Petition* at 130. Specifically, Caro argues that his counsel should have presented the following conclusions from Dr. Geyer:

> His violence while incarcerated appears to be gang related and tied directly to his involvement with the TS . . .. Inmate Caro has not been a disruptive inmate or violent in any other settings unless he was involved with TS activities. *Petition* at 130; *Sealed Exhibit* 56 at 2 (*Psychological Evaluation of Carlos Caro*, 9/7/2004).

> With regards to violence prediction, it appears that Inmate Caro has only acted aggressively with other Texas Syndicate gang members. His violence appears to be instrumental rather than impulsive. Inmate Caro is pleasant to interact with professionally and other staff at this facility have described him as a "good inmate." *Petition* at 130; *Sealed Exhibit* 56 at 3.

Caro argues that these reports "reflect a person who is amenable to supervision within the correctional system and who is not violent by nature," and that Dr. Geyer's conclusions "rebut the government's characterization of Mr. Caro as a dangerous, violent individual." Finally, Caro asserts that his counsel should have presented evidence from the Psychology Round Notes of January 2, 2004, which included a note that Caro "'initiated a conversation to advise that another inmate was experiencing psychological distress.'" *Petition* at 131. Caro argues that this information would have "revealed him to be a caring person with redeeming qualities." *Petition* at 131. For the reasons below, Caro cannot establish that his counsel was ineffective for failing to present this evidence, and further, even if this court concluded that Caro's counsel was ineffective, Caro cannot establish a reasonable probability that the outcome of the penalty phase would have been different but for any alleged error by counsel. *See Strickland*, 466 U.S. at 694. Given the aggravating factors in this case, and the strength of the government's case, there is no reasonable probability that the omitted evidence would have changed the conclusion that the aggravating circumstances outweighed the mitigating circumstances and, hence, the sentence imposed was justified. *See Strickland*, at 698-700.

JA 1403

Caro has not established that trial counsel was ineffective in failing to introduce his motivation to plead because trial counsel did not have any basis to make such an argument. The record reflects that Caro plead guilty in light of overwhelming evidence proving his guilt in the case, including video surveillance footage which showed Caro and Moreno-Marquez stabbing the victim, Benavidez, multiple times. *Transcript of Carlos Caro Guilty Plea*, Case No. 2:03CR115, August 3, 2004, pp. 14-18. At Caro's guilty plea the government represented that the evidence established that Caro and Moreno-Marquez assaulted fellow inmate Ricardo Benavidez with homemade knives made out of sharpened Plexiglas. *Id.* at 14. Caro had been identified at the time by prison employees as a member of the Texas Syndicate gang based on tattoos on his body, and Moreno-Marquez had also admitted his membership in the gang. *Id.* During the assault, Caro and Moreno-Marquez stabbed Benavidez multiple times. *Id.* at 14-15. The government stated that a prison employee saw Benavidez leaving one room with Caro and Moreno-Marquez in pursuit, and "at the same time striking him and striking at him with knives in their hands." *Id.* at 15. The assault was captured on video surveillance cameras, and a later search turned up two Plexiglas knives, and DNA testing established that Benavidez's blood was on the clothing of Caro and Moreno-Marquez. *Id.* at 15. Later, Moreno-Marquez made a spontaneous statement, saying, "We hit him like we hit Alcantara (sic)."[14] The transcript of the plea colloquy for Moreno-Marquez reflects that the government's evidence established that Caro "appeared to be the most culpable of all of the defendants," (*Ex.* 55), and at Caro's sentencing hearing, his attorney, Lou Dene, agreed that Caro "was one of the main instigators in the conspiracy." *Sealed Exhibit* 52, p. 3. Counsel for the government indicated that Caro had "admi[tted] that he and his co-defendant took the sharpened Plexiglas weapons and repeatedly

---

[14] The government indicated at the plea hearing that Alcantara was a reference to another inmate who had been assaulted by members of the Texas Syndicate about a month before the Benavidez assault. *Tr.* at 16.

58

JA 1404

stabbed the victim, . . ..” *Id*. at 4.   The record thus establishes that the government's evidence proved that Caro was in fact guilty of the offenses charged in the Benavidez case, and that Caro plead guilty in light of that evidence.

The government's counsel explained that the decision to treat Moreno-Marquez differently was based in part on an uncooperative victim, and that after determining that Caro was the most culpable of all the defendants, the respective agreements with Caro and Moreno-Marquez were in the best interests of the United States.  *Transcript of Moreno-Marquez Sentencing Hearing*, November 2, 2004, *Sealed Exhibit* 55, pp.5-6.   There is no dispute that Caro would have been aware that Moreno-Marquez's sentence would be much shorter than his own, given that the plea agreements were contingent upon one another and the maximum statutory penalty for the offense of conviction for Moreno-Marquez was five years.  *See Moreno-Marquez Plea Agreement, Sealed Exhibit* 53 at 1; 18 U.S.C. § 1791(a)(2) and (b)(3).  But there was no mention during this hearing, or at Caro's guilty plea or sentencing hearing, of his intention to plead guilty in order to allow Moreno-Marquez to get out of jail earlier.  In  his Petition, Caro cites to his argument in Issue Six F, which in turn relies on a declaration of his Mr. Dene for the assertion that he acted selflessly in pleading guilty to the Benavidez assault, only to benefit Mr. Moreno-Marquez.  *Petition* at 129, 119-20.  But Mr. Dene's declaration states that he obtained a plea agreement for Mr. Caro "whereby Mr. Caro would plead to the most serious offense of Conspiracy to Commit Murder and the Government would allow his co-defendant, Juan Carlos Moreno-Marquez to plead to the lesser offense of possessing a prohibited object." *Dene Declaration, Caro Exhibit* 3, p.1.  Mr. Dene continues, stating, "[t]he plea agreement, which I understood was proposed by Mr. Moreno-Marquez, provided no real benefit to Mr. Caro; however it did benefit Mr. Moreno-Marquez." *Id*.

JA 1405

Caro does not tell us why he pled guilty and from the record before the court it is impossible to ascertain what reason or reasons motivated his decision. Whether Caro plead guilty to benefit Moreno-Marquez, or because the government's evidence was overwhelming, is unknown. The fact that his decision to plead did benefit Moreno-Marquez, and that Caro's counsel now states that it "provided no real benefit" to Caro, does not establish Caro's intentions, and Mr. Dene's declaration does not, and could not, speak for Caro's mental state regarding his motives in pleading. Further, even had Caro's trial counsel attempted to establish Caro's intentions through Mr. Dene's testimony, such evidence would have been inadmissible as speculative on Mr. Dene's part. *See* Fed. R. Evid. 611(a), 701. Thus, trial counsel was not ineffective in failing to argue Caro's "selfless act" in connection with the Benavidez case.

However, even assuming that Caro was motivated by a desire to help Moreno-Marquez get out of prison earlier, and negotiated his plea agreement in order to accomplish that goal, he cannot say that he received no benefit from his plea. In the Benavidez case, Caro's total offense level was 34, which with a criminal history category of VI, translated to a guideline range of 262 to 327 months. *Transcript of Caro Sentencing Proceedings*, No. 2:03CR115, November 1, 2004, *Sealed Exhibit* 52, p. 2. Without his plea agreement, Caro would not have received the three level downward adjustment for acceptance of responsibility, and his range would have been 360-life. *See* U.S. Sentencing Guidelines, Sentencing Table. Thus, and even acknowledging that Caro was already subject to significant imprisonment, Caro benefitted from his plea agreement in the Benavidez case because he was able to reduce his guideline range to something less than life imprisonment.

Additional evidence regarding Caro's purported intentions in pleading to the assault would not have offset the aggravating factors in this case. Any effort to paint his guilty plea as a

60

JA 1406

"selfless act" would have been heard against the backdrop of the evidence of Caro's vicious crimes against both Benavidez and Sandoval, and his callous, highly incriminating statements about the murder. In that light, evidence that Caro plead guilty in order to make it possible for his fellow Texas Syndicate gang brother to be released from prison earlier does not create a reasonable probability that the jury would have reached a different sentencing decision.

Dr. Geyer's report is not entirely favorable to Caro. The report also reflects that Caro had "assaulted another TS member which resulted in the recent conviction and his deceased cell mate in SHU was also a TS gang member…." *Sealed Exhibit* 56, p.2. Dr. Geyer opined that "Inmate Caro's violence is *planned and instrumental, rather than impulsive*." *Id. Emphasis added.* Additionally, Dr. Geyer stated, "violence prediction is often difficult to ascertain and further evaluation into this inmate's violence risk would appear warranted in the future." *Id.* Finally, in his conclusions and recommendations, Dr. Geyer stated that "[i]f Inmate Caro is placed at U.S.P. Marion or Florence ADX, psychology staff may wish to conduct a thorough violence risk assessment before he is returned to a general population setting." *Id.* at 3. Though Dr. Geyer's notes reflect that Caro had some pleasant interactions with staff, his report was not inconsistent with the government's evidence and theory of the case. Caro was convicted of premeditated murder. Dr. Geyer describes Caro's violence as "planned and instrumental," rather than "impulsive, a conclusion which strongly suggests that Caro's violent acts are calculated, intentional, purpose driven and consistent with the government's case, which proved that Caro killed Sandoval in a premeditated manner.

Even if this Court finds that trial counsel was deficient in failing to present testimony from Dr. Geyer, Caro cannot establish prejudice. The addition of Geyer's conclusions would not have significantly altered the balance of mitigating and aggravating evidence that was presented

61

JA 1407

at sentencing. Caro's statements and actions unquestionably established that though he might not always be violent, he was capable of killing, willing to kill and exhibited no apparent remorse for his actions afterwards. In that light, additional evidence regarding the psychologist's conclusions, evidence that, on one occasion in January of 2004, Caro remarked that a fellow inmate was experiencing psychological distress, and the additional evidence of Caro's concern for another inmate in the Psychology Round Notes, would not have offset the aggravating factors in this case. Thus, after reweighing the totality of the mitigating evidence against the aggravating evidence, this Court should conclude that Caro has not shown a reasonable probability that the jury would have returned a sentence other than death. Caro has not met the *Strickland* standard in that he "has made no showing that the justice of his sentence was rendered unreliable by a breakdown in the adversary process caused by deficiencies in counsel's assistance. [The prisoner's] sentencing proceeding was not fundamentally unfair." *Strickland,* at 700; *Caro*, 597 F.3d at 636 (The proceeding below adhered to fundamental fairness. Each aggravating factor determined by the jury was well supported by the record. Finally, we cannot see how cumulative error could have caused the jury to weigh sentencing factors any differently.). For all these reasons, Caro's claim Six G should be denied.

Caro contends that the Bureau of Prisons "acted negligently and contrary to sound correctional practices in regards to housing of Caro and Sandoval," and that such evidence "could have influenced" the decision of one juror in the case. Claim Six H*, Petition at 132.* For the reasons set forth in response to Claim Four C, *supra,* the United States maintains that there is no basis to claim that the BOP was negligent in placing Sandoval in Caro's cell. Further, Caro's stated reason for murdering Sandoval was a dispute over breakfast and because Sandoval allegedly "disrespected" him. There is no basis to claim that the murder was causally connected

JA 1408

to the placement of Sandoval as opposed to any other random inmate in Caro's cell. His

argument that defense counsel was deficient in failing to "investigate and present" evidence of

something that did not exist should be rejected.

Caro claims that trial counsel was ineffective for failing to object to the government's

presentation of testimony concerning specific acts of violence by inmates other than Caro, in

violation of the Court's order of November 20, 2006 prohibiting such evidence.  Claim Six I.

*Strickland* requires defendants claiming ineffective assistance of counsel to show that their

attorneys' actions "were not supported by a reasonable strategy." *Massaro v. United States*, 538

U.S. 500, 504 (2003).  Courts, moreover, accord great deference to counsel's tactical decisions,

"such as refraining from cross-examining a particular witness or from asking a particular line of

questions." *Dows v. Wood*, 211 F.3d 480, 487 (9th Cir. 2000).  *Yarborough v. Gentry*, 540 U.S.

1, 8 (2003) (noting strong presumption that counsel makes decisions for tactical reasons, rather

than out of neglect).  It follows, then, that counsel has no obligation to raise a futile

objection.  *Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005); *Harris v. United States*, 204

F.3d 681, 683 (6th Cir. 2000).

As more fully explained below, because evidence of violence by inmates other than Caro

was offered in response to the testimony of Caro's expert, Cunningham, and to demonstrate bias

through cross-examination, the government did not violate the court order and, therefore, an

objection by trial counsel would have been futile.  Further, because such evidence was brief,

followed identical testimony by Cunningham and was collateral to the larger issue of the BOP's

ability to control inmate behavior, Caro cannot establish prejudice arising from the failure of trial

63

JA 1409

counsel to object.  Even if challenged testimony was excluded, there is no reasonable probability

that the outcome of the penalty proceeding would have been different.

On January 11, 2006, the United States filed a Notice of Intent to Seek the Death

Penalty, alleging Caro's future dangerousness as an aggravating factor.   Dkt. 8, 1/11/2006,

1:06CR-00001.  The notice did not include reliance on acts of violence by inmates other than

Caro.  Rather, the future dangerousness aggravator was based upon:

> a. Continuing *pattern of violence and recidivist conduct*: While imprisoned, CARLOS DAVID CARO has occupied a leadership position in a violent gang and, through his connection with the gang, has been involved in physical assaults on other inmates on at least two occasions. He also has committed numerous prior felony drug offenses.
>
> b. *Low rehabilitative potential*: CARLOS DAVID CARO has a lengthy history of illegal conduct outside the prison setting and a significant history of violent and non-violent rules violations while in custody. Through his words and recidivism, he has demonstrated that the threat of incarceration does not deter his misconduct.
>
> Among CARO'S in-custody misconduct, he participated in a July 11, 2002 gang-based assault on other inmates at the United States Prison in Oakdale.  When questioned about his involvement in the Oakdale incident, CARO expressed a lack of concern about being prosecuted because he was already serving a 30-year sentence. He implied his belief that government officials could not meaningfully punish him in view of his pre-existing sentence.  CARO expressed a similar lack of concern about the consequences arising from his August 29, 2003 attempted murder of Ricardo Benavidez, whom he stabbed 29 times.
>
> c. *Lack of remorse*:  CARLOS DAVID CARO has not expressed remorse for his violent acts, including (but not limited to) the murder of Sandoval, the stabbing of Benavidez and the gang-based assault in Oakdale.  After killing Sandoval, CARO referred to the victim in vulgar terms and taunted guards by asking when he would receive a new cell mate.

In response, trial counsel filed four discovery motions seeking data[15] from the BOP

records, including BOP records and data concerning (1) all inmates who have ever been confined

---

[15]  Caro does not allege that the government introduced any of the data sought by his discovery requests.

JA 1410

in the Florence ADMAX Control Unit; (2) all inmate homicides that have occurred in the BOP

nationwide in the last twenty years; and (3) all incidents of inmate violence at Florence

ADMAX.   The court noted that "[t]he information sought by the defendant is based on the

opinions of Dr. Cunningham," and his need for group data to support his scientific research

pertaining to an individualized future dangerousness risk assessment for Caro.  *Id*.

The government objected to the motion because Caro could not demonstrate that the data

sought was exculpatory under *Brady v. Maryland,* 373 U.S. 83 (1963) and production would

impose an undue burden to the government. *United States v. Caro*, 461 F.Supp.2d 478, 480-81

(W.D.Va. 2006).

The court sustained the government's objection.  In doing so, the court noted, first, that

the government had represented "that it does not intend to offer any of the contested information

into evidence itself." *Id.* The court recognized that "[i]f the defendant is convicted, the

government will likely introduce evidence in the sentencing phase of the trial that he poses a

threat of danger to prison staff and other inmates if he is imprisoned, rather than put to death.  In

rebuttal, the defendant may produce evidence that if the defendant is incarcerated at Florence

ADMAX, particularly in the Control Unit, he will not be a future threat to others." *Id*.  The court

found that Caro failed to establish that the data sought was material under Brady.  Further, the

court held the information was not discoverable under either Fed. R. Crim. P. 16 or 17.  The

court's ruling was based upon Caro's failure to provide "at least 'some indication that the pretrial

disclosure of the disputed evidence would have enabled the defendant significantly to alter the

quantum of proof in his favor.'" *Id., citing United States v. Ross,* 511 F.2d 757, 762-63 (5th Cir.

1975).  In conclusion, the court wrote, "I point out, however, that I (sustain the government's

objection) in light of the government's representation that it does not intend to introduce any of

JA 1411

the requested data in its own case.  Otherwise, Rule 16 might very well require its prior disclosure to the defendant . . . [a]ccordingly, absent proper disclosure, the government may not rely on specific instances of inmate violence (other than the defendant's own) in seeking to prove his future dangerousness." *Id* at 481-482.

The court's ruling was consistent with the language of Rule 16, which requires disclosure of documents the government intends to rely upon in its case-in-chief, and upon the well-established rule that the government need not provide documents it thinks it might use in rebuttal.  *United States v. Delia*, 944 F.2d 1010, 1017 -1018 (2d Cir. 1991); *United States v. Schneiderman*, 104 F.Supp. 405, 410 (C.D. Cal. 1952). The court's discovery rulings were affirmed by the Fourth Circuit on direct appeal.  *United States v. Caro, 597 F.3d at 619-622.*

 Caro asserts that the United States violated the court order and trial counsel was ineffective in failing to object to the elicitation by the government of instances of inmate violence not involving Caro.  He charges that "had his counsel objected, the Court would have had no choice but to sustain the objection." He further claims trial counsel's ineffectiveness was prejudicial to him in that the failure to object prevented him from being sentenced on the basis of his own conduct.  *Petition* at 133-136.  His arguments have no merit.

Caro challenges the propriety of testimony concerning acts of violence by other inmates during the government's (1) direct examination of its rebuttal witnesses, Olson and Hershberger, and (2) cross-examination of defense witness Cunningham. *Petition* at 133-136.

The court's order did not purport to preclude the government from introducing evidence of violence by other inmates for any and all purposes.  Rather, the prohibition related to the use of such information "in its own case." The testimony that Caro complains of here was developed during the defense case, in cross-examination of and rebuttal to Cunningham.  Olson and

66

JA 1412

Hershberger were clearly identified by the government as rebuttal witnesses. During the government's case-in-chief, government's counsel informed the court and trial counsel that because of witness scheduling issues, he intended to present rebuttal witness Olson out of order. (*TT*, 2/6/2007 at 29).  The government had anticipated the relevance of the testimony of Olson and Hershberger based on Cunningham's testimony in prior cases regarding specific acts of violence and the BOP response thereto, and the slideshow that trial counsel provided to the government in lieu of a formal report by Cunningham.

