*Privileged and Confidential*
*Attorney/Client Work Product*
   *Do Not Distribute Without Permission of Stephen Kalista and James Simmons, Esquires*

5



JA 1495

GOVERNMENT EXHIBIT 7

*Privileged and Confidential*
*Attorney/Client Work Product*
*Do Not Distribute Without Permission of Stephen Kalista and James Simmons, Esquires*

1

## Time-Line Narrative
## Chronological Critical Incidents and Developmental History of
## Carlos Caro

### Birth to Age 2

Carlos David Caro was born on February 9, 1967, at Brooks County Hospital in Falfurrias, Texas (birth weight: 9 lbs., 6 oz.). From birth to age two, family members reported that Carlos was unable to keep down food and vomited frequently. As a result, infant Carlos was unable to gain weight and was a listless, motionless baby. Family members reported the following:

- A paternal aunt recalled that when Virginia Caro (Carlos' mother) was pregnant with Carlos she was very ill. When Carlos was born, he was very sick too. Carlos, as an infant, was very sickly and really skinny. She remembered that Virginia was bedridden during this time. Carlos vomited a lot. Carlos was eventually only able to keep down goat's milk and then began to gain weight.

- Although other paternal aunts did not recall whether Virginia Caro had problems while pregnant with Carlos, they did remember that once Carlos was born he was very sickly and might have had problems with his stomach. They noted that back then they did not go to the doctors much for medical assistance. Carlos could not keep down regular milk and became very skinny as an infant. In addition, he was not like other babies because he was not very active and kept very still as a baby. Carlos' problem with not taking milk and being very skinny and sickly was a long-term problem that went on for two years.

- Carlos' brother, Noe Caro, was told by his mother that Carlos was sick when he was born. He could not gain weight and was real skinny. His mother thought he might have worms in his stomach. His mother had to make him special milk that he could keep down and begin to gain weight. Throughout his childhood, Carlos was very thin.

- Another paternal aunt stated that, after Carlos was born, he was a very sickly child. The family thought he might have a stomach virus and was allergic to

HS-1536

JA 1497

*Privileged and Confidential*
*Attorney/Client Work Product*
     *Do Not Distribute Without Permission of Stephen Kalista and James Simmons, Esquires*

2

formula. Carlos as a baby was unable to hold down milk. Susanna recalled that Carlos was eventually prescribed goat's milk, a powdered form that could be purchased at the local drugstore. However, Carlos was always very weak, and it took him a long time, one-and-a-half to two years, before he was able to start walking. Before he was able to walk, he crawled very little. She remembered that when Carlos was set down as a baby, he would stay where he was placed and not move.

- A maternal uncle remembered that Carlos was a sickly child, physically. He was throwing up or had diarrhea when he was young.

## Childhood and Teenage Years

Since birth and throughout his childhood, adolescence and adult years, Carlos was described by family members as unconnected to others, withdrawn, preoccupied, and in his own world. Various family members reported the following:

- A maternal first cousin described Carlos as very quiet, someone you could never get a word out of, reserved, and someone who kept to himself. His cousin said that she had to ask Carlos a question in order to get information from him. Carlos did not volunteer information.

- A maternal uncle said that he noticed something was wrong with Carlos. He seemed slow. At times he stared into space. Other times, when the uncle tried to talk to him, Carlos would not answer. It was as if he was thinking really hard about something. He was unresponsive when spoken too for an extended period of time without apparent comprehension of what was said to him. The uncle said that after noticing these things he felt that something was wrong with Carlos. The uncle observed that Carlos stayed to himself and avoided groups.

- Paternal aunts said that Carlos usually stayed at home and watched television all day, while his brothers, Joe and Noe, were running around the neighborhood. An aunt stated that she expected Joe and Noe to end up in trouble with the law but never Carlos. Another stated that her brother, Carlos' father, also had a reputation

JA 1498

*Privileged and Confidential*
*Attorney/Client Work Product*
*Do Not Distribute Without Permission of Stephen Kalista and James Simmons, Esquires*

3

for being a womanizer and a tough guy. Jose Maria Caro Jr.'s oldest son, Jose Maria Caro III, was very much like his father. In contrast, Carlos was very different from his father and older brother. Carlos was no trouble to anyone. Carlos was very quiet and never talked to anybody.

- Paternal aunts said that, as a baby, toddler and young child, Carlos continued to be inactive and non-interactive with others. He just sat in one place for a long time as if he was in his own little world, and he was very shy and kept to himself all the time. He was a slow child. For instance, he was unable to tie his shoe even after he had already entered school. He was slow, quiet and sat with his head down.

- A maternal uncle recalled that, regarding his nephew Carlos, he remembers very little because, of all his sister's children, he was the quiet one and was never in trouble or was fighting, like the other brothers were. He was a shy child.

- Jose Maria Caro III described his brother Carlos as real quiet. Carlos was known around the neighborhood as "El Mudo," the deaf one. He was called this because he never talked to anyone and kept to himself. Carlos never or rarely talked to his brothers. Carlos, unlike his brothers Jose Maria Caro III and Noe, never got into fights.

- A paternal aunt said that Carlos was the better child of her sister-in-law's [Virginia Caro's] four boys. Carlos was quiet, to himself, never a troublemaker, shy, and did not even have a mean streak. The aunt and her family were surprised to hear about Carlos' current case. Regarding Carlos, the aunt said that his brothers, Joe and Noe, felt sorry for him. He was a quiet child and was like a piece of furniture; the family treated him as if he was not even there. The aunt recalled seeing Carlos when he was out of prison the last time over the Thanksgiving holiday. Carlos had come to the aunt's parents' home. Carlos had already arrived when the aunt came into the home. She recalled that Carlos was sitting on the couch by himself. Carlos did not notice her come in. The aunt stated that it was as if it took awhile for Carlos to come out of a trance in order for him to notice and recognize her.

JA 1499

*Privileged and Confidential*
*Attorney/Client Work Product*
*Do Not Distribute Without Permission of Stephen Kalista and James Simmons, Esquires*

4

- Noe Caro stated that his brother Carlos was different than him and their brother Joe. He was not a troublemaker and did not fight or steal or use drugs and alcohol. Noe Caro said people called Carlos "El Mudo" [the mute] because he rarely spoke. Noe Caro stated that Carlos was not violent and helped his mother more than Noe and Joe did. Noe Caro said that his brother, Carlos, in contrast to Noe and Joe, was not involved in fights in the neighborhood; he was not violent; he was quiet; and people called him "El Mudo" because he rarely talked. At times, Carlos did not even respond when spoken to. Carlos was in his own little world and stared off into space; he kept to himself and stayed alone, even while sitting in hang-out spots in the neighborhood he would be by himself. Noe Caro said that Carlos liked to be alone and by himself. He stayed in his room to be alone and even in the neighborhood he preferred to be by himself when out in the community. Noe Caro remembered seeing his brother Carlos late at night sitting alone under a tree, a place considered a hang-out spot in the neighborhood, but Carlos would be alone. Carlos stayed to himself.

- Another paternal aunt stated that, except for Carlos, her nephews [Carlos' brothers] were troublemakers. Carlos was always the sweetest boy and respectful. He did not cuss around her. He was never violent. He was not involved in drugs until he got involved with his uncles on his mother's side of the family. The aunt thought it was strange that Carlos, in the fifth or sixth grade, was unable to tie his shoes or tell time. She had to help him tie his shoes. In addition, she noticed that Carlos' speech developed more slowly than normal, and he spent his time by himself. The aunt said that Carlos would just sit in the same place for hours. She always thought that the other boys [Carlos' brothers] were troublemakers and that Carlos just did not want any part of it. Carlos took a longer time than normal to potty train. The aunt remembered when her brother [Carlos' father] died in 1984. She, Carlos, and a few other relatives were in the hospital room when her brother took his last breath. The aunt said that Carlos would not leave his father's side. Carlos did not cry nor show any real emotion, saying nothing. The aunt said that Carlos was never in trouble and, as a result, did not get as much attention as his

JA 1500

*Privileged and Confidential*
*Attorney/Client Work Product*
*Do Not Distribute Without Permission of Stephen Kalista and James Simmons, Esquires*

5.

brothers. The aunt stated that she and her family thought he was all right because he was quiet and well-behaved. In contrast, Carlos' brothers, Joe and Noe, were always in trouble and, consequently, received most of the attention. In addition, the aunt said that on a daily basis, Carlos, his mother, and brothers were more involved with Virginia's side of the family.

## Traumatic Childhood Environment

Carlos Caro's post-natal, preschool, and school years environment was marked with paternal substance abuse, domestic violence, marital infidelity, and criminal behavior and, as a consequence, poverty and neglect. Family members reported the following:

- Abran, Carlos Caro's youngest brother, stated that his father left for work at 6 a.m. and returned home around 5/6 p.m. He drank beers after work, four to five jumbo Schlitz beers. His father drank on the weekends and received several DUIs.

- A maternal first cousin remembered that her maternal aunt Virginia Caro was physically abused by her husband, Jose Maria Caro Jr. The cousin recalled seeing the bruises on Virginia's face as a result of her husband's violence. The aunt' mother, Virginia Caro's sister, advised Virginia not to put up with her husband's assaultive behavior. The cousin stated that when Carlos and his brothers were children they witnessed their father abuse their mother. They also saw their father abuse alcohol. When Virginia was abused, she took the children and left the home.

- A maternal uncle recalled that Carlos' father, Jose Maria Caro Jr., was often physically abusive to his wife, Virginia. When she was beaten by her husband, Virginia left the home with the children and brought them to her parents' home. The uncle said that Carlos' father, whom they called Chemo, abused alcohol, smoked pot, and used whatever other drugs were available.

- A paternal aunt stated that her father, Jose Maria Caro Sr., did not have a drinking problem. However, her brother, Jose Maria Caro Jr., did have a drinking

JA 1501

*Privileged and Confidential*
*Attorney/Client Work Product*
*Do Not Distribute Without Permission of Stephen Kalista and James Simmons, Esquires*

6

problem. The aunt also recalled that her brother [Carlos' father] went to prison but she does not remember when. The aunt said that her brother [Carlos' father] often did some bad things but was not always arrested because the police knew who he was and they would just bring him home. For example, the aunt remembered that her brother once stole their father's car. The aunt recalled when her brother and sister-in-law, Virginia, separated. Some paternal aunts [Delia and Veronica] recalled that Virginia Caro seemed to always be at her mother's house, leaving the boys [Carlos and his brothers] home to fend for themselves, almost daily. The aunts said that as soon as her husband left for work, Virginia would leave the home to visit her mother, leaving the boys at home alone. The aunts said that Carlos usually stayed at home and watched television all day, while his brothers, Joe and Noe, were running around the neighborhood.

- Other paternal aunts stated that their brother, Jose Maria Caro Jr., started drinking as a teenager. He was an alcoholic. He got violent after drinking. When he drank, he quickly behaved tough and aggressively. For example, when drinking he got into fights at dances and drove his car recklessly. When drinking, Jose Jr. and Virginia were different. Jose Jr. went out drinking and Virginia went out dancing, leaving the boys home unsupervised and allowed to do anything and go anywhere they felt like. An aunt emphasized that both of Carlos' parents left the children home alone. Carlos' paternal grandmother, Mathilde, noticed this and repeated an old Mexican saying, "Son como el sol y el viento," which meant like the sun and the wind. This saying referred to Carlos and his brothers being left to raise themselves, to look after themselves, like the sun and the wind. The aunts also recalled that when Virginia became angry at her husband, which happened often because of his drinking and abusive behavior, she transferred this anger to Mathilde and the rest of the Caro family. For example, Virginia ceased contact with the Caro relatives and kept her boys from having any contact with the Caro side of the family for weeks at a time. The aunts also remembered instances when their brother, Jose Maria Caro Jr., heard that Virginia was out dancing somewhere and then he would go to the dance and pick fights with other men.

JA 1502

*Privileged and Confidential*
*Attorney/Client Work Product*
   *Do Not Distribute Without Permission of Stephen Kalista and James Simmons, Esquires*

      7

- A maternal aunt remembered that Virginia's husband, Jose Maria Caro Jr., was an alcoholic and had extra-marital affairs. One of the women, whom Jose Maria Caro Jr. was involved in an extra-marital relationship, harassed Virginia. For example, the aunt recalled when this woman put gasoline around Virginia's residence at ▮▮▮▮▮▮. However, the woman was stopped in time before she could light the gasoline. The aunt said they referred to this woman as the one who bounced around. The aunt stated that, when Jose Maria Caro Jr. beat Virginia, she would come and stay with her for a few days.

- A maternal uncle recalled his brother-in-law, Carlos' father, Jose Maria Caro Jr. Mr. Caro Jr. was a heavy drinker, abusing beer and whiskey, and he abused marijuana. He was constantly getting drunk several times a week. Mr. Caro Jr. was an abusive husband, beating his wife and other women and beating his children. The uncle said he was close to his sister, Virginia. The uncle disliked Mr. Caro Jr. and avoided him. The uncle recalled when Mr. Caro Jr. was shot in the chest by a woman with whom he was having an affair. At the time, the uncle was in his 20s. It happened at a party in a park. The uncle was there but left to buy beer. When he returned, the woman had already shot his brother-in-law. Mr. Caro Jr. was hospitalized. The uncle stated that Carlos and his brothers probably saw their father beat their mother because they lived in a small, two-room house on Palo Blanco. The uncle said that he once saw his sister, Virginia, with two black eyes. He confronted his brother-in-law, Mr. Caro Jr., and told him to quit doing that to her. But Virginia kept returning to him and the children continued to see the violence.

- Jose Maria Caro III, Carlos' older brother, recalled living at ▮▮▮▮▮▮ during preschool. The front door entered into the main living area that also served as his parents' bedroom. Behind the main room was a small kitchen and, adjacent to the kitchen, a small back bedroom where all four boys slept in the same bed. Jose Maria Caro III said that his father beat him for misbehaving with belts or tree limbs, hitting him hard across the back and arms, which left welts. His father always struck him more than he did the other boys. Jose Maria Caro III

    JA 1503

*Privileged and Confidential*
*Attorney/Client Work Product*
*Do Not Distribute Without Permission of Stephen Kalista and James Simmons, Esquires*

8

said that his paternal grandparents tried to tell his father his violence against him did not work to change his fighting, stealing, and drinking behavior, but only made Jose's behavior worse. His father did not listen to them and continued to beat Jose Maria Caro III. His father abused alcohol daily. Jose Maria Caro III remembered that, when he was very young, his father returned home from work and picked him, his younger brothers, and mother up in a truck. They stopped to buy beer for his father to drink. Then they drove the back roads into the country where his father killed rabbits and pigeons with his shotgun. His father also beat his mother, said Jose Maria Caro III, slapping her around in front of Jose and his brothers usually after his father had been drinking. His father's alcoholism and co-occurring violence resulted in his parents' separation on several occasions. The worst beating his mother received from his father happened during a period of separation. His mother had gone to a dance at a wedding and had taken Jose, Carlos, and Noe with her. Jose Maria Caro III said his father showed up drunk at the dance and grabbed his mother and the boys out of the dance and into his car. As his father drove home, he slapped his wife repeatedly while the boys in the back seat cried and screamed, telling their father to stop. When they arrived home, his father continued to beat their mother. The next day, the violence was ignored; no one spoke of it. Jose Maria Caro III recalled that his father, throughout his marriage, had an affair with another woman, whom they called "Gavi." She was a regular customer at a local beer joint known as La Soña where his father was also a regular customer. Jose Maria Caro III was told that the woman's son is possibly his half brother. In addition, Jose Maria Caro III recalled that this woman shot his father with a .22 caliber rifle after he slapped her. His father was shot in the chest near his heart. Jose Maria Caro III said he was a teenager when this occurred.

- A paternal aunt stated that, since her brother, Jose Maria Caro Jr., was an alcoholic, this caused him to constantly fight with his wife. After her brother separated from his wife, Jose Maria Caro Jr. returned to live with the aunt and their parents. The aunt recalled that her brother moved back into their parents'

JA 1504

*Privileged and Confidential*
*Attorney/Client Work Product*
   *Do Not Distribute Without Permission of Stephen Kalista and James Simmons, Esquires*

9

home when she was in the 7th or 8th grade. The aunt graduated from high school in 1987 and lived with her parents until she was 17 years old. The aunt said that her brother, Jose Maria Caro Jr., beat Virginia because she was never home. He would come home at the end of the day and find the kids at home alone and no supper prepared. This made Jose Maria Caro Jr. angry and they would fight. The aunt stated that Virginia was usually at her mother's house. The aunt stated that her brother, Jose Maria Caro Jr., went to prison when she was very young. She remembered her parents talk about it. The aunt stated that, after Jose Maria Caro Jr. and Virginia divorced, her brother stopped working. He was drinking heavily and was fired. The aunt said he lost his job because of his substance abuse, and the aunt was 11 or 12 years old at the time.

- Noe Caro, Carlo's younger brother, recalled living a low-income neighborhood in Falfurrias, Texas, called "Mexicito" [Little Mexico]. During his preschool and early school years, until age 10 or 11, he lived with his parents and brothers at ▆▆ ▆▆▆▆▆▆ The house was small and had two rooms and a small kitchen. Behind the house was an outhouse. The children bathed in a washtub in the kitchen. At age 10 or 11, they moved to another house in the same neighborhood on Oleander after his parents' separated. Noe Caro said that his father worked but had a serious drinking problem. His father and mother fought frequently as result of his father's alcohol problem. His father would come home drunk and beat his mother. This happened at least once a week on his father's payday. Although his father abused alcohol daily, weekly he spent his paycheck on alcohol rather than on household needs. This resulted in his father becoming severely intoxicated and his mother angry that he had used his paycheck to become inebriated, which led to a fight between them and to his mother getting beaten. Noe Caro said that his father would eventually lose his temper with his mother when they argued and his father would slap his mother. They argued often. Noe Caro said he remembered seeing his mother with black eyes. They lived in a small house and Noe Caro and his brothers could easily hear the frequent arguing. Noe Caro stated that he and his brothers cried when his parents fought. Sometimes they

JA 1505

*Privileged and Confidential*
*Attorney/Client Work Product*
    *Do Not Distribute Without Permission of Stephen Kalista and James Simmons, Esquires*

10

tried to help their mother and then their father would hit them too. Noe Caro remembered once when his mother struck his father with an object and lacerated his forehead. Noe Caro said the police were called at times to the house because of the commotion. Noe Caro said that his parents did not stop fighting until they separated permanently [separations occurred regularly as a result of his father's violence against his mother], when Noe Caro was in junior high school. Noe Caro stated that, although their father worked for Johnson's Tools, alcohol took him over. Consequently, Noe Caro's father lost the job and separated from his wife. Noe Caro said that he was probably in the ninth grade when his parents separated. Noe Caro stated that his father, after the separation, lived with his parents, Noe Caro's grandparents, Jose Maria Sr. and Mathilde Caro. His grandparents ran a small "Mom & Pop" store. They tried to talk to their son about his drinking problem. Jose Maria Caro Jr.'s drinking also caused them problems. Noe Caro remembered that his oldest brother, Jose "Joe" Maria Caro III, was already imprisoned by this time. His brother Joe started doing time at a real young age. Noe Caro said that he and his oldest brother, Joe, were more involved with each other than either of them was with Carlos. Unlike Carlos, Joe and Noe started using drugs at an early age. Noe began using marijuana at age 12 and then used cocaine at age 13. Noe Caro said that his father whipped him and his brother Joe with a horsewhip for getting into trouble, which included stealing at ages 12 and 13. Noe Caro and his brother Joe also liked to fight with other teenagers in the neighborhood. Noe Caro remembered that his brother Joe had fistfights with his father because Joe did not like it when his father beat their mother. Noe Caro said that his father's alcoholism and violence against their mother was known by both sides of the family but it seemed that no one really took an interest in their situation. His paternal grandparents would try to intervene. They advised Noe Caro to stay out of the neighborhood, meaning to not get involved in criminal activities and use of drugs. Noe Caro remembered that, as a result of his father's neglect and his eventual death, they had nothing. At times, their mother brought

JA 1506

*Privileged and Confidential*
*Attorney/Client Work Product*
   *Do Not Distribute Without Permission of Stephen Kalista and James Simmons, Esquires*

11

them second-hand clothes. But if they needed something, Noe Caro stated that he and his brothers would have to find a way to get what they needed themselves.

- The woman who had shot and had an affair with Carlos' father stated that she had an ongoing affair with Jose Maria Caro Jr. while he was married to Virginia Rodriguez Caro. She began her affair with Jose Jr. when she was 24 years old, in 1975. Rosa said that one of her sons is Jose Maria Caro Jr.'s son. She did not receive financial support from Jose Maria Caro Jr. because she noted that he would not support his own children so she did not try to force him to support their child. In 1977, she stated that, at age 39, she shot Jose Maria Caro Jr. and was sentenced to a year in prison. She served eight months. Jose Maria Caro Jr. had slapped her around so she shot him. She said that Jose Maria Caro Jr. was a frequent and heavy drinker. She said that he worked, but he squandered his money on drinking. His wife, Virginia, took a lot of abuse from her husband. She recalled that Jose Maria Caro Jr. and Virginia fought a lot. After Jose Maria Caro Jr. died, Virginia was thrust into poverty and went on welfare. In addition, she said that, after Jose Jr. died, Virginia began drinking but just at clubs.

- A paternal aunt stated that, in reference to her brother, Jose Maria Caro Jr., Carlos' father, he regularly had behavior problems, which involved fighting, drinking, drugs, and criminal behavior. Jose Maria Caro Jr. went to prison for burglary before he was married to Virginia but when she was pregnant with their first child, Jose Maria Caro III. The aunt stated that she was close to her brother. He was a womanizer, which caused problems in his marriage. When he and Virginia married, they lived with the aunt's parents. The aunt said that her brother left school in the sixth grade. He was expelled for pushing a teacher and never returned to school. Jose Maria Caro Jr. worked in the fields, just enough to earn money to drink. The aunt stated that their mother tried to talk to him, telling him not to drink, and their father got angry at him for drinking, but he did not change. The aunt recalled that her brother would disappear from their parents' home for a few days and then was returned home by his friends. When he was delivered home, Jose Maria Caro Jr. was drunk. The aunt stated that her brother

JA 1507

*Privileged and Confidential*
*Attorney/Client Work Product*
*Do Not Distribute Without Permission of Stephen Kalista and James Simmons, Esquires*

12

and sister-in-law, Carlos' parents, were not the type of parents to go to school and ask how their children were doing. Additionally, Virginia Caro spoke very little English and was illiterate. The aunt always read to Virginia the letters she received from the school about her boys. Virginia, because she could not read, also requested the aunt's help with paying her bills. As a result, the aunt was personally aware of how they struggled financially. In fact, the aunt remembered that the only time her brother and sister-in-law had come into a lot of money was in 1973 or 1974, as a result of her brother's drug trafficking. The aunt believed that the children were aware that their father was selling drugs because he was not very discreet about it. Jose Maria Caro Jr. kept bundles of cash in the freezer, and the boys knew the money was there and how it was procured. Also, when her brother and sister-in-law had one of their frequent arguments, Virginia, in anger, would call her husband a drug dealer in front of the children. She would also call the police at these times and tell the police that her husband was trafficking drugs. The police would come to the house. Again, the children heard and observed all of this. At times, Jose Maria Caro Jr. was arrested for domestic violence. The aunt witnessed her brother beat Virginia. For example, she recalled an instance when her brother punched Virginia with a closed fist, knocking her to the ground, and then he jumped on top of her and choked her. The aunt tried to stop her brother from choking Virginia but Jose Maria Caro Jr. had his wife pinned to the ground, yelling at the aunt to back off, and at the same time yelling at his wife to shut up. The aunt said that her brother was usually drunk when he beat his wife. The aunt also noted that Virginia provoked her husband's violence by attacking him and throwing objects at him when he returned home after she was told that he had been out with another woman. The aunt stated that Carlos and his brothers saw and heard the violence and threats. At times, when her husband was beating her, Virginia would cry out to her sons to call the police. During most of their threatening arguments with one another, Virginia, at the top of her lungs, cussed at her husband, which was usually followed by Jose Maria Caro Jr. smacking her. The aunt also witnessed her brother physically abuse Joe III and Noe, pummeling

JA 1508

*Privileged and Confidential*
*Attorney/Client Work Product*
*Do Not Distribute Without Permission of Stephen Kalista and James Simmons, Esquires*

13

them with his hands. The aunt stated that her brother worked for Johnson & Tool for three or four years when he was in his early 20s. Throughout his employment with Johnson, he abused alcohol. In the late 60s, the company went bankrupt and closed. After Jose Maria Caro Jr. lost his job, his drinking increased, and he also started using drugs. Jose Maria Caro Jr. worked sporadically. The aunt said that, in her brother and sister-in-law's household, nothing was on a schedule. In December 1973, the aunt said that Jose Maria Caro Jr. was arrested for drug smuggling. He was apprehended with 400 pounds of marijuana and a loaded gun in Freer or San Diego, Texas. He went to trial but did not receive a prison sentence. The aunt recalled the date because it was the same time her older son was born and she had to have surgery as a result. She recalled being upset that her parents did not come to support her through her difficult time and see their new grandson. Instead, her parents chose to attend Jose Maria Caro Jr.'s trial. The aunt remembered that her brother had an ongoing affair with a woman. The aunt stated that most of the fights between her brother and sister-in-law were because of this woman. This woman and Jose Maria Caro Jr. had a child together.

## Special Education Services

Carlos Caro struggled in school and performed inconsistently. In the sixth grade, he was evaluated by special education services and was placed in a resource center one period per day. He received special education resource center services during the sixth (1978/79), seventh (1979/80), and eighth (1980/81) grades. The following school year (1981/82), he entered the ninth grade but dropped out of school that year at age 15 [Brooks County Public School records, Falfurrias, Texas].

Carlos Caro's older brother, Jose "Joe" Maria Caro III, was retained in the seventh grade for three school years in a row (1977/78, 1978/79, 1979/80) and then was promoted to the eighth grade for the 1980/81 school year. He entered a different school district for the ninth grade but dropped out of school and never returned.

*Privileged and Confidential*
*Attorney/Client Work Product*
    *Do Not Distribute Without Permission of Stephen Kalista and James Simmons, Esquires*

14

Carlos Caro's younger brother, Noe Caro, he completed the seventh grade during the 1980/81 school year, did not attend the 1980/82 school year, and then completed the eight grade during the 1983/84 school year. Subsequently, he never returned to school.

Carlos Caro's parents had at best an elementary school education and spoke Spanish predominately. Carlos Caro's mother was reported to be illiterate.

## Environmental Stressors and Corruptive Influences

Carlos Caro's father, Jose Maria Caro Jr., was born on ▮▮▮▮▮▮. On May 20, 1963, before Carlos' birth, his father, at age 19, was found guilty of burglary and sentenced to two years of probation. The following year, on October 28, 1964, Jose Maria Caro Jr. was found guilty of burglary with intent to commit theft and violation of probation. He was sentenced to two years of confinement. At the time of his confinement, Jose Maria Caro Jr.'s wife-to-be, Virginia Rodriguez Caro ▮▮▮▮▮▮▮ was pregnant with their first child, Jose Maria Caro III, Carlos Caro's older brother.

Jose Maria Caro III was born on ▮▮▮▮▮. His father and mother, Jose Jr. and Virginia Caro, married on February 15, 1966. Carlos Caro was born on February 9, 1967, and weighed 9 lbs. and 6 oz. On ▮▮▮▮▮, Noe Caro, Carlos' younger brother, was born.

When Carlos Caro was almost three years old, on February 2, 1970, his father was found guilty of possession of marijuana and sentenced to two years of probation. In the fall of 1972, Carlo Caro entered kindergarten. The next school year, while in the first grade, his father, on October 16, 1973, was found guilty of Driving While Intoxicated [DWI] and sentenced to serve six months of probation. After Carlos completed the first grade, his father, on July 3, 1974, was charged with child non-support. (This charge was dismissed a year-and-a-half later.) During the same summer, his mother, on July 19, 1974, was charged with misdemeanor theft. (The charge was dismissed a year-and-a-half later.)

HS-1549

JA 1510

*Privileged and Confidential*
*Attorney/Client Work Product*
   *Do Not Distribute Without Permission of Stephen Kalista and James Simmons, Esquires*

15

During the second grade, his father, on November 26, 1974, was found guilty of DWI again and was sentenced to one year of probation.

In 1975, Carlos Caro's father, Jose Maria Caro Jr., began an extra-marital affair with woman. On ███████████, Abran Caro, Carlos' youngest brother was born. Several months later, on ███████████, Jose Maria Caro Jr.'s paramour gave birth to their male child. On August 13, 1977, when Carlos was 10 years old and about to enter the fifth grade, his father was shot by the woman with whom he was having an affair because he slapped her. She was sentenced to a year in prison. On November 29, 1977, Jose Maria Caro Jr. was charged with another DWI.

In 1978 in the sixth grade at age 11, Carlos Caro had been evaluated and found to have a learning problem. He was placed in a special education resource center class. The next two years, grades 7 and 8, he also attended the special education resource center. The following school year, 1981/82, in the spring quarter, at age 14/15, Carlos Caro dropped out of the ninth grade. The records indicate that Carlos might have attempted to repeat the ninth grade the following year (1982/83) but left again in the fall. Although his parents have separated temporarily many times as a result of Carlos Caro's father's physical abuse of his mother, alcoholism, and neglect, his parents separated permanently around this period of time. As a result of the permanent separation, Carlos' mother, Virginia Caro, fell into even more severe financial straits as her husband was the sole income provider. Consequently, for nearly two years, Carlos Caro and his mother began to work at Virginia Caro's brother-in-law and sister's ranch, just outside of Falfurrias. Virginia Caro did not drive and her sister's family transported them to the ranch at the end of the Carlos's school day and on the weekends. On most weekends, Carlos stayed overnight at his aunt and uncle's house but was returned to his mother's home on Sunday evening in order to attend school Monday morning. Carlos and Virginia Caro received food and cash payment for their work. Carlos recalled giving most of the money he earned to his mother to support the household.

HS-1550

JA 1511

*Privileged and Confidential*
*Attorney/Client Work Product*
  *Do Not Distribute Without Permission of Stephen Kalista and James Simmons, Esquires*

16

On February 22, 1982, around the time that Carlos Caro dropped out of the ninth grade, Joe Caro, his older brother, was charged with Arson. (The case was eventually dismissed in February 1986.) A year later, on January 29, 1983, Carlos Caro's father was arrested for burglary and sentenced to a period of probation. Six months later, on September 6, 1983, Carlos' father was again arrested for burglary of a building and charged with violation of probation. Jose Maria Caro Jr. pled guilty to a two-to-ten year sentence on September 26, 1983. Approximately three months later, on November 29, 1983, Joe Caro, Carlos Caro's older brother, was charged with DWI and Resisting Arrest and then the next day in court with Failure to Appear. Several months later, on February 21, 1984, Jose Maria Caro Jr., Carlos's father, died. Carlos was 17 years old when his father died.

Around the time of his father's death, Carlos Caro had already dropped out of school and stopped working at his aunt and uncle's ranch. A week after his father's death, Carlos's older brother, Joe Caro, had a charge of Unauthorized Use of a Vehicle dismissed because Joe Caro was imprisoned and serving time on another conviction. In addition, after Carlos' father died, Carlos Caro began spending more time with his maternal uncles, who were involved in drug trafficking. Eventually, Carlos' maternal uncles invited Carlos to work for them by backpacking marijuana across the border from Mexico to the United States in order to earn money.



JA 1512

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION

UNITED STATES OF AMERICA,                  Case Number 1:06CR00001-JPJ

vs.

CARLOS DAVID CARO,                         DEATH-PENALTY CASE

   Defendant/Petitioner.

_____

OPPOSITION TO UNITED STATES' MOTION TO DISMISS IN RESPONSE TO
PETITIONER'S MOTION FOR RELIEF PURSUANT TO TITLE 28,
UNITED STATES CODE, SECTION 2255

_____

JA 1513

**INTRODUCTION** ..................................................................................................1

  A.  Procedural Posture of the Case. ........................................................................ 1

  B.  Legal Standard of Review for Motion to Dismiss. ........................................... 2

  C.  Factual Disputes Noted in the Government's Statement of the Case. ..................... 8

     1.  Mr. Caro Disputes that He Was a Gang Leader. ................................... 8

     2.  Mr. Caro Disputes the Government's Assertions Regarding Mr. Sandoval's Motivation for Seeking Entry into Mr. Caro's Cell. .................................. 9

     3.  Mr. Caro Disputes the Inferences to Be Drawn from the Statements he Made after the Death of Mr. Sandoval. .................................................... 10

     4.  Mr. Caro Disputes the Government's Allegation that Trial Counsel Retained Mental Health Experts "Almost Immediately" After Their Appointment. ..................................................................................... 11

**GROUNDS FOR RELIEF: PRETRIAL** .............................................................11

**CLAIM ONE: MR. CARO HAS SUFFICIENTLY ALLEGED THAT THE GOVERNMENT VIOLATED his FIFTH AMENDMENT DUE-PROCESS RIGHTS BY DELIBERATELY AND TACTICALLY DELAYING THE INDICTMENT OF THE CAPITAL CASE UNTIL AFTER THE GOVERNMENT HAD NEGOTIATED A DISPROPORTIONATE PLEA AGREEMENT IN THE BENAVIDEZ ASSAULT, WHICH IMPAIRED MR. CARO'S CAPITAL DEFENSE.** .....................................................................11

**CLAIM TWO: MR. CARO HAS SUFFICIENTLY ALLEGED THE INEFFECTIVE ASSISTANCE OF COUNSEL AT THE DEATH-CERTIFICATION STAGE OF THE CASE.** ....................................................16

  A.  The Issue is Right to Effective Counsel, Not Right to Death-Certification Hearing. ............................................................................................................ 16

  B.  The Sixth Amendment Right to Counsel Applies at the Death Certifcation Stage. ............................................................................................................... 18

  C.  The Court Will Have to Decide the Appropriate Standard of Care for Defense Counsel in Capital Cases. ................................................................. 20

  D.  Whether Trial Counsel's Performance was a Reasonable Strategy is a Disputed Factual Issue. ................................................................................... 21

  E.  Whether Mr. Caro was Prejudiced by Trial Counsel's Deficient Performance is a Disputed Factual Issue. ......................................................... 22

**GROUNDS FOR RELIEF: GUILT/INNOCENCE PHASE** ...................................23

JA 1514

**CLAIM THREE: MR. CARO HAS SUFFICIENTLY ALLEGED THAT JUROR MISCONDUCT INFRINGED HIS RIGHT TO A FAIR TRIAL. ..............23**

A. Federal Rules of Evidence Do Not Apply to Capital Sentencing Proceedings. ...................................................................................................24

B. The Alleged Recent Statements of the Jurors Directly Conflict With Their Prior Voir Dire Answers, Creating a Disputed Issue of Material Fact. ........................24

C. Mr. Caro has Sufficiently Alleged that the Two Jurors Were Not Impartial and Would Have Been Struck for Cause if They Had Provided Truthful Answers in Voir Dire. ..................................................................................................26

D. The Juror-Misconduct Claims Are Not Procedurally Barred Because the Facts Necessary to Adjudicate the Claims Are Outside the Record and Must be Developed...............................................................................................28

**CLAIM FOUR: MR. CARO HAS SUFFICIENTLY ALLEGED THE inEFFECTIVE ASSISTANCE OF TRIAL COUNSEL DURING THE GUILT/INNOCENCE PHASE BECAUSE COUNSEL FAILED TO ADEQUATELY INVESTIGATE, DEVELOP, AND PRESENT A THEORY WITH SUPPORTING EVIDENCE IN MR. CARO'S DEFENSE. ..........................29**

A. Mr. Caro has Sufficiently Alleged that Trial Counsel Failed to Develop a Cohesive Theory of Defense. .................................................................30

   1. Trial Counsel Could Have Presented a Cohesive and Viable Defense Based on a "Cold Dose of Revenge" Theory. .........................................................31

   2. Trial Counsel's "Breakfast Dispute" Defense Was Unreasonable Because it Was Inconsistent with the Evidence, Failed to Answer Key Questions, and Added Nothing to the Mitigation Phase of Trial. ....................................................34

   3. Mr. Caro's Suggested Defense Is Not a "Fantasy" and the Government's Disagreement with His Allegations Makes Summary Dismissal Improper...............36

B. Mr. Caro has Sufficiently Alleged that Trial Counsel Failed to Adequately Investigate and Impeach the Government's Only Purported Eyewitness, Sean Bullock. ........................................................................................39

C. Mr. Caro has Sufficiently Alleged that Trial Counsel Failed to Adequately Investigate and Present Evidence of the BOP's Negligence Regarding the Decision to Grant Mr. Sandoval's Request to be Placed in Mr. Caro's Cell.................42

D. Mr. Caro has Sufficiently Alleged that Trial Counsel Failed to Adequately Investigate and Present Evidence In Support of Self-Defense, Second-Degree Murder, or Manslaughter..............................................................................44

JA 1515

E.  The Government Ignores the Fact that the Court Must Conduct a Cumulative Review of Allegations of Deficient Performance When Determining Prejudice, Thereby Making Mr. Caro's Claim of Ineffective Assistance of Counsel at the Guilt/Innocence Phase of Trial Improper for Summary Dismissal........ 46

**CLAIM FIVE: MR. CARO HAS SUFFICIENTLY ALLEGED THAT BY WITHHOLDING MATERIAL EXCULPATORY AND IMPEACHMENT EVIDENCE, AND MISLEADING TRIAL COUNSEL, THE GOVERNMENT VIOLATED MR. CARO'S RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS. ..................................... 47**

A.  Mr. Caro's Claim is Not Procedurally Defaulted Because it Relies on Evidence Outside of the Record and Thus Could Not Have Been Raised on Appeal. .......................................................................................................... 48

B.  The Government Did Not Disclose the Exculpatory Information in a Timely Manner. ..................................................................................................... 50

C.  In Light of the Government's Knowing Misrepresentations, the Evidence Was Not Otherwise Available to Mr. Caro. ................................................ 52

D.  The Suppressed Evidence Contradicted the Government's Sole Purported Eyewitness and Is Material. ....................................................................... 53

**GROUNDS FOR RELIEF: PENALTY PHASE ..................................................57**

**CLAIM SIX: MR. CARO HAS SUFFICIENTLY ALLEGED INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL AT THE PENALTY PHASE. ..................................................................................................57**

A.  Mr. Caro has Sufficiently Alleged that Trial Counsel Failed to Challenge the Government's Deliberate and Tactical Delay of Mr. Caro's Indictment........................ 57

B.  Mr. Caro has Sufficiently Alleged that Trial Counsel's Performance was Deficient When They Failed to Adequately Investigate, Develop, and Present a Compelling Mitigation Story About Mr. Caro's Life. .................................................. 59

1.  Whether Counsel's Failure to Present Mental Health Evidence Was a Decision Based on Reasonable Strategy is a Disputed Factual Issue. ........................ 62

2.  Whether Counsel's Failure to Present Testimony of Mr. Caro's Brothers Was a Decision Based on Reasonable Strategy is a Disputed Factual Issue. ............ 71

3.  Whether Counsel's Presentation of a Harmful Witness Was a Decision Based on Reasonable Strategy is a Disputed Factual Issue.................................... 74

4.  Mr. Caro Has Asserted Facts That, If True, Would Entitle Him to Relief; Summary Dismissal of Claim Six (B) Is Improper. ................................... 75

iii

JA 1516

C.  Mr. Caro has Sufficiently Alleged that Trial Counsel Failed to Adequately Investigate Prison Culture and Failed to Subject the Government's Evidence Regarding Mr. Caro's Purported Gang Leadership Position to Meaningful Adversarial Testing. .................................................................................................... 77

D.  Mr. Caro has Sufficiently Alleged that Trial Counsel Failed to Adequately Investigate Relevant Facts and Law Regarding the BOP's Ability to Control Improper Inmate Communications, and Failed to Subject the Government's Evidence to Meaningful Adversarial Testing. ........................................................... 80

E.  Mr. Caro has Sufficiently Alleged that Trial Counsel Failed to Adequately Investigate and to Present Mitigating Evidence Concerning Prison Culture and Statements of Remorse. ..................................................................................... 83

F.  Mr. Caro has Sufficiently Alleged that Trial Counsel's Performance Was Deficient When They Failed to File a Motion to Set Aside the Benavidez Conviction. ........................................................................................................ 85

G.  Mr. Caro has Sufficiently Alleged that Trial Counsel Were Ineffective in Failing to Present Additional *Skipper* Evidence To Rebut Aggravating Evidence. ...... 88

H.  Mr. Caro has Sufficiently Alleged that Trial Counsel Failed to Adequately Investigate and Present Evidence of the BOP's Negligence Regarding the Decision to Grant Mr. Sandoval's Request to be Placed in Mr. Caro's Cell. ................. 94

I.  Mr. Caro has Sufficiently Alleged that Trial Counsel Failed to Object to the Government's Presentation of Evidence of Specific Instaces of Violence by Persons Other than Mr. Caro. .......................................................................... 95

J.  Mr. Caro has Sufficiently Alleged that Trial Counsel's Performance Was Deficient When They Failed to Object to The Government's Improper Closing Argument. ............................................................................................................ 99

K.  Mr. Caro has Sufficiently Alleged that Trial Counsel's Performance Was Deficient When They Failed to Seek Removal of a Sleeping Juror. .......................... 102

L.  The Government Ignores the Fact that the Court Must Conduct a Cumulative Review of Allegations of Deficient Performance When Determining Prejudice, Thereby Making Summary Dismissal of Mr. Caro's Claim of Ineffective Assistance of Counsel at the Penalty Phase of Trial Improper. ................. 105

**CLAIM SEVEN:  MR. CARO HAS SUFFICIENTLY ALLEGED THAT BY WITHHOLDING MATERIAL EXCULPATORY AND IMPEACHMENT EVIDENCE, AND PRESENTING MISLEADING PREJDUCIAL ARGUMENT REGARDING FUTURE DANGEROUSNESS, THE**

iv

JA 1517

**GOVERNMENT VIOLATED MR. CARO'S RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS.** .....................................106

A.   The Government Violated Mr. Caro's Constitutional Rights under *Brady v. Maryland* by Withholding Material Exculpatory and Impeachment Evidence that the BOP Has Housed Many Inmates at ADX-Florence and its Precedessor Prison, USP-Marion, for More than Three Years. ........................................107

    1.   Mr. Caro's *Brady* Claim is Not Procedurally Defaulted Because it Rests on Evidence Outside the Record. ...........................................107

    2.   The Withheld Evidence Was Material, and the Government's Failure to Disclose it Undermines Confidence in Mr. Caro's Death Sentence. ........................109

B.   The Government Violated Mr. Caro's Constitutional Rights under *Brady v. Maryland* by Withholding Materially Exculpatory Evidence that Mr. Caro Was Not a Gang Leader at USP-Lee. ........................................116

    1.   The Withheld Evidence Was Material, and the Government's Failure to Disclose it Undermines Confidence in Mr. Caro's Death Sentence. ........................117

    2.   The Government's Contention That Mr. Caro Knew or Should Have Known About the Existence of This Evidence is Mere Conjecture. ........................119

C.   The Government's Argument Fails to Address the Cumulative Impact of the Withheld Evidenc, Thereby Making Summary Dismissal Improper. ........................120

D.   Mr. Caro's Death Sentence, Which Relied on Incomplete,  Misleading and Irrelevant Information Regarding Future Dangerousness Violated Mr. Caro's Rights Under the Eighth Amendment. ........................122

**CLAIM EIGHT: MR. CARO HAS SUFFICIENTLY ALLEGED THAT THE GOVERNMENT VIOLATED THE EIGHTH AMENDMENT AND THE RULE IN *CALDWELL V. MISSISSIPPI*, 472 U.S. 320 (1985), BY MAKING COMMENTS THAT MINIMIZED THE JURY'S RESPONSIBILITY AT THE PENALTY PHASE.** ........................123

**CLAIM NINE: MR. CARO HAS SUFFICIENTLY ALLEGED THAT APPELLATE COUNSEL HAS PROVIDED INEFFECTIVE ASSISTANCE BY FAILING TO RAISE NON-FRIVOLOUS APPELLATE ISSUES DURING MR. CARO'S DIRECT APPEAL.** ........................125

A.   Mr. Caro Has Sufficiently Alleged That Appellate Counsel Was Ineffective by Failing to Challenge the Court's Refusal to Instruct the Jury that the Aggravating Factors Must Outweigh the Mitigating Factors Beyond a Resonable Doubt. ........................127

v

JA 1518

B.   Mr. Caro Has Sufficiently Alleged That Appellate Counsel Was Ineffective by Failing to Challenge the Exclusion for Cause of Qualified Jurors with Misgivings as to the Death Penalty. ...................................................................132

C.   Mr. Caro Has Sufficiently Alleged That Appellate Counsel Was Ineffective by Failing to Appeal the Government's Use of Specific Acts of Violence by Person's Other Than Mr. Caro. ..............................................................................132

D.   Mr. Caro Has Sufficiently Alleged that Appellate Counsel Was Ineffective by Failing to Argue that the Rule in *Caldwell v. Mississippi* Was Violated by the Government's Minimization of the Jury's Responsibility for a Death Verdict. ...........135

E.   Mr. Caro Has Sufficiently Alleged that Appellate Counsel Was Ineffective by Failing to Assert Systemic Death Penalty Challenges. ............................................135

**GROUNDS FOR RELIEF: SYSTEMIC CHALLENGES**.......................................136

**CLAIM TEN: MR. CARO HAS SUFFICIENTLY ALLEGED THAT THE USE OF THE "FUTURE DANGEROUSNESS" AGGRAVATING FACTOR AT SENTENCING, WHICH RESULTED IN AN UNRELIABLE PREDICTION OF MR. CARO'S FUTURE DANGEROUSNESS BY THE JURY, VIOLATED MR. CARO'S RIGHT TO A NON-ARBITRARY SENTENCING PROCESS UNDER THE EIGHTH AMENDMENT AND 18 U.S.C. § 3595(C)(2)(A).** ................................................................................136

**CLAIM ELEVEN: MR. CARO HAS SUFFICIENTLY ALLEGED THAT THE ABSENCE OF A PRINCIPLED BASIS FOR DISTINGUISHING THOSE CASES IN WHICH THE FEDERAL DEATH PENALTY IS IMPOSED FROM THOSE CASES IN WHICH IT IS NOT IMPOSED RENDER THE FEDERAL DEATH-PENALTY ACT UNCONSTITUTIONAL.** ......................................................................................142

**CLAIM TWELVE: MR. CARO HAS SUFFICIENTLY ALLEGED THAT THE FEDERAL CAPITAL PUNISHMENT SYSTEM, IN WHICH CAPITAL PUNISHMENT IS IMPOSED ON BOTH THE INVIDIOUS BASIS OF RACE AND THE IRRATIONAL BASIS OF GEOGRAPHY, SHOULD NOT BE ENFORCED.** ....................................................................145

**CLAIM THIRTEEN: MR. CARO HAS SUFFICIENTLY ALLEGED THAT HIS DEATH SENTENCE IS CATEGORICALLY CRUEL AND UNUSUAL PUNISHMENT IN VIOLATION OF THE EIGHTH AMENDMENT.**..................147

**CLAIM FOURTEEN: MR. CARO HAS SUFFICIENTLY ALLEGED THAT THE FEDERAL CAPITAL PUNISHMENT SYSTEM AT THE TIME OF his TRIAL VIOLATED INTERNATIONAL LAW.** .............................................148

A.   The ICCPR Is a Self-Executing Treaty. ............................................................149

JA 1519

1.    The Doctrine of Self-Execution of Treaties. ....................................................... 149

2.    The Legal Import of the Senate's Declaration Regarding the ICCPR. .............. 152

B.    The Plain Language of the ICCPR Indicates That Individual Rights Were Created and That the United States Agreed to Provide a Forum and Remedies for the Vindication of Those Rights to Those of Its Citizens Who Claim a Violation of Those Rights. ......................................................................... 156

C.    The Biased and Disparate Federal Capital Punishment System in Place at the Time of Mr. Caro's Trial Violated the International Covenant on Civil and Political Rights. ............................................................................................. 158

**CLAIM FIFTEEN:  MR. CARO HAS SUFFICIENTLY ALLEGED THAT THE PRECLUSION OF "PLAIN-ERROR" REVIEW BY THE FEDERAL DEATH-PENALTY ACT RENDERS THE ACT UNCONSTITUTIONAL. ......... 159**

**GROUND FOR RELIEF: CUMULATIVE ERROR .............................................. 162**

**CLAIM SIXTEEN: MR. CARO HAS SUFFICIENTLY ALLEGED THAT HIS CONVICTION AND SENTENCE MUST BE VACATED DUE TO THE CUMULATIVE PREJUDICIAL EFFECT OF THE ERRORS IN THIS CASE. ........................................................................................................ 162**

**CONCLUSION ................................................................................................ 162**

JA 1520

**INTRODUCTION**

**A.      Procedural Posture of the Case.**

Carlos David Caro filed a Motion for Collateral Relief Pursuant to 28 U.S.C. §2255, consisting of 198 pages, with 16 claims and 28 sub-claims ("2255 Motion"). (ECF Nos. 781, 782, 790.)  The 2255 Motion includes detailed factual allegations, many of which rely on facts outside the existing court record.  Although Mr. Caro, at this early stage, was not required to produce any evidence,[1] he attached 60 exhibits in support of allegations made in his motion, including declarations from experts, trial counsel, and jurors, a neuropsychological report, grand jury testimony, internal Bureau of Prison ("BOP") memoranda and documents, juror questionnaires, and data regarding the death penalty.  Mr. Caro also asserted facts in his motion that were supported by citations to specific documents, but he did not attach the actual documents to the motion.   Counsel for Mr. Caro subsequently provided copies of these documents to the Government pursuant to an informal request.[2]

The Government responded to Mr. Caro's 2255 Motion, not by filing an answer, but by filing its Motion to Dismiss in Response to Petitioner's Motion for Relief Pursuant to title 28, United States Code, Section 2255 ("Motion to Dismiss") that asks the Court to summarily dismiss all of Mr. Caro's claims.  (ECF No. 791.)  The 127-page Motion to

---

[1] Rule 2 of the Rules Governing Section 2255 Proceedings in the United States District Court (hereinafter "2255 Rules") states only that a motion must specify the grounds for relief, state the facts supporting each ground, and state the relief requested.  Rule 2 does not require a petitioner to produce any evidence.

[2] Mr. Caro propounded his own informal request for documents to the Government, but the Government has taken the position that it is unwilling to produce any documents until after the Court rules on this Motion to Dismiss.

JA 1521

Dismiss does not raise any general procedural or technical defense to Mr. Caro's 2255 Motion, but rather responds to the merits of most claims.[3] The Government's choice to file its Motion to Dismiss, as opposed to an answer, is somewhat perplexing. Mr. Caro has alleged viable claims that are supported by specific factual allegations, many of which involve evidence outside the existing record, and most of the Government's arguments create disputed issues of fact. The Government's request for dismissal thus is premature, as Mr. Caro has not yet had the opportunity to introduce evidence in support of his extra-record allegations.

Mr. Caro also has filed a Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255 in the related case of *United States v. Caro et al.*, Case No. 2:03-cr-10115 (W.D. Va.). (ECF No. 189.) In response, the Government filed a motion to dismiss that argues that Mr. Caro's motion in that case is untimely. (ECF No. 195.)

The Court has set oral argument on both of the Government's motions to dismiss for November 25, 2013.

**B.    Legal Standard of Review for Motion to Dismiss.**

The Government's Motion to Dismiss repeatedly urges the Court to resolve factual disputes, make credibility determinations, and ignore Mr. Caro's allegations of new evidence. The Government's arguments rest on a misunderstanding of the standards that the Court must apply at this early stage of the proceedings. At this initial stage, before the Government has even answered Mr. Caro's 2255 Motion, the question before this

---

[3] For a limited number of claims, the Government alternatively argues procedural default based on the specific circumstances of that claim.

2

Court is whether Mr. Caro's allegations, viewed against the existing record, are so "palpably incredible" or "patently frivolous or false" that summary dismissal is appropriate. *See Blackledge v. Allison*, 431 U.S. 63, 76-78 (1977); *United States v. White*, 366 F.3d 291, 296-97 (4th Cir. 2004).

Dismissal is appropriate only when "the motion and the files and records of the case conclusively show that the petitioner is entitled to no relief."  28 U.S.C. § 2255(b). In evaluating the Government's Motion to Dismiss, the Court must construe Mr. Caro's 2255 Motion in the light most favorable to him and must accept Mr. Caro's factual allegations as true unless they are conclusively refuted by the record. *See, e.g.*, *United States v. Witherspoon*, 231 F.3d 923, 926 (4th Cir. 2000) (accepting petitioner's facts as true); *Battlefield Builders, Inc. v. Swango*, 743 F.2d 1060, 1061-62 (4th Cir. 1984) (stating that Rule 12 of the Federal Rules of Civil Procedure requires the court to construe plaintiff's allegations in the "light most favorable to plaintiff").  The Court also must draw all reasonable inferences in favor of Mr. Caro.  *See Goldfarb v. Supreme Court of Virginia*, 766 F.2d 859, 860 n.1 (4th Cir. 1985) (*citing Gardner v. Toilet Goods Ass'n*, 387 U.S. 167, 172 (1967)) (stating that when faced with a dismissal under Rule 12 of the Federal Rules of Civil Procedure, the court must "accept as true the facts stated in the complaint and all reasonable inferences that favor the plaintiff").

In responding to this Motion to Dismiss, Mr. Caro is not required to present evidence in support of his allegations.  Unless patently false and incredible on their face, the Court must accept all of his allegations as true.  Mr. Caro, however, has referred to and attached exhibits to his response, as he did in his 2255 Motion.  The exhibits have

3

been included to show the Court that his claims are factually supported and not "patently frivolous." The exhibits are only a portion of the evidence Mr. Caro intends to submit in support of his 2255 Motion. Mr. Caro anticipates the opportunity to develop the record through discovery and an evidentiary hearing, where factual disputes can be resolved. Mr. Caro anticipates filing his initial discovery motion and request for a hearing before the oral argument on November 25, 2013.

Evidentiary development is contemplated under the federal habeas statutes, rules, and case law. *See, e.g.*, 2255 Rule 6 (discovery), 2255 Rule 7 (expanding the record), and 2255 Rule 8 (evidentiary hearing). Based on the disputes raised by the Government in its Motion to Dismiss, Mr. Caro anticipates that an evidentiary hearing will be necessary. *See* 2255 Rule 5 Advisory Notes ("Numerous cases have held that the Government's answer and affidavits are not conclusive against the movant, and if they raise disputed issues of fact a hearing must be held") (citing numerous cases including *Machibroda v. United States*, 368 U.S. 487, 496 (1962).) In *Machibroda*, the Supreme Court granted an evidentiary hearing because "the specific and detailed factual assertions of the petition, while improbable" could not be said at that juncture to be incredible. 368 U.S. at 496. *See also Witherspoon*, 231 F.3d at 927 (holding that the district court erred in dismissing petitioner's motion without holding an evidentiary hearing because petitioner's "facts if true would entitle him to relief" and "the record does not conclusively demonstrate that [petitioner] was entitled to no relief").

It bears remembering that this is a capital case. The law requires courts to give careful consideration to claims when a defendant has been sentenced to death. *See*

4

JA 1524

*California v. Ramos*, 463 U.S. 992, 998-99 (1983) ("The qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination."); *Kyles v. Whitley*, 514 U.S. 419, 421-22 (1995) ("Our duty to search for constitutional error with painstaking care is never more exacting that it is in a capital case.") ([citation omitted]); *Teleguz v. Pearson*, 689 F.3d 322, 331 (4th Cir. 2012) (Courts should consider "the heightened need for fairness in the administration of death[,] . . . born of the appreciation that death truly is different from all other punishments a society inflicts upon its citizens.") (*quoting Callins v. Collins*, 510 U.S. 1141, 1149 (1994) (Blackmun, J., dissenting from denial of certiorari)).

The Government attacks Mr. Caro's 2255 Motion piecemeal and urges the Court to rule on each issue in isolation from the other evidence presented by Mr. Caro. The substantive law does not support this approach. To prove prejudice under *Strickland v. Washington*, the Court is required a review *all errors*. 466 U.S. 668, 649 (1984) (noting that "there is a reasonable probability that, but for counsel's unprofessional *errors*, the result of the proceeding would have been different[]") (emphasis added). Indeed, *Strickland* makes clear that "a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." 466 U.S. at 695. *See Elmore v. Ozmint*, 661 F.3d 783, 868 (4th Cir. 2011) (holding that the state PCR court's analysis "unreasonably broke from *Strickland* by considering less than the totality of the evidence, and . . . unreasonably discounted evidence favorable to [the petitioner] by unduly minimizing its import and evaluating it piecemeal").

5

JA 1525

This cumulative approach applies in reviewing the errors from guilt/innocence phase and the penalty phase. As the Fourth Circuit has recently explained "the totality-of-the-evidence standard required the state [post-conviction review] court to consider *all* of the trial and PCR evidence favoring [defendant's] acquittal and then to reweigh that evidence against the State's evidence of guilt." *Elmore v. Ozmint*, 661 F.3d 783, 868 (4th Cir. 2011). When determining whether there was prejudice during the penalty-phase, the Court must also apply the totality-of-the-evidence standard. *See Strickland*, 466 U.S. at 695; *Williams v. Taylor*, 529 U.S. 362, 397-98 (2000) (noting that courts must look at "both that [evidence] adduced at trial, and the evidence adduced in the habeas proceeding[s]"). Moreover, this Court should review the cumulative error of counsel's deficiencies related to the guilt/innocence phase when considering prejudice during the penalty phase. *See, e.g.*, *Moore v. Johnson,* 194 F.3d 586, 619 (5th Cir. 1999) ("When, as here, the same jury considered guilt and punishment, the question is whether the cumulative errors of counsel rendered the jury's findings, either as to guilt or punishment, unreliable."). This Court must undertake a factual review of counsel's alleged deficiencies, determine whether counsel's actions were reasonable, and if not, whether the combined errors prejudiced Mr. Caro. This type of analysis is not appropriate for summary dismissal.

This same comprehensive analysis is also required for *Brady* claims. *See Kyles* 514 U.S. at 436-37 n.10 (describing that the fourth aspect of materiality is defined "in terms of suppressed evidence considered collectively, not item by item"); *United States v. Ellis*, 121 F.3d 908, 916 (4th Cir. 1997) (Although "courts of necessity examine

6

undisclosed evidence item-by-item, their materiality determinations must evaluate the cumulative effect of all suppressed evidence to determine whether a *Brady* violation has occurred."); *Winston v. Kelly*, 592 F.3d 535, 556 (4th Cir. 2010) (noting that "it was necessary to consider all the evidence in the record—not just the new evidence—because the materiality element of a *Brady* claim requires a collective assessment of whether introduction of the exculpatory evidence might have affected the outcome of the trial" (*citing Monroe v. Angelone*, 323 F.3d 286, 297 (4th Cir. 2003)); *Monroe*, 323 F.3d at 298 ("we are obliged to assess the materiality of exculpatory evidence 'collectively, not item by item[]'") (*citing Kyles*, 514 U.S. at 436).

Finally, the court must consider the combined impact of all errors on a defendant's trial in order to determine whether the court still has confidence in the conviction and sentence, or whether a defendant's fundamental right to a fair trial was denied. *See, e.g., Cargle*, 317 F.3d at 1207 (explaining that "claims should be included in the cumulative-error calculus if they have been individually denied for insufficient prejudice").[4] Thus, a "petitioner's claim of error at the penalty phase may be cumulated with guilt-phase error, so long as the prejudicial effect of the latter influenced the jury's determination of sentence." *Id*. at 1208.

Analyzing the combined impact of all errors in post-conviction proceedings is no different than the analysis conducted by appellate courts when reviewing trial error. *See, e.g., Chambers v. Mississippi*, 410 U.S. 284, 302-03 (1973) (holding that the two separate

---

[4]   The errors in that case involved "ineffectiveness of trial counsel (and associated/alternative *Brady* error) and prosecutorial misconduct." *Cagle*, 317 F.3d at 1220.

7

errors of excluding evidence and prohibiting cross-examination of a witness together deprived defendant of a fair trial); *United States v. Caro*, 597 F.3d 608, 635-36 (4th Cir. 2010) (analyzing "several possible errors" cumulatively, but holding that they did not "fatally infect" the trial or sentencing hearing).

### C.    Factual Disputes Noted in the Government's Statement of the Case.

The Government's Motion to Dismiss begins with a seven-page "Statement of the Case." (ECF No. 791 at 1-7.)  Mr. Caro disputes many of the assertions made by the Government in this introductory section.  Listed below are some of these disputed assertions: [5]

### 1.    Mr. Caro Disputes that He Was a Gang Leader.

The Government states that Mr. Caro "has been identified by prison officials in at least one institution as a person who carried great influence in the gang."  (ECF No. 791 at 1.)  At trial, one Government witness, Officer John Gordon, testified to his belief that Mr. Caro was the leader of the Texas Syndicate at FCI-Oakdale and initiated an assault on members of another gang.  (Tr. 02/05/2007 at 168-69, 171-72.)  While Mr. Caro does not dispute that Mr. Gordon so testified at trial, Mr. Caro disputes his conclusions.  Mark Bezy, who has 28 years of experience working at BOP including working as Warden of FCC-Terre Haute, disagrees with Mr. Gordon's conclusion, and believes it was unlikely that Mr. Caro was a gang leader at FCI-Oakdale.  (ECF No.  790-1 ¶¶ 19-23.)

---

[5] In response to each claim, Mr. Caro also disputes additional assertions presented in the Government's motion.

The Government also fails to mention the suppressed evidence regarding Mr. Caro's lack of leadership position in the gang. The Government argued at trial that Mr. Caro might still be a leader a USP-Lee, but then withheld documents that reveal the BOP's belief that two individuals other than Mr. Caro were the leaders of the Texas Syndicate at USP-Lee, and that the BOP believed Mr. Caro to be in "bad standing" with the gang. (ECF No. 790 at 153-55.) Mr. Caro's alleged position in the gang was one of the non-statutory aggravators alleged by the Government and argued during the penalty phase of his trial.

**2.    Mr. Caro Disputes the Government's Assertions Regarding Mr. Sandoval's Motivation for Seeking Entry into Mr. Caro's Cell.**

The Government also claims that Mr. Sandoval "asked if he could share a cell with Caro rather than be placed with one of the incoming prisoners." (ECF No. 791 at 3.) Mr. Caro disputes this allegation. Officer Brian Laster testified at trial that Mr. Sandoval asked him if he could be placed in Mr. Caro's cell. Mr. Laster at no time testified about Mr. Sandoval's reason for wanting to get into Mr. Caro's cell. There is no evidence that Mr. Sandoval's request was driven by a concern regarding "incoming prisoners" and the Government's assertion is nothing more than speculation.[6]

Mr. Caro also disputes the assertion that the assigning officer, Dustin Watts, gave "careful thought" to the assignment of Mr. Sandoval in the Special Housing Unit

---

[6] Inmate Sean Bullock's testimony that "officers" asked Mr. Caro if he would take a cellmate because "a bus was coming in," was not supported by any officer's testimony at trial and is disputed by the large number of available spots in the Special Housing Unit at the time Mr. Sandoval was placed in Mr. Caro's cell. (*See* ECF No. 790 at 49-50.) More importantly, Mr. Caro has challenged Mr. Bullock's credibility and this issue must be resolved before dismissing the 2255 Motion. (*See id.* at 62.)

9

("SHU").[7] (*Id.*) According to Mr. Watts, this "thought" consisted of placing members of the same gang together. (Tr. 01/29/2007 at 62-64.) Mr. Watts' actions, however, were not appropriate in this circumstance, and were the result of BOP negligence and lack of communication, not "careful thought." (ECF No. 790 at 53-57.)

Mr. Watts assigned Mr. Sandoval in Mr. Caro's cell because they belonged to the same gang. (Tr. 01/29/07 at 63.) As discussed more fully in Claim Four (C), *infra*, the circumstances leading up to the death of Mr. Sandoval, however, dicated that the BOP should have done the exact opposite, and should have kept Mr. Caro separated from members of his gang. This same conclusion was reached by BOP employees when they recommended in their internal report on the Benavidez assault that Mr. Caro be housed separate from all other members of the Texas Syndicate. (ECF No. 782, Sealed Ex. 51 at 12; *see also* ECF No. 790-1 ¶¶ 13-18.) While the BOP officials responsible for investigating gang activities were cognizant of the risk of placing Mr. Sandoval into Mr. Caro's cell, that concern apparently was never communicated to the SHU officers.

### 3. Mr. Caro Disputes the Inferences to Be Drawn from the Statements he Made after the Death of Mr. Sandoval.

Mr. Caro disputes the inferences that should be drawn from statements he made after the death of Mr. Sandoval, and contends that these statements should be evaluated in light of prison culture, the tension within the Texas Syndicate before and at the time of Mr. Sandoval's death, and Mr. Caro's suggested defense. *See* Claim Six (E), *infra*.

---

[7] Mr. Watts's actual testimony was, "[i]t's something you have to give thought to." Tr. 01/29/2007 at 62.

JA 1530

**4.      Mr. Caro Disputes the Government's Allegation that Trial Counsel Retained Mental Health Experts "Almost Immediately" After Their Appointment.**

The Government alleges that "almost immediately" after appointment, trial counsel applied for and obtained the Court's permission to retain "mental health experts including a licensed clinical psychologist/neuropsychologist and a psychiatrist." (ECF No. 791 at 5.)  Mr. Caro disputes this statement.  Counsel did not seek funding for a psychologist, neuropsychologist or psychiatrist until after the DOJ certified Mr. Caro's case for death and after Mr. Caro was indicted—*over one year* after counsel was appointed.  (ECF No. 38 (revised budget filed Feb. 15, 2006, asking for funding for neuropsychologist, and also psychiatrist but only if client has brain damage); *see also United States v. Caro*, 2:05-mc-00001 (W.D. Va.), ECF No. 9 (Mar. 22, 2005, seeking funds only for mitigation specialist) ECF No. 14 (Apr. 13, 2005, seeking funds only for fact investigator).)

**GROUNDS FOR RELIEF: PRETRIAL**

**CLAIM ONE: MR. CARO HAS SUFFICIENTLY ALLEGED THAT THE GOVERNMENT VIOLATED HIS FIFTH AMENDMENT DUE-PROCESS RIGHTS BY DELIBERATELY AND TACTICALLY DELAYING THE INDICTMENT OF THE CAPITAL CASE UNTIL AFTER THE GOVERNMENT HAD NEGOTIATED A DISPROPORTIONATE PLEA AGREEMENT IN THE BENAVIDEZ ASSAULT, WHICH IMPAIRED MR. CARO'S CAPITAL DEFENSE.**

To prevail on this claim, Mr. Caro must show only that his claim is not "palpably incredible" or "patently frivolous or false."  He has met this burden.  Even if the Court finds his assertions "improbable," dismissal at this stage is inappropriate.  *See Machibroda,* 368 U.S. at 514.

11

JA 1531

The parties appear to agree on the appropriate test in reviewing Claim One:  Mr. Caro must show actual prejudice from the delay.  Once prejudice is shown, the analysis shifts to the Government's reasons for the delay, and the Court must then balance these two interests.  *Howell v. Barker*, 904 F.2d 889, 895 (4th Cir. 1990).  The unconstitutionality of a delay is not driven by the length of the delay.  *Compare United States v. Marion*, 404 U.S. 307, 325-26 (1971) (38-month delay did not violate due process) *with Howell*, 904 F.2d at 894-95 (27-month delay violated due process).  Rather, the test necessitates a case-by-case analysis that is fact intensive. *Id.* at 894 (noting that "the sound administration of justice to the rights of a defendant to a fair trial will necessarily involve a delicate judgment *based on the circumstances of each case*" (citation omitted).)

The Government argues that Mr. Caro has not shown actual prejudice because even if Mr. Caro had not been convicted for the Benavidez assault, it still could have argued that he was already serving a de facto life sentence based on his existing 378-month sentence for a drug violation.  Mr. Caro disagrees.  Assuming good time credit, it appears that under that sentence, Mr. Caro would have been eligible for release at about age 60.  (*See* ECF No. 782, Sealed Ex. 50 ¶¶ 32, 33.).  While incarceration until the age of 60 years is a long sentence, it is not a life sentence.  The Government therefore would not have been able to argue that a life sentence in this case was "zero punishment" (Tr. 02/13/07 at 94), or "no consequences, zero" (*id.*).   Mr. Caro has submitted evidence demonstrating that the Government's argument unfairly influenced the jury.  (*See* ECF No. 790-30) (Juror #33 declaring that "the single most important factor . . . was that

12

JA 1532

Carlos Caro was already serving a sentence that amounted to life in prison . . . ." And further declaring under oath that, "If Caro had not already been serving that lengthy sentence, then it is possible that I would not have voted for the death penalty."); ECF No. 790-29 (Juror #24 stating that "one of the factors" was "that he already had, essentially, a life sentence . . . .").)

Without the Benavidez conviction, the Government also would have lost its argument that Mr. Caro already had a prior conviction for conspiracy to commit murder. (Tr. 02/13/07 at 96-97 ("[T]hey convicted him of conspiracy to commit murder [and] Judge Jones sentenced him to another 27 years.").)  Without this prior conviction, Mr. Caro's counsel would have been able to point out to the jury that Mr. Caro did not have a single prior conviction for violent conduct.  And, unlike many drug offenses, none of Mr. Caro's prior three drug offenses involved either weapons or violence.  (ECF No. 782, Sealed Ex. 50 ¶¶ 31-33.)  These facts go directly toward showing actual prejudice.

The Government also argues that Mr. Caro "has failed to adduce any evidence" to support his claim that it intentionally delayed for tactical reasons or with reckless disregard for the consequences of the delay.  (ECF No. 791 at 10.)[8]  Mr. Caro disputes this contention.  The gross disproportionality of the plea agreements in the Benavidez case (ECF No. 790 at 20-24 (57-month sentence for co-defendant Moreno-Marquez

---

[8] The Government contends, without providing any evidence, that there was no plan by the Government.  (ECF No. 791 at 9.)  This assertion is not only unsupported by any evidence, it is meaningless in the context of a motion to dismiss.

compared to a 327-month sentence for Mr. Caro for identical conduct)),[9] the Government's misrepresentations to the Court, plus the failure to secure counsel for Mr. Caro in this capital case until shortly after the Court sentenced Mr. Caro based on the disproportionate plea agreement, is evidence of intentional delay for tactical reasons, or at a minimum, reckless disregard for the consequences of this delay.

The Government argues that the delay was reasonable given the gravity of the crime, the need to investigate, and the need to secure authorization to seek the death penalty from the Attorney General. But for the fact of the Benavidez prosecution, Mr. Caro might agree that 24 ½ months in a capital case was not an unreasonable delay. The Benavidez case, however, alters the analysis because the delay of the capital indictment had the immediate and predictable effect of preventing the appointment of specialized capital counsel, at a time when such counsel could have protected Mr. Caro against the disproportionate conviction and sentence. No capital counsel appointed during the Benavidez prosecution would have stood by and permitted Mr. Caro to enter into this plea agreement for conspiracy to commit murder. There was absolutely nothing to be gained, and everything, including Mr. Caro's life, to be lost from such a plea. (*See* ECF No. 790-4 (Declaration of Larry Hammond) at 15-16.)

The Government attempts to deflect its own role in the disproportionate pleas by noting that codefendant Moreno-Marquez "proposed" the plea agreement. (ECF No. 791 at 11.) This assertion is disingenuous. The Government has absolute control over the

---

[9] At the time of this sentencing, co-defendant Moreno-Marquez had 28 criminal history points, while Mr. Caro had 12 criminal history points. (ECF No. 782, Sealed Ex. 50 at 8; ECF No. 790-55 at 3.)

14

plea agreements it offers or doesn't offer. Moreover, the prosecutor has a duty, as an officer of the court, to seek justice, to properly advise the court, and to not mislead the court, regardless of what a codefendant proposes. Mr. Caro's codefendant Moreno-Marquez was not responsible for the Government's deals; he was merely a tool that provided an unjustifiable and unfair opportunity that the Government should have rejected, but which it improperly seized.

The Government provides no explanation for waiting until after Mr. Caro's sentencing in the Benavidez case before notifying either Mr. Caro or the Court that it was investigating Mr. Caro for the murder of Mr. Sandoval and that the Court should appoint counsel for him. (*See United States v. Caro*, No. 2:05-mc-00001 W.D. Va.), ECF No. 3 (Letter from Assistant United States Attorney, Anthony P. Giorno, to the Honorable James P. Jones, dated Dec. 30, 2004 letter to Court; Letter from A. Giorno to Carlos David Caro, dated Dec. 30, 2004 (hereinafter "Target Letter"), attached as Ex. 61.) The delay becomes even more suspect in light of the fact that the Government convened a grand jury in this case about two months after the offense and almost ten months before it sought capital counsel for Mr. Caro. (ECF No. 782, Sealed Ex. 26 at 42.)

Mr. Caro has sufficiently alleged that the Government's delay prejudiced him and that the Government's delay was tactical or reckless. His claim is supported by facts and reasonable inferences, which for purposes of this motion must be taken as true. The fact-intensive analysis that must be conducted to resolve this claim cannot occur in the context of this Motion to Dismiss.

**CLAIM TWO: MR. CARO HAS SUFFICIENTLY ALLEGED THE INEFFECTIVE ASSISTANCE OF COUNSEL AT THE DEATH-CERTIFICATION STAGE OF THE CASE.**

To prevail on this claim, Mr. Caro must show only that his claim is not "palpably incredible" or "patently frivolous or false." He has met this burden. Even if the Court finds his assertions "improbable," dismissal at this stage is inappropriate. *See Machibroda*, 368 U.S. at 514.

The Government suggests several unpersuasive arguments against Mr. Caro's claim of ineffective assistance of counsel at the death-certification stage: (1) that Mr. Caro had no substantive or procedural right to the death-certification review process created by the United States Attorney's Manual; (2) that the Sixth Amendment did not apply until Mr. Caro was indicted; (3) that the Court would have to determine an appropriate standard of care for a defense attorney representing capital defendants before the DOJ; (4) that trial counsel made a reasonable strategic decision in their handling of the death-certification proceeding; and (5) that Mr. Caro suffered no prejudice as a result of any deficiencies in trial counsel's performance. (ECF No. 791 at 13-16.) These arguments are insufficient in the context of the Government's request for summary dismissal.

A.    **The Issue is Right to Effective Counsel, Not Right to Death-Certification Hearing.**

The Government's first argument completely misses the point. The issue is not whether Caro had a right to the review process, but whether he had the right to *effective assistance of counsel* during the process, once the review process was afforded to him. It

16

JA 1536

is beyond debate that he had the right to effective assistance of counsel at that hearing. As one District Court noted, "For defense counsel to short circuit the DOJ mitigation process that could result in a death penalty declination would amount to ineffective assistance of counsel." *United States v. Baquedano*, No. 10-20338, 2011 WL 1743742, at *2 (E.D. Mich. May 5, 2011).

In the cases cited by the Government, in which claims involving the death-certification process were rejected, the issue did not involve effective assistance of defense counsel. Rather, these cases involved challenges to the Government's actions, such as timeliness of the death-certification hearing in relation to the indictment, and whether these procedural irregularities entitled the defendant to have the death penalty request judicially dismissed. *See, e.g.*, *United States v. Torres Gomez*, 62 F. Supp. 2d 402 (D.P.R. 1999); *United States v. Shakir*, 113 F. Supp. 2d 1182 (M.D. Tenn. 2000). Another case involved a discovery dispute, when defense counsel sought pre-indictment discovery of the Government's file, requesting items such as the U.S. Attorney's evaluation of the case. In denying the discovery on privilege and work-product grounds, the court assumed without deciding that the death-certification process was a critical stage in which defendant was entitled to effective assistance of counsel. *United States v. Fernandez*, 231 F.3d 1240, 1248 (9th Cir. 2000).

As an analogy, consider that a defendant is not entitled to receive an offered plea bargain from the Government. However, if an offer is made, counsel must be effective in communicating the offer and advising the defendant about it. *See Lafler v. Cooper*, 132 S. Ct. 1376 (2012); *Missouri v. Frye*, 132 S. Ct. 1399 (2012). Capital counsel also has an

17

JA 1537

obligation to explore the possibility of plea negotiations if an offer is not made..  Just as a defendant is not entitled to a plea offer, he may not be entitled to a death-certification process with the procedures adopted by the U.S. Attorney's Manual.  But if such a process is made available to the defense, through counsel, counsel then has a constitutional duty to handle the process effectively.

**B.    The Sixth Amendment Right to Counsel Applies at the Death Certifcation Stage.**

The argument that the Sixth Amendment does not apply at the death-certification hearing is specious.  Under the Sixth Amendment, an accused is guaranteed counsel "at any stage of the prosecution, formal or informal, in court or out," in which counsel's absence might be detrimental to the accused person's defense.  *United States v. Wade*, 388 U.S. 218, 226 (1967). Contrary to the Government's assertion, Mr. Caro was an "accused" long before the formal indictment was issued against him.  He was an accused from the moment he was questioned about the incident, when he was given his *Miranda* rights to protect his Fifth and Sixth Amendment rights.  He was an accused when the Government sent him the letter saying they were investigating him for the murder of Roberto Sandoval and that he was a target of a pending grand jury investigation. (*See* Target Letter, Ex. 61.)  The case law recognizes several instances when an accused has the right to counsel before the indictment has issued, including at preliminary hearings, *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991), and bond hearings, *United States v. Johnson*, 516 F. Supp. 696 (E.D. Pa. 1981), *aff'd*, 688 F.2d 826 (3d Cir. 1982) and *aff'd*, 709 F.2d 1496 (3rd Cir. 1983). The death-certification process is certainly an adversarial

18

JA 1538

one between the Government and the accused. The Government is represented by its United States Attorney, not by law enforcement officers; defense counsel is invited to participate in submitting material and oral argument in opposition to the U.S. Attorney's position. The outcome of the death-certification process is literally a determination of whether to seek life or death, and as such, it constitutes a critical stage at which a defendant is entitled to counsel. *United States v. Gomez-Olmeda*, 296 F. Supp. 2d 71, 87 (D.P.R. 2003).    Indeed, the Government implicitly acknowledges this right in its December 30, 2004 letter to the Court, stating, "we believe that Mr. Caro, upon request, will be eligible for the appointment of two counsel, one of whom has prior experience defending capital cases." *United States v. Caro*, 2:05-mc-00001 (W.D. Va.), ECF No. 3 (Dec. 30, 2004).

Because death-certification applies only to capital cases, there is a greater need for constitutional protection.   As the Supreme Court has long recognized, there is a "significant constitutional difference between the death penalty and lesser punishments." *Beck v. Alabama*, 447 U.S. 625, 637-38 (1980). The greater stakes require heightened procedural safeguards. *Id*. Certainly, the court has recognized some matters as "critical stages" in capital cases that are not necessarily critical in non-capital cases.  For instance, the accused in a capital case has a Sixth Amendment right to counsel's presence at a pre-sentence interview with the probation officer, while that right has not been accorded constitutional significance in non-capital cases. *Estelle v. Smith*, 451 U.S. 454 (1981).

The Court need not rely on the "death is different" principle to find the death-certification process to be a critical stage for Sixth Amendment purposes.  The Supreme

19

JA 1539

Court has already "recognized that negotiation of a plea bargain is a critical phase of litigation for purposes of the Sixth Amendment right to effective assistance of counsel." *Padilla v. Kentucky*, 130 S. Ct. 1473, 1486 (2010) (*citing Hill v. Lockhart*, 474 U.S. 52, 57 (1985)).  Counsel's ineffectiveness during the plea process will support a claim for ineffective assistance of counsel.  *Hill*, 474 U.S. at 57-58.  Because the Attorney General is the only one who can authorize a binding plea agreement that takes the death penalty off the table, effective representation at the death-certification proceedings prescribed by the Attorney General is essential to the plea negotiation and bargaining process.

> [P]lea bargains have become so central to the administration of the criminal justice system that defense counsel have responsibilities in the plea bargain process, responsibilities that must be met to render the adequate assistance of counsel that the Sixth Amendment requires in the criminal process at critical stages.

*Missouri v. Frye*, 132 S. Ct. 1399, 1407 (2012).  Anything less "might deny a defendant effective representation at the *only* stage" when legal advice can help him. *Massiah v. United States*, 377 U. S. 201, 204 (1964) (internal quotation marks and citation omitted) (emphasis added). If a defendant is entitled to effective counsel during the plea negotiation process when mere jail time or deportation is involved, the right must certainly exist in the more somber negotiations of a capital case.

C.    **The Court Will Have to Decide the Appropriate Standard of Care for Defense Counsel in Capital Cases.**

The Court will need to determine the appropriate standard of care for defense counsel in capital cases during the death-certification process.    Determining the parameters of the professional standards which prevailed at the time of Mr. Caro's trial

20

requires a critical factual inquiry that must be conducted by this Court in assessing the merits of this claim. Mr. Caro has alleged that trial counsel's representation did not meet the standard of care for defense attorneys in capital cases in several specific ways: They failed to conduct an adequate mitigation investigation before the death-certification hearing, and they failed to prepare and submit a written mitigation package to submit to the local United States Attorney. In support of the contention that these duties exist, Mr. Caro has cited ABA Guidelines for the Performance of Counsel in Capital Cases (2003)[10] and has attached a declaration from a *Strickland* expert on capital defense litigation (ECF No. 790-4). Notably, the Government's Motion to Dismiss did not dispute the existence of these duties. Having alleged these duties and their breach, Mr. Caro is entitled to the opportunity to develop any disputed facts further, as he will be entitled to relief if he can prove these allegations.

**D.     Whether Trial Counsel's Performance was a Reasonable Strategy is a Disputed Factual Issue.**

Mr. Caro contends that trial counsel's investigation was woefully inadequate and not a reasonable basis for any decision about what to submit at the death-certification hearing. Whether trial counsel's investigation was adequate to support any purported strategy depends on the quantity, quality, type, and impact of the materials discovered and developed after trial. These are issues of disputed fact. As these facts are outside the record, summary dismissal is not appropriate. Mr. Caro has alleged that trial counsel

---

[10] *American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, 31 Hofstra L. Rev. 913 (Summer 2003) (hereinafter "ABA Guidelines")  Pinpoint page references will be to the Hofstra Law Review.

JA 1541

unreasonably delayed in the selection and hiring of a mitigation specialist and an investigator, and that no mental-health experts were consulted before the certification hearing. He has further alleged that a proper investigation would have revealed Mr. Caro's frontal lobe developmental brain impairment, severe domestic abuse, educational and developmental delays, and the impact of prison gang culture on the events leading to Sandoval's death. Mr. Caro alleges that failure to investigate and obtain this information, before deciding what to present to the death-certification committee, renders any "strategic" decision uninformed and unreasonable. If Mr. Caro can prove these allegations, he would be entitled to habeas relief. Accordingly, summary dismissal of this claim is improper, and Mr. Caro is entitled to an opportunity to develop the record further at an evidentiary hearing.

**E.     Whether Mr. Caro was Prejudiced by Trial Counsel's Deficient Performance is a Disputed Factual Issue.**

Mr. Caro has alleged facts showing prejudice, including that Attorney General Ashcroft did not authorize the death penalty, after the certification process, in more than 75% of eligible cases. In cases involving BOP-inmate-homicides, the Attorney General did not authorize or withdrew authorization for the death penalty in more than 67% of the cases. This proceeding is the first opportunity for any court to assess the impact of counsel's omissions on the outcome of the death-certification process. The facts pled and reasonable inferences from them, if proven, demonstrate a reasonable probability of a different outcome but for trial counsel's ineffective performance. Mr. Caro has pled

22

JA 1542

sufficient facts to be entitled to develop his claim further, and it is premature to summarily dismiss this claim at this early stage.

**GROUNDS FOR RELIEF: GUILT/INNOCENCE PHASE**

**CLAIM THREE: MR. CARO HAS SUFFICIENTLY ALLEGED THAT JUROR MISCONDUCT INFRINGED HIS RIGHT TO A FAIR TRIAL.**

To prevail on this claim, Mr. Caro must show only that his claim is not "palpably incredible" or "patently frivolous or false." He has met this burden. Even if the Court finds his assertions "improbable," dismissal at this stage is inappropriate. *See Machibroda*, 368 U.S. at 514.

Mr. Caro has alleged specific facts in support of his claim that two jurors gave untruthful answers to questions on voir dire, and that factual answers to the questions would have warranted disqualification of the jurors on the grounds that they could not be impartial jurors in a death penalty case as required by *Morgan v. Illinois,* 504 U.S. 719 (1992). The Government argues that (1) Rule 606(b) of the Federal Rules of Evidence precludes consideration of testimony from former jurors about their thought processes during deliberations; (2) the alleged statements of the two jurors are not inconsistent with their voir dire answers; (3) the alleged statements do not show juror impartiality; and (4) the claim is procedurally defaulted because Mr. Caro did not raise the issue on his direct appeal. As discussed more fully below, none of these arguments is relevant at this stage of the proceeding.

JA 1543

**A.      Federal Rules of Evidence Do Not Apply to Capital Sentencing Proceedings.**

Under 18 U.S.C. § 3593(c), the Federal Rules of Evidence do not apply to capital sentencing proceedings under the Federal Death Penalty Act.  Accordingly, it would be anomalous to use the Federal Rules of Evidence to preclude Mr. Caro from proving, by juror declarations and future testimony, that they could not be impartial during sentencing proceedings.  *See United States v. Fell*, No. 2:01CR12, 2013, WL 1953322, at *3 (D. Vt. May 10, 2013) (noting that Fed. R. Evid. 606 (b) does not apply to penalty phase proceedings under the Federal Death Penalty Act).  The case cited by the Government, *Bacon v. Lee*, 225 F.3d 470 (4th Cir. 2000), involved application of a North Carolina statute to a North Carolina death-penalty case, and has no bearing on the applicability of Rule 606(b) to the present proceeding.

Even if Rule 606(b) applied, the allegations do not involve the deliberative process and interaction with other jurors, but only their expressed attitudes about the death penalty and their willingness to consider mitigating evidence with an open mind. Because these jurors have expressed attitudes that directly conflict with answers they gave on voir dire, it would be manifestly unjust to prevent Mr. Caro from proving that untruthful answers on voir dire led to the empanelment of two jurors improperly partial towards automatic imposition of the death penalty if there is no doubt about guilt.

**B.      The Alleged Recent Statements of the Jurors Directly Conflict With Their Prior Voir Dire Answers, Creating a Disputed Issue of Material Fact.**

The Government's arguments directly contradict the allegations pled in the 2255 Motion.  Mr. Caro's allegations and the inferences reasonably drawn from them create a

24

JA 1544

factual dispute that cannot be resolved on the pleadings alone, and he is entitled to an evidentiary hearing and the opportunity to develop this claim for adjudication on the merits. In particular, Mr. Caro has alleged the following specific statements in direct contradiction of answers given on voir dire.

Juror #32

Juror #32 stated in his questionnaire that he would not always vote for a sentence of death as punishment for someone guilty of a death-penalty-eligible offense. He admitted being in favor of the death penalty, but expressed reservations about the penalty if there were some lingering doubt about guilt. Nonetheless, he also stated that he would be open to consideration of all the evidence and would not automatically impose the death penalty if the person were guilty. (ECF No. 790-38, at 26-27.) In contrast, Juror #32 now states that he had made up his mind to vote for the death penalty *during the guilt phase of the trial*, before any sentencing evidence had been presented. This is the direct opposite of the constitutional mandate of *Morgan v. Illinois,* 504 U.S. 719 (1992). He formed an opinion on the appropriate sentence before hearing *any* sentencing phase evidence, either aggravating or mitigating, and said that no amount of mitigating evidence would persuade him to impose a sentence other than death because he had no doubt that Mr. Caro was guilty. This automatic vote for the death penalty, as long as he was certain of guilt, is not following the law, is not consideration of mitigating and aggravating circumstances as required by law, and is contrary to what he said he could do in voir dire. *Id.* at 729. Certainly at this stage of the proceedings, Mr. Caro has sufficiently pled that Juror #32's voir dire answers were untruthful and that truthful

25

JA 1545

answers would have made him subject to challenge for cause. Accordingly, he is entitled to develop this claim for adjudication on the merits.

Juror #62

On her voir dire questionnaire, Juror #62 stated that she neither favored nor opposed the death penalty and that she would not always vote for a sentence of death for someone convicted of a death-penalty-eligible offense. (ECF No. 790-44, at 27.)  In her declaration signed after trial, she stated that "I am now, and was at the time of the trial strongly in favor of the death penalty in cases where evidence of guilt is obvious." (ECF No. 790-32.) "Strongly in favor of the death penalty" is contradictory to "neither favor nor oppose."  She further stated in her declaration that "nothing that the defense offered or could have offered" would change her mind about the death sentence because Mr. Caro was guilty of the crime. (ECF No. 790-32.)  This directly conflicts with her voir dire statements that she would not always vote for the death penalty and would openly listen to the mitigating and aggravating evidence before making a decision. Mr. Caro's allegations are sufficient to raise a disputed issue of fact that needs to be developed for adjudication on the merits.  Summary dismissal is not warranted at this stage.

**C.      Mr. Caro has Sufficiently Alleged that the Two Jurors Were Not Impartial and Would Have Been Struck for Cause if They Had Provided Truthful Answers in Voir Dire.**

A new trial is required if Mr. Caro can show that (1) a juror failed to honestly answer a material question and (2) if the correct answer had been given, the defendant would have a valid basis to challenge the juror for cause.  *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556 (1984); *Jones v. Cooper*, 311 F.3d 306, 310 (4th

26

JA 1546

Cir. 2002). Contrary to the Government's implication, the untruthful information need *not* be intentional concealment. *Jones,* 311 F.3d at 310. Even if Jurors #32 and #62 believed that they could be fair and impartial, their post-trial statements make it abundantly clear that they really and truly favored automatic imposition of the death penalty, so long as they were sure of the defendant's actual guilt. The danger of impartiality is far more insidious when a person believes he can be fair, but cannot. Because they believed that the death penalty was the only appropriate punishment, once they were convinced of his actual guilt, they could not follow the Court's instructions to consider evidence of aggravating and mitigating circumstances as required by law *before* deciding to impose the death penalty.  *Morgan*, 504 U.S. at 729. Mr. Caro need not demonstrate his ultimate success on this issue at the pleading stage; he need only allege a non-frivolous claim that the juror's answer was false, and that he would have challenged the juror for cause if an honest, accurate answer had been provided.

The Government's suggestion that these jurors listened to the evidence before deciding the sentence contradicts Mr. Caro's factual allegations. Likewise, the Government's assertion that the penalty was based on the "egregious" nature of the case is pulled from thin air. (ECF No. 791 at 26.) The jurors did not say they voted to impose the death penalty because the crime was egregious. They said only that death was appropriate because they were sure of his guilt.  Such factual disputes require resolution at an evidentiary hearing.

27

**D.      The Juror-Misconduct Claims Are Not Procedurally Barred Because the Facts Necessary to Adjudicate the Claims Are Outside the Record and Must be Developed.**

Like ineffective-assistance-of-counsel claims, juror-misconduct claims are poorly suited to resolution on direct appeal. The evidence of misconduct is not in the trial record, because the jurors did not make the contradictory statements until well after the trial. Further, Mr. Caro had no way to know that these jurors had given inaccurate information on voir dire.  At the time of the appeal, by local Rules of Court, counsel for Mr. Caro could not contact jurors and discuss the case with them, because they were still serving a term of juror service to the Court. Failure to learn of the juror misconduct at the time of or before the appeal cannot be considered default when there is no lawful way he could have learned of the misconduct at the time.  *See Waley v. Johnston*, 316 U.S. 101, 104 (1942) (*per curiam*); *Ida v. United States*, 191 F. Supp. 2d 426, 436 (S.D.N.Y. 2002); *United States v. Fell*, No. 2:01CR12, 2013 WL 1953322 (D. Vt. May 10, 2013).

Because Mr. Caro has sufficiently alleged specific facts in support of his juror misconduct claim, which facts are disputed by the Government, and which could not have been raised at the time of his appeal, the Government's Motion to Dismiss this Claim is premature and are appropriately litigated in post-conviction proceedings, where the Court can consider extra-record information.[11]

---

[11] *See, e.g., Williams v. Taylor*, 529 U.S. 420, 440-43 (2000) (permitting claim in federal habeas corpus that a juror concealed information that would have disqualified her from being a juror); *Fullwood v. Lee*, 290 F.3d 663, 681-84 (4th Cir. 2002) (noting that state post-conviction counsel obtained affidavit from juror regarding extraneous influences and ordering a federal hearing to determine the effect upon the jury's verdict).

28

JA 1548

**CLAIM FOUR: MR. CARO HAS SUFFICIENTLY ALLEGED THE INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL DURING THE GUILT/INNOCENCE PHASE BECAUSE COUNSEL FAILED TO ADEQUATELY INVESTIGATE, DEVELOP, AND PRESENT A THEORY WITH SUPPORTING EVIDENCE IN MR. CARO'S DEFENSE.**

To prevail on this claim, Mr. Caro must show only that his claim is not "palpably incredible" or "patently frivolous or false." He has met this burden. Even if the Court finds his assertions "improbable," dismissal at this stage is inappropriate. *See Machibroda*, 368 U.S. at 514.

Mr. Caro has alleged that trial counsel was ineffective during the guilt phase of the trial by failing to adequately investigate a key government witness; prison and gang culture and other gang-related issues; and BOP negligence. As a result of this inadequate investigation, trial counsel (a) failed to develop a cohesive theory of defense that would have incorporated and explained evidence in a manner favorable to Mr. Caro; (b) failed to discover a key witness who would have impeached the Government's only purported eyewitness to the offense; (c) failed to present evidence of BOP negligence and lay a proper foundation for the admission of important evidence; and (d) failed to present evidence in support of self-defense or a lesser charge.

The Government disputes this claim on the merits, arguing that counsel's conduct was not deficient. (ECF No. 791 at 2-33.) The Government alternatively argues that even if counsel's conduct in Claim Four (B) and Four (D) was not deficient, Mr. Caro was not prejudiced. (*Id.* at 29 (Claim Four B), *id.* 32 (Claim Four D).) The Government did not move to dismiss Mr. Caro's argument that the Court should consider these sub-claims

29

JA 1549

together when determining whether counsel's deficient conduct prejudiced him. (ECF No. 790 at 61-62 (Claim Four E).)

The Government's arguments, which dispute or ignore Mr. Caro's alleged facts, are inappropriate in this Motion to Dismiss. Mr. Caro has alleged a plausible non-frivolous claim that does not warrant summary dismissal.

## A.    Mr. Caro has Sufficiently Alleged that Trial Counsel Failed to Develop a Cohesive Theory of Defense.

The Government urges the Court to summarily dismiss this claim on two grounds, neither of which is appropriate at this early stage of the proceedings. First, the Government argues that Mr. Caro's claim is not supported by the record and that any failure to provide a viable defense resulted from the lack of any substantive evidence. Second, the Government argues that the defense suggested here by Mr. Caro is "fantasy" because Mr. Sandoval wanted in Mr. Caro's cell to avoid placement with a rival gang member and Mr. Caro's reference to "prison culture" is a red herring that doesn't negate premeditation. (ECF No. 791 at 28-29.) The Government's arguments miss the point because it focuses solely on trial-record evidence. Mr. Caro's claim, however, relies on evidence outside the trial record. The Government improperly ignores Mr. Caro's new evidence; disputes Mr. Caro's allegations, including Mr. Sandoval's motivation for placement in Mr. Caro's cell; and questions the credibility of Mr. Caro's expert who has opined on prison culture. Resolution of these disputed issues cannot be resolved in the context of this Motion to Dismiss.

1.     **Trial Counsel Could Have Presented a Cohesive and Viable Defense Based on a "Cold Dose of Revenge"Theory.**

Had Mr. Caro's counsel adequately investigated, hired appropriate experts, and received all of the evidence from the Government to which they were entitled,[12] they would have been able to develop a cohesive and viable defense. Instead of arguing, as they did, that Mr. Caro killed in the heat of passion over a breakfast dispute, they could have presented a self-defense based on a "cold dose of revenge" against Mr. Caro for assaulting Mr. Benavidez. Mr. Caro's counsel, however, never discovered the relevant facts and thus never meaningfully considered a defense based on self-defense. (ECF No. 790-5 ¶ 11, ECF No. 790-9 ¶ 4.)

The Government believed that several months before Mr. Sandoval's death, Mr. Caro had assaulted the leader of the Texas Syndicate (the Benavidez assault) and that the attack was planned by inmate Tijerina "in an attempt to gain control of the Texas Syndicate leadersip" at USP-Lee. (ECF No. 782, Sealed Ex. 51 at 12; *also* Sealed Ex. 28 at 18-19.) As a result of his participation in this assault, Mr. Caro had reason to be concerned about retribution or, as phrased by a Government agent, "a cold dose of revenge." (Sealed Ex. 28 at 27.) This concern is revealed in a letter intercepted by the BOP from Mr. Caro and other Texas Syndicate members involved in the assault, which seeks forgiveness and claims that "they had been misled into thinking the attack on Benavidez was a sanctioned attack." (ECF No. 782, Sealed Ex. 51 at 10.) At trial, the Government's witness Jacoba Guzman testified that the letter stated that there had been

---

[12] *See* Claims 5 and 7(B), *infra*.

31

JA 1551

"no reason" for the attack on Mr. Benavidez and that Mr. Benavidez was in "good standing." (Tr. 02/06/07 at 18-21.)   There is no evidence that Mr. Caro ever received any communication via either telephone or letter that he had been granted the requested forgiveness and was not in bad standing.

Consistent with a concern for retribution, Mr. Caro refused to take Mr. Sandoval as a cellmate.  Mr. Sandoval was a Texas Syndicate prospective member, or prospect. (*See* United States Penitentiary, Lee County, VA, Intake Screening Interview of Robert Sandoval, dated June 17, 2003 (hereinafter "Intake Screening Interview"), Sealed Ex. 74.)   In order to become a full member, he needed to commit a "homicide or serious assault for the benefit of the gang."  (*See* Expert Disclosure in *United States v. Caro*, Case No. 03-10115 (hereinafter "Expert Disclosure"), Sealed Ex. 75 at JR-157; *also* ECF No. 782, Sealed Ex. 28 at 5 (stating that the Texas Syndicate was a "blood in, blood out" gang in which you "take someone's blood to get in, you lose your blood to get out").)   Mr. Sandoval's motive to get inside Mr. Caro's cell was to gain full membership status by assaulting or killing Mr. Caro.  Mr. Sandoval's request to be placed in Mr. Caro's cell, coming only hours after Mr. Caro's refusal to accept a cellmate, was unusual and, in light of prison culture, could be deemed aggressive.  (ECF No. 790, Ex. 1 ¶ 17.)  There was no video or audio recording of what happened inside Mr. Caro's cell, and the only purported eye-witness was cooperating inmate Bullock, who could have been impeached by counsel had they conducted an adequate investigation.

This "cold dose of revenge" defense would have been consistent with the testimony of FBI Agent Fender, who testified that he didn't think the killing was the

32

JA 1552

result of a "breakfast tray," but that it had something to do with the gang.[13]   The "cold

dose of revenge" defense also would have been consistent with FBI Agent Fender's

observation that the "Texas Syndicate . . . tend to prey more on themselves than they do

anybody else.  There's a lot of, lot of internal violence with the Texas Syndicate."  (ECF

No. 782, Sealed Ex. 27 at 5.)  Finally, if the events that resulted in Mr. Sandoval's death

were gang related, Mr. Caro would have been prohibited by gang rules from disclosing

this fact.     (Supplemental Declaration of Mark Bezy, dated Oct. 8, 2013 (hereinafter

"Bezy Supp. Decl."), attached as Ex. 62 ¶ 3.)[14]  Thus, this defense would have explained

why Mr. Caro would have portrayed the incident as anything other than a gang matter.

The Constitution guarantees a meaningful opportunity to present a defense.  *Crane*

*v. Kentucky*, 476 U.S. 683, 690-91 (1986) (reversing because the court erred in

precluding testimony about the environment of the defendant's confession).  Mr. Caro

could have presented this defense, either within the legal framework of second-degree

murder, manslaughter, or self-defense.[15]   Some of the evidence could have been

---

[13] At trial, Douglas Fender, the FBI agent in charge of investigating Mr. Sandoval's killing testified as follows:  "I began to engage Mr. Caro in a line of questioning basically concerning the fact that I didn't think this killing was as a result of the breakfast tray, that I thought it had something to do with the Texas Syndicate and his affiliation with the Texas Syndicate."  (Tr. 01/31/2007 at 25-26.)

[14] When FBI Agent Fender attempted to discuss with Mr. Caro whether the killing was gang related, Mr. Caro terminated the interview.  (Tr. 01/31/2007 at 25-26.)  *See also* Expert Disclosure, Sealed Ex. 75 at JR-163.

[15] The Court was cognizant of a defendant's right to present a defense, especially in a capital case.  *See, e.g.,* Tr. 01/31/07 at 89 (granting a jury instruction on second-degree murder even though "it's at most a close case, but there is a constitutional aspect to the question because it is a capital case, and for the reasons stated by defense counsel I think there is sufficient evidence under those circumstances to instruct the jury as to second degree murder").

introduced and developed through the Government's own trial witnesses, BOP Intelligence Officer D. Mrad, FBI Agent Fender, and Jacoba Guzman, and through Government's documents. This evidence could have been supplemented with the testimony of a gang expert, who could have testified about gang rules, gang "hits," and the consequences for unsanctioned "hits."[16] A cohesive and viable defense existed, but counsel failed to discover it.

> **2. Trial Counsel's "Breakfast Dispute" Defense Was Unreasonable Because it Was Inconsistent with the Evidence, Failed to Answer Key Questions, and Added Nothing to the Mitigation Phase of Trial.**

Rather than presenting a "cold dose of revenge" defense, counsel argued that Mr. Caro acted with heat-of-passion and killed Mr. Sandoval over a breakfast dispute. This defense was unreasonable because it was inconsistent with other evidence, left critical questions unanswered, did not lay the foundation for evidence of Mr. Sandoval's previous possession of a weapon, and provided nothing for mitigation in the penalty phase.

One of the main weaknesses of the "breakfast dispute" defense was that it was not supported by the timing of Mr. Sandoval's death, which occurred in the evening, long after breakfast. Rather than supporting a heat of passion defense, the long passage of time between breakfast and the death of Mr. Sandoval allowed time for premeditation.

The defense also failed to answer critical questions regarding Mr. Caro's initial refusal of Mr. Sandoval, and Mr. Sandoval's subsequent request to be placed in Mr.

---

[16] Defense counsel hired a "gang expert," James Marquart, but his expected testimony would have focused on future dangerousness. (*See* Letter from James W. Marquart to Stephen Kalista, dated Dec. 6, 2006 (hereinafter "Marquart Letter"), attached as Ex. 63.)

Caro's cell. Mr. Caro's attorneys raised these questions in their opening statement. (Tr. 01/29/07 at 36 ("There certainly could be a valid reason why the inmate in the cell refuses someone coming to that cell."); *id* at 46 ("We believe the real issue for you to decide is was it a premeditated killing? Why did Sandoval want in the cell with Caro?").)[17] After raising these questions, though, counsel did not deliver answers. This was a critical failing of counsel and their defense. Without any defense answer as to why Mr. Sandoval wanted in the cell with Mr. Caro, the jury had no reason to doubt the Government's speculation that Mr. Sandoval's motivation for entry into Mr. Caro's cell was to avoid placement with a rival gang member. This resulted in the jury having no choice but to find premeditation. Raising these issues and then failing to answer them through evidence reveals not only the inadequacies of their defense, but constitutes deficient performance. *See, e.g., Anderson v. Butler*, 858 F.2d 16, 17 (1st Cir. 1988) ("[L]ittle is more damaging than to fail to produce important evidence that [has] been promised in an opening.").

The "breakfast dispute" defense was unreasonable in other ways. This defense, which implicitly adopted Mr. Caro's statements about a breakfast dispute, did nothing to mitigate Mr. Caro's apparently callous post-offense statements about the dispute.[18] The "breakfast dispute" defense also failed to lay the foundation for introduction of evidence regarding Mr. Sandoval's possession of a weapon. (ECF No. 790 at 56-57.) *See United*

---

[17] This last unanswered question that linked premeditation with why Mr. Sandoval wanted into Mr. Caro's cell was the last word from defense counsel before the trial began. (Tr. 01/29/07 at 46.)

[18] Counsel could have explained these statements if they presented testimony regarding prison culture. *See* Claim Six E, *infra*.

35

*States v. Caro*, 597 F.3d 608, 634 (2010) (noting that defense counsel waited until the penalty phase to "offer information about why Sandoval was placed in the SHU" and affirming that Caro failed to lay the foundation for introduction of the weapon).

The "breakfast dispute" defense was unreasonable because it also failed to mitigate the anticipated penalty phase, which focused heavily on Mr. Caro's alleged leadership role in the gang and good standing in the Texas Syndicate.[19]  This defense did nothing to rebut the Government's claims about Mr. Caro's continued important role in the Texas Syndicate.  Finally, the proposition that Mr. Caro was a "hot head" who would kill over something as minor as a "breakfast dispute"—which was inconsistent with Mr. Caro's prior conduct in prison[20]—did nothing to mitigate the Government's argument that he would remain a danger in the future.

> **3.    Mr. Caro's Suggested Defense Is Not a "Fantasy" and the Government's Disagreement with His Allegations Makes Summary Dismissal Improper.**

The Government argues that Mr. Caro's suggested defense is "fantasy" and that his allegations regarding Mr. Sandoval's motive for seeking entry into Mr. Caro's cell are "contrary to the testimony of the SIS officers."  (ECF No. 791 at 29.)  The Government's argument merely highlights one of many factual disputes raised in Mr. Caro's 2255 Motion that cannot be resolved in this Motion to Dismiss.  Moreover, the Government's contention fails on the merits, as none of the SIS officers testified at trial that Mr.

---

[19] The Government concedes that it withheld evidence that indicated that after the Benavidez assault and Sandoval killing, the BOP believed that Mr. Caro was in bad standing with the gang.  (ECF No. 791 at 89, n.20.)

[20] *See* ECF No. 782, Sealed Ex. 52 at 2 (BOP report indicating that Mr. Caro has not been disruptive or violent outside of gang related activities).

36

Sandoval wanted into Mr. Caro's cell to avoid being celled with a member of a rival gang. Brian Laster was specifically asked if Mr. Sandoval made any comment to him or request of him. (Tr. 01/29/2007 at 115.) In response to this question, Mr. Laster testified that Mr. Sandoval "asked if he could move in with inmate Caro, if they could cell together." (*Id.*) Neither Mr. Laster nor any other officer testified that Mr. Sandoval asked to be placed in Mr. Caro's cell to avoid placement with a rival gang member.

The Government's proposition is inconsistent not only with evidence presented at trial but also with facts revealed during investigation in these collateral proceedings. At the time of Mr. Sandoval's request, he already had been placed in an empty cell. The USP-Lee housing logs further reveal that even after the bus arrived and inmates were placed in the prison, there still was sufficient housing for inmates in the SHU. [21] (ECF No. 790 at 49.)    Also inconsistent with the Government's contention, an assigning officer in the SHU testified at trial that the BOP did not place members of opposing gangs in the same cell. (Tr. 01/29/2007 at 63.)

The Government next argues, without any support, that the "whole prison culture theory" is a "red herring" and unrelated to premeditation. (ECF No. 791 at 29.) As discussed above, an understanding of gang and prison culture was essential to

---

[21] The only evidence that arguably supports the Government's assertion comes from cooperating inmate Sean Bullock, the Government's only purported "eye-witness." Mr. Bullock testified that the "officers" asked Mr. Caro if he would take a cellmate, *i.e.*, Mr. Sandoval, because a "bus was coming in." Mr. Bullock's testimony is not corroborated by the testimony of a single officer and is also not credible for the reasons stated in Mr. Caro's 2255 Motion (*see* ECF No. 790 at 46-51) and in Mr. Caro's response to claim Four (B), *infra*. Mr. Bullock's testimony also is contradicted by his cellmate, Joseph Bland, whose testimony was not presented at trial. (ECF No. 790-2.)

37

understanding the circumstances and players of the Benavidez assault and how they relate to this case, to understanding Mr. Caro's reluctance to take a cellmate, to understanding the implications to be drawn from Mr. Sandoval's request, and to understanding Mr. Caro's post-offense statements.  This killing occurred within a prison, by one inmate against another inmate.  It involved members of the same gang, similar to two prior and recent assaults at USP-Lee.

As stated by Mr. Bezy, there are two sets of rules that all inmates must follow or face the consequences; the BOP rules and the inmate rules.  If an inmate, like Mr. Caro, also belongs to a prison gang, there is a third set of rules to follow, the gang rules, which govern inmate conduct.[22]  One common gang rule, shared by the Texas Syndicate, is that members may not talk about any gang-related matters with people who are not members of the gang.  (*See* Expert Disclosure, Sealed Ex. 75 at JR-157, JR-183-84; Bezy Supp. Decl., Ex. 62 ¶ 3.)  Contrary to the Government's assertion, prison and gang culture does support Mr. Caro's "cold dose of revenge" defense and negates premeditation.  Trial counsel should have presented this evidence through a gang andn prison-culture expert, but failed to do so.

Mr. Caro's claim is supported by specific and disputed factual allegations that are not frivolous or incredible.  The Government's disagreement with these facts and the reasonable inferences that can be drawn from these facts is premature and inappropriate

---

[22] The Government's experts, in the Benavidez case, acknowledged that the Texas Syndicate "enforces its rules, of which there are a number and which are well-established, strictly, and establishes sanctions which range from a fine to death."  (Expert Disclosure, Sealed Ex. 75 at JR-157.)

in the context of this Motion to Dismiss.  Mr. Caro is entitled to a full and fair hearing on this claim.

**B.     Mr. Caro has Sufficiently Alleged that Trial Counsel Failed to Adequately Investigate and Impeach the Government's Only Purported Eyewitness, Sean Bullock.**

The Government does not dispute that Mr. Bullock had a cellmate, Joseph Bland, at the time of the offense, that trial counsel failed to discover and interview Mr. Bland, or that counsel failed to point out numerous inconsistencies and fallacies in Mr. Bullock's trial testimony.  Rather, the Government attempts to reconcile the declaration of Mr. Bland with Mr. Bullock's testimony, and argues that trial counsel's minimal impeachment effort was effective.  (ECF No. 791 at 29-30.)   The Government alternatively argues that Mr. Caro was not prejudiced by the alleged deficiencies.  (*Id.* at 30-31.)  The issues before the Court regarding counsel's investigation and prejudice to Mr. Caro involve facts outside the trial record and cannot be resolved in the context of a motion to dismiss.

The importance of Mr. Bullock's testimony to the Government's premeditation case cannot be underestimated.  The issue at trial was whether the murder was premeditated or conducted in the heat of the moment.  Mr. Bullock was the Government's sole purported eyewitness regarding premeditation.  The Government even took the unusual step of calling a character witness, BOP employee Gregory Bondurant, who testified to his opinion that Mr. Bullock was truthful.  (Tr. 01/31/2007 at 34-36.) The Government referred to Mr. Bullock's testimony on at least 13 separate occasions during trial to argue that Mr. Caro ambushed or "snuck up" on Mr. Sandoval from

39

JA 1559

behind.  (*See* ECF No. 790 at 52 (citing transcript).)  This evidence was critical to the Government's premeditation case.  As stated by Mr. Caro's *Strickland* expert, Larry Hammond:

> Exactly how the death of Mr. Sandoval occurred turned out to be the difference between a life or death sentence for Mr. Caro.  The image of the planned and violently executed strangulation dominated the Government's closing arguments.  The Government was able to weave together the circumstantial evidence and Mr. Caro's incriminating statements with Mr. Bullock's account to paint a picture that could only have propelled the jury to find as it did – that this homicide deserved the death penalty.

(ECF No. 790-4, ¶ 49.)

Trial counsel had a duty to investigate Mr. Bullock, a critical witness they knew the Government would call at trial.  *See Rompilla v. Beard*, 545 U.S. 374, 383-90 (2005). Trial counsel's failure to investigate Mr. Bullock and meaningfully impeach him constitutes deficient performance.  *See, e.g.*, *Elmore v. Ozmint*, 661 F.3d 783, 859 (2011) (holding that failure to investigate in *Strickland* analysis could not be justified by defense counsel's reliance on State's evidence); *Huffington v. Nuth*, 140 F.3d 572, 580 (4th Cir. 1998) (explaining that counsel has a duty to "investigate possible methods for impeaching prosecution witnesses") (citation omitted); *United States v. Mason*, 481 F. App'x 815, 818-19 (4th Cir. 2012) (unpublished opinion) (remanding case for further proceedings because defendant's *Strickland* claim that trial counsel was ineffective for failing "to investigate evidence that would have impeached the Government's key witness" arguably had merit).[23]

---

[23] Mr. Caro also has alleged that trial counsel failed to discover Mr. Bland, and failed to impeach Mr. Bullock with the known inconsistencies between his trial testimony and that

40

JA 1560

Had trial counsel conducted an adequate investigation, they would have discovered Mr. Bullock's cellmate, Mr. Bland, whose testimony would have directly contradicted that of Mr. Bullock. Counsel failed to do this. (See ECF No. 790-5, ¶ 21.) The fact that Mr. Bullock was the only purported eyewitness and that his testimony bore directly on the issue of premeditation leads to the conclusion that there is a "reasonable probability that at least one juror would have struck a different balance." *See Wiggins v. Smith*, 539 U.S. 510, 537 (2003). This conclusion is supported by the fact that at least two jurors have opined that Mr. Bullock's testimony was critical. (ECF No. 790 at 53). Finally, the prejudice to Mr. Caro from this deficient conduct must be viewed in light of the totality of the evidence, "both that adduced at trial, and the evidence adduced in the habeas proceeding[s]." *Williams v. Taylor*, 529 U.S. 362, 397-98 (2000). This "totality of the evidence," from a procedural point of view, simply cannot occur within the context of this Motion to Dismiss.

The Government attempts to paint a story where Mr. Bland's declaration and Mr. Bullock's testimony can be reconciled. They cannot be reconciled; Mr. Bland directly contradicts Mr. Bullock. The Government paints a picture where Mr. Bullock sees the murder, says nothing to Mr. Bland, and then sits down and plays cards. This story ignores the part of Mr. Bland's declaration where he states that Mr. Bullock "was not standing by the door prior to inmate Sandoval being removed from cell 123." (ECF No.

---

of his prior statements as well as the testimony of other trial witnesses, failing to point out that Mr. Bullock "got the day wrong, the weapon wrong, the statements made by Officer Gilley wrong, the statements made by Officer Laster wrong, the response by Officer Teters wrong, and, initially, his own viewpoint wrong." (ECF No. 790 at 50.)

41

JA 1561

790-2 ¶ 6)  Mr. Bland's statement cannot be reconciled with Mr. Bullock's testimony that he was standing at his cell door and watching the officers deliver mail when they discovered Mr. Sandoval down in the cell.  (Tr. 01/30/07 at 68.)

The Government fails to explain how it came to pass that Mr. Bullock, who purportedly was not to receive any benefit for his testimony in this case, recently received a concededly illegal reduction in his statutorily mandated life sentence, and now Mr. Bullock will be released in October 2017.   (ECF No. 790 at 51.)

**C.     Mr. Caro has Sufficiently Alleged that Trial Counsel Failed to Adequately Investigate and Present Evidence of the BOP's Negligence Regarding the Decision to Grant Mr. Sandoval's Request to be Placed in Mr. Caro's Cell.**

The Government disputes Mr. Caro's allegation that the BOP was negligent when it placed Mr. Sandoval in Mr. Caro's cell.  It first argues that the placement of Mr. Sandoval in Mr. Caro's cell "was not random or without thought."  (ECF No. 791 at 31.) This may be true, but it does not disprove Mr. Caro's claim, which is based not only on his expert's opinion, but also on the knowledge and opinion of the BOP's own officers in charge of gang investigations at USP-Lee and on common sense.

Officer Dustin Watts assigned Mr. Sandoval to Mr. Caro's cell because they belonged to the same gang.  (Tr. 01/29/07 at 63.)  While this general rule-of-thumb might be advisable at times, the circumstances here warranted the opposite conclusion.  The Texas Syndicate had been categorized as a "Disruptive Group," one of the five most dangerous prison gangs.  (ECF No. 790 at 54; Tr. 02/05/2007 at 92-96.)  Within the last five months, there had been two previous within-gang assaults on Texas Syndicate members.  The BOP knew that Mr. Caro had assaulted the leader of the Texas Syndicate,

42

JA 1562

that there had been a power struggle within the gang, and that Mr. Caro could expect "a cold dose of revenge" in the future.  (ECF No. 782, Sealed Ex. 28.)  The BOP officials who were investigating gang activities at USP-Lee, however, never bothered to communicate to the SHU officers that, in light of these recent circumstances, Mr. Caro should be separated from members of his own gang.[24]

The Government ignores the opinion of its own BOP investigator, and rather argues that Mr. Caro's expert, Mr. Bezy, perhaps misunderstood the facts because he referred to Mr. Sandoval's request as a "subsequent" or "second" request.  Mr. Bezy did not misunderstand the facts.  He clearly understood that BOP officers made the first request to place Mr. Sandoval in Mr. Caro's cell, that Mr. Caro refused, and then Mr. Sandoval made a second request after Mr. Caro's refusal.  (Bezy Supp. Decl., Ex. 62 ¶ 2.)

The Government further attacks Mr. Bezy's opinion about the significance of Mr. Sandoval possessing a weapon.  It dismisses this significance by asserting (without submission of evidence) that weapons are commonplace at the prison.  (ECF No. 791 at 32.)  Even if true, this fact does not negate Mr. Bezy's opinion and the fact that the BOP has a duty to insure a safe prison environment.

Second, the Government argues that "there is nothing to connect Sandoval's earlier possession of a shank and his death at the hands of Caro."  (ECF No. 791 at 32.)  Mr. Sandoval's possession of a deadly weapon is relevant for several reasons.  Consistent with other evidence presented in Mr. Caro's 2255 Motion, it demonstrates potential gang

---

[24] A susbsequent BOP internal investigation report similarly recommended that as a result of the Benavidez assault, Mr. Caro should be separated from all members of his gang. (ECF No. 782, Sealed Ex. 51 at 12.)

43

JA 1563

tension, which the BOP should have investigated. (*See* ECF No. 790-1 ¶ 18.) Moreover, it is possible that Mr. Sandoval deliberately allowed himself to be caught with a weapon, with the hope that he would be placed in the SHU with the other Texas Syndicate members.

Finally, the Government argues that Mr. Caro's claim fails because he never said that the killing was gang related or that he feared for his safety. This fact, however, is irrelevant. The Government's own FBI agent stated that gang members are "tightlipped" and "won't say anything." (ECF No. 782, Sealed Ex. 28 at 27.) The truth of this statement is shown by the refusal of Mr. Benavidez to say anything about his attackers (ECF No. 782, Sealed Ex. 51 at 4), as well as Mr. Caro's termination of his interview as soon as FBI Agent Fender attempted to speak with him about gang involvement in the killing of Mr. Sandoval (Tr. 01/31/07 at 25-26).

The Government disputes Mr. Caro's allegations and the opinions of his expert and discounts reasonable inferences that should be drawn in Mr. Caro's favor. These disputes reveal that the issue cannot be summarily resolved in this Motion to Dismiss.

**D.     Mr. Caro has Sufficiently Alleged that Trial Counsel Failed to Adequately Investigate and Present Evidence In Support of Self-Defense, Second-Degree Murder, or Manslaughter.**

Mr. Caro has alleged specific facts supporting a case of self-defense or lesser form of murder in his 2255 Motion (ECF No. 790 at 57-61) and in Claim Four (A), *supra*, of this opposition. The Government argues that these facts are unconnected, that his argument is specious, and that to accept it, one would have to conclude that "ALL murders at USP-Lee are arguably self-defense." (ECF No. 791 at 34-35.) The

44

Government's arguments cannot be resolved in a motion to dismiss, and highlight the need for further proceedings to resolve these disputes.

Mr. Caro's claim is not only not "palpably incredible" or "patently frivolous or false," *see Blackledge v. Allison*, 431 U.S. 63, 76-78 (1977), but is supported by the opinions of the Government's own investigators and agent. That there had been a struggle for leadership within the Texas Syndicate, that Mr. Caro had assaulted the gang leader, and that he might be facing a "cold dose of revenge," are all conclusions reached by BOP investigators. The Government itself even connected many of these facts in its grand jury proceeding that was generally titled, "In the Matter of: Texas Syndicate." (ECF No. 782, Sealed Ex. 28.)[25] There is nothing specious about these facts and analyzing them together does not lead to the conclusion that all prison murders are self-defense.

The Government also claims that this defense is at odds with Mr. Caro's statement that he killed over a "breakfast dispute." Again, the Government ignores the fact that gang members are forbidden from discussing gang matters with non-members, even when they are assaulted by another gang member. (*See* Claim Four (C), *supra*.) The fact that Mr. Caro did not blame the gang for what happened or inform the investigating officers that the attack was related to the Texas Syndicate is entirely consistent with the circumstances of this case.

---

[25] The Government did not disclose this document to trial counsel, and it is part of Mr. Caro's *Brady* claim in Claim Seven (B), *infra*. (*See also* ECF No. 790 at 153-55.)

45

**E.**     **The Government Ignores the Fact that the Court Must Conduct a Cumulative Review of Allegations of Deficient Performance When Determining Prejudice, Thereby Making Mr. Caro's Claim of Ineffective Assistance of Counsel at the Guilt/Innocence Phase of Trial Improper for Summary Dismissal.**

As the law requires, this Court must conduct a cumulative review of trial counsel's deficient performance to determine whether it undermined confidence in the outcome of Mr. Caro's trial. *See* Introduction (B), *supra*. The Government ignores this requirement in its Motion to Dismiss, perhaps because this review makes it difficult for summary dismissal. *See, e.g.*, *Lindstadt v. Keane*, 239 F.3d 191, 198-206 (2d Cir. 2001) ("*Strickland* directs us to look at the totality of the evidence before the judge or jury, keeping in mind that some errors have a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture. We therefore consider these errors in the aggregate.") (citations and internal quotation marks omitted).

Here, Mr. Caro has alleged that his counsel, by failing to adequately investigate, not only lacked a cohesive defense, but also fell short in undermining the Government's only purported eyewitness. What is more, counsel also failed to explain to the jury that the Mr. Sandoval's placement in Mr. Caro's cell was a result of both BOP negligence and an aggressive move by Mr. Sandoval. Had the jury been presented with a more complete and truthful portrait of the circumstances surrounding Mr. Sandoval's death, there is a reasonable probability that Mr. Caro could have been convicted of something less than premeditated murder. Moreover, trial counsel's failures at the guilt/innocence phase of trial set the stage for and impacted the outcome of the penalty phase as well. The ineffective-assistance-of-trial-counsel claims must be reviewed cumulatively.

46

JA 1566

Summary dismissal on Claim Four is improper at this stage of Mr. Caro's habeas proceedings. This 2255 proceeding is the only opportunity that Mr. Caro will have for court review of the facts that he is alleging in support of his claim that his Sixth Amendment right was violated at his capital trial. This Court, therefore, should deny the Government's Motion to Dismiss on Claim Four and allow further evidentiary development through discovery and a hearing.

**CLAIM FIVE: MR. CARO HAS SUFFICIENTLY ALLEGED THAT BY WITHHOLDING MATERIAL EXCULPATORY AND IMPEACHMENT EVIDENCE, AND MISLEADING TRIAL COUNSEL, THE GOVERNMENT VIOLATED MR. CARO'S RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS.**

To prevail on this claim, Mr. Caro must show only that his claim is not "palpably incredible" or "patently frivolous or false." He has met this burden. Even if the Court finds his assertions "improbable," dismissal at this stage is inappropriate. *See Machibroda v. United States*, 368 U.S. 487, 514 (1962).

A *Brady* claim lies when the requested evidence is (1) favorable to the defense; (2) material; and (3) within the possession or control of the Government or its agents, and was not disclosed. *Moore v. Illinois*, 408 U.S. 786, 794-95 (1972). Evidence is deemed "material" if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985). A "reasonable probability does not mean that the defendant 'would more likely than not have received a different verdict with the evidence.'" *Smith v. Cain*, 132 S. Ct. 627, 630 (2012) (internal quotation and

47

JA 1567

citation omitted) (holding that suppression of witness statement was material where witness's testimony was the only evidence linking the petitioner to the crime).

The Government does not dispute that it withheld exculpatory evidence from Mr. Caro. Rather, the Government argues (1) that this *Brady* claim is procedurally defaulted because it could have been raised on appeal, (2) that the evidence at issue was disclosed in a timely fashion and was otherwise available to Mr. Caro, and (3) that the suppressed evidence was not material.

In light of the trial counsel's specific request for a list of inmates on the SHU at the time of the offense, the Government's subsequent misrepresentations, trial counsel's reasonable reliance of these misrepresentations, and the untimely disclosure by the Government on the eve of trial and in the middle of more misleading statements and documents, this claim cannot be summarily resolved in the context of a motion to dismiss. The Court should not reward the Government's misconduct by precluding further inquiry, but rather should make an informed decision after an evidentiary hearing.

**A.    Mr. Caro's Claim is Not Procedurally Defaulted Because it Relies on Evidence Outside of the Record and Thus Could Not Have Been Raised on Appeal.**

The Government argues that Mr. Caro's claim is procedurally defaulted because he did not raise it on appeal, and Mr. Caro has not shown cause for this default. Mr. Caro's claim is not procedurally defaulted because it relies on new evidence that was not available to appellate counsel. If the Court finds that it is procedurally defaulted, however, the Government's withholding of evidence, misrepresentations, and trial

48

counsel's reasonable reliance on the Government's misrepresentations constitutes cause to overcome this default.

As alleged in his 2255 Motion, the Government withheld documents and misrepresented the fact that Mr. Bullock had a cellmate, Joseph Bland. (ECF No. 790 at 62-64.) Mr. Caro's habeas counsel subsequently found and interviewed Joseph Bland, who contradicts the Government's only purported eyewitness to the offense. (ECF No. 790 at 46-47; 62-64, ECF No. 790-2.) Mr. Bland's exculpatory declaration is newly discovered, extra-record evidence that was developed in the instant proceedings and did not exist at the time of the appeal. As a result, this *Brady* claim falls within the "exception to the procedural default rule" because it could not have been presented on appeal "without further factual development." *See Bousley v. United States*, 523 U.S. 614, 621 (1998) (acknowledging that a claim that a guilty plea was coerced falls within this exception to the procedural default rule); *see also Waley v. Johnston*, 316 U.S. 101, 104 (1942) (per curiam) (holding that an issue was appropriately raised in a habeas petition where "[t]he facts relied on are dehors the record and their effect on the judgment was not open to consideration and review on appeal"). Should the Court find that the claim is procedurally defaulted, the Government's misrepresentations and suppression of evidence constitute cause. *See Strickler v. Greene*, 527 U.S. 263, 283-88 (1999) (holding that documents suppressed by the government and claims of "open file" policy impeded "trial counsel's access to the factual basis for making a *Brady* claim" and establish cause for a procedural default).

Finally, the Government's argument must fail, as it would preclude any court from ever considering the merits of a *Brady* claim that relies, as virtually all *Brady* claims do, on evidence outside of the record. For this reason, *Brady* claims are typically developed in habeas or post-conviction proceedings. *See, e.g., Kyles v. Whitley*, 514 U.S. 419, 421(1995) (raising Brady claim in habeas corpus proceedings); *Strickler*, 527 U.S. at 265 (same); *Jean v. Rice*, 945 F.2d 82, 83 (4th Cir. 1991) (same).[26]

**B.      The Government Did Not Disclose the Exculpatory Information in a Timely Manner.**

Almost three years before trial, the Government knew that at the time of the offense its sole eyewitness, inmate Sean Bullock, had a cellmate, Joseph Bland. The Government did not reveal this fact to the defense until December 29, 2006, less than one month before the start of trial.[27] The Government appears to dispute Mr. Caro's allegation that its disclosures and statements misrepresented the fact that Mr. Bullock had a cellmate. (*Compare* ECF No. 790 at 62-64 *with* ECF No. 791 at 33-34.) The Government, however, does not and cannot dispute that counsel for Mr. Caro overlooked

---

[26] Had Mr. Caro raised a factually unsupported *Brady* claim on appeal, he would have lost and the Government now would be arguing that the claim was procedurally defaulted because it already had been presented on appeal. (*See* Claim 7, *infra*.) In the alternative and should the Court find that appellate counsel should have raised this claim, appellate counsel's ineffective conduct in failing to do so constitutes cause for the procedural default. *See Coleman v. Thompson*, 501 U.S. 722, 754 (1991) (recognizing ineffective assistance of counsel as cause for procedural default.); *Murray v. Carrier*, 477 U.S. 478, 488 (1986) (noting that appellate counsel's performance will constitute cause where counsel is "constitutionally ineffective under the standard established in *Strickland v. Washington*").

[27] Jury selection began on January 22, 2007 (ECF No. 517), and the parties gave opening statements on January 29, 2007 (ECF No. 556).

the existence of the cellmate, and that this failure was not due to strategy. (ECF No. 790-5 ¶ 21.)

There is no black-and-white rule that establishes when a disclosure is timely. The Supreme Court has cited ABA Standards for the prosposition that a "prosecutor should not intentionally fail to make timely disclosure to the defense, at the earliest feasible opportunity, of the existence of all evidence or information which tends to negate the guilt of the accused or mitigate the offense charged or which would tend to reduce the punishment of the accused." *Kyles*, 514 U.S. at 437 (*quoting* the ABA Standards for Criminal Justice, Prosecution Function and Defense Function 3-3.11(a) (3d ed. 1993).) Rather, a court must make this determination of the timeliness of the disclosure in light of all of the relevant circumstances. Here, the Government knew for almost three years that Mr. Bullock had a cellmate. When the Government finally disclosed this evidence, it was less than one month before trial, and was tucked away in grand jury testimony that was produced simultaneously with statements and other documents that strongly implied that Mr. Bullock had no cellmate.[28]

This "needle in the haystack" manner of disclosure, along with the Government's misrepresentations and disclosures that indicated that Mr. Bullock did not have a cellmate, must be considered when determining the timeliness of the Government's disclosure. The Government has not alleged any security concerns or other motive for

---

[28] On December 29, 2006, when it produced Mr. Bullock's grand jury testimony, the Government also stated that it had interviewed "all the inmates on the SHU" and was providing their interview forms as well. (Letter from A. Giorno to S. Kalista, dated Dec. 29, 2006 (hereinafter "Disclosure Letter"), attached as Ex. 64.) This group of interview forms did not include Mr. Bland's interview form.

51

withholding the evidence until the eve of trial.  It would be premature for the Court to summarily rule on this fact-driven inquiry in the context of this Motion to Dismiss.[29]

### C.    In Light of the Government's Knowing Misrepresentations, the Evidence Was Not Otherwise Available to Mr. Caro.

Early in this case, Mr. Caro's trial counsel specifically requested a list of all inmates on the SHU at the time of the offense; the Court also ordered the Government to provide such a list.  The Government responded by providing a list that indicated that Mr. Bullock did not have a cellmate.   (*See* ECF 790 at 63.)

The Government's misrepresentations and defense counsel's detrimental reliance on these misrepresentations necessarily alter the analysis of whether the evidence was otherwise available.  *Cf. United States v. Bagley*, 473 U.S. 667, 682 (1985) (noting that "the prosecutor's failure to respond fully to a *Brady* request may impair the adversary process" by causing the defense to "abandon lines of independent investigation, defenses, or trial strategies that it otherwise would have pursued").   The consequences of the Government's misleading response to this specific request, as well as subsequent misleading communications, should be borne by the Government, and the Court should not find that the evidence was "otherwise available."   *See id.* at 682 ("[T]he more specifically the defense requests certain evidence, thus putting the prosecutor on notice of its value, the more reasonable it is for the defense to assume from the nondisclosure that the evidence does not exist . . . ."); *also Banks v. Dretke*, 540 U.S. 668, 694 (2004)

---

[29] Mr. Caro's trial counsel overlooked the fact that Mr. Bullock had a cellmate.  (ECF No. 790-5 ¶ 21, ECF No. 790-9 ¶ 4.)  This oversight by counsel, as well as counsel's failure to seek a continuance from the Court in order to interview the cellmate when Mr. Bullock testified at trial that he had a cellmate, is addressed in Claim Four(B), *supra*.

52

(stating that a defendant may "assume that his prosecutors would not stoop to improper litigation conduct to advance prospects for gaining a conviction").

The Supreme Court has rejected the proposition that "the prosecution can lie and conceal and the prisoner still has the burden to . . . discover the evidence, . . . so long as the potential existence of a prosecutorial misconduct claim might have been detected." 540 U.S. *at* 696 (internal quotation marks and citation omitted) (rejecting the State's claim that the petitioner's *Brady* claim was procedurally defaulted). A "rule thus declaring 'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process." *Id.*

To resolve this claim, the Court must determine whether trial counsel's reliance on the Government's repeated misrepresentations was reliable and thus the evidence was not "otherwise available." This analysis is inappropriate in the context of this Motion to Dismiss and summary dismissal is premature.

## D.    The Suppressed Evidence Contradicted the Government's Sole Purported Eyewitness and Is Material.

The importance of Mr. Bullock's testimony to the Government's premeditation case cannot be underestimated. The issue at trial was whether the murder was premeditated or conducted in the heat of the moment. Mr. Bullock was the Government's sole purported eyewitness regarding premeditation. The Government even took the unusual step of calling a character witness, BOP employee Gregory Bondurant, who testified to his opinion that Mr. Bullock was truthful. (Tr. 01/31/07 at 34-36.) The Government relied on Mr. Bullock's statements on at least thirteen separate occasions

53

during trial to argue that Mr. Caro ambushed or "snuck up" on Mr. Sandoval from

behind. (ECF No. 790 at 52.)[30] Two of the jurors stated that Mr. Bullock's testimony

was essential to their decisions. (ECF No. 790 at 62.)[31] Mr. Bullock's testimony was

vital to the Government's case and the Government's failure to disclose this exculpatory

evidence prejudiced Mr. Caro. *See Smith v. Cain*, 132 S. Ct. 627, 630 (2012) (holding

that suppression of witness statement was material where witness's testimony was the

only evidence linking the petitioner to the crime).[32]

In light of defense counsel's specific request for a list of inmates in the SHU at the

time of the offense, it is reasonable to assume that they intended to interview these

inmates, especially the inmates who, like Mr. Bland, were housed in cells near Mr.

Caro's cell. Had counsel interviewed Mr. Bland, it also is reasonable to assume that he

---

[30] (Tr. 01/29/2007 at 15 ("snuck up behind"); *id.* at 15 (waited until he turned his back and "snuck up behind"); *id.* at 16 (this was a "sneak attack"); *id.* at 21 ("sneaks up behind"); *id.* at 26 ("sneaking up behind"); Tr. 02/1/2007 at 13 (saw Caro behind Sandoval); *id.* at 18 ("ambushed" Mr. Sandoval and "came up from behind"); *id.* at 45 ("from behind with a towel"); *id.* at 49 ("comes up behind him"); *id.* at 49 (had his back turned to him and "came up behind him"); Tr. 02/05/2007 at 19 ("snuck up behind him"); *id.* at 46 ("ambushed him from behind"); Tr. 02/13/07 at 88 ("snuck up behind him").)

[31] *See* ECF No. 790-31 (Juror #37 declaring that it would have made a difference if another inmate testified that Bullock "didn't see what happened" and if "Sandoval was sent to the SHU because he had a shank"); ECF No. 790-33 (Juror #79 stating that "inmate eye witness account of the murder was essential to my decision").

[32] Mr. Caro has briefed the materiality/prejudice of the suppressed evidence in Claim Four(B), *supra*, within the context of an ineffective-assistance-of-trial counsel claim. The standard for materiality is the same for both *Brady* and *Strickland* claims. *See United States v. Bagley*, 473 U.S. 667, 682 (1985) (the standard of materiality applicable to withheld impeachment evidence was adapted from the formulation of "prejudice" in *Strickland*). Mr. Caro therefore incorporates by reference all of the facts and arguments presented in Claim Four(B). As discussed earlier, the Court must consider the cumulative impact of both the Government's *Brady* and *Strickland* violations when determining materiality.

would then have contradicted Mr. Bullock's testimony, the same as he has done now. (ECF No. 790-2.)

The Government nevertheless claims that its failure to disclose this evidence did not prejudice Mr. Caro because Mr. Caro's callous post-offenses statements, together with the fact that Mr. Sandoval was found dead and strangled in in the cell, "constitute overwhelming evidence proving that Caro murdered Sandoval." (ECF No. 791 at 38.) This argument fails for a number of reasons. First, the issue at trial was not whether Mr. Caro killed Mr. Sandoval; in fact, counsel conceded this fact. The issue was whether the killing occurred with premeditation, and Mr. Bullock was the Government's only eye-witness regarding this assertion. The Government conveniently ignores its own reliance on Mr. Bullock at trial, which can be objectively measured by the Government's repeated references to Mr. Bullock's testimony in both the guilt and penalty phases of trial and its use of a character witness.

Second, the Government fails to analyze the materiality of Mr. Bullock's testimony in light of the entire record, which includes not only the trial record but also the facts alleged in Mr. Caro's 2255 Motion. This matters because Mr. Caro has alleged that his post-offense statements were for the purpose of self-preservation and to ward off future attacks on him by gang members or other inmates.[33] These allegations mitigate the purportedly "overwhelming evidence" of his post-offense statements. (*See* Claim Four (A) & (C), *supra*, and Claim Six (E) *infra*.) The Government also ignores the facts and

---

[33] In other sections, the Government has disputed these factual allegations, which perhaps explains its failure to address them in this section. For purposes of the Motion to Dismiss, however, the Court must assume the truth of Mr. Caro's allegations.

55

allegations supporting a "cold dose of revenge" defense that similarly mitigate the impact of Mr. Caro's post-offense statements. (*See id.*)  To accept the Government's argument, the Court would have to reject Mr. Caro's facts and allegations, which it cannot do in a motion to dismiss.

Finally, the Government fails to address the impact of defense counsel's specific request for this information.  While the test for materiality remains whether there is a reasonable probability that with the disclosure the result would have been different, the existence of a specific request provides additional force to the conclusion that the suppression undermined confidence in the result.  *See, e.g., Lindsey v. King*, 769 F.2d 1034,1041 (5th Cir. 1985) (stating that "all of the participating Justices [in *Bagley*] agreed on one thing at least:  that reversal for suppression of evidence by the Government is most likely where the request for it was specific");  *Jean v. Rice*, 945 F.2d 82, 87 (4th Cir. 1991) (finding *Brady* violation where "audio recordings and accompanying reports— twice requested—should have been disclosed to defense counsel").

Resolution of Mr. Caro's *Brady* claim involves the consideration of evidence outside the record, as well as an assessment of the cumulative materiality of all of the withheld evidence.  As such, this claim is not conducive to resolution in the context of a motion to dismiss.

56

**GROUNDS FOR RELIEF: PENALTY PHASE**

**CLAIM SIX: MR. CARO HAS SUFFICIENTLY ALLEGED INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL AT THE PENALTY PHASE.**

To prevail on this claim, Mr. Caro must show only that his claim is not "palpably incredible" or "patently frivolous or false." He has met this burden. Even if the Court finds his assertions "improbable," dismissal at this stage is inappropriate. *See Machibroda v. United States*, 368 U.S. 487, 514 (1962).

**A.    Mr. Caro has Sufficiently Alleged that Trial Counsel Failed to Challenge the Government's Deliberate and Tactical Delay of Mr. Caro's Indictment.**

The Government argues that for the reasons set forth in its Motion to Dismiss Claim One, there was no basis to challenge Mr. Caro's conviction or sentence in the Benavidez case, that any such challenge would have been futile, and therefore trial counsel were not ineffective in failing to raise such a challenge. (ECF No. 791 at 39.) Mr. Caro disagrees for the reasons presented in Claim One of his Opposition, *supra*, and herein incorporates those arguments by reference.

The Government further argues that Mr. Caro has not demonstrated prejudice, in that if the Benavidez case was still pending at the time of his capital penalty proceedings, the Government still would have been able to introduce evidence of the facts and circumstances surrounding the Benavidez assault as an aggravating factor. (ECF No. 791 at 39.) Mr. Caro disagrees. First, it is doubtful that the Benavidez case would not have been resolved by this time. *See United States v. Caro*, 2:03-cr-10115 (W.D. Va.), ECF No. 107 (resetting the jury trial to August 3 and 4, 2004). If Mr. Caro had gone to trial, an acquittal on the murder charge was likely in light of the fact that the victim was not

57

JA 1577

going to testify and the videotape was of poor quality. (ECF No. 790-55 at 6.) What is more, the victim, Ricardo Benavidez, suffered only superficial wounds (ECF No. 790-60 (doctor's report noting "no evidence of deeply penetrating injury"), indicating that his assailants were not, in fact, attempting to kill him. In fact, Mr. Benavidez was only in the hospital overnight for observation. Had Mr. Caro received an acquittal on the conspiracy to commit murder count, the Government could not have used the acquitted conduct as an aggravating factor. *See United States v. Stitt*, 760 F. Supp. 2d 570, 584 (E.D. Va. 2010) (holding that "acquitted conduct cannot be used as an aggravating factor in a capital case").

Even if the Benavidez case had not been resolved prior to Mr. Caro's capital trial, evidence of the circumstances of that assault would not have been nearly as condemning as a conviction for conspiracy to commit murder. Without a conspiracy-to-commit murder conviction, counsel could have argued that the Sandoval murder conviction was Mr. Caro's first conviction for a crime of violence, and therefore he was not "the worst of the worst" deserving of death. For these reasons, Mr. Caro has sufficiently alleged prejudice to survive this Motion to Dismiss.

Summary dismissal also is inappropriate at this juncture because the Court has not yet had an opportunity to consider the totality of all of counsel's unprofessional errors. A "court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Strickland v. Washington*, 466 U.S. 668, 695 (1984). According to the Fourth Circuit, the "totality-of-the-evidence standard" requires the Court to "consider *all* of the trial and PCR evidence favoring [Mr. Caro's] acquittal and then to reweigh that

JA 1578

evidence against the [Government's] evidence of guilt." *See Elmore v. Ozmint*, 661 F.3d 783, 868 (2011). This type of analysis cannot occur in the isolated manner urged by the Government in this Motion to Dismiss.

**B.      Mr. Caro has Sufficiently Alleged that Trial Counsel's Performance was Deficient When They Failed to Adequately Investigate, Develop, and Present a Compelling Mitigation Story About Mr. Caro's Life.**

Mr. Caro has sufficiently alleged that trial counsel failed to investigate, develop, and present a compelling story about Mr. Caro's life. (ECF No. 790 at 66-113.) The Government urges this Court to summarily dismiss this claim. (ECF No. 791 at 39-50.) For reasons stated herein, summary dismissal is inappropriate on Claim Six (B).

The Government initially claims that the "record" does not support Mr. Caro's claim. (*Id.* at 39.) That statement, in and of itself, demonstrates the fatal flaw in the Government's argument and its request for summary dismissal: a claim of ineffective assistance of counsel necessarily involves information developed *outside* the record. *See, e.g.*, *Martinez v. Ryan*, 132 S. Ct. 1309, 1317 (2012) (recognizing that "the evidentiary basis for a claim of ineffective assistance . . . often turns on evidence outside the trial record"). Indeed, "[c]laims of ineffective assistance at trial often require investigative work and an understanding of trial strategy." *Id.*; *see also Massaro v. United States*, 538 U.S. 500, 505 (2003) (evaluating claims of trial counsel's ineffectiveness not generally done on appeal because "trial record may contain no evidence of alleged errors of omission, much less the reasons underlying them"). "Without additional factual development, . . . [this] court may not be able to ascertain whether the alleged error was prejudicial." *Massaro*, 538 U.S. at 505. Because of that, Mr. Caro's detailed and fact-

59

JA 1579

specific claim that trial counsel failed to adequately investigate, develop, and present mitigating evidence is inappropriate for summary dismissal.

The bulk of the Government's argument attacks the merits of Mr. Caro's claim arguing only that trial counsel's performance was not deficient. The Government states that "Caro concedes, that despite these difficult circumstances, trial counsel made reasonable and diligent efforts to build a mitigation defense." (ECF No. 791 at 40.) Mr. Caro, however, never conceded that trial counsel's efforts were "reasonable and diligent." In fact, Mr. Caro's entire claim was based on the fact that counsel's performance regarding the mitigation case was *unreasonable*. (*See* ECF No. 790 at 88 ("[Counsel] failed to take the reasonable and necessary steps to present a compelling mitigation case that would convince at least one juror to vote for life."); *id.* at 94 ("counsel's decision not to present evidence of brain damage was inherently unreasonable because their inadequate development of a mental health defense before trial was unreasonable"); *id.* at 95 ("Any decision that counsel made based on purported concerns about Dr. Phillips's opinion were also unreasonable and uninformed."); *id.* at 96 ("Compounding the unreasonableness of counsel's decision is that it was based on a "feeling" that Dr. Phillip's anticipated testimony could not be rebutted."); *id.* at 98 ("Counsel's decision to prevent the jury from hearing this evidence was unreasonable and their performance was deficient."); *id.* at 100 ("failure to retain an expert to present testimony regarding the impact of these factors was unreasonable"); *id.* at 103 ("Counsel's failure to call these available witnesses to the stand was unreasonable.").) Perhaps the Government's

60

inaccurate statement is why the Government believes summary dismissal is appropriate for this claim. It is not.

Mr. Caro alleged five main factors in support of his claim that trial counsel failed to adequately investigate, develop, and present a compelling mitigation story about his life: (a) that counsel never developed a reasoned and cohesive mitigation theme; (b) that counsel failed to appropriately request, adequately develop, and present testimony of mental-health experts; (c) that counsel failed to obtain an expert to explain the effects Mr. Caro's traumatic childhood; (d) that counsel failed to present testimony of Mr. Caro's brothers; and (e) that the limited mitigation case was undermined by (1) counsel's argument to the jury and (2) counsel's introduction of an unhelpful witness.[34]   Rather than directly address several of Mr. Caro's factors supporting this claim of ineffective assistance of counsel, the Government generally attacks the evidence that Mr. Caro has presented to support his claim—refuting the diagnosis of brain dysfunction, criticizing the experts Mr. Caro retained to support the allegations in his 2255 Motion, and relying on purported strategic decisions of counsel—all without any evidentiary support. These arguments are fact-specific and highlight the need for an evidentiary hearing, rather than support the appropriateness of summary dismissal. What is more, the Government only refutes Mr. Caro's claims regarding counsel's performance; the Government makes no argument regarding prejudice. As such, summary dismissed is improper regarding Mr. Caro's allegations of prejudice.

---

[34] The Government fails to directly address subsection (a) or subsection (c), and it never even mentions subsection (e)(1).

The Government would have this Court believe that Mr. Caro's counsel exercised diligence by investigating and hiring appropriate experts and that any failure in presenting a mitigation defense was not due to counsel's deficiencies but was simply because Mr. Caro lacks "any humanizing characteristics." (ECF No. 791 at 50.)  This could only be true if the Government ignores the allegations and declarations that Mr. Caro has put forth in his 2255 Motion, all of which "humanize" Mr. Caro and the struggles he has faced since birth.  For purposes of a motion to dismiss, the Government cannot do that.

1. **Whether Counsel's Failure to Present Mental Health Evidence Was a Decision Based on Reasonable Strategy is a Disputed Factual Issue.**[35]

The Government spends much of its argument speculating why counsel's decision not to introduce mental-health evidence was reasonable.  The Government's argument undermines its request for summary dismissal; rather, it supports the need for a hearing.  The Government's attorney provides this Court with no rebuttal evidence from a mental-health expert, but instead makes broad allegations that are refuted by Mr. Caro's mental-health experts as well as the law.  Mr. Caro's claim regarding counsel's ineffective assistance as it related to mental health evidence is quite straightforward:  counsel's performance fell below the capital defense standards because they did present testimony from the neuropsychological expert that they hired nor did they retain other appropriate experts who could offer a valid mental-health defense at the penalty phase of trial.  Once

---

[35] Because Mr. Caro is responding to the Government's motion, he is organizing his response in a similar fashion.

JA 1582

counsel learned that Mr. Caro had brain dysfunction and a history of trauma, it was imperative for them to explain this to the jury at the penalty phase.  They never did.

The Government rewrites Mr. Caro's claim by saying that trial counsel were not deficient by failing to find the "right" psychiatrist and that Mr. Caro's "claim that trial counsel erred in failing to find a substitute for Caruso has no support in the law."  (ECF No. 791 at 46.)    But Mr. Caro did not allege that counsel failed to find the right psychiatrist; rather he alleged that counsel fell short by failing to retain appropriate and available experts who could have presented a compelling mitigation case.  This is a critical difference and one that the Government never refuted.  As Mr. Caro explained in his 2255 Motion, Dr. Caruso was not an appropriate mitigation witness because he was retained to assess Mr. Caro's mental state at the time of the crime (for purposes of a guilt-phase defense), and consequently he learned information that would have been unhelpful during the penalty phase. (ECF No. 790 at 93.)[36]   To determine whether counsel's strategy in abandoning the presentation of *all* mental health testimony was reasonable, this Court needs to hold a hearing.

Rather than address counsel's failure to present evidence of Mr. Caro's brain dysfunction, the Government attempts to attack Dr. Spica's neuropsychological findings that Mr. Caro, in fact, suffers from brain dysfunction. The Government's response, however, underscores the need for evidentiary development.  Counsel for the United

---

[36]The Government suggests that it is unknown when trial counsel learned that Dr. Caruso had unhelpful information.  (ECF No. 791 at 43.)  But Mr. Caro alleged that counsel knew "nearly five months before trial" that they would not use Dr. Caruso. (ECF No. 790 at 75.)  This allegation must be taken as true for purposes of summary dismissal.

States is not a neuropsychologist or a psychiatrist.  Yet in the Motion to Dismiss, counsel argues—without supporting documentation—that Dr. Spica's email is inconsistent with his report.  (*See* ECF No. 791 at 42 at n.9 (noting that the phrase "converging although somewhat inconsistent signs of frontal lobe dysfunction" is inconsistent with the conclusion that Mr. Caro has frontal lobe dysfunction).)  Dr. Spica "strongly disagree[s]" that the statement in his email is inconsistent with his report. (*See* Letter from D. Malcolm Spica, Ph.D., to Robin Konrad, dated Sept. 10, 2013 (herein after "Spica Letter"), attached as Ex. 65 at 1.)  This factual dispute should be properly resolved in a hearing.

The Government further attempts to discredit Dr. Spica's conclusion—and psychiatrist Donna Schwartz-Watts, M.D.'s diagnosis—that Mr. Caro has brain impairment because there is no mention in his report of "brain damage." (ECF No. 791 at 42.)  In his 2255 Motion, in explaining the diagnosis, counsel stated: "*In lay terms*, this means that Mr. Caro has brain damage." (ECF No. 790 at 93) (emphasis added).  But the lay use of the phrase "brain damage" does not undermine the existence of Mr. Caro's brain impairment, but rather supports the need for experts to explain the information in the proper terms.  There is an explanation why Dr. Spica, who is a mental-health expert, does not use the term "damage."  As Dr. Spica notes, "the term brain damage denotes a compromise from previous function." (Spica Letter, Ex. 65 at 1.)  Dr. Spica uses the term brain dysfunction rather than brain damage because Mr. Caro's "brain dysfunction" is due to a *developmental* condition rather than *acquired* 'damage.'" (*Id.*)  Regardless of

64

the term used, the Government has presented no evidence to refute Mr. Caro's supported allegation that his brain is impaired.

The Government also attempts to support its statement that "the absence of brain damage is supported by Dr. Swerdlow's reports" after reviewing Mr. Caro's EEG and MRI. (ECF No. 791 at 42, n.8.) Despite record evidence to the contrary, the Government assumes that the absence of an indication of brain impairment on an MRI means that Mr. Caro does not have brain damage. As Dr. Schwartz-Watts indicated in her declaration, "Having a normal MRI means that Mr. Caro's *brain structure* is intact, but it is not a study of *brain function*." (ECF No. 790-8, ¶ 13 (emphasis added).) The Government has not presented any expert declarations to support its argument. This fact, therefore, is contested and a hearing is the appropriate manner to resolve the dispute.

The Government also demonstrates a lack of understanding regarding the term "mental health" when it asserts that Dr. Selvog is a "licensed clinical social worker [LCSW], *not* a mental health expert." (ECF No. 791 at 42 (emphasis added).) This statement is factually inaccurate. An LCSW can diagnose and treat mental illness.[37]

---

[37] *See* National Ass'n of Social Workers, Standards for Clinical Social Work in Social Work Practice, at 7, *available at* http://www.socialworkers.org/practice/ standards/naswclinicalswstandards.pdf (last visited October 8, 2013) ("Clinical social workers represent the largest group of behavioral health practitioners in the nation. They are often the first to diagnose and treat people with mental disorders and various emotional and behavioral disturbances."); Clinical Social Work Association, Mission Statement, *available at* www.clinicalsocialworkassociation.org (last visited October 8, 2013) ("Clinical social workers are the most recognized practitioners of mental health services in the nation."); American Board of Examiners in Clinical Social Work, Clinical Social Workers, *available at* http://abecsw.org/csw-marketplace.html (last visited October 8, 2013) ("The nation's 200,000 Clinical Social Workers provide more mental healthcare, of more types and in more settings, than any other profession. . . . Recognized

Often LCSWs are qualified as "mental health experts" for purposes of testifying.[38]  More specifically, Dr. Selvog—who, in addition to being an LCSW in Virginia and Washington, D.C., at the time of Mr. Caro's trial, holds a Ph.D. in Social Work—had been qualified as an expert in many capital cases, in both state and federal courts.  (*See* Email from H. Selvog to S. Kalista (with Selvog CV attached), dated Mar. 15, 2006, attached as Ex. 66; *see also supra*, n.37.)  Had the Government looked at the definition of LCSW under Virginia law (one of the two jurisdictions where Dr. Selvog was licensed), it would have learned that "'Clinical social worker' means a social worker who, by education and experience, is professionally qualified at the autonomous practice level to provide direct diagnostic, preventive and treatment services where functioning is threatened or affected by social and psychological stress or health impairment."  Va. Code Ann. Chapter § 54.1-3700 (2012).[39]  This Court should not grant summary dismissal on Mr. Caro's claim related to mental-health evidence where the Government has no factual basis to support its statement.

---

with their own title, Clinical Social Worker, and their own level of licensure (to protect the public) in every state in the union, Clinical Social Workers are mental healthcare professionals similar to clinical psychologists.").

[38] *See Wiggins v. Smith*, 539 U.S. 510, 516 (2003) (granting habeas relief and noting that petitioner supported his claim in post-conviction proceedings with the expert testimony of licensed social worker Hans Selvog); *see also People v. R.R.*, 807 N.Y.S. 2d 516, 544 (N.Y. Sup. Ct. 2005) ("Clinical social workers are uniquely suited to assist the courts as forensic experts because they have particular competence in assessing the impact of a person's mental and physical condition on his or her social functioning, a key element in rendering forensic mental health assessments and opinions.").

[39] The language in the current statute was identical to the language in 2006, when Dr. Selvog was retained by Mr. Caro's trial counsel.

The Government's rebuttal to Mr. Caro's assertion that had counsel conducted a complete mental-health investigation, they could have discredited both of the Government's experts—Drs. Phillips and Montalbano—is speculative at best. The Government asserts that Rule 12.2 prevented counsel from reviewing Dr. Phillips's report before the penalty phase. (ECF No. 791 at 47.)[40] This rule, however, does not prevent counsel from making reasoned informed decisions. In fact, that the rule limited review of the report until after a guilty verdict further emphasizes the unreasonableness of counsel's investigation and preparation for the penalty phase. Unlike other jurisdictions where counsel may have the benefit of learning the Government's expert's opinion well in advance of trial, here counsel needed to prepare in anticipation of learning that information within a day of having to go forward with the penalty phase.

The Government claims that neither of Mr. Caro's assertions regarding challenging Dr. Phillips or Dr. Montalbano is reasonable. According to the Government, trial counsel were reasonable in abandoning the presentation of any mental-health evidence because, based on Dr. Caruso's examination, counsel could conclude that Dr. Phillips would provide information that was "extremely damaging." (ECF No. 791 at 47.) This is not supported by the record and is inappropriate speculation for purposes of a motion to dismiss. As Mr. Caro alleged, counsel had informed the Government that Mr. Caro would not discuss with Dr. Phillips the circumstances related to his current charges

---

[40] While this may be true under the rule, the Government offered to disclose Dr.Phillip's report prior to trial and pursuant to a reciprocal disclosure agreement between counsel. (Email from A. Giorno to S. Kalista, dated Sept. 28, 2006 (hereinafter "Reciprocal Disclosure Offer"), attached as Ex. 67.) Mr. Caro's trial counsel did not agree to this.

or his previous convictions.  (ECF No. 790 at 77.)[41]  Counsel had also withdrawn their notice that expert mental-health testimony would be presented in the merits phase of the trial.  (ECF No. 292, Withdrawal of Notice to Government's Attorneys of Intent to Present Evidence Pursuant to Rule 12.2(b)(1) on the Issue of Guilt, 09/21/2006.) Therefore, counsel could not reasonably assume that Dr. Phillip's report would have been extremely damaging.

The Government's assertion that Dr. Phillips's report itself supports the decision of counsel not to call a mental-health expert is contested and without merit.  (ECF No. 791 at 47 n.12.) As an initial matter, counsel never reviewed Dr. Phillips's report, so the Government cannot argue that any allegedly damaging information contained therein supports counsel's reason for not presenting a mental health expert.  What is more, the information in Dr. Phillips's report upon which the Government relies would have been easily refuted by a defense expert and even his report itself.  The Government highlights the fact that Dr. Phillips's reported that Mr. Caro said he had a happy childhood with no abuse. (ECF No. 791 at 47 n.12.)  But this statement fails to reconcile the fact that Dr. Phillips also wrote that Mr. Caro's father "was an alcoholic," would "get drunk and beat [Mr. Caro's mother] up" and that Mr. Caro's older brother always picked on him.  (ECF No. 561 at 14.)  As Dr. Schwartz-Watts explained in her declaration, Dr. Phillips's report "fail[ed] to discuss a complete trauma history."  (ECF No. 790-8, ¶ 20.)  An appropriate

---

[41] *See* Reciprocal Disclosure Offer, Ex. 67 (memorializing a conversation between the Government and Mr. Caro's trial counsel in which trial counsel explained that Mr. Caro would make no statements to Dr. Phillips about the Sandoval killing, the Benavidez stabbing, or the incident at Oakdale).

JA 1588

and properly prepared defense expert could have easily attacked Dr. Phillips's report and any assertion by the Government that Mr. Caro had a happy, abuse-free childhood. (See Supplemental Declaration of Donna Marie Schwartz-Watts, M.D., dated October 7, 2013(hereinafter "Schwartz-Watts Supp. Decl."), attached as Ex. 68 ¶ 2.)

The Government also relies on Dr. Phillips's statement that Mr. Caro has no deficits in adaptive functioning, and on prison psychologists finding that Mr. Caro's mental status is within normal limits. (ECF No. 791 at 47 n.12.)  Had counsel retained an appropriate expert for purposes of testifying at the penalty phase, he or she could have explained that measurements of adaptive functioning generally refer to a diagnosis of intellectual and development disability (formerly called mental retardation).  (Schwartz-Watts Supp. Decl., Ex. 68 ¶ 3.)  Mr. Caro has not been diagnosed as having intellectual and development disability, and therefore that statement is irrelevant to his brain dysfunction and anxiety disorder.  (*Id.*)  Further, a defense expert familiar with prison evaluations could have explained that prison psychologists conduct cursory evaluations that are completed generally within a few minutes.  (Schwartz-Watts Supp. Decl, Ex. 68 Attachments A-L.)  What is more, the prison psychologist's findings are not inconsistent with Mr. Caro's personality and do not contradict the opinions of Dr. Spica and Dr. Schwartz-Watts.  (Schwartz-Watts Supp. Decl., Ex. 68 ¶ 5.) [42]

The Government claims that Mr. Caro's assertion that counsel could have discredited Dr. Montalbano was speculative. (ECF No. 791 at 47 n.11.)  On the one hand,

---

[42] The Government fails to even rebut Mr. Caro's allegation in subsection (c) that counsel failed to obtain an expert to explain the effects of his traumatic childhood.

69

JA 1589

the Government bolsters the reasonableness of counsel's decision to forgo presentation of mental-health evidence based upon anecdotal evidence about Dr. Phillips's reputation (ECF No. 791 at 47), and on the other hand, discounts anecdotal evidence that Dr. Montalbano had used inadequate testing procedures (*id.*). Counsel would have been able to cross-examine Dr. Montalbano about his testing procedures in this case and potentially could have asked relevant questions about his inadequate testing in other cases. But, more importantly, the Government fails to mention Dr. Spica's declaration asserting that Dr. Montalbano did not administer multiple tests for executive functioning. (ECF No. 790-10, Spica Decl. ¶ 11.) This information is relevant because it means that the Government's expert testimony would have been compromised at the penalty phase.

Finally, the Government asserts that Mr. Caro lacked expert testimony to effectively rebut Dr. Phillips and that "the lack of rebuttal testimony was not due to counsel's failure to exercise due diligence in investigating and identifying appropriate mental health experts, but rather to the inability of their selected experts to assist them." (ECF No. 791 at 48.) This statement is refuted by Mr. Caro's allegations otherwise (ECF No. 790 at 90-98), which this Court must accept as true when reviewing the Government's Motion to Dismiss. Mr. Caro asserted that counsel did *not* identify appropriate experts. This is yet another reason why summary dismissal is improper at this stage of litigation.

70

JA 1590

**2.    Whether Counsel's Failure to Present Testimony of Mr. Caro's Brothers Was a Decision Based on Reasonable Strategy is a Disputed Factual Issue.**

As to subsection (d)—that counsel failed to present testimony of Mr. Caro's brothers—the Government asserts several uncompelling reasons why this claim should be dismissed. First, the Government asks this Court to dismiss the claim because Mr. Caro did not submit affidavits or other documents from either brother regarding their wiliness to testify. (ECF No. 791 at 48.)  But Mr. Caro is not required to provide documentary evidence supporting his allegations at the pleading stage. *See* Rule 2(b)(2) of the Rules Governing Section 2255 Proceedings for the U.S. District Courts (noting that motion for relief requires petitioner to allege the "facts supporting each ground" for relief); *United States v. Witherspoon*, 231 F.3d 923, 927 (4th Cir. 2000) (reversing district court's dismissal of motion where petitioner's "facts if true would entitle him to relief").  Mr. Caro alleged that both Jose and Noe were "available witnesses" (ECF No. 790 at 100), and provided a detailed description of the testimony that the brothers could have given (ECF No. 790 at 101-03).  Under the governing rules and this Circuit's precedent, these allegations are sufficient to defeat the Government's Motion to Dismiss.

Second, the Government believes it is relevant that there was no indication that Dr. Selvog recommended the brothers as crucial witnesses to counsel before his declaration of December 31, 2012, submitted to this Court in support of Mr. Caro's 2255 Motion. (ECF No. 791 at 48.)  This assertion is contrary to Mr. Caro's allegations and the trial court record.  Counsel were aware well in advance of trial that brothers Jose and Noe could provide a portrait of the Caro family household that no other witness could

71

JA 1591

provide.  As Mr. Caro alleged in his 2255 Motion, Dr. Selvog submitted a declaration to this Court supporting counsel's request for writs of habeas corpus ad testificandum over one month before trial; that declaration explained why Jose and Noe were important witnesses.  (ECF No. 790 at 80.)  The Government supports its conclusion that trial counsel were unaware that these witnesses were important by citing two of Dr. Selvog's memoranda, which the Government contends, did not include reference to Jose and Noe. (ECF No. 791 at 48.)  The first memorandum dated May 15, 2006, is heavily redacted.[43] (ECF No. 791-6 (Memorandum from H. Selvog to D. Mullikan, S. Kalista and J. Simmons, dated May 15, 2006.)  One of the redacted parts does, in fact, list both Noe and Jose as witnesses.  (Memorandum from H. Selvog to D. Mullikin, S. Kalista, and J. Simmons, dated      May 15, 2006, re: Witnesses/Records by Location, attached as Ex. 69.)  The second memorandum, dated June 13, 2006, outlines a list of witnesses for travel to Falfurrias, Texas. (ECF No. 791-4.)  Noe and Jose were not in Falfurrias because they were incarcerated.  The Government's factual inaccuracies further highlight the need to have an evidentiary hearing on Claim Six (B).

Third, the Government deems it relevant that Noe and Jose were portrayed as "criminal miscreants and ne'er-do-wells" in Dr. Selvog's timeline narrative.  (ECF No. 791 at 49.)  Mr. Caro does not dispute that both Noe and Jose have been involved in

---

[43] The Government requested a copy of this memorandum and referenced Mr. Caro's 2255 Motion at page 78, footnote 16.  The allegation made in footnote 16 related to counsel's request for funding to travel to Chicago and interview Mr. Caro's family, which never occurred.  In support of that statement, Mr. Caro cited to Dr. Selvog's memorandum dated May 15, 2006.  When Mr. Caro's current counsel provided a copy of the memorandum, they redacted any information that was not relevant to support that allegation.

72

criminal activity and have served time in prison.  But that fact does not discount their testimony.[44]  While the Government relies on a few pages of Dr. Selvog's timeline narrative to support its position, it ignores the relevant portions of the timeline that support Mr. Caro's allegations in this section.  In particular, under the section of the narrative titled "Traumatic Childhood Environment," Dr. Selvog summarizes information provided by both Jose and Noe.  (ECF No. 791-7 at 7-8, 9-11.)  This information supports Mr. Caro's allegation that the testimony of the brothers was critical and either they should have been called to testify to provide the jury with first-hand accounts of the abusive and traumatic environment in which they were raised, or an expert should have presented this information.

Finally, the Government argues that any testimony that the brothers gave would have "added nothing to the story" and "may well have been detrimental," and therefore the Government thinks it is "pure speculation" to claim Jose's and Noe's testimony would have "materially added to mitigation case."  (ECF No. 791 at 49.)  While the Government accuses Mr. Caro of speculating, it is the Government itself who is speculating by claiming that Jose's and Noe's testimony "may well have been detrimental" without pointing to any fact in the record to support that accusation.  Mr.

_____

[44] A mental health expert could have explained not only Mr. Caro's trauma history, but also that it was not unexpected for his brothers to also have a criminal history as a result of growing up in the same environment.  As alleged, Mr. Caro's attorney's failed to hire such an expert.  What is more, this expert could have also interviewed Mr. Caro's brothers and provided testimony based on their accounts of their childhood.  Therefore, even if counsel decided not to present the testimony of the brothers, the jury would have still been informed of the information to which the brothers would have testified by way of an expert.

73

JA 1593

Caro described generally the information that Jose and Noe would have provided had they been called to testify. (ECF No. 790 at 100-03.) This information was based on notes from pretrial interviews with these potential witnesses and Dr. Selvog's timeline narrative. It is a contested conclusion that such information—not presented by any other witness—would have "added nothing to the story." To the contrary, Mr. Caro asserts that this information, coupled with mental health experts, would have made a difference in the outcome of the penalty phase.

### 3.   Whether Counsel's Presentation of a Harmful Witness Was a Decision Based on Reasonable Strategy is a Disputed Factual Issue.

The Government only briefly addresses part of subsection (e), completely ignoring Mr. Caro's claim that his counsel were ineffective during opening statements and closing arguments. The Government has waived any argument regarding dismissal as to subsection (e)(1). As to subsection (e)(2), which explains the unreasonableness of counsel's decision to present testimony of Laura Perez and consequently allow the introduction of questions related to her damaging videotaped statement, the Government makes only a brief argument. "Trial counsel did not have the luxury of choosing witnesses who could portray Caro as a saint." (ECF No. 791 at 49.) The Government, once again, misses the point of Mr. Caro's allegations by ignoring his claim in its entirety. Mr. Caro did not fault counsel for failing to present more witnesses to demonstrate him as a "saint." Mr. Caro alleged that his counsel should have presented

74

JA 1594

testimony to humanize him and explain—through the testimony of both expert and lay witnesses—how he ended up in the situation which resulted in his current conviction.[45]

### 4. Mr. Caro Has Asserted Facts That, If True, Would Entitle Him to Relief; Summary Dismissal of Claim Six (B) Is Improper.

Mr. Caro agrees with one of the Government's assertion: "As trial approached, Spica was the only witness known to trial counsel could proffer mental health evidence at the sentencing phase." (ECF No. 791 at 46.) This was true because counsel failed from the beginning to request funding for appropriate experts, adequately investigate a mental health defense, and develop a cohesive mitigation theme. Counsel limited the scope of their mental health investigation so narrowly that they were forced to make untenable and unreasonable decisions. While Dr. Spica's testing resulted in evidence of brain dysfunction—information that would have been important to present to the jury—counsel abandoned this defense without a reasoned strategy. Rather than obtain a psychiatrist or other mental health expert to focus solely on developing a mental health defense

---

[45] Counsel could have also presented testimony from other helpful witnesses, such as Mr. Caro's maternal cousin Petra Herrera, who could have provided information about the traumatic childhood that was more descriptive than those witnesses who did testify. (*See* Declaration of Petra Herrera, dated Oct. 2, 2013, attached as Ex. 77.) Ms. Herrera could have provided imagery for the jury of the abusive household where Mr. Caro grew up. (*See, e.g., id.* ¶ 4 ("Carlos's mother ran out of her home screaming while Carlos's father chased her. When Jose caught up to Virginia, he grabbed her by the hair and pulled her back into their home where he would proceed to beat her."); *id.* ¶ 5 ("When Carlos's mother was being beaten in her home by Carlos's father, the kids would run out of the house crying and screaming for someone to help their mother, but none of us would help because we knew Carlos's mom would never leave her husband."); *id.* ¶ 7 ("When Carlos and his brothers tried to stop their father from beathing their mother, then they would get the brunt of the beating."); *id.* ¶ 10 ("Carlos often helped his mother, which often caused his brothers to bully him and beat him up. I saw Noe and Jose gang up on Carlos in the middle of the street. Carlos did not seem to fight back.").

JA 1595

(something that was beyond the scope of Dr. Spica's expertise as stated in his engagement letter), counsel hired Dr. Caruso to examine Mr. Caro's mental state at the time of the crime. When counsel learned that Dr. Caruso obtained unhelpful information related to the issue of guilt, they did nothing more to develop the mental health evidence for the penalty phase. As such, when they reached the time of trial, counsel determined that they had no viable mental health defense. That is so because they failed to develop one. This was unreasonable.

Counsel abandoned their investigation of Mr. Caro's mental-health background "after having acquired only rudimentary knowledge" from Dr. Caruso. *Wiggins v. Smith*, 539 U.S. 510, 524 (2003). Similar to the circumstances in *Wiggins*, where the Court found counsel ineffective, counsel here moved closer toward trial with the potential of presenting a mental health defense. Because of that, Mr. Caro's counsel "had every reason to develop the most powerful [mental health] case possible." *Id.* at 526. But they did not. The Government's contention that counsel's decisions were strategic "resembles more a *post hoc* rationalization of counsel's conduct than an accurate description of their deliberations prior to sentencing." *Id.* at 526-527. Moreover, this case was not like *Strickland* where the court found that counsel could "reasonably surmise . . . that character and psychological evidence would be of little help." 466 U.S. 668, 699 (1984). Here, presenting character and psychological evidence was critical. Because Mr. Caro has alleged, and provided a supporting declaration, that counsel's performance was unreasonable "under prevailing professional norms," *id*. at 688; ECF

JA 1596

No. 790-4 (Declaration of Larry Hammond) ¶¶ 27-32, 46-48, this Court should deny the Government's Motion to Dismiss on Claim Six (B).

In addition to alleging that his counsel's performance fell below prevailing norms, Mr. Caro has also alleged, and provided supporting declarations, that information regarding his brain impairment would have made a difference in sentencing. ECF Nos. 790-29 (Declaration of Juror #24); 790-31 (Declaration of Juror #47); 790-33 (Declaration of Juror #79). Mr. Caro's 2255 Motion laid out specific details related to expert and lay testimony that could have painted an entirely different picture at sentencing. (ECF No. 790 at 109-13.) The Government has not moved to dismiss Claim Six (B) based on Mr. Caro's failure to allege prejudice. As such, this Court should not dismiss the claim for lack of prejudice.

C.  **Mr. Caro has Sufficiently Alleged that Trial Counsel Failed to Adequately Investigate Prison Culture and Failed to Subject the Government's Evidence Regarding Mr. Caro's Purported Gang Leadership Position to Meaningful Adversarial Testing.**

The Government attempts to defeat this claim summarily by attacking the credibility of Mr. Caro's prison culture-and-gang expert, Mark Bezy, upon which this portion of Mr. Caro's ineffective-assistance-of-counsel claim rests. (ECF No. 791 at 50 (Bezy's opinion is "based entirely on conjecture"; "Bezy's conjecture is belied by the evidence")).

Not only does Mr. Caro disagree with the Government's conclusion that Mr. Caro was a gang leader at FCI-Oakdale, but a motion to dismiss is the improper vehicle for resolving this dispute and assessing the truth of Mr. Caro's facts or credibility of his

77

JA 1597

supporting witness.  Again, the Government improperly urges this Court to adopt its version of the facts and conclusions to be drawn from these facts, to discount Mr. Caro's facts, and to summarily rule against Mr. Caro without independently assessing the credibility and weight of this new evidence.  This is contrary to the law.  *See Machibroda v. United States*, 368 U.S. 487, 496 (1962) ("The Government's contention that [the petitioner's] allegations are improbable and unbelievable cannot serve to deny him an opportunity to support them by evidence.").  The Court must accept all of Mr. Caro's allegations as true unless conclusively refuted by the record; any factual disputes and all credibility determinations must be resolved on the merits, after full evidentiary development.  *See* 28 U.S.C. 2255(b); *United States v. Witherspoon*, 231 F.3d 923, 926 (4th Cir. 2000) (accepting petitioner's facts as true); *Raines v. United States*, 423 F.2d 526, 530 (4th Cir. 1970) ("There will remain, however, a category of petitions, usually involving credibility, that will require an evidentiary hearing in open court.").

Mr. Bezy's opinion is not conclusively refuted by the record.  Mr. Bezy's opinion is not only not improbable, but comports with common sense and a basic understanding of organizational dynamics.  His opinion also carries with it the length and breadth of his experience regarding prison-gang matters, both within the BOP for 28 years, and afterwards as the principal of a consulting firm.  (ECF No. 790-1 ¶¶ 1-10.)

The government's witness, Officer John Gordon, testified at trial that he had generally reached out to the leadership of the prison gangs to try to open up a dialogue between the prison and its gangs, and in response to this reaching out, Mr. Caro showed up for a meeting.  (Tr. 02/05/07 at 166-69.)  At that meeting, Mr. Caro stated that the

78

Texas Syndiacate was going to do what it had to do and that Mr. Gordon had to do what he had to do. (*Id.*) Based on this meeting, Mr. Gordon concluded that Mr. Caro was the leader of the Texas Syndicate at FCI-Oakdale. (*Id.*) Mr. Bezy's opinion that, under the circumstances to which Officer Gordon testified, a Disruptive Group like the Texas Syndicate would never blindly send in its leader into an initial meeting, is believable and directly contradicts that of Mr. Gordon. (ECF No. 790 at 115, ECF No. 790-1 ¶¶ 20-22.)

The Government appears to argue that trial counsel's conduct was not deficient because they (1) anticipated the argument; (2) took efforts to exclude the evidence; and (3) hired a "gang expert" to assist them. (ECF No. 791 at 50.) The Government is correct that counsel was aware of this issue before trial, as they filed two motions in limine to preclude Officer Gordon's *report* (ECF Nos. 589, 590), but those undisputed facts only highlight counsel's deficient conduct in failing to investigate Officer Gordon's conclusion. The motions in limine sought to preclude the actual report, and argued the report was inadmissible based on hearsay, the potential unreliability of a "summarized statement," and a possible *Crawford* violation. (*Id.*) These motions were irrelevant to the live testimony of Officer Gordon at trial. Once counsel knew that Officer Gordon's testimony would be admissible, they had a duty to investigate and refute his conclusion that Mr. Caro was a leader. The Government's assertion that counsel's performance was not deficient because they consulted with a gang expert is inaccurate. Trial counsel retained a "gang expert," but he only prepared to opine only about the future dangerousness of Mr. Caro. (*See* Marquart Letter, Ex. 63.)

Mr. Caro's attorneys failed to adequately investigate prison and gang culture, and in doing so they failed to rebut Officer Gordon's conclusion. As a result, to the great detriment of Mr. Caro, counsel merely accepted the Government's conclusion at face value, allowing the Government to argue for death because Mr. Caro was "not just a member [of the Texas Syndicate], but he's a leader." (ECF No. 790 at 153.)

Finally, the Government briefly argues that there is "no reason to believe" that Mr. Bezy's opinion would have been sufficient to impeach Mr. Gordon's conclusions and that, even if it had been presented to the jury, there is "no reasonable probability that the result of the penalty hearing would have been different." (ECF No. 791 at 51.) Again, Mr. Caro disagrees. The Government's penalty-phase case hinged on Mr. Caro being either a leader or active member of a gang. As discussed more fully in Claim Seven (B)(1), *infra*, 11 of the Government's 13 penalty-phase witnesses discussed gang-related matters to support the future-dangerousness aggravating factor. If Mr. Caro was not a leader of the Texas Syndicate, and if, as claimed by the BOP in one of the documents withheld by the Government (ECF No. 782, Sealed Ex. 59), Mr. Caro was in "bad standing" with the gang, he posed little or none of the dangers attributed to him by the Government.

**D.    Mr. Caro has Sufficiently Alleged that Trial Counsel Failed to Adequately Investigate Relevant Facts and Law Regarding the BOP's Ability to Control Improper Inmate Communications, and Failed to Subject the Government's Evidence to Meaningful Adversarial Testing.**

The Government argues that trial counsel was not deficient because the evidence presented at trial regarding the "inmates' ability to communicate with individuals outside

80

JA 1600

of the facility was not inaccurate or misleading." (ECF No. 791 at 51.) Mr. Caro disputes this contention.

For example, Mr. Hershberger, the Government's expert, testified that "[e]very federal inmate in the system has the opportunity for visits, they have the opportunity for correspondence out, receiving correspondence, magazines, so forth." (Tr. 02/12/07 at 185.) Mr. Hershberger also testified that the BOP could not completely prevent an inmate from "using the mail, or abusing the telephone to communicate to other gang members or family members on the outside." (Tr. 02/12/2007 at 191-92.)

These assertions are not supported by the BOP regulations, and could have been challenged at trial had trial counsel adequately investigated the law and BOP regulations. For example, the BOP can and does completely prevent some inmates from using the mail or telephone. (*See* ECF No. 790 at 117-18 (discussing BOP Program Statements), ECF No. 790-1 ¶ 26; 28 C.F.R. § 501.3, Special Administrative Measures (SAM) include "limiting certain privileges, including, but not limited to, correspondence, visiting, interviews with representatives of the news media, and use of the telephone").[46] An example of the BOP's ability to limit an inmate's correspondence is shown in the Dvorak affidavit, which reveals that of the 129 survey letters mailed to inmates at ADX-Florence, the BOP returned 14 of them, indicating that these inmates were under SAM, and thus could not accept the correspondence. (ECF No. 790-48 ¶ 3.)

---

[46] The regulations refer to "correspondence, visiting, . . . and use of the telephone" as inmate "privileges" not inmate "rights." *See* 28 C.F.R. § 501.3.

Mr. Caro's counsel was deficient in failing to inform the jury of these regulations and policies that would have revealed that, contrary to Mr. Hershberger's testimony, the BOP had the authority to completely limit phone and mail privileges, thus greatly reducing the risk of improper inmate communications.    (ECF No. 790 at 116-18.) Without knowing the existence of and specific nature of BOP tools for preventing improper communications, the jury was left to believe, as the Government argued in its closing, that the BOP could not control Mr. Caro's future communications in any meaningful way.  (Tr. 02/13/2007 at 34 ("[Caro] can probably still communicate with his gang buddies," "[h]e can use the telephone," "[h]e can have visitation with his buddies.").

The Government argues that even if Mr. Caro's counsel had presented evidence of the BOP's "prophylactic measures," there is no reasonable probability that the outcome would have been different.  (ECF No. 791 at 52.)  The Government ignores the objective fact that eight of its 13 penalty-phase witnesses testified about inmate communications. The ability of Mr. Caro to communicate with other gang members in the future was a substantive portion of the Government's penalty-phase testimony.   Mr. Caro has sufficiently alleged prejudice regarding this claim.  Moreover, the Court must consider the materiality of this error in light of "*all* of the trial and PCR evidence favoring [Mr. Caro's position] and then [] reweigh that evidence against the State's evidence." *Elmore v. Ozmint*, 661 F.3d 783, 868 (2011).  *Strickland* also makes clear that before ruling on prejudice, the Court is required to review *all errors. Strickland v. Washington*, 466 U.S. 668, 649 (1984).  This type of comprehensive analysis is not amenable to a motion to dismiss.

82

**E.    Mr. Caro has Sufficiently Alleged that Trial Counsel Failed to Adequately Investigate and to Present Mitigating Evidence Concerning Prison Culture and Statements of Remorse.**

The Government argues that this portion of Mr. Caro's ineffective-assistance-of-counsel claim fails because Mr. Caro cannot show that there is a reasonable probability that the "results of penalty proceeding or the jury's findings with regard to lack of remorse would have been different had Caro introduced the proffered testimony." (ECF No. 791 at 52.)   Again, the Government improperly limits its focus to only one portion of Mr. Caro's *Strickland* claim and fails to analyze the issue of materiality in the context of all of the alleged errors, as well as the totality of the evidence, including that presented by Mr. Caro in these post-conviction proceedings.

Mr. Caro has alleged in his 2255 Motion that counsel presented a defense based on a "breakfast dispute" that was neither cohesive nor viable.  (*See* Claim Four (A), *supra.*) The evidence, however, supported a viable and cohesive defense theory based on the fact that Mr. Caro could be facing a "cold dose of revenge" from other Texas Syndicate gang members as a result of his assault on the leader of the Texas Syndicate, Ricardo Benavidez, less than four months before the Sandoval killing.   The evidence also supported the theory that Mr. Sandoval, a prospect of the Texas Syndicate who need to commit an act of violence in support of the gang to become a member, deliberately went into Mr. Caro's cell to "hit" him.  All of the subsequent statements by Mr. Caro could then be viewed as not only inmate bravado critical for the survival of any inmate (ECF No. 790-1 ¶ 19), but also a specific attempt at self-preservation by warning other Texas Syndicate members—both inside and outside of the SHU—not to attempt similar "hits"

in the future.  According to gang rules (Bezy Supp. Decl., Ex. 62 ¶ 3), Mr. Caro would have been forbidden to talk about any gang implications related to the killing, whether verbally, on the phone, or in writing.   He also would have been aware of the intense scrutiny by inmates as well as increased prison surveillance after Mr. Sandoval's death, which included monitoring his every word, reading his letters, and recording his calls. (*See, e.g.*, Memorandum from W. Johnson re: Special Handling Instructions for Carlos David Caro, dated Dec. 19, 2003 (hereinafter "Special Handling Instructions"), attached as Ex 70.)

This new evidence places Mr. Caro's actions and statements in a completely different light and significantly weakens the Government's case.  The failure to present this evidence undermines confidence in Mr. Caro's sentencing proceedings.  Had the jury heard this evidence, there is a reasonable probability that at least one juror would have viewed Mr. Caro's post-offense statements much differently.  (*See* ECF No. 790 at 118-19.)

The Government's argument also must fail for procedural reasons, as this portion of Mr. Caro's ineffective-assistance-of-counsel claim relies on new evidence presented by Mr. Caro in his 2255 Motion, which the Government has ignored or disputed.  *See Elmore,* 661 F.3d at 868 (holding that the state PCR court "unreasonably broke from *Strickland*" by failing to consider the totality of the evidence and unreasonably discounting evidence favorable to the defendant by evaluating it piecemeal and unduly minimizing its import).  Finally, the Government fails to address the impact of this error, together with all of the trial errors, further precluding summary dismissal.  (See ECF No.

<div align="center">84</div>

<div align="right">JA 1604</div>

790 at 52-53.)  Mr. Caro's claim is not frivolous, and further proceedings are necessary to resolve this issue.

**F.     Mr. Caro has Sufficiently Alleged that Trial Counsel's Performance Was Deficient When They Failed to File a Motion to Set Aside the Benavidez Conviction.**

In its motion, the Government concedes that there are circumstances when counsel's failure to advise a client of the collateral consequences of a plea results in ineffective assistance of counsel.  (ECF No. 791 at 53.)  The Government also concedes that Mr. Caro's attorney Lou Dene failed to advise his client of the collateral consequence that his guilty plea in the Benavidez assault would be used as an aggravating factor in the Government's case against him in the Sandoval murder.  (ECF No. 791 at 54.)  Despite these concessions, the Government urges this Court to summarily dismiss Mr. Caro's claim that his capital counsel were ineffective by failing to challenge his underlying conviction.  Mr. Caro has pled specific facts—supported by declarations— that his trial counsel had no strategic reason for failing to pursue an ineffective- assistance-of-counsel claim against Dene and that counsel's performance in this regard was deficient.  (ECF No. 790 at  119-27; ECF No. 790-4, ¶¶ 37, 44-45; ECF No. 790-5, ¶ 22.)

The Government argues that Mr. Caro has not provided evidence that Dene would have recommended that Mr. Caro proceed to trial if he knew that his guilty plea would have been used against him.  This is an issue of material fact.  Mr. Caro submitted a declaration from Dene stating that Mr. Caro would have followed his advice and would have gone to trial if he so recommended.  (ECF No. 790-3, ¶ 8.)  This statement is

sufficient to present a dispute as to whether Dene would have recommended that his client exercise his right to trial. What is more, Mr. Caro alleged that he would have gone to trial, and that fact is sufficient for establishing prejudice as to the Benavidez conviction. (ECF No. 790 at 121.) Under the Supreme Court's decisions in *Missouri v. Frye*, 132 S. Ct. 1399, 1409-10 (2012); *Padilla v. Kentucky,* 130 S. Ct. 1473 (2010); *Hill v. Lockhart,* 474 U.S. 52, 58-59 (1985); and this Circuit's decision in *United States v. Akinsade*, 686 F.3d 248, 253-54 (4th Cir. 2012), prejudice is presumed when the consequence of ineffective legal advice would have been a decision to go to trial.[47]

As to the prejudice Mr. Caro suffered from his trial counsel's failure to challenge this conviction, the Government contends that "[e]ven if the evidence of [Mr. Caro's] plea and sentence in the Benavidez case had been excluded, there is no reasonable probability that the outcome of the penalty proceeding would have been different." (ECF No. 791 at 55.) The Government's assertion is contested (*see* Claim One, *supra*) and is inconsistent with the declarations submitted in support of Mr. Caro's 2255 Motion. One juror stated, "If Caro had not already been serving that lengthy sentence, then it is possible I would not have voted for the death penalty." (ECF No. 790-30, ¶ 3.) What is more, the underlying conviction allowed the Government to argue that because of Mr. Caro's lengthy sentence, he deserved the death penalty or else he would receive zero punishment. (ECF No. 790 at 127.) This argument was effective, as another juror indicated that one of the influential factors in voting for death was that Mr. Caro already

---

[47] Even if prejudice is not presumed, Mr. Caro has sufficiently alleged prejudice. (*See* Claim One, *supra*.)

86

JA 1606

had "essentially, a life sentence, so giving him another life sentence would not be any punishment for his crime." (ECF No. 790-29, ¶ 2.)

Moreover, as noted *supra*, this Court must conduct a cumulative review of prejudice and cannot look at this instance of deficient performance alone to determine prejudice (*See* Introduction (B).) The Government overlooks this fact. Mr. Caro's allegations of prejudice in this claim have satisfied the pleading requirement and thus the Court should not summarily dismiss it before considering it in the context of his other claims.

Finally, the Government's argument that Mr. Caro's *actions* in the Benavidez case would have still been admissible against him is not relevant to the issue of prejudice for two reasons. First, as noted in the previous paragraph, it was not simply Mr. Caro's actions in the Benavidez matter that bothered the jurors; it was the fact that a death sentence would not have been punishment because he was already serving a life sentence. Second, while actions related to the offense may have been introduced, an acquittal or a conviction for a lesser-included offense would certainly have had a different impact than a guilty conviction for conspiracy to commit murder. Mr. Caro's allegations of prejudice have satisfied the pleading requirement, and this Court should not summarily dismiss Claim Six (F).[48]

---

[48] Trial counsel's failure also has prejudiced Mr. Caro in another way. Had counsel investigated and challenged the Benavidez conviction and sentence upon appointment, Mr. Caro would not have faced the procedural hurdle facing him now in his related Motion to Vacate, Set Aside or Correct Sentence filed in the Benavidez case. *United States v. Caro*, 2:03-cr-10115 (W.D. Va.). As a result of trial counsel's failure to

JA 1607

**G.    Mr. Caro has Sufficiently Alleged that Trial Counsel Were Ineffective in Failing to Present Additional *Skipper* Evidence To Rebut Aggravating Evidence.**

When a petitioner alleges that counsel should have put forth additional evidence in mitigation, the Court assesses the prejudice by reweighing the aggravation evidence against the "*totality* of available mitigating evidence." *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (emphasis added). In opposing this claim, the Government correctly states the legal standard, but ignores the disputed facts alleged that must be developed in order for the Court to conduct the appropriate re-weighing.  Nothing in the Government's motion refutes the evidence in support of Mr. Caro's allegations; its disagreement with the import of those facts cannot serve as the basis for summary dismissal.

Mr. Caro alleged three miscellaneous items of *Skipper* mitigation that counsel should have introduced:  (1) the circumstances surrounding the Benavidez plea, (2) Dr. Geyer's observation that Mr. Caro was a "good inmate" suitable for housing at ADX-Florence; and (3) Mr. Caro's demonstration of concern for the psychological well-being of another inmate.  These mitigating items should have been introduced *in addition* to all of the other areas of mitigation ineffectively omitted, as discussed elsewhere in Mr. Caro's 2255 Motion, such as the severity of his developmental brain dysfunction and the effect of gang culture on his actions.  All of that missing mitigation evidence should be considered in its *totality*, not piecemeal, as the Government has tried to do.  The Government seeks to gloss over the undeveloped factual disputes and suggests that this

---

challenge that conviction, Mr. Caro must prove to the Court that his motion in that case is either timely or should be allowed under the doctrine of equitable tolling.

88

JA 1608

claim should be dismissed because each of these three items of evidence, individually, could not outweigh the aggravating circumstances. In so doing, the Government does not apply the "totality of the evidence" standard required and fails to recognize that Mr. Caro is entitled to develop the extent of the mitigating evidence that is missing from the record (and noticeably is not contradicted by the Government).

(1)    Regarding the circumstances surrounding the Benavidez guilty plea, the Government does not dispute that the plea agreement benefitted Moreno-Marquez, but argues that the motivation for the plea was the "overwhelming" evidence against Mr. Caro (ECF No. 791 at 58) and suggests that there is no prejudice because he could have received an even worse sentence if convicted on a "not guilty" plea (*id.* at 57). These arguments ignore the well-pled factual allegations in the 2255 Motion, which if proven, would entitle Mr. Caro to relief.

The first alleged fact that Mr. Caro is entitled to develop on the record is his motivation for entering the plea agreement, which on its face gave Moreno-Marquez a clear benefit, while giving Mr. Caro nothing more than what he could have received by pleading guilty straight up without an agreement. Mr. Caro's 2255 Motion alleges that his motivation was to give Moreno-Marquez a chance to get out of prison while still a young man. The Government suggests that this evidence should be dismissed because his motivation was never mentioned in Court during his guilty plea or during Moreno-Marquez's plea hearing. Of course, there is no record evidence of this at the time it happened. Had the Court been advised of the reasons for Mr. Caro's plea, the Court likely would not have accepted the agreements that were conditioned on one another, as

89

indicated by the Court's concern over the disparate agreements during the Moreno-Marquez hearing. (ECF No. 782, Sealed Ex. 55 at 4-6.) That is why Mr. Caro is entitled to a hearing to develop the facts alleged.  Even though the Government suggests that Mr. Caro is unlikely to successfully prove this allegation, Mr. Caro is still entitled to develop the factual record on his well-pled claim.  *Machibroda v. United States*, 368 U.S. 487, 496 (1962) (summary dismissal inappropriate where claim, while improbable, not clearly bereft of merit).

Further, the facts alleged show that Mr. Caro is likely to be able to prove his claim.  The agreement on its face benefitted Moreno-Marquez.  Mr. Caro has alleged in his motion that this was his intent when he entered the agreement.  His counsel in that case, Lou Dene, corroborates this fact.  Contrary to the Government's assertion, Dene's testimony on this issue would not be speculative; it would be based on his personal knowledge of the plea negotiations and his conversations with Mr. Caro during those negotiations.  Such testimony would be relevant and admissible as evidence of Mr. Caro's state of mind. *See* Fed R. Evid. Rule 803 (allowing admission of statements "of the declarant's then-existing state of mind (such as motive, intent, or plan)").

The second disputed factual issue is that the case against Mr. Caro for conspiracy to commit murder was "overwhelming" in the Benavidez case.  As previously asserted in Claim Six (F), if Mr. Caro had proceeded to trial in the Benavidez case, there is a good chance the jury would have found him *not* guilty on the conspiracy to commit murder charge.  As asserted by the Government at the sentencing of co-defendant Moreno-Marquez, the evidence in that case was not particularly strong.  In answering the Court's

JA 1610

question as to why the Government negotiated such a plea agreement with Mr. Moreno-

Marquez, Assistant U.S. Attorney Mountcastle explained that it was "because of the

problems of going forward with proof in a jury trial with a totally uncooperative victim."

(ECF No. 782, Sealed Ex. 55 at 4-6.)  The difficulty with that case applied equally to Mr.

Caro.

Not only was the proof of the case difficult, as admitted by the Government at

Moreno-Marquez's plea hearing, but the case was strikingly similar to another USP-Lee

prison assault case, *United States v. Edgar Garcia,* Case No. 2:03-CR-10110-JPJ (W.D.

Va.), which was tried shortly before the guilty pleas were taken in this case.  In that case,

the Government charged two defendants with a videotaped shank assault at USP Lee.

Like Mr. Caro, the defendants in *Garcia* were charged with conspiracy to commit

murder, assault with intent to commit murder, and weapons possession. (Case No. 2:03-

CR-10110-JPJ, Indictment, 10/22/2003, Dkt. 1.) The victim in that case had many

superficial shank cuts. (ECF No. 790-6 at ¶ 4.) Rather than plead guilty, the defendants in

*Garcia* went to trial.  The jury's verdict acquitted each of the defendants of the serious

charges, convicting them only on the weapons possession charges. (Case No. 2:03-CR-

10110-JPJ, ECF No. 26.) The rationale for the acquittal, even though the defendants were

admitted knife men, was that because the wounds were all superficial, no serious injury

or death had been intended. (ECF No. 790-6 at ¶ 6.) That same argument was available to

Mr. Caro, given the superficial nature of the wounds to Mr. Benavidez. (ECF No. 782,

Sealed Ex. 60 at 1) (noting that there was "no evidence of deeply penetrating injury").

91

There is a reasonable likelihood that Mr. Caro also would have been convicted only of the lesser offense.

At the very least, Mr. Caro has demonstrated a factual dispute about the circumstances surrounding his entry of a guilty plea to a crime that he reasonably could have challenged. Had the jury known Mr. Caro's motivation for entering the guilty plea to a charge he could have won, and subjecting himself to a prison sentence greater than 27 years, so that another young man would have the chance to leave prison and return to his family, members of the jury well may have seen Mr. Caro in a different light.

(2)     The Government next argues that there was *no prejudice* caused by the failure to introduce the opinion of Dr. Geyer, that Mr. Caro was a "good inmate" who was not normally disruptive or violent unless involved in gang activities. (ECF No. 790-56 at 2.)  The Government suggests that these positive statements about Mr. Caro would be outweighed by the doctor's note that Caro's violence was "planned and instrumental," rather than "impulsive," supporting the Government's argument that Mr. Caro was a cold, calculating killer. Of course, since Dr. Geyer never testified, the jury never got the benefit of any of his opinions. The fallaciousness of the Government's argument is that the Government had already introduced evidence that Mr. Caro was a cold, calculating killer and that he was a violent, dangerous person who could not be safely housed in the Bureau of Prisons.  What the jury did not ever get to hear was that prison staff considered Mr. Caro to be a good inmate and that the prison's own psychologist did not consider him *ordinarily* violent.   This evidence totally contradicts the image portrayed by the Government at trial, and Mr. Caro is entitled to develop this evidence fully before one

<div align="center">92</div>

<div align="right">JA 1612</div>

dismisses it as insufficient to "alter the balance of mitigating and aggravating evidence." (ECF No. 791 at 61.)

(3)    The Government dismisses Mr. Caro's concern about the psychological well-being of another inmate with a single sentence, saying that this "would not have offset the aggravating factors in this case." (ECF No. 791 at 62.) As noted previously, this item of mitigation is just one of several omissions by counsel, but when they are all taken together, they present a vastly different picture of Mr. Caro than the one painted by the Government at trial.

There was no valid strategic reason for trial counsel's failure to present any of the evidence identified as miscellaneous *Skipper* evidence. The failure to present the evidence was attributable solely to counsel's failure to obtain, review, and understand the importance of the information available.  The information was readily available from attorney Dene's file and in the discovery provided by the Government to trial counsel. The failure to appreciate the significance of and follow up on the available information constituted deficient performance under the controlling legal standards. Counsel's failure to present mitigating evidence allowed the Government to mischaracterize Mr. Caro as a violent person who killed over breakfast, when in fact, Mr. Caro was a caring person, not ordinarily violent, who was willing to spend the rest of his life in prison so that a younger man, Moreno-Marquez, could go home to his family while still a young man.  There is a reasonable probability that "at least one juror would have struck a different balance" at the penalty phase if this evidence had been presented.  *Wiggins*, 539 U.S. 510, 537 (2003).

93

JA 1613

**H.    Mr. Caro has Sufficiently Alleged that Trial Counsel Failed to Adequately Investigate and Present Evidence of the BOP's Negligence Regarding the Decision to Grant Mr. Sandoval's Request to be Placed in Mr. Caro's Cell.**

The Government contends that trial counsel was not deficient and disputes Mr. Caro's contention that the BOP was negligent in placing Mr. Sandoval in Mr. Caro's cell. The Government further argues that in light of Mr. Caro's statements that he murdered Mr. Sandoval over a breakfast dispute, there is no basis to claim that the murder was connected to the placement of Mr. Sandoval, as opposed to any other inmate, in Mr. Caro's cell.  (ECF No. 791 at 62-63.)   The Government's disagreement with the conclusion of Mr. Caro's expert, Mr. Bezy, reveals why this issue cannot be resolved in the context of a motion to dismiss.

Mr. Caro disagrees with all of the Government's contentions for the reasons asserted in Claim Four, *supra*, generally, and Claim Four (C), *supra*, specifically.  As already argued, in light of the Benavidez assault, the history of internal violence among Texas Syndicate members at USP-Lee, and the potential for retribution, all of which was known to the BOP, the placement of Mr. Sandoval in Mr. Caro's cell was not only negligent, but reckless.   The BOP's own report on the Benavidez assault, which recommended that Mr. Caro be celled separately from all Texas Syndicate members, confirms this conclusion.  (ECF No. 782, Sealed Ex. 51 at 12.)  Mr. Caro's statements, for the reasons previously discussed in Claim Four, *supra*, do not alter the reckless nature of this placement.

94

JA 1614

**I.      Mr. Caro has Sufficiently Alleged that Trial Counsel Failed to Object to the Government's Presentation of Evidence of Specific Instances of Violence by Persons Other than Mr. Caro.**

The Government urges this Court to summarily dismiss Claim Six (I) for several reasons, all of which fail at this stage of the proceedings.  First, the Government argues that because the specific-act evidence was presented in rebuttal rather than in its case-in-chief, it did not violate the Court's order and such evidence was proper.  (ECF No. 791 at 69.)   Regardless of whether the Government was in technical compliance with the Court's order, the information that was elicited from witnesses in "rebuttal" was highly prejudicial to Mr. Caro's defense.   Mr. Caro's counsel had a duty to object to the introduction of this improper evidence.   Their failure to do so constituted deficient performance.

Second, in an attempt to undermine Mr. Caro's claim, the Government asserts that Mr. Caro's counsel objected to the introduction of this evidence so he has not presented a factually valid claim.  (ECF No. 790 at 71.)  The fact that counsel objected to some of this improper testimony does not negate the claim.  Mr. Caro agrees that his counsel objected to the Government's questioning of defense witness Mark Cunningham, Ph.D., but the objection came too late and only after the Government had brought out irrelevant and prejudicial information about an al Qaeda terrorist.  (Tr. 02/12/07 at 87-89.)  There was no reason for the Government to ask Dr. Cunningham whether he testified in a case against a terrorist in 2001, only "75 days before 9/11," other to inflame the passion of the jury.  (*Id.* at 87.)  Without objection, the Government pursued this improper line of questioning; it was only after the Government began asking questions about another

95

JA 1615

defendant that counsel objected.  After discussion with counsel outside the presence of the jury, the Court ruled that it would not allow the Government to introduce facts of another prisoner's crime because not only was it irrelevant but it was also inflammatory and unfairly prejudicial. (Tr. 02/12/07 at 95.)  This ruling contradicts the Government's assertion that "counsel has no obligation to raise a futile objection."  (ECF No. 791 at 63.)  Given the Court's ultimate ruling, if counsel objected sooner, they could have prevented the jury from hearing the prejudicial information.

The Government also suggests that Mr. Caro somehow invited the prejudicial testimony through expert Dr. Cunningham's opinion that ADX-Florence had the capacity to prevent any future violence by Mr. Caro.  (ECF No. 791 at 63.)  Consideration of Dr. Cunningham's testimony and the grounds for fair rebuttal, however, show that this argument fails on its face.  The use of the Aryan Brotherhood evidence (with whom Mr. Caro had no association) was irrelevant to whether Mr. Caro could, in fact, be a future danger.  Similarly, evidence of two murders at USP-Marion twenty years earlier, as well as additional murders at USP-Marion and USP-Leavenworth, also decades old, was irrelevant to whether Mr. Caro would be a future danger at ADX-Florence and unfairly prejudicial.  This information improperly influenced the jury and violated Mr. Caro's right to an "individualized determination" at sentencing under *Zant v. Stephens*, 462 U.S. 862, 879 (1983).

Counsel's failure to object to the Government's reference to inmates Bruce Pierce and Trinity Ingle similarly constitutes deficient conduct.  During cross-examination of Dr. Cunningham, the Government introduced evidence, through its question, that

96

JA 1616

indicated that inmate Bruce Pierce had killed in prison and was no longer at ADX-Florence. (Tr. 02/12/07 at 134.) Defense counsel never objected, so the underlying circumstances of his situation were never presented to the jury. The BOP-locator website now indicates that Mr. Pierce is deceased. Whether or not his health was relevant to his transfer from ADX-Florence, the jury never heard because counsel failed to object and the Government has refused to produce this data.

Counsel also failed to object to the Government's questions to Dr. Cunningham regarding inmate Trinity Ingle. (Tr. 02/12/07 at 117.) When the Government initially asked a question about Mr. Ingle, counsel properly objected. (Tr. 02/12/07 at 89.) As a result of this objection and other prior improper testimony, the Court held that the Government could not pursue a line of questioning with specific facts "unless the Government can tie the facts of a particular crime to, similar to Mr. Caro's, that is, an in prison murder." (Tr. 02/12/07 at 89-95). The Government moved on to more general questions, but later returned to its question about Trinity Ingle. (Tr. 02/12/07 at 117.) This time trial counsel inexplicably did not object. With no objection, the Government was not pressed to show the Court how the facts of Mr. Ingle's case were relevant to Mr. Caro's case. In fact, they were not. Trinity Ingle was never convicted of an "in-prison" murder. *See United States v. Ingle*, 157 F.3d 1147, 1149 (8th Cir. 1998). The future violence also occurred at a state prison, not ADX-Florence. Thus, the jury heard irrelevant and highly inflammatory evidence concerning future acts of violence in a state prison by an inmate who had not committed an in-prison murder.

97

JA 1617

Finally, this evidence was not proper rebuttal evidence. Dr. Cunningham had not testified about Trinity Ingle or Bruce Pierce. Nor would he have relied on such anecdotal evidence. His testimony on future dangerousness, had he been allowed to review the relevant data that was in the sole possession of the BOP, would have been based on group statistical data, not misleading anecdotal stories. (ECF No. 316 ¶¶ 9-20.)

The Government claims that any potential prejudice from counsel's failure to object was cured by the Court's instruction to the jury. (ECF No. 791 at 71.) But the instruction was limited only to the initial testimony concerning al Qaeda and 9/11 (Tr. 02/12/07 at 163) and did not address the prejudicial impact of other equally irrelevant and inflammatory evidence, such as evidence regarding the Aryan Brotherhood, murders that occurred twenty or more years before Mr. Caro's trial, and other murders that occurred at BOP facilities other than ADX-Florence. Therefore, any impact of the curative instruction was limited.

The prejudice to Mr. Caro from counsel's failure to object to specific instances of violence, including that committed by members of other gangs, must also be considered in light of Mr. Caro's allegations that he was not a gang leader and that the BOP believed he was in "bad standing" with the gang at the time of his trial.

Mr. Caro has adequately pled a claim that counsel's repeated failure to object to this irrelevant, inflammatory, and highly prejudicial evidence constituted deficient conduct. He also has pled sufficient facts to show prejudice. There is a reasonable probability that had defense counsel objected to this testimony, the Court would have sustained the objections because the Government would not have been able to lay the

98

JA 1618

proper foundation, and at least one juror would not have found the aggravator that Mr. Caro was likely to commit acts of future violence within the federal prison system if sentenced to life instead of death. The Government's arguments do not warrant summary dismissal.

For all of these reasons, the allegations are sufficient to defeat the Government's Motion to Dismiss and require further factual development, hearing, and relief. *See Lockett v. Ohio*, 438 U.S. 586, 604 n.12 (1978) (reaffirming the trial court's authority in a capital sentencing hearing "to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense"); *cf. Rupe v. Wood*, 863 F. Supp. 1315, 1324-26, 1331 (W.D. Wash. 1994) (holding that a failure of trial counsel to object to irrelevant evidence concerning the size of the defendant's gun collection—as opposed to the weapon actually used in a homicide—violated the Sixth Amendment *Strickland* guarantee of effective representation since the evidence was inadmissible under *Zant*, but not finding prejudice based on the very brief nature of the improper testimony).

**J.    Mr. Caro has Sufficiently Alleged that Trial Counsel's Performance Was Deficient When They Failed to Object to The Government's Improper Closing Argument.**

Claim Six (J) involves three separate sets of statements: (1) the prosecution's improper arguments that the sentencing jury should "do [their] duty" by imposing the death penalty to "control" Mr. Caro; (2) the prosecution's improper arguments that Mr. Caro would receive "zero punishment" if the death penalty were not imposed; and (3) the prosecution's improper arguments to the jury that diminished the jury's responsibility for

99

JA 1619

the death verdict, in violation of the rule in *Caldwell v. Mississippi*. (ECF No. 790 at 136-40.) As to subsections J(1) and J(2), the Fourth Circuit has already found error but no prejudice. Accordingly, the Government asserts that Mr. Caro cannot show prejudice. (ECF No. 791 at 73 & n.17.) The Government's argument, however, ignores the fact that this Court's review, unlike the appellate court, is not confined to the trial-court record. Instead, this Court must "reweigh" the record in light of the totality of the evidence— which includes new facts presented in the instant habeas proceedings. *See Williams v. Taylor*, 529 U.S. 362, 397-98 (2000) (holding that a "prejudice determination was unreasonable insofar as it failed to evaluate the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding in reweighing it against the evidence in aggravation."); *Wiggins v. Smith*, 539 U.S. 510, 535 (2003) (holding that in the federal court's habeas analysis "we reweigh the evidence in aggravation against the totality of available mitigating evidence. . . . our review is not circumscribed by a state court conclusion with respect to prejudice . . . .").

Moreover, the Government fails to address the juror declarations submitted in support of prejudice. (*See* ECF No. 790-30, ¶ 2 (Juror #33 declaring that the "single most important factor" in deciding the penalty was the fact that Mr. Caro was already serving a *de facto* life sentence); ECF No. 790-29, ¶ 2 (Juror #24 declaring that "giving him another life sentence would not be any punishment for his crime"). The jurors' statements indicate that the Government's improper "zero punishment" argument could have influenced the decision for the death verdict. Thus, this new record shows that the

100

JA 1620

improper arguments were extremely prejudicial. For these reasons, the Government's

Motion to Dismiss subsections J(1) and J(2) should be denied.

As to subsection J(3), the *Caldwell* error,[49] the Government urges this Court to

dismiss the claim because Mr. Caro misstated the Government's closing argument. Mr.

Caro's counsel made an unintentional error by omitting the word "not" from the sentence

"It's not the law." (Tr. 2/13/2007 at 98.) The typographical error, however, does not

negate Mr. Caro's claim in its entirety. Mr. Caro also argued that Government's closing

argument downplayed the jury's responsibility by stating that other juries have done this.

(Tr. 02/13/2007 at 17) ("If it is your decision that Carlos David Caro should be sentenced

to death, if in fact the weighing process justifies the death sentence, you would not be the

first jury to come to that conclusion. It's something that other juries have done. You

would not be alone in that regard."). These comments suggest one of two things: either

that Mr. Caro had been sentenced to death previously by another jury or that other juries

have sentenced people to death. Both are improper and both arguments relieve the jury

of their ultimate responsibility in deciding whether death is the appropriate punishment.

What is more, these arguments were directed toward the "passion and prejudice"

of the jury, as opposed to the proper Eighth Amendment considerations. *See Zant v.*

*Stephens*, 462 U.S. 862, 879 (1983); *United States v. Wilson*, 135 F.3d 291, 297-98 (4th

Cir. 1998) (*citing Darden v. Wainwright*, 477 U.S. 168, 181 (1986)). Because "the

---

[49] In *Caldwell v. Mississippi*, 472 U.S. 320, 328-29 (1985), the Court held that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." Mr. Caro incorporates by reference here all arguments made *infra* as to Claim Eight.

JA 1621

decision whether to impose the death penalty should involve 'an individualized determination on the basis of the character of the individual and the circumstances of the crime,'" *United States v. Caro*, 597 F.3d 608, 625 n.17 (4th Cir. 2010) (*citing Zant*, 462 U.S. at 879 (emphasis omitted)), the Government's argument here was improper.  Mr. Caro has sufficiently alleged a claim that trial counsel performed deficiently by failing to make these objections.  The prejudice underlying this claim must be viewed cumulatively. [50]  This Court, therefore, should not dismiss this claim.

### K.    Mr. Caro has Sufficiently Alleged that Trial Counsel's Performance Was Deficient When They Failed to Seek Removal of a Sleeping Juror.

The Government urges this Court to summarily dismiss Claim Six (K) by making, yet again, factually specific arguments that are inappropriate at this stage of the proceedings.  First, the Government argues that the record does not "conclusively" show that Juror #33 was sleeping.  (ECF No. 791 at 79.)  Mr. Caro, however, has alleged that there was sufficient information, including the Court bringing attention to the matter not once but twice, to raise flags to alert defense counsel to the problem.  (ECF No. 790 at

---

[50] The Government asserts that because the Fourth Circuit determined that the error related to the prosecutor's comment on Mr. Caro's silence regarding lack of remorse was harmless, "Mr. Caro's argument that his attorney was ineffective for failing to object fails under the *Strickland* standard."  (ECF No. 791 at 76.)  Mr. Caro, however, did not argue that his counsel was ineffective for failing to object on these grounds because, as the Fourth Circuit noted, counsel did object.  *See United States v. Caro*, 597 F.3d 608, 627 (4th Cir. 2010) (noting that counsel moved to strike the Government's allegation).  Mr. Caro only mentioned this particular error in a parenthetical in his 2255 Motion to support the argument that all errors should be reviewed cumulatively to determine prejudice. (*See* ECF No. 790 at 140.)   The only claim involving Mr. Caro's alleged lack of remorse is one of ineffective assistance of trial counsel in failing to explain to the jury why the circumstances in this case were not conclusive of no remorse.  (*See* Claim Six (E), *supra*.)

JA 1622

141-42.)  The Court informed counsel on two different days during the penalty phase that Juror #33 was "nodding off" (Tr. 02/05/2007 at 105) and that he "appears to continue to sleep" (Tr. 02/07/2007 at 66).  It was at that point that counsel should have, but did not, seek to remove the juror for cause.  In fact, the Court indicated that it was "inclined to. . . discharge that juror."   (Tr. 02/07/2007 at 66.)   Therefore, the record rebuts the Government's assertion that even if counsel had moved to replace juror, the court would not have granted it.  (ECF No. 791 at 80.)

What is more, the Government fails to mention the declaration Mr. Caro submitted supporting his claim that trial counsel were deficient by failing to seek removal of Juror #33.  As Mr. Caro's *Strickland* expert Larry Hammond opined, trial counsel "should have moved and strongly advocated for the dismissal of that juror" because "the defendant's entitlement to a unanimous jury required that all jurors were engaged in the hard job of receiving testimony."   (ECF No. 790-4, ¶ 51.)   There is an issue of fact regarding counsel's failure to have Juror #33 removed and for that reason alone Claim Six (J) should not be summarily dismissed.

In addition to seeking the removal of Juror #33 for apparently sleeping during trial, once Juror #33 was questioned and admitted that he was having an "anxiety problem" (Tr. 02/07/2007 at 67), counsel had reason to seek to remove him from serving on the jury.  While the Court did not inquire as to the cause of his anxiety, a reasonable defense attorney could assume that it was the trial itself.  Mr. Caro's counsel should have, at minimum, asked the Court to inquire further regarding the root of Juror #33's anxiety. Had they asked follow-up questions regarding Juror #33's anxiety, they would have

103

learned that the trial triggered his anxiety and one day after court he went to the

emergency room because of the anxiety.  (*See* Declaration of Juror #33, dated Sept. 26,

2013 (hereinafter "Supp. Decl. of Juror #33"), attached as Ex. 71.)[51]

The Government also argues that Mr. Caro cannot meet his burden in showing

prejudice under *Strickland*.  (ECF No. 791 at 82.)  In making its point, the Government

relies upon two unpublished decisions from this Circuit: *United States v. Aguilar*, 409

Fed. App'x, 688, 2011 WL 288611 (4th Cir. Jan. 31, 2011); *United States v. Postell*, 891

F.2d 287, 1989 WL 141697 (4th Cir. Nov. 17, 1989) (Table) (unpublished).[52]  Those

cases, however, should not guide this Court's review of Mr. Caro's ineffective-

assistance-of-counsel claim.  Both of those cases discuss the plain-error review of

appellate claims of a sleeping juror.  In those cases, the Fourth Circuit held that absent a

showing that the juror failed to fairly consider the case, there was no plain error. *See*

*Aguilar*, 2011 WL 288611, at *3, and *Postell*, 1989 WL 141697, at *3.  But that is not the

relevant test here, as Mr. Caro has already indicated that the record in this case

demonstrated that the Court was inclined to remove the juror.  Further, as Mr. Caro has

argued, counsel's deficiencies must be viewed for cumulative error.  The fact that counsel

failed to remove this juror, who was sleeping at best and "nodding off" at worst, and who

was ridden with anxiety from the trial, must be considered in light of all the

---

[51] They would have also learned that Juror #33's close friend was shot while the trial was
in progress (Supp. Decl. of Juror #33, Ex.71)  This act of violence against a loved one
would have given counsel further reason to seek removal of Juror #33.  Juror #33's
declaration is also filed under seal as Sealed Ex. 76.
[52] The Fourth Circuit local rules discourage citing unpublished decisions issued before
January 1, 2007, because they were not intended as precedential authority.  *See* Fourth
Circuit Local Rule 32.1.

circumstances surrounding the claim of ineffective assistance of counsel. For these reasons, this Court should not dismiss Claim Six (K).

**L.    The Government Ignores the Fact that the Court Must Conduct a Cumulative Review of Allegations of Deficient Performance When Determining Prejudice, Thereby Making Summary Dismissal of Mr. Caro's Claim of Ineffective Assistance of Counsel at the Penalty Phase of Trial Improper.**

As the law requires, this Court must conduct a cumulative review of trial counsel's deficient performance to determine whether it undermined confidence in the outcome of Mr. Caro's trial and sentencing. *See* Introduction (B), *supra*. As it did in the previous claim related to trial counsel's performance at the guilt/innocence phase, the Government ignores the cumulative analysis requirement related to the penalty phase.

Mr. Caro has set forth specific and detailed allegations supporting the claim that his counsel was ineffective at the penalty-phase claim of his trial. Counsel failed to challenge not only the Government's tactical delay in bringing this case until after it had secured a guilty plea in the Benavidez case, but they also failed to collaterally challenge the plea in that case, which supported one of the Government's most harmful aggravating circumstances. Counsel also failed to present an adequate mitigation case for life through their inadequate development of mental-health evidence and their lack of presenting helpful lay witnesses and instead presenting harmful ones. Counsel's others deficiencies—such as failing to address the gang issues, inadequately responding to BOP's allegations of future dangerousness, and failing to object to improper questioning or a sleeping juror—must all be considered together. Certainly this information would

105

JA 1625

have changed the story that the jury would have heard and could have "struck a difference balance" in favor of a life sentence. *See Wiggins*, 539 U.S. at 537.

Summary dismissal on Claim Six is improper at this stage of Mr. Caro's habeas proceedings. This 2255 proceeding is the only opportunity that Mr. Caro will have for court review of the facts that he is alleging in support of his claim that his Sixth Amendment right was violated at his capital trial. This Court, therefore, should deny the Government's Motion to Dismiss on Claim Six and allow further evidentiary development through discovery and a hearing.

**CLAIM SEVEN: MR. CARO HAS SUFFICIENTLY ALLEGED THAT BY WITHHOLDING MATERIAL EXCULPATORY AND IMPEACHMENT EVIDENCE, AND PRESENTING MISLEADING PREJDUCIAL ARGUMENT REGARDING FUTURE DANGEROUSNESS, THE GOVERNMENT VIOLATED MR. CARO'S RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS.**

To prevail on this claim, Mr. Caro must show only that his claim is not "palpably incredible" or "patently frivolous or false." He has met this burden. Even if the Court finds his assertions "improbable," dismissal at this stage is inappropriate. *See Machibroda v. United States*, 368 U.S. 487, 514 (1962).

The majority of the Government's penalty-phase case rested on its argument that Mr. Caro would be dangerous in the future. *See, e.g.*, Tr. 11/13/2006 at 27-28 (Government agreeing with the Court that "a large portion of the Government's argument at the sentencing phase in this case will be future dangerousness, presented by the defendant, and the inability of the BOP to adequately secure the defendant to protect

against that threat of future dangerousness.")  In fact, 11 of the Government's 13 penalty-phase witnesses testified about the future dangerousness of Mr. Caro.

The Government does not dispute that it withheld exculpatory information regarding future dangerousness.  Instead, it argues that Mr. Caro is procedurally defaulted from raising this claim and/or that the withheld information was not material.  Both arguments are unavailing, and this *Brady* claim, which relies on facts not found in the existing record, cannot be resolved summarily and survives this Motion to Dismiss.

**A.**     **The Government Violated Mr. Caro's Constitutional Rights under *Brady v. Maryland* by Withholding Material Exculpatory and Impeachment Evidence that the BOP Has Housed Many Inmates at ADX-Florence and its Precedessor Prison, USP-Marion, for More than Three Years.**

The Government argues that Claim Seven (A) is procedurally defaulted and also fails because the withheld evidence was not material under the *Brady* standard.  Both arguments fail.

**1.**     **Mr. Caro's *Brady* Claim is Not Procedurally Defaulted Because it Rests on Evidence Outside the Record.**

The Government argues that this claim is procedurally defaulted because Mr. Caro is "re-litigating an issue that was raised on appeal."  (ECF No. 791 at 85.)  Contrary to the Government's argument, Mr. Caro did not raise, and could not have raised, this claim on appeal because it rests on facts outside the appellate record.[53]   *See Bousley v. United*

---

[53] On appeal, in a short footnote and in the context of different discovery-related claims, Mr. Caro briefly referenced a *Brady* claim and requested a hearing "to determine whether the information requested from BOP was *Brady* material." *United States v. Caro*, No. 07-5, Opening Br. at 69 n.45 (4th Cir. Feb. 12, 2009.)  The Government similarly responded in a footnote. *Id.*, Answering Br. at 46, n. 14 (4th Cir. Sept. 18, 2009.)  Mr. Caro attempted to expand the record on appeal through an evidentiary hearing, but the

JA 1627

*States*, 523 U.S. 614, 621-22 (1998) (recognizing an exception to the procedural default rule when the claim relied on facts outside the record).

The Government cites two cases in support of its argument. Neither case involves a *Brady* claim, and both involve procedural postures vastly different from Mr. Caro. In *United States v. Linder*, 552 F.3d 391 (4th Cir. 2009), the defendant had knowingly and voluntarily waived his right to appeal. After the court dismissed the defendant's appeal based on this waiver, he raised the same sentencing claims in a motion for post-conviction relief. In denying his motion, the court held that the defendant could not avoid the consequences of a valid appeal waiver by re-raising his *Booker* claim on collateral review. *Id.* at 392.

The Government's reliance on *Boeckenhaupt v. United States*, 537 F.2d 1182 (4th Cir.) *cert. denied,* 429 U.S. 863 (1976), similarly is misplaced. In *Boeckenhaupt,* the defendant claimed in his post-conviction motion that (1) his arrest was without probable cause; (2) the Air Force had no jurisdiction to detain him; and (3) his consecutive sentences were unlawful. In one paragraph, the Fourth Circuit held that these legal issues had previously been decided on direct appeal, and they were no different in substance from the allegations he lost on appeal. *Id.* at 1183. Neither of these cases involved *Brady* claims where the appellate record was devoid of facts due to the Government's withholding of evidence.

---

Fourth Circuit never gave Mr. Caro a hearing and quickly disposed of the claim, finding that Mr. Caro could only speculate on the exculpatory nature of the requested evidence. *United States v. Caro*, 597 F.3d 608, 619 (4th Cir. 2010).

JA 1628

By raising this claim in his 2255 Motion, Mr. Caro is not asking this Court to circumvent the Fourth Circuit's decision; he is merely asking the Court, for the first time ever, to meaningfully consider the claim.

### 2.  The Withheld Evidence Was Material, and the Government's Failure to Disclose it Undermines Confidence in Mr. Caro's Death Sentence.

As Mr. Caro explained in his 2255 Motion, the Government presented expert evidence and argued at trial that the BOP could house an inmate like Mr. Caro at its most secure facility, ADX-Florence, for only a few years and then would have no choice but to release him to a USP where he would harm other inmates. (ECF No. 790 at 149-50.)   In its penalty-phase closing, the Government argued, "Everyone agrees, every witness agrees he's getting out of ADX, that in some time within three to five years he will be back at a USP." (Tr. 2/13/2007 at 90.)  Before trial, Mr. Caro had suspected this was not true, and sought discovery relevant to this matter pursuant to Rules 16 and 17 of the Federal Rules of Civil Procedure and *Brady*.   At a court hearing, the Government admitted that it intended to argue that an inmate's stay at ADX was temporary and conceded that the defense was entitled to documents that would refute this assertion. (ECF No. 790 at 149; Tr. 11/03/2006 at 29-30.)  The Government told the Court and defense counsel that if the evidence existed it would be "considered material under Rule 16 and exculpatory" and should be produced (Tr. 11/03/2006 at 28) and generally agreed that the defense was entitled to data that refuted the Government expert's opinion (Tr. 11/03/2006 at 37).  The Government was aware of this issue, the importance of this issue to the defense, and its related discovery obligations before trial.

109

JA 1629

The Government, however, never produced the evidence.  Moreover, the evidence was not otherwise available, so when the Government refused to disclose the requested data, Mr. Caro had no other means to acquire it.[54]  Since that time, Mr. Caro has discovered selective information not available at the time of trial in the form of an informal survey and evidence released in other cases.  This new information includes the affidavit prepared by Jeanne Dvorak and supporting documents (ECF No. 790-48), documents produced by the Government in response to a 2010 subpoena issued to the Bureau of Prisons in another case, *United States v. Vincent Basciano*, 1:05-cr-060 (E.D.N.Y.), and documents received pursuant to a FOIA request in this case. (Declaration of Susan Richardson, dated Oct. 8, 2013 (hereinafter "Richardson Decl."), attached as Ex. 72 ¶ 3.)  This evidence shows that the Government possessed material exculpatory evidence at the time of Mr. Caro's trial and violated Mr. Caro's constitutional rights under *Brady* by failing to disclose it.  (Richardson Decl., Ex. 72 ¶¶ 6-11.)

The Government does not dispute that the evidence was in its possession or that it was favorable to Mr. Caro.  (ECF No. 791 at 86-87.)  Similarly, the Government does not dispute the factual accuracy of the informal survey cited by Mr. Caro in his 2255 Motion that impeaches Mr. Hershberger's testimony that an inmate who killed another inmate would be in the three-year step-down program (Tr. 02/12/07 at 200-03) and that step-

---

[54] There is no publicly available list of inmates housed at ADX-Florence.  Even if one somehow were able to discover the name of an inmate housed at ADX-Florence, the information still would be not publicly available under the Freedom of Information Act because the BOP will not release the information without a signed consent form from the inmate. *See, e.g.*, 28 C.F.R. §§ 16.3(a), 513.63.

110

JA 1630

down was automatic if there was no misbehavior and inmate showed responsibility (*id.* at 202); Nor does the Government dispute that the survey contradicts the Government's argument that Mr. Caro would get out of ADX within three to five years. (Tr. 2/13/2007 at 90.)

Rather, the Government argues that "there is no reasonable probability that the suppressed evidence would have produced a different sentence," and thus the withheld evidence was not material and there is no *Brady* violation. (ECF No. 791 at 85.) The Government's support for this proposition is weak. The Government first attempts to support its argument by noting that the jury unanimously found 12 of 22 mitigating factors, and that some of the jurors found (by a preponderance of the evidence) that Mr. Caro would be housed in a secure federal institution. (ECF No. 791 at 87.) These findings are largely irrelevant, and they pale in light of the jury's unanimous finding beyond a reasonable doubt that Mr. Caro "is likely to commit acts of violence against other inmates or staff within the federal prison system if imprisoned for life without possibility of release." (ECF No. 639.)

The Government next attempts to support its argument by referencing Dr. Cunningham's hearsay testimony that "illustrated that inmates could remain" at ADX-Florence for more than three years. (ECF No. 791 at 87.) Dr. Cunningham's testimony does not ameliorate the Government's failure to produce this evidence. First, Dr. Cunningham readily admitted to the jury that he had no personal knowledge or data upon which to formulate any opinions. (Tr. 2/12/07 at 40 ("I have limited information on

111

JA 1631

average length of stay at ADX."), *id.* at 76 ("I have asked for average length of stay on the Control Unit . . . I haven't gotten it.).

Dr. Cunningham then testified that he had heard that the average prisoner takes five years to work through the step-down program (*id.* at 41), that at least five individuals have been housed at ADX-Florence since 1994 (*id.*), and that inmates who killed other inmates were typically housed in ADX's Control Unit for six years (*id.* at 76). The problem with this hearsay evidence was that it was incorrect and grossly understated the length of time spent at ADX by many inmates. The Government's assertion that this hearsay evidence somehow corrects the problem not only defies common sense, but further perpetuates the inaccurate evidence presented at trial.[55]

Based on the informal survey and additional data Mr. Caro has gathered, Dr. Cunningham's hearsay numbers were wrong and underestimated the typical inmate's length of stay at ADX-Florence. The informal survey cited in Mr. Caro's 2255 Motion was based on responses received by 69 inmates, about 15% of the inmates at ADX-Florence. The results revealed that two-thirds of them had been housed at ADX-Florence/USP-Marion for more than five years, and that almost one-third of them had been there for at least 10 or more years. (ECF No. 790 at 152.)

Since that informal survey, Mr. Caro has been able to gather additional data regarding the length of time that inmates are housed at ADX-Florence. (*See* Richardson Decl., Ex. 72 ¶ 3.) These results further reveal that the Government withheld *Brady*

---

[55] Dr. Cunningham's hearsay testimony, which pales in comparison with the data Mr. Caro has been able to gather since his trial, also was improperly impeached by the introduction of irrelevant and specific acts of violence by other inmates.

information regarding the number of inmates housed at ADX for more than three or five years. This new data however, likely still under-represent the number of inmates who have been continuously housed at ADX-Florence for more than three or five years, as Mr. Caro still does not have access to all of the relevant data. The numbers also under-represent the length of time an inmate has been continuously housed under maximum security because they do not include an inmate's incarceration time at USP-Marion, BOP's maximum security facility before the opening of ADX-Florence in late 1994. Some of the inmates currently housed at ADX-Florence had previously been housed at USP-Marion under extremely restrictive conditions. (*See* Bezy Supp. Decl., Ex. 62 ¶ 4.) Even this limited data, however, further reveals that the Government withheld *Brady* information from Mr. Caro at trial.

The additional information now shows that at least 126 inmates have been incarcerated at ADX-Florence for more than five years and at least 155 inmates have been incarcerated there for more than three years. (Richardson Decl., Ex. 72 ¶ 7.) Of these 155 inmates, 125 are still designated to ADX-Florence, comprising almost 30% of the current ADX-Florence population. (*Id*.)

Mr. Caro is now aware of at least 79 inmates who, at the time of Mr. Caro's trial in 2007, had been designated to ADX-Florence for more than three years and at least 63 inmates who had been designated for more than five years. (*Id*. ¶ 8.) Twenty-five of these inmates had been housed at ADX-Florence continuously for at least ten years. (*Id*. ¶.) This data shows that, contrary to Mr. Hershberger's testimony, Mr. Silverstein was

113

JA 1633

not a "special case,"[56] and that a significant number of inmates have been continuously designated to ADX-Florence for more than five years. This data also shows that while the three-year step-down transfer program may have been a goal of the BOP, in practice it appears to have been the exception, not the rule. This new data is not cumulative of Dr. Cunningham's testimony or any other evidence presented at trial.

Mr. Caro also has analyzed the available data with an eye towards inmates whose circumstances more closely resemble Mr. Caro's circumstances. Mr. Caro separated out inmates who have been accused or convicted of committing a homicide within a BOP facility. Mr. Caro is aware of at least 54 such inmates who currently have been designated to ADX-Florence.[57] (*Id*. ¶ 9.) All 54 of these inmates have been continuously designated to ADX-Forence since their initial placement, including 22 inmates who entered ADX-Florence in 2007 or earlier. (*Id*.) In 2007, at least 14 of these inmates had been incarcerated at ADX-Florence for more than three years. Those 14 inmates are still designated to ADX-Florence. (*Id*.)[58]

Finally, Mr. Caro was able to locate ten cases nationwide where the Government sought the death penalty for a homicide committed at a BOP facility, but where the

---

[56] Defense counsel attempted to impeach Mr. Hershberger by referring to an inmate, Thomas Silverstein, who had been at ADX for a long period of time. Mr. Hershberger discounted the experience of Mr. Silverstein by stating that his was a "very special case." (ECF No. 790 at 150.)

[57] These numbers also under-represent the number of continuous years that inmates have spent in the BOP's maximum security facility as they do not include the years that these inmates may have spent at ADX-Florence's predecessor, USP-Marion.

[58] With the exception of the two ADX-Florence murders discussed at trial (Tr. 02/12/07 at 108), none of these 54 inmates have been indicted for a subsequent homicide since their designation to ADX-Florence. (Richardson Decl., Ex. 72 ¶ 10.)

114

defendant ended up with a life sentence. (*Id.* ¶ 11.) Nine of these ten defendants have been continuously designated to ADX-Forence since imposition of their life sentences. (*Id.*) The one inmate who was not designated to ADX-Florence had been diagnosed with schizophrenia, and thus, according to BOP policy, could not be placed at ADX-Florence. (*Id.* at 11, Table 3 n.3.) With the exception of the one inmate who entered ADX in 2012, all of these inmates have been designated to ADX-Florence for more than three years. (*Id.*)

The evidence Mr. Caro has been able to accumulate shows that an inmate, like Mr. Caro, who was convicted of a homicide within the BOP, but received a sentence of life, likely would not have been processed through the BOP's three-year step down program, but would have been continuously housed at ADX-Florence. Such evidence would have been extremely helpful in impeaching the Government's witness, Mr. Hershberger, and the Government's subsequent argument.

Mr. Caro has not only alleged but presented evidence that the Government provided false and misleading testimony about the average length of stay of inmates at ADX-Florence, that it withheld this critical evidence that would have revealed the truth, and that the suppression of this evidence prejudiced Mr. Caro during the penalty phase of his trial.[59] Had that evidence been provided to Mr. Caro, he would have been able to

---

[59] The prejudice to Mr. Caro from this withheld evidence was exacerbated by the Government's vouching in closing argument: "We know if, if Carlos Caro goes to [ADX-Florence], he's not going to stay there. . . . he eventually . . . will graduate out, be stepped down out of that facility" back into a USP. (ECF No. 790 at 150.) Mr. Caro disputes the Government's argument (ECF No. 791 at 92-94) that this statement was neither vouching nor prejudicial. When combined with the Government's *Brady* errors

JA 1635

effectively argue that, while ADX-Florence may have been designed as a temporary housing (ECF No. 791 at 70),  it is the practice of the BOP to continuously house inmates it considers dangerous for many years at ADX-Florence.  Therefore, consistent with this practice, the BOP would not have moved Mr. Caro out of ADX-Florence unless and until it believed that it was safe to do so.  Had the evidence been disclosed, there is a reasonable probability that a jury would not have found that Mr. Caro "is likely to commit acts of violence against other inmates or staff within the federal prison system if imprisoned for life without possibility of release" and would not have voted for a death sentence.

**B.**     **The Government Violated Mr. Caro's Constitutional Rights under *Brady v. Maryland* by Withholding Materially Exculpatory Evidence that Mr. Caro Was Not a Gang Leader at USP-Lee.**

The Government concedes that it withheld the three documents referenced in Mr. Caro's 2255 Motion.  (ECF No. 791 at 89 n.20)  As alleged in the 2255 Motion, those documents revealed (1) the BOP's belief that while Mr. Caro was at USP-Lee, inmate Ricardo Benavidez was initially the leader of the Texas Syndicate until he was assaulted, and then another inmate, Francisco Tijerina, became the leader; (2) that an inmate reported to the BOP that unnamed inmates had met and made a decision that whoever killed Mr. Sandoval was "gonna be in trouble," and (3) that the BOP believed that Mr. Caro was in "'bad standing' with the [redacted] gang."  (ECF No. 790 at 153-54.)

---

and misrepresentations to the jury regarding the ability of the BOP to house an inmate at ADX-Florence as long as necessary, the Government's vouching was highly prejudicial to Mr. Caro.

116

The Government argues, however, that it did not violate *Brady* because this information was not material. The Government also argues that this information was already known or should have been known to Mr. Caro, and thus it did not violate *Brady* in failing to disclose the evidence. Again, it would be premature for the Court to resolve these factual disputes in the context of a motion to dismiss.

> **1.   The Withheld Evidence Was Material, and the Government's Failure to Disclose it Undermines Confidence in Mr. Caro's Death Sentence.**

The Government's claim that information regarding the fact that Mr. Caro's position and standing in the gang is not material loses credence when one looks at the evidence presented by the Government in its penalty-phase case. Eleven of the Government's thirteen penalty-phase witnesses discussed gang-related matters.[60] The Government and its witnesses said the words "gang" or "Texas Syndicate" at least 129 different times during the penalty phase.[61] Mr. Caro's membership and alleged position in the gang was a key issue during the penalty phase of trial.

The Government now claims that it never said that Mr. Caro was "*the* leader of Texas Syndicate" and that the withheld documents "are of questionable utility to rebut evidence of Caro's statements and actions at FCI-Oakdale concerning his leadership role." (ECF No. 791 at 90-91.) The Government's assertions ignore the statements it

---

[60] The two witnesses who did not discuss gang matters were Kristin Sandoval, the daughter of Mr. Sandoval, and Thomas O'Neill, one of Mr. Caro's prior probation officers, whose testimony was presented by stipulation.

[61] The Government's reliance on gang activity is further revealed by the fact that it also mentioned the Aryan Brotherhood gang on at least seven occasions during the penalty phase of the trial. Mr. Caro argues the prejudicial impact of this irrelevant and inflammatory evidence in Claim Six (I), *supra*.

117

JA 1637

made to both the jury and Court during trial. During its closing argument, the Government argued the following:

> What do we know about the Texas Syndicate? It's not just any group that we see on the street corners in our cities; the Texas syndicate is labeled and classified by the Bureau of Prisons as a disruptive group, one of the five most violent, difficult gangs in the Bureau of Prisons system.
>
> The Bloods, the Crips, the gangs we hear about, they don't make the disruptive group; the Texas Syndicate is one of the five disruptive groups classified by the Bureau of Prisons, and this man is not just a member, but he's a leader in that.

(Tr. 2/13/2007 at 21.) The Government directly stated that Mr. Caro was still a leader, and at other times implied that he might still be the leader. (Tr. 02/13/07 at 21-22, 96.) It made these statements in the face of its own undisclosed evidence that clearly stated that Mr. Caro, in fact, was *not* the leader, and that the BOP believed he was in bad standing with the gang.

Not surprisingly, the Government also led the Court to believe that it asserted that Mr. Caro was a leader of the Texas Syndicate. When ruling on an evidentiary matter, the Court made the following statement, which the Government did not correct:

> For example, someone who was in the position that the Government contends that the defendant is in, that is a gang leader . . . .

(Tr. 2/12/2007 at 94.)

An inmate who is in "bad standing" and does not have the force of a gang behind him, and may even have the gang focused against him, poses less of a future danger than a gang leader. If Mr. Caro no longer had the support of the gang and its affiliates, then all of the Government's testimony about the danger of potential future gang communications would have been irrelevant. While the Government believed that inmates other than Mr.

118

JA 1638

Caro were the gang leaders at USP-Lee and that Mr. Caro was in bad standing with the gang, it never once mentioned this to defense counsel, the Court, or the jury, but instead argued that he "is a leader" or might still be a leader.  Failure to provide this evidence to the defense undermined confidence in the jury's death verdict.

> **2.     The Government's Contention That Mr. Caro Knew or Should Have Known About the Existence of This Evidence is Mere Conjecture.**

The Government alternatively argues that it has not violated Mr. Caro's *Brady* rights because "it appears that Caro knew his own standing within the gang; or, at the very least, knew Texas syndicate members who could have informed him of his standing."  (ECF No. 791 at 92.)  To support this assertion, the Government refers to a letter that Mr. Caro sent in January 2004 to a purported gang member outside of the prison, asking that "he remain in good standing with the gang."  (ECF No. 791 at 92.) The Government, however, does not refer to any evidence answering Mr. Caro's question.  Thus, this letter actually disproves the Government's contention and shows that Mr. Caro was questioning his own standing in the gang.  The Government provides no further evidence in support of its speculation.

Moreover, after the death of Mr. Sandoval, the BOP placed Mr. Caro under extremely strict and isolated housing conditions, ordering that "Inmate Caro will receive recreation alone.  This means no other inmates will be in any other recreation cage while he is receiving recreation.  Additionally, he is to be celled alone.  Staff should ensure he has minimal if any contact with other inmates particularly inmates belonging to or associated with the Texas Syndicate." (Special Handling Instructions, Ex. 70 ¶ 7.)  After

JA 1639

Mr. Sandoval's death, the BOP also moved Mr. Caro from USP-Lee to ADX-Florence before trial.  (Federal Bureau of Prisons Transfer Order for Carlos David Caro, dated Oct. 11, 2005, attached as Ex. 73.)  All of these facts would have made it much more difficult for Mr. Caro to receive communication about gang matters, including his own standing within the gang.  The Government's unsupported arguments are contrary to existing facts and are not sufficient to warrant summary dismissal.

The cases cited by the Government do not address the situation at hand and do not support the proposition that the Court should summarily dispose of this issue.  Rather, the cases involve completely different and irrelevant situations involving evidence regarding the defendant's physical whereabouts,[62] unspecified evidence that allegedly would have shown that the defendant's confession was fabricated,[63] and the statement of a witness whom any reasonable defense counsel would have interviewed.[64]

The Government's attempt to resolve this factual dispute in its favor does not support summary dismissal, but warrants further consideration outside of a motion to dismiss.

C.      **The Government's Argument Fails to Address the Cumulative Impact of the Withheld Evidenc, Thereby Making Summary Dismissal Improper.**

The Government's motion regarding this claim also fails because it does not address the cumulative impacts of all of its *Brady* errors.  The Government's failure to

_____

[62] *See United States v. Roane*, 378 F.3d 382, 402 (4th Cir. 2004); *United States v. Diaz*, 922 F.2d 998, 1007 (2d Cir. 1990).

[63] *See West v. Johnson*, 92 F.3d 1385, 1398-99 (5th Cir. 1996).

[64] *See United States v. Wilson*, 901 F.2d 378, 380-81 (4th Cir. 1990).

JA 1640

address this issue in a cumulative manner renders its analysis inadequate, precluding summary dismissal.

As discussed in the introductory section, *Brady* errors must be reviewed cumulatively. (*See* Introduction, Section (B), *supra*.) The Government presented two main arguments at the penalty phase regarding Mr. Caro's future dangerousness. First, it argued that Mr. Caro would be dangerous in the future in large part due to his gang association. Second, the BOP could not safely house him for more than three years, especially in light of his gang associations. The Government withheld evidence regarding both of these issues. It withheld evidence indicating that Mr. Caro was never a leader of the Texas Syndicate at USP-Lee; it withheld evidence indicating the BOP's belief that Mr. Caro was in "bad standing" with the gang; it withheld evidence that it had received word from an inmate that a "decision" had been made and that "whoever did this to Sandoval, if they come out, there's going to be trouble"; and it withheld evidence regarding the BOP's ability to securely hold Mr. Caro at ADX-Florence for as long as necessary.

Finally, the Government withheld evidence relevant during the merits phase of the trial that would have impeached Sean Bullock, its only purported eyewitness, who provided the only direct evidence regarding premeditation. (*See* Claim Five, *supra*; ECF No. 790 at 62-64.) Mr. Bullock, who was not adequately investigated and subjected to meaningful cross-examination in part due to the government's *Brady* error, provided a false image to the jury of Mr. Caro "sneaking" up behind a helpless and defenseless Mr. Sandoval. That false image was relied upon by the Government in its penalty-phase

121

closing argument. (Tr. 02/13/07 at 88 ("He snuck up behind him with a wet towel, tightened it up, put a knot in it and for four minutes strangled the life out of him. This was not a fight. It was an assault. That's a significant difference.").) The prejudice from this guilt/innocence phase *Brady* error also contributed to Mr. Caro's prejudice in the penalty phase.

The cumulative impact of all of these *Brady* violations had a significant impact on Mr. Caro's trial. These errors denied Mr. Caro's trial attorneys the evidence they needed to meaningfully challenge the most important issues of the trial—premeditation, future dangerousness, gang involvement, and the BOP's ability to securely house Mr. Caro at ADX-Florence as long as necessary. These alleged errors, which rely on evidence outside of the record, reveal that there can be no confidence in the integrity of Mr. Caro's trial. They also reveal why this issue cannot be resolved in this Motion to Dismiss.

**D.     Mr. Caro's Death Sentence, Which Relied on Incomplete, Misleading and Irrelevant Information Regarding Future Dangerousness Violated Mr. Caro's Rights Under the Eighth Amendment.**

The Government did not move to dismiss this particular subsection. This subsection, which is based on the evidence and arguments presented in other claims, including Claim Six, Claim Seven, and Claim Ten, cannot be summarily dismissed before the underlying issues raised in these three claims are resolved. As resolution of those underlying issues cannot occur in the context of a motion to dismiss, the summary dismissal of this claim also is inappropriate.

JA 1642

**CLAIM EIGHT: MR. CARO HAS SUFFICIENTLY ALLEGED THAT THE GOVERNMENT VIOLATED THE EIGHTH AMENDMENT AND THE RULE IN *CALDWELL V. MISSISSIPPI*, 472 U.S. 320 (1985), BY MAKING COMMENTS THAT MINIMIZED THE JURY'S RESPONSIBILITY AT THE PENALTY PHASE.**

To prevail on this claim, Mr. Caro must show only that his claim is not "palpably incredible" or "patently frivolous or false." He has met this burden. Even if the Court finds his assertions "improbable," dismissal at this stage is inappropriate. *See Machibroda v. United States*, 368 U.S. 487, 514 (1962).

While the Government argues that this claim is procedurally defaulted (ECF No. No. 791 at 99), it spends the bulk of time responding to the merits of the claim. If this Court finds that this claim is defaulted, then Mr. Caro can show cause to overcome the default because appellate counsel was ineffective in failing to raise this claim. (*See* Claim Nine D, *infra*.) The Court should not summarily dismiss this claim on procedural grounds.

The Government also argues that Mr. Caro's claim fails on the merits. Mr. Caro concedes that counsel made an unintentional error by omitting the word "not" from the sentence "It's not the law." (Tr. 2/13/2007 at 98.) The typographical error, however, does not negate Mr. Caro's claim in its entirety. The Supreme Court's decision in *Caldwell v. Missisippi* disapproved of the argument made by the State's attorney because he "sought to minimize the jury's sense of responsibility for determining the appropriateness of death." 472 U.S. 320, 341 (1985). As the Government notes, the Supreme Court has since described *Caldwell* as holding that "the jury must not be misled

123

JA 1643

regarding the role it plays in the sentencing decision." *Romano v. Oklahoma*, 512 U.S. 1, 8 (1994); *see* ECF No. 791 at 97.

In closing argument, the Government downplayed the jury's responsibility in sentencing Mr. Caro by stating that other juries have done this. (Tr. 02/13/2007 at 17) ("If it is your decision that Carlos David Caro should be sentenced to death, if in fact the weighing process justifies the death sentence, you would not be the first jury to come to that conclusion. It's something that other juries have done. You would not be alone in that regard."). The Government asserts that there is "no reasonable possibility that the jury was confused into thinking that some other jury could be partly responsible for causing the death of Caro." (ECF No. 791 at 96.) But the Government misses the point. Mr. Caro does not argue that another jury would later be responsible for Mr. Caro's death sentence. Rather, the prosecutor's comments at closing suggest one of two things: either that Mr. Caro had been sentenced to death previously by another jury or that other juries have sentenced people to death. Both are improper and both arguments relieve the jury of their ultimate responsibility in deciding whether death is the appropriate punishment in this case.

If the jury believed the former, then it would be relieved of its responsibility because another jury already sentenced Mr. Caro to death and where others have already made that finding, the pressure is removed from the current jurors. If the jury believed the latter, then the prosecutor's comment also diminished the jury's responsibility because it downplays the seriousness of imposing a death sentence. Contrary to the Government's argument in its motion that the prosecutor was just making a factual

124

observation, the fact that other juries have sentenced people to death "is not linked to any arguably valid sentencing consideration." *Caldwell*, 472 U.S. at 336. This irrelevant comment improperly relieved the jury of "the gravity of its task" and "awareness of its 'truly awesome responsibility.'" *Id.* at 341. Thus, the Government's argument must fail at this stage of the proceedings.

Compounding the error here, trial counsel failed to object and therefore there were no curative instructions given. *Cf. Caldwell*, 472 U.S. at 339 (emphasizing that no curative instructions were given and distinguishing another case where court "had in fact given the jury a strong curative instruction"). Mr. Caro has sufficiently alleged that the prosecutor violated *Caldwell* and therefore this Court should not dismiss Claim Eight.

## GROUNDS FOR RELIEF: DIRECT APPEAL

## CLAIM NINE: MR. CARO HAS SUFFICIENTLY ALLEGED THAT APPELLATE COUNSEL HAS PROVIDED INEFFECTIVE ASSISTANCE BY FAILING TO RAISE NON-FRIVOLOUS APPELLATE ISSUES DURING MR. CARO'S DIRECT APPEAL.

To prevail on this claim, Mr. Caro must show only that his claim is not "palpably incredible" or "patently frivolous or false." He has met this burden. Even if the Court finds his assertions "improbable," dismissal at this stage is inappropriate. *See Machibroda v. United States*, 368 U.S. 487, 514 (1962).

The Government seeks summary dismissal on all but one of Mr. Caro's appellate counsel claims.[65] As the Government concedes, Mr. Caro's appellate counsel claims

---

[65] The Government failed to address Claim Nine (B), which alleged that appellate counsel failed to challenge the exclusion for cause of qualified jurors with misgivings as to the

JA 1645

require evidentiary development to determine whether appellate counsel had a strategic

reason for failing to raise these claims. (*See* ECF No. 791 at 100 (noting that "without

the benefit of additional evidence, this Court cannot know or discern counsel's reasoning

in deciding what issues to present on appeal").)  This is consistent with law governing

claims of ineffective assistance of appellate counsel.  *See generally Bell v. Jarvis*, 236

F.3d 149, 164-65 (4th Cir. 2000) (discussing standard for appellate ineffectiveness claim

and citing case law for the proposition that counsel may make an "acceptable strategic

decision" to raise certain claims); *Shaw v. Wilson*, 721 F.3d 908, 915 (7th Cir. 2013)

(noting that if appellate counsel "abandoned a nonfrivolous claim that was both 'obvious'

and 'clearly stronger' than the claim that he actually presented, his performance was

deficient, unless his choice had a strategic justification"); *Eagle v. Linahan*, 279 F.3d

926, 939 (11th Cir. 2001) (noting that "whether a decision by [appellate] counsel was a

tactical one is a question of fact") (citation omitted).

The standard of care for capital appellate attorneys requires counsel "to litigate all

issues, whether or not previously presented, that are arguably meritorious under the

standards applicable to high quality capital defense representation, including challenges

to any overly restrictive procedural rules."  ABA Guideline 10.15.1(C); *see also* ECF No.

790-4, ¶ 52 (*Strickland* expert Larry Hammond stating that capital appellate attorneys

"have special duties not always encountered by defense counsel in noncapital cases" and

that "[t]he duty to advocate for reversal of the death sentence is especially important

---

death penalty. (ECF No. 790 at 162-68.)  For that reason alone, that claim should not be
dismissed.

126

when the case is on direct appeal"). As the ABA Guidelines explain, "'[w]innowing" issues in a capital appeal can have fatal consequences. . . .When a client will be killed if the case is lost, counsel should not let any possible ground for relief go unexplored or unexploited." ABA Guideline 10.15.1, cmt. at 1083. This Court must make the factual determination whether Mr. Caro's direct appeal attorneys fell below that standard of care.

Despite its concession that factual development is needed on this claim, the Government urges this Court to summarily dismiss these claims based on Mr. Caro's inability to show prejudice. For the reasons discussed below, Mr. Caro can demonstrate prejudice, and this Court should not dismiss this claim. *See Smith v. Robbins*, 528 U.S. 259, 285 (2000) (noting that, in appellate counsel claim, prejudice is shown where there is "a reasonable probability that, but for his counsel's unreasonable failure to file a merits brief, he would have prevailed on his appeal").

A.      **Mr. Caro Has Sufficiently Alleged That Appellate Counsel Was Ineffective by Failing to Challenge the Court's Refusal to Instruct the Jury that the Aggravating Factors Must Outweigh the Mitigating Factors Beyond a Resonable Doubt.**

At the time of Mr. Caro's appeal, there was not only Supreme Court law but also other persuasive circuit precedent supporting the argument that the court erred in failing to instruct the jury that the Government must prove beyond a reasonable doubt that the aggravating factors sufficiently outweigh the mitigating circumstances. (*See* ECF No. 790 at 159-62 (setting forth supporting law).)[66] Appellate counsel, however, failed to

---

[66] Since Mr. Caro filed his 2255 Motion, the Fourth Circuit has issued an opinion rejecting this argument. *See United States v. Runyon*, 707 F.3d 475, 515-16 (4th Cir. 2013); *see also United States v. Hager*, 721 F.3d 167, 206-07 (4th Cir. 2013) (same).

127

raise this claim on appeal.  The Government contends that Mr. Caro loses on the merits of the claim.

Although this Court instructed the jury that it must determine whether the Government had proven the aggravating factors beyond a reasonable doubt, the Court failed to given the requested instruction to the jury that this reasonable-doubt standard must *also* apply to the weighing of the aggravating and mitigating factors.[67]  The failure to properly instruct on the burden of proof is a structural error "without which [the penalty trial] cannot serve its function." *Sullivan v. Louisiana*, 508 U.S. 275, 281 (1993).  It is, therefore, reversible error and would have entitled Mr. Caro to relief on appeal. *Id.* at 281-82.  For that reason, contrary to the Government's assertion, Mr. Caro has alleged prejudice.

The Government attacks the merits of Mr. Caro's claim in two ways, both of which must fail.  First, the Government argues that the Supreme Court decisions in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Ring v. Arizona*, 536 U.S. 584 (2002), are "unhelpful" because "[n]othing in the record . . . implicates th[ose] holdings."  (ECF No. 791 at 103-04.)[68]  Mr. Caro disagrees.  Reviewing *Apprendi* and the relevant cases

---

Had Fourth Circuit law been against appellate counsel *at the time of Mr. Caro's direct appeal*, Mr. Caro would have a more difficult time arguing that appellate counsel was ineffective for failing to raise this claim.  When Mr. Caro was on direct appeal, however, the issue was not decided and there was persuasive authority supporting the claim.

[67]The fact that trial counsel requested, but were denied, a constitutionally adequate jury instruction on this issue further supports appellate counsel's deficient performance. *See Shaw v. Wilson*, 721 F.3d 908, 916 (2013) ("Trial counsel's preservation of a claim can make [raising a claim on appeal] obvious.").

[68] The government's citation, without explanation, to *Tuilaepa v. California*, 512 U.S. 967 (1994), is unpersuasive.  First, *Tuilaepa* was decided before *Apprendi* or *Ring*, and

128

following that holding, coupled with *United States v. Gaudin*, 515 U.S. 506 (1995), gives rise to a meritorious and winning argument that could have been raised, and resulted in relief, on appeal.

*Apprendi* held that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. The Supreme Court has consistently applied the holding in *Apprendi* to *any* determination that increases the maximum statutorily-permissible sentence and found that such determination must be proven beyond a reasonable doubt and made by a jury. *See Cunningham v. California*, 549 U.S. 270, 278-79, 288-89 (2007); *United States v. Booker*, 543 U.S. 220, 230 (2005); *Blakely v. Washington*, 542 U.S. 296, 306-07 (2004); *Ring v. Arizona*, 536 U.S. 584, 602 (2002); *Jones v. United States*, 526 U.S. 227, 232 (1999).[69] Recently, the Supreme Court applied the holding in *Apprendi* to any fact that increases a mandatory minimum sentence. *See Alleyne v. United States*, 133 S. Ct. 2151, 2155 (2013) In *Ring*, the Supreme Court applied *Apprendi* to capital sentencing. "Capital defendants, no less than noncapital

---

before *Gaudin*. Second, the Court in *Tuilaepa* determined that California's death-penalty statute did not require a "mandatory sentencing scheme" that would require death if a jury found "a certain kind or number of facts, or found more statutory aggravating factors than statutory mitigating factors." 512 U.S. at 980. Mr. Caro, however, does not make that argument. Rather, he asserts that the jurors should have been instructed that they must find beyond a reasonable doubt that the aggravating factors outweighed the mitigating factors.

[69] The Court linked the Sixth Amendment jury trial right with the due-process reasonable-doubt requirement back in *Apprendi* itself. 530 U.S. at 477-78 (*citing In re Winship*, 397 U.S. 358 (1970)).

defendants, we conclude, are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." *Ring*, 536 U.S. at 589.

In Mr. Caro's case, the Court refused to instruct the jury that it must find that the Government has proven "beyond a reasonable doubt that the aggravating factors sufficiently outweigh the mitigating factors in order to justify the death penalty." (ECF No. 611 at 1.) Instead, the Court only instructed the jury that after it determined whether "the Government has proved beyond a reasonable any additional aggravating factors" (Tr. 02/13/2007 at 100), it then "must decide whether the proved aggravating factors outweigh the mitigating factors sufficiently to justify the death sentence" (Tr. 02/13/2007 at 101). The Court went on and explained, "If you determine that the weighing process does justify a death sentence, then you should impose that sentence." (*Id.*) In its instruction, the Court violated the Supreme Court's rule in *Apprendi* that any determination that increases a defendant's punishment—in this case, it was increased from life to death—must be found beyond a reasonable doubt. It is the "outweighing" determination that violated Supreme Court law.

The Supreme Court has often referred to these types of determinations as "fact" findings and has never suggested that *Apprendi* covers only determinations of historical fact. On the contrary, in *United States v. Gaudin*, 515 U.S. 506 (1995), the Court rejected such an argument. In *Gaudin*, the government argued that the Constitution permits a judge, rather than a jury, to find an element when it involves applying a "legal standard" to certain "historical facts" found by the jury. The Court rejected this argument on two grounds. First, "the application-of-legal-standard-to-fact sort of question . . . , commonly

130

called a 'mixed question of law and fact,' has typically been resolved by juries." *Id.* at 512. This description applies fully to the "outweighing" determination in a federal capital case, in which the jury needs to draw inferences from aggravating and mitigating factors and determine the significance of those inferences. Second, the Court found that the government's argument "has absolutely no historical support." *Id.* Indeed, if the government's argument were true, then juries would only make "findings of fact" pertaining to mixed-law-and-fact issues and the judge would then apply the facts to make a determination of guilt. *Id.* at 512-13. Applying these principles to Mr. Caro's case, the requirement that the jury reach an "outweighing" determination without instruction that such finding was to be made beyond a reasonable doubt violates the Constitution.

Further support for the "outweighing" determination is found in the statute itself. Before a jury can decide to impose a death sentence, it must make a finding that aggravating factors outweigh mitigating factors. *See* 18 U.S.C. § 3593(e). A death verdict returned without such a finding would be statutorily invalid. The maximum eligible sentence for *Apprendi* purposes is the sentence authorized by statute based only on the findings made by the jury beyond a reasonable doubt. If an additional finding is needed to impose the greater sentence, then the Constitution is violated. While the determination that aggravating factors do or do not outweigh the mitigating factors may be subjective, it nevertheless qualifies as a fact finding under the Sixth Amendment.

Second, the Government argues that the Federal Death Penalty Act (FDPA) "does not set out a reasonable doubt standard" regarding the instruction on weighing aggravating and mitigating factors. (ECF No. 791 at 102.) According to the

131

Government, this signals that "Congress did not intend the reasonable doubt standard to apply to the weighing process." (*Id.*)  The FDPA, 18 U.S.C. § 3591 *et. seq.*, was enacted in 1994 before the Supreme Court announced its decisions in *Apprendi* and *Ring*.  As such, the Government's argument that there is not statutory language mandating that the "outweighing" determination be made beyond a reasonable doubt is irrelevant.  Regardless, the Supreme Court's interpretation of constitutional law trumps the statutory provision otherwise.  *Cf. United States v. Windsor*, 133 S. Ct. 2675, 2695 (2013) (finding that even though Congress has "great authority to design laws," it cannot deny constitutional rights in doing so).

For these reasons, Mr. Caro has sufficiently alleged that appellate counsel's failure to raise this claim prejudiced him, and Mr. Caro is entitled to a hearing and ultimately relief.

**B.**     **Mr. Caro Has Sufficiently Alleged That Appellate Counsel Was Ineffective by Failing to Challenge the Exclusion for Cause of Qualified Jurors with Misgivings as to the Death Penalty.**

As noted, the Government did not move to dismiss this claim.  For that reason, Mr. Caro stands on the facts alleged and arguments advanced in his 2255 Motion.

**C.**     **Mr. Caro Has Sufficiently Alleged That Appellate Counsel Was Ineffective by Failing to Appeal the Government's Use of Specific Acts of Violence by Person's Other Than Mr. Caro.**

The Government argues that Mr. Caro cannot demonstrate deficient performance or prejudice on this claim.  (ECF No. 791 at 105.)  As stated *supra*, a determination of deficient performance cannot be made from the record alone.  Mr. Caro alleged in his 2255 Motion that appellate counsel did not have a tactical reason for failing to raise this

132

JA 1652

claim.  (ECF No. 790 at 169.)  Contrary to the Government's argument that "counsel understandably" omitted this claim (ECF No. 791 at 107), this Court must take Mr. Caro's allegations as true.  The Government's motion cites law that appellate counsel need not raise every nonfrivolous issue (ECF No. 791 at 105), but this claim has merit and should have been raised in this capital case. Therefore, evidentiary development is required to prove deficient performance on this claim.

The Government's argument that Mr. Caro cannot demonstrate prejudice also fails at this stage of the proceedings.  Mr. Caro incorporates here by reference his argument made in related Claim Six (I), *supra*.  Claim Six (I) alleges ineffective assistance of trial counsel because counsel failed to challenge the Government's improper introduction of highly prejudicial testimony during trial.  Because trial counsel failed to preserve this claim, the Government relies on the notion that had the claim been raised on appeal it would have been subject to plain-error review and therefore not winnable.  (ECF No. 791 at 107-08.)  Even applying the plain-error test, the Fourth Circuit could have granted relief because the error affected Mr. Caro's substantial rights and seriously affected the fairness and integrity of the proceedings.  *See United States v. Olano*, 507 U.S. 725, 732 (1993).

As explained in Claim Six (I), the testimony was highly prejudicial and impacted the fairness of Mr. Caro's sentencing proceedings.  The damaging testimony had no relevance to Mr. Caro's alleged future dangerousness and improperly inflamed the passion of the jury.  The Government continues to defend its introduction of this improper evidence because it was "in rebuttal to the defense testimony."  (ECF No. 791

at 107.)[70]   But when sustaining one of trial counsel's objections to the Government's attempted introduction of specific acts of violence of other individuals, the Court found "it's inflammatory and may unfairly prejudice the defendant."  (Tr. 2/12/07 at 95.)  The Court's statement, therefore, defeats the Government's argument that the introduction of this testimony was "proper" rebuttal evidence.

Finally, the Government argues that even if the Fourth Circuit concluded that the introduction of the specific-act evidence was error, Mr. Caro cannot show prejudice. (ECF No. 791 at 108.)  It recites the appellate court's opinion, which found that the errors it did find were not prejudicial enough to have infected the trial or sentencing.  (ECF No. 791 at 108-09.)  These conclusions by the appeals court, however, do not preclude Mr. Caro from obtaining relief on his appellate ineffectiveness claim but rather lend further support for relief.  Had Mr. Caro's appellate counsel raised additional claims and been able to show additional errors, then such errors may have tipped the balance and resulted in a finding that the penalty phase was in fact unfair.  *Cf. Wiggins v. Smith*, 539 U.S. 510, 537 (2003) (noting that if additional information was considered, "there is a reasonable probability that at least one juror would have struck a different balance").

---

[70] As Mr. Caro already argued in Claim Six (I), regardless of whether the Government did or did not technically comply with the Court's order, the Government did not comply with the Constitution, and its introduction of other prisoners' specific acts of violence violated Mr. Caro's right to an individualized sentencing.  *See Zant v. Stephens*, 456 U.S. 410 (1982).

134

JA 1654

**D.**  **Mr. Caro Has Sufficiently Alleged that Appellate Counsel Was Ineffective by Failing to Argue that the Rule in *Caldwell v. Mississippi* Was Violated by the Government's Minimization of the Jury's Responsibility for a Death Verdict.**

In its motion, the Government cross-references Claim Eight and makes no additional argument in support of summary dismissal on this claim. (ECF No. 791 at 109.) Mr. Caro incorporates here by reference the argument he made in response to the merits of Claim Eight, *supra*. Because the Government has not offered any additional support for the dismissal of Claim Nine (D), Mr. Caro asserts that for the reasons stated in Claim Eight, his claim has merit and appellate counsel was ineffective by failing to raise it on appeal.

**E.**  **Mr. Caro Has Sufficiently Alleged that Appellate Counsel Was Ineffective by Failing to Assert Systemic Death Penalty Challenges.**

The Government cross-references Claims Ten, Eleven, Twelve, Thirteen, Fourteen, and Fifteen and makes no additional argument in support of summary dismissal on this claim. (ECF No. 791 at 109.) Mr. Caro incorporates here by reference the arguments he makes in response to the merits of Claims Ten, Eleven, Twelve, Thirteen, Fourteen, and Fifteen, *infra*. Because the Government has not offered any additional support for the dismissal of Claim Nine (E), Mr. Caro asserts that for the reasons stated in Claims Ten, Eleven, Twelve, Thirteen, Fourteen, and Fifteen, his claims have merit and appellate counsel was ineffective by failing to raise them on appeal.

JA 1655

**GROUNDS FOR RELIEF: SYSTEMIC CHALLENGES**

**CLAIM TEN: MR. CARO HAS SUFFICIENTLY ALLEGED THAT THE USE OF THE "FUTURE DANGEROUSNESS" AGGRAVATING FACTOR AT SENTENCING, WHICH RESULTED IN AN UNRELIABLE PREDICTION OF MR. CARO'S FUTURE DANGEROUSNESS BY THE JURY, VIOLATED MR. CARO'S RIGHT TO A NON-ARBITRARY SENTENCING PROCESS UNDER THE EIGHTH AMENDMENT AND 18 U.S.C. § 3595(C)(2)(A).**

To prevail on this claim, Mr. Caro must show only that his claim is not "palpably incredible" or "patently frivolous or false." He has met this burden. Even if the Court finds his assertions "improbable," dismissal at this stage is inappropriate. *See Machibroda v. United States*, 368 U.S. 487, 514 (1962).

In Mr. Caro's 2255 Motion, he asserted that the sentencing jury's consideration of the future-dangerousness aggravating factor violated his right to a non-arbitrary sentencing process under the Eighth Amendment and 18 U.S.C. § 3595(c)(2)(A). (ECF No. 790 at 170–79.) Mr. Caro supported his assertion with case law, *e.g.*, *United States v. Sampson*, 335 F. Supp. 2d 166 (D. Mass. 2004), and contemporary studies, *e.g.*, Mark D. Cunningham, Jon R. Sorensen & Thomas J. Reidy, *Capital Jury Decision-Making: The Limitations of Predictions of Future Violence*, 15 Psychol. Pub. Pol'y & 223 (2009), all of which serve to illustrate the radical decline in the confidence of courts and academics in the reliability of the future-dangerousness factor over the past three decades. As the district court mused in *Sampson*, "the evolution of the law, and of scientific research, presents the question of whether it can now be said that future dangerousness can generally be predicted with sufficient reliability to assure that the

136

JA 1656

death penalty is not being imposed arbitrarily and capriciously." *Sampson*, 335 F. Supp. 2d at 222–23. The answer is no.

The Government argues that "the future dangerousness factor meets Constitutional standards of reliability and is not arbitrary." (ECF 791 at 110.) In the absence of any studies to support its position, it relies primarily on *Jurek v. Texas*, 428 U.S. 262 (1976). In *Jurek*, the Supreme Court held that a jury considering whether to impose a death sentence can predict and consider as an aggravating factor a convicted person's probable future conduct. *Id.* at 275–76. In so holding, the Court acknowledged that "[i]t is, of course, not easy to predict future behavior." *Id.* at 275. Furthermore, the Court did not explicitly consider the fundamental question of whether the Eighth Amendment permits consideration of future dangerousness.

As Mr. Caro explained in his 2255 Motion, the Eighth Amendment strictly regulates the procedures by which death sentences are imposed, paying particular attention to their reliability. *See Lockett v. Ohio*, 438 U.S. 586, 604 (1978) ("[T]he qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed."). And as study after study has shown, the utilization of the future-dangerousness factor could hardly be a less reliable means of determining whether a person should live or die.[71] All of the cited studies reach roughly

---

[71] *See, e.g.*, Mark D. Cunningham, Jon R. Sorensen & Thomas J. Reidy, *Capital Jury Decision-Making: The Limitations of Predictions of Future Violence*, 15 Psychol. Pub. Pol'y & L. 223 (2009); Mark D. Cunningham, Thomas J. Reidy & Jon R. Sorensen, *Assertions of "Future Dangerousness" at Federal Capital Sentencing: Rates and Correlates of Subsequent Prison Misconduct and Violence*, 32 Law & Hum. Behav. 46 (2008); Thomas Regnier, *Barefoot in Quicksand: The Future of "Future Dangerousness"*

137

JA 1657

the same conclusion: "Predicting future dangerousness appears to depart little from gazing in a crystal ball when it comes to determining the fate of capital murderers." Marquart et al., *supra*, at 464. The error rate of such clairvoyance unquestionably exceeds that which the Eighth Amendment allows. *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (explaining that the Eighth Amendment demands an exceptionally high degree of reliability when a death sentence is imposed).

Drawing a parallel between *Jurek* and this case, the Government contends that "the capital sentencing jury's task in answering the question of future dangerousness [in *Jurek*] was 'no different from the task performed countless times each day throughout the American system of criminal justice.'" (ECF No. 791 at 110 (*quoting Jurek*, 428 U.S. at 276).) But this is untrue. Tasks such as setting bail, considering eligibility for parole, and determining the terms of incarceration are in no way comparable to the task of determining whether to sentence a defendant to death. None of those tasks is as consequential or irreversible as the task of a capital sentencing jury in answering the

---

*Predictions in Death Penalty Sentencing in the World of* Daubert *and* Kumho, 37 Akron L. Rev. 469 (2004); Texas Defender Service, *Deadly Speculation: Misleading Texas Capital Juries with False Predictions of Future Dangerousness* (2004), http://www.texasdefender.org/images/publications/DEADLYSP.pdf; Erica Beecher-Monas, *The Epistemology of Prediction: Future Dangerousness Testimony and Intellectual Due Process*, 60 Wash. & Lee L. Rev. 353 (2003); Erica Beecher-Monasa & Edgar Garcia-Rill, *Danger at the Edge of Chaos: Predicting Violent Behavior in a Post-*Daubert *World*, 24 Cardozo L. Rev. 1845 (2003); Jonathan R. Sorensen & Rocky L. Pilgrim, *An Actuarial Risk Assessment of Violence Posed by Capital Murder Defendant*, 90 J. Crim. L. & Criminology 1251 (2000); William J. Bowers & Benjamin D. Steiner, *Death by Default: An Empirical Demonstration of False and Forced Choices in Capital Sentencing*, 77 Tex. L. Rev. 605 (1999); James W. Marquart et al., *Gazing into the Crystal Ball: Can Jurors Accurately Predict Dangerousness in Capital Cases?*, 23 Law & Soc'y Rev. 449 (1989).

JA 1658

question of future dangerousness.  Accordingly, the degree of reliability required to undertake those non-capital tasks in a manner that comports with the requirements of due process is less than the degree of reliability required to establish a fact that will determine whether a person will live or die.  *See Woodson v. N. Carolina*, 428 U.S. 280, 305 (1976) ("Because of that qualitative difference [between a death sentence and a sentence of imprisonment, however long], there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.").

The Government criticizes Mr. Caro for "repeat[ing] the argument reviewed and refuted by the Supreme Court in *Barefoot* [*v. Estelle*, 463 U.S. 880 (1983)]."  (ECF No. 791 at 112.)  The Government is particularly bothered by the fact that Mr. Caro relies on studies even though, in *Barefoot*, the Court itself observed "that many mental health professionals have questioned the usefulness of psychiatric predictions of future dangerousness in light of studies indicating that such predictions are often inaccurate." *Id.* at 901 n.7.  Moreover, the Court decided *Barefoot* in 1983, while all of the studies cited by Mr. Caro were published between 1989 and 2009, well after the publication of any study considered by the Court.

Lastly, the Government takes issue with the fact that Dr. Mark D. Cunningham both authored the statistical studies cited in Mr. Caro's 2255 Motion and testified in Mr. Caro's behalf at trial.  (ECF No. 791 at 114.)  According to the Government, Mr. Caro "cannot have it both ways" with Dr. Cunningham "opin[ing] on the unlikelihood of a capital defendant being a future danger" and Mr. Caro "claim[ing] that neither jurors nor

JA 1659

experts can reliably determine which such offenders pose a danger." *Id.* First, and most significantly, Dr. Cunningham testified at Mr. Caro's trial prior to the publication of the statistical studies. As far as Mr. Caro knew, Dr. Cunningham had complete faith in the reliability of the future-dangerousness factor. Nothing in Dr. Cunningham's declaration and affidavit (ECF No. 316–1 at 1–17) or his curriculum vitae (*id.* at 18–25) at the time of the trial would have led one to believe Dr. Cunningham held a view at odds with his testimony.

Second, Mr. Caro had no choice but to put on a witness to testify about future dangerousness. That his expert witness, Dr. Cunningham has now published articles suggesting the inability to predict future dangerousness does not defeat this claim.[72] Ours is an adversarial system, and the Government alleged future dangerousness as a nonstatutory aggravating factor. (ECF No. 119 at 8 (Government's Motion in Limine).) By the same token, Mr. Caro made several pre-trial motions aimed at diminishing or eliminating the significance of the future-dangerousness factor, all of which the district

---

[72] It is not extraordinary for one's conclusion to change once more information is gathered. *See, e.g.*, *Baze v. Rees*, 553 U.S. 35, 78-79 (2008) (Stevens, J., concurring) (determining based on, inter alia, sociological evidence and empirical evidence over the past 30 years that the death penalty is unconstitutional); *Callins v. Collins*, 510 U.S. 1141 (1994) (mem.) (Blackmun, J., dissenting from denial of cert.) ("For more than 20 years I have endeavored-indeed, I have struggled-along with a majority of this Court, to develop procedural and substantive rules that would lend more than the mere appearance of fairness to the death penalty endeavor.[]Rather than continue to coddle the Court's delusion that the desired level of fairness has been achieved and the need for regulation eviscerated, I feel morally and intellectually obligated simply to concede that the death penalty experiment has failed."); *Moore v. Parker*, 425 F.3d 250, 268-69 (6th Cir. 2005) (Martin, J., dissenting) (concluding that, after reviewing cases as a federal appellate judge for over twenty-five years, "the death penalty in this country is arbitrary, biased, and so fundamentally flawed at its very core that it is beyond repair").

140

court denied.  (*See, e.g.*, ECF No. 474 (Motion for Daubert Hearing) ("It is Defendant's position that the [Government's witnesses'] opinions regarding future dangerousness are not based upon sufficient facts or data or reliable principles and methods and are therefore unreliable and should be excluded."); ECF No. 423 (Motion in Limine Regarding Evidentiary Matters) (seeking to prevent the Government from eliciting "[a]ny expression of opinion by a witness as to the 'dangerousness' or similar description of the Defendant").)  Indeed, the Government anticipated such a response.  *See* ECF No. 119 at 8 (Government's Motion in Limine) ("The United States has alleged as a nonstatutory aggravating factor in this case 'future dangerousness.'  We anticipate that the defendant, in response to our evidence of future dangerousness, will call a prison expert to testify about security arrangements in a prison's control unit . . . .").)

Finally, the Government briefly argues that this claim is procedurally defaulted (ECF No. 791 at 110).  If this Court finds that this claim is defaulted, then Mr. Caro can show cause to overcome the default because appellate counsel was ineffective in failing to raise this claim.  (*See* Claim Nine D, *supra*.)  Additionally, "[o]bjective factors that constitute cause include . . . a showing that the factual or legal basis for a claim was not reasonably available to counsel."  *McCleskey v. Zant*, 499 U.S. 467, 493-94 (1991). Inasmuch as one of the two statistical studies at the heart of Mr. Caro's future-dangerousness claim was published in November 2009, approximately two months after the filing of the opening brief on direct appeal, much of the factual basis for the claim was unavailable to appellate counsel.  *See* ECF 790 at 174, 176–78 (citing Mark D. Cunningham, Jon R. Sorensen & Thomas J. Reidy, *Capital Jury Decision-Making: The*

*Limitations of Predictions of Future Violence*, 15 Psychol. Pub. Pol'y & L. 223 (Nov. 2009)).  The then-unpublished study shed new light on the question of the predictive accuracy of violence risk determinations made by capital juries.  For instance, it was the first study to test the accuracy of jury predictions for the future violence of federal, as opposed to state, capital offenders.  Essentially, absent this study, appellate counsel could not have made the claim Mr. Caro now makes.  The Court should not summarily dismiss this claim on procedural grounds.

Mr. Caro has sufficiently alleged that the use of the future-dangerousness aggravating factor at sentencing, which resulted in an unreliable prediction of his future dangerousness, violated his right to a non-arbitrary sentencing process under the Eighth Amendment and 18 U.S.C. 3595(c)(2)(A).  This Court should deny the Government's Motion to Dismiss with respect to this claim and proceed to the review the claim's merits.

**CLAIM ELEVEN: MR. CARO HAS SUFFICIENTLY ALLEGED THAT THE ABSENCE OF A PRINCIPLED BASIS FOR DISTINGUISHING THOSE CASES IN WHICH THE FEDERAL DEATH PENALTY IS IMPOSED FROM THOSE CASES IN WHICH IT IS NOT IMPOSED RENDER THE FEDERAL DEATH-PENALTY ACT UNCONSTITUTIONAL.**

To prevail on this claim, Mr. Caro must show only that his claim is not "palpably incredible" or "patently frivolous or false."  He has met this burden.  Even if the Court finds his assertions "improbable," dismissal at this stage is inappropriate.  *See Machibroda v. United States*, 368 U.S. 487 514 (1962).

In Mr. Caro's 2255 Motion, he asserted that the federal death penalty is imposed without a principled basis and therefore must be abolished.  (ECF No. 790 at 179–84.)  Guided by the Supreme Court's precept that "capital punishment be imposed fairly, and

142

with reasonable consistency, or not all," *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982),

Mr. Caro supported his claim with 73 pages of meticulously organized case summaries,

each containing the facts and the status of every authorized federal death-penalty case

between 1988 and 2003. (*See* ECF No. 790-12 through 790-22.) These summaries were

further condensed for inclusion in Mr. Caro's 2255 Motion, where they formed a list

devised to preemptively defeat any argument that comparing cases is inherently

impossible. (ECF No. 790 at 180–84.) Nevertheless, the Government's principle

argument against this claim is that the summaries are "too-brief statements of no value to

an assessment of his claim." (ECF No. 791 at 116.)

Mr. Caro contends that the case-by-case summaries do in fact "disclose sufficient

individual detail" to demonstrate inconsistencies in the imposition of the federal death

penalty. (*Id.* at 116.) For example, following are two summaries of average length and

detail:

> **Rollack, Peter**      Eight racketeering murders between 1994 and 1997 by
> a gang headed by Rollack called "Sex, Money, and Murder," which later
> affiliated itself with the "Bloods." Rollack approved a Thanksgiving 1997
> double killing and personally killed four others, including a witness to
> another homicide. One victim in the Thanksgiving shooting was thought to
> be a witness in a North Carolina drug enterprise prosecution against
> Rollack, but actually was not. Only Rollack was targeted, and authorized
> for, a federal capital prosecution. All involved were African-American or
> Hispanic. On January 3, 2000, just before jury selection was about to
> begin, the defendant entered a guilty plea in exchange for a life sentence.
> He was sent to "super-max" with severe restrictions on who he may
> communicate with.

(ECF No. 790-16 at 10.)

> **Robinson, Julius & Britt, L.J.**      A Forth Worth drug trafficking
> prosecution of the leaders of an Arlington-based drug ring responsible for

<div align="center">143</div>

<div align="right">JA 1663</div>

multiple (three) murders. The first killing involved a 1998 shooting of an African-American, mistaken for the intended victim, in a car traveling on Central Expressway. A second 1999 killing was of an Hispanic person, mistaken for the intended victim, his brother, who allegedly sold a fake kilo of cocaine to Robinson. Britt was the triggerman in the third 1999 killing of another drug dealer, a Mexican national, who had stolen 20 kilos from a Laredo drug kingpin. Robinson was following in another car. Britt and Robinson, African-American, both allegedly fired weapons in the first and second incidents. The Court set, then extended a deadline for the approval of a capital prosecution. Attorney General Ashcroft rejected a plea agreement involving a life sentence. [Robinson was sentenced to death.] Co-defendant Britt was sentenced to life in prison at a separate trial.

(ECF No. 790-19 at 2; ECF No. 790-21 at 3.)

There is more than enough detail to perceive the arbitrariness in the treatment of these three defendants. Moreover, it is impossible to discern a principled basis for distinguishing between the imposition of a death sentence in Robinson's case and the imposition of a life sentence in Rollack's case and Britt's case. If there is any basis, it is race, geography, or both, as Mr. Caro argued in Claim Twelve.

The arbitrariness in the treatment of Robinson, Rollack, and Britt is typical of the capital defendants described in the case-by-case summaries. Mr. Robinson, like Mr. Caro and dozens of others, is "among a capriciously selected random handful upon whom the sentence of death has in fact been imposed." *Furman v. Georgia*, 408 U.S. 238, 309–10 (1972) (Stewart, J., concurring). Contrary to the Government's critique, Mr. Caro has provided the Court with ample evidence to make a showing of arbitrariness, and, in doing so, has sufficiently alleged that the federal death penalty is imposed without a principled basis and therefore must be abolished. This Court should deny the Government's Motion to Dismiss with respect to this claim and proceed to the review the claim's merits.

144

**CLAIM TWELVE: MR. CARO HAS SUFFICIENTLY ALLEGED THAT THE FEDERAL CAPITAL PUNISHMENT SYSTEM, IN WHICH CAPITAL PUNISHMENT IS IMPOSED ON BOTH THE INVIDIOUS BASIS OF RACE AND THE IRRATIONAL BASIS OF GEOGRAPHY, SHOULD NOT BE ENFORCED.**

To prevail on this claim, Mr. Caro must show only that his claim is not "palpably incredible" or "patently frivolous or false." He has met this burden. Even if the Court finds his assertions "improbable," dismissal at this stage is inappropriate. *See Machibroda v. United States*, 368 U.S. 487, 514 (1962).

In Mr. Caro's 2255 Motion, he asserted that the federal death penalty has been invidiously sought against minority-group defendants in violation of the Fifth and Eighth Amendments, and irrationally sought on a regional basis in violation of the Eighth Amendment. The statistics submitted by Mr. Caro demonstrate precisely the type of risk of invidiousness and irrationality in sentencing that the United States Supreme Court has condemned in its Fifth and Eighth Amendment jurisprudence. *See, e.g.*, *Furman v. Georgia*, 408 U.S. 238 (1972). The Government, however, urges this Court to reject Mr. Caro's claims, contending that those statistics "are no more probative of whether the statistical discrepancies should be attributed to discriminatory motive or the plethora of other possible factors." (ECF No. 791 at 118 (*citing McClesky v. Kemp*, 481 U.S. 279 (1987).)

The factual showing made by Mr. Caro was materially different from the showing made in *McCleskey*. In *McCleskey,* the United States Supreme Court reviewed the claim of a Georgia prisoner who alleged that the Georgia capital sentencing statute violated the Equal Protection Clause because it was administered in a racially discriminatory manner.

145

JA 1665

481 U.S. at 286. In support of his claim, Mr. McCleskey offered a sophisticated statistical study that demonstrated that Georgia defendants whose victims were white were 4.3 times as likely to receive a death sentence as those whose victims were black. *Id.* The Court nonetheless denied his claim, holding that Mr. McCleskey's statewide statistics did not meet his burden of proving that the imposition of the death penalty in his particular case was the product of purposeful discrimination. *Id.* at 293.

Unlike Mr. McCleskey, however, Mr. Caro offered statistics that provide information limited to the charging entity—the United States Attorney General—and its death penalty charging practices over time. Thus he provided what the statistics in *McCleskey* lacked: information specific to the decisionmaker in his case. Statistics relating to the charging entity, such as those presented by Mr. Caro, are materially more probative of discrimination in capital charging than those considered by the Supreme Court in *McCleskey*. *See United States v. Bass*, 536 U.S. 862 (2002) (endorsing "a showing regarding the record of the decisionmakers in respondent's case"). Thus, Mr. Caro's proffered statistics are not barred by *McCleskey* and support a prima facie showing of unlawful charging discrimination.

Mr. Caro has sufficiently alleged that the federal capital punishment system, in which capital-punishment is imposed on both the invidious basis of race and the irrational basis of geography, should not be enforced. This Court should deny the Government's Motion to Dismiss with respect to this claim and proceed to the review the claim's merits.

146

**CLAIM THIRTEEN:   MR. CARO HAS SUFFICIENTLY ALLEGED THAT HIS DEATH SENTENCE IS CATEGORICALLY CRUEL AND UNUSUAL PUNISHMENT IN VIOLATION OF THE EIGHTH AMENDMENT.**

To prevail on this claim, Mr. Caro must show only that his claim is not "palpably incredible" or "patently frivolous or false."  He has met this burden.  Even if the Court finds his assertions "improbable," dismissal at this stage is inappropriate.  *See Machibroda v. United States*, 368 U.S. 487, 514 (1962).

The Government argues that this claim is foreclosed by existing precedent in the Supreme Court and Fourth Circuit.  (ECF 791 at 120.)  Despite the existence of unfavorable precedent,[73] the validity and the force of Mr. Caro's arguments are undiminished.  In the years since *Gregg*, a steady stream of empirical evidence has eroded the legal justifications for the death penalty.  *See, e.g.*, Steven F. Shatz & Terry Dalton, *Challenging the Death Penalty with Statistics:* Furman*,* McCleskey*, and a Single County Case Study*, 34 Cardozo L. Rev. 1227 (2013); Radha Iyengara, *Who's the Fairest in the Land? Analysis of Judge and Jury Death Penalty Decisions*, 54 J.L. & Econ. 693 (2011).  Accordingly, the death penalty should be abolished in conformance with the "evolving standards of decency that mark the progress of a maturing society."  *Trop v. Dulles*, 356 U.S. 86, 101 (1958) (plurality opinion).

---

[73] Mr. Caro concedes, as he did in his 2255 Motion, that the United States Supreme Court has held that "the death penalty is not a form of punishment that may never be imposed, regardless of the circumstances of the offense, regardless of the character of the offender, and regardless of the procedure followed in reaching the decision to impose it."  *Gregg v. Georgia*, 428 U.S. 153, 187 (1976).  He concedes as well that this Court has previously dismissed claims such as this one on the basis of Supreme Court precedent.  *See United States v. Lighty*, 616 F.3d 321, 370 (4th Cir. 2010) (*citing Gregg*, 428 U.S. at 187).

JA 1667

Mr. Caro has sufficiently alleged that his death sentence is categorically cruel and unusual punishment in violation of the Eighth Amendment. This Court should deny the Government's Motion to Dismiss with respect to this claim and proceed to the review the claim's merits.

## CLAIM FOURTEEN: MR. CARO HAS SUFFICIENTLY ALLEGED THAT THE FEDERAL CAPITAL PUNISHMENT SYSTEM AT THE TIME OF HIS TRIAL VIOLATED INTERNATIONAL LAW.

To prevail on this claim, Mr. Caro must show only that his claim is not "palpably incredible" or "patently frivolous or false." He has met this burden. Even if the Court finds his assertions "improbable," dismissal at this stage is inappropriate. *See Machibroda v. United States*, 368 U.S. 487, 514 (1962).

In Mr. Caro's 2255 Motion, he sufficiently alleged that the biased and disparate federal capital-punishment system in place at the time of his trial violated international law. (ECF No. 790 at 189-91.) In doing so, he established that, under both the Convention on the Elimination of All Forms of Racial Discrimination ("CERD"), *adopted* Dec. 21, 1965, 660 U.N.T.S. 195, and the International Covenant on Civil and Political Rights ("ICCPR"), *adopted* Dec. 16, 1966, 999 U.N.T.S. 171, statistical evidence of racial disparity is enough to warrant—and require—corrective action by the United States. The Government in its Motion to Dismiss argues that the ICCPR is a "non-self-executing" treaty and therefore its ratification by the United States did not create individual rights that are enforceable in federal court. (ECF No. 791 122–23 (citing unpublished and extra-circuit dispositions in support of the proposition that the ICCPR is not self-executing).) The Government also argues that the United States, by

148

JA 1668

way of reservations, "made clear that it is bound only by the Constitution in its application of capital punishment, and not by any contrary interpretation of the ICCPR." (*Id.*) The Government does, however, acknowledge that relief under § 2255 extends to treaty violations. (*Id.* at 122 (citing *Davis v. United States*, 417 U.S. 333, 344 (1974)).)

## A.    The ICCPR Is a Self-Executing Treaty.

### 1.    The Doctrine of Self-Execution of Treaties.

Under the doctrine of self-execution of treaties, "a self-executing treaty may be defined as a treaty that may be enforced in the courts without prior legislation by Congress, and a non-self-executing treaty, conversely, as a treaty that may not be enforced in the courts without prior legislative 'implementation.'" Carlos Manuel Vazquez, *The Four Doctrines of Self-Executing Treaties*, 89 Am. J. Int'l L. 695 (1995). Unfortunately, this doctrine sometimes promotes a rule whereby treaties are presumed to be non-self-executing, when in fact the text and history of the Supremacy Clause counsel exactly the opposite. *Cf. Safety Nat'l Cas. Corp. v. Certain Underwriters,* 587 F.3d 714, 737 (5th Cir. 2009) (en banc) (Clement, J., concurring in the judgment) (explaining that, while "there may be a growing judicial consensus that multilateral treaties are presumptively non-self-executing," such "consensus" does not override the Supreme Court's plain-text approach to questions of self-execution). In the United States, as evidenced by the unambiguous language of the Supremacy Clause, as well as by the intent of its framers, treaties are presumed to be self-executing. *See* U.S. Const. art. VI, cl. 2 ("[A]ll Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land").

149

JA 1669

The historical record sustaining this proposition is unquestionable. During the Constitutional Convention, a proposal to the effect that treaties be sanctioned by the legislature before they had "the operation of law" was specifically rejected. *See* James Madison, *Notes of Debates in the Federal Convention of 1787*, 597 (W.W. Norton 1987) (1840). An alternative proposal, which was also rejected, would have established two types of treaties: one requiring only action by the President and the Senate, and a second requiring additional action by the House of Representatives. 2 *The Records of the Federal Convention of 1787*, 538 (Max Farrand ed., rev. ed. 1966). In a similar vein, the Committee on Style removed from the final version of the Supremacy Clause language that would have given the national Government the power to "enforce treaties." The Committee struck this language because it was redundant, considering the clear language of the Supremacy Clause. *Id.* at 389–90. The rejection of these proposals illustrates that the language of the Supremacy Clause was not coincidental, but rather chosen after due deliberation, and deliberately, to mean what it says.

The expectation that treaties would become operative as domestic law upon ratification is also expressed in the Federalist Papers and the ratification debates within the States. In *The Federalist No. 22,* for example, Alexander Hamilton explained that "[t]he treaties of the United States, to have any force at all, must be considered as part of the law of the land. Their true import, as far as respects individuals, must, like all other laws, be ascertained by judicial determinations." *The Federalist No. 22*, at 150 (Alexander Hamilton) (Clinton Rossiter ed., 1961).

<div align="center">150</div>

<div align="right">JA 1670</div>

In *Foster v. Neilson*, decided by Chief Justice Marshall in 1829, the Court concluded that the treaty in question was not self-executing because, *by its terms, it did not establish a right in the individual claimant,* but rather placed an obligation on the legislative branch to act.  27 U.S. (2 Pet.) 253, 314–15 (1829), *overruled in part by United States v. Percheman,* 32 U.S. (7 Pet.) 51.  Properly applied, the *Foster* rule makes sense.  A treaty is what amounts to a contract between nations, and as such, what needs to be done at the outset, as in the case of a contract between private parties, is to inquire into the content of the agreement to determine the obligations established thereunder, and to establish the scope of the various rights and duties within its purview.  *See, e.g., Sea Hunt v. Unidentified Shipwrecked Vessel,* 221 F.3d 634, 646 (4th Cir. 2000) ("Treaties are contracts between sovereigns, and as such, should be construed to give effect to the intent of the signatories." (citation omitted)).  Plainly put, what determines whether a treaty is self-executing, or not, is the language of the treaty *as interpreted by the courts,* not the nature of the rights established therein *as opined by the Senate that ratifies the treaty.*

Thus, when placed within its proper perspective, the *Foster* rule simply requires courts to examine the treaty in question to determine from its text (or when not apparent, from the history of the treaty), whether the treaty has created individual rights or whether it is non-self-executing, and therefore requires further legislative action to put it into effect domestically.  *See, e.g., Abbott v. Abbott,* 130 S. Ct. 1983, 1990 (2010) ("The interpretation of a treaty . . . begins with its text." (citation omitted)); *United States v. Stuart*, 489 U.S. 353, 365–66 (1989) ("The clear import of treaty language controls unless application of the words of the treaty according to its obvious meaning effects a

151

JA 1671

result inconsistent with the intent or expectations of the signatories." (citation and internal quotation marks omitted)).

In *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004), the United States Supreme Court stated without analysis or elaboration that "the United States ratified the [ICCPR] on the express understanding that it was not self-executing and so did not itself create obligations enforceable in the federal courts," *id.* at 734–35.  But this dictum—the question of self-execution was never presented to the Court—ignores the *Foster* rule, as the Court engaged in no interpretation whatsoever.  If it had, the Court would have found that the text of the ICCPR unequivocally spells out self-executing, individual rights and clearly establishes the obligations of the contracting parties regarding the enforcement of those rights.  *Sosa* is therefore wrongly decided.  Contrary to the Government's assertions, the ICCPR is a self-executing treaty.[74]

### 2.    The Legal Import of the Senate's Declaration Regarding the ICCPR.

Notwithstanding these established rules, the Government contends that the Senate's declaration, purporting to establish that the substantive provisions of the ICCPR would not be self-executing, *ipso facto* results in making the treaty non-self-executing. The Government is wrong for several reasons.

First of all, a "declaration" is a statement of position by the Senate that "is not presented to the other international signatories as a request for a modification of the

---

[74] The Fourth Circuit has not discussed this issue except in an unpublished opinion, *Dutton v. Warden, FCI Estill*, 37 Fed. App'x 51, 53 (4th Cir. 2002).  Because this unpublished opinion predates 2007, the Fourth Circuit disfavors citation of it except for purposes of res judicata, estoppel, or law of the case, none of which apply here.  4th Cir. R. 32.1 (Citing Judicial Dispositions).

treaty's terms." *Igartúa-De La Rosa v. United States*, 417 F.3d 145, 190 (1st Cir. 2005) (Howard, J., dissenting). Thus a declaration is not part of the treaty, but instead "is directed primarily toward United States courts to express 'the sense of the Senate' that the treaty should . . . be interpreted [in the manner proposed by the Senate]." *Id.*

In the case of the ICCPR, the Senate also made several reservations, which were specifically directed at Articles 6, 7, 10, 14, 15 and 20 of the treaty. A "reservation" is a "unilateral statement . . . whereby . . . [a State] purports to exclude or to modify the legal effect of certain provisions of the treaty in their application to that State." Vienna Convention on the Law of Treaties, art. 2(1)(d) (May 23, 1969), 1155 U.N.T.S. 331. In contradistinction with a declaration, a reservation has an actual effect on the terms of the treaty. *See Haver v. Yaker,* 76 U.S. (9 Wall.) 32, 35  (1869); *see also* Restatement (Third) of Foreign Relations Law of the United States § 314 cmt. d (1986) (noting that, when the United States accedes to a treaty with reservations, this statement has domestic legal effect, whereas other indications that the President or Senate assigned a distinct meaning to the treaty, such as declarations, are only pertinent to treaty interpretation in "the same way that the legislative history of a statute is relevant").

The Senate's declaration that the ICCPR is non-self-executing is *ultra vires* with respect to the ratification process and as such that declaration is not binding on the courts, who are required to exercise their independent judicial power under the Supremacy Clause in interpreting the meaning and import of all treaties entered into by the United States.

153

JA 1673

> [T]he Senate lacks the constitutional authority to declare the non-self-executing character of a treaty with binding effect on U.S. courts. The Senate has the unicameral power only to consent to the ratification of treaties, not to pass domestic legislation. A declaration is not a part of a treaty in the sense of modifying the legal obligations created by it. A declaration is merely an expression of an interpretation or of a policy or position. U.S. courts are . . . not bound to apply expressions of opinion adopted by the Senate (and concurred in by the President). The courts must undertake their own examination of the terms and context of each provision in a treaty to which the United States is a party and decide whether it is self-executing. The treaty is law. The Senate's declaration is not law. The Senate does not have the power to make law outside the treaty instrument.

Stephan A. Riesenfeld & Frederick M. Abbott, *Foreword: Symposium on Parliamentary Participation in the Making and Operation of Treaties*, 67 Chi.–Kent L. Rev. 293. 296–97 (1991).

In *Medellín v. Texas*, 552 U.S. 491 (2008), the Supreme Court affirmed the separate and distinct roles assigned to the Senate and Executive by the Constitution under Article II. There, the Court held that an executive memorandum purporting to grant individuals rights under a non-self-executing agreement was invalid because, while "[t]he President has an array of political and diplomatic means available to enforce international obligations . . . unilaterally converting a non-self-executing treaty into a self-executing one is not among them. The responsibility for transforming an international obligation arising from a non-self-executing treaty into domestic law falls to Congress," through, for example, the enactment of implementing legislation. 552 U.S. at 525–26. The Court explained:

> The requirement that Congress, rather than the President, implement a non-self-executing treaty derives from the text of the Constitution, which divides the treaty-making power between the President and the Senate. The Constitution vests the President with the authority to "make" a treaty. *If the*

154

JA 1674

> *Executive determines that a treaty should have domestic effect of its own force, that determination may be implemented in "mak[ing]" the treaty, by ensuring that it contains language plainly providing for domestic enforceability.* If the treaty is to be self-executing in this respect, the Senate must consent to the treaty by the requisite two-thirds vote, consistent with all other constitutional restraints.

*Id.* at 526 (emphasis added) (internal citations omitted). Thus, as the Supreme Court has reinforced, the constitutional prerogative to "make" treaties, and to set their domestic legal effect, falls in the first instance to the executive. While the Senate's views regarding self-execution may be relevant to the interpretation of an ambiguous treaty, *see* Restatement (Third) of Foreign Relations Law of the United States § 314, cmt. d (1987) ("[I]ndication that . . . the Senate ascribed a particular meaning to the treaty is relevant to the interpretation of the treaty by a United States court in much the same way that the legislative history of a statute is relevant to its interpretation."), those views are not capable of supplanting the plain language of an agreement. *United States v. Stuart,* 489 U.S. 353, 373 (1989) (Scalia, J., concurring) ("Only when a treaty provision is ambiguous have we found it appropriate to give authoritative effect to extratextual materials.").

In conclusion, the declaration by the Senate to the effect that the ICCPR is non-self-executing is not binding on the courts. Courts are required by the Supremacy Clause to make an independent judgment of that issue, based on the language of the treaty and, if that is not clear, on the negotiating history of the treaty in question.

155

JA 1675

**B.    The Plain Language of the ICCPR Indicates That Individual Rights Were Created and That the United States Agreed to Provide a Forum and Remedies for the Vindication of Those Rights to Those of Its Citizens Who Claim a Violation of Those Rights.**

The text of the ICCPR unequivocally spells out individual rights and establishes the obligations of the contracting parties regarding their enforcement by individual citizens who claim violations of these rights.  A straightforward reading of this language should leave little doubt that the United States entered into an international agreement creating individual rights.  At a minimum, the United States agreed that "[e]very human being has the inherent right to life."  ICCPR, pt. 3, art. 6, para. 1.  Upon ratification of the ICCPR by the Senate, this right became the supreme law of the land.  *Flores v. S. Peru Copper Corp.*, 414 F.3d 233, 257 (2d Cir. 2003) ("Self-executing treaties are those that 'immediate[ly] creat[e] rights and duties of private individuals which are enforceable and [are] to be enforced by domestic tribunals.'" (citation omitted)).  Furthermore, the United States agreed to provide "an effective remedy" for the violation of these rights, ICCPR, pt. 2, art. 2, para. 3(a), and it agreed "that any person claiming such a remedy *shall have* the right thereto determined by competent, judicial, administrative, or legislative authorities, or by any other competent authority provided for by the legal system of the State, *and to develop possibilities of judicial remedies*," *id.* para. 3(b) (emphasis added).

There is nothing "aspirational" or "precatory" in the language of the ICCPR.  *See Fund for Animals, Inc. v. Kempthorne*, 472 F.3d 872, 881 (D.C. Cir. 2006) (explaining that one way courts may find a treaty non-self-executing is if its "provisions are precatory, aspirational, or otherwise too vague to be judicially enforceable").  Rather, it

156

JA 1676

speaks to the establishment of specific individual rights.  *Compare* ICCPR, pt. 3, art. 6, para. 1 ("Every human being has the inherent right to life.  This right shall be protected by law.  No one shall be arbitrarily deprived of his life."), *with Jogi v. Voges,* 480 F.3d 822, 833–34 (7th Cir. 2007) (holding that Article 36.1(b) of the Vienna Convention, which "states, plainly enough, that authorities '*shall* inform the person concerned without delay of *his rights* under this sub-paragraph'" confers "individual rights," notwithstanding general language of preamble providing that "the purpose of [the Convention's] privileges and immunities is not to benefit individuals").  It is as precise and as mandatory as any law on the subject would be, had it been enacted directly by Congress.  *Cf. Medellín v. Dretke,* 544 U.S. 660, 687 (2005) (O'Connor, J., dissenting from dismissal of writ of certiorari) ("[I]f [like Article 36 of the Vienna Convention] a statute were to provide, for example, that arresting authorities 'shall inform a detained person without delay of his right to counsel,' I question whether more would be required before a defendant could invoke that statute to complain in court if he had not been so informed.").

Thus, the plain language of the ICCPR establishes individual, enforceable rights on behalf of persons situated as is Mr. Caro, and obligates the United States to provide a judicial remedy in its courts to vindicate their violation.  To conclude otherwise is to ignore the clear import of the treaty as well as our basic constitutional duty to interpret international agreements as the law of the land.

JA 1677

**C.**   **The Biased and Disparate Federal Capital Punishment System in Place at the Time of Mr. Caro's Trial Violated the International Covenant on Civil and Political Rights.**

Article 6 of the ICCPR enshrines the right to life, providing in part:  "Every human being has the inherent right to life.  This right shall be protected by law.  No one shall be arbitrarily deprived of his life."  ICCPR, pt. 3, art. 6, para. 1.  Article 7 provides: "No one shall be subjected to torture or to cruel, inhuman or degrading treatment or punishment."  *Id.* art. 7.  When the United States Senate ratified the ICCPR in 1992, it did so subject to the following reservations:

> [T]he United States reserves the right, subject to its Constitutional constraints, to impose capital punishment on any person (other than a pregnant woman) duly convicted under existing or future laws permitting the imposition of capital punishment, including such punishment for crimes committed by persons below eighteen years of age.

> [T]he United States considers itself bound by Article 7 to the extent that "cruel, inhuman or degrading treatment or punishment" means the cruel and unusual treatment or punishment prohibited by the Fifth, Eighth and/or Fourteenth Amendments to the Constitution of the United States.

138 Cong. Rec. S4783 (April 2, 1992) (statement of presiding officer).

Mr. Caro does not dispute the validity of the ratification reservations.  *See* Restatement (Third) of Foreign Relations Law of the United States § 314 cmt. d (1986) (noting that, when the United States accedes to a treaty with reservations, this statement has domestic legal effect).  None of the reservations, however, has any effect upon the arbitrary-deprivation clause of Article 6.  The United States may have reserved the right to impose capital punishment subject to certain restraints, but it did not reserve the right to arbitrarily deprive anyone of his or her life.  Yet, as Mr. Caro demonstrates in Claims

JA 1678

Ten, Eleven, and Twelve, the federal death penalty system has operated and continues to operate in an arbitrary manner. It was operating in an arbitrary manner when Mr. Caro was sentenced to death, and it was doing so in violation of the ICCPR.

Furthermore, the ICCPR and the Constitution are coincident with regard to capital punishment. *See United States v. Duarte-Acero*, 208 F.3d 1282, 1284 (11th Cir. 2000). In ratifying the ICCPR, the United States reserved the right to impose capital punishment "subject to its Constitutional constraints" and foreswore "cruel, inhuman or degrading treatment or punishment" to the extent that "cruel and unusual treatment or punishment [is] prohibited by the Fifth, Eighth and/or Fourteenth Amendments to the Constitution." 138 Cong. Rec. S4783 (April 2, 1992) (statement of presiding officer). Thus, the United States violates the ICCPR whenever the federal death-penalty system violates the Constitution. Because Mr. Caro's death sentence is the product of multiple constitutional violations, as these systemic challenges show, his death sentence is also the product of multiple violations of the ICCPR.

Mr. Caro has sufficiently alleged that the federal capital punishment system in place at the time of his trial violated international law. This Court should deny the Government's Motion to Dismiss with respect to this claim and proceed to the review the claim's merits.

**CLAIM FIFTEEN: MR. CARO HAS SUFFICIENTLY ALLEGED THAT THE PRECLUSION OF "PLAIN-ERROR" REVIEW BY THE FEDERAL DEATH-PENALTY ACT RENDERS THE ACT UNCONSTITUTIONAL.**

To prevail on this claim, Mr. Caro must show only that his claim is not "palpably incredible" or "patently frivolous or false." He has met this burden. Even if the Court

159

finds his assertions "improbable," dismissal at this stage is inappropriate. *See Machibroda v. United States*, 368 U.S. 487, 514 (1962).

In Mr. Caro's 2255 Motion, he asserted that the Federal Death Penalty Act ("FDPA") does not provide for constitutionally adequate appellate review. (ECF No. 790 at 191–93.) Specifically, Mr. Caro asserted that the FDPA deprives the courts of appeals of their usual power to review and reverse or remand for plain error. *See* Fed. R. Crim. P. 52(b) (providing for plain-error review); *see also United States v. Olano*, 507 U.S. 725, 731–37 (1993) (discussing the standards for plain-error review by the courts of appeal under Rule 52(b)); *United States v. Frady* 456 U.S. 152, 163 & n.13 (1982) ("Rule 52(b) was intended to afford a means for the prompt redress of miscarriages of justice."). The FDPA imposes this deprivation by the inclusion of the following provision:

> Whenever the court of appeals finds that—
>
> (A)    The sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor;
>
> (B)    the admissible evidence and information adduced does not support the special finding of the existence of the required aggravating factor; or
>
> (C)    the proceedings involved any other legal error requiring reversal of the sentence *that was properly preserved for appeal under the rules of criminal procedure*, the court shall remand the case for reconsideration under section 3593 or imposition of a sentence other than death.

18 U.S.C. § 3595(c)(2) (emphasis added). Mr. Caro submits that the FDPA, by limiting appellate review to legal error "that was properly preserved for appeal under the rules of criminal procedure" and thereby curtailing plain-error review, is unconstitutional. *See Parker v. Dugger*, 498 U.S. 308, 321 (1991) (emphasizing "the crucial role of meaningful

160

JA 1680

appellate review in ensuring that the death penalty is not imposed arbitrarily or irrationally" in contravention of the Constitution).

The Government in its Motion to Dismiss points to *Jones v. United States*, 527 U.S. 373 (1999), as an all-encompassing rebuke of Mr. Caro's argument that the FDPA does not provide for constitutionally adequate appellate review. In *Jones*, however, the Supreme Court was focused on a challenge to jury instructions, not the constitutionality of the FDPA. *Id.* at 388–89. Thus, the Court stated in cursory fashion: "The statute does not explicitly announce an exception to plain-error review, and a congressional intent to create such an exception cannot be inferred from the overall scheme." *Id.* The observation that the "statute does not explicitly announce an exception to plain-error review" cannot be equated with a conclusion that the FDPA, in all contexts, does not deprive courts of appeals of their usual power to review and reverse or remand for plain error. The Supreme Court has yet to reach that conclusion.

Finally, the Government briefly argues that this claim is procedurally defaulted. (ECF No. 791 at 123). If this Court finds that the claim is defaulted, then Mr. Caro can show cause to overcome the default because appellate counsel was ineffective in failing to raise this claim. (*See* Claim Nine D, *supra*.) The Court should not summarily dismiss this claim on procedural grounds.

Mr. Caro has sufficiently alleged that the preclusion of plain-error review by the FPDA renders the act unconstitutional. This Court should deny the Government's Motion to Dismiss with respect to this claim and proceed to the review the claim's merits.

161

JA 1681

**GROUND FOR RELIEF: CUMULATIVE ERROR**

**CLAIM SIXTEEN: MR. CARO HAS SUFFICIENTLY ALLEGED THAT HIS CONVICTION AND SENTENCE MUST BE VACATED DUE TO THE CUMULATIVE PREJUDICIAL EFFECT OF THE ERRORS IN THIS CASE.**

To prevail on this claim, Mr. Caro must show only that his claim is not "palpably incredible" or "patently frivolous or false." He has met this burden. Even if the Court finds his assertions "improbable," dismissal at this stage is inappropriate. *See Machibroda v. United States*, 368 U.S. 487, 514 (1962).

Mr. Caro has alleged numerous errors in both the guilt/innocence and penalty phases of his trial. As discussed in the introductory section of this opposition, *supra*, the law requires the Court to analyze the combined impact of all of these errors when assessing whether Mr. Caro's due process right to a fair trial has been violated. This type of analysis cannot occur in the context of a motion to dismiss in the piecemeal fashion urged by the Government.

**CONCLUSION**

For the reasons discussed above, this Court should deny the Government's Motion to Dismiss, and allow further development of Mr. Caro's claims.

Respectfully submitted this 9th day of October, 2013.

<div style="margin-left:40%">

s/Karen M. Wilkinson
Jon M. Sands
Federal Public Defender
Karen M. Wilkinson (Arizona Bar No. 014095)
Robin C. Konrad (Alabama Bar No. 2194-N76K)
Office of the Federal Public Defender
District of Arizona
850 West Adams Street, Suite 201

</div>

162

JA 1682

Phoenix, Arizona  85007
karen_wilkinson@fd.org
robin_konrad@fd.org
Telephone:  602-382-2816
Facsimile:  602-889-3960

Fay F. Spence, Esquire (Virginia State Bar No. 27906)
Federal Public Defender's Office
210 First Street, SW, Suite 400
Roanoke, Virginia 24011
fay_spence@fd.org
Telephone:  540-777-0880
Facsimile:  540-777-0890

Brian J. Beck (Virginia Bar No. 78049)
Federal Public Defender's Office
201 Abingdon Place
Abingdon, Virginia 24211
brian_beck@fd.org
Telephone:  276- 619-6080

Attorneys for Defendant/Petitioner
Carlos David Caro

163

JA 1683

## CERTIFICATE OF SERVICE

I hereby certify that on October 9th, 2013, I filed the foregoing document with the Clerk of the Court using the CM/ECF System which will send notice of such filing to the parties listed below:

Anthony Giorno, AUSA.
Email: anthony.giorno@usdoj.gov


s/Stephanie Bame\_\_\_\_\_
Legal Assistant
Capital Habeas Unit

164

JA 1684

*United States v. Carlos David Caro*
Case No. 06-CR-00001-JPJ

**Exhibits to Mr. Caro's Opposition to the Government's Motion to Dismiss**

Ex. 61          Letter from A. Giorno to Carlos David Caro, dated Dec. 30, 2004

Ex. 62          Supplemental Declaration of Mark Bezy, dated Oct.8, 2013

Ex. 63          Letter from James W. Marquart to Stephen Kalista, dated Dec. 6, 2006

Ex. 64          Letter from A. Giorno to S. Kalista, dated Dec. 29, 2006

Ex. 65          Letter from D. Malcolm Spica, Ph.D. to Robin Konrad,
                dated Sept. 10, 2013

Ex. 66          Email from H. Selvog to S. Kalista (with Selvog CV attached),
                dated Mar. 15, 2006

Ex. 67          Email from A. Giorno to S. Kalista, dated Sept. 28, 2006

Ex. 68          Supplemental Declaration of Donna Marie Schwartz-Watts, M.D.,
                dated Oct. 7, 2013

Ex. 69          Memorandum from H. Selvog to D. Mullikin, S. Kalista, and J. Simmons,
                dated  May 15, 2006, re: Witnesses/Records by Location

Ex. 70          Memorandum from W. Johnson re: Special Handling Instructions for
                Carlos David Caro, dated Dec. 19, 2003

Ex. 71          Declaration of Juror #33, dated Sept. 26, 2013

Ex. 72          Declaration of Susan Richardson, dated Oct. 9, 2013

Ex. 73          Federal Bureau of Prisons Transfer Order for Carlos David Caro,
                dated Oct. 11, 2005

Exs. 74-76      Filed under seal

Ex. 77          Declaration of Petra Herrera, dated Oct. 2, 2013

JA 1685

# EXHIBIT 61

# EXHIBIT 61

JA 1686

**U.S. Department of Justice**

*United States Attorney*
*Western District of Virginia*

---

*John L. Brownlee*

*United States Attorney*

*United States Courthouse and Federal Building*
*255 West Main Street, Room 104*
*Charlottesville, Virginia 22901*
*Telephone: 434/293-4283   Fax: 434/293-4910*

December 30, 2004

Carlos David Caro
Inmate No. 37786-079
United States Penitentiary - Lee County
P.O. Box 305
Jonesville, Virginia 24263-0305

            Re:  Grand Jury Investigation

Dear Mr. Caro:

        This office is currently investigating possible violations of federal law involving, but not necessarily limited to the murder of Roberto Sandoval.  A federal grand jury has been empaneled in Abingdon, Virginia and is investigating that matter.

        This letter is to notify you that you may be designated a target of this grand jury investigation. If you have any evidence of an exculpatory nature in the form of either documents or witnesses which would be relevant to the Grand Jury's determination of your culpability, please bring such evidence to my attention so that the Grand Jury may be apprised of such evidence.  If you have an attorney in connection with this investigation please have him contact me as soon as possible.

                        Very truly yours,

                        JOHN L. BROWNLEE
                        United States Attorney

                        _____

                        Anthony P. Giorno
                        Assistant United States Attorney

JA 1687

# EXHIBIT 62

# EXHIBIT 62

JA 1688

## SUPPLEMENTAL DECLARATION OF MARK A. BEZY

I, MARK A. BEZY, declare as follows:

1.    I have read the Motion to Dismiss filed by the government in *United States v. Carlos Caro* (ECF 791) and stand by my previous declaration and the opinions stated therein.

2.    I did not misunderstand the circumstances regarding the placement of Mr. Sandoval into Mr. Caro's cell. (ECF 791 at 31.) I understood that prison officers initially assigned Mr. Sandoval to the same cell as Mr. Caro and that when an officer attempted to place Mr. Sandoval in Mr. Caro's cell, Mr. Caro refused. After this refusal, Mr. Sandoval asked to be placed in Mr. Caro's cell.

3.    Prison inmates must abide by two different sets of rules, the prison rules and the inmate rules, or face consequences. If an inmate is a member of a prison gang, there also is a third set of rules that he must follow—the rules of the gang. For prison gangs like the Texas Syndicate, failure to abide by the rules will result in punishment, and depending on the perceived seriousness of the infraction, can result in the death of the offending inmate. A common rule of gangs, including the Texas Syndicate, is that gang members are forbidden from talking about gang matters outside of the gang, and should never "snitch" on another member.

4.    Prior to the opening of the United States Penitentiary, Administrative Maximum Facility near Florence, Colorado (ADX-Florence) in late 1994, the United States Penitentiary at Marion, Illinois (USP-Marion) was the Bureau of Prisons' most secure and restrictive institution. The mission of USP-Marion was to house the most dangerous, violent and escape-prone inmates in the Bureau of Prisons system. Once ADX-Florence opened, this mission was transferred to ADX-Florence. As a result, many of the inmates who had been housed under the most restrictive

1

JA 1689

and controlled conditions at USP-Marion were transferred to ADX-Florence to continue serving their sentences under similar restrictive conditions. I am familiar with these transfers because of my positions within the Bureau of Prisons at that time. Between January 1992 and May 1995, I was a Captain at USP-Marion and was involved in the transfer of high security inmates from USP-Marion to ADX-Florence. I then was promoted to the position of Correctional Services Administrator for the North Central Region, and wrote the plan for the last transfer of inmates from USP-Marion to ADX-Florence. While these transfers occurred about 18 years ago, some of the inmates who were transferred from USP-Marion to ADX-Florence are still housed at ADX-Florence.

I declare under penalty of perjury that the foregoing is true and correct.

10-8-13
Date

Mark A. Bezy

2

JA 1690

# EXHIBIT 63

# EXHIBIT 63

JA 1691

December 6, 2006


Stephen Kalista
Attorney at Law
Suite 1, Mutual Pharmacy Building
Big Stone Gap, VA 24219



Dear Mr. Kalista:


This letter represents my preliminary opinion concerning the future dangerousness of Mr. Carlos D. Caro in the case 1:06CR001. Currently I am a Professor of Criminology and Chair of the Criminology Program at the University of Texas at Dallas. I have been in this position since August 2005. Prior to this appointment I was a Professor of Criminal Justice at Sam Houston State University (1986-2005). Both of my academic and research careers have centered on examining inmate and guard subcultures, and the effects of policy changes and shifts on prison organizations. Currently I am examining inmate attitudes towards sexual assault in Texas prisons. My research activity throughout my career has allowed me to talk to and interview 1,000s of prisoners and security officers. I have also conducted research on the issue of future dangerousness.

Mr. Caro is a 39 year old Hispanic male inmate serving a 378 month (roughly 32 years) sentence of incarceration for possession with the intent to deliver cocaine. He is from Falfurrias, Texas. He has been classified as a high security inmate within the Federal Bureau of Prisons due to his membership in the Texas Syndicate (or TS), a designated "Security Threat Group" within the FBOP. Between 1994 and 2001 Mr. Caro was in and out of federal prisons serving time for drug-related offenses. His behavior while in the free community was marked by several arrests for the possession of marijuana. He has limited formal education experience and can best be described as a manual laborer. While in prison, Mr. Caro has been involved in several gang-related incidents and was found to be in possession of a weapon and morphine. He has no known history of escape activity, assaults on security staff, or premeditated attacks on security staff. He is currently alleged to have murdered another inmate in his administrative segregation cell at USP-Lee in December 2003.

In my opinion, which is based on my reading of court documents and legal materials and FBOP records of Mr. Caro provided by Mr. Stephen Kalista, Mr. Caro is an older but dangerous offender to other inmates, especially rival prison gang members. He is not a threat to the security staff. However dangerousness in a prison environment is intensified by proximity to other inmates and if Mr. Caro were to be removed from the general population and placed in an administrative segregation housing area where his contact

DB-4262

JA 1692

with other inmates were eliminated, Mr. Caro would pose a limited threat to institutional security and operations. I believe that the FBOP has the security housing resources to adequately house, confine, and manage Mr. Caro for many years. Also Mr. Caro is an "older" inmate and older inmates typically pose little threat to other inmates and staff.

In sum, an administrative segregation setting with the advantages of a single cell would virtually eliminate any future threat from Mr. Caro. If other information about Mr. Caro comes to my attention, I reserve the opportunity to alter or change my present opinion.

Sincerely


James W. Marquart
84 Elkins Lake
Huntsville, Texas 77340

DB-4263

JA 1693

# EXHIBIT 64

# EXHIBIT 64

JA 1694



**U.S. Department of Justice**

*United States Attorney*
*Western District of Virginia*

---

John L. Brownlee
United States Attorney

BB&T Building
310 First Street, S.W., Room 906
P. O. Box 1709
Roanoke, Virginia 24008-1709
Telephone: 540/857-2250
Fax: 540/857-2614

December 29, 2006

Stephen Kalista, Esq.
P.O. Box 1186
Big Stone Gap, Virginia 24219

Re:  United States v. Carlos Caro

Dear Steve:

Enclosed herewith please find a copy of the grand jury testimony of the government's inmate witness as well as a report of interview he gave at the time of the incident. The latter was done as part of a mass interview of all the inmates on the SHU. Copies of all the interviews conducted at that time are attached.

If you have any questions, please feel free to call me. I will be in the Abingdon office January 2nd through the 4th. The number at that office is (276) 628-4161.

Very truly yours,

JOHN L. BROWNLEE
United States Attorney

Anthony P. Giorno
Assistant United States Attorney

DB-9656

JA 1695

# EXHIBIT 65

# EXHIBIT 65

JA 1696

D. MALCOLM SPICA, PH. D.
Licensed Clinical Psychologist
Neuropsychologist

September 10, 2013

Robin C. Konrad
Assistant Federal Public Defender
Capital Habeas Unit
Federal Public Defender for the District of Arizona
850 West Adams Street, Suite 201, Phoenix, AZ 85007

v. (602) 382.2734
f.  (602) 889.3960
e.  robin_konrad@fd.org

RE: Response to government motion to dismiss - Carlos Caro

Dear Ms. Konrad:

As you requested, I have reviewed the excerpt from the Government Motion to Dismiss (Document 791 - page ID 7404-7407), and Government Exhibit 3 (page ID 7499-7500). As we discussed via telephone on 9/03/13, I wish to clarify the following points raised in the motion:

1)  The authors of the motion stated that I made no mention of "brain damage" in my evaluation. I wish to clarify that the term brain damage denotes a compromise from previous function. That is, brain damage assumes a normally functioning brain that was then injured or compromised and exhibited subsequent decrements in functioning from a previous state. I prefer (and utilized) the term 'dysfunction,' as it better conveys an abnormally functioning brain exhibiting processing deficits.

    This is especially relevant in Mr. Caro's case, as it appears his brain dysfunction is due to a *developmental* condition rather than *acquired* "damage." As noted in my report, Mr. Caro's results suggested frontal lobe dysfunction that was likely lifelong in nature, and he reportedly failed to thrive as an infant, exhibited delays in developmental milestones difficulties, and had no clear cerebral insults later in life. Nonetheless, the examination results speak for themselves in that Mr. Caro demonstrated severe deficits in functions known to be mediated by the cerebral frontal lobes.

2)  The authors of the motion to dismiss stated in a footnote that my description of frontal lobe dysfunction in the neuropsychological report was contrary to my 6/20/06 e-mail to attorney Stephen Kalista and mitigation specialist Hans Selvog presented in Government Exhibit 3, where I stated:

    "Mr. C demonstrates converging although somewhat inconsistent signs of frontal lobe dysfunction. He performed as low as the 1st percentile on tasks requiring:
        Management of information
        Maintaining cognitive set
        Concept formation"

    I strongly disagree that the statements in my neuropsychological report are contrary to my 6/20/06 e-mail. In fact the inconsistent signs of frontal lobe dysfunction further raise the probability that Mr. Caro's brain condition is developmental in nature rather than acquired. We frequently observe that people who have lived with development deficits throughout the lifespan learn personal strategies that accommodate their

220 Fort Sanders West Boulevard, MOB 2          ✦          Suite 300, Knoxville, Tennessee 37922
Tel. 865.531.9088                                         Fax: 865.531.9089

JA 1697

problems, allowing them to enlist preserved functions to compensate for deficits. For example, whereas Mr. Caro demonstrated cognitive disorganization, he performed adequately on the Trail Making Test-B due to his ability to complete hand-eye speed tasks very rapidly. However, when provided a task requiring mental organization where rapid hand-eye performance is not factored into the score, his performance fell to the impaired range: E.g., Wisconsin Card Sorting Test-Failure to Maintain Set, <1st percentile. Mr. Caro's pattern of performance suggested that his problems with mental organization are long-standing in nature rather than acquired through injury after his childhood development.

3) Finally, the authors of the motion to dismiss recounted that I recommended psychiatrist Keith Caruso, M.D. for further analysis of Mr. Caro, but I did not recommend a neonatologist or expert in any other medical specialty. As I had experience with Dr. Caruso in a previous forensic case, I thought he would be effective in describing how Mr. Caro's neurocognitive deficits might have contributed to his alleged illegal actions. I deferred to Dr. Caruso to determine if any other medical specialty experts were indicated.

I hope these clarifications are helpful. As always, please feel free to contact me if I can be of any more assistance in this matter.


Sincerely,

D. Malcolm Spica, Ph.D.
Licensed Clinical Psychologist

[Transcribed by speech recognition software]

JA 1698

# EXHIBIT 66

# EXHIBIT 66

JA 1699

**Stephen J. Kalista**

From:    Hans Selvog [HSELVOG@NCIANET.org]
Sent:    Wednesday, March 15, 2006 3:28 PM
To:      skalista@mounet.com
Subject: C.V.

Steve: Attached please find my C.V. that I assume you will submit to the Court under seal. Also, for your information, I've attached a generic affidavit that details most of the cases in which I've been involved over the past 20 years. My C.V. reflects my 20 years of experience in providing death penalty mitigation, forensic mental health evaluation, and clinical intervention, and my doctoral education.

Thank you for your attention to this information. Should you have any other questions or requests, please feel free to contact me.

Respectfully,

Hans H. Selvog, Ph.D., L.C.S.W.

3/15/2006

**KS-286**

JA 1700

Affidavit of Hans Selvog    1
Capital Case Mitigation

COMMONWEALTH OF VIRGINIA
CITY OF ALEXANDRIA

## AFFIDAVIT OF HANS H. SELVOG

Personally appeared before the undersigned officer duly authorized to administer oaths, HANS H. SELVOG, who, after having been duly sworn, deposes and says on oath, that the facts set forth below are true and correct.

1.    My name is Hans H. Selvog. I am the Clinical Director of the Augustus Institute, an outpatient mental health clinic of the National Center on Institutions and Alternatives. Formerly, from September 1986 to June 1989, 1 was the Director of the Southeast Regional Office of the National Center on Institutions and Alternatives in Atlanta, Georgia. My background is in Clinical and Forensic Social Work and, since 1973, includes case management services to the juvenile justice system in Illinois, Minnesota and Virginia, and direct sentencing services in adult and juvenile courts to attorneys and their clients throughout the Midwestern, Northeastern and Southeastern regions of the United States. I also have clinical experience treating the chronically mentally ill, the chronic substance abuser, and the victims and perpetrators of sexual abuse, which includes juvenile, adult and developmentally handicapped populations. I have provided therapeutic services to juveniles, adults, couples and families. I have a Doctoral Degree in Social Work and I am certified as a Licensed Clinical Social Worker in both Virginia and the District of Columbia. I have conducted hundreds of comprehensive social histories for use in the courts. I have spent hundreds of hours per case investigating social backgrounds of capital case defendants in over 150 cases. In most of these cases, I have provided testimony in court on the information I have gathered. I have been qualified as an expert witness in six capital cases in Maryland, one capital case in Tennessee, one capital case in Louisiana, one capital case in Indiana, two federal capital cases in the Eastern District of Virginia, Richmond Division and Norfolk Division, a federal habeas corpus hearing before a

**KS-287**

JA 1701

Affidavit of Hans Selvog    2
Capital Case Mitigation

magistrate in the Western District of Virginia in Roanoke, and in the United States Marine Corps'

general court-martial proceedings involving two capital offenses in North Carolina and one in

California. As Director of NCIA's Southeast Regional Office, I received a grant to utilize my

office as a national clearinghouse on expert mitigation development and assistance to attorneys

representing capital defendants. In 1988, I conducted a training seminar on mitigation

development and social history investigation for the annual NAACP Legal Defense Fund Death

Penalty Conference at Airlie House in Warrenton, Virginia. Subsequently, I have been an invited

lecturer on capital case mitigation to continuing legal education seminars for defense attorneys in

Louisiana and Virginia. Finally, I recently taught at the Naval Justice School in Newport, Rhode

Island, on death penalty mitigation preparation.

2.    The National Center on Institutions and Alternatives is a private, non-profit

criminal justice and mental health organization with 20 years experience providing penalty phase

services to defense counsel and their clients. Services in capital cases include a comprehensive

compilation of the defendant's psychosocial background, a clinical assessment of this data, and

expert testimony during the penalty phase.

3.    Capital defense experts unanimously agree that preparation of each and every

death penalty trial should include a realistic expectation that the case will progress to the penalty

phase. Therefore, it is imperative from the very beginning that the defense team aggressively

search out and put together a complete economic, educational, medical, mental health, and

psychosocial history of the client from several generations prior to the defendant's birth to the

present day. Otherwise, mitigating circumstances may go undiscovered or misunderstood. The

United States Supreme Court has clearly stated the purpose of presenting mitigation information

which I have an expertise in gathering and presenting. With the defendant's life in the balance, it

is incumbent upon trial counsel to conduct an adequate mitigation investigation which trial

counsel is obligated by law to do.

**KS-288**

JA 1702

Affidavit of Hans Selvog    3
Capital Case Mitigation

4.      Defense counsel asked me in my capacity as an expert mitigation specialist to estimate the cost and time of conducting a social history for the consideration of the court. Conducting a thorough investigation requires a minimum range of 250 to 300 hours and an expertise quite different in scope from that of most defense attorneys. My rate for providing this service is $150 an hour plus expenses. Expert testimony at sentencing is in addition to this estimate.

5.      First and foremost will be to interview the defendant. The initial interview will take two full days. At least two or more follow-up interviews will be conducted following the different phases of the investigation: interviewing witnesses and examining retrieved records.

6.      The defendant's formative and developmental years are critical and it will be required to interview family, friends and other witnesses who knew the defendant. These witnesses include but are not limited to medical doctors, school teachers, and neighbors. Documents such as medical, educational, social service, mental health, etc. pertaining to the defendant, which includes relevant records of family members, will be reviewed and attempts will be made to interview those who, as noted in the records, had direct contact with the defendant or his family. In the course of an investigation, many new leads are discovered that were not anticipated prior to the investigation's embarkment. Time must be allowed to follow-up on additional and potentially effective newly discovered witnesses.

7.      Once this information is obtained, an equal and usually greater amount of time is required to analyze it and to write a corroborated, comprehensive chronological narrative addressing the defendant's psychosocial development as well as the pertinent legal issues raised by defense counsel. All time and tasks will be carefully documented for the Court and filed on a regular and timely basis for payment.

**KS-289**

JA 1703

Affidavit of Hans Selvog   4
Capital Case Mitigation

8.    A completed psychosocial history is foremost and critical to defense counsel by informing them of the issues in the defendant's background which point to other experts who will be needed to further investigate the effects of particular areas of mitigation specific to the defendant. A thoroughly investigated background report takes a minimum range of four to six months to complete.

9.    Drawing on my clinical background in assessing symptoms of substance abuse, mental illness, mental retardation, learning disorders, domestic violence, physical/sexual abuse, and other emotional/psychological disorders and environmental/developmental stressors, the information derived from an investigation would be used to corroborate pertinent mitigating factors of the defendant's psychosocial background and developmental history. The facts obtained would be presented during the sentencing phase of the trial and do most certainly shape defense counsel's approach to the guilt/innocence phase.

10.    A complete capital case social history investigation will include the following:
    a)    Interview Defendant.

    b)    Interview nuclear and extended family members, significant others, employers, co-workers, neighbors, friends, school teachers, classmates, co-defendants; if applicable, interview probation officers, foster parents, foster siblings, social workers, institutional staff: mental health, jails, prisons, medical.

    c)    Compile records of social service, mental health, criminal justice, educational, and medical documents to complete a psychosocial history and interview practitioners directly involved with defendant in each record.

    d)    Travel will be required for interviews and many interviews may need to be conducted several times. Also gather physical evidence (i.e., photographs, video tapes) to recreate background of defendant for jury.

    e)    Identify witnesses, prepare affidavits, identify custodian of records, obtain certified records to be used as evidence. Obtain

**KS-290**

JA 1704

Affidavit of Hans Selvog   5
Capital Case Mitigation

court order when defendant was raised in a different state than the state where the individual is being tried to have records released or when juvenile records are present.

f)   Assess symptoms of psychosocial/medical problems and alert defense attorneys of additional experts necessary to establish presence of mental handicap, learning disorder, substance abuse/addiction, physical/sexual abuse, neurological condition (i.e., temporal lobe disorder), mental illness, and other conditions or trauma significant to mitigation.

g)   Development of mitigation for presentation to jury.

h)   Investigate institutions:   Gather reports which describe conditions and practices of the treatment facilities in which the defendant was committed.

11.   In many cases, in order to provide assistance to indigent capital defendants, the Court has authorized funds for counsel to hire the Augustus Institue/National Center on Institutions and Alternatives for expert assistance in preparation of the penalty phase of a capital trial. Funds have been authorized in the following capital cases (the cases in bold face type are those in which I personally conducted the investigation): State of Georgia v. Carl Isaacs, Perry, 1987; State of Georgia v. Wayne Coleman, Atlanta, 1987; State of Georgia v. Larry Ragus, Gwinnett County, 1989; State of Georgia v. Danny Rucker, Royston, 1989; State of Georgia v. Johnnie Dee Jones, Lincoln County, 1992; Commonwealth of Virginia v. Frank Weston, City of Alexandria, 1986; Commonwealth of Virginia v. Ronald Henderson, Winchester, 1991; Commonwealth of Virginia v. Virgil Fox, Jr., Nelson County, 1991; Commonwealth of Virginia v. Joseph Wise, 1993; Commonwealth of Virginia v. Russell Tross, Rockingham County, Harrisonburg, 1993; Commonwealth of Virginia v. Carlson Robinson, 1994; Commonwealth of Virginia v. Bruce Kenney, 1995; Commonwealth of Virginia v. Gregory Murphy, 2001; State of Tennessee v. Jay Cameron, Nashville, 1987; State of Tennessee v. David Scott Poe, Montgomery County, 1991; State of Tennessee v. Joe T. Baker Jr., Clarksville, 1992; State of Tennessee v. Courtney Mathews, 1995; State of New Hampshire v. Kenneth Johnson, Hillsborough County Superior Court, 1990; State of

JA 1705

Oklahoma v. Alfred Brian Mitchell, 1992; State of Indiana v. Rufus Averhart, Allen County, 1995, State of Ohio v. Rosalie Grant, Johnston, Ohio, 1985; and State of Indiana v. Rufus Averhart, 1995. In the federal courts, I have been appointed in the following cases: United States of America v. Private Ronnie Curtis, U. S. Court of Military Appeals, 1991; United States of America v. L.Cpl. Kenneth G. Parker, Onslow County, North Carolina, 1992; United States v. LCDR Michael W. Fricke, SC, USN, Naval Base Norfolk, Virginia, 1994; United States v. L.Cpl. Shannon Schlamer, Camp Lejeune, 1994; United States of America v. Srgt. Jesse Quintanilla, Camp Pendleton, 1996; United States of America v. Richard Tipton and United States of America v. Marvin Damon, Eastern District of Virginia - Richmond Division, 1992; United States of America v. Jean Claude Oscar, Eastern District of Virginia - Norfolk Division, 1994; United States of America, District of Columbia, v. Wayne Perry, 1994, United States of America, District of Columbia, v. Donzell McCauley, 1994; United States of America, Northern District Court of New York, v. Tyrone Walker, 1995; United States of America v. Terrance Boyd, Rhode Island, 1995; United States of America v. Cory Gist, Eastern District of North Carolina, 1996; United Stated of America v. Denis Rivera, Eastern District of Virginia – Alexandria Division, 2005; United States of America v. John Richard Mayhew Jr., Southern District of Ohio, 2005; United Stated of America v. Tommie Dorsey, Washington, D.C., 2005; and United States of America v. Donald York, Eastern District of Michigan, 2005.

12.    The State of Maryland through the Public Defender's Service has authorized expenditure of public funds for our services in the following cases: State of Maryland v. Derrick White, 1988; State of Maryland v. Michael Moore; State of Maryland v. James Bailey, Prince Georges County, 1984; State of Maryland v. James Calhoun El, Montgomery County, 1990; State of Maryland v. Timothy Deadrick, 1991; State of Maryland v. Marselle Bowers, 1991; State of Maryland v. Richard Tichnell, 1991; State of Maryland v. Ronald Scoates, Queen Anne County, 1991; State of Maryland v. Tyrone Gilliam, Towson, 1992; State of Maryland

KS-292

JA 1706

USCA4 Appeal: 16-1    Doc: 32-4    Filed: 12/27/2016    Pg: 213 of 306

Case 1:06-cr-00001-JPJ   Document 797-1   Filed 10/09/13   Page 23 of 89   Pageid#: 7738

v. Kenneth Collins, Somerset County, 1992; State of Maryland v. Damon Bowie, Prince George's County, 1992; State of Maryland v. Michael Warren, Montgomery County, 1992; State of Maryland v. Kevin Wiggins, 1993; State of Maryland v. Michael Whittlesey, Caroline County, 1993; State of Maryland v. Michael Bryson, Anne Arundel County, 1993; State of Maryland v. Alan Newman, Montgomery County, 1993; State of Maryland v. Rodney Solomon, Howard County, 1993; State of Maryland v. Scotland Williams, 1994; State of Maryland v. Wallace Ball, Towson, 1995; State of Maryland v. John Johnson, Cumberland, 1995; and State of Maryland v. Alexander Watson, 2005.  The State of Louisiana, through the indigent defender offices has authorized expenditure of public funds for our services in the following cases:  State of Louisiana v. Stanley Lay, New Orleans, 1986; State of Louisiana v. Willie Watson; State of Louisiana v. Floyd Carmouche, Lafayette, 1988; State of Louisiana v. Chad Lukas Young, Opelousas, 1990; State of Louisiana v. Andra Coleman, Opelousas, 1990; State of Louisiana v. Jeffrey William Simpson, Lafayette, 1989; State of Louisiana v. Gerald Wilson, Metarie, 1989; State of Louisiana v. Jimmy Charles, Opelousas, 1991; State of Louisiana v. Darrell Aucoin, Lafayette, 1991; State of Louisiana v. Kevin Touchet, Lafayette, 1991; State of Louisiana v. Tyjuane Williams, Baton Rouge, 1992; State of Louisiana v. Bartholomew Cross, Lake Charles, 1993; State of Louisiana v. Rickey Langley, Lake Charles, 1993; State of Louisiana v. James Christopher Hudson, Opelousas, 1993; State of Louisiana v. Albert Earl Lavalais, Opelousas, 1993; State of Louisiana v. Sidney Robinson, 1995; and State of Louisiana v. Eric Proctor, Lafayette, 1996.

13.    In the western region of the United States, NCIA has been appointed in the following cases:  State of California v. Peter Fan, 1986; State of California v. Robert Massie, 1986; State of California v. Ernest Kirkwood, 1987; State of California v. Brian L. Marquess, 1988; State of California v. James O'Malley, 1988; State of California v. Fermin Ledesma, 1989;

KS-293

JA 1707

Affidavit of Hans Selvog   8
Capital Case Mitigation

State of California v. Carlos Avena, 1989; State of California v. Peter Edelbacher, 1989; State of California v. Edward Wilson, 1991.

14.    In addition, we have provided services through funding by the Louisiana Indigent Defense Board, the Florida Office of the Capital Collateral Representative, and the Virginia Capital Representation Resource Center.

15.    Finally, NCIA has been appointed in several cases at the federal habeas corpus level of appeal: Commonwealth of Virginia v. Herman Barnes, Oklahoma v. Wayne Thompson, several cases in Florida, Commonwealth of Virginia v. Roy Bruce Smith, 1994; Commonwealth of Virginia v. Larry Stout, 1994; Commonwealth of Virginia v. Ronald Watkins, 1994; and Commonwealth of Virginia v. Johnile Dubois, 1995.

**KS-294**

JA 1708

# EXHIBIT 67

# EXHIBIT 67

JA 1709

## Stephen J. Kalista

From:      Giorno, Anthony (USAVAW) [Anthony.Giorno@usdoj.gov]
Sent:      Thursday, September 28, 2006 9:21 AM
To:        Stephen J. Kalista
Cc:        Brownlee, John (USAVAW)
Subject:   Caro mental health exam

Steve

This email will confirm our conversation of this morning concerning Dr. Phillips' request to question Mr. Caro about his role in the murder of Sandoval, the stabbing of Benevidez and the incident at Oakdale.  Dr. Phillips informed me that when he attempted to question Mr. Caro on these matters, Mr. Caro, on advice of counsel, refused to answer any of Dr. Phillips' inquiries.

When I spoke with you and Jim this morning, you advised that your mental condition expert has based his opinion solely on diagnostic tests given to Mr. Caro and he did not question Caro about his role in the Sandoval murder, Benevidez stabbing or Oakdale, and Caro made no statements to the expert pertaining to those matters.  You advised me that because Caro was not questioned on these matters by your expert and did not volunteer any statements on these matters, Dr. Phillips should be precluded from making inquiries, and you would not permit your client to answer questions pertaining to those matters.

I have passed this information to Dr. Phillips.  If Dr. Phillips tells us that, in the absence of such inquiries, he cannot conduct a meaningful examination sufficient to allow him to opine on issues relating to penalty, it may be necessary for us to ask the court either to order Caro to answer the questions or, in the alternative, to bar the defense from introducing evidence as to Caro's mental condition at the penalty phase.  Time is of the essence on this issue.

I have also asked you to consider reciprocal disclosure of the results of both defense and prosecution mental health examinations prior to trial.  This will allow both sides to prepare to address any mental health issues that may arise in the penalty phase.  Because your expert did not ask and Caro did not volunteer information about the Sandoval murder, the Benevidez stabbing or the Oakdale incident, there would be no statements in your expert's report which we could use to his detriment at the guilt phase.  You said that you and Jim would further discuss the disclosure issue and get back to me.  I further stated that if we could not agree on early disclosure, we would simply follow the provisions of the Rule.

If I have misstated anything about our conversation of this morning, please let me know.

Thanks.

Tony

9/28/2006

DB-4264

JA 1710

# EXHIBIT 68

# EXHIBIT 68

JA 1711

## Supplemental Declaration of Donna Marie Schwartz-Watts, M.D.

I, Donna Marie Schwartz-Watts, M.D., declare under penalty of perjury:

1. I have reviewed pages 47 and 48 of Document 791, filed 06/11/13, which Mr. Caro's counsel informed me was an excerpt from the Government's Motion to Dismiss in Mr. Caro's case. I offer the following opinions regarding footnote 12.

2. That Dr. Phillips stated Mr. Caro reported a happy childhood and denied a history of abuse is inconsistent with other parts of Dr. Phillips's report discussing Mr. Caro's father's abusive behavior toward Mr. Caro's mother and the mistreatment Mr. Caro suffered from his older brother. (Phillips's Report at page 14.) Moreover, Dr. Phillips's report fails to relate a thorough trauma history of Mr. Caro's childhood.

3. That Dr. Phillips opined that Mr. Caro does not demonstrate any deficits in adaptive functioning is not inconsistent with Mr. Caro's brain dysfunction. Review of adaptive functioning is frequently used to assess whether an individual can be diagnosed as having intellectual disability (intellectual developmental disorder), which is the diagnosis formerly referred to as mental retardation. Mr. Caro displayed developmental deficits as a child. That he may not currently exhibit deficits in adaptive functioning does not negate a finding of brain dysfunction.

4. That reports from prison psychologists have determined Mr. Caro's mental status to be within normal limits also does not preclude a finding of brain dysfunction. I have reviewed the twelve reports listed as psychological reviews in Dr. Phillips's report, which are attached as exhibits to my declaration:
   Exhibit A – Psychological Review by Dr. Paul A. Kern, Chief Psychologist, dated 2/26/97 (listed in Phillips Report, at page 5 [IV.5.t])
   Exhibit B – Psychological Review by Dr. Paul A. Kern, Chief Psychologist, dated 7/25/97 (listed in Phillips Report, at page 5 [IV.5.t])
   Exhibit C – Psychological Review by M.T. Plasay, Ph.D., dated 10/28/97 (listed in Phillips Report, at page 6 [IV.6.h])
   Exhibit D – Psychological Review by M.T. Plasay, Ph.D., dated 5/1/98 (listed in Phillips Report, at page 6 [IV.6.h])

Page 1 of 2

JA 1712

Exhibit E – Psychological Review by Tamara L. Mischel, Ph.D., dated 2/12/98 (listed in Phillips Report, at page 6 [IV.6.j])
Exhibit F – Psychological Review by Tamara L. Mischel, Ph.D., dated 3/8/98 (listed in Phillips Report, at page 6 [IV.6.j])
Exhibit G – Psychology Services Intake Screening by C. Scott Eckholdt, Ph.D., dated 1/24/02 (listed in Phillips Report, at page 8 [IV.9.o])
Exhibit H – Psychological Review by M. Geyer, Psy. D., dated 5/22/03 (listed in Phillips Report, at page 8 [IV.10.l])
Exhibit I – Psychological Review by M. Geyer, Psy. D., dated 10/8/03 (listed in Phillips Report, at page 8 [IV.10.l])
Exhibit J – Psychological Review by M. Geyer, Psy. D., dated 11/5/03 (listed in Phillips Report, at page 8 [IV.10.l])
Exhibit K – Psychological Review by S. Henn, Psy. D., dated 9/12/03 (listed in Phillips Report, at page 9 [IV.10.cc])
Exhibit L – Intake Screening (Psychological Data System) by Marie L. Bailey, Staff Psychologist, dated 11/16/05 (listed in Phillips Report, at page 10 [IV.11.h])

5. Exhibits A through L are one-page, standard forms that do not assess Mr. Caro's neuropsychological functioning. No neuropsychological testing was reported in these forms and none of the report writers are psychiatrists. The fact that Mr. Caro's mental status was within normal limits in these several forms does not undercut a finding that he has brain impairment as evidenced by Dr. Spica's neuropsychological testing and his performance on the mental status exam I performed.

I declare under penalty of perjury that the foregoing is true and correct.

Signed this 7th day of October 2013, in the State of Arizona.

_Donna Marie Schwartz-Watts, M.D._
Donna Marie Schwartz-Watts, M.D.

JA 1713

# Attachment A

## To the Supplemental Declaration of Donna Schwartz-Watts, M.D.

JA 1714

Psychology Data System                                    Page 1 of 1

**LIMITED OFFICIAL USE**

SHU REVIEW

```
Date.........: Wednesday, February 26, 1997
Inmate.......: CARO, CARLOS DAVID
Reg. No......: 37786-079

Author.......: DR. PAUL A. KERN
Title........: CHIEF PSYCHOLOGIST
Institution.: TRV
```

Inmate CARO was placed in the Special Housing Unit on 1/28/1997.  In
accord with Discipline and SHU policy, a psychological review was conducted.

At the time of this review, inmate CARO was housed in the Special Housing
Unit with a quarters assignment of DISC. SEGREGATION.

Inmate CARO was interviewed.  Other staff members and/or available records
were consulted as necessary and appropriate.

MENTAL STATUS ..... : Current mental status, emotional expression, and behavior
                      do not suggest significant mental health problems.

ADJUSTMENT ........ : Based on current information, current adjustment to the
                      Special Housing Unit appears to be SATISFACTORY.

THREAT TO SELF..... : Precise prediction of self-injurious behavior is difficult
                      and should be modified over time as individual circumstances
                      change.  Based on the inmate's history, exisiting conditions,
                      and other information available at the time of the review,
                      the current risk of self-harm is judged to be LOW.

THREAT TO OTHERS .. : Precise prediction of dangerousness is difficult and should
                      be modified over time as individual circumstances change.
                      Based on the inmate's history, exisiting conditions, and other
                      information available at the time of the review, the current
                      potential for harm to others is judged to be LOW.

COMMENTS:
```

https://bop-pds.bop.gov/PDSViewer/det FOIA M611327                     2/28/2012

JA 1715

# Attachment B

To the Supplemental Declaration of Donna Schwartz-Watts, M.D.

Psychology Data System                                              Page 1 of 1

**LIMITED OFFICIAL USE**

SHU REVIEW

Date.........: Friday, July 25, 1997
Inmate.......: CARO, CARLOS DAVID
Reg. No.....: 37786-079

Author......: DR. PAUL A. KERN
Title.......: CHIEF PSYCHOLOGIST
Institution.: TRV

---

Inmate CARO was placed in the Special Housing Unit on 6/24/1997. In
accord with Discipline and SHU policy, a psychological review was conducted.

At the time of this review, inmate CARO was housed in the Special Housing
Unit with a quarters assignment of ADMIN. DETENTION.

Inmate CARO was interviewed. Other staff members and/or available records
were consulted as necessary and appropriate.

MENTAL STATUS ..... : Current mental status, emotional expression, and behavior
                      do not suggest significant mental health problems.

ADJUSTMENT ........ : Based on current information, current adjustment to the
                      Special Housing Unit appears to be SATISFACTORY.

THREAT TO SELF..... : Precise prediction of self-injurious behavior is difficult
                      and should be modified over time as individual circumstances
                      change. Based on the inmate's history, exisiting conditions,
                      and other information available at the time of the review,
                      the current risk of self-harm is judged to be LOW.

THREAT TO OTHERS .. : Precise prediction of dangerousness is difficult and should
                      be modified over time as individual circumstances change.
                      Based on the inmate's history, exisiting conditions, and other
                      information available at the time of the review, the current
                      potential for harm to others is judged to be LOW.

COMMENTS:

Reports no problems.

JA 1717

# Attachment C

To the Supplemental Declaration of Donna Schwartz-Watts, M.D.

Psychology Data System                                        Page 1 of 1


**LIMITED OFFICIAL USE**

PSYCHOLOGY SERVICES INTAKE SCREENING


Date..........: Tuesday, October 28, 1997
Inmate........: CARO, CARLOS
Reg. No......: 37786-079

Author........: M.T. PLASAY, PH.D.
Title.........: CHIEF PSYCHOLOGIST
Institution.: BMP

---

TREATMENT/MENTAL HEALTH HISTORY:

Inmate CARO reported no treamtment/mental health history.

MENTAL STATUS:

During the screening interview no mental status items were noteworthy.
The inmate's psychological stability for custody is judged to be
FAVORABLE.


DRUG ABUSE HISTORY:

Inmate CARO does not report a history of substance abuse.

PROGRAM TREATMENT RECOMMENDATIONS:

No programs/treatment are recommended at this time.

Inmate CARO reported no interest in participating in programs/treatment.


COMMENTS:

S:  Inmate denied any mental health problems either current or in
the past.

O: o x 4, well groomed, denied suicidal/homicidal
ideations/intentions, denied hallucinations/delusions/illusions,
reported mood ok, appeared euthymic with full range of affect
noted, intelligence estimated within the average range,
insight/judgement fair.

A: Deferred

P: No other problems noted at this time.  Inmate instructed on how
to contact psychology in the future.

JA 1719

# Attachment D

To the Supplemental Declaration of Donna Schwartz-Watts, M.D.

Psychology Data System                                          Page 1 of 1

**LIMITED OFFICIAL USE**

SHU REVIEW

```
Date........: Friday, May 01, 1998
Inmate......: CARO, CARLOS
Reg. No.....: 37786-079

Author......: M.T. PLASAY, PH.D.
Title.......: CHIEF PSYCHOLOGIST
Institution.: BMP
```

Inmate CARO was placed in the Special Housing Unit on 4/15/1998. In
accord with Discipline and SHU policy, a psychological review was conducted.

At the time of this review, inmate CARO was housed in the Special Housing
Unit with a quarters assignment of ADMIN. DETENTION.

Inmate CARO was interviewed. Other staff members and/or available records
were consulted as necessary and appropriate.

MENTAL STATUS ..... : Current mental status, emotional expression, and behavior
                      do not suggest significant mental health problems.

ADJUSTMENT ........ : Based on current information, current adjustment to the
                      Special Housing Unit appears to be SATISFACTORY.

THREAT TO SELF..... : Precise prediction of self-injurious behavior is difficult
                      and should be modified over time as individual circumstances
                      change. Based on the inmate's history, exisiting conditions,
                      and other information available at the time of the review,
                      the current risk of self-harm is judged to be LOW.

THREAT TO OTHERS .. : Precise prediction of dangerousness is difficult and should
                      be modified over time as individual circumstances change.
                      Based on the inmate's history, exisiting conditions, and other
                      information available at the time of the review, the current
                      potential for harm to others is judged to be LOW.

COMMENTS:

Inmate reported no difficulties adjusting to the SHU. Officers
interviewed also reported no problems with inmate at present. Routine
follow-up in 30 days. Inmate knows pscyhology makes rounds on
weekly basis and also knows to contact SHU officers if he requests
psychology services.
```

Attachment E

To the Supplemental Declaration of Donna Schwartz-Watts, M.D.

Psychology Data System                                      Page 1 of 1

**LIMITED OFFICIAL USE**

SHU REVIEW

Date.........: Thursday, February 12, 1998
Inmate.......: CARO, CARLOS
Reg. No......: 37786-079

Author.......: TAMARA L. MISCHEL, PH.D.
Title........: CLINICAL PSYCHOLOGIST
Institution.: BMP

---

Inmate CARO was placed in the Special Housing Unit on 1/23/1998.  In
accord with Discipline and SHU policy, a psychological review was conducted.

At the time of this review, inmate CARO was housed in the Special Housing
Unit with a quarters assignment of ADMIN. DETENTION.

Inmate CARO was interviewed.  Other staff members and/or available records
were consulted as necessary and appropriate.

MENTAL STATUS ..... : Current mental status, emotional expression, and behavior
                      do not suggest significant mental health problems.

ADJUSTMENT ........ : Based on current information, current adjustment to the
                      Special Housing Unit appears to be SATISFACTORY.

THREAT TO SELF..... : Precise prediction of self-injurious behavior is difficult
                      and should be modified over time as individual circumstances
                      change.  Based on the inmate's history, exisiting conditions,
                      and other information available at the time of the review,
                      the current risk of self-harm is judged to be LOW.

THREAT TO OTHERS .. : Precise prediction of dangerousness is difficult and should
                      be modified over time as individual circumstances change.
                      Based on the inmate's history, exisiting conditions, and other
                      information available at the time of the review, the current
                      potential for harm to others is judged to be LOW.

COMMENTS:

Inmate presented with appropriate affect and congruent mood. Inmate
denied any current suicidal or homicidal ideations. Inmate does not appear
to be in any psychological distress at this time.  Inmate reported that he
knew how to contact this department if he were to experience any problems.
Inmate was seen in SHU on 02-09-98.

https://bop-pds.bop.gov/PDSViewer/detail.aspx?rec=1324           2/28/2012

JA 1723

# Attachment F

## To the Supplemental Declaration of Donna Schwartz-Watts, M.D.

JA 1724

Psychology Data System                                    Page 1 of 1

**LIMITED OFFICIAL USE**

SHU REVIEW


Date.........: Sunday, March 08, 1998
Inmate.......: CARO, CARLOS
Reg. No......: 37786-079


Author.......: TAMARA L. MISCHEL, PH.D.
Title........: CLINICAL PSYCHOLOGIST
Institution.: BMP

---

Inmate CARO was placed in the Special Housing Unit on 1/23/1998.  In
accord with Discipline and SHU policy, a psychological review was conducted.

At the time of this review, inmate CARO was housed in the Special Housing
Unit with a quarters assignment of ADMIN. DETENTION.

Inmate CARO was interviewed.  Other staff members and/or available records
were consulted as necessary and appropriate.

MENTAL STATUS ..... : Current mental status, emotional expression, and behavior
                      do not suggest significant mental health problems.

ADJUSTMENT ........ : Based on current information, current adjustment to the
                      Special Housing Unit appears to be SATISFACTORY.

THREAT TO SELF..... : Precise prediction of self-injurious behavior is difficult
                      and should be modified over time as individual circumstances
                      change.  Based on the inmate's history, exisiting conditions,
                      and other information available at the time of the review,
                      the current risk of self-harm is judged to be LOW.

THREAT TO OTHERS .. : Precise prediction of dangerousness is difficult and should
                      be modified over time as individual circumstances change.
                      Based on the inmate's history, exisiting conditions, and other
                      information available at the time of the review, the current
                      potential for harm to others is judged to be LOW.

COMMENTS:

Inmate was seen in SHU on 03-06-98. Inmate presented with appropriate
affect and congruent mood.  Inmate denied any current suicidal or
homicidal ideations. Inmate does not appear to be in any
psychological distress at this time. Inmate reported that he knew
how to contact this department if he were to experience any
problems.

JA 1725

USCA4 Appeal: 16-1    Doc: 32-4    Filed: 12/27/2016    Pg: 232 of 306

# Attachment G

To the Supplemental Declaration of Donna Schwartz-Watts, M.D.

Psychology Data System                                          Page 1 of 1

**LIMITED OFFICIAL USE**

                    PSYCHOLOGY SERVICES INTAKE SCREENING


Date........: Thursday, January 24, 2002
Inmate......: CARO, CARLOS
Reg. No.....: 37786-079

Author......: C. SCOTT ECKHOLDT, PH.D.
Title.......: STAFF PSYCHOLOGIST
Institution.: OAK

_____


TREATMENT/MENTAL HEALTH HISTORY:

               Violence: two fights at USP Beaumont

MENTAL STATUS:

During the screening interview no mental status items were noteworthy.
The inmate's psychological stability for custody is judged to be
FAVORABLE.


DRUG ABUSE HISTORY:

Inmate CARO reports a history of substance abuse.  More than on substance
was reported as the primary drug of choice.  The inmate is not interested in drug
abuse treatment.

PROGRAM TREATMENT RECOMMENDATIONS:

No programs/treatment are recommended at this time.

Inmate CARO reported no interest in participating in programs/treatment.


COMMENTS:

Mr. CARO returned from court where he was given an addditional 18 months for
violating the conditions of his supervised release program. He reports that
he is re-adjusting well to general population. He denied any mental health
crises while away and denies suicidal/homicidal ideation, plans, or intent.
He states that he did not use any drugs or have any incident reports while
away. His sleeping and eating is undisturbed. Also, he denied being the
victim or perpetrator of any sexual assault while away. He stated that he
would contact psychology if he desired services in the future.

                                                                    JA 1727

# Attachment H

To the Supplemental Declaration of Donna Schwartz-Watts, M.D.

Psychology Data System                                              Page 1 of 1

**LIMITED OFFICIAL USE**

PSYCHOLOGY SERVICES INTAKE SCREENING

Date........: Thursday, May 22, 2003
Inmate......: CARO, CARLOS DAVID
Reg. No.....: 37786-079

Author......: M. GEYER, PSY.D.
Title.......: CODE COORDINATOR
Institution.: LEE

---

TREATMENT/MENTAL HEALTH HISTORY:

        Violence: History of inmate assaults while incarcerated; TS gang

MENTAL STATUS:

During the screening interview no mental status items were noteworthy.
The inmate's psychological stability for custody is judged to be
FAVORABLE.

DRUG ABUSE HISTORY:

Inmate CARO does not report a history of substance abuse.

PROGRAM TREATMENT RECOMMENDATIONS:

No programs/treatment are recommended at this time.

Inmate CARO reported no interest in participating in programs/treatment.

COMMENTS:

Inmate Caro completed the Psychology Services Intake Questionnaire
and intake interview this date at U.S.P. Lee. He voiced no
mental health concerns and stated that he does not have a history
of psychiatric treatment. He denied all symptoms associated with
a major mood or psychotic disorder. During this interview, no
symptoms appeared that would indicate further psychological
attention is necessary. He denied suicidal and homicidal
ideation. He denied being the victim or perpetrator of a sexual
assault while incarcerated. He was provided verbal information
concerning psychology services at U.S.P. Lee and was aware of how
to solicit services, if necessary. In addition, this inmate read
and signed the confidentiality statement relating to psychology
services. At this time, no M.D.S. code is warranted.

M.D.S. = 0

JA 1729

USCA4 Appeal: 16-1    Doc: 32-4    Filed: 12/27/2016    Pg: 236 of 306
Case 1:06-cr-00001-JPJ   Document 797-1   Filed 10/09/13   Page 46 of 89   Pageid#: 7761

# Attachment I

To the Supplemental Declaration of Donna Schwartz-Watts, M.D.

JA 1730

Psychology Data System                                          Page 1 of 1


**LIMITED OFFICIAL USE**


SHU REVIEW


Date........: Wednesday, October 08, 2003
Inmate......: CARO, CARLOS DAVID
Reg. No.....: 37786-079


Author......: M. GEYER, PSY.D.
Title.......: CODE COORDINATOR
Institution.: LEE

_____

Inmate CARO was placed in the Special Housing Unit on 8/29/2003.  In
accord with Discipline and SHU policy, a psychological review was conducted.

At the time of this review, inmate CARO was housed in the Special Housing
Unit with a quarters assignment of ADMIN. DETENTION.

Inmate CARO was interviewed.  Other staff members and/or available records
were consulted as necessary and appropriate.

MENTAL STATUS ..... : Current mental status, emotional expression, and behavior
                      do not suggest significant mental health problems.

ADJUSTMENT ........ : Based on current information, current adjustment to the
                      Special Housing Unit appears to be SATISFACTORY.

THREAT TO SELF..... : Precise prediction of self-injurious behavior is difficult
                      and should be modified over time as individual circumstances
                      change.  Based on the inmate's history, exisiting conditions,
                      and other information available at the time of the review,
                      the current risk of self-harm is judged to be LOW.

THREAT TO OTHERS .. : Precise prediction of dangerousness is difficult and should
                      be modified over time as individual circumstances change.
                      Based on the inmate's history, exisiting conditions, and other
                      information available at the time of the review, the current
                      potential for harm to others is judged to be LOW.

COMMENTS:

This inmate was seen on this date to complete the 30 day SHU review.  During
his contact, he denied any symptoms suggestive of a major mental illness.
Specifically, he denied all mood disturbances or symptoms of psychosis.  He
denied suicidal and homicidal ideation.  He denied the need for psychological
services.  No other concerns were voiced.  No follow up necessary.

JA 1731

# Attachment J

To the Supplemental Declaration of Donna Schwartz-Watts, M.D.

JA 1732

Psychology Data System                                         Page 1 of 1

**LIMITED OFFICIAL USE**

SHU REVIEW

Date.........: Wednesday, November 05, 2003
Inmate.......: CARO, CARLOS DAVID
Reg. No.....: 37786-079

Author......: M. GEYER, PSY.D.
Title.......: CODE COORDINATOR
Institution.: LEE

---

Inmate CARO was placed in the Special Housing Unit on 8/29/2003.  In
accord with Discipline and SHU policy, a psychological review was conducted.

At the time of this review, inmate CARO was housed in the Special Housing
Unit with a quarters assignment of ADMIN. DETENTION.

Inmate CARO was interviewed.  Other staff members and/or available records
were consulted as necessary and appropriate.

MENTAL STATUS ..... : Current mental status, emotional expression, and behavior
                      do not suggest significant mental health problems.

ADJUSTMENT ........ : Based on current information, current adjustment to the
                      Special Housing Unit appears to be SATISFACTORY.

THREAT TO SELF..... : Precise prediction of self-injurious behavior is difficult
                      and should be modified over time as individual circumstances
                      change.  Based on the inmate's history, exisiting conditions,
                      and other information available at the time of the review,
                      the current risk of self-harm is judged to be LOW.

THREAT TO OTHERS .. : Precise prediction of dangerousness is difficult and should
                      be modified over time as individual circumstances change.
                      Based on the inmate's history, exisiting conditions, and other
                      information available at the time of the review, the current
                      potential for harm to others is judged to be LOW.

COMMENTS:

Inmate Caro was seen this date for the 30-day psychology SHU reviews.  During
this contact, he denied any mental health issues that required attention.  He
denied suicidal and homicidal ideation.  There is no evidence suggestive of
psychosis or a mood disorder.  At this time, only routine psychology rounds
are indicated for this individual.  If this individual remains in SHU for
thirty days past this date, he will be re-evaluated as per BOP policy.

https://bop-pds.bop.gov/PDSViewer/de FOIA Med 303                   2/28/2012

JA 1733

# Attachment K

To the Supplemental Declaration of Donna Schwartz-Watts, M.D.

JA 1734

Psychology Data System                                             Page 1 of 1

**LIMITED OFFICIAL USE**

SHU REVIEW

Date........: Friday, September 12, 2003
Inmate......: CARO, CARLOS DAVID
Reg. No.....: 37786-079

Author......: S. HENN, PSY.D.
Title.......: STAFF PSYCHOLOGIST
Institution.: LEE

---

Inmate CARO was placed in the Special Housing Unit on 8/29/2003.  In
accord with Discipline and SHU policy, a psychological review was conducted.

At the time of this review, inmate CARO was housed in the Special Housing
Unit with a quarters assignment of ADMIN. DETENTION.

Inmate CARO was interviewed.  Other staff members and/or available records
were consulted as necessary and appropriate.

MENTAL STATUS ..... : Current mental status, emotional expression, and behavior
                      do not suggest significant mental health problems.

ADJUSTMENT ........ : Based on current information, current adjustment to the
                      Special Housing Unit appears to be SATISFACTORY.

THREAT TO SELF..... : Precise prediction of self-injurious behavior is difficult
                      and should be modified over time as individual circumstances
                      change.  Based on the inmate's history, exisiting conditions,
                      and other information available at the time of the review,
                      the current risk of self-harm is judged to be LOW.

THREAT TO OTHERS .. : Precise prediction of dangerousness is difficult and should
                      be modified over time as individual circumstances change.
                      Based on the inmate's history, exisiting conditions, and other
                      information available at the time of the review, the current
                      potential for harm to others is judged to be LOW.

COMMENTS:

Inmate Caro was briefly interviewed and observed in SHU.  Based on this
interview, the inmate does not appear to be experiencing significant
psychological distress at this time.  The inmate's current level of
adjustment appears satisfactory.  He presented no psychological symptoms of
distress.  He does not appear to be a threat to self or others.  In addition,
SHU staff noted no significant changes in his behavior.  He had no complaints
or concerns at this time.  He was instructed to contact psychology services
if the need arose.

JA 1735

# Attachment L

To the Supplemental Declaration of Donna Schwartz-Watts, M.D.

**SENSITIVE BUT UNCLASSIFIED**



## Federal Bureau of Prisons
## Psychology Data System

**Date-Title:** 11-16-2005 - Intake Screening
**Reg Number-Name:** 37786-079 - CARO, CARLOS D.
**Author:** MARIE L. BAILEY, STAFF PSYCH
**Institution:** FLM - FLORENCE ADMAX USP

### TREATMENT/MENTAL HEALTH HISTORY:

Inmate **CARO** reported no treatment/mental health history

### ABUSE HISTORY:

Inmate CARO reported no abuse history

### MENTAL STATUS:

During the screening interview no mental status items were noteworthy.

His psychological stability for custody is judged to be **FAVORABLE** .

### DRUG ABUSE HISTORY:

Inmate CARO does not report a history of substance abuse.

### PROGRAM TREATMENT RECOMMENDATIONS:

No programs/treatment are recommended at this time.

Inmate CARO reported NO interest in participating programs/treatment.

### COMMENTS:

Inmate Caro was assessed for an initial Psychology Services Intake screening. Inmate has no significant history of receiving psychiatric tx and currently no signs of acute distress nor psychopathology appear present. MSE=WNL. He denied a history of suicide attempts or ideation. He currently denies SI, intent or plan and does not appear to be a danger to self or others at this time. He denied a hx of substance abuse and reported that he does not desire drug abuse tx. He indicated he does not desire Psychological Services at this time. He denied ever being a victim or perpetrator of sexual assault. No apparent disabilities, no MDS required at this time.

**SENSITIVE BUT UNCLASSIFIED**

**FOIA-Med-424**

JA 1737

# EXHIBIT 69

# EXHIBIT 69

JA 1738

*Privileged and Confidential*                                                    1
*Attorney/Client Work Product*
        *Do Not Distribute Without Permission of Stephen Kalista and James Simmons, Esquires*

## MEMORANDUM

To:         Danny Mullikin, Steve Kalista, Jim Simmons

From:       Hans Selvog

Date:       May 15, 2006

RE:         **Carlos Caro**
            **Witnesses/Records by Location**



Chicago Illinois
  - Rosa Garza (Carlos' maternal aunt) lives in Chicago, Illinois, 708-753-0268.
  - Marguerita Silguero (Carlos' maternal aunt) lives in Chicago, Illinois.
    (Temporarily living with Rosa Garza, her sister.) She has several children: Joe,
    Anni, another daughter, and another son who is a school teacher in Kingsville,
    TX.



**HS-189**

JA 1739

*Privileged and Confidential*
*Attorney/Client Work Product*
   *Do Not Distribute Without Permission of Stephen Kalista and James Simmons, Esquires*

2



**HS-190**

JA 1740

*Privileged and Confidential*
*Attorney/Client Work Product*
*Do Not Distribute Without Permission of Stephen Kalista and James Simmons, Esquires*

3



**HS-191**

JA 1741

*Privileged and Confidential*
*Attorney/Client Work Product*
*    Do Not Distribute Without Permission of Stephen Kalista and James Simmons, Esquires*

4

Gatesville Texas
- Jose Maria "Joe" Caro III (DOB: 6-16-65) (inmate #649423, Rt. 2, P.O. Box 4400, A. Hughes Unit, Gatesville, TX, 76597).



Lovelady Texas
- Noe Caro (DOB: 3-16-68) (inmate #: 644150, Eastham Unit, D 315, P.O. Box 16, Lovelady, TX, 7581).



**HS-192**

JA 1742

*Privileged and Confidential*
*Attorney/Client Work Product*
   *Do Not Distribute Without Permission of Stephen Kalista and James Simmons, Esquires*

5



**HS-193**

JA 1743

# EXHIBIT 70

# EXHIBIT 70

JA 1744

P.O. Box 900, Jonesville, Virginia 24263-0900

December 19, 2003

MEMORANDUM FOR ALL SPECIAL HOUSING UNIT STAFF

FROM:    William R. Johnson, Special Investigative Agent

SUBJECT:    Special Handling Instructions for
Carlos David Caro, #37786-079

As you are all aware, an incident recently transpired in the Special Housing Unit involving inmate Carlos David Caro, #37786-079.  I would like to express the importance of ensuring he is handled appropriately.

1.    Staff should never engage in conversations with inmate Caro.

2.    Staff must always ensure the highest level of professionalism exists when handling or dealing with inmate Caro.

3.    Anytime inmate Caro makes a spontaneous statement in the presence of staff, the staff member will immediately document that comment in the provided log book.

4.    In that leg entry the staff member will write the comment verbatim, write their printed name, signature, and the time and date of the comment.  It is imperative this procedure is followed exactly as described.

5.    These log entries should also contain any comments made to other inmates that are overheard by staff.

6.    This log book is to be neat and free of any un-professional or un-appropriate markings.  This log book will become a legal document introduced in court.

7.    Inmate Caro will receive recreation alone.  This means no other inmates will be in any other recreation cage while he is receiving recreation.  Additionally, he is to be celled alone.  Staff should ensure he has minimal if any contact with other inmates particularly inmates belonging to or associated with the Texas Syndicate.

8.    Anytime inmate Caro is removed from his cell, a Lieutenant will he present, at the cell.

Any questions associated with this memorandum or inmate Caro should be directed to me personally.

JA 1745

# EXHIBIT 71

# EXHIBIT 71

JA 1746

DECLARATION OF ██████████
PURSUANT TO 28 U.S.C. § 1746

I, ██████████, do make oath and swear:

I was a member of the jury for the criminal trial United States of America v. Carlos Caro,

Western District of Virginia Case Number 2:06cr1. I was juror number 33.

I was treated for anxiety problems as a child. My last treatment for anxiety issues prior to the trial was when I was approximatley 14 years old. Symptoms related to the anxiety issue came back during the trial. I had chest tightness and tingling in my hands during the trial. I also had trouble sleeping at night. My anxiety during the trial was caused by watching the videos of the medical treatment and because it was a death penalty case. Once I knew that Caro was guilty my anxiety increased because I knew how I would have to vote on the death penalty.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 9/26/13 ████████

██████████

pg 1 of 2

1

JA 1747

DECLARATION OF ▮▮▮▮▮▮
PURSUANT TO 28 U.S.C. § 1746

I, ▮▮▮▮▮▮, do make oath and swear:

I was a member of the jury for the criminal trial United States of America v. Carlos Caro,

Western District of Virginia Case Number 2:06cr1. I was juror number 33.

In addition to the trial, my anxiety was caused by a personal issue. A close friend of mine was shot during the trial and almost died. The friend was like a brother to me and I was unable to be with him or his family because I had to serve on the jury. I also had anxiety because I felt I was pushed onto being on the jury. I told everyone that I did not want to be on the jury because I was needed at my family business. Being on the jury resulted in a loss of income because I could not work. One day after court I went to the Abingdon hospital because my anxiety symptoms became severe. KM

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 9-26-13.

▮▮▮▮▮▮

pg. 2 of 2

Since the trial I have remained on anti-anxiety medication. ▮

I ~~was~~ don't believe that I took any anti-anxiety medication during trial.

JA 1748

# EXHIBIT 72

# EXHIBIT 72

JA 1749

DECLARATION OF SUSAN RICHARDSON
PURSUANT TO 28 U.S.C. § 1746

I, Susan Richardson, declare as follows:

1. I am employed as an Investigator with the Federal Public Defender's Office for the Western District of Virginia. I have been assigned to work on the case of *United States v. Carlos Caro*, 1:06cr00001 (W.D. Va.).

2. One of my assignments has been to collect as much data as possible on the length of stay of inmates designated to the Bureau of Prison's Administrative Maximum facility in Florence, Colorado ("ADX-Florence") and on violent conduct committed by certain inmates while housed at ADX-Florence. Based on my research, I have prepared the attached tables:

   - Table 1: Inmates Known to be Designated to ADX-Florence For More Than Three Years;

   - Table 2: Inmates Currently Designated to ADX-Florence Who Have Been Convicted or Accused of Committing a Homicide Within a Bureau of Prisons (BOP) Facility; and

   - Table 3: Inmates Convicted of Committing a Homicide in the Bureau of Prisons Following a Jury Trial In Which the Government Sought the Death Penalty.

3. I obtained the information presented in these tables from various sources, including the Affidavit prepared by Jeanne Dvorak (ECF 790-48); documents produced by the

1

JA 1750

Government in response to a 2010 subpoena issued to the Bureau of Prisons in *United States v. Vincent Basciano*, 1:05-cr-060 (E.D.N.Y.); the Bureau of Prisons Inmate Locator and federal court PACER websites; the Federal Death Penalty Resource Counsel website; documents received pursuant to a FOIA request in this case; and internet searches for articles containing names of inmates known to be housed at ADX-Florence.

4.  Information regarding the population at ADX-Florence was obtained from the Bureau of Prisons' web site and a population report supplied as a result of a 2010 subpoena issued to the Bureau of Prisons in *United States v. Vincent Basciano*, 1:05-cr-060 (E.D.N.Y.). This information revealed that as of October 3, 2013, 434 inmates were designated to ADX-Florence. In January 2007, at the time of Carlos Caro's criminal trial, the average daily population was 470 inmates.

5.  The numbers presented in Tables 1, 2, and 3 are based only on the limited public data I have been able to gather. The numbers are necessarily incomplete and are believed to under-represent the total number of inmates who have been designated to ADX-Florence for more than three years.

6.  The numbers presented in the attached tables also do not include years that the inmate may have been assigned to the Control Unit at USP-Marion, the Bureau of Prisons' most secure facility prior to opening ADX-Florence in 1994. For this additional reason, the numbers under-represent the number of years that an inmate has been continuously designated to the Bureau of Prisons' most secure facility, either USP-Marion or ADX-Florence.

7.  My research estimates that at least 126 inmates have been incarcerated at ADX-Florence for more than five years, and at least 155 inmates have been incarcerated for more than

JA 1751

three years at ADX-Florence. (*See* Table 1.) Of these 155 inmates who have been incarcerated for more than three years, 125 are still designated to ADX-Florence, comprising almost 30% of the current ADX-Florence population. (*Id.*)

8. In January 2007, at the time of Carlos Caro's criminal trial, there were at least 79 inmates who had been incarcerated for more than three years at ADX-Florence; at least 63 inmates who had been incarcerated for more than five years at ADX-Florence; and at least 25 inmates who had been incarcerated for at least 10 years at ADX-Florence. (*See* Table 1.) In January 2007, ADX-Florence had been in operation for only about 12 years.

9. I also created a table specifically listing inmates who had been convicted or accused of committing a homicide within a Bureau of Prisons facility, and who are designated to ADX-Florence. There currently are at least 54 such inmates who have been designated to ADX-Florence. (*See* Table 2.) All 54 of these inmates have been continuously designated to ADX-Florence since their initial designation to ADX-Florence, including 22 inmates who entered ADX-Florence in 2007 or earlier. (*Id.*) Thirty-six inmates who have been convicted or accused of committing a homicide within a Bureau of Prisons facility have served more than three years at ADX-Florence. (*Id.*) In 2007, at least 14 inmates who had been convicted or accused of a BOP homicide had been incarcerated at ADX-Florence for more than three years. Those 14 inmates are still designated to ADX. (*Id.*)

10. I also checked the PACER website for the District of Colorado to find out if any of these 54 inmates who have been continuously designated to ADX-Florence have been indicted with any new crimes of violence after their homicide convictions. Not counting the two murders that occurred at ADX-Florence in 2005 that were discussed in Mr. Caro's trial

3

JA 1752

(Tr. 02/12/07 at 108), none of these inmates have been indicted for a subsequent homicide since their designation to ADX-Florence.

11. Through my research, I was also able to locate ten cases nationwide where the Government sought the death penalty for a defendant who committed a homicide within a Bureau of Prisons facility, but where the defendant received a life sentence following a jury trial. (*See* Table 3.) Nine of these ten defendants have been continuously designated to ADX-Florence since imposition of their life sentences. One defendant was sent to USP-Hazelton instead of ADX-Florence. (*Id.*) Based upon my research, I believe that this defendant was not eligible for placement at ADX-Florence due to a significant mental disorder. (*See id.* n.3.)

12. In another case, the defendant received a death sentence, but for an unknown reason, has remained designated to ADX-Florence for the four years following his trial, and he has never been transported to USP-Terre Haute's Death Row.

13. I have attempted to verify the data in these tables to the best of my ability based on the limited information available to me, and upon information and belief, I believe the data to be accurate.

I declare under penalty for perjury that the foregoing is true and correct.

Executed on ___10-9-13___ .

_Susan Richardson_

Susan Richardson

4

JA 1753

Case 1:06-cr-00001-JPJ   Document 797-1   Filed 10/09/13   Page 70 of 89   Pageid#: 7785

# United States v Caro

## Table 1
### INMATES  KNOWN TO BE DESIGNATED TO ADX-FLORENCE
### FOR MORE THAN THREE YEARS[1]
### (October 3, 2013)

| # | Name | Register # | Enter ADX | # of Years at ADX (as of 2007) | Total # of Years  at ADX | BOP Homicide |
|---|------|-----------|-----------|-------------------------------|--------------------------|--------------|
| 1 | Gometz, Randy | 35556-118 | 1994 | 13 | 19 | |
| 2 | Mason, Howard | 24651-053 | 1994 | 13 | 19 | |
| 3 | Bradshaw, Wayman | 07109-018 | 1995 | 12 | 17 | |
| 4 | Bruscino, Ronnie | 20168-148 | 1995 | 12 | 18 | |
| 5 | Edwards, Delroy | 25109-053 | 1995 | 12 | 18 | |
| 6 | Filkins, Glen | 84015-012 | 1995 | 12 | 18 | |
| 7 | Gambina, Ralph | 12508-116 | 1995 | 12 | 18 | |
| 8 | Gibson, Christopher | 81372-011 | 1995 | 12 | 18 | Yes |
| 9 | Hicklin, Steven | 01242-097 | 1995 | 12 | 18 | Yes |
| 10 | Kikumura, Yu | 09008-050 | 1995 | 12 | 12 | |
| 11 | Lynn, Richard | 09748-004 | 1995 | 12 | 16* | |
| 12 | Matthews, Norman | 88752-132 | 1995 | 12 | 16* | |
| 13 | Presley, James | 41368-019 | 1995 | 12 | 14 | |
| 14 | Scott, Steve | 55341-065 | 1995 | 12 | 18 | |
| 15 | Simas, Russell | 23188-086 | 1995 | 12 | 18 | |
| 16 | Young, Timothy | 60012-001 | 1995 | 12 | 18 | |
| 17 | Black, Clifford | 55458-097 | 1996 | 11 | 17 | |
| 18 | Harrelson, Charles | 02582-016 | 1996 | 11 | 11 | |
| 19 | Kolb, Mitchell | 02689-081 | 1996 | 11 | 15* | |
| 20 | Masters, Henry | 01413-046 | 1996 | 11 | 17 | Yes |
| 21 | Stallings, Larry | 14534-057 | 1996 | 11 | 17 | |
| 22 | Abrego, Juan | 09935-000 | 1997 | 10 | 16 | |
| 23 | Eusi, Maulana | 02218-045 | 1997 | 10 | 14* | |
| 24 | Hevle, Edgar | 13950-116 | 1997 | 10 | 16 | Yes |

JA 1754

*United States v Caro*

Table 1
**INMATES KNOWN TO BE DESIGNATED TO ADX-FLORENCE
FOR MORE THAN THREE YEARS[1]**
(October 3, 2013)

| # | Name | Register # | Enter ADX | # of Years at ADX (as of 2007) | Total # of Years at ADX | BOP Homicide |
|---|------|-----------|-----------|--------------------------------|-------------------------|--------------|
| 25 | Moreno, Jesse | 03326-112 | 1997 | 10 | 16 | |
| 26 | Aguirre, Alex | 03334-112 | 1998 | 9 | 15 | |
| 27 | Bridgewater, Wayne | 20220-148 | 1998 | 9 | 15 | Yes |
| 28 | Casso, Anthony | 16802-050 | 1998 | 9 | 13* | |
| 29 | Hoover, Larry | 86063-024 | 1998 | 9 | 15 | |
| 30 | Houston, Henry | 94434-012 | 1998 | 9 | 15 | Yes |
| 31 | Ismoil, Eyad | 37802-054 | 1998 | 9 | 15 | |
| 32 | Jones, Anthony | 32124-037 | 1998 | 9 | 15 | |
| 33 | Kaczynski, Theodore | 04475-046 | 1998 | 9 | 15 | |
| 34 | McMahan, Jamie | 05327-030 | 1998 | 9 | 15 | |
| 35 | Mendez, Raymond | 03329-112 | 1998 | 9 | 15 | |
| 36 | Nicholson, Harold | 49535-083 | 1998 | 9 | 15 | |
| 37 | Salameh, Mohammad | 34338-054 | 1998 | 9 | 15 | |
| 38 | Yousef, Ramzi | 03911-000 | 1998 | 9 | 15 | |
| 39 | Akers, Montgomery | 02866-081 | 2000 | 7 | 10 | |
| 40 | Colon, Gustavo | 07984-424 | 2000 | 7 | 13 | |
| 41 | Farrakhan-Muhammad, Q Ili-Yass a/k/a Christopher Mitchell | 02791-088 | 2000 | 7 | 13 | |
| 42 | Felipe, Luis | 14067-074 | 2000 | 7 | 13 | |
| 43 | McIntosh, Richard | 02012-028 | 2000 | 7 | 13 | Yes |
| 44 | Rowe, Joseph | 02218-112 | 2000 | 7 | 13 | |
| 45 | Sablan, Rudy | 00074-005 | 2000 | 7 | 13 | Yes |
| 46 | Sablan, William | 00232-005 | 2000 | 7 | 13 | Yes |

USCA4 Appeal: 16-1   Doc: 32-4   Filed: 12/27/2016   Pg: 261 of 306

JA 1755

*United States v Caro*

Table 1
INMATES KNOWN TO BE DESIGNATED TO ADX-FLORENCE
FOR MORE THAN THREE YEARS[1]
(October 3, 2013)

USCA4 Appeal: 16-1    Doc: 32-4    Filed: 12/27/2016    Pg: 262 of 306

| # | Name | Register # | Enter ADX | # of Years at ADX (as of 2007) | Total # of Years at ADX | BOP Homicide |
|---|---|---|---|---|---|---|
| 47 | Santiago, Richard | 53961-097 | 2000 | 7 | 13 | Yes |
| 48 | Shelby, David | 05374-081 | 2000 | 7 | 12 | |
| 49 | Von Moos, Jon | 79328-012 | 2000 | 7 | 13 | |
| 50 | Cunningham, Harold | 04685-000 | 2001 | 6 | 12 | |
| 51 | Doughterty, Joseph | 01924-135 | 2001 | 6 | 12 | |
| 52 | El-Hage, Wadih | 42393-054 | 2001 | 6 | 12 | |
| 53 | Ghailani, Ahmed | 02476-748 | 2001 | 6 | 12 | |
| 54 | Oecsle, Raymond | 44776-066 | 2001 | 6 | 12 | |
| 55 | Ressam, Ahmed | 29638-086 | 2001 | 6 | 12 | |
| 56 | Shepard, Robert | 04574-088 | 2001 | 6 | 12 | |
| 57 | Swango, Michael | 08352-424 | 2001 | 6 | 12 | |
| 58 | Odeh, Mohamed | 42375-054 | 2001 | 6 | 12 | |
| 59 | Al-Owhali, Mohamed | 42371-054 | 2001 | 6 | 12 | |
| 60 | Mohamed, Khalfan | 44623-054 | 2001 | 6 | 12 | |
| 61 | Palazzola, Dominic | 53757-097 | 2001 | 6 | 12 | Yes |
| 62 | Powers, John Jay | 03220-028 | 2001 | 6 | 11 | |
| 63 | Stewart, Dominic | 10819-007 | 2001 | 6 | 12 | Yes |
| 64 | Bruhl, Leroy | 40114-066 | 2002 | 5 | 11 | |
| 65 | Hanssen, Robert | 48551-083 | 2002 | 5 | 11 | |
| 66 | Leggett, Jaison | 09411-077 | 2002 | 5 | 10 | |
| 67 | Johnson, Damion | 14980-047 | 2002 | 5 | 11 | Yes |
| 68 | Nosair, El-Sayyid | 35074-054 | 2002 | 5 | 9* | |
| 69 | Petty, Ishmael | 10738-042 | 2002 | 5 | 11 | Yes |
| 70 | Saleh, Mohammed | 34853-054 | 2002 | 5 | 9* | |

JA 1756

# United States v Caro

## Table 1
### INMATES KNOWN TO BE DESIGNATED TO ADX-FLORENCE FOR MORE THAN THREE YEARS[1]
(October 3, 2013)

| # | Name | Register # | Enter ADX | # of Years at ADX (as of 2007) | Total # of Years at ADX | BOP Homicide |
|---|---|---|---|---|---|---|
| 71 | Shaifer, Ernest | 30674-048 | 2002 | 5 | 11 | |
| 72 | Duckett, James | 19214-083 | 2002 | 5 | 8* | Yes |
| 73 | Barron, Percy | 04710-00 | 2003 | 4 | 10 | |
| 74 | Custard, Bob | 02728-031 | 2003 | 4 | 10 | |
| 75 | Deberry, Frederick | 09303-042 | 2003 | 4 | 10 | |
| 76 | Georgeacarakos, Peter | 03029-036 | 2003 | 4 | 8* | |
| 77 | O'Driscoll, Michael | 03029-037 | 2003 | 4 | 10 | Yes |
| 78 | Reid, Richard | 03029-038 | 2003 | 4 | 10 | |
| 79 | Abouhalima, Mahud | 03029-039 | 2003 | 4 | 10 | |
| 80 | Heisler, Donald | 03029-040 | 2004 | 3 | 9 | |
| 81 | Nichols, Terry | 03029-041 | 2004 | 3 | 9 | |
| 82 | Portee, Omar | 03029-042 | 2004 | 3 | 9 | |
| 83 | Salim, Mamdough | 03029-043 | 2004 | 3 | 9 | |
| 84 | Faris, Iyman | 03029-044 | 2004 | 3 | 9 | |
| 85 | Vega, Jose | 03029-045 | 2004 | 3 | 6 (suicide 2010) | |
| 86 | Hernadez, Joseph | 03029-046 | 2004 | 3 | 9 | |
| 87 | Hernandez, Tex | 03029-047 | 2004 | 3 | 9 | |
| 88 | Morado, James | 03029-048 | 2004 | 3 | 9 | |
| 89 | Rubalcaba, Gerald | 03029-049 | 2004 | 3 | 9 | |
| 90 | Rizzuto, Vito | 03029-050 | 2004 | 3 | 8 (deported 2012) | |
| 91 | Scott, Bernard | 03029-051 | 2005 | 2 | 8 | |
| 92 | Silverstein, Thomas | 03029-052 | 2005 | 2 | 8 | Yes |
| 93 | Rivera, Silvestre | 03029-053 | 2005 | 2 | 8 | Yes |
| 94 | Tristan, Cornelio | 03029-054 | 2005 | 2 | 8 | |
| 95 | Tuttamore, Timothy | 03029-055 | 2005 | 2 | 8 | |

USCA4 Appeal: 16-1    Doc: 32-4    Filed: 12/27/2016    Pg: 263 of 306

Case 1:06-cr-00001-JPJ   Document 797-1   Filed 10/09/13   Page 73 of 89   Pageid#: 7788

JA 1757

USCA4 Appeal: 16-1    Doc: 32-4    Filed: 12/27/2016    Pg: 264 of 306

Case 1:06-cr-00001-JPJ    Document 797-1    Filed 10/09/13    Page 74 of 89    Pageid#: 7789

# United States v Caro

## Table 1
### INMATES  KNOWN TO BE DESIGNATED TO ADX-FLORENCE
### FOR MORE THAN THREE YEARS[1]
### (October 3, 2013)

| # | Name | Register # | Enter ADX | # of Years at ADX (as of 2007) | Total # of Years  at ADX | BOP Homicide |
|---|------|-----------|-----------|-------------------------------|--------------------------|--------------|
| 96 | Rudolph, Eric | 03029-056 | 2005 | 2 | 8 | |
| 97 | McKinney, Aaron | 03029-057 | 2005 | 2 | 6* | |
| 98 | Hale, Matthew | 03029-058 | 2005 | 2 | 8 | |
| 99 | Crawford, John | 03029-059 | 2005 | 2 | 8 | |
| 100 | Ayyad, Nidal | 03029-060 | 2005 | 2 | 6* | |
| 101 | Alvarez, Victor | 03029-061 | 2005 | 2 | 8 | |
| 102 | Bingham, Tyler | 03029-062 | 2006 | 1 | 7 | Yes |
| 103 | Bond, Erving | 03029-063 | 2006 | 1 | 7 | |
| 104 | Bornman, Gary | 03029-064 | 2006 | 1 | 7 | |
| 105 | Kitchen, Brandon | 03029-065 | 2006 | 1 | 5* | |
| 106 | Martin, Roy | 03029-066 | 2006 | 1 | 7 | |
| 107 | Martinez, Francisco | 03029-067 | 2006 | 1 | 7 | Yes |
| 108 | Mills, Barry | 03029-068 | 2006 | 1 | 7 | Yes |
| 109 | Moussaoui, Zacarias | 03029-069 | 2006 | 1 | 7 | |
| 110 | Sattar, Ahmed | 03029-070 | 2006 | 1 | 7 | |
| 111 | Segura, Phillip | 03029-071 | 2006 | 1 | 7 | |
| 112 | Shryock, Raymond | 03029-072 | 2006 | 1 | 7 | |
| 113 | Tokash, Joe | 03029-073 | 2006 | 1 | 7 | |
| 114 | Usher, John | 03029-074 | 2006 | 1 | 5* | |
| 115 | Al Shaaban, Shaaban | 03029-075 | 2006 | 1 | 7 | |
| 116 | Abu Ali, Ahmed | 03029-076 | 2006 | 1 | 7 | |
| 117 | Folts, Shaun | 03029-077 | 2006 | 1 | 7 | |
| 118 | McNair, Richard | 03029-078 | 2006 | 1 | 7 | |
| 119 | Fort, Jeff | 03029-079 | 2006 | 1 | 7 | |
| 120 | York, Dwight | 03029-080 | 2006 | 1 | 7 | |

JA 1758

# United States v Caro

## Table 1
### INMATES KNOWN TO BE DESIGNATED TO ADX-FLORENCE FOR MORE THAN THREE YEARS[1]
(October 3, 2013)

| # | Name | Register # | Enter ADX | # of Years at ADX (as of 2007) | Total # of Years at ADX | BOP Homicide |
|---|------|-----------|-----------|--------------------------------|-------------------------|--------------|
| 121 | Al-Amin, Jamil | 03029-081 | 2007 | - | 6 | |
| 122 | McMillan, Shane | 03029-082 | 2007 | - | 6 | |
| 123 | McCallister, Timothy | 03029-083 | 2007 | - | 6 | Yes |
| 124 | Narducci, John | 03029-084 | 2007 | - | 5* | |
| 125 | Ozsusamlar, Osman | 03029-085 | 2007 | - | 4* | |
| 126 | Rodriguez, Osiel | 03029-086 | 2007 | - | 4* | |
| 127 | Yarbrough, Gary | 03029-087 | 2007 | - | 6 | |
| 128 | Temple, Eric | 03029-088 | 2007 | - | 6 | Yes |
| 129 | Murray, Greg | 03029-089 | 2007 | - | 6 | |
| 130 | Pinson, Jeremy | 03029-090 | 2007 | - | 6 | |
| 131 | Guillen, Osiel | 03029-091 | 2007 | - | 6 | |
| 132 | Duka, Dritan | 03029-092 | 2008 | - | 5 | |
| 133 | Watland, Gary | 03029-093 | 2008 | - | 5 | |
| 134 | Perkins, Herbert | 03029-094 | 2008 | - | 5 | |
| 135 | Clark, Willie | 03029-095 | 2008 | - | 5 | Yes |
| 136 | Murillo, Jose | 03029-096 | 2008 | - | 5 | Yes |
| 137 | Rodriguez, Oscar | 03029-097 | 2008 | - | 5 | Yes |
| 138 | Gulley, Arzell | 03029-098 | 2008 | - | 5 | Yes |
| 139 | Jennings, David | 03029-099 | 2008 | - | 5 | Yes |
| 140 | Slocum, Ronald | 03029-100 | 2008 | - | 5 | Yes |
| 141 | Mosher, Ellis | 03029-101 | 2008 | - | 5 | Yes |
| 142 | Pineda, Juvenal | 03029-102 | 2008 | - | 5 | |
| 143 | Padilla, Jose | 03029-103 | 2008 | - | 4* | |
| 144 | McElhiney, Michael | 03029-104 | 2008 | - | 5 | Yes |
| 145 | Castro, Ruben | 03029-105 | 2008 | - | 5 | |
| 146 | Knorr, Carl | 03029-106 | 2009 | - | 4 | Yes |

*United States v Caro*

Table 1
## INMATES  KNOWN TO BE DESIGNATED TO ADX-FLORENCE
## FOR MORE THAN THREE YEARS[1]
(October 3, 2013)

| # | Name | Register # | Enter ADX | # of Years at ADX (as of 2007) | Total # of Years  at ADX | BOP Homicide |
|---|------|-----------|-----------|-------------------------------|--------------------------|--------------|
| 147 | Leon, Raul | 03029-107 | 2009 | - | 4 | |
| 148 | Sahakian, David | 03029-108 | 2009 | - | 4 | Yes |
| 149 | Ebron, Joseph | 03029-109 | 2009 | - | 4 | Yes |
| 150 | Meeks, Tommy | 03029-110 | 2009 | - | 4 | Yes |
| 151 | Bacote, Michael | 03029-111 | 2009 | - | 4 | Yes |
| 152 | Johnson, Terrell | 03029-112 | 2009 | - | 4 | Yes |
| 153 | Ferguson, Juwan | 03029-113 | 2009 | - | 4 | Yes |
| 154 | Branch, Edgar | 03029-114 | 2009 | - | 4 | Yes |
| 155 | Myers, Walter | 03029-115 | 2009 | - | 4 | |

[1]The data in this table is compiled only from publically available information and thus likely does not include all of the inmates who have been housed at ADX for more than 3 years.

\* These inmates left ADX at some time between 2011 and the present, but the exact date is not known.  The number listed is a conservate estimate that assumes the inmate left in 2011.

Years printed in RED are estimates based on the date of conviction and pleadings reviewed on the PACER website.

The limited data available shows that at least 155 inmates have been designated to ADX for more than 3 years; at least 126 inmates have been designated to ADX for more than 5 years; and at least 125 are still housed at ADX.

The limited data available shows that in 2007, at least 79 inmates had been designated to ADX for more than 3 years; at least 63 inmates had been designated to ADX for more than 5 years; and at least 25 inmates had been designated to ADX for at least 10 years.

*United States v Caro*

Table 2
INMATES CURRENTLY DESIGNATED TO ADX-FLORENCE
WHO HAVE BEEN CONVICTED OR ACCUSED OF COMMITTING
A HOMICIDE WITHIN A BUREAU OF PRISONS (BOP) FACILITY[1]
(October 3, 2013)

| # | Name | Register # | Enter ADX | Leave ADX | Total Years at ADX | Details |
|---|------|-----------|-----------|-----------|--------------------|---------|
| 1 | Gibson, Christopher | 81372-011 | 1995 | No | 18 | Aryan Brotherhood gang member charged in RICO indictment alleging 17 BOP murders. Case No. 02CR938 (C.D. Cal.) |
| 2 | Hicklin, Steven | 01242-097 | 1995 | No | 18 | Aryan Brotherhood member charged in RICO indictment alleging 17 BOP murders. Case No. 02CR938 (C.D. Cal.) |
| 3 | Masters, Henry | 01413-046 | 1996 | No | 17 | USP Atlanta inmate murder. Case No. 1:95CR503 (N.D. Ga.) |
| 4 | Hevle, Edgar | 13950-116 | 1997 | No | 15 | Aryan Brotherhood gang member charged in RICO indictment alleging 17 BOP murders. Case No. 02CR938 (C.D. Cal.) |
| 5 | Bridgewater, Wayne | 20220-148 | 1998 | No | 15 | RICO indictment of members of Aryan Brotherhood . 17 BOP murders were alleged. Bridgewater was a member of the federal council for AB and accused of personally killing two black inmates. Case No. 02CR938 (C.D. Cal.) |
| 6 | Houston, Henry | 94434-012 | 1998 | No | 15 | Aryan Brotherhood member charged in RICO indictment alleging 17 BOP murders. Houston was alleged to be personally involved in 4 inmate deaths.  Case No. 02CR938 (C.D. Cal.) |
| 7 | McIntosh, Richard | 02012-028 | 2000 | No | 13 | USP Marion inmate stabbing death.  Defendant was a member of the Aryan Brotherhood. Case Nos. 99CR40044 (S.D. Ill.);  02CR938 (C.D. Cal.) |
| 8 | Sablan, Rudy | 00074-005 | 2000 | No | 13 | USP Florence inmate strangulation and evisceration stabbing death. Case No. 00CR531 (D. Colo.) |
| 9 | Sablan, William | 00232-005 | 2000 | No | 13 | USP Florence inmate strangulation and evisceration stabbing death. Sablan removed organs and taunted officers. Case No. 00CR531 (D. Colo.) |
| 10 | Santiago, Richard | 53961-097 | 2000 | No | 13 | ADX inmate beating death. Case No. 1:10CR164 (D. Colo.) |
| 11 | Palazzola, Dominic | 53757-097 | 2001 | No | 12 | FMC Lexington inmate beating death.  Case No. 00CR132 (E.D. Ky.) |

USCA4 Appeal: 16-1      Doc: 32-4      Filed: 12/27/2016      Pg: 267 of 306

*United States v Caro*

Table 2
INMATES CURRENTLY DESIGNATED TO ADX-FLORENCE
WHO HAVE BEEN CONVICTED OR ACCUSED OF COMMITTING
A HOMICIDE WITHIN A BUREAU OF PRISONS (BOP) FACILITY[1]
(October 3, 2013)

| # | Name | Register # | Enter ADX | Leave ADX | Total Years at ADX | Details |
|---|------|-----------|-----------|-----------|--------------------|---------|
| 12 | Stewart, Dominic | 10819-007 | 2001 | No | 12 | ADX inmate beating death. Case No. 1:10CR129 (D. Colo.) |
| 13 | Petty, Ishmael | 10783-042 | 2002 | No | 11 | USP Pollock inmate murder. Case No. 1:02CR10006 (W.D. La.) |
| 14 | O'Driscoll, Michael | 04221-016 | 2003 | No | 10 | USP Allenwood inmate stabbing death. Case No. 4CR01-227 (M.D. Pa.) |
| 15 | Rivera, Silvestre | 26147-008 | 2005 | No | 8 | ADX inmate beating death. Case No. 1:10cr164 (D. Colo.) |
| 16 | Silverstein, Thomas | 14634-116 | 2005 | No | 8 | USP Marion inmate and officer death. |
| 17 | Bingham, Tyler | 03325-091 | 2006 | No | 7 | RICO indictment of members of Aryan Brotherhood . 17 BOP murders were alleged. Bingham and another AB leader (Mills) were alleged to have made all of the decisions involving crimes in federal prison. Case No. 02CR938 (C.D. Cal.) |
| 18 | Folts, Shaun | 84197-198 | 2006 | No | 7 | USP Marion stabbing and beating death. The victim's eyes were removed by a homemade prison weapon. Case Nos. 11MC42 (S.D. Ill.); 4:12CR40015 (S.D. Ill.) |
| 19 | Gulley, Arzell | 18249-039 | 2006 | No | 7 | USP Beaumont inmate stabbing death. Case No. 1:05CR51 (E.D. Tex.) |
| 20 | Mills, Barry | 14559-116 | 2006 | No | 7 | RICO indictment of members of Aryan Brotherhood . 17 BOP murders were alleged. Mills and another AB leader (Bingham) were alleged to have made all of the decisions involving crimes in federal prison. Mills was also charged with personally committing one murder. Case No. 02CR938 (C.D. Cal.) |
| 21 | McCallister, Timothy | 02659-087 | 2007 | No | 6 | USP Terre Haute inmate killing. Case No. 2:07CR07 (S.D. Ind.) |
| 22 | Temple, Eric | 33039-018 | 2007 | No | 6 | USP Atwater inmate death by strangulation and disfigurement (removal of eye) of cellmate. Case No. 1:06CR309 (E.D. Cal.) |

*United States v Caro*

Table 2
INMATES CURRENTLY DESIGNATED TO ADX-FLORENCE
WHO HAVE BEEN CONVICTED OR ACCUSED OF COMMITTING
A HOMICIDE WITHIN A BUREAU OF PRISONS (BOP) FACILITY[1]
(October 3, 2013)

| # | Name | Register # | Enter ADX | Leave ADX | Total Years at ADX | Details |
|---|------|-----------|-----------|-----------|--------------------|---------|
| 23 | Clark, Willie | 97815-024 | 2008 | No | 5 | FCI Edgefield inmate stabbing. Defendant was an enforcer for the Gangster Disciples gang.   Case No. 04CR1123 (D.S.C.) |
| 24 | McElhiney, Michael | 04198-097 | 2008 | No | 5 | Aryan Brotherhood member charged in RICO indictment alleging 17 BOP murders. McElhiney was alleged to be responsible for day to day operations at USP Marion, including disciplining AB members. Case No. 02CR938 (C.D. Cal.) |
| 25 | Mosher, Ellis | 02875-087 | 2008 | No | 5 | USP Beaumont inmate murder.  Case No. 06CR101 (E.D. Tex.) |
| 26 | Murillo, Jose | 04354-112 | 2008 | No | 5 | USP Victorville inmate stabbing death. Case No. 5:05CR69 (C.D. |
| 27 | Rodriguez, Oscar | 35945-048 | 2008 | No | 5 | USP Victorville inmate stabbing death. Case No. 5:05CR69 (C.D. Cal.) |
| 28 | Watland, Gary | 99901-555 | 2008 | No | 5 | USP Forence inmate murder.  Case No.1:11CR38 (D. Colo.) |
| 29 | Bacote, Michael | 05835-007 | 2009 | No | 4 | USP Beaumont inmate stabbing of a previous government witness. Victim was stabbed more than 100 times.  Case No. 1:08CR36 (E.D. Tex.) |
| 30 | Branch, Edgar | 14916-031 | 2009 | No | 4 | USP Pollock inmate stabbing.  Branch strapped a "shank" to each hand and stabbed victim. Case No. 07CR10029 (W.D. La.) |
| 31 | Ebron, Joseph | 08655-007 | 2009 | No | 4 | USP Beaumont inmate stabbing of a previous government witness. Defendant was a member of DC Crew prison gang and victim previously testified against other DC inmates.  The victim was stabbed more than 100 times.  Case No. 1:08CR36 (E.D. Tex.) |
| 32 | Ferguson, Juwan | 97034-011 | 2009 | No | 4 | USP Atwater inmate beating death.  Case No. 08CR116 (E.D. Cal.) |

USCA4 Appeal: 16-1      Doc: 32-4      Filed: 12/27/2016      Pg: 269 of 306

JA 1763

### United States v Caro

## Table 2
### INMATES CURRENTLY DESIGNATED TO ADX-FLORENCE
### WHO HAVE BEEN CONVICTED OR ACCUSED OF COMMITTING
### A HOMICIDE WITHIN A BUREAU OF PRISONS (BOP) FACILITY[1]
(October 3, 2013)

| # | Name | Register # | Enter ADX | Leave ADX | Total Years at ADX | Details |
|---|------|-----------|-----------|-----------|-------------------|---------|
| 33 | Johnson, Terrell | 16390-047 | 2009 | No | 4 | USP Big Sandy inmate stabbing death. Defendant was a member of the Crips gang and stabbed a member of the DC Crew gang with a homemade weapon. Case No. 7:07CR18 (E.D. Ky.) |
| 34 | Knorr, Carl | 13161-075 | 2009 | No | 4 | USP Marion inmate stabbing death. Defendant was a member of the Aryan Brotherhood. Case Nos. 99CR40044 (S.D. Ill.); 02-938 (C.D. Cal.) |
| 35 | Meeks, Tommy | 39492-018 | 2009 | No | 4 | USP Allenwood inmate beating death using a 3 pound rock wrapped in a shirt. Case No. 4:07CR196 (M.D. Pa.) |
| 36 | Sahakian, David | 54744-097 | 2009 | No | 4 | Aryan Brotherhood member charged in RICO indictment alleging 17 BOP murders. Ordered other AB members to murder a black inmate at USP Marion. Sahakian was also alleged to be responsible for the day to day operations at USP Marion, including disciplining AB members. Case Nos. 99CR40044 (S.D. Ill.); 02-938 (C.D. Cal.) |
| 37 | Farias, Osbaldo | 90662-079 | 2010 | No | 3 | USP Coleman inmate stabbing and beating. Attack lasted 30 minutes and was captured on video. Case No. 5:08CR43 (M.D. Fla.) |
| 38 | Martinez, Gerardo | 16249-085 | 2010 | No | 3 | USP Coleman inmate stabbing and beating. Attack lasted 30 minutes and was captured on video. Case No. 5:08CR43 (M.D. Fla.) |
| 39 | Delaney, Daniel | 09416-112 | 2011 | No | 2 | USP Terre Haute inmate murder by strangulation. Case No. 2:11CR5 (S.D. Ind.) |
| 40 | Francisco, Jonathan | 17439-075 | 2011 | No | 2 | USP Pollock inmate stabbing involving Crips gang members. Case No. 10CR123 (W.D. La.) |
| 41 | Gravely, Dwaune | 12867-050 | 2011 | No | 2 | USP Big Sandy inmate beating death. Defendant was a Blood gang member and the victim was a mentally ill DC Crew inmate. Case No. 7:09CR13 (E.D. Ky.) |

USCA4 Appeal: 16-1   Doc: 32-4   Filed: 12/27/2016   Pg: 270 of 306

*United States v Caro*

Table 2
INMATES CURRENTLY DESIGNATED TO ADX-FLORENCE
WHO HAVE BEEN CONVICTED OR ACCUSED OF COMMITTING
A HOMICIDE WITHIN A BUREAU OF PRISONS (BOP) FACILITY[1]
(October 3, 2013)

| # | Name | Register # | Enter ADX | Leave ADX | Total Years at ADX | Details |
|---|------|-----------|-----------|-----------|--------------------|---------|
| 42 | Hernandez, Justin | 30123-013 | 2011 | No | 2 | FCI Florence beating death of an inmate using hands, feet and weapons made from padlocks attached to belts. Case No. 1:09CR301 (D. Colo.) |
| 43 | Hurley, Allen | 28652-037 | 2011 | No | 2 | USP Canaan inmate stabbing. Victim was stabbed 90 times. Case No. 3:11CR360 (M.D. Pa.) |
| 44 | Johnson, Damion | 80124-038 | 2011 | No | 2 | USP Leavenworth  inmate beating death. Case No. 2:99CR20060 (D. Kan.) |
| 45 | Milburne, Darryl | 58478-066 | 2011 | No | 2 | USP Big Sandy inmate beating death. Defendant was a Blood gang member and the victim was a mentally ill DC Crew inmate. Case No. 7:09CR13 (E.D. Ky.) |
| 46 | Morones, Daniel | 39448-048 | 2011 | No | 2 | FCI Florence beating death of an inmate using hands, feet and weapons made from padlocks attached to belts. Case No. 1:09CR301 (D. Colo.) |
| 47 | Napper, Harry | 32403-037 | 2011 | No | 2 | USP Beaumont  inmate beating and strangulation death.  Case No. 1:11CR62 (E.D. Tex.) |
| 48 | Pluma, Jose | 34104-013 | 2011 | No | 2 | FCI Florence beating death of an inmate using hands, feet and weapons made from padlocks attached to belts. Case No. 1:09CR301 (D. Colo.) |
| 49 | Rosalez, Mark | 08961-091 | 2011 | No | 2 | FCI Florence beating death of an inmate using hands, feet and weapons made from padlocks attached to belts. Case No. 1:09CR301 (D. Colo.) |
| 50 | Ruelas, Juan | 04298-280 | 2011 | No | 2 | FCI Florence beating death of an inmate using hands, feet and weapons made from padlocks attached to belts. Case No. 1:09CR301 (D. Colo.) |
| 51 | Villanueva, Sheldon | 02539-748 | 2011 | No | 2 | USP Pollock inmate stabbing death involving the Nortenos gang. Villanueva previously pled guilty to a stabbing in 2007 at USP Pollock. Case No. 08CR386 (W.D. La.) |

*United States v Caro*

## Table 2
### INMATES CURRENTLY DESIGNATED TO ADX-FLORENCE
### WHO HAVE BEEN CONVICTED OR ACCUSED OF COMMITTING
### A HOMICIDE WITHIN A BUREAU OF PRISONS (BOP) FACILITY[1]
(October 3, 2013)

| # | Name | Register # | Enter ADX | Leave ADX | Total Years at ADX | Details |
|---|------|-----------|-----------|-----------|-------------------|---------|
| 52 | Bush, Willie | 41756-074 | 2012 | No | 1 | USP Lee inmate stabbing death of one Blood gang member by another Blood gang member.  Case No. 2:11CR15 (W.D. Va.) |
| 53 | Johnson, Antonio | 35987-007 | 2012 | No | 1 | USP Lee inmate stabbing death. Victim was stabbed numerous times. Case No. 2:12CR7 (W.D. Va.) |
| 54 | Richardson, Brian | 91507-011 | 2012 | No | 1 | USP Atlanta inmate stabbing and strangulation death. Case No. 1:08CR139 (N.D. Ga.) |

[1]The data in this table is compiled from publically available information and likely does not include all of the inmates who are currently designated to ADX and who have been accused or convicted of a homicide within a BOP facility.

Years printed in RED are estimates based on the date of conviction and pleadings reviewed on the PACER website.

At least 54 inmates currently housed at ADX have been accused or convicted of a BOP homicide.

JA 1766

USCA4 Appeal: 16-1      Doc: 32-4      Filed: 12/27/2016      Pg: 272 of 306

*United States v Caro*

Table 3

SMALL CAPS: INMATES CONVICTED OF COMMITTING A HOMICIDE IN THE BUREAU OF PRISONS
FOLLOWING A JURY TRIAL IN WHICH THE GOVERNMENT SOUGHT THE DEATH PENALTY[1]
October 3, 2013

| # | Name | Register # | Case Number | Details | Result | Location | Enter ADX | Leave ADX | Years at ADX |
|---|------|-----------|-------------|---------|--------|----------|-----------|-----------|--------------|
| 1 | Houston, Henry | 94434-012 | No. 02CR938 (C.D. Cal.) | Aryan Brotherhood RICO indictment. 17 BOP murders; 4 committed by Houston. | Life Sentence | ADX | 1998 | No | 15 |
| 2 | Bridgewater, Wayne | 20220-148 | No. 02CR938 (C.D. Cal.) | Aryan Brotherhood RICO indictment. 17 BOP murders; 2 committed by Bridgewater. | Life Sentence | ADX | 1998 | No | 15 |
| 3 | Sablan, William | 00232-005 | No. 00CR531 (D. Colo.) | USP Florence inmate death by evisceration stabbing. | Life Sentence | ADX | 2000 | No | 13 |
| 4 | Sablan, Rudy | 00074-005 | No. 00CR528 (D. Colo.) | USP Florence inmate death by evisceration stabbing. | Life Sentence | ADX | 2000 | No | 13 |
| 5 | O'Driscoll, Michael | 04421-016 | No. 4-CR-01-277 (M.D. Pa.) | USP Allenwood inmate death by stabbing. | Life Sentence | ADX | 2003 | No | 10 |
| 6 | Mills, Barry | 14559-116 | No. 02CR938 (C.D. Cal.) | Aryan Brotherhood RICO indictment. 17 BOP murders. | Life Sentence | ADX | 2006 | No | 7 |
| 7 | Bingham, Tyler | 03325-091 | No. 02CR938 (C.D. Cal.) | Aryan Brotherhood RICO indictment. 17 BOP murders. | Life Sentence | ADX | 2006 | No | 7 |
| 8 | Mosher, Ellis | 02875-087 | No. 1:06CR00101 (E.D. Tex.) | USP Beaumont inmate murder. | Life Sentence | ADX | 2008 | No | 5 |
| 9 | Ebron, Joseph | 08655-007 | No. 1:07CR142 (E.D. Tex.) | USP Beaumont inmate stabbing death. Victim stabbed more than 100 times. | Death Sentence | ADX[2] | 2009 | No | 4 |
| 10 | Richardson, Brian | 91507-011 | No. 1:08CR139 (N.D. Ga.) | USP Atlanta inmate stabbing and strangulation death. | Life Sentence | ADX | 2012 | No | 1 |
| 11 | Jackson, David | 13567-039 | No. 1:06CR51 (E.D. Tex.) | USP Beaumont inmate stabbing death. | Death Sentence<br><br>Vacated / Re-sentenced to Life | Held at ADX pre-trial; then to USP Terre Haute on Death Row; then to USP Hazelton[3] | - | - | - |
| 12 | Snarr, Mark | 11093-081 | No. 1:09CR15 (E.D. Tex.) | USP Beaumont inmate stabbing death. Two correctional officers stabbed but survived. | Death Sentence | USP Terre Haute Death Row | - | - | - |
| 13 | Garcia, Edgar | 28132-177 | No. 1:09CR15 (E.D. Tex.) | USP Beaumont inmate stabbing death. Two correctional officers stabbed but survived. | Death Sentence | USP Terre Haute Death Row | - | - | - |

USCA4 Appeal: 16-1     Doc: 32-4     Filed: 12/27/2016     Pg: 273 of 306

JA 1767

*United States v Caro*

Table 3

INMATES CONVICTED OF COMMITTING A HOMICIDE IN THE BUREAU OF PRISONS
FOLLOWING A JURY TRIAL IN WHICH THE GOVERNMENT SOUGHT THE DEATH PENALTY[1]
October 3, 2013

| # | Name | Register # | Case Number | Details | Result | Location | Enter ADX | Leave ADX | Years at ADX |
|---|------|-----------|-------------|---------|--------|----------|-----------|-----------|--------------|
| 14 | Caro, Carlos | 37786-079 | No.1:06CR00001 (W.D. Va.) | Current Case | Death Sentence | USP Terre Haute Death Row | - | - | - |
| 15 | Battle, Anthony | 11451-056 | No. 1:95CR528 (N.D. Ga.) | USP Atlanta murder of a corrections officer | Death Sentence | USP Terre Haute Death Row | - | - | - |
| 16 | Agofsky, Shannon | 06267-045 | No. 1:0CR173 (E.D. Tex.) | USP Beaumont inmate beating death. | Death Sentence | USP Terre Haute Death Row | - | - | - |

[1] The data in this table is compiled from publically available information and thus may not include all of the inmates who have been convicted of committing a homicide in the Bureau of Prisons and for whom the government sought the death penalty.

[2] Joseph Ebron was sentenced to death, but has never been transported to USP Terre Haute's death row. He has been continuously housed at ADX since the completion of his jury trial.

[3] David Jackson has been diagnosed as being schizophrenic and therefore cannot be referred to ADX as a matter of policy. *See* BOP Program Statement 5212.07 at 6 ("The Warden may not refer an inmate for placement in a control unit: 1) if the inmate shows evidence of significant mental disorder.")

Years printed in RED are estimates based on the date of conviction and pleadings reviewed on the PACER website.

USCA4 Appeal: 16-1   Doc: 32-4   Filed: 12/27/2016   Pg: 274 of 306

JA 1768

# EXHIBIT 73

# EXHIBIT 73

BP-5305.038    **TRANSFER ORDER**  COPIDS
MAY 94

**U.S. DEPARTMENT OF JUSTICE**                           **FEDERAL BUREAU OF PRISONS**

In accordance with the authority provided in Title 18, U.S. Code, Section 3621, and the authority delegated to me by the Director of the Bureau of Prisons, I hereby order transfer of:

| Name of inmate:<br>CARO, Carlos David | Register No.<br>37786-079 |
|---|---|
| From:<br>USP Lee County, P.O. Box 900, Jonesville, Virginia 24263 | |
| To:<br>USP, ADX, Florence, P.O. Box 8500, Florence, Colorado 81226-8500 | |

| Reason for Transfer:<br>Disciplinary | Transfer Code:<br>309 |
|---|---|
| Parole Status:<br>N/A | Custody Classification:<br>High/MAX |

| Health Status:<br><br>Suitable for Transfer | Central Inmate Monitoring Case:<br>___ No<br>_XX_ Yes - CMC Assignment _DO TEX SYN. SEPARATION_ | CSW _ire_<br><br>UM _Yu_ |
|---|---|---|

| Signature of Transferring Authority:<br><br>B. A. Bledsoe | Title of Transferring Authority:<br><br>Warden | Date:<br><br>10·11·05 | CMC _Sm_<br><br>AWP _OW_ |
|---|---|---|---|

RETURN OF SERVICE - Pursuant hereto, I have this _16th_ Day of _November_, 20_05_, executed the above order and committed the inmate to the institution indicated.

| Signature:<br>M. H. SOSA | Name:<br>m. N. Aa— |
|---|---|
| Title:<br>Asst ISM | Agency:<br>BOP |

For Transfer to CCC's, complete the following:

| Projected release date: | Type of release: |
|---|---|
| Scheduled date and time of departure and transportation information: | Scheduled date and time of arrival: |

Record Copy - J & C; Copy - Central File
(This form may be replicated via WP)                           Replaces BP-399(58) of OCT 86

**DM-755**

JARD770

# EXHIBIT 77

# EXHIBIT 77

JA 1771

## Declaration of Petra Herrera

I, Petra Herrera, declare under penalty of perjury the following to be true to the best of my information and belief:

1. I am Carlos Caro's maternal cousin. My mother, Leonor, and Carlos's mother, Virginia, were sisters. My mother is the oldest sibling. I am 52 years old. I am 6 years older than Carlos.

2. Ever since I can remember, Carlos's family resided in the same neighborhood as my family in Falfurrias, Texas. Carlos's parents moved homes a few times during Carlos's childhood; all of the homes Carlos's family rented were less than one minute walking distance from my family home. Our neighborhood was very small. At one point Carlos and his family lived across the street from my childhood home.

3. Carlos's father, Jose Maria Caro Jr., was an alcoholic. Carlos's father rarely worked, but when he did, he would hold a job long enough to get some money to get drunk. Carlos's mother, Virginia, earned money by cleaning houses or working at a local food shack. Carlos's father would take the money Virginia had earned for the family and go get drunk at the local bar. After Carlos's father was drunk, he would come home and beat Virginia. This happened a lot throughout Carlos's childhood.

4. On several occasions, Carlos's mother ran out of her home screaming while Carlos's father chased her. When Jose caught up to Virginia, he grabbed her by the hair and pulled her back into their home where he would proceed to beat her. I saw this situation happen many times during my childhood.

5. When Carlos's mother was being beaten in her home by Carlos's father, the kids would run out of the house crying and screaming for someone to help their mother, but none of us would help because we knew Carlos's mom would never leave her husband. My family would just try to calm the boys down outside until the beating was over.

6. My family, neighbors, and I would hear Carlos's mother screaming from inside the Caro home. We knew what was going on inside the home but chose not to get involved because we were afraid of Carlos's father. We also did not get involved because we did not think it would make a difference; Carlos's mother would return to her abusive, violent husband. Things in Falfurrias, Texas were different when Carlos and I were young, and the police did not respond to domestic violence as they may do now.

7. Carlos's father also beat Carlos and his brothers. I saw Carlos's father come home drunk and chase all the kids out of the house because he did not want them in the home. When Carlos and his brothers tried to stop their father from beating their mother, then they would get the brunt of the beating.

8. Carlos's paternal grandparents lived in the neighborhood too, and they did not try and stop their son from beating his family.

Page 1 of 2

JA 1772

9. Carlos's mother would come over to visit my family, but I do not recall her talking to me or hearing her talk about her problems or the physical abuse at home. She never asked our family to help her leave her abusive, violent, alcoholic husband.

10. Carlos was a skinny, quiet boy who loved his mother very much. Carlos often helped his mother, which often caused his brothers to bully him and beat him up. I saw Noe and Jose gang up on Carlos in the middle of the street. Carlos did not seem to fight back. Carlos was the only son who did not talk back to his mother. His brothers were bad because they would talk back to their mother, they never listened to anyone, they would frequently get into trouble, and they were mean and abusive to their mother. When Carlos's oldest brother, Jose, was older he followed in his father's footsteps and beat his mother. Jose was violent like his father.

11. I was not contacted by Carlos's legal team before his capital murder trial. Had his defense team contacted me before trial, I would have met with them and provided the information that I provided in this declaration. I would have also been willing to testify at trial.

Signed this ___2___ day of ___Oct.___, 2013.

___Petra Herrera___       ___Petra Herrera___
Name (Printed)                       Signature

___Premont, Tx___
City, State

Witnessed by:

___Erica Rodriguez___       ___Erica Rodriguez___
Name (Printed)                       Signature

Page 2 of 2

JA 1773

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case Number 1:06CR00001-JPJ |
| Plaintiff/Respondent, | ) | (Hon. James P. Jones) |
| | ) | |
| v. | ) | |
| | ) | |
| CARLOS DAVID CARO, | ) | DEATH-PENALTY CASE |
| Defendant/Petitioner. | ) | (Oral Argument Requested) |

**DEFENDANT'S FIRST MOTION FOR LEAVE TO CONDUCT DISCOVERY**

**AND**

**PRELIMINARY REQUEST FOR AN EVIDENTIARY HEARING AND EXPANSION
OF THE RECORD**

Petitioner/Defendant Carlos David Caro, pursuant to 28 U.S.C. § 2255(b) and Rules 6 (Discovery), 7 (Expanding the Record) and 8 (Evidentiary Hearing) of the Rules Governing Section 2255 Proceedings for the United States District Courts ("2255 Rules"), moves this Court for an order granting the specific discovery requests set forth in this motion, expansion of the record to include the evidence presented by Mr. Caro to date, and Mr. Caro's request for an evidentiary hearing, at the appropriate time, to resolve the factual disputes presented in Mr. Caro's Motion for Collateral Relief Pursuant to 28 U.S.C. § 2255 ("2255 Motion") (ECF No. 790); the Government's Motion to Dismiss in Response to Petitioner's Motion for Relief Pursuant to title 28, United States Code, Section 2255 ("Motion to Dismiss") (ECF No. 791); and Mr. Caro's Opposition to United States' Motion to Dismiss in Response to Petitioner's Motion

1

JA 1774

for Relief Pursuant to title 28, United States Code, Section 2255 ("Opposition to Motion to Dismiss") (ECF No. 797).

This motion is supported by Mr. Caro's 2255 Motion and his Opposition to Motion to Dismiss, as well as the record in this case and the following memorandum.  Counsel has consulted with the Assistant United States Attorney on this case, Anthony Giorno, who opposes the motion.  Mr. Caro requests oral argument on this motion.

### DEFENDANT'S FIRST MOTION FOR LEAVE TO CONDUCT DISCOVERY

Mr. Caro, through counsel, requests leave to conduct discovery pursuant to Rule 6 of the 2255 Rules.  Mr. Caro has established good cause for his requests, in that he has shown that if the facts are developed as requested, he may be able to demonstrate that he is entitled to relief. *See Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997) (*quoting Harris v. Nelson*, 394 U.S. 286, 299 (1969)).

### MEMORANDUM IN SUPPORT OF MOTION

### I.    Procedural Background.

Mr. Caro was sentenced to death on February 13, 2007.  (ECF No. 639.)  On January 8, 2013, Mr. Caro filed his 2255 Motion under seal.  (ECF 781.)  Mr. Caro later filed a redacted 2255 Motion.  (ECF 790.)  On June 11, 2013, instead of answering Mr. Caro's 2255 Motion, the Government filed a Motion to Dismiss Mr. Caro's 2255 Motion.  (ECF 791.)  Mr. Caro has filed an opposition to the Government's Motion to Dismiss.  (ECF 797.)  Mr. Caro has unsuccessfully attempted to acquire much of the discovery requested in this First Motion for Leave to Conduct Discovery and Preliminary Request for an Evidentiary Hearing and Expansion of the Record ("Discovery Motion") through Freedom of Information Act ("FOIA") requests, as well as an informal discovery request to the Government.  The Government has been unwilling to produce

2

JA 1775

any discovery until after the Court rules on its Motion to Dismiss.  This is Mr. Caro's first formal request for discovery in connection with his 2255 Motion.

## II.      Standard Governing Discovery in Section 2255 Proceedings.

Mr. Caro's discovery requests are governed by Rule 6 of the 2255 Rules.  This rule was promulgated in 1976 and was intended to be consistent with the United States Supreme Court's decision in *Harris v. Nelson*, 394 U.S. 286 (1969), which held that "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is confined illegally and is therefore entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry."  *Id.* at 300.  One category of procedures which may be necessary for an adequate inquiry is "discovery procedures . . . reasonably fashioned to elicit facts necessary to help the court to 'dispose of the matter as law and justice require.'"  *Id.* at 290 (*quoting* 28 U.S.C. § 2243).

Rule 6 states that "[a] judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Criminal Procedure or Civil Procedure, or in accordance with the practices and principles of law."  2255 Rule 6(a).  Good cause will be established whenever "specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief."  *Bracy*, 520 U.S. at 908-09 (*quoting Harris*, 394 U.S. at 299).  When a petitioner establishes good cause, discovery must be allowed.

The Supreme Court has explained that "[t]he very nature of the writ demands that [habeas proceedings] be administered with the initiative and flexibility essential to insure that miscarriages of justice within its reach are surfaced and corrected."  *Harris*, 394 U.S. at 291; *accord McDaniel v. United States District Court*, 127 F.3d 886, 888 (9th Cir. 1997) (where

3

JA 1776

petitioner "presented specific allegations . . . [he was] entitled to discovery"); *Johnston v. Love*, 165 F.R.D. 444, 445 (E.D. Pa. 1996) ("[I]t is a court's obligation to allow discovery in cases in which a petitioner has provided a sufficient basis for believing that discovery may be necessary to adequately explore a petitioner's claim for relief."); *Gaitan-Campanioni v. Thornburgh*, 777 F. Supp. 1355, 1356 (E.D. Tex. 1991) ("Although discovery is permitted only by leave of the court, the court should not hesitate to allow discovery, where it will help illuminate the issues underlying the applicant's claim."). The policy of maintaining flexibility to protect against miscarriages of justice is particularly crucial here, as a court's "duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case." *Kyles v. Whitley*, 514 U.S. 419, 422 (1995) (*citing Burger v. Kemp*, 483 U.S. 776, 785 (1987)).

### III.   Mr. Caro has Shown Good Cause for the Following Discovery.

Mr. Caro seeks discovery relating to Claims One, Four, Five, Six, and Seven of his 2255 Motion. (ECF No. 790 at 20-38, 43-64, 65-157; ECF No. 797 at 11-15, 29-47, 47-56, 57-106, 106-122.)   In these claims, Mr. Caro has alleged specific facts that once fully developed will demonstrate that he is entitled to relief.

In the following sections, Mr. Caro identifies his specific discovery requests and the alleged claims to which they relate. In some instances, a request is related to more than one claim. Accordingly, Mr. Caro incorporates into each section all of the arguments presented in the other sections. Mr. Caro has generally presented the substance of each claim, and has also specifically referred to his 2255 Motion and Opposition to Motion to Dismiss, both of which provide more detailed information regarding each claim and which are incorporated now by reference.

JA 1777

As used in Mr. Caro's discovery requests, the term "communication" means any oral, written, or electronic utterance, notation, or statement of any nature whatsoever, draft or final, by and to whomever, made or attempted to be made, including but not limited to correspondence, memoranda, conversations, dialogues, discussions, interviews, consultations, agreements, and other understandings between two or more persons.

The term "document" means any medium upon which intelligence or information can be recorded or retrieved and can be handwritten, typewritten, or electronically stored. The term "document" includes but is not limited to any record, note, email, memorandum, contract, draft, chart, report, drawing, sketch, graph, index, list, tape recording, or photograph.

### A. Discovery Relating to Mr. Caro's Claim that the Government Unconstitutionally Delayed Prosecuting Mr. Caro in this Capital Case in Order to Gain a Tactical Advantage (Claim One).

In Claim One of Mr. Caro's 2255 Motion, Mr. Caro alleges that the Government delayed its prosecution of Mr. Caro in this case so that the Court would not appoint capital counsel until after the Government had secured a grossly disproportionate plea agreement for him in another case, Case No. 03-cr-10115 (the "Benavidez Case"). (ECF No. 790 at 20-38; ECF No. 797 at 11-15.) As described in his 2255 Motion and Opposition to Motion to Dismiss, but for this delay, it is highly unlikely that Mr. Caro would have been convicted for Conspiracy to Commit Murder. This prior conviction prejudiced Mr. Caro during his penalty phase, providing the Government with the argument that a life sentence would be no sentence at all, as Mr. Caro already was serving a de facto life sentence. The conviction also precluded Mr. Caro's trial counsel from arguing that Mr. Caro did not have a single prior conviction for a crime of violence, or indeed any prior conviction that involved guns or violence, and that he thus was not the "worst of the worst."

JA 1778

Mr. Caro has presented strong circumstantial evidence supporting this claim, including (1) the grossly disproportionate plea agreements in the Benavidez Case;[1] (2) the Government's inconsistent representations to the Court asserted to convince the Court that these unjustly disparate agreements were somehow justified;[2] (3) the Government's failure to accurately inform the Court of the involvement of the codefendants in the offense; (4) the fact that the Government waited until after it had secured Mr. Caro's conviction and sentence in the Benavidez Case before notifying the Court that Mr. Caro needed the appointment of capital counsel;[3] and (5) the fact that the Government already had been investigating Mr. Caro for ten months before contacting the Court, and had acquired much of the evidence used to prosecute Mr. Caro months before it requested capital counsel for Mr. Caro. (*See, e.g.,* ECF No. 782, Sealed Ex. 26 at 42.) This evidence supports Mr. Caro's claim that the Government delayed the prosecution of Mr.

---

[1] Mr. Caro was the only defendant out of seven codefendants who was required to plead to Conspiracy to Commit Murder. The Government offered deals to the other defendants allowing them to plead to possession of a weapon. Codefendant Moreno-Marquez, whose conduct was virtually identical to Mr. Caro, and who had 28 criminal history points as opposed to Mr. Caro's 12 criminal history points, received a sentence of 57 months, while Mr. Caro was sentenced to 327 months. (ECF No. 797 at 13-14.) The codefendant who the Government believed planned the assault, Francisco Tijerina, received a sentence of only 30 months. (ECF No. 790 at 21-22.)

[2] During codefendant Moreno-Marquez's change of plea hearing, the Government represented that it had a strong case against both Mr. Moreno-Marquez and Mr. Caro, stating that it had witnesses, DNA evidence, and a videotape. (ECF 790 at 22-23.) By the time of Mr. Moreno-Marquez's sentencing, the video was of "poor quality," the victim unwilling to testify, and there was no mention of the DNA evidence. (*Id.*) The Government also contended that Mr. Caro "appeared to be the most culpable of all of the defendants" (ECF 790-55 at 6), but the evidence does not support this assertion. Rather, the Government knew that codefendant Tijerina planned the assault, and the evidence showed that Mr. Moreno-Marquez and Mr. Caro participated equally in carrying out the assault.

[3] The assault on Mr. Benavidez occurred on August 29, 2003. The death of Mr. Sandoval occurred shortly thereafter on December 17, 2003. Mr. Caro was sentenced in the Benavidez case on Nov. 1, 2004, and the Government sought capital counsel for Mr. Caro on December 30, 2004.

JA 1779

Caro either intentionally to seek a tactical advantage by delaying the appointment of capital counsel or acted with reckless disregard for the consequences of its delay on Mr. Caro's ability to defend in the capital case. The right to counsel is a fundamental right within our adversary system. *See Martinez v. Ryan*, 132 S. Ct. 1309, 1317 (2012) ("The right to the effective assistance of counsel at trial is a bedrock principle in our justice system. . . . Indeed, the right to counsel is the foundation of our adversary system.") The Government's conduct deprived Mr. Caro of his right to counsel at a critical time in his capital case and thus violates fundamental concepts of justice.

In support of this claim, Mr. Caro requests the following documents:

1.    All communications and documents relating to the Government's decision to notify the Court on December 30, 2004, as opposed to any other date, that it was investigating Mr. Caro for murder, and that the Court should appoint counsel for him. *See United States v. Caro*, No. 2:05-mc-00001, W.D. Va., ECF No. 3.

2.    All communications and documents between the attorneys responsible for prosecuting Mr. Caro for the death of Roberto Sandoval, including but not limited to Anthony Paul Giorno and John Leslie Brownlee, and the attorneys responsible for prosecuting Mr. Caro for Conspiracy to Commit Murder in Case No. 03-cr-10115 (the "Benavidez Assault"), including but not limited to Rick A. Mountcastle, Robert Lucas Hobbs, and Zachary T. Lee, regarding (1) the plea agreements ultimately negotiated in the Benavidez Case for Mr. Caro, Juan Moreno-Marquez, and Francisco Tijerina; and (2) the timing of the Government's decision to notify the Court that it was investigating Mr. Caro for the death of Mr. Sandoval.[4]

Mr. Caro also seeks the deposition of Rick Mountcastle, the Assistant United States Attorney who made the inconsistent representations to the Court in the Benavidez Case.

---

[4]   If the Court finds it necessary, Mr. Caro is willing to submit documents legitimately covered by a privilege to the Court for an *in camera* review.

JA 1780

There is reason to believe that, if these facts are developed, Mr. Caro may be able to prove that he is entitled to relief. Thus, this Court should permit discovery of this specific information. *Bracy*, 520 U.S. at 908-09.

**B.      Discovery Relating to the Government's Misrepresentations and Failure to Produce Material Exculpatory and Impeachment Evidence Regarding its Only Purported Eyewitness, Inmate Sean Bullock (Claim Five).**

Mr. Caro has alleged that the Government misrepresented to trial counsel the fact that Mr. Bullock had a cellmate, and withheld relevant documents. (ECF 790 at 62-64; ECF 797 at 47-56.) The withheld evidence was materially exculpatory and prejudiced Mr. Caro in both his guilt/innocence and penalty phases at trial.[5]

At trial, Mr. Bullock testified that he saw Mr. Caro standing behind his cellmate, choking him with a towel. (Tr. 01/30/07 at 74-75.) This testimony was the sole support for the Government's repeated argument that Mr. Caro "snuck up" on Mr. Sandoval from behind and ambushed him. (ECF 790 at 52.)[6] These statements were vital to the Government's case. (ECF No. 790 at 52-53; ECF No. 797 at 39-41.) These statements also prejudiced Mr. Caro. (*See, e.g.* ECF No. 790-31 (Juror #37 declaring that it would have made a difference if another inmate testified that Bullock "didn't see what happened"); ECF No. 790-33 (Juror #79 stating that "inmate eye witness account of the murder was essential to my decision"). After his trial, Mr.

---

[5] Mr. Caro alleges in Claim Four (B) that trial counsel failed to adequately investigate and impeach Sean Bullock, in violation of *Strickland*. (ECF No. 790 at 46-53; ECF No. 797 at 39-42.) The discovery requests asserted for Claim Five also relate to Claim Four (B).

[6] (Tr. 01/29/2007 at 15 ("snuck up behind"); *id.* at 15 (waited until he turned his back and "snuck up behind"); *id.* at 16 (this was a "sneak attack"); *id.* at 21 ("sneaks up behind"); *id.* at 26 ("sneaking up behind"); Tr. 02/1/2007 at 13 (saw Caro behind Sandoval); *id.* at 18 ("ambushed" Mr. Sandoval and "came up from behind"); *id.* at 45 ("from behind with a towel"); *id.* at 49 ("comes up behind him"); *id.* at 49 (had his back turned to him and "came up behind him"); Tr. 02/05/2007 at 19 ("snuck up behind him"); *id.* at 46 ("ambushed him from behind"); Tr. 02/13/07 at 88 ("snuck up behind him").)

JA 1781

Caro's habeas counsel discovered that these statements could have been impeached by Mr. Bullock's cellmate, Joseph Bland, who has provided a declaration that contradicts Mr. Bullock's trial testimony. (ECF 790-2 (Joseph Bland Declaration).)

The Government knew, almost three years before Mr. Caro's trial, that Mr. Bullock had a cellmate at the time of the offense. (ECF 797 at 50.) Regardless of this knowledge, the Government provided documents to trial counsel and made statements that indicated that Mr. Bullock was single-celled at the time of the offense. (ECF No. 790 at 62-64, ECF No. 797 at 50-52.) The Government represented to trial counsel in a letter that it had interviewed all of the inmates on the SHU and that "copies of all the interviews conducted at that time are attached." (Letter to Kalista from Giorno, 12/28/2006.) The Government never produced any interview report for Mr. Bland. *Id.* In fact, the Government did not even disclose the fact that Mr. Bullock had a cellmate until December 29, 2006, less than one month before the start of the trial, and when it did, that fact was presented with other statements that were misleading and there was no attempt to highlight the fact that this new evidence contradicted its previous representations. (ECF No. 797 at 50-51.)

Mr. Sandoval's motivation for wanting to get into Mr. Caro's cell is also disputed by the parties and is a key issue in this case. Mr. Bullock testified that the officers said they placed Mr. Sandoval in Mr. Caro's cell because they needed space to make room for inmates coming in on a bus. (Tr. 01/30/07 at 70-71.) Mr. Caro's habeas counsel have gathered evidence showing that this statement is not supported by the facts. (ECF 790 at 49.)

The Government interviewed Mr. Bullock on numerous occasions. Mr. Bullock testified at trial that he spoke with government officers "at the dentist's office" shortly after the offense on his birthday. (Tr. 01/30/07 at 66-67.) Mr. Caro, however, never received any reports or notes

9

JA 1782

regarding this interview. In light of the inconsistencies among Mr. Bullock's various statements and testimony, it is believed these notes and reports also contain *Brady* information.

Finally, Mr. Bullock testified that he was going to spend the rest of his natural life in prison (Tr. 01/30/07 at 57, 81) and that he would receive nothing for his trial testimony (i*d.* at 80-81). Mr. Caro's habeas counsel discovered that, contrary to Mr. Bullock's trial testimony, he has received a reduction to his statutorily mandated life sentence, such that he now will be released from prison in October 2017. (ECF 790 at 51.)

To resolve these factual disputes, Mr. Caro requests the following documents:

3.      All documents contained in Sean Bullock's current inmate file maintained by the BOP.

4.      All sealed documents in the case in which Mr. Bullock's mandatory life sentence was reduced.

5.      All documents and communications relating to the fact that Mr. Bullock had a cellmate on December 16 and December 17, 2003.

6.      All documents and communications relating to the Government's interviews of Sean Bullock and attempts to interview him, including the interview at the dentist's office.

7.      All documents and communications to, from, or within the BOP, any United States Attorney's Office, the Department of Justice, and Mr. Bullock's defense attorneys, regarding Mr. Bullock's cooperation with the Government in this case and his subsequent reduction in sentence.

8.      All documents and communications relating to Mr. Bullock's reduction in sentence or any other special benefits received by him after he testified in Mr. Caro's case, including but not limited to housing transfers or other forms of special consideration or privileges.

9.      All documents referring to special benefits or special treatment provided by the Government to Mr. Bullock as a result of cooperation in any case.

10.      All documents relating to government interviews of Joseph Bland, attempts to interview Mr. Bland, or discussions regarding whether the Government should interview Mr. Bland.

JA 1783

11.     All documents relating to BOP policies regarding the placement of inmates within the Special Housing Unit at USP-Lee ("SHU").

12.     All documents showing the inmate population in the SHU, as well as the SHU capacity, on December 16, 17, and 18, 2003.[7]

Finally, Mr. Caro requests permission to depose Mr. Bullock regarding his cellmate, his interviews with the Government, and the privileges and preferential treatment he received from the Government after Mr. Caro's trial, including but not limited to his drastically reduced life sentence.

There is reason to believe that, if these facts are developed, Mr. Caro may be able to prove that he is entitled to relief.  Thus, this Court should permit discovery of this specific information.  *Bracy*, 520 U.S. at 908-09.

**C.     Discovery Relating to the Bureau of Prison's Negligence in Placing Mr. Sandoval into Mr. Caro's Cell (Claims Four (C) and Six (H)).**

Mr. Caro has alleged that his trial counsel was deficient in failing to adequately investigate and present evidence of the Bureau of Prison's ("BOP") negligence regarding placement of Mr. Sandoval in Mr. Caro's cell, and that this failure prejudiced him in both the innocence/guilt and penalty phases of his trial.  (ECF 790 No. at 53-57, 132; ECF 797 at 42-44, 94.)[8]

The Government and Mr. Caro disagree on whether the BOP acted negligently.  (*See* ECF 797 at 42-44.)  Mr. Caro has alleged that the BOP officers in charge of gang activities knew

---

[7] Much of this requested information is relevant not only as impeachment evidence, but also as substantive evidence relevant to Claim Four (C), in which Mr. Caro alleges that the BOP was negligent in placing Mr. Sandoval in Mr. Caro's cell.  (*See* Section C, *infra*.)

[8] The BOP's alleged negligence also relates to Claim Four (A) (trial counsel's failure to develop a cohesive theory to defense); and Claim Four (D) (trial counsel's failure to adequately investigate and present evidence of self-defense, second-degree murder, or manslaughter).

JA 1784

that Mr. Caro had assaulted the leader of the Texas Syndicate and that he might be facing revenge as a result of this assault. (ECF No. 782, Sealed Ex. 28.) As a result, these officers knew or should have known that members of the Texas Syndicate should not be placed in the same cell as Mr. Caro. (*See* ECF No. 782, Sealed Ex. 51 at 12.) The officer in charge of cell assignments in the SHU at USP-Lee, however, apparently was never advised of these circumstances, and indeed testified that he assigned Mr. Sandoval to Mr. Caro's cell *because* they both belonged to the Texas Syndicate. (Tr. 01/29/07 at 63.)

Mr. Caro also has alleged that the BOP was negligent in not communicating Mr. Caro's refusal to take a cellmate to the SHU officers on the next shift, when Mr. Sandoval asked to be placed in Mr. Caro's cell. The parties disagree about the implications to be drawn from *Mr. Sandoval's* request to be placed in Mr. Caro's cell. (ECF No. 797 at 43-44.) The parties also disagree about the BOP's negligent failure to investigate Mr. Sandoval's prior possession of a weapon that caused him to be placed in the SHU. (*Id.*)

In support of this claim, Mr. Caro requests the following documents:

13. All documents and communications regarding the BOP's attempts to discern the reasons why Mr. Sandoval possessed a weapon on December 16, 2003, the day before he asked to be placed in Mr. Caro's cell.

14. All documents and communications regarding the BOP's attempts to discern the reasons for Mr. Caro's refusal to take a cellmate on December 16, 2003.

15. All documents and communications regarding BOP policies and other directive statements issued for or applicable to USP-Lee between 2003 and 2007, regarding procedures to be followed by prison officers and other BOP personnel when an inmate refuses to take a new cellmate.

16. All documents and communications regarding BOP policies and other directive statements issued for or applicable to USP-Lee between 2003 and 2007, regarding the preparation of investigation reports of incidents occurring within

JA 1785

BOP facilities, including but not limited to any recommended time frame for completing the report.

17.    All documents and communications regarding BOP policies and other directive statements issued for or applicable to USP-Lee between 2003 and 2007, regarding procedures to be followed by prison officers and other BOP personnel when an inmate is found with a weapon in his possession.

18.    All documents and communication between the BOP employees working in the Special Housing Unit at USP-Lee and any other individual or entity, including but not limited to officers or agents within the Special Investigative Department, regarding the appropriate housing of Mr. Caro after the assault on Ricardo Benavidez on August 29, 2003, and prior to the death of Roberto Sandoval on December 17, 2003.

19.    All documents and communication between the BOP employees working in the Special Housing Unit at USP-Lee and any other individual or entity, including but not limited to officers or agents within the Special Investigative Department, regarding the monitoring and handling of all Texas Syndicate members after the assault on Ricardo Benavidez on August 29, 2003, and prior to the death of Roberto Sandoval on December 17, 2003.[9]

In support of this claim, Mr. Caro also seeks to depose Brian Laster, the correctional officer at USP-Lee who placed Mr. Sandoval in the cell with Mr. Caro on December 16, 2003.[10] Mr. Laster will be able to provide testimony regarding directives given to him regarding the placement of Mr. Sandoval in Mr. Caro's cell.

Mr. Caro has alleged sufficient facts in support of this claim. Because there is reason to believe that if these facts are developed Mr. Caro may be able to prove that he is entitled to relief, this Court should permit discovery of this specific information. *Bracy*, 520 U.S. at 908-09.

---

[9] Some of the document requests in this section are also relevant to Claim Seven (B), discussed in Section F, *infra*.

[10] Mr. Caro's current investigator attempted to interview Mr. Laster, and he refused to speak with her.

13

JA 1786

**D.**      <u>**Discovery Relating to the Government's Expert Psychiatrist and Psychologist (Claim Six (B)).**</u>

In Claim Six of his 2255 Motion, Mr. Caro alleged that he is entitled to relief because his counsel's deficiencies during the penalty phase of his trial prejudiced him. (ECF No. 790 at 65-146.) Mr. Caro has specifically alleged, in a sub-claim, that counsel failed to adequately investigate, develop, and present a compelling mitigation story. (*Id.* at 66-113 (Claim Six (B).) A factual component of this sub-claim involves counsel's failure to appropriately request, adequately develop, and present mental-health experts and evidence. (*Id.* at 90-100.) Counsel's purported reason for failing to present *any* evidence from a mental health expert despite knowing that Mr. Caro is brain damaged was a "feeling" that the testimony of the Government's selected expert could not be rebutted. (*See* ECF No. 791-5 (Declaration of Stephen J. Kalista) ¶ 18.)

Mr. Caro asserted that the decision by his trial counsel to forego presentation of evidence of brain damage during the penalty phase of trial was neither informed nor reasonable and violated his right to the effective assistance of counsel. In support of this claim, Mr. Caro requests the following documents:

> 20.      All documents provided to Dr. Robert Phillips and Dr. Paul Montalbano by the Government in this case.
>
> 21.      All documents generated by Dr. Phillips and Dr. Montalbano in conducting their evaluations of Mr. Caro and in preparing their reports, including but not limited to handwritten notes, raw data, and test scoring, and documents related to communications with David A. Griesemer, M.D.; Elizabeth Quillen; Roger Mullins, Senior Officer Specialist, Bureau of Prisons; and Anthony Davis, Sacramento Intelligence Unit, Bureau of Prisons.
>
> 22.      All receipts, including supporting documents, for services rendered in the case by Dr. Phillips and Dr. Montalbano.

Had trial counsel presented a mental health defense at trial, the Government would have been required to produce these documents. As such, they are relevant to Mr. Caro's claim of

JA 1787

ineffective assistance of counsel based on counsel's decision to forego mental health evidence. As explained in Mr. Caro's 2255 Motion, counsel's failure to present expert testimony left the jury without an accurate portrait of their client and his mental functioning. (ECF No. 790 at 109-13.)  At least two jurors have said that had expert evidence been presented about Mr. Caro's brain damage, it could have made a difference in their sentencing decision. (*See* ECF No. 782, Sealed Ex. 33 (Declaration of Juror #79); ECF No. 782, Sealed Ex. 29 (Declaration of Juror #24).

To fully develop this claim, Mr. Caro needs the information that would have been available had trial counsel performed competently and presented a mental health defense. Because there is reason to believe that if the facts are developed Mr. Caro may be able to show that he is entitled to relief, this Court should permit discovery of this specific information. *Bracy*, 520 U.S. at 908-09.

> **E.     Discovery Relating to the Government's Failure to Provide Material Exculpatory Evidence Regarding Its Ability to House Dangerous Inmates (Claim Seven (A)).**

The Government presented expert evidence and argued during the penalty phase of trial that the BOP could house an inmate like Mr. Caro at its most secure facility, ADX-Florence, for only a few years and then would have no choice but to release him to a USP where he would harm other inmates. (ECF No. 790 at 148-53; ECF No. 797 at 106-16.)   The Government argued, "Everyone agrees, every witness agrees he's getting out of ADX, that in some time within three to five years he will be back at a USP." (Tr. 2/13/2007 at 90.)[11]

---

[11] When trial counsel attempted to impeach the Government's expert by referring to an inmate, Thomas Silverstein, who had been at ADX-Florence for a long period of time, the expert

JA 1788

Trial counsel had anticipated this argument and requested discovery on the length of inmate stay at ADX-Florence, but the request was opposed by the Government and denied by the Court, and the Government never produced any evidence regarding how long the BOP kept inmates at ADX-Florence. (ECF No. 790 at 148-49.) Trial counsel's attempts to otherwise secure this evidence, which was not public information, failed. As a result, the defense had no hard evidence to support their argument that the Government could securely house Mr. Caro at ADX-Florence for more than three years, and the Government's arguments were largely un-rebutted by trial counsel. As explained in Mr. Caro's 2255 Motion and Opposition to Motion to Dismiss, the Government's evidence prejudiced Mr. Caro (ECF No. 790 at 155-56; ECF No. 797 at 109-116), and the jury found that Mr. Caro "is likely to commit acts of violence against other inmates or staff within the federal prison system if imprisoned for life without possibility of release" (ECF No. 639). On appeal, the Fourth Circuit upheld the Court's denial of the discovery requests. With respect to Mr. Caro's *Brady* claim, the court denied the claim because Mr. Caro "failed to establish that the information requested would be favorable to him." *United States v. Caro*, 597 F.3d 608, 619 (4th Cir. 2010).

As alleged in Claim Seven of his 2255 Motion, Mr. Caro now has evidence showing not only that the requested evidence would have been favorable to him, but that it was materially exculpatory and that its suppression violated *Brady*. (ECF No. 790 at 147-57.) Since Mr. Caro's trial, Mr. Caro's 2255 counsel have discovered new information that confirms trial counsel's suspicions that the Government withheld materially exculpatory information and misled the jury at trial. For example, counsel acquired information from a 2010-2011 informal survey of a

---

discounted the experience of Mr. Silverstein by stating that his was a "very special case." (ECF No. 790 at 150.)

16

JA 1789

limited number of inmates housed at ADX-Florence.  The survey was sent to 129 inmates at ADX-Florence, and 69 inmates responded.  Of these 69 inmates, 43 (almost 2/3 of the inmates) claimed that they had been at ADX-Florence, or ADX-Florence and its predecessor USP-Marion, for eight or more consecutive years, which means that at the time of Mr. Caro's trial, they would have been there for five years or more.  (ECF No. 790 at 151-53; ECF No. 791-48.)  In fact, 22 of these inmates had been at ADX-Florence/USP-Marion, the highest security facilities available within the BOP, for over 13 years, which means that at the time of Mr. Caro's trial, they would have been there at least 10 years.  (*Id.* at 152.)[12]  This evidence also is supported by the anecdotal evidence presented in the declaration of Mark Bezy, a retired BOP warden.  Mr. Bezy recalled eight inmates who had been housed for more than three years under very strict conditions of confinement and who were still at ADX-Florence as of January 2013.  (ECF No. 790 at 152; ECF No. 790-1 (Declaration of Mark A. Bezy) ¶ 28.)

Since filing the 2255 Motion, Mr. Caro's 2255 counsel have discovered additional evidence that is consistent with the results of the informal survey and further shows that the Government withheld Brady information.  Counsel now is aware of at least 155 inmates who have been incarcerated at ADX for more than three years, and 125 of those inmates are still designated to ADX-Florence, comprising almost 30% of the current population.  (ECF No. 797 at 12-14; ECF No. 799-1 (Declaration of Susan Richardson).)  At the time of Mr. Caro's trial in 2007, at least 79 inmates had been designated to ADX-Florence for more than three years and at least 63 had been designated there for more than five years.  (ECF No. 799-1.)  The numbers are

---

[12] These numbers do not include the 14 inmates under Special Administrative Measures (SAM), whose mail was returned unopened because the BOP had denied them the privilege of receiving this mail.  Thus, the number of inmates continuously housed at ADX-Florence for more than three years is likely even higher.

even more startling for inmates who, like Mr. Caro, have been accused of or committed homicides within BOP facilities. The limited evidence available to the public reveals that 54 such inmates have been continuously designated to ADX since their initial placement, including 22 inmates who entered ADX in 2007 or earlier. (*Id.*) In 2007, at least 14 of these inmates had been incarcerated at ADX-Florence for more than three years. Those 14 inmates are still designated to ADX-Florence. (*Id.*)

The Government's evidence is completely contradicted when one looks only at cases where the Government sought the death penalty for a homicide committed at a BOP facility, but where the defendant ended up receiving a life sentence. Mr. Caro was able to locate ten such cases nationwide. (*Id.* ¶ 11.) Nine of these ten defendants have been continuously designated to ADX-Florence since imposition of their life sentences. (*Id.*) The only inmate who was not designated to ADX-Florence had been diagnosed with schizophrenia, and thus, according to BOP policy, could not be placed at ADX-Florence. (*Id.* ¶ 11, Table 3 n.3.) With the exception of the one inmate who entered ADX in 2012, and for whom three years has not yet elapsed, all of these inmates have been designated to ADX-Florence for more than three years. (*Id.*)

Mr. Caro's efforts to secure additional data through FOIA requests have been extremely time consuming and largely unsuccessful. (See Ex. 78 (Declaration of Christine Oliver).) Moreover, even if Mr. Caro is fortunate enough to glean some additional information through a FOIA request, it will necessarily be incomplete. Without cooperation from the Government or a court order, the only source for the data is the inmate himself. There is no publicly available list of inmates housed at ADX-Florence. Even if one somehow were able to discover the name of an inmate who was or had been housed at ADX-Florence, the BOP still will not release the information without a signed consent form from the inmate. *See, e.g.*, 28 C.F.R. §§ 16.3(a),

18

JA 1791

513.63.[13] Mr. Caro has no control over whether an inmate or deceased inmate's family member will agree to sign a release of information form. Mr. Caro also has no access to inmates designated to ADX-Florence (or elsewhere) whose communication privileges have been limited by the BOP because of Special Administrative Measures (SAM) or for other disciplinary reasons. (*See, e.g.*, Ex. 78 ¶ 9.)

At the time of Mr. Caro's trial, the Government not only possessed this *Brady* information, but had exclusive control over it. It refused to produce the information in response to trial counsel's specific *Brady* pretrial requests. Knowing that Mr. Caro's counsel lacked the evidence they needed to impeach its expert, the Government then provided inaccurate and misleading testimony and argument, deliberately misleading the jury on a crucial issue regarding future dangerousness.[14]

In support of this claim, Mr. Caro now requests the following discovery:

23.    For all inmates currently housed at ADX-Florence, the Inmate History, the Institutional Assignment and Movement History form, the Inmate Quarters History, and the Control Unit Classification Summary.

24.    For the inmates listed in Appendix A, the Inmate History, the Institutional Assignment and Movement History form, the Inmate Quarters History, and the Control Unit Classification Summary.

25.    All documents memorializing the dates of an inmate's admission to, and, if applicable, discharge from ADX-Florence between its opening in 1994 and January 2007.

---

[13] For deceased inmates, the BOP will not release any information without a release of information form signed by a member of the deceased inmate's family. (*See* Ex. 78 ¶ 12.)

[14] *See, e.g.*, Tr. 11/13/2006 at 27-28 (Government agreeing with the Court that "a large portion of the Government's argument at the sentencing phase in this case will be future dangerousness, presented by the defendant, and the inability of the BOP to adequately secure the defendant to protect against that threat of future dangerousness.") In fact, 11 of the Government's 13 penalty-phase witnesses testified about the future dangerousness of Mr. Caro.

19

26.     For inmates who were transferred from USP-Marion to ADX-Florence in 1994, 1995 or 1996, all documents memorializing the dates of the inmate's admission to USP-Marion and the inmate's transfer to ADX-Florence.

27.     All documents relating to the ability of ADX-Florence to safely and securely house BOP inmates who have been convicted of committing a murder in prison.

28.     All documents referencing BOP staff opinions or conclusions that certain inmates will never be accepted into or will never successfully complete the step-down program at ADX-Florence.

29.     Notices of Intent to Seek the Death Penalty (including amended notices) for all federal capital-authorized cases between 1994 and 2007.

30.     For each BOP inmate who has been convicted of committing a homicide in prison, all documents memorializing the inmate's institutional history within the BOP.

31.     All versions of ADX Institutional Supplement 5321.06K(1), a BOP policy document that governs placement into, advancement through, and transfer out of the ADX-Florence step-down program.

The requested data is necessary to fully develop Mr. Caro's claim. Mr. Caro has alleged sufficient facts showing that, at the time of Mr. Caro's trial and to the present, numerous inmates have been housed at ADX-Florence for more than three or five years and that the Government's evidence and arguments to the contrary prejudiced him. If permitted to fully develop the facts, Mr. Caro will be able to demonstrate that he is entitled to relief. This Court should permit discovery of this specific information. *Bracy*, 520 U.S. at 908-09.

**F.      Discovery Relating to Mr. Caro's Claim that the Government Withheld Evidence Indicating that Mr. Caro Was Not a Leader of the Texas Syndicate (Claim Seven (B)).**

The Government concedes that it withheld three documents referenced in Mr. Caro's 2255 Motion. (ECF No. 791 at 89 n.20) As alleged in the 2255 Motion, those documents revealed (1) the BOP's belief that while Mr. Caro was at USP-Lee, inmate Ricardo Benavidez

JA 1793

was initially the leader of the Texas Syndicate until he was assaulted, and then another inmate, Francisco Tijerina, became the leader; (2) that an inmate reported to the BOP that unnamed inmates had met and made a decision that whoever killed Mr. Sandoval was "gonna be in trouble," and (3) that just before Mr. Caro's trial, the BOP believed that Mr. Caro was in "'bad standing' with the [redacted] gang." (ECF No. 790 at 153-54; ECF 782, Sealed Exs. 28, 58. 59.) Mr. Caro has alleged that the Government's failure to produce these documents violated his rights under *Brady*. (ECF No. 790 at 153-57; ECF No. 797 at 116-20.)

At the time of trial, the Government believed that Mr. Caro was not the leader of the Texas Syndicate at USP-Lee, and indeed was in bad standing with the gang. (ECF No. 790 at 153-54; ECF No. 782, Sealed Ex. 28 at 15 (Grand Jury testimony), *id.*, Sealed Ex. 58 (Internal BOP memo).) The BOP's belief that Mr. Caro was in bad standing is consistent with the evidence revealing that the "hit" on Ricardo Benavidez had not been a "sanctioned" hit (ECF No. 782, Sealed Ex. 51 at 10), and with BOP Intelligence Officer David Mrad's belief that Mr. Caro might be facing a "cold dose of revenge" for his participation in this assault (ECF No. 782, Sealed Ex. 28 at 27).

The Government, however, failed to disclose these documents that revealed its belief that Mr. Caro was not a leader of the Texas Syndicate at USP-Lee and that he was in bad standing with the gang. To make matters worse, the Government argued the opposite at trial; alternately contending that Mr. Caro was a gang leader of "one of the five most violent, difficult gangs in the [BOP] system," might be a gang leader, might be an enforcer, and is a "player" in the gang.[15]

---

[15] *See, e.g.*, Tr. 02/13/2007 at 21-22 (arguing that the Texas Syndicate is "one of the five most violent, difficult gangs" in the BOP and Mr. Caro, "is not just a member [of the Texas

The Government's penalty phase argument assumed that Mr. Caro was a dangerous gang member and would remain so in the future. Eleven of its 13 penalty-phase witnesses discussed gang-related matters. (ECF No. 797 at 117.) If Mr. Caro was not in good standing with the Texas Syndicate, the testimony of 11 of its 13 penalty phase witnesses was irrelevant.

Mr. Caro believes the BOP possesses other exculpatory documents never produced to Mr. Caro, including investigative reports on the death of Mr. Sandoval, which will reveal further information that the BOP knew that Mr. Caro was not a leader of the gang. These documents, requested below, will show that during the months surrounding the Benavidez assault and the Sandoval killing, the BOP believed that there was a leadership struggle going on between two other gang members (not Mr. Caro) and that Mr. Caro was not the leader. These documents also will show the Government's belief that the death of Mr. Sandoval was gang-related. The requested documents will support Mr. Caro's claim that the Government withheld evidence and misrepresented facts at trial regarding his purported role in the Texas Syndicate.

Mr. Caro has good reason to believe the documents exist and will be supportive of his claim. Mr. Caro's expert, Mark Bezy, reviewed the BOP documents produced in this case. Mr. Bezy found it remarkable that the Government had not produced any investigation reports concerning the death of Mr. Sandoval. (ECF No. 790-1 ¶¶ 40-43.) After a suspected homicide, the BOP normally conducts an extensive review of the incident to determine what happened and why, and make necessary recommendations to prevent a recurrence of such incidents in the future. (*Id.* ¶ 41.) One such local investigation report, the SIS Report, is required by national BOP policy. (*Id.*) According to Mr. Bezy, it also is common for the BOP to conduct a regional

─────────────────────

Syndicate], but he's a leader"); *id.* at 96 (arguing that Mr. Caro "becomes a player" in the Texas Syndicate . . . "[w]hether he's a leader, whether he's an enforcer, don't know").

22

investigation, which results in an "After-Action Report." (*Id.* ¶ 42.) While Mr. Caro has received investigative reports concerning other assaults at BOP facilities, no such reports were ever produced by the Government regarding the death of Mr. Sandoval, and the BOP produced only one investigative report on the assault on Ricardo Benavidez.

The BOP form that indicates that as of November 14, 2006, the Government believed that Mr. Caro was in "bad standing" with the gang was prepared in anticipation of a transport of Mr. Caro outside of USP-Lee for medical reasons, and was signed by a Unit Manager, not a BOP gang intelligence officer. (ECF 782, Sealed Ex. 59.) Thus, it is likely that the Unit Manager was relying on other documents prepared by a BOP Intelligence Officer from the BOP's Special Investigative Department to conclude that Mr. Caro was in "bad standing." The Government has never produced those documents.

Mr. Caro also has reason to believe that the Government has not produced all relevant grand jury testimony. Mr. Caro's 2255 counsel, through their investigation, discovered the existence of grand jury testimony by one of the Government's trial witnesses, Officer David Mrad. (ECF No. 782, Sealed Ex. 28.) That testimony is captioned "In the Matter of: Texas Syndicate," and occurred on October 22, 2003, shortly before the death of Mr. Sandoval. During Officer Mrad's testimony, it was revealed that Ricardo Benavidez also had testified before the same Grand Jury. (Mrad Testimony at 17.) The Government failed to produce these transcripts to Mr. Caro. Based on the Government's failure to produce these two grand jury transcripts, Mr. Caro has cause to believe that the Government has failed to produce other exculpatory grand jury evidence regarding the Texas Syndicate.

JA 1796

In support of these claims, Mr. Caro requests the following documents:

32.    An un-redacted copy of the BOP transportation document indicating the Government's belief that Mr. Caro was in bad standing with the gang. (Redacted copy at ECF No. 782, Sealed Ex. 59.

33.    All documents that indicate that Mr. Caro was not or might not be in good standing within the Texas Syndicate while housed at USP-Lee.

34.    All documents prepared by or for the BOP regarding the death of Roberto Sandoval, including but not limited to SIS Reports, After-Action Reports, Board of Inquiry Reports, and any other investigative report, corrective action plans or recommendations. This request also includes but is not limited to all documents relating to the preparation of these reports.

35.    All documents prepared by or for the BOP regarding the assault on Ricardo Benavidez on August 29, 2003, at USP-Lee, including but not limited to SIS Reports, After-Action Reports, Board of Inquiry Reports, and any other investigative report, corrective action plans or recommendations. This request also includes but is not limited to all documents relating to the preparation of these reports.

36.    All documents prepared by or for the BOP regarding the assault on July 15, 2003, at USP-Lee, that was prosecuted in *United States v. Garcia*, Case No. 2:03cr00110 (W.D. Va.), including but not limited to SIS Reports, After-Action Reports, Board of Inquiry Reports, and any other investigative report, corrective action plans or recommendations. This request also includes but is not limited to all documents relating to the preparation of these reports.

37.    All documents that were considered or relied upon by the BOP in rendering its recommendations in the October 8, 2004, SIS report, filed in this case at ECF 782-51 at 12-13, Sealed Exhibit 51.

38.    All documents regarding the organizational structure of the Texas Syndicate at USP-Lee, including the identification of its leaders, between 2003 and 2007.

39.    All Grand Jury testimony given at any time between 2003 and 2007 regarding the Texas Syndicate gang, with the exception of the testimony of David C. Mrad provided on October 22, 2003, at 1:43 P.M.

40.    All Grand Jury testimony regarding the assault on Ricardo Benavidez on August 29, 2003.

JA 1797

41.    All Grand Jury testimony from the assault case of *United States v. Garcia*, Case No. 2:03cr10110 (W.D. Va.), which involved a within-gang Texas Syndicate assault as USP-Lee in July 2003.

42.    All Grand Jury testimony regarding the death of Roberto Sandoval on December 17, 2003, with the exception of the testimony of William Johnson on February 17, 2004, Douglas Fender on January 3, 2006, and four inmates who testified on February 19, 2004 or July 20, 2005.[16]

Finally, based on the information Mr. Caro currently has and the information he anticipates receiving as a result of this Discovery Motion, he anticipates that he will need to depose FBI Agent Douglas Fender, BOP Intelligence Officer David Mrad, BOP Intelligence Officer William Johnson, and BOP Special Investigative Supervisor's Office Technician Jacoba Guzman.  All of these witnesses have intimate knowledge of the Texas Syndicate at USP-Lee during the relevant time.  All but William Johnson testified at Mr. Caro's trial.  Mr. Johnson had been identified as a Government expert during the Benavidez case, and he was prepared to testify about the Texas Syndicate at USP-Lee, including the identity of the Texas Syndicate leader. (Expert Disclosure, Sealed Ex. 75 at JR-157.)  It is possible that additional discovery will reveal the need for Mr. Caro to depose additional persons or to amend the 2255 Motion.

Mr. Caro has alleged sufficient facts showing that the Government withheld documents indicating that Mr. Caro was not the leader of the Texas Syndicate at either USP-Lee or FCI-Oakdale, and that the Government believed he was in bad standing with the gang at the time of his trial.  Mr. Caro also has alleged prejudice resulting from this misconduct.  If the facts alleged in this claim are developed, Mr. Caro may be able to prove that he is entitled to relief.  Thus, this Court should permit discovery of this specific information.  *Bracy*, 520 U.S. at 908-09.

---

[16] Based on a review of trial counsel's files, it appears that transcripts of these grand jury witnesses were produced by the Government.

JA 1798

## DEFENDANT'S PRELIMINARY REQUEST FOR AN EVIDENTIARY HEARING AND EXPANSION OF THE RECORD[17]

In addition to discovery, Mr. Caro also requests that this Court expand the record and grant him an evidentiary hearing. *See* 2255 Rules 7 and 8. The Court may expand the record with materials including affidavits, letters, or exhibits. 2255 Rule 7(b). In determining whether a hearing is appropriate, the Court should review not only the trial record but also all exhibits submitted in these proceedings. 2255 Rule 8(a). A hearing must be held "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b); *see also United States v. Magini*, 973 F.2d 261, 264 (4th Cir. 1992) ("A federal court in a [2255] habeas proceeding must hold an evidentiary hearing when the petitioner alleges facts which, if true, would entitle her to relief."). Moreover, "the government's answer and affidavits are not conclusive against the movant, and if they raise disputed issues of fact a hearing must be held." 2255 Rule 5, Advisory Committee Notes (citing cases). In the instant case, Mr. Caro has alleged facts, which have been contested by the Government, that would entitle him to relief.

Mr. Caro asks this Court to expand the record with Exhibits 1-78 submitted in support of his 2255 Motion, his Opposition to Motion to Dismiss, and this Discovery Motion. (*See* ECF Nos. 782, 790-1-60, 797-1, 799-1.) These exhibits include declarations, reports, case summaries, grand jury testimony, juror questionnaires, BOP documents, letters and emails, and transcripts from a related case. All of these documents are appropriate for consideration under

---

[17] To preserve the issue, Mr. Caro is requesting an evidentiary hearing and expansion of the record based on the allegations made and documents presented at this point in the proceedings. He recognizes, however, that this request will likely be supplemented after he is provided the materials requested in discovery. For that reason, a hearing set before discovery is complete is premature.

2255 Rule 7(b). The Court should consider these exhibits when determining whether to grant an evidentiary hearing. 2255 Rule 8(a).[18]

Mr. Caro also requests an evidentiary hearing on his 2255 Motion. This case is similar to *Machibroda v. United States*, where the Supreme Court determined that a hearing was appropriate because that "was not a case where the issues raised by the motion were conclusively determined either by the motion itself or by the 'files and records' in the trial court." 368 U.S. 487, 494 (1962). The factual assertions in Mr. Caro's 2255 Motion "relate[] primarily to purported occurrences outside the courtroom and upon which the record could, therefore, cast no real light." *Id.* at 494. Much like Mr. Machibroda's motion, Mr. Caro's "motion and affidavit[s] contain charges which are detailed and specific." *Id.* at 495. The fact that the Government has contested the information "cannot serve to deny [Mr. Caro] an opportunity to support them by evidence." *Id.* (citation omitted).

Mr. Caro has raised many claims that cannot be resolved on the trial court record.[19] As the Fourth Circuit has explained, "[w]hen a colorable Sixth Amendment claim is presented, and where material facts are in dispute involving inconsistencies beyond the record, a hearing is necessary." *Magini*, 973 F.2d at 264. Mr. Caro has raised colorable claims that he was denied his constitutional right to trial counsel at the death-certification stage, at the guilt/innocence stage, and at the penalty phase. (*See* ECF 790 (2255 Motion), Claims Two, Four, and Six.) The

---

[18] While the Court must give the opposing party the "opportunity to admit or deny" the correctness of the exhibits before expanding the record, *see* 2255 Rule 7(c), the Government has already had an opportunity to respond to Exhibits 1-60.

[19] Because this is a capital case, this Court should refrain from dismissing any claims outright before a hearing. *Cf. Telaguz v. Pearson*, 689 F.3d 322, 331 (4th Cir. 2012) (recognizing the heightened need for fairness in death penalty cases) (citation omitted). Evidence that is presented at a hearing could shed light upon the entire 2255 Motion and indirectly impact claims that may, on their face, appear to be record based.

27