No. 16-1

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA, Plaintiff-Appellee,

vs.

CARLOS DAVID CARO, Defendant-Appellant.

Appeal from the United States District Court for the Western District of Virginia
Hon. James P. Jones, District Judge, Presiding
Dist. Ct. No. 1:06CR00001

## JOINT APPENDIX TO OPENING BRIEF
## VOLUME 4 JA 1801 – JA 2021

JON M. SANDS
Federal Public Defender
District of Arizona
TIMOTHY M. GABRIELSEN
Nevada Bar No. 8076
Assistant Federal Public Defender
407 West Congress Street, Suite 501
Tucson, Arizona 85701
tim_gabrielsen@fd.org
Tel. (520) 879-7614
Facsimile (520) 622-6844

FAY F. SPENCE
Virginia Bar No. 27906
First Assistant Federal Public Defender
210 First Street, SW, Suite 400
Roanoke, Virginia 24011
fay_spence@fd.org
Tel. (540) 777-0880
Facsimile (540) 777-0890

BRIAN J. BECK
Virginia Bar No. 78049
Assistant Federal Public Defender
201 Abingdon Place
Abingdon, Virginia 24211
brian_beck@fd.org
Tel. (276) 619-6080
Facsimile (276) 619-6090

*Counsel for Defendant-Appellant Carlos David Caro*

## U.S. District Court Docket and Transcripts

JA 1        Dkt. 2 - Indictment, *United States v. Caro*, W.D.Va. No.
           1:06CR00001-JPJ (Jan. 3, 2006);[1]

JA 4        Dkt. 8 - Notice of Intent to Seek the Death Penalty (Jan. 11, 2006);

JA 8        Dkt. 19 - Motion for Exculpatory Evidence (Jan. 27, 2006);

JA 13       Dkt. 29 - Order (Discovery and *Brady*) (Feb. 6, 2006);

JA 15       Dkt. 307 - Carlos David Caro's Motion for Exculpatory Evidence
           Related to Penalty Phase Information (Oct. 3, 2006);

JA 22       Dkt. 316 - Notice of Filing of Affidavit of Declaration of Mark
           Cunningham, Ph.D. (Oct. 16, 2006);

JA 49       Dkt. 343 - Memorandum Opinion (Magistrate Judge) (Nov. 8, 2006)
           (granting Defendant's Motion at Dkt. 307);

JA 61       Dkt. 344 - Order (Nov. 8, 2006) (re: Dkt. 343);

JA 65       Dkt. 345 - Objection to Order of the Magistrate Judge (Nov. 8, 2006);

JA 66       Dkt. 346 - Carlos David Caro's Response to Objection to Magistrate
           Judge's Order of November 8, 2006 (Nov. 9, 2006);

JA 68       Transcript, Hearing November 13, 2006 (District Court ruling on Dkt.
           307 and Government objection to Magistrate Judge's Memorandum
           Opinion, Dkt. 343);

JA 109      Dkt. 353 – Declaration of Tomas J. Gomez (Nov. 16, 2006);

JA 115      Dkt. 354 – Declaration of Jennifer Batchelder (Nov. 16, 2006);

JA 116      Dkt. 355 – Declaration of Linda Thomas (Nov. 16, 2006);

JA 118      Dkt. 356 – Declaration of Joetta A. Terrell (Nov. 16, 2006);

---

[1] All references to Case No. 1:06CR00001-JPJ are to "Dist. Ct." and the docket number.

JA 121      Dkt. 358 – Response to Government's Affidavits (Nov. 17, 2006);

        JA 126      Dkt. 358-1 Declaration of Mark Cunningham (Nov. 17, 2006);

        JA 131      Dkt. 358-2  Appendix A-H (Nov. 17, 2006);

JA 144      Dkt. 363 - Opinion and Order (Nov. 20, 2006) (District Court re: objections to Magistrate Judge's ruling at hearing on Nov. 8, 2006);

JA 151      Transcript, Capital Sentencing Hearing, Feb. 5, 2007;

JA 333      Transcript, Capital Sentencing Hearing, Feb. 6, 2007;

JA 410      Transcript, Capital Sentencing Hearing, Feb. 7, 2007;

JA 583      Transcript, Capital Sentencing Hearing, Feb. 8, 2007;

JA 661      Transcript, Capital Sentencing Hearing, Feb. 12, 2007;

JA 880      Dkt. 639 – Special Verdict (Feb. 13, 2007);

JA 890      Transcript, Capital Sentencing Hearing, Feb. 13, 2007;

JA 1015      Transcript, Capital Sentencing Hearing, Mar. 30, 2007;

JA 1020      Dkt. 790 - Redacted Motion for Collateral Relief Pursuant to 28 U.S.C. § 2255 & exhibits (Mar. 22, 2013):

        JA 1220      Exhibit 1 Declaration of Mark A. Bezy (Jan. 1, 2013);

        JA 1230      Exhibit 4 Declaration of Larry A. Hammond (Jan. 8, 2013);

        JA 1255      Exhibit 5 Declaration of Stephen J. Kalista (Dec. 29, 2012);

        JA 1260      Exhibit 7 Declaration of Hans Selvog, Ph.D. (Dec. 31, 2012);

JA 1286    Exhibit 8 Declaration of Donna Marie Schwartz-Watts, M.D. (Jan. 7, 2013);

JA 1307    Exhibit 9 Declaration of James Simmons (Dec. 29, 2012);

JA 1309    Exhibit 10 Declaration of D. Malcolm Spica, Ph.D. (Jan. 4, 2013);

JA 1336    Exhibit 11 Report of Thomas M. Hyde, M.D., Ph.D. (Dec. 22, 2012);

JA 1338    Exhibit 48 Affidavit of Jeanne Dvorak (Nov. 11, 2011);

JA 1347    Dkt. 791 - Gov't's Motion to Dismiss in Response to Motion for Relief & Exhibits (June 11, 2013);

JA 1475    Exhibit 1 to Motion to Dismiss, copies of defense emails (Jan. 24, 2006);

JA 1478    Exhibit 2 to Motion to Dismiss, copies of defense emails (Dec. 12, 2006;

JA 1482    Exhibit 3 to Motion to Dismiss, copies of defense emails (June 20, 2006);

JA 1484    Exhibit 4 to Motion to Dismiss, defense Memorandum Re: Potential Caro Witnesses and Other Issues;

JA 1489    Exhibit 5 to Motion to Dismiss, copies of defense emails (Sept. 25, 2006);

JA 1491    Exhibit 6 to Motion to Dismiss, Memorandum, Carlos Caro, Witnesses/Records by Location (May 15, 2006);

JA 1497    Exhibit 7 to Motion to Dismiss, Timeline Narrative - Chronological Critical Incidents and Developmental History of Carlos Caro;

JA 1513    Dkt. 797 - Carlos David Caro's Response to Motion to Dismiss (Oct. 9, 2013);

JA 1687    Ex. 61 Letter from A. Giorno to Carlos David Caro (Dec. 30, 2004);

JA 1689    Ex. 62 Supplemental Declaration of Mark Bezy (Oct. 8, 2013);

JA 1692    Ex. 63 Letter from James W. Marquart to Stephen Kalista (Dec. 6, 2006);

JA 1695    Ex. 64 Letter from A. Giorno to S. Kalista (Dec. 29, 2006);

JA 1697    Ex. 65 Letter from D. Malcolm Spica, Ph.D. to Robin Konrad (Sept. 10, 2013);

JA 1700    Ex. 66 Email from H. Selvog to S. Kalista (with Selvog CV attached) (Mar. 15, 2006);

JA 1710    Ex. 67 Email from A. Giorno to S. Kalista (Sept. 28, 2006);

JA 1712    Ex. 68 Supplemental Declaration of Donna Marie Schwartz-Watts, M.D. (Oct. 7, 2013);

JA 1739    Ex. 69 Memorandum from H. Selvog to D. Mullikin, S. Kalista, and J. Simmons (May 15, 2006), re: Witnesses/Records by Location;

JA 1745    Ex. 70 Memorandum from W. Johnson re: Special Handling Instructions for Carlos David Caro (Dec. 19, 2003);

JA 1747    Ex. 71 Declaration of Juror #33 (Sept. 26, 2013);

JA 1750    Ex. 72 Declaration of Susan Richardson (Oct. 9, 2013);

JA 1770    Ex. 73 Federal Bureau of Prisons Transfer Order for Carlos David Caro (Oct. 11, 2005);

JA 1772    Ex. 77 Declaration of Petra Herrera (Oct. 2, 2013);

JA 1774    Dkt. 800 - Defendant's First Motion for Leave to Conduct Discovery and Preliminary Request for an Evidentiary Hearing and Expansion of the Record (Oct. 25, 2013);

JA 1809    Dkt. 803 - Government's Response to Defendant's First Motion for Leave to Conduct Discovery and Preliminary Request for an Evidentiary Hearing and Expansion of the Record (Nov. 15, 2013);

JA 1816    Transcript, Oral Argument, Nov. 25, 2013;

JA 1889    Dkt. 808 – Opinion (May 4, 2015);

JA 1984    Dkt. 810 – Certificate of Appealibility (May 4, 2015);

JA 1985    Dkt. 811 – Carlos David Caro's Motion to Alter or Amend Judgment Pursuant to Federal Rule of Civil Procedure Rule 59(e) (June 1, 2015);

JA 1997    Dkt. 813 – Government's Response to Motion to Alter or Amend Judgment (June 18, 2015);

JA 2008    Dkt. 816 – Reply to Government's Response to Motion to Alter or Amend Judgment (July 6, 2015);

JA 2015    Dkt 818 – Order Denying Rule 59(e) Motion (Nov. 6, 2015);

JA 2019    Dkt. 819 – Carlos David Caro's Notice of Appeal (Jan.4, 2016).

Government has contested the factual assertions made in Mr. Caro's 2255 Motion. (*See* Motion to Dismiss at 13-16, 27-33, 38-50.)  Summary dismissal on this "hotly disputed" record would be inappropriate. *See United States v. White*, 366 F.3d 291, 302 (4th Cir. 2004).  As such, Mr. Caro is entitled to a hearing to prove his claims of ineffective assistance of trial counsel.

Mr. Caro also raised extra-record claims related to the jurors' and the Government's misconduct.  (*See* ECF 790 (2255 Motion), Claims One, Three, Five, and Seven.)    The allegations supporting these claims involve facts that were not before this Court during Mr. Caro's trial.  Mr. Caro has supported these claims with declarations from jurors and experts, as well as other data and documents that he has gathered during these proceedings.  (*See generally* ECF 790 (2255 Motion) Exs. 1, 2, 3, 25-55;  ECF 797 (Opposition to Motion to Dismiss) Exs. 62, 70-77.)   The Government has moved to dismiss Mr. Caro's claims by asserting that no evidence exists to support his claim (*see* ECF 791 at 9-12); by challenging declarations (*id.* at 16-21); and by refuting the timing, disclosure, and substance of *Brady* material (*id.* at 35-37, 86-92).   But where Mr. Caro has presented information outside the record and "where the ultimate resolution rests on a credibility determination, an evidentiary hearing is especially warranted." *White*, 366 F.3d at 302 (*citing Raines v. United States,* 423 F.2d 526, 530 (4th Cir.1970)).  These claims provide further example why an evidentiary hearing is appropriate before dismissing Mr. Caro's 2255 Motion.

Here, because the record does not conclusively show that Mr. Caro is not entitled to relief, an evidentiary hearing is warranted.  *See* 28 U.S.C. § 2255(b); *Machibroda*, 368 U.S. at 494; *Fontaine v. United States*, 411 U.S. 213, 215 (1973) (remanding for hearing where "we cannot conclude with the assurance required by the statutory standard 'conclusively show' that under no circumstances could the petitioner establish facts warranting relief under § 2255");

28

JA 1801

*United States v. Witherspoon*, 231 F.3d 923, 926 (4th Cir. 2000) (holding that district court erred

in dismissing the 2255 motion where the motion, files, and records "failed to conclusively show

that Witherspoon was entitled to no relief").

## IV.    Conclusion

Mr. Caro respectfully asks the Court to grant this motion for the reasons provided.

Respectfully submitted this 25th day of October, 2013.

> s/Karen M. Wilkinson
> Jon M. Sands
> Federal Public Defender
> Dale A. Baich (Ohio Bar No. 0025070)
> Karen M. Wilkinson (Arizona Bar No. 014095)
> Robin C. Konrad (Alabama Bar No. 2194-N76K)
> Office of the Federal Public Defender,
> District of Arizona
> 850 West Adams Street, Suite 201
> Phoenix, Arizona  85007
> dale_baich@fd.org
> karen_wilkinson@fd.org
> robin_konrad@fd.org
> Telephone:  602-382-2816
> Facsimile:  602-889-3960
>
> Fay F. Spence (Virginia Bar No. 27906)
> Federal Public Defender's Office
> 210 First Street, SW, Suite 400
> Roanoke, Virginia 24011
> fay_spence@fd.org
> Telephone:  540-777-0880
> Facsimile:  540-777-0890
>
> Brian J. Beck (Virginia Bar No. 78049)
> Federal Public Defender's Office
> 201 Abingdon Place
> Abingdon, Virginia 24211
> brian_beck@fd.org
> Telephone:  276-619-6080
>
> Attorneys for Petitioner/Defendant
> Carlos David Caro

JA 1802

## CERTIFICATE OF SERVICE

I hereby certify that on October 25, 2013, I filed the foregoing First Motion for Leave to Conduct Discovery and Preliminary Request for an Evidentiary Hearing and Expansion of the Record using the CM/ECF system, which will send notification of such filing to Anthony Giorno, First Assistant United States Attorney, counsel for the United States.


s/Stephanie Bame
Legal Assistant
Capital Habeas Unit

JA 1803

# APPENDIX A

# APPENDIX A

JA 1804

Attachment A
Inmate Register Numbers

| |
|---|
| 00074-005 |
| 0334-112 |
| 00232-005 |
| 01192-087 |
| 01242-097 |
| 02476-748 |
| 02536-748 |
| 01924-135 |
| 02539-748 |
| 02550-748 |
| 02552-748 |
| 02012-028 |
| 02158-090 |
| 02837-748 |
| 02846-748 |
| 02218-045 |
| 02582-016 |
| 02659-087 |
| 02689-081 |
| 02728-031 |
| 02866-081 |
| 02875-087 |
| 03029-036 |
| 03220-028 |
| 03326-112 |
| 03328-112 |
| 03329-112 |
| 03332-112 |
| 03325-091 |
| 04307-748 |
| 03911-000 |
| 04298-280 |
| 04198-097 |
| 04221-016 |
| 04354-112 |
| 05151-748 |
| 04475-046 |
| 04574-088 |
| 04685-000 |
| 04764-067 |
| 04710-000 |
| 05374-081 |
| 05680-089 |
| 05835-007 |
| 06373-097 |
| 07145-062 |
| 07318-045 |
| 07580-091 |
| 07984-424 |
| 07797-028 |

JA 1805

| |
|---|
| 08352-424 |
| 08157-031 |
| 08655-007 |
| 08961-091 |
| 09008-050 |
| 09219-014 |
| 09303-042 |
| 09416-112 |
| 09411-077 |
| 09748-004 |
| 09883-016 |
| 09935-000 |
| 10783-042 |
| 10788-026 |
| 10819-007 |
| 12508-116 |
| 12873-057 |
| 12867-050 |
| 13161-075 |
| 13680-014 |
| 13829-045 |
| 13950-116 |
| 14067-074 |
| 14559-116 |
| 14534-057 |
| 14634-116 |
| 14801-116 |
| 15177-424 |
| 14916-031 |
| 16203-083 |
| 16249-085 |
| 16267-064 |
| 16390-047 |
| 16802-050 |
| 16917-050 |
| 17133-014 |
| 17439-075 |
| 17911-054 |
| 18249-039 |
| 18282-058 |
| 19015-050 |
| 19214-083 |
| 20168-148 |
| 20220-148 |
| 20486-148 |
| 20796-424 |
| 21136-018 |
| 22806-009 |
| 23188-086 |
| 24079-038 |
| 24651-053 |
| 25109-053 |
| 26147-008 |

Attachment A                                                                 Page 2

| |
|---|
| 26370-077 |
| 27896-016 |
| 28064-054 |
| 28652-037 |
| 29638-086 |
| 29796-016 |
| 29820-016 |
| 30063-037 |
| 30123-013 |
| 30674-048 |
| 30694-054 |
| 30793-053 |
| 30906-004 |
| 32124-037 |
| 32403-037 |
| 33039-018 |
| 34104-013 |
| 34338-054 |
| 34848-054 |
| 34853-054 |
| 35074-054 |
| 35556-118 |
| 35945-048 |
| 35987-007 |
| 37802-054 |
| 38267-048 |
| 39448-048 |
| 39574-133 |
| 39492-018 |
| 40114-066 |
| 40172-051 |
| 40581-079 |
| 41756-074 |
| 42371-054 |
| 42375-054 |
| 42393-054 |
| 42426-054 |
| 43018-060 |
| 44107-039 |
| 44623-054 |
| 44776-066 |
| 45189-053 |
| 46680-083 |
| 48551-083 |
| 49535-083 |
| 51427-054 |
| 53271-054 |
| 53506-054 |
| 53757-097 |
| 53961-097 |
| 54744-097 |
| 55341-065 |
| 55458-097 |

Attachment A

| |
|---|
| 55891-097 |
| 58146-054 |
| 58478-066 |
| 58478-066 |
| 60012-001 |
| 61285-066 |
| 62604-079 |
| 63510-054 |
| 65114-053 |
| 70250-083 |
| 73629-012 |
| 79328-012 |
| 80882-280 |
| 81372-011 |
| 84197-198 |
| 84015-012 |
| 85114-020 |
| 86063-024 |
| 88752-132 |
| 90662-079 |
| 91147-011 |
| 92298-024 |
| 94434-012 |
| 95335-198 |
| 95518-022 |
| 97034-011 |
| 97815-024 |
| 99974-555 |
| 99898-011 |

Attachment A                                                                    Page 4

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | **Case No. <u>1:06CR00001</u>** |
| | ) | |
| **CARLOS CARO,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S FIRST MOTION FOR LEAVE TO
CONDUCT DISCOVERY AND PRELIMINARY REQUEST FOR AN EVIDENTIARY
HEARING AND EXPANSION OF THE RECORD**

The defendant, Carlos Caro, by counsel, has filed a petition pursuant to 28 U.S.C. §2255

seeking to vacate his capital murder conviction and death sentence. The United States has moved

to dismiss the petition and a hearing on the motion to dismiss is pending. Caro has moved the

court for the entry of an order granting leave to conduct discovery and for an evidentiary hearing

relating to five of the claims he has advanced in his petition. Pet'r's Mot. for Discovery at 4. The

United States opposes Caro's motion for discovery and an evidentiary hearing.

<u>THE MOTION IS PREMATURE</u>

Caro's motion seeks "an order granting . . . specific discovery requests . . . expansion of

the record to include the evidence presented . . . to date, and Mr. Caro's request for an

evidentiary hearing, *at an appropriate time,* to resolve factual disputes" arising from his petition.

Pet'r's Mot. for Discovery at 1. To the extent that the motion seeks to delay discovery and an

evidentiary hearing until after the court rules on the United States' motion to dismiss, the United

States does not oppose the request. However, if Caro seeks discovery and an evidentiary hearing

before the court so rules, his motion should be denied.

JA 1809

Discovery in a §2255 proceeding is governed by Rule 6 of the Rules Governing Section 2255 Proceedings for the United States District Courts (hereinafter, "Rule 6"). That rule requires the parties to obtain leave of court to conduct discovery. The decision to grant leave and the scope of discovery allowed is vested in the sound discretion of the court. *Barry v. United States, 528 F.2d 1094 (7th Cir. 1976)*; Rule 6 advisory committee's note, 1976 adoption. Discovery normally follows the granting of an evidentiary hearing. *Wagner v. United States,* 418 F.2d 618, 621 (9th Cir. 1969).

Caro's request for leave to conduct discovery should be denied for several reasons. First, the court has not yet ruled on the motion of the United States to dismiss the petition. The court may after consideration of the written material and oral argument opine that some or all of the claims on which he seeks discovery are without merit and should be dismissed. Discovery in relation to dismissed claims would be unnecessary and a waste of resources. Granting Caro's delayed motion for leave to conduct discovery will unduly delay the court's ruling on the merits of the government's motion to dismiss.

Second, a court order granting discovery to Caro may and likely will trigger a reciprocal request by the United States for discovery on those issues. For example, Caro seeks to depose AUSA Rick Mountcastle with regard to Caro's claim that the government delayed the capital indictment until it could exact a disproportionate plea in connection with the Benevidez assault. Pet'r's Mot. for Discovery at 5-7. He alleges that Mountcastle's testimony will support his claim that the United States used the Benevidez plea to "gain a tactical advantage" in connection with the capital case. In support of that claim, he has submitted the affidavit of Lou Dene, his defense counsel in the Benevidez case. Dene, however, does not support Caro's argument. Rather, he states explicitly that the suggestion that Caro plead to the more serious charges in the Benevidez

JA 1810

case was not propounded by the United States, but by his co-defendant Juan Moreno-Marquez. The suggestion was accepted by Caro because, according to Dene, Caro said he "wasn't going anywhere, so the long sentence did not matter to him." Thus, according to Caro's counsel, the plea in the Benevidez case was proposed by a fellow gang member / co-defendant and Caro, sensing that the younger gang member had more to lose than he, accepted the proposal. The United States played no role in the proposal by Moreno-Marquez or the acceptance of the proposal by Caro. In light of Dene's affidavit, it is pure speculation for Caro to suggest that his plea in the Benevidez case was part of a strategy by the government to gain some advantage in the capital case.[1] The request to depose AUSA Mountcastle is a fishing expedition.

Granting discovery with regard to Caro's claim will require the United States to depose Dene to obtain a more detailed statement of the circumstances that led to Caro's plea in the Benevidez case. The Virginia State Bar Rules, however, do not authorize the disclosure of client confidences without some threshold determination by the court of the merits of the claim. Legal Ethics Opinion 1859, issued on June 6, 2012, recognizes that while Rule 1.6 of the Virginia Rules of Professional Responsibility allows the disclosure of confidential information in order to "respond to allegations in any proceeding concerning the lawyer's representation of the client," the disclosure must be limited to information necessary to address the claim. The LEO provides

A habeas petition that alleges ineffective assistance of counsel undoubtedly "concerns" the lawyer's representation of the former client, since it is a claim that the former client's conviction should be set aside because of the lawyer's performance during the representation. However, the lawyer may reveal information only to the extent reasonably necessary to defend against these claims. It is unlikely that it is reasonably necessary for the lawyer to disclose confidential information at the time the petition is filed, when the court has not made a determination of whether the petition is legally and procedurally sufficient. Many habeas petitions fail on legal grounds, and in those cases there is no need for the lawyer to ever reveal information about his representation.

---

[1] Caro has in a separate proceeding charged that Dene was ineffective in allowing him to plead to the charges in the Benevidez case and in failing to advise him of the potential consequences of the plea in relation to the capital case. The United States has moved to dismiss those claims as time barred. The court has not yet ruled on the motion.

JA 1811

Although a pre-litigation disclosure of all relevant information may make it more likely that the claim of ineffective assistance will be disposed of quickly, that fact alone does not make it necessary that the lawyer reveal the information.

By the terms of the LEO, Dene risks violation of the VSB rules if he were to disclose client confidences prior to the court ruling on the motion to dismiss the claim. While the United States could obtain a court order compelling disclosure with limitations, such an action would be unnecessary if the court were to sustain the government's motion to dismiss.

A similar argument can be made with regard to Claims Four, Five, Six and Seven. The government has moved to dismiss each of these claims and discovery may be entirely unnecessary if the court finds that the government's motions are well taken. Accordingly, the United States submits that discovery should be denied until the court rules on the merits of the government's motion to dismiss the petition.

## THE MOTION IS OVERBROAD

Rule 6(b) requires the requesting party to provide reasons to support the requested discovery. The purpose of this rule is to "advise the judge of the necessity for discovery and enable him to make certain that the inquiry is relevant and appropriately narrow." Rule 6 advisory committee's note, 1976 adoption.[2] Caro's discovery requests are overly broad and constitute a fishing expedition for documents that may or may not be relevant to the issues he has presented. Locating and producing the information requested, even if it exists, would be onerous. The court and the parties should have the benefit of knowing what issues survive in order to consider whether any discovery requests are "relevant and appropriately narrow." Compliance with the discovery requests would be unnecessary if the court sustains the government's motion to dismiss all or some of those claims.

---

[2] This language actually appears in the advisory committee notes governing Rule 6 of the Rules Governing Section 2254 Cases In the United States District Courts. Rule 6 expressly provides that the §2254 committee notes are "fully applicable to discovery" in §2255 proceedings.

JA 1812

Further, Caro's requests for discovery seek information and documents that are irrelevant and unnecessary for the court to adjudicate the merits of his claims even if the court were to deny the government's motion to dismiss. Caro's request for discovery with regard to Claim Six (B) relating to the government's mental health experts, Pet'r's Mot. For Discovery at 14-15, illustrates the point.

Caro challenges defense counsel's decision not to present any mental health evidence during the penalty phase of the trial. He mistakenly asserts that counsels' decision was based on nothing more than a "feeling" that they had an insufficient basis to rebut the mental health testimony of the government's experts.

Caro's discovery request has no relevance to his claim. He seeks discovery of documents provided by the government to its experts, work product "generated" by the government's experts in conducting their evaluations of Caro and in preparing their reports, and receipts for services rendered by the government experts. These documents are wholly irrelevant to his claim that defense counsel was ineffective in failing to present a mental health defense. As Caro points out, "Had trial counsel presented a mental health defense at trial, the Government would have been required to produce these documents." The United States agrees with that assertion. However, the government in such case would have been entitled to reciprocal discovery of the work product and related documents prepared by Caro's experts. However, because Caro did not present a mental health defense, neither he nor the government was required to produce the work products of their respective experts. Although Caro may be entitled to the documents he seeks in some other proceeding, he cannot obtain them in connection with the claim he has asserted in this §2255 proceeding.[3]

---

[3] Discovery of the work product of the experts on both sides may be appropriate if Caro's sentence is set aside and a new hearing is held during which Caro elects to introduce evidence of his mental health as a mitigating factor.

## CONCLUSION

The United States respectfully submits that the court should not grant leave to conduct discovery unless and until it determines which, if any, of Caro's claims are sufficient to survive the government's motion to dismiss. It is only after the court rules on the motion that the parties can discern what discovery is necessary and permissible with regard to any claim or part of any claim that survives. Similarly, the parties would be in a better position to comply with the provisions of Rule 6 that require specificity when requesting discovery. It would further allow the parties to make reasoned objections to any discovery requests they believed to be irrelevant, overbroad or unnecessary to a fair adjudication of the remaining issues as articulated by the court.

Respectfully submitted,

TIMOTHY J. HEAPHY
United States Attorney

Date: November 15, 2013                   /s/ Anthony P. Giorno
                                          Anthony P. Giorno
                                          Assistant United States Attorney
                                          Virginia State Bar No. 15830
                                          P.O. Box 1709
                                          Roanoke, VA  24008-1709
                                          Tel: (540) 857-2250; Fax: (540) 857-2283
                                          Email: anthony.giorno@usdoj.gov

## CERTIFICATE OF SERVICE

I certify that on November 15, 2013, I caused the foregoing

JA 1814

**GOVERNMENT'SRESPONSE TO DEFENDANT'S FIRST MOTION FOR LEAVE TO CONDUCT DISCOVERY AND PRELIMINARY REQUEST FOR AN EVIDENTIARY HEARING AND EXPANSION OF THE RECORD**

to be filed with the Clerk of the Court using the CM/ECF system, which will send notification of this filing to counsel of record.

/s/ Anthony P. Giorno
Assistant United States Attorney

JA 1815

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF VIRGINIA
Abingdon Division

```
----------------------------x
                            :
UNITED STATES OF AMERICA,    :
                            :
      Plaintiff,             :
                            :
v.                          :    1:06CR1/2:03CR10115
                            :
CARLOS D. CARO,             :
                            :
      Defendant.            :    Abingdon, Virginia
                            :    November 25, 2013
----------------------------x    1:30 p.m.
```

TRANSCRIPT OF ORAL ARGUMENT
BEFORE THE HONORABLE JAMES P. JONES
UNITED STATES DISTRICT JUDGE.

APPEARANCES:

ANTHONY P. GIORNO, Esquire
RICK A. MOUNTCASTLE, Esquire
Asst. United States Attorneys
P.O. Box 1709
Roanoke, VA 24008
    For the United States of America.

KAREN A. WILKINSON, Esquire
ROBIN KONRAD, Esquire
Assistant Federal Public Defenders
850 West Adams, Suite 2012
Phoenix, Arizona
    Counsel for the Defendant.


Proceedings recorded by Stenography, transcript
produced by computer.


**BRIDGET A. DICKERT**
**UNITED STATES COURT REPORTER**
**180 WEST MAIN STREET, ROOM 104**
**ABINGDON, VIRGINIA 24210**
**(276) 628-5116**

APPEARANCES (Cont.)

    FAY F. SPENCE, Esquire
    Assistant Federal Public Defender
    210 First Street, S.W.
    Roanoke, Virginia  24011
    and
    BRIAN J. BECK, Esquire
    Assistant Federal Public Defender
    201 Abingdon Place
    Abingdon, Virginia  24211
        Counsel for the Defendant

(Proceedings commenced at 1:30 p.m.)

THE COURT:  Good afternoon, ladies and gentlemen. The clerk will call the cases.

THE CLERK:  *United States of America* v. *Carlos Caro*, Criminal Action Numbers 1:06CR10 and 2:03CR10115.

THE COURT:  We're here today for oral argument in the Government's motions to dismiss in these 2255 cases. I'd be grateful if counsel would enter their appearances so I know who's here, and indicate who is going to be arguing. First, from the Government.

MR. GIORNO:  Your Honor, for the United States Tony Giorno.  I will be arguing the substantive motions to dismiss, the 2255s, with the exception of the one that was filed by Mr. Mountcastle in which I believe he's responding He'll be arguing that.

MS. WILKINSON:  Good afternoon, Your Honor.  Karen Wilkinson on behalf of Carlos Caro who is not present but is in custody.  With me is Fay Spence, Brian Beck and Susan Richardson, and on video is Robin Konrad appearing from Phoenix.  I will be arguing the two, the responses to the Government's motions to dismiss both of them.  I guess if the court is having oral argument also on our discovery motion --

THE COURT:  Yes, ma'am, I am, and I neglected to mention that, but that's true.

MS. WILKINSON:  Then Ms. Spence will be arguing that motion.

THE COURT:  All right.  Well, thank you.  We, we have, in terms of time for argument, until 4:00.  I'm going to allow the Government to open, and give them 45 minutes, and then the defendant 90 minutes, and then the Government 45 minutes to respond.

Now, obviously, counsel does not need to take all of that time if they don't wish to, but that's our outside limitation.  And in terms of, of the issues, and there are the two cases, of course, plus the motion seeking, a motion seeking an order of discovery, I'll allow counsel to divide that time up and argument within these time limits as indicated.

I understand that the defendant has moved to, for discovery, but I want to include their time in the response time of 90 minutes.  So, is that clear to everyone?

MR. GIORNO:  Yes, sir.

THE COURT:  Very well.  We can proceed.

MR. MOUNTCASTLE:  Good afternoon, Your Honor.  Rick Mountcastle.  I'll be arguing the motion to dismiss in case number 2:03CR10115 which, I think at times, has been referred to as the Benavidez case, and basically I think the pleadings set forth the essence of our argument.

The 2255 motion comes way out of time, some seven or

eight years, eight years or so past the judgment date, and there is no showing of any basis for an equitable, inequitable tolling in this case.

I think the primary thing since 2007, Mr. Caro, regardless of his mental condition, his ability to understand legal proceedings, and, and not withstanding an allegation that he was represented by ineffective or incompetent counsel up to that point has continuously been represented by counsel in this particular case, the Public Defender's Office in one capacity or another since 2007, and there does not appear to be any basis for him not taking advantage of a perceived issue with Mr. Dene's representation in this case prior to 2012 when the motion was filed.

So, I'm happy to answer any question the court may have with respect to our arguments, but I think they are fairly clearly set forth in the pleadings.

THE COURT:  All right.  I have no questions. Thank you.  Mr. Giorno?

MR. GIORNO:  Good afternoon, Your Honor.

THE COURT:  Good afternoon.

MR. GIORNO:  Your Honor, there are, of course, in regard to the pleadings in connection with the capital case, the Sandoval case, I count 16 separate claims governing every possible phase of the proceedings beginning with

pretrial, in connection with the Benavidez case. We have filed a fairly lengthy reply to the petition citing facts as well as the law in the Government's motions to dismiss. I don't know if the court has any particular issues that you have concerns about, or questions about. I'm happy to, to begin to discuss those cases.

Obviously, ones that are, I have most concerns about are the ones in which they claim the Government did something wrong. I have a vested interest in those. And I have outlined those first.

If the court feels like there's something else, if you would rather pose questions to me as we go along, however the court wants to do it, I'm certainly willing to do, but I do have an outline and am prepared to proceed as the court wishes.

THE COURT: I don't mean to place any particular emphasis on one ground over another. But I think there are some things that I'm certainly interested in, in the Government speaking to, and certainly the Government has filed a lengthy and complete response.

But just in terms of jumping in at someplace, what about the argument that the, the Sandoval case was delayed so the Government could obtain a lengthy sentence in the Benavidez case?

MR. GIORNO: That's claim number one, Your Honor.

I believe it comes up later on in claim 6A concerning the penalty phase in the case. Essentially, our response is we recognize the case law is in certain cases pre-indictment delay where the Government does gain some tactical advantage with reckless disregard to the impact on the defendant can state a due process claim. We don't have that here, Your Honor.

The first point we'd make is that the delay between the time of the murder and the request for appointment of counsel was 13 months which, in the context of a capital case, is not a disproportionately long delay.

We have, of course, this was a capital case, there is a duty to investigate, there's a duty to make certain threshold determinations concerning whether to seek the death penalty, or not. My concern is, my belief is if we had tried to move quicker we'd certainly be open to a claim that the Government made a rush to judgment in this case.

In this case there were certain things that had to be done to determine whether to proceed with the Sandoval case. In addition to that there is no proof, nothing that would suggest that that delay was done because the Government had some, some reason to try to gain a tactical advantage.

