RECORD NO. 16-1

IN THE
**UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

**UNITED STATES OF AMERICA,**

Plaintiff - Appellee,

v.

**CARLOS DAVID CARO,**

Defendant - Appellant.

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ABINGDON DIVISION**

_____

**BRIEF OF APPELLEE**
_____

**Rick Am Mountcastle
Acting United States Attorney
Jean B. Hudson
Assistant U.S. Attorney
255 West Main Street
Charlottesville, VA 22902
(434-293-4283**

**Counsel for Appellee**

# TABLE OF CONTENTS

**Page No.**

TABLE OF AUTHORITIES .................................................................................ii

STATEMENT OF JURISDICTION AND APPELLATE JURISDICTION………1

STATEMENT OF THE ISSUES..........................................................................1

STATEMENT OF THE CASE AND FACTS ......................................................1

STANDARDS OF REVIEW ...............................................................................34

SUMMARY OF THE ARGUMENT ...................................................................35

ARGUMENTS......................................................................................................37

    **I.**    **Caro was not denied due process under the Fifth Amendment because he cannot meet the Brady materiality standard, and in any event, he is barred from relitigating his claim….……………………37**

    **II.**    **Caro has not established that he was denied his Sixth Amendment right to counsel because his trial counsel made a strategic decision to not introduce mental health evidence at the penalty phase of the trial……………………………………………………………..43**

CONCLUSION ............................................................................ ..58

CERTIFICATE OF COMPLIANCE.................................................. ..59

CERTIFICATE OF SERVICE ........................................................ ..60

# TABLE OF AUTHORITIES

**CASES:**                                                                **Page No.**

*Supreme Court*

*Bobby v. Van Hook*, 558 U.S. 4 (2009)...............................................54

*Brady v. Maryland*, 373 U.S. 83 (1963)……………………….................4, 38

*Caro v. United States*, 565 U.S. 1110 (2012) ......................................26

*Kyles v. Whitley*, 514 U.S. 419 (1995)..............................................38

*Porter v. McCollum*, 558 U.S. 30 (2009)…………………………………..53, 54

*Rompilla v. Beard,* 545 U.S.  374 (2005)…………………………………46, 56, 57

*Strickland v. Washington*, 466 U.S. 668 (1984)………………………43, 45, 51, 55

*United States v. Agurs*, 427 U.S. 97 (1976) .........................................42

*United States v. Bagley*, 473 U.S. 667 (1985) ......................................38

*Weatherford v. Bursey*, 429 U.S. 545 (1977).......................................38

*Wiggins, v. Smith*, 539 U.S. 510 (2003)…………………………………..*passim*

*Williams v. Taylor*, 529 U.S. 362 (2000)…………………………...50, 51, 52, 53

*Courts of Appeals*

*Boeckenhaupt v. United States*, 537 F.2d 1182 (4th Cir. 1976)………………39, 40

*Bunch v. Thompson*, 949 F.2d 1354 (4th Cir. 1991)…………………….. 47, 48, 50

*Byram v. Ozmint,* 339 F.3d 203 (4th Cir. 2003)…………………….....43, 50, 55

*Meyer v. Branker*, 506 F.3d 358 (4th Cir. 2007) ...................................…..48

*Springer v Collins*, 586 F.2d 329 (4th Cir. 1978) .................................…..44

*Truesdale v. Moore,* 142 F.3d 749 (4th Cir. 1998)..............................…..50

*United States v. Aramony*, 166 F.3d 655 (4th Cir. 1999) ....................…..43

*United States v. Caro*, 597 F.3d 608 (4th Cir. 2010) ………………………..*passim*

*United States v. Dyess*, 730 F.3d 354 (4th Cir. 2013) .............................39

*United States v. Linder*, 552 F.3d 391 (4th Cir. 2009) ............................39

*United States v. Roane, 378 F.3d 382 (4th Cir. 2004) ...……………………...35, 39*

*United States v. Wilson*, 901 F.2d 378, 381 (4th Cir. 1990)…………………....38

*Walton v. Angelone*, 321 F.3d 442 (4th Cir. 2003) ................................48

**District Court Case**:

*United States v. Caro*, No. 1:06cr00001, 2006 WL 3251738,
    (W.D. Va.  Nov. 8, 2006)(Sargent, J.) ...............................................5

**Statutes**

18 §§ 7 ..................................................................................... …3

18 U.S.C. §1111 ..................................................................... …3

18 U.S.C. § 3591…………………………….……………………….....12

18 U.S.C. § 3592(c)(10)...........................................................…..12

18 U.S.C. § 3592(c)(12)...........................................................…..12

28 U.S.C. § 2255……………………………………………………1, 26

28 U.S.C. § 1291 ........................................................................................ 1

28 U.S.C. § 2253. ......................................................................................1


*Rules*

Fed. R. Crim. P. 12.2(b) ...........................................................................10

Fed. R. Crim. P. 16 (a)(1)(E) ...................................................................4

Fed. R. Crim. P. 16 (a)(1)(E)(ii) ..............................................................6

Fed. R. Crim. P. 17.....................................................................................4

## STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

The district court had jurisdiction of Caro's proceedings below pursuant to 28 U.S.C. § 2255.  This Court has jurisdiction of Caro's appeal pursuant to 28 U.S.C. §§ 1291 and 2253.

## STATEMENT OF THE ISSUES

I.    Whether Caro was denied his right to due process under the Fifth Amendment where the records he requested from the BOP did not constitute material exculpatory evidence under *Brady* because Caro cannot show a reasonable probability of a different result?

II.    Whether Caro was denied his right to effective assistance of counsel under the Sixth Amendment because his trial counsel made a strategic choice not to introduce mental health evidence at the penalty phase of the trial?

## STATEMENT OF CASE AND FACTS

On May 7, 2001, Carlos David Caro was sentenced to 360 months' imprisonment for a third drug trafficking conviction, to run consecutive to an eighteen-month revocation sentence previously imposed.  JA 1347. [1]

---

[1] References in this brief to the Joint Appendix shall be "JA _."  References to the Supplemental Joint Appendix shall be "SJA _."

1

Caro is a member of the Texas Syndicate, a violent prison gang, and in 2002, while Caro was incarcerated at Federal Correctional Institute (FCI)-Oakdale, Louisiana, prison officials attempted to secure his assistance in avoiding conflict with newly arriving prisoners who were members of a rival gang, but Caro rebuffed those efforts, and subsequently, the Texas Syndicate members violently attacked the newcomers. JA 1347-348. Caro took responsibility for the attacks, and afterwards stated that the gang "follow[s] orders" and that it didn't matter to him if he were prosecuted in light of the thirty-year sentence he was already serving. JA 1348; *United States v. Caro,* 597 F.3d 608, 610 (4th Cir. 2010).

The Bureau of Prisons (BOP) transferred Caro to the United States Penitentiary-Lee (USP-Lee), a more secure facility, but in August, 2003, Caro and another Texas Syndicate inmate used "shanks," to ambush and attack Ricardo Benavidez, stabbing him twenty-nine times. JA 1348. Caro pled guilty to attempted murder and weapons offenses in connection to the Benavidez assault and on November 1, 2004, was sentenced to 327 months' imprisonment, to run consecutively to any sentence Caro was serving. JA 1348.

After the Benevidez assault, Caro was sent to the Special Housing Unit (SHU), arguably the most secure part of the penitentiary, and, by nature and definition, the most secure facility within the BOP. JA 1348. On December 16,

2

2003, Texas Syndicate member Roberto Sandoval was admitted to the SHU, and was placed with Caro. JA 1349. The next day, Caro stated to a guard, "Come and get this piece of shit out of here," and pointed at Sandoval lying next to the cell door, motionless, with blood on him and a towel wrapped around his neck. JA 1350. When asked whether Sandoval was still breathing, Caro replied, "No. At this time he's stinking up the room, get him out." JA 1350.

In a post-*Miranda* statement to FBI Special Agent Douglas Fender, Caro readily admitted that he killed Sandoval because, in his words, he had eaten Sandoval's breakfast that morning and Sandoval threatened to eat Caro's breakfast the following day. *Id*.

On January 3, 2006, a federal grand jury sitting in Abingdon, Virginia, within the Western District of Virginia, returned an indictment against Caro charging him in Count One with first degree premeditated murder of Roberto Sandoval, in violation of 18 U.S.C. §§ 7 and 1111. JA 1-3, 1351. On January 11, 2006, the United States filed a Notice of Intent to Seek the Death Penalty. JA 4-7.

On January 27, 2006, Caro filed a Motion for Exculpatory Evidence under *Brady v. Maryland*, 373 U.S. 83 (1963). JA 8-12. On February 6, 2006, United States Magistrate Judge Pamela Sargent issued an Order noting that the

government's obligations under *Brady* exited "regardless of any specific direction by the court." JA 13-14.

Caro filed various discovery motions requesting data from the Bureau of Prisons and records on inmates housed at Florence ADMAX. The motions sought the same information on different grounds, including data showing inmates' length of stay since the prison opened in 1994. On October 3, 2006, Caro filed a Motion for Exculpatory Evidence Related to Penalty Phase Information, stating that the defendant intended to rebut the government's evidence regarding future dangerousness with evidence that he "can be safely housed, managed and controlled by and within the Bureau of Prisons; and that prior to his indictment, the Defendant was confined for a time without incident at Florence ADMAX Colorado, the only super-maximum facility within the Bureau of Prisons' system." JA 15-21. Caro's motion detailed in paragraphs A-M of the motion, specific requests for data, records, reports and information which he asserted was material and important to his case during the sentencing phase. JA 18-20. Caro filed a motion requesting the same information pursuant to Fed. R. Crim. P. 16 (a)(1)(E). SJA 2093. Caro also sought subpoenas duces tecum directed to the director of the BOP and the warden of Florence ADMAX pursuant to Fed. R. Crim. P. 17. SJA 2091.

