4/18/2018    Inside America's Toughest Federal Prison - The New York Times

**The New York Times Magazine** | https://nyti.ms/1D1rbRa

# Inside America's Toughest Federal Prison

For years, conditions inside the United States' only federal supermax facility were largely a mystery. But a landmark lawsuit is finally revealing the harsh world within.

By MARK BINELLI    MARCH 26, 2015

In prison, Rodney Jones told me, everyone had a nickname. Jones's was Saint E's, short for St. Elizabeths, the federal psychiatric hospital in Washington, best known for housing John Hinckley Jr. after he shot Ronald Reagan. Jones spent time there as well, having shown signs of mental illness from an early age; he first attempted suicide at 12, when he drank an entire bottle of Clorox. Later, he became addicted to PCP and crack and turned to robbery to support his habit.

I met Jones a few blocks from his childhood home in LeDroit Park, a D.C. neighborhood not far from Howard University. It was a warm October afternoon, but Jones, 46, was wearing a puffy black vest. The keys to his grandmother's house, where he currently lives, hung from a lanyard around his neck. His face was thin, a tightly cropped beard undergirding prominent cheekbones, and he had a lookout's gaze, drifting more than darting but always alert.

Jones had been out of prison for three years, a record for him, at least as an adult, but he still sounded a bit like Rip Van Winkle as he marveled at how gentrified his old neighborhood had become. We sat on a cafe's sun-dappled terrace, surrounded by creative-class types. A chef wandered outside to pluck some fresh rosemary from a planter. Jones was the only black patron at the cafe and probably the only person who remembered when it used to be a liquor store. "You wouldn't be sitting here," Jones said. He nodded at some toddlers playing across the street. "That

park right there, that wasn't a park. That was just an open field where everybody gambled. At any given time, you would hear shots ring out."

From the age of 15, Jones found himself in and out of juvenile detention, St. Elizabeths or prison — never free for much longer than a month or so. The outside world came to feel terrifying; once, he wanted to get back inside so badly, he bought a bag of crack and called the cops on himself. "That was the world that I knew," he said.

It hadn't been easy for Jones to transition back to a life of freedom. He managed to stick it out, he said, because he was determined not to return to the place where he spent the final eight years of his last sentence: the United States Penitentiary Administrative Maximum Facility in Florence, Colo., known more colloquially as the ADX. The ADX is the highest-security prison in the country. It was designed to be escape-proof, the Alcatraz of the Rockies, a place to incarcerate the worst, most unredeemable class of criminal — "a very small subset of the inmate population who show," in the words of Norman Carlson, the former director of the Federal Bureau of Prisons, "absolutely no concern for human life." Ted Kaczynski and the Atlanta Olympics bomber Eric Rudolph call the ADX home. The 9/11 conspirator Zacarias Moussaoui is held there, too, along with the 1993 World Trade Center bombing mastermind Ramzi Yousef; the Oklahoma City bomber Terry Nichols; the underwear bomber Umar Farouk Abdulmutallab; and the former Bonanno crime-family boss Vincent Basciano. Michael Swango, a serial-killing doctor who may have poisoned 60 of his patients, is serving three consecutive life sentences; Larry Hoover, the Gangster Disciples kingpin made famous by rappers like Rick Ross, is serving six; the traitorous F.B.I. agent Robert Hanssen, a Soviet spy, 15.

Along with such notorious inmates, prisoners deemed serious behavioral or flight risks can also end up at the ADX — men like Jones, who in 2003, after racking up three assault charges in less than a year (all fights with other inmates) at a medium-security facility in Louisiana, found himself transferred to the same ADX cellblock as Kaczynski.

Inmates at the ADX spend approximately 23 hours of each day in solitary confinement. Jones had never been so isolated before. Other prisoners on his cellblock screamed and banged on their doors for hours. Jones said the staff

psychiatrist stopped his prescription for Seroquel, a drug taken for bipolar disorder, telling him, "We don't give out feel-good drugs here." Jones experienced severe mood swings. To cope, he would work out in his cell until he was too tired to move. Sometimes he cut himself. In response, guards fastened his arms and legs to his bed with a medieval quartet of restraints, a process known as four-pointing.