Cunningham's direct testimony followed the pattern predicted by the government.  He presented himself as an "expert in prison violence and security measures within the Bureau of Prisons." *TT 2/12/07 at 17.*  His testimony was based in part on his review of "an extensive body of statistical data provided . . . over the years" by the BOP" and "extensive disciplinary files related to ADX." *Id. at 20.* He spoke first about "mechanisms available" within BOP to "control disruptive or violent inmates." *Id. at 23.*  He provided extensive testimony citing instances of violence by inmates other than Caro.  He informed the jury that "32 percent of the inmates at ADX have killed another inmate in prison," and the rate of inmate on inmate murder varies from three to six in any given year. . . that rate is someplace between 18 and 24 per 100,000 inmates per year." *Id. at 37, 39.* Cunningham specifically mentioned multiple inmate on inmate murders at ADX and the measures put in place by the BOP, not only at ADX but at other federal facilities, to prevent future occurrences. *Id. at 45-48.*  He cited specific examples of inmates fashioning shanks from materials at ADX and the institutions prophylactic responses.  *Id. at 69-70.*

67

JA 1413

Cunningham also testified extensively about the ADX step down process and the length of stay for each inmate in the Control Unit[16] at ADX. *Id. at 41-45.* Although he complained that the BOP had not provided certain information to him, he told the jury that, based on testimony from ADX wardens in other cases, "the typical policy of the Bureau of Prisons is to confine an inmate who has killed another inmate on the Control Unit for six years" before reviewing the placement. *Id. at 75-76.* He acknowledged, further, that he had received information on "assaultive conduct in the general population" from 1994 to 2001 but was awaiting updated data from the BOP. *Id. at 79-80.*

Cunningham conceded that Caro would continue to pose a danger to other inmates and staff "for the foreseeable future, I would certainly say for the next five to ten years. . . and perhaps beyond that. . . and perhaps much further out." *Id. at 104.* The gist of his testimony, however, was that the Bureau of Prisons responsiveness to prison violence was "dynamic" and learning from those lessons, the BOP had the ability to control Caro despite his conceded future dangerousness.

Hershberger and Olson were offered in response to Cunningham. Olson, a "code breaker," employed by the government, told the jury that certain inmates use code to communicate with inmates and also with people on the outside. *TT 2/6/07 at 25.* His testified about a letter sent in 1997, from a member of the Aryan Brotherhood, from Florence ADMAX. *Id.* at 27-28, 31-32. When Caro's counsel objected to the testimony, the government explained, saying "I discussed this with defense counsel earlier. Technically, if we were going to call Mr. Olson, he would be a rebuttal witness. . . . What Agent Olson's testimony is going to relate to is the types of codes used to show that in spite of the best measures at ADMAX inmates are able to communicate in code, and we'll explain one of the codes that he, . . ., personally worked on and

---

[16] The Control Unit at ADX appears to be that facility's version of the SHU.

JA 1414

personally broke, and explain to the jury briefly how that works." *Id*. at 29.    Olson testified

about the coded messages embedded in the 1997 letter, including one "Baconian message" that

stated, " 'confirmed message from Chris to move on DC.'" *Id.* at 37.  Olson testified that it was

his understanding (anecdotally) that after this letter was sent, two African American inmates

were assaulted and killed in Lewisburg, Pennsylvania.

Hershberger, a long time BOP employee and former warden at ADX, testified

immediately after Cunningham.  He spoke extensively about the disciplinary procedures and

security protocols that are used by the BOP system-wide, including ADX.  *TT 2/12/07* at 174 et

seq.  Acknowledging that ADX is used to house inmates who have killed other inmates,

Hershberger told the jury about the strictures that could or could not be used to control inmates.

For example, Hershberger said that "every federal inmate in the system has the opportunity for

visits. . . correspondence out, receiving correspondence, magazines and so forth. *Id. at 185.*  He

described conditions at USP-Marion, another high security facility, as being "similar" to ADX,

Notwithstanding those security measures, two guards and Marion were murdered and two

seriously wounded in two separate incidents on the same day. *Id. at 188.*  Similar to

Cunningham's testimony, Hershberger told the jury that, in response to those attacks, the BOP

implemented changes in protocol with a view toward preventing similar occurrences.  *Id. at 189.*

The United States submits that there was no violation of the court's order of November

20, 2006.  Both Hershberger and Olson were rebuttal witnesses.  Their testimony came only after

Cunningham's recitation of rates and instances of inmate on inmate homicides, including

specific examples of such violence, relating to the general ability of the BOP to control inmate

misconduct.  Their testimony, like Cunningham's, stands for the proposition that regardless of

JA 1415

the security measures implemented, there is no mechanism to guarantee that inmate will commit acts of violence while incarcerated.

Assuming, arguendo, that the trial court had relied on its earlier discovery ruling to completely bar the rebuttal testimony of Olsen and Hershberger concerning acts of violence by other inmates (before and after the defense case-in-chief), no reasonable probability exists that the outcome of the penalty proceeding would have been different. Caro's future dangerousness was conceded by his own experts. The evidence from both the prosecution and defense indicated that ADX housing was, by design, temporary. Through Cunningham's testimony alone, the jury learned about inmate murders and acts of violence in the ADX and even in the Control Unit. Significantly, the jury found the future dangerousness allegation despite agreeing with the defense that Caro had been, subsequent to the murder, "properly and securely housed . . . at various high security federal institutions" since December, 2003.

Caro also complains that during the cross-examination of Cunningham, the government "asked questions about another defendant's case in which Dr. Cunningham was an expert." *Petition* at 135. Caro complains that the government "asked if the defendant (in that case) was a member of Al Qaeda, and then further asked if he built the bomb to blow up American embassies." *Id.* The government did, in fact, ask Dr. Cunningham whether the defendant in that case was a member of Al Qaeda, and to confirm that the defendant had been convicted of conspiring to blow up the American embassies in Africa. Those questions, however, were asked in the context of a cross-examination directed at establishing bias and attacking Dr. Cunningham's credibility. *TT 2/12/2007* at 87-89.

Caro's complaint that his counsel should have objected to this testimony fails for several reasons, first and foremost among them being the fact that Mr. Kalista did in fact object to the

70

government's line of questioning, arguing that the government was improperly suggesting "that somehow he [was] aligned with the defendant" and that this was "simply an attempt to inflame the passions of the jury against him, and not deal with the substance of the information brought out on [] direct." *Id*. at 89-90, 148-149. Thus, Caro's assertion that his trial counsel did not object fails as a factual matter.

Additionally, Caro's argument fails because the government did not violate the court's order during cross-examination of Cunningham. In response to Mr. Kalista's objection, government's counsel explained, "Your Honor, this is proper bias cross-examination. This witness's evidence is he makes a living coming in here testifying on behalf of, or however he wants to define it, criminal defendants charged with capital murder. It doesn't matter who sits over there. And the jury should know that that's what he does. And so we think it's proper bias cross-examination." *Id*. at 90. After some considerable discussion with the parties, the Court concluded that it was permissible for the government to establish that Cunningham was willing to testify for many individuals and that in each case he opined that they have a low likelihood of future violence in the prison system. But court found objectionable the government's attempt to "characteriz[e] the witness as being less subject to credibility because in some way he stands up for people who have committed horrible acts." *Id*. at 92-93.

The district court gave a limiting instruction which cured any potential prejudice resulting from the use of the Al Qaeda example in the cross of Cunningham. *TT* 2/12 /07 at 163. *See United States v. Francisco,* 35 F.3d 116, 119 (4th Cir. 1994); *see also Richardson v. Marsh,* 481 U.S. 200, 211 (1987) ( "[J]uries are presumed to follow their instructions."); *United States v. Ince,* 21 F.3d 576, 584 (4th Cir. 1994) ("[W]e recognize the presumption of cure by a court's instruction.").

71

JA 1417

Finally, Caro complains that the government introduced evidence "that three terrorists managed to send out coded letters from ADX." *Petition* at 135. Again, this testimony was developed during the cross-examination of Cunningham, *TT 2/12/07* at 119, and does not mention a specific instance of violence by any inmate.

In any event, Caro cannot demonstrate prejudice resulting from trial counsel's failure to object to the challenged testimony. Certainly, the jury was not surprised by the testimony or Olson or Hershberger that inmates harm other inmates. Cunningham gave them specific examples of such acts and the jury heard that Caro stabbed Benavidez and strangled Sandoval to death in the SHU. Cunningham initiated the presentation of evidence concerning inmate on inmate violence to establish that the BOP had the experience and resources to mitigate such violence within the system. The government does not dispute that the BOP uses its best efforts to protect those entrusted to its care. Rather, the specific instances of inmate violence despite the efforts of the BOP supports the government's argument, recognized in the Court's order, that such violence can never be abated completely.

Caro's status as a danger to others was uncontested. Indeed, it was conceded by his experts and was supported by evidence of his acts of violence against other inmates while incarcerated. There is no reasonable probability that exclusion of testimony of acts of violence by inmates other than Caro would have produced a different outcome in the penalty proceeding. For all of the above reasons, Caro's claim in Issue Six-I should be denied.

Caro alleges that his trial counsel rendered constitutionally ineffective assistance of counsel by failing to object to certain arguments made by the government's counsel during closing argument. Claim Six J, *Petition* at 136. Caro asserts that the government improperly argued that "it was the responsibility of the jury to 'control' Carlos Caro and the only means to

72

do so was by imposing the death penalty." *Id*. at 137.  He also asserts that the government improperly argued that the death penalty was necessary because otherwise there would be no punishment for Caro for Sandoval's murder. *Id*. at 137.  Finally, he argues that the government violated the Eighth Amendment and *Caldwell v. Mississippi*, 472 U.S. 320 (1985), when it "made improper statements in closing argument that attempted to minimize the jury's responsibility regarding Caro's sentence, . . .and encouraging the jury to focus instead on what it called 'the law.'" *Petition* at 138.  Caro argues that his right to effective representation was violated by virtue of his counsel failing to object to these arguments. *Id*. at 136-140.  For the reasons set forth herein, Caro's appeal on this issue should be denied.

Caro acknowledges, as he must, that his appellate counsel raised on direct appeal a challenge to the government's closing argument that the jury should "control" Caro by imposing the death penalty, and that Caro would receive no punishment for his crime without the death penalty. *Id*. at 137-38.  He further acknowledges that the Fourth Circuit found that neither of these arguments prejudiced Caro, and his appeal on these grounds was denied.[17]  *See United States v. Caro*, 597 F.3d at 624-627.  Caro cannot prevail on these claims (Claim Six J1 and J2) under the *Strickland* standard because, even assuming that his counsel was ineffective for failing to object to one of these arguments, he cannot establish prejudice where the Fourth Circuit has already determined that there was no prejudice resulting from the error. *See Caro*, 597 F.3d at 624-27.

Caro's third allegation in this issue (Claim Six J3) pertains to the government's statements in closing arguments which Caro alleges violated the rule in *Caldwell v. Mississippi*. Petition at 138.  Caro accuses the government of "minimiz[ing] the severity of a death sentence

---

[17] Though the Court found the government's argument regarding the use of the death penalty to "control" Caro troubling, it stated, "we cannot conclude that Caro suffered such prejudice as to warrant reversal." *Caro*, 597 F.3d at 625.

JA 1419

by shifting the emphasis away from the act of putting a defendant to death, and encouraging the jury to focus instead on what it called 'the law.'" *Petition* at 138.  But Caro has failed to set forth a meritorious claim under *Caldwell v. Mississippi.*  As set forth fully in the response to Claim Eight, Caro misstates the government's argument.  The record clearly reflects that counsel for the government stated " . . .You will not hear Judge Jones use that term.  The job is not to kill anyone.  It's *not* the law."  *TT* 2/13/2007 at 98 (emphasis added).  By leaving out the word "not," Caro completely and meaningfully alters the meaning of the government's statement.  For the reasons set forth *infra*, regarding Claim Eight, (addressing both statements which Caro alleges were made in violation of *Caldwell*), Caro has failed to establish that the government violated *Caldwell v. Mississippi*, and for the same reasons, his appeal alleging that his counsel was ineffective for failing to challenge the government's statements should also fail.[18]

Lastly, Caro alleges that despite the Fourth Circuit's decision denying relief on the two grounds raised in that appeal alleging error in closing arguments, this court should revisit that Court's conclusions, "in light of the additional facts and arguments presented on this modified record." *Petition* at 140.  Caro asserts that the combined "errors in jury argument (including both the error in commenting about the defendant's silence and the error in asserting that the jury had a law enforcement role, as well as the prosecutor's attempt to minimize the jury's responsibility) by themselves or when coupled with the other errors in these proceedings," warrant relief. *Petition* at 140.

As already noted, the Fourth Circuit found that there was no prejudice to Caro as a result of any argument by the government that the jury should "control" Caro by imposing the death

---

[18] In his Claim Eight, Caro presents a substantive legal argument alleging that certain of the government's statements in closing argument were in violation of *Caldwell v. Mississippi*, and the government has responded to that issue in this response regarding Claim Eight.  The United States incorporates by reference its response to the substantive legal arguments, as they pertain to Caro's argument in this issue, regarding ineffective assistance of counsel for failing to object to those arguments.

JA 1420

penalty, and that Caro would receive no punishment for his crime without the death penalty. *Caro*, 597 F.3d at 624-627.   And as set forth above, Caro cannot establish prejudice, even assuming his counsel was ineffective for failing to raise an objection, where the Fourth Circuit has determined that there was no prejudice resulting from the error.  *See id*.  Nor can Caro establish that he was prejudiced by adding to the list any of the other claimed errors in this issue. *See Petition* at 140.  For the reasons already stated regarding sub-issue J3, Caro has entirely failed to set forth a viable claim of error in reliance upon *Caldwell v. Mississippi*, and therefore cannot establish that his counsel was ineffective for failing to object, or that he was prejudiced by such a failure, and considering this argument in conjunction with issues J1 and J2 does nothing to advance Caro's argument.

Finally, regarding his claim that the government erred in commenting on the defendant's silence, that, too, was found to be harmless error by the Fourth Circuit in its opinion.[19]  *Caro*, 597 F.3d at 627.  The Fourth Circuit resolved the issue on direct appeal, finding that "given the court's cautionary instruction and overwhelming information showing Caro's lack of remorse, we conclude that any error would have been harmless under 18 U.S.C. 3595(c)(2)."  *Id*.  The court's cautionary instruction stated, "Remember that the defendant has a constitutional right to remain silent, and mere silence, alone, by the defendant should not be considered as proof of lack of remorse."  *Id*. at 630-31.  The *Caro* Court "presume[d] that a properly instructed jury has acted in a manner consistent with the instruction."  *Id*. at 631 (internal quotation and citations omitted).  The Court also considered Caro's "affirmative conduct displaying lack of remorse" in

---

[19] The government assumes in this regard that Caro is referring to the language in the government's notice of intent to seek the death penalty under the FDPA, which asserted a non-statutory aggravating factor of lack of remorse, specifically stating that "Carols David Caro has not expressed remorse for his violent acts, including (but not limited to) the murder of Sandoval, the stabbing of Benavidez and the gang-based assault in Oakdale."  The government makes this assumption because Caro raised a challenge to this language in his direct appeal, arguing that the government and the district court violated his Fifth Amendment privilege against self-incrimination by having the jury consider his failure to speak words of remorse.  *Caro*, 597 F.3d at 627.

JA 1421

reaching its conclusion that "the jury could not reasonably have reached another conclusion regarding lack of remorse." *Id*. at 631. Specifically, the Court noted that Caro yelled after killing Sandoval, "Come get this piece of shit out of here." *Id*.; J.A. 676. When asked whether Sandoval was breathing, Caro answered, "No. At this time he's stinking up the room, get him out." *Id*.; J.A. 684. Caro explained his actions, saying, "[Sandoval] called me a mother fucker, that whore, that's why I fucked him up; and Caro bragged, "I killed a guy two weeks ago . . .[f]or being a fool." *Id*. Thus, because the Fourth Circuit concluded that any error in the government's comments pertaining to Caro's right to silence was harmless, Caro's argument that his attorney was ineffective for failing to object fails under the *Strickland* standard. For all of the above reasons, Caro has not established that his counsel was ineffective for failing to object to certain arguments, nor that any combined alleged failures collectively establish ineffective assistance of counsel. For all these reasons, Caro's argument in Claim Six-J should be denied.

Caro alleges that the record reflects that Juror #33 was "frequently sleeping," and that his trial counsel rendered ineffective assistance of counsel by failing to strike Juror #33. Claim Six K, *Petition* at 141. For the reasons set forth below, Caro's claim should be denied.

On February 5, 2007, just before the lunch recess, the district court spoke to counsel, and stated as follows:

> Counsel, Juror Number 33, who is the young man seated in the back on the end, has been nodding off some. And obviously I'm concerned about that, particularly in view of the importance of these proceedings. And what I intend to do is see what he does after lunch, but I am concerned about his situation, and would be interested in any comments that counsel may have in that regard. So, we'll take our luncheon recess and we'll be in recess for one hour. *Tr.* 2/05/2007 at 105.

The record does not reflect any further comments from either counsel or the court after lunch or at the end of the day's proceedings.

JA 1422

On February 7, 2007, two days later, the court stated as follows:

Counsel, we are still having a problem with juror #33 who appears to continue to sleep. He's near to me at the end of the second row. He has his hand in front of his face, and his eyes closed, and he did that a lot this morning. He was better yesterday, but as I indicated, we had another problem today. And I'm inclined to, to discharge that juror. I want to give counsel an opportunity to give me their views, either now or before we come back. *Tr.* 2/7/2007 at 66.

Counsel for the United States opposed excusing the juror, and suggested that the court talk to the juror. *Id.* The government's counsel said, "I have kind of been watching him since we were first alerted a few days ago. He does tend to, they close, they open, and he kind of rubs his head, puts his hands on his face, drinks water, he does a lot of movements. I don't know, I would say that if you talk to him and ask him is he okay, is he paying attention, before we just discharge him." *Id.* In response, Caro's attorney said, "Your Honor, that would also, I think, I have not observed him today, I observed him yesterday. He did seem to be awake and alert yesterday. I think it would be appropriate for the court to question him. If he's on medication, is he working night shift, or something, I don't know. *Id.* at 66-67. The court then agreed to talk to the juror, as follows:

> The Court:     Yes, sir, juror number 33, seems to me you've been having a little problem this morning. Are you feeling all right? Are you having any difficulty?
>
> Juror #33:     Just a little bit. I'm just been having trouble sleeping. I have a little bit of anxiety problem, sir.
>
> The Court:     Have you been able to stay awake during the course of the proceedings?
>
> Juror #33:     Yes, sir.
>
> The Court:     So, you're hearing everything?

Juror #33:     Yes, sir.

The Court:     You understand how important it is every member of the jury hear the evidence?

Juror #33:     Yes, sir.

The Court:     If you'll let me know if you're having any difficulty, if you're not being able to concentrate, will you do that?

Juror #33:     Yes, sir.