Other than the delay, itself, and the fact that Mr. Caro was given a rather lengthy sentence in the Benavidez case, with regard to the lengthy sentence in the

Benavidez case what the defense has submitted is the affidavit that was part of the pleadings in this case. In paragraphs five and six of Mr. Dene's affidavit he makes it very clear that the decision to plead out Mr. Caro in the Benavidez case had nothing to do with the Government. The Government didn't insist on this plea, or anything like that. According to Mr. Dene, Mr. Dene said that the plea agreement in that particular Benavidez case was proposed by Mr. Moreno-Marquez. As the court will recall from the Moreno-Marquez case, Mr. Moreno-Marquez was the TS member who, along with Caro, actually made it into the room where Benavidez was stabbed. He was the one, along with Mr. Caro, who committed the, physically committed the assault on Mr. Benavidez. It would have been of benefit to Mr. Moreno-Marquez, and lesser benefit to Mr. Caro, and was proposed by Mr. Marquez. According to Mr. Dene, he said, "I advised Mr. Caro the plea agreement would mean he would receive a very long sentence. Mr. Caro stated he wasn't going anywhere so the long sentence didn't matter to him."

So, what you have here is a plea agreement that was proposed in the first instance not by the Government, but by Moreno-Marquez, and Mr. Caro coming along saying, just as he did in Louisiana in Oakdale, "I'm already serving a very long sentence. I'm going to be in here for a long, long time, so it doesn't matter to me." That's how the plea

agreement came to be.

On that particular set of facts, Your Honor, there is absolutely no indication that the Government was somehow complicit in setting this up, or that somehow Mr. Caro would be set up to have a long sentence in connection with the Sandoval prosecution.  In any event, Your Honor, let's --

THE COURT:  Well, the Government, I guess, knew, understood that a conviction of Mr. Caro in that case would assist it in the capital case in obtaining not the ultimate penalty, but some significant penalty.

MR. GIORNO:  Correct.

THE COURT:  I guess the question is what, what, what did the Government do wrong, if anything?

MR. GIORNO:  Well, that's, nothing, Your Honor. The, if you look at the -- I mean, this is a plea with Mr. Mountcastle, a separate Assistant U.S. Attorney.  I understand it's the Government, but there's no evidence that Mr. Mountcastle sat down with the Sandoval prosecution team and said, "Hey, look, we need to make sure we delay the Benavidez case."

THE COURT:  Except the defendant would like, in his motion for discovery, for you to disclose any e-mails, communications, as I understand, about that decision, the decisions in those cases.

MR. GIORNO:  They have to provide a basis for it,

Your Honor. They can't just go fishing around and think there might be something out there. I notice in their discovery request they asked for e-mails asking for, about his prior deal, and there's simply nothing. They can't even make a threshold showing.

In addition to that we have the prejudice part of it. Let's suppose, hypothetically, there had never been a plea deal in the Benavidez case. The Government's argument, which we made, is he's a violent guy, in which case we've brought in the evidence of him going into a room with, along with Moreno-Marquez, and stabbing Benavidez, which certainly goes to show he's a future danger, and he was serving the functional equivalent of life.

When you look at the sentence he had coming out of FCI Oakdale, he had well over 30 years of time to serve. He already -- it would not have materially changed the Government's argument to future danger or basically he had nothing to lose, and there would be no effective punishment if he didn't get the death penalty which were the two main prongs of the Government's case.

Even assuming the Government did something wrong, which we do not concede, and assuming we would have been successful in getting a lesser sentence on that evidence in Benavidez, there still would have been no prejudice.

THE COURT: Or going to trial.

MR. GIORNO: Or even going to trial. I mean, you know, what's his defense? He's on tape stabbing this guy violently. I just don't see where that would have made a material difference.

From our standpoint, the case against Mr. Caro, capital case, much like the Benavidez case, you didn't have to be Clarence Darrow from a prosecution standpoint to prosecute those cases. The evidence was very clear cut, and it didn't require some trickery or gamesmanship by the Government to try to gain an advantage when the advantages were already there.

So, we would submit that there is, that particular claim of Government misconduct is a non starter. If the court doesn't have further questions about it, I can turn to some other claims in which there is, the court might have some concerns about.

THE COURT: Let me ask you, and again I'm, I'm hopping around a little bit, and I apologize if I've thrown you off your notes, but, and obviously I'm going to let you say whatever you'd like within the time permitted, what about the, there is another claim directed at Government, the Government, the Government's argument, of course, which was very powerful in the capital case that, of future dangerousness, and the fact that there couldn't be any clear assurance that Mr. Caro wouldn't murder again in prison, and

the whole evidence about what would happen to him in the maximum security, and the defendant has now presented some allegations that, in fact, the Government's testimony was incorrect about the length of time that people stay in the maximum security facility. What about that?

MR. GIORNO: Your Honor, that is, if my notes serve me correctly, claim seven. There was a Brady violation by withholding ADX information showing inmates were there for more than three years.

THE COURT: Yes, sir.

MR. GIORNO: In that regard I looked at the testimony of Hershberger. Hershberger was a former warden at ADX in Florence, and he testified about the step down procedure, who goes to AdMax, and what they did there. He talked about how they step you down from the control unit to ultimately the general population, and he talked about how less than one percent of the inmates actually stay at ADX. And in his testimony, although he described in general terms the step down procedure, had said it was the goal of BOP to matriculate out of ADX back into BOP. He never once testified, "Oh, after three to five years they'll be gone for sure." In fact, his testimony on cross examination, one of the last things he said, and this was a question by Mr. Simmons, and just for reference of the court, this is Mr. Hershberger's testimony at page 203 of the trial

transcript -- pardon me -- 206 of the trial transcript, question by Mr. Simmons, "If he, Mr. Caro, doesn't meet the criteria to where the Bureau of Prisons believes that there's another appropriate placement other than ADX he will remain there?" Mr. Hershberger's answer was, "That's correct, yes."

The Government has never said that, "Oh, no one stays in ADX for more than three to five years." In fact, Cunningham testified when he did his visit to ADX he met an inmate who had been there since 1994, since the place opened. There was never a representation by the Government, evidence from the Government, "Oh, if you put Mr. Caro there, guarantee he'll be there." Everyone agreed that the placement at ADX is temporary, and as a general rule that's what happens. You can't keep everybody there. That was the gist of the Government's testimony.

So, the fact that there is evidence from ADX, "Oh, there have been inmates there more than three years, more than five years, more than nine years," the Government never disputed that. We didn't claim, "Oh, everyone is there and gets matriculated out." That's not the case. Some people are, a very select few are there longer. We never disputed that.

So, we do not feel that, in and of itself, would have been dispositive or otherwise rebuttal to the Government's

evidence in the case.

THE COURT: Let me ask you about the issue of Mr. Bland, Joseph Bland. That's the cellmate, allegedly, of Mr. Bullock who has filed a declaration in the case. And again, the defendant points a finger at the Government here and claims that the Government hid the ball on whether Mr. Bullock had a cellmate, although of course it did come out at trial. Mr. Bullock testified that he had a cellmate, but that the, the information that he had one was not provided to defense counsel adequately and/or in time for them to make, make an investigation of that person, who it is alleged now was Mr. Bland, who has made a declaration that, it is argued it is contrary to Mr. Bullock's testimony. So, what's the Government's response there?

MR. GIORNO: Let me start, first of all, with the allegation that we somehow hid the ball, lulled them, led them down the primrose path on that. That's claim five. From my notes it looks like Mr. Caro made discovery requests on March 27, 2006. He asked for a list of the inmates in the SHU with cell assignments for December 16th and 17th of 2003. At the time when he made this request, the Government checked and there was no such list, per se. There wasn't anything showing that the list, the inmates in the SHU for those dates. But we did have a roster for December 20th, which at that time didn't show that Bullock had any

cellmate. That's as of December 20th. We did, however, turn over the SHU logs which, according to Mr. Kalista's affidavit, he said he had those, but those SHU logs from the 17th to 20th show that Mr. Bland was moved from cell 146, which was, in fact, Mr. Bullock's cell, on December 19, 2003. So, if you look at those, that information, you could determine that he was moved out of the cell on 12/19 to another range or cell. They could assume that Mr. Bland was, in fact, in there with Mr. Bullock on 12/17.

In addition, I also want to address the fact that there was no mass interview form for Mr. Bland. The reason for that is, at least from what I can tell, if you look at Mr. Bullock's mass interview form that was conducted on December 22, 2003, at that particular time Mr. Bland would not have been even in the SHU as far as we could tell. That's why there was no mass interview form.

But more importantly, as Mr. Kalista's affidavit says, paragraph 21, at the time that Mr. Kalista received grand jury testimony of Mr. Bullock he was certainly aware at that particular time that Mr. Bullock had a cellmate. Mr. Kalista says this. He says, "I was aware that the Government was going to introduce testimony from Sean Bullock who was housed across from Mr. Caro at the time Sandoval was killed. I received a copy of the grand jury transcript where Mr. Bullock testified, and I reviewed the

housing logs from USP Lee.  I overlooked the fact that Mr. Bullock had a cellmate at the time of Mr. Sandoval's death."

It wasn't a matter of the Government failing to disclose this.  I think the defense attorney, for whatever reason, did not, was not able to surmise at that time that, that, in fact, Mr. Bland was his cellmate.

THE COURT:  Is that ineffective assistance of counsel?

MR. GIORNO:  I don't think it is for the reasons we stated in response to their claim that it was.  Certainly Mr. Bland's declaration is far from clear about whether he would have been able to impeach Mr. Bullock.  In addition to that, if you look at Mr. Bullock's testimony, I mean, we put on Mr. Bullock because he observed something, but his observation, according to his testimony, was like a second. And to say that his, he was all of a sudden the reason why that Mr. Caro was convicted in this case, which does go to the guilt phase of it, that that was the basis of the conviction, that split second observation, ignoring all the other evidence in this case, somehow Bullock's testimony was prejudicial I think would be an overstate.

Mr. Caro, as the court heard the evidence, he confessed.  There was no denial he did it.  He gave a reason.  He said, "I did it because it was over breakfast,"

and I don't think Mr. Bullock, I think even if Mr. Bullock had been thoroughly impeached I don't think he would have made a difference in the case. I don't think Mr. Caro suffered any prejudice as a result of it.

THE COURT: Well, why don't you go ahead with your list, Mr. Giorno.

MR. GIORNO: One of the things that they argue is, again, this is pointing a finger at the Government, that somehow we, we failed to disclose evidence of Mr. Caro's status as a leader of the Texas Syndicate.

And again, I think that misstates the Government's position as it relates to Mr. Caro's leadership status. The evidence that came in from the Government as far as leadership status related to his role in the 2002 incident at FCI Oakdale. If the court would recall, a warden from down at FCI Oakdale came in and testified that happened when the Paisas and Border Brothers were coming into the facility. They sent out the word they wanted to talk to somebody from the leadership of the Texas Syndicate. Mr. Caro showed up. He made very clear that he was a leader in the Texas Syndicate at that particular time. That was the Government's evidence. We never purported to show that Mr. Caro was the leader of the Texas Syndicate or the leader of the Texas Syndicate at USP Lee. Certainly he, he had been in an altercation with another TS member there, so it

would certainly suggest there was some friction between the groups. But as far as his leadership, the evidence was uncontradicted that Mr. Caro did, in fact, have a leadership role in the Texas Syndicate at some point as recently as 2002 at FCI Oakdale. It wasn't like we had to hide information. I believe there was perhaps some testimony from Mr. Mrad, in maybe the Benavidez case, saying that Mr. Caro was not in good standing.

Your Honor, where he gets that from, it's an opinion. I don't know that it would be admissible if Mr. Mrad would be called to testify, certainly not at the guilt phase. Certainly there was no effort on the part of the Government to hide the ball concerning his status as a leader of the Texas Syndicate.

There is an argument concerning ineffective assistance of counsel during the capital review process, which we have addressed, and basically what we're saying is that's essentially a discretionary function of the executive branch; it's not a judicial proceeding. There's no constitutional right to a hearing, there's no statutory right to a hearing before the Attorney General's Capital Case Review Unit, and more importantly there's no standards.

What is effective assistance of counsel in the Capital Case Review Unit? Even their expert, Mr. Hammond, says it's a legitimate approach at these reviews not to put on

anything. Why? Because if you have a case like this, according to Mr. Kalista, I think realistically he said, "We knew this was going to be a penalty phase case," and you know, their best hope was to get him life in prison instead of the death sentence.

As Mr. Hammond recognizes, in a case like that it's a perfectly valid strategy to not go in and show your hand to the Government because the Government goes, "I see they're going to call Dr. So and So to come in and testify, let's see what they can find out about Dr. So and So." So, in essence you're giving the Government a snap shot of what is your only defense. It was their decision to forgo any evidence as to his mental health and his background, I think was not ineffective assistance of counsel, even if we assume the Sixth Amendment right attaches during the capital case review process.

There are a number of guilt, innocence claims. The first one relates to juror misconduct on the part of jurors 32 and 62. I found those to be, to be interesting. With regard to, with regard to juror number 32, there is, they rely on the juror questionnaire, and there is no declaration from juror 32. But there is, with regard to juror 62, they submit a declaration of, in which juror 62 supposedly said, "Once I found him guilty nothing the defense could have offered would have changed my mind with regard to the

penalty." And in that regard the courts have pretty much said that, that a consideration of a juror's statement after the trial is not reasonably probative over whether they could consider the evidence with an open mind, and follow the law. That was *Neil* v. *Gibson*. There's no statement on the affidavit they lied in the questionnaire. There's no statement that the juror number 62 lied to the court on voir dire. The court heard the voir dire of that juror, and if we compare that to the statement that the Fourth Circuit found insufficient in the *Jones* v. *Cooper* case, that's 311 F.3d 306, in that case there was an investigator's affidavit, and the investigator's affidavit recounts the jurors believed -- this is from *Jones* -- that the Bible mandates imposition of the death penalty in every case of first degree murder, and represents when the investigator asked her whether she could imagine any first degree murder case where the death penalty would not be appropriate, other than if the defendant grew up in the jungle with no contact with humanity. The affidavit we have in this case would be likewise insufficient.

Claim number four, and there are numerous subparts to claim number four that go into the guilt/innocence phase, as well, essentially the defense failed to develop a cohesive theory, the defense, and we would disagree with that.

The court has already asked me about the, about the

cross examination of Bullock, and we've addressed that. There is, with regard to the theory of the case, you have to remember what the defense had in this case. More than likely, didn't have. They walk in and they have a fellow who has admittedly, there's no doubt that Mr. Caro killed Mr. Sandoval. The way he notifies the authorities of what he had done is, "Hey, come and get this piece of shit out of my cell." He taunts the guards later on --

THE COURT: Well, of course, the defendant says that, that counsel should have explained that that was just bravado, that was prison bravado, that that's how he had to portray it to keep his, his status.

MR. GIORNO: Who is going to testify to that? I mean, Mr. Caro's going to say, "I was just doing bragging."

THE COURT: A prison expert, is what the defendant contends, an expert in prison culture would have said any person in Mr. Caro's position has to show that he's the toughest hombre around, and is cold and unfeeling, and that's the only way you survive in a maximum security situation.

MR. GIORNO: Is this during the guilt/innocence phase, Your Honor, or penalty, or both?

THE COURT: Both. Well, yes, both.

MR. GIORNO: Let me address the, first of all the guilt/innocence phase. We've all done a lot of cases out of

prison, people do things for a lot of different reasons.  In this particular case there's no indication that Caro killed Sandoval, or that the statements he made later on were bravado.  Let's, assuming hypothetically that his statements to the guards, or in the presence of the guards was bravado, that he had to show that he was, in the court's words, the biggest, baddest hombre on the block.  The court, the jury still had the evidence of Caro's conversations with his family members, his correspondence with TS members, in which it's the same thing.  "I killed him because he disrespected me.  He was, I needed to do it.  He, the guy disrespected me."  There was no remorse at all in any phase.  Had nothing to do with bravado.

What is the explanation for the letters to his family members, or his conversations with his family members?  "I killed a guy."  That was not bravado.  And given the facts of the case, the, the statements Mr. Caro made, his admissions to Agent Fender, I think it would be easy to talk about the prison culture.  I'm not sure the expert's testimony would be admissible at the guilt/innocence phase because there's no factual predicate for it, and even assuming it would be admissible in the penalty phase, which it probably would be, maybe, it's still that bravado argument carries very little weight in the light of the circumstances of this case.

I mean, Caro, no witness has ever said that there's bravado. People do things in prison for a lot of reasons, but there's never been any indication that his statements were bravado. So, we would submit to the court that prison culture would not be sufficient to rebut that.

I would point out to the court that as far as the evidence in this case, there is zero evidence of any motive other than articulated by counsel in the briefing, there's no gang motive, no evidence of self-defense, no evidence of provocation, no evidence of mutual combat --

THE COURT: He, well, I mean, the argument was made at trial, at the guilt and innocence phase, I mean, as you say, this is what they were left with, but the argument was that this was bound to be a second degree murder situation. It was, it was bound to be a spur of the moment deal because there were two people placed in a small cell, you know, counsel showed us how small the cell was, and that there was this disrespect, and so it likely was a flare up between the two of them. That was the argument that was made.

MR. GIORNO: That's correct, Your Honor. If the, as the court points out, the defense went through a very elaborate thing, sometimes people snap, and the court, as I recall, over the Government's objection, I think, the court wisely chose to instruct on second degree murder, and the

jury received that information.  You can find him guilty of second degree murder if you want.  And the jury rejected that.  But it wasn't like they, I mean that was what they had.  I don't think that prison culture on the issue of guilt or innocence, say, yeah, if you're in prison it's somehow okay to murder someone over breakfast?  I don't think that would have been, that would have carried the day.

The defense did, in fact, put on evidence, and the court instructed the jury on second degree murder.  The jury just rejected it.  And so I think they have a cohesive theory of defense based on what they had to work with.

THE COURT:  Their claim 4C is that the defense, in the guilt/innocence phase, was negligent because they failed to put on evidence of Bureau of Prison's negligence.  This relates to claim 6H, as well, regarding the penalty phase.

MR. GIORNO:  The theory there, as I understand it, is that somehow the fact that the Bureau of Prisons put Sandoval and Caro together would have been somehow relevant to the issue of guilt or innocence, and I'll state to the court that there was no evidence to support such an argument or such evidence in this case.  In this particular case what you had was, and I went back and looked at the transcript, the initial request was, the decision to put Sandoval in Caro's cell wasn't because Sandoval asked to do it; it was done at the request of Bureau of Prisons.  They had people

come in on a bus, they tried to figure out who to put together, they said, "Okay, Sandoval and Caro are in the same gang.  Let's put them in here."  There's no evidence of animosity or prior bad blood between them, so they put them in the same cell together, or wanted to.  Mr. Caro said, "I don't want a cellmate.  Not Sandoval.  I just don't care for a cellmate."  Later on Sandoval is going to be placed, and Sandoval says, "Can you put me in with Caro?"  They go back to Caro and Caro says, "Yeah, I'll take him.  We're brothers.  We've done time together."  He goes in the cell with him.  Okay.

According to the testimony of Watts, Gilley and Laster, I mean, they, they did everything they could to make sure it wasn't going to be a problem.  There was no reason to think that putting these two together would end up the way it did, particularly when you look at Caro's stated reason for the killing, it had nothing to do with the fact that they were enemies, or I think they used the term a cold dose of revenge that Sandoval was going to mete out.  There's no evidence of that.  Things just went horribly wrong in that cell.  From others that the court heard, it was over something trivial, like breakfast.  I don't understand it, but that appears to be what it was, and nothing more.

There was no evidence of BOP negligence.  So, I don't think defense counsel could have been ineffective of failing

to put on evidence of something that did not exist.

There are a number of penalty phase arguments, Your Honor. The only one I think that perhaps might require a little bit of elaboration is the evidence concerning mental health. Because when we were looking at that we thought, okay, well, where is the, where is the mental health defense? Why isn't it here? And the, if you look at, again, starting with Mr. Kalista's affidavit, Mr. Kalista talks about the fact that, I mean, they knew at the outset that mental health would be something they wanted to look at. According to the affidavit they had, and the information we have, they right out of the box started getting mental health experts, mitigation specialists, things like that. And they have, they retain Mr., Dr. Spica in January of 2006. He's a licensed clinical psychologist and neuropsychologist. His examinations don't suggest any brain impairment or abnormality. Spica does ultimately report something called a frontal lobe dysfunction, but his report's inconsistent, some say it's inconsistent with frontal lobe dysfunction; some say it's consist testimony.

If you look at Dr. Spica's testimony, Dr. Caruso (phonetic), who said, "I can't help you in this case," the other defense expert, they were really left with not much of anything at the end of the day.

As I understand it in January of 2007, Dr. Spica comes

along and tells him for the first time right before the trial starts, "I can't help you on the issue of mens rea." So, at that particular point the defense had very little in the way of mental health evidence that would have made a difference.  That's all they had.

The flip side of that was they knew the Government had retained Dr. Phillips.  I mean, all indication is the defense lawyers did their homework on Phillips, and knew he would have done his homework and done a good job.  They did not have the benefit of his report when they made the decision to forego the presentation of mental health evidence because under the rulings of court, as I understand, they could not get it, just as we couldn't get theirs unless and until they notified the court they were going to make that an issue at trial.

What they were left with at the time they made the decision not to put on any mental health evidence was they really didn't have the experts to be in a position to rebut Phillip's testimony, and they thought, they believed and surmised, and tactically, so when you looked at Phillips' record that, Dr. Phillips would have made a compelling case, there were no issues of mental health, no mental health issues in this case that would help the defense in this case.  Particularly when Phillips reports -- I noted this -- Phillips' report cites 12 psychological reviews from seven

different psychologists and five different correctional facilities which found that Caro's mental status to be within normal limits.

Now, through Caro's brief, he talks about brain damage. And perhaps I've just overlooked it in the volume of documents, but I didn't see any mental health expert who said that Mr. Caro had brain damage. The, the defense really made a pretty compelling case. They introduced teachers, they introduced family members, they introduced his wife, they introduced Dr. Cunningham, they introduced Mr. Aiken to talk about the prison things, they did an effective job of cross-examining the Government's experts, but at the end of the day there really wasn't a lot that could have been offered in mitigation that wasn't offered.

They also mentioned calling the two brothers, Noe and Jose. Noe and Jose, according to some of the family members, were the bad apples in the family, so to speak, whereas Carlos Caro was quiet and shy and grew up in a tumultuous household. The brothers were ripping and snorting and tearing up the roads. Their testimony, I would submit to the court, they could not have added anything to the testimony about his upbringing and background that the family members couldn't testify to. It would have, it could have been counter-productive given who they are. So, the decision not to call them, I think, was a strategic decision

which was certainly well supported by the record in this case.

THE COURT:  I think your initial time is just about up.

MR. GIORNO:  Thank you, Your Honor.

THE COURT:  Thank you.  All right.  Ms. Wilkinson?

MS. WILKINSON:  Thank you, Your Honor.  I think that I'd like to structure my argument first by addressing the capital case, motion to dismiss, and then the Benavidez, what we call the Benavidez case, and then Ms. Spence will address the evidentiary motion.

THE COURT:  If you wouldn't mind pulling that mic closer to you just to make sure.  That way your colleague in Arizona can also hear you better, too.

MS. WILKINSON:  Okay.  Your Honor, as we have argued in our response, the Government's motion is contrary to the law and is not supported by the existing record or the record that we have presented to the court; the factual allegations which, for purpose of this motion, must be accepted as true.

We ask the court to deny the motion for the reasons that we stated.  There's three sort of bigger picture reasons why we believe that the motion's contrary to the law.  First, the Government applied the wrong standard of review and continues to do so today in this hearing.  Two,

the Government's motion, and its argument today, actually highlights factual disputes and supports the need for further discovery, and an evidentiary hearing. And the Government also improperly analyzed the issues in a piecemeal fashion which is inappropriate. And I'll address each of these in a little bit more detail.

The test before the court on these two motions is not who wins on the merits. That's not the court's job right now. But whether, accepting as true all of Mr. Caro's allegations and drawing inferences in his favor, whether his claims are patently frivolous, I think the word is palpably incredible or conclusively without merit.

The Government doesn't address this standard in its motion. In fact, doesn't present any standard to guide this court. And instead, they improperly, they dispute Mr. Caro's factual allegations, they draw inferences against Mr. Caro, they criticize his experts and other evidence, they ask the court to make credibility determinations, and they ignore the new factual, the new record that we have put before this court --

THE COURT: Well, it would be true, though, if on a particular ground that if everything that was alleged was true, it still would not have amounted to a deprivation of rights, or violation of law, then you could not prevail, that is, the Government's motion would be good.

MS. WILKINSON: Correct, Judge. I guess the one caveat I would put to that is at this point we have only alleged facts; we have not yet had an opportunity to present evidence supporting those facts. But that is a correct statement.

THE COURT: Well, certainly you haven't presented evidence except through the declarations, I suppose, but, again, isn't the question whether, assuming that everything, every fact that you allege is correct, is true, or it would be found true after an evidentiary hearing, if it still would not result in a sufficient ground to set aside the judgment, then the Government's motion would be good?

MS. WILKINSON: That's correct, Your Honor. What makes it a little more complicated in this case is that many of the factual issues that we have raised are not discrete; they actually are pervasive throughout the whole trial.

I think actually there was some discussion on whether an issue went to the guilt and innocence phase or penalty, and I think both the judge and Mr. Giorno agreed that actually it went to both phases, so it makes it more difficult when the court is trying to resolve an issue of prejudice because you can't just look at that isolated issue within that isolated framework. The court has to consider, for example, the totality of the mitigation that has been presented and how that specific allegation, you know,

changes that totality.

So, for example, some of the factual disputes here, one of them, in fact, the Government just ended on is the parties dispute strongly whether Mr. Caro suffers from a brain impairment. The parties dispute whether the Bureau of Prisons could house Mr. Caro at ADX for more than three to five years. I think I'll address this in a little more detail, but I think it's disingenuous for the Government now to say their only testimony was that this was a goal, and that it wasn't what happened at ADX. And I'll get into that in more detail.

The parties dispute the reasonableness of counsel's decisions. The Government has conceded in its motion that, that without an evidentiary hearing this court doesn't know what trial counsel's reasons were. We have alleged that counsel's decisions were unreasonable, but not strategic. This court has no way to determine that now without further evidence.

And then finally, again, this piecemeal approach is contrary to the law in *Strickland*, it's contrary to the law in *Brady*, it's contrary to the law in *Williams*, it's, it's also contrary to the law of the Fourth Circuit case of *Elmore* v. *Osmond* which is a 2011 case addressing *Strickland's* claims.

And under the law, we believe that the correct approach

for any sort of analysis here has to be, the court has to consider, as I said, all of the mitigation, and all of the errors in looking at the prejudice. And that cannot be determined in isolation until the court has identified all of the errors, and the court can't, it's our position, the court can't identify all these errors until the evidentiary hearing has been completed and further factual development has been concluded.

And as always, I think the guiding principle is did the errors infect the trial such that Mr. Caro was denied his due process right to a fair trial. So that's the guiding principle for all, all of the alleged errors regarding the type of error.

I guess I'd like to briefly address the points raised by both the court and the Government in its time. The first claim that the court asked about was claim one which had to do with tactical delay. And I guess the test for that, as we've set out, Your Honor, is whether or not Mr. Caro has shown actual prejudice. At this stage has he alleged prejudice from that? We believe we have alleged sufficient prejudice on that. And I would just rely on our papers for that.

THE COURT: Tell me, though, about, what was done wrong? What was the problem? I mean, what should the Government have done in relation to the prosecution of

Mr. Benavidez?

MS. WILKINSON: Several things, Your Honor --

THE COURT: The prosecution involving that case.

MS. WILKINSON: Correct. First of all, Your Honor, they shouldn't have misrepresented the case to the court.

THE COURT: Wait, wait, wait. Misrepresented what to the court?

MS. WILKINSON: In one hearing before the court, I believe that it was in the change of plea hearing for Mr. Moreno-Marquez, the Government represented that it had a very strong case, that it had video, taped videos, it had DNA evidence, it had witnesses, it was a very strong evidence.

At the time of Mr. Moreno-Marquez's sentencing, which was, I believe, a day or two after Mr. Caro's sentencing, this court sentenced Mr. Caro to 327 months, and then when it came time to sentence the co-defendant, who had participated equally in the assault, the court was concerned and said, "Well, why should I allow this man to plead to possession of weapons and to a much shorter sentence when the co-defendant, I gave him just the other day 327 months," and that was an appropriate question, especially assuming the fact that Mr. Caro had 12 criminal history points, Mr. Moreno-Marquez had as many. I believe he had 26

criminal history points.  There was nothing in the record to indicate that there was a difference in culpability, although the Government alleged Mr. Caro was more culpable. But there's no evidence to support that claim.

And the other, the other part of that is the Government also did not inform the court that another co-defendant, Mr. Tijerina, actually was the one who planned the assault, and ordered the assault because he wanted to become leader. Benavidez, at that time, was the current leader of the Texas Syndicate at USP Lee.  And this is all according to the Government's witnesses, Your Honor --

THE COURT:  How would any of that prejudice Mr. Caro?  I mean, suppose, suppose I had, I had given his co-defendants more time or Mr. Caro less time, what difference would that have made, or could have made?

MS. WILKINSON:  For example, if you allowed Mr. Caro to plead possession of a weapon similar to Mr. Moreno-Marquez, then he would have had no other prior crime of violence other than possession, which I guess in some circuits can be considered that --

THE COURT:  I don't get to decide who gets to plead to what.  The Government is in charge of placing the charges against the defendant.

MS. WILKINSON:  That's exactly right, Your Honor, but Mr. Moreno-Marquez and the others also had been charged

with conspiracy to commit murder. However, at the end we had a one person conspiracy, Mr. Caro, because the Government allowed everyone else to plead to possession of weapons. They now say, "Oh, well, it wasn't their fault because Mr. Moreno-Marquez proposed the deal." I think that's disingenuous, Your Honor. The Government always controls what the offers are in these cases.

THE COURT: Again, I'm having a problem -- I'm sorry, maybe I, I'm not communicating very well. How did it harm Mr. Caro, what his co-defendants, co-conspirators in that case were allowed to plead to or got?

MS. WILKINSON: What harmed Mr. Caro was his sentence, Your Honor, and maybe this is the point that you're getting to. And he was harmed because the Government delayed in notifying this court that it was proceeding with a capital case, and that, and that the court should secure counsel for Mr. Caro. It did not make that request until after it had secured this disproportional sentence for Mr. Caro. Had the Government come forward to this court before that and said, "Your Honor, we have this case, but there's another case that's out there, too, that we plan to pursue; in fact, we've already impaneled a grand jury on this and we're collecting evidence as it is now."

THE COURT: What difference would that have made?

MS. WILKINSON: I think if he had capital counsel,

there's no capital counsel that would have allowed Mr. Caro to plead to conspiracy to commit murder that would have been an aggravator --

THE COURT:  So, he would have gone to trial on this, that charge?

MS. WILKINSON:  He would have gone to trial, that's correct, Your Honor.

THE COURT:  And the evidence is he likely would have been convicted.

MS. WILKINSON:  Well, Your Honor, we believe if he was convicted, similar to another case before this court, the Garcia case, I think Alcantaro was the name of the alleged victim, very similar, supposedly videotape, stabbing, but that case did go to trial and the defendants were acquitted of the more serious conspiracy to commit murder charge.  I think they were found guilty of possession of weapons, and it was the same sort of thing with superficial wounds.  Mr. Benavidez had a lot of wounds, none of which were that serious.  He was taken to the hospital, he was kept there overnight for observation, and then released.  I think the same sort of case could and would have been presented in Mr. Caro's case had capital counsel said this is ridiculous; you're setting him up for a death sentence in this case --

THE COURT:  So, your contention is that the

Government should not have, should have obtained the appointment of capital counsel for Mr. Caro before it proceeded with the Benavidez case?

MS. WILKINSON: That is one of the claims, yes, Your Honor. And again, the, at this point I believe that we have the claim that's not patently frivolous, and we have sufficiently pled it, such that the claim should survive to move forward.

THE COURT: What evidence would there be, though? I mean, isn't that the facts? What more would we know after an evidentiary hearing?

MS. WILKINSON: Well, I think we would hear the testimony of Mr. Hammond that would say that it was unreasonable of Mr. Dene to allow this to go forward. Mr. Hammond, the *Strickland* expert, would testify that a capital attorney would never have, would have advised Mr. Caro against going forward with this plea agreement.

We have requested in our discovery some of the e-mails which the court discussed earlier. We attempted to very narrowly tailor that request. We don't want to invade on all of the work product; we just want anything that goes to the timing. For example, if the Government had an e-mail saying early on in the year, "We plan to prosecute Mr. Caro for the capital case, but I don't think we should go forward with that now because it just, let's go ahead and get this

sentence done and we'll have a great aggravator, and we can proceed like that." I think that sort of evidence, and that's what we requested in our discovery, evidence there goes toward the timing, not why, but the timing of their decision.

THE COURT: All right. Go ahead.

MS. WILKINSON: Judge, moving on to the claim about ADX, again, it's disingenuous for the Government not to say Hershberger said it was only a goal. As the Government said at the very end, you know, there was no prejudice because it came out at trial that a select few inmates were there longer than three to five years, but that's, that misses the point, Your Honor. We're not saying there was one or two exceptions, that came out at trial, Mr. Silverstein was an unusual case who was there longer. What we are finding now is that, I think, our latest numbers, we have found that there were, we've discovered, and this, again, we don't have all of the available information, this is what we've been able to glean from various public sources that have recently become available, we know of 155 inmates that were incarcerated more than three years. That's not one or two, or a select few; that's a substantial amount. And 126 of these are still at ADX. At the time of Mr. Caro's trial we presented evidence that 79 inmates had been incarcerated more than three years.

Sixty-three had been incarcerated more than five years. So, the evidence is not that one or two people were there more than three to five years. The evidence is that many inmates were there more than that. And the fact that ADX had a goal was very misleading because they never followed that goal. And that didn't come out. And, in fact, we cited statements by Hershberger in our pleadings, and we also cited the Government's argument at the end that says, where they argue that everyone agrees, everyone's experts agree that this man is getting out in three to five years. That was the intent of the testimony. That was the argument. And that was flat out false, Your Honor. And we've now been able to present evidence showing that that was false.

And as I said, we've even narrowed it down to BOP homicide cases. And again, we have found that 54 inmates have been continuously designated to ADX since their initial placement there, and these are inmates who have, for the most part, been convicted of BOP homicides. And that includes 22 that were there at the time of Mr. Caro's arrival.

If you narrow it down to cases where the Government sought death but eventually got life, we found ten cases nationwide. Nine of those ten have been continuously housed at ADX, not three to five years and moved, and the only inmate that hasn't suffers from schizophrenia. And

according to the rules at ADX he was ineligible.

As far as the situation with Mr. Bland, we do contend, and we do allege that the Government hid the ball and misrepresented the situation.  It's, the Government knew that Mr. Bullock had a cellmate three years before trial, they knew that when Mr. Bullock testified in his grand jury, yet there was no interview form, nothing to indicate -- the Government, when they produced the list of SHU inmates, they didn't say, "Well, this is what we have on the 19, but we also know there was somebody who wasn't on the list who wasn't there, too, because we, we know Mr. Bullock had a cellmate.  He's not on the list because we don't have the exact date, but here it is."  Later on, when they produced the grand jury testimony it was attached to a letter that said, "Oh, we've also, we also interviewed all of the SHU inmates and we've attached their mass interview forms." Again, they're saying, "Here it is; we're giving it all to you," and they don't give anything from Mr. Bland, and they don't say, "Oh, by the way, we haven't included Mr. Bland's, but he was there."  It's very misleading.