On October 16, 2006, Caro filed an Affidavit of Mark D. Cunningham, Ph.D., a clinical and forensic psychologist retained by Caro's counsel to offer expert testimony regarding whether Caro could be housed within the BOP subject to conditions which would reduce the probability that he will commit any further serious prison violence. JA 22-48, 55. Dr. Cunningham's affidavit indicated that the information Caro requested was necessary to rebut the government's claims that assignment to Florence ADMAX is a temporary assignment and that the BOP will be unable to adequately secure Caro within the BOP system regardless of whether or not he was in the Control Unit at Florence ADMAX. JA 33, 35-40, 55.

The motions were referred to Magistrate Sargent, and after a hearing on November 3, 2006, the Magistrate entered a Memorandum Opinion and Order granting the motion based on *Brady* and denying the other motions. *United States v. Caro*, No. 1:06cr00001, 2006 WL 3251738, at \*4-\*5 (W.D. Va. Nov. 8, 2006)(Sargent, J.); JA 49-64. The court emphasized that, "despite ... [its] inquiries at the November 3 hearing, the government ha[d] produced no evidence through affidavit or otherwise as to its argument that production of the documents and information requested would be burdensome to the BOP." JA 55. The parties filed objections and on November 12, 2006, United States District Judge James P. Jones issued an Opinion and Order regarding certain of the objections. JA 65-67; SJA

5

2096.   On November 13, 2006, the district court held a hearing regarding the government's objection to the Magistrate Judge's Order.  JA 68-108.  On November 16, 2006, the United States filed affidavits by BOP employees Tomas Gomez, Jennifer Batchelder, Linda Thomas, and Joetta Terrell, in support of its objections.  JA 109-20.  On November 17, 2006, Caro filed a response and a supporting "Second Declaration" by Dr. Cunningham, with various attachments. JA 121-43.

On November 20, 2006, Judge Jones issued an Opinion and Order sustaining the government's objection.  JA 145-50.  The court concluded that though the government clearly has an obligation under *Brady* to disclose material evidence favorable to the accused, in this case, Caro only hoped that the requested information would support his expert's opinion, but that there was "no indication before [the court] that it will do so," and that the material thus "cannot be said to be material."  JA 149.  The court also found that Fed. R. Crim. P. 16 (a)(1)(E)(ii) did not require the production of the requested information because "materiality in this context requires at least 'some indication that the pretrial disclosure of the disputed evidence would have enabled the defendant significantly to alter the quantum of proof in his favor.'"  JA 149 (internal citation omitted).  The court also concluded that "the use of a Rule 17 subpoena duces tecum cannot substitute for

the limited discovery otherwise permitted in criminal cases and the hope of obtaining favorable evidence does not justify the issuance of such a subpoena." JA 150.

Caro's counsel were faced with uncontradicted evidence that Caro killed Sandoval, his admissions of guilt, as well as his statements establishing the trivial reasons he gave for taking a human life, and further, his words and actions evincing a lack of remorse for the murder.  Against that backdrop, trial counsel concluded that Caro's "would be a penalty phase case" and that their best result would be a life sentence.  JA 1255.

Despite these difficult circumstances, trial counsel made reasonable and diligent efforts to build a mitigation defense. Within two months of their appointment, trial counsel sought assistance from mental health experts to address "issues such as competency, criminal responsibility, impaired capacity, disturbance, and other mental health related factors." JA 1086.  Counsel retained a mitigation specialist, Dr. Lee Norton, but after beginning her work, through no fault of trial counsel, Dr. Norton withdrew from the case, and there is no evidence that Dr. Norton's investigation developed any useful mitigation evidence. Counsel then promptly obtained the appointment of another mitigation specialist, Hans Selvog, who assisted them for the duration of the case.  JA 1087, 1081.  In April,

2006, counsel obtained the court's permission to hire D.A. Mullikin as a private investigator to assist with the development of mitigation evidence, JA 1087, but there is no indication that his investigation revealed any useful or relevant mitigation evidence.

Beginning in January, 2006, trial counsel investigated mental health professionals who could "conduct testing on (Caro) to determine the possibility of organic brain damage and to do a routine psychological work up prior to a psychiatric evaluation." JA 1475, 1476. On February 15, 2006, upon recommendation of Dr. Davis, President of the Knoxville Area Psychological Association, they retained Dr. Malcolm Spica, a licensed clinical psychologist and neuropsychologist. Dr. Spica spent 7.5 hours with Caro over two days, June 9 and June 16, 2006. JA 1309, 1328. According to Dr. Spica's neuropsychological consultation report, Caro "stated that he has not suffered any significant head injuries of which he is aware. . . no history of serious illness, losses of consciousness, prolonged high fevers, seizures or sensory disturbances," JA 1328. Dr. Spica found no evidence of "major head injuries." JA 1334. His evaluation made no mention of "brain damage."[2] He reported that "neuropsychological test

---

[2] The absence of brain damage was supported by Dr. Swerdlow's reports to trial counsel on December 12, 2006 (EEG purporting to show abnormalities is "worthless") and December 14, 2006 (EEG "inadequate . . . to establish interictal

results revealed converging signs of frontal lobe dysfunction," and diagnosed Caro with "Cognitive disorder – NOS (not otherwise specified)." JA 1333-334. He "speculate[d]" that those "cognitive deficits" caused Caro to have "disordered thinking when under pressure," and "deficits in discriminating between actual information and distorted approximations." JA 1334. At the conclusion of his report, Spica recommended consultation with "a forensic psychiatrist to integrate these findings with an assessment of Mr. Caro's psychiatric, neurocognitive, and adaptive functioning relative" to his case. JA 1334. He specifically recommended Dr. Keith Caruso, who he had "found . . . to be particularly helpful in this regard." JA 1334. Dr. Spica's report did not mention the need for a neonatologist or an expert in any other medical specialty.

On June 13, 2006, the mitigation specialist, Selvog, a licensed clinical social worker, sent a memorandum to defense counsel offering "random thoughts . . . about the case." JA 1484-87. Selvog suggested that the defense needed a neonatologist "to help us figure out Caro's diagnosis regarding post-natal Failure to Thrive problem (i.e. sensory disintegration) anecdotally reported by the family." JA 1486. He also conjectured that an occupational therapist or child psychiatrist

---

abnormality suggestive of focal lesion") and December 20, 2006 (MRI was "normal."). JA 1478-480.

9

might be needed regarding Caro's "muteness, isolation, almost autistic-like persona and behavior throughout childhood." JA 1486.

Trial counsel accepted the recommendations of Selvog and Dr. Spica. They hired Dr. Caruso, who examined Caro in August, 2006. In attorney Kalista's declaration, he stated that Dr. Caruso "interviewed Caro about the crime, and he learned information that was not helpful to the defense." JA 1256. In Selvog's December 31, 2012 declaration, he confirmed that Dr. Caruso received certain unspecified information from Caro regarding the offense that was "not helpful" and that he would not be able to serve as a mitigation witness. JA 1261. Selvog did not state when he learned this from Dr. Caruso. There is no indication that Selvog, Dr. Spica or any other expert recommended that trial counsel seek court approval to retain another forensic psychiatrist. There appears to be no further record of Dr. Caruso's interview, and no report of Dr. Caruso's findings or recommendations to trial counsel.

On September 15, 2006, relying on Dr. Spica to provide mitigating mental health evidence, Caro's counsel filed a notice pursuant to Fed. R. Crim. P. 12.2(b), stating their intention to introduce at trial expert evidence relating to a mental disease or defect, or any other mental condition of the defendant bearing on the issue of guilt or punishment. SJA 2091. The government immediately moved the

court to have Caro examined under procedures to be set by the court and the court granted the government's request on September 21, 2006. SJA 2091-092. On September 21, 2006, perhaps concerned that the damaging admissions made by Caro to Dr. Caruso regarding the offense would be repeated to the court-designated expert, Caro's counsel modified its notice to limit mental health evidence to the penalty phase. SJA 2092.

The court's examination of Caro was conducted by Dr. Robert T.M. Phillips beginning on September 26, 2006. JA 2023. His report dated January 29, 2007 was filed with the court under seal and was not disclosed then to trial counsel or the government. JA 2022-269.

In January, 2007, apparently for the first time, according to Selvog, Dr. Spica "raised concerns that he could not offer testimony regarding mens rea." JA 1262. Selvog "assured him" that the only things they wanted him to testify about were "his test results showing brain damage" and Caro's "developmental background." JA 1262. There is no indication that Selvog recommended that trial counsel hire other mental health experts, despite knowing that Dr. Caruso was not a viable witness, and that no other mental health expert other than Dr. Spica was available.

11

Caro went to trial starting on January 22, 2007. At the trial, the defense counsel conceded that Caro had killed Sandoval, and did not call any witnesses, but argued that the killing had not been premeditated. JA 1898. The jury convicted Caro of capital murder on February 1, 2007. JA 2110.