One day in 2009, Jones was in the rec yard and spotted Michael Bacote, a friend from back home. The familiar face was welcome but also troubling. Bacote was illiterate, with an I.Q. of only 61, and suffered from acute paranoia. He had been sent to the ADX for his role as a lookout in a murder at a Texas prison, and he was not coping well. His multiple requests for transfers or psychological treatment had been denied. He was convinced that the Bureau of Prisons was trying to poison him, so he was refusing meals and medication. "You would have to be blind and crazy yourself not to see that this guy had issues," Jones said, shaking his head. "He can barely function in a normal setting. His comprehension level was pretty much at zero."

Bacote had paperwork from previous psychiatric examinations, so Jones went to the prison's law library (a room with a computer) and looked up the address of a pro bono legal-aid group he had heard about, the D.C. Prisoners' Project. Because Bacote couldn't write, Jones ghosted a query. "I suppose to have a hearing before coming to the ADX," Jones, as Bacote, wrote. "They never gave me a hearing." He continued, "I need some help cause I have facts! Please help me."

The story of the largest lawsuit ever filed against the United States Bureau of Prisons begins, improbably enough, with this letter. Deborah Golden, the director of the D.C. Prisoners' Project, fields approximately 2,000 requests each year, but Bacote's, which she received in October 2009, caught her eye. "I thought I might be missing something, because it was inconceivable to me that the Bureau of Prisons could be operating in such a blatantly illegal and unconstitutional manner," she said. Golden was referring to B.O.P. regulations that forbid the placement of inmates who "show evidence of significant mental disorder" in prisons like the ADX.

Groups like Golden's D.C. Prisoners' Project tend to focus their reform efforts on state-run prisons — in part because the Prison Litigation Reform Act, passed by Congress in 1996, made it more difficult for prisoners to file federal lawsuits, and in

part because the federal government possesses, as Golden put it, "an inexhaustible supply of resources." A droll 42-year-old attorney who once considered rabbinical school, Golden has spent her entire career practicing human rights law. As she investigated Bacote's claims, she came to realize there were dozens of inmates at the ADX with comparable stories, or worse: cases of self-mutilation, obvious psychosis, suicide. Her organization had never considered filing such an enormous suit. Because it is so difficult to win cases against the federal government, challenging the B.O.P. "just didn't fit into anyone's strategic goals," Golden explained. The last major B.O.P. lawsuit to result in a settlement was in the mid-'90s (Lucas v. White, brought by a group of female inmates who had been sexually assaulted). But the clarity of Bacote's claims gave her pause. "A lot of cases we see involve matters of interpretation: Who knew what and when," she said. "This didn't seem to involve that kind of uncertainty. I wasn't sure if we had a chance. But it seemed like a court had to see it."

**Since opening in** 1994, the ADX has remained not just the only federal supermax but also the apogee of a particular strain of the American penal system, wherein abstract dreams of rehabilitation have been entirely superseded by the architecture of control. Throughout our country's history, there have been different ideas about what to do with the "worst of the worst" of our criminal offenders, ranging from the 19th-century chain gangs, who toiled in enforced silence, to the physical isolation of Alcatraz Island. The use of solitary confinement in the United States emerged as a substitute to corporal punishments popular at the end of the 18th century. The practice was first promoted in 1787, by a group of reformers called the Philadelphia Society for Alleviating the Miseries of Public Prisons. At a salon hosted by Benjamin Franklin, a pamphlet was read calling for the construction of a "house of repentance," in which solitude could work to soothe the minds of criminals — an enlightened alternative, the group believed, to inhumane "public punishments" like "the gallows, the pillory, the stocks, the whipping post, and the wheelbarrow." Inmates at Philadelphia's Eastern State Penitentiary, which opened in 1829, were completely isolated from one another in cells outfitted with skylights, toilets and access to private outdoor exercise yards, where they worked at various trades, took all meals and read the Bible. Other states tried, but quickly abandoned, the so-called Pennsylvania System, and an 1890 Supreme Court ruling against the use of solitary

on Colorado's death row noted that "a considerable number of the prisoners fell, after even a short confinement, into a semifatuous condition, from which it was next to impossible to arouse them, and others became violently insane; others still, committed suicide, while those who stood the ordeal better were not generally reformed."