Later in the trial, on February 12, 2007, the court returned to the question of juror #33. The court asked if there were any further comments from counsel or the defendant. *Tr. 2/12/2007* at 217. The government's attorney stated that "based upon our observations of him, I think the court's admonition to him was sufficient. He seems to be doing well. We have nothing." *Id.* at 217. Counsel for Caro stated, "[y]our Honor, we have no problem. We think the admonition was apparently taken to heart, and he seems to be paying attention." *Id.* The court then summarized for the record what had happened regarding Juror #33. The court stated, "On the first day of the sentencing phase of the trial, it did appear, and again, that was during the Government's case in chief in the sentencing hearing, it did appear that Juror Number 33 was having some difficulty in staying awake in the morning. It was all right in the afternoon. And then on the third day of the, again, continuing in the Government's evidence in the morning, he had another problem. At that time the court indicated that it was considering removing him as a juror. Counsel, counsel for both parties requested I interview him in the courtroom, and I did. He, he indicated that he had been not sleeping very well, but that he had been following the evidence, and I admonished him to let me know if he was having any problems. And since then, and particularly since the defense evidence, he appears to have done all right. So, based on that, and on the request of the parties in the case, I will not remove him as a juror. *Id.* at 218.

78

JA 1424

In *United States v. Freitag,* 230 F.3d 1019 (7th Cir.2000), the Seventh Circuit discussed the standard for addressing the issue of sleeping or dozing jurors. That Court held that "[i]f sleep by a juror makes it impossible for that juror to perform his or her duties or would otherwise deny the defendant a fair trial, the sleeping juror should be removed from the jury. *Id.* at 1023, citing *United States v. Kimberlin,* 805 F.2d 210, 244 (7th Cir.1986); *United States v. Bradley,* 173 F.3d 225, 230 (3d Cir.1999); *United States v. Springfield,* 829 F.2d 860, 864 (9th Cir.1987). However, a court is not invariably required to remove sleeping jurors, and a court has considerable discretion in deciding how to handle a sleeping juror. *Id.* (internal citations omitted). Reversal is appropriate only if the defendant was deprived of his Fifth Amendment due process rights or his Sixth Amendment right to an impartial jury. *Id.,* citing *Springfield,* 829 F.2d at 864. In order to warrant a new trial, the *effect* of the sleeping juror must have "prejudiced the defendant to the extent that he has not received a fair trial," and "not every incident of juror misconduct requires a new trial." *United States v. Hendrix,* 549 F.2d 1225, 1229 (9th Cir. 1977).

In this case, Caro has raised an ineffective assistance claim under *Strickland v. Washington,* which requires that he show that in failing to attempt to strike the allegedly sleeping juror, his counsel's performance was deficient, and that the deficiency prejudiced the defense. 466 U.S. at 687. For the reasons herein, Caro is unable to meet his burden under *Strickland.*

First, as a factual matter, the record does not conclusively establish that the juror was sleeping. Though the court initially noted its observations that the juror was "nodding off some," and later, "appear[ed] to continue to sleep," when the juror was questioned by the court, he claimed to have heard everything in the proceedings. *TT* 2/5/2007 at 105; *TT* 2/6/2007 at 66-67. The record further reflects that during the remainder of the first day in question, February 5, 2007, and on the next day, the juror was fine. *See TT* 2/12/2007 at 217-218. On the third day,

79

JA 1425

February 7, 2007, the court noticed that the juror was having problems again, and at the request of the parties, the court interviewed the juror. Significantly, the juror confirmed that he had been following the evidence in the case, though he had not been sleeping well, and had some anxiety problems. *See TT* 2/7/2007 at 67. Later, Caro's counsel and the government's counsel agreed that there was no need to strike the juror. *TT 2/12/2007 at 217*. When asked if there were any further comments from the parties regarding juror #33, Caro's counsel even noted, "we have no problem." *Id*. Caro's argument assumes as a necessary predicate, that the juror was sleeping, and that his counsel was aware that the juror was sleeping and failed to make a motion to strike the juror. But instead, trial counsel stated, "[y]our Honor, we have no problem. We think the admonition was apparently taken to heart, and he seems to be paying attention." *Id*. The record thus contradicts Caro's underlying assumptions, and entirely undermines his argument. Caro cannot establish that the juror was actually sleeping, or that his counsel was ineffective for failing to attempt to have the juror removed  for sleeping, when neither his counsel, nor government's counsel nor the court, ultimately, were persuaded that the juror was inattentive to a degree that he needed to be removed.

For the same reasons, even if counsel had moved to replace the juror with an alternate, or for a new trial, and while recognizing that the court first had concerns that the juror may have been sleeping, it is unlikely that the court would have granted such relief because the evidence developed after the court's initial observations was not sufficiently strong to warrant removal. *See Bell v. True*, 413 F.Supp.2d 657, 717-719 (W.D.Va. 2006). Though the district court initially indicated that it was considering removing the juror, as set forth above, the factual record developed after the court's initial observations indicates that both parties and the court were satisfied that the juror was paying attention, and the juror himself confirmed that this was

80

JA 1426

so.  The court considered its own observations of the juror, the colloquy with the juror, and the remarks of both parties before concluding that it would not remove the juror.  The record reflects that the parties paid particular attention to the juror's attentiveness, that the court inquired specifically with the juror regarding his attentiveness, and that the juror confirmed he had heard the evidence in the proceedings.  Thus, especially when after the admonition, the parties and the court agreed that the juror was paying attention, Caro cannot meet his burden under *Strickland* of proving either ineffectiveness or prejudice from his counsel's failure to attempt to have the juror removed.

The cases cited by Caro in support of his argument are factually distinguishable.  For example, in *Barrett*, 703 F.2d 1076, 1082, the juror admitted that he was sleeping.  In *People v. Simkins*, 792 N.Y.S. 2d 170 (N.Y. App. Div. 2005), though the juror did not admit sleeping, and instead stated that he had closed his eyes, but was otherwise aware of the proceedings, the record reflected that "the court itself observed that this juror was sleeping during much of the testimony.  Other jurors were questioned, who informed the court that not only was the juror sleeping, but that they had to continuously nudge the juror to wake him."  In *People v. Evans*, 710 P.2d 1167, 1168 (Colo. App. 1985), the court found that the juror was sleeping, gave no notice of this fact to defense counsel, and instituted contempt proceedings against the juror only after the verdict was returned.  In *People v. Jones*, 861 N.E. 2d 176, 278 (Ill. App. Ct. 2006), the "trial court was aware of the inattentiveness of the juror throughout almost the entire proceedings."   And in *State v. Majid*, 914 N.E. 2d 1113 (Ohio Ct. App. 2009), the judge saw numerous instances of the juror sleeping, but responded to counsel's objections, saying, "I saw it.  So what.  Let him sleep.  You guy's picked the jury.  I didn't."   In Caro's case, the evidence is not nearly so compelling.  The record in Caro's case does indicate that the court observed that juror #33 was "nodding off

81

JA 1427

some," and "appear[ed] to continue to sleep," during proceedings on the mornings of February 5,

and 7, 2007, respectively. However, regarding the observation on February 7, counsel for the

government clarified that the juror had been putting his hands in front of his face and closing his

eyes. Tr. 2/7/07 at 66. The court then questioned the juror, at which time the juror said he had

been able to stay awake, and had heard the evidence in the proceedings. *Id*. at 67. Caro's case is

thus unlike those above, where the record much more definitively established that a juror was

sleeping, either through an admission, the court's ultimate conclusions or other evidence. Here,

the juror did not admit he was sleeping, the juror affirmed that he was following the evidence in

the proceedings, and the record established that the parties were satisfied that the juror did not

need to be removed and that the court concurred with that view in its opinion deciding not to

remove the juror.

Moreover, even assuming that the juror had dozed at some point during the

Government's case-in-chief, or that the court's remarks indicate that the court was persuaded that

the juror had slept through some portion of the proceedings, but that it was not necessary to

remove the juror, Caro still cannot meet his burden under *Strickland* establishing ineffectiveness

or prejudice, absent any evidence that the juror was unable to consider the case fairly. *See*

*United States v. Johnson,* 409 Fed.Appx. 688, 692 (4th Cir. 2011). In *Johnson*, the Court

concluded that "there [was] no evidence that the juror was sleeping," and that "[a]t worst, the

record reflects that the juror was tired and perhaps inattentive for an undefined period of time

during the Defense's opening argument and the informant's direct testimony." 409 Fed.Appx.

at 692. The *Johnson* Court noted that "once the [trial] court noticed the juror, the court took a

momentary break and instructed the jury on the importance of being alert. Absent any evidence

that the juror was unable to consider the case fairly, Johnson has failed to show error, much less

82

JA 1428

plain error." Caro's claim is also similar to one rejected in *United States v. Postell*, 891 F.2d 287 (4th Cir. 1989) (unpublished). In *Postell*, the defendants claimed (on direct appeal) that the district court had erred in failing to remove a juror who fell asleep during trial. The *Postell* Court rejected the assignment of error for several reasons, including the fact that there was some question as to "whether the juror actually fell asleep, or was only momentarily inattentive," and because the appellants failed to make any showing that the juror "slept through essential portions of the trial and was unable to consider the entire case fairly." *Id.* Again, based on the record developed by the trial court after noticing that juror #33 may be having trouble staying awake, Caro cannot establish that the juror was unable to consider the case fairly. *See United States v. Aguilar*, 188 Fed.Appx. 897, 900 (11th Cir. 2006). In *Aguilar*, the record indicates that the district court judge noticed that Juror Bivins was sleeping or having trouble staying awake during both side's opening arguments and on the first day of trial. No mention is made of Bivins being asleep on the second day of trial. At the end of the third day of trial, the district court judge noted that Bivins slept through a considerable portion of that day's session. In his order denying a new trial, the district court judge stated that he kept a close watch on Bivins and instructed a court officer to do the same. The district court believed that it was not necessary to remove Bivins, as he was alert through the substantial portions of the trial. Additionally, the judge was satisfied by Bivins's reassurances that he could perform his duty. The *Aguilar* Court held that "that the district court did not abuse its discretion in allowing Bivins to remain on the jury." 188 Fed.Appx. at 900, citing *Freitag,* 230 F.3d at 1023. The *Aguilar* Court further found that "[t]he district court judge was in the best position to determine the extent of Bivins's inattention and he decided that Bivins could deliberate and render judgment in this case." *Id.* In Caro's case, the court likewise ultimately determined that the juror did not need to be removed, and only after

JA 1429

Caro's counsel and counsel for the government had both articulated their agreement that they were satisfied that the juror was paying attention to the case. In that light, Caro is unable to establish either that his counsel was ineffective for failing to attempt to strike the juror, or that he was prejudiced by the juror remaining on the jury. *See Cutchin v. Pearson*, 2006 WL 2659982 (W.D.Va. 2006) ("Once the judge had found that the juror was not sleeping, counsel had no ground on which to move for a mistrial and his failure to make such a motion did not prejudice Cutchin's defense"). For all these reasons, Caro's claim should be denied.

Claim Seven: Caro claims that the government violated his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments by withholding exculpatory and impeachment evidence and presenting improper evidence and argument regarding future dangerousness. *Petition at 147.* His claim is without merit.

Caro asserts that his Constitutional rights under *Brady v. Maryland* were violated when the Government failed to provide his counsel with information regarding the length of stay of inmates at Florence ADMAX. Claim Seven A. Specifically, Caro claims that this information would have shown that, despite Florence ADMAX's "Step Down" program, many inmates remained incarcerated in Florence ADMAX for more than three years. According to Caro, without this information he was unable to counter the Government's assertion that he could not remain at Florence ADMAX for an extended period of time. Caro's *Brady* violation claim is unavailing. First, Caro raised this issue on direct appeal. *See United States v. Caro*, 597 F.3d 608, 617 (4th Cir. 2010). As such, Caro cannot raise this issue on collateral review. *Boeckenhaupt v. United States*, 537 F.2d 1182, 1183 (4th Cir. 1976). Second, even if the Court were to find that this issue was not raised on direct appeal, there is no *Brady* violation because

JA 1430

there is no reasonable probability that the suppressed evidence would have produced a different sentence. *See Strickler v. Greene*, 527 U.S. 263, 281 (1999).

   a.   *Caro is re-litigating an issue that was raised on appeal*

Prior to sentencing, Caro requested information from BOP records regarding, among other things, "Names, prison numbers, assignment rationale and tenures of all inmates in the Control Unit at Florence ADMAX since opening in 1994 to present date showing date assigned, the reason assigned and date exiting the Control Unit to lesser security or release from BOP." *Caro*, 597 F.3d at 617. After the government denied this request, Caro filed various motions— one of which requested a court order compelling the government to produce the information under *Brady*. On November 20, 2006, the district court denied Caro's *Brady* motion. On direct appeal, Caro challenged, in pertinent part, the district court's denial of his *Brady* motion. The Fourth Circuit fully considered this issue and affirmed the district court's decision.

The Fourth Circuit has held that a litigant "may not circumvent a proper ruling . . . on direct appeal by re-raising the same challenge in a § 2255 motion." *United States v. Linder*, 552 F.3d 391, 396 (4th Cir. 2009). Here, Caro has asserted in his § 2255 motion the same *Brady* violation that he asserted on appeal—that the Government violated *Brady* by not turning over data regarding the length of stay of inmates at Florence ADMAX. *See* Brief of Appellant, *United States v. Caro*, 597 F.3d 608 (4th Cir. 2010) (No. 07-5), 2009 WL 2996586, n.45 ("Because Rule 16 and *Brady* both require the disclosure of exculpatory evidence, this claim also alleges a violation of *Brady*'s constitutional commands. . . . Appellant requests a remand for a hearing to determine whether the information requested from BOP was *Brady* material."). Simply stated, Caro's § 2255 motion attempts to evade the Fourth Circuit's ruling by re-alleging the same issue. *Boeckenhaupt v. United States*, 537 F.2d, at 1183 (holding that issues previously

85

JA 1431

decided on direct appeal may not be raised on collateral review).  Accordingly, Petitioner's motion should be denied.

> b. *Even if the Court were to find that this issue was not raised on appeal, there is still no Brady violation.*

To prove a *Brady* violation, the defendant must show that non-disclosed evidence was (1) favorable to the defendant; (2) material; and (3) that the prosecution had the materials and failed to disclose them.  *See United States v. King*, 628 F.3d 693, 701-02 (4th Cir. 2011).  Evidence is "material" if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceedings would have been different."  *United States v. Bagley*, 473 U.S. 667, 682 (1985).  And, a "reasonable probability" of a different result is shown "when the government's non-disclosure 'undermines confidence in the outcome of the trial.' " *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (quoting *Bagley,* 473 U.S. at 678).  Thus, while "the term '*Brady* violation' is sometimes used to refer to any breach of the broad obligation to disclose exculpatory [or impeachment] evidence . . . , strictly speaking, there is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler*, 527 U.S. at 281; *see also United States v. Bagley,* 473 U.S. at 677 (Supreme Court precedent does not "automatically require a new trial whenever a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict.") (internal quotation marks omitted).

Caro claims that the non-disclosed information would have shown, that at the time of his sentencing hearing, there were inmates at Florence ADMAX who had served more than three years.  As a result, the Government prevented Caro from rebutting the testimony of the Government's witness, Warden Hershberger, and misrepresented to the jury the truth regarding

86

JA 1432

Florence ADMAX's Step Down program.  There is no reasonable probability, however, that this information would have had any bearing on the jury's ultimate sentencing decision, let alone undermine the confidence of the sentencing.

When deciding the punishment for a defendant who has been found guilty in a capital murder case, jurors are asked to weigh the aggravating and mitigating circumstances of the case. *See* 18 U.S.C. §3593(d) (2013).  Here, the jury found that each alleged aggravating factor had been established beyond a reasonable doubt.  Also, the jurors indicated that they unanimously found 12 of the 22 mitigating factors that Caro proposed.  Finally, some jurors found that four other mitigating factors were proven including the mitigating factor that Caro would be incarcerated in a secure federal institution.  Besides citing to an informal survey conducted by a law firm in New Mexico in November 2010, Caro provides no plausible reason to believe that the non-disclosed information would have significantly altered the evidence heard by the jury and influenced the sentencing.  Simply stated, there is not a reasonable probability that this additional information would have caused the mitigating factors to outweigh the aggravating factors presented by the Government.  Indeed, evidence from both the Government and Caro's witnesses illustrated that inmates could remain at Florence ADMAX for more than three years.

Caro's expert witness, Dr. Mark Cunningham, informed the jury that while DOJ and BOP had refused to provide him data regarding the length and range of stay for prisoners at Florence ADMAX, he had an opportunity to tour the Florence ADMAX facilities.  Cunningham testified that he had been told by senior staff during this tour that it has taken five years' time for the average prisoner to successfully complete the Step Down program and that at least five individuals had been incarcerated continuously at Florence ADMAX since its 1994 opening.  *TT 02/12/07* at 40-41 ("I have requested from the [DOJ] and [BOP] very specific statistical

JA 1433

information on length of stay at [Florence ADMAX] . . . .  During the last tour  the, the individual who was providing that, one of the senior staff member there, indicated that of the inmates that do successfully exit the facility on what's called a stop down program, that their average length of stay there has been five years.  That's an average.  Your range must be much greater.  He also described that there were five individuals . . . who had been there since the facility opened in December, 1994").  Cunningham also noted that his research revealed that BOP typically placed a federal inmate who killed another inmate in Florence ADMAX's more restrictive Control Unit for six years before even considering other placements, though typical did not mean automatic.  *TT 02/12/07a*t 76 ("Testimony in other cases by wardens from [Florence ADMAX] reflects that the typical policy of the [BOP] is to confine an inmate who has killed another inmate on the Control Unit for six years.").  Even the Government's witness, Warden Gregory Hershberger, conceded that in special cases, inmates might remain in Florence-ADMAX for years.  *See id.* at 184, 202.

The informal survey that Caro cites in his § 2255 motion merely reiterates a fact that the jury already heard:  that some Florence ADMAX prisoners take more than three years to complete the Step Down program.  Moreover, the informal survey does not counter the government's central argument—that Caro's term at Florence ADMAX would not be permanent.  Even Dr. Cunningham admitted that Florence ADMAX is not "intended to be a permanent placement . . . ," *see id.* at 39, and that the "hope" of the BOP is to return the inmates to the general population at another facility.  *See id.* at 40 ("But many of the inmates that are there they hope they can send out some day.").  Warden Hershberger echoed this fact.  *See id.* at 177, 184.

For the reasons discussed above, the non-disclosed information concerning the length of stay of inmates at Florence ADMAX is not material under *Brady*.  Furthermore, the non-

88

disclosed information would not have impeached the Government's central argument that an

inmate's term at Florence ADMAX is intended to be temporary. As such, Caro's claim should

be denied.