THE COURT:  Well, I mean, isn't it true, though, that defense counsel knew that, or should have known that he did have a cellmate?

MS. WILKINSON:  We allege that also, Your Honor. One month before, there were records there that, had they

scoured through the records with a fine tooth comb, they would have discovered it in the SHU logs.

THE COURT: They knew it when they got his grand jury.

MS. WILKINSON: They knew it at that point, and we allege at that point they should have said, "Oh, Your Honor, wait, wait, wait. There's new evidence here. Move to continue the trial." And do whatever they did. They just missed it. There's no strategic reason.

THE COURT: What was the prejudice to Mr. Caro? You know, your *Strickland* expert says that this was the most important thing that led to Mr. Caro's death penalty, that this was it, that Mr. Bland had, if Mr. Bland testified Mr. Caro would not have received the death penalty. Isn't that right? Isn't that what he says?

MS. WILKINSON: He says something similar to that. I don't have the quote in front of me, but you are correct.

THE COURT: I think he said it pretty close to what I said. Isn't that extravagant, at the least?

MS. WILKINSON: It's your decision, but if you look at the facts that he alleges, the only purported eye witness to this offense, the Government cited his testimony repeatedly, and we put that in, we've cited all, I don't know how many there are, 12, 15, I don't know how many, repeatedly, he snuck up behind him, this wasn't a fair

fight, he ambushed him from behind, from behind, snuck up, snuck up, and the Government took the unusual step to having a character witness to say this man is very truthful, and that's not very typical --

THE COURT:  All Bullock said was, in fact as he was cross examined about it, he thought they were tussling. He said for a second or half a second he saw Mr. Sandoval, Mr. Caro behind Mr. Sandoval, and he saw this orange towel around his neck, and that disappeared from view in a second or half second.  That's essentially what he said.  How would you strangle someone if you didn't ambush them?  How would that happen?  I mean, I guess my point is, again, I'm just struck by your expert's opinion that this was the most significant thing in the whole trial.

MS. WILKINSON:  Well, I guess my answer --

THE COURT:  I guess my point is, didn't the Government have, I mean, there's no question that he, Mr. Sandoval, was strangled with a towel, with a hard knot.

MS. WILKINSON:  Correct.

THE COURT:  And obviously, Mr. Caro did it.  There wasn't anybody else in the cell.  And, I mean, what other inference is there?  I mean, nobody likely would let -- they weren't playing.

MS. WILKINSON:  They weren't playing.

THE COURT:  He had to surprise him to get the

towel around his neck and strangle him for two, three or four minutes is what the medical examiner said it would take.

MS. WILKINSON: To be honest, I haven't thought about the various ways you could strangle someone, but what I do know is that the tussling was in the first interview of Mr. Bullock. Later that story changed. I mean, initially he says he had his hands, and then the changed to the towel. It's like at various different stages his story changed. And I guess that Mr. Bland goes not only to what happened, but also would have been evidence that would have impeached Mr. Bullock.

We believe that we have sufficiently pled prejudice, Judge. And again, the other thing that I would make note of is that the prejudice has to be analyzed in light of the other prejudice, the other errors.

THE COURT: All right. Go ahead.

MS. WILKINSON: As far as the, there was discussion on Carlos' status as a gang leader. And again, Your Honor, our claim is not patently frivolous, which is the standard before this court. I'm typically a trial attorney, so I want to get in and fight all the facts, Your Honor, but I'm trying to hold back because that is not the question before this court. The question before this court is whether it has been sufficiently pled. Having stated

that, there are many factual disputes in this claim that preclude resolution on a motion to dismiss. We agreed that the evidence at trial that was presented was that Carlos was a leader at FCI Oakdale. Our expert, Mark Beazy (phonetic) disputes that for the reasons stated in the pleadings.

As far as the Government's claim, the Government denies that it withheld that it, well, that the Government believes, didn't believe Carlos was the leader of TS at USP Lee ever. The Government never believed that. They believed it had been Mr. Benavidez and Tijerina. Mr. Caro never contended to be the leader. The Government argued at one point he's not just a member of this dangerous, disruptive group; he's a leader. That's what they say in the, in the argument. One of them goes as far, I believe just weeks or a month before trial, in a transport document, the Government said, "Be careful. He's in bad standing with the gang."

Now, Mr. Kalista never saw he was in bad standing. There's a similar one which the, one of the officers said, "Whoever did this to Mr. Sandoval is in trouble. We've taken a vote and he's in trouble." None of that came to light to trial counsel. If Mr. Caro was not a leader at USP Lee, but actually was in bad standing, then the vast majority of the Government's penalty phase witnesses, their testimony was irrelevant because it focused on gang

communication, it focused on how dangerous gangs were, how you couldn't securely house gang members.  If Mr. Caro was in bad standing not only didn't he have the force of the gang behind him, he probably was a target of the gang.  I think 11 of their penalty phase witnesses talked in some manner about gang matters.

Regarding the IAC claim regarding DOJ death certification, the argument that the Government makes shows that it's a very fact intensive issue.  What we do know is that there was very little investigation that was done before that.  We claim there was an inadequate investigation.  Again, there's an issue of fact, that they submitted nothing in writing.  We do have testimony saying that that was unreasonable for them to do that, and contrary to what the Government says, nowhere does it say it was reasonable for them not to show their cards at this hearing.  Again, we've sufficiently alleged a claim.

I'm sorry, Judge --

THE COURT:  Let's see, you used an hour.

MS. WILKINSON:  I don't have much more.  I have 30 minutes?

THE COURT:  Yes, ma'am.

MS. WILKINSON:  There's a couple of minutes that I would like to address --

THE COURT:  I'm sorry, you haven't used an hour;

you've used half an hour.  I think it was 2:15 when you started.  Tell you what, I'll give you time to get your thoughts in order, and give us all a break.  We'll be in short recess.

(Recess from 2:47 p.m. to 3:00 p.m.)

THE COURT:  All right.  You may proceed.

MS. WILKINSON:  I'm not very good with math, especially under pressure.  Is it correct I have an hour left?

THE COURT:  Why don't you give it 45 minutes.  We also need to hear the discovery issue.  That will give the Government an opportunity to respond, stay within our time limits.  I'm not sure if I calculated it accurately when we started, but in any event, that would be great.  I'm not going to hold you to the exact minute.  But if you could try to do it that way, we'll finish in time.

MS. WILKINSON:  The next issue that was raised by the Government has to do with claim three, juror misconduct. The only point I'd like to make with that is the basis for our juror misconduct claim which we have alleged is that the jurors made statements in their voir dire that are inconsistent with what they say now, and it is that inconsistency that we have alleged that gives rise to the misconduct.  Again, we believe that we have sufficiently alleged the claim that's not patently frivolous.

For example, juror number 62 said in voir dire that she neither favored nor disfavored the death penalty. Now what she says is, "Oh, no, I'm strongly in favor of the death penalty where the evidence of guilt is obvious." Had she said that during voir dire, that would have been a basis for striking her. Similarly, juror 32 in voir dire said he would not automatically vote for death if he found the defendant guilty.

THE COURT: Let me ask you this. I've had a number of habeas cases, of course, and I guess in every capital case it's procedure for capital habeas counsel to go to the jurors and interview them. But I'm always interested in how that's presented. Do you, have you told these jurors what you're doing? I mean, how is that produced? How are their affidavits produced? I don't think I've had a capital habeas case, and I've had many, that hasn't had a juror declaration on a particular point. "If I had known this," or, "If this had happened," "If," and so on.

MS. WILKINSON: Procedurally how that happens, Your Honor, is our investigator goes out and talks to the juror and identifies herself and the fact that she's representing Mr. Caro --

THE COURT: I don't doubt that. I guess my bigger point is it just seems to me that it's, it's very tough for these jurors, of course, to sit in a capital case, but seems

to me that it's really tough for them after the fact to be presented by counsel, it's like polling, it depends on the question you ask, you know, "Did you know, Madam Juror, that if we had gotten evidence in, now that would have made a difference to you, wouldn't it?"  And what do you say as a juror?  Be cold hearted and say, "No it wouldn't have made any difference to me."  Or what do you say?

MS. WILKINSON:  Actually we've had jurors that say that.

THE COURT:  You don't file those.

MS. WILKINSON:  No, we don't file those, Your Honor.

THE COURT:  I don't know that you can answer that question, but it's always interesting to me.

MS. WILKINSON:  Judge, I guess those type of, of affidavits, they go to prejudice, would it have made a difference, we give them a hypothetical, knowing what you know would that have made a difference?  In our case I just want to make clear that that is not the only evidence of prejudice that we have put forward in our claims, that is just one portion of it, and it is just intended to show that a reasonable person could have reached a different result if they had known this.  It's not all of our prejudice, Your Honor; it's just one piece of it.

Regarding the, the claim about, that we have alleged

that the defense counsel did not provide a cohesive theory of defense, Your Honor, we believe that we've alleged a sufficient claim here.

The, at trial what you heard was what we call the breakfast dispute defense, which was basically two men in a small cell get in a heated argument over breakfast, and one man kills the other man. Not a very pretty story, Your Honor.

THE COURT: Well, what is the alternative story?

MS. WILKINSON: The alternative story is what we call the cold dose of revenge story, and the, quote, "cold dose of revenge" actually comes from one of the Government employees, Mr. Mrad, a gang investigator, and it was from his grand jury testimony when he is talking about the Benavidez case, and also a previous Texas Syndicate case that occurred before that, too. The grand jury is basically In Re: Texas Syndicate, and what he says at the very end, the jurors are saying, "Well, why if he was a leader, why did they hit him," and that's where he says, "No, Mr. Benavidez had been the leader," and then he says, "And it wouldn't be surprising for the people who hit him to be facing a cold dose of revenge as a result of this assault."

There was then also evidence at trial, I believe, Ms. Guzman, or whatever, there was basically some testimony that the Benavidez assault had not been a sanctioned hit.

Meaning that the gang had not approved it. Mr. Tijerina ordered it because he wanted to take over the gang, but there was a lot of internal tension. So, the cold dose of revenge story, Your Honor, is based on the fact that Mr. Caro, along with Mr. Moreno-Marquez, had hit, had assaulted the leader of the gang, and the gang was in turmoil, it was expected that there would be more -- in fact, the Government's SIS people in their report on Benavidez had recommended that Caro be isolated from all other TS members for that reason.

Now, that apparently was never communicated to the officers on the SHU because they did the exact opposite. They said, "Oh, yeah, they're in the same gang. Let's put them in the same cell."

THE COURT: But Caro accepted Sandoval, he said, "We're brothers. We've done time together."

MS. WILKINSON: At first he said no, and --

THE COURT: But he didn't know, he was just asked, as I recall he was asked, "Will you take a cellie?"

MS. WILKINSON: Your Honor, we don't know all of the facts. It was not established at trial whether he knew, or not --

THE COURT: We don't have another trial in this case.

MS. WILKINSON: No, Your Honor, but that's

evidence, I think, that would be pretty easy to get from Mr. Laster, or from the previous officer because, as I understand, standard procedure is for the inmate to gather up their belongings, walk beside the guard, go to the door, knock, knock, will you take this inmate, they can see, they know what's going on.  I don't know the answer, but --

THE COURT:  I think the facts here were that they had an influx of people, a bus had come, as I understood the testimony, he was seeing where there were cells that he could put these inmates.  You may be right, I don't know.

MS. WILKINSON:  We dispute that, and we dispute that for a couple of reasons.  There was no testimony at trial that that was the reason that the BOP attempted to place Mr. Sandoval in that cell.  There was no testimony about that, whatsoever, from the guards.  The only person who said that was Mr. Bullock who said, "Oh, yeah they wanted to put them in there because a bus was coming in." So, we dispute that.

But getting back to the theory, the cold dose of revenge --

THE COURT:  That's a speculation, I mean, maybe so Sandoval got into the cell in order to kill Caro.  But what is the evidence of that?  I mean, what, what could, could counsel, even with everything that we know now, have argued that in any way more than they could have argued the, this

was just a simple flare up, disrespect, and thus no premeditation?

MS. WILKINSON: Well, Your Honor, I guess the other facts are we know Mr. Sandoval was not a full member at that time; he was a prospective member. In order to become a full member he had to commit an act of violence. This would have been the perfect opportunity for that. We know the testimony at trial could have been from a gang expert, or from some of the Government's gang people, they would tell you this is a blood in/blood out gang. In order to do that you have to commit an act of violence, and yes, he was a prospective member.

The other evidence would have been -- well, I guess the point is I think there would have been as much evidence or more of a cold dose of revenge than heat of passion over a breakfast dispute that happened nine hours after breakfast.

THE COURT: Half dozen of one, six of the other. If they argued that wouldn't we be right here with you saying they made a terrible mistake, they argued somehow Sandoval was put in there to kill Caro, and there was no evidence of that, and they should have, in fact, argued that, you know, this just came up out of a sudden dispute in hot blood, and no premeditation?

MS. WILKINSON: I disagree, Your Honor. The reason I disagree is that as you go through, and you start

JA 1868

to put together the puzzle pieces here, the puzzle pieces fit the cold dose of revenge. Like I said, just the things I've talked about, plus the things in our pleading, the pieces didn't fit a breakfast dispute. The timing was off. There was no evidence of that. There was no motivation why, you know -- one point, the second point, Your Honor, is that the cold dose --

THE COURT: What do you mean the timing didn't fit?

MS. WILKINSON: Breakfast is in the morning, and if you're going to have a heat of passion it would seem that that would occur when the person wakes up and finds out that you ate my breakfast. Their position was that it boiled, it boiled, boiled, throughout the day. The Government's argument was premeditation, premeditation, premeditation throughout the day. So, it was a difficult argument.

The other thing, Your Honor, the cold dose of revenge would have explained Mr. Caro's statements, because if you're a gang member, as he was, you don't disclose gang issues so he's not going to tell anybody that this was a gang matter, "He attacked me because of my hit on, my assault on Mr. Benavidez." He can't say that. That would have been to violate the gang rules. He comes up with this story that says, about disrespect. And the Government's own agent, Agent Fender, when he was interviewing Carlos, he

tells him, he says, "You've told me this breakfast story. I don't believe you. I don't believe this story. I think it had something to do with the gang." What does Mr. Caro do? He says, "This interview is over. I'm not talking to you anymore." Those pieces all fit, Your Honor. And we've alleged them in our papers.

But the bravado, the court asked about the bravado, the statements, again, it wasn't just I'm the biggest, baddest hombre on the cell block, Mr. Sandoval went in there to assault Mr. Caro, whether he went in to kill, whatever. Our story is he went in there to get retribution for Benavidez because Mr. Caro had the audacity to try to hit the leader of TS. He went in there to try assault him. After it's done he needs to send a message out to other members of the gang, don't you try this, too, because it isn't going to work.

THE COURT: Why would he tell his wife and his girlfriend, I mean, why would he give them the same, you know, no remorse story, which he did?

MS. WILKINSON: Well, possibly several different reasons, Your Honor. One is that he's aware everything is being monitored by the BOP, so he knows every letter he writes is going to get opened, every phone call is going to be recorded. He doesn't have private space to do that.

The second reason would be, and I'm just totally

speculating here, Judge, but when you're, when you're acting and you have to walk the straight and narrow you don't change your story because you might slip up.  You get that story, you're in character, and you keep that story.  So, that fits the cold dose of revenge.  It explains the statements.  The impulsive breakfast doesn't fit with Mr. Caro's records.  He doesn't have the history of being involved in impulsive fights in prison.  He doesn't blow up.  That's not his personality.  So, the story fit with all the other facts that are out there and we have alleged.  They may not have been part of the trial record, but we have alleged them before this court and this needs to be considered.

Quickly, on BOP negligence, I think I've already talked about that.  The Government is ignoring the new evidence we presented as far as why that's negligence, including the Government's own report that says they shouldn't have been housed together.

The evidence regarding the mental health, there are several issues there, Your Honor.  We do dispute that Dr. Spica's exam says it doesn't show brain impairment, doesn't report it.  We think it clearly does, and the supplemental letter that we provided also helps explain that.

I think there was some confusion about the words brain

damage or brain dysfunction. Damage means that you had a good brain and that it was damaged because you hit your head against a tree, or something, whereas dysfunction or impairment refers to a life long problem which is what Caro's history shows. It shows in sixth grade he was placed in special ed. As a child he had learning delayed development. He couldn't tie his shoes at the age of seven. He's getting non-satisfactory in kindergarten.

But the Government raises the opinions of the prison officials. We've submitted the supplemental declaration of Dr. Schwartz-Watts who disputes that, Your Honor. Is that based on a ten minute discussion with Mr. Caro? It doesn't appear that there were tests. We believe that we have submitted more than sufficient evidence of brain impairment. And the Government says that when they came to the penalty phase they weren't, trial counsel wasn't left with much to work with, and we agree with that. And the reason, though, is because they had not done an adequate investigation up front. And the fact that they didn't even review Dr. Phillips' report until the penalty phase just enhances their negligence. If they knew they couldn't look at that report until the end, it behooved them to do even more up front investigation so once they got the report they would have someone in place, someone who knew the situation, Mr. Caro, who could then apply that to Dr. Phillips' report.

They hadn't done any of that.

Dr. Caruso they had hired initially for the guilt phase, for competency, for mens rea, as far as for the offense. He wasn't prepared to do a penalty phase. He wasn't prepared to put together the evidence of the childhood trauma, the evidence that Dr. Spica had. He just did strictly tests. They needed someone to put together Spica's results with the trauma history of his childhood, with all of the background evidence that they had, whatever mental health testimony they had to explain to the jury during the penalty phase, none of that ever occurred, and it's our contention that, Your Honor, that they were deficient in that, and it did prejudice Mr. Caro.

Again, if you think of it, the mental health issue becomes more relevant when you consider that in light of the fact that Dr. Spica said he's very suggestible, and then you put someone with the reasoning ability of a ten year old under the best of situations, he's in prison and gets involved in a gang, how he responds to that and how he reacts, we believe, lessens his culpability.

All right, Your Honor. Quickly moving on, two other points that I wanted to address, the claims we feel could be resolved by the court in a motion to dismiss are claims that are record based, and there are some totally record based claims, Your Honor. Claims eight, 9A, 9B, 9D and 15, we

believe all of those are just record based.  We have nothing to add to those claims.

So, if you conclude, based on the record before you, that Mr. Caro has, if the files and the records conclusively show that he's entitled to no relief, then that's appropriate, but the other claims, Your Honor, they either involve disputed facts, which precludes summary dismissal, they involve the introduction of new facts, allegations, which similarly preclude summary dismissal, and even some of the systemic challenges, we have attached new evidence and we would like the opportunity to present evidence in support of these new factual allegations.

Finally, I wanted to briefly talk about this issue of the court's analysis of prejudice because it's, it's, there's a dispute on that between parties, Your Honor, and whether the court should impose or analyze this with a cumulative analysis, or whether it's an isolated analysis, our position is -- let me start first, the proof necessary for this court for reversible error, *Strickland* requires a showing of prejudice, *Brady* errors require a showing of prejudice, and all other errors, trial court errors.  In, as to the *Strickland* errors, we believe that actually the *Strickland* case directs this court to do a cumulative analysis of all errors.  It's, *Strickland* speaks in terms of errors, plural.  It doesn't say one error in *Strickland*,

there are six different IAC claims, the court analyze those errors, and similarly the Fourth Circuit in *Elmore* v. *Osmond* applies a cumulative analysis. *Brady* does not dispute that a cumulative analysis is appropriate, and as to all other others, there's the case of *U.S.* v. *Woods*, a recent Fourth Circuit case that, again, talks about the cumulative error analysis in the context of court errors.

So, if the court has any more questions on the capital case --

THE COURT: I don't believe so.

MS. WILKINSON: I'd like to quickly move to the Benavidez case and the discovery motion. Our position in the Benavidez case was that it was timely filed, and if it was, was timely filed we would ask the court to delay its ruling on that unless it resolves the similar issues in the 2255.

There are two factual positions that overlap, and it's our position will require an evidentiary hearing. The first is Caro's mental impairment and capital counsel's ineffective assistance, both of which constitute --

THE COURT: Let me ask you, what could capital counsel have done with respect to the Benavidez case?

MS. WILKINSON: They could have done what we've done, Your Honor, only they could have done it a lot sooner than we did.

THE COURT: Well, I mean, in other words, argued that the Government set this up, and so, I mean, what would that have meant? I don't understand, you know, practically speaking, what anybody would have done to have set aside the guilty plea and judgment in that case.

MS. WILKINSON: Actually, the main focus here is on Lou Dene's failure to properly advise Mr. Caro.

THE COURT: Well, I understand, but that's a problem where the statute of limitations is, and I understand you have an argument there, but what would, what was wrong, what did capital counsel in the capital case do wrong?

MS. WILKINSON: They should have challenged, they should have challenged in a timely manner this conviction based on Lou Dene's ineffective assistance of counsel. Had they done that, and had they been successful, then that would have removed that aggravator from the capital case.

THE COURT: And what would the grounds of ineffective assistance of counsel been?

MS. WILKINSON: Failure to adequately advise Mr. Caro of the collateral consequences of the plea, and basically he, he did not advise him that this plea was really ill advised because it was setting Mr. Caro up for the death penalty, essentially. And we figure, we, that, I can't imagine a more serious collateral consequence, Your

Honor.

THE COURT:  So, they would have filed a 2255, they should have filed a 2255, and that is an independent ground that allows escape from the statute of limitations?

MS. WILKINSON:  They might have been able to do it within the one year, depending on how the court defines the one year.

THE COURT:  No, no, it gets around the statute of limitations in the present Benavidez case, the 2003 case.

MS. WILKINSON:  Correct.  Our argument is that there's two extraordinary circumstances for equitable tolling, Your Honor.  You have to have diligence, prove diligence, and that there's some extraordinary circumstance that stood in Mr. Caro's way and prevented him from filing timely, or counsel.  Our position is the first extraordinary circumstance is his mental or brain impairment.  The Government does not dispute that he has a serious mental disorder, or at least I didn't think they did, and they don't dispute that that can constitute extraordinary circumstances.  But they argue, they apparently, without presenting any expert evidence, they apparently say, "Well, it wasn't severe enough because he wasn't incapacitated."

Your Honor, I'm not a mental health expert, and I have no evidence that the Government prosecution, prosecutors are mental health experts.  This is an issue that the court

needs expert testimony on.  We've provided evidence that Mr. Caro has the reasoning ability of a ten year old, so I suppose the court would have to conclude that the ten year old has the ability to file a 2255, and that's a ten year old with serious limitations.  The other --

THE COURT:  Is the law to the effect that if you don't, if you don't understand your right to file a 2255 that the statute of limitations doesn't apply?  Wouldn't that apply to about 90 percent of our prison population?

MS. WILKINSON:  You're right, Your Honor.  The test isn't a misunderstanding of the law or failure to appreciate the law.  That is not the test.  There has to be something above and beyond that.  Here our argument is that Mr. Caro's brain impairment, and the reasoning ability of a ten year old, made it impossible for him to file a 2255.

THE COURT:  So, he was incompetent to be tried?

MS. WILKINSON:  No, we're not making that allegation, Your Honor.

THE COURT:  All right.  Go ahead, ma'am.

MS. WILKINSON:  And again, we've submitted evidence showing brain impairment, cognitive dysfunction from both a neuropsychologist and psychiatrist, and we've also submitted his school records showing he was in special education in sixth grade, and had obviously developmental problems and difficult in school until tenth grade when he

dropped out.

We reject the Government's contention that somehow the plea agreement in Benavidez shows he was not mentally impaired. In fact, we contend the exact opposite. That plea agreement was completely against Mr. Caro's self interest. There was nothing for him to be gained in it, and everything to be lost. And it does not show an ability to show a reasoned judgment, but the opposite.

The last point there is that the Government argues that the IAC of Mr. Caro, capital counsel is not an extraordinary circumstance because he had appellate counsel. He had a federal public defender appointed to represent him in the appellate case. This involves facts outside the -- the appellate counsel are not authorized or equipped to investigate facts outside the record, and the appeal would not have been an appropriate forum to raise this claim. In fact, I believe they asked the court for an evidentiary hearing on one of his discovery issues, and they said no, of course you can't have an evidentiary hearing here. This claim involves facts outside the record, and it would not have been appropriate in the appeal.

Your Honor, I'm going to try to leave 15 minutes for Ms. Spence.

MS. SPENCE: May it please the court, I'm happy to start with one area that we agree on. We're not asking the

court to rule on this discovery motion before ruling on the merits of the motions to dismiss. We are just getting it in now so that we're ready to go forward quickly and expeditiously once the issues have been --

THE COURT: Tell me your understanding of the standard for granting discovery in a 2255 case.

MS. SPENCE: The standard is you have to show good cause, and that has been specifically defined by the Supreme Court as where there are specific allegations before the court that show reason to believe the petitioner may be entitled to relief if he can prove those facts, then he's entitled to discovery with those facts.

THE COURT: Will, it's not the same as discovery in a normal civil case. Don't you have to have some reasonable grounds to believe that you will find the information that is helpful?

MS. SPENCE: Exactly. And that's why, as the court noted earlier, on issues where even if all the facts are accepted as true, if there's no legal grounds for relief, there's no, then you can rule that the, at the motion to dismiss, and there's no evidentiary hearing and no discovery. But certainly on any issue where there's a factual dispute and a credibility issue, then under the language of 2255(b) the court shall grant an evidentiary hearing to resolve those issues, and the Supreme Court has

said that if there's going to be an evidentiary hearing that is strong evidence that discovery is also appropriate on those issues.

THE COURT: Well, I again, I guess it depends, doesn't it, on a 2255 case depending on what it is you want to discover. It's certainly true that discovery is possible, but there has to be good cause to believe that you can find something that will be relevant to the issues --

MS. SPENCE: Absolutely. That's why in the motion we've endeavored to make it very clear what specific issues we're directing our discovery requests to.

THE COURT: Get back to a topic we discussed earlier, you want to find and see if there are any e-mails or memoranda that Government counsel has in this case as to the sequencing for the capital case vis-a-vis the Benavidez case, but you don't know that there are any such memoranda, or have any idea, any reason to believe there are any such memoranda, right?

MS. SPENCE: We don't know what memoranda do or do not exist. We don't know what discussions were or were not had. We do have the very strong circumstantial evidence that led to the factual allegation. When the court asked the prosecutor at the sentencing hearing of Moreno, you know, why should I accept this agreement and give them 58 months when we just gave Mr. Caro, for the same conduct, 327

months?  And at that point, well, you were told the video wasn't a very good quality, we have an uncooperative victim that doesn't want to testify, and all those reasons that they couldn't really make a good case on this, and that's not disclosed until after Mr. Caro has already been sentenced.  It's only then a month after he's sentenced for the Benavidez case it's brought to the court's attention we're ready to proceed on this capital case and we'd like to appoint him counsel now.

So, we have raised a legal theory.  There might be evidence to support it.  If the facts that we allege to be true can be supported we're entitled to the opportunity to make that presentation, and that's what good cause amounts to in a 2255 case, recognize it's got to be a little bit flexible to prevent a miscarriage of justice where someone's life it as stake.

THE COURT:  All right.

MS. SPENCE:  I would next note that the Government, with the exception of the arguments they raised, that they filed, they don't appear to oppose the request for discovery, if the issues that the discovery targets are allowed to proceed past the motion to dismiss.  I would respond to the items they did object to.  First they said that the request to depose Mr. Mountcastle was a fishing expedition.  We respectfully disagree.  A fishing expedition

is when you hope you will find some facts that will help you figure out a claim to make. We've made the claim. We know what facts we're looking for. That's a request for discovery that's narrowly tailored to the issue we have already raised.

There's also the issue of discovery might be premature. Again, we're not asking for the court to approve discovery before it's ruled on whether or not the claim is sufficient to proceed beyond this point.

And then the last one that they objected to was the underlying Dr. Phillips' opinion in the case, and say because our theory is that defense counsel should have presented a mental defense and didn't, they weren't entitled to those reports because they didn't present the defense.

But at this stage we not only have to prove that what they did was unreasonable, we also have to prove that they were prejudiced by it, and that includes being able to consider what evidence they would have introduced and what evidence was underlying that opinion.

We've already filed, in some of our affidavits, reasons that our experts would say now Dr. Phillips' opinion wasn't addressing the right issue, and therefore wasn't really rebutting what Dr. Spica said in the first place. But if the evidence, he relied on evidence we need to get that in our case to present a mental health defense and the

circumstances that were present.

Unless the court has any questions, that's all I have to say.

THE COURT:  Thank you, Ms. Spence.  Yes, ma'am?

MS. WILKINSON:  Can I have five minutes, Your Honor?

THE COURT:  Sure.

MS. WILKINSON:  I just want to remind the court this is an early stage in this 2255 proceeding.  The Government has not yet answered, no discovery, there's been no evidentiary hearing, and this is a capital case.

As the Supreme Court said in *Kyles*, the court's duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case.  The Government seeks to end this capital case through summary dismissal precluding Mr. Caro from any opportunity to actually prove his claims.  As stated earlier, the law in effect did not support summary dismissal and we would ask the court to deny the Government's motion.  Thank you, Your Honor.

MR. MOUNTCASTLE:  On the non-capital matter, Your Honor, just one item I wanted to raise with the court.  This case is appropriate for a motion to dismiss because it's untimely, and it's untimely on the face of the pleadings, and even accepting, for purposes of the motion, the issue or

the fact that Mr. Caro might have some mental issues, and the fact that capital counsel may have, or Mr. Dene, his attorney, may have erred in some form or fashion, there's still a five and a half year hole in the case from August 22, 2007 when new counsel was appointed relieving both Mr. Dene and Mr., and his capital counsel of their responsibilities, to January 13, 2013 when the 2255 was filed in this case, there's a five year hole, and Mr. Caro was represented throughout that entire time by counsel. And there's no explanation for why he was not advised to file a 2255, or one was not filed on his behalf during that time frame.

And so the, there's no equitable tolling appropriate in this case, and we'd ask the court to dismiss the 2255 in this matter.

THE COURT:  All right.  Thank you.  Mr. Giorno?

MR. GIORNO:  Your Honor, I only have two brief points with regard to the capital case, and one with regard to discovery.  The first one is defense counsel --

THE COURT:  If you wouldn't mind moving your mic.

MR. GIORNO:  Your Honor, the first point I have related to the capital case relates to a statement that Ms. Wilkinson said, that the Government somehow miscomprehended a standard of review at this stage.  I understand exactly what the standard of review is.  We have

to accept what they say as being factually accurate. What I disagree with is their assertion that somehow the mere statement by an expert concerning what should have been done or could have been done, that that creates a legitimate issue about whether trial counsel was effective. I don't agree with that.

I also don't agree with counsel's speculation about what Mr. Sandoval went in the cell for, what he was going to do. I don't think that creates a legitimate factual issue. That's what my disagreement is. But I do not disagree on the standard to be applied in assessing their claims.

The second issue I have concerns about, they are asking for an evidentiary hearing based on this new evidence, as they call it. And you know that loses sight of the fact that we're assessing the performance and competence of trial counsel with the information that they have, and what they did in connection with this case, and we would submit to the court defense counsel did everything they could or should have done. They got mental health experts, they talked to them, they got mitigation experts, they chased down all those leads. In fact, the fact that they didn't find the right one that was going to say what they were going to do isn't necessarily dispositive in the, an ineffective assistance of counsel claim. I'd ask the court to look at what counsel did as to whether or not this is ineffective

assistance of counsel. Of course, the court can make its own assessment. They have to satisfy both prongs. And if you take everything they say as true, they still don't satisfy the prongs. And I think the court can make that decision without an evidentiary hearing.

One point I want to make on discovery, Ms. Spence said the Government doesn't oppose the discovery request. If I said that, it was not what I intended. What I meant to say was that until the court articulates what, if any, issues remain, the rule does contemplate limited discovery. It's tailored to those specific issues identified by the court. I can't know whether these requests are valid or invalid until I have a ruling from the court. I don't mean to say every claim in this case is okay except for that one point. Thank you, Your Honor.

THE COURT: All right. Well, thank you, counsel, for your arguments. They've been helpful to me, and I will, of course, take the motions under advisement and issue a decision just as soon as I'm able. And if there's nothing further, then, we will adjourn court.

(Proceedings concluded at 3:43 p.m.)

CERTIFICATE


    I certify the foregoing is an accurate transcript

from the record of proceedings in the above-entitled

matter.