The sentencing phase of the trial began on February 5, 2007, and lasted six days. JA 151, 1898. The jury first determined that Caro was eligible for the death penalty, concluding that Caro was eighteen years or older at the time of the offense in Count One, and that the government had proven beyond a reasonable doubt that Caro intentionally killed Roberto Sandoval. JA 151-61, 171-75, 186, 1898. The jury found that Caro had committed a capital offense covered under 18 U.S.C. § 3591, and that the government had proven two statutory aggravating factors beyond a reasonable doubt, including (1) that Caro was previously convicted of two offenses involving distribution of illegal drugs committed on different occasions and punishable by imprisonment for over one year, and (2) Caro had been previously convicted of a federal drug offense punishable by five or more years. 18 U.S.C. §§ 3592(c)(10) and (c)(12); JA 158, 186-87, 1353, 1898-99.

Following the death penalty eligibility verdict, the government presented twelve witnesses and alleged three non-statutory aggravating factors, including (1)

12

the impact on Sandoval's friends and family, (2) Caro's future dangerousness, and (3) Caro's lack of remorse. *See* JA 880-81;1899.

The government presented testimony from David Mrad, an intelligence officer with the Federal Bureau of Prisons, USP-Lee, who testified that he intercepted a letter from Caro to Eduardo Rivas, another member of the Texas Syndicate who had been released from prison. JA 224-27. Mrad testified that inmates use codes when they communicate with people on the outside, and about a conversation between Caro and Rivas, in which Caro asked Rivas if he could read "the code." JA 229-30. Mrad testified that he was aware of Caro's involvement in the August 29, 2003 incident at USP-Lee, that Caro was convicted of conspiracy to commit murder and that Caro was serving a total of 705 months with eight years of supervised release. JA 235-36. On cross-examination, Mrad agreed that there had been no instances of assaults since December 17, 2003, that in the file Mrad had with him, there was no record of assault of a BOP employee, that the assaultive behavior by Caro was with other inmates, and that until he was incarcerated by BOP, Caro was nonviolent. JA 239. Mrad confirmed that the Texas Syndicate was one of the most dangerous prison gangs, referred to as "disruptive groups." JA 246.

The parties stipulated that Caro had been convicted for the conspiracy to commit murder in relation to the Benavidez attack, and sentenced to a term of 327 months to run consecutively to any other term of imprisonment he was serving. JA 255-56.

The government presented witnesses who identified the letter from Caro to Rivas, testified that indented writing was found on the back of the letter, and that Caro's finger and palm prints were on the letter. JA 260, 267-68, 281-89.

Kirsten Sandoval, Sandoval's seventeen-year-old daughter, testified about her relationship with her father, and identified some correspondence from her father. JA 291-300.

John Blaze, an employee of the Federal Detention Center, FCI-Oakdale, testified about the July 11, 2002 incident in which Caro and other Texas Syndicate members assaulted other inmates. JA 301-12. John Gordon, special investigations officer of the BOP assigned to Oakdale FCC, testified that he tried to reach out to the leadership of the prison gangs in order to "keep the peace." JA 313-17. He reached out to Caro approximately three weeks before the 2002 assault, but Caro responded that the Texas Syndicate were going to "do what they had to do." JA 318, 319. He also testified that during his investigation of the assault, Caro gave a statement saying, "Caldera, he is an Azteca. He did not have anything to do with

it, just the Texas Syndicate.  I don't give a fuck if they send me to the United

States Penitentiary.  My brothers follow orders.  They know what they're getting

into.  It doesn't even matter if we're prosecuted.  I have 30 years to do.  I certainly

don't care about myself."  JA 321.  Gordon also testified that his investigation

revealed that the Texas Syndicate was responsible for the assault, that Caro was 'in

the leadership at FCI-Oakdale at the time, and that Caro initiated the assault.  JA

321, 330.

The government presented witnesses to the Benavidez assault, including an

eye-witness from USP-Leewho was able to identify Benavidez and Caro from a

video of the incident.  JA 376-81, 383-90.   Officer Mrad was the lead BOP

investigator for the Benavidez assault, and testified  that the victim of the assault as

Ricardo Benavidez, and the attackers were Juan Moreno, a prospect of the Texas

Syndicate, and Caro, a validated member.  JA 398.  Officer Mrad testified that he

recovered two shanks, including a Plexiglas knife used to stab Benavidez; he saw

Moreno-Marquez go into the television room where one weapon was found; he

was able to determine from the video that after the assault, Caro placed a knife on

the television stand in the common area where the other knife was found.  JA 399-

401.

During the penalty phase, the jury heard evidence from several defense witnesses including James Aiken, a correctional specialist, and Dr. Mark Cunningham, a clinical and forensic psychologist.  JA 418, 663.  Both agreed that Caro was a dangerous inmate, but opined that the BOP had the ability to manage and control him safely if he received a life sentence.  JA 447-48, 763-64. Dr. Cunningham explained that Caro remained in the Secure Housing Unit at USP-Lee following the Sandoval murder, and until mid-November of 2005.  JA 682.  Dr. Cunningham stated that Caro was housed in a single cell there for almost two years, before being transferred to ADX Florence, a "super maximum facility."  JA 682, 685.  He further described the Control Unit within the ADX as a "prison within a prison," for inmates who have committed "particularly serious acts of violence in the Bureau of Prisons and may require longer term placement in a highly restricted status."   JA 685.   Dr. Cunningham testified that Caro's BOP history did not show that he had ever tried to escape or any incidence of assault on a correctional officer or staff member.  JA 698.  Dr. Cunningham testified that ADX was not intended to be a permanent placement and that the hope is that the inmates may "cycle . . . back out" into the BOP or returned to a lower level of security at some point.  JA 699-700.  Dr. Cunningham testified about his tour of ADX Florence, during which he learned that the average stay was five years before

16

being moved to another facility through the "step-down" program that prepares inmates for release, but that five inmates had been at ADX Florence for twelve years since the prison opened in 1994. JA 701. Dr. Cunningham described security measures, procedures and protective measures for moving inmates, and certain special security measures, or "SAMs", which could control or eliminate contact visits and inmate communications, as well as other measures which could prevent access to materials from which weapons could be created. JA 719-30.

Dr. Cunningham testified on cross-examination that "there is a very high risk that Mr. Caro would seriously injure someone else, so if at large in a U.S. penitentiary there is grave risk of serious violence." JA 763-64. But he followed that statement by saying "there is a security level that he can be held at. . . . There is a security level that he can be held in where that risk becomes very low. But if at large, that risk is quite high." JA 764. Dr. Cunningham stated that the risk would be expected to drop as Caro gets older, and that "for the foreseeable future, . . . for the next five to ten years that he would pose a significant risk if at large in a U.S. penitentiary." JA 764. Dr. Cunningham testified that 32.2 percent of inmates in ADX had killed another inmate in prison, and that there had been two murders in ADMAX since the facility opened in 1994. JA 699, 768. Dr. Cunningham acknowledged that Caro had used a Plexiglas shank to stab Benavidez, and a towel

17

to strangle Sandoval, and that Caro would likely use whatever weapons were at his disposal to commit violent acts.  JA 769.  Dr. Cunningham testified that the possibility of earning time off his sentence had not been an incentive for good behavior for Caro, and that based on his statements, Caro apparently viewed the thirty-year sentence he was serving before the Benavidez attack as "the rest of his life."  JA 771-74.  Dr. Cunningham testified that a life sentence would not itself have a positive or negative deterrent effect but the security measures associated with the life sentence would instead incapacitate Caro.  JA 775.

The government also questioned Cunningham using his affidavit which listed forty-seven inmates who committed homicide in prison and in which he argued that Caro needed more information about these inmates to prepare his defense.  JA 126, 137-38, 792.  The government asked whether Cunningham knew those inmates' current locations. Defense counsel objected, saying the government had withheld this information, but the district court overruled the objection.  JA 793.  Using the Inmate Locator on the BOP's public website, the government then showed that, for example, Bruce Pierce had committed homicide in prison and been transferred away from Florence ADMAX.  JA 793.  Cunningham agreed, but further responded, saying:

> The critical issue is what happened to him between the time he was guilty of
> the killing, and ... now that he's at Lewisburg[,] ... where did he go for how

18

> long, why did they decide to put him in Lewisburg, at what level of Lewisburg is he in with what disciplinary history. So just to put his name up and show where he is is misleading, at best, in the face of the data that I requested from you that would have fully informed this issue for me and for the jury.

JA 794. The government then made the same point for another inmate, David Fleming, and implied that other inmates listed in Cunningham's affidavit also had been transferred away from Florence ADMAX. JA 794-97.

Caro also presented evidence in mitigation from family members and a teacher. Rodriguez, an aunt, testified that Caro's father was an alcoholic who became violent when he drank, had a criminal record and fought with Caro's mother, often actually hitting her. 481, 487-89, 499-500. Caro's parents dropped out of grade school, Caro and his siblings dropped out of high school. JA 492-93. Caro and his brothers all had criminal records. JA 495. Caro's brothers were always in trouble, but Caro was quiet and kept to himself. JA 501-02. Caro had trouble holding down milk as an infant, and was an inactive baby. JA 503. Rodriguez recalled an incident when Caro was around nine years old when she realized he could not tie his shoes or tell time. JA 504. Caro was never in trouble. JA 506. Rodriguez suspected Caro's father earned money dealing drugs, and thought that he and Caro's uncles encouraged Caro to do what they were doing. JA 510, 517.