The concept soon fell out of favor, and beginning in the 1930s, the hardest cases in the federal system — men like Al Capone and George (Machine Gun Kelly) Barnes — were housed in the converted military prison on Alcatraz Island, until it was closed in 1963 because of the costly upkeep inherent to an island prison. By the end of the decade, many of its prisoners had been transferred to the new "control units" at a federal penitentiary in Marion, Ill., where they were kept in solitary confinement. In 1983, after the assassination of two guards in separate attacks on the same day, by members of the Aryan Brotherhood, the Marion penitentiary was converted to the first modern all-lockdown facility, the entire prison now a solitary unit. (One of the guards' killers, Tommy Silverstein, is now at the ADX. He has been in solitary confinement for the past 22 years.)

Beginning in 1989 with California's Pelican Bay, states began building their own lockdown penitentiaries, inspired by the Marion model. The renewed use of solitary coincided with the era of mass incarceration and the widespread closing of state-run mental-health facilities. The supermax became the most expedient method of controlling an increasingly overcrowded and psychologically volatile prison population. A result of this unfortunate confluence has been a network of ever more austere and utilitarian penitentiaries, built specifically to seal off a significant portion of state and federal inmates, using methods that would shock many Americans. According to a 2014 Amnesty International report, more than 40 states now operate supermax prisons. On any given day, there are 80,000 U.S. prisoners in solitary confinement.

Norman Carlson, the B.O.P. director at the time of the Marion attacks, spearheaded the construction of a federal supermax that could eventually replace Marion. Florence, a faded Colorado mining town, lobbied hard for the $60 million prison to be built within its city limits, with residents eventually donating 600 acres of land to the B.O.P.

The ADX can house up to 500 prisoners in its eight units. Inmates spend their days in 12-by-7-foot cells with thick concrete walls and double sets of sliding metal doors (with solid exteriors, so prisoners can't see one another). A single window, about three feet high but only four inches wide, offers a notched glimpse of sky and little else. Each cell has a sink-toilet combo and an automated shower, and prisoners sleep on concrete slabs topped with thin mattresses. Most cells also have televisions (with built-in radios), and inmates have access to books and periodicals, as well as certain arts-and-craft materials. Prisoners in the general population are allotted a maximum of 10 hours of exercise a week outside their cells, alternating between solo trips to an indoor "gym" (a windowless cell with a single chin-up bar) and group visits to the outdoor rec yard (where each prisoner nonetheless remains confined to an individual cage). All meals come through slots in the interior door, as does any face-to-face human interaction (with a guard or psychiatrist, chaplain or imam). The Amnesty report said that ADX prisoners "routinely go days with only a few words spoken to them."

Robert Hood, the warden of the ADX from 2002 to 2005, told me that when he first arrived on the campus, he was struck by "the very stark environment," unlike any other prison in which he ever worked or visited — no noise, no mess, no prisoners walking the hallways. When inmates complained to him, he would tell them, "This place is not designed for humanity," he recalled. "When it's 23 hours a day in a room with a slit of a window where you can't even see the Rocky Mountains — let's be candid here. It's not designed for rehabilitation. Period. End of story."

Hood was not trying to be cruel with such frankness. The ADX was built explicitly to house men often already serving multiple life sentences and thus facing little disincentive to, say, murder a guard or another prisoner. Still, during his own tenure, Hood said he made a point of developing one-on-one relationships with as many inmates as possible — he described Salvatore (Sammy the Bull) Gravano as "a very likable guy, believe it or not," and he bonded with the Unabomber over their shared interest in running marathons — in hopes of eliciting good behavior in exchange for whatever he could do to make their sentences more bearable. But he also needed them to understand that even as warden, he lacked the authority to change the rules of their confinement. In the past, Hood has memorably described the ADX as "a clean version of hell."

**Five years ago,** a major lawsuit against the Federal Bureau of Prisons would have sounded quixotic. But in the present moment, the ADX case feels like the crest of a wave, as the excessive use of solitary confinement in U.S. prisons has come under intensifying scrutiny. Senator Dick Durbin, Democrat of Illinois, held the first-ever congressional hearing on the issue in 2012. Dr. Craig Haney, a psychology professor at the University of California, Santa Cruz, testified that "a shockingly high percentage" of the prisoners in solitary confinement are mentally ill, "often profoundly so" — approximately one-third of the segregated prisoners on average, though in some units the figure rises to 50 percent. The emptiness that pervades solitary-confinement units "has led some prisoners into a profound level of what might be called 'ontological insecurity,' " Haney, who worked as a principal researcher on the Stanford Prison Experiment while in graduate school, told the senators. "They are not sure that they exist and, if they do, exactly who they are."