Caro asserts that the Government failed to disclose exculpatory evidence regarding his

status as a leader of the Texas Syndicate. Claim Seven B. In particular, Caro argues that the

Government possessed three documents that suggested that Caro was not the leader of the Texas

Syndicate at USP-Lee and was possibly in "bad standing" with the Texas Syndicate. Caro

claims that if these three documents had been produced, they would have refuted the

government's assertions that Caro was in fact the leader of the Texas Syndicate at the time of the

trial.[20] Caro's claim is without merit.

As explained earlier, to prove a *Brady* violation, the defendant must show that non-

disclosed evidence was (1) favorable to the defendant; (2) material; and (3) that the prosecution

had the materials and failed to disclose them. *See United States v. King*, 628 F.3d 693, 701-02

(4th Cir. 2011). Thus, a real *Brady* violation does not occur "unless the nondisclosure was so

serious that there is a reasonable probability that the suppressed evidence would have produced a

different verdict." *Strickler v. Greene*, 527 U.S. 263, 281 (1999); *see also United States v.*

*Bagley,* 473 U.S. at 677 (Supreme Court precedent does not "automatically require a new trial

whenever a combing of the prosecutors' files after the trial has disclosed evidence possibly

useful to the defense but not likely to have changed the verdict.") (internal quotation marks

omitted). There is no reasonable probability, however, that this information would have had any

bearing on the jury's ultimate sentencing decision, let alone undermine the confidence of the

sentencing.

---

[20] The Government concedes that the three documents referenced in this claim of Caro's § 2255 motion were not disclosed. As such, Caro's ineffective assistance of counsel claim outlined in footnote 41 is moot.

JA 1435

The three documents referenced in Caro's § 2255 motion only suggest that Caro was not *the* leader of the Texas Syndicate[21] and that Caro may have been in "bad standing" with the Texas Syndicate after he murdered Sandoval.  The Government, however, never argued that Caro was *the* leader of the Texas Syndicate.  *See TT 02/13/07* at 21-22 ("How do we know he is a leader in [the Texas Syndicate]? Because he said so."); *id.* at 96 ("Whether he's a leader, whether he's an enforcer, don't know, but he was a player.  When they needed somebody for a hit on Benavidez, they picked him.").  Rather, based on Caro's past, the Government argued that Caro was involved in the Texas Syndicate and, at the very least, had a high-ranking position.  *See id.* at 22 (explaining that in the summer of 2002, when Lieutenant Gordon needed to talk to a leader of the Texas Syndicate in an effort to keep the peace with another rival gang, the Texas Syndicate sent Caro as their representative).[22]

Caro provides no plausible reason to believe that the non-disclosed information regarding his possible "bad standing" with the Texas Syndicate would have significantly altered the evidence heard by the jury and influenced the sentencing.  Thus, there is not a reasonable probability that this additional information would have altered the jury's analysis of the aggravating factors presented by the Government.  Simply stated, this non-disclosed information could not reasonably be taken to put Caro's whole sentencing hearing in such a different light as to undermine confidence in the sentence.  *See Winston v. Kelly*, 592 F.3d 535, 556 (4th Cir. 2010) (explaining that a *Brady* violation requires a "collective assessment of whether

---

[21] The Grand Jury testimony of Mr. Mrad simply stated that after Ricardo Benavidez was the leader of the Texas Syndicate and after he was assaulted, by Caro and others, Francisco Tijerina assumed leadership of the Texas Syndicate.

[22] Caro responded to Lt. Gordon's request for peace by explaining that "the Texas Syndicate were going to do what they had to do."  Soon after, Caro and fellow Texas Syndicate members violently attacked the rival gang members.  Taking responsibility, Caro commented: "I don't give a fuck if they send me to the United States Penitentiary.  My brothers follow orders.  They know what they're getting into.  It doesn't even matter if we're prosecuted. I have 30 years to do.  I certainly don't care about myself."

JA 1436

introduction of the exculpatory evidence might have affected the outcome of the [punishment].").

For these reasons, the non-disclosed information concerning the leader of the Texas Syndicate

and Caro's alleged standing with the Texas Syndicate is not material under *Brady*. Furthermore,

the non-disclosed information would not have impeached the Government's main assertion—that

Caro was a member of the Texas Syndicate and was considered to occupy and presented himself

as occupying a leadership role in the gang.

Furthermore, two of the non-disclosed documents, a December 24, 2003 internal BOP

memorandum and a November 14, 2006 internal BOP form, suggested that Caro was in "bad

standing" with the Texas Syndicate. As an initial matter, the BOP memoranda reflect the

opinions of the BOP. It is highly unlikely that the Texas Syndicate told the BOP that Caro was

in "bad standing." The BOP memoranda are of questionable utility to rebut evidence of Caro's

statements and actions at FCI-Oakdale concerning his leadership role.

As a secondary matter, it is well-recognized that the government cannot be said to have

suppressed evidence of what the defendant himself knew or could have learned from other

sources. *See United States v. Roane*, 378 F.3d 382, 402 (4th Cir. 2004) ("[I]nformation actually

known by the defendant falls outside the ambit of the *Brady* rule."); *United States v. Wilson*, 901

F.2d 378, 380-81 (4th Cir. 1990) (finding that *Brady* requires that the government disclose only

evidence that is not available to the defense from other sources, either directly or through diligent

investigation); *see also West v. Johnson,* 92 F.3d 1385, 1399 (5th Cir.1996) (rejecting capital

defendant's *Brady* claim that the prosecution suppressed evidence suggesting that the defendant

fabricated his confession of stealing a necklace from the victim; the defendant "knew whether or

not he had taken the necklace, and necessarily knew that better than the prosecution could

have"); *United States v. Diaz,* 922 F.2d 998, 1007 (2d Cir.1990) ("[T]here is no improper

JA 1437

suppression within the meaning of *Brady* where the facts are already known by the defendant."").

Here, it appears that Caro knew his own standing within the gang; or, at the very least, knew Texas Syndicate members who could have informed him of his standing. Indeed, sometime in January 2004, Caro sent a letter to "the godfather of the Texas Syndicate," *see TT 02/13/07* at 28, requesting that he remain in good standing with the gang. As such, Caro had no need for the Government to provide him with information he already knew. *See, e.g., Owens v. Guida*, 549 F.3d 399, 415-16 (6th Cir. 2008) ("*Brady* obviously does not apply to information that is not wholly within the control of the prosecution. . . . This rule makes sense because if the defendant could have presented similar evidence to prove the same point that the allegedly-suppressed information would have been introduced to prove, but did not, it is not reasonably probable that government disclosure would have led to a different result.").

For the reasons expressed above, Caro's *Brady* claim regarding information about his status in the Texas Syndicate should be denied.

Caro asserts in footnote 38 of his petition that the Government's comment during its closing argument that "[w]e know if, if Carlos Caro goes to [Florence ADMAX], he's not going to stay there," was vouching and Caro's counsel's failure to object constitutes ineffective assistance of counsel. *Petition* at 150. This claim is without merit.

Improper remarks during the government's closing arguments violate a defendant's due process rights if the remarks "so prejudiced the defendant's substantial rights that the defendant was denied a fair trial." *United States v. Wilson,* 624 F.3d 640, 656 (4th Cir. 2010). Therefore, to obtain relief on this claim, the defendant must demonstrate both that the statement was improper and that it caused prejudice. *United States v. Smith,* 441 F.3d 254, 264 (4th Cir. 2006). The Fourth Circuit has recognized four relevant factors when evaluating prejudice: "(1) the

JA 1438

degree to which the comments could have misled the jury; (2) whether the comments were isolated or extensive; (3) the strength of proof of guilt absent the inappropriate comments; and (4) whether the comments were deliberately made to divert the jury's attention." *United States v. Collins,* 415 F.3d 304, 309 (4th Cir. 2005) (quoting *United States v. Sanchez,* 118 F.3d 192, 198 (4th Cir. 1997)) (internal quotation marks omitted).

Moreover, a prosecutor may not vouch for a government witness in arguments to the jury. *United States v. Sanchez,* 118 F.3d 192, 198 (4th Cir. 1997). "Vouching occurs when the prosecutor indicates a personal belief in the credibility or honesty of a witness. . . ." *Sanchez,* 118 F.3d at 198.

Although attempts to bolster a witness by vouching for his credibility are normally improper, *see Sanchez*, 118 F.3d at 198, the government may explain why the jury might find the government's witnesses credible. *See United States v. Sullivan*, 455 F.3d 248, 259 (4th Cir. 2006); *see also United States v. Bentley*, 561 F.3d 803, 813 (8th Cir. 2009). After careful review of the record of this case, the Government's statement that "we know" does not constitute improper vouching. The remark occurred before the prosecutor discussed the testimony of the Government and Caro's witnesses' comments regarding Florence ADMAX. The Government did not ask the jury to rely on him in making its decision, but later instructed the jury to consider the testimony of Warden Hershberger and Dr. Cunningham. *See TT 02/13/07* at 34-35. In short, the statement was properly argumentative and simply reiterated a fact that both Hershberger and Dr. Cunningham articulated—that an inmate's term at Florence ADMAX is temporary, not permanent. *See TT 02/12/07* at 39-40, 177, 184.

Even if the court were to define the Government's comments as vouching, Caro was not prejudiced by the failure of trial counsel to object. The comment was isolated and not extensive.

JA 1439

Furthermore, the one minor remark neither misled nor diverted the juries' attention from the evidence elicited during the sentencing hearing.  Finally, whether to enter formal objections during a prosecutor's closing argument is a strategic decision that many trial counsel approach differently.  *See*, *e.g.*, *United States v. Gomes*, 642 F.3d 43, 47 (1st Cir. 2011).  Even if Caro's counsel made a poor decision in not objecting to the prosecutor's statement, it does not fall so short of the ordinary standards of the legal profession as to be objectively unreasonable within the meaning of *Strickland*.  Again, as just stated, Caro counsel's decision did not unduly prejudice him.  For these reasons, Caro's vouching and ineffective assistance of counsel claim is without merit.

Claim Eight:  Caro complains that the government's comments in closing arguments violated his Eighth Amendment rights under *Caldwell v. Mississippi.  Petition at 157*.  His complaint is without merit.

Caro argues that the government violated the Eighth Amendment and the rule in *Caldwell  v. Mississippi*, 472 U.S. 320 (1985), with two remarks in its closing arguments.   Caro alleges the  violations stemmed from the following two statements:

1)   If it is your decision that Carlos David Caro should be sentenced to death, if in fact the weighing process justifies the death sentence, you would not be the first jury to come to that conclusion.  It's something that other juries have done.  You would not be alone in that regard. . . .

2)  The last thing I would like to talk about is the law.  Mr. Kalista talks about and uses words like kill.  You will not hear Judge Jones use that term.  The job is not to kill anyone.  It's the law.

JA 1440

*Petition* at 157-158, citing *TT.* 2/13/2007 at 17, 98. Caro argues that "the implicit messages of the government were: You need not feel responsible for causing the death of Mr. Carlos Caro, other juries have done so. And, it is not your job to kill, it's the law." *Id*. at 158. Caro argues that "[t]he jury, not the 'law' or the Judge or the Fourth Circuit was responsible for deciding whether Mr. Caro would live or die," and that the government's statements had an intended purpose of minimizing the jury's sense of responsibility, and likely achieved that purpose, in violation of the Eighth Amendment and the Supreme Court's holding in *Caldwell v. Mississippi*, 472 U.S. 320 (1985). *Id.*

In *Caldwell,* 472 U.S. 320, 325-26, this Court found constitutionally impermissible a prosecutor's statement, at the penalty phase of a capital trial, that the jury's decision was "not the final decision" because it was "automatically reviewable." The prosecutor's assurances were impermissible, the Court ruled, because they created an unacceptable risk that the jury would "minimize the importance of its role," "believ[ing] that the responsibility for determining the appropriateness of the defendant's death rest[ed] elsewhere." *Caldwell,* 472 U.S., at 333, 329. This belief, the Court explained, is inconsistent with the "heightened 'need for reliability' " in capital sentencing. *Id.,* at 323, quoting *Woodson v. North Carolina,* 428 U.S. 280, 305 (1976) (plurality opinion). In *Romano v. Oklahoma,* 512 U.S. 1, 9 (1994), however, the Supreme Court subsequently explained that "[t]o establish a *Caldwell* violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law." (quoting *Dugger v. Adams,* 489 U.S. 401, 407 (1989). The issue is whether the jury was "affirmatively misled regarding its role in the sentencing process." *Id.* at 9.

Caro's assertion that the two statements from the government's closing remarks violate the Eighth Amendment under *Caldwell* is misplaced and fails for several reasons. First and

95

JA 1441

foremost is that Caro has misrepresented the government's statement in the second quote upon

which he relies.  The correct quote is, " . . .You will not hear Judge Jones use that term.  The job

is not to kill anyone.  It's *not* the law."  *TT 2/13/07* at 98 (emphasis added).  Clearly, the

prosecutor did not make the statement that Caro alleges, and his claim relating to that statement

fails on its face.[23]

The second remark, though accurately quoted, does not establish any *Caldwell* error.

Caro argues that the government was in effect saying to the jury that they "need not feel

responsible for causing the death of Mr. Carlos Caro, other juries have done so."  *Petition* at 158.

Though it is true that grammatically, the sentence could be read to say that this jury would not be

the first jury to conclude that Carlos Caro should be sentenced to death, such a conclusion does

not comport with common sense, nor does it advance Caro's argument.  There is simply no

reasonable possibility that the jury was confused into thinking that some other jury could be

partly responsible for "causing the death" of Caro, as he puts it.[24]  To suggest that the

prosecutor's remark may have persuaded the jury to think that another jury had made that

decision – thereby relieving this jury of responsibility - is not within the realm of reasonable

possibilities, and is inconsistent with the entirety of the judge's instructions and arguments from

both counsel.  There was only one jury deciding Caro's guilt and punishment, and nothing the

government said in its remarks could have confused the jury on this point.  Instead, it is clear that

the prosecutor was simply and correctly stating that the jury in this case was not the first jury

historically to have had the weighty responsibility of deciding whether to punish a criminal

---

[23] It should be noted that in Issue Six J-3, Caro relies upon this same inaccurate representation of the transcript to argue that his trial counsel was ineffective, and in Issue Nine D, as the grounds for ineffectiveness of appellate counsel. *Petition* at 138, 170.

[24] Of course, the jury does not in its decision making, "cause the death" of the defendant, but rather votes, after considering all the evidence and aggravating and mitigating factors, and in light of the law as the court's instructions reflect, to determine whether the defendant should be sentenced to death.

JA 1442

defendant with the death penalty and that they would not be the first jury to impose the death

penalty if that is what they decided to do, after considering the evidence, and the aggravating and

mitigating factors in light of the law and the court's instructions.   The remark was a true and

accurate observation of historical fact, and with that intended meaning, the prosecutor's remark

did not minimize the "awesome responsibility" that accompanies the jury's decision in a death

penalty case.

     The prosecutor's remarks immediately preceding the alleged erroneous statement lend

further support for the government's view on this point.  The prosecutor stated:

> the judge has told you, and I think you consider it, it's not just a matter of a
> mechanical process of saying, well, let's count up the number of mitigators as
> opposed to counting up the number of aggravators.  It's a weighing process . . ..
> The judge is also going to tell you, and there will be specific language from one
> of his instructions, instruction number one, he's going to tell you that if you
> determine the weighing process does justify a death sentence, you should impose
> that sentence.  Ladies and gentlemen, I want you always to be mindful of this
> task. *Tr.* at 17.

     With these words, the prosecutor appropriately communicated the nature of the jury's

task  by  highlighting repeatedly that the jury was required to weigh the mitigating factors against

the aggravating factors in reaching their decision, and noting that the court would instruct them

regarding the application of the death penalty. The Supreme Court has held that "*Caldwell* is

relevant only to certain types of comment- those that mislead the jury as to its role in the

sentencing process in a way that allows the jury to feel less responsible than it should for the

sentencing decision." *Darden v. Wainwright*, 477 U.S. 168, 184, n.15 (1986).  To establish a

violation under *Caldwell*, Caro "must show that the prosecutor's remarks improperly described

the role assigned to the jury . . .." *Dugger v. Adams*, 489 U.S. 401, 407 (1989).   Caro cannot

make such a showing by looking at the particular remark in isolation, nor by examining the fuller

JA 1443

context of the prosecutor's comments, because the remarks were not misleading in describing the jury's role in the sentencing process.

Further, it is significant that the complained of remark was stated in the past tense. The remark was undeniably referencing the fact that *in the past*, "other juries have [imposed the death penalty]." This can only mean that the prosecutor is speaking of other juries *in other cases*. Given that the prosecutor was referring to past juries in other cases, as a matter of logic, the remark could not be suggesting to the jury that some other jury or person would *later* bear any of the responsibility in *Caro's* case. In *Caldwell*, the prosecutor's remark was ultimately problematic because it referenced the higher court which would *later* review the jury's decision, potentially relieving the jurors from their own sense of responsibility at the time of their decision. It thus minimized the importance of the jury's role because it led potentially to a belief that the responsibility for the determination "rest[ed] elsewhere." *Caldwell* at - -. By telling Caro's jury that other juries had made the decision to impose the death penalty in other cases, the prosecutor was stating the simple truth that they would not be the first in our system of justice to reach such a weighty decision. But that observation did not carry any message that the jury in this case should not feel entirely responsible for the decision that lay before them, and only them.

Finally, in his continuing remarks, the prosecutor stated:

> You'll be asked to make one judgment, and it's this: Is the death penalty for Carolos Caro justified? Is it justified? And you have this balancing test of aggravators and mitigators, and you must come to a decision. And if you collectively and unanimously find that the death sentence is, in fact, justified, then what do you do? Well, the law tells you, Judge Jones will tell you, and it's before you, if you determine that the weighing process does justify a death sentence, you should impose that sentence. That's the law. The law commands if you find it to be justified, you should impose it. Petition at 98.

98

JA 1444

In this way, the prosecutor again clearly *emphasized* the jury's responsibility to weigh the aggravating and mitigating factors and clarified that only if they found that in the weighing process a death sentence was *justified*, should they should impose that sentence.  The comments were within the boundaries of the law, consistent with the court's instructions, and nothing in these remarks was in violation of the Eighth Amendment, nor in conflict with the holding in *Caldwell*.

Finally, a collateral attack under § 2255 may not substitute for an appeal. Claims regarding trial errors that could have been, but were not raised on direct appeal are barred from review under § 2255, unless the defendant shows cause for the default and actual prejudice resulting from such errors or demonstrates that a miscarriage of justice would result from the refusal of the court to entertain the collateral attack because he is likely actually innocent of criminal conduct. *See United States v. Mikalajunas,* 186 F.3d 490, 492–93 (4th Cir.1999) (citing *United States v. Frady,* 456 U.S. 152, 167–68 (1982)).   Caro could have, but did not raise this *Caldwell* challenge in his direct appeal to the Fourth Circuit Court of Appeals, and his claim is therefore procedurally defaulted.  However, even if the claim were not defaulted, for the reasons above, Caro cannot prevail on the merits of his claim, and his claim should be denied.