5/30/14                        /s/ Bridget A. Dickert
Date                            U.S. Court Reporter

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | Case No. 1:06CR00001 |
| | ) | |
| v. | ) | **OPINION** |
| | ) | |
| **CARLOS DAVID CARO,** | ) | By:  James P. Jones |
| | ) | United States District Judge |
| | ) | |
| Defendant. | ) | |

*Anthony P. Giorno, Acting United States Attorney, and Jean B. Hudson, Assistant United States Attorney, Roanoke and Charlottesville, Virginia, for United States; Dale A. Baich and Robin C. Konrad, Assistant Federal Public Defenders, Office of the Federal Public Defender, Phoenix, Arizona, and Fay F. Spence and Brian J. Beck, Assistant Federal Public Defenders, Roanoke and Abingdon, Virginia, for Defendant.*

## TABLE OF CONTENTS

I.    BACKGROUND .................................................................................... 5

II.   STANDARDS OF REVIEW ....................................................................17

III.  ANALYSIS    ........................................................................................21

    A.    CLAIM I:  STRATEGIC DELAY OF THE INDICTMENT ............................21

    B.    CLAIM II:  DEPRIVATION OF EFFECTIVE ASSISTANCE
        OF COUNSEL AT THE DEATH CERTIFICATION STAGE ..........................24

    C.    CLAIM III:  JUROR MISCONDUCT ......................................................26

D.    CLAIM IV:  INEFFECTIVE ASSISTANCE OF
      COUNSEL DURING GUILT/INNOCENCE PHASE ......................................31

      1.    *Cohesive Theory of Defense*......................................................32

      2.    *Impeachment of Sean Bullock*...................................................34

      3.    *Prison Culture and Cell Placement* ..........................................36

      4.    *Self Defense, Second-Degree Murder, or
            Manslaughter* ............................................................................37

      5.    *Cumulative Error* ......................................................................39

E.    CLAIM V: *BRADY* VIOLATIONS CONCERNING BULLOCK.......................40

F.    CLAIM VI: INEFFECTIVE ASSISTANCE
      OF COUNSEL DURING PENALTY PHASE ..................................................41

      1.    *Failure to Challenge Delay of Indictment* ...............................41

      2.    *Failure to Develop A Compelling Mitigation Story* ................42

      3.    *Failure to Challenge Government's
            Evidence that Caro was a Gang Leader* ...................................47

      4.    *Failure to Challenge Government's Evidence
            Regarding BOP's Ability to Control Improper
            Inmate Communications* ...........................................................49

      5.    *Failure to Present Evidence on Prison
            Culture and Statements of Remorse*..........................................51

      6.    *Failure to Challenge Conviction for Conspiracy
            to Commit Murder Related to Benavidez Assault*.....................52

      7.    *Failure to Present Skipper Evidence* .......................................54

      8.    *Failure to Present Evidence of BOP Negligence
            Regarding Decision to Place Sandoval in Caro's Cell*............55

JA 1890

9.     *Failure to Object to Government's Evidence on Specific Instances of Violence by Persons Other than Caro* ...............................................................................57

10.    *Failure to Object to Improper Arguments During Government's Closing*.................................................58

11.    *Failure to Move to Strike Sleeping Juror* ..............................60

12.    *Cumulative Error* .................................................................62

G.     CLAIM VII:  *BRADY* VIOLATIONS CONCERNING FUTURE DANGEROUSNESS ...............................................................................62

1.     *BOP Housing Information* ......................................................62

2.     *Information on Caro's Status as a Gang Leader*.....................73

3.     *Cumulative Violation* ............................................................76

4.     *Eighth Amendment Violation*.................................................76

H.     CLAIM VIII:  MINIMIZATION OF JURY'S RESPONSIBILITY.....................77

I.      CLAIM IX:  INEFFECTIVE ASSISTANCE OF COUNSEL ON DIRECT APPEAL ............................................................79

1.     *Failure to Challenge Refused Instruction* ..............................80

2.     *Failure to Challenge Exclusion for Cause of Qualified Jurors with Misgivings as to the Death Penalty* .........................................................................83

3.     *Failure to Challenge Trial Counsel's Failure to Object to Specific Instances of Violence Committed by Persons Other Than Caro* ..............................86

4.     *Failure to Raise Claim That Government Improperly Minimized Jury's Responsibility* ........................90

JA 1891

5.   *Failure to Raise Systemic
     Challenges to the Death Penalty* ...............................................90

J.   CLAIMS X-XV: SYSTEMIC
     CHALLENGES TO DEATH PENALTY ...................................................91

K.   CLAIM XVI: CUMULATIVE ERROR .....................................................94

IV.  CONCLUSION..............................................................................................95

A jury in this court convicted Carlos David Caro of the 2003 pre-meditated murder of his federal prison cellmate, Roberto Sandoval, and fixed his punishment at death. After an unsuccessful direct appeal, Caro now seeks relief from his conviction and sentence pursuant to 28 U.S.C. § 2255.

Caro's § 2255 motion raises 16 claims asserting that his conviction and sentence were unconstitutionally obtained. Among these claims, Caro contends that his trial counsel was ineffective at both the guilt and penalty phases, that his appellate counsel was ineffective on direct appeal, and that the government violated his Fifth Amendment due process rights by delaying indictment in this case until after it had negotiated a plea agreement in a separate case involving a conspiracy to murder another inmate. Caro also brings claims of juror and government misconduct, asserts systemic challenges to the death penalty, and asserts cumulative error. The United States has filed a Motion to Dismiss. Following briefing and oral argument, and after careful review of the record, I find

that Caro's claims are without legal merit. I accordingly find that the United States' Motion to Dismiss must be granted.

## I.    BACKGROUND.

Carlos David Caro was born into poverty in the south Texas town of Falfurrias in 1967. He grew up with three brothers, a mother, and a violent, alcoholic father. His maternal uncles introduced him at a young age to the illegal drug trade, eventually resulting in a series of federal drug convictions. He was convicted of possession of marijuana with intent to distribute and sentenced to 24 months custody in 1988, at age 21, when he and his brother were caught near the border transporting 66 pounds of marijuana. In 1992 he was found to have violated the terms of his post-imprisonment supervision and sentenced to an additional six months incarceration.

In 1994 Caro was convicted of conspiracy to possess marijuana with intent to distribute after he was found with 185 pounds of marijuana. He was sentenced to 71 months of imprisonment. Finally, in 2001 at age 34, he was convicted of possession of five kilograms of cocaine with intent to distribute and sentenced to 360 months custody, to run consecutively to a previously imposed 18-month supervised release revocation sentence.

While incarcerated, Caro became a member of a violent prison gang called the Texas Syndicate. In 2002, at the Federal Correctional Institution in Oakdale,

Louisiana, Caro participated in an attack on newly arriving inmates who were members of a rival gang. Prison official John Gordon had talked to Caro about avoiding conflict with the new inmates about three weeks before the incident occurred, but Caro "responded that the Texas Syndicate were going to do what they had to do." (Trial Tr. 168, Feb. 05, 2007, ECF No. 678.) After the incident, Caro admitted his involvement and stated, "I don't give a fuck if they send me to the United States Penitentiary. My brothers follow orders. They know what they're getting into. It doesn't even matter if we're prosecuted. I have 30 years to do. I certainly don't care about myself." (*Id.* at 171.)

Caro was subsequently transferred by the Bureau of Prisons ("BOP") from FCI Oakdale to the United States Penitentiary Lee County ("USP Lee"), a high security prison located in this judicial district. On August 29, 2003, he participated in another violent attack by members of the Texas Syndicate. Caro and Juan Moreno-Marquez, a fellow inmate and gang member, ambushed inmate Ricardo Benavidez in a recreation area of the prison and stabbed him multiple times with shanks before officers could intervene. Five other Texas Syndicate members were nearby and also armed with shanks, but had been denied admittance to the recreation area where the attack took place. Caro pleaded guilty in this court to conspiracy to commit murder and was sentenced on November 1, 2004, to 327 months imprisonment, to run consecutively to his other sentences.

JA 1894

The murder that is the subject of this case occurred only a few months after the attempted murder of Benavidez.  After the Benavidez incident, Caro was placed in USP Lee's Special Housing Unit ("SHU"), the segregation area of the prison.[1]  On December 16, 2003, inmate Roberto Sandoval was assigned to Caro's cell in the SHU.

Caro initially stated that he was "not accepting a cellmate."  (Trial Tr. 101, Jan. 29, 2007, ECF No. 668.)  However, he approved Sandoval as a cellmate later in the evening on December 16, 2003, stating, "That's fine.  We're brothers.  Done some time together."  (*Id.* at 116.)  Sandoval was placed in Caro's cell at approximately 9:00 p.m.

On December 17, 2003, Caro and Sandoval were served breakfast in their cell at approximately 6:10 a.m.  They took recreation outside that evening, and were last observed in their cell by prison staff during rounds at approximately 6:17 p.m.  No problems between the two were reported.

Shortly thereafter, at 6:40 p.m., a correctional officer came by on rounds.  Caro called out, "[G]et this piece of shit out of here."  (Trial Tr. 19, Jan. 30, 2007,

---

[1]  "Special Housing Units (SHUs) are housing units in Bureau institutions where inmates are securely separated from the general inmate population, and may be housed either alone or with other inmates. Special housing units help ensure the safety, security, and orderly operation of correctional facilities, and protect the public, by providing alternative housing assignments for inmates removed from the general population."  28 C.F.R. § 541.21.

ECF No. 670.)  Caro pointed at Sandoval, who was lying next to the cell door motionless, with blood visible and a towel tied with one overhand knot around his neck.  Other officers arrived and handcuffed Caro.  When asked whether Sandoval was still breathing, Caro replied, "No.  At this time he's stinking up the room, get him out." (*Id.* at 47.)

Caro later was interviewed by FBI Special Agent Douglas Fender, after having been advised of his *Miranda* rights.  Caro stated that he had killed Sandoval because he had eaten Sandoval's breakfast that morning, and Sandoval had cursed him and threatened to eat his breakfast the following day.  Agent Fender asked Caro whether Sandoval's murder had something to do with the Texas Syndicate. Caro denied that it did, and when Agent Fender continued this line of questioning, Caro stated to the guards, "Get me out of here."  (Trial Tr.  26, Jan. 31, 2007, ECF No. 674.)

Caro later made multiple statements about Sandoval's death.  The day after Sandoval's death, Caro smiled and asked when an officer was "going to assign him a new cellie."  (Trial Tr. 75, Jan. 29, 2007, ECF No. 668.)   In a letter, Caro wrote, "You know, I killed a guy two weeks ago." At the end of this sentence, he used a Spanish word that when translated suggests that he killed Sandoval "[f]or being a fool."  (Trial Tr. 58, Jan. 31, 2007, ECF No. 674.)   He also stated to his wife in a telephone call that "[Sandoval] called me a mother fucker, that whore, that's why I

-8-

JA 1896

fucked him up." (*Id.* at 49.) He later reassured her, "But I'm all right." (*Id.* at 51.) Finally, Caro discussed the murder with Roel Rivas, another member of the Texas Syndicate. He told Rivas on the phone, "And I also have a death," explaining, "It's because they gave me a cell mate and he disrespected me, so I took him down." (*Id.* at 53.) When Rivas proposed claiming self-defense, Caro said, "That is what I'm going to do." (*Id.* at 54.)

On December 30, 2004, the United States Attorney for this district sent a target letter to Caro related to Sandoval's murder, and contemporaneously requested that the court appoint counsel for him. On January 27, 2005, the court appointed James Simmons of Nashville, Tennessee, as lead counsel and Stephen J. Kalista, a member of the bar of this court, as co-counsel. In preparation for a meeting with the Attorney General's Capital Case Review Committee ("CCRC"), the court authorized counsel to retain a mitigation specialist, a private investigator, a neuropsychologist, and a psychiatrist. The meeting with the CCRC took place on June 6, 2005.

Following the CCRC meeting, the Attorney General authorized the United States Attorney for this district to seek the death penalty against Caro. On January 3, 2006, an Indictment was returned in this court charging Caro with first-degree murder within the territorial jurisdiction of the United States for the killing of

-9-

JA 1897

Sandoval, in violation of 18 U.S.C. §§ 7, 1111. Shortly thereafter, pursuant to 18 U.S.C. § 3593, the government filed its notice of intent to seek the death penalty.

Caro was tried in this court in Abingdon, Virginia, beginning January 22, 2007. Jury selection lasted five days. The guilt/innocence phase of the trial began on January 29. The government presented evidence suggesting that Caro had strangled Sandoval from behind with a towel. Inmate Sean Bullock, who had been in the cell across from Caro's, testified that he had seen Caro behind Sandoval, and watched them fall to the floor. The defense did not call any witnesses, conceding that Caro had killed Sandoval, but arguing that the killing had not been premeditated. In a verdict returned on February 1, 2007, the jury found Caro guilty of first degree murder.

The separate sentencing phase of the trial began on February 5, and lasted for six days. The jury was first asked to determine whether Caro was eligible for the death penalty. In addition to finding that Caro had committed a capital offense covered under 18 U.S.C. § 3591, the jury found that the government had established the existence of two statutory aggravating factors beyond a reasonable doubt: (1) that Caro had been previously convicted of two offenses punishable by a term of imprisonment of more than one year, committed on different occasions, and involving the distribution of a controlled substance, 18 U.S.C. § 3592(c)(10), and (2) that Caro had been previously convicted of a federal drug offense

JA 1898

punishable by a term of imprisonment of five or more years, 18 U.S.C. § 3592(c)(12).

Following the death penalty eligibility verdict came the final phase of the trial, where the jury heard evidence on mitigating factors and non-statutory aggravating factors to determine whether to select a sentence of either death or life imprisonment. The government presented 12 witnesses and alleged three non-statutory aggravating factors: (1) the impact on Sandoval's friends and family, (2) Caro's future dangerousness, and (3) Caro's lack of remorse. The defense presented eight witnesses, including six individuals from Caro's past, and two experts who opined that the BOP had the ability to safely house Caro if he received a life sentence. The defense asserted 22 mitigating factors.

In its verdict returned on February 13, 2007, the jury unanimously found that 12 mitigating factors proposed by the defense had been proved. It determined that Caro was (1) exposed to repeated instances of domestic violence growing up, (2) raised in a home where education was not valued, (3) raised in an impoverished community, (4) well-behaved growing up, (5) a special education recipient who did not complete the ninth grade, (6) shy and respectful compared to his brothers, (7) brought into illegal drug trafficking by his maternal uncles, (8) not physically abusive toward his wife or daughter, (9) not violent or aggressive until he received his 30-year sentence for drug trafficking, (10) not violent toward prison staff, (11)

-11-

not an inmate who attempted escape from any correctional officer or from any correctional facility, and (12) securely housed throughout his incarceration.  Some jurors found that four additional mitigating factors had been proved.  The jury also found that the government's three non-statutory factors had been proved beyond a reasonable doubt.  After assessing whether the aggravating factors sufficiently outweighed the mitigating factors, the jury unanimously determined that Caro should be sentenced to death for the murder of Sandoval.

No post verdict motions were filed, and the mandated sentence of death was imposed by the court on March 30, 2007.

A Notice of Appeal was timely filed.  Nearly three years later, on March 17, 2010, after briefing and argument, the court of appeals issued a detailed opinion that addressed each of Caro's challenges and affirmed the conviction and sentence. *United States v. Caro*, 597 F.3d 608, *reh'g denied*, 614 F.3d 101 (4th Cir. 2010). The court of appeals held that this court's refusal to offer certain voir dire questions proposed by Caro was not an abuse of discretion.  It also affirmed the denial of discovery motions under *Brady v. Maryland*, 373 U.S. 83 (1963), and Federal Rules of Criminal Procedure 16(a)(1)(E) and 17(c).  It held that (1) denial of a *Brady* motion was appropriate as Caro failed to establish that the requested information would be favorable to him, (2) denial of a motion under Rule 17(c) was not an abuse of discretion since Caro could only speculate as to the contents of

JA 1900

the requested information, and (3) denial of a motion under Rule 16(a)(1)(E) was not an abuse of discretion since Caro did not present facts indicating whether the requested information would have actually helped prove his defense.

The court of appeals addressed several additional challenges. It held that the government's closing argument did not cause prejudice warranting reversal. It determined that the jury instruction and the government's argument concerning lack of remorse did not violate Caro's Fifth Amendment privilege against self-incrimination, since given this court's cautionary instruction and evidence showing Caro's lack of remorse, any error would have been harmless under 18 U.S.C. § 3595(c)(2). It held that the statutory aggravating factors in § 3592(c)(10) and (12) did not violate the Eighth Amendment. It ruled that the decision not to give Caro's proposed mercy instruction was not an abuse of discretion given that the proposed instruction was legally incorrect. Finally, it held that various decisions by this court concerning the admissibility of testimony were not abuses of discretion.

On May 11, 2011, following the Fourth Circuit's affirmance, this court granted a motion to appoint the Federal Public Defenders for the District of Arizona and the Western District of Virginia to represent Caro in connection with post-conviction remedies, conditioned upon a denial of certiorari.[2] On January 9,

---

[2]   The Federal Public Defender for the District of Arizona has a Capital Habeas Unit, with extensive experience in federal capital habeas cases. *See, e.g.*, *Ryan v. Gonzales*, 133 S. Ct. 696 (2013) (representing habeas petitioner).

2012, the Supreme Court denied Caro's petition for a writ of certiorari.  *Caro v. United States*, 132 S. Ct. 996 (2012).

Through his appointed counsel, Caro filed a Motion for Collateral Relief Pursuant to 28 U.S.C. § 2255 on January 8, 2013.[3]  In response, the United States filed a Motion to Dismiss.  Caro subsequently filed a Response in Opposition to the United States' Motion to Dismiss.  Caro also filed a First Motion for Leave to Conduct Discovery and Preliminary Request for an Evidentiary Hearing and Expansion of the Record.  On November 25, 2013, oral arguments were held on

---

[3] I find that Caro's § 2255 motion was timely filed.  A person convicted of a federal offense has one year to file a § 2255 motion, starting from the latest of the following dates:

(1) the date on which the judgment of conviction becomes final;

(2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;

(3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2255(f).  Where a federal prisoner has filed a petition for a writ of certiorari with the Supreme Court, the date on which the judgment of conviction becomes final is the day that the Court "affirms a conviction on the merits on direct review or denies a petition for a writ of certiorari, or when the time for filing a certiorari petition expires." *Clay v. United States*, 537 U.S. 522, 527 (2003).

JA 1902

the discovery motion and on the United States' Motion to Dismiss. The issues have been fully briefed and are now ripe for disposition.

Through present counsel, Caro also filed a Motion to Vacate, Set Aside or Correct Sentence pursuant to 28 U.S.C. § 2255 in Case No. 2:03CR10115, related to the stabbing of Ricardo Benavidez. In that motion, Caro challenged the validity of his guilty plea to conspiracy to commit murder under 18 U.S.C. § 1117, alleging ineffective assistance of counsel. The United States filed a Motion to Dismiss, asserting that the § 2255 motion was untimely filed. I have addressed and denied this § 2255 motion in a separate Opinion and Order entered this day, but I will recount the relevant underlying facts here as follows.

In Case No. 2:03CR10115, a Superseding Indictment was returned on December 11, 2003, charging Caro and six other inmates with conspiracy to commit murder and unlawful possession of a weapon, arising from the August 29, 2003, stabbing of Benavidez. Caro and his codefendant Juan Moreno-Marquez, the only inmates who actually stabbed Benavidez, were also charged with assault with the intent to commit murder.

Pursuant to a plea agreement, Caro pleaded guilty to conspiracy to commit murder, while his codefendants, including Moreno-Marquez, pleaded guilty to possession of a weapon, also pursuant to plea agreements. Caro's Plea Agreement provided that the other charges against Moreno-Marquez would be dismissed, and

-15-

Moreno-Marquez was thereafter sentenced to 57 months imprisonment. On November 1, 2004, Caro was sentenced to 327 months imprisonment, to run consecutively to his current sentence. Caro did not appeal.

Caro's attorney in the Benavidez matter, Louis Dene, has submitted a declaration stating that he had advised Caro that the Plea Agreement provided him no real benefit. (Mot. Collateral Relief Ex. 3 ¶ 5, ECF No. 790-3.) Caro responded that "'he wasn't going anywhere,' so the long sentence did not matter to him." (*Id.* at ¶ 6.) Dene then went forward with the Plea Agreement, which benefited Moreno-Marquez and which Dene understood to have been proposed by Moreno-Marquez, Caro's fellow Texas Syndicate member. Dene did not advise Caro to reject the Plea Agreement. Dene was aware that the government intended to proceed with a death penalty case against Caro for Sandoval's murder, but did not advise Caro that any conviction and sentence in the Benavidez assault could be used against him in the death penalty case. (*Id.*)

The government listed Caro's conspiracy to murder Benavidez as an aggravating factor in its Notice of Intent to Seek the Death Penalty. In addition, the government pointed out during the penalty phase of the trial that Caro's prior federal prison sentences, totaling more than 57 years, constituted a life sentence for him. Based on that fact, the government argued, Caro would receive no punishment in the capital case unless death was imposed.

-16-

JA 1904

## II.    STANDARDS OF REVIEW.

In his present Motion for Collateral Relief, Caro asserts 16 claims, the majority of which incorporate multiple subclaims.  In support of these claims, Caro relies on the trial record and an appendix of additional evidence.  Before addressing these claims, I will outline the legal principles governing his petition.

My review of Caro's application is largely governed by 28 U.S.C. § 2255, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214.  Section 2255 provides:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

*Id.* § 2255(a).  Rule 4(b) of the Rules Governing § 2255 Proceedings provides that the courts must promptly review the § 2255 petition along with "any attached exhibits, and the record of prior proceedings" to determine if the petitioner is entitled to any relief.  If the court concludes that the petitioner is not entitled to relief, it must dismiss the petition.  Otherwise, it must direct the United States Attorney to file a response.  An evidentiary hearing is required "[u]nless the motion and the files and records of the case conclusively show that the prisoner is

-17-

JA 1905

entitled to no relief." 28 U.S.C. § 2255(b). In the case at hand, I have considered the record and relevant authority to determine whether an evidentiary hearing is necessary. I find that the record clearly shows that the petitioner is not entitled to relief, and that an evidentiary hearing is not needed.

An issue already considered and decided on direct appeal cannot be relitigated in a § 2255 motion. *See United States v. Linder*, 552 F.3d 391, 396 (4th Cir. 2009) ("Linder may not circumvent a proper ruling on his *Booker* challenge on direct appeal by re-raising the same challenge in a § 2255 motion."); *Boeckenhaupt v. United States*, 537 F.2d 1182, 1183 (4th Cir. 1976) (holding that issues previously decided on direct appeal may not be raised on collateral review).

A collateral attack under § 2255 is also not a substitute for direct appeal. Claims regarding trial or sentencing errors that could have been, but were not, raised on direct appeal are barred from review under § 2255, unless the petitioner shows both cause for the default and actual prejudice, or demonstrates actual innocence. *Bousley v. United States*, 523 U.S. 614, 622 (1998) ("Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either cause and actual prejudice, or that he is actually innocent." (internal citations and quotation marks omitted)).

Cause for procedural default "requires a showing of some external impediment preventing counsel from constructing or raising the claim." *Murray v. Carrier*, 477 U.S. 478, 492 (1986). Grounds for cause include "government interference or the reasonable unavailability of the factual basis for the claim." *McCleskey v. Zant*, 499 U.S. 467, 497 (1991). Attorney error can also serve as cause for default, but only if it amounts to a violation of the right to effective assistance of counsel. *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000). Prejudice requires a showing that "there is a reasonable probability that his conviction or sentence would have been different." *Strickler v. Greene*, 527 U.S. 263, 296 (1999).

Procedural default does not apply to claims of ineffective assistance of counsel or claims that rely on extra-record evidence. *See Massaro v. United States*, 538 U.S. 500, 503 (2003) ("[T]here is no procedural default for failure to raise an ineffective-assistance claim on direct appeal."); *Bousley*, 523 U.S. at 622 (recognizing an exception to procedural default for claims that cannot be presented without further factual development). Extra-record evidence is narrowly defined; not every piece of evidence introduced by the petitioner constitutes extra-record evidence. *Id.* (holding that there was no proper extra-record evidence because the factual basis for the claim could have been developed "fully and completely addressed on direct review based on the record created."). Procedural default is an

affirmative defense in the habeas context. *Yeatts v. Angelone*, 166 F.3d 255, 261 (4th Cir. 1999) ("[T]he issue of procedural default generally is an affirmative defense that the [government] must plead in order to press the defense thereafter."). Under some circumstances, however, a district court may raise the issue of procedural default sua sponte, despite the government's failure to present the defense. *See id.* at 261-62. Before deciding whether to exercise its discretion, "'the court should consider whether justice requires that the habeas petitioner be afforded with notice and a reasonable opportunity to present briefing and argument opposing dismissal.'" *Id.* at 262 (quoting *Magouirk v. Phillips*, 144 F.3d 348, 360 (5th Cir. 1998)).

Several of Caro's claims assert ineffective assistance of counsel. To prove that counsel's representation was constitutionally defective, a petitioner must show both (1) deficient performance and (2) prejudice. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To show deficient performance, the petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness," considering circumstances as they existed at the time of the representation. *Id.* at 688. The petitioner must overcome a strong presumption that counsel's performance was within the range of competence demanded from attorneys defending criminal cases. *Id.* at 688-89.

JA 1908

To show prejudice, the petitioner must demonstrate a "reasonable probability" that but for counsel's errors, the outcome would have been different. *Id.* at 694-95. If it is clear that the petitioner has not satisfied one prong of the *Strickland* test, the court need not inquire whether he has satisfied the other prong. *Id.* at 697. In a § 2255 motion, the petitioner bears the burden of proving his claims by a preponderance of the evidence. *Miller v. United States*, 261 F.2d 546, 547 (4th Cir. 1958).

### III.    ANALYSIS.

### A.    CLAIM I: STRATEGIC DELAY OF THE INDICTMENT.

In his first claim, Caro alleges that the government violated his Fifth Amendment due process rights by "deliberately and tactically delaying the indictment of the capital case until after the government had negotiated a disproportionate plea agreement in the Benavidez assault." (Mot. Collateral Relief 20, ECF No. 790.) He argues that the delay impaired his defense and enabled the government to argue that death would be the only effective punishment since he was already serving a de facto life sentence.

This claim is procedurally defaulted, because its factual basis was available to counsel at the time of direct appeal. *Bousley*, 523 U.S. at 622. The terms of Caro's and his codefendants' guilty pleas in the Benavidez assault, the date of Sandoval's murder, and the dates the United States Attorney sent the target letter

-21-

JA 1909

and obtained the Indictment for Sandoval's murder were all available to counsel. I find no cause preventing counsel from raising this claim and must dismiss it.[4]

Even assuming Caro could establish cause and prejudice to overcome the procedural default, he still would not be entitled to relief. To establish a due process violation due to a pre-indictment delay, a petitioner must prove that the delay caused him actual prejudice. *Howell v. Barker*, 904 F.2d 889, 895 (4th Cir. 1990). If actual prejudice is proved, the court must balance that prejudice against the government's justification for the delay. *Id.* In conducting this balancing test, the court must determine whether the government's actions violate "fundamental conceptions of justice or the community's sense of fair play and decency."[5] *Id.* (internal quotation marks and citations omitted).

In *United States v. Lovasco*, 431 U.S. 783 (1977), the respondent was indicted more than 18 months after the offenses were alleged to have occurred. *Id.* at 784. The respondent argued that he had suffered prejudice because he had lost the testimony of two material witnesses due to the delay. *Id.* at 785-86. The Court

---

[4] Because this claim, like all of Caro's claims, is the subject of the government's Motion to Dismiss, Caro has had an opportunity to respond and assert arguments opposing dismissal.

[5] While many circuits require the defendant to prove improper prosecutorial motive in pre-indictment delay due process analysis, the Fourth Circuit does not. *See Howell,* 904 F.2d at 895. The Fourth Circuit has recognized that it has adopted a minority position in this regard, but nonetheless has not overruled *Howell. See Jones v. Angelone*, 94 F.3d 900, 905 (4th Cir. 1996).

held that "to prosecute a defendant following investigative delay does not deprive him of due process, even if his defense might have been somewhat prejudiced by the lapse of time." *Id.* at 796. The government asserted that the delay was due to efforts to identify additional defendants, and the Court reasoned, "We must assume that these statements by counsel have been made in good faith. In light of this explanation, it follows that compelling respondent to stand trial would not be fundamentally unfair." *Id.* at 796.

The situation at hand is similar. Sandoval was murdered on December 17, 2003. The government sent a target letter to Caro on December 30, 2004, and obtained the Indictment on January 3, 2006. While Caro argues that the pre-indictment delay was due to the government's desire to obtain a strategic advantage through an ability to argue that Caro was already serving a life sentence due to previous convictions, it is clear that as the government contends, the time between the offense and the Indictment was due to the need to investigate and adhere to the death-penalty guidelines of the Department of Justice. Any delay in the Indictment against Caro does not offend "fundamental conceptions of justice or the community's sense of fair play and decency." *See Howell*, 904 F.2d at 895 (internal quotation marks and citations omitted). "Actual prejudice to the defense of a criminal case may result from the shortest and most necessary delay; and no one suggests that every delay-caused detriment to a defendant's case should abort a

-23-

JA 1911

criminal prosecution." *United States v. Marion*, 404 U.S. 307, 324-25 (1971). Neither the year that passed between Sandoval's murder and the target letter nor the two years that passed between Sandoval's murder and the return of the Indictment justify vacating or setting aside Caro's conviction and sentence.

### B.    CLAIM II: DEPRIVATION OF EFFECTIVE ASSISTANCE OF COUNSEL AT THE DEATH CERTIFICATION STAGE.

In his second claim, Caro argues that his Sixth Amendment rights were violated because he was deprived of effective assistance of counsel at the "death-certification stage of the case." (Mot. Collateral Relief 26, ECF No. 790.)

Under the Sixth Amendment, a defendant has the right to the presence of counsel at all "critical stages" of the proceedings. *United States v. Wade*, 388 U.S. 218, 227 (1967). A court is required to

> scrutinize any pretrial confrontation of the accused to determine whether the presence of his counsel is necessary to preserve the defendant's basic right to a fair trial as affected by his right meaningfully to cross-examine the witnesses against him and to have effective assistance of counsel at the trial itself.

*Id.* The "death-certification stage" to which Caro refers concerns the pre-indictment period during which the Department of Justice conducted internal proceedings in order to determine whether to seek the death penalty. Although Caro had counsel during this period, he had no constitutional right to counsel.

The process by which the Department of Justice decides to seek the death penalty is a confidential administrative process, and the final decision is made by

-24-

JA 1912

the Attorney General.  U.S. Dep't of Justice, *U.S. Attorneys' Manual* § 9-10.050,

1998 WL 1745001 (2014).  The Department normally affords defense counsel "an

opportunity to present evidence and argument in mitigation" before making a final

decision.  *United States v. Montgomery*, No. 2:11-cr-20044-JPM-1, 2014 WL

1453527, at *1 n.5 (W.D. Tenn. Apr. 14, 2014).  In Caro's case, this internal

process was conducted after he received a target letter, but before the Indictment

was issued against him.

The government has the prosecutorial discretion to seek the death penalty.

*See* 18 U.S.C. § 3593(a) (discussing notice requirements for government attorneys

seeking the death penalty); *United States v. Armstrong*, 517 U.S. 456, 464 (1996)

("In the ordinary case, 'so long as the prosecutor has probable cause to believe that

the accused committed an offense defined by statute, the decision whether or not to

prosecute, and what charge to file or bring before a grand jury, generally rests

entirely in his discretion.'" (citing *Bordenkircher v. Hayes*, 434 U.S. 357, 364

(1978))).  A defendant has no right to counsel during the stage where the

government decides what charges to file and what sentence to seek, as the process

is internal and administrative.  *See United States v. Craveiro*, 907 F.2d 260, 264

(1st Cir. 1990) ("[T]he internal guidelines of a federal agency, that are not

mandated by statute or the constitution, do not confer substantive rights on any

party."); *United States v. Le*, 306 F. Supp. 2d 589, 592 (E.D. Va. 2004) ("[I]nternal

-25-

JA 1913

DOJ guidelines do not create any substantive or procedural rights for a defendant.").[6]    This process is precursory, when the defendant has yet to be confronted.   As the court explained in *United States v. McVeigh*, 944 F. Supp. 1478, 1483-84 (D. Colo. 1996):

> [T]he decision to seek the death penalty under the Act is a matter of prosecutorial discretion. The Protocol did not create any individual right or entitlement subject to the due process protections applicable to an adjudicative or quasi-adjudicative governmental action.
>
> . . . .
>
> The constitutional protections of the life and liberty of a defendant are provided by the sentencing hearing following trial of the charges in the indictment.

Because Caro had no right to counsel during the death-certification phase, he is not entitled to relief on this claim.

## C.    CLAIM III: JUROR MISCONDUCT.

Caro asserts in his third claim that juror misconduct violated his Fifth Amendment right to due process and his Sixth Amendment right to an impartial jury.   He asserts that Juror No. 62 and Juror No. 32 provided factually inaccurate

---

[6] The defendant cites *United States v. Pena-Gonzalez*, 62 F. Supp. 2d 358 (D.P.R. 1999), for the proposition that the right to counsel attaches at the death certification stage. *Id.* at 363-64.  The court in *Pena-Gonzalez* reached its decision by analogizing the death certification process to an adult certification hearing, which is presided over by a judge. *Id.* at 363.  However, the death certification process is not presided over by a judge and is a completely internal procedure of the Department of Justice. *See United States v. Shakir*, 113 F. Supp. 2d 1182, 1188 (M.D. Tenn. 2000) (criticizing rationale of *Pena-Gonzalez*); *United States v. Torres Gomez*, 62 F. Supp. 2d 402, 405-06 (D.P.R 1999) (same).

JA 1914

answers about their attitudes toward the death penalty during voir dire.   He contends that Juror No. 32 also lied about his ability to follow the instructions of the court during the penalty phase, because the juror allegedly stated after the conclusion of the trial that he decided to vote for the death penalty as soon as he decided that Caro was guilty.

The government argues that this claim is procedurally defaulted, but Caro contends that it relies on evidence outside the record.   He includes an affidavit from Juror No. 62.  It states:

> 2.  It was obvious from the evidence that Carlos Caro was guilty of first-degree murder.   I am now, and was at the time of the trial, strongly in favor of the death penalty in cases where evidence of guilt is obvious.
>
> 3.  There is nothing that the defense offered, or could have offered, that would have changed my mind about the sentence because Caro committed the crime.

(Mot. Collateral Relief Ex. 32, ECF No. 790-32.)  Caro also includes a summary of statements allegedly made by Juror No. 32:

> After trial, however, [Juror No. 32] stated that the evidence was "conclusive" that Carlos Caro was guilty of first-degree murder, and once he reached that conclusion, he had made up his mind about the death penalty, noting that the Bible states "An eye for an eye."  After trial he also said nothing the defense could have offered would have changed his mind.

(Mot. Collateral Relief 42, ECF No. 790.)  These two sources constitute Caro's extra-record evidence.

After careful consideration of the record and the party's arguments, I find that this claim is without merit. Both the juror affidavit and the alleged juror statements concern internal mental processes, and are inappropriate for this court to consider.

Unless in conflict with the Rules Governing § 2255 Proceedings, the Federal Rules of Evidence apply to § 2255 proceedings. *See* Fed. R. Evid. 1101(a) ("These rules apply to proceedings before . . . United States district courts"), 1101(b) ("These rules apply in . . . civil cases and proceedings"), and 1101(e) ("A federal statute or a rule prescribed by the Supreme Court may provide for admitting or excluding evidence independently from these rules."). Accordingly, Rule 606(b) applies to the situation at hand. *See Fullwood v. Lee*, 290 F.3d 663, 679-80 (4th Cir. 2002) (applying Rule 606(b) to capital habeas proceedings); *Bacon v. Lee*, 225 F.3d 470, 485 (same); *Stockton v. Virginia*, 852 F.2d 740, 743-44 (same). Rule 606(b) states:

> During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

Fed. R. Evid. 606(b)(1). Caro does not assert that any exception to Rule 606(b) applies. *See* Fed. R. Evid. 606(b)(2) (listing extraneous prejudicial information,

-28-

JA 1916

outside influence, or a mistake in entering the verdict on the verdict form as exceptions).

Though a criminal defendant enjoys the right to trial by an impartial jury, "the Sixth Amendment does not require that all evidence introduced by the defendant tending to impeach the jury's verdict be considered by the courts." *Robinson v. Polk*, 438 F.3d 350, 358-60 (4th Cir. 2006) (citing *Tanner v. United States*, 483 U.S. 107, 117 (1987)). "In order to protect the finality and integrity of verdicts and to guard against the harassment of jurors, a party seeking to invalidate a verdict may not rely upon evidence of 'a juror's mental process in connection with the verdict.'" *Fullwood*, 290 F.3d at 679-80 (quoting *United States v. Cheek*, 94 F.3d 136, 143 (4th Cir. 1996)). I cannot consider the affidavit or alleged statements which Caro puts forth in support of this claim.