Yomieda Martinez was Caro's eighth grade math teacher who had not seen Caro since he was in her class. JA 534, 537. Martinez testified that Caro was a timid boy, quiet and respectful, and polite. JA 537-38. She testified that his brothers were disrespectful, disobedient, and impolite. JA 538. She knew that Caro had dropped out, and was shocked to hear what he had done. JA 539.

Delia Contreras, another aunt, testified that Caro's father had a drinking problem, and would end up fighting with his wife, and would hit her, and that Caro was very frequently around when these fights took place – on multiple occasions per week, for years. JA 554-57. She described Caro as shy, gentle, and not disrespectful. JA 558. She stated that Caro's father was never there for them and that his mother did not give them the attention that they needed. JA 559. Caro's father died from cirrhosis of the liver and complications from being shot by a woman with whom he had had an affair. JA 555, 561. Caro was sick as an infant, and could only take goat's milk until he was about a year old, after which he was okay. JA 561.

Diamanta Raza, an aunt, testified that Caro's father developed a drinking problem, and that when he drank he and his wife started fighting, and that she had said he hit her, though Raza said she never witnessed "him lay a hand on her." JA 572-73. She testified that Caro's mother was a good mother, and did the best she

could, but did not always know where her children were. JA 574-76. Caro was quiet, not violent or disrespectful, and a loner who liked to play by himself. JA 576-77.

Laura Perez, Caro's cousin, testified that she witnessed Caro's father fighting with his wife and "pushing her around," but never saw him "punch her." JA 593. Perez was terrified of her uncle. JA 594. Caro's mother died in a house fire. JA 599. Perez testified that she loved her cousin Caro, that his execution would be devastating to his daughter, and that she did not think it would fix anything. JA 600. Although Caro's father was violent with his mother, there was no evidence that he was violent with Caro or his brothers.

Finally, Caro's wife, Louyveth Caro, testified. JA 606. She chronicled his involvement with drugs, resulting incarcerations, and their several separations. JA 606-29. She testified that his daughter, Xinia, was born after one drug arrest, and was taken to meet her father for the first time when he was in prison. JA 612. However, she also said that he was never violent and while they were together in February of 2000, their relationship was "great." JA 621, 622. Ms. Caro testified that her daughter loves her father, that his execution would be devastating to them, and that when she heard her husband tell her that he had killed a man, she was stunned and in disbelief. JA 625, 627, 628.

21

In rebuttal, the government presented the testimony of Gregory Hershberger, a retired former warden at Florence ADMAX and long-time BOP employee. JA 824. Mr. Hershberger testified that the ADMAX facility "is designed to house those individuals who can't function in open United States penitentiary settings . . .." JA 834. Mr. Hershberger answered in the negative when asked whether the ADX was intended to be a permanent placement. JA 835. He stated, "[w]e don't have a permanent assignment to the ADX." JA 835. Mr. Hershberger described the step-down program at Florence ADMAX. JA 837-42. He then described the Control Unit, and testified that the goal for the Control Unit was also to "return the inmate to an open population institution," but that the process was different from the general population Step Down Unit process. JA 843. Hershberger agreed that the BOP had not been able to devise a system that was completely failsafe. JA 850. Finally, Hershberger agreed that he could not guarantee that Caro would not send coded messages to his associates, or that someone like Caro could not obtain some type of material from which to make a weapon or use as a weapon. JA 851-52.

On cross-examination, Hershberger was asked about Tommy Silverstein, an inmate at ADX who had killed two inmates and a guard. JA 860-61. Hershberger stated that Silverstein was housed in a "very high security setting with very limited

contact, and no contact with other inmates." JA 860-61. Hershberger acknowledged that the BOP would continue to evaluate Silverstein in the future, and could decide whether to move him to a different program, or to leave him where he was. JA 861. Hershberger agreed that Silverstein's situation was special, and acknowledged that in special cases there can be a special review process. JA 861. Finally, Hershberger agreed that if Caro were at ADMAX and did not meet the criteria which the BOP believed would justify another appropriate placement, Caro would remain at ADMAX. JA 866.

On redirect examination, Hershberger recalled that Mr. Silverstein was convicted of murder "probably in the late seventies," and that he had received a life sentence for his first murder of an inmate. JA 868. Hershberger testified that Silverstein was incarcerated at Marion, and that he murdered another inmate in the Control Unit there, and then murdered a staff member at Marion. JA 868-69. Hershberger believed that Silverstein had received another life sentence after the second murder, but was not entirely sure. JA 869. Hershberger testified that there was no federal death penalty for murdering inmates or staff at the time of the second or third murders. JA 869-70. Hershberger also agreed that since Silverstein's three murders, and since the implementation of the federal death penalty, Silverstein had not committed any more murders. JA 870. Hershberger

23

further stated that those particular circumstances were the reason for the "special security precautions." JA 870. Hershberger agreed that after Mr. Silverstein committed the murders, the BOP used its best efforts to secure him, and stated that after Silverstein "killed the officer, he has not killed again." JA 870. The government asked Hershberger if, "from what you know of Mr. Caro, is he going to be treated the same way as Silverstein," and Hershberger answered, "No." JA 870-71.

In closing arguments, the parties presented arguments regarding whether the BOP would adequately secure Caro during a life sentence. The government argued that if Caro went to ADMAX, "we know . . .he's not going to stay there" and that he would eventually be stepped down to a USP facility. JA 923-24. The government pointed to Hershberger's testimony, arguing that he indicated that Caro may initially go to ADMAX, but "would be moved out to the USP on a three year program, well within the life of violence of Carlos Caro." JA 924. Caro's counsel argued that the BOP "could adequately and securely house Mr. Caro for the rest of his life." JA 954.

The jury found three non-statutory aggravating factors including future dangerousness, impact on the family of the victim and lack of remorse. JA 880-81, 1009, 1353. The jury found twelve mitigating factors, including that Caro (a)

24

was exposed to repeated instances of domestic violence and household disruption through childhood; (b) was raised in a household where education was not valued; (c) raised in a poverty-stricken community with limited economic opportunities; (d) despite his environment, throughout childhood was an obedient, respectful, well-behaved child at home, in school and in the community; (e) required special education services and eventually dropped out of school without having completed the ninth grade; (f) according to his 8th grade math teacher, was a shy respectful student in contrast to his brothers, and their parents showed no interest in their academic progress; (g) his maternal uncles involved him in illegal drug trafficking; (h) he was never physically abusive toward his wife or daughter; (i) was not violent or aggressive until he received his 30-year sentence in 2001; (j) during his entire history of incarceration, has never assaulted or harmed a correctional guard, counselor, or other prison staff; (k) has never tried to escape, and (l) had been properly and securely housed at various high security federal institutions since December 18, 2003.  JA 880-89, 1009, 1353, 1899-900.

The entire penalty phase of Caro's capital trial lasted nine days, including closing arguments, following which the jury returned a sentence of death.  JA 886, 1009.  That sentence was imposed by the court on March 30, 2007.  JA 1017.

Caro appealed to this Court, raising claims including that the district court erred in denying his motions alleging a *Brady* violation, and on March 17, 2010, this Court affirmed the district court's rulings, holding that because Caro could only speculate as to what the requested information might reveal, he could not satisfy *Brady's* requirement of showing that the requested evidence was favorable to him. *Caro*, 597 F.3d 608. On January 9, 2012, the Supreme Court denied Caro's petition for a writ of certiorari. *Caro v. United States*, 565 U.S. 1110 (2012).

On January 8, 2013, Caro filed a Motion for Relief under 28 U.S.C. § 2255.[3] JA 1902. In his petition, Caro argued among many issues, in claim Six B(2)(b), that he was denied effective assistance of counsel under the Sixth Amendment because his trial counsel failed to introduce at the selection phase of the capital sentencing proceeding the testimony of Dr. Spica indicating that he had seen evidence of "frontal lobe dysfunction," and had diagnosed Caro with "Cognitive Disorder NOS"; and in claim Six B(2)(c), that his counsel was ineffective by failing to produce Caro's history of exposure to domestic violence as a child, and to present a mental health expert. JA 1020, 1110-120.

---

[3] On March 22, 2013, Caro filed a redacted version of his petition. JA 1020.

In Claim Seven, Caro argued that the government violated his constitutional rights by "withholding material exculpatory and impeachment evidence that the BOP has housed many inmates at ADX-Florence and its predecessor prison, USP-Marion, for more than three years." JA 1168. In his petition, Caro stated that though he still has not received the requested BOP data, he had an informal survey conducted by a law firm in November 2010, and attached to his petition the affidavit of Jeanne Dvorak, who conducted the survey. JA 1171. Caro stated that the "survey questionnaire was sent to 129 inmates housed at ADX-Florence seeking information about the number of consecutive years each inmate had been housed at ADX-Florence," and alleged that though the survey represented only a portion of ADX-Florence inmates, "the results refute the government's evidence presented at trial." JA 1171, 1338-46. Caro claimed that his new information showed that at least 43 inmates currently at ADX-Florence had been there or at Marion for more than five years, that 22 had been there for 10 or more years, and the longest stay, 27 years. JA 1172. Caro further alleged that he learned through consulting with former BOP official Mark Bezy that Bezy recalled eight inmates who had been housed under very strict conditions of confinement due to security concerns and who are still housed at ADX-Florence today. JA 1172. Caro argued that the government had access to this information, that the evidence would have

27

shown that in spite of the BOP's goal to move inmates out of ADX-Florence through its step down program, BOP did not often meet its goal, and that there were many exceptions in this regard. JA 1172-173.