According to David Cloud, a senior associate at the Vera Institute of Justice, a nonpartisan, nonprofit organization dedicated to the reform of the criminal-justice system, "The research is pretty conclusive: Since people started looking at this, even 200 years ago, when a guy named Francis Gray studied 4,000 people in 'silent prisons,' the studies have found that the conditions themselves can cause mental illness, stress, trauma." The devastating effects of solitary confinement, even on those who showed no previous signs of psychological problems, are now so broadly accepted by mental-health professionals that policy makers are finally taking notice. Last year the New York State attorney general approved a deal forbidding the placement of minors and mentally ill prisoners in solitary; in January, New York City banned solitary for anyone under 21. Gov. John W. Hickenlooper of Colorado signed a similar bill at the urging of the state corrections chief, Rick Raemisch, who spent a night in solitary confinement and wrote about it in a New York Times Op-Ed, concluding that its overuse is "counterproductive and inhumane." As Cloud told me, "Even if you tried to employ solitary confinement with the most humane intentions, people are still going to lose their minds and hurt themselves."

Golden recognized that a lawsuit against the B.O.P. would still be a long shot — and that a co-counsel with deeper pockets than her own would be necessary. So she approached Arnold & Porter, a white-shoe law firm with a history of taking on high-profile pro bono cases. Ed Aro, a partner based in Denver, was intrigued; a close

family member had spent time in prison, and other relatives had suffered from mental illness. Aro himself, though, was a trial lawyer who mostly represented corporations and had never set foot in a correctional facility. The prison jargon so baffled him at first that Golden had to send him a glossary that she put together.

A Colorado native who looks the part, Aro, 50, favors cowboy boots and fleece jackets, and his cheeks have the ruddy, slightly cured quality of a man who enjoys vigorous exercise at high altitudes. "Juries are my stock in trade," he told me. "They bring me in when the story is complicated and there's not going to be a settlement and they need someone to tell a convincing narrative. With this case, I worried, How do you weave a narrative and humanize people at a prison like this?"

As he tried to get a handle on the lawsuit, he made the two-hour drive to Florence nearly every week. For years, conditions inside the ADX had remained largely a mystery; from 2002 on, the Amnesty report noted, ADX officials denied every media request for a visit or prisoner interview, aside from a restricted tour in 2007. (The B.O.P. declined to comment for this article or to allow a site visit.) Aro assumed he would find a small number of prisoners who had somehow slipped through the cracks. "The thing that shocked me most was how massive the problem was," Aro said. "The ADX is the most closely monitored and evaluated subset of the prison population in the entire country. With the extent of the problem, it's incomprehensible to me that the B.O.P. didn't notice what was going on." How, Aro wondered, did the toughest prison in the United States become a mental asylum — one incapable of controlling its own population?

He enlisted Dr. Doris Gundersen, a Denver-based forensic psychiatrist, who was allowed inside the ADX as part of his legal team. After evaluating 45 prisoners, she estimated that 70 percent met the criteria for at least one serious mental illness. She and Aro spoke to inmates who swallowed razor blades, inmates who were left for days or weeks shackled to their beds (where they were routinely allowed to soil themselves), an inmate who ate his own feces so regularly that staff psychiatrists made a special note only when he did so with unusual "voracity." A number of prisoners were taken off prescribed medications. (Until recently prison regulations forbade the placement of inmates on psychotropic medication in the Control Unit, the most restrictive section of the ADX, as, by definition, such medication implies

USCA4 Appeal: 16-1      Doc: 80-2      Filed: 05/08/2018      Pg: 9 of 17

severe mental illness.) Others claimed that they were denied treatment, aside from "therapy classes" on the prison television's educational station and workbooks with titles like "Cage Your Rage," despite repeated written requests. (The ADX lawsuit says that only two psychologists and one part-time psychiatrist serve the entire prison.)