<u>REPLY TO CLAIMS FOR RELIEF:  DIRECT APPEAL</u>

<u>Claim Nine</u>:  Caro complains that his appellate counsel failed to appeal a variety of issues and that his Sixth Amendment right to effective counsel was violated by counsel's failure to pursue certain issues on appeal. *Petition* at 159.  His complaint has no merit.

In *Evitts v. Lucey*, 469 U.S. 387 (1985), the Supreme Court held that due process of law requires that a defendant receive effective assistance of appellate counsel on direct appeal. Claims for ineffective assistance of appellate counsel, like those for trial counsel, are properly

JA 1445

analyzed under the two-pronged test of *Strickland*.  *Smith v. Murray,* 477 U.S. 527, 535–36

(1986) (applying *Strickland* to claim of attorney error on appeal).  The Supreme Court, however,

also has held that appellate counsel has no constitutional duty to raise every nonfrivolous issue

on appeal if counsel, as a matter of professional judgment, decides not to raise such issue on

appeal. *Jones v. Barnes*, 463 U.S. 745, 751-54 (1983). The *Barnes* Court determined that

appellate counsel must be allowed to exercise his reasonable professional judgment in selecting

those issues most promising for review.  *Id*. at 752-53.  The *Barnes* Court specifically stated

that "[a] brief that raises every colorable issue runs the risk of burying good arguments...." *Id.*  In

this case, without the benefit of additional evidence, this Court cannot know or discern counsel's

reasoning in deciding what issues to present on appeal.  However,  such a hearing is unnecessary

in that Petitioner has failed to set forth any issue which if it had been appealed would have

resulted in any different outcome in his case, and has therefore failed to show prejudice as

required under the second prong of the *Strickland v. Washington*, 466 U.S. 668 (1984).  *See*

*Griffin v. Aiken*, 775 F.2d 1226, 1235-36 (4th Cir. 1985).[25]

        Caro's appellate counsel was not ineffective for failing to challenge the court's refusal to

instruct the jury that the aggravating factors must outweigh the mitigating factors sufficiently and

beyond a reasonable doubt. Claim Nine A.

        In Caro's trial pleading titled "Defendant's Response to Issues Regarding Proposed Jury

Instructions," he requested that the Court instruct the jury "that the government must prove

beyond a reasonable doubt that the aggravating factors sufficiently outweigh the mitigating

---

[25] This Court is not required to address the issue whether "counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Strickland*, 466 U.S. at 697.  Instead, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice,  which we expect will often be so, that course should be followed." *Richardson v. Branker*, 668 F.3d 128, 141 (4th Cir. 2012), quoting *Strickland* at 697; *see also Buckner v. Polk,* 453 F.3d 195, 202 (4th Cir.2006) (following Supreme Court's instruction in *Strickland* to proceed directly to "prejudice" prong if petitioner cannot demonstrate reasonable probability that outcome of trial would be different but for counsel's performance).

JA 1446

factors in order to justify the death penalty."   The Court did not accept Caro's instruction.  In the Court's Instruction No. 6, regarding "Aggravating Factors," the District Court instructed the jury that they must consider the factors separately, and that they "must decide for each one whether you unanimously agree that it has been proved by the government beyond a reasonable doubt, . . . ." In the Court's Instruction No. 9, regarding "Weighing Aggravation and Mitigation," the Court instructed the jury, "You must determine whether the proven aggravating factors sufficiently outweigh any proven mitigating factors to justify a sentence of death."  CITE.  The Court instructed the jury that "What constitutes sufficient justification for a sentence of death in this case is exclusively left to you. . .. If you unanimously find that the comparative weight of the aggravating factor or factors is sufficient to justify a sentence of death, answer "Yes" on the Special Verdict Form, Part III-A . . . ."

"The Supreme Court has repeatedly has emphasized that key to harmonizing a capital sentencing scheme with the proscription against cruel and unusual punishment is an individualized determination by the jury of whether, taking into account all the relevant aggravating and mitigating factors, a death sentence is appropriate in a particular case." *United States v. Sampson*, 486 F.3d 13, 31 (1st Cir. 2007), citing *Tuilaepa v. California,* 512 U.S. 967, 973 (1994); *Zant v. Stephens,* 462 U.S. 862, 879 (1983).   The Court has held that the jury's discretion must be "suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action."  *Id*., citing and quoting *Gregg,* 428 U.S. at 189 (opinion of Stewart, Powell, and Stevens, JJ.). However, once a jury has concluded that a defendant is eligible for the death penalty, "it may be given unfettered discretion in the weighing process."  *Id*., citing *Tuilaepa,* 512 U.S. at 979 (explaining that "[a] capital sentencer need not be instructed how to weigh any particular fact in the capital sentencing decision"); *see also Ayers v. Belmontes,* 549

101

JA 1447

U.S. 7 (2006). Caro's argument that the jury should have been further instructed, requiring that they find beyond a reasonable doubt that the aggravating factors outweigh the mitigating factors is foreclosed by these precedents.

In further support, the Government notes that the FDPA does not set out a reasonable doubt standard in the portion of the statute that deals with weighing aggravating and mitigating factors. *See* 18 U.S.C. § 3593(e). The statute does refer to the reasonable doubt standard in two other sections. *See id.* §§ 3591(a)(2), 3593(c). Because the inclusion of a term in one part of a statute is persuasive evidence that its omission elsewhere is deliberate, *see Green,* 407 F.3d at 443, it is apparent that Congress did not intend the reasonable doubt standard to apply to the weighing process. For that reason, the instructions that the Court gave regarding how the jury should weigh the aggravating factors and mitigating factors, that is, without Caro's requested instruction requiring that they find beyond a reasonable doubt that the aggravators outweighed the mitigators, was not in conflict with the statute and he was not harmed by the instruction given. Caro relies upon two Circuit Court cases, *United States v. Fell*, 531 F.3d 197 (2d Cir. 2008) and *Sampson*, 486 F.3d 13, in support of his argument that his appellate counsel should have challenged the district court's refusal to give his requested instruction. *Pet*. at 161-162. But neither of these cases provides a basis upon which this Court could conclude that the jury in this case was improperly instructed, or that as a result, Caro's appellate counsel was ineffective for failing to object to the instruction.

In *Sampson*, the district court did give an instruction which went beyond the Caro Court's instructions. *See Sampson*, 486 F.3d at 30. The Sampson Court instructed the jury in pertinent part, "[h]owever you personally define sufficiency, the prosecution must convince you beyond a reasonable doubt that the aggravating factor or factors sufficiently outweigh the mitigating

JA 1448

factors to make death the appropriate penalty in this case." *Id.* Nonetheless, Sampson appealed, arguing (in part) that the instructions failed to require that the jury find beyond a reasonable doubt that aggravating factors outweighed mitigating factors before voting to impose the death penalty. *Id*. at 29. Finally, the *Sampson* Court pointed to the Supreme Court's decision in *Tuilaepa*, 512 U.S. at 979, for the holding by that Court that "once a jury has found a defendant death-eligible, it may be given unfettered discretion in the weighing process." *Id*. at 31. The *Sampson* Court, in reliance on *Tuilaepa*, concluded that Sampson's argument was "foreclosed by these precedents." *Id*. Likewise, Caro's argument is precluded by the Supreme Court's *Tuilaepa* decision. 512 U.S. at 979-980.

In *Fell*, as Caro notes in his Petition, the Court included an instruction telling the jury that they "may find . . .that the aggravating factors proven, do not, standing alone, justify the imposition of death beyond a reasonable doubt." 531 F.3d at 234. But the issue (pertaining to the jury instructions) that the *Fell* Court was considering was whether "the overlap of aggravating factors necessarily skewed the jury's decision-making in favor of the death penalty." [26] *Id*. Thus, though the district court's instruction was different from Caro's, the holding in *Fell* does not constitute legal precedent sufficient to support Caro's argument.

Finally, Caro's reliance upon *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and its progeny, including *Ring v. Arizona*, 536 U.S. 584 (2002), is equally unhelpful to his argument. As he recognizes, the Supreme Court in *Apprendi* held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at

---

[26] The "district court in *Fell* instructed the jury to consider three statutory aggravating factors and four non-statutory aggravating factors, as well as nineteen mitigating factors. " *Fell*, 531 F.3d at 234. Fell argued on appeal "that three of the non-statutory aggravating factors substantially overlapped because they rest on the same factual predicate-that Fell intentionally participated in the death of King." *Id*. Fell argued that "by finding this fact, the jury could more easily find aggravating factors and then more easily find that those factors outweighed the mitigating factors presented by Fell." *Id*. at 235.

JA 1449

490; *Pet*. at 160.  Shortly thereafter, the *Ring* Court addressed a challenge to Arizona's capital sentencing scheme, under which a judge, after a jury finding of guilt for first-degree murder, determines the presence or absence of the aggravating factors required by Arizona law for imposition of the death penalty.  *Ring v. Arizona*, 536 U.S. at 584.  The *Ring* Court held that the Arizona statute violated the Sixth Amendment right to a jury trial in capital prosecutions, and in so doing, overruled *Walton v. Arizona,* 497 U.S. 639 (1990), "to the extent that it allows a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the death penalty."  *Id.* at 585.   Nothing in the record of Caro's case implicates the holdings in *Apprendi* or *Ring v. Arizona*, and in light of the Supreme Court's holding in *Tuilaepa, id*., Caro cannot say that his attorney was ineffective for failing to challenge the district court's instruction in this case, or that the outcome of his case would have been different in light of such an appeal.  For all the above reasons, Caro's claim should be denied.

Caro argues that his appellate counsel was ineffective for failing to argue that the government violated the order of the district court regarding the presentation of specific acts of violence by inmates other than Caro to prove future dangerousness. Claim Nine-C**.**  His complaint has no merit

Caro's complaint is closely related to his claim in issue Six-I, *supra*, wherein he argues that his trial counsel was ineffective for failing to object to the government's presentation of testimony during the direct examination of its rebuttal witnesses Daniel Olson  and Gregory Hershberger, and during the cross-examination of defense witness Dr. Cunningham.  *See Petition* at 133.   Here, Caro claims that his appellate counsel was also ineffective for failing to raise the same argument on direct appeal.  *Petition* at 168.

JA 1450

In evaluating Petitioner's claim, this Court applies the familiar *Strickland* standard, *Richardson v. Branker,* 668 F.3d 128, 139–40 (4th Cir.2012), *cert. denied,* —— U.S. ——, 133 S.Ct. 441 (2012) (noting that in the context of an ineffective assistance of appellate counsel claim, the "proceeding" at issue is the forum in which the petitioner's appeal was heard). It is well-established that appellate counsel need not raise on appeal every nonfrivolous issue requested by a defendant. *Jones v. Barnes,* 463 U.S. at 752. Indeed, " '[w]innowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray,* 477 U.S. 527, 536 (1986) (quoting *Jones,* 463 U.S. at 751–52). For reasons similar to those set forth in its response in Six-I, incorporated by reference herein, Caro cannot establish either the performance or prejudice prongs under *Strickland,* and he is therefore not entitled to relief on this issue. *See Strickland*, 466 U.S. at 690, 694.

Caro's appellate counsel challenged the district court's denial of his motion for discovery under *Brady*, the denial of his motions for Rule 17(c) subpoenas, and his discovery motion under Federal Rule of Criminal Procedure 16(a)(1)(E).[27] *See Caro*, 597 F.3d at 619-22. Regarding Caro's challenge under Rule 16, the appellate Court noted that Caro only asserted that subsection (i) of Rule 16 applied.[28] *Id*. at 620-21. The Court therefore focused on

---

[27] The Fourth Circuit agreed with the District Court's decision denying Caro's *Brady* motion on the grounds that "Caro failed to establish that the information requested would be favorable to him." *Id*. at 619. The Court concluded that Caro could "only speculate as to what the requested information might reveal," and therefore that he could not satisfy *Brady's* requirement that the requested material would be favorable to him. *Id*. The Court also found that the District Court did not abuse its discretion in denying Caro's motion for Rule 17 subpoenas, because "'a Rule 17 subpoena *duces tecum* cannot substitute for the limited discovery otherwise permitted in criminal cases and the hope of obtaining favorable evidence does not justify the issuance of such a subpoena.'" *Id.* at 620, quoting *Caro*, 461 F.Supp.2d at 481.

[28] Rule 16, as the Court noted, provides in pertinent part:

> Upon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and :

JA 1451

subsection (i) of Rule 16, and in doing so, concluded that the District Court had not abused its

discretion "by finding that the requested information was not 'material to preparing the

defense.'" *Id*. at 622-23; Fed. R. Crim. P. 16(a)(1)(E)(i).  In its footnote 14, the Court of Appeals

stated,

> "When asked during oral argument whether Caro asserted any claim arising from
> the government having violated the district court's order that it 'may not rely on
> specific instances of inmate violence  (other than the defendant's own) in seeking
> to prove his future dangerousness,' *Caro*, 461 F.Supp.2d at 482, counsel for Caro
> stated that she noted the governments misconduct merely to bolster her argument
> about subsection (i).   Regardless of whether subsection (ii) would apply, we
> cannot grant relief that Caro plainly failed to request." *Caro*, 597 F.3d at 612,
> n.14.

Footnote 14 thus pertains to the question of whether subsection (ii) of Rule 16 would

have applied to require disclosure of material that "the government intends to use in its case-in-

chief at trial." *Caro*, 597 F.3d at 621, n.14; Fed. R. Crim. P. 16(a)(1)(E).   As already stated, the

testimony Caro objects to was not introduced in the government's case-in-chief, but in rebuttal

and on cross-examination, of Cunningham.[29]   The court's order was premised on the language

of Rule 16(a)(1)(E)(ii) and the government's representation that it would not introduce "any of

the requested data in its own case." *Caro*, 461 F.Supp.2d at 481-82.   The court noted, however,

that "[i]f the defendant is convicted, the government will likely introduce evidence in the

sentencing phase of the trial that he poses a threat of danger to prison staff and other inmates if

---

(i)       The item is material to preparing the defense;

(ii)      The government intends to use the item in its case-in-chief at trial; or

(iii)     The item was obtained from or belongs to the defendant.

Fed.R.Crim.P. 16(a)(1)(E); *Caro*, 597 F.3d at 620.

[29] The record reflects that the government presented evidence in support of the alleged aggravators, which focused on Caro's own obduracy, that is his recidivism and lack of rehabilitative potential.  It was in response to the government's case-in-chief that Dr. Cunningham testified regarding the ability of the BOP to house Caro securely. And it was in rebuttal to the defense, specifically Dr. Cunningham's testimony, that the government presented its cross-examination of Dr. Cunningham, and its rebuttal witnesses Olson and Hershberger.

JA 1452

he is imprisoned, rather than put to death. In rebuttal, the defendant may produce evidence that if the defendant is incarcerated at Florence ADMAX, particularly in the Control Unit, he will not be a future threat to others." *Caro*, 461 F.Supp.2d at 481.   The district court's order did not address or preclude the possibility that the government might, in rebuttal to the defense testimony, present evidence pertaining to specific instances of violence by others.  The Court was properly considering Caro's request within the parameters of Rule 16, which does not require disclosure of rebuttal material.  Fed. R. Crim. P. 16(a)(1)(E).  Thus, where Cunningham's testimony opened the door to the government's response, it is unlikely that the Court would have granted any request for discovery, or sustained any objection by Caro to the rebuttal or cross-examination testimony.[30]  *See* Fed. R. Crim. P. 16 (a)(1)(E)(ii).  For these reasons, the testimony presented by the government did not violate Rule 16 or the district court order, and Caro has not established that his appellate counsel rendered ineffective assistance of counsel in omitting a challenge to this portion of the trial.

It should also be noted that any claim made on appeal would have been subject to plain-error analysis.  Fed. R. Crim. P. 52(b); *Jones v. United States*, 527 U.S. 373, 388-89 (1999).  At the trial, Caro's counsel understandably, and for the reasons set forth in the response to Six-I, omitted a demand for discovery arising from the presentation of Olson and Hershberger's rebuttal  testimony, and Cunningham's cross-examination, and likewise refrained from objecting to the portions of those presentations which mentioned specific instances of violence by persons

---

[30] Consistent with this view, it must be assumed that Caro's counsel understood that both Olson and Hershberger were rebuttal witnesses, when counsel for the government made specific representations to that fact, see tr. 2/6/2007 at 29, 2/7/2007 at 3.

107

JA 1453

other than Caro.   Counsel thus failed to preserve the issue for appeal, and review would be only for plain error.  *Id.*  Plain error occurs when there is "(1) . . . error, (2) which is plain, (3) which affects substantial rights, and (4) which seriously affects the fairness, integrity, or public reputation of judicial proceedings."  *United States v. Foster,* 507 F.3d 233, 249 (4th Cir. 2007). In that light, Caro cannot establish that his appellate counsel was ineffective under *Strickland* for omitting an argument that the circumstances described herein establish a plain error.

Caro relies on footnote 14 for his assertion that the Fourth Circuit "makes fairly plain that the government's use of specific instances of violence by persons other than Mr. Caro was error because it violated the district court's ruling," and therefore, he was prejudiced by his appellate counsel's failure to raise the issue on direct appeal."  *Petition* at 168.   But Caro's interpretation of the Court's footnote reads meaning into the Court's words which is contradicted by the record .  It is just as likely that the Court was simply explaining why it was not addressing the issue, and not hinting at a factual finding that it declined to make.  But even assuming that the Fourth Circuit had internally concluded that the record reflected error, Caro cannot meet *Strickland's* prejudice prong given the facts and circumstances of this case.  *See Response*, Issue Six-I, *supra*. Significantly, in consideration of Caro's argument that cumulative error warranted reversal, the Fourth Circuit   concluded that "[a]lthough we recognized several possible errors, they were not widespread or prejudicial enough to have fatally infected Caro's trial or sentencing hearing." *Caro*, 597 F.3d at 636.  The Court found that "[t]he proceedings below adhered to fundamental fairness," And that "[e]ach aggravating factor determined by the jury was well supported by the record."  *Id*.  Finally, in consideration of whether Caro could have been prejudiced by any of the errors the Court noted, it observed, [w]e cannot see how cumulative error could have caused the

108

JA 1454

jury to weigh sentencing factors any differently." *Id.* For all these reasons, Caro is not entitled to relief, and his appeal on this issue should be denied.