To the extent that Caro seeks to assert a claim of juror deceit under *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548 (1984), his claim fails. Under *McDonough*, in order to receive federal habeas corpus relief on a claim of juror deceit on jury questionnaires or during voir dire, the petitioner "must first demonstrate that a juror failed to answer honestly a material question . . . and then further show that a correct response would have provided a valid basis for a challenge for cause." *Id.* at 556. However, *McDonough* applies to instances of deceit that can be proved through objective facts that can be obtained through

-29-

JA 1917

sources other than the juror.[7] *See United States v. Fulks*, 454 F.3d 410, 431 (4th Cir. 2006) (applying test where juror failed to disclose her husband's murder in a timely manner); *Conaway v. Polk*, 453 F.3d 567, 585 (4th Cir. 2006) (applying test where juror failed to disclose that he was double first cousins with the petitioner's codefendant); *Conner v. Polk*, 407 F.3d 198, 204-05 (4th Cir. 2005) (applying test where juror who had covered petitioner's first trial for a newspaper denied that she

---

[7] Although the Fourth Circuit did address a juror's belief in *Jones v. Cooper*, 311 F.3d. 306, 310 (4th Cir. 2002), that does not necessitate consideration of the juror statements asserted here. *Jones v. Cooper* concerned a multipart *McDonough* claim based on an affidavit prepared by an investigator.

> [The] investigator reported that the challenged juror stated that several of her relatives had been subjected to arrests or jury trials; that she had gone to the Fast Fare the day after the murder and robbery; that she had strong, religiously-motived views in favor of the death penalty; and that she knew that appellant had previously received a death sentence.

*Id.* at 311 (citation and alternation omitted). The third part of the affidavit concerned the juror's belief "'that the Bible mandates imposition of the death penalty in every case of first degree murder.'" *Id.* at 312 (citation omitted). With regard to this belief, the court held: "It cannot be inferred from any statement in the affidavit that the juror could not disregard her personal feelings about the death penalty or apply the law as written, or that the juror lied when she stated that she could be a fair juror." *Id.* This alleged belief obviously could not have been verified by objective facts that did not depend on the juror's own assessment of her beliefs and mental processes. However, this one basis for the *McDonough* claim in *Jones v. Cooper* does not mean that courts should consider similar arguments about jurors' internal thought processes in subsequent cases. In *McNeill v. Polk*, 476 F.3d 206 (4th Cir. 2007), the court suggested that this portion of the opinion was dicta, stating that because the state court quashed the juror affidavit based on an unspecified state rule of evidence, it "implicitly accepted the affidavit and rejected the petitioner's claims on the merits." *Id.* at 213. The court "did not question whether the state court's [evidentiary] ruling was proper." *Id.* Thus, *Jones v. Cooper* does not preclude use of Rule 606(b) when analyzing claims of juror deceit.

JA 1918

had firsthand knowledge of the facts of the crime).    In contrast, Caro seeks to prove that the jurors were deceitful through their own statements.

Finally, to the extent that Caro seeks to assert a violation of *Morgan v. Illinois*, 504 U.S. 719 (1992), his claim also fails.  *Morgan* held that "If even one such juror [who would automatically vote for the death penalty in every case] is empaneled and the death sentence is imposed, the [government] is disentitled to execute the sentence."  *Id.* at 729.  *Morgan* concerned the adequacy of voir dire, and held that "part of the guarantee of a defendant's right to an impartial jury is an adequate *voir dire* to identify unqualified jurors."  *Id.*  In the case at hand, Caro was afforded extensive opportunity to investigate all prospective jurors during voir dire.  Juror No. 62 and Juror No. 32 were questioned about their beliefs regarding the death penalty in juror questionnaires and during voir dire before being selected for the jury.  Caro has not alleged inadequate voir dire proceedings, and his reliance on *Morgan* does not salvage his juror misconduct claim.

### D.    Claim IV:  Ineffective Assistance of Counsel During Guilt/Innocence Phase.

Caro asserts five grounds for ineffective assistance of counsel during the guilt/innocence phase of the trial.  He argues that prejudicial error resulted from trial counsel's failure to (1) develop a cohesive theory of defense, (2) adequately investigate and impeach government witness Sean Bullock, (3) adequately investigate and present evidence of the BOP's negligence regarding the decision to

JA 1919

place Sandoval in Caro's cell, and (4) adequately investigate and present evidence in support of self defense, second-degree murder, or manslaughter.  Finally, he argues that even if these deficiencies are individually insufficient to demonstrate prejudice, they do so when considered cumulatively.  For the reasons stated below, I will deny relief on Caro's claim of ineffective assistance of counsel during the guilt/innocence phase.

### 1. *Cohesive Theory of Defense.*

At trial, Caro's counsel argued that he killed Sandoval "in hot blood."  (Trial Tr. 43, Jan. 29, 2007, ECF No. 668.)  They argued that first-degree murder was not appropriate because there was conflict between the two men at breakfast, they were confined in a small cell, and "this was a case of a pot boiling over."  (*Id.*)

Caro now claims that his trial counsel was ineffective for failing to develop a cohesive theory of defense to be presented during the guilt/innocence phase and brought out during the penalty phase.  He argues that trial counsel could have claimed that he killed Sandoval, a Texas Syndicate member, because he feared retribution for assaulting Benavidez, a Texas Syndicate leader.  He also argues that trial counsel could have presented evidence that he suffers from a brain impairment and anxiety disorder, that their theory of a hot-blooded killing failed to account for the time between Sandoval's death and the breakfast dispute, and that their theory

JA 1920

did nothing to mitigate his post-offense statements or the government's positions on his gang leadership and future dangerousness.

It is clear that Caro's trial counsel was faced with the difficult task of developing a theory around a conceded killing and recorded statements that did not suggest remorse. Caro stated that his impetus for killing Sandoval was that Sandoval disrespected him. (*See* Trial Tr. 49, 53, Jan. 31, 2007, ECF No. 674 (stating that he killed Sandoval because Sandoval tried to call him a "mother fucker" and "disrespected" him).) Trial counsel had to consider how a jury might interpret these statements, and develop a theory of the case that they felt would be most convincing in light of the evidence they could present and the evidence they could expect from the government. Considering the circumstances of the case, trial counsel's theory was not unreasonable.

Caro, with the benefit of hindsight, suggests alternative arguments and points to perceived weaknesses. His critiques do not overcome the presumption that trial counsel's decisions fell within the bounds of reasonable professional judgment. "There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Strickland,* 466 U.S. at 689. Caro has not demonstrated that trial counsel's theory of a hot-blooded killing was an unreasonable strategic decision.

-33-

JA 1921

## 2. *Impeachment of Sean Bullock.*

Caro claims that trial counsel was ineffective for failing to adequately investigate and impeach the government's eyewitness, Sean Bullock, and failing to present the testimony of Bullock's cellmate, Joseph Bland. He argues that trial counsel overlooked Bland as a potential witness after Bullock stated in his grand jury testimony that he had a cellmate. Caro contends that trial counsel failed to pursue the issue after Bullock testified at trial that he had a cellmate, but could not recall his cellmate's name on cross examination. He also argues that trial counsel failed to adequately cross-examine Bullock on inconsistencies between his trial testimony and previous statements. Caro claims that trial counsel's failure to impeach Bullock prejudiced him because Bullock's testimony was the only evidence that supported the government's proposition that he had ambushed Sandoval from behind.[8]

With regard to Caro's claim that trial counsel was ineffective for failing to impeach Bullock, I find that Caro has failed to show that counsel's representation fell below an objective standard of reasonableness. "Trial counsel have an obligation to investigate possible methods for impeaching a prosecution witness, and failure to do so may constitute ineffective assistance of counsel." *Tucker v.*

---

[8] Caro also seeks to support this subclaim with two juror affidavits. These affidavits will not be considered pursuant to Federal Rule of Evidence 606(b). *See Fullwood*, 290 F.3d at 679-80.

*Ozmint,* 350 F.3d 433, 444 (4th Cir. 2003). However, there remains "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. In this situation, trial counsel did investigate and pursue several methods of impeachment. They sought to impeach Bullock with inconsistencies in his testimony at trial, his grand jury testimony, and his mass interview form. They questioned him about facets of his background, including his use of false identities. They tried to elicit a hope that he would receive benefits for his testimony, and they questioned him about why he did not tell his cellmate what he saw. There is no indication that trial counsel's efforts to impeach Bullock were unreasonable.

With regard to Caro's claim that trial counsel was ineffective for overlooking Bland as a potential witness and failing to introduce his testimony, I find that Caro has not established prejudice. It is not clear that Bland's testimony would have changed the jury's assessment of Bullock's credibility. Bland's affidavit states that he and Bullock had been playing cards on the bed for at least 30 minutes before officers opened the door to Sandoval's cell. (Mot. Collateral Relief Ex. 2, ¶ 5, ECF No. 790-2.) He states that he and Bullock were unaware of what happened until Sandoval was removed from the cell, and that Bullock "was not standing by the door prior to inmate Sandoval being removed from cell 123." (*Id.* ¶ 6.) However, Bullock testified that did not tell his cellmate about what he

-35-

saw. Bullock did not say he was standing at the door when Sandoval was removed from his cell. Rather, he stated that he was at that location earlier when he observed Caro with an orange towel around Sandoval's neck. The jury would have had to assess the credibility of both men, and there is nothing to suggest that they would have believed Bland over Bullock. Caro has not demonstrated a reasonable probability that the outcome of the guilt/innocence phase would have been different but for this alleged deficiency.

### 3. *Prison Culture and Cell Placement.*

Caro argues that trial counsel was ineffective for failing to adequately investigate and present evidence of prison culture in order to demonstrate that the BOP was negligent in placing Sandoval in his cell. He contends that a prison culture expert might have testified that the refusal of Sandoval as a cellmate could have been a sign that he feared retribution from the Texas Syndicate. Caro argues that such an expert could have opined that the BOP should have housed him separately from other Texas Syndicate members, and that Sandoval's request to be placed in the same cell could have been a challenge to him. It is asserted that a prison culture expert could have laid a foundation for the fact that Sandoval was placed in the SHU for possession of a weapon, and explained the significance of that. Caro contends that the prison's gang intelligence officers should have been consulted before he was given a cellmate. He also argues that the officer who

JA 1924

witnessed his refusal to take a cellmate violated standard operating procedures by failing to record it in the SHU log book.

None of these arguments undermine confidence in the jury's verdict of first-degree murder. Caro has not established prejudice. As Caro admitted to killing Sandoval and was the only possible perpetrator, the primary issue during the guilt/innocence phase was that of premeditation. The government introduced significant evidence in support of premeditation, including Bullock's testimony, Caro's proffered reasons for killing Sandoval, and the time that passed between their dispute and Sandoval's death. Caro must demonstrate a reasonable probability that counsel's deficiencies undermined the outcome of the trial, and he has not done so. Even if trial counsel had provided testimony from a prison culture expert, there was extensive alternative evidence to support a finding of premeditation.

### 4. *Self Defense, Second-Degree Murder, or Manslaughter.*

Caro argues that trial counsel was ineffective for failing to adequately investigate and present evidence in support of self defense, second-degree murder, or manslaughter. He asserts that trial counsel should have presented a theory of self defense based on fear of retribution. He argues that trial counsel should have utilized a prison culture expert to explain the context of his post-offense statements and the impropriety of Sandoval's request to be placed in the same cell. Caro

JA 1925

argues that trial counsel was ineffective for raising the question of why Sandoval wanted in the cell, but failing to answer it. He claims that these deficiencies present a reasonable probability that a juror would have concluded that he acted in response to a real or perceived threat, and not with premeditation.

While Caro argues that trial counsel should have presented a fear of retribution theory which might have supported a conviction for a lesser crime, such a theory does not easily accord with Caro's post-offense statements regarding Sandoval's killing. (*See, e.g.*, Trial Tr. 53, Jan. 31, 2007, ECF No. 674 ("[T]hey gave me a cell mate and he disrespected me, so I took him down.").) Caro stated that he killed Sandoval because Sandoval disrespected him; he never stated that he was in fear of Sandoval.

Even if trial counsel had presented testimony from a prison culture expert that Caro's post-offense statements were due to a need for bravado but his actions were in self defense, a reasonable juror still could have concluded from Caro's statements that the killing was premeditated. Reading Caro's post-offense statements as a guise of bravado "is quite strained . . . and is not supported by the [post-offense statements] as a whole." *Pruett v. Thompson*, 996 F.2d 1560, 1571 (4th Cir. 1993). For example, Caro stated on the phone to his wife, "[Sandoval] tried to call me mother fucker, that whore, that's why I fucked him up." (Trial Tr. 49, Jan. 31, 2007, ECF No. 674.) A need to maintain a facade of toughness around

-38-

JA 1926

prison inmates and correctional officers would not explain this statement to his wife.

Additionally, the fact that trial counsel alluded to Sandoval's motivation for wanting to be in Caro's cell, but did not introduce evidence to answer that question, does not establish ineffective assistance of counsel. *See Turner v. Williams*, 35 F.3d 872, 904 (4th Cir. 1994) ("In our view, assuming counsel does not know at the time of the opening statement that he will not produce the promised evidence, an informed change of strategy in the midst of trial is virtually unchallengeable.") (internal quotation marks and citation omitted)), *overruled on other grounds by O'Dell v. Netherland,* 95 F.3d 1214 (1996).

### 5. *Cumulative Error.*

Caro argues that "[e]ven if a single deficiency in counsel's performance does not result in prejudice, the cumulative impact of all failures resulted in . . . an unfair trial." (Mot. Collateral Relief 61, ECF No. 790.)  This contention must fail. I have found each of Caro's subclaims of ineffective assistance of counsel during the guilt/innocence phase without merit.  Counsel's acts or omissions "'that are not unconstitutional individually cannot be added together to create a constitutional violation.'" *Fisher v. Angelone*, 163 F.3d 835, 853 (4th Cir. 1998) (quoting *Wainwright v. Lockhart*, 80 F.3d 1226, 1233 (8th Cir. 1996)).  These claims do not collectively establish a right to collateral relief.

JA 1927

### E.    CLAIM V: *BRADY* VIOLATIONS CONCERNING BULLOCK.

In his fifth claim, Caro argues that the government violated his Fifth, Sixth, Eighth, and Fourteenth Amendment rights by withholding material exculpatory and impeachment evidence and misleading defense counsel.  He argues that the government misrepresented the fact that Bullock had a cellmate at the time of the offense, and failed to provide a mass interview report for Bland even though it asserted that all SHU inmates had been interviewed.

While the government argues that this claim is procedurally barred, Caro asserts that it relies on extra-record evidence — Bland's declaration.  Assuming that Bland's declaration constitutes appropriate extra-record evidence to overcome procedural default, this claim still must be dismissed.

In order to prove a *Brady* violation, a defendant must demonstrate that the government failed to provide the defendant with material exculpatory evidence. Specifically, the defendant must prove: (1) there was evidence favorable to the accused, (2) the government suppressed it, and (3) the defendant suffered prejudice.  *Strickler*, 527 U.S. at 281-82.  Additionally, "where the exculpatory information is not only available to the defendant but also lies in a source where a reasonable defendant would have looked, a defendant is not entitled to the benefit of the *Brady* doctrine."  *United States v. Wilson*, 901 F.2d 378, 381 (4th Cir. 1990).

-40-

JA 1928

Trial counsel had information from which to infer that Bullock had a cellmate. The government disclosed the SHU daily logs for December 17-20, 2003, and a SHU roster for December 20, 2003. The daily log for December 19, 2003, showed that Bland was moved from cell 146 (Bullock's cell) that day. Additionally, the government produced Bullock's grand jury testimony, which referenced his cellmate, one month before trial. Whether the government "never overtly corrected [trial counsel's] misconception," (Mot. Collateral Relief 64, ECF No. 790), is irrelevant. The government is not required to illuminate facts in this manner for the defense. Caro has failed to establish a *Brady* violation.

### F.      CLAIM VI: INEFFECTIVE ASSISTANCE OF COUNSEL DURING PENALTY PHASE.

In his sixth claim, Caro argues that he was deprived of effective assistance of counsel during the penalty phase of the trial in violation of his Sixth Amendment rights. He asserts 12 grounds for ineffective assistance of counsel, which are addressed individually below.

### 1. *Failure to Challenge Delay of Indictment.*

Caro alleges that trial counsel was ineffective for failing to challenge the government's delay in obtaining the Indictment for Sandoval's murder until after a conviction had been obtained for the Benavidez assault. This subclaim builds on Caro's allegations in Claim I. He now argues that trial counsel should have

-41-

JA 1929

pursued a pretrial remedy that would have prevented the government from arguing that the Benavidez assault was an aggravating factor in support of death.

## 2. Failure to Develop A Compelling Mitigation Story.

Caro contends that his trial counsel failed to adequately investigate, develop, and present a compelling mitigation story about his life. It is well settled that defense counsel must conduct a reasonable investigation into mitigating evidence to be presented during the penalty phase, and that failure to present mitigating evidence cannot be justified as a tactical decision unless the duty to investigate has been fulfilled. *See Wiggins v. Smith*, 539 U.S. 510, 522-23 (2003). In this case, there is no indication that trial counsel failed to conduct a reasonable investigation into Caro's background.

Trial counsel hired many experts to investigate Caro's background, and received mixed results. They hired a mitigation specialist whom they eventually had to replace. They hired a fact investigator, two experts to opine on future dangerousness, a neuropsychologist, a neurologist, and a psychiatrist.

Trial counsel also presented mitigating evidence during the penalty phase. They alleged 22 mitigating factors, and put on eight witnesses over the course of three days. In addition to hearing from two future dangerousness experts, the jury also heard testimony from three of Caro's aunts, Caro's wife, a former teacher, and a cousin.

JA 1930

As a result of trial counsel's efforts, the jury unanimously found that 12 mitigating factors had been proved. Caro argues that his trial counsel should have done more to develop a compelling mitigation story, but he has failed to demonstrate how their conduct fell below prevailing professional norms. Due to trial counsel's efforts, many elements of Caro's past were given weight as mitigating factors. While Caro asserts numerous deficiencies of trial counsel, their overall efforts during the penalty phase were not objectively unreasonable. Caro's subclaim is without merit, and his specific allegations of deficiency, addressed below, are without merit.

Caro argues that trial counsel should have obtained more than two mental health experts, and points to the fact that a child psychiatrist and neonatologist were not retained despite the mitigation specialist's recommendation to do so.

Caro has not demonstrated that his trial counsel acted unreasonably in the number and type of experts they obtained. Trial counsel developed mitigation evidence under time and financial constraints. They could not investigate every possible lead, and had to make professional judgments about what leads were likely to be the most fruitful. Caro has not established that helpful testimony could have been elicited from the additional experts he mentions. *See Bassette v. Thompson*, 915 F.2d 932, 940-41 (4th Cir. 1990) ("He claims that his counsel conducted an inadequate investigation to discover persons who would testify in his

JA 1931

favor, but he does not advise us of what an adequate investigation would have revealed or what these witnesses might have said, if they had been called to testify.").

Caro next challenges trial counsel's reliance on Keith Caruso, M.D.  First, he argues that trial counsel should have sought another psychiatrist after Dr. Caruso opined that his testimony would not be helpful to the defense.  Second, he argues that trial counsel should have obtained another psychiatrist after they discovered that Dr. Caruso's research work in medical school would likely compromise his credibility as an expert witness.

Trial counsel did not provide ineffective assistance because they failed to find a psychiatrist whose testimony was favorable to Caro.  Trial counsel's performance should not be evaluated based on a qualified expert's unfavorable conclusions or testimony.  *See Wilson v. Greene*, 155 F.3d 396, 403 (4th Cir. 1998) (rejecting an inmate's claim that trial counsel should have pursued mental health defenses where a mental health report indicated that the inmate was competent to stand trial); *Roach v. Martin*, 757 F.2d 1463, 1477 (4th Cir. 1985) (holding that trial counsel was not ineffective for failing to explore an insanity defense after a psychiatrist found him sane).  Trial counsel was also not ineffective in failing to obtain another psychiatrist less susceptible to impeachment than Dr. Caruso.  Caro

-44-

JA 1932

has not shown prejudice on this argument, considering that trial counsel chose a strategy where no evidence from a psychiatrist was presented.

Caro argues that his trial counsel was ineffective in failing to call mental health experts during the penalty phase. He argues that his trial counsel should have reviewed the report of the government's experts before making such a decision. He claims that even if the government's experts had presented testimony harmful to Caro, at least one of the government's experts could have been impeached. He also argues that trial counsel should have presented the neuropsychologist's diagnosis that he had Cognitive Disorder NOS.

The decision to forego mental health evidence was not unreasonable. Trial counsel was not permitted to view the government's experts' report until after they gave notice of intent to present mental health evidence, and trial counsel had reason to believe that the testimony of the government's expert might be unfavorable to Caro. In contrast, only one expert available to testify for the defense, neuropsychologist D. Malcolm Spica, Ph.D., had a professional opinion favorable to Caro. Trial counsel could have decided that Dr. Spica's testimony would not be beneficial enough to overcome harmful testimony from the government's testifying expert. *See Bunch v. Thompson*, 949 F.2d 1354, 1364 (4th Cir. 1991) (finding reasonable a decision not to call a psychiatrist when damaging findings could have been brought out on cross-examination).

JA 1933

Caro argues that trial counsel was ineffective for failing to obtain a mental health expert to explain the effects of Caro's childhood trauma. Several mitigating factors concerning Caro's childhood were found by the jury. Additionally, several relatives testified about negative aspects of Caro's childhood, such as the violent nature of his father. There is not a reasonable likelihood that the testimony of a mental health expert on Caro's childhood trauma would have changed the outcome of the penalty phase.

Caro argues that trial counsel was ineffective in failing to call his brothers, Jose and Noe, to testify during the penalty phase. However, both brothers have criminal histories, and trial counsel's decision was not unreasonable. Whether to call a witness "necessitate[s] the weighing of risks and returns that is an intrinsic part of defense counsel's choice of strategy." *Goins v. Angelone*, 52 F. Supp. 2d 638, 661 (E.D. Va. 1999). While Caro's brothers could have presented mitigating evidence about their troubled childhood and their abusive father, trial counsel might have felt that their testimony would be undermined by their previous convictions.

Caro argues that trial counsel was ineffective in presenting the testimony of his cousin, Laura Perez, who testified about a positive aspect of Caro's childhood, his loving grandparents. Caro has not established ineffective assistance of counsel merely because he points to a witness who gave testimony that was damaging as

-46-

JA 1934

well as helpful. Trial counsel made a strategic decision regarding the value of Perez's testimony, and no evidence suggests that the decision was unreasonable.

Finally, Caro argues that trial counsel was ineffective in making prejudicial remarks during their opening and closing statements, including stating that Caro took the easy way out by choosing the drug trade and admitting that Caro was not a good father. These statements cannot be construed as objectively unreasonable. Both are grounded in fact — Caro joined the drug trade at a young age, and was frequently apart from his wife and child. Trial counsel could have made a strategic decision to address these topics in an attempt to reduce the sting of their impact on the jury.

Caro asserts many arguments in support of his claim that his trial counsel failed to develop a compelling mitigation story. However, for each argument he has failed to demonstrate prejudice or objectively unreasonable professional conduct.

### 3. *Failure to Challenge Government's Evidence that Caro was a Gang Leader.*

Caro argues that trial counsel was ineffective for failing to investigate prison culture, and failing to subject the government's evidence concerning Caro's leadership position in the Texas Syndicate to meaningful adversarial testing. He specifically points to trial counsel's failure to challenge the testimony of John Gordon.

JA 1935

At trial, the government presented testimony from John Gordon, a Special Investigative Service Lieutenant at FCI Oakdale in 2002, during the time when Caro was involved in assaults on newly arriving inmates who were members of a rival gang. Gordon testified that he had told known Texas Syndicate members that he wanted to meet with their leader, and that in response to this request, Caro showed up and told Gordon that the "Texas Syndicate were going to do what they had to do." (Trial Tr. 168, Feb. 05, 2007, ECF No. 678.) The assaults occurred shortly thereafter, and Caro later told Gordon that the Texas Syndicate was responsible for the assaults and that his brothers follow orders. (*Id.* at 171-72.) Based on these interactions, Gordon concluded that Caro was a leader of the Texas Syndicate. (*See id.* at 171-174.)

Caro argues that trial counsel was ineffective for failing to present rebuttal evidence that Caro was not a gang leader at the time of the 2002 assault at FCI-Oakdale. He claims that trial counsel could have discredited Gordon by introducing evidence that he relied on the erroneous assumption that the Texas Syndicate would have sent their actual leader to the meeting, and by introducing evidence that his request of Caro during their initial meeting to reveal the identity of other gang members was naïve.

Trial counsel's performance was not objectively unreasonable. Trial counsel properly anticipated that the government would argue that Caro was a gang leader,

-48-

JA 1936

and made efforts to exclude that evidence through motions in limine. The government's evidence was that when Gordon requested to meet with a Texas Syndicate leader, Caro showed up, and that after the assault occurred, Caro took responsibility for it. Even if trial counsel had presented expert testimony in line with Caro's arguments, the jury still had plenty of evidence from which to reasonably conclude that Caro was a leader of the Texas Syndicate. The impeachment methods now suggested by Caro do not necessarily undermine Gordon's testimony. There is not a reasonable probability that the result of the penalty hearing would have been different had such evidence been introduced.

### 4.  *Failure to Challenge Government's Evidence Regarding BOP's Ability to Control Improper Inmate Communications.*

Caro argues that trial counsel failed to adequately investigate relevant facts and law regarding the BOP's ability to control improper inmate communications, and failed to subject the government's evidence to meaningful adversary testing.

At trial, the government presented testimony from a former BOP warden, Gregory Hershberger, that Caro would likely have future access to telephone, visitors, and mail services. (Trial Tr. 185-86, 191-92, Feb. 12, 2007, ECF No. 686.) Hershberger also testified that Caro might be able to communicate with gang members through phone and letters, although the BOP would try to prevent it. (*Id.*)

Caro argues that trial counsel was ineffective for not establishing that the

-49-

JA 1937

BOP does have the authority and ability to control his communications. He argues that trial counsel could have introduced evidence about Special Administrative Measures, which allow the government to construct individualized conditions of confinement, or BOP program statements, which describe the authority of prison officials to curb inmate communication methods. *See, e.g.*, 28 C.F.R. § 501.3 (Prevention of acts of violence and terrorism); U.S. Dep't of Justice, Fed. Bureau of Prisons, Program Statement No. P5264.08 (1/24/2008), *available at* http://www.bop.gov/policy/progstat/5264_008.pdf (telephone restrictions), *id.* at 5267.08 (5/11/2006), *available at* http://www.bop.gov/policy/progstat/5267_008 .pdf (visitors). Caro argues that without knowing about BOP tools for preventing improper communications, the jury was left to believe that the BOP could not control his future communications.

At trial, Hershberger testified that Caro's visitation, telephone, and commissary rights "can't just arbitrarily be taken from him." (Trial Tr. 202-03, Feb. 12, 2007, ECF No. 686.) He also testified that while the BOP staff would try to prevent inmates like Caro from sending out coded messages, he did not think they could guarantee it. (*Id.* at 191.) A jury could reasonably conclude from Hershberger's testimony that while BOP officials may make efforts to curb an inmate's communications, they cannot do so without reason, nor can they guarantee success. Caro has not established that but for trial counsel's failure to

-50-

JA 1938

present evidence on the BOP's mechanisms for controlling inmate communications, the result of the penalty phase would have been different. I find that Caro has not suffered prejudice, and is not entitled to relief on this subclaim.

### 5. *Failure to Present Evidence on Prison Culture and Statements of Remorse.*

Caro argues that trial counsel failed to adequately investigate and present mitigating evidence on prison culture and statements of remorse.

At trial, the government argued that Caro lacked remorse, and presented as evidence Caro's several post-offense statements previously described. Caro argues that trial counsel should have presented evidence on prison culture in order to mitigate the effects of these statements. He contends that these statements could have been due to a desire to present an image of strength in order to prevent attacks on his person, and that remorse could have been viewed by other inmates as a sign of weakness. Because the jury found beyond a reasonable doubt that Caro had not expressed remorse for killing Sandoval, Caro argues that trial counsel's failure to present evidence on his statements in the context of prison culture was prejudicial.

I find that Caro has not established prejudice. Even if trial counsel had presented evidence that Caro's statements were due to a need for bravado, the jury had enough evidence from which to conclude that Caro did not demonstrate remorse. Additionally, evidence on prison culture would have been irrelevant to some of Caro's post-offense statements. As previously noted, an inmate's need to

-51-

JA 1939

maintain an air of bravado in prison would not account for Caro's statement to his wife that, "[Sandoval] tried to call me mother fucker, that whore, that's why I fucked him up." (Trial Tr. 49, Jan. 31, 2007, ECF No. 674.)

### 6. *Failure to Challenge Conviction for Conspiracy to Commit Murder Related to Benavidez Assault.*

Caro argues that trial counsel was ineffective for failing to adequately investigate his prior conviction for conspiracy to commit murder, and for failing to file a collateral challenge to that conviction. He argues that the attorney who represented him in the separate Benavidez assault prosecution was ineffective for failing to advise him that a guilty plea for conspiracy to murder likely would be used against him as an aggravating factor in the Sandoval case. He argues that had he gone to trial instead of accepting a guilty plea, a jury might have found him not guilty because the victim was uncooperative and the video footage of the stabbing was of low quality.

Building on these assertions, Caro next claims that his trial counsel in this matter was ineffective for failing to file a collateral challenge to the Benavidez conviction and sentence. He argues that trial counsel should have known that the Benavidez conviction was prejudicial because it was his only conviction for a significant crime of violence. He points out that his three previous drug trafficking convictions did not involve violence. He contends that because the conviction for conspiracy to commit murder was used as an aggravating factor, the government

was able to present him as a violent inmate already facing prison for the rest of his life, who, without the death penalty, would receive no punishment for his crime. He argues that trial counsel also failed in their duty to investigate. He claims that they did not interview his prior attorney or obtain copies of the discovery in the Benavidez matter.

At issue is the performance of trial counsel in this matter, not the performance of Caro's prior attorney. Caro has failed to show that his trial counsel acted unreasonably in failing to challenge the prior conviction, interview prior counsel, and obtain discovery for the prior matter. "[A] petitioner has no Sixth Amendment right to counsel in order to mount a collateral challenge to his conviction." *United States v. Williamson*, 706 F.3d 405, 416 (4th Cir. 2013). It follows that trial counsel was not ineffective for failing to file a collateral challenge to an earlier conviction. It certainly is within the bounds of professional norms to focus on the case at hand rather than attempting to challenge and reinvestigate prior convictions. Furthermore, trial counsel was not ignorant of the Benavidez assault. Trial counsel contacted Caro's prior counsel, talked to him, and collected a portion of his files to review. Caro's prior conviction for conspiracy to commit murder was only one element of a complex murder trial. Trial counsel acted reasonably in researching this prior conviction, but devoting the majority of their attention to the case at hand.

JA 1941

### 7. *Failure to Present <u>Skipper</u> Evidence.*

Caro argues that trial counsel was ineffective for failing to present mitigating evidence in accordance with *Skipper v. South Carolina*, 476 U.S. 1 (1986), which held that "the sentencer may not refuse to consider or be precluded from considering 'any relevant mitigating evidence.'" *Id.* at 4 (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 114 (1982)).

Caro presents three arguments.  He first argues that trial counsel was ineffective for failing to introduce evidence that his plea in the Benavidez assault was a "selfless act" done to benefit Moreno-Marquez, a fellow inmate who was able to plead guilty to a lesser charge and went from facing 27 years to facing a maximum of five years imprisonment.  (Mot. Collateral Relief 129, ECF No. 790.) He next contends that trial counsel was ineffective for failing to introduce evidence from a prison psychologist who reported that Caro was primarily violent with other members of the Texas Syndicate, and that some prison staff members had described him as a good inmate.  Finally, he argues that trial counsel was ineffective for failing to introduce evidence of Caro's concern for the well-being of others, referring to a time when Caro reported that another inmate was experiencing psychological distress.

That trial counsel did not present evidence on these three topics does not render their assistance ineffective.  Caro's claim does not concern evidence that the

-54-

JA 1942

court determined was irrelevant and inadmissible, as in *Skipper*, but rather concerns evidence that trial counsel chose not to present. *See* 476 U.S. at 3. Trial counsel may have made a strategic decision to exclude this evidence. They may have thought that a jury might not consider the circumstances of Caro's plea to be a mitigating factor. While trial counsel could have argued that Caro's plea was a selfless act that enabled Moreno-Marquez to leave prison sooner, the government could have highlighted the gang connection between the two men. The government could have pointed out that Caro's plea was designed to benefit a violent inmate who was videotaped stabbing an unarmed man. Similarly, trial counsel may have decided not to present evidence from the prison psychologist's report because it addressed both positive and negative aspects of Caro's behavior. The reason for deciding not to introduce Caro's comment about another inmate's psychological distress is less obvious, but the decision was not unreasonable or in violation of professional norms. Caro has not demonstrated that his right to effective assistance of counsel was violated.

### 8. *Failure to Present Evidence of BOP Negligence Regarding Decision to Place Sandoval in Caro's Cell.*

Caro argues that trial counsel was ineffective for failing to argue and present evidence during the penalty phase that the BOP was negligent in placing Sandoval in Caro's cell. He relies on the same assertions that he made in Claim IV(C). He asserts that the BOP should have housed Caro separately from other Texas

-55-

Syndicate members after the Benavidez assault, that the BOP should have recognized that Caro might face retribution from the Texas Syndicate for the Benavidez assault, that Sandoval's request to be placed in the same cell as Caro might have been a challenge to Caro, that the BOP should have recognized the significance of Sandoval being placed in the SHU because he was caught with a weapon, that gang intelligence officers should have been consulted before Caro was given a cellmate, and that Caro's initial refusal to take a cellmate should have been documented in a log book.

Caro has not established that trial counsel's failure to argue that the BOP was negligent in placing Sandoval in his cell constituted ineffective assistance of counsel. Even if his trial counsel had introduced evidence supporting all of the arguments he proposes, the jury still could have decided that the death penalty was appropriate. The jury could have rejected the arguments that the BOP was negligent and that Caro feared retribution, and instead decided, based on the government's case and Caro's own statements, that Caro killed Sandoval due to their dispute over breakfast. Or, the jury could have concluded that the BOP was negligent in placing Sandoval in Caro's cell, but that the balance of aggravating and mitigating factors still warranted the death penalty. Because there is not a reasonable probability that this evidence would have changed the outcome of the penalty phase, this claim fails.

-56-

JA 1944

### 9. *Failure to Object to Government's Evidence on Specific Instances of Violence by Persons Other than Caro.*

Prior to trial, I directed that "absent proper disclosure, the government may not rely on specific instances of inmate violence (other than the defendant's own) in seeking to prove his future dangerousness." *United States v. Caro,* 461 F. Supp. 2d 478, 482 (W.D. Va. 2006). Caro claims that his trial counsel was ineffective for failing to adequately object to the government's evidence on specific acts of violence from inmates other than Caro.