Caro attached Bezy's declaration to his petition, in which Bezy stated that he was a former Associate Warden at USP Leavenworth, and a captain at USP-Marion. JA 1220. Mr. Bezy stated, "there were many inmates who were housed at USP-Marion for much longer than three years and were unable to cycle out of the program." JA 1220. Bezy referred to three particular inmates who were later transferred to ADX-Florence, and who remained there at the time of his declaration, over 18 years later. JA 1220. Bezy stated that he "strongly disagree[d] with the government's witness testimony and argument at trial that Mr. Caro would necessarily have been housed at the ADX for only three-to-five years and then sent to another facility." JA 1225. Bezy stated that the main goal of the BOP is to safely and securely house inmates and that if that goal required that inmates stay indefinitely at the ADX then they would not be moved. JA 1225.

Caro also presented evidence in support of his claims of ineffective assistance of counsel. He presented a declaration by Dr. Spica, stating that he had earlier determined that Caro had "cognitive deficits clinically described as front lobe dysfunction." JA 1309. He stated that if he had testified, he would have said

28

that Caro's reasoning abilities are at the level of a ten-year-old when conditions are calm and controlled, but that those skills are unstable and that if he had to perform under pressure, Caro "performs at a much lower level due to mental deficits associated with frontal lobe dysfunction. He also offered some criticism of Dr. Montalbano's tests, one due to the possible "practice effect" from having been exposed to the same tests in less than six months after first taking the tests, and because Dr. Montalbano "did not administer multiple tests for executive functioning," which Dr. Spica says is "essential, as executive functioning represents Mr. Caro's chief deficit and indicator of frontal lobe dysfunction." JA 1310. Caro offered a letter dated December 22, 2012 from Dr. Thomas M. Hyde, a neurologist, concluding that Dr. Phillips "performed a substandard forensic neurological examination of Caro," and pointing out that Dr. Phillips ignored an abnormality described as "increased left-sided deep tendon reflexes in the upper and lower extremities," which Dr. Hyde asserts correlates to right frontal lobe dysfunction. JA 1336. Caro also presented a Declaration dated January 7, 2013 from Dr. Donna Marie Schwartz-Watts, a psychiatrist, who evaluated Caro for two hours on January 3, 2001, and reviewed certain records from the earlier examinations. JA 1287. Dr. Schwartz-Watts corroborated Dr. Spica's conclusion that Caro was properly diagnosed with Cognitive Disorder NOS, and also

29

concluded that he met the criteria for Anxiety Disorder and Adult Antisocial Behavior.  JA 1288-295.

The government filed a Motion to Dismiss Caro's petition on June 11, 2013. JA 1347.   On October 9, 2013, Caro filed a response to the government's motion. JA 1513.  One of Caro's exhibits to his response was a letter from Dr. Spica responding to the government's observation that he had not mentioned "brain damage" in his evaluation of Caro.  JA 1697.  Dr. Spica indicated that he "wished to clarify that the term brain damage denotes a compromise from previous function.  That is, brain damage assumes a normally functioning brain that was then injured or compromised and exhibited subsequent decrements in functioning from a previous state."  JA 1697.  Dr. Spica indicated that he preferred the term "dysfunction," and that Caro's dysfunction was "due to a *developmental* condition rather than *acquired* 'damage.'"  JA 1697 (emphasis in original).  Dr. Spica concluded that "Caro's results suggested frontal lobe dysfunction that was likely lifelong in nature, and he reportedly failed to thrive as an infant, exhibited delays in developmental milestones difficulties, and had no clear cerebral insults later in life.  Nonetheless, … Mr. Caro demonstrated severe deficits in functions known to be mediated by the cerebral frontal lobes."  JA 1697.  Dr. Spica also strongly disagreed with the government's assertion that statements in his

neuropsychological report were contrary to his June 20, 2006 email. JA 1697. He explained that "the inconsistent signs of frontal lobe dysfunction further raise the probability that Mr. Caro's brain condition is developmental in nature rather than acquired." JA 1697.

Caro also attached a supplemental declaration by Dr. Schwartz-Watts which stated that Dr. Phillips' statement that Caro reported a happy childhood and denied a history of abuse was inconsistent with other parts of his report discussing Caro's father's abusive behavior towards Caro's mother and the mistreatment Caro suffered from his older brother. JA 1712. She further stated that "Dr. Phillips' opinion that Mr. Caro does not demonstrate any deficits in adaptive functioning is not inconsistent with Caro's brain dysfunction." JA 1712.

Finally, Caro attached a declaration by Susan Richardson, an investigator with the Federal Public Defender's Office for the Western District of Virginia. JA 1750. Ms. Richardson reviewed Ms. Dvorak's survey questionnaires, documents produced by the BOP in response to a subpoena in 2010 in a case from the Eastern District of New York, information from the BOP Inmate Locator website, the federal court PACER websites, the Federal Death Penalty Resource Counsel website, documents produced pursuant to a FOIA request in this case and internet searches for articles containing the names of inmates housed at ADX-Florence. JA

1750-751. Ms. Richardson concluded that at least 126 inmates had been incarcerated at ADX-Florence for more than five years, and 155 more than three years. JA 1751-752. She represented that in January of 2007, at the time of Caro's trial, at least 63 inmates had been incarcerated for more than five years, and at least 25 for at least 10 years at ADX-Florence. JA 1752. Ms. Richardson reviewed the numbers of inmates who had been convicted or accused of committing a homicide within the BOP who were designated to ADX-Florence, and concluded that there were 54 such inmates, all of whom "have been continuously designated to ADX-Florence since their initial designation," including 22 who entered ADX in 2007 or earlier. JA 1752. Ms. Richardson also stated that of ten defendants who got life instead of death where the Government sought the death penalty a within-BOP homicide, nine of the ten have been continuously designated to ADX-Florence since they were sentenced. JA 1753, 1767.

On May 4, 2015, Judge Jones denied Caro's petition. JA 1889. Regarding Caro's Claim Six (B)(2)(b), the district court first found that there was "no indication that trial counsel failed to conduct a reasonable investigation into Caro's background." JA 1930. The court noted that Caro's counsel hired experts to investigate his background, and that they received mixed results. JA 1930. The court observed that counsel had hired a mitigation specialist whom they had to

32

replace, a fact investigator, two experts on future dangerousness, a neuropsychologist, a neurologist, and a psychiatrist. The court noted that counsel presented mitigating evidence during the penalty phase, alleging 22 mitigating factors, and that they put on eight witnesses to support the mitigation arguments. In addition, counsel put on two future dangerousness experts, and testimony from three of Caro's aunts, Caro's wife, a former teacher and a cousin. JA 1930. In response to Caro's argument that counsel should have obtained more than two mental health experts – a child psychiatrist and neonatologist – the court found that Caro had not demonstrated that his trial counsel acted unreasonably in the number and type of experts they obtained. JA 1931. The court noted that counsel developed mitigation evidence under time and financial constraints, and "could not investigate every possible lead, and had to make professional judgments about what leads were likely to be the most fruitful." JA 1931. The court concluded that Caro had not established that helpful testimony could have been elicited from the additional experts. JA 1931. In response to Caro's argument that his counsel should have sought another psychiatrist after Dr. Caruso opined that his testimony would not be helpful to the defense, the court concluded that counsel had not rendered "ineffective assistance because they failed to find a psychiatrist whose testimony was favorable to Caro." JA 1932. The court concluded that trial

33

counsel's decision to forego mental health evidence was not unreasonable.  JA 1933.  The court noted that counsel was not permitted to view the government's expert's report until after they had given notice of intent to present mental health evidence, and that trial counsel had reason to believe that the testimony of the government's expert might be unfavorable to Caro.  The court noted that in contrast, only one expert available to testify for the defense, Dr. Spica, had a professional opinion favorable to Caro, and that "counsel could have decided that Dr. Spica's testimony would not be beneficial enough to overcome harmful testimony from the government's testifying expert."  JA 1933.

The court rejected Caro's claim Six B(2)(c), noting that several mitigating factors concerning Caro's childhood were found by the jury, and that several relatives testified about negative aspects of Caro's childhood.  JA 1934.  The court thus concluded that "[t]here is not a reasonable likelihood that the testimony of a mental health expert on Caro's childhood trauma would have changed the outcome of the penalty phase."  JA 1934.[4]

On May 4, 2015, the district court issued its Opinion granting the Motion to Dismiss, and denying Caro's First Motion for Leave to Conduct Discovery and

---

[4] On June 1, 2015, Caro filed a Motion to Alter Judgment and on November 6, 2015, Judge Jones denied Caro's motion.  JA 1985-2018.

Preliminary Request for an Evidentiary Hearing and Expansion of the Record. JA 1889. The district court granted a certificate of appealability only as to claim Seven. JA 1984. Caro filed a timely notice of appeal on January 4, 2016. JA 2019.

On December 19, 2016, Caro filed his Brief with this Court, including two uncertified issues and a Request for Certificate of Appealability regarding those issues. On February 7, 2007, the United States filed its response. On March 23, 2017, this Court issued an Order granting a certificate of appealability regarding Issue II, and denying his motion regarding Issue III.