Gunderson and Aro met one inmate, Marcellus Washington, sentenced to life for carjacking and armed robbery, who slashed his wrists in a suicide attempt and was punished for it: He lost his television and radio privileges for several weeks. They met another inmate, Herbert Perkins, also serving life for armed robbery, who, after slashing his throat with a razor and being rushed to a hospital, was returned to the same cell, given a mop and bucket and ordered to clean up the blood.

They also met David Shelby, a schizophrenic who, in 1995, became convinced that God wanted him to free Charles Manson from prison and that the best way to achieve this would be to send threatening letters to President Bill Clinton. He arrived at the ADX in 2000. Nine years later, in response to another command from God, Shelby, who just a few months earlier tried to commit suicide by slashing his arms, legs and stomach, fashioned a tourniquet around the base of his left pinkie, hacked off the top two joints with a Bic razor blade and ate his finger with a bowl of ramen. When he became agitated and summoned a guard to say he'd done a "terrible thing," he mostly meant that he'd eaten meat; for the previous few months, he had been a vegetarian.

Aro had interviewed about 25 ADX prisoners when, in October 2011, he met the man who would become the face of the lawsuit. This particular inmate, Jack Powers, who was 52, refused to take a seat during their first meeting; years in solitary had made him skittish around other humans. Still, Aro immediately found Powers striking: bright, articulate, no history of institutional violence.

"If you looked at Jack's criminal history," Aro said, "at the bizarre, unhappy confluence of circumstances that led him to the ADX and into this incredible descent into madness, it's impossible to believe what happened to him has nothing to do with his conditions of confinement." In his search for a compelling character whose story

USCA4 Appeal: 16-1    Doc: 80-2    Filed: 05/08/2018    Pg: 10 of 17

could explain the lawsuit, Aro thought as he left the prison that day, it wouldn't get much better than Jack Powers.

**Jack Powers grew up** in Norwich, N.Y., the son of a Vietnam veteran who beat him regularly. Powers ran away from home at 14; a few years later he was sent to prison on burglary charges. He was released in 1982, at 21, and he married and moved to Holland, Mich., where he founded a construction company and beauty salon. But by the end of the decade, both businesses had gone bankrupt, and he began robbing banks — at least 30, according to his 1990 conviction. He never armed himself; he always just slipped a note to the bank teller. He thinks his wife (now ex) turned him in.

At the U.S. penitentiary in Atlanta, where he was serving his 40-year sentence, he befriended a new inmate named Eduardo Wong, a heroin smuggler with supposed ties to Chinese organized crime. "Nice guy," Powers said in a recorded deposition. "I mean, relatively speaking." Wong and Powers liked to play chess. "But it wasn't that long, just a matter of weeks," Powers said, "before things went awry."

Wong became a target of members of the Aryan Brotherhood, who threatened to kill him if he didn't procure cash for them. Powers warned Wong about the seriousness of his situation, but Wong hesitated. One afternoon, a group of men ran onto their tier and stabbed Wong multiple times while Powers was held in the cell next door at knife point. After they ran off, Wong stumbled into Powers's arms, blood gushing from his neck. "John, help me," he said. Powers managed to carry Wong down several floors to the prison hospital, where he died.

During the murder investigation, Powers was moved to a protective custody unit. Shortly after his transfer, though, the face of an Aryan Brotherhood member appeared at the food slot of his door. "If you tell on my boys," the man warned, "I'm going to chop your head off." But Powers had a teenage son in Syracuse he wanted to reconnect with, so in exchange for what he believed would be a sentence reduction, he agreed to appear as a witness for the government. Three of the four Aryan Brotherhood members he testified against were convicted and received life sentences.

Powers had no history of mental illness before his incarceration. But after Wong's murder, he began to display symptoms of post-traumatic stress disorder, which manifested in the form of panic attacks, near-constant anxiety and nightmares in which inmates with weapons cornered Powers in an isolated area of the prison. By 1999, he had not received his sentence reduction and had become convinced that the B.O.P. was planning on transferring him out of protective custody. So he decided to escape.

He put a dummy in his bed, hid inside a grate in the rec yard and scaled the side of a building with a homemade grappling hook. From the rooftop, he jumped over a 16-foot electric fence, then climbed a second barbed-wire fence with FedEx boxes tape to his arms and legs. Once outside, he stole a car and headed to Syracuse to see his son.