Caro argues that his appellate counsel was ineffective for failing to argue on direct appeal that the government, in closing argument, violated the Eighth Amendment and the Rule in *Caldwell v. Mississippi*, 472 U.S. 320 (1985). Claim Nine D. For the reasons set forth in this Response, pertaining to Claim Eight, incorporated herein by reference, Caro fails to establish that his appellate counsel's performance was deficient under *Strickland*. As already noted, appellate counsel need not raise on appeal every nonfrivolous issue requested by a defendant. *Jones v. Barnes,* 463 U.S. at 752.

Further, for the same reasons as set forth in response to Claim Eight, Caro has failed to establish prejudice because he cannot show that there is any reasonable probability that but for his counsel's unprofessional errors, the result of the proceedings would have been any different. *See Strickland*, 466 U.S. at 694.

Caro argues that his appellate counsel was ineffective for failing to argue on direct appeal the systemic challenges he presents in Claims Ten, Eleven, Twelve, Thirteen, Fourteen and Fifteen of this Petition. Claim Nine E. For the reasons set forth in this Response pertaining to those claims, and incorporated herein by reference, Caro fails to establish that his appellate counsel's performance was deficient under *Strickland*. Further, for the same reasons, Caro has failed to establish prejudice because he cannot show that there is any reasonable probability that but for his counsel's unprofessional errors, the result of the proceedings would have been any different. *See Strickland*, 466 U.S. at 694.

Caro next argues that the Government's use of the non-statutory aggravating factor of future dangerousness violated his right to a non-arbitrary sentencing process under the Eighth

JA 1455

Amendment and 18 U.S.C. § 3595(c)(2)(A).  Claim Ten.  Caro could have, but did not raise this challenge in his direct appeal to the Fourth Circuit Court of Appeals, and his claim is therefore procedurally defaulted.   In any event, Caro's argument does not comport with Supreme Court precedent, however.[31]  Additionally, Caro's reliance on statistical studies is inappropriate and unpersuasive.  As such, Caro's claim should be denied.

    a.  *The Future Dangerousness Factor Meets Constitutional Standards of Reliability and is Not Arbitrary*

In *Jurek v. Texas*, the Supreme Court held that a capital sentencing jury may evaluate and consider a defendant's propensity to commit future acts of violence as an aggravating factor weighing in favor of the death penalty.  *Jurek v. Texas*, 428 U.S. 262, 274-76 (1976).  In rejecting the claim that it was impossible to predict future behavior, the *Jurek* Court recognized that many decisions rendered throughout the criminal justice system, such as bail determinations, sentencing, and parole decisions, are predictions of future criminal conduct of a defendant. *Jurek*, 428 U.S. at 275.  Thus, the capital sentencing jury's task in answering the question of future dangerousness was "no different from the task performed countless times each day throughout the American system of criminal justice." *Id.* at 276.  Consequently, under *Jurek*, a capital sentencing jury's prediction of future dangerousness is not only Constitutional, but essential.  *See United States v. Sampson*, 335 F. Supp.2d 166, 222 (D. Mass. 2004) ("Future dangerousness is certainly relevant to the decision of whether the death penalty is justified in a particular case.").

---

[31] Under 18 U.S.C. § 3595(c)(2)(A), if the Court of Appeals finds that "the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor," then the Court of Appeals should remand the case for reconsideration under section 3593 or impose a sentence other than death.  Caro appears to argue that by considering future dangerousness, the jury imposed the death penalty based on an "arbitrary factor."  As such, Caro's 3595(c)(2)(A) claim rests solely on whether future dangerousness is an aggravating factor that is constitutionally reliable to assure that the death penalty is not being arbitrarily imposed.

While the Court recognized that predicting future behavior was "not easy," *Jurek*, 428 U.S. at 274, the Court has not deviated from its holding in *Jurek*. *See California v. Ramos*, 463 U.S. 992, 1003 (1983) ("[T]he Briggs Instruction focuses the jury on the defendant's probable future dangerousness. The approval in *Jurek* of explicit consideration of this factor in the capital sentencing decision defeats respondent's contention . . . ."); *Simmons v. South Carolina*, 512 U.S. 154, 162 (1994) ("This Court has approved the jury's consideration of future dangerousness during the penalty phase of a capital trial."). Indeed, the Court has affirmed a death sentence where the jury determined future dangerousness based in part on lay witness testimony about unadjudicated acts of violence committed by the defendant both prior and subsequent to the instant capital murder. *See Johnson v. Texas*, 509 U.S. 350 (1993). And, the Court has affirmed the government's use of expert testimony to establish future dangerousness. *See Barefoot v. Estelle,* 463 U.S. 880, 897–99 (1983), *superseded in part by statute,* Pub.L. No. 104–132, § 102 (1996) (28 U.S.C. § 2253(c)), *as recognized in Slack v. McDaniel,* 529 U.S. 473, 480–81 (2000). Finally, the Court has approved consideration of a defendant's future dangerousness as both a statutory and non-statutory aggravating factor in capital sentencing. *See California v. Ramos*, 463 U.S. at 1008 ("Once the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty . . . the jury then is free to consider a myriad of factors to determine whether death is the appropriate punishment"); *Simmons v. South Carolina*, 512 U.S. 154, 162 (1994) ("Although South Carolina statutes do not mandate consideration of the defendant's future dangerousness in capital sentencing, the State's evidence in aggravation is not limited to evidence relating to statutory aggravating circumstances.").

Applying these precedents, the Fourth Circuit has consistently upheld consideration of future dangerousness as an aggravating factor. *E.g.*, *United States v. Runyon*, 707 F.3d 475, 505

111

JA 1457

(4th Cir. 2013) (permitting the introduction of unadjudicated conduct to support non-statutory aggravators for future dangerousness); *United States v. Basham*, 561 F.3d 302, 331-32 (4th Cir. 2009) ("The Supreme Court has recognized future dangerousness as a legitimate aggravating factor in capital proceedings."); *Eaton v. Angelone,* 139 F.3d 990, 998 (4th Cir. 1998) (denying habeas relief, upholding state capital sentencing scheme that considered a defendant's future dangerousness).

In citing to studies that suggest predictions of future dangerousness are often wrong, Caro argues that the court should deviate from the controlling law of *Jurek* and its progeny. Caro cannot point to a single case in which a court determined that the future dangerousness aggravating factor failed to meet the Constitutional standards of reliability, however. Even the district court in *Sampson*, the one court decision cited by Caro that called into question a jury's ability "to predict reliably whether a murderer is likely to commit violent crimes again," ultimately concluded that it could not strike down the future dangerousness factor based on the "relatively recent studies" cited by the defendant because the Supreme Court's opinion in *Jurek* and *Barefoot* controlled. *See United States v. Sampson*, 335 F.Supp.2d 166, 218-23 (D. Mass. 2004).

Moreover, the reliability concerns raised by Caro in the instant motion are not new considerations. Rather, Caro repeats the argument reviewed and refuted by the Supreme Court in *Barefoot*. Specifically, in *Barefoot*, the Supreme Court recognized that some studies indicated that predictions of future dangerousness were often wrong. *Barefoot*, 463 U.S. at 901 n. 7. Regardless, this did not render consideration of future dangerousness unconstitutional because "[a]ll of these professional doubts about the usefulness of psychiatric predictions can be called to the attention of the jury." *Id*.

112

JA 1458

Because *Jurek* is still controlling law, the Government asserts that future dangerousness, as a non-statutory aggravating factor, meets the Constitutional standards of reliability.

b.  *Defendant's Reliance on Statistical Studies is Inappropriate and Unpersuasive*

In *McCleskey v. Kemp*, the Supreme Court discussed the inappropriate and unpersuasive nature of statistical studies offered by the defendant to "prove" the unconstitutional nature of the capital sentencing process. *McClesky v. Kemp*, 481 U.S. 279 (1987).  The *McCleskey* defendant presented statistical studies to prove Georgia jurors were imposing the death penalty in a racially discriminatory manner.  The studies purported to show that black defendants were statistically far more likely to be condemned to death by a Georgia jury than similarly situated white defendants, particularly when the victim was white.  *Id*. at 286-87.

The defendant in *McCleskey* urged the Court to change the sentencing procedure without support from case law or statute, relying solely on statistical studies.  Now, Caro wishes for this Court to do the same thing.  The *McCleskey* Court refused to consider the statistical studies, describing the studies as the sort of anecdotal data best suited to sway politicians, not judges; and as a result, found the defendant's argument meritless.  *Id.* at 319 ("It is the legislatures, the elected representatives of the people that are 'constituted to respond to the will and consequently the moral values of the people.' Legislatures also are better qualified to weigh and 'evaluate the results of statistical studies in terms of their own local conditions and with a flexibility of approach that is not available to the courts,' . . . It is the ultimate duty of courts to determine on a case-by-case basis whether these laws are applied consistently with the Constitution.")(internal citations omitted).  This Court should follow suit and find Caro's statistical studies equally inappropriate and unpersuasive.

Additionally, the two statistical studies cited by Caro were written by Dr. Mark D. Cunningham.  Although these studies suggest that predictions of future dangerousness are completely unreliable, Dr. Cunningham made predictions of future dangerousness in this case. *United States v. Caro*, 597 F.3d 608, 616, 626 n.18 (4th Cir. 2010) (Cunningham testified "that Caro would be unlikely to endanger anyone during a life sentence because the BOP would adequately secure Caro," but Cunningham admitted that "in the general population of a U.S. penitentiary, there is a very high risk that Mr. Caro would seriously injure someone else."); *see also*, *United States v. Barnette,* 211 F.3d 803, 810 (4th Cir. 2003) (Cunningham "conclude[ed] that there was little likelihood Barnette would commit future violent acts in prison."); *Martinez v. Dretke,* 173 F. App'x 347, 350 (5th Cir. 2006) (per curiam) ("Cunningham testified that there was only a small chance that a person like Martinez would commit future acts of violence in prison").

While Dr. Cunningham seems to frequently opine on the unlikelihood of a capital defendant being a future danger, Caro claims that neither jurors nor experts can reliably determine which such offenders pose a danger. Caro cannot have it both ways.  Future dangerousness is either a characteristic that may reliably be predicted or it is not.

For the above-stated reasons, Caro's claim that the use of future dangerousness as an aggravating factor violated his right to non-arbitrary sentencing under the Eighth Amendment and 18 U.S.C. § 3595(c)(2)(A), should be denied.

Claim Eleven: Caro charges that the federal death penalty act is rendered unconstitutional because it allows prosecutorial and jury discretion. Relying on *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982), he argues that the Federal Death Penalty Act allows the death penalty to be imposed in a way that is inconsistent and unpredictable, and that it is therefore unconstitutional.

JA 1460

*Petition* at 179. As the First Circuit aptly stated in an analogous case, however, "[t]his argument mistakes the nature of the arbitrariness concern in the Supreme Court's jurisprudence. . . . [T]he primary emphasis of the Court's death penalty jurisprudence has been the requirement that the discretion exercised by juries be guided so as to limit the potential for arbitrariness." *United States v. Sampson*, 486 F.3d 13, 24 (1st Cir. 2007). Likewise, "[t]his argument ignores the remainder of the *Eddings* Court's discussion of consistency, in which the Court recognized that 'a consistency produced by ignoring individual differences is a false consistency.'" *Id.* at 24 (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982)).

Instead, nuance and guided discretion are crucial to the proper functioning of the criminal justice system. After all, "[t]he capital sentencing decision requires the individual jurors to focus their collective judgment on the unique characteristics of a particular criminal defendant. It is not surprising that such collective judgments often are difficult to explain. But the inherent lack of predictability of jury decisions does not justify their condemnation." *McCleskey v. Kemp*, 481 U.S. 279, 311 (1987) And "a capital punishment system that did not allow for discretionary acts of leniency 'would be totally alien to our notions of criminal justice.'" *Id.* at 312 (quoting *Gregg v. Georgia*, 428 U.S. 153, 199 n.50 (1976)). At most, the evidence offered by Caro demonstrates the exercise of some discretion, not the exercise of discretion arbitrarily and capriciously.

In support of the alleged inconsistencies, Caro provides thirty-four extremely short summaries of various death penalty cases. *Petition* at 180-84. He likewise includes lists of facts related to "every authorized federal death penalty case from 1988 until 2003." *Petition, Exs*. 12-22. These fact summaries are unhelpful; much more detailed information would be required to make any meaningful comparison between cases. Absent a showing of arbitrariness and

115

JA 1461

capriciousness, Caro would need to be able to show that other similarly situated defendants did not receive the death penalty. *See McCleskey*, 481 U.S. at 306-07. He has entirely failed to do so.

The evidence provided by Caro is no evidence at all of arbitrary or capricious imposition of the FDPA but rather too-brief statements of no value to an assessment of his claim. *Accord Sampson*, 486 F.3d at 25 ("In all events, the 'evidence' that Sampson submits is wholly inadequate to prove that the death penalty has been imposed in an arbitrary manner. The summaries on which Sampson relies to demonstrate inconsistency are devoid of details and fail to account for the objective circumstances of the underlying crimes."). By failing to disclose sufficient individual detail that could account for individual variations, Caro's evidence proves nothing at all. Furthermore, Caro's claim that the government has the burden of demonstrating a principled basis for distinguishing these cases, *Petition* at 184, is completely unsupported by any case law. *See United States v. Williams*, S100CR.1008(NRB), 2004 WL 2980027 at *6 (S.D.N.Y. Dec. 22, 2004), *aff'd*, 506 F.3d 151 (2d Cir. 2007). Ultimately, there is no basis on which this Court should under the Federal Death Penalty Act "find[] that similar cases are treated differently." *Sampson*, 486 F.3d at 25. Caro's claim should therefore be rejected.

In a similar vein, Caro next contends that the federal capital punishment system is imposed on the basis of race and geography and that it is therefore unconstitutional. Claim Twelve. *See Petition* at 185, 188. He requests that his sentence be vacated on this ground. *Id.* at 185. Although he requests a comprehensive hearing explaining the charging practices of the DOJ, he does not explain specifically which "constitutional violations" have occurred. *See id.* 188. Assuming that his basis for asking for his sentence to be vacated is on the basis of a violation of either his Fifth or his Eighth Amendment rights, his claims are entirely unavailing.

116

JA 1462

Furthermore, he provides insufficient evidence to support any claim for a hearing about discriminatory practices; this claim should therefore also be rejected.

## A. *The Decision of the Supreme Court in* McClesky v. Kemp *Is Controlling*

The Supreme Court, in *McCleskey v. Kemp*, 481 U.S. 279 (1987), set the standard for what proof was required to show a violation of a defendant's right to equal protection.[32] "[T]o prevail under the Equal Protection Clause, [a defendant] must prove that the decision makers in *his* case acted with discriminatory purpose." *Id.* at 292. The Court elaborated that in some circumstances, as in a Title VII case, statistical evidence may be inferential support for a conclusion of discriminatory intent. But "the application of an inference drawn from the general statistics to a specific decision in a trial and sentencing simply is not comparable to the application of an inference drawn from general statistics to a specific venire-selection or Title VII case. In those cases, the statistics relate to fewer entities, and fewer variables are relevant to the challenged decisions." *Id.* at 294-95 (footnote omitted). In the capital punishment context, "absent far stronger proof" of individualized discriminatory intent, "it is unnecessary to seek . . . rebuttal" of statistical evidence of discriminatory impact, "because a legitimate and unchallenged explanation for the decision is apparent from the record: [the defendant] committed an act for which the United States Constitution and Georgia laws permit imposition of the death penalty." *Id.* at 296-97. "Similarly, the policy considerations behind a prosecutor's traditionally 'wide discretion' suggest the impropriety of our requiring prosecutors to defend their decisions to seek death penalties, 'often years after they were made.'" *Id.* at 296 (footnote omitted).

The imposition of the penalty in the instant case was permitted by the United States Constitution and the Federal Death Penalty Act. All that Caro has provided is bare statistical

---

[32] Although *McCleskey* dealt directly with claims brought under the Fourteenth Amendment, the analysis under *McCleskey* has applied to both Fifth and Eighth Amendment claims brought under the Federal Death Penalty Act in this way. *See United States v. Sampson*, 486 F.3d 13, 26 (1st Cir. 2007).

117

JA 1463

data.[33] This is exactly what *McCleskey* holds insufficient.  Caro does not even attempt to

distinguish his case from *McCleskey*. Based on binding precedent from the Supreme Court,

Caro's claims should be rejected.

### B. The Specific Statistical Evidence Offered By Caro Does Not Provide Any Basis For Distinguishing McCleskey

Notwithstanding the fact that Caro has provided different statistical evidence, *McCleskey*

still directly controls because there are no material differences in the statistics provided.

Specifically, they are no more probative of whether the statistical discrepancies should be

attributed to discriminatory motive or the plethora of other possible factors. In fact, the First

Circuit rejected an identical argument made by a capital defendant and based on the same DOJ

study and supplement as the one referenced by Caro. The First Circuit analyzed both the Fifth

and Eighth Amendment claims brought in that case, held that *McCleskey* controlled, and rejected

the claims. *See United States v. Sampson*, 486 F.3d 13, 26 (1st Cir. 2007). In the words of that

court, "[t]he statistics submitted by Sampson are no more probative than those rejected in

*McCleskey*. The DOJ study provides no basis for attributing the statistical discrepancies with

respect to geography and race in FDPA prosecutions to discrimination rather than to other

factors, such as differences in the nature of the crimes involved." *Id.* at 26-27. The Ninth Circuit,

like the First Circuit, has given exactly the same response to a challenge to the federal death

penalty act on exactly the same grounds and statistical evidence. *See United States v. Mitchell*,

502 F.3d 931, 982 (9th Cir. 2007) (applying *McCleskey* to reject an identical argument to the one

in *Sampson* and in the instant case that was also based on the same statistics). For the same

reasons elaborated by the Supreme Court in *McCleskey* and the First Circuit in *Sampson*, this

---

[33] Statements by individuals that they are troubled by racial disparity in capital sentencing are in no way probative of discriminatory intent in charging practices. Such statements are therefore not evidence of discriminatory intent.

JA 1464

Court should hold that Caro has failed to show discriminatory intent sufficient to make out a Fifth or Eighth Amendment claim.

### C. Caro Provides No Evidence of Discriminatory Effect or Intent, and Therefore His Request for a Hearing Is Entirely Unsupported

Caro requests a hearing on the issue of the Department of Justice's capital charging practices, claiming that he is entitled to know what is "behind the numbers." *Petition* at 188. Caro is simply wrong; he is not entitled to a hearing on this issue. The only way in which he would be entitled to information about the capital charging practices of the Department of Justice would be if he could demonstrate both that similarly situated defendants of a different race were not prosecuted and that prosecutors in his case acted with discriminatory purpose. Because the statistics he offers show nothing about similarly situated defendants, and because he provides no evidence of discriminatory intent specific to his case, his request for a hearing should be denied. Precedent regarding the standard required for discovery for a claim of selective prosecution is instructive. *See United States v. Barnes*, 532 F. Supp. 2d 625, 636-37 (S.D.N.Y. 2008) (applying the selective prosecution standard to reject a claim that a defendant against whom the death penalty was sought was entitled to an "explanation"). This standard is a high hurdle that cannot be met by Caro's bare statistics.