Caro first argues that his trial counsel was ineffective for failing to adequately object to government witness Daniel Olson's testimony that inmates in the Aryan Brotherhood used a coded letter to order the deaths of two African-American inmates. Caro's trial counsel made a hearsay objection, but did not argue that this was "specific instances" evidence that violated the court's order. (Trial Tr. 34-37, Feb. 06, 2007, ECF No. 683.)

Caro next argues that trial counsel failed to adequately object when the government asked defense expert Mark Cunningham on cross examination about the facts of other defendants' cases. He asserts that the government asked irrelevant and prejudicial questions about whether Dr. Cunningham had testified in the trial of a defendant who was a member of al-Qaeda. (Trial Tr. 87-88, Feb. 12, 2007, ECF No. 686.) Caro also argues that trial counsel failed to object when the

-57-

JA 1945

government questioned Dr. Cunningham during cross-examination about three terrorists who managed to send coded letters from ADX-Florence.

Finally, Caro argues that trial counsel failed to object when government witness Mark Hershberger testified that 20 years earlier, an inmate at USP Marion had murdered two correctional officers and wounded two others.

Caro has failed to establish prejudice. First, some of this evidence might have been admitted even if trial counsel had objected as Caro suggests. Dr. Cunningham's answers during cross-examination might have been admissible as bearing on his credibility and bias. Similarly, Hershberger and Olsen, the other two witnesses whose testimony is in question, were offered as rebuttal witnesses to Dr. Cunningham. Second, even without the specific-acts evidence in question, the jury had an abundance of evidence from which to conclude that Caro would be a future danger, most notably Caro's own statements and past violence.

### 10. *Failure to Object to Improper Arguments During Government's Closing.*

Caro argues that his trial counsel was ineffective for failing to object to the government's improper arguments during closing.

He argues that trial counsel should have objected to the government's argument that the jury should control Caro by imposing the death penalty and that if Caro did not receive the death penalty then there would be no punishment for Sandoval's death. The Fourth Circuit addressed these arguments on appeal and

-58-

JA 1946

concluded that while they were improper, they did not prejudice Caro. Because no prejudice resulted, these arguments fail to establish ineffective assistance of counsel.[9]

Caro also asserts that his trial counsel should have objected to the government's minimization of the jury's responsibility in the capital sentencing process. However, this claim is based on a misreading of the trial transcript. Caro argues that the government minimized the act of putting a defendant to death by arguing that "it's the law." (Mot. Collateral Relief 158, ECF No. 790.) However, the prosecutor actually said, "It's not the law." The prosecutor stated:

> The last thing I would like to talk about is the law. Mr. Kalista talks about and uses words like kill. You will not hear Judge Jones use that term. The job is not to kill anyone. It's not the law. You'll be asked to make one judgment, and it's this: Is the death penalty for Carlos Caro justified?

(Trial Tr. 98, Feb. 13, 2007, ECF No. 687.) In rebuttal, Caro asserts that his claim stands despite his initial misreading of the transcript, because the government also downplayed the jury's responsibility by arguing that other juries have sentenced people to death. He refers to an earlier portion of the government's closing, where the government stated, "If it is your decision that Carlos David Caro should be

---

[9] Caro argues that he has presented additional facts and arguments, and that accordingly, the Fourth Circuit's conclusion must be reweighed. Caro's additional facts and arguments for this claim consist of his briefs and a supporting juror affidavit. The juror affidavit will not be considered pursuant to Federal Rule of Evidence 606(b). *See Fullwood*, 290 F.3d at 679-80.

sentenced to death, if in fact the weighing process justifies the death sentence, you would not be the first jury to come to that conclusion. It's something that other juries have done." (*Id.* at 17-18.)

Caro's argument does not create a reasonable probability that the outcome of the trial would have been different. The fact that some juries have voted for the death penalty is common knowledge, and trial counsel's failure to object to either of the government's statements did not constitute an unreasonable professional decision. More egregious conduct is required before counsel's failure to object will constitute ineffective assistance. *See Hodge v. Hurley*, 426 F.3d 368, 386-87 (6th Cir. 2005) (finding ineffective assistance where counsel failed to object to prosecutor's false, unsupported, and misleading statements during closing); *Driscoll v. Delo*, 71 F.3d 701, 711 (8th Cir. 1995) (finding ineffective assistance where counsel failed to object when prosecutor referred to judge as 13th juror and stated that the jury's sentence of death would be a mere recommendation to the judge).

### 11. *Failure to Move to Strike Sleeping Juror.*

Caro argues that his trial counsel was ineffective for failing to move to strike Juror No. 33 after discussions occurred about whether the juror was sleeping, and after the juror informed a court security officer that he was experiencing anxiety problems. Caro asserts that this was not a reasonable strategy decision since trial

JA 1948

counsel had rated the first alternate more favorably than Juror No. 33. Caro also argues that the continued presence of Juror No. 33 infringed his right to a fair trial.

Caro cannot show that trial counsel's decision not to move to remove the juror was unreasonable. A juror is properly dismissed where the juror's sleeping "makes it impossible for that juror to perform his or her duties or would otherwise deny the defendant a fair trial." *United States v. Freitag*, 230 F.3d 1019, 1023 (7th Cir. 2000). "However, a court is not invariably required to remove sleeping jurors, and a court has considerable discretion in deciding how to handle a sleeping juror." *United States v. Johnson*, 409 F. App'x 688, 692 (4th Cir. 2011) (unpublished) (quoting *Freitag*, 230 F.3d at 1023 (citations omitted).) There is no clear evidence that Juror No. 33 was sleeping. Neither the lawyers nor I thought that the juror was inattentive to the degree that he needed to be removed. When Juror No. 33 was questioned by me, he stated that he was staying awake and paying attention. (Trial Tr. 66-68, Feb. 7, 2007, ECF No. 684.) I find that Caro has failed to show that his attorneys were ineffective for failing to seek Juror No. 33's removal, or that his right to a fair trial was compromised.

Even if trial counsel had moved to replace this juror, Caro cannot show prejudice on this claim. I likely would not have granted the motion because the evidence supporting removal was weak in light of my first-hand knowledge of the

JA 1949

circumstances.  Caro has not demonstrated either prong of the *Strickland* test, and his claim fails.

### 12.  *Cumulative Error.*

Finally, Caro argues that deficiencies of counsel during the penalty phase prejudiced him cumulatively.  None of these claims individually warrant granting Caro's Motion for Collateral Relief, nor do they do so collectively.  *Fisher*, 163 F.3d at 852-53.

### G.    CLAIM VII: *BRADY* VIOLATIONS CONCERNING FUTURE DANGEROUSNESS.

During the penalty phase, the government alleged future dangerousness as a non-statutory aggravating factor.  The government presented evidence that Caro held a leadership position in a violent gang, and that Caro would only temporarily be at the BOP's most secure facility.  In his seventh claim, Caro argues that the government violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments by withholding material exculpatory and impeachment evidence on these topics.  He also argues that the government misled the jury regarding his future dangerousness.  His claims are individually addressed below.

### 1.  *BOP Housing Information.*

In this *Brady* claim, Caro argues that the government withheld material, exculpatory, and impeachment evidence that the BOP had often housed inmates in its most secure prison, Administrative Maximum United States Penitentiary in

-62-

JA 1950

Florence, Colorado ("Florence ADMAX"), for more than three years. Caro moves

to engage in discovery to obtain BOP data, expand the record, and conduct a

hearing on this evidence and its potential impact on his sentence. I find, however,

that because Caro raised this same *Brady* claim on direct appeal, he is barred from

relitigating it under § 2255. *Linder*, 552 F.3d at 396 (finding that defendant "may

not circumvent a proper ruling on his [claim] on direct appeal by re-raising the

same challenge in a § 2255 motion."). I also find that the BOP information Caro

claims the government should have disclosed does not qualify as *Brady* evidence.

*See Strickler*, 527 U.S. at 281 ("[T]here is never a real '*Brady* violation' unless the

nondisclosure was so serious that there is a reasonable probability that the

suppressed evidence would have produced a different verdict.").

Prior to trial, Caro filed four separate discovery motions for BOP data and

records on inmates housed at Florence ADMAX. The motions sought the same

information on different grounds, including data showing inmates' length of stay

since the prison opened in 1994. Two of the motions sought subpoenas duces

tecum directed to the director of the BOP and the warden of Florence ADMAX

pursuant to Rule 17 of the Federal Rules of Criminal Procedure (ECF Nos. 273 &

274). Another motion sought an order from the court requiring the government to

produce the information under Federal Rule of Criminal Procedure 16(a)(1)(E)

(ECF No. 308), and the final motion sought an order from the court to produce the

-63-

JA 1951

information as exculpatory within the meaning of *Brady* (ECF No. 307). The motions were referred to the magistrate judge, who granted the motion based on *Brady* and denied the other motions. *See United States v. Caro*, No. 1:06cr00001, 2006 WL 3251738, at *4-*5 (W.D. Va. Nov. 8, 2006) (Sargent, J.). The parties filed objections to the magistrate judge's order. I sustained the government's objections on the ground that the defense had not demonstrated that the requested evidence was material as defined under *Brady*. *Caro*, 461 F. Supp. 2d at 481. The Fourth Circuit affirmed this ruling on Caro's direct appeal. *Caro*, 597 F.3d at 619.

Some time after Caro murdered Sandoval, he was transferred from USP Lee to Florence ADMAX. Caro presented evidence about Florence ADMAX from Mark Cunningham, Ph.D., a psychologist and expert in prison violence and security measures within the BOP.[10] He explained that at Florence ADMAX, inmates, even in so-called "general population," are confined in single cells, 23 hours per day, with shackled movement and single-person exercise. Dr. Cunningham described in great detail the intense security restrictions imposed upon inmates in this prison. He testified that in his opinion, the BOP had an available level of security that could house Caro so that "the likelihood of serious violence is very low." (Trial Tr. 82, Feb. 12, 2007, ECF No. 686.)

---

[10]   Dr. Cunningham is a frequent defense future-dangerousness expert in capital cases. *See, e.g, United States v. Umana*, 750 F.3d 320, 354 (4th Cir. 2014); *United States v. Hager*, 721 F.3d 167, 196 (4th Cir. 2013), *cert. denied*, 134 S. Ct. 1936 (2014).

-64-

Importantly, Cunningham also testified that "for most of the inmates that are there . . . it's not intended to be a permanent placement," the idea being that "you could modify this person sufficiently, or get their attention sufficiently that they could be returned to a lower level of security at some point."   (Trial Tr. 39-40, Feb. 12, 2007, ECF No. 686.)  He explained that the prison has a so-called step-down program that has a minimum period of three years before an inmate can be reassigned to another facility, with an average transfer period of five years.  On the other hand, he pointed that there are inmates at Florence ADMAX for whom there is no foreseeable plan of a lower level of security, such as "Al Qaeda terrorists," the Unabomber Ted Kaczynski, and prison gang leaders. (*Id.* at 40.)

In rebuttal, the government presented testimony from Gregory Hershberger, a retired former warden at Florence ADMAX and long-time BOP employee.  He also described the three-year step-down program.  Hershberger testified that Caro would always present a danger within the BOP system.  He agreed with the prosecutor's assertion that "no system that the Bureau of Prisons has been able to devise to control the inmates is completely failsafe." (*Id.* at 190.)

Relying on the testimony of these experts, the government argued to the jury that Caro would likely leave Florence ADMAX as soon as three years after he entered the facility.  (Trial Tr. 35, Feb. 13, 2007, ECF No. 687 ("[H]e may initially go to ADMAX, but he will be moved out to the USP on a three year program.").)

JA 1953

In his § 2255 motion, Caro asserts that at the time of his trial, the government had exclusive access to data showing that in actuality, the BOP often did not meet its goal of moving inmates out of Florence ADMAX in three years through the step-down program. He claims that the government committed a *Brady* violation by failing to disclose BOP data on this topic and misrepresenting to the jury that if sentenced to life in prison, BOP officials could not protect staff and other inmates from Caro's violence for more than three to five years.

Even without the requested access to BOP data about inmates' terms at Florence ADMAX, Caro has developed evidence on the topic that he presents in support of his § 2255 motion. Caro has submitted an informal survey conducted by a law firm in New Mexico in November 2010. (Mot. Collateral Relief Ex. 48, ECF No. 790-48.) The survey sought information on the number of consecutive years that each inmate at Florence ADMAX had spent there. Of the 129 questionnaires sent, 14 were returned unanswered with indications that the prisoners were under special administrative measures and could not respond. Sixty-nine were returned. (*Id.* at 1, ¶ 3.) The survey suggests that in 2007, at least 30 inmates had been housed at Florence ADMAX for five or more years. (*Id.* at Ex. A, 1-4.) The survey also suggests that 43 inmates had been at Florence ADMAX, or United States Penitentiary Marion, the most secure BOP institution before Florence ADMAX was built, for eight or more consecutive years. (*Id.* at 1,

JA 1954

¶ 4.)

Caro has also presented new evidence in his response to the government's Motion to Dismiss.[11]   The evidence is a collection of data from various sources, some of which were not available at the time of Caro's trial.   This rough compilation of data suggests that at least 126 inmates have been at Florence ADMAX for more than five years, and at least 155 inmates have been at Florence ADMAX for more than three years.  (Pet'r's Opp'n Mot. Dismiss Ex. 72 ¶ 7, ECF No. 797-1.)  It also suggests that inmates who have been at Florence ADMAX for more than three years comprise almost thirty percent of the current population. (*Id.*)  Caro argues that this data likely does not fully represent the number of inmates who have been continuously housed at Florence ADMAX for more than three years.

The new evidence also suggests that there are at least 54 inmates who have been accused or convicted of committing a homicide within a BOP facility who have been designated to Florence ADMAX.  (*Id.* at ¶ 9.)  Allegedly, these 54 inmates have continuously remained at Florence ADMAX since their initial

---

[11] The evidence presented is a collection of various sources.  It includes the Dvorak Affidavit (*Id.* Ex. 48); documents produced by the government in response to a 2010 subpoena issued to the BOP in *United States v. Vincent Basciano*, 1:05-CR-060 (E.D.N.Y.); the Bureau of Prisons Inmate Locator and federal court PACER websites; the Federal Death Penalty Resource Counsel website; documents received pursuant to a FOIA request in this case; and internet searches for articles containing names of inmates known to be housed at Florence ADMAX.  (Pet'r's Opp'n Mot. Dismiss Ex. 72 ¶ 3, ECF No. 797-1.)

placement there.  (*Id.*)  The new evidence suggests that in 2007, at least 14 of these inmates had been incarcerated at Florence ADMAX for more than three years. (*Id.*)

Finally, Caro has located 10 cases where a defendant committed a homicide within a BOP facility, but ended up with a life sentence.  (*Id.* at ¶ 11.)  Allegedly, nine of these defendants have been at Florence ADMAX since the imposition of their life sentences.

"[S]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  *Brady*, 373 U.S. at 87.  Failure to disclose because the evidence is in possession of another government department is no defense.  *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). "[S]howing that the prosecution knew of an item of favorable evidence unknown to the defense does not amount to a *Brady* violation, without more."  *Id.* at 437. The government's constitutional duty to disclose is triggered only when a "reasonable probability" arises that the undisclosed evidence would result in a different outcome—or in other words, when the "government's evidentiary suppression 'undermines confidence in the outcome of the trial.'"  *Id.* at 434 (quoting *United States v. Bagley*, 473 U.S. 667, 678 (1985)).

I must first decide whether Caro is attempting to relitigate the *Brady* claim that was raised on appeal and rejected by the Fourth Circuit. It is well established that a § 2255 motion is not a vehicle for relitigating claims already decided by the appellate court. *See Linder*, 552 F.3d at 396; *Boeckenhaupt*, 537 F.2d at 1183 (holding that issues previously decided on direct appeal may not be raised on collateral review).

The record is clear that Caro raised this same *Brady* claim at trial and again on appeal. Now, as he did then, Caro is seeking access to BOP data on inmates from which he can build statistics about how long inmates are confined at Florence ADMAX. His current version of the claim presents some newly developed, sample statistics extrapolated from raw data he has located on his own since the appeal, that are favorable to his position on future dangerousness. Nevertheless, this recast version of the claim is still seeking the same data for the same reasons. Caro makes no showing that he could not have collected and presented similar evidence when he raised his original *Brady* claim. Had he done so, such evidence would have been a part of the record — for me to consider in reviewing the

JA 1957

magistrate judge's ruling and for the court of appeals to consider.[12]  Caro's legal claim here is no different in substance from the claim that he lost on appeal, and therefore, it is barred.  *Boeckenhaupt*,  537 F.2d at 1183.

In any event, Caro's new statistics do not meet the materiality standard under *Brady*.  The same element that was missing at trial and on appeal is still missing now — a likelihood that additional BOP data would boil down into statistics that undermine confidence in the jury's verdict on future dangerousness.  *See United States v. Agurs*, 427 U.S. 97, 109-10 (1976) ("The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense.").

When deciding the appropriate punishment for a defendant who has been convicted of capital murder, jurors are directed to weigh the aggravating and

---

[12] Caro asserts that his § 2255 *Brady* claim falls within an exception to the procedural default rule because it relies on evidence that could not have been presented on appeal without further factual development.  *See Bousley*, 523 U.S. at 622 (quoting *Waley v. Johnston*, 316 U.S. 101, 104 (1942) (per curiam) (holding that an issue was appropriately raised in a habeas where "the facts [relied on are] '*dehors* the record and their effect on the judgment was not open to consideration and review on appeal'")).  I cannot find that Caro's claim falls within this exception.  Rather, I find it clear that Caro is now raising the same *Brady* claim that he raised in earlier proceedings.  He is, in effect, asking me to reverse the Fourth Circuit's ruling on that claim, based on a type of evidence that was not made part of the trial record only because Caro did not then make the effort to do so.  Such relitigation of an already decided claim, using newly acquired ammunition, is barred.  *Boeckenhaupt*,  537 F.2d at 1183.

JA 1958

mitigating circumstances presented in the case. *See* 18 U.S.C. §3593(d). In Caro's case, jurors unanimously found each alleged aggravating factor, including Caro's lack of remorse and his record of violence against other inmates. They also found 12 of the 22 mitigating factors that Caro had proposed, including the fact that the BOP had securely confined Caro since Sandoval's death in December of 2003. In addition, some jurors found that four other mitigating factors had been established beyond a reasonable doubt, including the mitigating factor that, if not sentenced to death, Caro would be incarcerated in a secure federal institution for the rest of his life.

Both Caro and the government presented expert testimony about BOP mechanisms to maintain security over dangerous inmates like Caro which indicated that inmates could remain at Florence ADMAX for more than three years. Caro's expert witness, Dr. Cunningham, testified that senior staff at Florence ADMAX had estimated that it takes an average of five years for any inmate to complete the step-down program. He also testified that staff had told him about several inmates who had been incarcerated there continuously since the facility opened in 1994. (Trial Tr. 40-41, Feb. 12, 2007, ECF No. 686.) Cunningham further testified that, based on his research, a federal inmate who had killed another inmate would be maintained at Florence ADMAX for six years before BOP officials even considered an alternate placement. The government's

JA 1959

expert witness, Dr. Hershberger, also conceded that in special cases, inmates sometimes remained at Florence ADMAX for years.

The new facts that Caro presents with his § 2255 claim merely reiterate these facts adduced at trial, indicating that inmates often take more than three years to complete the step-down program to earn transfer to a less restrictive placement. Caro's new evidence does not contradict the government's central argument on this issue, which was that Caro could not be permanently assigned to the ADMAX facility. As Cunningham admitted, Florence ADMAX is not intended to be a permanent placement for any inmate, because the goal of the BOP is that exposure to the restrictive environment at Florence ADMAX and its rehabilitative programs would modify an inmate sufficiently to allow his safe transfer to less restrictive housing.

After review of the evidence that the jury heard on this one mitigating factor, I find no plausible reason to believe that the additional, undisclosed BOP data now presented would have persuaded jurors that the mitigating factors outweighed the aggravating factors, such that Caro should not be sentenced to death. Thus, I conclude that the government did not commit a *Brady* violation by failing to disclose the BOP data Caro seeks. For the same reason, I cannot find that the interests of justice require discovery, expansion of the record, or an evidentiary hearing on this matter, and will deny Caro's requests in this regard.

JA 1960

## 2. *Information on Caro's Status as a Gang Leader.*

Caro next argues that the government withheld material exculpatory evidence that Caro was not the leader of the Texas Syndicate at USP Lee and that he might be in bad standing with the Texas Syndicate.

Caro argues that the government should have disclosed three pieces of evidence. The first piece of evidence is the grand jury testimony of a gang intelligence officer at USP Lee. The officer testified that intelligence information had suggested that Benavidez was the leader of the Texas Syndicate at USP Lee before he was assaulted, and that Francisco Tijerina was the leader of the Texas Syndicate at USP Lee at the time of the officer's testimony in 2003. (Mot. Collateral Relief Ex. 28, 14-15, ECF No. 790-28.) The second piece of evidence is an internal BOP memo dated one week after Sandoval's death. The memo states that an inmate told a prison official that a group had decided that whoever had killed Sandoval would face trouble. (*Id.* at Ex. 58.) The third piece of evidence is an internal BOP transportation report from 2006. The report states that Caro "is believed to be in 'bad standing'" with the Texas Syndicate. (*Id.* at Ex. 59.)

Caro argues that these three documents are material because the government argued that he was, or might still be, a leader of the Texas Syndicate. (Pet'r's Opp'n Mot. Dismiss 126.) During the sentencing phase of the trial, the prosecutor stated several times that Caro was a leader of the Texas Syndicate. (*See, e.g.*, Trial

Tr. 21-22, Feb. 13, 2007, ECF No. 687.)   The prosecutor also specifically referenced Caro's role in the Benavidez assault at USP Lee, stating, "Whether he's a leader, whether he's an enforcer, don't know. But he was a player." (*Id.* at 96.)

As discussed above, to demonstrate a *Brady* violation, Caro must prove that the undisclosed evidence was "(1) favorable to him either because it is exculpatory, or because it is impeaching; (2) material to the defense, *i.e.,* prejudice must have ensued; and (3) that the prosecution had materials and failed to disclose them." *United States v. Bartko*, 728 F.3d 327, 338 (4th Cir. 2013) (internal quotation marks and citation omitted).

The government argues that there is not a reasonable probability that the disclosure of these three documents would have changed the sentencing outcome. (Gov.'s Mot. Dismiss 89, ECF No. 791.)  I agree.  Caro has failed to demonstrate prejudice, or that this evidence is exculpatory or impeaching.

These three pieces of evidence primarily concern BOP assessments of Caro's position in the Texas Syndicate, and are not authoritative assessments of Caro's gang standing.  Additionally, evidence was presented on the uncertain nature of Caro's status in the Texas Syndicate after the assault on Benavidez at USP Lee.

Jacoba Guzman, a technician in the Special Investigative Supervisor's Office of the Bureau of Prisons, translated a letter concerning the Benavidez

-74-

JA 1962

assault that law enforcement had intercepted.  (Trial Tr. 16, Feb. 6, 2007, ECF No. 683.)  The letter was addressed to a Mr. Gomez.  Guzman testified that the letter was likely intended for Nick Gomez, the leader of the Texas Syndicate outside of prison.  (*Id.* at 17.)  The letter was signed by several inmates, including Caro, whose name was signed first.  (*Id.* at 18-19.)  The letter stated in part:

> With all respect and moving to the purpose of the present it's necessary sincerely to clear without a doubt the matter that's been placed on the procedure in respect to blank Benavidez . . . .  At this moment it's asked and let be clear [sic] that everything is good or clear with this person.  Therefore, there is no or doesn't exist any testification against one or any brothers of ours Texas Syndicate [sic].

(*Id.* at 21.)

In addition to introducing this letter, the government referred to the uncertainty of Caro's status in the Texas Syndicate during their closing arguments:

> And after the Benavidez stabbing, what does he do?  He sends out letters to this Mr. Gomez who, according to Jackie Guzman, was like the godfather of the Texas Syndicate. . . .  [He said] [w]e didn't know we weren't supposed to take orders from Tijerina, and please let me back in good standing with the gang.

(Trial Tr. 28, Feb. 13, 2007, ECF No. 687.)  It thus appears that evidence and argument that Caro might be in bad standing with the Texas Syndicate were presented during the penalty phase, and that Caro had personal knowledge that he might be in bad standing with the Texas Syndicate.  *See United States v. Roane*, 378 F.3d 382, 402 (4th Cir. 2004) ("[I]nformation actually known by the defendant falls outside the ambit of the *Brady* rule.").

JA 1963

In light of all evidence presented during the penalty phase, there is not a reasonable probability that this evidence was material, exculpatory or impeachment evidence that would have changed the outcome.

### 3. *Cumulative Violation.*

Caro argues that the government's cumulative failures to produce exculpatory and impeachment evidence violated his constitutional rights. He argues that the government misled the jury with regard to his gang association and the BOP's ability to safely house him for more than three years, and that the government's cumulative errors prejudiced him.

However, I find that the items of evidence that Caro claims were withheld in violation of *Brady* are not material when considered cumulatively. "[T]his evidence, even viewed cumulatively, does not place [the petitioner's] trial in such a different light that confidence in the verdict is undermined." *Richardson v. Branker*, 668 F.3d 128, 149 (4th Cir. 2012).

### 4. *Eighth Amendment Violation.*

Caro argues that his death sentence violates the Eighth Amendment because misleading evidence led to the finding that he presented a future danger. He states that his claim relies on the evidence and arguments presented in other claims, specifically Claims VI, VII, and X. Insofar as these claims have been found to be without merit, this claim is also without merit.

JA 1964

## H.    CLAIM VIII: MINIMIZATION OF JURY'S RESPONSIBILITY.

Caro argues that the government violated the Eighth Amendment by minimizing the jury's responsibility.

*Caldwell v. Mississippi*, 472 U.S. 320, 333 (1985), states in relevant part: "The uncorrected suggestion that the responsibility for any ultimate determination of death will rest with others presents an intolerable danger that the jury will in fact choose to minimize the importance of its role."  A *Caldwell* violation occurs when a sentencer "has been led to the false belief that the responsibility for determining the appropriateness of the defendant's capital sentence rests elsewhere." *Sawyer v. Smith*, 497 U.S. 227, 233 (1990).

Caro argues that the government made two statements during its closing argument that diminished the jury's responsibility.  First, the government stated:

> If it is your decision that Carlos David Caro should be sentenced to death, if in fact the weighing process justifies the death sentence, you would not be the first jury to come to that conclusion.  It's something that other juries have done.

(Trial Tr. 17, Feb. 13, 2007, ECF No. 687.)  Second, the government stated:

> The last thing I would like to talk about is the law.  Mr. Kalista talks about and uses words like kill. You will not hear Judge Jones use that term.  The job is not to kill anyone. It's not the law.

(*Id.* at 98.)

As the government points out, this claim is procedurally defaulted.  It rests on facts and law that were available to counsel at the time of appeal.  A sentencing

-77-

JA 1965

error that could have been raised on direct appeal, but was not, is barred from review under § 2255 unless the petitioner shows both cause for the default and actual prejudice. *Bousley*, 523 U.S. at 622. Prejudice requires a showing that "there is a reasonable probability that his conviction or sentence would have been different . . . ." *Strickler*, 527 U.S. at 264. In this instance, prejudice has not been demonstrated.

Caro's first argument is that the government sent a message to the jury that it did not need to feel responsible for causing the death of Caro because other juries have done so. (Mot. Collateral Relief 159, ECF No. 790.) I do not find that the government's statements created the perception that the responsibility for determining the appropriateness of a death sentence rested elsewhere. The reasonable interpretation of the government's remarks was that other juries have imposed the death sentence in other capital cases. Additionally, this statement was preceded by a discussion of the jury's responsibility to weigh aggravating and mitigating factors. (Trial Tr. 16-17, Feb. 13, 2007, ECF No. 687.)

Caro's second argument is based upon a typographical error. He incorrectly quoted the transcript as stating, "The job is not to kill anyone. It's the law." (Mot. Collateral Relief 158, ECF No. 790.) I do not find that the government's actual statement, quoted above, created the perception that the responsibility for determining the appropriateness of a death sentence rested elsewhere. This

JA 1966

statement was followed by a discussion of the jury's responsibility to weigh aggravating and mitigating factors.  (Trial Tr. 98, Feb. 13, 2007, ECF No. 687.)

This claim has been procedurally defaulted, and because prejudice has not been demonstrated, Caro cannot overcome the procedural default.[13]

### I.    CLAIM IX:  INEFFECTIVE ASSISTANCE OF COUNSEL ON DIRECT APPEAL

In his ninth claim, Caro argues that he was deprived of his constitutional right to effective assistance of counsel on direct appeal.  He argues that appellate counsel was ineffective in failing to raise five claims.   First, he argues that appellate counsel failed to challenge the court's refusal to instruct the jury that aggravating factors must outweigh mitigating factors sufficiently and beyond a reasonable doubt.  Second, he argues that appellate counsel failed to challenge the exclusion for cause of qualified jurors with misgivings as to the death penalty. Third, he argues that appellate counsel failed to raise an argument regarding trial counsel's failure to object to the introduction of specific instances of violence committed by persons other than Caro.  Fourth, he argues that appellate counsel failed to raise the claim that the government violated Caro's constitutional rights by minimizing the jury's responsibility.   Fifth and finally, Caro argues that

---

[13]  Caro asserts that he can overcome this claim's procedural default by establishing ineffective assistance of counsel.  However, this argument is without merit because establishing ineffective assistance of counsel also requires a showing of prejudice.  *See infra* Claim IX.D.

-79-

JA 1967

appellate counsel failed to raise systemic challenges to the death penalty. These arguments are individually addressed below.

### 1. *Failure to Challenge Refused Instruction.*

Caro argues that appellate counsel was ineffective in failing to challenge the court's refusal to instruct the jury that aggravating factors must outweigh mitigating factors sufficiently and beyond a reasonable doubt. He asserts that this violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

At trial, Caro requested an instruction stating that "the government must prove beyond a reasonable doubt that the aggravating factors sufficiently outweigh the mitigating factors in order to justify the death penalty." (Def.'s Resp. Regarding Proposed Jury Instructions 1, ECF No. 611.) I declined to give that proposed instruction. (*See* Final Jury Instructions Sentencing Hr'g. Part 2, ECF No. 640.)

At trial, the court instructed the jury to consider the aggravating factors separately, and to decide for each if they unanimously agreed that the government had proved it beyond a reasonable doubt. (*Id.* Instruction No. 6, 9.) The court also told the jurors to determine whether the aggravating factors that they unanimously found to exist sufficiently outweighed any mitigating factors that they individually found to exist. (*Id.* Instruction No. 8, 13.)

JA 1968

Caro argues that although the court instructed the jury to determine whether the government had proved the aggravating factors beyond a reasonable doubt, the court failed to instruct the jury that the reasonable doubt standard must also apply to the weighing of aggravating and mitigating factors. Caro points to two out-of-circuit cases that were decided after trial, but before appellate counsel filed their opening brief. He argues that these two cases, *United States v. Fell*, 531 F.3d 197 (2d Cir. 2008), and *United States v. Sampson*, 486 F.3d 13 (1st Cir. 2007), approved the "beyond a reasonable doubt" language as applied by his proposed instruction.

As Caro concedes, after the filing of the 2255 motion, the Fourth Circuit rejected his argument. *United States v. Runyon*, 707 F.3d 475, 515-16 (4th Cir. 2013), *cert. denied*, 135 S. Ct. 46 (2104); *United States v. Hager*, 721 F.3d 167, 206-07 (4th Cir. 2013), *cert. denied*, 134 S. Ct. 1936 (2014). In any event, appellate counsel was not ineffective in failing to raise this claim. *See Jones v. Barnes*, 463 U.S. 745, 751 (1983) (holding that appellate counsel has no duty to raise every colorable claim and is entitled to exercise professional judgment). The FDPA does not set forth a reasonable doubt standard in the portion of the statute that deals with weighing aggravating and mitigating factors. (*See* 18 U.S.C. § 3593(e).) *Fell* and *Sampson* are persuasive authority only, and do not hold that juries must be instructed that aggravating factors outweigh mitigating factors

JA 1969

beyond a reasonable doubt.  *See Fell*, 531 F.3d at 233-34 (finding no constitutional error where three of the non-statutory aggravating factors had some overlapping factual predicate, especially where the jury was charged with making a qualitative assessment of the aggravating and mitigating evidence as a whole).

Indeed, in *Sampson*, the First Circuit addressed a district court instruction that said jurors could impose the death penalty if the aggravating factors "slightly outweigh[ed]" the mitigating factors, but then later said that the prosecution had to convince them "beyond a reasonable doubt that the aggravating factor or factors sufficiently outweigh the mitigating factors to make death the appropriate penalty in [the] case."  486 F.3d at 33.  The court reasoned:

> There are only two possibilities: either the jurors eschewed the reasonable doubt standard vis-à-vis the weighing process (which, as we have held, would have comported fully with the law) or they applied the reasonable doubt standard (which would have *benefitted* Sampson by imposing a more onerous burden on the government).

*Id.*  This case does not hold that an instruction such as the one proposed by Caro is required under the law, but rather states that such an instruction imposes a higher standard than that required by law.  *See also Tuilaepa v. California*, 512 U.S. 967, 979 (1994) ("A capital sentencer need not be instructed how to weigh any particular fact in the capital sentencing decision.").

Additionally, the other cases cited by Caro do not address this issue and thus do not support his argument.  *See Apprendi v. New Jersey*, 530 U.S. 466, 490

JA 1970

(2000) (holding that any fact other than a prior conviction that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt); *Ring v. Arizona*, 536 U.S. 584, 609 (2002) (holding that a sentencing judge, sitting without a jury, cannot find an aggravating circumstance necessary for imposition of the death penalty).

That appellate counsel did not present this argument does not render their assistance ineffective. To show deficient performance under *Strickland*, a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness," considering circumstances as they existed at the time of the representation. 466 U.S. at 688. Appellate counsel's conduct did not fall below an objective standard of reasonableness, which is clearly demonstrated by the lack of case law supporting Caro's argument.

### 2. *Failure to Challenge Exclusion for Cause of Qualified Jurors with Misgivings as to the Death Penalty.*

Caro next argues that appellate counsel was ineffective for failing to challenge the exclusion for cause of qualified jurors with misgivings as to the death penalty. He argues that he ended up with a death-leaning jury because Jurors #40 and #57, who had concerns about the death penalty, were questioned in a manner that resulted in their disqualification, even though they had indicated that they were willing to follow the law. He argues that while appellate counsel made general

-83-

JA 1971

arguments regarding the overall voir dire process, they were ineffective in failing to also challenge the particular voir dire and exclusion of Jurors #40 and #57.