## STANDARDS OF REVIEW

I.      In reviewing the district court's rulings, this Court reviews its legal conclusions de novo and its findings of fact for clear error. *United States v. Roane*, 378 F.3d 382, 395 (4th Cir. 2004)(internal citations omitted); *United States v. Caro*, 597 F.3d 608, 616 (4th Cir. 2010)(internal citations omitted)(Because no factual findings were made by the district court, this Court reviews the court's Brady decision de novo).

II.      This Court reviews de novo mixed questions of law and fact addressed by the district court - including the issue of whether a lawyer's performance was constitutionally adequate. *Roane*, 378 F.3d at 395.

35

## SUMMARY OF THE ARGUMENTS

I.    Caro's current *Brady* claim is the same substantive claim that he raised on appeal, and he is barred from relitigating it in his § 2255 appeal.  Caro was not denied his right to due process under the Fifth Amendment because he cannot meet the materiality requirement under *Brady*.  The  jury heard evidence from both parties' experts that ADX is not intended to be a permanent placement as well as additional testimony establishing that some inmates have no foreseeable plan to go to a lower level of security, that an inmate is not automatically stepped down and that after individualized assessment, if an inmate did not show sufficient responsibility, he would not be stepped down.  Against that backdrop, even in light of Caro's new statistics, his new facts simply reiterate the facts presented at trial on the relevant points, and he cannot show a reasonable probability that the undisclosed BOP data would have resulted in a sentence of life instead of death.

II.    Caro's counsel were not ineffective when they conducted a reasonable investigation and made a reasoned strategic decision to forego mental health evidence based on the circumstances known to them.

Counsel made diligent efforts to build a mitigation case by hiring a mitigation specialist, a fact investigator, to future dangerousness experts, a

neurologist, a neuropsychologist and a forensic psychiatrist, but received mixed results from their efforts. Counsel alleged twenty-two mitigating factors and presented testimony on future dangerousness and Caro's difficult childhood, and on the basis of that evidence, the jury found twelve mitigating factors. Counsel made a reasoned strategic decision by weighing the beneficial evidence along with the damaging evidence their own investigation had developed against the likelihood of harmful cross-examination and other harmful testimony from the government's expert.

Further, there is not a reasonable likelihood that the testimony of a mental health expert on Caro's childhood trauma would have changed the outcome of the penalty phase of the trial where the jury heard from several witnesses who testified regarding Caro's difficult childhood, and on the basis of that evidence found mitigating factors supported by that testimony.

## ARGUMENTS

I. **Caro was not denied due process under the Fifth Amendment because he cannot meet the Brady materiality standard, and in any event, he is barred from relitigating his claim.**

The Due Process Clause requires the government to disclose "evidence favorable to an accused upon request ... where the evidence is material either to

guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Failure to disclose because the evidence is in possession of another government department is no defense. *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). However, "showing that the prosecution knew of an item of favorable evidence unknown to the defense does not amount to a *Brady* violation, without more." *Id*. at 437. Favorable evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley,* 473 U.S. 667, 682 (1985). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id.* This Court has consistently noted that *Brady* requests cannot be used as discovery devices. *Caro*, 597 F.3d at 619. Further, the Supreme Court has stated, "There is no general constitutional right to discovery in a criminal case, and *Brady* did not create one." *Id*. (citing and quoting *Weatherford v. Bursey,* 429 U.S. 545, 559 (1977)). Finally, where the exculpatory information is not only available to the defendant but also lies in a source where a reasonable defendant would have looked, a defendant is not entitled to the benefit of the *Brady* doctrine. *United States v. Wilson*, 901 F.2d 378, 381 (4th Cir. 1990).

**a**. **Caro's current *Brady* claim is the same substantive claim that he raised on appeal, and he is barred from relitigating it in his § 2255 appeal.**

Petitioner's claim is barred because a § 2255 motion is not a vehicle for relitigating claims already decided by the appellate court. *Boeckenhaupt v. United States*, 537 F.2d 1182, 1183 (4th Cir. 1976)(A criminal defendant cannot "recast, under the guise of collateral attack, questions fully considered by this court [on direct appeal]."). Absent a change in the law, a prisoner cannot relitigate in a collateral proceeding an issue rejected on direct appeal. *See, e.g., United States v. Dyess,* 730 F.3d 354, 360 (4th Cir. 2013);*United States v. Linder,* 552 F.3d 391, 396 (4th Cir. 2009); *United States v. Roane,* 378 F.3d 382, 396 n. 7 (4th Cir.2004) ( "Because the Defendants have not pointed to any change in the law that warrants our reconsideration of these claims, we agree with the district court that they cannot relitigate these issues.").

Caro argues now that he was denied his Fifth Amendment right to due process under *Brady* where the government withheld requested BOP data on inmates at Florence ADX. *Br. of Appellant* at 18-19. This is precisely the same issue he raised on direct appeal, *Caro*, 597 F.3d at 616-17, and under these circumstances, the court properly held, "relitigation of an already decided claim, using newly acquired ammunition, is barred." *Id*. Caro argues that the claim was not "fully considered" because "[t]he district court could not make an accurate

39

assessment of *Brady* materiality in the absence of the suppressed BOP data. Br. of Appellant at 34. But this Court did "fully consider" the issue, and the district court correctly concluded that Caro was in effect asking it to reverse this Court's ruling on the *Brady* claim. JA 1958, n.12 (citing Boeckenhaupt, 537 F.2d at 1183).

### b. Caro cannot meet the materiality standard under *Brady*.

In Caro's direct appeal, this Court concluded that Caro had "failed to establish that the information requested would be favorable to him." *Caro*, 597 F.3d at 619. The Court determined that "[b]ecause Caro can only speculate as to what the requested information might reveal, he cannot satisfy *Brady's* requirement of showing that the requested evidence would be 'favorable' to [the] accused." *Id*. at 619. Now, though in the course of his habeas proceedings, Caro presented some statistical evidence extrapolated from raw data he located independently, that appears favorable to his position on future dangerousness, he still cannot show that the evidence he requested would meet the materiality standard under *Brady*, that is, a reasonable probability the result of the proceeding would have been different if he had been able to present the requested evidence at sentencing.

At the trial, the jury heard evidence from both parties' experts that ADX is not intended to be a permanent placement. JA 699, 835. Dr. Cunningham

40

testified that the hope is that the inmates may "cycle . . .back out' into the BOP or returned to a lower level of security at some point. JA 699-700, 835. Cunningham also informed the jury that there were "individuals at ADX, though, for whom there is no foreseeable plan for their return to a lower level of security." JA 700. Dr. Cunningham also testified that he had learned from BOP staff that the average stay was five years before being moved through the "step-down" program, that the "range must be much greater," and that at least five inmates had been at ADX for twelve years since the prison opened in 1994. JA 701. On cross-examination, the government's witness, Hershberger, also acknowledged that the BOP conducts periodic individualized evaluations of inmates, and based on the evaluation, can either make changes or not to the housing for that inmate. JA 860. He also acknowledged that regarding the ADMAX policies, there were exceptions, and that an inmate is not automatically stepped down to a lower security assignment, and that if the inmate does not show sufficient responsibility, he would not be stepped down. JA 861-62.

Against that backdrop, even in light of Caro's new statistics, he cannot meet the materiality standard under *Brady*, because he cannot show a reasonable probability that the undisclosed BOP data would have resulted in a sentence of life instead of death. The heart of the government's argument was that Caro could not

be permanently assigned to the ADMAX facility, and Caro's new facts simply reiterate the facts presented through trial testimony on that point, indicating that some inmates stay five and more years there, that some inmates had no foreseeable plan to go to any lower security level, and that certain inmates incarcerated at ADX continuously since 1994. For all these reasons, Caro's claim that the requested evidence was material for purposes of *Brady*, should be denied. *See United States v. Agurs,* 427 U.S. 97, 109-10 (1976) ("The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense.").

Finally, it is not clear at all that the BOP possesses, or can produce the data that Caro claims it has – that is data that would show with certainty how long Caro would be incarcerated. There is nothing in Caro's new evidence or in the testimony presented to suggest or establish that the BOP data would "reflect[] precisely how long BOP would hold Caro at ADX Florence . . .." *Br. of Appellant* at 18, 23, 34. In this regard, Caro has again failed to show that the requested evidence is favorable, because he is only speculating what the information might reveal, where it is clear that regardless of statistical data, Caro would be evaluated on an individual basis, looking at his own behavior – unknowable at this time - before determining whether or when he would be stepped down within the BOP

42

system. *See Caro*, 597 F.3d at 619. ; *see also United States v. Aramony*, 166 F.3d 655, 661 (4th Cir. 1999). In other words, there could be no certainty regarding Caro's sentence in the statistical data from the BOP, because the statistics would only be representative of the fact that some inmates stay longer than others – a fact already established with the testimony at the trial.

Caro cannot meet *Brady's* materiality requirement, the government did not commit a *Brady* violation by failing to disclose the BOP data that Caro requested, and Caro was not denied due process under the Fifth Amendment.