When his son didn't answer his phone, he tried to visit his half sister. (She wasn't home, but when he spotted a neighbor struggling with a lawn mower, he cut her grass.) The police picked him up after two days. A reporter from The Syracuse Post-Standard interviewed Powers at the local jail and asked him whether he would do it again. The article reads as a lighthearted human-interest feature about a gentleman bandit, and Powers's affirmative answer became the kicker. "Without life's normal sensations and emotions and feelings," Powers said, "what have you got?"

In October 2001, Powers, now considered a flight risk, was transferred to the ADX — where all three of the Aryan Brotherhood members Powers had testified against were serving their own sentences. Powers's PTSD intensified. Tagged as a snitch and, more damaging, as an enemy of the Aryan Brotherhood, even unaffiliated prisoners avoided speaking to him. The guards, Powers said, treated him differently as well. If the whole unit is against a prisoner, he explained, "it's like, the majority prevails. If they're trying to be cool with the rest of these guys, then they can't be cool with you."

Over the next decade, Powers, by any rational accounting, lost his mind. He cut off both earlobes, chewed off a finger, sliced through his Achilles' tendon, pushed staples into his face and forehead, swallowed a toothbrush and then tried to cut open

his abdomen to retrieve it and injected what he considered "a pretty fair amount of bacteria-laden fluid" into his brain cavity after smashing a hole in his forehead. In 2005, after slicing open his scrotum and removing a testicle, Powers was sent to the medical center for federal prisoners in Springfield, Mo., for treatment, where a psychiatrist determined he was "not in need of inpatient psychiatric treatment or psychotropic medication" and that his behavior "was secondary to his antisocial disorder." When he was returned to Springfield four years later, after slashing his wrists and writing "American Gulag" in blood on his bedsheets, the doctor wrote, "Considerations that [Powers] has some form of psychosis, thought disorder or mental illness are unfounded."

In 2007, an inmate named Jose Vega was placed in the cell directly below Powers. Vega had come to the ADX after attacking an associate warden with a razor blade at another prison. He had received a diagnosis of depression, and because he was sick and disruptive — flinging feces and urine at the staff — the guards came to despise him, according to Powers. But he and Vega began talking through the drains of their sinks. (Prisoners in neighboring cells could communicate through the plumbing if they used toilet-paper rolls to blow the water from the U-shaped pipes, called sink traps, that ran beneath their basins.) For the first time in years, Powers had someone he considered a friend. They would chat about the prison, their families, legal issues. Vega had lost his television privilege, so Powers would place his own headphones near the sink drain and play music loud enough so that his friend could listen, too.

At times, a guard would provoke Vega. He became convinced that staff members were sneaking into his cell at night and assaulting him. Powers knew that was impossible — the heavy cell doors could not be opened without Powers hearing — but he said that guards did withhold Vega's mail and intentionally dropped his food on the floor. One guard told Vega that he might as well kill himself, because things weren't going to get any better. "They started to break him," Powers said. "Almost like you see with pro wrestlers, like a tag-team-type thing, where one of them passes it off to the next and to the next and to the next."

On the morning of May 1, 2010, Vega was found dead in his cell. He had hanged himself with a bedsheet. After Vega's death, Powers shaved his head and began

decorating his body with what he would describe as his "Avatar stripes," a reference to the striped blue aliens in the James Cameron movie. Using a razor blade to make tiny cuts in his skin and then rubbing carbon-paper dust into the wounds, Powers tattooed spiky black slashes along his arms, legs, neck, skull, under his eyes and around his Adam's apple. A photograph from 2011 presents an astounding transformation: The smirking, shaggy-haired young bank robber who entered the federal prison system in 1990 no longer existed, and the man who replaced him looked like something out of a nightmare.

**Aro's team first met** with members of the U.S. Justice Department in November 2011. A series of conversations with the B.O.P. followed, in which the lawyers proposed specific remedies that could head off a lawsuit. Aro described the agency as "routinely unhelpful" and said it soon became "crystal clear that they were circling the wagons. They weren't going to even admit there were problems, let alone try to fix them."