In the words of the Supreme Court, "a defendant who seeks discovery on a claim of selective prosecution must show some evidence of both discriminatory effect and discriminatory intent. . . . [T]he defendant must make a 'credible showing' that 'similarly situated individuals of a different race were not prosecuted.'" *United States v. Bass*, 536 U.S. 862, 863 (2002) (quoting *United States v. Armstrong*, 517 U.S. 456, 465, 470 (1996)). Likewise, "raw statistics regarding overall charges say nothing about charges brought against *similarly situated defendants*." *Id.* at 864. Furthermore, a defendant seeking a hearing on a selective prosecution claim must provide

119

JA 1465

evidence of discriminatory intent specific to his case. He must credibly demonstrate that "that the decision to prosecute was 'invidious or in bad faith.'" *United States v. Olvis*, 97 F.3d 739, 743-44 (4th Cir. 1996). And "statistical evidence of racial disparity alone cannot establish any element of a discrimination claim," including a claim of bad faith. *United States v. Venable*, 666 F.3d 893, 903 (4th Cir. 2012), as amended (Feb. 15, 2012). For all of these reasons, Caro has not carried his burden to show that he is entitled to a hearing. His request should be rejected.

Claim Thirteen: Caro charges that the death penalty is categorically cruel and unusual punishment.  He concedes that the death penalty is not cruel and unusual per se under the Supreme Court's jurisprudence. "[T]he death penalty is not a form of punishment that may never be imposed." *Gregg v. Georgia*, 428 U.S. 153, 187 (1976) (opinion of Stewart, Powell, and Stevens, JJ.); *accord id.* at 226 (opinion of  White, J., joined by Burger, C.J., and Rehnquist, J). *See also McCleskey v. Kemp*, 481 U.S. 279, 300-05 (1987); *Kansas v. Marsh*, 548 U.S. 163, 174 (2006). This Court has definitively recognized that the argument that the death penalty is per se unconstitutional is unavailing. *United States v. Lighty*, 616 F.3d 321, 370 (4th Cir. 2010). Caro's argument is simply foreclosed by the longstanding, binding precedent of the Supreme Court and the Fourth Circuit.

Claim Fourteen:  Caro argues that the federal capital punishment system at the time of his trial violated international law. *Petition* at 189.  More specifically, Caro argues that under the Convention on the Elimination of All Forms of Racial Discrimination ("CERD"), adopted Dec. 21, 1965, 660 U.N.T.S. 195, and the International Covenant on Civil and Political Rights ("ICCR"), adopted  Dec. 16, 1996, 999 U.N.T.S. 171, "statistical evidence of racial disparity is enough to warrant – and require – corrective action by the United States." *Petition at 189-190.* Caro argues that under CERD, specifically, "the United States must take action to correct

JA 1466

governmental policies that have a discriminatory effect, regardless of whether they also have a discriminatory purpose." Caro points out that the ICCPR, addresses the administration of capital punishment, and that it provides that " '[n]o one shall arbitrarily deprived of his life.'" *Petition* at 190; ICCPR, pt. 3, art. 6, § 1, 999 U.N.T.S. 171.

Questions such as those raised by Caro relating to the relationship of international treaties and the application of the death penalty, are decided according to American constitutional law. *See Celestine v. Butler,* 823 F.2d 74, 79-80 (5th Cir.1987), *cert denied* 483 U.S. 1036 (1987)(Petitioner, alleging racial discrimination, claimed that treaties of which the United States was a signator superseded Louisiana law under the Supremacy Clause. The court held that "how these issues are to be determined is settled under American constitutional law."). In general, federal courts to have considered similar arguments have rejected them. For example, in *Buell v. Mitchell,* 274 F.3d 337, 370-372 (6th Cir.2001), the Sixth Circuit held that the Ohio death penalty does not violate the International Covenant or any other international agreements entered into by the United States, because these agreements do not specifically outlaw the death penalty, and to the extent that they ban cruel and unusual punishment, the United States has included reservations preserving the right to impose the death penalty within the limits of the U.S. Constitution. *See also United States v. Bin Laden et al.,* 126 F.Supp.2d 290, 294 (S.D.N.Y.2001). In fact, the undersigned has found no case in which a federal court has ever held that international law superseded the FDPA. *See, e.g., Hain v. Gibson,* 287 F.3d 1224, 1243–44 (10th Cir.2002); *Buell v. Mitchell,* 274 F.3d 337, 337-76 (6th Cir. 2001); *Coleman v. Mitchell,* 268 F.3d 417, 443 (6th Cir.2001); *White v. Johnson,* 79 F.3d 432, 440 n. 2 (5th Cir.1996); *Bemore v. Cullen,* No. 08–311, 2011 WL 1044633 (S.D.Cal. Mar. 22, 2011); *United States v. Williams,* No. 06–79, 2007 U.S. Dist. LEXIS 73775, at *20–21 (D.Haw. Oct. 2, 2007);

121

*United States v. Perez,* No. 3:02–7, 2004 WL 935260 (D.Conn. Apr. 29, 2004); *United States v.*

*Quinones,* No. 00–761, 2004 WL 1234044 (S.D.N.Y. June 3, 2004); *United States v. Bin Laden,*

126 F.Supp.2d 290, 294 (S.D.N.Y.2001).[34]

 Relief under § 2255 does extend to treaty violations. *Wesson v. U.S. Penitentiary*

*Beaumont, TX*, 305 F.3d 343, 348 (5th Cir. 2002), citing *Davis v. United States,* 417 U.S. 333,

344 (1974). But "[i]n ratifying the ICCPR, the United States specifically reserved the right to

impose capital punishment subject only to U.S. Constitutional restraints." *Perez*, citing

International Covenant on Civil and Political Rights (ICCPR), opened for signature Dec. 19,

1966, 999 U.N.T.S. 171 (entered into force Mar. 23, 1976) (ratified by United States on Sept. 8,

1992). Moreover, the United States also made clear in its ratification of the ICCPR that it

"considers itself bound by article 7 to the extent that 'cruel, inhuman or degrading treatment or

punishment' means the cruel and unusual treatment or punishment prohibited by the Fifth,

Eighth, and/or Fourteenth Amendments to the Constitution of the United States." *Id.* Thus, the

United States has made clear that it is bound only by the Constitution in its application of capital

punishment, and not by any contrary interpretation of the ICCPR. Further, with respect to the

ICCPR and the CERD, the United States expressly declared upon ratification that "the provisions

of the Convention are not self-executing." *See United States v. Perez*, 3:02CR7(JBA), 2004 WL

935260 (D. Conn. Apr. 29, 2004)(internal citations and quotations omitted); *accord Dutton v.*

*Warden, Fed. Corr. Inst. Estill, 37 Fed.Appx. 51, 53 (4th Cir. 2002) (unpublished) ("[T]he*

*ICCPR is not privately enforceable.");; Ruhaak v. Commissioner of Internal Revenue*, 422

Fed.Appx. 530, 532 (7th Cir. 2011); *Kanli v. Duke University*, 1:12CV63, 2012 WL 2366449

---

[34] One federal district court in Ohio observed in 2007, that "[s]ince the reinstatement of the death penalty in *Gregg v. Georgia,* 429 U.S. 875 (1976), the Supreme Court has never relied on those international agreements to find a death penalty unconstitutional. *Montgomery v. Bagley,* 482 F.Supp.2d 919, 1000 (N.D.Ohio 2007).

JA 1468

(M.D.N.C. June 21, 2012).  Because the treaties are not self-executing, neither the  ICCPR nor

CERD bind federal courts and Congress has yet to enact implementing legislation. *Buell*  274

F.3d at 372 (collecting cases); see also *Grandison v. Corcoran* 78 F.Supp.2d 499, 517 (D.Md.

2000), citing *White v. Johnson,* 79 F.3d 432, 440 n. 2 (5th Cir.), *cert. denied,* 519 U.S. 911

(1996)("The federal courts have observed that the ICCPR gives no more protection in criminal

prosecutions, including death penalty cases, than that afforded by the Constitution.").  Thus,

habeas relief is not available to Caro regarding his claims in Issue Fourteen. *See United States, ex*

*rel. Perez v. Warden, FMC Rochester,* 286 F.3d 1059, 1063 (8th Cir.2002); *accord Dutton v.*

*Warden, FCI Estill,* 37 Fed.Appx. 51 at *1 (4th Cir. 2002) (detailing congressional history of

treaty).   For these reasons, Claim Fourteen should be denied.

    Claim Fifteen:  Caro argues in his Claim Fifteen, that "the preclusion of 'plain-error'

review by the Federal Death-Penalty Act renders the statute unconstitutional. *Petition at 191-*

*194*.  As a preliminary matter, the government argues that Caro could have, but did not raise this

challenge in his direct appeal to the Fourth Circuit Court of Appeals, and his claim is therefore

procedurally defaulted.   A collateral attack under § 2255 may not substitute for an appeal.

Claims regarding trial errors that could have been, but were not raised on direct appeal are barred

from review under § 2255, unless the defendant shows cause for the default and actual prejudice

resulting from such errors or demonstrates that a miscarriage of justice would result from the

refusal of the court to entertain the collateral attack because he is likely actually innocent of

criminal conduct. *See United States v. Mikalajunas,* 186 F.3d 490, 492–93 (4th Cir.1999) (citing

*United States v. Frady,* 456 U.S. 152, 167–68 (1982).  However, even if this claim were not

defaulted, for the reasons below, Caro cannot prevail on the merits, and his appeal in this regard

should be denied.

JA 1469

There is nothing in the FDPA that would preclude plain error review.  The FDPA provides in pertinent part:

(b)  Review.  The court of appeals shall review the entire record on the case, including - -

    (1) the evidence submitted during the trial;

    (2) the information submitted during the sentencing hearing;

    (3) the procedures employed in the sentencing hearing; and

    (4) the special findings required under section 3593(d).

(c)  Decision and disposition.

    (1) The court of appeals shall address all substantive and procedural issues raised on the appeal of a sentence of death, and shall consider whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor and whether the evidence supports an aggravating factor required to be considered under section 3592.

    (2)  Whenever the court of appeals finds that - -

        (A) The sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor;

        (B) the admissible evidence and information adduced does not support the special finding of the existence of the required aggravating factor; or

        (C)  the proceedings involved any other legal error requiring reversal of the sentence that was properly preserved for appeal under the rules of criminal procedure, the court shall remand the case for reconsideration under section 3593 or imposition of a sentence other than death.  The court of appeals shall not reverse or vacate a sentence of death on account of any error which can be harmless, including any erroneous special finding of an aggravating factor, where the Government establishes beyond a reasonable doubt that the error was harmless.

The statute thus provides for review of errors "properly preserved for appeal under the rules of criminal procedure." 18 U.S.C. § 3595(c).   Fed. R. Crim. P. 52(b) provides that "plain errors or defects affecting substantial rights may be noticed although they were not brought to

124

JA 1470

the attention of the court." The Supreme Court has applied plain-error review to jury instruction challenge in an FDPA prosecution, holding that the FDPA "does not explicitly announce an exception to plain-error review, and a congressional intent to create such an exception cannot be inferred from the overall scheme." *See Jones v. United States,* 527 U.S. 373, 389-390 (1999); *United States v. Fell*, 531 F.3d 197, 209-210 (2d Cir. 2008)(citing *Jones*, 527 U.S. at 388-89, and concluding in reliance upon *Jones* that review for plain error in a death penalty case was appropriate for certain evidentiary issues not preserved at trial); *United States v. Cooper*, 91 F. Supp. 2d 90, 99 (D.D.C. 2000)(citing *Jones* in support of conclusion that the FDPA does not preclude plain error review).   In light of *Jones*, Caro's argument the FDPA is unconstitutional for failing to allow for plain-error review is without merit and should be denied.

Claim Sixteen:  Finally, aggregating the claims discussed above, Caro maintains that the cumulative effect of the alleged errors entitles him to habeas relief.  Petition at 194.  The cumulative error doctrine affords relief when multiple harmless errors prejudice a defendant to the same degree as a single reversible error. *United States v. Basham,* 561 F.3d 302, 330 (4th Cir. 2009).  However, as for ineffective assistance of counsel claims, the Fourth Circuit has emphasized that it evaluates such claims on an individual rather than cumulative basis. *Compare Fisher v. Angelone,* 163 F.3d 835, 852 (4th Cir. 1998) (finding that "ineffective assistance of counsel claims, like claims of trial court error, must be reviewed individually, rather than collectively"), *with Kubat v. Thieret,* 867 F.2d 351, 370 (7th Cir. 1989) (finding the consideration of combined errors to be appropriate). The same goes for alleged cumulative errors of the trial court. *See Arnold v. Evatt,* 113 F.3d 1352, 1364 (4th Cir. 1997) (rejecting a claim of cumulative effect of trial court's errors based on rejection of each of the individual court error claims), *cert. denied,* 522 U.S. 1058 (1998); *Mohr v. United States,* No. 03–2893, 2007 WL

125

JA 1471

2903235, at *10 (D.Md. Sept. 30, 2007) (holding that once the court found no attorney error, there could be no cumulative error); *Robinson v. Conroy,* No. 01–1671, 2002 WL 32785545, at *4 (D.Md. Jan. 16, 2002) ("Because none of the issues raised by Robinson could be considered error, he cannot string them together in hopes of forming a constitutional violation.") Here, because Caro has failed to prove individual constitutional errors by counsel, his claim of cumulative error would fail, even if the law of this Circuit recognized the cumulative error argument. *See Fisher,* 163 F.3d at 852 ("Having just determined that none of counsel's actions could be considered constitutional error ... it would be odd ... to conclude that those same actions, when considered collectively, deprived [the defendant] of a fair trial."). In any case, Caro has failed to prove any constitutional error which warrants relief. Accordingly, his request for relief under the cumulative error doctrine should be denied.

CONCLUSION

Trial counsel was not ineffective in any aspect of their representation of Caro at the pretrial, guilt / innocence, penalty or appellate phases of his case. Nor did the prosecution violate any of Caro's rights by withholding information in violation of *Brady, Giglio* or other material evidence. The systemic challenges raised by Caro are without merit. Accordingly, the United States requests that Caro's petition be dismissed.

Respectfully submitted,

TIMOTHY J. HEAPHY
United States Attorney

Date: June 11, 2013

/s/ Anthony P. Giorno
Anthony P. Giorno
Assistant United States Attorney
Virginia State Bar No. 15830
P.O. Box 1709
Roanoke, VA  24008-1709

126

JA 1472

Tel: (540) 857-2250; Fax: (540) 857-2614

Email: anthony.giorno@usdoj.gov


/s/ Jean B. Hudson

Jean B. Hudson

Assistant United States Attorney

Virginia State Bar No. 25870

255 West Main Street, Room 130

Charlottesville, VA  22902

Tel: (434) 293-4283

Email: jean.hudson@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that I have this 11th day of June, 2013, electronically filed the **United States'**

**Motion to Dismiss in Response to Petitioner's Motion to Vacate, Set Aside, or Correct Sentence**

**Pursuant to Title 28, United States Code, Section 2255** with the Clerk of the Court using CM/ECF

system, which will send notification of such filing to all counsel of record.

/s/ Anthony P. Giorno
Assistant United States Attorney

127

JA 1473

# GOVERNMENT EXHIBIT 1

JA 1474

USCA4 Appeal: 16-1    Doc: 32-3    Filed: 12/27/2016    Pg: 281 of 300
Case 1:06-cr-00001-JPJ    Document 791-1    Filed 06/11/13    Page 2 of 3    Pageid#: 7493

Page 1 of 1

## Steve Kalista

From:       "Doris E. Nevin Ph.D" <dnevin@aca.roacoxmail.com>
To:         "Stephen J. Kalista" <skalista@mounet.com>
Sent:       Tuesday, January 24, 2006 5:17 PM
Subject:    Re: Neuropsychologist

Mr. Kalista,

Thank you for thinking of the VPA website. I am currently the President of the regional clinical academy in southwestern Virginia. While a substantial portion of my clinical practice is in the area of forensic assessment, I am not a neuropsychologist, nor do I engage in work related to capital cases. If I might be of assistance in any future cases please let me know.

At the same time, as an active participant in VPA, I do have colleagues who are neuropsychologists, some routinely working at the national level and who may either work within the forensic arena or know those who might. I will forward your needs to them and see if we can assist you.

Warm regards,

Doris E. Nevin, Ph.D.
3247 Electric Road, Suite 1-A
Roanoke, VA  24018

----- Original Message -----
From: Stephen J. Kalista
To: dnevin@aca.roacoxmail.com
Sent: Tuesday, January 24, 2006 4:01 PM
Subject: Neuropsychologist

Dr. Doris Nevin,

I saw your name on the Virginia Psychological Association website.

I am an attorney in Big Stone Gap who is representing a federal inmate on a capital case pending in the federal court in Abingdon. The inmate is currently being sent to Lee United States Penitentiary in Jonesville VA. My co-counsel and I feel that we need the services of a neuropsychologist to conduct testing on our client to determine the possibility of organic brain damage and to do a routine psychological work up prior to a psychiatric evaluation. I presume that this testing/workup would have to be done at the penitentiary.

Can you provide me with the names and addresses of members of your association who may be qualified for this work so that I can contact them directly? If you are also aware of neuropsychologists in upper East Tennessee or South Eastern Kentucky, I would certainly appreciate that information. I do not know, but is this your specialty; and if so, do you have any interest in this matter?

Thank you.