As to this claim, Caro has failed to demonstrate deficient performance.

Because they are tasked with identifying relevant prejudices, district courts have discretion concerning what questions are asked during voir dire. *Rosales-Lopez v. United States*, 451 U.S. 182, 188-89 (1981); *United States v. Barber*, 80 F.3d 964, 967 (4th Cir. 1996). "[A] juror should be excluded for cause if his 'views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Fulks*, 454 F.3d at 427 (quoting *Wainwright v. Witt*, 469 U.S. 412, 424 (1985)).

During voir dire, Juror #40 expressed an inability to impose the death penalty,[14] as did Juror #57.[15] The exclusion for cause of jurors who indicate an

_____

[14] During voir dire, Juror #40 answered as follows:

THE COURT: Well, I know, and again, there's no right or wrong answer here. I just need to know what you believe, and so you need to tell me honestly. I mean, either way is, is fine. People have beliefs both ways. Some people believe that they could vote to impose the death penalty, some people believe that they could not. And I just need to know what your position is.

JUROR NUMBER FORTY: I guess if it all come down to it - -

THE COURT: That you could not.

JUROR NUMBER FORTY: No, if it all come down to it.

(Trial Tr. 136-37, Jan. 22, 2007, ECF No. 693.)

unwillingness to consider the death penalty as a potential punishment has been routinely upheld. *See, e.g., United States v. Jackson*, 327 F.3d 273, 296 (4th Cir. 2003) (finding that the district court did not act improperly in excluding a juror who indicated that he could not sign his name to a verdict sheet which would require the court to impose the death penalty). The exclusion of Jurors #40 and #57 based on the answers that they provided during voir dire was not unusual, and appellate counsel was not ineffective in failing to challenge this on appeal. The law affords a strong presumption that counsel's performance was within the range of competence demanded from attorneys defending criminal cases. *Strickland*, 466

---

[15] During voir dire, Juror #57 answered as follows:

THE COURT: Well, are you telling me that if you were a juror in this case and the defendant were found guilty that you could not vote for the death penalty?

PROSPECTIVE JUROR: Yes, sir.

THE COURT: Is that what you're saying?

PROSPECTIVE JUROR: I could not vote for it.

THE COURT: All right. No matter what the circumstances?

PROSPECTIVE JUROR: No.

THE COURT: Your mind would be in essence closed to the death penalty, is that what you're saying? Is that right?

PROSPECTIVE JUROR: Yes, sir.

(Trial Tr. 57-58, Jan. 23, 2007, ECF No. 672.)

JA 1973

U.S. at 688-89.  In the case at hand, there is no indication that appellate counsel's performance fell below an objective standard of reasonableness, or even departed from usual practice.

### 3.  *Failure to Challenge Trial Counsel's Failure to Object to Specific Instances of Violence Committed by Persons Other Than Caro.*

Caro argues that appellate counsel rendered ineffective assistance of counsel for failing to raise a claim regarding trial counsel's failure to object to specific instances of violence committed by inmates other than Caro, in violation of the trial court's order.  He notes that the Fourth Circuit stated that it could not grant relief as to the use of specific instances of violence by persons other than Caro when that claim was never raised on appeal.  *See Caro*, 597 F.3d at 621 n.14.  He argues that the Fourth Circuit's opinion establishes the prejudicial impact of appellate counsel's failure to raise this claim, and establishes that the government's use of evidence of specific instances of violence by persons other than Caro was error because it violated the district court's ruling.  He also argues that the government's use of this evidence violated the Eighth Amendment because it constituted aggravation evidence that was not "an *individualized* determination on the basis of the character of the individual and the circumstances of the crime." *Zant v. Stephens*, 462 U.S. 862, 879 (1983).

Caro has failed to prove prejudice under *Strickland*, because he has failed to demonstrate a "reasonable probability" that but for counsel's errors, the outcome of the penalty phase would have been different.  466 U.S. at 694-95.

At trial, the government presented evidence of specific instances of violence committed by other inmates.  Witness Olson testified that an inmate at Florence ADMAX who was a member of the Aryan Brotherhood had sent a coded message that had resulted in the death of two other inmates.  (Trial Tr. 27-30, Feb. 6, 2007, ECF No. 683.)  Former warden Hershberger testified that an inmate had killed two guards at USP Marion, the predecessor to Florence ADMAX. (Trial Tr. 188, Feb. 12, 2007, ECF No. 686.)

The Fourth Circuit's discussion of this evidence does not establish prejudice.  The Fourth Circuit mentioned trial counsel's failure to challenge this evidence in its opinion:

> When asked during oral argument whether Caro asserted any claim arising from the government having violated the district court's order that it "may not rely on specific instances of inmate violence (other than the defendant's own) in seeking to prove his future dangerousness," counsel for Caro stated that she noted the government's misconduct merely to bolster her argument about subsection (i). Regardless of whether subsection (ii) would apply, we cannot grant relief that Caro plainly failed to request.

*Caro*, 597 F.3d at 621 n. 14 (internal citation omitted).  The Fourth Circuit discussed this evidence in the context of Federal Rule of Criminal Procedure 16, which concerns documents and objects that (i) are "material to preparing the

-87-

JA 1975

defense;" or (ii) "the government intends to use . . . in its case-in-chief at trial."

Fed. R. Crim. P. 16(a)(1)(E)(i)-(ii).  The rule does not address rebuttal evidence.

Similarly, the order banning use of evidence of specific instances of violence

by inmates other than Caro did not address rebuttal evidence, but rather concerned

evidence that the government intended to use in its case in chief.  *See Caro*, 461 F.

Supp. 2d at 481-82 ("For these reasons, I will sustain the government's objection

to the magistrate judge's order and deny the defendant's objection . . . . I do so in

light of the government's representation that it does not intend to introduce any of

the requested data in its own case." (internal citations omitted).)  Hershberger and

Olsen were offered as rebuttal witnesses to defendant's expert Cunningham.[16]  The

Fourth Circuit's discussion of their testimony and Rule 16(a)(1)(E) does not

establish prejudice sufficient to prove Caro's ineffective assistance of counsel

claim.

Caro premises his ineffective assistance of counsel claim on appellate

counsel's failure to challenge trial counsel's failure to challenge the introduction of

specific acts evidence in violation of the court's order, but Caro has not

demonstrated a violation of the court's order.  Furthermore, Caro has failed in his

attempts to establish prejudice.  There is not a reasonable likelihood that the

---

[16] Although Olson's testimony preceded Cunningham's, it still was presented as rebuttal testimony.  See discussion concerning the admission of Olson's testimony on the matter of the coded letter at Trial Tr. at 27-31, Feb. 6, 2007, ECF No. 683.

JA 1976

outcome of the penalty phase would have been different but for the introduction of this evidence. The government offered other evidence that could have served as a basis for the jury's finding that Caro constituted a future danger — for example, Caro's record of gang involvement and violence against other inmates. There is no indication that the totality of the evidence presented on Caro's future dangerousness "was merely speculative or that it was constitutionally infirm." *United States v. Hager*, 721 F.3d 167, 200 (4th Cir. 2013). Accordingly, this claim is without merit.

To the extent that Caro asserts a claim under the Eighth Amendment, this claim also fails. The evidence in question was introduced in rebuttal, and extensive evidence specific to Caro was presented to the jury. The jury found that the parties had proved three non-statutory aggravating factors and twelve mitigating factors. The jury weighed the aggravating and mitigating factors before delivering a death verdict, and made "an individualized determination on the basis of the character of the individual and the circumstances of the crime." *Zant*, 462 U.S. at 879. That specific acts evidence was introduced in rebuttal at trial does not mean that the jury failed to make an individualized determination.

JA 1977

#### 4.  *Failure to Raise Claim That Government Improperly Minimized Jury's Responsibility.*

Caro argues that appellate counsel was ineffective in failing to claim that the government violated the Eighth Amendment by minimizing the jury's responsibility.

The underlying claim that the government violated the Eighth Amendment by minimizing the jury's responsibility (Claim VIII) has been procedurally defaulted and is without merit.  As discussed above, Caro has not shown that the government's challenged statements misrepresented or minimized the jurors' role in determining the appropriateness of a death sentence.  Accordingly, Caro cannot establish that counsel's representation was deficient or prejudicial, and this claim fails under *Strickland.*

#### 5.  *Failure to Raise Systemic Challenges to the Death Penalty.*

Caro argues that appellate counsel was ineffective in failing to raise systemic challenges to the death penalty.  He argues that appellate counsel should have raised the arguments that he asserts in Claims X through XV, which are discussed hereafter.

Caro cannot establish that appellate counsel was ineffective for failing to raise these arguments.  To show prejudice under *Strickland*, the petitioner must demonstrate a "reasonable probability that, but for counsel's unprofessional errors,

-90-

JA 1978

the result of the proceeding would have been different." 466 U.S. at 694. As discussed below, Claims X through XV seek to overturn clearly established law concerning the death penalty. Accordingly, these claims are without merit, and no prejudice occurred from appellate counsel's failure to raise them.

### J.    CLAIMS X-XV: SYSTEMIC CHALLENGES TO DEATH PENALTY.

In Claims X through XV, Caro asserts systemic challenges to the death penalty. In Claim X, he argues that the use of future dangerousness as an aggravating factor violated his right to a non-arbitrary sentencing process under the Eighth Amendment and 18 U.S.C. § 3595(C)(2)(A). In Claim XI, he argues that the FDPA is unconstitutional due to the absence of a principled basis for distinguishing between cases where the death penalty is imposed and cases where it is not. In Claim XII, he asserts that his sentence should be vacated because the death penalty was imposed "on both the invidious basis of race and the irrational basis of geography ." (Mot. Collateral Relief 186, ECF No. 790.) In Claim XIII, he asserts that the death sentence is a categorically cruel and unusual punishment that violates the Eighth Amendment. In Claim XIV, he claims that the death sentence violates international law, namely the Convention on the Elimination of All Forms of Racial Discrimination and the International Covenant on Civil and Political Rights ("ICCPR"). Finally, in Claim XV, he argues that the FDPA precludes plain error review, and is thus unconstitutional.

JA 1979

Claims X through XV have been procedurally defaulted, because they concern alleged errors which could have been raised on direct review, but were not.[17]   *See Bousley*, 523 U.S. at 622.   Caro has not shown any "external impediment preventing counsel from constructing or raising" these claims on direct appeal," *Murray*, 477 U.S. at 492, or "a reasonable probability that his conviction or sentence would have been different" if counsel had raised any of these claims.  *Strickler*, 527 U.S. at 264.

Caro has not demonstrated cause and prejudice for failing to raise any of these claims on direct appeal.  It is clear from the record that these claims rely on facts and law that were available to counsel at the time of appeal.  The case summaries and statistical studies that Caro has put forth are not new evidence and do not constitute "exceptionally clear proof" of discriminatory purpose.

---

[17] The government explicitly argues that Claim X and Claim XV are procedurally defaulted.  Caro argues that he can overcome the procedural default due to ineffective assistance of appellate counsel in failing to raise these claims.  As discussed in Claim IX E, this argument is without merit, because Caro has failed to establish prejudice.

The government moved to dismiss Claims XI through XIV, but did not explicitly argue that they were procedurally defaulted.  However, these claims are appropriate for sua sponte application of procedural default. *See, e.g.*, *Yeatts*, 166 F.3d at 261.  A finding that these claims are procedurally defaulted furthers interests in the finality of the judgment, judicial efficiency, and conservation of judicial resources. *See Hines v. United States*, 971 F.2d 506, 509 (10th Cir. 1992).  These interests are particularly furthered due to the fact that Caro is raising systemic challenges to the death penalty, a punishment which has been repeatedly upheld under federal law.  Caro received notice that the government had moved to dismiss these claims, and had opportunity to respond.  Thus, I find that sua sponte application of procedural default is warranted under the circumstances of this case.

JA 1980

*McCleskey v. Kemp*, 481 U.S. 279, 292-97 (1987) (discussing problems with using statistical studies to challenge the imposition of a death sentence). *See also Bell v. Ozmint*, 332 F.3d 229, 239 (4th Cir. 2003) (discussing "very exacting standards for entitlement to constitutional relief based on statistical evidence" (internal quotation marks and citation omitted)).   Furthermore, these claims can be fully and completely addressed based on the existing record in this case. *See Bousley*, 523 U.S. at 622.

Additionally, Claims X through XV seek to overturn well-established case law, and are without merit. *See, e.g., Jones v. United States*, 527 U.S. 373, 389 (1999) (reviewing claims challenging a sentence imposed under the FDPA for plain error); *McCleskey*, 481 U.S. at 292  (rejecting use of statistical study as sufficient proof of discrimination in equal protection claim challenging capital sentencing decision); *United States v. Lighty*, 616 F.3d 321, 370 (4th Cir. 2010) (affirming that death penalty is not per se cruel and unusual punishment under the Eighth Amendment); *United States v. Caro*, 614 F.3d 101, 101-02 (4th Cir. 2010) (affirming constitutionality of FDPA and recognizing its purpose of eliminating arbitrariness in capital sentencing); *United States v. Basham*, 561 F.3d 302, 331 (4th Cir. 2009) (recognizing future dangerousness as a legitimate non-statutory aggravating factor in capital proceedings); *Sampson*, 486 F.3d at 25 (rejecting Fifth and Eighth Amendment claims that the FDPA is unconstitutional due to racial and

geographical discrimination); *Dutton v. Warden, FCI Estill*, 37 F. App'x 51, 53 (4th Cir. 2002) (unpublished) (holding that treaties such as the ICCPR that are not self-executing and have not had implementing legislation passed by Congress do not create private causes of action in U.S. courts). Caro has failed to establish that he is entitled to relief on these claims.

### K. CLAIM XVI: CUMULATIVE ERROR.

In his final claim, Caro asserts that his claims establish prejudicial error when considered cumulatively. This claim is without merit. Cumulative error seldom supports reversal:

> Pursuant to the cumulative error doctrine, the cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error. Generally, however, if a court determines that none of a defendant's claims warrant reversal individually, it will decline to employ the unusual remedy of reversing for cumulative error. To satisfy this requirement, such errors must so fatally infect the trial that they violated the trial's fundamental fairness. When none of the individual rulings work any cognizable harm, it necessarily follows that the cumulative error doctrine finds no foothold.

*Basham*, 561 F.3d at 330 (internal alterations, citations, and quotation marks omitted). Insofar as I have found Caro's claims meritless individually, I also find that Caro's claims, when considered cumulatively, do not violate his trial's fundamental fairness.

JA 1982

## IV. CONCLUSION.

For the reasons stated above, the government's Motion to Dismiss (ECF No. 791) will be GRANTED and the defendant's Motion for Collateral Relief Pursuant to 28 U.S.C. § 2255 (ECF No. 781) and the defendant's First Motion for Leave to Conduct Discovery and Preliminary Request for an Evidentiary Hearing and Expansion of the Record (ECF No. 800) will be DENIED.   A separate Final Order will be entered herewith.

DATED:   May 4, 2015

/s/  James P. Jones
United States District Judge

JA 1983

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION**

UNITED STATES OF AMERICA ... )
                                   )
                                   )     Case No. 1:06CR00001
                                   )
v.                              )     **CERTIFICATE OF APPEALABILITY**
                                 )
**CARLOS DAVID CARO,**      )     By:  James P. Jones
                                 )     United States District Judge
                                 )
         Defendant.      )

The court hereby GRANTS a Certificate of Appealability as to Claim Seven of the

Defendant's Motion for Collateral Relief Pursuant to 28 U.S.C. § 2255. A Certificate of

Appealability is DENIED as to all other claims and issues.

It is so **ORDERED**.

                           ENTER:  May 4, 2015

                           /s/  James P. Jones
                           United States District Judge

JA 1984

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 1:06CR00001-JPJ |
| Plaintiff, | DEATH-PENALTY CASE |
| vs. | Motion to Alter or Amend Judgment |
| CARLOS DAVID CARO, | Pursuant to Federal Rule of Civil Procedure Rule 59(e) |
| Defendant. | |

Pursuant to Federal Rule of Civil Procedure 59(e), Defendant Carlos David Caro moves to alter or amend the Court's May 4, 2015 Opinion dismissing Caro's Motion for Collateral Relief ("Op.") (ECF No. 808), and the accompanying Judgment (ECF No. 809). In accordance with Rule 11(c)(1) of the Local Civil Rules for the United States District Court for the Western District of Virginia, this motion is supported by the attached Memorandum of Points and Authorities, and all pleadings and exhibits on file herein.

Respectfully submitted this 1st day of June, 2015.

s/Robin C. Konrad
Jon M. Sands
Federal Public Defender
Robin C. Konrad (Alabama Bar No. 2194-N76K)
Office of the Federal Public Defender
District of Arizona
850 West Adams Street, Suite 201
Phoenix, Arizona 85007
robin_konrad@fd.org
Telephone: 602-382-2816
Facsimile: 602-889-3960

JA 1985

Fay F. Spence (Virginia Bar No. 27906)
Federal Public Defender's Office
210 First Street, SW, Suite 400
Roanoke, Virginia 24011
fay_spence@fd.org
Telephone:  540-777-0880
Facsimile:  540-777-0890

Brian J. Beck (Virginia Bar No. 78049)
Federal Public Defender's Office
201 Abingdon Place
Abingdon, Virginia 24211
brian_beck@fd.org
Telephone:  276-619-6080
Facsimile:  276-619-6090

Attorneys for Defendant
Carlos David Caro

**Memorandum of Points and Authorities in Support of Rule 59(e) Motion**

## I.    Procedural History

On January 8, 2013, Mr. Caro filed a Motion for Collateral Relief Pursuant to 28 U.S.C. § 2255 ("2255 Motion").  (ECF No. 781.)  In his motion, he sought discovery, an evidentiary hearing, and relief from his unconstitutional conviction and sentences.  (ECF No. 781 at 195-96.)  On June 11, 2013, the Government filed a motion to dismiss the 2255 Motion.  (ECF No. 791.)  On October 9, 2013, Mr. Caro filed his reply to the Government's motion to dismiss. (ECF No. 797.)  On October 25, 2013, he filed a motion for discovery (ECF No. 800), to which the Government responded (ECF No. 803).  On November 25, 2013, the Court heard argument on the Government's motion to dismiss and Mr. Caro's motion for discovery. (ECF No. 804.)  On May 4, 2015, this Court granted the Government's motion and dismissed Mr. Caro's 2255 Motion.  (ECF Nos. 808, 809.)  Mr. Caro now timely files his Motion to Alter or Amend Judgment.

1

## II.    Legal Standard

Under Federal Rule of Civil Procedure 59(e), a district court has the power "to rectify its own mistakes in the period immediately following the entry of judgment." *White v. New Hampshire Dep't of Employment Security*, 455 U.S. 445, 450 (1982).  The Fourth Circuit recognizes three grounds for amending a judgment pursuant to Rule 59(e) of the Federal Rules of Civil Procedure: (1) to accommodate an intervening change in the law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice.  *Pac. Ins. Co. v. Am. Nat'l Fire Ins. Co.*, 148 F.3d 396, 403 (4th Cir. 1998).  In this Motion, Mr. Caro invokes the third of these grounds.  Specifically, he submits that, in the incidents identified in this motion, the Court has committed clear errors of law.[1]

## III.    The Court has Committed Clear Errors of Law

The district court committed several errors of law when it reviewed Mr. Caro's ineffective assistance of counsel (IAC) claims.  To begin, it did not rule upon one of Mr. Caro's subclaims.  The Court also failed to apply the relevant standard for dismissal; rather than accepting all allegations as true, the Court substituted its own speculation regarding trial counsel's performance.  In assessing prejudice, the Court erred by failing to review cumulatively the impact of the trial counsel's errors, by applying a test that directly contradicts Supreme Court precedent, and by erroneously excluding relevant evidence in its decision.  These errors should result in this Court vacating its judgment and granting an evidentiary hearing on Mr. Caro's claims for relief.

---

[1] Mr. Caro asserts that all claims for relief set forth in his § 2255 Motion are meritorious and should not have been summarily dismissed. His decision not to address any particular claim or assert any particular argument in this motion constitutes neither a waiver nor a withdrawal of that claim or argument.

2

## A.    The Court failed to decide Subclaim VI.A.

An order is not appealable unless it is "final" as defined by the Federal Rules of Civil Procedure.  Fed. R. Civ. P. 54(b).  Rule 54(b) provides that an order addressing fewer than all of the claims in an action is not a final action, unless the court expressly determines that there is no just reason for delaying an appeal and directs that final judgment be entered.  Accordingly, an order disposing of a habeas petition must be final as to the entire subject matter before it may be appealed.  *See Andrews v. United States*, 373 U.S. 334, 340 (1963) (noting that the standard of finality followed in federal cases to avoid piecemeal litigation applies equally to habeas proceedings).

Mr. Caro alleged that he was denied his right to effective counsel during the penalty phase of his trial because, *inter alia*, counsel failed to challenge the Government's delay in bringing the indictment.  (ECF No. 790 at 65-66.)  In its opinion, the Court recites Mr. Caro's subclaim but failed to reach a decision regarding that aspect of the IAC claim.  (Op. at 41-42.)  Because the Court failed to decide subclaim VI.A, which is one of the aspects of Mr. Caro's claim that he was denied effective counsel at the penalty phase, the appellate courts cannot review the decision.  This Court should grant this motion[2] and amend its order and enter a final ruling on all aspects of his IAC claim.

## B.    This Court erred by imposing its own speculation regarding trial counsel's performance instead of accepting all allegations as true.

Because this Court granted the Government's motion to dismiss without a hearing, it was "obliged" to accept Mr. Caro's "well-pleaded allegations as true" and "draw all reasonable inferences therefrom" in his favor.  *Gordon v. Braxton*, 780 F.3d 196, 204 (4th Cir. 2015).  In many instances, rather than accept

---

[2] This Court can also amend its ruling pursuant to Federal Rule of Civil Procedure 60(a) to "correct a clerical mistake or a mistake arising from oversight or omission."

3

JA 1988

Mr. Caro's allegations as true, this Court instead substituted its own speculation as to what might have occurred. For example, in dismissing the IAC claim related to the penalty phase, the Court made findings regarding what trial counsel's strategy *could or might* have been—findings that directly contradict allegations in the 2255 Motion and have no support in the record. *See, e.g.*, Op. at 45 (noting what trial counsel "could have decided" regarding expert); *id.* at 46 (noting what trial counsel "might have felt"); *id.* at 47 (finding, absent any evidence, that trial counsel "made a strategic decision regarding the value of Perez's testimony"); *id.* at 47 (finding trial counsel "could have made a strategic decision"); *id.* at 55 (finding that "counsel may have made a strategic decision"); *id.* (speculating as to why "counsel may have decided not to present evidence from the prison psychologist's report").

This Court erred by engaging in speculation to justify its dismissal of Mr. Caro's 2255 Motion. Under § 2255, the Court should have granted a hearing to make findings of fact. *See* 28 U.S.C. § 2255, ¶ 2 ("Unless the motion and the files and the records of the case *conclusively show* that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States Attorney, *grant a prompt hearing thereon*, determine the issues and make findings of fact and conclusions of law with respect thereto.") (emphasis added). By failing to hold a hearing and imposing its own speculation regarding trial counsel's strategy, this Court committed clear error.

**C.    This Court failed to conduct a cumulative review of the deficient performance in determining whether prejudice resulted from those deficiencies during the guilt/innocence phase or penalty phase of trial.**

This Court also misapplied the controlling law in deciding the IAC claims raised in his motion. Mr. Caro alleged that he was denied his Sixth Amendment right to effective counsel both at the guilt/innocence phase (Claim IV) and at the penalty phase (Claim VI). In supporting the constitutional violations that occurred, he alleged that counsel's deficiencies prejudiced him at trial and sentencing. (ECF

4

No. 790 at 61-62, 146.)  Cumulative review of the deficiencies in counsel's performance is the appropriate legal test when considering allegations of ineffective assistance of counsel.

The requirement of undertaking cumulative review of counsel's deficiencies is set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  There, the Supreme Court repeatedly explained that lower courts must consider whether trial counsel's *errors* impacted the trial in a manner that violated the Sixth Amendment; it did not instruct that each individual error should be reviewed for prejudice, but rather the opposite.  *See Strickland*, 466 U.S. at 687 (stating that prejudice "requires showing that counsel's *errors* were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable") (emphasis supplied); *see also id.* at 693 ("[I]f a defendant shows that particular *errors* of counsel were unreasonable . . . the defendant must [also] show that they actually had an adverse effect on the defense.") (emphasis supplied); *id.* at 694 (noting that "defendant must show that there is a reasonable probability that, but for counsel's unprofessional *errors*, the result of the proceeding would have been different") (emphasis supplied);  *id.* at 695 ("The governing legal standard plays a critical role in defining the question to be asked in assessing the prejudice from counsel's *errors*.") (emphasis supplied).

The cumulative analysis of IAC claims applies to courts when reviewing counsel's errors from guilt/innocence phase and the penalty phase.  "*Strickland* stands for the proposition that a multifaceted claim of ineffective assistance of counsel must be treated as a single claim." *Johnson v. United States*, 860 F. Supp. 2d 663, 756 (N.D. Iowa 2012).  The Supreme Court's post-*Strickland* decisions reiterate this point.  In *Williams v. Taylor*, the petitioner identified multiple categories of mitigating evidence omitted by trial counsel's deficient mitigation investigation. 529 U.S. 362, 396 (2000). Nevertheless, those omissions were treated collectively as part of the singular failure of "trial counsel [to] fulfill their obligation to conduct a thorough investigation of the defendant's background." *Id.*

JA 1990

Likewise, the Supreme Court in *Wiggins v. Smith* treated the investigatory omissions and multiple categories of evidence as a single IAC claim for assessing prejudice: "In order for counsel's inadequate performance to constitute a Sixth Amendment violation, petitioner must show that counsel's *failures* prejudiced his defense." 539 U.S. 510, 534 (2003) (emphasis added).

When this Court dismissed Claim IV (IAC during guilt/innocence phase), it determined that each subclaim lacked merit; and it found that because "each of Caro's subclaims" lacked merit, then it necessarily followed that there was no cumulative error. (Op. at 39.) The fundamental flaw in the Court's determination, however, is that it rejected two of the subclaims *only* because they did not result in prejudice. (Op. at 37) (finding that "Caro has not established prejudice" for subclaim IV.C); (Op. at 38) (dismissing subclaim IV.D because "[e]ven if trial counsel had presented testimony from a prison culture expert . . . a reasonable juror still could have concluded from Caro's statements that the killing was premeditated"). In dismissing those two subclaims, the Court either determined or assumed that counsel's performance was deficient. Therefore, under *Strickland*, the Court was required to determine whether, in reviewing both of those errors *cumulatively*, the record "conclusively show[s]" that Mr. Caro is "entitled to no relief." 28 U.S.C. § 2255(b).

The Court also committed a legal error when it dismissed Claim VI (IAC during penalty phase). In misapplying *Strickland*'s cumulative requirement, the Court found: "None of these claims individually warrant granting Caro's Motion for Collateral Relief, nor do they do so collectively." (Op. at 62.) But, as it did with the subclaims related to guilt/innocence phase, the Court rejected five subclaims *solely* on the basis that those individual instances of deficient performance did not result in prejudice. (Op. at 50-51 (finding no prejudice on subclaim VI.D); *id.* at 51 (finding no prejudice on subclaim IV.E); *id.* at 56 (finding no prejudice on subclaim IV.H); *id.* at 58 (finding no prejudice on

subclaim IV.I); *id.* at 60 (finding no prejudice on subclaim IV.J)).[3]  By rejecting these subclaims in this manner, the Court once again assumed that counsel's performance was deficient.  Yet it failed to undertake a cumulative analysis of these five subclaims in deciding whether all of these deficiencies combined resulted in prejudice.

When determining whether there was prejudice amounting from counsel's deficient performance at both phases of trial, this Court should have reviewed *all* errors and *all* new facts supporting prejudice. *See Strickland*, 466 U.S. at 695; *Williams v. Taylor*, 529 U.S. 362, 397-98 (2000) (noting that courts must look at "both that [evidence] adduced at trial, and the evidence adduced in the habeas proceeding[s]"). Its failure to do so was legal error that should result in reconsideration.[4]

---

[3] As noted *supra*, the Court never ruled upon Subclaim VI.A so the allegations of deficient performance set forth in VI.A could not have be part of its cumulative-error analysis.

[4] At minimum, this Court should grant a certificate of appealability (COA) on Claims IV and VI because Mr. Caro "has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and because reasonable jurists could debate the Court's resolution of the claims.  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also Miller-El v. Cockrell*, 537 U.S. 322, 336-38 (2003) (noting that a court "should not decline the application for a COA merely because it believes the applicant will not demonstrate entitlement to relief").  Moreover, the fact that this is a capital case weighs in favor of granting COAs for Claims IV and IV. *Barefoot v. Estelle*, 463 U.S. 880, 893 (1983) (noting that nature of penalty is proper consideration in determining COA in capital cases); *see also Graves v. Cockrell*, 351 F.3d 143, 150 (5th Cir. 2003) ("Any doubt regarding whether to grant a COA is resolved in favor of the petitioner, and the severity of the penalty may be considered in making this determination."); *Jermyn v. Horn*, 266 F.3d 257, 279 n.7 (3rd Cir. 2001) ("In a capital case, the nature of the penalty is a proper consideration in determining whether to issue a [COA].").

7

JA 1992

**D.      This Court applied the incorrect standard for assessing prejudice in reviewing Subclaim VI.H.**

As part of the penalty-phase IAC claim, Mr. Caro alleged that counsel failed to adequately investigate and present evidence regarding BOP negligence. (2255 Mot. at 132.)   This Court dismissed this subclaim, finding "[e]ven if his trial counsel had introduced evidence supporting all of the arguments he proposes, the jury still could have decided that the death penalty was appropriate." (Op. at 56.) This conclusion is in direct contravention of Supreme Court precedent.

In *Rompilla v. Beard*, 545 U.S. 374 (2005), the Supreme Court reviewed a claim alleging trial counsel's failure to investigate and present mitigation evidence in support of a life sentence during a capital trial. In reviewing the evidence that was uncovered post-trial to determine prejudice, the Court specifically rejected the test that this Court imposed: "This evidence adds up to a mitigation case that bears no relation to the few naked pleas for mercy actually put before the jury, and *although we suppose it is possible that a jury could have heard it all and still have decided on the death penalty, that is not the test*." *Id.* at 393 (emphasis added). Instead, the Court restated the appropriate evaluation: "the undiscovered mitigating evidence, taken as a whole, might well have influenced the jury's appraisal of [Rompilla's] culpability, and the likelihood of a different result if the evidence had gone in is sufficient to undermine confidence in the outcome actually reached at sentencing." *Id.* (internal citations and quotation marks omitted; alteration in original).  The Court's decision here, which is directly counter to the test rejected in *Rompilla*, is clear error.

**E.      This Court committed clear error in its wholesale rejection of juror statements.**

In support of his 2255 Motion, Mr. Caro submitted several juror affidavits to demonstrate the prejudice that resulted from his counsel's deficient performance. (ECF Nos. 790-29, 790-30, 790-31, 790-33.)   In dismissing his IAC claims, the

8

JA 1993

Court found that it could not consider juror affidavits as evidence of prejudice. (Op. at 34 n.8; Op. at 59 n.9.) In doing so, it relied upon Federal Rule of Evidence 606(b). This was clear error.

In determining whether a capital defendant's Sixth Amendment right to counsel was violated during the penalty phase of trial, the Court must assess prejudice by determining whether "there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695. In other words, prejudice is shown where "there is a reasonable probability that *at least one juror* would have struck a different balance." *Wiggins v. Smith*, 539 U.S. 510, 537 (2003) (emphasis added). In an attempt to prove that a juror would have struck a different balance if trial counsel's performance was not deficient, Mr. Caro submitted affidavits from three jurors who said that had they known certain information, it would have made a difference to them. *See* ECF No. 790-29 (juror declaring that knowing that, inter alia, Mr. Caro has brain damage would have made a difference); ECF No. 790-33 (same); ECF No. 790-31 (juror saying that he would not have voted for death if he knew Mr. Caro has brain damage). The juror statements were properly before the Court for the sole purpose of demonstrating that it was more probable than not that the jury would have struck a different balance if counsel's performance were not deficient. *See* Fed. R. Evid. 401(a).

Rule 606(b) is inapplicable in these circumstances.[5] First, the plain language of Rule 606(B) prohibits juror testimony regarding "an inquiry into the validity of a verdict or indictment." Fed. R. Evid. 606(b)(1). The juror affidavits that Mr. Caro submitted with his motion were not to challenge the validity of a verdict. Rather, they were submitted to demonstrate that prejudice resulted from counsel's

---

[5] Moreover, at least one other district court, in a capital 28 U.S.C. § 2255 proceeding, has held that "Rule 606(b) does not apply to death penalty-phase proceedings under the Federal Death Penalty Act." *United States v. Fell*, No. 2:01-cr-12, 2013 WL 1953322, at * 3 (D. Vt. May 10, 2013).

failures to perform as required by the professional norms.  Second, the rule generally prohibits (absent limited exceptions not applicable to this argument) a juror from testifying "about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment." Fed. R. Evid. 606(b)(1).  The question under *Strickland* is not about what took place in the jury room, but how the outcome of the proceedings may have been affected by counsel's actions or omissions.  Mr. Caro did not submit juror affidavits to demonstrate that the verdict was wrong; instead, he introduced this evidence to sustain his burden of proof—e.g., "there is a reasonable probability that *at least one juror* would have struck a different balance."  *Wiggins*, 539 U.S. at 537.

The determination of prejudice does not impeach the jury's verdict for purposes of Rule 606(b).  Thus, the court's failure to consider evidence in support of the prejudice prong was clear error under *Strickland* and *Wiggins*.

**IV.    Conclusion**

Because the Court's Judgment is based on errors of law and the failure to decide each and every claim before it, relief under Rule 59(e) is appropriate. In particular, Mr. Caro asks the Court to provide the following relief: (1) alter, amend and set aside its Judgment on all the issues addressed herein; (2) grant Mr. Caro an evidentiary hearing; (3) grant Mr. Caro a COA on claims IV and claims VI; or (4) reopen the proceedings and grant whatever relief this Court deems just.

JA 1995

**Certificate of Service**

I hereby certify that on June 1, 2015, I electronically filed the foregoing Motion to Alter or Amend Judgment Pursuant to Federal Rule of Civil Procedure 59(e) with the Clerk's Office by using the CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/ Stephanie King
Legal Assistant
Capital Habeas Unit

11

JA 1996

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ABINGDON DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 1:06-CR-00001** |
| | ) | |
| **CARLOS DAVID CARO** | ) | |

### GOVERNMENT'S RESPONSE TO MOTION TO ALTER OR AMEND JUDGMENT

The Petitioner, Carlos David Caro, has filed a motion pursuant to Fed.R.Civ.P. 59(e) seeking to alter or amend the Court's judgment of May 4, 2015 dismissing his 28 U.S.C. §2255 petition collaterally attacking his conviction and death sentence. *Motion to Alter or Amend Judgment Pursuant to Federal Rule of Civil Procedure 59(e)* (hereinafter, "*Motion to Alter or Amend*"). He asserts five bases to support his claim that the Court made "clear errors of law" in denying his petition. For the reasons set forth herein, his motion is without merit and should be denied.