**II.    Caro has not established that he was denied his Sixth Amendment right to counsel because his trial counsel made a strategic decision to not introduce mental health evidence at the penalty phase of the trial.**

Under *Strickland v. Washington,* 466 U.S. 668 (1984), to prove ineffective assistance of counsel, Caro must show (1) that his counsel's representation fell below an objective standard of reasonableness and (2) that counsel's deficient performance prejudiced him. *Strickland*, 466 U.S. at 687-88,694. If a petitioner fails to satisfy either prong of the *Strickland* test, a court does not need to inquire whether he has satisfied the other prong. *Id*. at 697.

A showing of prejudice requires the defendant to prove that "counsel's errors were so serious as to deprive the defendant of a fair trial." *Id*. at 687; *Byram v. Ozmint*, 339 F.3d 203, 209 (4th Cir. 2003). In the context of a capital sentencing

proceeding, the question is whether "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Wiggins v. Smith,* 539 U.S. at 510, 534 (2003). Assessing prejudice requires this Court to "reweigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins*, 539 U.S. at 534.

*Strickland* established a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," and the petitioner "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." 466 U.S. at 689 (internal citation and quotation omitted). "Judicial scrutiny of counsel's performance must be highly deferential" and "every effort [must] be made to eliminate the distorting effects of hindsight . . . and to evaluate the [challenged] conduct from counsel's perspective at the time." *Id.* "[E]ffective representation is not synonymous with errorless representation." *Springer v. Collins*, 586 F.2d 329, 332 (4th Cir. 1978).

It is well-settled that defense counsel must conduct a reasonable investigation into mitigating evidence to be presented during the penalty phase, and that failure to present mitigating evidence cannot be justified as a tactical decision unless the duty to investigate has been fulfilled. *Wiggins*, 539 U.S. at 522-23. "[S]trategic choices made after thorough investigation of law and facts

44

relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.*; *see also Wiggins,* 539 U.S. at 533 (quoting *Strickland,* 466 U.S. at 690-91). A particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments. *Strickland*, 466 U.S. at 691.

Reasonableness is the benchmark by which counsel's performance is measured. *Strickland*, 466 U.S. 668, 688-92. The American Bar Association Guidelines for the Appointment and Performance of Counsel in Capital Cases (the "ABA Guidelines") "are guides to determining what is reasonable, but they are only guides." *Id*. at 688. No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant. Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions. *Id*. at 688-89. Similarly, the declarations of legal

45

"experts," while informative, do not set the standard to evaluate the performance of trial. Further, this Court has previously held that the ABA Guidelines "certainly cannot be dispositive in and of themselves" even though they "emphasize the importance of mental health mitigation evidence, and may be of some relevance in determining what constitutes reasonable performance in a capital trial." *Meyer*, 506 F.3d at 372 (citing *Rompilla v. Beard*, 545 U.S. 374 (2005), 545 U.S. at 387 and *Wiggins*, 539 U.S. at 524). There simply is no *per se* rule requiring the presentation of mental health evidence, and "different circumstances often require different strategies." *Id.* "Such a *per se* rule would also potentially place lawyers in a very difficult position: forced to present mental health evidence, defense counsel could be challenged for ineffective assistance in the event the evidence is impeached. *Id.*

Caro's appeal should be denied because the investigation by Caro's counsel was reasonable, and counsel were not ineffective when they made a reasoned strategic decision to forego mental health evidence based on the circumstances known to them. Further, there is not a reasonable likelihood that the testimony of a mental health expert on Caro's childhood trauma would have changed the outcome of the penalty phase of the trial.

In a case similar to Caro's, this Court refused to find ineffectiveness because counsel had made a strategic choice not to offer testimony in light of harmful evidence which would have emerged on cross-examination. *Bunch v. Thompson*, 949 F.2d 1354, 1364-65 (4th Cir. 1991). In *Bunch,* trial counsel did not call a psychiatrist to testify about the defendant's childhood and mental state. *Id*. at 1364. The *Bunch* attorneys feared that harmful cross-examination of their psychiatrist and they were worried about other matters that they did not want before the jury. *Id*. at 1363-64. The *Bunch* Court thus observed, "Counsel was aware of this beneficial testimony but was also cognizant of the risks involved . . .." *Id*. at 1364. The *Bunch* Court concluded that defense counsel had made a "reasoned strategic choice not to offer psychiatric testimony," based on facts known to them, including knowledge of "damaging findings" from the government's evaluations. *Id*. at 1363-64. The *Bunch* Court stated, however, that "[t]o use that decision as a basis for finding ineffective assistance would be to institute a rule that psychiatric testimony should always be offered in the sentencing phase, no matter how counterproductive or damaging." *Id*. at 1364. The Court concluded, saying "[t]his we refuse to do." *Id*.

Here, Caro's counsel had only one expert with a professional opinion favorable to Caro, combined with knowledge that their other expert, Dr. Caruso,

had reported that he had information about the offense that was "not helpful to the defense."   JA 1256.  Counsel had also learned that Dr. Phillips, the government's expert, "had a good reputation and was known to present well on the stand," and counsel indicated that they did not believe that they could rebut Phillips' testimony.[5]  JA 1257.  Thus, though they did not have the benefit of the government's expert's report, counsel nonetheless had reason to anticipate a damaging cross-examination.  *Bunch*, 949 F.2d at 1364.  Counsel in this case made a "reasoned strategic choice" based on the information they had before them, and to use that decision as a basis for finding ineffective assistance would create a rule whereby counsel would be required always to offer psychiatric testimony, regardless of the risks associated with the testimony.  *See Bunch*, 949 F.2d at 1364; *see also Walton v. Angelone*, 321 F.3d 442 (2003).   This Court has refused to create such a rule.  *See id.; Meyer v. Branker*, 506 F.3d 358, 372 (4th Cir. 2007).

---

[5] Dr. Phillips' report validated counsel's concerns, reflecting that Caro "reported a happy childhood and denied any history of abuse."  JA 2036.  The report further indicated that "  . . .Caro . . . does not demonstrate any deficits in adaptive functioning . . .(t)here was no evidence that Mr. Caro suffers from any mental or emotional condition that  . . .impairs his capacity to meet the tasks of day-to-day living."  JA 2061.  Additionally, "twelve psychological reviews performed by seven different psychologists at five different federal correctional facilities consistently found that his mental status was within normal limits."  JA 2038.

Caro's counsel could have decided based on their own thorough investigation, that Dr. Spica's testimony would not be helpful enough to justify the risks inherent in opening the door to cross-examination or the government's testifying expert. For example, though Dr. Spica concluded that Caro's tests revealed "converging signs of frontal lobe dysfunction," he also indicated that Caro has "verbal expressive abilities within normal limits," and Dr. Spica could only "speculate" that the cognitive deficits causing the worst problems for Caro were "instability of reasoning" and "deficits in discriminating between actual information and distorted approximations." JA 1334. Dr. Spica concluded that Caro "appears to be a man of only modest internal/intellectual resources, with unreliable judgment skills, and an inability to sort through information provided to him." JA 1334. Counsel could have reasonably determined that these conclusions were simply not persuasive enough on the issue of future dangerousness to risk damaging cross-examination or the dangers of Phillips' testimony. Dr. Spica also concluded that Caro's reasoning ranked at the level of a 10-year-old under calm conditions and lower when under pressure. JA 1334. Yet, to the contrary, Caro was able to plan a conspiratorial assault on an inmate, including the manufacture of homemade weapons, calculated timing and placement of weapons, all while incarcerated at a federal correctional facility under guard. Further, the evidence of

49

Caro's leadership position in the Texas Syndicate, his loyalty to the organization, his ability to communicate in code, and his respect for the hierarchy of his gang would seem to cut against Dr. Spica's overall conclusions. In this light, counsel was in a "'no-win situation,'" where "the introduction of evidence that the jury does not credit or that the state turns to its advantage leads to ineffectiveness claims also." *Truesdale v. Moore,* 142 F.3d 749, 754-55 (4th Cir. 1998)(citing and quoting *Bunch*, 949 F.2d at 1364). The strategic decision not to present psychological evidence was reasonable, especially where this Court has held that "such evidence 'is a double-edged sword that might as easily have condemned [defendant] to death as excused his action.'" *Byram v. Ozmint*, 339 F.3d at 210 (citing and quoting *Truesdale*, 142 F.3d at 755).

Further, Caro's case is distinguishable from the circumstances in *Wiggins* and *Williams v. Taylor*, 529 U.S. 362, 396 (2000), where the Supreme Court found that counsel were ineffective for failing to conduct a reasonable investigation. 539 U.S. at 511; 529 U.S. at 396. In *Wiggins,* the Court concluded that the investigation was not reasonable where counsel had looked at limited records but the postconviction proceedings included "expert testimony by a forensic social worker about the severe physical and sexual abuse [Wiggins] had suffered at the hands of his mother and while under the care of a series of foster parents." *Id.* at

50

510-11. But importantly, the Court clarified that its decision "d[id] not mean that *Strickland* requires counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing." *Id*. at 512. "Rather, the conclusion is based on the much more limited principle that 'strategic choices made after less than complete investigation are reasonable' only to the extent that 'reasonable professional judgments support the limitations on investigation.'" *Id*. at 512 (citing and quoting *Strickland*, at 690-91).