According to Golden, prisons have a history of getting lawsuits mooted by simply transferring the litigious inmate to a different facility. In anticipation of such a maneuver, Golden and Aro assembled a broad platform of plaintiffs, unwieldy enough to make the transfer strategy impractical: The initial complaint featured six primary inmates, including Powers and Shelby, and 11 backups, demonstrating a range of illnesses, races and backgrounds. (The legal team also filed a suit on behalf of the family of Jose Vega seeking damages for abuse and wrongful death.)

In 2013, Aro and a U.S. attorney representing the B.O.P. spent two days questioning Powers in a filmed deposition (the source of much of the preceding account of his time at the ADX). The video frames Powers, dressed in the standard prison uniform, seated behind a table, his hands shackled. At one point, he tells a lawyer he can't remember the last time he was in a room with so many people, probably years ago. He's thoughtful and deliberate, obviously intelligent. Despite the litany of horrors he relates, you can almost understand how people might have judged him sane.

By that fall, Judge Richard Matsch, who presided over the Oklahoma City bombing trial, had denied motions to dismiss filed by the B.O.P., and the lawsuit

entered its discovery phase. And then, to Aro and Golden's genuine surprise, the government's lawyers broached the subject of a potential settlement — which, according to Golden, "is almost unheard-of" for the B.O.P. Aro added, "I don't think any of us went into this very optimistic that we'd get to a resolution without dragging them kicking and screaming across the finish line. The government routinely defends lawsuits if they think they have a snowball's chance in hell of winning."

Matsch assigned a federal magistrate judge to oversee the potential settlement, and Aro and Golden presented the B.O.P. with a list of 27 points that needed to be addressed, including specific demands for diagnosis and treatment and an oversight board to ensure that these demands were met. (The lawsuit does not include any financial settlements.) After nearly a year of negotiations, Golden told me in January, "I think we're very close to a settlement." Aro, though also increasingly optimistic, told me this month that he still couldn't predict whether there would be a settlement or a trial.

Simultaneous to the settlement negotiations, however, the B.O.P. unilaterally began effecting certain (though by no means all) of the requested changes at the ADX. New mental-health programming was added, additional psychologists were hired and a new unit for high-security mentally ill prisoners opened in Atlanta. As predicted, a number of the inmates named in the suit have been transferred out of the ADX — including Powers, who was sent to a high-security prison in Tucson last year.

Powers couldn't cope with the openness of the new facility. Aro believes the B.O.P. acted with good intentions, but it dismally failed to acclimate a man who spent much of the previous 13 years alone in a cell. Prisoners' cell doors were left unlocked for much of the day, but Powers rarely ventured out into communal areas, and his mood turned ugly. After he struck a staff member during an argument, he was put in solitary. There, with a drill bit fashioned out of a battery, he managed to bore a hole through the top of his skull in an attempted trepanation.

Aro and Golden had both grown close to Powers over the course of the lawsuit. Separately they told me how protective they felt about him and how worried they were about his continued self-destructive behavior. Changes are very likely coming

at the ADX, in no small part thanks to Powers's story. But it seemed entirely possible that he might not survive to see the outcome.

**David Shelby,** the ADX inmate who ate his finger, was also transferred to a medium-security facility, in Butner, N.C. He is six feet tall and 300 pounds, with thick-framed prison-issue glasses and a round, clean-shaven face. (At the ADX, he had an unruly beard, suggestive of a backwoods survivalist). Before he described a violent episode from his past when I visited him this fall, he paused and said, softly: "I hope I don't make you feel uncomfortable, sir. I'm well-medicated now, so you're perfectly safe."

As a child in Mitchell, Ind., Shelby hunted squirrel and rabbit for supper and would occasionally trade the meat to old-timers for food stamps. His parents drank, and Shelby developed a taste of his own. (His favorite cocktail was a mixture of Everclear and Wild Turkey, which he called Wilder Turkey.) He went to prison in his late teens after pulling a shotgun on a man who owed him $2, and again in his 20s following a string of burglaries. He also began experiencing schizophrenic episodes in which he heard God's voice in his head. It's not difficult to imagine that Shelby's life would have followed a different trajectory had he received comprehensive psychological treatment. When officials picked him up at a post office, he was preparing to mail Clinton a package containing a pocketknife and a light bulb that was booby-trapped, Looney Tunes style, with gunpowder. "I think you are doing a good job," the note read, "and I am sending you the pocketknife as a gift and a light bulb so you won't strain your eyes." Shelby, in a deal with prosecutors, pleaded guilty and received a 24-year prison sentence. He was moved to the ADX two years later, after he took a female cook hostage with a homemade knife. Shelby told her that he wanted a warden "to order the best sniper to come in here and kill me." By all subsequent accounts, including his hostage's, he was careful not to hurt her during his suicide attempt. A staff psychiatrist eventually talked him down.