Stephen J. Kalista, Esq.
P.O. Box 1186
Big Stone Gap VA  24219
276 523 1950

Page 1 of 1

### Steve Kalista

From:      <na7davis@bellsouth.net>
To:        "Stephen J. Kalista" <skalista@mounet.com>
Sent:      Tuesday, January 24, 2006 6:07 PM
Subject:   Re: neuropsychologist

I recommend Dr. Malcolm Spica, 865/588-7598, mspica@ameritech.net. His training and experience
are extensive, and I don't think you can find anyone better qualified.
Nancy Davis
>
> From: "Stephen J. Kalista" <skalista@mounet.com>
> Date: 2006/01/24 Tue PM 04:07:36 EST
> To: <na7davis@bellsouth.net>
> Subject: neuropsychologist
>
> Dr. Nancy Davis,
>
>
>
>        I understand that you are the President of the Knoxville Area
> Psychological Association. I obtained your email address from the
> TPAonline.org site.
>
>
>
>        I am an attorney in Big Stone Gap VA who is representing a
> federal inmate in a capital case. The inmate will shortly be held at the
> Lee United States Penitentiary in Jonesville VA. My co-counsel and I are
> interested in hiring a neuropsychologist to administer tests to our client
> to determine the possibility of organic brain damage and to perform a
> routine psychological work up prior to a psychiatric examination. We are
> close to Upper East Tennessee and the Tri-Cities region. Can you provide me
> with names of qualified neuropsychologists whom I might contact about this
> matter? I thank you very much for your assistance.
>
>
>
> Stephen J. Kalista, Esq.
>
> P.O. Box 1186
>
> Big Stone Gap VA  24219
>
> 276 523 1950
>
>
>
>
>

KS-1243

1/25/2006

JA01476

GOVERNMENT EXHIBIT 2

JA 1477

USCA4 Appeal: 16-1    Doc: 32-3    Filed: 12/27/2016    Pg: 284 of 300
Case 1:06-cr-00001-JPJ   Document 791-2   Filed 06/11/13   Page 2 of 4   Pageid#: 7496

Page 1 of 5

## Steve Kalista

| | |
|---|---|
| From: | "skalista" <skalista@mounet.com> |
| To: | "Swerdlow, Russell H. *HS" <RHS7E@hscmail.mcc.virginia.edu>; "Stephen J. Kalista" <skalista@mounet.com>; <hselvog@ncianet.org> |
| Sent: | Tuesday, December 12, 2006 7:56 PM |
| Subject: | RE: mri and eeg--Carlos David Caro |

I don't know. I presume that you need the eeg tracings? sent
to you rather than what was sent?  I will call them tomorrow
but tell me what to ask for.
Steve Kalista

----- Original Message Follows -----
From: "Swerdlow, Russell H. *HS"
<RHS7E@hscmail.mcc.virginia.edu>
To: "Stephen J. Kalista" <skalista@mounet.com>,
<hselvog@ncianet.org>
Subject: RE: mri and eeg--Carlos David Caro
Date: Tue, 12 Dec 2006 17:54:48 -0500


> Hi Steve and Hans,
>
> 1.  Still awaiting the MRI report.  I imagine it will come
> soon. 2.  The EEG report was received as a fax.  It was
> one page.  It was handwritten.  It said:  "Abnormal EEG
> with left frontal and right temporoparietal region".  This
> is a worthless report. (I mean that literally - it is
> impossible to conclude ANYTHING from it, aside from the
> conclusion that the person reading the EEG has not been
> trained to read EEGs).  Is there a part of the EEG report
> I am missing?
>
> Russ
>
> -----Original Message-----
> From: Stephen J. Kalista [mailto:skalista@mounet.com]
> Sent: Tuesday, December 12, 2006 2:37 PM
> To: Swerdlow, Russell H. *HS
> Cc: 'Hans Selvog'; 'Jim Simmons'
> Subject: RE: mri and eeg--Carlos David Caro
>
>
>
> Dr. Swerdlow,
>
>         I spoke with the hospital again.  They said
> their record show that the MRI was mailed to you on
> December 4 from Radiology.
>
>         Respiratory said that they would fax the eeg

KS-805

USCA4 Appeal: 16-1    Doc: 32-3    Filed: 12/27/2016    Pg: 285 of 300
Case 1:06-cr-00001-JPJ   Document 791-2   Filed 06/11/13   Page 3 of 4   Pageid#: 7497

Page 1 of 2

## Steve Kalista

**From:**  "Swerdlow, Russell H. *HS" <RHS7E@hscmail.mcc.virginia.edu>
**To:**  "Stephen J. Kalista" <skalista@mounet.com>
**Sent:**  Thursday, December 14, 2006 4:29 PM
**Subject:**  RE: mri and eeg

Hi Steve,

I usually figure on 3-4 days to get to UVA, and then up to a week to get through the UVA system. The MRI report didn't come today either. It might be worthwhile to have the report faxed to me, or emailed to me. Better yet, the MRI itself is probably on a disk somewhere, and maybe could be mailed to me. If the quality of the MRI report is equal to that of the EEG report, I may end up having to look at the actual MRI.

The hospital did fax the EEG. They faxed up all the court order stuff too, so I suspect they pay attention to those things. I looked at the EEG. Here is a more accurate assessment:

1) Most of the tracing is inadequate for interpretation because of poor electrode placement. There is substantial artifact due to poor lead placement/attachment running through the majority of the tracing. Poor A2 lead attachment in particular renders much of the tracing over the right side of the brain uninterpretable. The original report mentioned an abnormality over the "right temporoparietal region", but this is not supported on further review. There is also artifact over the left frontal region due to poor attachment of electrode F7. The original report mentioned an abnormality over the "left frontal region", but this is not supported on further review.

2) Much of the rest of the tracing is confounded by movement artifact.

3) For brief periods of one montage that minimizes the poor A2 lead, the tracing appears essentially normal.

4) Final Interpretation: This is an inadequate study that fails to establish an interictal abnormality suggestive of a focal lesion. Because most of the study is confounded by artifact, it also cannot exclude a focal lesion. The few technically adequate parts of the study do suggest if there is a focal lesion it would be minor in nature. If there is a desire to more reliably assess for focal lesions electrographically, then a repeat study is recommended.

My personal recommendation would be not to bother with a repeat study, unless perhaps the MRI shows focal abnormality. If it is redone, it would probably be best to ensure an adequate study is done, and the best way to do this would be to have it done either at UVA or MCV.

Russ

 ------Original Message------
 **From:** Stephen J. Kalista [mailto:skalista@mounet.com]
 **Sent:** Thursday, December 14, 2006 10:31 AM
 **To:** Swerdlow, Russell H. *HS
 **Cc:** 'Jim Simmons'
 **Subject:** RE: mri and eeg

 Dr. Swerdlow,
  When you say that the mail is slow at UVA, and given that the hospital says they mailed the mri on December 4, even with slow mail, should you have received the mri by now?
  I presume that the hospital has not faxed the eeg either?
  My idea is, if you have not received anything today, to personally go down to the hospital tomorrow and try to stir things up.
  What is the usual and customary way that a hospital would transmit this data to you for review?

 Steve Kalista
 ------Original Message------

KS-801

12/15/2006    JA1479

USCA4 Appeal: 16-1    Doc: 32-3    Filed: 12/27/2016    Pg: 286 of 300
Case 1:06-cr-00001-JPJ   Document 791-2   Filed 06/11/13   Page 4 of 4   Pageid#: 7498

Page 1 of 2

## Stephen J. Kalista

**From:** Swerdlow, Russell H. *HS [RHS7E@hscmail.mcc.virginia.edu]
**Sent:** Wednesday, December 20, 2006 1:57 PM
**To:** Stephen J. Kalista
**Subject:** RE: eeg tracings--Carlos David Caro

Hi Steve,

I received the MRI and reviewed it. It's certainly a good quality study. By my reading it is normal.

I don't have the outside reading. Have you seen it? If it was also read as normal by the radiologist, then we'll have two independent readings. If they called an abnormality, then I can go back and look specifically at what they're calling abnormal. That way I can comment specifically on any divergence between my impression and their impression. I'm saying this partly because there was a huge divergence between my analysis of the EEG and the outside reading.

Yours,
Russ Swerdlow

-----Original Message-----
**From:** Stephen J. Kalista [mailto:skalista@mounet.com]
**Sent:** Tuesday, December 19, 2006 10:59 AM
**To:** Swerdlow, Russell H. *HS
**Cc:** 'Hans Selvog'
**Subject:** RE: eeg tracings--Carlos David Caro

I think I can now assure you that you should receive via FedEx tomorrow morning the mri scans from Lee Regional Medical Center regarding Carlos David Caro. I was just down there and it should be taken care of. Let me know when you receive it. Thanks.

Steve Kalista

-----Original Message-----
**From:** Swerdlow, Russell H. *HS [mailto:RHS7E@hscmail.mcc.virginia.edu]
**Sent:** Monday, December 18, 2006 2:31 PM
**To:** Stephen J. Kalista
**Subject:** RE: eeg tracings--Carlos David Caro

Steve,

1)    I did (sent regular mail on friday)
2)    Russell Swerdlow, MD
      Room 2001, McKim Hall
      University of Virginia Health System
      1 Hospital Drive
      Charlottesville, Virginia 22908
      Phone: 434-924-5785

Russ

-----Original Message-----
**From:** Stephen J. Kalista [mailto:skalista@mounet.com]
**Sent:** Monday, December 18, 2006 1:30 PM

12/21/2006

KS-802

JA 1480

GOVERNMENT EXHIBIT 3

JA 1481

## Hans Selvog

| | |
|---|---|
| **From:** | Malcolm Spica [mspica@ameritech.net] | **Sent:** Tue 6/20/2006 6:28 PM |
| **To:** | Stephen J. Kalista; Hans Selvog; apeye@earthlink.net | |
| **Cc:** | 'Jim Simmons' | |
| **Subject:** | RE: caro | |
| **Attachments:** | | |

Dear Mr. Kalista and Mr. Simmons:

I had an opportunity to examine Mr. C again on 6/16/06; my previous contact with him was on 6/9/06. I wanted to share the main findings with you:

Mr. C demonstrates converging although somewhat inconsistent signs of frontal lobe dysfunction. He performed as low as the 1st percentile on tasks requiring:

Management of information

Maintaining cognitive set

Concept formation

His difficulty with managing information causes him to mistake actual information to which he has been exposed and plausible alternatives. This deficit is likely impairing in C's daily life, as it makes him highly suggestible, believing that information presented to him is familiar. He likely has difficulty discriminating between actual facts and information that is close but distorted.

His problems with maintaining cognitive set limit his ability to learn from his mistakes (gaining from experience). Mr. C appears to easily lose track of what he's doing and misunderstand why is a behavior results in a certain outcome. For example, while attempting a task requiring him to sort cards according to an over arching rule, he repeatedly lost track of the rule (e.g., sorting by color) and was puzzled by the feedback that he was getting items wrong.

Persons with frontal lobe dysfunction tend to respond impulsivity, without planning, and without proper consideration of competing information. Mr. C's difficulty with concept formation (1st percentile) results in poor understanding cause-and-effect relationships.

Each of the above three neurocognitive activities fall under the general domain of Executive Control. Executive control has been found to be mediated by the cerebral frontal lobes throughout neuropsychological scientific literature. From my understanding of Mr. C's history, his frontal lobe dysfunction is likely life-long in nature; he reportedly demonstrated failure to thrive as an infant, and developmental milestone difficulties (e.g., speech fluency and motor programming such as tying his shoes), and he has had no clear cerebral insults later in life (e.g., no major head injuries).

# GOVERNMENT EXHIBIT 4

JA 1483

# MEMORANDUM

To:        Jim Simmons, Steve Kalista, and Danny Mullikin

From:      Hans Selvog

Date:      June 13, 2006

RE:        **Potential Caro Witnesses and other issues**

Below please find the contact information regarding several family members that Jim and
Steve want to interview in Texas.  As best I could, I've listed the witnesses to correspond
with the proposed itinerary:



- Melissa Caro
- Susanna Rodriguez
- Diamantina Razo
- Roy          (Rolando)
- Veronica Caro
- Delia Contreras
- Rosa Munoz
- Eva Rodriquez (Rosendo's ex-wife and close friend to Virginia Caro)
- Yomeida Martinez,
- Sylvia Hernandez,
- Edna Balderias

DM-1572

JA 1484

2

- Abran Caro and Margo Cassanova. ▇▇▇▇▇▇

- Michael Guerra, esquire. ▇▇▇▇▇▇
- Danny Rodriguez ▇▇▇▇▇▇

- Felipe Rodriguez ▇▇▇▇▇▇

This completes the list of persons that Danny and I interviewed and recommend them as witnesses and whom you want to interview. Next, I am supplying a list of other potential witnesses that we were unable to interview. If you had time, you might want to try to meet with them.

- Guadelupe Guzman ▇▇▇▇▇▇

- Adela Quintanilla ▇▇▇▇▇▇

- Maclovio Lara ▇▇▇▇▇▇ and Guadelupe Almendarez, ▇▇▇▇▇▇

- The Falfurrias library has on microfilm issues of local newspaper (Fal Facts) that would have story on Virginia Caro's death and house fire and obituary.
- Maria Lopez ▇▇▇▇▇▇

- Coastal Plains MH/MR ▇▇▇▇▇▇

- Lowell E. Wilder, M.D. ▇▇▇▇▇▇

- Melissa Munoz and Norma Villa ▇▇▇▇▇▇

- Laura Perez ▇▇▇▇▇▇

- Rosa Maria ▇▇▇▇▇▇

- Substance abuse treatment records for Carlos from Tropical Texas Center (MH/MR) in Edinburg from 1987.
- Edna Gonzalez ▇▇▇▇▇▇

DM-1573

JA 1485

3



- Mr. Arredondo █████████████████████████████
  ████████████████████████████████████████
  ██████████████████████████████████
- Juanita Ayers █████████████████████████████
  ██████████████████████████
- Coach Mora at the Boys & Girls Club. ████████████████
  ██████████████████████████████
- Balde ████████████████████████████████
  █████████████████████████████

Finally, I want to list some random thoughts I've had about the case and other issues that might need to be explored. Thanks for your indulgence as you read through this:

- Need to develop the neighborhood/community/poverty/economic hardship/community toxins (i.e., pesticides) and impact on Caro. Do we hire an expert to do this?
- Need neonatologist to help us figure out Caro's diagnosis regarding post-natal Failure to Thrive problem (i.e., sensory disintegration), anecdotally reported to us by the family and then maybe other experts (occupational therapist or Child Psychiatrist) to address the effect on development regarding his muteness, isolation, almost autistic-like persona and behavior throughout childhood.
- Based on the two items above (and perhaps other reasons), we need to think strategically about getting a continuance to fully develop these issues, especially in light of Spica's preliminary impression that Caro has frontal lobe damage and may need further laboratory testing to investigate the extent of brain damage.
- If continuance is granted, we need to increase family contact and get face-to-face contact set up with as many family members as possible; this allows us to show rehabilitation of Caro in progress.
- We still need a gang expert to explain why Carlos acclimated to the gang; maybe an issue of duress and self-protection and why was he unable to acclimate to community/family life. New study on Commission on Prison Safety shows violence in prison due to overcrowding, lack of family contact, idleness, and lack of meaningful programming.
- Do we need to alert our witnesses that the government may try to contact them and interview them?
- Do we need an interpreter in Falfurrias to help with interviews like Eva Rodriguez who may be able to tell us more if she could express herself in Spanish?
- Regarding Carlos special education records. My gut tells me the director did not actually look for the records and they still may exist. We need to identify and locate the special education diagnostician that worked when Caro was in school and locate the special education resource teacher at that time. We need to try to go around current director and get someone else from that office to look for the records. Maybe the current diagnostician would be able to help us if we befriend her and explain our situation and how critical it is to find these records.
- We may need a psychopharmacologist expert to analyze the substance abuse history of this family and the heredity and genetic impact on Caro.

JA 1486

4

DM-1575

- Do we have Caro's complete BOP file and institutional records regarding all of his incarcerations, including state, county jail, etc?
- We need to locate and interview Caro's prior co-defendants, girlfriends, friends, peers, and associates, for their recollections of Caro's behavior.
- Should we get an affidavit from Danny Rodriguez since he is in dialysis three times a week and just had a mild stroke and might die soon?

In summary, we have a lot of open areas to investigate and no time. Can we push for a continuance and what would it take to make the case? I am suggesting at least hiring several more experts that we could not have anticipated in the beginning: psychopharmacologist (substance abuse expert); neonatologist (post-birth issue); child psychiatrist (shut-down, autistic-like behavior throughout childhood); neighborhood effects expert; and gang expert.

**End of Memorandum**

JA 1487

GOVERNMENT EXHIBIT 5

JA 1488

## Steve Kalista

| | |
|---|---|
| From: | ███████ < ███████ |
| To: | '"Stephen J. Kalista'" <skalista@mounet.com>; '"Jim Simmons'" <jas52@earthlink.net>; '"Hans Selvog'" <hselvog@nclanet.org> |
| Cc: | < ███████ |
| Sent: | Monday, September 25, 2006 4:57 PM |
| Subject: | Caro experts: T.M. Phillips, MD, PhD, FAPA and Paul Montalbano, PhD |

I've not heard of Montalbano.

Robert Phillips, however, is known as a bright, smooth, psychiatrist who started out in capital cases on the defense side (John Blume and Steve Bright used him a number of times) but has since switched sides to become a very capable government witness.  He's African-American, which makes him especially sought-after by prosecutors in interracial cases.

Phillips was a gov't expert in the EDVA MS - 13 case (against Nina Ginsburg's client) and was apparently a good witness attacking an MR claim.

---

From: Stephen J. Kalista [mailto:skalista@mounet.com]
Sent: Monday, September 25, 2006 11:18 AM
To: ███████████
Cc: 'Jim Simmons'; 'Hans Selvog'
Subject: Robert T.M. Phillips, MD, PhD, FAPA and Paul Montalbano, PhD

We have just been informed that the above are the government's experts doing a 12.2.(c)(1)(B) exam on our client.  Phillips is apparently from the Annapolis Md area, not sure about Montalbano.  Any info at all would be greatly appreciated.   United States v. Caro, 1:06cr0001, USDC WD VA  at Abingdon.

Reply to

Stephen J. Kalista, Esq.
276 523 1950

Jim Simmons, Esq.
615 329 9122

GOVERNMENT EXHIBIT 6

JA 1490

*Privileged and Confidential* ————————————————————————— 1
*Attorney/Client Work Product*
*Do Not Distribute Without Permission of Stephen Kalista and James Simmons, Esquires*

## MEMORANDUM

To:        Danny Mullikin, Steve Kalista, Jim Simmons

From:      Hans Selvog

Date:      May 15, 2006

RE:        **Carlos Caro**
           **Witnesses/Records by Location**



Chicago Illinois
- Rosa Garza (Carlos' maternal aunt) lives in Chicago, Illinois, ▮▮▮▮▮
- Marguerita Silguero (Carlos' maternal aunt) lives in Chicago, Illinois. (Temporarily living with Rosa Garza, her sister.) She has several children: Joe, Anni, another daughter, and another son who is a school teacher in Kingsville, TX.



HS-189

JA 1491

USCA4 Appeal: 16-1    Doc: 32-3    Filed: 12/27/2016    Pg: 298 of 300

Case 1:06-cr-00001-JPJ   Document 791-6   Filed 06/11/13   Page 3 of 6   Pageid#: 7510

*Privileged and Confidential*
*Attorney/Client Work Product*
  *Do Not Distribute Without Permission of Stephen Kalista and James Simmons, Esquires*

2



HS-190

JA 1492

*Privileged and Confidential*
*Attorney/Client Work Product*
*Do Not Distribute Without Permission of Stephen Kalista and James Simmons, Esquires*

3



*Privileged and Confidential*

HS-191

JA 1493

*Privileged and Confidential*
*Attorney/Client Work Product*
*Do Not Distribute Without Permission of Stephen Kalista and James Simmons, Esquires*

4



HS-192

JA 1494