After an introductory discussion of the applicable standard for assessing a Rule 59(e) motion, each of Caro's claims will be addressed seriatim.

### RELIEF UNDER FED.R.CIV.P. 59(e) IS TO BE USED SPARINGLY AND ONLY WHEN THE COURT'S DECISION OR FINDINGS ARE "CLEARLY WRONG"

As Judge Faber observed in <u>Savoca v. United States</u>, No. CIV. A. 2:06-00572, 2010 WL 2367366, at *1 (S.D.W. Va. June 8, 2010), in opining on the propriety of granting a motion to alter or amend a judgment under Rule 59(e), the Fourth Circuit has stated:

A district court has the discretion to grant a Rule 59(e) motion only in very narrow circumstances: "(1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or to prevent manifest injustice." *Hill v. Braxton,* 277 F.3d 701, 708 (4th Cir. 2002) (citation omitted); *see also United States ex rel. Becker v. Westinghouse*

Page 1 of 11

JA 1997

USCA4 Appeal: 16-1    Doc: 32-5    Filed: 12/27/2016    Pg: 204 of 227
Case 1:06-cr-00001-JPJ   Document 813   Filed 06/18/15   Page 2 of 11   Pageid#: 8285

*Savannah River Co.,* 305 F.3d 284, 290 (4th Cir. 2002), *cert. denied,* 538 U.S. 1012 (2003). The circumstances under which this type of motion may be granted are so limited that "[c]ommentators observe 'because of the narrow purposes for which they are intended, Rule 59(e) motions typically are denied.' " *Woodrum v. Thomas Mem'l. Hosp. Found., Inc.,* 186 F.R.D. 350, 351 (S.D.W.Va. 1999) (citation omitted).

A Rule 59(e) motion may not be used to raise arguments or present evidence that could have been raised prior to the entry of judgment. *See Pac. Ins. Co. v. Am. Nat'l Fire Ins. Co.,* 148 F.3d 396, 403 (4th Cir. 1998) (citing 11 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2810.1, at 127–28 (2d Ed.1995). A motion to reconsider should not be granted where the moving party simply seeks to have the Court "rethink what the Court ha[s] already thought through—rightly or wrongly." *United States v. Torain,* 77 F.Supp.2d 749, 751 (S.D.W.Va. 1999)(citing *Above the Belt, Inc. v. Mel Bohannan Roofing, Inc.,* 99 F .R.D. 99, 101 (E.D.Va.1983).

Caro seeks relief solely to correct what he argues are "clear errors of law" in the Court's rejection of his petition. *Motion to Alter or Amend* at 2.   The Western District of North Carolina in McKinney v. Colvin, No. 1:11CV199, 2013 WL 1320788, at *1 (W.D.N.C. Apr. 1, 2013) aff'd, 552 F. App'x 214 (4th Cir. 2013), repeated a colorful yet apt description of the standard cited by the Fourth Circuit in *TFWS, Inc. Franchot,* 572 F.3d 186, 194 (4th Cir. 2009) in evaluating the merits of such a claim. "A prior decision does not qualify for [reconsideration pursuant to Rule 59(e)] by being just maybe or probably wrong; it must ... strike us as wrong with the force of a five-week-old, unrefrigerated dead fish. That is, the decision must be "dead wrong."

It is the government's position that none of the arguments that Caro offers in support of his *Motion to Alter or Amend* meet those standards.   The motion raises arguments that could have been raised prior to the entry of judgment in response to the government's motion to dismiss. In addition, it fails to articulate any "clear error" as that term has been construed by the Fourth

Circuit.  Under prevailing standards, Caro fails to make a threshold showing of entitlement to relief under Rule 59(e).  Regardless of whether the motion is sufficient to survive the procedural hurdles, the government further submits that there is no substantive merit to any of Caro's arguments.

> **A.  THE COURT'S DENIAL OF CLAIM I (STRATEGIC DELAY OF INDICTMENT) IS DISPOSITIVE OF THE IDENTICAL CLAIM MADE IN CLAIM VI.A.**

Caro asserts that the Court's order of dismissal is not "final" for purposes of Rule 54 of the Federal Rules of Civil Procedure because the Court failed to decide one of his claims. *Motion to Alter or Amend* at 3. Specifically, he alleges that the Court did not address Claim VI. A,[1] which charged that his counsel was ineffective in failing to challenge "the government's deliberate and tactical delay" of his indictment during the penalty phase.  *Defendant's Motion for Collateral Relief Pursuant to 28 U.S.C. §2255* (hereinafter, "*Petition*"), at 65.

In Claim One, Caro alleges that counsel was ineffective at the pretrial stage in failing to raise the claim that the government violated his Fifth Amendment due process rights by "deliberately and tactically delaying the indictment of the capital case until after the government had negotiated a disproportionate plea in the Benevidez assault." *Petition* at 20.  In sustaining the government's motion to deny relief under Claim I, the Court held, first, that the claim was procedurally defaulted. Second, assuming without deciding that Caro had demonstrated "actual prejudice," the Court conducted the required balancing test, weighing any prejudice he may have suffered against the government's justification for the delay.  Noting that "(A)ctual prejudice to the defense of a criminal case may result from the shortest and most necessary delay," the Court

---

[1] The Petition lists the claims using the full spelling of the number rather than the Roman numerals used in the *Motion to Alter or Amend*.   In this response, the United States will use the Roman numerals used by Caro in the latter document.

JA 1999

found that the government had articulated legitimate reasons for the delay and rejected Caro's allegation that the delay was a deliberate effort by the government to gain some strategic advantage. The Court concluded, "Any delay in the indictment against Caro does not offend 'fundamental conceptions of justice or the community's sense of fair play and decency.'" *United States v. Caro,* No. 1:06CR00001, Doc. 808 (May 4, 2015) (hereinafter, "Caro Opinion") at 21-23.

Caro's contentions in Claims I and VI. A. are identical except that they pertain to different stages of the trial. In support of Claim VI. A, Caro relies upon and "incorporates the facts and law stated in Claim One." *Petition* at 65. Indeed, in addressing Claim VI. A, the Court noted that Claim VI. A "builds on Caro's allegations in Claim I." *Caro Opinion* at 41. Although the Court did not expressly find that the legal bases relied upon to deny Claim I were dispositive of Claim VI. A, that conclusion is implicit in the opinion. If the Court found that the government had legitimate bases for the delay and the timing of the indictment did not "offend fundamental conceptions of justice or the community's sense of fair play and decency" during the pretrial stage, that same reasoning would dictate the same result with regard to Claim VI. A.[2]

**B.** **BECAUSE THE PARTIES SUBMITTED EVIDENCE OUTSIDE OF THE RECORD, THE COURT WAS NOT REQUIRED TO ACCEPT ALL ALLEGATIONS IN THE PETITION AS TRUE.**

Caro charges that throughout its opinion, the Court "imposed its own speculation regarding trial counsel's performance instead of accepting the allegations in the Petition as true." *Motion to Alter or Amend* at 3. That claim is belied by the record.

At the outset, Caro is wrong when he asserts that the Court was "obliged" to accept his "well-pleaded allegations as true." Because the parties both submitted evidence that was extrinsic

---

[2] If it feels the need to do so, the court may wish to supplement its May 4, 2015 opinion to make that conclusion explicit.

JA 2000

to the pleadings, the Court was permitted to analyze the merits of the claims pursuant to Rule 56 of the Federal Rules of Civil Procedure and was not required to accept Caro's pleadings as true.

The case he cites, *Gordon v. Braxton,* 780 F.3d 196 (4th Cir. 2015), does not support his claim. *Gordon* analyzed a district court's summary dismissal without an evidentiary hearing of a habeas petition filed *pro se* by a state court prisoner pursuant to 28 U.S.C. §2254.  Gordon initiated his quest for collateral relief by filing his petition in the state court.   His petition raised six claims. After denying Gordon's request for an evidentiary hearing, the state court summarily dismissed the first five, all related to counsel's performance at the sentencing phase, based on a finding that Gordon failed to show deficient performance and prejudice. The sixth claim, however, asserted that counsel failed to file an appeal when Gordon specifically asked him to do so.   The state court also dismissed that claim without a hearing and despite pleadings that created a clear factual dispute, opining that Gordon "merely inquired about an appeal" rather than directing his attorney to file one. 780 F.3d at 199-200. The district court likewise summarily dismissed the petition based upon the state court's reasoning.

The Fourth Circuit granted a certificate of appealability to consider "whether, in light of *Roe v. Flores–Ortega,* 528 U.S. 470, 120 S.Ct. 1029, 145 L.Ed.2d 985 (2000), and *United States v. Cooper,* 617 F.3d 307 (4th Cir. 2010), counsel was ineffective for not filing a notice of appeal." After first finding that the state court "unreasonably truncated further factual development on Gordon's contention that (his counsel) failed to file an appeal," and that Gordon, as a *pro se* litigant should not be held to the "high standards of legal draftsmanship" expected of an attorney, the Fourth Circuit found that the state and district courts erred in dismissing the claim "on a materially incomplete record." 780 F.3d at 202. That is not the case here.

JA 2001

It is well settled that the evaluation of ineffective assistance of counsel claims is controlled by *Strickland v. Washington,* 466 U. S. 668 (1964) and its progeny.   *Strickland* established a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *Hutchins v. Garrison,* 724 F.2d 1425, 1430-31 (4th Cir. 1983), and the petitioner must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. The Court's analysis of the Caro's claims is consistent with this precedent.   It is apparent from the Caro Opinion that rather than relying upon "mere speculation," the Court properly considered all of the evidence before it and found that trial counsels' decisions, under all of the circumstances, were reasonable. There is no error in those conclusions and Caro's arguments to the contrary should be rejected.

C.    **THERE WAS NO INDIVIDUAL ERROR IN ANY ASPECT OF CARO'S TRIAL AND HENCE THERE WAS NO BASIS TO FIND CUMULATIVE ERROR WARRANTING HABEAS RELIEF.**

Caro complains that the Court failed to consider his cumulative error arguments with regard to Claims IV and VI.   For the reasons set forth in the Court's opinion, his complaint should be rejected.

After analyzing all of Caro's individual claims of error, finding each to be without merit and observing that "cumulative error seldom supports reversal," the Court considered and rejected Caro's "cumulative error" argument[3] in each instance in which it was raised.   *Caro Opinion* at 39, 62, 76, 94. In doing so, the Court relied upon and cited the analysis of cumulative error in

---

[3] Indeed, the Fourth Circuit had little trouble rejecting Caro's "cumulative error" argument challenging the sentencing on direct appeal, finding that, "Although we recognized several possible errors, they were not widespread or prejudicial enough to have fatally infected Caro's trial or sentencing hearing. The proceeding below adhered to fundamental fairness. Each aggravating factor determined by the jury was well supported by the record. Finally, we cannot see how cumulative error could have caused the jury to weigh sentencing factors any differently." *United States v. Caro,* 597 F.3d 608, 635-36 (4th Cir. 2010)

Page 6 of 11

JA 2002

*United States v. Basham,* 561 F.3d 302 (4th Cir. 2009), observing

> Pursuant to the cumulative error doctrine, "[t]he cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error." *United States v. Rivera,* 900 F.2d 1462, 1469 (10th Cir. 1990) *cited with approval in United States v. Martinez,* 277 F.3d 517, 532 (4th Cir. 2002). Generally, however, if a court "determine[s] ... that none of [a defendant's] claims warrant reversal individually," it will "decline to employ the unusual remedy of reversing for cumulative error." (citation omitted). To satisfy this requirement, such errors must "so fatally infect the trial that they violated the trial's fundamental fairness." *United States v. Bell,* 367 F.3d 452, 471 (5th Cir. 2004). When "none of [the] individual rulings work any cognizable harm, ... [i]t necessarily follows that the cumulative error doctrine finds no foothold.

561 F.3d at 330.

The district Court's analysis comports with controlling Fourth Circuit precedent, is consistent with the record and correct as a matter of law. Caro's suggestion to the contrary is meritless.[4]

**D.     THE COURT APPLIED THE PROPER STANDARD IN CONCLUDING THAT THERE WAS NO PREJUDICE IN CONNECTION WITH CARO'S CLAIM THAT COUNSEL FAILED TO INVESTIGATE AND PRESENT EVIDENCE OF BOP NEGLIGENCE (CLAIM VI.H).**

Caro argues that the Court applied an incorrect standard for assessing prejudice in connection with his claim that defense counsel failed to investigate and present evidence of negligence by Bureau of Prisons (BOP) employees. *Motion to Alter or Amend* at 8.   The law is to the contrary.

The Court addressed and rejected Caro's claim that counsel was ineffective in failing to investigate and present evidence of what he terms "negligence" by BOP officials at USP-Lee in

---

[4] In a footnote to argument C, Caro states that, "At a minimum, the court should grant a certificate of appealability (COA) on Claims IV and VI." The government is uncertain if this statement relates only to cumulative error or the myriad of sub-arguments in each claim. In either case, and for the reasons set forth in the court's opinion, the United States submits that a COA should not issue as to either claim.

JA 2003

placing Sandoval in Caro's cell, finding that "there is not a reasonable probability that this evidence would have changed the outcome of the trial." *Caro Opinion* at 56. This conclusion is consistent with the record.

The government restates its position that the record conclusively establishes that the BOP officials were not negligent in placing Sandoval in Caro's cell. *Gov't Motion to Dismiss* at 31-33. With the exception of speculation postulated by Bezy, the record is devoid of any statement or testimony that Caro murdered Sandoval for any reason other than that which Caro gave to the prison officials and to other gang members during his jail calls: he was upset that Sandoval threatened to eat his breakfast and Sandoval had "disrespected" him. There is no basis to support any claim that BOP officials were negligent, to support any claim that defense counsel's failure to present such testimony was unreasonable and certainly no basis to refute the Court's finding that any such testimony would not have changed the outcome of the trial. Because the Court did not err, much less clearly err, Caro's argument to the contrary must be rejected.

E.      **THE COURT PROPERLY RELIED UPON RULE 606(b) OF THE FEDERAL RULES OF EVIDENCE IN REJECTING JUROR STATEMENTS OFFERED TO IMPUGN THE IMPOSITION OF THE DEATH PENALTY.**

Caro challenges what he characterizes as the Court's "wholesale rejection" of the post-verdict affidavits of jurors obtained by §2255 counsel, which were offered as "evidence to establish prejudice" resulting from the deficient performance of defense counsel during the penalty phase of the trial. Specifically, he cites the affidavits of Juror 790-29 (knowing that Caro had brain damage would have made a difference), Juror 790-33 (same) and 790-31 (knowledge of brain damage would have caused juror not to vote for death penalty). These affidavits, he contends, are not offered to impugn the validity of the jury verdict, but rather to demonstrate that it was "more probable than not that the jury would have struck a different balance (on the imposition

JA 2004

of the death penalty) if counsel's performance were not deficient." *Motion to Alter or Amend* at 8-9. This is a distinction without a difference. Despite Caro's protestations to the contrary, the affidavits do indeed target the validity of the verdict imposing the death penalty.

Caro fails to establish any error much less clear error under Rule 59(e). Relying on an unpublished Vermont district court case, *United States v. Fell,* No. 2:01cr-12, 2013 WL 1953322 (D.Vt. May 10, 2013), Caro contends that Rule 606(b) of the Federal Rules of Evidence does not apply to capital §2255 proceeding and that the affidavits are not in any case barred by the Rule because they are offered solely to support his claim that at least one juror would have struck a different balance with regard to the death penalty. His arguments are without merit.

*Fell* is not controlling precedent in the Fourth Circuit. It is unpublished, has not been cited in any reported decision and, to the extent it purports to extend a blanket prohibition on the applicability of Rule 606(b) in capital §2255 proceedings, it is directly contrary to established law in our circuit. *Fullwood v. Lee,* 290 F.3d 663 (4th Cir. 2002).

*Fell's* reliance on *United States v. Jones,* 132 F.3d 232 (5th Cir. 1988) seems misplaced. In *Jones*, the defendant offered juror affidavits to impugn the death penalty based upon a claim that the jurors were confused by the court's jury instructions. Rejecting the affidavits, the court opined

> Jones cannot utilize juror affidavits to undermine the jury verdict. *See* Fed.R.Evid. 606(b); *United States v. Ruggiero,* 56 F.3d 647, 652 (5th Cir. 1995). Federal Rule of Evidence 606(b) bars juror testimony regarding at least four topics: (1) the method or arguments of the jury's deliberations, (2) the effect of any particular thing upon an outcome in the deliberations, (3) the mindset or emotions of any juror during deliberations, and (4) the testifying juror's own mental process during the deliberations. *See Ruggiero,* 56 F.3d at 652. Under the rule, a juror may only testify to extraneous forces which influence jury deliberations. . . . The defendant argues that the inapplicability of the Federal Rules of Evidence during sentencing hearings precludes the use of Rule 606(b) to bar juror affidavits impeaching the sentence. *See* 18 U.S.C. § 3593(c). The reasons for not allowing jurors to undermine verdicts in jury trials, however, apply with equal force to sentencing hearings. *See Silagy v.*

JA 2005

*Peters,* 905 F.2d 986, 1009 (7th Cir. 1990) (holding that a juror's statements could not be used in a habeas corpus proceeding to impeach the jury's sentencing determination). Noting that the Eighth Amendment requires a "greater degree of reliability when the death sentence is imposed," we are convinced that Rule 606(b) does not harm but helps guarantee the reliability of jury determinations in death penalty cases.

Caro's argument also fails for factual reasons. First, the Court found that trial counsel conducted a reasonable investigation into Caro's background, including but not limited to his mental health. Second, the Court concluded that counsel's decision to forego the presentation of mental health evidence was not unreasonable. *Caro Opinion* at 42-45. Thus, Caro cannot establish the first prong of the *Strickland* test, that is, that counsels' performance was so deficient that they was not functioning as the "counsel" guaranteed to the defendant by the Sixth Amendment. Since Caro cannot establish deficient performance, any argument relating to prejudice is moot.

Restating the argument made in its motion to dismiss Caro's Petition, the government contends that there is no reliable information that Caro suffered from "brain damage." *Gov't Motion to Dismiss* at 41-43. As the Court opinion observes, defense counsel was aware of the potential that Caro's mental health might be at issue, they conducted an immediate and thorough investigation of that potentiality and, at the end of the day, reasonably concluded that their case would not benefit from the introduction of mental health testimony. *Caro Opinion* at 42-45 Certainly, there is no evidence from any qualified expert available to the defense that Caro suffered from "brain damage." Hence, the factual predicate that §2255 counsel asserts as the premise for the jurors' affidavits does not exist.

Based upon the foregoing, the United States submits that the Court's evaluation of the admissibility of juror affidavits was correct. In any case, the Court's finding that defense counsel conducted a reasonable investigation of Caro's mental health forecloses any argument that their performance was deficient. Hence, Caro's claim must fail.

JA 2006

## CONCLUSION

The government submits that Caro not demonstrated any clear error of law, but instead relies on Rule 59(e) merely to request that the Court "' rethink what the Court ha[s] already thought through-rightly or wrongly.' " *United States v. Torain,* 77 F. Supp.2d 749, 751 (S.D.W.Va. 1999) (citing *Above the Belt, Inc. v. Mel Bohannan Roofing, Inc.*, 99 F.R.D. 99 (E.D.Va. 1983). It would be improper for the Court to grant the instant motion on that basis. In the absence of clear error of law, any suggestion of intervening controlling case law or presentation of newly discovered evidence, the Court should deny the Caro's Rule 59(e) motion, instead appropriately reserving this extraordinary remedy for truly exceptional circumstances which do not exist in this case.

Respectfully submitted,

/s/ Anthony P. Giorno_____
ANTHONY P. GIORNO
Acting United States Attorney
Virginia State Bar No. 15830
P.O. Box 1709
Roanoke, VA   24008-1709
Tel: (540) 857-2250
Fax: (540) 857-2614
Email: anthony.giorno@usdoj.gov

## **C E R T I F I C A T E**

I hereby certify on June 18, 2015, I electronically filed the foregoing Response with the Clerk of the Court using the CM/ECF filing system which will send the notification of such filing to all counsel of record.

/s/ Anthony P. Giorno_____
Anthony P. Giorno
Acting United States Attorney

Page 11 of 11

JA 2007

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 1:06CR00001-JPJ |
| Plaintiff, | DEATH-PENALTY CASE |
| vs. | Reply to Government's Response to |
| CARLOS DAVID CARO, | Motion to Alter or Amend Judgment |
| Defendant. | |

Carlos David Caro, through undersigned counsel, files his Reply to the Government's Response to his Motion to Alter or Amend Judgment (ECF No. 813). For the reasons in his motion and in this reply, Mr. Caro respectfully requests that this Court grant him relief.

**INTRODUCTION**

The Government contends that motions filed pursuant to Rule 59(e) "typically are denied." (ECF No. 813 at 2). This case, however, is anything but typical. Indeed, it would have been typical to have held a hearing in accordance 28 U.S.C. § 2255, which requires a hearing unless the motion and files "conclusively show that the prisoner is entitled to no relief." Instead, this Court dismissed this capital 2255 motion without a hearing. That, in and of itself, should provide this Court with reason to reconsider its denial of relief. Mr. Caro responds below to the arguments presented in the Government's response.

**A.      The Court failed to decide Subclaim VI.A.**

The Government argues that the Court ruled on subclaim VI.A, but points to no language in the Court's opinion to support that conclusion. Instead, it argues merely that the ruling was "implicit in the opinion." (ECF No. 813 at 4.) The Government even suggests that the Court "may wish to supplement" its

opinion to make its ruling explicit. (*Id.* at 4, n.2.)   As even the Government recognizes, this Court failed to address subclaim VI.A, and therefore it must do so before Mr. Caro may appeal the decision.

**B.    This Court erred by imposing its own speculation regarding trial counsel's performance instead of accepting all allegations as true.**

The Government asserts that the Court did not "rely[ ] upon 'mere speculation'" in dismissing Mr. Caro's 2255 Motion. (ECF No. 813 at 6.)   Yet it makes this assertion without even addressing the multiple instances from the Court's opinion where it postulated what "could have" been counsel's reasoning or strategy for their performance. (*See* ECF No. 811 at 4.)   Instead, the Government spends the bulk of its argument attempting to distinguish a Fourth Circuit case that Mr. Caro cited for the proposition that the Court should accept well-pleaded allegations as true when considering a motion to dismiss.  (*See id.* at 3) (citing *Gordon v. Braxton*, 780 F.3d 196, 204 (4th Cir. 2015)). The fact that *Gordon* was a habeas proceeding that arose from a state-imposed conviction is irrelevant for the purposes for which Mr. Caro cited the case.  Finally, even if the Government's argument is correct that the Court need not accept Mr. Caro's allegations as true because exhibits were submitted with the pleadings (ECF No. 813 at 5),[1] an evidentiary hearing was still necessary to resolve multiple areas of factual dispute.  Instead, the Court hypothesized as to the potential rationale for counsel's actions.   That was clear error, and the Court should set aside its judgment.

---

[1] The Court's opinion failed to address the numerous exhibits that Mr. Caro attached to his motion in support of his penalty-phase IAC claim, including declarations from a standard-of-care expert, trial counsel, and mental health experts.

JA 2009

**C.      This Court failed to conduct a cumulative review of the deficient performance in determining whether prejudice resulted from those deficiencies during the guilt/innocence phase or penalty phase of trial.**

The Government misapprehends Mr. Caro's argument regarding the Court's legal error in reviewing his ineffective assistance claims for cumulative error. Mr. Caro does not contest that the Court included a discussion—albeit brief—of cumulative error at the conclusion of each of his ineffectiveness claims. (*See* ECF No. 6.) What he argues was the Court's error—and what the Government fails to address—is that the cumulative review was fundamentally flawed. Mr. Caro alleged several deficiencies regarding counsel's performance that combined would constitute prejudice. As to some of those allegations, the Court assumed deficient performance and only found that each of those deficiencies *alone* did not constitute prejudice. What the Court was then bound to determine was whether those combined deficiencies *combined* prejudiced Mr. Caro by denying him a fair trial or sentencing. Because the Court failed to conduct this review, it should grant Mr. Caro's motion and conduct a proper review of the claims.[2]

**D.      This Court applied the incorrect standard for assessing prejudice in reviewing Subclaim VI.H.**

The Government fails to address Mr. Caro's argument that the Court misapplied the law as explained by the Supreme Court in *Rompilla v. Beard*, 545 U.S. 374, 393 (2005). Rather, the Government simply claims that the Court's conclusion is consistent with the record. Because the Government presents no argument explaining why it was not clear error for the Court to apply a test that was specifically rejected by the *Rompilla* Court, this Court should grant Mr.

---

[2] To address the Government's uncertainty (ECF No. 813 at 7, n.4), Mr. Caro has requested a COA on both Claim IV and IV in their entirety, as it would be unusual to only grant a COA on the cumulative aspect of the claim without being able to assert the allegations of deficient performance that support the claim.

JA 2010

Caro's motion for relief.

### E.    This Court committed clear error in its wholesale rejection of juror statements.

Contrary to Mr. Caro's argument, the Government claims that the juror affidavits do impugn the jury's verdict. (ECF No. 813 at 9.)   But Mr. Caro explained that the affidavits were submitted as evidence supporting *Strickland/Wiggins* prejudice.   Mr. Caro has the burden of demonstrating that there is a reasonable probability that the evidence that trial counsel could have presented, but did not, would have struck a different balance for at least one juror. For the Court to then reject the consideration of the evidence proffered in support of his claim was clear error.[3]

Moreover, the Government's argument that that Mr. Caro's claim fails for factual reasons is belied by the record and provides, once again, additional support that the Court erred in denying an evidentiary hearing.  The Government contends both that the trial counsel's decision to forego presentation of mental health evidence was reasonable and that there is "no evidence from any qualified expert available to the defense that Caro suffered from 'brain damage.'" (ECF No. 813 at 10.)   Mr. Caro submitted declarations from trial counsel and the mitigation specialist (ECF Nos. 790-5, 790-7, 790-9) and each of these declarations contradict a finding that the decision to forego presentation of mental health evidence was "reasonable." Counsel admitted that they did not to present *any* expert to explain Mr. Caro's brain dysfunction and childhood trauma because of who the Government selected as their expert witness—and they made this decision *without even reviewing the Government expert's report*.  (ECF No. 790-

---

[3] The Government spends the bulk of its argument explaining that *Fell* is inapplicable here.  (ECF No. 813 at 9.)   But even if the Court disregards the District Court's opinion in *Fell*, the Government has not explained why it was not legal error under *Strickland/Wiggins* for the Court to have discounted entirely the juror affidavits.

JA 2011

5, ¶ 18.)  Mr. Caro also submitted an unrebutted declaration from a standard-of-care expert that explained that trial counsel fell below the standard of care in death penalty cases.  (ECF No. 790-4.)

Further, the Government makes a baseless assertion that there is no evidence to support the fact that Mr. Caro has "brain damage." (ECF No. 813 at 10.)   The record, however, reflects the exact opposite of the Government's position. Mr. Caro submitted exhibits from the defense psychologist who tested Mr. Caro before trial and from a psychiatrist who evaluated Mr. Caro during the instant proceedings who each concluded that Mr. Caro has brain impairment and explained their findings. (ECF Nos. 790-8, 790-10.)  Moreover, both trial counsel and the mitigation specialist indicated that they were aware Mr. Caro had brain damage.  (ECF Nos. 790-5, ¶13; 790-7, ¶ 8.)  For the Government to contend in its response that no evidence exists to support a finding that Mr. Caro has brain damage is at odds with the record.

## CONCLUSION

For the reasons stated in the Motion to Alter or Amend Judgment (ECF No. 811), and the reasons stated in this reply, Mr. Caro respectfully requests that this Court grant his motion.

Respectfully submitted this 6th day of July, 2015.

s/Robin C. Konrad
Jon M. Sands
Federal Public Defender
Robin C. Konrad (Alabama Bar No. 2194-N76K)
Office of the Federal Public Defender
District of Arizona
850 West Adams Street, Suite 201
Phoenix, Arizona  85007
robin_konrad@fd.org
Telephone:  602-382-2816
Facsimile:  602-889-3960

5

JA 2012

Fay F. Spence (Virginia Bar No. 27906)
Federal Public Defender's Office
210 First Street, SW, Suite 400
Roanoke, Virginia 24011
fay_spence@fd.org
Telephone:  540-777-0880
Facsimile:  540-777-0890

Brian J. Beck (Virginia Bar No. 78049)
Federal Public Defender's Office
201 Abingdon Place
Abingdon, Virginia 24211
brian_beck@fd.org
Telephone:  276-619-6080
Facsimile:   276-619-6090

Attorneys for Defendant
Carlos David Caro

6

**Certificate of Service**

I hereby certify that on July 6, 2015, I electronically filed the foregoing Reply with the Clerk's Office by using the CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/ Robin Stoltze
Legal Assistant
Capital Habeas Unit

3

JA 2014

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | Case No. 1:06CR00001 |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| **CARLOS DAVID CARO,** | ) | By: James P. Jones |
| | ) | United States District Judge |
| Defendant. | ) | |

*Anthony P. Giorno, Acting United States Attorney, Roanoke, Virginia, for United States. Jon M. Sands, Federal Public Defender, and Robin C. Konrad, Assistant Federal Public Defender, Phoenix, Arizona, and Fay F. Spence and Brian J. Beck, Assistant Federal Public Defenders, Roanoke and Abingdon, Virginia, for Defendant.*

In this death penalty case, Defendant Carlos David Caro filed a Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255, raising sixteen claims asserting that his conviction and sentence were unconstitutionally obtained. I denied the § 2255 motion. *United States v. Caro*, No. 1:06CR00001, 2015 WL 1964430 (W.D. Va. May 4, 2015). The defendant has timely filed a motion to alter or amend judgment pursuant to Federal Rule of Civil Procedure 59(e). The motion to alter or amend has been fully briefed.

The relevant facts are set forth in my earlier opinion, and I will not repeat them here. Caro contends that I committed five errors of law. First, he asserts that I failed to decide subclaim VI.1, which was a claim of ineffective assistance of

JA 2015

counsel during the penalty phase. Second, he contends that I failed to accept his allegations as true and instead engaged in speculation regarding trial counsel's strategy. Third, he claims that I failed to conduct a cumulative review of the alleged deficiencies in trial counsel's performance. Fourth, he contends that I applied an incorrect standard for assessing whether he had been prejudiced by trial counsel's decision not to present evidence or argument during the penalty phase that the Bureau of Prisons had been negligent in giving Caro a cell mate. Finally, Caro argues that I erred in declining to consider affidavits from jurors stating that had they been presented with certain evidence, they might not have voted to impose the death penalty. Caro also filed a Notice of Supplemental Authority drawing the court's attention to the Tenth Circuit's recent decision in *United States v. Barrett*, 797 F.3d 1207 (10th Cir. 2015), and urging the court to hold an evidentiary hearing on the § 2255 motion.

"A Rule 59(e) motion may only be granted in three situations: (1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice." *Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369, 378 (4th Cir. 2012) (internal quotation marks and citation omitted). "It is an extraordinary remedy that should be applied sparingly." *Id.*

Here, the defendant relies on the third ground. The Supreme Court has

-2-

stated that "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing [court] on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 622 (1993) (citation omitted). "[M]ere disagreement does not support a Rule 59(e) motion," and a judgment that is "factually supported and legally justified" is not clearly erroneous. *Hutchinson v. Staton*, 994 F.2d 1076, 1081-82 (4th Cir. 1993).

Regarding Caro's first contention, I agree that my ruling on subclaim VI.1 is not entirely clear. To avoid any uncertainty, I hereby amend my earlier opinion to state unequivocally that the subclaim is without merit because trial counsel's failure to challenge the delay of Caro's indictment did not constitute deficient performance, nor did it result in any prejudice. This amendment does not affect the judgment entered in this case.

Concerning Caro's other assertions, I have reviewed and considered all of the evidence and arguments submitted in support of the § 2255 motion and the motion to alter or amend the judgment. I am unconvinced that the judgment is clearly erroneous, and I find that none of the circumstances justifying a motion to alter or amend a court's judgment are present in this case.

Accordingly, it is **ORDERED** that the Motion to Alter or Amend Judgment Pursuant to Federal Rule of Civil Procedure Rule 59(e) (ECF No. 811) is DENIED.

-3-

-4-

ENTER:   November 6, 2015

/s/  James P. Jones
United States District Judge

-4-

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

| | |
|---|---|
| **CARLOS DAVID CARO,** | **Case No.  1:06CR00001** |
| **Defendant,** | **Judge James P. Jones** |
| **vs.** | **DEATH-PENALTY CASE** |
| **UNITED  STATES OF AMERICA,** | **Notice of Appeal** |
| **Plaintiff.** | |

Notice is hereby given that Carlos David Caro, Defendant, appeals to the United States Court of Appeal for the Fourth Circuit from the Opinion and Final Order entered in this action by the United States District Court for the Western District of Virginia on May 4, 2015, denying his Motion for Collateral Relief pursuant to 28 U.S.C. § 2255 (ECF Nos. 808, 809) and from the Opinion and Order denying his Motion to Alter or Amend Judgment Pursuant to Federal Rule of Civil Procedure 59(e) entered on November 6, 2015 (ECF No. 818).   Defendant appeals from the denial of habeas relief and from all other adverse rulings in this case, including but not limited to the denial of additional certificates of appealability (ECF No. 810), the denial of discovery, and the denial of an evidentiary hearing and expansion of record.

Respectfully submitted this 4th day of January, 2016.

s/Robin C. Konrad
Jon M. Sands
Federal Public Defender
Robin C. Konrad (Ala. Bar No. 2194-N76K)
Assistant Federal Public Defender
850 West Adams Street, Suite 201
Phoenix, Arizona 85007
robin_konrad@fd.org
602.382.2816 / 602.889.3960 facsimile

Fay F. Spence (Virginia Bar No. 27906)
Federal Public Defender's Office
210 First Street, SW, Suite 400
Roanoke, Virginia 24011
fay_spence@fd.org
540.777.0880 / 540.777.0890 facsimile

Brian J. Beck (Virginia Bar No. 78049)
Federal Public Defender's Office
201 Abingdon Place
Abingdon, Virginia 24211
brian_beck@fd.org
276.619.6080 / 276.619.6090 facsimile

Attorneys for Defendant Carlos David Caro

**Certificate of Service**

I hereby certify that on January 4, 2016, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: Anthony Giorno, Assistant United States Attorney and Jean Barrett Hudson, Assistant United States Attorney and I hereby certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participants: N/A

s/ Elise Knepper
Assistant Paralegal
Capital Habeas Unit

3