In *Williams v. Taylor*, 529 U.S. 362, 396 (2000), the Supreme Court concluded that trial counsel had not fulfilled "their obligation to conduct a thorough investigation of the defendant's background," and that he was prejudiced by his counsel's failure. *Id*. at 363-64, 396-97. The record in *Williams* revealed that "counsel failed to prepare for sentencing until a week beforehand, to uncover extensive records graphically describing Williams' nightmarish childhood, to introduce available evidence that Williams was 'borderline mentally retarded' and did not advance beyond sixth grade," and to seek helpful prison records and beneficial testimony from prison officials. *Id*. at 363-64. The *Williams* Court concluded that "[a]lthough not all the additional evidence was favorable to Williams, the failure to introduce the comparatively voluminous amount of

51

favorable evidence was not justified by a tactical decision and clearly demonstrates that counsel did not fulfill their ethical obligation to conduct a thorough investigation of Williams' background." *Id*. at 364, 396.

In Caro's case, by contrast, counsel hired several experts to investigate Caro's background, and received mixed results. They hired a mitigation specialist, whom they later had to replace, a licensed clinical social worker,  a fact investigator, two experts to opine on future dangerousness, a neuropsychologist, a neurologist, and a forensic psychiatrist.  Caro's counsel alleged twenty-two mitigating factors, and investigated and presented relevant mitigating testimony from family members, his wife, and one of his teachers, in an attempt to humanize the man who had so brutally and callously strangled Sandoval to death for no reason.  They also presented testimony from the two prison experts who stated that although Caro continued to pose a danger to other inmates, the BOP could effectively control him such that he would not harm anyone else if he were to be imprisoned for life.  JA 447-48, 456-57, 763, 774-75.  The jury heard from three of Caro's aunts, a former teacher and a cousin, who testified regarding Caro's difficult childhood.  On the basis of this evidence, the jury found twelve mitigating factors.  JA 881-85.  Thus, in stark contrast to the scenarios in *Williams* and *Wiggins*, the record in this case establishes that Caro's counsel conducted a

thorough and reasonable investigation into the possibility of mitigating mental health evidence, and weighed the beneficial evidence they had along with the damaging evidence their own investigation had developed through against the likelihood of harmful cross-examination and other harmful testimony from the government's expert.

Finally, Caro's case is distinguishable from *Porter v. McCollum*, 558 U.S. 30 (2009), in which the Supreme Court held that defense counsel's failure to uncover and present mitigating evidence regarding the defendant's mental health, family background or military service during the penalty phase was deficient. During the postconviction proceedings, Porter presented new evidence establishing that he had an abusive childhood, and witnessed horrible domestic violence episodes of his father attacking him and his mother. *Id*. at 33-34. Porter presented evidence of great heroism during the Korean War, including very significant awards and decorations. *Id*. at 34-35. Porter also presented evidence of the psychological effects of his traumatic war experiences and an expert in neuropsychology who concluded that "Porter suffered from brain damage that could manifest in impulsive, violent behavior" and expert testimony supporting two statutory mitigators. *Id*. at 36. But the facts in *Porter* are very different from those in Caro's case for the reasons stated above, regarding *Williams* and *Taylor*,

53

The *Porter* Court found that Porter's counsel "did not even take the first step of interviewing witnesses or requesting records." *Id*. (citing *Bobby v. Van Hook*, 558 U.S. 4 (2009)(holding that counsel's performance was not deficient when counsel gathered a substantial amount of information and then made a reasonable decision not to pursue additional sources)).  558 U.S. at 39.  But Caro's counsel did investigate Caro's mental health background, hired appropriate experts and reviewed their reports and records, investigated Caro's childhood and presented several witnesses to testify about the negative aspects of his childhood.  JA 1934. The strategic decision to forego presenting additional mental health evidence was not unreasonable in this light.

Nor can Caro establish that he was prejudiced by the failure of his counsel to present mental health evidence because there is not a reasonable likelihood that the additional testimony would have changed the outcome of the proceeding.  Most importantly, as already noted, the jury heard evidence from the various defense witnesses and found several mitigating factors in Caro's favor before deciding on the penalty.  When assessing prejudice, and "reweigh[ing] the evidence in aggravation against the totality of available mitigating evidence," Caro has not shown that the outcome of his case would be any different.  He points to Dr. Schwartz-Watts and a qualified mental health expert who could have caused a

juror to "strike a different balance." *Br. of Appellant* at 53. But the failure of the defense to call certain witnesses is not sufficient grounds for a Sixth Amendment claim. *Strickland*, 466 U.S. 668, 690 (strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable). And this Court has long held that a failure to "shop around" for a favorable expert opinion after an evaluation yields little in mitigating evidence does not constitute ineffective assistance." *Bryam v. Ozmint*, 339 F.3d at 210.

For similar reasons, Caro cannot establish ineffectiveness or prejudice regarding his claim that his attorneys should have produced his traumatic social history to a qualified mental health practitioner. Caro acknowledges that his counsel retained Dr. Caruso, a forensic psychiatrist, and that he interviewed Caro about the crime and reported to counsel that his testimony would not be useful. *Br. of Appellant* at 52. And Caro's social history was presented, through the various witnesses who succeeded in convincing the jury that Caro was raised in a poverty stricken community; that his parents did not value education; that he required special education and dropped out of school before completing the ninth grade; that Caro's father was violent, alcoholic, criminal and neglectful and had a pervasive, devastating influence on his sons' lives; that Caro was exposed to

repeated instances of domestic violence and household disruptions; and that his uncles involved him in illegal drug trafficking.

None of the cases cited by Caro stands for the proposition that defense counsel must always present mental health evidence in mitigation, without any strategic analysis, or no matter the consequences. Caro cites to *Rompilla* in support of his claim that his social history was insufficiently addressed. *Br. of Appellant* at 53. In *Rompilla*, the lawyers failed to examine the court file on Rompilla's prior rape and assault conviction when they knew that the Commonwealth would attempt to use the prior conviction to show Rompilla's violent criminal history, and that it would "emphasize his violent character by introducing a transcript of the rape victim's trial testimony." *Id*. at 375. The *Rompilla* Court held that "[n]o reasonable lawyer would forgo examination of the file [that he knows the prosecution will use] thinking he could do as well by asking the defendant or family relations whether they recalled anything helpful or damaging in the prior victim's testimony. . . .." *Id*. at 389. Caro points out that the Court considered in part that if Rompilla's attorneys had looked at the file, they would have found leads to other sources, including testimony from family members who could have established that Rompilla's childhood was horrific, defined by alcoholism, severe abuse, domestic abuse of his mother and severe

deprivations of affection and basic comforts. *Br. of Appellant* at 53; *Id.* at 392.

But *Rompilla* does not stand for the proposition that there can never be a strategic

decision to not present mental health evidence in mitigation. The Court concluded

that "[o]ther situations, where a defense lawyer is not charged with knowledge

that the prosecutor intends to use a prior conviction in this way, might well warrant

a different assessment." *Id.* Caro's case is a different situation, but most

significantly, in light of the evidence that was presented to the jury regarding

Caro's childhood, *Rompilla* does not establish that Caro's counsel were ineffective

or that he was prejudiced by their decision regarding the evidence of his childhood

experiences.

Finally, Caro's later evidence from Dr. Spica and Dr. Schwartz-Watts does

not establish that his counsel were unreasonable or ineffective. For example,

though Caro pointed out that Dr. Schwartz-Watts "averred that 'the developmental

delays which were reported by his family members prior to and during this trial . . .

can be seen in children with cognitive impairments and in children who are

exposed to trauma," she also acknowledged that regarding her diagnosis of Adult

Antisocial Behavior, Caro did not have a life-long history or childhood history of

engaging in aggressive behavior, and that the diagnosis was the result of his

current conviction – "an act that imposed physical or psychological harm on

another person." JA 1290. She also said that there was no evidence that Caro "has been a follower or a leader," and that he "is a reserved individual who tends to avoid conflicts and unnecessary interactions with others." JA 1295. In light of Caro's reported history, it is not at all clear, and certainly not reasonably probable, that Dr. Schwartz-Watts would have changed the outcome of the proceeding. For all these reasons, Caro has not established that his counsel were ineffective, or that he was prejudiced by their strategic decisions.

## CONCLUSION

For the foregoing reasons, we respectfully request that the Court affirm the judgment and sentence imposed by the district court.

Respectfully submitted,

RICK A. MOUNTCASTLE
Acting United States Attorney

s/ Jean B. Hudson
Assistant U.S. Attorney
United States Attorney's Office
VA Bar No. 25870
Jean.Hudson@usdoj.gov

58

## **CERTIFICATE OF COMPLIANCE**

This brief has been prepared using fourteen point, proportionally spaced, serif typeface – Microsoft Office Word 2010, Times New Roman, 14 point, and is in compliance with Fed. R. App. P. 32(a)(7)(B).

This brief contains 58 pages and approximately 13,105 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(ii), and is in compliance with Fed. R. App. P. 32(a)(7)(B).

I understand that a material misrepresentation can result in the Court striking the brief and imposing sanctions.

<u>s/</u> Jean B. Hudson
Assistant United States Attorney
 VA Bar No. 25870

## CERTIFICATE OF SERVICE

I certify that on June 23, 2017, I electronically filed the foregoing motion of Appellee with the Clerk of the Court using the CM/ECF System, which will send notice, and constitute service, of such filing to the following registered CM/ECF user(s):  Fay Spence, Assistant Federal Public Defender,  Brian Beck, Assistant Federal Public Defender, and Timothy M. Gabrielsen, Federal Public Defender, Counsel for the Appellant.

<u>s/</u> Jean B. Hudson
Assistant U.S. Attorney
VA Bar No.  25870