Since his move to Butner, Shelby has thrived. He shares his cell with another prisoner, and the door remains unlocked for much of the day. Shelby said his unit, Duke, was for people who are "special." (All the units at Butner are named for Southeastern college-sports powers.) "We're crazy," he cheerily explained. "We're all in the pill line in Duke. I've got three kinds of insanity: One is depression, one is

bipolar, one is schizophrenia. But right now, my personal prescription is perfect." He has even had a couple of brief encounters with Butner's most famous inmate, Bernard Madoff, though, Shelby noted: "We're from such different worlds, I don't think he'd want to know me. Unless he's interested in squirrel hunting."

Aro, who accompanied me on my visit, said this funny, personable version of Shelby was nothing like the Shelby of the ADX. The morning of my visit, I spotted other inmates tending to a vegetable garden in a pleasant central courtyard. Shelby works as a janitor. "We've got four bathrooms that stay good and clean because of me," he said, adding earnestly, "I must have done something good in a past life to deserve this. There are times in the free world where I've never had it this good."

**In January,** Aro and Golden told me that Powers's health also appeared to be on the upswing. He had been transferred back to Florence, to a new mental-health program the B.O.P. started in a lower-security penitentiary, part of the same complex as the ADX. The multistep program focuses on inmates' developing coping mechanisms, via individual and group-therapy sessions. During the early stages, the prisoners remain largely in solitary but are rewarded with more freedoms as they progress. Aro forwarded me a recent photograph of Powers that showed him actually smiling. Soon afterward, I began receiving letters from Powers, neatly handwritten, in all caps. He sounded upbeat at first, though subsequent correspondence expressed increasing skepticism about the program. "Traditional notions of penological care, custody and control of prisoners — and especially those who have a mental illness — differ from psychological treatment initiatives like night differs from day," he wrote, claiming the mood in the new unit had "reverted back to distrust, hostility and resistance — like a jungle reclaims an abandoned settlement."

Still, in the same letter, he acknowledged the policy changes might eventually yield results. "These programs are works in progress and must be given time to develop," he wrote. And then, without signing his name or adding any other form of valediction, he concluded with a final line: "Right now the participants are guinea pigs."

Robert Hood, the former ADX warden, thinks that changes at the supermax are long overdue. He had requested his assignment there, his last before retiring. He

found the challenge appealing, especially because he considered himself a "teaching-oriented guy," rather than the "custody-oriented" type of warden you might expect to find at a supermax. Hood is proud of his time at the ADX but has also come to believe that it needs to be transformed. "Not everyone in the ADX needs to be in a supermax. I could reduce that population. I don't know what the magic number is, but a certain percentage could be put in a place that doesn't require 23-hour lockdown. The public might not like it, but I don't care if Sammy the Bull is out in the yard playing Ping-Pong with Robert Hanssen."

Hood noted that the ADX's predecessors, Alcatraz and Marion, each existed for roughly 30 years before shutting their doors. "The supermax in Colorado has been there for 20 years," Hood said, "so it's getting close to the last third of its life. I'd say the bureau is looking in the mirror and saying: 'Guess what? The world is different now than in 1994.'"

### Correction: April 12, 2015

An article on March 29 about a federal prison in Florence, Colo., misspelled the surname of a well-known inmate. As the article correctly noted in other references, he is Ted Kaczynski, not Kacynski.

Mark Binelli is a contributing editor at Rolling Stone and the author of "Detroit City Is the Place to Be." His last article for the magazine was about the artist Lonnie Holley.

*Sign up for our newsletter to get the best of The New York Times Magazine delivered to your inbox every week.*

A version of this article appears in print on March 29, 2015, on Page MM37 of the Sunday Magazine with the headline: 'This Place Is Not Designed for Humanity'.

© 2018 The New York Times Company